MCLKCARC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

E. JEAN CARROLL,

                Plaintiff,

          v.                          22 CV 10016 (LAK)

DONALD J. TRUMP,

                Defendant.

------------------------------x
                                 New York, N.Y.
                                 December 21, 2022
                                 10:00 a.m.

Before:

               HON. LEWIS A. KAPLAN,

                                 District Judge

                    APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA ANN KAPLAN
     SHAWN GEOVJIAN CROWLEY
     HELEN ANDREWS

HABBA MADAIO & ASSOCIATES LLP
     Attorneys for Defendant
BY:  MICHAEL T. MADAIO
```

MCLKCARC

```
 1                  (Case called)
 2                  THE DEPUTY CLERK:  Counsel for plaintiff, are you
 3     ready to proceed?
 4                  MS. KAPLAN:  We are, your Honor.
 5                  THE DEPUTY CLERK:  Could you please put your
 6     appearances on the record.
 7                  MS. KAPLAN:  Sure.  Roberta Kaplan from Kaplan Hecker.
 8     I'll let my colleagues do it for themselves.
 9                  MS. CROWLEY:  Good morning, your Honor.  Shawn Crowley
10     and our colleague, Helen Andrews, are present as well.
11                  THE COURT:  Good morning.
12                  THE DEPUTY CLERK:  Counsel for defendant, are you
13     ready?
14                  MR. MADAIO:  Yes.  Good morning, your Honor.  Michael
15     Madaio, with Habba Madaio & Associates, on behalf of the
16     defendant, Donald J. Trump.
17                  THE COURT:  Good morning, Mr. Madaio.
18                  Before we get into talking about timing, I want to
19     make sure I understand everything you've told me in your joint
20     submission.
21                  First of all, with respect to the plaintiff, in
22     footnote No. 2 on page 3, you indicate that you will have — I
23     assume this means you'll furnish to the defense — the report of
24     forensic psychologist regarding damages from the alleged rape.
25                  Do you know who that is now?  Who is that, if you
```

MCLKCARC

1    know?

2              MS. KAPLAN:  Yes.  A woman by the name of Leslie

3    Lebowitz, your Honor.

4              THE COURT:  Leslie Lebowitz?

5              MS. KAPLAN:  Leibowitz.

6              THE COURT:  Has she been involved in this case or the

7    other case before?

8              MS. KAPLAN:  No.

9              THE COURT:  So, she's an entirely new expert?

10             MS. KAPLAN:  She's an entirely new expert.  And I

11   think we said we'd have that report to them on the 9th.

12             THE COURT:  We'll deal with that in a minute.

13             MS. KAPLAN:  Okay.

14             THE COURT:  Now, you referred to a second report from

15   your original damage expert.

16             So, who was that?  I maybe should know this, but I

17   haven't memorized every paper in both cases.

18             MS. KAPLAN:  A woman by the name of Ashlee Humphreys,

19   who teaches at Northwestern.

20             THE COURT:  So, it's not a supplemental report,

21   because it's in a different docket number, but, in effect, it's

22   a supplemental report?

23             MS. KAPLAN:  Exactly, your Honor.

24             THE COURT:  Okay.  Thank you for that.

25             Now, let me get to Mr. Madaio and footnote 3 in the

MCLKCARC

1    joint submission.

2             You talk about conducting an independent medical

3    examination of the plaintiff.  You don't really mean medical,

4    do you?  You mean psychologically?  Psychological?

5             MR. MADAIO:  Correct, your Honor.

6             THE COURT:  Now, did you do any psychological exam in

7    relation to the first case?

8             MR. MADAIO:  No, we did not, your Honor.

9             THE COURT:  Have you identified the person who you

10   want to do the exam?

11            MR. MADAIO:  We are in the process.  We have not

12   obtained an expert as of right now, but we believe we will

13   shortly.

14            THE COURT:  Okay.  And then you referred to

15   defendant's own forensic expert.

16            Who is that?

17            MR. MADAIO:  Robert Fisher, your Honor.

18            THE COURT:  And he's an expert in what?

19            MR. MADAIO:  He is a rebuttal expert to Ashlee

20   Humphreys, essentially an expert in reputational damage.

21            THE COURT:  By the way, in federal court, we stand up.

22   I know the state court is different.  I mean, it's probably

23   different in New Jersey, too.

24            Now, you talk also about conducting additional

25   depositions of the plaintiff and potential additional nonparty

MCLKCARC

1    witnesses with respect to the new issues.

