UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                     Plaintiff,

                -against-                        22-cv-10016 (LAK)

DONALD J. TRUMP,

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

        Appearances:

                Roberta Kaplan
                Joshua Matz
                Shawn Crowley
                Matthew Craig
                KAPLAN HECKER & FINK LLP
                *Attorneys for Plaintiff*

                Alina Habba
                Michael T. Madaio
                HABBA MADAIO & ASSOCIATES LLP
                *Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        Plaintiff E. Jean Carroll alleges that businessman Donald J. Trump, as he then was, raped her in a dressing room at the New York department store, Bergdorf Goodman, more than two decades ago. Mr. Trump denies the allegation. These circumstances have given rise to two lawsuits now before me.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/13/2023

The first (*"Carroll I"*) originally began in a state court, but it later was removed to this one.  It accuses Mr. Trump only of libeling Ms. Carroll in a series of statements he issued in June 2019, shortly after Ms. Carroll went public with her account of the alleged rape.[1]  It does not include any claim based on the alleged rape itself.  That doubtless is so because such a claim almost certainly would have been barred by the statute of limitations at the time the case was filed.[2]  But the law then changed.

In 2022, New York enacted the Adult Survivors Act (the "ASA").[3]  Under the ASA, persons who allegedly were abused sexually as adults were given a new one-year period within which to sue their alleged abusers.  Ms. Carroll then brought this action (*"Carroll II"*) to recover damages and other relief for (1) the alleged rape, and (2) additional libels allegedly committed by Mr. Trump in a statement he made on October 12, 2022.

As is obvious, the central issue in both *Carroll I* and *Carroll II* is exactly the same – whether Mr. Trump raped Ms. Carroll.  If he did not, then Ms. Carroll's sexual assault claim in *Carroll II* and her libel claims in both cases likely would fail.  If he did, then little would remain in either case except perhaps a few  minor issues related to Mr. Trump's statements and determination

---

[1]

*Carroll v. Trump,* 20-cv-7311 (LAK).

[2]

Both sides appear to assume that this claim would have been barred by the statute of limitations.  This decision so assumes for ease of expression.  Nevertheless, the question of whether the claims asserted in this case would be time-barred in the absence of the ASA is not before me, and I do not now decide it.  In view of my ruling on the constitutionality of the ASA, the issue is immaterial.

[3]

N.Y. CPLR § 214-j.

of damages.[4]

       *Carroll II* – this case – now is before me on Mr. Trump's motion to dismiss the complaint.[5]  He contends that the sexual abuse claim must be dismissed because the ASA violates the Due Process Clause of the New York State Constitution.  He argues also that the libel claim is legally insufficient because Ms. Carroll's complaint fails to allege what New York law refers to as "special damages."  Both of his arguments are without merit.

### *Facts*

       As this is a motion to dismiss the complaint, the plaintiff's well-pleaded factual allegations and all inferences that reasonably may be drawn from them are deemed true.  The fact that Mr. Trump denies Ms. Carroll's allegations does not enter into the analysis at this stage of the case.  What, if anything, actually occurred must await further proceedings if the complaint withstands the present motion.

---

[4]

      The ultimate viability of *Carroll I* ultimately remains subject, for reasons having nothing to do with the inherent merits of the libel claim, to further determinations by appellate courts.  In *Carroll v. Trump,* 49 F.4th 759 (2d Cir. 2022), the Second Circuit determined that Mr. Trump  was an "employee" of the United States within the meaning of the Westfall Act when he allegedly libeled Ms. Carroll but certified the question whether his alleged libel was within the scope of his employment to the District of Columbia Court of Appeals.  That court heard argument on January 10, 2023.  If either of those questions ultimately were resolved in favor of Ms. Carroll, *Carroll I* would be viable.  If both ultimately were resolved in favor of Mr. Trump, *Carroll I* almost certainly would be dismissed pursuant to the Federal Tort Claims Act.  *Carroll I,* 498 F. Supp. 3d 422, 427 (S.D.N.Y. 2020) (hereinafter "*Carroll I*").

[5]

      Also before me is a motion by Mr. Trump to stay this action pending a decision on this motion. Dkt 22.

4

*The Alleged Rape*

As I wrote in *Carroll I:*

"According to the complaint [(in *Carroll I*, which in these respects is identical to that in this case)], Mr. Trump, then a private citizen, encountered Ms. Carroll at the Bergdorf Goodman department store in Manhattan some time between the fall of 1995 and the spring of 1996. Ms. Carroll, who was an advice columnist appearing on television, alleges that Mr. Trump recognized her and asked her to help him select a present for a woman who was not with him at the store. The two eventually went to the lingerie department, where, according to the complaint, Mr. Trump insisted that the plaintiff try on a bodysuit. Ms. Carroll alleges next that what she first perceived as playful banter took a dark turn when Mr. Trump closed the door of a dressing room, pushed her against a wall, and began kissing her without her consent. She claims that she pushed Mr. Trump away and laughed at him, and that he then pressed her against the wall once more, pulled down her tights, and forcibly raped her for several minutes until she managed to push him off and flee the store."[6]

*The Story Comes Out*

"Ms. Carroll asserts that she immediately told one friend about the alleged rape and told another friend in the coming days. She did not, however, make the

---

[6]

*Carroll I,* 498 F. Supp. 3d at 430.

allegations public at that time.  They remained private for many years."[7]
The reasons they remained private are spelled out in the *Carroll II* complaint, the truth of which must be assumed for purposes of this motion.

