N27QcarC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   E. JEAN CARROLL

 4                   Plaintiff

 5            v.                        22 Civ. 10016 (LAK)
                                             Conference
 6   DONALD J. TRUMP

 7                   Defendant

 8   ------------------------------x
                                        New York, N.Y.
 9                                      February 7, 2023
                                        11:00 A.M.
10
     Before:
11
                        HON. LEWIS A. KAPLAN
12
                                        District Judge
13
                           APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     ROBERTA ANN KAPLAN
16   SHAWN GIOVJIAN CROWLEY
     HELEN ANDREWS
17   TREVOR MORRISON

18   TACOPINA SEIGEL & DeOREO
          Attorneys for Defendant
19   JOSEPH TACOPINA
     CHAD DEREK SEIGEL
20   MATTHEW G. DeOREO

21   HABBA MADAIO & ASSOCIATES LLP
          Attorneys for Defendant
22   ALINA HABBA
     MICHAEL MADAIO
23

24

25
```

N27QcarC

```
 1              (In open court; case called)
 2              DEPUTY CLERK:  Counsel for plaintiff, are you ready?
 3     Can you please put your appearances on the record.
 4              MS. KAPLAN:  We are.  Roberta Kaplan from Kaplan
 5     Hecker.  I'm here with my partner Shawn Crowley, my colleague
 6     Trevor Morrison, and my other colleague Helen Andrews.
 7              DEPUTY CLERK:  Counsel for defendant, are you ready?
 8              MR. TACOPINA:  Yes.  Good morning, your Honor.
 9              THE COURT:  Good morning.
10              MR. TACOPINA:  Joseph Tacopina for Donald Trump, along
11     with my partners Chad Seigel and Matthew DeOreo seated directly
12     to my right.  Good morning, your Honor.
13              MS. HABBA:  Good morning, your Honor Alina Habba and
14     Michael Madaio also for Donald Trump.
15              THE COURT:  Good morning.
16              Well, Ms. Habba, I had a rather delphic letter from
17     you last week saying several unspecified scheduling issues had
18     arisen, and you wanted to raise them.  So tell me what they are
19     please.
20              MS. HABBA:  Yes, your Honor.  Most of them we -- I'm
21     going to actually have Mr. Tacopina raise, if that's okay with
22     you, as he is going to be handling some of these issues himself
23     in terms of scheduling.
24              But there's a general question and concern, frankly,
25     with having Carroll I and Carroll II having separate dates and
```

N27QcarC

1   general questions on how that would work given that they're the

2   same set of facts.

3            THE COURT:  Mr. Tacopina.

4            MR. TACOPINA:  Thank you very much, your Honor.

5            Your Honor, I trust you also received our letter dated

6   yesterday, February 6, outlining I guess basically --

7            THE COURT:  No.

8            MR. TACOPINA:  No.  Okay.

9            Can we hand one up to the Court, your Honor?  I'm

10  going to talk to you about it anyway.  It was hand delivered at

11  4:00 p.m.

12            THE COURT:  Where and to whom was it hand delivered?

13            MR. TACOPINA:  Your Honor, I can't speak to who.  We

14  had a messenger from our office bring it to the Court and

15  deliver it.  Was it filed also electronically?  I'm going to

16  hand you up the letter your Honor.

17            THE COURT:  I appreciate that.

18            MR. TACOPINA:  I'm sorry, your Honor.

19            THE COURT:  But since the pandemic, we don't have mail

20  delivery within the court.  We have to send staff to get mail,

21  and we don't do it every hour.  Okay.

22            MR. TACOPINA:  Could I hand this up?

23            THE COURT:  Sure, you can.

24            MR. TACOPINA:  I know co-counsel has it, your Honor.

25  But if you don't mind, could I use the podium, by the way?

N27QcarC

```
 1                THE COURT:  I'd prefer it.

 2                MR. TACOPINA:  Your Honor, there are scheduling issues

 3      I'd like to address.  Would the Court want a minute to peruse

 4      the letter or do you want me to plow ahead?

 5                THE COURT:  I think it might be a good idea if I read

 6      the letter.

 7                MR. TACOPINA:  Why don't I sit down for five minutes.

 8                THE COURT:  I'm only up to the first sentence of the

 9      second paragraph, but right away let me tell you all that I've

10      had enough of the personal accusations between and among

11      lawyers, and I don't want to see any more.  I thought I made

12      that clear in the past.

