# EXHIBIT A

| From: | Chad Seigel <cseigel@tacopinalaw.com> |
| --- | --- |
| Sent: | Wednesday, February 15, 2023 3:28 PM |
| To: | Matthew Craig; Roberta Kaplan; Joshua Matz; Shawn G. Crowley |
| Cc: | Joe Tacopina; Matthew DeOreo; Alina Habba, Esq.; Michael Madaio; Peter Swift; Peter Gabra |
| Subject: | RE: Carroll II IME of Plaintiff |

This email was sent from outside the Firm.

Counsel,

At the outset, for purposes of moving forward expeditiously, please be advised that we have secured a location for plaintiff's IME on Monday and Tuesday, February 20th and 21st. That location is the offices of Veritext Court Reporters, at 7 Times Square, 16th Floor, NY, NY 10036.

It is our sincerest hope that the contents of this email may avoid unwarranted objections that risk delaying this matter. In short, your last email took exception with what you characterize as our providing "a list of 40 different tests, many of which are plainly inapplicable, and/or represent newer or older versions of the same test." Accordingly, you have asserted that the provision of this list is "plainly intended to obstruct the process," and "intimidate" and "harass and burden" plaintiff. Rather than baselessly slinging mud and professing that our actions are nefarious, a more collegial atmosphere might exist if you refrained from making unjustified accusations against counsel. With that said, we can assure you that our provision of the list was made in good faith.

Indeed, it is impossible to meaningfully narrow the list for the simple reason referenced in our former email, namely that selection of specific tests will depend on the content of the evaluation *as it unfolds in real time*. So that you may better understand that concept, if you were to call an auto repair shop to diagnose why your car is not starting or running properly, and instruct the mechanic that he can only use five tools in his tool box to diagnose the issue, you would be substantially impairing the mechanic's ability to perform a proper assessment. While we understand why you may want to limit our ability to obtain an accurate examination of plaintiff, that circumstance does not change the fact we are entitled to one.

Moreover, despite your contention that the list of tests contains instruments which are "plainly" inapplicable, that is not correct. Were any such test plainly inapplicable, it would not have been included in our list. To be clear, our intention is only to obtain a reliable and accurate evaluation of plaintiff. For that matter, your assertion that certain tests represent newer or older versions of the same instrument fails to reflect that changes to certain instruments were made, such that none of the tests listed are identical. That being said, it is not the intention of our expert to administer newer and older versions of the same test. Rather, depending on how the evaluation proceeds, including with respect to the issue of timing, our expert may determine that one version is better suited over the other. As a reminder, we have agreed to your request to significantly reduce the time for our expert to conduct an in-person evaluation of plaintiff, *in order to accommodate her*. Accusing us now of seeking to harass, intimidate, and burden her is the very type of personal attack against which the Court admonished. It is also baseless and beyond the pale. In order to further buttress that fact, the actual administering of the tests themselves should take no more than four hours *cumulatively*.

Furthermore, you previously cited *Hirschheimer v. Associated Metals & Mins. Corp.*, No. 94 Civ. 6155, 1995 WL 736901, at *4 (S.D.N.Y. Dec. 12, 1995) to support your prior request that we identify "by name any standardized tests" that our expert plans to perform. Although we complied with that request promptly, you have now sought additional information, namely that our expert "articulate a reason why a particular test serves [the] purpose" of rebutting Dr. Lebowitz. Notably, the *Hirschheimer* case you cited does not impose such an obligation upon us; it requires only that we identify the contemplated tests and not explain our expert's reasoning for the use of such tests. Nonetheless, for

purposes of avoiding what may be reasonably seen as you once again attempting to delay our IME, please be advised that the tests listed serve the purpose of evaluating plaintiff's emotional and psychological condition and identifying whether she is malingering her claim of trauma and emotional injuries. To that end, while there is no requirement that we do so, here is a description of each test listed:

1. **The Adaptive Behavior Assessment Scale, Third Edition (ABAS-3)** is a widely-used assessment tool designed to evaluate the adaptive functioning of individuals aged 0 to 89 years. The ABAS-3 measures an individual's ability to independently perform everyday activities and social skills necessary for personal and social responsibility. The results of the ABAS-3 can be used to inform clinical decision-making, intervention planning, and outcome evaluation in various settings, including schools, clinics, and research studies.

2. **The Adverse Childhood Experiences (ACEs) Scale** is a questionnaire-based tool used to measure the extent to which an individual has been exposed to various types of traumatic experiences during childhood, such as abuse, neglect, household dysfunction, and violence. The ACEs Scale consists of 10 items, each representing a different type of adverse experience. Research has linked higher ACE scores with a greater risk of negative health and social outcomes later in life.

