# EXHIBIT F

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff,*

v.

DONALD J. TRUMP,

*Defendant.*

No. 22 Civ. 10016 (LAK)

## EXPERT REPORT OF DR. LESLIE LEBOWITZ, PHD
## LICENSED CLINICAL PSYCHOLOGIST

January 9, 2023

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

I.   **INTRODUCTION**........................................................................................ **3**

    A.   Assignment ............................................................................................. 3

    B.   Qualifications.......................................................................................... 3

    C.   Procedure ............................................................................................... 5

    D.   Summary of Expert Opinions ................................................................ 6

II.   **EVALUATION FRAMEWORK**............................................................... **7**

    A.   Traumatic Stress..................................................................................... 7

        i.     Emotional and Biological Responses.......................................... 8

        ii.    Thinking and Meaning............................................................... 11

        iii.   Self-Blame ................................................................................. 14

III.   **E. JEAN CARROLL'S BACKGROUND**................................................ **17**

    A.   Childhood and Upbringing ................................................................... 17

    B.   Professional Life .................................................................................. 19

    C.   The Alleged Rape ................................................................................. 21

    D.   Coming Forward .................................................................................. 24

IV.   **PSYCHOLOGICAL ANALYSIS**............................................................ **25**

    A.   Unresolved Traumatic Memory ........................................................... 26

    B.   Negatively Altered Schemas: Self-Blame and the Decision to Remain Silent..... 27

    C.   Fear: Avoidance and Constriction ....................................................... 30

    D.   Loss ...................................................................................................... 33

    E.   Prior Adverse Events Have Not Contributed Significantly to Her Harm............ 34

        i.     Child Sexual Abuse.................................................................... 35

        ii.    Adverse Adult Experiences........................................................ 37

        iii.   Differences Between Prior Experiences and the Alleged Rape................ 38

V.   **CONCLUSIONS**...................................................................................... **39**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## I.     INTRODUCTION

### A.     Assignment

Kaplan Hecker & Fink LLP, counsel for Plaintiff E. Jean Carroll, has requested that I assess whether Ms. Carroll suffered harm as a result of her interactions with Defendant Donald J. Trump in relation to an alleged assault occurring in the mid-1990s.

### B.     Qualifications

I am a licensed clinical psychologist. For more than three decades, my clinical and research work has centered on the assessment and treatment of traumatic life experiences with a particular focus on sexual violence. I received a B.A. from Oberlin College in 1979 and both an M.A. and a Ph.D. in psychology from Duke University in 1985 and 1990, respectively.

I began working with survivors of sexual trauma (e.g., rape, sexual assault, and incest) in 1984 as part of my doctorate. Over the next six years, I interviewed survivors extensively, provided individual and group therapy, and evaluated specialized trauma-focused treatment. This work became the launchpad for a career focusing on trauma in general and sexual victimization in particular. For more than three decades, I have interviewed and treated survivors, as well as provided supervision, training, and consultation to individuals and programs treating survivors of sexual victimization and other traumatic life experiences. In addition, I have lectured extensively in colleges and universities on trauma and sexual victimization.

In 1990, I completed my clinical internship at Beth Israel Medical Center in New York City, and later that year, I became an assistant professor at the University of Massachusetts, Boston. There, I taught general psychology classes to undergraduate and graduate students, developed courses in psychological trauma, and supervised research in the area of interpersonal violence. Also in 1990 and continuing for several years, I consulted at the Victims of Violence

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Program at the Cambridge Hospital regarding the development of a programmatic evaluation of its ongoing treatment of sexual trauma survivors.

In 1994, I joined the Women's Health Sciences Division of the National Center for Posttraumatic Stress Studies (NCPTSD) at the Jamaica Plain VA in Boston, where I was seminal in centering sexual trauma in the evaluation and treatment of female combat veterans. At the NCPTSD, I also conducted research, performed psychological assessments, trained and supervised psychology interns, and provided individual psychotherapy to male and female combat veterans. Subsequently, I was invited to supervise senior faculty (who were primarily treating survivors of complex developmental trauma) at the Trauma Center of the Justice Resource Institute, which I did for several years.

In 2005, I was asked to develop the psychological portion of the curriculum used by the United States Air Force to educate their Sexual Assault Response Coordinators, and for the next decade, I provided several trainings each year for the Air Force on how to respond effectively and helpfully to survivors of sexual assault. From 2005 to 2009, I also provided bi-annual trainings for peer counselors working in a rape crisis program at Harvard University. Starting in 2007, I began to work with researchers at the NCPTSD and at Boston University to develop and test a treatment protocol for psychologically injured redeploying United States Marines. In this role, I also supervised the treatment of traumatized combat veterans.

Since 1992, I have maintained a private psychotherapy practice in which I provide short- and long-term therapy to adults and supervision to clinicians working with survivors of trauma. Finally, starting in 1993, I have been qualified as an expert witness in United States state and federal courts in criminal and civil cases in the areas of complex developmental trauma and sexual abuse. I have also testified in military sexual assault trials.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

My clinical research has focused on the long-term effects of exposure to trauma and the treatment of traumatic stress reactions, including sexual trauma. My findings have been published in *The Journal of Traumatic Stress*, *Psychotherapy*, *The Journal of Interpersonal Violence*, *Cognitive and Behavioral Practice*, *Clinical Psychology Review*, *Journal of Trauma and Dissociation*, and other professional journals. I am a member of the International Society for Traumatic Stress Studies and the American Psychological Association.

Please see the attached Curriculum Vitae for additional details.

**C.     Procedure**

My evaluation included a review of documents provided by counsel as well as in-depth interviews. The following documents were reviewed:

- Complaint, *Carroll v. Trump*, No. 20 Civ. 07311 (LAK) (Nov. 4, 2019)
- Complaint, *Carroll v. Trump*, No. 22 Civ. 10016 (LAK) (Nov. 24, 2022)
- E. Jean Carroll Deposition Transcript
- Cande Carroll Deposition Transcript
- Carol Martin Deposition Transcript
- Lisa Birnbach Deposition Transcript
- Roberta Myers Deposition Transcript
- E. JEAN CARROLL, WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL (2019)
- E. Jean Carroll, *Ask E. Jean: Tormented? Driven Witless? Whipsawed by Confusion?*, ELLE
- E. Jean Carroll, *Ask E. Jean: How Should I Respond to Catcalls in My Post-40s*, ELLE (Feb. 4, 2016)
- E. Jean Carroll, *Ask E. Jean: I Loathe Trump, but I Can't Stop Watching Everything He Does*, ELLE (Sept. 23, 2016)
- E. Jean Carroll, *E. Jean's Answers*, NEW YORK NEWSDAY (Mar. 22, 1994)
- E. Jean Carroll, *Loves of My Life*, ESQUIRE (June 1, 1995)
- E. Jean Carroll, *Red Flags*, SUBSTACK (May 13, 2022)
- E. Jean Carroll, *Taking the Fifth!*, SUBSTACK (Aug. 10, 2022)
- Kristen McCumber, *America's Answering Machine*, ENT. WEEKLY (Sept. 30, 1994)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Amy E. Gross, *E. Jean Carroll*, SOAP OPERA DIGEST (Spring 1995)
- Joan Kelly Bernard, *Get a Grip . . . and Take Some Sassy but Sane Advice from Elle's E. Jean*, NEWSDAY

I interviewed Ms. Carroll for approximately 22 hours: 16 hours in person in New York City, with follow-up interviews conducted over Zoom for an additional 6 hours. An unstructured clinical interview format was used to facilitate the emergence of unprepared reflection and to allow for a more complete evaluation of emotional and psychological processes. Ms. Carroll was open and forthcoming. She was well-anchored in day-to-day reality, and there was no evidence of a thought disorder or any serious mental illness. Her demeanor was consistent with her disclosures and her life history, as well as what is known clinically and in the research literature about responses to trauma more generally, and rape in particular.

### D.    Summary of Expert Opinions

Ms. Carroll's evaluation provided evidence of significant and enduring damage emanating from the assault that allegedly occurred at the hands of Mr. Trump. The nature and pattern of the symptoms fit within what has been documented in the literature on the aftermath of rape. They also fit within what is known about response to trauma more generally.

Her harms are manifest in pronounced avoidant behaviors which reflect ongoing fearfulness related to the alleged assault, as well as diminished and negative alterations in her self-representation. These symptoms curtailed her ability to engage with potential romantic partners relationally and sexually, derailing her intimate life and the possibility of the joy and companionship that had previously been her life's pattern.[1] Following her disclosure years later of the alleged rape at the hands of Mr. Trump, her symptoms were exacerbated by the public

---

[1] While Ms. Carroll had suffered sexual adversity prior to the alleged rape, there is no indication that these prior events caused the significant avoidant behaviors and fearfulness with which Ms. Carroll now lives.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

denunciation she received. This denunciation and its consequences confirmed many of her worst fears about how she would be viewed and treated if she disclosed that she was raped by Mr. Trump, and added new fears of bodily harm on top of her longstanding traumatic fears. All of the above have incurred significant and painful losses with which Ms. Carroll, at the age of 79, has only begun to deal.

## II.    EVALUATION FRAMEWORK

This report will begin with a brief description of relevant, well-established aspects of responses to trauma so as to provide a framework for the ensuing evaluation. Following this, I will explain Ms. Carroll's description of her experiences, including relevant details about her childhood, prior adversity, career, the alleged rape, and Mr. Trump's denial of it. Finally, I will describe the psychological and behavioral aftermath.

### A.    Traumatic Stress

Psychological trauma occurs when an event causes feelings of such negative intensity and meaning that normal coping fails. Subsequently, if the individual is not able to resolve the event (i.e., re-establish a feeling of safety, successfully process the painful feelings and arrive at a meaning that protects their senses of self, safety, and relationships to others), harm is likely to ensue.[2] The hallmark of psychological trauma is its capacity to adversely affect fundamental areas of functioning (e.g., what we think, how we feel, how our bodies respond, and how memory functions) with or without the person's conscious awareness or control.[3] These effects can endure indefinitely, changing and often diminishing the trajectory of someone's life. Thus, someone may

---

[2] *See, e.g.*, HERMAN, J. L., TRAUMA AND RECOVERY: THE AFTERMATH OF VIOLENCE—FROM DOMESTIC ABUSE TO POLITICAL TERROR (1992).
[3] *See, e.g.*, VAN DER KOLK, B., THE BODY KEEPS THE SCORE: BRAIN, MIND, AND BODY IN THE HEALING OF TRAUMA, Penguin Books (2014).

suffer the life-altering consequences of a traumatic event, but have little or no awareness of the link between their symptoms and the event.

