# EXHIBIT 1

1             UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3

4   E. Jean Carroll,                  )
                                      )
5              Plaintiff,             )
                                      ) Case No.
6        vs.                          )
                                      ) 1:22-CV-10016-LAK
7   Donald J. Trump,                  )
                                      )
8              Defendant.             )
    _____   )
9

10

11

12

13

14        VIDEO DEPOSITION OF ROBERT J. FISHER

15           Via Zoom Videoconference

16             Monday, February 6, 2023

17

18

19

20

21   Reported by:

22   LISA MOSKOWITZ, CA CSR 10816, RPR, CRR, CLR,

23   Washington CSR 21001437, Nevada CCR 991,

24   NCRA Realtime Systems Administrator

25   JOB NO. 222071

1              In Carroll II, as you're talking

2     about, I was asked to do just an expert

3     report, and it had nothing to do with

4     rebuttal reports but do an expert report in

5     that case.

6          Q.   And by you were asked, you were

7     asked by defendant's counsel; is that

8     correct?

9          A.   Yes, that's correct.

10         Q.   Mr. Fisher who's on the line

11    today -- I'm sorry.  Mr. Swift.

12         A.   Mr. Swift, yes.  He can claim my

13    name.  That's fine.

14         Q.   So is it your testimony that your

15    report in Carroll II which was dated

16    January 30, 2023, was not a rebuttal report?

17         A.   No, not at all.  No.  In Carroll I,

18    I was specifically retained to do -- as a

19    rebuttal expert, and my main task was to do

20    a rebuttal report, and we had two

21    subsequent -- or one deposition over two

22    periods.

23              In rebuttal II after the

24    plaintiff -- I'm sorry.  In Carroll II when

25    the plaintiff refiled, they asked me to do

1   an expert report which had nothing to do

2   with rebutting anything.  It was just

3   strictly to do a report on -- as an expert

4   in that case.

5          So the first one was a rebuttal

6   report.  The second one was a plain expert

7   report.

8      Q.   Okay.

9          So your position is that your

10  report in Carroll II is not a response to or

11  rebuttal of Professor Humphreys' report in

12  Carroll II?

13     A.   No.  In fact, I didn't even read --

14  Professor Humphrey did two reports.  She did

15  a rebuttal report -- or she did a report on

16  the June 21, June 22, and June 24 statements

17  of Mr. Trump.  I wrote -- and then she filed

18  a report on that.  I wrote a rebuttal report

19  on that.

20         Subsequently Mr. Trump made other

21  statements on October 12, 2022, of which

22  case subsequent to that, the plaintiff filed

23  a second lawsuit which included battery I

24  think, as well as defamation.  I was asked

25  after that to do a full expert report based

1  on her, you know, her new complaint

2  addressing defamation.  None of it has to do

3  anything -- Professor Humphreys subsequently

4  did a second report based on the October 12

5  statement.  I was not asked to do a rebuttal

6  report on her second report and, as a matter

7  of fact, I didn't even read it.  I skimmed

8  it, but I'm not here to talk about her

9  second report.

10      Q.   Understood.

11      A.   Okay.

12      Q.   And so I'm going to -- we'll mark

13  this as Fisher 1.

14           (Exhibit Number 1 was marked

15           for identification.)

16  BY ATTORNEY CRAIG:

17      Q.   The court reporter just handed you

18  a document marked as Exhibit 1.  Is this the

19  report you prepared in Carroll II and issued

20  on January 30, 2023?

21      A.   That's correct.

22      Q.   Okay.  How many hours did it take

23  you to draft this report?

24      A.   I don't know exactly, but I'm going

25  to guess probably around 12, 15 hours.

1      Q.   When you say you were approached by

2   a case with Meghan Markle, do you mean

3   Meghan Markle approached you or someone who

4   is looking to sue Meghan Markle?

5      A.   Yes, her half sister.  It's gotten

6   a lot of public exposure already.  But, yes,

7   it's a case where Meghan Markle's half

8   sister is suing her for defamation.  Based

9   on a book and interviews that she did on

10   Oprah and with, you know, various interviews

11   she's done along with Harry, she's basically

12   made claims about her family, both her half

13   sister and father, that aren't true.  The

14   father is not part of the suit, but the half

15   sister says that her reputation has been

16   damaged by the false statements that

17   Ms. Markle has made.

18      Q.   And has your approach to your work

19   as an expert changed since your Carroll I

20   deposition in any way?

21      A.   No, no.  I've been -- no, the

22   answer is no.  I mean, I've had 80 cases

23   over 17 years, and I'll end there because

24   you like yes or no answers.

25            No, it hasn't changed.  I try to

1   give context and perspective when I guess

2   it's not needed sometimes.

3       Q.   Have you developed any new methods

4   or methodologies or techniques as part of

5   your work since your Carroll I deposition?

6       A.   No, because those methodologies are

7   rock solid.  There's no reason to reinvent

8   the wheel when they are accepted

9   methodologies, and they're effective

10  methodologies.

11      Q.   And would you say your methodology

12  in Carroll II is similar to your methodology

13  in Carroll I?

14      A.   I would say so, yes.

15      Q.   Okay.

16           And if we can look at your report

17  which is Exhibit 1 which you still have in

18  front of you, I just had a -- on page 2 --

19      A.   Oh, they're back and back.  That's

20  unusual.  Okay.  I went from 1 to 3, and I

21  thought a page was missing.  Yes, go ahead.

22      Q.   Do you see there's a section in the

23  middle of the page with the title Media

24  Expert/Analysis?

25      A.   Yes.

1       Q.   And then three of them are from

2  right after his October 20, 2022, alleged

3  defamatory statement; correct?

4       A.   Yes.

5       Q.   And how did you identify these six

6  particular articles?

7       A.   I don't understand what you mean by

8  identify.

9       Q.   How did you choose to review these

10  six articles as opposed to a different set

11  of six articles?

12       A.   Well, as I mentioned last

13  deposition, they were representative.  I

14  looked at a lot more articles than that,

15  but, I mean, most of the articles were

16  exactly the same.  I mean, different

17  publications, different reporters but

18  basically information provided was exactly

19  the same.

20            In other words, I could have read

21  20 articles that were no different.  So I

22  picked two or three out that were

23  representative of them.

24            And I didn't see the need to list

25  every article that I looked at given that

1    most of them were rubber stamps of the

2    others.  It didn't seem to be productive or

3    needed.

4         Q.   So is it your testimony that you

5    relied on articles besides these six in

6    forming your opinion or that these are the

7    only six that you relied on in forming your

8    opinion?

9         A.   Well, I don't know what you -- I

10   quibble with the word relied on, quite

11   frankly.  I looked at media articles to see

12   how they were addressing this situation.  I

13   mean, were they doing it straight arrow,

14   just totally objective?  Were they slanting

15   it to one side or the other, slanting it to

16   the plaintiff's side or defendant's side?

17   So I was just basically trying to get a feel

18   of what the -- of how the press was handling

19   this situation, and that was the purpose of

20   it.  And I felt that these six -- I didn't

21   feel I needed to list 30 articles because

22   these six were certainly representative of a

23   whole.

24        Q.   But in terms of the analysis you

25   just described, that analysis applies to

1  these six articles, or did you analyze other

2  articles that you haven't disclosed in your

3  report?

4      A.   I don't know if the word analyze is

5  appropriate.  I've read other articles.  As

6  I've said, since they were mirror images of

7  these articles, they didn't offer anything

8  new or substantive that would have required

9  me to put them down.

10          In other words, if you have ten

11  articles and every word has -- every one has

12  the exact same words in them, there's no

13  reason to list ten.  You can just list a

14  representative sample of them.

15     Q.   Is it your testimony that every

16  other article that you read has the exact

17  same words as these six articles?

18     A.   Not exact words.  Don't take it

19  literally.  What I'm saying they covered the

20  same subjects.  They covered the -- they

21  were reporting the same facts.

22     Q.   So, Mr. Fisher, I think you

23  testified yes, but let me make sure I've got

24  it right.  You're familiar with the

25  requirement that an expert witness disclose

1    in their report the facts or data considered

2    in forming their opinion.  Are you familiar

3    with that requirement?

4        A.   Yes, I am.

5        Q.   And besides these six articles, did

6    you consider any other articles in forming

7    your opinion?

8        A.   No.

9        Q.   Okay.

10       A.   Because they were all the same as

11   these.  Once I read the first one, and then

12   I read all the others that were the same, I

13   didn't consider them.

