# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| E. JEAN CARROLL | ) | |
| | ) | |
| | ) | |
| v | ) | Case No. 1:22-CV-10016-LAK |
| | ) | |
| DONALD J. TRUMP | ) | |
| | ) | |

**EXPERT REPORT OF ROBERT J. FISHER**

**PREPARED FOR DONALD J. TRUMP**

**January 30, 2023**

TABLE OF CONTENTS

Assignment……………………………………………………………….. 1

Compensation…………………………………………………………….. 1

Background and Qualifications…………………………………………… 1-5

Record of Testimony……………………………………………………… 5-7

Case Background…………………………………………………………. 7-9

Lawsuit Information……………………………………………………… 9-11

Information/Input Reviewed to Form Opinions……………………………… 11-12

Analysis and Opinions………………………………………………….. 12-16

Analysis of Reputation Impact…………………………………………... 17-21

Plaintiff's Expert………………………………………………………… 21-24

Conclusion………………………………………………………………. 24-25

ASSIGNMENT

I am a veteran communications professional, executive and counselor – acquired from my background as both a journalist (reporter for the New York Times) and a half-century career in the communications fields of public relations, advertising and marketing.  I have also been acknowledged nationally by the legal profession and news media as an expert in the field of crisis communications and image/reputation management and damage repair.  Additionally, I am an experienced expert witness who has been involved in over approximately 80 cases, 70 of which were defamation or reputational harm-related cases during the past 17 years.  Due to that experience and expertise, I have been retained as an expert on behalf of the Defendant, Donald J. Trump to address the Cause of Action of Defamation in the lawsuit filed by the Plaintiff, E. Jean Carroll.  Specifically, I have asked to review, analyze and offer my comments, conclusions and opinions of any reputation harm that may or may not have been incurred by the Plaintiff as a result of the alleged false statements made about her attributed to the Defendant in a public pronouncement made on October 12, 2022.

COMPENSATION

For consultations, information gathering, research and the preparation of this report, my compensation was $600 per hour.  If a deposition is required, the rate will be $700 per hour with a four-hour minimum. Should I testify at the trial for this case, the rate will be $2,500 for a half day and $5,000 for a full day. Travel fee is $200 per hour and travel expenses would be required to be reimbursed as well.

BACKGROUND AND QUALIFICATIONS

General Summary

I am a veteran public relations, advertising, marketing and communications executive and counselor and journalist with 54 years of experience, including 42 years operating my own communications firm, Fisher & Associates, Inc., located in the Los Angeles, California. During my professional career, I have provided counsel and services to clients in a broad range of businesses, professions, and industries as well as to nonprofit organizations and government entities on a local, national and international basis as required.

While I am a communications generalist through the breadth of my professional background and experience (e.g., journalism, public relations, marketing, advertising), I am also a nationally-recognized expert in crisis communications, reputation management and image repair and counseling. My firm was a (and possibly the) national pioneer in creating and developing public relations and marketing/communications programs for the legal profession. My firm has provided litigation support in over 100 civil and criminal cases (including trials) throughout the United States. Additionally, for the past 17 years I have served as an expert witness, representing both Plaintiff's and Defendants in approximately 80 cases in 30 states and the District of Columbia.  For decades I have functioned as an expert information source and analyst for the mass media on issues relating to crisis communications, damaged image and reputation.

Litigation Experience

Because of my 42-year background in representing law firms and being involved in litigation and trials by handling communications and the "Court of Public Opinion," I have amassed a great

amount of background and experience in the judicial process and all aspects of litigation. This has led to me periodically receiving calls from law firms, individuals and businesses throughout the U.S. from those who needed aid and counsel. A brief list of some of the major litigation and/or legal actions in which I was called to provide counsel or services, include:

- Iranian Hostages before the U.S. Supreme Court (Washington, D.C.)
- Dennis Wilson (Beach Boys) Estate Dispute (Los Angeles)
- Maxicare Bankruptcy (Los Angeles)
- United Airlines Crash in Iowa Cornfield (Chicago)
- International Organization Branded Cult (Scottsdale, Arizona)
- Legislature Threat to Ban Brothels in Nevada
- High School Students Killed (Paducah, Kentucky)
- Rodney King Beating (Los Angeles)
- IRS Indictment of CPA Firm for Tax Fraud (San Francisco)
- Homeowners Facing Loss of Homes (Los Angeles)
- BKK/BFI Landfill Fraud (Southern California)
- Firestone Tire Class Action Lawsuit re Defective Tires (Los Angeles/Washington, D.C.)

Media Expert/Analysis

As a direct result of my involvement in many litigious situations (many high profile), over the past few decades, I have often been sought out by the media as an expert information source and analyst to provide background, information, interpretation and analysis, commentary and opinions on news, issues and matters relating to those people, businesses, institutions, governments, etc. who were controversial, in conflict or in trouble. Generally, this related to what the public perception of the situation was, how could it be changed by those involved and what damage has or was it causing to their image, reputation or brand in the short and/or long terms. As an example, with both of the O.J. Simpson civil and criminal trials, and in-between the two, I was regularly interviewed by local, national and international print and electronic media as an expert media source/analyst.

Expert Witness

In 2006, due to my extensive career in journalism, public relations, marketing and advertising, I began providing service to litigants as an expert witness. Since then I have served as an expert witness in approximately 80 cases on behalf of both Defendants and Plaintiffs in 29 states throughout the United States (California, New York, Florida, West Virginia, Georgia, North Carolina, Mississippi, Virginia, Utah, Tennessee, New Mexico, Nevada, Hawaii, Washington, Colorado, Minnesota, Michigan, Maryland, Louisiana, Delaware, Michigan, Wisconsin, Ohio, Louisiana, Kentucky, Arizona, Texas, Alabama) plus the District of Columbia. I have provided sworn testimony in depositions, hearings, arbitration hearings and trials. The bulk of the cases have primarily been in the areas of journalism, defamation (libel and slander) and public opinion/perception. I have also been involved in cases relating to professional malpractice, overbilling, inappropriate billing, loss of image and reputation, professional business operation and damage to a future professional career.

Education

San Jose State College    Bachelor of Arts degree    Public Relations (1966)
University of California at Los Angeles (UCLA) Periodic courses taken to upgrade knowledge. Numerous seminars, workshops and other education forums to enhance knowledge.

Professional Experience

- New York Times           Newspaper                  Reporter
- Los Angeles Beautiful, Inc.   Non-profit organization   Public Relations Director
- Harshe, Rotman & Druck   National PR Firm           Asst. Account Executive
- Burson-Marsteller, Inc.    National PR Firm           Account Executive
- Atlantic Richfield Plaza    Shopping Center            Promotion Director
- Doremus & Company        National PR Firm           Account Supervisor
- Fisher & Associates, Inc.   PR Firm (Founded 1978)     President

Related Experience

While in the United States Army (1966-68), I served as a Public Information Officer in West Germany. I provided traditional public relations counsel and services for the Army, and I also interacted with the German media/community on its behalf.

