UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

        Plaintiff,

   -against-             22-cv-10016 (LAK)

DONALD J. TRUMP,

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM AND ORDER ON
PLAINTIFF'S *IN LIMINE* MOTION**

LEWIS A. KAPLAN, *District Judge.*

    Plaintiff moves *in limine* for an order (1) adopting the evidentiary rulings recently

made in *Carroll v. Trump,* 20-cv-7311 (LAK) (*"Carroll I"*), (2) precluding the testimony of Mr.

Trump's purported rebuttal expert, Robert J. Fisher, and (3) ruling on two contested and a number

of uncontested requests made in *Carroll I* and incorporated by reference in this case. The motion is

granted in part and denied in part.

*Carroll I Evidentiary Rulings*

    The analysis of the evidentiary issues resolved in *Carroll I*[1] is entirely applicable here

---

[1]    *Carroll I,* Dkt 145; *Carroll v. Trump,* No. 20-cv-7311 (LAK), 2023 WL 2441795 (S.D.N.Y. Mar. 10, 2023).

    Except where preceded by *"Carroll I",* "Dkt" references are to the docket in this case.

2

with one minor exception. The exception is the issue of whether *Carroll I* is based on an alleged sexual assault because *Carroll I* asserts only a defamation claim. But this case, unlike *Carroll I*, contains a claim for what, if it occurred, undeniably was a sexual assault. Hence, the "based on" analysis in the *Carroll I* decision[2] has no bearing here. Accordingly, all of the evidentiary rulings previously made in *Carroll I* apply here.


*Mr. Fisher*

    *The Proposed Testimony*

        Ms. Carroll intends to call as an expert witness Professor Ashlee Humphreys, Ph.D. Dr. Humphreys intends to testify principally on the extent of the dissemination of Mr. Trump's allegedly defamatory statement of October 12, 2022, the damage, if any, of Mr. Trump's statement to Ms. Carroll's reputation and "person brand,"[3] and the means and costs of repairing that damage.[4] Mr. Trump seeks to call Robert J. Fisher as an expert witness, purportedly to rebut Dr. Humphreys's conclusions. Ms. Carroll seeks the exclusion of Mr. Fisher's testimony on the grounds that (1) it would not be proper rebuttal testimony, (2) defendant has failed to establish that Mr. Fisher's methods in arriving at his opinions are reliable and, in any case, (3) each portion of his proposed

---

2       *Carroll I*, Dkt 145 at 6-7; *Carroll*, 2023 WL 2441795 at *2-3.

3       According to Dr. Humphreys, "[p]erson brands are well-known people who also possess a set of brand meanings and associations that have value." Dkt 74-3 (Humphreys Rep.) at 4.

4       Dkt 74-3 (Humphreys Rep.) at 2-5 and *passim*.

testimony is inadmissible for other reasons.[5]

### Is Mr. Fisher a Rebuttal Expert?

The dispute regarding whether Mr. Fisher would be a proper witness to rebut Dr. Humphreys's opinions, or something else instead, is significant because there are procedural differences between principal and rebuttal experts. These are spelled out in Ms. Carroll's motion papers, not disputed by Mr. Trump, and need not be discussed here in detail.[6] Ms. Carroll's point is essentially that Mr. Fisher's deposition testimony and his report make very clear that he was not hired to rebut Dr. Humphreys's proposed testimony and did not view that as his assignment. Moreover, the vast bulk of Mr. Fisher's report, Ms. Carroll's argument goes, has nothing to do with

---

[5]

Ms. Carroll moved *in limine* also to exclude Mr. Fisher's testimony in *Carroll I*, where he was hired by Mr. Trump also purportedly to rebut Dr. Humphreys's conclusions with respect to the harm, if any, to Ms. Carroll's reputation caused by Mr. Trump's June 2019 statements. Although the two sets of reports – like the two cases – are closely related, this case concerns only Mr. Fisher's and Dr. Humphreys's reports and testimony submitted in *Carroll II* with respect to Mr. Trump's October 12, 2022 statement.

[6]

Dkt 73 (Pl. Mem.) at 4-7.