2              Now, first of all, I can understand, and I imagine,

3    that you want to ask plaintiff questions that go to the issue

4    of emotional and psychological damage with respect to the

5    alleged rape as distinguished from the first defamation that's

6    claimed, and also the second, and questions with respect to

7    October 12, 2022.

8              Anything beyond those subjects?

9              MR. MADAIO:  We believe there could potentially be

10   other witnesses that we would want to depose.

11             THE COURT:  Let's talk about the plaintiff first.

12             Anything else besides those subjects?

13             MR. MADAIO:  I believe that would definitely be the

14   vast majority of it, would be related to emotional damages --

15             THE COURT:  And what would be the small minority?

16             MR. MADAIO:  I believe that would essentially be it.

17   At this point, we would not want to waive any additional

18   questions we may have.

19             THE COURT:  You're not waiving, but I'm going to enter

20   an order here that's going to set the scope of discovery.

21             MR. MADAIO:  Right.

22             THE COURT:  So, it's in your interests to tell me if

23   there's some other subject that you want to examine her about.

24             MR. MADAIO:  The other subject would be in terms of

25   reputational damage and anything resulting from the second

MCLKCARC

1    statement.

2                THE COURT:  The October 12, 2022?

3                MR. MADAIO:  That's correct.

4                THE COURT:  Now, who are these potential additional

5    nonparty witnesses with respect to new issues?

6                MR. MADAIO:  We have not identified any at this time,

7    your Honor, but believe that based on the plaintiff's

8    deposition, additional names could be identified that we would

9    want to depose --

10                THE COURT:  I'm sorry, you went a little fast for me

11    there.

12                MR. MADAIO:  Apologies, your Honor.

13                THE COURT:  Based on the plaintiff's deposition?

14                MR. MADAIO:  Based on the plaintiff's deposition.

15                THE COURT:  In the first case?

16                MR. MADAIO:  No, her deposition in the second case.

17    When we --

18                THE COURT:  Have you taken her deposition in the

19    second case?

20                MR. MADAIO:  No, we have not.

21                THE COURT:  Okay.  Go ahead.

22                MR. MADAIO:  We believe, as we delve into the issues

23    of the emotional damage/emotional harm, there could be

24    additional witnesses that could become relevant at that time.

25                THE COURT:  Anything else besides that?

MCLKCARC

1           MR. MADAIO:  I don't believe so, your Honor.

2           THE COURT:  Okay.  Thank you.

3           Now, I have one or two other questions about some of

4      your contentions.

5           You say, if I understand you correctly, that you need

6      additional discovery with respect to alleged violations of the

7      New York Penal Law.

8           Did I get that right?

9           MR. MADAIO:  Yes, your Honor.

10          THE COURT:  How so?

11          MR. MADAIO:  It's a more fact-intensive question; as

12     opposed to the first case dealt broadly with whether or not

13     this alleged incident did in fact occur.  There are now, I

14     believe, five or six additional penal laws that have been

15     cited, each of which has their own individual elements.  So, we

16     would want to have the opportunity to have a more fact-specific

17     inquiry into the plaintiff.

18          THE COURT:  Well, the complaint in the first action

19     alleges, does it not, all of the elements of rape in the first

20     degree under New York Penal Law?

21          MR. MADAIO:  I believe it does, your Honor.

22          THE COURT:  And aren't all of the other offenses to

23     which you've referred either lesser included offenses or simply

24     less serious offenses, the elements of which would be satisfied

25     by the elements of rape in the first degree, like forceable

MCLKCARC

1    touching or touching an intimate part?

2        MR. MADAIO:  I believe that's correct, your Honor.

3    But at the time that we did the deposition, we did not have

4    these specific laws in mind, and it would potentially change

5    our line of questioning.

6        THE COURT:  Well, explain that to me, please.  The

7    allegation here — and I want to get the complaint in front of

8    me, and this is from the original complaint, and it's repeated

9    word for word in the complaint in this action — the plaintiff,