Initially, according to the complaint, Ms. Carroll was in shock and did not wish to think of herself as a rape victim.[8]  The two friends in whom she confided gave her conflicting advice about reporting the event.[9]  Ultimately, she was persuaded by the advice of the friend who advised her to keep quiet.  That friend stressed that Mr. Trump was powerful and would "bury" Ms. Carroll if she came forward.[10]  Ms. Carroll says she "knew how brutal and dangerous Trump could be," feared "being dragged through the mud if she reported the rape," "was convinced that nobody would believe her if she came forward," and "like so many other survivors of sexual assault, [she] also blamed herself" for her stupidity in  "agreeing to go lingerie shopping with Trump."[11]  She "also considered that, in our society, women who have been raped are looked at as 'spoiled goods,' and she resented the fact that practically every woman who courageously came forward with their stories of abuse was subjected to questions like 'why didn't you scream' and 'why didn't you come forward

---

[7]      *Id.*

[8]      Cpt. ¶ 44.

[9]      *Id.* ¶¶ 44, 46-47.

[10]      *Id.* ¶¶ 47-48.

[11]      *Id.* ¶¶ 48-49.

immediately.'"[12] "She thus chose silence" and kept still for years.[13]

*Ms. Carroll Goes Public in 2019*

In the fullness of time, the Harvey Weinstein revelations in *The New York Times* and their *sequelae,* including the public reaction to women coming forward with accounts of prior sexual abuse, triggered for Ms. Carroll a process that resulted in a decision to begin writing a book.[14]  Her book told of her experiences with "twenty-one men who had, each in his own way, left indelible and ugly marks on her story."[15]  One of those men was Donald Trump.

On June 21, 2019, *New York* magazine published an excerpt from the plaintiff's then forthcoming book.  The excerpt tells a more detailed version of the allegations outlined above.  The book was published on July 2, 2019."[16]

*Mr. Trump's 2019 Reaction*

As described elsewhere, Mr. Trump, at that time President, responded to the emergence of Ms. Carroll's allegations with a number of demeaning, insulting and allegedly

---

[12]

    *Id.* ¶ 51.

[13]

    *Id.* ¶ 52.

[14]

    *Id.* ¶¶ 67-75.

[15]

    *Id.* ¶ 75.

[16]

    *Carroll I,* 498 F. Supp. 3d at 431.

defamatory remarks about Ms. Carroll.[17]  As Ms. Carroll's claims regarding those remarks are at issue in *Carroll I* and not in this case*,* there is no need to elaborate upon them here.

*Carroll I*

Ms. Carroll commenced *Carroll I* against Mr. Trump in 2019 for making allegedly libelous statements about her in the wake of the rape allegation made public by Ms. Carroll.  As noted, she could not then sue him for the alleged rape because the New York statute of limitations for such an action had expired.[18]  In any case, the details of *Carroll I* are not relevant to the present motion and need not be discussed here.

*The New York Adult Survivors Act*

In the midst of all this, New York in May 2022 enacted the ASA which, in relevant part, created a one-year revival period, starting November 24, 2022, during which adult survivors of sexual assault could sue their abusers despite  the expiration of the previously applicable statutes of limitation.[19]

*Ms. Carroll Announces Intent to Sue Under the ASA, and Mr. Trump Responds*

On August 8, 2022, more than three months before the effective date of the ASA, Ms.

---

[17]       *Id.*

[18]       *See supra* note 2.

[19]       N.Y. CPLR § 214-j.

8

Carroll's counsel announced privately to her adversaries and to the Court that Ms. Carroll would sue Mr. Trump for damages for the alleged rape once the ASA became effective on November 24.[20] Mr. Trump on October 12, 2022 responded by posting this statement on his social media outlet:

> "This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. * * * I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years.  And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost

---

[20] That announcement was filed publicly on September 20, 2022.

everything else in our Country."

He then continued:

> "In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me. This can only happen to 'Trump'!"[21]

*Carroll II*

A bare nine minutes after the ASA became effective on Thanksgiving morning, Ms. Carroll brought the present lawsuit – *Carroll II* – against Mr. Trump.  The complaint contains two claims for relief.