13                All right.  Go head, Mr. Tacopina.

14                MR. TACOPINA:  Thank you very much, your Honor.

15                THE COURT:  Does this, by the way, respond to some

16      writing or writings that I haven't been provided with?  Because

17      it quotes from them.

18                MS. HABBA:  Yes.

19                MR. TACOPINA:  Maybe Ms. Kaplan -- I think Ms. Kaplan

20      submitted a letter as well that maybe you didn't receive also.

21                MS. KAPLAN:  I apologize your Honor we thought you

22      received it.  We submitted a letter on February 6 that we

23      thought we had delivered to chambers.

24                MR. TACOPINA:  It's all right if you only read mine,

25      your Honor.  There's no need to read both.
```

N27QcarC

1          THE COURT:  I'm sure Ms. Kaplan feels I only need to

2     read hers, and not yours.

3          MS. KAPLAN:  I'm not going to comment, your Honor.

4          THE COURT:  Okay, Mr. Tacopina.

5          MR. TACOPINA:  Thank you, your Honor.

6          At the outset, let me just say Andrew informed us

7     going forward we will email Andrew when we're delivering

8     something by mail.  I think both sides will do that as well to

9     make sure you got it.

10          At the outset, I want to ensure the Court that we have

11     not come into this case looking to delay it just for dilatory

12     reasons.  We want to proceed to trial as quickly as possible to

13     put this behind our client.

14          I was brought into this case, my firm was brought into

15     this case to try it, and that's what I will do.  I intend to

16     try it as quickly as possible.  We were just retained, your

17     Honor, January -- one week ago.

18          THE COURT:  Is Ms. Habba going to stay in the case or

19     not?

20          MR. TACOPINA:  Yes, your Honor.

21          THE COURT:  Go ahead.

22          MR. TACOPINA:  In fact, we were retained January 31,

23     one week ago.  On that same day, that we filed our notices of

24     appearances.  We appeared at a deposition of the plaintiff on

25     the same day we were retained.  That being said, in order to

N27QcarC

1   sufficiently prepare for trial, we do need several items to be

2   brought to the Court's attention bearing on that timing.  Most

3   importantly, the scheduling order that was entered on

4   December 21 set yesterday, February 6, as the deadline for

5   completion of expert discovery.  However, before we entered the

6   case, your Honor, our co-counsel, Ms. Habba's firm, experienced

7   some substantial difficulties retaining someone, an expert to

8   conduct the IME.

9           By way of background, pursuant to your scheduling

10  order of December 21, co-counsel -- when I say co-counsel,

11  Ms. Habba's firm -- immediately contacted potential experts for

12  the purposes of performing that IME and issuing an expert

13  report.  Quite frankly, unfortunately, due to the unique nature

14  of this case and the incredibly expedited schedule, it was

15  substantially difficult for them to secure a --

16          THE COURT:  No, it is not incredibly expedited.

17          MR. TACOPINA:  Okay.

18          THE COURT:  It is not.  *United States v. Microsoft*, a

19  case of some moment went to trial within five months of the

20  filing of the complaint.

21          MR. TACOPINA:  Okay, your Honor.

22          So to revert back to at least -- it was -- at least

23  the timing was expedited for some of the experts' availability,

24  but I understand what you're saying.  And, again, I don't

25  quarrel with that at all.  But, anyway, it was difficult for

N27QcarC

them to find an expert willing to assist very quickly.

Nonetheless, they conferred with an expert referral service and ultimately were able to retain the services of Edgar Nace on January 9, and right after the holidays and they were able to do that.