3. **The Beck Anxiety Inventory (BAI)** is a self-report questionnaire designed to measure the severity of anxiety symptoms in adults and adolescents. The BAI consists of 21 items that assess a range of cognitive, behavioral, and physiological symptoms of anxiety, including nervousness, fear, and panic.

4. **The Beck Depression Inventory, Second Edition (BDI-II)** is a widely used self-report questionnaire designed to measure the severity of depression symptoms in adults and adolescents. The BDI-II consists of 21 items that assess a range of affective, cognitive, and behavioral symptoms of depression, such as sadness, guilt, and loss of interest in activities.

5. **The Brief Symptom Inventory (BSI)** is a brief psychological self-report tool used to assess an individual's psychological symptoms and distress. It consists of 53 items that assess a range of symptoms such as anxiety, depression, somatization, and hostility. The BSI is often used to measure changes in psychological symptoms over time, to aid in diagnosis, and to monitor treatment progress. The BSI is easy to administer and score, making it a useful tool for quickly identifying psychological distress in a variety of populations.

6. **The Clinician-Administered PTSD Scale for DSM-5 (CAPS-5)** is a structured interview designed to assess and diagnose Posttraumatic Stress Disorder (PTSD) in individuals aged 18 years or older. The CAPS-5 consists of 30 items that evaluate the presence and severity of PTSD symptoms in accordance with the DSM-5 diagnostic criteria. The interview is conducted by a trained clinician and covers a wide range of trauma types and symptom clusters, providing a comprehensive and reliable assessment of PTSD.

7. **The Cross-Cutting Symptom Measures for DSM-5, Level 1 and Level 2** are self-report questionnaires designed to assess and monitor common symptoms that are present across multiple mental disorders. The Level 1 measures include 13 items that assess symptoms such as anxiety, depression, and sleep disturbance, while the Level 2 measures include an additional 90 items that cover a range of symptom domains, including somatic symptoms, irritability, and substance use. The measures are intended to be used as part of a comprehensive evaluation.

8. **The Cultural Formulation Interview (CFI)** is a semi-structured interview used to assess the impact of cultural factors on an individual's experience of mental health symptoms and their help-seeking behavior. The CFI includes 16 questions that cover the individual's cultural identity, cultural explanations of the illness, cultural factors that may affect the care process, and the cultural support available to the individual.

9. **The Detailed Assessment of PTSD (DAPS)** is a self-report instrument that assesses peri- and posttraumatic symptoms and associated features related to a specific traumatic event. It provides a detailed assessment of PTSD in a short amount of time.

10. **The Dissociative Experiences Scale (DES)** is a self-report questionnaire used to measure the extent of dissociative experiences in individuals. Dissociation refers to a disconnection between thoughts, emotions, and sensations that may occur in response to trauma or other stressful events. The DES consists of 28 items that assess different types of dissociative experiences, such as depersonalization and amnesia.

11. **The Dissociative Subtype of Posttraumatic Stress Disorder (PTSD) Scale** is a self-report questionnaire designed to measure dissociative symptoms that may occur in individuals with PTSD. The scale consists of 8 items that assess dissociative symptoms, including depersonalization, derealization, and dissociative amnesia. The scale is used to identify individuals who meet the criteria for the dissociative subtype of PTSD, which is a diagnostic specifier for PTSD in the DSM-5.

12. **The Epworth Sleepiness Scale (ESS)** is a self-report questionnaire used to measure an individual's level of daytime sleepiness. The ESS consists of 8 items that ask the individual to rate their likelihood of dozing off or falling asleep in various situations, such as while watching TV or sitting in a car. The total score on the ESS can range from 0 to 24, with higher scores indicating a higher level of daytime sleepiness. The ESS is commonly used in sleep medicine and can help identify individuals who may have a sleep disorder or who may be at risk for accidents or other negative consequences due to excessive sleepiness.

13. **The Geriatric Depression Scale (GDS)** is a self-report questionnaire used to measure depression in older adults. The GDS consists of 30 yes/no items that assess symptoms of depression, such as feelings of sadness, hopelessness, and loss of interest in activities. The scale is designed to be used with individuals who are aged 60 years or older and can be used as a screening tool for depression in this population. The GDS is a commonly used assessment tool in geriatric mental health.

14. **The Gudjonsson Suggestibility Scale (GSS)** is a standardized tool used to assess an individual's susceptibility to suggestion. The scale consists of two parts. The GSS is commonly used in forensic psychology.

15. **The Impact of Events Scale-Revised (IES-R)** is a self-report questionnaire used to measure symptoms of post-traumatic stress disorder (PTSD). The IES-R consists of 22 items that assess the individual's subjective experience of distress following a traumatic event, including symptoms such as intrusive thoughts, avoidance, and hyperarousal. The scale is often used in research and clinical practice to assess the severity of PTSD symptoms and to monitor the individual's response to treatment over time. The IES-R is considered to be a reliable and valid tool for assessing PTSD symptoms in a variety of populations.