Rape is recognized within the field of traumatic stress as having a high probability of causing enduring psychological harm.[4] The responses and behaviors that may result from rape are, by definition, not typical of our everyday (i.e., non-traumatized) functioning. As a result, these responses, while commonly observed across many kinds of traumatized people, may be unidentifiable or confusing to lay people. An understanding of central findings from decades of trauma research is useful for discerning the effects of trauma, in particular as it relates to rape. I outline below some of the well-documented ways that trauma can affect people in order to provide a framework for the ensuing evaluation. For purposes of this report, I will focus on an acute assault, which would include the rape of an adult woman.[5]

### i.       Emotional and Biological Responses

An assault floods its victims with intense, overwhelming, negative emotions of fear, helplessness, anger, confusion, and disgust. These feelings—and the flood of stress hormones that they animate—alter the functioning of the brain, body, and psyche. For example, feelings of acute fear decrease the influence of the pre-frontal cortex.[6] Consequently, more automatic, habitual, and reflexive behaviors are likely to predominate, leading people to respond to assaults in ways that are not necessarily what they, or an observer, would expect (e.g., it may not occur to them to

---

[4] *See, e.g.*, Resick, P.A., *The Psychological Impact of Rape*, J. OF INTERPERSONAL VIOLENCE, 8(2), 223-55 (1993); Haskell, L., & Randall, M. *The Impact of Trauma on Adult Sexual Assault Victims*, Gov't of Canada, D.O.J., Rsch. & Statistics Div. (March 26, 2019), https://www.justice.gc.ca/eng/rp-pr/jr/trauma.

[5] Although both men and women are raped, and almost all of the following applies to both, for purposes of simplicity, in this report, the experiences of women raped by men will be centered and the feminine pronoun will be used as the default.

[6] The pre-frontal cortex is the seat of higher mental functioning, and it directs and influences many of our complex cognitive and behavioral processes. For example, it directs attention and facilitates memory functions, helps modulate emotion, inhibits errant impulses, and is responsible for executive functions such as planning, providing context, complex reasoning, and many other functions.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

scream or call for help, they may not notice an exit, they may forget how to dial 911, etc.). We now know that the typical vocabulary for how someone responds to an assault includes freezing (which often reflects the initial shock of the assault and may be brief or protracted), falling back on habitual behaviors (e.g., accommodation, politeness, reasoning, or laughter), and trying to flee and/or fight.[7] After an assault, alterations in expected functioning may persist. For example, a victim may appear calm or laugh excitedly while disclosing terrible events or their memory may fluctuate or seem to fasten on irrelevant details. The effect of stress hormones on behavior, both in the moment and afterwards, can result in behaviors that seem illogical or inconsistent with being assaulted, often perplexes both the victim and observers, and leads to disbelief or victim-blaming.[8]

Peritraumatic dissociation is the clinical term used to refer to symptoms that occur during and immediately after a traumatic event revealing a breakdown in communication and information processing within the brain that reflects the impact of acute stress. Symptoms include altered perceptions and states of consciousness, sometimes described as feeling as if one is inebriated or in some way not oneself. Signs of peritraumatic dissociation can also include feeling separated from one's body and/or feeling as though the world is far away and unfamiliar. There are often gaps in awareness and memory that include the loss of information that one might expect to be present. The individual's emotional presentation may be discordant with the content of what they are speaking about: they may feel numb or appear removed even though they are highly distressed,

---

[7] *See, e.g.*, Hopper, J., Lonsway, K., & Archambault, J., *Important Things to Get Right About the "Neurobiology of Trauma,"* EVAWINTL.ORG (2020), https://www.evawintl.org/wp-content/uploads/TB-02_Victim-Responses.pdf; Haskell, L., *supra* n.4; Fanflik, P. L., *Victim Responses to Sexual Assault: Counterintuitive or Simply Adaptive?*, AM. PROSECUTORS RES. INST. (2007).
[8] *Id.*

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

or they may laugh inappropriately or seem disconnected from what they are disclosing. Peritraumatic dissociation has been associated with a more severe response to trauma.[9]

The ways in which a terrifying event alters brain functioning also have significant implications for how our memories function, as well as how we remember and how we react to subsequent reminders of what happened.[10] Under conditions of traumatic arousal (e.g., fear), what we attend to, how we encode information in the brain, what we move into long-term storage, whether and how we connect aspects of memory together with contextual information, whether and how we retrieve those memories, what they feel like when they are retrieved, and how they influence us (i.e., with or without awareness) can all be altered as a function of stress.[11] For example, when fear is provoked, the relative control of the prefrontal cortex is diminished in the service of responses that are driven by fear. As a result, certain information—namely, whatever seems most threatening—is likely to be focused on, whereas other details may be lost. In addition, the hippocampus (which plays a central role in the consolidation of memory) absorbs and facilitates the storage of more information at the onset of a traumatic event, and less information—particularly contextual and temporal information—later on. Thus, some information may be over-consolidated, meaning it becomes intrusive and cannot be forgotten regardless of the desire to do so or the passage of time. Other details, such as what happened right afterwards, may be lost.

---

[9] Galatzer-Levy, I.R., Madan, A., Neylan, T.C., Henn-Haase, C., & Marmar, C.R., *Peritraumatic and Trait Dissociation Differentiate Police Officers with Resilient Versus Symptomatic Trajectories of Posttraumatic Stress Symptoms*, J. OF TRAUMATIC STRESS, 24(5), 55765 (2011), https://doi.org/10.1002/jts.20684.

[10] What we experience (what we see, smell, feel, hear) enters the brain through our senses. Our experience of a memory is determined, among other things, by complex mental processes (e.g., those in the prefrontal cortex) that direct attention, store memories, link contextual information to sensory information, and determine how and in what ways we will be able to access that memory and what the memory will feel like when it surfaces. This complex iterative process is subject to myriad influences and is highly responsive to including stress.

[11] *See, e.g.*, Hopper, J., *supra* n.7.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Going forward, when something activates (or "triggers") the memory, pieces of the memory may surface without adequate context and with visceral intensity.[12] A woman who was raped many years earlier may suddenly find herself acting afraid but be unable to identify the trigger for her fear (which may have been a visual, olfactory, or contextual reminder) or even the memory to which it is attached. She may change her behavior in response to the sense of threat with or without conscious awareness of what is driving her behavior. Thus, traumatic memory, or memory fragments, may guide behaviors with or without the survivor discerning the link between their feelings, behaviors, and the trauma they experienced. This is one of the mechanisms that compels trauma survivors to do things, often many years later, that seem confusingly self-defeating or, in some way, inconsistent with the demands of the present.

### ii.    Thinking and Meaning

_Schemas_. An acute adult trauma can change how we think about ourselves and our lives in ways that shape our posttraumatic response. Over the course of our lifetimes, we build what are called schemas, or mental maps, that contain our expectations, knowledge, and assumptions about ourselves, other people, and how our world works. These schemas are tasked with explaining the data of reality as we experience it subjectively. They anchor us psychologically in a familiar and predictable landscape, inform our feelings, and guide our behaviors. They are built over the course of development and change, usually slowly through accommodation and assimilation, in response to learning and experience.[13] They exist in both explicit and implicit memory (i.e., both in and out

---

[12] _See, e.g._, VAN DER KOLK, B., _supra_ n.3; VAN DER KOLK., B.A., _Clinical Implications of Neuroscience Research in PTSD_, ANNALS OF THE N.Y. ACAD. OF SCI., 1071(1) 277-93 (2006).

[13] Although there is a drive to maintain homeostasis (i.e., for schemas to remain the same), they change throughout our lives as a function of learning and experience and do so through the mechanisms of assimilation and accommodation. Assimilation is when the information is absorbed into the schema without the schema needing to change (and this can include distortions or editing of information so that it fits), and accommodation (whereupon the schema changes to fit with the new information). _See, e.g._, PIAGET, J., _When Thinking Begins_, _in_ THE ORIGINS OF INTELLIGENCE IN CHILDREN 25-36 (1952); HOROWITZ, M.J., STRESS RESPONSE SYNDROMES (1979).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

of awareness)[14] and can contradict each other. Typically, people utilize the most positive schemas they can access that adequately account for or predict, the experience they are having.

_Peritraumatic Cognitive Disorientation_. Acute adult trauma shatters these positive schemas (e.g., that we are safe, that other people are trustworthy, that we will be treated with respect), leaving us temporarily bereft of a way to understand what has happened. Into this void, other schemas that better "fit" emotionally with the experience are likely to surface. These alternative schemas are often negative, and may come to define the individual's post-trauma belief system (e.g., whole classes of people are dangerous, the self is unworthy, etc.).[15] When these traumatically altered schemas endure, an individual's life contracts and is diminished.

_Context, Meaning, and Feeling_. Myriad psychological processes are activated by traumatic emotions, stress hormones, and the profound disorientation that follows the loss of one's typical operating schemas. In all of these processes, the interplay between emotions, meaning, and the context of the trauma—what a person associates it with both during the event, as well as its larger context (i.e., before and after)—matters greatly in determining whether something is traumatic and in what way. A physical intrusion, even a very painful one, is not likely to be traumatic if it is understood as positive (e.g., medical assistance or childbirth).

Conversely, a non-painful intrusion that is maliciously intended may be traumatic. It is the meaning of the trauma to the woman and in her life more generally that bears on its capacity to do harm. For example, a woman raped by a known enemy while fleeing a war, or who allows herself to be raped so as to obtain passage and safety for her family, may be able to give that experience

---

[14] Explicit memory involves conscious remembering of experience, typically accessed intentionally. Implicit memory involves knowledge (including how to do things), as well as memories of events that guide and influence behavior without intentional retrieval or conscious awareness.

[15] _See, e.g._, JANOFF-BULMAN, R., SHATTERED ASSUMPTIONS: TOWARDS A NEW PSYCHOLOGY OF TRAUMA (1992).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

a meaning that allows her to maintain positive, life-affirming schemas going forward (e.g., to trust people and to value herself), as well as to locate the experience in another time and place. On the other hand, when a woman is raped in the flow of everyday life by a man she believes she has reason to trust, maintaining positive schemas and avoiding traumatic triggers without constricting her life may be extremely difficult.

It is for these reasons that in spite of the greater mortal threat (and related fear) of being raped by a stranger, research indicates that being raped by someone you know can be just as harmful.[16] When a woman is raped by a man who she believed she could trust, long-standing positive beliefs about men, as well as faith in her own judgment and self-worth, can be shattered. The ensuing feelings of fear, humiliation, confusion, and negatively altered schemas about the self and others can become part of the enduring traumatic network of associations. These associations and changed beliefs can exist both with and without awareness, altering perceptions and behaviors in ways that diminish functioning and happiness going forward. They can also be brought vividly and unpredictably into consciousness by triggers that remind her of the past.[17] Avoiding unnecessary reminders (e.g., which in the first example might include war movies) is a far cry from avoiding the category of men one might trust. The latter is not possible without decrements to one's life.

Thus, in all of the psychological processes initiated by a trauma exposure, it is the interplay between emotions, thoughts, and associations that remains paramount. For example, the feelings of fear, shock and helplessness and the corresponding flood of hormones that attends an assault, in conjunction with the loss of one's operating schemas, can be so intense and disorienting as to

---

[16] Koss, M.P., Dinero, T.E., Seibel, C.A., & Cox, S.L., *Stranger & Acquaintance Rape: Are There Differences in the Victim's Experience?*, PSYCHOL. OF WOMEN Q., 12(1), 1-24 (1988), https://doi.org/10.1111/j.1471-6402.1988.tb00924.x.

[17] *See, e.g.*, VAN DER KOLK, B., *supra* n.3.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

make people feel like they are disintegrating or "falling apart," propelling a powerful need for stabilization. Minimization, denial, avoidance, and self-blame are all methods people employ (often automatically and with or without conscious choice) to try and tame the flood of feelings and restore some sense of agency and stability: e.g., if it didn't really happen or wasn't that bad, then the victim can hope to move on without harm.