14       Q.   Okay.

15           And the next header down on this

16   page 12 of Exhibit 1, you'll see it says:

17   Internet research?

18       A.   Yes.

19       Q.   And you write:  During the course

20   of this assignment, I conducted research to

21   review information on the internet that

22   might be pertinent to the litigants and the

23   lawsuit as well as to seek clarification and

24   definition of various subjects.

25           Do you see that?

1   at out of curiosity.  It doesn't affect my

2   findings, whatever, but it's just curiosity.

3        Q.   In this case are there any internet

4   sources that you reviewed that aren't listed

5   in your report in any way?

6        A.   Well, I didn't list the -- I didn't

7   list the -- you know, in this case -- well,

8   this case involved individuals, not

9   companies.  It involved Mr. Trump and

10  Ms. Carroll; so I wasn't looking up websites

11  of businesses or anything.  I didn't look up

12  Trump's website, for instance, and I don't

13  even know if Carroll has one.  So I guess

14  not, no.

15       Q.   So are there any internet sources

16  that you considered that are not disclosed

17  in this report that you think are relevant

18  to your opinions or findings in the report?

19       A.   No.  I think the only type of -- in

20  all the types of research -- by the way,

21  there's one other type of research I didn't

22  get to finish.  That's as I'm writing a

23  report, I'll research for spelling of words

24  or is one word better than another and all

25  that.

1   it's relevant to the case, yes, I do list

2   it.

3            But usually that only comes in the

4   form of media articles for the most part.

5       Q.   And those relevant media articles

6   in this case are the six that we are talking

7   about before?

8       A.   Yeah.  One other thing too is if I

9   come across a legal document on the internet

10  which they haven't provided me, then I would

11  put that down as well.  I would record that

12  because that's -- that's specifically

13  related to the case as opposed to the

14  background and what products this company

15  makes.

16      Q.   Were there any legal documents in

17  this case that you found through your

18  internet research that you didn't -- that

19  you listed here?

20      A.   No, there were none in this case

21  that I -- sometimes I come across, not often

22  but not in this case, no.

23      Q.   Approximately how long did you

24  spend on your internet research in

25  connection with your Carroll II report?

1       A.   I would say at most an hour,

2   maybe -- I'd say a half hour to an hour and

3   a half is generally for most cases, you

4   know, I just do a cursory look at -- you

5   know, I Google whatever it is, and then I

6   look down, scroll down and look and see if

7   there's anything.

8           So I would say 45 minutes to an

9   hour and a quarter would be average.

10      Q.   Average in all your cases?

11      A.   Yeah, in most cases.

12      Q.   In this case 30 to 60 minutes?

13      A.   Yeah, unless something like the one

14   case I had which I won't mention the name

15   of, there were like 2- or 300 media articles

16   on; so I probably spent three or four hours

17   on that.  But that's a rare case.

18      Q.   Are there any parts of your report

19   that are based on the internet research that

20   you did in connection with this case?

21      A.   I would say -- I would say no

22   except maybe -- no, I mean, the legal

23   documents, complaints gave me information.

24   Deposition.  I got a lot of good information

25   off the depositions.  And the expert report.

1          I would say off the internet

2    possibly if I got one of those articles off

3    the internet, I don't know -- as I sit here,

4    I don't remember where the articles came

5    from, but I would have listed it, and that

6    would have been a factor.

7        Q.    In terms of the legal documents

8    that you list here, I know a number of them

9    were also listed in your rebuttal report in

10   Carroll I.

11       A.    Probably most of them.

12       Q.    Did you re-review the documents in

13   connection with preparing your Carroll II,

14   or did you list them because you previously

15   considered them?

16       A.    Yes -- no, I didn't re-review

17   anything.  I just listed -- anything

18   important in them I would have had in my

19   original rebuttal report or in my notes, the

20   notes I take when I read things.  So there's

21   no need for me to go back and look at the

22   original documents.

23       Q.    And elsewhere in your report you

24   refer to the idea that you reviewed and

25   analyzed previous applicable experiences

1    that you've had in your professional

2    communications and expert witness

3    backgrounds.  Are there specific previous

4    applicable experiences you drew upon in

5    preparing this Carroll II report?

6        A.    I think I mean that in a general

7    sense as opposed to individual cases.  No, I

8    can't say that there was a specific case or

9    more than one case.  It's more or less the

10   broad overview of circumstances that

11   happened in such cases of this type.

12       Q.    And did you review any files from

13   prior cases in connection with your Carroll

14   II report?

15       A.    No, not in writing this report, no.

16       Q.    Okay.

17             And you also write in your report

18   that you don't rely on, quote, surveys,

19   studies, tests, research, or other forms of

20   qualitative types of analyses, facts

21   gathering procedures.  Is that sort of a

22   fair reflection of the type of materials you

23   didn't consider in connection with your --

24       A.    Yes.

25       Q.    -- Carroll II report?

1      A.   Yes.  I'm sorry to interrupt.  I do

2  that often unfortunately.

3           No -- yes, I think all of those

4  things -- some of those things are

5  applicable and need to be -- need to be

6  done.  But as I said in a previous

7  deposition, this wouldn't be the time to do

8  it.  In other words, I think it's -- I

9  have -- like when I do reputation --

10  reputation damage programs, then it's

11  important to do that.  But it's important to

12  do it at the time the program is to be done,

13  not prior.

14           I don't need to do those kind of

15  things basically to assess, you know, the

16  type of damage that our -- you know.

17           For instance, what if you go out in

18  the street --

19      Q.   Just --

20      A.   Okay.  Right.

21           I think there's a need for those

22  but not necessarily at this point in time

23  and further down the line.

24      Q.   In going back to -- it's on page 11

25  of your report, Exhibit 1, at the bottom

1   it -- you write:  Partial review.  Next up,

2   Professor Humphreys Carroll II report.

3            What did you mean by partial

4   review?

5       A.   I spent two minutes looking at it.

6       Q.   Okay.

7       A.   Basically what I did is -- unless

8   you just want me to say -- basically what I

9   did is skim through the report to see how it

10  compared to her original report that I was

11  tasked to analyze and brought on.

12           So, in other words, her basic

13  opinions, concepts, whatever.  So I took

14  maybe two, three minutes, and I went through

15  it, just scrolled through it.  This report

16  was shorter than her first one.  And I just

17  scrolled through it to see if the same --

18  she was offering the same line of thinking

19  and opinions as she did before.

20      Q.   Were you directed to only do a

21  partial review of Professor Humphreys'

22  report?

23      A.   No, I wasn't directed to do

24  anything with her second report.  I mean, I

25  was provided it by Mr. Swift, but he didn't

1    give me any direction as to what to do.  He

2    said -- she did another report based on the

3    October 12 thing.

4            I mean, he didn't ask me to read it

5    in total.  He didn't ask me to comment on it

6    or anything.  He just said -- I assume he

7    just thought it would be good for me for

8    background.

9       Q.   Are there any parts of Professor

10   Humphreys' Carroll II report that you sought

11   to rebut in connection with your Carroll II

12   report?

13      A.   No, not at all.  But I did -- I do

14   have a section in this report, which I'm

15   sure you're aware of, that does discuss

16   Ms. Carroll's expert, but most of that is

17   information derived from the first report,

18   is basically on her views and opinions.

19           I did put one paragraph into this

20   report.  The only thing I picked out of that

21   report in skimming it was a statistic that

22   she had related to the number of people that

23   might be influenced by Mr. Trump's comments.

24   And that's near the end of the report.

25           You know, I just made a reference

Page 55

1      Q.   Understood.

2           And in the skimming that you

3   referred to before of Professor Humphreys'

4   report, was that just the body of the

5   report, or did you also skim the appendices?

6      A.   Oh, I didn't look at the

7   appendices.  I just looked at the report

8   itself from the top to the bottom.  In other

9   words, I just scrolled down the report.

10           For instance, her introduction of

11   herself was the same.  You know, her

12   qualifications was the same as before.  I

13   just wanted to see if her second report was

14   consistent with the first in terms of her

15   general opinions and conclusions.  And it

16   was.

17      Q.   And did you run a redline of the

18   two reports?

19      A.   I don't know what you mean running

20   a redline.

21      Q.   That's fine.

22           Did you receive a link to the

23   folder that Professor Humphreys provided on

24   a cloud content management site called Box?

25      A.   What, from Mr. Swift?

1    Q.    Yes.

2    A.    A link to a folder that Professor

3  Humphreys did called Box?

4    Q.    Through a site called Box?

5    A.    No, I never received anything like

6  that.

7    Q.    Okay.

8          In connection with your Carroll II

9  report, did you do any analysis to calculate

10  the total number of times Mr. Trump's

11  October 12, 2022, statement was viewed?

12    A.    We're going to go through this

13  again.