Awards and Honors

I have received numerous awards from local and national public relations and marketing organizations for my counsel and service to clients during the past five decades.

Professional Memberships

- Public Relations Society of America (former Executive Committee Member of Counselor's Academy)
- Public Communicators of Los Angeles (officer for five years)
- Institute of Management Consultants (board member)
- Public Interest Radio and Television Education Society
- American Heart Association (Vice Chairman, Communications Committee)

Lectures and Publications

Throughout my professional career, I have spoken and written on a wide variety of subjects related to public relations, marketing and communications for business as well as for specialty areas (e.g., crisis communications, legal marketing/litigation support).

- Lectures/Presentations – I have lectured at universities (e.g., UCLA), to national conventions (e.g., American Bar Association) and at a variety of speaking forums (e.g. weekly/monthly meetings, seminars, symposiums) held by a diverse range of professional and business organizations.

- Publications – I have written a large number of articles for a variety of local, regional and national general, business, professional (e.g., legal) and trade publications, online and offline, including newspapers, magazines, newsletters and websites. (I have also been interviewed for, quoted in and had articles written about me in local, regional and national legal publications.)

- Defamation/Reputation Harm Articles – Articles I have written specifically addressing reputation damage and defamation during the past 10 years have included:

- ■ *"Image/Reputation/Brand Damage: Does Litigation Solve the Problem?"*
- ■ *"Defamation: The Stain That Can Never Be Removed."*
- ■ *"Negative Communications: The Process of Absorption and Transmission."*
- ■ *"Harmful Media Exposure: Beware of the Hidden Sources of Damage."*
- ■ *"Defamation: Guiding Principles of Negative Communications That Result in Image and Reputation Damage."*
- ■ *"Defamation Defense: Is there a Third Bite of the Apple."*
- ■ *"Image/Reputation Damage From Media News Reports: Is it Legally Actionable."*
- ■ *"Reputation Damage Can Emanate From Actions/In-Actions…As well as Words."*
- ■ *"Defamation Cases: Why an Expert Witness is Vital."*

RECORD OF TESTIMONY

List of cases for which I have provided testimony over the past four years

During this period, I have had my deposition taken 15 times:

- May 8, 2019 – *Robert Gish, M.D.; Robert G. Gish Consultants, LLC v Celeste E. Le Sage*, Superior Court of California, County of San Diego.

- January 23, 2020 – *Kenneth L. Creal and Kenneth L. Creal, an Accountancy Corporation v Amitiss Nasiri,* Superior Court of the State of California for the County of Los Angeles

- January 31, 2020 – *Examination Board of Professional Home Inspectors and American Society of Home Inspectors, Inc. v International Association of Certified Home Inspectors and Nickifor Gromicko a/k/a Nick Gromicko.* United States District Court for the District of Colorado

- February 27, 2020 – *Party Animal, Inc. v Evanger's Dog and Cat Food Co, Inc., Nutripack, LLC,* United States District Court, Central District of California.

- June 12, 2020 – *Riley's American Heritage Farms, James Patrick Riley v James Elsasser, Steven Llanusa, Hilary LaConte, Beth Bingham, Nancy Treser Osgood, David S. Nemer, Ann O'Connor, and Brenda Hamlett,* United States District Court Central District of California – Eastern Division.

- February 24, 2021 - *Hebrew Health Homes Network, Inc., Arch Plaza, Inc. Arch Plaza Properties, Inc. Aventura Plaza, Inc. Jackson Plaza, Inc., Hebrew Homes of Miami Beach, Inc., Ponce Plaza, Inc. Ponce Plaza Properties, Inc., Hebrew Home Sinai, Inc., South Beach Plaza, Inc., Hebrew Homes of South Beach, Inc., South Beach Nursing and Rehabilitation Center, Inc., University Plaza Rehabilitation and Nursing Center, Inc., University Plaza Properties, Inc., Hebrew Homes management Services, Inc. v* Greenberg Traurig, P.A., a Florida Corporation, Greenberg Traurig, LLP, a New York Limited Liability Partnership and William B. Eck. Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida

4

- April 27, 2021 – *Russ Newman v American Psychological Association (APA), David H. Hoffman, Sidley Austin LLP and Sidley Austin (D.C.) LLP.* American Arbitration Association, Washington, D.C.

- June 18, 2021 - *The Law Offices of Brenden R. Appel and Brenden R. Appel v Georgia's Restaurant and Pancake House, Inc. and Harry Kulubis.* Circuit Court of Cook County, Illinois County Department, Law Division.

- December 10, 2021 – *Legno Bastone, Inc. v Provenza Floors, Inc. and Brian J. Sullivan.* In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida Civic Action.

- March 16, 2022 – *Doan Restoration of Arizona, LLC and Doan Restoration of Michigan, LLC v Paul Curtis, Jane Doe Curtis and PR&C Specialities, LLC*, Superior Court of the State of Arizona, Maricopa County.

- April 7, 2022 – *Michael Coleman and Jamael Stewart v City of Delray Beach.* In the Circuit Court of the 15th Judicial District in and for Palm Beach County, Florida.

- September 30, 2022 – *Linda Fairstein v Netflix, Inc., Ava DuVernay and Attica Locke,* United States District Court, Southern District of New York.

- October 31, 2022 – *Cumberland Family Medical Centers, Inc., d/b/a Health Kids Clinics v James A. Miller, M.D. and Blue Grass Clinics, PLLC.*, Commonwealth of Kentucky, Casey Circuit Court.

- November 29, 2022 – *San Juan Products, Inc. and American Environmental Corporation v River Pools & Spas, Inc.; River Pools Franchising, Inc.; and Thursday Pools, LLC.*, The United States District Court for the Middle District of Florida, Tampa Division.

- December 14 and 20, 2022 - E. Jean Carroll v Donald J. Trump, Supreme Court of the State of New York, County of New York.

During this period, I have testified at the following one arbitration hearing:

- On December 11, 2019, I testified at an arbitration hearing in the case of *Susan M. Packard v Morgan Stanley,* Financial Industry Regulation Authority, Washington, D.C.