It suffices to say here that (1) a party is not obligated to identify a rebuttal expert and to disclose information concerning that witness and the proposed testimony until closer to trial compared to when it is obliged to disclose such information regarding experts called on its case-in-chief, and (2) the party against whom a rebuttal witness is called has less opportunity to respond to a rebuttal witness than it would have had if the witness were called on the calling party's case-in-chief. Fed. R. Civ. P. 26(a)(2)(D) (providing that a party must disclose expert testimony "(i) at least 90 days before the date set for trial or for the case to be ready for trial; or (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure"); *Ebbert v. Nassau Cnty.*, No. 05-cv-5445 (FB) (AKT), 2008 WL 4443238, at *14 (E.D.N.Y. Sept. 26, 2008) ("The Court finds that [p]laintiff is prejudiced by the very fact that [her expert] did not have an opportunity to respond to the new material contained in [defendant's expert's] [r]ebuttal [r]eport and [d]efendants took no steps to cure this prejudice.").

4

Dr. Humphreys's opinions.

There is a great deal of merit to Ms. Carroll's argument. Indeed, Mr. Fisher testified at his deposition, to cite but one example, as follows:

> "Q.    Are there any parts of Professor Humphreys' *Carroll II* report that you sought to rebut in connection with your *Carroll II* report?

> "A.    No, not at all.  But I did – I do have a section in this report . . . that does discuss Ms. Carroll's expert, but most of that is information derived from the first report, is basically on her views and opinions.  I did put one paragraph into this report. The only thing I picked out of that report in skimming it was a statistic that she had related to the number of people that might be influenced by Mr. Trump's comments.  And that's near the end of the report.  You know, I just made a reference[.]"[7]

Federal Rule of Civil Procedure 26 defines rebuttal expert testimony as testimony "intended solely to contradict or rebut evidence on the same subject matter identified [in the expert testimony offered] by another party."[8]  "[T]he [rebuttal] expert's testimony should be to 'explain, repel, counteract or disprove evidence' presented by the expert to whom he or she is responding."[9]

Mr. Fisher addresses Dr. Humphreys's findings and conclusions in the last few pages

---

[7]    Dkt 74-1 (Fisher Dep.) at 52:9-25.

[8]    Fed. R. Civ. P. 26(a)(2)(D)(ii).

[9]    *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 386 (S.D.N.Y. 2014) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir.2006)).

of his report.[10]  He (1) opines that Dr. Humphreys is not qualified to testify as to reputation damage

or repair, (2) evaluates and critiques Dr. Humphreys's proposal for reputational repair, specifically

her emphasis on social media, (3) comments on Dr. Humphreys's finding that only approximately

21.42 percent of those people exposed to Mr. Trump's October 12, 2022 statement, the alleged

defamation in *Carroll II*, would have been receptive to it, and (4) concludes that Ms. Carroll

"benefitted from this public dispute in terms of increased positive exposure for her as a professional

and positive enhancement of her personal character and reputation."[11]  With the exception of Mr.

Fisher's views of Dr. Humphreys's qualifications, which are not proper subjects of expert testimony

at all,[12] these aspects of Mr. Fisher's proposed testimony would be proper rebuttal to the extent that

they rest on reliable methodology.[13]

        That said, the rest of Mr. Fisher's report is not rebuttal of Dr. Humphreys.  It contains

a mixture of legal opinions – including his views as to the elements of defamation and whether the

---

[10]

    Dkt 87-4 (Fisher Rep.) at 22-24.

    The testimony Mr. Fisher offers in rebuttal responds to findings and conclusions common to Dr. Humphreys's reports in both cases. Although the citations to certain statements in his report are to Dr. Humphreys's report in *Carroll I*, the same statements – with one exception – appear also in Dr. Humphreys's report in *Carroll II*. As a result, Mr. Fisher's admissions in his deposition that he did not seek to rebut Dr. Humphreys's report in this case is not dispositive of whether any of his proposed testimony properly constitutes rebuttal testimony.

[11]

    *Id.*

[12]

    *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 142 (S.D.N.Y. 2022), *motion to certify appeal denied*, No. 19-cv-1422(PAE)(VF), 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022) ("[A]t trial, [defendant's expert] may not opine on the qualification of another expert to testify on a particular subject. . . . That . . . is a judicial function . . . .").

[13]

    As the issue of Mr. Fisher's qualifications have not been raised on this motion, I do not now address that question.

alleged false statements are defamatory under New York law,[14] that his proposed testimony satisfies Federal Rule of Evidence 702[15] and that one of the allegedly defamatory statements "was clearly an opinion"[16] – as well as arguments about the evidence (including that there is no evidence that Mr. Trump knew the falsity of his statements[17] or that "[Mr. Trump and Ms. Carroll] met at [Bergdorf]"[18]), and sundry other things. None of these is a proper subject of expert testimony either on a party's case-in-chief or in rebuttal. Hence, I turn to the small part of the proposed testimony that in substance is arguably proper rebuttal testimony to determine whether it is inadmissible on other grounds.