10   speaking about what she says happened in the dressing room at

11   Bergdorf Goodman, said that the defendant pushed her against

12   the wall and put his mouth on her lips.  That is the first

13   thing she says.  Then she says he seized both her arms and

14   pushed her against the wall, he rammed his hand under her

15   coat/dress and pulled down her tights, he pushed his fingers

16   around her genitals, and he forced his penis into her.

17        Now, what lack of specificity is there in those

18   allegations?  And how would it be that you need discovery now

19   about whether he forcibly touched her or about whether he had

20   nonconsensual sexual contact, as distinguished from rape in the

21   first degree?  How could that be?

22        MR. MADAIO:  Your Honor, I believe it's a more

23   specific question at the time than we were inquiring into

24   because, essentially, the first question comes down to a

25   statement stating an alleged event never happened; this is a

MCLKCARC

1    more specific analysis.

2              THE COURT:  Well, no, she's very specific about what

3    she says happened.  And your client's position, as I understand

4    it, is, never happened, she made up the whole thing, he didn't

5    know her, and it's a complete work of fiction, right?

6              MR. MADAIO:  That's correct, your Honor.

7              THE COURT:  It's not like he's saying, I had sex with

8    her in the dressing room but it was consensual, or I touched

9    her but not the way she said, or I touched her but it was not

10   an intimate part of her body, or I saw her there and there was

11   no sexual contact, or there was sexual contact but it wasn't to

12   gratify my sexual desires or to abuse her in that sort of way.

13   I mean, I could understand your argument if that was his

14   position, but that's not his position.

15             So, what other discovery do you need from the

16   plaintiff?  She's told you what she said happened, and she's

17   given you a deposition where you examined her about exactly

18   what happened, right?

19             MR. MADAIO:  Yes, your Honor, I do understand your

20   point.  I do understand.

21             THE COURT:  Okay, I'm glad.

22             Let me see if there's anything else that I need for

23   clarification.

24             I think not.  So, I'll hear both sides about schedule.

25             We'll start with the plaintiff.

MCLKCARC

1          MS. KAPLAN:  Your Honor, I don't know if I have much

2     to add from the schedule that we submitted.  Obviously, there's

3     a very large gap in the parties' positions.

4          We just covered the discovery reasons, whether there

5     are any reasons in discovery that would require the time period

6     that defendant is asking for.  And there doesn't appear to

7     be -- at least I'm not personally seeing any reason why you

8     would need, for example, 9.3 months after the answer is served

9     to get to trial.

10          I'll also note, your Honor, that I'm not very good at

11    math but I actually calculated this morning that the 279 days

12    is 9.3 months.  Again, it's after the answer.  That actually

13    means that the trial date they're proposing probably overlaps

14    when the New York Attorney General's trial is happening, which

15    is in October.  The reason I know that, your Honor, is because

16    we had a scheduling issues with Trump's lawyers in another

17    matter pending in this court before Judge Schofield and the

18    question of Attorney General James' trial was a big issue

19    there.  So, that trial, the New York Attorney General trial, is

20    scheduled for October.

21          In terms of the motion to dismiss and the stay of

22    discovery, your Honor, again, we think their arguments --

23          THE COURT:  I don't think we're up to that.

24          MS. KAPLAN:  Okay.  We think we're going to get them

25    the report on the 9th.  We will certainly make Ms. Carroll

MCLKCARC

| | |
|---|---|
| 1 | available for her deposition, and, as we've just covered, we |
| 2 | don't think it has to be very lengthy. |
| 3 |      In terms of our expert, our new expert, our |
| 4 | psychological expert, we think that they still will have -- |
| 5 |      THE COURT:  You think what? |
| 6 |      MS. KAPLAN:  They obviously have a right, if they |
| 7 | want, to have an expert, and they may have a right under Rule |
| 8 | 35 for an exam, but we think they should wait until they see |
| 9 | our expert's report because we don't believe -- |
| 10 |      THE COURT:  Sorry, you think they should wait until |
| 11 | what? |
| 12 |      MS. KAPLAN:  They see our expert's report. |
| 13 |      THE COURT:  See your expert report. |