The first seeks compensatory and punitive damages and other relief for Mr. Trump's alleged rape and groping of Ms. Carroll in the Bergdorf dressing room years ago.  The timeliness of that claim depends directly upon the newly enacted revival statute, the ASA.

The second claim is for common law defamation based on allegedly false and defamatory statements about Ms. Carroll contained in Mr. Trump's October 12, 2022 statement.  It too seeks compensatory and punitive damages and other relief.

---

[21] Cpt. ¶ 92.

*The Pending Motion*

As noted, Mr. Trump seeks dismissal of this case.  He argues that the ASA is unconstitutional and that the first claim for relief therefore is barred by the statute of limitations.  He contends also that the second claim is legally insufficient because it fails to plead "special damages" as supposedly required by New York law.

## Discussion

*The ASA*

It is undisputed that the ASA by its terms would make Ms. Carroll's sexual assault claim against Mr. Trump timely despite the fact that the statute of limitations otherwise would have expired long ago.[22]  So Mr. Trump now contends that the ASA is unconstitutional under the Due Process Clause of the New York State Constitution.[23]

---

[22]

    *See supra* note 2.

[23]

    N.Y. CONST. art. 1, § 6.

    Despite representing to this Court shortly before making this motion that he would seek dismissal of the ASA on the ground that it violates the Due Process Clause of the United States Constitution, Dkt 15, at 7, he has not done so. Indeed, he now admits that "[c]laim-revival statutes generally pose no issue under the Fourteenth Amendment to the United States Constitution."  Dkt 21, at 7 (quoting *Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.,* 30 N.Y.3d 377, 394 (2017) (hereinafter *"World Trade Ctr."*) (internal quotation marks omitted)). He contends only that it violates the Due Process Clause of the New York State Constitution.

*The ASA Is Constitutional As A Matter of New York Law*

"[T]he New York Court of Appeals recently made clear that the test for whether a claim-revival statute is consistent with the New York Due Process Clause is simply whether the revival statute is 'a reasonable measure to address an injustice.'"[24]  The answer is obvious.

As an initial matter, the New York Legislature long has recognized the problem created by what it characterized as a "culture of silence" and the existence of comparatively short limitations periods for bringing civil and criminal actions for sexual assaults and other sexual offenses.  In 2019, it substantially extended the limitations periods for both types of actions.  The bill jacket contained the Senate sponsors' statement, which said:

> "Statutes of limitations on sexual offense cases impose a ticking clock on how long victims are able to come forward if they want to seek charges. For crimes of sexual violence in particular, the clock ticks against the trauma and culture of silence that prevents victims from speaking out.

> "Over the last year, victims who have suffered in silence for decades have bravely spoken about their abuse, and have also laid bare the state's limited ability to prosecute their abusers due to the passage of time. In recognition of this fact, states across the country are lengthening or eliminating the statutes of limitations on crimes of sexual violence. While New York removed the statute of limitations for rape or criminal sexual act in the first degree, a five year statute of limitations remains for

---

[24] *Giuffre v. Prince Andrew*, 579 F. Supp.3d 429, 453 (S.D.N.Y. 2022) (rejecting state due process challenge to statute reviving otherwise time-barred claims for childhood sexual abuse) (quoting *World Trade Ctr.*, 30 N.Y.3d at 400).

rape in the second and third degree and criminal sexual act in the second and third degree.

> "This bill would extend the statute of limitations to twenty years for rape in the second degree and criminal sexual act in the second degree, to ten years for rape in the third degree and criminal sexual act in the third degree, and would make conforming changes to incest in the first and second degrees. *Further, this bill would increase the time period in which the victim could bring a civil suit for these offenses to twenty years*."[25]

But the amendment of the civil statute of limitations did not fully solve the problem the Legislature sought to address with respect to civil claims. The extension applied only with respect to claims arising from "acts or omissions occurring on or after [the] effective date" of the statute, September 18, 2019.[26]

> Recognizing that the 2019 amendment – as articulated by an Assembly member – "left so many survivors who had already missed their chance out in the cold with no opportunity for justice,"[27] the Legislature took up that situation in 2022 when it passed the ASA. The legislative committee report that accompanied Senate Bill 66, which ultimately became the ASA, stated:

> "In 2019, the New York State Legislature enacted the Child Victims Act (S.2440/A.2683), prospectively increasing the criminal and civil statutes of

---

[25]   New York Bill Jacket, 2019 S.B. 6574, Ch. 315 (emphasis added).

[26]   *Id.*, 2019 S.B. 6574 § 4; *see also* N.Y. CPLR § 213-c.