So co-counsel contacted plaintiff's counsel that same day to request the IME and identify Dr. Nace as the examiner in accordance with the scheduling order, but because Dr. Nace's wife was suffering from a life-threatening medical condition which limited his availability, co-counsel wasn't at the time able to give a date certain for the IME.  Instead, inquired as to the plaintiff's availability, when the plaintiff might be available.

By the way, let me just say this -- and, again, we weren't here yet -- but the expert, Dr. Nace, did assure that despite his wife's condition at the time, he would be able to meet the scheduling order.  He assured co-counsel of that.

Two days later, on January 11, the plaintiff's counsel sent co-counsel a letter objecting to the IME for three reasons:

First, they didn't file -- co-counsel didn't file a motion for an IME under Rule 35.

Second, the IME wasn't needed because the plaintiff wasn't diagnosed with any "mental disorder or condition."

And, lastly, Dr. Nace wasn't qualified because he

N27QcarC

1    purportedly focused on drug addiction only.

2              As to the first claim, your Honor, pursuant to the

3    scheduling order, your Honor directed plaintiff to submit to an

4    IME upon request, so no motion in fact was needed.

5              As to the second claim, a diagnosis isn't needed as a

6    prerequisite for an IME.  All that's needed is a claim of

7    emotional damages, which you have in abundance here.

8              Indeed, their expert, Dr. Liebowitz, diagnosed the

9    plaintiff with suffering from an ongoing trauma from the

10   alleged rape that was so severe that it significantly

11   diminished her quality of life, and her losses were profound

12   and enduring and lasted over 20 years.

13             THE COURT:  I took the time to read your letter.

14             MR. TACOPINA:  Okay.

15             THE COURT:  It's not all that helpful for you to read

16   it back to me.

17             MR. TACOPINA:  It's not the letter, but yes, you're

18   right.

19             So the bottom line is this:  Those issues were

20   presented.  That caused a back-and-forth because at that point

21   then, after the objection, instead of performing the

22   examination of the IME and complying with the schedule for the

23   report, what then happens is the objection then created this

24   delay.

25             On January 19, co-counsel responded to the objection

letter explaining all the things we just discussed and

requested a meet-and-confer, which occurred on the 24th.  On

the 24th, plaintiff's counsel wanted to know the precise amount

of time Dr. Nace would need to examine the plaintiff, and

co-counsel said a meaningful amount of time because, remember,

their expert, Dr. Liebowitz, had 22 hours with the plaintiff.

So anyway, that's when the issue happened.  That's

again referenced in the letter.  I'm not going to read the

letter.  And I don't have the letter in front of me, your

Honor.  But that's when the issue happened with Dr. Nace's wife

where she took a dramatic turn for the worse, had surgery, and

there was a risk of death, apparently.

THE COURT:  Is that behind us now, or not?

MR. TACOPINA:  She's here still, but there's some

severity.  What Dr. Nace said to co-counsel, and I confirmed

that before we arrived here today, was that by February 28, he

would be able to do the IME and complete the report.

And as far as we know, that still stands correct.

MS. HABBA:  Yes.

MR. TACOPINA:  So that's one of the focal points of

this sort of scheduling issue.

I'm trying to see if there is anything else I need to

say.  Your Honor, you read the letter.  Dr. Nace's issue speaks

for itself.  Obviously, since we've entered the case, we've

tried to come up with other options for experts to do this IME.

N27QcarC