16. **The Millon Clinical Multiaxial Inventory, 4th Edition (MCMI-IV)** is a personality assessment tool that provides information on an individual's personality characteristics and psychopathology. The MCMI-IV consists of 195 true/false questions that assess 28 personality scales and 10 clinical syndrome scales, including depression, anxiety, and substance abuse. The scale is designed to be used by mental health professionals to assist in diagnosis and treatment planning, and can provide information on an individual's personality style, potential psychological disorders, and treatment needs. The MCMI-IV is considered to be a reliable and valid assessment tool in the field of psychology.

17. **The Mini-Mental State Examination (MMSE)** is a commonly used screening tool for cognitive impairment. The MMSE assesses several cognitive domains, including orientation, memory, attention, and language. The test consists of a series of questions and tasks that the individual must complete, such as recalling three objects after a delay or following a three-stage command. The total score on the MMSE ranges from 0 to 30, with a lower score indicating greater cognitive impairment. The MMSE can be completed quickly.

18. **The Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-2)** is a widely used personality assessment tool in forensic psychology. The MMPI-2 consists of 567 true/false questions that assess personality traits and psychopathology, such as depression, anxiety, and paranoia. The scale can provide information on an individual's personality style, potential psychological disorders, and treatment needs. The MMPI-2 is considered to be a reliable and valid assessment tool, and has been used in a wide range of settings, including clinical practice, research, and forensic evaluations.

19. **The Montreal Cognitive Assessment (MoCA)** is a screening tool used to assess cognitive function, including memory, attention, language, and visuospatial abilities. The MoCA consists of a series of questions and tasks that the individual must complete, such as identifying the similarities between two words or drawing a clock face. The test takes approximately 10-15 minutes to complete and is often used in clinical settings to screen for cognitive impairment and to monitor changes in cognitive function over time. The MoCA is considered to be a reliable and valid tool for assessing cognitive function in a variety of populations, including individuals with Alzheimer's disease and other forms of dementia.

20. **The Life Events Checklist, 5th Edition (LEC-5)** is a screening tool used to assess exposure to potentially traumatic events. The LEC-5 consists of 17 items that assess whether the individual has experienced or witnessed a range of traumatic events, such as combat exposure, physical assault, or natural disasters. The scale is often used in research and clinical practice to assess the individual's history of trauma exposure and to screen for post-traumatic stress disorder (PTSD). The LEC-5 is considered to be a reliable and valid tool for assessing exposure to traumatic events and can provide important information for the diagnosis and treatment of PTSD.

21. **The Mental Status Examination for Chronic Dissociative Symptoms (MSED)** is a clinical tool used to assess dissociative symptoms and related cognitive processes. The MSED consists of a series of questions and tasks that assess a range of dissociative symptoms, including amnesia, depersonalization, and identity confusion. The scale also assesses cognitive processes such as attention, memory, and executive functioning. The MSED is designed to be used in clinical settings to assist in the diagnosis and treatment of dissociative disorders. The MSED is considered to be a reliable and valid tool for assessing dissociative symptoms and can provide important information for the diagnosis and treatment of dissociative disorders.

22. **The Mood Disorder Questionnaire (MDQ)** is a screening tool used to assess the presence of symptoms of bipolar disorder. The MDQ consists of 13 yes/no questions that assess the individual's history of manic and depressive symptoms, as well as the impact of these symptoms on their daily life. The scale is designed to be used to screen for bipolar disorder and can provide information on the individual's mood symptoms, family history, and treatment needs. The MDQ is considered to be a reliable and valid tool for assessing symptoms of bipolar disorder and can assist in the diagnosis of this condition.

23. **The Modified Somatic Perceptions Questionnaire (MSPQ)** is a self-report measure designed to assess the physical symptoms and sensations experienced by an individual. The questionnaire contains 34 items related to various bodily symptoms, such as pain, fatigue, and gastrointestinal distress. Respondents rate the intensity and frequency of each symptom on a scale of 0 to 4. The MSPQ has been used in forensic psychology as a tool for assessing the credibility of an individual's physical complaints. It can be administered to individuals who have filed personal injury claims, disability claims, or worker's compensation claims.

24. **The Multi-Dimensional Iowa Suggestibility Scale (MDISS)** is a tool used to assess an individual's suggestibility to false memories. The MDISS consists of 64 items that assess suggestibility in several dimensions, including memory distortion, confabulation, and susceptibility to misinformation. The scale is designed to be used in clinical and forensic settings to evaluate an individual's ability to recall and report accurate information. The MDISS is considered to be a reliable and valid tool for assessing suggestibility to false memories, and can provide important information for forensic evaluations.