### iii.    Self-Blame

Self-blame is a nearly ubiquitous response to being sexually victimized—so much so that it warrants its own discussion. There are three forces that drive self-blame: (1) intense feelings of helplessness and fear, (2) culturally located ideas about women and rape, often referred to as "rape myths," and (3) the cognitive disorientation that follows an assault.

*Helplessness and Fear*. Helplessness is central to being penetrated against one's will. It is also one of the most psychologically threatening and aversive of emotions. Our experience of ourselves as people is predicated, in part, on having a boundary between ourselves and others, as well as having a basic sense of control and agency in our lives, which includes the maintenance of those boundaries. Rape not only violates of our physical boundaries but, psychologically, it also erases our agency and personhood. As a result, being raped is often described as feeling like one is about to be killed, even when there is no clear mortal threat.

Blaming oneself for being raped is an immediately accessible way to restore some sense of agency and to anchor one's future safety within one's own control (i.e., without having to trust that other people will behave appropriately). Most simply, if the crime is a reflection of something the victim did or caused, then the victim can reclaim a sense of safety by never doing that thing again and/or relinquishing the part of herself that she holds responsible for someone else's decision to commit a crime.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

_Rape Myths_. Further fostering the process of self-blame are culturally located ideas typically referred to as "rape myths."[18] These ideas about women and rape, which have been the subject of research since the 1970s, are widely held, inaccurate, and prejudicial. I will highlight three.

First, there is a predominating myth that there are "real" rape victims versus women who claim to be raped but are not truly victimized. This myth believes that the "real victims" of rape are women who were raped by strangers—often violently or with a weapon, who scream and fight, who are hysterical afterward, and who immediately report to the police. The truth, however, is that most victims are raped by men they know or have reason to trust—without weapons, and the women often appear calm—they may be in shock, numb, or dissociated—and/or they may vacillate between distress—which can be expressed as hysterical laughter, crying, or extreme anger—and apparent calm—which may also reflect states of numbness, denial, or dissociation.[19]

Second, it is a myth that rape is a primarily sexual event and is a reasonable (sometimes inevitable) response to what a woman is wearing, whether she is flirting, or any other supposed sexual provocations on the part of the victim. In other words, rape is something that the actions or the presentation of the woman encourages, permits, or forces the man to do. In reality, however, rape is a mixture of the rapist's dominance, anger, and sexual motivations, with dominance leading.[20] Rape is often premeditated and is not caused by victim behavior.

---

[18] _See, e.g._, Burt, M.R., _Cultural Myths & Supports for Rape_, J. OF PERSONALITY & SOC. PSYCHOL., 38(2), 217-30 (1980), https://doi.org/10.1037/0022-3514.38.2.217.

[19] _See, e.g._, Haskell, L., _supra_ n.4.

[20] Lisak, D., & Roth, S., _Motivational Factors in Nonincarcerated Sexually Aggressive Men_, J. OF PERSONALITY & SOC. PSYCHOL., 55(5), 795-802 (1988), https://doi.org/10.1037/0022-3514.55.5.795.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Third, there is a cultural myth predicated on the idea of women as property or things to be possessed, which fosters the idea that a woman who has been raped is worth less than she was previously—that she is somehow sullied and diminished in her value as a person.[21]

*Cognitive Disorientation/Shattered Schemas*. In the immediate aftermath of a rape, the victim's schemas have, by definition, failed to account for what has occurred. Thus, in addition to feeling unlike oneself as a function of extreme stress, there is an urgent need for a new way to understand what just happened. In this period of psychological chaos, rape myths tend to surface in the victim and offer an emotionally congruent explanation for what just happened—and which may also function as a psychological defense against feelings of helplessness. In other words, she may think of herself not as being a "real" rape victim because she knew her rapist or she did not fight back; she may think she caused the rape by what she was wearing or how she was interacting with her soon-to-be-rapist; or she may feel like she is worthless or ruined because she has been assaulted. It is important to note is that this is often an automatic and non-volitional process. Even a woman who has cognitively (e.g., politically) rejected "rape myths," may nonetheless feel the guilt, shame, and diminished self-esteem that emerges directly from these myths. While there has been extensive push-back on these myths in the last several decades, they remain widely entrenched in our society and continue to influence the perspective of victims, observers, rapists, police, jurors, and judges.[22]

\*       \*       \*

---

[21] Koshan, J.R., *The Criminalisation of Marital Rape and Law Reform in Canada: A Modest Feminist Success Story in Combatting Marital Rape Myths*, *in* RIGHT TO SAY NO: MARITAL RAPE AND LAW REFORM IN CANADA, GHANA, KENYA AND MALAWI 139-64, at 144 (2017).

[22] *See, e.g.*, Du Mont, J., Miller, K., & Mhyr, T.L., *The Role of "Real Rape" and "Real Victim" Stereotypes in the Police Reporting Practices of Sexually Assaulted Victims*, VIOLENCE AGAINST WOMEN, 9, 466-96 (2003); Temkin, J., *And Always Keep A-hold of Nurse, for Fear of Finding Something Worse: Challenging Rape Myths in the Courtroom*, NEW CRIMINAL L. REV. 13(4), 710-34 (2010).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

In summation, traumatic stress is the result of overwhelming emotions and negative meanings that threaten a woman's ability to create an adaptive meaning and cope with what has happened. Like other traumas, rape leads to emotional, biological, and cognitive effects that are often enduring and can adversely affect fundamental areas of functioning without the person being aware of the ways in which the course of their life has been altered. In the case of rape, women often respond by adopting beliefs that confirm a diminished sense of personal worth or ongoing danger. To the extent that the trauma remains unresolved, the victim will be also be vulnerable to triggers that may painfully remind them of what happened, intruding on their present life and distracting them from it. They may also be prone to avoidance and other responses associated with the trauma that entrenches more restrictive ways of living, which causes additional loss.

## III.     E. JEAN CARROLL'S BACKGROUND

The following summary is based on my interviews with Ms. Carroll, as well as my review of deposition transcripts and writings by Ms. Carroll provided by counsel.

### A.  Childhood and Upbringing

Ms. Carroll grew up in a rural community outside of Huntertown, Indiana, the oldest of four siblings. Her parents are described as having a long, loving, and successful marriage. Born in 1943, she identifies as a member of the WWII "silent" generation, which, according to Ms. Carroll, includes being socialized to be emotionally tough and resilient, to never complain, and to always meet the world, whatever the circumstances, with a smile:

> My father always said "smile." In relation to *everything*, just smile.
> Not smiling, being in pain, being vulnerable—those are all failures.
> We were supposed to smile in relation to *everything*.[23]

---

[23] All quotations, unless otherwise identified, are taken verbatim from interviews with the evaluator. Emphases belong to the interviewee.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Ms. Carroll provides many examples of this socialization—its origins, its historic and present manifestation in her family, and its lifelong effects. Several examples, spanning decades, will illustrate. The first is described in her most recent book.[24] At four years old, she decided to walk to the store (which was approximately a mile away from her home). She was quickly frightened by a neighbor's dog and returned home. Her mother answered the door and the following exchange occurred:

> "What's the matter Jeannie?"
>
> "The sawmill dog barked at me."
>
> "You're going to let the Garman's dog *scarrrrrrrrrre* you," said my mother.
>
> "No," I said. And I hung my head.
>
> "Well . . ." said my mother. "How can you run away if you keep coming back?"
>
> And holding Heidi [my dog] inside, she shut the door! You either grow up to be a wimp with a mother like this or a hardnose who never gives up. I grew up to be both. I avoid all confrontations and joke my way through.[25]

Ms. Carroll adored her mother, and in 2016, she described the following exchange with her youngest sister, Barbie after her mother passed:

> My mother had just died moments before. I looked at my sister and I said, "I am not going to cry, Barbie—I am NOT going to cry." And she said, "Neither am I." And then I said, "Are those tears I see?," and she was like, "NO, they are not." "I think you are crying." "No I am NOT," and then she did the same thing, back and forth, and before we knew it, we were both laughing. And that is how we handled things.

In this quotation, we hear both her and her family's absolute prohibition against sadness and vulnerability. We also see how those feelings, so resolutely pushed away, can sometimes return

---

[24] E. JEAN CARROLL, WHAT DO WE NEED MEN FOR?: A MODEST PROPOSAL (2019).
[25] *Id.* at 87.

18

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

forcefully at unexpected times. Ms. Carroll also describes how she avoids memorializing or reflecting on painful events, but instead seeks to move assiduously away from them so that they do not affect her.

> I don't want it to be real, don't want it to stick to me. I just keep moving, putting one foot in front of the other. If I am sad, I just get out of bed, keep moving, and forget about it. . . . Can't think about the past or your life will be in shambles.

The majority of her memories of childhood are vivid and positive. She had a tremendous amount of independence, spent a great deal of time outdoors—both alone and in rough and tumble play—and was athletic. She was not a reader of books, but her family subscribed to many magazines, including *Esquire*, *Time*, *Life*, *Look*, *McCall's*, and *Ladies' Home Journal*, all of which she loved. She remembers reading Ann Landers in the morning and Dear Abby in the evening. She always wanted to write for magazines (she submitted her first effort, at the age of twelve, to *Sears* and *Roebuck*), and in particular, she aspired to be an advice columnist.

### B.  Professional Life

Ms. Carroll graduated high school and matriculated at Indiana University. After brief stints as a model and a saleswoman, she married and moved to Montana. Both she and her husband wanted to be writers and she spent the next 15-20 years pitching one story after another—and getting rejected. Finally, in 1980, she got her first break when *Esquire* accepted a submission. Capitalizing on that, she pitched a story to *Outside Magazine* about taking Fran Leibowitz camping. She cold-called Ms. Leibowitz, who agreed to go. Ms. Carroll moved to New York City soon after and, in 1983, her story was published on the cover of *Outside Magazine*, launching her career as a journalist.[26]

---

[26] Ms. Carroll and her husband divorced within a couple of years following her move to New York City. They remained friends.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

In the subsequent years, Ms. Carroll wrote for a wide variety of publications, including *Esquire*, *Outside*, *New York Magazine*, *Rolling Stone*, *Playboy*, *Men's Journal*, *The Atlantic*, *Vanity Fair*, and *Elle*. She made appearances on *Good Morning America* and *The Today Show*, wrote for *Saturday Night Live*, and helmed her own show (on the America's Talking cable network, now known as MSNBC) called *Ask E. Jean*, which ran for two years. In 1993, she fulfilled her lifelong dream to become an advice columnist for *Elle Magazine* while continuing to work as a journalist. Her descriptions of how she approached being an advice columnist capture not only her unique "brand" but also highlights how she approaches adversity.

> I always wanted to be a writer. Before *Elle* I was the girl journalist—it was so exciting. Then the editor of *Elle* invited me to lunch and said, how would you like an advice column, and I was like, OMG yes. . . . My approach was: Action! Do it! You only live once! And that column ran on that for 20 years. The underlying plumb line was action. I don't think I have ever written, "sit down and have a talk." The surge of progress of the last 2000 years is because humans don't dwell on catastrophe. My flag is forward thrust. The people who dwell are going to be in analysis for 20 years. The secret of humanity is don't dwell. We went through the second World War and look at us and I just completely believe in that and that is why I try and thrust people forward, into action.