14          No, I didn't.

15    Q.    So you have no idea how many people

16  actually saw or read Mr. Trump's October 12,

17  2022, statement about Ms. Carroll?

18    A.    No.  But I do know that it was on

19  his Truth social which he has 2 million

20  people I think.  I'm not sure, but I assume

21  knowing that he has a very dedicated fan

22  base and that he has his own since he got

23  kicked off Twitter, I assume a fair amount

24  of people saw it.  It doesn't matter to me

25  whether it was a hundred thousand or

1  correctly, is it your testimony -- did you

2  see it as your role as an expert to sort of

3  look at the statement standing alone to

4  assess sort of the degree of harm that a

5  statement like that could cause?

6      A.   Well, for a large part, yes.  I

7  mean, what my job was to analyze two issues:

8  One is were the statements defamatory.

9  Again, not making a legal conclusion or

10 anything, but I am a communications expert,

11 and I can read what the New York law is

12 relating to defamation, and I can form my

13 own opinions on whether they were false

14 statements or not.

15          The second thing is whether they

16 were false statements or not, that's for a

17 jury to decide.  It's not for me to decide.

18 That's what the trial is for and for the

19 jury to decide.

20          But looking at it, whether they're

21 false or not, did they cause reputation harm

22 to the plaintiff?

23          Now you're talking about magnitude

24 here.  What you're talking about is

25 magnitude.  Did 50 people see it or did

1  popularity polls and whether they are going

2  to vote for him, but I've never seen a poll

3  that was taken of a person.  I don't know

4  that any polls exist, so it's hard for me to

5  research.

6      Q.   Have you ever looked for any polls

7  about the media habits of Donald Trump

8  supporters?

9      A.   No, because I'm pretty sure I know

10  what they are.  Try Fox News.

11      Q.   Just turn back to page 11 in your

12  report.

13      A.   I wish these were not front and

14  back.

15      Q.   I share your preference.

16      A.   Yeah, it's a lot easier to thumb

17  through.

18      Q.   On page 11 of Exhibit 1 in the

19  middle of the page, there's a header that

20  reads, Information input reviewed to form

21  opinions.

22          Do you see that?

23      A.   Yes, I do.

24      Q.   And then under that it says:  I

25  have received and reviewed from the

1  plaintiff's legal counsel the following

2  documents and information.

3          Did you mean defendant's legal

4  counsel?

5      A.   Yes.

6      Q.   I just wanted to make sure.

7      A.   Sometimes I try save a little money

8  by using -- by cutting and pasting a little

9  bit.  That one got by me.

10     Q.   Are there -- I guess just on that

11  topic, are there other parts of your report

12  that you draw from other reports in terms of

13  background or whatever it might be?

14     A.   Well, yes.  There's some things.

15  For instance, page 12 and 13.  I mean,

16  there's things -- I still read over these

17  things when I go through, you know, the

18  report, but I would say the section analysis

19  of opinion -- I mean, I'd say the section

20  internet research, sources to obtain the

21  information, analysis of opinion, preface,

22  methodology -- well, no, I take it back.

23          Some of these I do change these.

24  But the basic framework of these are pretty

25  much the same although I do add -- for

1    instance, under methodology, I change that

2    from time to time.  I add things in, take

3    things out.

4             But yes, I mean, the bottom line is

5    since I approach every case the same way

6    basically, whether I'm representing a

7    plaintiff or defendant, you know, that kind

8    of thing, there are certain things that are

9    applicable to every case I do.

10            And I don't believe in charging my

11   client -- reinvent the wheel and charge my

12   client extra hours to retype the information

13   that I already have.  I missed that

14   plaintiff/defendant thing.  I feel bad about

15   that.

16       Q.   If we turn to page 12 under that

17   paragraph that has the header, Preface, the

18   last sentence reads:  Where there is a

19   disagreement since I was retained by the

20   plaintiff, I will presume that the

21   information provided on their behalf is

22   correct and will base my conclusions and

23   opinions on it being true unless I am aware

24   of -- or will be subsequently provided --

25   evidence to the contrary.

1          In that sentence did you mean

2    defendant as opposed to plaintiff as well?

3        A.   Yes, obviously, yeah.

4          I was told that by several lawyers

5    that concept there.  Several lawyers have

6    told me that in various cases.

7          Yes, I meant for that to be

8    defendant as well.

9        Q.   What parts of your report or

10   opinion are based on a presumption that the

11   information provided by defendant is true?

12       A.   Well, none really.  In other

13   words -- in other words, as I said, this is

14   a he said/she said case.  In the case

15   there's really no collaborating evidence --

16   there's no outside collaborating evidence on

17   either side like with the rape.  Did he rape

18   her or didn't he rape her?  There's no

19   evidence any way whether it happened or

20   didn't happen.  It could have happened, or

21   maybe it did, maybe it didn't.

22          The point is some cases that I've

23   had that there was a lot of gray area the

24   best way to term it.  And I've had to, but

25   in this case there wasn't any of that.  You

1  had the plaintiff making certain statements

2  and the defendant -- I didn't particularly

3  look at Mr. Trump's statements as being true

4  or not.  I looked at most of these

5  statements and the fact that there was no

6  outside collaborating evidence, that -- in

7  some instances there was no outside

8  collaborating evidence, so I don't know

9  what's true.  So I didn't take his side or

10  the other side.  I don't know what's true.

11           In others, I think they were

12  clearly opinion.  I don't think they were

13  statements at all.  I think they were

14  clearly opinion.

15    Q.   If we turn to page 14 of your

16  report.  And at the top you have a section

17  titled, Defamation Damages.

18           Do you see that?

19    A.   No, I don't.  I see a section that

20  says, Defamation Definition, not damages.

21    Q.   Sorry.  My mistake.  Let me restate

22  the question.

23           At the top of page 14, do you see a

24  section with the title, Defamation

25  Definition?

1  down on that same page, page 14 of your

2  report, there's a section that's titled

3  Analysis of Statements.

4          Do you see that?

5      A.   Yes, I do.

6      Q.   And this goes on for a couple of

7  pages.  In this section of your report are

8  you offering your opinion on whether or not

9  Mr. Trump's statement about Ms. Carroll

10 satisfies the elements of defamation you set

11 forth above?

12     A.   I wouldn't say the word opinion.  I

13 would say assessment.

14     Q.   What's the difference between --

15     A.   Well, I mean, you know -- well,

16 yeah, opinion I think is a little bit of a

17 stronger word.

18          Yes, it basically answers yes to

19 that.  I'm a reasonably intelligent person.

20 I can look at what the -- what something

21 is -- is purported to fit a certain criteria

22 is to be considered defamation, and I can

23 analyze what the specific statements are and

24 offer my assessment of whether I feel it

25 meets that.  I'm not offering a legal

1    is some -- an assessment I have of how I see

2    it.

3           You know, I'm not shoving it down

4    their throat.  I mean, I'm adding a little

5    more -- people are not sophisticated.

6    People on juries are not sophisticated in

7    communications.  I mean, they can be

8    housewives, they can be plumbers, they can

9    be architects, they can be engineers,

10   whatever.  They're experts in their areas or

11   whatever, but they're not sophisticated.

12   Lawyers aren't sophisticated in

13   communications either.  Lawyers are the

14   worst I've seen.

15          But the point being is I'm there as

16   an expert witness.  My field of expertise is

17   communications.  I'm not trying to ram

18   anything down their throats.  I'm just

19   saying that from a communications standpoint

20   as being an expert, this is my analysis or

21   this is a thing.  And you can factor that

22   in, ignore it, factor it in if helps you

23   give some insight or perspective or context

24   what the statements are about, all the

25   better.

1    in this part of your report under analysis

2    of the statements you're offering an expert

3    opinion or something different?

4        A.    No, I'm not offering expert

5    opinion.  It's not my job to offer an expert

6    opinion.

7              As I said, if you go through these

8    items one by one, you'll see -- I mean, I do

9    comment at the end of each one.  Some of it

10   I include testimony.  I include different

11   things in here, additional information that

12   the jury can decide from Trump's testimony,

13   from Carroll's testimony from, you know,

14   from various factors.  I'm trying to give

15   them a broader picture from which they make

16   a decision on.

17             This is my assessment.  Whether

18   expert opinion, I think maybe we're

19   splitting hairs a little bit in here.  But I

20   mean, it is my assessment.  I agree with

21   you, opinion is, you know, sort of saying

22   the same thing.  But, yeah, I mean, it is my

23   opinion as an individual as an expert.