During this period, I have testified in three jury trials:

- On January 24, 2020, I testified in the trial of *Harry Loveland; Charlene Loveland v Sol Del Cielo, LLC; Abraham Sandoval, Jr, an individual; M. L. Culkin Construction Company, Inc.*, Superior Court of California County of Los Angeles

- On February 24 and March 2, 2020, I testified in the trial of *Justice Protection Project, Lenore Albert v Xcentric Ventures LLC, Yelp, Inc. George Olivo, Megan Nikolic, Pam Ragland, Karen Rozier, Sheryl Alexander and Rene Dawson,* Superior Court of California County of Orange

- On February 25, 2020, I testified in the trial of *Nicholas Krakana v Scottsdale Police Department,* United States District Court, District of Arizona

During this period, I have testified in one bench trial:

- On September 21, 2021, I testified in the trial of *Kenneth L. Creal and Kenneth L. Creal,an Accountancy Corporation v Amitiss Nasiri,* Superior Court of the State of California for the County of Los Angeles.

CASE BACKGROUND

Reason for Lawsuit

The Plaintiff maintains that the Defendant sexually assaulted and raped her in the Bergdorf Goodman department store in New York City sometime during the period of the Fall of 1995 and the Spring of 1996. When she went public with the alleged crime in June 2019, she contends that the Plaintiff, in defending himself, issued a number of false statements in June of 2019 and October of 2022 which defamed her and damaged her reputation. The lawsuit was filed on November 24, 2022 for Battery and Defamation.

Profile of Parties Related to This Case

A brief profile of the litigants in this lawsuit is as follows:

Plaintiff

The Plaintiff in this case is E. Jean Carroll ("Carroll"), a resident of the State of New York who is a journalist, author (five books), former writer for Saturday Night Live (Emmy nominated), and advice columnist for *Elle* magazine (reputedly the longest serving columnist in the U.S.) and hosted her own TV program "Ask E. Jean" on America's Talking network.

Defendant

The Defendant is Donald J. Trump ("Trump"), a resident of the State of Florida and a former President of the United States. Prior to that he was a businessman (real estate developer) and was the host of a NBC network television program.

Background to Rape Allegation

As detailed in her Complaint, following is a description of the alleged sexual assault and rape as the Plaintiff described it. It should be noted, there is no documentation, evidence or independent verification of her account of this incident and the Defendant denies any of this occurred.

The Plaintiff alleges that sometime between the Fall of 1995 and Spring of 1996, she encountered the Defendant when she was exiting the Bergdorf Goodman Department Store in New York City. She maintains that after speaking briefly, he requested that she assist him in helping to select a gift for a female friend. In the course of assisting him in finding a gift, she alleges that he assaulted and raped her in a dressing room in the store. She reports that after suggesting handbags or hats as a gift, the Defendant said he wanted to purchase some lingerie. They proceeded to the lingerie department which was empty with no sales attendants (and

presumably customers) in sight.  Plaintiff contends that the Defendant maneuvered her into a dressing room, shut the door and proceeded to force himself upon her, to include forcing his penis inside her.  She subsequently pushed him away, broke free and exited the dressing room and building.

Plaintiff Reporting Incident

Immediately after leaving the building, Plaintiff reports she used her mobile telephone to call a friend, Lisa Birnbach, and informed her of the incident. Ms. Birnbach urged her to contact the police and report the attack.  She chose not to and requested her friend not to tell anyone.  Within a few days, she revealed the incident in a meeting with another friend, Carol Martin.  Ms. Martin cautioned her not to tell anyone because the Defendant was too powerful and he would "bury her."  Weighing both pieces of advice, the Plaintiff decided not to report the alleged rape to law enforcement nor report the incident publicly because she was afraid of retaliation from the Defendant and feared the disclosure and subsequent turmoil would ruin her life.

Plaintiff Goes Public With Report of the Incident

Approximately 20 years later, in the aftermath of the Weinstein controversy and the "Me Too" movement, she decided to come forward and included an account of the incident in a book she wrote ("What Do We Need Men For? A Modest Proposal") which was published on July 2, 2019.  She determined that it was the right format for her to come forward about the Defendant's assault and it would allow her to tell her own story in her own words and on her terms rather than have it interpreted through an interview or revealed through social media channels.  Prior to publication, however, an excerpt from the book detailing the alleged assault and rape appeared in New Yorker Magazine on June 21, 2019.  This became the first public exposure for her claim.

Defendant's Reaction and Response

The Defendant immediately responded to the disclosure published in the June 21 New Yorker article three times over the next four days denying the Plaintiff's allegations of sexual assault and rape. These included:

- On June 21, he issued the following public statement:

  *"Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.*

  *Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.*

  *Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming they have no video footage of any such incident, because it never happened.*

7

*False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.*

*If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."*

- On June 22, he made the following statement to reporters:

*"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—*

*[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson— a newscaster.*

*[Reporter]: You were in a photograph with her.*

*[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.*

*And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.*

*New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.*

*It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.*

*You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.*

*But here's a case, it's an absolute disgrace that she's allowed to do that."*

- On June 24, The Hill published an interview with the Defendant in which he was quoted as saying: *"I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"*

Plaintiff Files Lawsuit

On November 4, 2019, Carroll filed a lawsuit against Trump in the Supreme Court of the State of New York, County of New York (Case No. 20 civ. 7311 (LAK) (JLC)) with a single Cause of Action of Defamation. The lawsuit was filed in response to Trump's comments and alleged false statements (outlined above) in response to the Plaintiff going public with her allegations of assault and rape.

Defendant' Additional Public Defense

Prior to the Plaintiff filing the new lawsuit under the Adult Survivors Act ("ASA") which included a Cause of Action for Battery as well as one for Defamation, Trump commented on the alleged incident in a post he made on his social media platform, Truth Social on October 12, 2022. Allegedly, he also distributed the statement to news media headquartered in New York. The statement included the following text:

> *"This 'Ms. Bergdorf Goodman case' is a complete con job, and our legal system in this Country, but especially in New York State (just look at Peekaboo James), is a broken disgrace. You have to fight for years, and spend a fortune, in order to get your reputation back from liars, cheaters, and hacks. This decision is from the Judge who was just overturned on my same case. I don't know this woman, have no idea who she is, other than it seems she got a picture of me many years ago, with her husband, shaking my hand on a reception line at a celebrity charity event. She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, 'swooned' her. It is a Hoax and a lie, just like all the other Hoaxes that have been played on me for the past seven years. And, while I am not supposed to say it, I will. This woman is not my type! She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. Our Justice System is broken along with almost everything else in our Country."*

> *In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance. Now all I have to do is go through years more of legal nonsense in order to clear my name of her and her lawyer's phony attacks on me. This can only happen to 'Trump'!"*

LAWSUIT INFORMATION

The new lawsuit was filed on behalf of the Plaintiff, E. Jean Carroll, against the Defendant, Donald J. Trump, on November 24, 2022, in the United States District Court, Southern District of New York.