### Standard for Reliability of Expert Testimony

Trial courts are required to ensure that any expert testimony that is admitted is relevant and reliable.[19] Under Federal Rule of Evidence 702, expert testimony is admissible if:

"(a) the expert's scientific, technical, or other specialized knowledge will help the

---

[14] Dkt 87-4 (Fisher Rep.) at 14, 24.

[15] *Id.* at 13.

[16] *Id.* at 16.

[17] *Id.* at 14-16.

[18] *Id.* at 16.

[19] *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 42 (S.D.N.Y. 2016) ("Trial courts serve as gatekeepers for expert evidence and are responsible for 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'") (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).

trier of fact to understand the evidence or to determine a fact in issue;

"(b) the testimony is based on sufficient facts or data;

"(c) the testimony is the product of reliable principles and methods; and

"(d) the expert has reliably applied the principles and methods to the facts of the case."[20]

"When evaluating the reliability of an expert's testimony, the court must 'undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'"[21] A district court "must focus on the 'principles and methodology' employed by the expert, not on the conclusions reached."[22] Where the expert's testimony does not rely on scientific methods, "the court may permit testimony 'where a proposed expert witness bases her testimony on practical experience rather than scientific analysis.'"[23] Courts have excluded rebuttal testimony where the rebuttal expert "failed to employ a reliable methodology or illustrate how [the expert's] experience informed [his or her] analysis"[24] or where the rebuttal expert "was unable to articulate a specific process or

---

[20]    Fed. R. Evid. 702.

[21]    *Scott*, 315 F.R.D. at 43 (quoting *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir.2002)).

[22]    *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 595).

[23]    *Scott*, 315 F.R.D. at 43 (quoting *Davis v. Carroll*, 937 F.Supp.2d 390, 412 (S.D.N.Y.2013)).

[24]    *Scott*, 315 F.R.D. at 44 (citing *Cospelich v. Hurst Boiler & Welding Co., Inc.*, 08-cv-46(LG)(JMR), 2009 WL 8599064, at *2 (S.D. Miss. July 7, 2009)).

methodology by which [the expert] reached [his or her] conclusions."[25]

### Reliability of Mr. Fisher's Proposed Rebuttal Testimony

Mr. Fisher's conclusion that Ms. Carroll "benefitted from this public dispute in terms of increased positive exposure for her as a professional and positive enhancement of her personal character and reputation,"[26] if received in evidence, would contradict Dr. Humphreys's conclusion that Mr. Trump's October 12 statement "caused short- and long-term harm to Ms. Carroll's person brand" and that her "reputational value has been diminished due to [Mr. Trump's] [s]tatement."[27] His purported explanation of this conclusion discusses Ms. Carroll's preexisting "positive public profile," certain public perceptions of Mr. Trump and his "perceived public reputation for inappropriate sexual contact with women," the Me Too movement, and Ms. Carroll's public exposure and her "[p]ositive [m]edia [e]xposure" following her public rape accusation against Mr. Trump."[28] And while Mr. Fisher is entitled to his personal opinion, the question here is whether that personal opinion reflects the application of a reliable methodology, as it must be in order for him to be permitted to express that opinion to the jury.  And Mr. Fisher has made clear that it does not.

Mr. Fisher states in his report that "the methodology [he] used in this case is

---

[25]   *Id.* (citing *Rondor Music Int'l Inc. v. TVT Records LLC*,  05-cv-2909(JTL), 2006 WL 5105272, at *3 (C.D. Cal. Aug. 21, 2006)).

[26]   Dkt 87-4 (Fisher Rep.) at 24.

[27]   Dkt 74-3 (Humphreys Rep.) at 5.