| 14 |      MS. KAPLAN:  I'm sorry, your Honor. |
| 15 |      -- on the 9th because she's not going to do an |
| 16 | official diagnosis of anything like PTSD or anything like that. |
| 17 | So, that will narrow, we think, substantially what they'll need |
| 18 | to do in rebuttal. |
| 19 |      I don't know if I have anything else to say other than |
| 20 | what's in our papers, your Honor, in terms of the schedule. |
| 21 |      THE COURT:  Okay.  Thank you. |
| 22 |      Mr. Madaio? |
| 23 |      MR. MADAIO:  Thank you, your Honor. |
| 24 |      The schedule that we proposed takes into account, |
| 25 | again, that we believe there are significant issues in this |

MCLKCARC

1    case that were not addressed in the prior case, largely

2    relating to the damages aspect, any reputational damage arising

3    from the second statement as well as obviously the emotional

4    and mental damages arising from the alleged incident itself,

5    which were --

6              THE COURT:  Excuse me.  Let me clarify one thing.

7              Ms. Kaplan, there's no claim for any economic damages

8    in this case, right?

9              MS. KAPLAN:  The reputational damages from the second

10   defamation, I can tell you right now, your Honor, is going to

11   be much less and much more circumscribed than it was from the

12   original defamation.

13             THE COURT:  Yes, I understand.  But is it a claim for

14   economic damages?

15             MS. KAPLAN:  No.  I believe it's a claim for what it

16   would take to restore her reputation, given the internet

17   explosion about this, if that happens.

18             So, what it would cost — and that's what their

19   rebuttal expert addresses, Dr. Fisher or Mr. Fisher — what it

20   would cost to run a campaign, or a program, that would restore

21   her good name and reputation.

22             THE COURT:  Is that recoverable under New York law?

23             MS. KAPLAN:  We believe it is, your Honor.

24             THE COURT:  Well, that's an interesting theory.

25             Okay.  Go ahead, Mr. Madaio.  Thank you, Ms. Kaplan.

MCLKCARC

1          MR. MADAIO:  Thank you, your Honor.

2          So, the schedule that we proposed, again, takes into

3    consideration that there is significant discovery that does

4    need to be performed with regard to especially the damages

5    aspect.  And we essentially are --

6          THE COURT:  Explain it to me.  What is the discovery

7    that you would take?

8          MR. MADAIO:  Well, we need written discovery --

9          THE COURT:  Well, I understand — right, you want to

10   serve written discovery, meaning what?  Documents?  Production

11   of documents?

12         MR. MADAIO:  Correct, your Honor, documents and

13   interrogatories.

14         THE COURT:  Okay.

15         So, generally speaking, what are the interrogatories

16   going to ask?

17         MR. MADAIO:  Questions aimed at damages, emotional

18   damages, largely.

19         THE COURT:  But you're going to have a report from

20   their expert, and you're going to presumably want to take the

21   expert's deposition, right?

22         MR. MADAIO:  That's correct.  But we would still want

23   to have the answers from the plaintiff herself.

24         THE COURT:  Well, I thought you wanted to take her

25   deposition on the issue of damages.

MCLKCARC

1          MR. MADAIO:  We want to take her deposition as well.

2          THE COURT:  What's the point of doing both?

3          MR. MADAIO:  The same as would be for any case, and it

4     would be essentially so we can have her answers to the

5     questions and we can question her under oath.

6          THE COURT:  So, give me an idea of what you're going

7     to ask her in written interrogatories.  You must have thought

8     about that —

9          "Were you emotionally damaged by being raped?

10         "Answer:  Yes.

11         "How?"

12         I mean, where are you getting?

13         MR. MADAIO:  Off the top of my head right now, I would

14    think of a number of questions in terms of the effect she

15    purports that the incidents had on her life, if she treated

16    with anybody up to this date with regard to psychological harm.

17         THE COURT:  That's a legitimate inquiry, sure.

18         MR. MADAIO:  And any number of other questions that

19    would relate, essentially, to the issues.

20         THE COURT:  Well, I have limited imagination and

21    vision here.  Give me an idea of what these innumerable other

22    questions would look like.

23         MR. MADAIO:  I think, your Honor, it would be mostly

24    about any treatment, any history, and anyone that she had

25    spoken to about any of the effects or any --

MCLKCARC