[27]   Sen. Bill No. 66A, 2022 N.Y. Assemb., Reg. Sess. (May 23, 2022) at 35.

limitations for child sexual offenses, and creating a one-year window for the revival of otherwise time-barred child sexual abuse-re- lated lawsuits. The Legislature also enacted legislation (S.6574/A.8412) to prospectively increase the criminal and civil statutes of limitations for a subset of sexual offenses committed against adults. *Both bills were predicated on the widespread recognition that New York's existing statutes of limitations were insufficient in giving survivors of these heinous crimes enough time to pursue justice through criminal charges or filing a civil lawsuit.*   *   *   *

"This legislation, the Adult Survivors Act, would create a one-year window for the revival of otherwise time-barred civil claims arising out of sexual offenses committed against people who were 18 or older at the time of the conduct. *Those who have had justice denied them as a result of New York's formerly insufficient statutes of limitations should be given the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law.*"[28]

In addition, one of the proponents of the ASA, against the background of the 2019 legislation, said on the floor of the State Senate in support of the enactment of what became the ASA:

"*[W]e see* child abuse survivors, young adults and *older survivors [of sexual abuse] often either suppressing memories of their abuse or they are afraid to come forward right away.  And by the time that adult survivors get the help that they need and finally can take action against their abusers, it's too late to do anything about*

---

[28] N.Y. Comm. Rept., 2021 NY S.B. 66 (NS) (emphasis added).

14

> *it legally.*

> "It is time to enact commonsense legislation that would do away with New
> York's vague statute of limitations, which denies many justice."[29]

And the Legislature agreed.  The bill passed the New York Senate unanimously (62-0) and the New

York Assembly by a vote of 140 to 3.[30]  Thus, the creation of a revival period for otherwise time-

barred claims based on sexual assaults against adults was aimed at what New York reasonably and

permissibly regarded as an injustice.

Mr. Trump nevertheless argues that the ASA is unconstitutional because, he claims,

the Justification section of what he refers to as the "legislative memorandum" accompanying the bill

that became the ASA did not explicitly sufficiently articulate the injustice the legislation was

intended to remedy.[31]  Regrettably, that assertion is demonstrably incorrect.  The Justification section

of the legislative memorandum submitted with Assembly Bill 648A stated:

> "In 2019, the New York State Legislature enacted the Child Victims Act
> (S.2440/A.2683), prospectively increasing the criminal and civil statutes of
> limitations for child sexual offenses, and creating a one-year window for the revival
> of otherwise time-barred child sexual abuse-related lawsuits. The Legislature also

---

[29]

N.Y. SENATE, *Stenographic Record* 2705 (Apr. 26, 2022) (emphasis added).  *See also* Sen. Bill No. 66A, 2022 N.Y. Assemb., Reg. Sess. (May 23, 2022) at 35 (Statement of Assembly member Judy Griffin) ("We must do all we can to empower those who have been harmed by others, *no matter their age*, so they may hold their perpetrators accountable if they choose. This bill is focused on those survivors who have yet to be heard.") (emphasis added).

[30]

NY S.B. 66 (NS), bill tracking (May 24, 2022).

[31]

Dkt 34, Def.'s Reply Mem., at 1-2.

enacted legislation (S.6574/A.8412) to prospectively increase the criminal and civil statutes of limitations for a subset of sexual offenses committed against adults. Both bills were predicated on the widespread recognition that New York's existing statutes of limitations were insufficient in giving survivors of these heinous crimes enough time to pursue justice through criminal charges or filing a civil lawsuit.

"New Jersey similarly enacted legislation in 2019 that prospectively increased the civil statute of limitations for both child and adult survivors of sexual offenses, as well as created a two-year window for the revival of otherwise time-barred lawsuits alleging conduct constituting specified sexual offenses. Unlike New York's revival window, however, which applies only to survivors of sexual offenses who were minors at the time of the abuse, the New Jersey window also applies to survivors of sexual offenses who were adults (i.e. 18 or older) at the time of the alleged conduct.

"*This legislation, the Adult Survivors Act, would create a one-year window for the revival of otherwise time-barred civil claims arising out of sexual offenses committed against people who were 18 or older at the time of the conduct. Those who have had justice denied them as a result of New York's formerly insufficient statutes of limitations should be given the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law.*"[32]

---

[32] Legislative memorandum accompanying A 648A (available at https://nysassembly.gov/leg/?default_fld=&leg_video=&bn=A00648&term=2021&Summary=Y&Memo=Y (last visited Jan. 13, 2023).

Even if the factual premise of defendant's argument were correct, and it is not, defendant's position would reflect a disregard of the wealth of additional evidence of the Legislative purpose in enacting the ASA well as a parsimonious approach to determining the purpose of the ASA that is inconsistent with New York law.

As an initial matter,

> "In construing statutes, courts [applying New York law] are permitted to consider extrinsic sources—legislative reports, for example, and petitions to the legislature requesting that some piece of legislation be passed to aid in statutory interpretation. Reports and recommendations of public bodies submitted to the legislature for its remedial action also help to shed light on the legislative intent."[33]

Moreover, as the New York Court of Appeals long ago wrote, "[a]s bearing upon the intention of the Legislature of this state in the enactment of a statute, we may consider such historical or other facts as are reasonably within the scope of judicial cognizance."[34]  That includes statements by bill sponsors,[35] as we have in this case.