```
1    Again, that's been one week.  It's not been incredibly easy

2    because of our imposed -- not the Court's, but our imposed

3    timeline -- and we need them to drop everything and commence

4    immediately.  But we are doing that.  We are working toward

5    that.

6           But on the 25th, co-counsel reached out to plaintiff's

7    counsel to meet and confer regarding the extension of time to

8    complete discovery, and plaintiff's counsel said that they

9    basically by email, they'd give a slight extension but

10   indicated that, you know, their expert examined the plaintiff

11   for 22 hours, but we should forego -- this is not a personal

12   attack.  I respect everyone at that table, by the way -- but we

13   should forego an expert examination of the plaintiff and just

14   rely on her three-hour deposition that covered not only

15   emotional damages but financial damages.

16          The obvious problem with that is that would give the

17   plaintiff an enormous unfair advantage in the eyes of a jury

18   because they would have an expert testifying who spent 22 hours

19   with the plaintiff and would testify to their findings based on

20   that.  We would have an expert get up there and say "Never met

21   the plaintiff, I read a deposition, and here is my opinion."

22   You can imagine how that would play out in the eyes of a fact

23   finder.  Sounds like their expert was prepared, spent time with

24   the plaintiff, and ours didn't.  Just read some cold words on a

25   transcript.  So anyway, that is sort of where we are at, I
```

N27QcarC

1    think.

2              Following that exchange was another meet-and-confer

3    that was contemplated for January 27, but that didn't happen

4    because co-counsel didn't have our expert yet, aside from

5    Dr. Nace and his delayed schedule, which was, again,

6    February 28.

7              So we are -- we, my firm, is coming in.  We are

8    diligently trying to supplement Dr. Nace and find a backup

9    expert, and we're doing that on a daily basis.  I have my

10   entire firm working on that.  And we've spoken with several.

11   Dr. Nace again informs that he is available still to do this by

12   the 28th.

13             And sort of that's where we stand, your Honor.  We are

14   looking -- I'm looking for --

15             THE COURT:  To be precise, what you said before, if I

16   understood you correctly, was that he can do the IME and his

17   report by February 28, right?

18             MR. TACOPINA:  Again, I -- yes.  I've not spoken to

19   him.  I looked over to co-counsel who just acknowledged yes,

20   so...

21             MS. HABBA:  Yes, your Honor, that's our understanding

22   from Dr. Nace.

23             THE COURT:  Thank you.

24             MR. TACOPINA:  So that's where we're at, your Honor.

25             I don't think I need to then go into the issue of why

N27QcarC

1   the Carroll II case, the one I'm brought in to try, is

2   different than the first case because the whole issue of the

3   damages are completely -- completely different in that case.

4        The bottom line is, your Honor, I am looking for a

5   slight, a slight adjustment of the Court's schedule; not a

6   massive one, but a slight one.  Some of them have to do with us

7   being competently prepared to try this case.  This is a case

8   where the allegations happened, as we stand here now, like 27

9   years ago, around 27 years ago.  I think there's a lot of work

10  for us to do to catch up to be ready to try this case.  As I

11  asked, I asked for a six-week adjournment from the Court's

12  trial schedule.  The first week of June we will be ready to go.

13  There will be nothing, come hell or high water, to prevent us

14  from doing that.

15        THE COURT:  You know, I've heard that before.

16        MR. TACOPINA:  Not from me you haven't.  You and I

17  have tried a case before, your Honor.  And I give you my word

18  here, with all those people behind us taking notes.

19        THE COURT:  Mr. Tacopina, I understand you have been

20  before me.  To say we have no issues is a vast understatement.

21  I have a lot of respect for you.  I have a lot of respect --

22        MR. TACOPINA:  Thank you.

23        THE COURT:  -- for the folks at the front table too,

24  as you know.  And but things keep happening in this case and

25  the cases involving your client, and I'd be fool not to take

1    that into account too.

2             MR. TACOPINA:  I understand, your Honor.  All I can

3    tell you is this:  I'm new to this foray.

4             THE COURT:  It's not your first rodeo.

5             MR. TACOPINA:  Not my first rodeo.  It is my first

6    rodeo in this Saldome, if you will.

7             THE COURT:  Okay.  Yes.

8             MR. TACOPINA:  But it's certainly, your Honor, I give

9    you my word.  I will be ready to try this case.  Look, I'll be

10   ready for this case.  If you say April, I'm trying it in April.

11   I'm not running from this obligation.

12             THE COURT:  I know that.

13             MR. TACOPINA:  That was very magnanimous of me to tell

14   you that.  But, your Honor, I'm asking just to be ready -- we

15   have an expert who is now going to spend some time with the

16   plaintiff, issue a report.  I have to do some catch up.  We do

17   have a trial schedule in May.  Not your problem; mine.  I have

18   a personal issue in April.  Not your problem; mine.  I can

19   relay it to the Court if you'd like.  I'm asking for the first

20   week of June.  I will not be anywhere but here to start the

21   trial in this case.

22             If you can't do it, your Honor, I understand.  I'll be

23   ready whenever you want me to be ready.  If you say start

24   tomorrow, I'll be ready, but I'm asking to be competent in this

25   case, to be completely prepared, and at least discharge my

N27QcarC

```
 1    obligations.  I'm asking if we could push the trial date over.

 2                The IME schedule and everything else, February 28.  I

 3    think Ms. Kaplan in her letter yesterday suggested February 21

 4    as the sort of date for the service of rebuttal for defendant's

 5    psychological expert.  I guess we're asking for a week past

 6    that.  And I'm just asking for the trial to start the first

 7    week of June, if your Honor could accommodate for substantial

 8    reasons.

 9                THE COURT:  Look, we've got fundamentally two

10    different -- I think different issues.  One is the problem with

11    the expert.  I understand what that's all about.

12                And the other is that you'd like more time to get

13    ready.

14                In the best of all possible worlds -- actually, maybe

15    a third issue, which is whatever personal issue you have.  But

16    they're very different.

17                MR. TACOPINA:  Yes.

18                THE COURT:  Because two of those issues were on the

19    table when you agreed to come into this case.  You came in to

20    an April 17 trial date knowing whatever your April schedule

21    was, and knowing that in the best of all possible worlds, all

22    lawyers want as much time as they can get to prepare for trial.