25. **The Negative Acts Questionnaire (NAQ)** is a tool used to assess workplace bullying. The NAQ consists of 22 items that assess negative acts experienced by employees, such as being humiliated or excluded from social activities. The scale is designed to be used in to assess the prevalence and impact of workplace bullying. The NAQ is considered to be a reliable and valid tool for assessing workplace bullying.

26. **The Peritraumatic Dissociative Experiences Questionnaire (PDEQ)** is a tool used to assess dissociative experiences that occur during or immediately after a traumatic event. The PDEQ consists of 10 items that assess the individual's experience of dissociation during or immediately after a traumatic event, such as feeling detached from the event or experiencing time slowing down. The scale is designed to assess dissociative symptoms that occur in the context of trauma. The PDEQ is considered to be a reliable and valid tool for assessing peritraumatic dissociation.

27. **The Personal Problems Checklist for Adults (PPC)** is a tool used to assess the severity and types of personal problems experienced by an individual. The PPC consists of 208 items that assess a range of personal problems, including emotional and behavioral problems, relationship difficulties, and occupational and financial concerns. The scale is designed to be used to assess the severity and impact of personal problems on an individual's life, and can provide important information for the development of interventions to address these problems. The PPC is considered to be a reliable and valid tool for assessing personal problems, and can assist in the diagnosis of a range of mental health conditions.

28. **The Personality Inventory for DSM-5 (PID-5)** is a tool used to assess personality traits and pathological personality functioning. The PID-5 consists of 220 items that assess five broad domains of personality functioning, including negative affectivity, detachment, antagonism, disinhibition, and psychoticism. The scale is designed to be used to assess personality traits that are relevant to the diagnosis and treatment of a range of mental health conditions. The PID-5 is considered to be a reliable and valid tool for assessing personality traits and can provide important information for the diagnosis and treatment of mental health conditions that have a significant personality component.

29. **The Personality Assessment Inventory (PAI)** is a tool used to assess a range of mental health conditions and personality traits. The PAI consists of 344 items that assess a range of domains, including clinical syndromes, personality traits, and interpersonal functioning. The scale is designed to be used to assess mental health conditions such as anxiety, depression, and personality disorders, and can provide important information for the diagnosis and treatment of these conditions. The PAI is considered to be a reliable and valid tool for assessing mental health conditions and personality traits and can provide valuable information for the development of treatment plans.

30. **The Post-Traumatic Distress Scale (PTDS)** is a tool used to assess symptoms of post-traumatic stress disorder (PTSD). The PTDS consists of 10 items that assess the severity of symptoms related to the experience of a traumatic event, including intrusive thoughts, avoidance behaviors, and hyperarousal symptoms. The scale is designed to be used to assess the presence and severity of PTSD symptoms and can provide important information for the diagnosis and treatment of PTSD. The PTDS is considered to be a reliable and valid tool for assessing PTSD symptoms and can assist in the development of interventions to address these symptoms.

31. **The Recent Life Changes Questionnaire (RLCQ)** is a tool used to assess the number and impact of life events that an individual has experienced in a recent period of time. The RLCQ consists of a list of 24 life events that are commonly experienced, such as job loss, marriage, or a major illness, and asks individuals to rate the impact of each event on their life. The scale is designed to be used to assess the impact of life events on mental health and can provide important information for the development of treatment plans. The RLCQ is considered to be a reliable and valid tool for assessing recent life events and their impact on mental health.

32. **The St. Louis University Mental Status Exam (SLUMS)** is a tool used to assess cognitive function in older adults. The SLUMS consists of 11 items that assess various domains of cognitive function, including orientation,

memory, attention, language, and visuospatial abilities. The scale is designed to be used in clinical and research settings to assess cognitive impairment in older adults, and can provide important information for the diagnosis and treatment of conditions such as dementia. The SLUMS is considered to be a reliable and valid tool for assessing cognitive function in older adults and can assist in the development of interventions to address cognitive impairment.

33. **The Structured Clinical Interview for DSM-5 (SCID-5)** is a diagnostic tool used to assess mental disorders according to the criteria outlined in the DSM-5. The SCID-5 consists of a series of questions that are designed to elicit information about the presence and severity of symptoms related to specific mental disorders. The scale is designed to be used by trained clinicians to make accurate diagnoses of mental disorders and can provide important information for the development of treatment plans. The SCID-5 is considered to be a reliable and valid tool for assessing mental disorders and can assist in the accurate diagnosis and treatment of these conditions.

34. **The Substance Abuse Subtle Screening Inventory (SASSI)** is a self-report screening tool designed to identify individuals who may have a substance use disorder. The SASSI-4 consists of a series of questions that assess a range of factors related to substance use, including denial, defensiveness, and problems related to substance use. The scale is designed to be used by healthcare professionals and can provide important information for the development of treatment plans. The SASSI-4 is considered to be a reliable and valid tool for assessing substance use disorders and can assist in the accurate diagnosis and treatment of these conditions.