Her longtime editor at *Elle*, Roberta Myers, described her as follows,

> She's a gifted writer. She is a journalist first and everything that she writes is informed by that, meaning the facts. . . . [S]he also [] has a lot of wit and I think that's why her readers loved her so much. . . . [S]he's kind of a rock star.[27]

She was gregarious and extroverted both at work and in her personal life, engaging in playful banter with colleagues, strangers, authority figures. Ms. Myers described her as engaging vividly with colleagues,[28] and Ms. Carroll describes herself as being passionately and lovingly interested in other people, as well as always up for a party or social gathering.

---

[27] Oct. 12, 2022 Deposition of Roberta Myers ("Myers Dep.") at 21:18-22, 22:12-13.
[28] Myers Dep. at 22:8-18.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### C.     The Alleged Rape

Ms. Carroll's recollection of her alleged encounter with Mr. Trump has been detailed elsewhere,[29] so this narrative will focus on aspects of the alleged assault and its context that were psychologically important.[30]

By her early 50s, Ms. Carroll's divorce had ended amiably, and her career was going extremely well. She felt confident, accomplished, and positioned exactly where she wanted to be socially and professionally:

> I was on the top of the world: everything was in drive. I had the kind of a social life one reads about in Steinbeck and Fitzgerald: up all night in cafés and brasseries hanging out with writers. It was amazing. I could call a magazine and pitch a story and they would assign it. One of the greatest feelings was fastening a seatbelt on an airplane about to take off about to do a story. Then I got the advice column. I could have died of happiness.

She knew Mr. Trump very casually. They had previously met at a party (and she had seen him on the street, where he waved at her),[31] but most of her knowledge of him was that he was a celebrity who traveled in some of the same circles she did, with a large presence and a reputation of someone who was fun. As she put it,

> We all knew who he was—he was a celebrity and so I felt I knew him, and I assumed I could trust him. He got invited to all the best parties.

Ms. Carroll encountered Mr. Trump while she was exiting and he was entering the Bergdorf Goodman department store. According to Ms. Carroll, Mr. Trump asked her to help him pick out a gift for a "girl," and she remembers being delighted at the humor of being asked to help

---

[29] *See* Oct. 14, 2022 Deposition of E. Jean Carroll ("Carroll Dep.") at 95:2-129:24.
[30] The following description and psychological analysis assume that Ms. Carroll's report of the alleged encounter between her and Mr. Trump accurately reflects her relevant psychological experience of that day. I am not offering an opinion on whether the alleged sexual assault, in fact, occurred.
[31] Carroll Dep. at 48:10-51:23.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

him pick out a gift and immediately began thinking about what a great story it would make. As they started to look at bags and hats, she asked how old the lady in question was. He responded with "How old are you?" When she told him her age, he responded, laughing, "You're so *old.*" She recalls, "That took me off my guard. Then I had to please him, to prove that I was young and fun." He initiated looking at lingerie and asking her to try some on. She responded by insisting he try it on, and they bantered back and forth, throwing the garment between them. Although she had no intention of trying on the lingerie (her aim was to make him try it on over his pants), she didn't hesitate when he guided her into the dressing room. As she put it, "If you feel you know somebody, you feel they are safe."

She describes the attack as occurring immediately upon entering the dressing room, when Mr. Trump slammed her up against the wall, banging her head and pressing his face and body against her. She recalled a brief moment of shock and paralysis and then shoving him back, whereupon he grabbed her arms and again slammed her against the wall. She recalled that at this point,

> The force of his body against me is the closest anyone has ever come to squashing me. He was a big man, about 100 lbs. heavier than me (I was 123 lbs., he was at least 225). There was just this overwhelming "OOF" against me. My head got banged really hard. Then he tried to kiss me. I can't really describe it as a kiss. A kiss is tender, but this was just him mounting my mouth. I didn't want it and it felt horrible. I started laughing hysterically. It was my first defense. I still thought I could save it by laughing him off, let's get the joke back. But I couldn't communicate with him at all. He was incommunicado.

According to Ms. Carroll, Mr. Trump used one hand to yank her tights down and penetrate her, first digitally and then with his penis. She remembers hitting him with her free hand—the one holding her purse—and also struggling repeatedly to get her knee up to push him away. In the following, she reveals the signs of peritraumatic dissociation: she remembers the feelings in her

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

body, but at the same time, it felt as though she was not there. She can't remember if she kept laughing or said something.

> During the onslaught, I was there the whole time, I was in my body the whole time. I can see myself, see the room, feel his weight, but I can't remember if I laughed the whole time. But when they asked me if I said stop or if I laughed the whole time, I didn't remember. It was almost like I wasn't there, but I was in my body the whole time. I kept thinking I was going to get out of it. When he pulled down my tights and put his fingers in me, that felt horrible, so horrible. I can still feel it today. Ugh. After that happened, I was struggling so hard to get my knee up. But it was hard because my tights were down—I had to keep working at getting my knee up.

She was able to fight her way free, flee the store, and get to the sidewalk outside (although exactly how she exited the store is lost to memory). Afterwards, still flooded with stress hormones and stunned by the experience, she felt "high, disordered. Everything felt foreign."

She called a friend, Lisa Birnbach, and related what had happened. Ms. Birnbach recalls that Ms. Carroll was "very agitated," "hyperventilating," "emotional," and "laughing excited[ly]."[32] She recalls that Ms. Carroll said, "He pulled down my tights. He pulled down my tights. He penetrated me."[33] Thinking back, Ms. Carroll is not certain why she called this particular friend who was a close but not—at the time—her closest friend. However, she notes, "I might have called her because she was hilarious. If Lisa had laughed, I would've been home free." However, instead of minimizing the event, Ms. Birnbach labelled it as a rape.[34] Ms. Carroll recalls being stunned at the word and immediately refusing the label and its implications, including the suggestion that she report to the police.[35] Instead, she told Ms. Birnbach that it would never be spoken about again.[36]

---

[32] Sept. 21, 2022 Deposition of Lisa Birnbach ("Birnbach Dep."), at 34:14-15, 35:20-23.
[33] *Id.* at 53:19-21.
[34] Carroll Dep. at 137:20.
[35] *Id.* at 138:17-139:6, 134:12-23; Birnbach Dep. at 39:14-20.
[36] Carroll Dep. at 138:7-15.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

However, a day or so later, with her head still hurting and still feeling "disordered" and not like herself, she approached a closer friend, Carol Martin, with whom she worked at the time. She recalls,

> My head hurt the next day. The dressing room kept flashing in my mind's eye. And then I focused on getting past it. That is just my way. I woke up, wrote the show, fed the dogs, walked the dogs, went to work—I went on. And then as soon as I saw Carol, I told her, and she said "We have to talk at my house, not here." She told me to come over after work. Talking to Carol did help me. We went over it several times: she told me to slow down and take her through it. She dissected everything with me, helped me to unload. Then she laid her hands on me and she said, "Tell no one. He has 200 lawyers, and he will bury you."

### D.    Coming Forward

In 2017, after several decades of receiving letters from her female readers complaining about the men in their lives, Ms. Carroll decided to write a book around the question of men's role in society. She planned a trip, intending to ask women about how they viewed the men in their lives. The day she set out, allegations against Harvey Weinstein made the news. Like many survivors, this event felt seismic to her. The ensuing #MeToo movement activated her unresolved traumatic memories. At this time, she began to feel hypocritical as she reflected on the discrepancy between the advice she was giving, the testimonies and risks other women were taking, and the secret she was still too afraid to reveal.

Thus, in addition to interviewing women for her book, she began, unexpectedly and (initially) non-volitionally, to review the sexually adverse events in her life. This review became her list of the "20 most hideous men" in her life, changing the nature of the book. Mr. Trump was number 20 on the list. An excerpt from the book was published in *New York Magazine* and led to her first public disclosure of the alleged events with Mr. Trump. Although at some level she was

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

aware of the public opprobrium she might face (this being part of the reason she had stayed silent so long), she was not prepared for what actually ensued.

Mr. Trump repeatedly denied knowing her, said she was not his "type," and accused her of lying to sell copies of her book. Ms. Carroll was shocked by the content and vehemence of his denial and felt humiliated, denigrated, and erased all over again. Until now, she had felt that she was able to keep her professional life separate from the harms of the alleged assault. At this time, the repeated accusations that she was lying, amplified by Mr. Trump's position, led her to feel her credibility was under serious attack. According to Ms. Carroll, he also invited people who had information about her to be forthcoming. She began to receive hate mail that echoed Mr. Trump's denunciations and to fear that someone might try and harm her. Here is her description:

> Three days running, he gives interviews about how I am too ugly to rape, a total liar, etc. It felt like all of America was being told that I was a liar. It was a total onslaught . . . . I couldn't sleep. I am usually a good sleeper, but that week, I wasn't sleeping at all. I lost my appetite. I think I lost five lbs; my pants were falling off. . . . Then I started getting horrible emails; I started getting hate emails. I would delete them as fast as they came in. "You fucking whore, you fucking cunt, you dried up old hag. On and on and on and on." Death threats. That week was a blur. I wasn't feeling anything.

The death threats led her to learn how to shoot a gun, which she keeps by her bed to this day

> Death threats. . . . You just CANNOT think about it. When I hear people talk about it, I think, "Don't think about it. You can't. Your life will be over if you think about it." So you get a gun and let them come and get you. I sleep with a loaded gun by my bed.

## IV.   PSYCHOLOGICAL ANALYSIS

The events that Ms. Carroll alleges occurred at the hands of Mr. Trump have harmed her life. Her history and her evaluation reveal (1) the presence of ongoing, unresolved traumatic pain, (2) traumatically altered schemas, (3) avoidance and constriction, and (4) loss.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A.      **Unresolved Traumatic Memory**

As noted earlier, the hallmark of trauma is its ability to persist emotionally, biologically, and cognitively. This persistence means that unresolved traumatic feelings and associated thoughts and sensations remain active in implicit memory, driving perceptions, responses, and behaviors. Avoidance (both with and without awareness) is the characteristic way that people try to protect themselves against the fear encoded in their memories and the pain of their traumatically altered schemas. When avoidance fails, intrusions that feel visceral and present-day are likely to surface, revealing the presence of unresolved traumatic pain. When the past does break though into the present, the victim is unprepared for the frightening, disorienting, painful re-experiencing.

In ways that are consistent with her upbringing and her lifelong patterns, as well as responses to trauma more generally, Ms. Carroll has worked hard to push her memories away, avoiding all reminders and focusing on the future. On the rare occasion when her conscious efforts to avoid failed, the imprint of the past is clear. One example is illustrative: Ms. Carroll recalled during our interviews a meeting she had nearly 10 years after the rape, with a producer at NBC where she went with a colleague to pitch a TV show. The producer decided to give her a sneak preview of an upcoming show, which turned out to be a trailer for *The Apprentice*. She remembers being so overwhelmed by seeing Mr. Trump that she found herself unable to speak and had to rely on her colleague to carry the pitch.

> I was totally knocked back [demonstrates being hurled back in her chair]. It created this feeling in me that was so opposite from the facts: this was this horrible person who brutally attacked me, but the trailer I saw was this brilliant piece of TV, and it was like I was just in shock, just stunned. It was like I was knocked off my rail. I had gone in all prepared to pitch and then I couldn't. I had done my homework and was perfectly prepared to pitch this show we were working on, and then I couldn't speak. My friend took over. I couldn't. I wasn't myself.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

As noted earlier, when an unresolved traumatic memory surfaces, the body floods with stress hormones, altering the person's state (she feels unlike herself) and diminishing the language centers of the brain (she cannot speak normally).