24       Q.    And it's your position that as an

25   expert you're permitted to testify to

1    hearing from many multiple people.

2        Q.   Mr. Fisher, if you can just answer

3    my question.

4            What's the difference between the

5    question -- so the jury will have to ask

6    whether or not Mr. Trump's statements meet

7    the criteria for defamation.  And it says

8    here that you are offering your assessment

9    on whether or not Mr. Trump's statements

10   meet the criteria for defamation.  I'm

11   wondering what's the difference between the

12   question the jury will ask and the question

13   that you are purporting to answer?

14       A.   Probably no difference at all.  But

15   then I'm not the decision maker, and I'm not

16   telling them to make that decision.

17           As I said, they're going to hear

18   from Professor Humphreys.  They're going to

19   hear from other people.  I'm one factor.

20   I'm not like a mosaic.  I'm one piece of a

21   puzzle or whatever.  They're going to hear a

22   lot of pieces of puzzle, and it's their job

23   to listen to everyone and make an informed

24   decision.

25       Q.   In your Carroll I report that we

1    went over in your last designation, that

2    also had a section that was entitled

3    Analysis of Statements.

4            Do you recall that?

5    A.   Yes, I do.

6    Q.   Is what you're doing in your

7    Carroll I report with respect to analysis of

8    statements the same as what you're doing in

9    your Carroll II report with respect to the

10   analysis of statements?

11   A.   Yes, but the statements are a

12   little different.

13   Q.   Of course.

14   A.   I'm doing the October 12.  There

15   were several things that he covered in his

16   June 21, 22, and 24 statements that aren't

17   in the October 12.  I focused on the

18   October 12 statements here.

19   Q.   But the type of the analysis is the

20   same?

21   A.   Generally, yeah.  The format,

22   generally, yeah.

23   Q.   And were you asked to perform an

24   analysis of the statements regarding whether

25   or not they met the criteria for defamation?

1      Q.    Toward the -- right at the bottom

2   you write:  There is no evidence that the

3   defendant assaulted or raped the plaintiff.

4   It cannot be a false statement to deny some

5   action that hasn't been proven to have taken

6   place.

7           Do you see that?

8      A.    Yes.

9      Q.    Is it your opinion that Trump's

10  denial of the rape is true or currently

11  true?

12     A.    We don't know.  Nobody knows.

13  There is no -- she -- he could have raped

14  her or he may not have raped her.  No one

15  knows.  I mean, I've pored through

16  everything trying to find something that

17  would sway my thought one way or the other,

18  but the point is all you have is her

19  accusation and his denial.

20          We don't know if she's telling the

21  truth or he -- no one.  I haven't seen -- if

22  you've got any evidence or people that say

23  they saw it happen or forensic evidence or

24  she had gone to the hospital and there was a

25  rape kit -- this is -- it's like me.  If I

1      A.   I don't know.  It's not false

2  because -- I don't know if it's true or not,

3  but it's not false because there's no

4  documentation that the event ever occurred.

5      Q.   So is it your opinion that when a

6  person denies sexually assaulting or raping

7  someone, is it your position that person is

8  telling the truth unless it has been proven

9  in court that they actually did rape that

10 person?

11     A.   Not necessarily in a court, but

12 there's some evidence of it, yes.

13          I mean, a false statement -- a

14 statement as opposed to an opinion -- a

15 statement is something that can be proven

16 true or not true.  That's the difference

17 between an opinion and statement.

18     Q.   And do you think Mr. Trump's

19 statement that he didn't rape Ms. Carroll is

20 a statement or an opinion?

21     A.   Well, it's an opinion of his that

22 he didn't do it.  I mean, it's --

23     Q.   What part of raping someone

24 involves an opinion?

25     A.   Well, there has to be -- there has

1   to be confirmation that the act happened in

2   the first place.

3       Q.   Is Ms. Carroll's testimony

4   sufficient to prove that the act happened in

5   the first place?

6       A.   No.  I don't know where you're

7   coming from to be honest with you,

8   Mr. Craig.

9           You're trying to tell me that

10  anyone that accuses someone of something is

11  telling the truth, and that's the -- I mean,

12  any accusation is true?  I'm sorry.  Maybe

13  we're on different -- we're on different

14  planes.  I don't understand.

15          If that were true that

16  everybody that accused someone of doing

17  something wrong, would the other person go

18  to jail instantly?

19          ATTORNEY SWIFT:  I'm sorry.  Let me

20      jump in one more time.

21          Mr. Fisher, Mr. Craig cannot answer

22      your questions.

23          THE WITNESS:  I understand.  That

24      was rhetorical, Mr. Swift.  That was

25      rhetorical.

1           The bottom line is unless there's

2      some evidence that something happened,

3      there's no way you can tell whether

4      Ms. Carroll was telling the truth or

5      Mr. Trump was telling the truth.

6  BY ATTORNEY CRAIG:

7      Q.   And the evidence that you're

8  referring to can't be Ms. Carroll's

9  testimony.  Is that what you're saying?

10     A.   No, not by itself.  The point is

11  what would this world be like if people were

12  making accusations and everybody assumed

13  they were true?  The bottom line is there is

14  no fact -- there's no fact in this case.

15  The fact would be that the rape occurred or

16  didn't occur.  There's no -- there's no

17  fact.  I mean, one side is saying something

18  and the other side is saying something.

19     Q.   If all the jury heard in this case

20  was Ms. Carroll's testimony that the rape

21  did happen, that wouldn't be enough to prove

22  defamation?

23     A.   No.  If I'm sitting on the jury and

24  the woman is on the stand and said I was

25  raped, and there's no -- there's no evidence

1  that she was raped whatsoever, I wouldn't

2  consider the other side denying it as being

3  defamatory.

4      Q.   And so sitting here today, is it

5  your position that Trump's denial of the

6  rape cannot be false?

7      A.   It may or may not.  It has to be

8  proven to be false.  She's making the

9  accusation he made a false statement.  We

10 don't know if it's a false statement or not.

11 She doesn't know -- I mean, in her mind she

12 may.  So yes.  No, you can't declare it as a

13 false statement because there's no fact base

14 to judge whether he's telling the truth or

15 not.

16     Q.   And Ms. Carroll's testimony isn't a

17 factual basis to judge --

18     A.   No.

19     Q.   -- whether he's telling the truth

20 or not?

21     A.   No.

22     Q.   Why not?

23     A.   Because an accusation of something

24 is -- are we to take her word for it?  No,

25 it's not.

1  police will go out and arrest the person and

2  try them and convict them just based on the

3  one person's accusation.  That doesn't

4  happen.

5     Q.   On page 15 of your report, you

6  write:  Whether Trump knew her or not is

7  unknowable barring a third person

8  documenting this was true, and I have not

9  seen any evidence of that.

10    A.   Yes --

11    Q.   These could not be false statements

12 unless there's verification that they indeed

13 knew each other.

14    A.   Yes.

15    Q.   What do you mean by verification in

16 that?

17    A.   Yes, this is the same exact concept

18 as the last one.  The point is she says

19 Trump knew her.  He says he didn't.  What I

20 find hard to believe is if she did know

21 Trump, somebody else must have known that

22 they knew each other, somewhere.  Somebody

23 must have witnessed them talking or know.

24 Therefore, why -- I haven't seen any

25 affidavits or declarations from her, from

1   friends or somebody that says, oh, yeah, I

2   know she knows Trump.  I've seen them

3   talking at parties or this or that.

4           The bottom line is their

5   relationship it's hard to believe strictly

6   no one else witnessed their knowing each

7   other except the two of them.  It just seems

8   to be somewhere along the line -- even her

9   husband hasn't come forward.

10          Why hasn't her husband done a

11  deposition and said my wife knows Trump.

12  I've been with them.  I've seen them, you

13  know.  I know them.  Nobody has come --

14  she's basically making allegations with

15  offering no proof.  So this is the exact

16  same thing as her accusing him of rape.

17  There's no verifiable evidence or

18  third-party verification or validation that

19  they knew each other.  Nobody else has come

20  forward and said, yeah, I know they know

21  each other.