Causes of Action

In its Complaint, the Plaintiff cites the following Causes of Action:

- Battery
- Defamation

## Relief Sought in Lawsuit

Through its lawsuit, the Plaintiff is seeking the following relief:

- Order Trump to retract his defamatory statement.

- Award Carroll compensatory damages in an amount to be determined at trial.

- Award Carroll punitive and exemplary damages in an amount to be determined at trial.

- Award Carroll pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

## Plaintiff's Contentions

With respect to the Cause of Action of Defamation, in her Complaint, the Plaintiff offered the following contentions:

- Trump published his October 12, 2022 statement containing numerous defamatory claims on Truth Social, to members of the media, and to his supporters.
- Trump's statement identified—and was "of or concerning"—Carroll.

- Trump's statement contained numerous falsehoods about Carroll, whether on its face and/or by virtue of a clear implication affirmatively intended by Trump.

- Trump's false statement regarding Carroll was defamatory *per se*.

- Trump's false and defamatory statement was published throughout New York State and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Trump ensured that his false and defamatory statement about Carroll would receive a wide circulation by providing it to the national press.

- Trump made his false and defamatory statement knowing that it was false or with reckless disregard for its truth or falsity.

- Trump made his false statement with ill will and spite, and with wanton, reckless, or willful disregard for its injurious effects on Carroll and her rights.

- Trump's false and defamatory statement caused Carroll to suffer reputational, emotional, and professional harm.

## Plaintiff's Alleged Reputation Harm

In her Complaint, the Plaintiff alleged the following forms of reputation harm she has suffered:

- Trump's false and insulting claims about Carroll were defamation *per se*. They tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information.

- Carroll has suffered harm as a direct result of Trump's false, defamatory statement.

- Coming forward put Carroll in the crosshairs of one of the most powerful men on the planet. He has since created and used his own powerful social media platform to attack her integrity, demean her appearance, condemn her as a liar, and accuse her of fabricating a rape allegation to promote a book.

- Trump's October 12 statement has caused Carroll emotional pain and suffering at the hands of the man who raped her, as well as injury to her reputation, honor, and dignity.

- Carroll has suffered professional harm as a direct result of Trump's defamatory statement. By attacking Carroll, Trump has injured the reputation on which she makes her livelihood as a writer, advice columnist, and journalist.

INFORMATION/INPUT REVIEWED TO FORM OPINIONS

In connection with my preparation of this report, I have received and reviewed from the Plaintiff's legal counsel, the following documents and information relating to this case:

Complaints

- E. Jean Carroll v Donald J. Trump (November 4, 2019)
- E. Jean Carroll v Donald J. Trump (November 24, 2022)

Legal Documents

- Answer (January 23, 2020)
- Plaintiff E. Jean Carroll's Response and Objections to Defendant Donald J. Trump's Request for Production of Documents (January 27, 2022)
- Plaintiff E. Jean Carroll's Second Set of Interrogatories to Defendant Donald J. Trump (August 2, 2022)
- Defendant's Amended Responses and Objections to Plaintiff's First Request for Production of Documents (August 26, 2022)
- Defendant Donald J. Trump's Responses and Objections to Plaintiff's Second Set of Interrogatories (September 7, 2022)

Depositions

- E. Jean Carroll (October 14, 2022)
- Donald J. Trump (October 19, 2022)

Miscellaneous Documents

- Expert Report of Professor Ashlee Humphreys, Ph.D (October 14, 2022)
- Expert Report of Professior Ashlee Humphreys, Ph.D (Partial Review) (January 9, 2023)

11

Media Exposure

- Slate Magazine: "E. Jean Carroll Told Her Story Anyway" (June 25, 2019)
- Christian Science Monitor: "E. Jean Carroll: She Said, He Said, and How Media Weighs Balance" (June 26, 2019)
- New York Times: "Why E. Jean Carroll, 'The Anti-Victim,' Spoke Up About Trump" (June 27, 2019)
- New York Times: "What to Know About E. Jean Carroll's Defamation Suit Against Trump" (October 19, 2022)
- Forbes: "E. Jean Carroll Case:  What to Know About the Defamation Suit Accusing Trump of Rape" (October 20, 2022)
- Associated Press: "Donald Trump Response in Defamation Suit filed by E. Jean Carroll" (October 20, 2022)

Internet Research

During the course of this assignment, I conducted research to review information on the internet that might be pertinent to the litigants and the lawsuit as well as to seek clarification and definition on various subjects.

Sources to Obtain Information

The aforementioned documents and informational materials listed along with internet research I conducted and information I received from Plaintiff's legal counsel provided me with the information related to this case and specific to it which formed the basis for the findings, conclusions and opinions I offer in this report.

ANALYSIS AND OPINIONS

Preface

Following are my comments, conclusions and opinions as they pertain to the issues I was asked to address as outlined in the previous "Assignment" section of this report. My input in this report will be based on the information I obtained and reviewed in this case which was detailed in the "Information/Input Received to Form Opinions" section of the report.  The information, which emanated from both sides in this litigation, reflects both of their understandings of the facts as well as their interpretations and views of them. In some instances, they agree on information and facts and in others they don't. It is not my task or responsibility to determine who is right or wrong; that will be determined in court. My responsibility is to analyze, evaluate and opine on reputational damage from the facts I know to be true.  Where there is a disagreement, since I was retained by the Plaintiff, I will presume that the information provided on their behalf is correct and will base my conclusions and opinions on it being true unless I am aware of – or will be subsequently provided - evidence to the contrary.

Methodology

To reach these conclusions and opinions, the methodology I used in this case is consistent with that which is standard operating procedure that public relations and communications professionals as well as expert witnesses use when addressing issues and situations for clients like those in this case in making their determinations and offering their findings, conclusions and opinions.

- Carefully reviewed all documentation and information on the background to this dispute as well as that related to the litigation as well any other unrelated information that is germane to this the issues in contention in this case.

- Carefully analyzed the information provided regarding the dispute and their positions on it as espoused by both parties in this litigation (as reflected in the Case Background section of this report).

- Queried Defendant's legal counsel to get additional information and clarification as needed.

- Researched information as needed on the internet.

- Applied the principles of negative communications to this case as appropriate.

- Followed peer accepted procedures in both the public relations and expert witness professions as to how to analyze and assess situations which negatively impact reputations as well as devise strategies, plans and actions to restore them.

- Reviewed and analyzed previous applicable experiences I have had in my professional communications and expert witness background that may be applicable to this situation and would provide me with insight to assist me in forming my conclusions and opinions.