[28]   Dkt 87-4 (Fisher Rep.) at 18-21.

consistent with that which is standard operating procedure that public relations and communications professionals as well as expert witnesses use when addressing issues and situations for clients like those in this case . . . ."[29] This methodology purportedly includes, *inter alia*, "[a]pplying the principles of negative communications to this case as appropriate" and "follow[ing] peer accepted procedures in both the public relations and expert witness professions as to how to analyze and assess situations which negatively impact reputations as well as devise strategies, plans and actions to restore them."[30]  Nowhere, however, does he explain what the "peer accepted procedures" or "principles of negative communications" are, let alone how his application of those procedures and principles led him to his conclusion. He states also that his "input in this report [is] based on the information [he] obtained and reviewed in this case," which consists of (1) litigation documents in *Carroll I* and *Carroll II*, (2) a total of *six* media articles about Ms. Carroll and/or these cases, and (3) whatever he saw in his "[i]nternet [r]esearch," on which he testified he spent "at most an hour" and apparently simply "Googled" Ms. Carroll.[31]  In short, there is no reliable basis for Mr. Fisher's conclusion.  Indeed, when asked during his deposition how he reached his conclusion that Ms. Carroll experienced a "net benefit" from her dispute with Mr. Trump, he testified:

> "A. * * *  I think that factoring in common sense and logic, a lot of positive things would have come out from his, for lack of a better word, tirade against her based on her comments that he raped her.

---

[29]

    *Id.* at 12.

[30]

    *Id.* at 13.

[31]

    *Id.*; Dkt 74-1 (Fisher Dep.) at 47:1, 148:10-11.

10

"Q.      Is there any data that supports that conclusion?

"A.      Not data, no. There are no data. It's just -- you know, it's just basic

in my assessment based on my background and expertise and experience in the field

of communications particularly as it relates to * * * "[32]

He further explained:

"Q.      So besides that sort of personal experience you had [], did you -- is

there any data to quantify the media coverage that Ms. Carroll received after Mr.

Trump's defamation as compared to before?

"A.      Well, I think, yes. I think if you're just doing an analysis or Google

or something like that, you can see that there weren't hardly any articles on her prior

to the Trump incident, for lack of a better word, and now -- exponentially her

visibility has risen tremendously. I mean, the bottom line -- I just used myself as an

example because I had never heard of her before I started reading articles about

Trump being accused of rape and whatever. And most of those articles, and I did

analysis in this report which is in the next section, by the way, on 20 here is that the

* * *

"A. [Question omitted from record filed with the Court] . . . No. From looking

online and looking at the first ten pages of her Google presence, it was clear that

there was a tremendous increase in articles about her or exposure than there was prior

to that.

---

[32]      Dkt 74-1 (Fisher Dep.) at 130:14-25.

"Q.      By looking -- by your reference to looking at the first ten pages of Google, you just mean the nature of the search results that you would see if you put in E. Jean Carroll's name in Google?

"A.      Yeah, in other words, you know, each page has 10 to 12 things on it and you go through pages 2, 3, 4, 5. You know, I saw other references to Ms. Carroll but not nearly the weight of the exposure she received after she came forward to accuse Mr. Trump of rape."[33]

Mr. Fisher's blanket invocation of his experience in the communications field to justify his conclusion does not suffice. Instead, an "expert must 'show how his or her experience . . . led to his conclusion,'"[34] which Mr. Fisher has not. His observation that he saw more Google search results mentioning Ms. Carroll after she publicly accused Mr. Trump of rape and his discussion in his report of four news articles with positive comments on Ms. Carroll after her public accusation, in the perhaps one hour he spent on his Googling, also do not make his methodology reliable.[35] The number of Google hits in a brief search, without any investigation of the nature of those results or the full extent of the relevant universe of results, says nothing about whether Ms. Carroll has had more positive compared to negative or neutral media coverage after her public accusation against Mr. Trump. Four news articles with positive comments, or even the six news

---

[33]      *Id.* at 195:7-25, 197:1-17.

[34]      *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, No. 1:00-1898, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008) (quoting *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props.*, LLC, 467 F.3d 107, 132 (2d Cir. 2006)).

[35]      Dkt 87-4 (Fisher Rep.) at 20-21 (discussion of four news articles).

articles in total cited in his report, are insufficient to support a conclusion that Ms. Carroll has experienced a "net benefit" from her dispute with Mr. Trump. The other elements of his analysis fare no better. The gist of his reasoning – essentially that more people think favorably of Ms. Carroll than they do of Mr. Trump, and therefore she has benefitted more than she has suffered from Mr. Trump's remarks – lacks the kind of foundation in facts, evidence, and/or experience that is demanded of expert witnesses. It is also unresponsive to the key issue on which he purportedly would be called – whether and to what extent Ms. Carroll was harmed by Mr. Trump's allegedly defamatory statement.