```
 1              THE COURT:  You already deposed her in Carroll I about
 2     whether she'd ever spoken to anybody about the incident, right?
 3              MR. MADAIO:  Right, your Honor.  But, I mean, for
 4     example, if she had spoken to anybody about a period where she
 5     went through depression or anything like that, that may be
 6     relevant to this case.
 7              THE COURT:  You didn't ask about that in the first
 8     deposition?
 9              MR. MADAIO:  The emotional aspect was never --
10              THE COURT:  You didn't ask why you talked to Sharon
11     Jones about this incident?  "What did you say to her and what
12     did she say to you?"  You didn't ask that question?
13              MR. MADAIO:  No, we did speak about, obviously, the
14     incident in question, but there was -- at least I don't recall
15     an intensive line of questioning with regard to her mental
16     health history and mental well-being.
17              THE COURT:  You examined her on her claim that she
18     couldn't form a romantic relationship or a sexual relationship
19     as a result of the alleged rape, right?  You did examine her
20     about that?
21              MR. MADAIO:  Yes, your Honor, that's correct.
22              THE COURT:  Okay.  So let's go on from there.  I mean,
23     I interrupted why this should take over a year to do, or nearly
24     a year.
25              MR. MADAIO:  Again, in terms of the time, your Honor,
```

MCLKCARC

1    obviously, we presented dates.  We don't want to delay this any

2    longer than is necessary, and those are flexible dates that we

3    proposed.  Again, they were largely reflected on the discovery

4    dates that were used in Carroll I.  And we took the discovery

5    orders and we essentially mapped them up to here --

6        THE COURT:  But in Carroll I, you were conducting

7    discovery about whether this incident ever happened, and, if

8    so, what the incident was, and that's all done.

9        MR. MADAIO:  That's correct.  But the damages

10   themselves are significantly different now, and we think that

11   that does justify a significant amount of additional discovery.

12       THE COURT:  Well, it justifies some additional

13   discovery; you get no argument from me on that.

14       It's a psychological or emotional distress case,

15   principally, from a damages point of view, right?

16       MR. MADAIO:  Yes, your Honor.

17       THE COURT:  Okay.

18       You know it's almost impossible to quantify that

19   scientifically.  Somebody either believes the plaintiff and the

20   plaintiff's mental health expert, whatever you want to call

21   them, and then the jury comes up with a number, not because

22   there's a number that the expert witness is going to provide

23   but because they reach a number.

24       That's the way it's done, right?  You know that.

25       MR. MADAIO:  Right, yes.

MCLKCARC

1              THE COURT:  Okay.

2              So, this is not like figuring out the damages in an

3      antitrust case.

4              MR. MADAIO:  Well, again, we think, in terms of the

5      experts and the emotional damages, that there is a significant

6      amount that needs to be done in terms of the examination, the

7      reports after that, the written questions, the deposition, but

8      then an entirely different aspect is also the second defamation

9      claim, which involves a whole second set of purported

10     reputational damage, which not only will we need to figure out

11     how much damage was caused by the second statement purportedly,

12     but also, I guess, where the causal link is between the first

13     statement and the second statement and how the damages differ.

14             THE COURT:  And you're going to get discovery of that

15     from somebody?  Tell me who.

16             MR. MADAIO:  The plaintiff.

17             THE COURT:  Help me — I'm looking for a way to help

18     you — help me here in understanding what you're going to do

19     that you have a legitimate interest in doing.

20             MR. MADAIO:  Well, aside from the expert testimony --

21     again, this is something that we would want to see what

22     evidence, if any --

23             THE COURT:  You're going to get an expert report,

24     you're going to get a deposition of the expert.  That's clear.

25     That's common ground.

MCLKCARC