The materials appropriate for consideration here all point in one direction.  The Legislature in 1999 identified the injustice inflicted on child victims of sexual abuse as a result of the interaction between their difficulties in coming to grips with and seeking remedies against their

---

[33]    97 N.Y. JUR.2D, *Statutes* § 164 (2d ed 2022) (collecting New York cases) (footnotes omitted).

[34]    *In re Hamlin,* 226 N.Y. 407, 413 (1919); 97 N.Y. JUR.2D, *Statutes* § 170.

[35]    *E.g., Civil Serv. Employees Ass'n, Inc.  v. Oneida Cty.,* 78 A.D.2d 1004, 1005 (4th Dept. 1980).

abusers and the relevant preexisting limitations period.  It created a revival window for otherwise time-barred claims.  Just three years later – using almost precisely the same statutory language – it came to the same view and the same result as to adult survivors, the ASA.  In doing so, it recognized that adult survivors of sexual abuse unjustly have encountered very much the same difficulties in pursuing legal remedies as have child victims.  Indeed, as already noted, the Justification section of the committee report on S.B. No. 66, the bill that became the ASA, explicitly referred to the fact that adult survivors of sexual abuse had been subjected to injustice by "New York's formerly insufficient statutes of limitations" and "should be given the opportunity to seek civil redress against their abuser[s] . . . in a court of law."  The Legislature gave that opportunity by enacting the ASA with a unanimous vote in the State Senate and an overwhelming majority of 140 to 3 in the Assembly.

To suggest that the ASA violates the State Due Process Clause because the Legislature supposedly did not describe that injustice to the defendant's entire satisfaction in a particular paragraph of a particular type of legislative document – itself a dubious premise – is absurd.  There is not a single word in the New York Due Process Clause to support that suggestion. Moreover, the historical context, literally all of the indicia of legislative intent available to us, and the precise words of the statute laid alongside the words to the CVA undeniably demonstrate the precise injustice that moved the Legislature to act.  In any case, under New York law, it is not the function of courts to second guess the Legislature as to the existence of a serious injustice in determining the constitutionality of a revival statute.

The New York Court of Appeals made clear in *World Trade Ctr.* that the existence of an injustice is a determination fundamentally committed to the Legislature and the governor. It stated that, in each of its prior cases upholding claim revival statutes, "there existed an identifiable

injustice that moved the legislature to act."[36]  It rejected "[a] more heightened standard" as "too strict," saying:

> "In the context of a claim-revival statute, there is no principled way for a court to test whether a particular injustice is 'serious' or whether a particular class of plaintiffs is blameless; *such moral determinations are left to the elected branches of government.*"[37]

Thus, in adopting the ASA, the New York Legislature, virtually unanimously, identified what it regarded as an injustice – the fact that even adult victims of sexual abuse too often have no legal remedies because they "suppress[] memories of their abuse or they are afraid to come forward" until it is too late to sue.  The governor did as well when she signed the bill that the Legislature passed.  Mr. Trump has suggested no convincing reason why the judgment of the New York Legislature and governor – that this indeed is an "identifiable injustice" – is not precisely the sort of "moral determination" that the New York Court of Appeals has held is "left to the elected branches of government" by New York's Due Process Clause.

Nor can the claim revival provision of the ASA be distinguished from that in the Child Victims Act on that basis that adult survivors – unlike child victims, who are not permitted to bring lawsuits until they reach adulthood – are not legally disabled from suing immediately following the alleged sexual abuse.  The New York Court of Appeals long ago rejected just such a

---

[36]

*World Trade Ctr.,* 30 N.Y.3d at 399.

[37]

*Id.* at 400 (emphasis added).

contention in *Hymowitz v. Eli Lilly and Co.*[38]

*Hymowitz* involved the constitutionality of the revival of DES[39] products liability claims that had become barred under the former rule that such claims accrued upon exposure to a toxic substance and thus could be time-barred before a plaintiff even knew that she had been exposed.  The court upheld that revival statute, writing:

"We need not light upon a precise test here . . . because the Legislature's revival of DES claims meets the highest standard. For at least 25 years this court maintained an exposure rule for toxic substances, because it was felt that change in this area was the responsibility of the Legislature (*see, e.g., Schwartz v Heyden Newport Chem. Corp.,* 12 NY2d 212, 220; *Fleishman v Lilly & Co., supra,* at 890). Indeed, in *Fleishman v Lilly & Co. (supra)* the Legislature's attention was drawn specifically to DES by the majority, which stated that any change in the exposure rule was the Legislature's role.