23    I did when I did it, and I understand that.

24                Let me hear from Ms. Kaplan, and we'll see where we

25    go.
```

N27QcarC

1          MS. HABBA:  Your Honor, before Ms. Kaplan's rebuttal

2     to his argument, there is one other portion with Carroll I, if

3     you'd like me to speak to it first, and then she can address

4     them both, or we can, you know, bounce back and forth.

5          THE COURT:  Have a seat, Ms. Kaplan.

6          MS. HABBA:  Sorry.  I thought I would raise it so

7     Robbie doesn't have to get up twice.

8          So, your Honor, thank you for hearing me as well.  I

9     know it's burdensome having multiple firms on one case.

10          As far as Carroll II, we have not had any delays.  My

11     firm has been on it and met all deadlines outside -- with

12     meet-and-confers working properly with co-counsel -- with

13     opposing counsel, and I think we've made headway through

14     several calls without getting court intervention.  So,

15     respectfully, anybody saying otherwise would just be false.

16     This was filed November, end of November, as you know,

17     Carroll II, and there have not been any extensions.

18          The other issue I want to address on Carroll I, which,

19     again, I have not asked for any trial adjournments or

20     extension.  I came into that case and had to argue in a week

21     front of the Second Circuit, and did so on the Westfall Act, as

22     you know, which the Court stated that the former president was

23     an employee of the government.  That, of course, decision

24     delayed things, but that was by no means counsel's intention to

25     move this along, and, quite honestly, as co-counsel has said,

N27QcarC

Mr. Tacopina, our client wants this behind him.  He's very

confident that this will be behind him, and we would like to

get this trial over and done with.

          I would like to echo the sentiments of Mr. Tacopina

because I do have firsthand knowledge on the issue of the

expert.  He is telling us the 28th.  It was a very serious

issue.  Obviously, life happens.  I again am happy to --

          THE COURT:  Can we get to Carroll I, which is what you

rose for.

          MS. HABBA:  Well, that's what I was going to say.

Happy to have on Carroll II a separate hearing, but I'm not

really sure on why we would be doing that.  This is something

Mr. Tacopina and I have addressed.

          Another issue with Carroll I is, as you know, we just

argued in January due to the Court's scheduling in Washington,

and are waiting for that decision.  We can't deny that that is

also happening.  We filed a motion to stay in the Southern

District of New York, and then opposing counsel agreed to a

stay pending the D.C. Court of Appeals decision.  We're still

waiting on that, sir.

          THE COURT:  A stay of what?

          MS. HABBA:  A stay pending the decision from

Washington.

          THE COURT:  A stay of what?

          MS. HABBA:  Of this hearing.  Of this case.  So what

N27QcarC

1    happened was we had a meet-and-confer, your Honor, without

2    intervention from the Court.  Ms. Kaplan agreed to push off --

3    it's true, is this not accurate?  I'm sorry, Robbie is

4    disagreeing, and I'm happy to hear, but we had originally

5    decided that we were going to wait to argue in Washington on

6    the second issue, which was bounced by the Second Circuit.  We

7    are still waiting on a decision on that.

8             THE COURT:  I know that.

9             MS. HABBA:  Right.  So I just raise that to the Court

10   as we are still to this day waiting on that decision, which in

11   my estimation would be that they are going to bounce it back to

12   the Second Circuit, but that's just a guess from our

13   conversations in court that day.  So I have to raise it on the

14   record.  It's obviously --

15            THE COURT:  They have to respond to the Second Circuit

16   one way or another.

17            MS. HABBA:  Of course.  I just wanted to raise to the

18   Court that we are still waiting on a decision from that bench.

19            THE COURT:  I appreciate being informed of that.

20            MS. KAPLAN:  Your Honor, I can be very brief.

21            What we just heard from Mr. Tacopina -- and I'm trying

22   to be as -- I'm trying to avoid any (indecipherable).  What we

23   just heard from Mr. Tacopina is the meet-and-confer that should

24   have happened between counsel before we showed up in court.

25            I just heard for the first time that Dr. Nace is

N27QcarC

1   available in an email sent to us on January 25.  They wrote,

2   "As such, we will not be able to proceed with Dr. Nace as the

3   defense psychiatric expert in this matter."  If they told us on

4   Friday that Dr. Nace was available and he can do it by

5   February 28, we would have agreed to that.  We implored them on

6   the call on Friday to offer us something short of a six-week