35. **The Sullivan Pain Questionnaire** is a self-report assessment tool used to measure the intensity and quality of pain experienced by individuals. It consists of a series of questions designed to elicit information about the location, severity, and duration of pain, as well as its impact on daily functioning and emotional well-being. The scale is designed to be used by healthcare professionals in clinical settings and can provide important information for the development of treatment plans. The Sullivan Pain Questionnaire is considered to be a reliable and valid tool for assessing pain and can assist in the accurate diagnosis and treatment of pain-related conditions.

36. **The Symptom Checklist-90-Revised (SCL-90-R)** is a self-report questionnaire used to assess a wide range of psychological symptoms and distress. It includes 90 items related to various mental health symptoms, such as anxiety, depression, somatic complaints, and interpersonal sensitivity. The questionnaire is designed to be used by healthcare professionals and can provide important information for the diagnosis and treatment of mental health disorders. The SCL-90-R is considered to be a reliable and valid tool for assessing psychological symptoms and can assist in the accurate diagnosis and treatment of mental health conditions.

37. **The Trauma Symptom Inventory, Second Edition (TSI-2)** is a self-report questionnaire used to assess trauma-related symptoms and their severity. It includes 136 items related to various psychological symptoms, such as dissociation, anxiety, depression, and somatization. The questionnaire is designed to be used by healthcare professionals and can provide important information for the diagnosis and treatment of trauma-related disorders. The TSI-2 is considered to be a reliable and valid tool for assessing trauma-related symptoms and can assist in the accurate diagnosis and treatment of trauma-related conditions.

38. **The Wide Range Achievement Test, 5th Edition (WRAT5)** is a standardized test used to assess an individual's basic academic skills in reading, spelling, and math. It is designed to be used with children, adolescents, and adults, and can be helpful in identifying academic strengths and weaknesses. The WRAT5 consists of three subtests: Word Reading, Sentence Comprehension, and Spelling. The test can be administered individually or in groups and takes approximately 30 minutes to complete. The WRAT5 is considered to be a reliable and valid tool for assessing basic academic skills and can assist in the evaluation of learning disabilities, academic achievement, and cognitive development. It is often used as part of a battery of psychological tests to ensure the respondent's academic abilities are commensurate with the remainder of the test's requirements, thus ensuring the remainder of the battery is not invalidated by issues with reading comprehension, etc.

39. **The World Health Organization Disability Assessment Schedule, 2.0 (WHODAS 2.0)** is recognized by the DSM-5 Disability Study Group as a measure of disability for routine clinical use and recommended by that group for inclusion in the DSM-5. WHODAS 2.0 is based on and reflects concepts that underlie the World Health Organization's Family of International Classifications, in particular, the International Classification of Diseases (ICD),13 currently in its 10th edition, and the International Classification of Functioning, Disability, and Health (ICF). WHODAS 2.0 is a patient self-report assessment tool that evaluates the patient's ability to perform activities in six domains of functioning over the previous 30 days and uses these to calculate a score representing global disability.

40. **The Yale–Brown Obsessive Compulsive Scale (Y-BOCS)** is a test to rate the severity of obsessive–compulsive disorder (OCD) symptoms. The Y-BOCS was designed to remedy the problems of existing rating scales by providing a specific measure of the severity of symptoms of obsessive-compulsive disorder that is not influenced by the type of obsessions or compulsions present.

As we trust you can discern, we are diligently and reasonably attempting to address the issues you present. However, if you continue to raise new concerns, which are plainly unwarranted, it will serve no purpose of than to obstruct our good faith efforts and deter our required preparation for trial. As trial counsel, we understand your desire to seek advantages in this litigation. But doing so at the expense of our necessary and entitled preparation is not appropriate. We sincerely hope we do not find ourselves again in a situation where your meritless objections cause the need for additional time. As we advised the Court, we were retained to try this case, and we wish to do so as expeditiously as possible.

In light of the foregoing, we expect that: (1) you will produce plaintiff for the IME on Monday at 9:00 am as scheduled, and (2) plaintiff will sign the consent form so that the IME may proceed at that time without unnecessary delay. Kindly note that Dr. Lamoureux will be flying from Arizona to New York for purposes of conducting the IME. As a professional courtesy to all involved, we ask you to bear that in mind in the event you contemplate once again employing some strategy to interfere with our right to an IME of plaintiff.