Similarly, when Ms. Carroll was asked to describe the rape during our interview, her body language notably revealed her intense discomfort, and upon questioning, she acknowledged that nearly three decades later she can still feel Mr. Trump inside her body when she speaks about the rape, revealing the raw feelings and memories she has spent nearly 30 years attempting to avoid.

### B.   Negatively Altered Schemas: Self-Blame and the Decision to Remain Silent

The assault called into question her positive schemas about herself, tainting both her own view of herself and her expectations of how others would view her. Like many women, she blamed herself for what happened and for her misplaced trust, judging herself "stupid":

> In general, I'm not a big blamer of myself. This was unusual. I did blame myself there. I thought, "I won't do that again. That was dumb. That was stupid." I never blamed him. I never thought he shouldn't have done that. I was too busy focusing on "That was dumb, Jean." . . . I don't want to be seen as a woman to whom that happened. All I can think is, "You are so stupid. How could you have been so stupid?"

She also feared the reactions of others. Her confidence and self-esteem were infected with the fear that she would be seen as "soiled goods," a "slut," or a "liar." This is consistent with her earlier refusal (still lingering as a hesitation) to apply the term rape to herself (she prefers to refer to the event as a fight), thereby minimizing and eliding the sexual aspect of the event. Being seen as a "stupid" victim was the opposite of the public persona Ms. Carroll lived, providing confident, heartfelt advice to women dealing with sex and relationships.

Though she recalls receiving relatively few letters regarding rape from her readers at *Elle*, she does remember being told by her editor that she could not respond to the ones she did get in the way she wanted. Her inclination was to advise women to take precautions and prioritize safety,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

including to never drink more than a glass of wine when socializing with men. Her editor steered her away from this advice, feeling that this was victim-blaming. She remembers later being unable to sleep and wishing she could protect the women who had written to her. Her wish to protect women by advising caution is a departure from her usual approach to advice, which was far more permissive (she exhorted women to be brave, adventurous, and just "do it"). Pragmatics aside, her caution was not only a departure for her, but as her editor had noted, it also shifted responsibility onto the woman to prevent the rape.

These fears also controlled her decisions not to report, not to seek help, and never to speak of the incident again. Indeed, one of her closest friends "advised her not to do anything," because "Mr. Trump had many lawyers and he would bury her."[37] The assumption that one will be judged negatively, seen as less than and blamed are among the most frequently cited reasons women do not report being raped. Fears of retaliation are also common and can be assumed to be heightened when the man in question is a powerful one.[38]

As noted earlier, the meaning of an event is one of the lynchpins of its capacity to be traumatic and to harm someone psychologically. In this instance, Mr. Trump's stature carried meaning that exacerbated the harm Ms. Carroll experienced. In the mid-1990s, his stature endangered her (i.e., she trusted that she was safe because he was a public figure), as well as contributed to her decision not to come forward. The discrepancy between their social power also heightened the degradation she felt as a result of the assault. Ms. Carroll comes from a rural part of Indiana, and New York City represented the apex of glamour, status, and accomplishment to her. Through extraordinary tenacity and initiative (e.g., persevering through 15-20 years of steady

---

[37] Martin Dep. at 33:14-15, 23-24.
[38] Rennison, C.M., *Rape and Sexual Assault: Reporting to Police and Medical Attention*, 1992-2000, U.S. D.O.J. BUREAU OF JUSTICE STATISTICS (2002), https://bjs.ojp.gov/content/pub/pdf/rsarp00.pdf.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

rejections, cold-calling Fran Liebowitz, etc.) she had attained entry to that world. But she was not

an intrinsic part of that world but rather an aspirant to it, a guest as it were. Donald Trump, on the

other hand, seemed to her to own the house. In her eyes, he was a powerful figure who belonged

to the city and represented New York City at its apex. As a result, when he assaulted her, she felt

especially diminished and erased. When she spoke about it during the interview, she felt sick and

this feeling lasted long after the interview ended.

> It was [so bad] because he was Donald Trump. My heart is racing
> now. Oof. That was the biggest difference. He was this New York
> celebrity. He was in the tabloids every day. He had high status, fame,
> power, money. He was so prominent. It was the attack, smashing my
> head against the wall twice. He was huge. I am a lowly advice
> [columnist] and it is like I am even more diminished as a woman, as
> a person, and even more diminished because of who he was. My
> heart [is] pounding now. My stomach hurts.

In 2017, Mr. Trump's subsequent wholesale denial (which included claiming he had never

met her, as well as denigrating her personally) and the position of authority from which he issued

his denunciation felt to Ms. Carroll like another erasure, as well as a public shaming, a call to harm

her, and an assault on her professional credibility, all of which was potentiated because he was the

President. Consistent with her (and many women's) responses, she continues to blame herself for

his actions, which in and of itself is costly to her ability to hold herself in positive regard.

> I thought he would say it was consensual, which would at least
> [have] been an acknowledgement that it had happened. But not that
> I wasn't even there. It was stunning. It meant that I was zero. That I
> don't exist. And he did it for three straight days. I couldn't really
> take it in—it was too overwhelming. And then the tweets and emails
> started: "you skinny old hag. Are you kidding? He wouldn't touch
> you. No one would want you. Look at his wife." I had never been
> the target of something like that.

> But it was my fault for coming forward. I feel like I fucked up
> coming forward. I felt guilty being dumb and him slamming my
> head in the room, and then I felt guilty bringing all this negativity
> down. No wonder women don't come forward.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### C.        Fear: Avoidance and Constriction

As long as painful, unresolved feelings and intolerable meanings persist, they will drive avoidant behaviors. Avoidance contributes significantly to anchoring the posttraumatic condition, essentially freezing it in place while enacting an ongoing price in terms of lost opportunity and freedom in one's thoughts and behaviors.[39] Insofar as avoidance keeps frightening, confusing memories in abeyance, it also precludes their resolution.

Ms. Carroll's self-blame and her efforts to avoid ever being in a similarly dangerous situation have had far-reaching consequences for her life, most notably in the area of intimate relationships with men. Starting immediately after her assault, she began to avoid anything that triggered her fear of a recurrence. For her, this meant any interaction with a man around her own age (Mr. Trump is approximately three years younger than Ms. Carroll) that could possibly lead to any kind of an intimate or sexual situation. Normally gregarious and extroverted and eager to strike up a conversation, she became (and still is) unable to make eye contact or to exchange any but the most cursory conversation with any man who could be a potential romantic partner.

Her avoidance of men her own age was so pronounced, and so inconsistent with who she had always been and her brand, that at some point her colleagues at *Esquire* decided to take matters into their own hands and arrange a party at which an eligible man would be present. Without being able to stop herself, she did everything necessary to eliminate any possible romantic spark.

> I was at *Esquire* and I was writing something about sexuality, and there was a joke about how I couldn't get a date. So, they decided to get me a date and they found this lovely appropriate guy right up my alley: attractive, writer. They chose perfectly. He even looked like my first husband. And I couldn't have been more not myself. I was just utterly obnoxious. I was aware I was doing dumb stuff and I wondered why, but I did it anyway. They went to a lot of trouble

---

[39] Gold, S.N., Zandberg, L., Porter, E., & Foa, E., *Exposure Therapy*, *in* APA HANDBOOK OF TRAUMA PSYCHOLOGY, AM. PSYCHOL. ASS'N, at 169-92 (2017).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

> and had a party and I just wasn't there. . . . That is how hard I was
> working to ensure nothing would happen.

The process by which she avoids engaging with men her own age is automatic, and it

illustrates how her traumatic fear triggers involuntary behaviors intended to maintain safety:

> I can feel the shut-down. It's like when shopkeepers pull down the
> metal grate to secure the store. I can feel it when it happens. It is a
> physical sensation of closing up shop. And boy do I close up shop.
> There is a way that when you are interested in someone, you
> communicate it [in] a million little physical ways, and when you like
> them, you pursue them in some way. I haven't done that since then.
> I shut it down, shut it all down. I haven't called a boy since Trump.
> Something really was killed, no doubt about it. Little Jeanie who
> was so boy crazy her whole life just shut it down.

These behaviors began after the event and have persisted until the present:

> I'd get in an elevator with somebody—I just did it this morning. I
> am staying at the Mondrian, I get in the elevator, and a very cute
> guy—bald, wireless glasses—gets in. He has his cup and I have
> mine. I say good morning and I nod and look down. We both fill our
> coffee and re-enter the elevator, and instead of saying something
> funny about our two coffee cups, I just look at the floor. I don't even
> like riding in an elevator with a man. And that's not like me to do
> that, except to a man who is age appropriate or slightly younger with
> a cute sparky look. I shut it down before anything can happen. . . .
> It's automatic. I hate it, but I can't stop it.

> In the elevator today, I caught myself looking at the floor and
> thought, "What is the matter with you?" I am aware of the fear.
> Mostly I deal with fear pretty well—I have a button I push that gets
> me past the fear. I still have the button and can use it with other
> things, but I don't push it for this. I just don't want to end up in a
> place where I could be vulnerable. . . . I am aware that I am doing
> something that hurts me, but I can't stop doing it.

These behaviors are involuntary and like many survivors, she had lost the connection

between what had happened and her behaviors intended to maintain a sense of safety. She hadn't

realized how long it has been since she had sex until she finished writing the book, and she hadn't

really made the connection between the assault and the way she closes down, until the evaluation.

She reported that, for the most part, while she knew she was afraid sometimes, and noticed that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

she was unpartnered and unable to date, she had not understood that these behaviors were connected to her rape.

Her avoidance is behavioral, cognitive, and emotional, and importantly, moreover, she has lost awareness of the connection between her experience and her behaviors. In other words, prior to our interviews, Ms. Carroll had largely been unable to make the connection, cognitively, between the fear she feels as a result of the assault and the behaviors that fear has caused. Further, this vibrantly social and sexual woman was relatively unaware that it had been decades since she had had sex. And when she did notice that she hadn't had sex or had a new relationship, she didn't hold onto the information, or perceive its significance. Finally, her behavior is involuntary—she "hates it" and tries to stop it but cannot. All of these odd disconnections and lacunae reveal the action of implicit memory that is not well integrated (meaning that parts of her memory are not well-linked), nor easily accessed. These are all the hallmarks of poorly integrated (i.e., unresolved) traumatic memory:

> I shut things down all the time and I didn't know why. I would make up reasons—I am not in the mood, I don't like that guy—but I never put it together at all until I was writing the book, and I realized I hadn't had sex since then, and it was so embarrassing to realize I give advice but I no longer have sex. It seemed so unlike me, I had to stop and ask myself, "Is that even true, can that be right? I was concerned about whether or not to report it, as a journalist. I was an advice columnist who had been advising women for years, and what would happen if I admitted I hadn't had sex in years? I had made snide remarks in the 1990s that most sex books are written by elderly women who haven't had sex in 20 years. I had said it again much later, and then I thought about it for a moment for real, but then I put it out of mind. And then when I wrote the book I had to stop and ask myself: "Was that really possible?" And it was. It's amazing how little one can know oneself. I was doing it, shutting it all down, but I didn't make the connection.

Fear of men her own age is the most dramatic and persistent change in her behavior, and it was greatly heightened by later experiences. After she came forward about the rape, she felt that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Mr. Trump's denunciation was a call to his supporters to hurt her, and as noted earlier, she became

so fearful that she continues to sleep with a gun. This shows that she now lives with a higher level

of chronic fearfulness than she did before his denunciation.