22      Q.   Is there a rule of evidence you're

23  relying on that would require evidence from

24  a third party as verification as you call

25  it?

```
1        A.   No, but -- no, not necessarily.
2   But what I'm saying is like the other one,
3   you can't convict somebody of something,
4   whether it be a false statement or rape or
5   anything without verifiable proof that
6   what's being alleged is true.  Like she's
7   alleging here that he knew her.  Well, he
8   denies it.  So who do you believe?  Him or
9   her?
10       Q.   So is it your testimony that it's a
11  principle of defamation law that proof from
12  a third party would be required to resolve
13  Ms. Carroll's claim about knowing Mr. Trump?
14       A.   No, I don't think there's anything
15  in defamation law that addresses that
16  subject at all.  Nothing I've ever seen.
17       Q.   So where does the principle come
18  from?
19       A.   Well, of common sense.  Rhyme,
20  reason, logic, common sense or American
21  justice.  The American jurisprudence system
22  says a person is considered innocent until
23  proven guilty.  That means somebody -- it's
24  not enough to say somebody did something
25  wrong.  You have to prove it.  You don't
```

1    send people to jail based on someone's

2    accusation.  It's the same concept here.

3         You don't consider somebody defamed

4    someone if they're denying something that no

5    one knows happened or not.

6         And in terms of this, I just

7    find -- this is part -- the rape, I don't

8    know.  I have no idea whether he raped her

9    or not.

10        But this one doesn't make sense.

11   If he knew her, there's got to be other

12   people that witnessed their knowledge --

13   that had the knowledge that they knew each

14   other.  Why would she not -- I believe in

15   logic, common sense.  If she's got a case,

16   why doesn't she bring someone forward --

17   it's not my job to determine this.  Why

18   doesn't she bring someone forward to say I

19   know that they knew each other.  And say

20   why -- I witnessed them talking, sitting in

21   a bar having a drink together, or I saw them

22   at a party talking, or I went over to their

23   house and he was there.  I mean, why --

24        Basically what you have is you have

25   one party, Ms. Carroll, making a series of

1  accusations or at least a couple that have

2  no -- there is no fact.  There's no

3  verification that it is true.

4      Q.   And if Ms. Carroll testifies at

5  trial that she had met Donald Trump before,

6  that's insufficient verification.  Is that

7  your position?

8      A.   By herself, yeah.  I mean,

9  especially if he denies it.

10          Now, we'll go back to this

11  picture --

12     Q.   Again, Mr. Fisher, we're trying to

13  keep it confined to the questions.

14     A.   Okay.

15     Q.   Then on page 16 of Fisher -- your

16  report, Exhibit 1, do you see the final

17  comment under the series of bullets where

18  you write:  There is no reckless regard for

19  the truth if there is no, quote, truth to

20  base it on.

21          Do you see that?

22     A.   Yeah, 100 percent.

23     Q.   And what -- do you understand what

24  the concept of reckless -- I think it's

25  disregard means in the defamation context?

1    Q.   I'm just going to read again the

2  part of Exhibit 1.  You write:  Her

3  allegations of false statements appear to be

4  based on speculation, conjecture,

5  supposition, assumption, presumption, and

6  hypothesizing.

7         So what part of her allegations are

8  based on speculation?

9    A.   Well, that's probably misworded a

10  little bit.  I'm talking about people that

11  would take her -- I'm talking about how

12  other people would interpret what she was

13  saying.  It's probably not -- it's probably

14  not worded properly.  I'm not talking about

15  her.

16         Obviously her statements that he

17  raped her are not based on a presumption or

18  a hypothesizing assumption.  I'm talking

19  more how other people would interpret what

20  she was saying.  I didn't mean that to

21  reference to her.  I meant it to reference

22  to other people that would believe what

23  she's saying.

24    Q.   So is it your position sort of

25  sitting here today, not in your report, but

1      thing.

2          Speculation and conjecture maybe I

3      got carried away a little bit on wording

4      but yes.  You're assuming -- if somebody

5      tells you something that you have no

6      evidence or knowledge is true or not,

7      you're assuming, you're presuming,

8      you're speculating, all of those, that

9      they're telling the truth.

10          They're all -- I didn't have to use

11      all those words probably, but the bottom

12      line is it all basically goes around

13      their accepting that what she's telling

14      them is true because they don't know.

15  BY ATTORNEY CRAIG:

16      Q.   And if a jury were to believe

17  Ms. Carroll's allegations of sexual assault,

18  are they also engaging in speculation,

19  conjecture, supposition, assumption,

20  presumption and hypothesizing?

21      A.   Yeah.

22          ATTORNEY SWIFT:  Objection to form.

23          THE WITNESS:  I mean, yes anybody

24      that believes something, whether it's

25      her friend, her doctor, her husband, or

1     the jury, anybody -- now, the jury has a

2     right to do that.  If they want to do

3     that, fine.  They have a right to do

4     that.

5          In this case when they're faced

6     with a he said/she said situation and

7     they have to make a determination, they

8     can't just say -- well, they can hang.

9     They can say we don't know, but that

10    usually doesn't happen.

11         They are most likely going to have

12    to choose between one of the two.  Most

13    likely.  They're going to have to see

14    who they believe or not.

15         And since it's not based on any

16    knowledge, any direct knowledge or any

17    concrete evidence or anything that

18    guides them to which is right or wrong,

19    they're making -- they're going to make

20    up in their mind who they believe.

21    BY ATTORNEY CRAIG:

22    Q.   If we go down a bit below on

23    page 16 of your report, you write:  In

24    summary, after a careful review of all the

25    alleged false statements and negative

1   implications that the plaintiff claims that

2   Trump made, it is my opinion that none of

3   the statements she identified can be

4   determined as being false.

5            Is it not possible to determine

6   whether or not Donald Trump raped

7   Ms. Carroll?

8        A.   No.

9        Q.   And is it possible to determine --

10       A.   You tell me how.

11       Q.   Is it possible to determine whether

12  or not Donald Trump and Ms. Carroll met at

13  Bergdorf's that day?

14       A.   I haven't seen evidence of it.

15       Q.   And is it possible to determine

16  whether or not Donald Trump knew

17  Ms. Carroll?

18       A.   That's more likely to be

19  determined.  The first two I'd say no

20  because there's no evidence.  That one -- if

21  the police or someone did a thorough

22  investigation, they probably -- if a

23  detective got on it or something like that,

24  that's possible to be determined, yes.  But

25  so far the plaintiff hasn't done that or

1           But it seems to me that on whether

2      he knew her or not would be easier for

3      someone to ferret out by doing some

4      investigation.  I mean, talking to

5      everyone that he knew, talking to

6      everyone that she knew and saying, do

7      you know that you travel in the same

8      social circles.  Can you verify that

9      they knew each other?

10          I think if somebody delved into it,

11     which I'm surprising she hasn't, I think

12     that's probably provable.  But the other

13     two, if there was going to be any way to

14     prove it, it would have come out by now.

15 BY ATTORNEY CRAIG:

16     Q.   If there was a photo of those two

17 together, would that be the type of evidence

18 that would prove that Donald Trump, in fact,

19 knew Ms. Carroll?

20     A.   Absolutely not.  If -- you know,

21 Trump moves around.  Trump draws people

22 around like a magnet.  His explanation --

23 and I don't know if it's true or not, he

24 said that was a receiving line where a bunch

25 of people came there and somebody caught a

1   must --

2       Q.   Again, Mr. Fisher, try to keep it

3   to the questions.

4       A.   Okay.

5       Q.   In all this discussion we've had

6   about the evidence in this case, what part

7   of your experience in public relations

8   informs your opinions on the strength of the

9   evidence in this case?

10      A.   There is no evidence in this case.

11  Tell me what evidence there is in this case?

12  There is no -- evidence is concrete

13  information or verification of anything.

14  There's no evidence in this case.  What

15  evidence is there in this case?  That's

16  rhetorical again.

17          There is only two people making

18  claims.  There is absolutely no evidence one

19  way or the other in this case.  There's just

20  two people that are making verbal claims

21  back and forth, claims or opinions or

22  accusations, whatever.  I haven't seen any

23  concrete evidence of any kind in this case.

24      Q.   You testified before that you

25  reviewed the depositions of both Ms. Carroll

1   and Mr. Trump from Carroll I; correct?

2       A.   Yes, that's correct.

3       Q.   Have you reviewed any of the other

4   depositions that were taken in this case?

5       A.   No, none have been provided to me.

6   I didn't know there were any others.

7       Q.   Have you reviewed any of the

8   documents that were produced by either side

9   in this case?

10      A.   Yeah, I mean, the documents I

11  reviewed are -- which were provided to me --

12  some were from the plaintiffs and some were

13  on the defendants.  Page 11.

14      Q.   Besides those documents listed

15  under legal documents in your report, are

16  there other parts of the discovery record

17  that you reviewed in this case that you

18  didn't list there?

19      A.   Absolutely not.  Absolutely not.

20           When it comes to -- I might decide

21  whether to put a newspaper article down on

22  my list or something like that, but when it

23  comes to legal documents or any kind of

24  documents, I list -- like here.  Under

25  page 11, legal documents.  Answer.  That's

1   defamation per quod.  There's different

2   subsets of defamation, and this is a

3   separate one.