Relative to the last point above, it is important to note that any conclusions and opinions I offer are based on the professional background and the experience and expertise I have amassed during my 54-year background in communications (outlined in earlier sections of this report) and not emanating from surveys, studies, tests, research or other forms of qualitative, qualitative types of analyses or fact gathering procedures. They are based on direct experience and observations working with people, businesses and/or entities in similar situations and what transpired from them.  This is covered in Rule 702 and 703 which states:

- The use of opinions will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts.

- The expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education."

- Using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert is qualified; (2) the testimony addresses a subject matter on which the factfinder can be assisted by an expert; (3) the testimony is reliable; and (4) the testimony "fit" the facts of the case.

My five-decade background in all major professional areas of communications along with my 42 years of experience in litigation support, my specialization in reputation management and repair counseling and programs as well as my 17 years as an expert witness clearly gives credence to the validity of the following comments, conclusions and opinions I offer relating to this case.

Defamation Definition

In the Plaintiff's lawsuit, one of the Causes of Action is Defamation.  Under New York law, a claim of Defamation must contain these elements:

- A false statement
- That is published to a third party
- Without privilege or authorization
- That causes harm, unless the statement is one of the types of publications actionable regardless of harm.
  (*Cain v. Atelier Esthetique Inst. of Esthetics Inc.*, 733 Fed.Appx. 8, 11 (2d Cir. 2018) (citing *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017); *Stepanov v. Dow Jones & Co.*, 987 N.Y.S. 2d 37, 41-42 (1st Dept. 2014)).

General Overview

I have reviewed the documents listed in the preceding section of this report, have received additional input from the Defendant's legal counsel and have done some basic internet research to obtain some background on the litigants, see what type of information existed on the lawsuit itself as well as to get a sense of the type and extent of media exposure that was generated by this lawsuit.

The core of this case which emanated from an alleged assault and rape is a classic "he said, she said" situation.  The Plaintiff says he did, and the Defendant says he didn't. There is no empirical evidence to support either side as there weren't any witnesses nor forensic evidence.   The Plaintiff reports she told two friends about the assault within a couple days and the Defendant said it couldn't have happened because he was accompanied at all times by a security person who would have witnessed the encounter with the Plaintiff.  The Plaintiff has an explanation why she waited 23 years to go public with the assault and rape (fearing damage to her professionally and personally) and the Defendant reacted to the news with vehement statements of denial.  The Cause of Action of Defamation in this lawsuit is directly related to the Defendant's responses and denials of being accused of sexual assault and rape.

Analysis of Statements

As aforementioned, on October 12, 2022, slightly more than three years after the aforementioned comments made by Trump about Carroll at the time she went public with her allegations of assault and rape, Trump made additional comments through his social media platform, Truth Social.  Much of his comments were similar to those previously made.  The following are those cited in the Complaint and my assessment on them:

- In the October 12 statement, Trump falsely stated that he did not rape Carroll.

  Comment:  In the American Judicial System, the cardinal principle is that every person accused of a crime is presumed to be innocent unless and until his or her guilt is established beyond a reasonable doubt.   There is no evidence that the Defendant assaulted or raped the Plaintiff.  It cannot be a false statement to deny some action that hasn't been proven to have taken place.  In fact, it is more of a defamatory statement for the Plaintiff to have made a statement that it did occur, especially without any evidence of it.

14

- <u>In the October 12 statement, Trump falsely stated that he had no idea who Carroll was.</u>

Carroll declares that she first met Trump when she was a writer on Saturday Night Live in 1987, then met him at a party in the 1990's and later they waved at each other across Fifth Avenue in 1994 or 1995.

In his deposition, Trump responded to this assertion by testifying:

> Q.  *When the allegation came out in 2019, you said you – I think it's your testimony that you had no idea who she was.*
>
> A.  *I still don't.*

Carroll produced a photograph showing herself talking with Trump at a party as a form of proof that they knew each other. Trump maintains that he was in a receiving line at the party and greeted a number of people which is not an indication he knew her. In his deposition (Page 18, 17-23), he testified:

> Q.  *So, if I can understand your testimony, sir, you're saying that at the time you made the statement, you were not aware of ever meeting Ms. Carroll? You have since seen a photograph that shows you with Ms. Carroll on a receiving line; correct?*
>
> A.  *Along with a lot of other people. (81 – 17-23)*

Comment:  Whether Trump knew her or not is unknowable barring a third person documenting this was true and I have not seen any evidence of that.  These could not be false statements unless there is verification that they indeed knew each other.  Further, even if it was proven that these were false statements, it is highly questionable that a dispute over whether he knew her or not would cause Carroll reputational harm.

- <u>In the October 12 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a "hoax," "scam," or ploy to increase her book sales.</u>

Specifically, In a similar alleged false statement made on June 12, 2019, Trump was reported to have said the following:

> *"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh."*

In her deposition, Carroll testified (Page 157, 8-11):

> Q.  *Did you think it would help sell the book?*
>
> A.  *I thought people would be interested.*

Comment:  In the above excerpts of their testimony, Trump did not refer to Carroll directly when alluding to selling a book and in her testimony, Carroll implied that

people would have interest in the rape charge, which indirectly would could be construed that it would result in an increase in sales. Further, Trump's comment was clearly an opinion and constitutes speculation and supposition.

- *The false statement that Trump made about Carroll on October 12, 2022, was published with knowledge of its falsity and/or with reckless disregard for the truth.*

  Comment: To be determined at trial.

- *Trump identified Carroll on sight when they met at Bergdorf Goodman.*

  Comment: No evidence that they ever met at the store.

- *In that period, Trump moved in the same highly publicized New York City media circles as Carroll, who also appeared on her own popular daily television program.*

  Comment: Moving in the same circles does not guarantee they knew each other and there is no evidence that he ever watched her television program.

- *In October 2022, Trump's defamatory claim that Carroll had "completely made up a story" and thus fabricated the rape accusation to promote her book rested on the express or deliberately-implied premise that Carroll's underlying accusation was false. Because Trump knew that the accusation was true, he also knew that his claim about Carroll's motive was false.*

  Comment: There is no evidence that the rape occurred other than her allegation. He denies the allegation of rape. Unless there is proof it happened, his denial is not a false statement.

- *Moreover, Trump lacked any factual basis for his statement implying that Carroll had revealed to the public that he raped her at Bergdorf Goodman to promote "a really crummy book." And since his statement about Carroll was made to impute motives for lying, when in fact he knew that Carroll had spoken the truth, Trump had strong reason to doubt the veracity of his own insulting claims. Trump thus published his statement with reckless disregard for the truth.*

  Comment: There is no reckless regard for the truth if there is no "truth" to base it on.