Mr. Fisher's other rebuttal testimony similarly is unreliable. Mr. Fisher does not explain how his experience informs his criticisms of Dr. Humphreys's proposal for reputation repair. Nor does he rely on any specific facts, data, or evidence. Indeed, his entire analysis of Dr. Humphreys's proposal for reputation repair contains no citation other than to Dr. Humphreys's report.[36] As a result, it is unclear how he reached his conclusions that "[t]he most successful type of communications program features dissemination of information through multiple communications channels giving each sufficient budget to effectively ensure all bases are covered in terms of reaching the target audiences," the "relatively small size of the audience that can be impacted or influenced by [Dr. Humphreys's proposal]," that "there is no need for a massive online and social media campaign . . . when the mass media would give coverage for free . . . .," or that, if Ms. Carroll wins, "the positive outcome of the litigation would significantly repair her reputation and a program would

---

[36]     *Id.* at 21-24.

only be needed to build on that news and lessen the need for such a major program."[37]  Although one could hypothesize that his opinions were informed by his experience in the communications and reputation management fields, how exactly that experience leads to those opinions remains unknown and would be nothing more than speculation. Moreover, almost all of Mr. Fisher's "analysis" with respect to Dr. Humphreys's proposal consists of potential discrepancies or shortcomings in Dr. Humphreys's background and report that can be observed readily by jurors and/or brought out in cross examination without benefitting from any aid by an expert.[38]  The same is true of Mr. Fisher's comment – which he characterizes as a "reference" in his deposition – that Dr. Humphreys is "reporting that less than one in four people might possibly have given any credence to [Mr. Trump's] alleged false statements."[39]  His opinions as to Dr. Humphreys's report and proposal therefore must be excluded.

*Contested Issues First Raised in Carroll I But Not Yet Ruled Upon*

    *Reference to Ms. Carroll's Public Statements Concerning DNA Evidence*

        Ms. Carroll testified at her deposition in *Carroll I* as follows:

> "Q.    *   *   *   [Y]ou stated in the public that you had DNA from the former president; is that correct?
>
> "A.    Yes.

---

[37]    *Id.* at 23-24.

[38]    *Id.* at 21-24 (purporting to point out inconsistencies or "admissions" by Dr. Humphreys in her report).

[39]    *Id.* at 24.

"Q.     Why did you say that?

"A.     Because we sent the dress to be examined and then we got back a report. Robbie published it.

"Q.     What did that report say that you recall? And don't divulge anything that's privileged, please, so conversations between you and your attorney I don't want to know.

"Q.     It is so far above my head. The reports about DNA are so detailed and so much scientific rigor is required to understand even the opening paragraph, I can't really -- I can't say."[40]

Ms. Carroll seeks to preclude any testimony or commentary regarding DNA evidence.[41] Mr. Trump responds that "Defendant is entitled to cross-examine Plaintiff with respect to the fact that she publicly, and falsely, proclaimed that she was in possession of Defendant's DNA."[42] Cross-examination on that point, he argues, would be relevant to Ms. Carroll's credibility

---

[40]     *Carroll I,* Dkt 137 (Habba Decl.), *Carroll I,* Dkt 137-5 (Ex. E) at 217:23-218:16.

[41]     *Carroll I,* Dkt 134 (Pl. Mem.) at 27-30; *see also Carroll II,* Dkt 86 at 3.

[42]     *Carroll I,* Dkt 136 (Def. Mem.) at 19; *see also* Dkt 75 (Def. Mem.) at 1 (incorporating by reference his arguments in opposition to Ms. Carroll's motion *in limine* in *Carroll I*).

Mr. Trump argues that Ms. Carroll made "numerous public assertions that she *obtained* Defendant's DNA." *Carroll I,* Dkt 136 at 20-21 (emphasis added). None of Ms. Carroll's posts on social media that he cited, however, refer to her having "obtained" his DNA. Instead, as she did also in her deposition testimony, her posts all refer to his DNA being on her dress. Indeed, in one of the posts, she wrote that she is "STILL waiting for Trump to provide his DNA sample to be tested against the dress." E. Jean Carroll, TWITTER, May 1, 2020, *available at* https://twitter.com/ejeancarroll/status/1256301599426785280.

and Mr. Trump's contention that she fabricated her defamation claim to garner publicity.[43] But the probative value of such examination – if it would have any at all – would be extremely modest, and it would be outweighed substantially by the likelihood of unfair prejudice coupled with the risk of confusion of the issues and a waste of time that would be caused by permitting it. This is apparent when one considers both the deposition testimony and the whole story of DNA in this case.