```
 1              MR. MADAIO:  Your Honor, we would simply want to see

 2    what evidence, if any, the plaintiff has to support her claim

 3    for damages.

 4              THE COURT:  Well, you're certainly going to get her

 5    deposition on damages.  I don't hear any objection to that.

 6              Right, Ms. Kaplan?

 7              MS. KAPLAN:  No objection, your Honor.

 8              MR. MADAIO:  That's all we're looking for, is an

 9    opportunity to see what evidence the plaintiff has, question

10    her on it, and have the experts opine.

11              THE COURT:  Okay, all right.

12              Now, what about the Attorney General trial?

13              MR. MADAIO:  I do believe --

14              THE COURT:  When is that set for?  Is that really

15    October?

16              MR. MADAIO:  I believe it is scheduled for October 23.

17              THE COURT:  Is your office the defense counsel in that

18    case?

19              MR. MADAIO:  We are one of several firms.

20              THE COURT:  Any reason why this couldn't be tried

21    considerably earlier than October?

22              MR. MADAIO:  I think, again — and this will tie into

23    the motion to dismiss issue — in terms of the --

24              THE COURT:  I wouldn't count on that.

25              MR. MADAIO:  All right.  But in terms of the period of
```

MCLKCARC

1    discovery, I don't see why we would need until October for the

2    discovery.  I think we could likely make it through discovery

3    faster than that point, and then motions and everything, to get

4    to the point of trial.

5            For us, the main issue is the motion to dismiss and

6    motion to stay and the issue that -- we believe there's a

7    serious and substantial question here as to whether or not the

8    Adult Survivors Act is constitutional.

9            THE COURT:  How is that issue any different, if at

10   all, from the same question with respect to the Revival Act

11   with respect to victims of child sexual abuse?

12           MR. MADAIO:  I think that that statute serves a

13   different purpose, and it's aimed at a specific subset of

14   vulnerable population, as opposed to the Adult Survivors Act.

15           THE COURT:  Okay.  Well, sufficient unto the day.

16           My law clerk just passed me a note of a question I

17   meant to ask you.

18           Your footnote 3, Mr. Madaio, on page 5 of the joint

19   submission, talks at one place — oh, I think you've answered

20   this already — about a forensic expert.  And that, you've told

21   me, is Robert Fisher, right?

22           MR. MADAIO:  That's correct, your Honor.

23           THE COURT:  And you anticipate getting a psychologist

24   or a psychiatrist --

25           MR. MADAIO:  Yes, your Honor.

MCLKCARC

1          THE COURT:  -- to do that sort of examination and a

2     report of the plaintiff's claim of emotional distress?

3          MR. MADAIO:  Yes, your Honor.

4          THE COURT:  So, they're two different people?

5          MR. MADAIO:  That's correct, your Honor.

6          THE COURT:  I understand that.

7          Okay.  I will issue a scheduling order probably later

8     today.

9          Anything else anybody wants to raise with me at this

10    point?

11         MS. KAPLAN:  Nothing for plaintiff, your Honor.

12         MR. MADAIO:  Nothing from defendant.

13         THE COURT:  Okay.  Well, I thank you all for coming

14    in, and I wish everybody a merry Christmas and a happy New

15    Year.

16         MR. MADAIO:  Thank you, your Honor.

17         MS. KAPLAN:  Thank you, your Honor.

18                              * * *

19

20

21

22

23

24

25