"The Legislature has now revived DES actions that were time barred under the exposure rule, while also instituting a discovery rule for future application (L 1986, ch 682, § 4; CPLR 214-c). The latent nature of DES injuries is well known, and it is clear that in the past the exposure rule prevented the bringing of timely actions for recovery. Thus we believe that exceptional circumstances are presented, that an injustice has been rectified, and that the requirements of *Gallewski v Hentz*

---

[38]  73 N.Y.2d 487 (1989).

[39]  DES is an acronym for a particular pharmaceutical product that allegedly proved carcinogenic in some people.

*& Co. (supra)* have been met.

"Defendants argue further that, even if the statute is generally valid, it may be unconstitutionally applied in cases in which the plaintiff could have sued originally, but did not. It does seem that some plaintiffs may have known of their injuries a day, or a week, a month, or perhaps longer, before the original limitations period ran. Some may have known of their exposure, but did not develop injuries during the limitations period. Others may have known of some effect upon them of DES exposure, which became cancerous only after any action would have been time barred. Under these circumstances, the Legislature properly determined that it would be more fair for all plaintiffs to uniformly now have one year to bring their actions, rather than for the courts to begin drawing arbitrary lines transecting this area's shades of gray."[40]

The fact that adult victims of sexual abuse are legally and in some respects practically capable of instituting civil litigation against their abusers from the moment the abuse occurs thus is constitutionally immaterial.   The elected branches of the New York State government have determined that many such victims are unable to do so, sometimes for long periods of time.   They

---

[40]

*Id.* at 514-15.

*Hymowtiz*'s reference to "exceptional circumstances, even if it was meant as more than an illustration or description of the facts before it in that case, " has not survived *World Trade Ctr.   World Trade Ctr.* construed *Hymowitz* together with other claim-revival cases as "express[ing] one and the same rule: a claim-revival statute will satisfy the Due Process Clause of the State Constitution if it was enacted as a reasonable response in order to remedy an injustice."  30 N.Y.3d at 400.  Moreover, as discussed above, *World Trade Ctr.* left the determination of the existence of the necessary injustice at least substantially, and perhaps entirely, to the judgment of the elected branches of government.

are prevented by suppression of awful memories or deterred by fear and a "culture of silence" – just as Ms. Carroll claims she was dissuaded from reporting or suing Mr. Trump.

As to whether the ASA constitutes a "reasonable measure" to address an injustice, Mr. Trump's objections again fail to persuade.  Mr. Trump contends first that the ASA's claim revival provision is unreasonably broad in comparison to the Child Victims Act because "[a]s opposed to the one-year lookback window of [the Child Victims Act ("CVA")]—which was passed in conjunction with, and as a supplement to, the extension of the CVA's statute of limitations to age 55—[the ASA's] look-back window was not passed in connection with any other durational provisions under the ASA."[41]  Second, he argues that "the scope" of the ASA "would not be a reasonable response because the lookback window does not align with—and vastly exceeds—the extended twenty-year statute of limitations of period under the revised 2019 amendment."[42]

Both protests are grounded in inappropriate juxtapositions of the ASA and the Child Victims Act and, in any case, are immaterial.  As discussed above, the ASA was enacted against the backdrop of the 2019 amendment's extension of the statutes of limitations for civil and criminal actions for sexual assaults.  The scope of the lookback window in the ASA also does not differ from that in the Child Victims Act, which also "applies broadly to *any* [victim of child sexual abuse] and revives *any* qualifying claim."[43]  Mr. Trump has not offered any meritorious reason to reject the one-year revival period in the ASA as unreasonable when the nearly identical two-year revival period in

---

[41]     Dkt 21 at 12.

[42]     *Id.* at 13.

[43]     *Id.* at 12.

the Child Victims Act has been accepted as reasonable by all courts to consider it.[44]

The one year ASA revival statute is a constitutional means of addressing that inability just as the similar revival provision of the Child Victims Act has passed constitutional muster by every court to consider the question.[45]

*Libel Per Se*

With respect to Ms. Carroll's defamation claim in relation to Mr. Trump's October 12, 2022 statement, Mr. Trump contends Ms. Carroll has failed to state a claim because she did not plead "special damages" as he claims is required by New York law.  Mr. Trump's argument falls short because he fails to appreciate the distinction in New York law between libel *per se* and slander *per se*.

*Ms. Carroll's Defamation Claim Is for Libel, Not Slander, Per Se*

There are two categories of defamation under New York law: *libel*, for written

---

[44]

When the Child Victims Act was enacted, it had a one-year revival window, which the Legislature subsequently extended by another year during the global COVID-19 pandemic. *Giuffre*, 579 F. Supp. 3d at 454.