7   extension of all deadlines in all cases.

8           Second of all, with respect to the IME, I heard more

9   about what they think about the IME from Mr. Tacopina just now

10  than I have ever heard on a phone call from them.  We're not

11  refusing to do the IME.

12          THE COURT:  I'm sorry, you're what?

13          MS. KAPLAN:  We're not refusing to offer our client

14  for an IME.  We wanted to know how long they needed, what

15  tests, if any, they intended to run.  It's not like examining

16  someone's knee.  It's a different kind of examination, and

17  under the rules, we're entitled to understand what the timing

18  and the scope of the IME.  And we've heard nothing from them

19  for all these weeks until I heard a little bit from

20  Mr. Tacopina.

21          Similarly, on Friday, if Mr. Tacopina had a personal

22  issue, he should have raised it with us.  It's not appropriate

23  to have consultations like this among counsel before your

24  Honor.  It's a waste of everyone's time.

25          So we obviously would object, your Honor, to any

1    extension of the deadlines outside of the expert issue.  With

2    respect to the expert issue, we have no trouble with

3    February 28 and could adjust the schedule accordingly just for

4    issues that relate to the expert psychiatric issue, but there's

5    a lot of other dates in the case that have nothing to do with

6    that.  None of those dates should move, and we should be on

7    trial for April.  Thank you, your Honor.

8             THE COURT:  And you should be on trial when?

9             MS. KAPLAN:  For April.  April 17 as scheduled.

10            THE COURT:  All right.

11            Is there anything confidential, Mr. Tacopina, about

12   whatever your personal issue with April is?

13            MR. TACOPINA:  None whatsoever.  And the reason it

14   wasn't raised with Ms. Kaplan in the meet-and-confer really is

15   not the overriding issue.

16            THE COURT:  No, it's not, but I'd like to hear about

17   that.

18            MR. TACOPINA:  No, here is the issue.  I will be blunt

19   with you.  My daughter, who lives in London, is about to have

20   her first child.  It's my first grandchild, and I wanted to be

21   there on April 17 is the date that she is due, to be there for

22   the birth of my first grandchild, and my daughter's first baby.

23   That's it.  Obviously, if you tell me to be here, I'll see some

24   pictures and some videos and do a Zoom call, and we'll be fine.

25   That wasn't the basis --

N27QcarC

| | |
|---|---|
| 1 | THE COURT:  Look, you have my good wishes about -- |
| 2 | MR. TACOPINA:  Thank you. |
| 3 | THE COURT:  -- the forthcoming grandchild.  We hope |
| 4 | everything goes well, and -- |
| 5 | MR. TACOPINA:  Your Honor, that wasn't the thrust of |
| 6 | the request.  And it's a matter of weeks, not months, for the |
| 7 | adjournment, the trial.  Weeks, not months.  That's all I want |
| 8 | to point out.  Dilatory tactics come in.  Your Honor, I'd like |
| 9 | to try this in October.  You've heard enough.  I know. |
| 10 | THE COURT:  I know enough about it. |
| 11 | MR. TACOPINA:  I know.  I know.  I know. |
| 12 | THE COURT:  Anything else, Ms. Kaplan? |
| 13 | MS. KAPLAN:  Not from us, your Honor. |
| 14 | THE COURT:  All right.  So far as the contretemps of |
| 15 | this morning, I will let you know what I decide soon. |
| 16 | What do we estimate for the duration of the trial? |
| 17 | MS. KAPLAN:  Sometime between five days and ten days, |
| 18 | I'm not exactly sure where, but probably closer to five is my |
| 19 | guess.  There are not that many witnesses, your Honor. |
| 20 | THE COURT:  Mr. Tacopina? |
| 21 | MR. TACOPINA:  Sounds about right to me.  I wouldn't |
| 22 | imagine it would be longer than that at all. |
| 23 | THE COURT:  All right.  Based on my experience not too |
| 24 | long ago in another comparable case, the estimates sound more |
| 25 | or less right.  All right.  I will let you know about that. |

N27QcarC

1          Now, I, of course, am extremely well aware of the

2     pendency of the Carroll I case in the District of Columbia

3     Court of Appeals.  We are just all going to have to wait.  That

4     case is trial ready, if there is to be a trial.  Whether we try

5     it, assuming there is going to be a trial, jointly with this or

6     not, I haven't decided yet.  We will see what happens.

7     Preparation for that ought to be basically done.  And so I

8     don't think I have to decide now.  And I won't.

9          I don't think I'd be giving away a state secret to say

10    I listened to the argument, watched the argument, I think, at

11    some later date in the D.C. Court of Appeals, and I think it's

12    anybody's guess what they're going to do.  And we'll leave it

13    at that.

14          You'll hear from me.  Thank you.

15          (Adjourned)

16

17

18

19

20

21

22

23

24

25