Regards,

Chad



**From:** Matthew Craig [mailto:mcraig@kaplanhecker.com]
**Sent:** Tuesday, February 14, 2023 7:31 PM
**To:** Chad Seigel <cseigel@tacopinalaw.com>; Roberta Kaplan <rkaplan@kaplanhecker.com>; Joshua Matz

<jmatz@kaplanhecker.com>; Shawn G. Crowley <scrowley@kaplanhecker.com>
**Cc:** Joe Tacopina <jtacopina@tacopinalaw.com>; Matthew DeOreo <mdeoreo@tacopinalaw.com>; Alina Habba, Esq. <ahabba@habbalaw.com>; Michael Madaio <mmadaio@habbalaw.com>; Peter Swift <pswift@habbalaw.com>; Peter Gabra <pgabra@habbalaw.com>
**Subject:** RE: Carroll II IME of Plaintiff

Counsel,

We are reviewing your email and the attachment closely, but as an initial matter, we ask that you identify the tests that Dr. Lamoureux actually intends to use. It does not satisfy the requirement to identify the methods of examination to provide a list of 40 different tests, many of which are plainly inapplicable, and/or represent newer or older versions of the same test. The law operates to allow for pre-examination challenges to proposed methods, and an overbroad list of potential tests is plainly intended to obstruct that process. And your suggestion that "[s]election of specific tests will depend on the content of the evaluation" provides no excuse for your failure to identify Dr. Lamoureux's proposed methods now. Your expert is limited to rebutting Dr. Lebowitz's report. If he cannot articulate a reason why a particular test serves that purpose, then that test should not be used.

We need an answer regarding Dr. Lamoureux's actual tests before we are able to respond to or reach agreement on the full range of items you've raised in the various emails over the last 24 hours, including the involvement of a second expert, your characterization regarding the scope of the examination, Dr. Lamoureux's so-called "consent form," and the suggestion that you will record the examination. We also reserve our rights with respect to timing, as your list of 40 tests does not suggest an appropriate examination designed to rebut Dr. Lebowitz, but rather a days-long test-by-test process that serves only to harass and burden Ms. Carroll.

Please get back to us at your earliest convenience.

Matt

**Matthew Craig | Kaplan Hecker & Fink LLP**
Counsel
350 Fifth Avenue | 63rd Floor
New York, New York 10118
(W) 929.294.2542 | (M) 646.719.7443
mcraig@kaplanhecker.com

---

**From:** Chad Seigel <cseigel@tacopinalaw.com>
**Sent:** Tuesday, February 14, 2023 5:47 PM
**To:** Matthew Craig <mcraig@kaplanhecker.com>; Roberta Kaplan <rkaplan@kaplanhecker.com>; Joshua Matz <jmatz@kaplanhecker.com>; Shawn G. Crowley <scrowley@kaplanhecker.com>
**Cc:** Joe Tacopina <jtacopina@tacopinalaw.com>; Matthew DeOreo <mdeoreo@tacopinalaw.com>; Alina Habba, Esq. <ahabba@habbalaw.com>; Michael Madaio <mmadaio@habbalaw.com>; Peter Swift <pswift@habbalaw.com>; Peter Gabra <pgabra@habbalaw.com>
**Subject:** RE: Carroll II IME of Plaintiff

> This email was sent from outside the Firm.

Counsel,

Given that the objections you made and then withdrew with respect to Dr. Nace previously caused an unnecessary delay which led to his unavailability, we hope we can allay your present concerns swiftly. To that end, please see the below responses to your four points:

**First**, we confirm that the scope of our rebuttal expert examination and testimony will be limited to the topics authorized by Judge Kaplan's pretrial and scheduling order as well as Dr. Lebowitz's report. Accordingly, such examination and testimony will not opine on the ultimate question as to whether plaintiff's claimed sexual assault occurred.

**Second**, your expressed concern about the use of Dr. Hayes is misplaced. Specifically, you state that it would appear Dr. Hayes would be called upon to assist "with testing methods that go to Ms. Carroll's credibility in testifying about the underlying sexual assault." Moreover, you contend that Dr. Lamoureux's own work on malingering and "false sexual assault allegations" suggests "an examination that is entirely out of bounds." Accordingly, you request confirmation that our "experts will not perform any neuropsychological assessments or any malingering assessments, which would violate Judge Kaplan's order." For the sake of clarity, consistent with our first response above, neither Dr. Lamoureux nor Dr. Hayes would be conducting any assessment of the credibility of plaintiff's underlying claim of sexual assault. Indeed, per the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders - Fifth Edition (DSM-5), malingering is defined as follows:

> "As the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs. Under some circumstances, malingering may represent adaptive behavior - for example, feigning illness while a captive of the enemy during wartime."