### D.     Loss

The trauma she endured has diminished Ms. Carroll's life, personally and professionally.

The automatic shutting down of contact with men her own age deprived her of intimacy and social

opportunities that, prior to the assault, had been central to her life. Before Mr. Trump, her

relational pattern was exuberantly extroverted: she was consistently interested in men her own

age, had been married twice, dated steadily, and socialized frequently in small and large groups.

Afterwards, while she continued to be interested in people as a journalist, she withdrew.

> The social part of my life changed. I didn't sit in brasseries anymore.
> I didn't hang out in cafés. I wasn't meeting people anymore, and I
> wasn't going to parties. I was looking down.

Looking back now, she can see how much her life changed after her encounter with Mr.

Trump and how much she has lost. As she described it,

> When you are 50, you are raring to go, you are over your body issues,
> all the things you worry about in your 20s and 30s you get over, you
> have it all worked out, you have more bravery, and you are ready for
> adventure. And I loved sex at the time. I loved sex with someone I
> was in a relationship with.
>
> It costs [me] everything: the joy, the elation of sharing a life, going
> for a swim with your lover, cuddling, fixing dinner, making bets,
> playing Scrabble. . . . And then there is that yearning—when your
> lover walks through the door and there is that feeling in your body
> like you stepped on a live wire and the feeling shoots through your
> body from your feet to your head, and then you are in each other's
> arms. I remember coming home unexpectedly and each of my
> husbands, their faces would just light up. You lose that. You lose all
> of it. It's too bad. He did a bad thing. If I had a boyfriend, I would
> leave here and he and I would go out to dinner and I would tell him
> everything we had talked about, and he would hold my hand and then
> we would go to a hotel room and we would make love. And none of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

> that is possible now. I have lost the impetus: I lack the desire to
> desire, and I totally lack the drive to be desirable—that is also gone.

More recently, her experience of being denounced by Mr. Trump, followed by the loss of her job at *Elle* a few months later, confirmed her fears about what would happen if she came forward and ushered in additional losses, fears, and feelings of being diminished. Her work is the cornerstone of her life and her advice column had nourished her life in ways that were unique: providing a sense of connection, relevance, and purpose.

The fear being viewed negatively and losing her professional standing that had persisted from her first encounter with Mr. Trump inflected the loss of her job with what had happened earlier, and in this way, the loss of her advice column was experienced as an extension and exacerbation of her sense of being erased and diminished. She described it this way,

> Suddenly, I lacked status and in New York, status is everything. I
> felt a fall. And it was tinged with female humiliation—a tinge of
> shame and being not nice and soiled. . . . I hate that. I hate, hate, I
> hate that. I felt like I was soiled goods, both because of what Donald
> Trump did but also because I was fired. I felt small, diminished. It
> was a completely different way of living. I was just another person.
> So long, E. Jean.

### E.    Prior Adverse Events Have Not Contributed Significantly to Her Harm

Not all events that could be traumatic are so; there is significant variation across people depending on the subjective experience and meaning of the event (which determines its emotional intensity and schematic relevance). Even within an individual life, someone may be more resilient at some points than at others. As noted earlier, certain responses like peritraumatic dissociation reveal more intense subjective experiences and are associated with more severe reactions.

During interviews, Ms. Carroll described several adverse events, including sexual abuse, she suffered prior to being raped by Mr. Trump.  The section that follows briefly summarizes her

description of these events, discusses whether and to what extent they caused her lasting harm, and concludes that they did not contribute to the harm she suffered as a result of the rape.

### i.     Child Sexual Abuse

Ms. Carroll detailed several instances of what could be characterized as child sexual abuse.[40] The first occurred when she was five years old with a boy who was seven or eight, who she describes as having penetrated her with some kind of object, hurting her.[41] She reports that she did not understand it as a sexual event, but rather as being hurt, and she does not associate any shame with it. She also reports that her babysitter and babysitter's boyfriend molested her, but explains that she was not frightened and did not feel badly about the event. Finally, she reports another event that occurred when she was four years old in which she and other children, the oldest of which was eleven or twelve, masturbated together at a sleepover.[42] She reports that she understood this as play and was untroubled by it afterward. While these events can be classified as sexual abuse, the evidence from her history is that she was able to manage them successfully. In each of these instances, she appears to have maintained authority over the process of remembrance (experiencing neither emotionally disruptive intrusions nor harmful avoidance) and no diminishment in her positive self-schemas.

The most problematic of the abuse she suffered as a child was being molested by the adult waterfront director at the camp she attended from ages eight through sixteen. Ms. Carroll reports that the waterfront director (who she refers to as "Cam") molested her when she was 12 years

---

[40] Some child sexual abuse is readily classifiable, such as when an adult uses a child for sexual purposes. Other events may be more ambiguous in terms of how the child understands it—a very young child may not decode the sexual nature of the event, like Ms. Carroll in one instance. Relatedly, some sexual activity may be experienced as unharmful sexual play (as she claims occurred with her babysitter). To further complicate matters, the same event can be experienced very differently by different children depending on contextual factors.
[41] *See* CARROLL, *supra* n.24, at 90-91.
[42] *Id.* at 114.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

old.[43] She remembers feeling fear, helplessness, and profound confusion as a result of the behavior of this person she had trusted. She explained during our interviews that while she now regrets not reporting Cam because of the other girls he may have molested, at the time she had no model or roadmap for articulating an assault and would not have wanted to be seen as "soiled" or "powerless." In the subsequent years that she returned to camp (graduating into being a camp counselor), she was able to avoid this man successfully, even though he still worked there, and remarked during our interviews that she felt there was "nobody stronger than me at that point."

This experience tainted her memories of being a camper and, unlike the other adversities she describes, it echoed throughout her life, entering her thoughts and at times intruding in her dreams. Years later, when events like the abuse of young gymnasts by Larry Nassar were broadcast, she thought about her own molestation experiences frequently. When it came up during the evaluation, she said she briefly felt as if she could not catch her breath and acknowledged that for a moment, it felt as though the event had just happened. This feeling lasted for a couple of minutes during the interview, and then it passed, seemingly completely, and with no residual distress. Ms. Carroll reports that throughout her life, she has been able to "bat away" memories of this molestation quite quickly, and that as soon as she did this, her distress evaporated.

This was a serious adversity, and she has had intrusions from it. However, she has also always been able to stop thinking about it quickly, the thoughts do not cause significant, persisting distress, and they have not led to any discernable impairment or loss (e.g., she did not avoid men, sex, or camp, or denigrate herself following the event). The molestation reveals the imprint of trauma; however, the aftereffects do not rise to the standard of a clinical (i.e., pathological)

---

[43] *Id.* at 73-75.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

symptom.[44] In other words, it left a scar, but one that she was able to manage with her characteristic way of coping. As she explained during the interview:

> Cam didn't affect my day-to-day life, didn't affect my mood going forward, my career, or my overall outlook on life. I went in boats, swam, became a counselor, didn't avoid men, beauty contests, boats, water, or even being a camp counselor. It didn't come up during sex. It didn't make me cautious. I was always up for an adventure. I think my life would have been exactly the same if that hadn't happened.

### ii.    Adverse Adult Experiences

As a teenager and young woman, Ms. Carroll experienced several events that could be considered sexual assaults or attempted sexual assaults, which included being chased, groped, and once threatened with a knife.[45] She recalls being frightened by these events but able to quickly restore a sense of safety each time. Significantly, none of these prior events resulted in penetration. Even when the event was terminated through a lucky intervention (for example, when an assault was interrupted by the unexpected arrival of someone),[46] she was able to feel relief, to reflect briefly on the event (in terms of behaviors to be avoided), and not blame herself unduly. Like many women her age, she accepted a certain level of aggressive male behavior (e.g., being groped) as the inevitable price of moving through the world independently. She did not experience these events as overwhelming or degrading but rather as situations to be managed, and she felt she

---

[44] To meet criteria as a symptom, a posttraumatic intrusion must cause a level of distress that distracts an individual from their present life and/or causes significant impairment or loss in an important area of functioning (e.g., social or occupational). *See, e.g.*, *Diagnostic and Statistical Manual of Mental Disorders*, AM. PSYCHOL. ASS'N (5th ed., text rev. 2022).

[45] *See* Nos. 1, 2, 3, 13, 15, 17 on Ms. Carroll's "most hideous men of my life list." CARROLL, *supra* n.24. These events included being chased by a boy who had tried to put his hand up her skirt, *id.* at 18-19, being tackled by a boy who pulled out a knife and attempted to take her clothes off, *id.* at 14-18, being kissed and groped by her boss who chased her to her hotel room, *id.* at 154-48, being groped by a television executive in an elevator, *id.* at 186, and being assaulted by a network publicist in a car, *id.* at 232. In each event, she was able to flee. Further, in 1986, she married newsperson John Johnson, and while Ms. Carroll reported that they had great fun together, the marriage was fraught with conflict and punctuated by three episodes of domestic violence in four years. She experienced Mr. Johnson's violence as unacceptable but also understandable, emerging from his history of trauma, the pressures of racism, and being the first Black anchorman of a major network. After the third assault, she ended the marriage. There was no sexual violence, and once the marriage was over, her fear dissipated, and she and Mr. Johnson remained friends.

[46] *Id.* at 16-17.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

managed them successfully. Sometimes she took a lesson away from the event (e.g., don't date "creepy" men), but in no instance did she judge herself harshly for having been in danger.

Going forward, she neither avoided reminders nor experienced intrusions from them, and there is no evidence that these experiences diverted her from anything she wanted to do, including situations in which she might be threatened with—or have to think about—sexual assault. For example, not only did she date and socialize avidly, but in the 1980s she trekked approximately 340 miles across Papua New Guinea alone with the exception of two local male guides. Prior to her experiences with Mr. Trump, her resiliency and habit of focusing on the positive allowed her to keep moving forward and maintain an expansive life.

### iii.    Differences Between Prior Experiences and the Alleged Rape

Although the aforementioned events constitute potentially traumatic events, there was evidence, both from my observations and her description of her history, that she was able to process and cope with them such that they did not intrude on her psyche and life in ways that were harmful. Even the most serious of the events—the molestation by her camp counselor—while painful and upsetting, was ultimately managed successfully. That the pain was tolerable is highlighted by the fact that she was never driven to avoid reminders in ways that constricted her life, and when reminders did surface memories (as occurred in the interview), her distress was fleeting and not disruptive. Further, over the course of decades, there is no evidence that this experience interfered with her ability to be intimate, or do what she wanted to do.

In contrast to the above, her alleged experiences with Mr. Trump clearly exceeded her ability to cope. She felt the power difference between them acutely and this held a meaning which intensified her feelings of shame and diminishment (e.g., she felt soiled, dirty, and worthless in ways that she had not felt before). His assault was violent and, unlike the other assaults she had

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

experienced, he penetrated her (according to Ms. Carroll, he put his fingers and his penis inside of her in spite of her efforts to fight him off). Immediately after the event, Ms. Carroll repeatedly told Lisa Birnbach: "He pulled my tights down,"[47] signifying that she had been helpless to stop him and that this fact was highly salient to her. Based on her account, it is clear that at the time of the assault she experienced fear and helplessness sufficient to induce peritraumatic dissociation—she felt altered and unlike herself and was laughing uncontrollably about something that did not feel funny, all of which indicates that this assault felt overwhelming to her.