4           And I found it hard to believe in

5   the first thing, the first complaint, that

6   they didn't -- cause of action.  The second

7   complaint they didn't either.

8           I thought that since it was thrown

9   out there in both complaints and also

10  mentioned in Ms. -- or Professor Humphreys'

11  original report, I don't know if it was in

12  the second, but she also mentioned it in the

13  second report that I thought that, you know,

14  to dot my Is and cross my Ts, I would

15  address that with a paragraph or two in

16  here, which I did.

17      Q.   Are you an expert on the

18  requirements of pleading causes of action in

19  federal court?

20      A.   No, I'm not.

21      Q.   And you opined in here that

22  Mr. Trump's October, 2022, statement does

23  not constitute defamation per se; is that

24  correct?

25      A.   No, no.  Because he didn't -- I

1    mean, he didn't --

2         Q.   Just yes or no.

3         A.   No, no.  It's obvious from the --

4    none of these relate to him.

5         Q.   Are you aware that Mr. Trump moved

6    to dismiss Ms. Carroll's defamation claim in

7    Carroll II on that very basis?

8         A.   No, I wasn't informed of that.

9         Q.   And are you aware that Judge Kaplan

10   rejected that argument?

11        A.   Judge Kaplan?

12        Q.   Judge Kaplan is the judge in this

13   case?

14        A.   Interesting.  Judge Kaplan and the

15   law firm is Kaplan.  That's interesting.

16   Any relation?

17             No, I was not aware.  I said I

18   wasn't aware.

19        Q.   Is it your opinion, understanding

20   now that Judge Kaplan rejected the argument

21   that this was not defamation per se, that

22   his decision was incorrect?

23        A.   I'm sorry.  Repeat that.

24        Q.   I'll represent to you Judge Kaplan

25   rejected Mr. Trump's argument that his

1  statement was not defamatory per se.

2      A.   So he's saying that it could be

3  defamation per se?

4          ATTORNEY SWIFT:  Matt, if you can

5      just rephrase the question.

6          THE WITNESS:  Yeah, because I'm

7      confused.

8  BY ATTORNEY CRAIG:

9      Q.   So I will represent to you that

10 Mr. Trump moved to dismiss Ms. Carroll's

11 defamation claim in Carroll II arguing that

12 it was -- did not constitute defamation per

13 se.  And Judge Kaplan rejected that argument

14 and refused to dismiss the complaint.

15          Given the opinion that you express

16 in your report, is it your position that

17 Judge Kaplan's decision was wrong in holding

18 that these statements did constitute

19 defamation per se?

20     A.   Obviously not.  I'm not a judge.

21 If this was -- if this was looked at in

22 court and the judge made a decision after

23 hearing both sides, I mean, I wasn't aware

24 of that, and I'll defer to the judge.

25     Q.   So is it your position that your --

1        in other words, to make a decision.

2             And we're going to take a lunch

3        break now.  I can't even focus on what

4        you're saying at this point.  I haven't

5        eaten since 6 o'clock in the morning.

6             THE VIDEOGRAPHER:  The time is now

7        12:33 p.m., and we are off the video

8        record.

9             (Lunch recess taken from

10            12:33 p.m.  to 1:11 p.m.)

11            THE VIDEOGRAPHER:  The time is now

12       1:11 p.m., and we are back on the video

13       record.

14   BY ATTORNEY CRAIG:

15       Q.   Mr. Fisher, you conclude in your

16   report that plaintiff has benefited from,

17   quote, this public dispute.  I'll direct

18   you, if you want to look at it, it's on

19   page 24 of Exhibit 1.

20            Is it your position that plaintiff

21   has benefited from her dispute with

22   Mr. Trump?

23       A.   I believe so.  I believe there are

24   extraneous factors that -- I said a net

25   benefit.  I think my term was net benefit.

1    I think when you weigh what possible harm

2    there was to her from his comments and you

3    weigh that against some of the possible

4    positive benefits to her that came from him,

5    I think it's clear all things, you know,

6    being considered that she came out better

7    for this.

8        Q.   And when you say possible harm and

9    possible positive benefits, why do you use

10   the term "possible"?

11       A.   I think they're more real than

12   possible.  I guess you can't -- I guess

13   there's no way you can make a declarative

14   judgment but I think that factoring in

15   common sense and logic, a lot of positive

16   things would have come out from his, for

17   lack of a better word, tirade against her

18   based on her comments that he raped her.

19       Q.   Is there any data that supports

20   that conclusion?

21       A.   Not data, no.  There are no data.

22   It's just -- you know, it's just basic in my

23   assessment based on my background and

24   expertise and experience in the field of

25   communications particularly as it relates to

1   particularly with someone like Mr. Trump

2   that the effects of positive or negatively

3   that he has on segments of society based on

4   what he says and does.

5       Q.   Are you aware of any literature

6   that supports the view that defamation might

7   be beneficial to the person about whom false

8   information has spread?

9       A.   No.  And as a matter of fact, I've

10  never made that -- in 60 cases of which I've

11  probably represented plaintiffs in 50 of

12  them, I've never made that kind of assertion

13  before.  This is a new territory.

14              I think it's an unusual

15  circumstance, and I think that the facts

16  and, as I say, combined with common logic

17  would lead you to that inevitable

18  conclusion.

19      Q.   And I take it you're unaware of any

20  literature that supports the view that rape

21  victims might benefit from being defamed by

22  their accuser?

23              ATTORNEY SWIFT:  Objection to form.

24              THE WITNESS:  Not being defamed by

25      their accuser, although that's generally

1  self-admittedly came forward because she

2  admired the women that came forward because

3  of Weinstein and these other people, and she

4  felt that they had the courage to do so and

5  she should as well.

6      Q.   And it's your position that the

7  women who come forward and then are defamed

8  by their -- the person they've accused

9  experience a net benefit, positive change to

10  their reputation?

11      A.   Yes, I do.  I think so.  I think

12  that -- I think the weight of -- every

13  person that's accused of rape is going to

14  shoot back at their accuser.  I mean, that's

15  standard.  They don't have the fame of

16  Mr. Trump.  They don't have the

17  communications form of Mr. Trump.  They

18  don't have the devoted following of

19  Mr. Trump.

20          I challenge you to name me one

21  person that's ever been accused of rape that

22  didn't turn around and attack his accuser.

23          So I think there's a lack of

24  validity -- not a lack of validity.  I think

25  there's a lack of impact on someone to try

1  Because, quite frankly, I think it's human

2  nature -- don't ask me if I'm a clinical

3  psychologist.  My wife is.  I'm not.  But I

4  think it's human behavior that someone that

5  accuses someone of something like that is --

6  has had a more sympathetic view of her than

7  the person that says I didn't do it.  She's

8  lying.  I didn't do it.  She's crazy.

9          I think 80 percent of people --

10  that's my own.  I don't have any data.  I

11  think 80 percent would tend to side with the

12  woman who accused than some guy saying they

13  didn't do it.

14     Q.   Can you think of any other scenario

15  in which you would take the position that

16  someone was better off after someone defamed

17  them in terms of their reputation?

18     A.   Another person?  Or what do you

19  mean by scenario?  I'm sorry.

20     Q.   Outside of the sexual assault and

21  rape allegation context, is there any other

22  context in which you believe that someone

23  would be better off after someone spread

24  false information about them?

25     A.   Oh, yes.  I think anything related

1           Again, I go back to saying this is

2    an unusual case.  This is maybe a one in a

3    million type of case where I don't think

4    I've ever not only in expert witness work

5    but as a PR professional, I don't think I've

6    ever felt that the person that was a victim

7    of defamation was better off than they were

8    before it.

9        Q.   So is there any professional

10   experiences that you're drawing upon to

11   reach your conclusions in this what you call

12   one in a million case?

13       A.   Well, yes.  I think the

14   professional experience is that every

15   case -- I mean, forget expert witness work,

16   although that's part of it obviously.  I've

17   had 50, 60 cases.  I think that -- 60.

18           I think going back to my 50 years

19   in public relations that -- yes.  I've seen

20   the effects of reputation harm.  I've seen

21   them on famous people.  I've seen them on

22   unknown people.  I've seen them in every

23   way, shape, or form.  Not only with

24   individuals but with businesses.

25           So what I'm saying is this is a

1          Certified Stenographer.)

2    BY ATTORNEY CRAIG:

3        Q.    The six newspaper articles we

4    talked about before, is there anything

5    besides those newspaper articles?

6        A.    Well, reading her biography, her

7    profile.