This is entirely a "he said, she said" situation where there is no concrete evidence advanced by the Plaintiff or anyone on her behalf that her "statements of fact" are true. Only her word. Without verifiable proof, her allegations of false statements appear to be based on speculation, conjecture, supposition, assumption, presumption and hypothesizing. The Defendant's denials are only false statements if the allegations they address are based on fact. In summary, after a careful review of all the alleged false statements and negative implications that the Plaintiff claims that Trump made, it is my opinion that none of the statements she identified can be determined as being false and the negative implications are expressions of his opinions which constitute his right to free speech. (This is not meant to be a legal conclusion, just my analysis of them.)

ANALYSIS OF REPUTATION IMPACT

In this section of the report, an analysis will be made of what, if any, reputation harm resulted from the alleged false statements of the Defendant and what effect – negative or positive – it would have on the Plaintiff, professionally and personally.

In the Plaintiff's Complaint, there were numerous allegations regarding the reputation harm that she suffered from the Defendant's statements, comments and assertions. This is reflective of her assertions that the Defendant's remarks caused a significant decrease in letters for advice she was receiving at Elle Magazine and led to her eventual dismissal from the magazine.   Both were debunked by the Plaintiff in her deposition through her own testimony.  On the issue of receiving less letters from public awareness of the alleged rape:

> Q.  *Did you -- were you told in any of these letters or did you get any information from the outside that they were going down because of your article or was this just your perception?*
>
> A.  *No, it was my perception…*   (Page 216, 3-8)

On being terminated by Elle because of the Trump alleged rape exposure:

> Q.   *Did someone from Elle tell you that?*
>
> A.   *No, they would never admit it.*   (Page 178 9-11)
>
> Q.  *And at the bottom of this article do you see that it says in the last paragraph on the first page in response to a list of questions sent by The New York Times, a Hearst spokeswoman e-mailed the statement, quote, E. Jean Carroll was long a beloved voice in the pages of Elle. The decision not to renew her contract was a business decision that had nothing to do with politics, it said. Do you see that?*
>
> A.  *Yes*                        (Page 183, 10-21)

Similarly, the Plaintiff, in her Complaint, states that that Trump's statements and comments constituted Defamation Per Se (which was not listed as a Cause of Action) because they tended to (and did) damage Carroll in her trade, occupation, and/or business. Under New York law, Defamation Per Se is defined by the following criteria:

- Statements charging a Plaintiff with a serious crime.
- Statements that tend to injure another in their trade, business, or profession.
- Statements imputing a loathsome disease on a Plaintiff.
- Statements imputing unchastity on a woman.
  (*Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992).

Trump's comments and opinions did not accuse her of a serious crime, having a loathsome disease or being unchaste. As to the criteria listed above relating to professional harm, the Complaint states that the Plaintiff has suffered professional harm as a direct result of the Defendant's defamatory statement(s).  By attacking her, it alleges, he has injured the reputation on which she makes her livelihood as a writer, author, advice columnist, and journalist.  In point of fact, in all his remarks, the Defendant did not directly say anything negative about her ability

or competence as a writer, columnist, journalist or book author or any other aspect of her professional capability or career.

Additional forms of reputation harm the Plaintiff cites in her Complaint, include:

- Plaintiff has suffered harm as a direct result of Trump's false, defamatory statement.

  Comment:  Whether the statement(s) was defamatory will be determined at trial.

- Plaintiff coming forward put her in the crosshairs of one of the most powerful men on the planet.

  Comment:  She was aware of that when she went public with her accusations.

- Defendant has created and used his own powerful social media platform to attack her integrity, demean her appearance, condemn her as a liar, and accuse her of fabricating a rape allegation to promote a book.

  Comment:  Defendant did make his October 12 statement on his social media platform and his comments and opinions are the subject of this lawsuit.

- Defendant's October 12 statement has caused the Plaintiff emotional pain and suffering at the hands of the man who raped her, as well as injury to her reputation, honor, and dignity.

  Comment:  The allegation he raped her is unproven and the damage to her reputation will be addressed in the next section.

Reputation Damage Perspective

To some degree, the Plaintiff most likely suffered some reputational harm.  Unquestionably, the Defendant has a following of loyal supporters who take everything he says as "gospel."  However, the trial will determine whether his disparaging remarks about the Plaintiff is actionable against him based on whether his statements were defamatory or not.  If not, he cannot be held legally responsible for any reputational harm that emanated from his negative comments, allegations or opinions about her.

There is a case to be made that this dispute and resulting litigation may actually have proven to be a net benefit to the Plaintiff in terms of her reputation and public standing.  The following factors must be weighed in evaluating this hypothesis:

- Plaintiff's Positive Reputation – Prior to the Defendant's statements, the Plaintiff Carroll was not an unknown entity who had no public presence and was, in effect, a "clean slate" which the Defendant Trump could negatively define her with his comments and opinions.  Carroll was a "public person" who was well known for three decades and had an excellent reputation as a writer, author (five books) journalist and had a high profile position as an advice columnist for 27 years with a leading national magazine (Elle).  Additionally she was a writer for one of television's most popular programs (Saturday Night Live) and had received an Emmy nomination for her work on it.

This positive public profile affords Carroll a virtual "shield" to a large extent to offset the negative portrait that Trump may have tried to paint of her with his negative remarks about her as opposed to if she was a person no one had ever heard of or who had not have had a pre-existing positive reputation.  In short, people would be less likely to think ill of her and here reputation damaged based on his input.

- Defendant's Own Reputation – The Defendant Trump is, arguably, a highly controversial person who, while having a passionate following – is highly unpopular with a vast majority of the public.  In a recent poll (December 14, 2022) conducted by Quinnipiac University, 31% of those polled approved of him and 59% disapproved.  It was reported that this was the lowest approval rating he has ever received.  It is reasonable to project that his favorability rating could continue to decline with the multitude of investigations and litigation with which he is embroiled.

  Additionally, two other factors need to be considered.  One is his personality which is seen by many as volatile, combustible, inflammatory and he is renowned for attacking his opponents.  The Plaintiff herself cited this as a reason she did not go public when the alleged assault took place in the late 1990's.    The other is his perceived public reputation for inappropriate sexual contact with women – approximately 20 women have accused him of inappropriate behavior.  Some he has self-admitted to while other such allegations he has denied.

  There are some basic conclusions that can be drawn from these three factors, including:

  - More than two-thirds of the country (Quinnipiac University Poll) d no quite give credence to his negative remarks about the Plaintiff (i.e. consider the source).  In fact, many if not most would be predisposed to favor or think well of anyone he opposes.

  - Given his controversial personality and his penchant towards often excessive and relentless attacks on those who oppose him, it is reasonable to presume that most would consider his remarks in that light and would be sympathetic to the Plaintiff.