Of course, if Ms. Carroll simply and knowingly had made a false claim that Mr. Trump's DNA is on the dress, that would be a fit subject for cross examination. But the record in fact suggests something else. There is evidence before the Court that there is male DNA on the dress in question but that the identity of the source could not be established.[44] It might be Mr. Trump's DNA; it might be someone else's. The lab could not reach such a conclusion at least in part because Mr. Trump refused to allow the taking of a sample of his DNA for comparison despite a request that had been outstanding for years.[45] As a result, neither party intends to adduce any scientific evidence concerning the recovery of male DNA from the dress or the laboratory analysis that was done. And

---

[43]
    *Carroll I*, Dkt 136 at 20.

[44]
    *Carroll v. Trump*, Index No. 160694/2019 (N.Y. Sup. Ct.), Dkt 56, Ex. A (DNA test report attached to Ms. Carroll's notice in which she sought Mr. Trump's DNA) at 22-24.

[45]
    This is detailed in another opinion in this case. Dkt 56; *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023).

    About ten weeks before this case is set to be tried, Mr. Trump proposed a "deal" in which he offered to provide a DNA sample but only on the condition that this Court require Ms. Carroll first to turn over to him a previously undisclosed appendix to the DNA test report. The Court denied Mr. Trump's application in part because "Mr. Trump [gave] the Court no reason to believe that pursuing that course would be likely to yield any admissible evidence, let alone a guarantee that anything important would come of it." Dkt 56 at 4; *Carroll*, 2023 WL 2006312 at *2.

several things follow from these facts.

First, the premise of Mr. Trump's argument is incorrect, as Ms. Carroll's statement has not been proven either true or false. She might have been right.  She might have been wrong. Or it might be impossible to determine whether she was right or wrong.  In any case, the failure  of Mr. Trump to allow a DNA sample prevented the laboratory from even trying to determine whether the male DNA found on Ms. Carroll's dress is his.

Second, as indicated, there will be no scientific DNA evidence at this trial. Cross-examination of Ms. Carroll about her statement, while potentially relevant to her credibility,[46] in these circumstances would be susceptible to an inference (and the risk of an argument by Mr. Trump) that would be unfairly prejudicial – namely, that the reason that Ms. Carroll did not adduce scientific DNA evidence at the trial is that Mr. Trump's DNA is not on the dress and, perhaps, that this proves her sexual assault allegation false.[47]  The unfairly prejudicial nature of such an inference, let alone the possible argument, is apparent – there is no such evidence, at least in part due to Mr. Trump's

---

[46]    There are a number of possible reasons Ms. Carroll made public statements implying that Mr. Trump's DNA was on her dress. She may have leapt to an incorrect conclusion about the meager laboratory findings that do exist. She may have understood the laboratory conclusion but exaggerated based upon the fact that she allegedly knew that Mr. Trump had been in contact with the dress, and believed that once she obtained his DNA to test against the dress, there would be a match. Or perhaps she knowingly lied.  There may be other explanations.  But whatever the reason, the fact that the statement may have been inaccurate has at least some relevance.

[47]    Indeed, Mr. Trump in his motion to compel production of an appendix to a DNA report obtained by Ms. Carroll in January 2020 "surmise[d] that the answer to [why Ms. Carroll did not produce previously the appendix] is that she knows [Mr. Trump's] DNA is not on the dress because the alleged sexual assault never occurred." Dkt 51 at 3. The Court explained that his surmise "of course is factually impossible for a simple reason: Mr. Trump never provided a DNA sample for the purpose of comparing it to the DNA on her dress. No one knows whether his DNA is on the dress."  Dkt 56 at 20, *Carroll*, 2023 WL 2006312 at *8.

failure to allow the DNA sample.

Third, that unfair prejudice to Ms. Carroll could be avoided by placing before the jury the facts concerning Mr. Trump's failure to allow collection of his own DNA. But to do so would require (1) scientific evidence concerning the testing of the dress stains as well as the fact that the DNA on the dress could not be tied to or eliminate Mr. Trump as its source without Mr. Trump's DNA, and (2) evidence of Mr. Trump's refusal to provide it. It would require evidence also as to why the presence or absence of Mr. Trump's DNA on the dress would go only to whether Mr. Trump was in Ms. Carroll's presence or touched her, but would not in either case be dispositive of her sexual assault claim.[48] Thus, any questioning of Ms. Carroll about the statement upon which Mr. Trump relies would lead to consumption of a good deal of trial time, would be distracting and needlessly confusing for the jury, and ultimately would not contribute materially to a fair result in this case.