[45]

*See, e.g.*, *Giuffre*, 579 F. Supp. 3d at 455; *Farrell v. United States Olympic & Paralympic Comm.*, 567 F. Supp. 3d 378, 393 (N.D.N.Y. 2021)*; PC-41 Doe v. Poly Prep Country Day Sch.*, 20-cv-03628 (DG) (SJB), 2021 WL 4310891, at *7 (E.D.N.Y. Sept. 22, 2021)*; PC-41 Doe v. Poly Prep Country Day Sch.*, No. 20-cv-3628-DG-SJB, 2021 WL 791834, at *1 (E.D.N.Y. Mar. 1, 2021); *Torrey v. Portville Cent. Sch.*, 66 Misc. 3d 1225(A), 125 N.Y.S.3d 531 (N.Y. Sup. Ct. 2020); *ARK3 Doe v. Diocese of Rockville Ctr.*, No. 9000010/2019 (N.Y. Sup. Ct. Nassau Co. May 11, 2020); *Giuffre v. Dershowitz*, No. 19-cv-3377 (LAP), 2020 WL 2123214, at *2-3 (S.D.N.Y. Apr. 8, 2020).

statements, and *slander*, for spoken statements.[46]  Written statements actionable as libel include

statements published on social media outlets and on the Internet.[47]

Ms. Carroll alleges that Mr. Trump's October 12, 2022 statement was "defamatory

*per se*" and caused her "to suffer reputational, emotional, and professional harm."[48]  The October 12

statement "appeared on Trump's personal account on Truth Social, a social media platform."[49]  Mr.

Trump allegedly "had his statement distributed to reporters, including reporters at publications

headquartered in New York such as Fox News and the New York Times, and emailed to a listserv

of supporters," and the statement "was widely reported in the press."[50]

Ms. Carroll's defamation claim, as presented in her complaint, therefore properly is

categorized as a claim for libel *per se*.

*Libel Per Se Does Not Require Direct Aim at a Person's Occupation*

A written statement is libelous *per se* if it "*tends* to disparage a person in the way of

---

[46]

> *E.g.*, 43A N.Y. Jur. 2d, *Defamation and Privacy* § 2 (2022).

[47]

> *Torati v. Hodak*, 147 A.D.3d 502, 504 (1st Dept. 2017) (Facebook message actionable as libel); *Valley Electronics AG, et al., v. Polis*, No. 20-cv-2133ARRLB, 2021 WL 3919244, at *6 (E.D.N.Y. Aug. 6, 2021) ("'An action for defamation that is expressed in writing or print,' including on the Internet, 'constitutes the common law cause of action for libel.'") (quoting *Murawski v. Pataki*, 514 F. Supp. 2d 577, 589 (S.D.N.Y. 2007); citing *Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 88 (2d Cir. 2003)).

[48]

> Cpt. ¶¶ 131, 135.

[49]

> *Id.* ¶ 93.

[50]

> *Id.* ¶¶ 94-95.

his [or her] office profession or trade."[51]  A writing also is libelous *per se* if it "tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him [or her] in the minds of a substantial number of the community, even though it may impute no moral turpitude to him [or her]."[52]

  In the October 12 statement, Mr. Trump accused Ms. Carroll of lying about her rape allegation against him:

> "This 'Ms. Bergdorf Goodman case' is a complete con job. . . . She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie .... She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. . . . In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance."[53]

---

[51]   *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985) (quoting *Nichols v. Item Publishers*, 309 N.Y. 596, 601 (1956)) (emphasis in original).

[52]   *Nichols*, 309 N.Y. at 600–01.

[53]   *Id.* ¶ 92.

Ms. Carroll is a "writer, advice columnist, and journalist."[54]  Honesty and credibility

are critical to these professions, which rely heavily on the trust and confidence of their audiences.

A writer who writes about his or her own experiences, as Ms. Carroll did, depends on his or her

readers believing the writer, which they may be less inclined to if the writer is called dishonest.[55]

The October 12 statement – in addition to accusing Ms. Carroll of "completely ma[king] up a story"

about Mr. Trump – states that Ms. Carroll "changed her story from beginning to end" during an

interview "where she was promoting a . . . book."[56]  Drawing all reasonable inferences in favor of

plaintiff, the October 12 statement on the whole can be construed as Ms. Carroll falsely accusing Mr.

Trump of rape in order to promote her book and increase its sales.[57]  Based on the facts alleged in

---

[54]

*Id.* ¶ 120.

[55]

Mr. Trump argues that the "attack[] [on] Plaintiff's honesty" in the October 12 statement "does not pass muster" because "most professions are predicated on dealing with others honestly." Dkt 34 at 10.  This proposition is irrelevant to the test at issue, which assesses the tendency of the specific written statement to disparage a person in their particular trade or profession.  A statement accusing a librarian of lying on the librarian's tax returns does not create the same tendency to disparage a person in the way of his or her profession as does a statement accusing a writer of making up a story that is included in the writer's book.

[56]

*Id.* ¶ 92.