Consequently, malingering has nothing to do with the specific allegation the plaintiff makes vis-a-vis the legal action itself and is instead solely focused on illness/symptoms. It is well-established that it is best practice to assess for malingering in all forensic evaluations, as the DSM-5 itself states that malingering should be suspected in medicolegal contexts. Practice guidelines put forth by the American Academy of Psychiatry and the Law specifically discuss assessing malingering. In light of the foregoing, the intended psychological testing is well within the parameters of topics authorized by Judge Kaplan's pretrial and scheduling order as well as Dr. Lebowitz's report. As to the latter, Dr. Lebowitz claims that her assessment of plaintiff (and, in particular, plaintiff's statements) led Dr. Lebowitz to opine that plaintiff suffers from trauma. It is certainly within the bounds of appropriate rebuttal to examine plaintiff for the purpose of assessing whether her claim of trauma – not the underlying alleged sexual assault – is the product of malingering.

**Third**, it is common practice for psychologists to provide consultation to psychiatrists to perform an independent forensic evaluation (IME/IPE). Forensic psychologists generally assist forensic psychiatrists by administering the testing itself and testifying about such testing. In contrast, forensic psychiatrists opine about the *results* of such testing. In accord with such common practice, here, Dr. Lamoureux and Dr. Hayes will each have their own qualifications, such that neither will be duplicative of the other and each will offer their own opinions. Furthermore, as you requested, the psychological test list is attached. Selection of specific tests will depend on the content of the evaluation, but we can confirm that no instrument excluded from the list will be used.

**Fourth**, in an effort to reach a prompt agreement and satisfy your concern about making plaintiff available two consecutive eight-hour days, we agree to your alternative proposal that she be subject to only two consecutive five-hour days (with appropriate breaks) followed by Zoom sessions for any limited follow-up thereafter if necessary. That being said, rather than performing the in-person examination at your office, we would require that it be conducted at a neutral site in midtown Manhattan in order to avoid improper monitoring and interference, even if unintentional. Of course, the expense of securing such a neutral location would be borne by the defense.

We are hopeful that the foregoing alleviates any concerns on your part, so that we may proceed with this matter expeditiously, with an eye towards complying with the Court's scheduling order and beginning trial on April 25th.

Regards,

Chad



**From:** Matthew Craig [mailto:mcraig@kaplanhecker.com]
**Sent:** Tuesday, February 14, 2023 12:27 PM
**To:** Matthew DeOreo <mdeoreo@tacopinalaw.com>; Alina Habba, Esq. <ahabba@habbalaw.com>; Michael Madaio <mmadaio@habbalaw.com>; Peter Swift <pswift@habbalaw.com>; Peter Gabra <pgabra@habbalaw.com>; Joe Tacopina <jtacopina@tacopinalaw.com>; Chad Seigel <cseigel@tacopinalaw.com>
**Cc:** Roberta Kaplan <rkaplan@kaplanhecker.com>; Joshua Matz <jmatz@kaplanhecker.com>; Shawn G. Crowley <scrowley@kaplanhecker.com>
**Subject:** RE: Carroll II IME of Plaintiff

Counsel:

We have serious concerns about the examination you propose, as your choice of experts (and your assertion that you need two of them) seems intended to serve as the basis for testimony that clearly exceeds the subject matter of Dr. Lebowitz's report, violates Judge Kaplan's pretrial and scheduling order (ECF 19), and goes to an issue that is in the exclusive province of the jury.

Indeed, this is already clear from the record. You expressed that improper intention in your February 6 letter to the Court, suggesting that a six-week adjournment of the trial was necessary so that you could find an expert to help you "explore" Ms. Carroll's "underlying claim of being sexually assaulted." On February 10, you once again confirmed your mistaken belief that the permissible scope of discovery in *Carroll II* includes the fact question whether Ms. Carroll was sexually assaulted: you wrote that "the question as to whether the alleged sexual assault even occurred goes directly to the issue of Plaintiff's purported damages." You also stated at the court conference that you would be retaining the services of Dr. Nace for these purposes; now we understand you want to use Drs. Lamoureux and Hayes instead.

As you are surely aware, the parties completed fact discovery in *Carroll I* on October 19, 2022. The Court later entered a scheduling order in *Carroll II*, where the Court recognized that *Carroll I* had "fully explored the question whether the defendant sexually assaulted the plaintiff." ECF 19 at 1. That issue is therefore off limits in *Carroll II*, where the Court expressly delineated the scope of permissible rebuttal expert discovery—and limited it (as relevant here) to "an independent psychological or psychiatric examination of plaintiff with respect to any emotional or psychological damages as a result of the alleged sexual assault and defendant's October 12, 2022 statement."

Given that, and given the applicable rules of evidence, we would raise four points.

First, will you confirm that the scope of rebuttal expert examination and testimony will be limited to the topics authorized by Judge Kaplan's pretrial and scheduling order as well as Dr. Lebowitz's report, and that it will not address

"whether the defendant sexually assaulted the plaintiff" (the topic that Judge Kaplan has already held to be out of scope for discovery in *Carroll II*, and one that was not addressed in the report that your expert would be rebutting)?