Subsequently, her fear and helplessness, as well as feelings of shame, irrational guilt (she blamed herself, not him, for the attack), diminished self-representations, and humiliation persisted, driving significant, enduring avoidance behaviors that she could not control, and which robbed her of interactions she wished to have. When her avoidance was punctured, her traumatic memories felt present, intruding in the form of painful and visceral sensory memory fragments (e.g., at the time of the interview she could still feel him inside of her). This kind of traumatic re-experiencing and persistent, self-defeating avoidance reveals the presence of ongoing traumatic injury. It is also a sharp departure from her success in coping with her prior adversity. There, her resiliency and habits of coping were sufficient. With Mr. Trump, her resiliency and habits of coping could not surmount the traumatic feelings and altered schemas associated with the rape.

## V.    CONCLUSIONS

Ms. Carroll was harmed by her alleged encounters with Mr. Trump. The initial damage is visible in her ongoing efforts to avoid having her terror reactivated and by the secrecy compelled by her shame, self-blame, and fear of being viewed negatively. Throughout, Mr. Trump's status and fame most likely heightened her feelings of helplessness and degradation, and exacerbated the

---

[47] Birnbach Dep. at 53:19-21.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

damage to her relational life, to her ability to feel safe, and to her self-esteem that she has suffered over a period of nearly 30 years and into the present.

By nature, Ms. Carroll is a resilient, gregarious, extroverted, playful woman whose paramount lifelong interest, both personally and professionally, has been people and relationships. She is also a vibrantly sexual person who positioned herself at the very beginning of the women's movement as a champion of female autonomy and sexual agency. She is not someone able to easily admit being terrorized, rendered vulnerable, or controlled by fear or by a man. However, the alleged rape engendered precisely that experience. Her efforts to manage the ongoing consequences of her trauma have cost her the opportunity of intimate relationships, along with the joy that she found in them, which characterized her relational pattern before her encounter with Mr. Trump. Her traumatic experiences also rendered her self-esteem more brittle and fraught as her self-schemas became permeated with irrational guilt, shame, and denigration. More recently, she has suffered an acute exacerbation of her ability to feel safe, to feel professionally credible, and to feel dignified.

Trauma is painful in the moment, and it is painful and costly over a lifetime, in ways both obvious and subtle. Ms. Carroll's life has been diminished by her encounters with Mr. Trump. Initially, it left her with fears and altered self-schemas that she couldn't integrate into who she was, leading to behaviors that likely changed the course of her personal life. More recently, it also affected her work and her public identity. Her losses are profound and enduring, and they remain painful for her to contemplate:

> Twenty-plus years. So much loss. I am going to be angry with myself. I blamed myself instead of him. I gave up a lot. I can't even think about that. I just can't.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Certain processes and dynamics hold generally true across groups of people (e.g., as a group, traumatized people show enduring biological, emotional, and schematic impacts) while others are highly specific to types of trauma (e.g., the sense of being dirty and soiled may be specific to rape). Other traumatic effects are specific to the unique characteristics of the event and what it means to a particular individual (e.g., that Ms. Carroll's alleged perpetrator is Mr. Trump and that the denial came from the presidency at a time of social polarization). The psychological processes and symptoms revealed by Ms. Carroll's disclosures and behaviors are consistent with what is known about trauma more generally as well as women and rape more specifically. The ways in which the pain she experienced manifested in her life and diminished it are also internally consistent with her socialization and her lifelong practices and attitudes.

Dated: January 9, 2023

Dr. Leslie Lebowitz, PhD

41

# LESLIE LEBOWITZ, PhD

Licensed Clinical Psychologist
lebowitz.leslie@gmail.com
(617) 947-0325

## EDUCATION

Ph.D., Duke University, Clinical Psychology (1990)
M.A., Duke University, Psychology (1985)
B.A., Oberlin College, Psychology (1979)

## HONORS AND AWARDS

Faculty Development Grant, UMass/Boston (1992)
Faculty Development Grant, UMass/Boston (1991)
Junior Faculty Development Grant, UMass/Boston (1991)
The Katherine Banham Named Instructorship, Duke University (1987)
Dissertation Research Award, Duke University (1987, 1988)
The Ann McDougal Memorial Award, Duke University (1986)
Graduate Fellowship, Department of Psychology, Duke University (1985-1987)

## PROFESSIONAL EXPERIENCE

Psychotherapist (1992-present): Private psychotherapy practice with adults. Special expertise in the area of psychological trauma and adversity across the lifespan.

Forensic Consultant (1993-present): Consultation and expert witness testimony provided for civil, criminal, and military litigation. Expertise includes the psychological and behavioral aftermath of sexual exploitation, harassment and assault, combat, domestic violence, community violence, and the physical, emotional, and sexual abuse of children.

Co-investigator, National Center for Post-Traumatic Stress Disorders, Veterans Affairs Medical Center, Jamaica Plain, MA and Boston Veterans Affairs Research Institute, MA (2007-2016): Collaborated on the development and evaluation of a psychotherapeutic treatment protocol for moral injury and traumatic loss in combat-exposed military personnel. Supervised the therapeutic treatment of active-duty traumatized Marines.

Curriculum Developer and Trainer, United States Air Force (2005-2015): Developed the psychological curriculum for training Sexual Assault Response Coordinators and Sexual Assault Victim Advocates within the Air Force and the Air Force Reserves. Provided ongoing training to Air Force personnel.

Senior Supervisor, The Trauma Center of the Justice Resource Institute, Brookline, MA (2004-2008): Supervised clinicians providing treatment to chronically traumatized men and women.

Clinical Psychologist, The National Center for Post-Traumatic Stress Disorders: Veterans Affairs Medical Center, Boston, MA (1994-1996): Conducted research, supervised psychology interns, and provided assessments of (and psychotherapy to) traumatized veterans. Developed an assessment for sexually traumatized service members.

Research Consultant, The Victims of Violence Program, Cambridge Hospital, Cambridge, MA (1991-1997): Consulted on the development of a research program to evaluate the psychotherapeutic treatment of repeatedly traumatized women.

Reviewer, *Journal of Traumatic Stress* (1991-2008): Evaluated research articles for the journal.

Task Force Member, American Psychological Association Task Force (1996-1997): Appointed by Division 35 (The Psychology of Women) for an APA white paper on "Women and the New Chronic Illnesses (MCS, CFIDS, Fibromyalgia)."

Psychotherapist, Cambridge Associates in Psychotherapy and Mediation, Cambridge, MA (1991-1992): Provided individual and group psychotherapy to adults and adolescents.

Psychology Intern, Beth Israel Medical Center, New York, NY (1988-1989): Performed rotations on medical, child, and adolescent short-term therapy and inpatient units.

Clinician/Researcher, Sexual Trauma Research Project, Department of Psychology, Duke University, Durham, NC (1984-1988):  Provided individual and group treatment of traumatized adults and adolescents. Research focused on the psychological aftermath, and treatment of, sexually traumatized women.

Staff Therapist, Duke Psychology Clinic, Duke University, Durham, NC (1984-1988): Provided short and long-term psychotherapy to a diverse array of adults and adolescents.

Consultant/Evaluator, Department of Public Safety, Durham, NC (1984-1987): Provided psychological assessment of candidates for the Department of Public Safety.

Activities Therapist/Case Manager, Newark Beth Israel Center, Partial Care Program, Newark, NJ (1981-1983): Created and provided therapeutic services for economically disadvantages and chronically mentally ill clients.


## TEACHING EXPERIENCE

**Positions Held**
    Educator, Bi-annual trainings for RESPONSE (peer rape crisis counseling program), Harvard University, Cambridge, MA (2005-2009)
    Adjunct Assistant Professor, University of Massachusetts at Boston (1994-1997)
    Adjunct Assistant Professor, Simmons School of Social Work (1995-1997)
    Assistant Clinical Professor of Psychiatry, Tufts University Medical School (1994-1996)
    Assistant Professor, University of Massachusetts at Boston (1990-1994)

Instructor, Duke University (1987-1988, 1990)
Teaching Fellow, Duke University (1984-1987)
Teaching Assistant, Duke University (1983, 1984, 1986)

**College and Graduate Courses (developed and taught)**
Psychological Trauma: Individual and Society
Psychological Trauma: Response and Recovery (graduate)
Advanced Psychotherapy Practicum Seminar (graduate)
The Psychology of Women
Personality Theory
Psychopathology
Contemporary Feminist Thought
Developmental Psychology


**PRESENTATIONS (Papers, Symposia, Workshops, & Talks)**

Lebowitz, L. (2015, July). *The phenomenology of military sexual trauma*. Invited talk at the Veterans Court Treatment Conference, Washington, DC.

Lebowitz, L. & Blue-Howell, J. (2015, July). *Working with justice involved female veterans.* Invited presentation at the Veterans Court Treatment Conference, Washington, DC.

Lebowitz, L. (2013, December). *Understanding sexual trauma, victimization and recovery*. Briefing provided for the Chief of Staff of the AF Leaders Summit, Washington, DC.

Lebowitz, L. & Yniguez, D. (2013, June). *Military sexual assault prevention and response*. Briefing provided for the Sea Services Leadership Association (SSLA), Washington, DC.

Lebowitz, L. (1997, August). *Moral science and the need for narrative methods*. In L. Lebowitz (Chair), *Narrative methods: Illuminating the intersection of gender, race and power*. Symposium presented at the annual meeting of the American Psychological Association, Chicago, IL.

Lebowitz, L. (1997, November). *Narrative studies of trauma: Critique and implications*. In S. Weine (Chair), *Narrative trauma studies: Attitudes, techniques, approaches*. Symposium presented at the annual meeting of the International Society for Traumatic Stress Studies, Montreal, CA.

Lisak, D. (1996, November). *Childhood abuse, murder and redemption: A cycle of trauma*. In L. Lebowitz (Chair), *Controversies at the intersection of mental health and the death penalty*. Symposium conducted at the Annual Meeting of the International Society for Traumatic Stress Studies, San Francisco, CA.

Lebowitz, L. & Weine, S. (1996, November). *Narrative approaches to studying trauma and survivors.* Co-chair and presenter at Pre-institute held at the annual meeting of the International Society for Traumatic Stress Studies, San Francisco, CA.

Lebowitz, L. (1996, November). *Two sides of the coin: Cultural scripts for the experience and perpetration of hate crimes*. In Lebowitz (Chair), *Narrative Analysis: Applications and implications for the study of trauma*. Symposium presented at the annual meeting of the International Society for Traumatic Stress Studies, San Francisco, CA.

Lebowitz, L. (1996, June). *Understanding psychological trauma: Implications for survivors and the people who work with them*. Intensive training invited by the Refugee Mental Health Training Workshop, Bureau of Refugee and Immigration Affairs, Hamilton, NY.

Lebowitz, L. Lisak, D., Miller, N. & Krugman, S., (1995, November). *Integrating an understanding of gender into the treatment of trauma survivors.* Chair and presenter at pre-institute meetings held at the annual meeting of the International Society for Traumatic Stress Studies, Boston, MA.

Lebowitz, L. (1995, November). *The systematic application of narrative methodology to the study of trauma*. In S. Roth (Chair), *Thematic constructs for the assessment and treatment of trauma*. Symposium presented at the annual meeting of the International Society for Traumatic Stress Studies, Boston, MA.