8        Q.    Where did you see her biography?

9        A.    Well, I went online and saw

10   information about her.  I told you I Googled

11   her.  A gal like that, she had a couple of

12   pages of content about her on there, and I

13   looked at some of it for background.  As I

14   said, I looked to see who she was, and I saw

15   nothing negative whatsoever about her, not

16   unrelated to the Trump case, but I saw

17   nothing in her background that was negative.

18   It appears she was a total professional and

19   viewed that way.

20       Q.    So besides the articles you

21   mentioned before and the Googling you did,

22   anything else that you considered?

23       A.    Yeah, these -- I have it in my

24   report here.  These articles.  I quote some

25   of the articles on the Trump case, the six

1    that I listed there.  I quoted some of them

2    in my report and talked about the highly

3    laudatory comments that were made in those

4    articles about her after the fact.  After

5    the suit.

6        Q.   Is your entire understanding of

7    Ms. Carroll's reputation based on the

8    comments in those six articles?

9        A.   Well, we already talked about

10   online I saw --

11       Q.   So the six articles and the

12   Googling you did?

13       A.   Yeah, the Googling for the most

14   part, yeah, and also in the complaint.  The

15   complaint, the original complaint and the

16   other complaint talked about her image, her

17   reputation, talked about her

18   accomplishments.

19            I mean, it's all over the place.  I

20   don't deny the woman -- I never heard of her

21   before the Trump case.  I mean, I live in

22   L.A.  She's in New York.  I don't read Elle

23   magazine.  So I didn't know who she was from

24   these two people when I walked in this room.

25            The point is I did do research on

1          ATTORNEY SWIFT:  I'm sorry.  Two

2     people talking over each other.  Can we

3     go over that one more time, please.

4  BY ATTORNEY CRAIG:

5     Q.   The question was this:  So this is

6  the first case that you've used the concept

7  of a virtual shield against defamation; is

8  that correct?

9     A.   Well, certainly the first time I've

10  ever used that phrase or that thought but,

11  yeah, I don't -- it's hard to think that

12  anyone has a shield against defamation per

13  se.  But --

14     Q.   Again, it's a yes-or-no question.

15     A.   Yeah, yeah, it's yes.

16     Q.   And are you aware of any

17  peer-reviewed literature that addresses the

18  concept of a virtual shield against

19  defamation?

20     A.   No.

21     Q.   And is it your position that a

22  well-known person with a positive reputation

23  cannot be harmed by false statements about

24  them?

25     A.   No, I didn't say that across the

1    accusations.  It's more involved with the

2    people involved and how each of these people

3    are viewed.

4        Q.   You've written before that it can

5    take a lifetime to build a reputation and

6    only seconds to destroy it?

7        A.   Oh, that's true.

8        Q.   And you've actually included that

9    principle in almost every other expert

10   report you've offered?

11       A.   When I'm representing the

12   plaintiff, yeah, and not when I'm

13   representing the defendant.

14       Q.   Why wouldn't you include that

15   principle when you're representing the

16   defendant?

17       A.   Because I'm not trying to make the

18   plaintiff's case for them.  Why would I put

19   something in a report that is basically

20   making the other side's case?  That would be

21   kind of idiotic, I think.

22       Q.   I'm going to mark this as

23   Exhibit 3.

24            (Exhibit Number 3 was marked

25            for identification.)

1    Quinnipiac University poll from December 14,

2    2022; is that correct?

3        A.   Yes.

4        Q.   And did you review the actual

5    polling data, or did you see the results of

6    the poll reported somewhere?

7        A.   I saw the results in a newspaper

8    article; I saw them.

9        Q.   And do you recall what newspaper

10   article that was?

11       A.   No, I don't.  In fact, I backtrack.

12   I'm not even sure it was a newspaper

13   article.  It must have been.  It wouldn't

14   have been online like that; so I had to see

15   it in some form of a document.  It probably

16   was a newspaper article.  No, I didn't make

17   note of what it was.  It was just a report.

18   Was probably an AP report, but I'm not sure.

19       Q.   And do you know the actual question

20   that the Quinnipiac poll asked for which it

21   reported results?

22       A.   Not exact wording, but the poll was

23   basically do they have a favorable view --

24   do they have a favorable view of Mr. Trump

25   or not.  It was basically a view of what's

Page 168

1   your approval of Mr. Trump.

2       Q.   And do you know what the sample

3   size was?

4       A.   No, I didn't.

5       Q.   Do you know what the margin of

6   error was?

7       A.   No, not specifically.

8       Q.   And was there a reason you selected

9   this particular poll to rely upon?

10      A.   Just mainly because it was the most

11  recent one I saw.  At the time I wrote this

12  report, it was three weeks old or something

13  like that.  And I thought this reflects the

14  current view according -- the Quinnipiac

15  poll is considered a fairly reliable poll.

16      Q.   Sorry, I didn't mean to --

17      A.   No, it's not like it's done by

18  Frank Luskin or someone, Frank whatever his

19  name was who was at Fox.  It's an

20  independent poll.  It's not looked upon as

21  favoring one side or the other.

22      Q.   Have you considered any other

23  polling data in connection with your report?

24      A.   No, no.  I just thought that that

25  was pretty representative.  It seemed to me

1    grain of salt, in other words, because they

2    know he's prone to excessive attacks.

3        Q.    And earlier in your report you

4    state that the plaintiff, quote, was aware

5    that she was, quote, putting herself in the

6    crosshairs of one of the most powerful men

7    on the planet?

8        A.    Yeah, her best friend told her that

9    when she -- she told two people.  One of

10   them said go to the police department.  One

11   said don't because he's rich and powerful

12   and has a lot of lawyers and why expose

13   yourself to that.  And she basically said

14   she concurred with that opinion, that she

15   knew she would be going into the dragon's

16   mouth, so to speak, if she came forward.

17       Q.    Do you think Ms. Carroll bears some

18   of the responsibility for the harm that

19   resulted from her accusations against

20   Mr. Trump?

21       A.    Absolutely not.

22            ATTORNEY SWIFT:  Objection to form.

23            THE WITNESS:  Absolutely not.  She

24       has a right to come forward and make the

25       accusation.  I mean, you know, we don't

1           know if it's true or not.  But, you

2           know, if it isn't true, then she's lying

3           and shouldn't have come forward.  If it

4           is true, she certainly has the right to

5           come forward, that kind of thing.

6                At one point in time, 20 some years

7           ago, she decided it would be in her best

8           interest not to come forward.  And then

9           as a result of occurrences that happened

10          a few years ago she decided that maybe I

11          should, and she did.

12     BY ATTORNEY ANDREWS:

13          Q.   Have you looked at any data or

14     studies about how Mr. Trump's personality

15     informs the public's reception to things he

16     says?

17          A.   I don't think I have to do studies

18     or anything like that.  I mean, as I say,

19     Mr. Trump's been in the news for six years,

20     day in and day out.  You don't need to do a

21     study to observe what goes on with him.  The

22     purpose of study is because you're privy to

23     it on a day-to-day basis.

24          Q.   How do you know how other people

25     respond to him based on his personality --

1      A.   He's a public figure, Mr. Craig.  I
2  talk to people all the time about him.  I
3  talk to friends, relatives, family, business
4  colleagues, people on the street.  I go on a
5  cruise, we talk about -- we meet strangers,
6  you talked about Trump.  Trump is a highly,
7  highly visible figure that people like to
8  talk about.  You don't have to do a study
9  when day in and day out over six years
10  you're talking to a broad cross-section of
11  people of all persuasions.  I've talked to
12  Trump supporters.  I've talked to people
13  that don't know his name almost, and I've
14  talked to people that hate him vehemently.
15           I've done a study.  I've been in a
16  study for six years ever since he first ran
17  for president.
18      Q.   And by study you mean those
19  conversations you just described?
20      A.   Yeah, what more can you do in a
21  survey.  I've talked to people in all walks
22  of life, and all areas of the country.  In
23  fact in Europe.  We do all of our cruises in
24  Europe.  I've talked to people over there.
25  I've talked to old people, young people.  I

1  conversations like anyone else in the United

2  States would have been having over the last

3  six years?

4      A.   For the most part anyone else in

5  the United States has had over -- I haven't

6  since I was retained which was what?  A

7  couple months ago?  I haven't done any as an

8  expert.  I haven't talked to people

9  specifically an expert because I didn't

10 feel -- I felt I had enough insight from

11 that.

12          No, just talking to people in

13 general, kind of water cooler conversations,

14 you know.

15     Q.   And on this same page of Exhibit 1,

16 page 19, you refer to Mr. Trump's, quote,

17 long and very public history of accusations

18 by women -- let me just go down here.