  - With consideration given to the Defendant's long – and very public – history of accusations by women and inappropriate sexual behavior, as well as his own admissions in this area, the most likely conclusion is that significant amount of people might believe the Plaintiff's allegations against him.

  Weinstein/Me Too Phenomenon – The environment and dynamics of women reporting sexual assaults and rapes changed dramatically in recent years emanating from the Harvey Weinstein scandal and movements spawned by it (e.g. Me Too, Times Up).  The Plaintiff herself pointed to this as the reason that she came forward with her allegations against the Defendant after two decades.  The culture now is that women are "heroes" who come forward to report sexual assaults, harassment or rapes.  The Plaintiff would be seen as being particularly brave to accuse such a famous, rich and powerful person as the Defendant.

- Visibility and Prominence – As previously stated, the Plaintiff was a public figure over a three decade span, most notably in the New York area and among women who were aware of her advice column in Elle Magazine.  However, it is without question that

19

coming forward to accuse the Defendant has raised her profile exponentially nationwide through the massive media coverage that ensued as well as internet exposure. This has been virtually non-stop since she went public with her accusations in June 2019. It will continue at least through the trial which is scheduled for April of this year. (Note: I had never heard of the Plaintiff prior to her lawsuit but I became of aware of her professional accomplishments prior to being contacted to serve as an expert witness in this case.)

- Positive Media Exposure – Similar to several of the factors above, the extensive media coverage of her initial reporting of the alleged assault and rape continuing through all the litigation that has been ongoing since she filed her original lawsuit in November 2019 has highly positive for her for several reasons: sympathy for being a victim, coming forward publicly to report a wrong and being brave in taking on a powerful person who cause her harm. Some examples of media exposure that was complimentary and highly positive to her in terms of creating awareness of her professional credentials and competence:

  - Touting her background – In an article in the Christian Science Monitor (June 26, 2019) titled "E. Jean Carroll: She Said, He Said, and How Media Weighs Balance," it published her credentials:

    --- *"...when the writer and advice columnist E. Jean Carroll…"*

    --- *"...the well-known author's…"*

    --- *"...given a respected public figure like Ms. Carroll, whose advice column "Ask E. Jean" has appeared in Elle magazine since 1993…"*

  - Articles of Praise – In an article in the New York Times (June 27, 2019) titled "Why E. Jean Carroll, 'The Anti-Victim,' Spoke Up About Trump," her resume was accentuated with praise for her character and professionalism. Some quotes:

    --- "Ms. Carroll, who once wrote for 'Saturday Night Live'…"

    --- *"Carroll has written the "Ask E. Jean" column for 20 years."*

    --- *"Emmy nominated…"*

    --- *"Ask E. Jean" televisions series on NBC's America's Talking."*

    --- *"...Playboy's first female contributing editor."*

    --- *"She's a total original."*

    --- *"She was incapable of being uninteresting, or writing a boring sentence,"* said Bill Tonelli, her editor at Esquire. *"She was fearless." "She is a very honorable woman."*

    --- *Those public appearances are in keeping with how friends describe her: the girlfriend who would ride a Yugoslav freighter to Tangier; the plucky author of a popular column who dispensed advice on every aspect of her*

*devoted readers' lives, from sex to careers, but kept her own struggles private. She is a former Miss Cheerleader USA turned journalist, whose gonzo-style approach led The New York Times in 1981 to call her "feminism's answer to Hunter S. Thompson."*

In the Slate magazine (June 25, 2019), the article "E. Jean Carroll Told Her Story Anyway" included the following highly positive assessment:

--- *"...Carroll is that he's merely the one who caused the popular advice columnist..."*

--- *"...Or she could take her prodigious skills as a writer, a television personality, and a raconteur and tell her own story in her own way."*

Since she came forward publicly in 2019 to accuse the Defendant of sexual assault and rape, there have been scores of articles about her accusations and the litigation. The above examples are indicative of the positive treatment she received in those articles.

Based on all these factors as outlined in this section, it is my opinion – as a communications expert with 50 years of working in the field of reputation management and repair – that while the Plaintiff may have suffered some reputation harm (mainly with the small segment of the population that is enamored with the Defendant), there have been significant benefits to her in terms of increased visibility and prominence as well as positive enhancement of public perception of her character and reputation.

Footnote. In the New York Times article referenced above, another passage from the article is quite revealing as to any negative impact of the Plaintiff personally and how she was coping with the situation. As excerpt from the article:

*"After taping an interview with CNN on Monday, Ms. Carroll went to a party in Brooklyn, where friends and former editors had gathered to toast her with a bottle of Chartreuse (her favorite) and a cake that read BRAVE. How was she? They wanted to know. Was she checking Twitter? Was she scared?*

*"I'm having a ball," she replied."*

PLAINTIFF'S EXPERT

To assist with the case, the Plaintiff retained Professor Ashlee Humphreys, Ph.D ("Humphreys") to serve as an expert witness on her behalf. A graduate of Northwestern University with a Bachelor of Arts degree in Economics and Philosophy, Humphreys currently is employed by the University as a Professor of Integrated Marketing Communications at its Medill School of Journalism and as Professor of Marketing with its Kellogg School of Management. She reports that her focus of instruction is on assessing the impact of social media campaigns and strategically directing a portfolio of social media tools to pursue managerial goals involving persuasion, advertising, market growth, and branding. She purports to have a decade of experience in the field of digital communications and marketing and states that her expertise is the fields of marketing, advertising, market growth and social media.

From my review of Humphreys credentials she has a very impressive background of accomplishments, (including awards), however, she does not indicate nor has she demonstrated that she has any professional background, experience or expertise in reputation management,

damage or repair - which are at the center of this lawsuit. I have also studied her 14-page CV and see no indication of anything in her professional career in this area. As stated above, her expertise is in fields that are promotion-oriented, including marketing, advertising, digital and social media campaigns. This case requires a background, experience and expertise in assessing, coping with and overcoming negative communications which cause harm to and damage a reputation. She states that her current professional focus is as follows:

> *"My current work continues to investigate market emergence and change, but has expanded include the areas of social media and sustainability. I also continue to be a leader in the method of automated text analysis in consumer research by publishing and leading workshops and seminars for scholars in both consumer psychology and CCT."*

This is consistent with her work and expertise in her past professional career and this is not suitable expertise for the issues in this lawsuit.

<u>Assignments</u>

Humphreys was retained by the Plaintiff's legal counsel twice to prepare Expert Witness Reports. The first was to cover the alleged false statements made by the Defendant on June 21, 22 and 24, 2019. The second report covered his October 12, 2022 statement.