Rule 403 of the Federal Rules of Evidence permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time . . . ."[48] In these circumstances, the Court finds that pursuit of such cross-examination or argument touches heavily upon each of the quoted bases for exclusion. Those considerations substantially outweigh whatever probative value might be obtained by going down that path. Accordingly, the Court excludes any evidence or argument by either party concerning DNA.

---

[48] The laboratory findings did not find semen on the dress. Dkt 56 at 7; *Carroll*, 2023 WL 2006312, at *3.

[48] Fed. R. Evid. 403.

*Preclusion of Five of Mr. Trump's Proposed Witnesses*

Mr. Trump lists in the joint pretrial order five witnesses he may call at trial – namely, David Haskell, Elizabeth Dyssegaard, Erin Hobday, Laurie Abraham, and Sarah Lazin – whom Ms. Carroll seeks to preclude from testifying. She seeks to exclude them on the grounds that Mr. Trump was obliged under Rule 26(a) and (e) to have disclosed them and that he might call them as witnesses far earlier in the case and that his delay was prejudicial because it prevented Ms. Carroll from taking their depositions.

Ms. Carroll herself disclosed four of the five witnesses – all except Ms. Hobday – in response to Mr. Trump's interrogatory in June 2022 in *Carroll I*, which asked her to "[i]dentify all [p]ersons who have any knowledge or information about any of the allegations in the [c]omplaint, and . . . the subject matter of the knowledge that each [p]erson possesses."[49] Ms. Carroll discussed Ms. Hobday during her deposition on October 14, 2022.[50] Mr. Trump accordingly argues that he was not obliged to disclose them under Rule 26 because "they were known to—in fact, disclosed by—Plaintiff" and even if he was, his violation was harmless because they already were known to Ms. Carroll.[51] Ms. Carroll contends that her knowledge of these witnesses is immaterial because Mr. Trump was obliged to inform her that he intended to call these witnesses at trial.[52] There is case law

---

[49]     *Carroll I*, Dkt 137-6 at 5.

[50]     *Carroll I*, Dkt 137-5 (Ex. E, Carroll Dep.) at 178:12-25, 188:25-189:19.

[51]     *Carroll I*, Dkt 136 (Def. Mem.) at 21.

[52]     Dkt 86 (Pl. Reply Mem.) at 2.

in favor of both positions.[53]

The fundamental purpose of Rule 37(c)(1) – which permits courts to preclude testimony if a party fails to satisfy its disclosure obligations under Rule 26 – is "to prevent the practice of 'sandbagging' an opposing party with new evidence."[54] With this principle in mind, the Court agrees with Mr. Trump that he was not obliged to disclose under Rule 26 the four witnesses whom Ms. Carroll disclosed in her June 2022 interrogatory responses as persons knowledgeable of the allegations in the complaint, or, if he was, his violation would be harmless. Each of the four witnesses, as identified by Ms. Carroll, were individuals who she informed about Mr. Trump's alleged assault prior to the publication of the article with an excerpt with Ms. Carroll's account of the alleged rape from her then-forthcoming book in *New York* magazine.[55] Each was involved in

---

[53]

*E.g.*, *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011), *aff'd in part, vacated in part sub nom.*, 726 F.3d 119 (2d Cir. 2013) ("Because [plaintiff] became aware of [witnesses] at . . . depositions, the [defendants] did not have a duty to supplement their Rule 26 initial disclosures."); *Howard Univ. v. Borders*, No. 20-cv-04716 (LJL), 2022 WL 3568477, at *2 (S.D.N.Y. Aug. 17, 2022) (concluding that the plaintiff was not obligated to supplement its initial disclosures and that even if it was, the violation would be harmless, where "[d]efendants were well aware of [witness's] identity and her role from the beginning of the litigation and that it was possible that [plaintiff] might choose to use her as a witness."). *But see, e.g.*, *Pal v. New York Univ.*, No. 06-cv-5892 (PAC) (FM), 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008) ("[Plaintiff's] knowledge of the existence of a witness does not satisfy the Rule 26(a)(1)(A) disclosure obligation; that obligation is fulfilled only if [defendant] informed [plaintiff] that it might call the witness in support of its claims or defenses."); *Lebada v. New York City Dep't of Educ.*, No. 14-cv-758 (LAK) (GWG), 2016 WL 626059, at *5 (S.D.N.Y. Feb. 8, 2016), *objections overruled*, No. 14-cv-0758 (LAK), 2016 WL 8453417 (S.D.N.Y. May 16, 2016) ("[T]he mere discussion of an individual in documents or deposition testimony is insufficient to create a duty on defendants to assume that such an individual is a witness that plaintiffs 'may use to support [their] claims' under Rule 26(a)(1)(A)(i).").