[57]

Mr. Trump's remaining arguments related to the October 12 statement fail to persuade. First, contrary to Mr. Trump's assertion that his statement was non-actionable opinion because he "was simply disputing the merits of [Ms. Carroll's] prior lawsuit" (Dkt 34 at 7), the October 12 statement accused Ms. Carroll of "completely ma[king] up a story" about meeting Mr. Trump, a factual statement actionable as defamation  Second, Mr. Trump's contention that a statement cannot be defamatory *per se* if it requires reference to extrinsic facts is inapposite.  The October 12 statement expressly references Ms. Carroll's book and connects Ms. Carroll's promotion of the book to his accusations of her lying about meeting Mr. Trump.  Moreover, the connection between Mr. Trump's alleged rape of Ms. Carroll and Ms. Carroll's book is "presumably known to [the] readers" of Mr. Trump's statement given the extensive media coverage of Ms. Carroll's first lawsuit. *See Alvarado v. K-III Mag. Corp.*, 203 A.D.2d 135, 137 (1st Dept. 1994).

the complaint, Ms. Carroll has sufficiently pleaded a claim of libel *per se* because the October 12

statement may have affected her in her profession by "imputing to [her] . . . fraud, dishonesty,

[and/or] misconduct . . . ."[58]

      Mr. Trump's argument to dismiss this claim is premised on his mistaken conflation

of the higher standard applied to slander *per se* with the lower standard for libel *per se*.  Mr. Trump

argues that there are "four narrowly defined categories of statements which are considered to be

defamatory *per se*," and that Ms. Carroll has failed to state a claim for defamation *per se* "because

it does not, on its face, defame [P]laintiff in her trade, business or profession," one of the four

categories.[59]  However, nearly every authority Mr. Trump cites, including the case identifying those

four categories and the cases describing the category of injury in one's profession are *slander per

se*, not libel, cases.[60]  Unlike a libelous *per se* statement, a slanderous *per se* statement "must be

made with reference to a matter of significance and importance for that purpose [(of defaming a

person in his or her trade, business, or profession)], rather than a more general reflection upon the

plaintiff's character or qualities."[61]  Moreover, if a complaint fails to allege sufficient facts to state

---

[58]      *Grimaldi v. Schillaci*, 106 A.D.2d 728, 729–30 (3d Dept. 1984).

[59]      Dkt 21 at 14-15 (citation omitted).

[60]      The few cases cited by Mr. Trump that concern written statements cite to slander *per se* precedents for their discussion of the applicable standard.

[61]      *Liberman v. Gelstein*, 80 N.Y.2d 429, 436 (1992); *see also Van Lengen v. Parr*, 136 A.D.2d 964 (4th Dept.1988) (noting in a slander *per se* context that there must be "some reference, direct or indirect, in words or in circumstances attending their utterance, which connects charge of incompetence of dishonesty to particular profession or trade engaged in by plaintiff"); *Tacopina v. Kerik*, No. 14-cv-749-LTS-FM, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) ("The allegedly defamatory statement must be targeted at specific standards of performance that are directly relevant to the plaintiff's business, and must impute conduct

a claim for slander *per se*, "the plaintiff must show . . . that the statement complained of caused him or her special harm" – generally "the loss of something having economic or pecuniary value."[62]  The more stringent standard for slander *per se* is grounded in sound logic: "What gives the sting to the writing is its permanence of form. The spoken word dissolves, but the written one abides and perpetuates the scandal."[63]

      Mr. Trump's contention that the October 12 statement does not include "language aimed at a particular skill or trait that reflects upon Plaintiff's competency as a writer, advice columnist, and journalist" is inapposite to Ms. Carroll's libel *per se* claim.[64]  Nor was Ms. Carroll required to plead special damages because she has sufficiently pleaded the requirements of a libel *per se* claim.

---

that is of a kind incompatible with the proper conduct of the business, trade, profession or office itself.") (internal quotation marks and citation omitted).

[62]

*Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir. 2001) (quoting *Liberman*, 80 N.Y.2d at 435 (internal quotation marks omitted).

[63]

*Ostrowe v. Lee*, 256 N.Y. 36, 39 (1931); *see also Davis*, 754 F.2d at 85 ("[S]lander is generally considered less actionable than libel, because a written publication of a defamatory statement is more lasting and has the likelihood of a wider audience than an oral communication."); ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 2:8.3 (4th ed.2011) ("Statements that are libelous per se when written often are not slanderous per se when spoken."); 43A N.Y. JUR. 2D, *Defamation and Privacy* § 3 (2022) ("What gives the sting to the writing is its permanence of form; the spoken word dissolves, but the written one abides and perpetuates the scandal.").

[64]

Dkt 21 at 16.

*Conclusion*

Mr. Trump's arguments as to both of Ms. Carroll's claims for relief are without merit. Accordingly, the motion to dismiss [Dkt 20] is denied.  The motion to stay [Dkt 22] is denied as moot.

SO ORDERED.

Dated:        January 13, 2023

_____

Lewis A. Kaplan
United States District Judge