Second, we see no proper basis for the inclusion of a second expert to "assist" in the examination. Dr. Hayes appears to specialize in neuropsychological evaluations, as well as malingering assessments, suggesting that the reason for her inclusion is to assist with testing methods that go to Ms. Carroll's credibility in testifying about the underlying sexual assault or whether she suffers from any cognitive or neuropsychological issues. That, in conjunction with Dr. Lamoureux's own work on malingering and "false sexual assault allegations," suggests an examination that is entirely out of bounds. Given that, we request that you expressly confirm to us that your experts will not perform any neuropsychological assessments or any malingering assessments, which would violate Judge Kaplan's order.

Third, if Dr. Hayes has an expertise that Dr. Lamoureux does not, then she cannot contribute to Dr. Lamoureux's opinions, as Dr. Lamoureux must be qualified to give all of his opinions, and we must be able to examine him regarding the basis for them. If Dr. Hayes and Dr. Lamoureux have identical qualifications, then the inclusion of a duplicative expert during the examination would seem to serve no purpose but to intimidate Ms. Carroll. Given that, we request that you describe the methods and scope of Dr. Lamoureux's proposed examination, including identifying by name any standardized tests that he plans to perform, and the precise role that Dr. Hayes intends to play. We are entitled to this information under the law. FRCP 35(a)(2)(B); *see, e.g.*, *Hirschheimer v. Associated Metals & Mins. Corp.*, No. 94 Civ. 6155, 1995 WL 736901, at *4 (S.D.N.Y. Dec. 12, 1995). Notably, none of these requests should be new to you—we have been seeking this information about the scope, manner, and conditions of your proposed examination since mid-January and still have no answers.

Please get back to us by no later than noon tomorrow with responses to the above so that we can seek guidance from Judge Kaplan if necessary.

Finally, assuming we can reach agreement on the above, we cannot make Ms. Carroll available two consecutive eight-hour days. As your co-counsel know from our scheduling discussions relating to her *Carroll II* deposition, Ms. Carroll has had some health issues as of late, and your proposal will not allow for fair examination conditions. Examining her for 16 total hours is also marked departure from the shorter examination period that Peter had indicated when we discussed such an examination in January. Assuming we come to an understanding with respect to the proper scope, manner, and conditions of an examination, we could agree to make Ms. Carroll available at our office for two consecutive five-hour days (with appropriate breaks at her request). Because Ms. Carroll does not live in New York City, any additional limited follow up would have to be by Zoom. (We note in this regard that your co-counsel suggested that Dr. Nace do his entire examination by Zoom.)

Regards,
Matt

**Matthew Craig | Kaplan Hecker & Fink LLP**
Counsel
350 Fifth Avenue | 63rd Floor
New York, New York 10118
(W) 929.294.2542 | (M) 646.719.7443
mcraig@kaplanhecker.com

---

**From:** Matthew DeOreo <mdeoreo@tacopinalaw.com>
**Sent:** Monday, February 13, 2023 5:33 PM
**To:** Matthew Craig <mcraig@kaplanhecker.com>; Alina Habba, Esq. <ahabba@habbalaw.com>; Michael Madaio <mmadaio@habbalaw.com>; Peter Swift <pswift@habbalaw.com>; Peter Gabra <pgabra@habbalaw.com>; Joe Tacopina <jtacopina@tacopinalaw.com>; Chad Seigel <cseigel@tacopinalaw.com>
**Cc:** Roberta Kaplan <rkaplan@kaplanhecker.com>; Joshua Matz <jmatz@kaplanhecker.com>; Shawn G. Crowley <scrowley@kaplanhecker.com>
**Subject:** Carroll II IME of Plaintiff

This email was sent from outside the Firm.

Hi Matt,

See the attached CV of our psychiatric expert. He wishes to conduct the IME of your client on February 20 and 21. He believes it will be 16 hours of evaluation.

It will be in NYC, and we can agree on a neutral location. No attorneys shall be present.

Dr. Lamoureux will be assisted by psychologist Dr. Jill Hayes.

Please let me know if those dates work for your client.

Thanks

Matt



DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you many not review, copy or distribute this message. if you have received this communication in error, please notify us immediately by e-mail and delete the original message.

This email and its attachments may contain information that is confidential and/or protected from disclosure by the attorney-client, work product or other applicable legal privilege. If you are not the intended recipient of the email, please be aware that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please notify the sender immediately and destroy all copies of the message from your computer system. Thank you.

This email and its attachments may contain information that is confidential and/or protected from disclosure by the attorney-client, work product or other applicable legal privilege. If you are not the intended recipient of the email, please be aware that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please notify the sender immediately and destroy all copies of the message from your computer system. Thank you.