Lebowitz, L. (1995, November). Discussant in P. Deiter (Chair), *Integrating perspectives in the re-victimization of trauma survivors*. Symposium presented at the annual meeting of the International Society for Traumatic Stress Studies, Boston, MA.

Lebowitz, L. (1995, November). *Radicalization and transformation in the aftermath of hate crimes*. In J. Greenwald (Chair). *Transforming the impact of chronic violence*. Symposium presented at the annual meeting of the Massachusetts Psychological Association, Boston, MA.

Lebowitz, L. (1995, October). *Helping refugee women deal with rape trauma.* Invited presentation at: *Refugee women and their families: A Bosnian case study*.  Intensive training sponsored by the Refugee Mental Health Program, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services, Atlanta, GA.

Lebowitz, L. (1994, November). Discussant in M. Harvey (Chair), *Memory work in three treatment modalities: A conceptual framework*. Symposium presented at the annual meeting of the International Society for Traumatic Stress Studies, Chicago, IL.

Harvey, M. & Lebowitz, L. (1994, November). *A multidimensional model of recovery from trauma*. In M. Harvey (Chair), *Recovery from traumatic experiences: Theory research and clinical applications*. Symposium presented at the annual meeting of the International Society for Traumatic Stress Studies, Chicago, IL.

Lebowitz, L. (1993, December). *A stage by dimension model of recovery*. In M. Harvey (Chair), *Treating psychological trauma: Theory and practice*. Paper presented at the Cambridge Hospital/Harvard Medical School Conference, Cambridge, MA.

Lebowitz, L. (1993, October). *Cultural messages and recovery from sexual violence*. In D. Corriveau (Chair), *Trauma and abuse*. Symposium on the Psychology of Adversity, Boston, MA.

Lebowitz, L. (1993, October). *Developmental and cultural influences on response to interpersonal violence.* Colloquium presented at the University of New Mexico Medical Center, Albuquerque, NM.

Lebowitz L. & Kiely, M. (1993, October). *The cultural messages scale: Development and psychometric properties.* In B. Hudnall-Stamm (Chair), *New instrumentation in the field of traumatic stress*. Paper presented as part of a pre-institute workshop at the annual meeting of the International Society for Traumatic Stress Studies, San Antonio, TX.

Lebowitz, L. (1993, October). *An ecological perspective on sexual trauma: Cultural meanings and women's recovery.* In M. Harvey (Chair), *Ecological perspective on sexual trauma: Gender, cultural constructions, and recovery.* Symposium presented at the annual meeting of the International Society for Traumatic Stress Studies, San Antonio, TX.

Lisak, D. (1993, October). *Does adherence to male gender norms contribute to violence?* In L. Lebowitz (Chair), *Trauma and cultural constructions of gender: Assessment and implications*. Symposium conducted at the Annual Meeting of the International Society for Traumatic Stress Studies, San Antonio, TX.

Lebowitz, L. (1993, October). *The cultural messages scale: Assessing cultural constructions of women and sexuality*. In Lebowitz (Chair), *Trauma and cultural constructions of gender: Assessment and implications*. Symposium presented at the annual meeting of the International Society for Traumatic Stress Studies, San Antonio, TX.

Keily, M. & Lebowitz, L. (1993, August). *Gender, sexuality, and sexual assault: Assessing cultural messages.* Poster presented at the annual meeting of the American Psychological Association, Toronto, CA.

Lebowitz, L. & Lisak, D. (1993, April). *Gender and sexual violence: Males and females as victims.* Colloquium presented at the Sussex County Community College, Newton, NJ.

Lebowitz, L. (1992, December). *Cultural meanings and response to trauma: Looking across populations*. In E. Shapiro (Chair), *Issues in cross cultural and developmental clinical psychology: Trauma and its sociocultural context.* Conference presented at the University of Massachusetts, Boston, MA.

Lebowitz, L. & Lisak, D. (1992, December). *Assessment of childhood abuse in death row inmates.* Workshop presented at the California Appellate Project, San Francisco, CA.

Lebowitz, L. & Lisak, D. (1992, December). *Vicarious traumatization and post-traumatic stress disorder in capital litigators.* Workshop presented at the California Appellate Project, San Francisco, CA.

Lebowitz, L. (1992, October). *A thematic analysis of psychological response to anti-gay victimization*. In E. Newman (Chair), *Narrative analysis of the impact of trauma across several populations*. Symposium presented at the annual meeting of the International Society for Traumatic Stress Studies, Los Angeles, CA.

Lebowitz, L. & Kaufman, C. (1992, October). *Group treatment of sexually traumatized women.* Workshop presented at the annual meeting of the International Society for Traumatic Stress Studies, Los Angeles, CA.

Lebowitz, L. (1992, August). *Psychological response to anti-gay violence*. In L. Lebowitz (Chair), *Hate crimes against gays and lesbians: Causes, psychological consequences, and interventions*. Symposium conducted at the Annual Meeting of the American Psychological Society, Washington DC.

Lebowitz, L. (1992, April). *Culture, context, and recovery from sexual violence.*  In J. Lepen (Chair), *Popular culture and violence against women*. Symposium presented at Radcliff College, Cambridge, MA.

Lebowitz, L. (1991, August). *Culture, meaning, and recovery from rape*. In L. Lebowitz & D. Lisak (Chairs), *Rape and culture: Beyond the traditional psychological paradigms*. Symposium conducted at the Annual Meeting of the American Psychological Association, San Francisco, CA.

Lebowitz, L. (1991, October). *Gender roles and gender hate: Deconstructing cultural norms in the context of the group treatment of women sexual trauma survivors*. In L. Lebowitz (Chair), *Salient issues in the group treatment of women sexual trauma survivors*. Symposium presented at the annual meeting of the International Society for Traumatic Stress Studies, Washington DC.

Lebowitz, L. (1991, October). *Innovative techniques for group therapy with sexually traumatized women*. In L. McCann (Chair), *Treatment innovations in family, group, and drama therapies*. Paper and workshop presented at the Annual Meeting of the International Society for Traumatic Stress Studies, Washington DC.

Lebowitz, L. (1990, December). *Developing a research program in a clinical context.* Paper presented at the Victims of Violence Program of the Cambridge Hospital, Cambridge, MA.

Lebowitz, L. (1990, November). *The phenomenology of sexual trauma: A systematic analysis*. Paper presented at the National Center for Post Traumatic Stress Disorder, Boston, MA.

Lebowitz, L., & Roth, S. (1990, October). *The cultural context and women's response to being raped*. Paper presented at the meeting of the International Society for Traumatic Stress Studies, New Orleans, LA.

## PUBLICATIONS

Berke, D.S., Carney, J., & Lebowitz, L., (2021). The role of anger in traumatic harm and recovery for survivors of sexual violence. *Journal of Trauma and Dissociation*, 10, 1-13.

Litz, B.T., Lebowitz, L., Gray, M., & Nash, W. (2015). *Adaptive Disclosure: An Experiential Approach to Military Trauma, Loss, and Moral Injury.* Guilford Press.

Steenkamp, M.M., Nash, W.P., Lebowitz, L., & Litz, B.T. (2013). How best to treat deployment-related guilt and shame: Commentary on Smith, Duax, & Rauch. *Cognitive and Behavioral Practice*, 20(4), 471-475.

Gray, M., Schorr, Y., Nash, W., Lebowitz, L., Lansing, L., Lang, A. & Litz, B. (2012). Adaptive disclosure: An open trial of a novel exposure-based intervention for service members with combat-related psychological stress injuries. *Behavior Therapy*, 43(2), 407-415.

Steenkamp, M. M, Litz, B. T., Gray, M., Lebowitz, L., Nash, W., Conoscenti, L., Amidon, A., & Lang, A. (2011). A brief exposure-based intervention for service members with PTSD. *Cognitive and Behavioral Practice*, 18, 98-107.

Litz, B. T., Stein, N., Delaney, E., Lebowitz, L., Nash, W. P., Silva, C., & Maguen, S. (2009). Moral injury and moral repair in war veterans: A preliminary model and intervention strategy. *Clinical Psychology Review*, 8, 695-706.

Harvey, M., Liang, B., Harney, P., Koenan, K., Tummala-Narra, P., Lebowitz, L. (2003). A multidimensional approach to the assessment of trauma impact, recovery and resiliency: Five psychometric studies. *Journal of Aggression, Maltreatment, and Trauma*, 6(2), 87-109.

Roemer, L. & Lebowitz, L. (1998). Understanding severe traumatization. *The Advocate: Journal of Criminal Justice Education and Research*, 20, 7-19.

Harney, P., Lebowitz, L. & Harvey, M.L. (1997). A stage by dimension model of recovery from trauma. *In Session: Psychotherapy in Practice*, 3, 91-103.

Roth, S., Lebowitz, L., & DeRosa, R. (1997). Thematic assessment of post-traumatic stress reactions. In J.P. Wilson & T.M Keane (Eds.), *Assessing Psychological Trauma and PTSD: A Handbook for Practitioners*, 512-529. Guilford Press.

Lebowitz, L. & Newman, E. (1996). The role of cognitive-affective themes in the assessment and treatment of trauma reactions. *Clinical Psychology and Psychotherapy: An International Journal of Theory and Practice*, 3, 196-207.

Lebowitz, L. & Keily, M. (1996). Psychometric review of the Cultural Messages Scale. In B.H. Stamm (Ed.), *Measurement of Stress Trauma and Adaptation*. Sidrian Press.

Lebowitz, L. & Roth, S. (1994). I felt like a slut: The cultural context and women's response to being raped. *Journal of Traumatic Stress*, 7, 363-390.

Lebowitz, L., Harvey, M.R., & Herman, J.L. (1993). A stage by dimension model of recovery from sexual trauma. *The Journal of Interpersonal Violence*, 8, 378-391.

Lebowitz, L. (1993). The convergence of feminism and trauma-focused therapy in the treatment of female sexual trauma survivors. *The Journal of Training and Practice in Professional Psychology*, 7, 81-99.

Roth, S., Dye, E., & Lebowitz, L. (1988). Group therapy for sexual assault victims. *Psychotherapy*, 25, 82-93.

Roth, S., & Lebowitz, L. (1988). The experience of sexual trauma.  *The Journal of Traumatic Stress*, 1, 79-107.

## PROFESSIONAL ORGANIZATIONS

American Psychological Association
International Society for Traumatic Stress Studies

## EXPERT WITNESS EXPERIENCE

*A.M. v. Jefferson County Board of Education, et al.*, No. 3:20-cv-00560-CRS-RSE (Western District of Kentucky) *and* No. 19-CI-000831 (Cir. Ct., Jefferson Cnty., Ky. 2020) (expert report)

*State v. Charles Taylor*, No. D-202-CR-2018-01530 - DA#2018-02982-1 (2d Judicial Dist., N.M. 2018) (pretrial interview)

*People v. LaBelle*, No. 18-000596-FC-14A-1 (Dist. Ct., Washtenaw Cnty., Mich. 2018) (expert report and trial testimony)

*State v. Terry Allen Pepiot*, No. 16CR50841 (Cir. Ct., Linn Cnty., Or. 2016) (trial testimony)

## FEE & INTERESTS

For my services as an expert in this matter, I am being compensated at a rate of $600 per hour. I will be compensated at a rate of $300 for travel time. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in this report or subsequent testimony, or the outcome of this or any other proceeding. I have no other interest in this proceeding.