19     A.   The last bullet point.

20     Q.   Yeah.  Let me start over.

21          You write here, you refer to

22 defendant's long and very public history of

23 accusations by women and inappropriate

24 sexual behavior as well as his own

25 admissions in this area.

1  skirt.  He admitted to that.

2      Q.   Is that part of the Billy Bush

3  tape, or is that something different?

4      A.   That was the Billy Bush tape.  I

5  think the one about him -- I think that was

6  also on the Billy Bush tape about him

7  sitting next to a stranger and kiss them,

8  and they're not going to do anything.

9          I think I read the part about him

10  kissing anyone somewhere else as well.  I

11  think that was mainly the whole brouhaha

12  that came when the Billy Bush tape came in.

13     Q.   And you write on page 19, the same

14  page that we're on, under the header

15  Weinstein/Me Too phenomenon?

16     A.   Yes.

17     Q.   Quote, the environment and dynamics

18  of women reporting sexual assaults and rapes

19  changed dramatically in recent years

20  emanating from the Harvey Weinstein scandal

21  and movement spawned by Me Too, Time's Up.

22     A.   Yeah.

23     Q.   In drafting your report, what

24  sources did you consider in forming your

25  opinions with respect to the, quote,

1    environment and dynamics, close quote, of

2    reports of sexual assault and rapes?

3        A.   No specific.  That is just --

4    that's just from reading multiple --

5    listening and hearing multiple reports over

6    the years.  I mean, I've -- like most people

7    I followed the Weinstein trials.  I'm aware

8    of the Me Too.  I read countless magazine

9    articles and listen to TV, radio over the

10   period of years talking about the impact

11   that the Weinstein thing had on people

12   coming forward.

13           And actually Cosby predated

14   Weinstein.  But it was Weinstein that was

15   the big one.  Over a period of years I've

16   been ongoing reading reports and information

17   relating to how women would now come

18   forward, and they were emboldened to come

19   forward.

20           Even Ms. Carroll is a perfect

21   example.  She said that she claimed that

22   genesis of that was why she came forward.

23       Q.   And the sort of reading magazine

24   articles and listening to radio that you

25   referenced, were you doing that as part of

1    prior to her lawsuit, but I became aware of

2    her professional accomplishments prior to

3    being contacted to serve as an expert

4    witness in this case.

5              Do you see that?

6        A.   Yes, I do.

7        Q.   So besides that sort of personal

8    experience you had had, did you -- is there

9    any data to quantify the media coverage that

10   Ms. Carroll received after Mr. Trump's

11   defamation as compared to before?

12       A.   Well, I think, yes.  I think if

13   you're just doing an analysis or Google or

14   something like that, you can see that there

15   weren't hardly any articles on her prior to

16   the Trump incident, for lack of a better

17   word, and now -- exponentially her

18   visibility has risen tremendously.  I mean,

19   the bottom line -- I just used myself as an

20   example because I had never heard of her

21   before I started reading articles about

22   Trump being accused of rape and whatever.

23   And most of those articles, and I did

24   analysis in this report which is in the next

25   section, by the way, on 20 here is that the

1    study?  No.  From looking online and looking

2    at the first ten pages of her Google

3    presence, it was clear that there was a

4    tremendous increase in articles about her or

5    exposure than there was prior to that.

6        Q.   By looking -- by your reference to

7    looking at the first ten pages of Google,

8    you just mean the nature of the search

9    results that you would see if you put in

10   E. Jean Carroll's name in Google?

11       A.   Yeah, in other words, you know,

12   each page has 10 to 12 things on it and you

13   go through pages 2, 3, 4, 5.

14            You know, I saw other references to

15   Ms. Carroll but not nearly the weight of the

16   exposure she received after she came forward

17   to accuse Mr. Trump of rape.

18       Q.   You referred in your earlier answer

19   to you did an analysis in this report which

20   is in the next section on page 20, and those

21   articles are highly favorable toward

22   Ms. Carroll.  Are you referring just to the

23   three articles you talk about on page 20 and

24   carrying over to page 21?

25       A.   Yeah, in other words, on page 20

1    it's those square points there touting her

2    background, article, and praise.  In other

3    words, the bottom line is in reporting the

4    news, the news was that she accused him of

5    rape and he made some statements, and she

6    sued him for defamation.  That's the news.

7              You know, any good reporter is

8    going to give background on the participants

9    in such a dispute.  Trump you don't have to.

10   They mention -- but going beyond mentioning

11   she was a well-known author and had been a

12   columnist for Elle magazine.  Some of them

13   went into making very complimentary remarks

14   about her.

15      Q.   Besides these three articles, are

16   there any other articles that you considered

17   in connection with this part of your report?

18      A.   Yeah, as I said earlier today, I've

19   seen -- I mean, a lot of these articles

20   were -- contained the same information.  I

21   didn't -- I didn't -- I just used these as a

22   representative sample.  I believe I saw

23   others that said nice things about her too,

24   you know, whatever.  I mean, I don't have to

25   do pages on it.  I gave some examples from

1      Q.   And did you consider any other

2   sources of information besides those 10 to

3   12 articles and the three you selected from

4   those here in generating or drafting this

5   portion of your report?

6      A.   No, no.  I don't think so.  I was

7   using the media.  I think the media is a

8   good harbinger of what is out there.  I

9   think that's the job of the media is to

10  reflect what's going on in the world and

11  society and not only to report the news but

12  give perspective about the news background,

13  interpretation.  That's why you have

14  editorials, columns, commentary, that kind

15  of thing.  You don't only report the news

16  but to give insight and perspective on it.

17     Q.   Is it your opinion that being known

18  as a rape victim of a powerful person is a

19  positive reputational characteristic?

20          ATTORNEY SWIFT:  Objection to form.

21          THE WITNESS:  I would say that

22     it's -- no, no.  I don't think it's --

23     I'm sure somebody would -- something

24     somebody would not want on their résumé

25     per se.  But the point -- all I'm saying

1       record.

2               (Recess taken from 2:59 p.m. to

3               3:08 p.m.)

4               THE VIDEOGRAPHER:  The time is now

5       3:08 p.m., and we're back on the video

6       record.

7    BY ATTORNEY CRAIG:

8       Q.   So, Mr. Fisher, if you want to turn

9    to page 22 of your report at Exhibit 1, you

10   see there's a section that has the header,

11   Reputation Repair Program?

12      A.   Yes.

13      Q.   And you note in here that at the

14   bottom of -- sorry.  Right above that

15   section you say:  While I attribute the

16   following mostly to her first report, the

17   content from my brief review from her second

18   report was the same in both her reports.

19              And then you go on to the section

20   entitled Reputation Repair Program.

21              Do you see that?

22      A.   Uh-huh.

23      Q.   Is it accurate to say that the text

24   of this with the exception of that one

25   paragraph on page 24 draws from your first

1   report?

2        A.   Yes, yes.

3        Q.   And so this is written,

4   specifically concerns the reputation repair

5   program that Professor Humphreys developed

6   in her Carroll I report?

7        A.   Yeah.  Most of this text was in my

8   rebuttal report.  It's just since I was

9   doing an overview of the entire case, I

10  thought I should have a section in here

11  about her report.  But most of this is old

12  ground covered in our first two depositions.

13       Q.   And, in fact, the citations in this

14  section are to pages in Professor Humphreys'

15  first report --

16       A.   Correct.

17       Q.   -- from Carroll I?

18       A.   Correct.  100 percent, yes.

19       Q.   Is there anything different sort of

20  in substance between what's in this report

21  and then what's in your prior Carroll I

22  report?

23       A.   No, I don't believe so.  I think

24  that -- I mean, obviously this is only an

25  excerpt from my first report because my

1   first report was, what, 10, 12 pages.  I

2   just put out -- basically from the first

3   report I just pulled out sort of the gist

4   of, you know, the important points from that

5   first report.  I added in a paragraph just

6   referencing the second report which you saw.

7           And so there's no real new ground

8   break in that.  It's just I thought if I was

9   doing a comprehensive report on the whole

10  case, I would have had to add in, you know,

11  something related to their expert.

12      Q.   Were there any additional materials

13  that we didn't cover --

14      A.   No.

15      Q.   -- in your last deposition --

16      A.   No.

17      Q.   Let me just get the question out.

18           Are there any materials that

19  weren't addressed or covered in your last

20  deposition that you considered before

21  including this section in your Carroll II

22  report?

23      A.   No, no.  As I said, what I was

24  trying to do was just to kind of summarize

25  the main points I had in the -- relating to