Both of Humphrey's expert reports for the June 21, 22 and 24 statements as well as the one for October 12 are extremely impressive in terms of the quality and quantity of the information, the research and statistics she advances, her thought processes and her attention to detail. Unfortunately, nowhere in her reports is it more evident that she doesn't have the background, experience, knowledge, or insight into matters relating to reputation damage or repair than in the presentation of her reputation damage repair program. Humphreys' self-stated expertise is in advertising, marketing, social media and digital communications. The orientation of these is all primary geared to promotion and advancing positive content. Promoting someone or something as opposed to overcoming and reversing negative impressions, images and reputations are two different worlds. This is evident in aspects of her proposed program, from conception to the budget. Following is my analysis and my thoughts on her program. (Note: While I will attribute the following mostly to her first report, the content, from my brief review of the second report, was the same in both her reports.)

<u>Reputation Repair Program</u>

In her Expert Witness Reports, Humphreys outlined a Reputation Damage Repair Program to be implemented to restore the Plaintiff's reputation. Following is my analysis and comments on this program advocated and advanced by Humphreys.

In describing the type of program that would be needed to repair the reputation of Carroll, Humphreys in her first report stated:

> *"A holistic, <u>integrated</u> campaign is needed to effectively create attitudinal change and in turn repair reputational damage"* (Page 5, H)

However, this is not what she is proposing. Later she clarifies it to state the following:

> *"A holistic <u>social media</u> campaign that includes these integrated elements is therefore the most effective way to repair reputational damage in this case."* (Page 186, 65i)

Note the "integrated" reference in the first quote is actually related to a social media campaign - not a diverse. Multi-faceted communications campaign – as defined in the second quote. Humphreys' background and expertise is largely concentrated with the internet and social media. The vast majority of her program is linked to both, at the near exclusion of other channels of communication.  In her first report, she states:

> *"Reputational repair is a matter of public good and must occur in relation to the public sphere and the sphere in which it was originally damaged."*  (Page 12, i)

The initial damage was from widespread news coverage as traditional media had a field day with the news of the alleged rape. That was the genesis of the negative exposure, not social media. She also states in her first report:

> *"The public in which the reputational harm originally occurred persists on social media and may have limited exposure to traditional media."*  (Page 47, 15)

This may be true, but conversely, there are a great amount of people (e.g., senior citizens, technologically- challenged people) that are not on the internet (except maybe for e-mails). Having highest concentration of the program and budget geared to online exposure is equivalent to "putting all your eggs in one basket."  The most successful type of communications program features dissemination of information through multiple communications channels giving each sufficient budget to effectively ensure all bases are covered in terms of reaching the target audiences.  Also, overreliance on the use of statistical data on impressions to determine where the focus and budget is allocated is not necessarily prudent to achieve the objectives.

(Side note:  A good analogy is Custer at the last stand.  There were 2,000 Indians to his 196 soldiers.  He was not defeated because they outnumbered him.  The massacre occurred because they surrounded him. If they came from one direction, they could have escaped by going the opposite direction.   The theory is the same in communications, don't overemphasize or rely heavily on one channel of communications, use a variety to ensure the message is received.)

In her reports Humphreys herself gave two other reasons why it would be important to put a major focus on traditional news media instead of strictly social media:

> *"Since the news broke in June 2019, these same news publications have continued to cover the story, which has extended the effect of Mr. Trump's Statements further into the present day."*  (Page 50, iv)

In short, she has made her own case for making a public relations program targeted to free media exposure an integral part of the program as opposed to the major thrust of her program dwelling almost solely on internet exposure and social media.

However, Humphreys appears to have a negative view of traditional news media as evidenced by this comment:

> *"Secondly, trust in traditional media has declined across the ideological spectrum. Whereas legitimate  sources of news once went unquestioned, assessing trust of the source is now a primary concern of users when assessing claims…"*      (Pages 22-23, Ci, First Report)

(Side note:  Somewhat ironically, it is Trump and conservatives that have the most distrust of traditional media, often labeling reports as "false news.")

23

It also important to note that internet exposure (and even media exposure) is a form of "indirect" communications meaning that the receiver is not getting the message directly from the sender. The most effective form of communications is "direct" contact.  There are many ways to do this (e.g., direct verbal conversations, letters, emails, speaking engagements, appearance at events) and it does not appear that any form of direct communications is in Humphreys' program.

When evaluating the approach to her program, here are some factors to consider:

- The relatively small size of the audience that can be impacted or influenced by the program as discussed in the preceding section.

- As stated in a previous section, there is no need for a massive online and social media campaign (e.g. extensive advertising and marketing, paying influencers) when the mass media would give coverage for free of an ongoing story which she readily admits.

- If Carroll were to prevail in this case, the initial media exposure would be substantial and the positive outcome of the litigation would significantly repair her reputation and a program would only be needed to build on that news and lessen the need for such a major program. (Note:  If she loses the case, Trump wouldn't be responsible for the program and a larger program would be needed in that instance.)

Second Expert Report

In her second report covering the Defendant's October 12 statement, Humphreys - as her assignment was essentially the same - she reported she used the same methodology to develop her findings as she did in the first report.  In her report, she estimated that 21.42% of those people exposed to the Defendant's negative comments about the Plaintiff would have been receptive to them.  (Note: in effect, she is reporting that less than one in four people might possibly have given any credence to the Defendant's alleged false statements.)

CONCLUSION

As stated in the Assignment section of this report, I was asked to review, analyze and provide my comments, observations, conclusions and opinions on the Cause of Action of Defamation in this lawsuit as well as to assess what, if any, impact there was on the reputation of the Plaintiff from the negative communications about her emanating from the Defendant in his October 12, 2022 statement. It is my professional and expert opinion - based on all available evidence, the information I reviewed as well as my experience and expertise in the communications field and (as it relates to negative reputations) and as an expert witness in the field of Defamation that:

- While I can not offer a legal opinion, it is my personal assessment and judgment, as a professional communicator and communications expert, that the alleged false statements attributed to the Defendant in this lawsuit did not meet the criteria for Defamation as I understand it under New York law.

- While the views, comments and opinions of the Defendant may have caused some minimal reputation harm to the Plaintiff (which would not be actionable if not determined to be Defamation at trial), it is my professional assessment and opinion that the Plaintiff benefitted from this public dispute in terms of increased positive exposure for her as a professional and positive enhancement of her personal character and reputation.

Report Disclaimer

The views, conclusions and opinions stated in this report are based on information and input related to this case that I have received to date. Based on receiving additional documents or information (e.g. legal filings, expert reports, depositions or hearing transcripts, records, communications, data) that may be made available to me in the future, I would reserve the right to either add to, change and/or expand on the scope of what I have offered in this report.

_____          JANUARY 30, 2023
Robert J. Fisher                                          Date

25