[54]

*Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) (internal quotation marks in original) (quoting *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y.2004)).

[55]

*Carroll I*, Dkt 137-6 at 5.

some way with Ms. Carroll's book and/or the *New York* magazine article, both of which are relevant to issues in this case. These witnesses (as well as the fifth witness, Ms. Hobday) received notices of subpoenas by Mr. Trump, although it is not clear which, if any, was served.[56] In these circumstances, there was sufficient notice – albeit just barely – to Ms. Carroll that there was a possibility they would be called as witnesses by Mr. Trump and sufficient time for Ms. Carroll to have deposed them. Mr. Trump's failure to disclose them does not equate to him "sandbagging" Ms. Carroll.

   A different conclusion is appropriate with respect to Ms. Hobday. Unlike the other four witnesses, neither Ms. Carroll nor Mr. Trump disclosed Ms. Hobday as a person with relevant knowledge. Ms. Hobday was mentioned only in Ms. Carroll's deposition in October 2022, during which Ms. Carroll identified her as the managing editor of *Elle* magazine who advised Ms. Carroll that her contract with the magazine was being terminated.[57] Nothing about the context in which Ms. Hobday was mentioned, nor her actual role as discussed in the excerpts of Ms. Carroll's deposition that were provided, demonstrate that Ms. Carroll should have expected she might be called as a witness by Mr. Trump. He therefore was obligated to disclose Ms. Hobday in his Rule 26 disclosures. His failure to do so prejudiced Ms. Carroll by preventing her from deposing her or even knowing that she perhaps should depose her. The circumstances with respect to Ms. Hobday justify the drastic but occasionally warranted sanction of precluding her from testifying at trial.

---

[56]    Dkt 86 (Pl. Reply Mem.) at 3, 3 n.3.

[57]    *Carroll I*, Dkt 137-5 (Ex. E, Carroll Dep.) at 178:12-25.

*Uncontested Issues First Raised in Carroll I But Not Yet Ruled Upon*

Ms. Carroll has incorporated in her motion in *Carroll II* several requests for *in limine* relief on which the Court has not yet ruled but that Mr. Trump has not opposed.  Accordingly, those requests are granted.

*Conclusion*

Plaintiff's motion *in limine* (Dkt 72) is granted to the extent that:

(1) plaintiff's prior consistent statements to Mss. Birnbach and Martin about defendant's alleged sexual assault are admissible;

(2) the testimony of Mss. Stoynoff and Leeds regarding their experiences involving the defendant come within Federal Rules of Evidence 413 and 415 and will not be excluded under Rule 403;

(3) defendant is precluded from giving or eliciting testimony concerning information allegedly known to persons whom he has not disclosed under Rules 26(a) and (e);

(4) both parties are precluded from any testimony, argument, commentary or reference concerning DNA evidence;

(5) defendant is precluded from cross-examination or eliciting evidence regarding Stephanie Grisham's prior misdemeanor convictions, her unrelated pending lawsuit, and her use of a prescription medication;

(6) defendant is precluded from commenting upon or eliciting any evidence regarding plaintiff's choice of counsel or her counsel's activities outside the

22

litigation between plaintiff and defendant;

(7) Mr. Fisher is precluded from testifying at trial as a rebuttal expert witness; and

(8) defendant is precluded from calling Ms. Hobday to testify at trial.

Plaintiff's motion *in limine* (Dkt 72) is denied to the extent that defendant is not precluded from calling Mss. Dyssegaard, Abraham, Lazin, and Mr. Haskell at trial.

SO ORDERED.

Dated:          March 27, 2023

                              /s/ Lewis A. Kaplan
                              Lewis A. Kaplan
                              United States District Judge