# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

April 14, 2023

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007

      Re:    *E. Jean Carroll v. Donald J. Trump*, 22-cv-10016 (LAK)

Dear Judge Kaplan,

      President Donald J. Trump, by and through his undersigned counsel, respectfully submits this Letter Motion requesting that the Court (1) conduct jury selection using the procedures outlined herein, including the use of a written juror questionnaire;[1] and (2) reconsider and modify its April 10, 2023 ruling, such that the attorneys for the parties are permitted access to the names of prospective jurors.[2]  As set out more fully below, the relief sought by this Motion is necessary in light of the exceptional circumstances of this case and will increase the chance that President Trump receives a fair trial.

---

[1] Counsel for President Trump has submitted a proposed questionnaire at ECF No. 98, which is attached hereto as **Exhibit A**.

[2] Counsel is aware that the Court has noted any objections to the use of anonymous jury be filed by March 17, 2023, counsel filed "no objections" by that date, and has held that the joint letter (which was filed April 7, 2023) requesting modification of this Court's order on an anonymous jury dated March 23, 2023 was "untimely."  ECF No. 105 at 3.  However, the unsealing of President Trump's indictment, and subsequent media frenzy that was unleashed, occurred well after the Court's initial March 17 deadline.  Moreover, that March 17, 2023 deadline did not specifically address the use of a jury questionnaire or the protocol proposed here, and President Trump has not filed briefing on that issue until this present letter brief.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 2

## I.   EXTENSIVE PRETRIAL PUBLICITY OF THIS CASE AND THE UNPRECEDENTED INDICTMENT OF PRESIDENT TRUMP WARRANT HEIGHTENED PROTECTIONS IN SELECTING A JURY

This Court has recognized that "this is a unique case"[3] which will take place under "unprecedented circumstances."[4]  It has further recognized that this case "has been the subject of widespread media coverage" in which "even the most modest developments have attracted a good deal of attention," and "that coverage is likely only to increase once the trial is imminent or in process."[5]  President Trump agrees fully with the Court's observations regarding the extraordinary context of this case, but with this Motion adds several important points that reveal a clear basis for heightened protections in the jury selection process.

"The Constitution guarantees both criminal and civil litigants a right to an impartial jury." *Warger v. Shauers*, 574 U.S. 40, 50, 135 S. Ct. 521, 528-29 (2014).  *Voir dire* plays an important role in the jury selection process and serves to protect the constitutional right of a fair trial "by exposing possible biases, both known and unknown, on the part of potential jurors." *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006).  Although district courts have broad discretion in conducting *voir dire*, a defendant must be given "a full and fair opportunity to expose bias or prejudice on the part of veniremen." *United States v. Nieves,* 58 F.4th 623, 632 (2d Cir. 2023).

This case arises under an unprecedented confluence of circumstances that gravely threatens President Trump's right to an impartial jury.  The relief sought herein is necessary to maximize the chance that President Trump receives a fair trial.

---

[3] Mem. and Op. re Anonymous Jury, ECF No. 94 at 2.

[4] *Id.* at 9.

[5] *Id.* at 5.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 3

### A.   This Case Has Attracted Widespread and Prejudicial Media Coverage That Has Spiked Since President Trump's Criminal Indictment

Since this case was filed on November 24, 2022, at least 7,270 articles[6] have repeated or referenced Ms. Carroll's allegations against President Trump. In fact, the public backlash and rush to judgment were immediate and severe when Ms. Carroll's claims surfaced in 2019. For example, there were over 900 comments in the comments section of Ms. Carroll's article and initial accusation on June 21, 2019 in *New York Magazine*[7], which included, *inter alia*:

- "Trump is a monster. Because he rapes. Because he lies. . . **He raped Ms. Carroll** as sure as he is compulsed to, given his need to destroy the value of others, and given an opportunity for which he's learned he can destroy any consequence."

- "Trump and his children are **monsters**. I'm so sorry you had to go through that and I thank you for speaking out."

- "**Her story is entirely credible**. It is Trump doing exactly what he SAID he likes to do..." grab them by the *****."

- "I am so heartsick at reading . . . your dreadful account of **Trump's assault**. . . But now I'm worried about what forces this man-beast (who could have been the **Anti-Christ**), if he were not so stupid) might bring to bear on you, Ms. Carroll, for having told the truth."

- "To say that I believe you is superfluous, like saying I believe the sky is blue. Of course you are telling the truth. Anyone who would assume otherwise is so far gone down a path of willful ignorance that not even an essay this powerful could reach them."

- "Trump is going to attack her physical appearance as 'proof' that he didn't rape her, exactly as he has done with **so many of the other women that he has raped**."

---

[6] According to a search on Google news for "Jean Carroll Donald Trump" limited to results between November 24, 2022 – April 7, 2023. Since Ms. Carroll made her allegations public in New York Magazine on June 21, 2019, there have been approximately 10,600 stories or articles.

[7] E. Jean Carroll, *Hideous Men, Donald Trump Assaulted Me in a Bergdorf Goodman Dressing Room 23 Years Ago. But He's Not Alone on the List of Awful Men in My Life*, NEW YORK MAGAZINE, June 21, 2019, *available at* https://www.thecut.com/2019/06/donald-trump-assault-e-jean-carroll-other-hideous-men.html#comments.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 4

- "[L]et me just say to all the Trump supporters – WOW. . . You are quite literally the most brainwashed & utterly confused 'people' on earth. . . You have to make a decision not about who you think he is but about who YOU are.  There is no mistake as to the things he has done so get over it.  It's true.  Your hero is a liar. **Your hero lacks class, has no morals, is arrogant, rude & nasty."**

- "Fact is that Trump supporters you know these women are telling the truth they know that **he is a serial sexual predator** but if it gets them just one more judge on the court they will give him their daughters in exchange. . . as if all these women are making up these stories just so they could be dragged through the mud and abused and threatened. Lol."

The New York Times reported on this story around the same time, and the commentary showed a similar level of animus and prejudgment.  For example, there were 1,349 comments in a New York Times article dated June 27, 2019[8], which included:

- "I beg you to keep talking, to shout it from the mountaintop, and by your example encourage his other victims to shout about **Donald Trump's many crimes of sexual assault** too.  Know that the real men of this country will always stand beside you, and with every woman who dares to call out the gutless creeps who think they can be prey on women and get away with it."

- "I believe her 100%"

- "Trump is **the Harvey Weinstein of Politics**.  Why isn't everyone outraged?"

- "I was always inclined to believe E. Jean Carroll.  However listening to the recording, and hearing how she laughed about it when telling Lisa Birnbach I froze with the sickening familiarity of the story.  I am even more convinced.  It reminds me of an experience I had when my good friend was raped eight years ago."

- "Donald Trump is a sociopath.  Throughout his life he has destroyed everything around him to gratify himself.  **Serial sexual assault** is just one example."

---

[8] Jessica Bennett, Megan Twohey, and Alexandra Alter, *Why E. Jean Carroll, the 'Anti-Victim,' Spoke Up About Trump,* N.Y. TIMES, June 27, 2019, *available at* https://www.nytimes.com/2019/06/27/us/politics/jean-carroll-trump-sexual-assault.html#commentsContainer

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 5

These are just two examples of articles generating at least 1,000 reader comments out of the roughly 10,000 articles that have covered Ms. Carroll's allegations since 2019.

Coverage of President Trump's recent indictment and arraignment has been inescapable and has greatly increased the risk of prejudice in the venire. On April 4, 2023—the day the indictment was unsealed—over 60,000 articles covered the historic event.[9] To be sure, President Trump is a persistent subject of media coverage, and one expects coverage of the parties to intensify as trial approaches. But the data shows that the indictment is a unique circumstance, generating a volume of coverage that sets this case apart from other high-profile cases.

Indeed, the increases in coverage just prior to jury selection in the criminal trials of Harvey Weinstein,[10] Elizabeth Holmes,[11] and Ghislaine Maxwell[12] pale in comparison. Jury selection in Weinstein's trial was preceded by only a modest increase in coverage. Ms. Holmes's trial followed a small decrease in coverage. Ms. Maxwell's trial was also preceded by a moderate decrease in coverage. The following graphs show volume of coverage relative to proximity to trial:

---

[9] Google search results for "Donald Trump Indictment" that bear the "news" designation, limited to April 4, 2023, reflect 60,400 results.

[10] To determine the change in media coverage for Harvey Weinstein (whose criminal trial jury selection began on January 8, 2020), a Google search for "Harvey Weinstein" was limited to results designated "news" and was run for the period December 2 through December 9, 2019, and again for the period of December 16 through December 23, 2019.

[11] To determine the change in media coverage for Elizabeth Holmes (whose criminal trial jury selection began on August 31, 2021), a Google search for "Elizabeth Holmes" was limited to results designated "news" and was run for the period July 27 through August 3, 2021, and again for the period of August 10 through August 17, 2021.

[12] To determine the change in media coverage for Ghislaine Maxwell (whose criminal trial jury selection began on November 16, 2021), a Google search for "Ghislaine Maxwell" was limited to results designated "news" and was run for the period October 12 through October 19, 2021, and again for the period of October 26 through November 2, 2021.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 6







By contrast, coverage of "Donald Trump" yielded approximately 88,500 news results during a one-week period prior to news of the indictment breaking (March 20 through March 27, 2023). After the indictment (April 4 through April 11), those news results leapt to 461,000. The indictment therefore drove a more than five-fold increase in news results about President Trump.



TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 7

Moreover, the indictment has caused coverage of Ms. Carroll's allegations to spike.  For example, a search on Google for coverage of the dispute between Ms. Carroll and President Trump between March 22 and March 29, 2023 showed approximately 335 news results.[13]  For March 30 through April 7, 2023, that same search yielded about 1,440 results.[14]  This represents a spike a media coverage of over 329%, which shows that the indictment led to an immediate increase in coverage of Ms. Carroll's allegations in this civil action.

Even under "normal" circumstances, prospective jurors would be exposed to a staggering amount of extrajudicial and prejudicial information regarding President Trump.  But the data described above shows that the risk of prejudice is even more elevated in light of the criminal charges.

The reaction among prospective jurors continues to reveal prejudicial bias.  The comment section of a New York Magazine article dated March 31, 2023, outlining the legal cases against President Trump (including this case),[15] for example, includes:

- "Really looking forward to matching the **deranged sociopath's** DNA to Carroll's dress."

- "**Hang 'em**!  Just take him out and hang 'em!"

- "Maybe the crime rate would be lower if Trump and his colleagues stopped committing them."

---

[13] The search string used in this Google search was "Jean Carroll Donald Trump" and was limited to results designated as "news" between March 22 and March 29, 2023.

[14] The search string used in this Google search was "Jean Carroll Donald Trump" and limited to results designated as "news" between March 30 and April 7, 2023.

[15] Nia Prater, *The Case(s) Against Donald Trump. It's Hard to Keep Track, so we Made a Guide*, NEW YORK MAGAZINE, March 31, 2023, *available at* https://nymag.com/intelligencer/2023/03/what-are-the-legal-cases-against-donald-trump.html#comments.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 8

The comment section of an article in the New York Post dated March 31, 2023[16] included the following:

- "Jump suits being orange has never been more appropriate.  Well done, God. Gotta give it to ya. Well done.  Lol"

- "The very fact that Trump is f i n a l l y getting prosecuted for his crimes that he evaded for decades is a miracle!!!! . It couldn't happen to a more deserving man/child, **he is appalling** and not very appealing in ANY way!!! **LOCK HIM UP** !!!"

- "I heard Rikers island is being painted white just in case he does win and will feel at home.  Bars will be gold of course."

- "Time to send in the FBI swat team to violently arrest Trump the traitor on TV.  **Ship him to gitmo** for some real interrogation."

In short, President Trump—who like any litigant has a constitutional right to an impartial jury—must defend a civil suit while criminal allegations against him dominate headlines.  The comments sections of articles covering this case and the criminal case reveal a clear risk of bias against President Trump and prejudgment of the issues in this case.  President Trump should be given "a full and fair opportunity to expose" that bias during the jury selection process.  *United States v. Nieves*, 58 F.4th 623, 632 (2d Cir. 2023).

### B.    *President Trump Has Been Subjected to Widespread Public Animus in the Most Politically Charged Climate in Recent History*

In addition to the pretrial publicity described above, the context of this case—one of the most politically divided eras in American history—is an independent basis for the relief sought herein.  Indeed, the widespread public animus and prejudgment of President Trump is not just apparent from the thousands of negative reader comments to news articles.  His actions have been pre-judged and condemned, for example, by everyone from celebrities[17] to members of

---

[16] Isabel Vincent and Mara Siegler, *Events Suspended at Mar-a-Lago as Trump Hunkers Down with Legal Team*, NEW YORK POST, March 31, 2023, *available at* https://nypost.com/2023/03/31/donald-trump-hammers-out-defense-at-mar-a-lago-for-indictment/.

[17]*See, e.g., Tweet from John Cusack* dated March 30, 2023 at 7:17 p.m., stating in part "TRUMP INDICTED…A beautiful day – a day I thought I'd never see…Only a pathological criminal idiot", *available at* https://twitter.com/johncusack/status/1641580509632565248.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 9

Congress.[18]  And since President Trump has run for President twice, millions of New Yorkers have already made judgment calls about President Trump by voting against him.[19]  Political polarization in the United States is at extreme levels, with members of opposite political affiliations more likely than ever to harbor distrust and animus toward each other.[20]  The questions proposed in President Trump's questionnaire, and the ability to conduct meaningful *voir dire* through jury research, go to the heart of uncovering that distrust and animus.

## II.   A JUROR QUESTIONNAIRE IS CRITICAL TO SAFEGUARD PRESIDENT TRUMP'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL

In its April 10, 2023 Order, the Court stated in a footnote that it finds "a jury questionnaire unnecessary in this case, and will not employ one."  ECF No. 105 at 5, n.8. Because the parties have not fully briefed the issue of a juror questionnaire, President Trump respectfully requests that the Court revisit its decision as set forth more fully below.

A juror questionnaire is critical to ensuring President Trump receives a fair trial here. Prospective jurors who have *not* been exposed to the prejudicial media coverage—and do not otherwise have a strong opinion about President Trump—will be rare and potentially nonexistent.  The Court and the parties are faced with the daunting challenge of keeping this bias and tribalism outside of the courtroom so that jurors decide the case based on the evidence alone.

Indeed, the Second Circuit has long recognized that district courts "routinely employ questionnaires to facilitate *voir dire* in a number of circumstances," including where "an

---

[18] *See, e.g., Tweet from Rep. Adam Schiff* dated March 30, 2023 at 5:54 p.m., stating in part "the indictment of a former president is unprecedented.  But so too is the unlawful conduct in which Trump has been engaged", *available at*
https://mobile.twitter.com/RepAdamSchiff/status/1641559612494168067.

[19] In the 2016 Presidential Election, for example, 4,556,118 people in New York voted for Hillary Clinton and a majority of New Yorkers in counties within SDNY favored her.  *E.g.,* New York County (557,859); Bronx (347,893); Westchester (265,256); Rockland (67,098). *See* 2016 Election Results, New York State Board of Elections, *available at* https://www.elections.ny.gov/2016ElectionResults.html; in the 2020 Presidential Election, the turnout against President Trump was even stronger, with 5,244,886 people in New York voting for President Biden, again with a majority of New Yorkers in counties within SDNY favoring President Biden.  *E.g.,* New York County (540,748 voted for Biden); Bronx (337,789); Westchester (296,193); Rockland (71,656). *See* 2020 Election Results, New York State Board of Elections, *available at* https://www.elections.ny.gov/2020ElectionResults.html.

[20] Boxell, *et al., Cross-Country Trends in Affective Polarization,* 26669 NATIONAL BUREAU OF ECONOMIC RESEARCH (August 2021), at 2.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 10

anonymous jury is to be empaneled"[21] or "where there has been extensive pre-trial publicity."
*United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007).

Against this longstanding practice of using juror questionnaires and other heightened
protections in exceptional cases like this one, the Second Circuit's recent decision in *United
States v. Nieves*, 58 F.4th 623 (2d Cir. 2023) is particularly instructive.  In 2021, Christian Nieves
was tried in this District and convicted of witness retaliation against a fellow gang member.  *See
id.* at 628.  The trial was conducted during a period in which gang violence permeated local
news, and New York City was emerging from a "frenetically publicized reported spike in violent
crimes" that law enforcement had "broadly attributed to gang violence."  *Id.* at 633.  There, as
here, both sides proposed detailed *voir dire* questions around a host of topics, including "jurors'
feelings about law enforcement, their educational and employment backgrounds, what they like
to read and watch, their families, and their hobbies."  *Id.* at 628.  The defense also urged the
court to "individually question each prospective juror" and explore "specific concerns related to
the circumstances of this case, and potential biases."  *Id.*  Judge Rakoff rejected those requests,
opting instead for his "long-standing practice" of an abbreviated *voir dire* process[22] and
ultimately selecting a twelve-person criminal jury (plus three alternates) in an hour and a half.

The Second Circuit vacated the district court's judgment and remanded for a new trial.
Although district courts operate with broad discretion, the Second Circuit cautioned "that the
trial court's discretion must be exercised consistent with 'the essential demands of fairness'" and
"even in that forgiving, deferential light, 'the defense deserves 'a full and fair opportunity to
expose bias or prejudice on the part of veniremen.''"  *Id.* at 632 (citations omitted).

A juror questionnaire is an effective tool for ensuring the parties in this case have "a full
and fair opportunity to expose bias or prejudice on the part of veniremen."  *Id.* at 632.  For
instance, in the high-profile securities fraud trial of Enron executive Jeffrey Skilling, the district
court issued a 14-page questionnaire that included 77 questions asking prospective jurors about
"their sources of news and exposure to Enron-related publicity, beliefs concerning Enron and
what caused its collapse, opinions regarding the defendants and their possible guilt or innocence,

---

[21] As set forth below, President Trump does not take issue with the Court's decision to empanel
an anonymous jury, but requests the Court modify its April 10, 2023 ruling by allowing the
attorneys for the parties to know prospective jurors' names.

[22] Specifically, Judge Rakoff presented a high-level overview of the charges (without referencing
gangs); asked generally "whether any jurors had any doubts about their ability to be fair";
whether prospective jurors or their loved ones had any connection to the defendants, lawyers, or
witnesses, any connections to various law enforcement agencies; whether jurors had any eyesight
or language impediments, any prior criminal charges, or any past experience as a party to a civil
lawsuit or as a juror in a criminal trial.  Judge Rakoff then solicited three or four question
individualized *voir dire*, soliciting each prospective juror's county or borough of residence,
occupation, relationship status, and if so, the significant other's occupation.  *See id.* at 629.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 11

and relationships to the company and to anyone affected by its demise." *Skilling v. United States*, 561 U.S. 358, 371, 130 S. Ct., 2896 (2010). The Supreme Court determined on appeal that the extensive screening questionnaire and follow-up *voir dire* overcame a presumption of juror prejudice based on pretrial publicity or widespread community impact of the company's bankruptcy. *See id.* at 384. *Skilling* also instructed lower courts on the proper procedure in the event a questionnaire response necessitates further inquiry. Such follow-up *voir dire* should be individualized and outside the presence of the other jurors, "thus preventing the spread of any prejudicial information to other venire members." *Skilling,* 561 U.S. at 389.

Courts in the Second Circuit have also routinely employed jury questionnaires in cases like this one that are infected with political issues. In the political corruption trial of New York Senator Joseph L. Bruno, a questionnaire was used to screen the jury pool and expedite jury selection. *United States v. Bruno*, 700 F. Supp. 2d 175, 178 (N.D.N.Y. 2010). The questionnaire contained fifty-five questions covering topics such as jurors' involvement in political campaigns, organizations, and unions, their political affiliations, and their personal views regarding public officials. *Id.* at 179. The court explained that "because the parties anticipated trial evidence relating to political matters, [the] questions were [] relevant to the parties' assessment of juror qualifications and the need for further questioning during formal *voir dire*." *Id.* A jury questionnaire was also used in the trial of former New York Senator Pedro Espada Jr. *See United States v. Pedro Espada Jr.,* No. 10-cr-985 (E.D.N.Y. 2010) (*see* Minute Entry for March 6, 2012 proceeding). In answering over fifty questions, potential jurors listed their membership in groups and organizations, the television shows they watched, the newspapers and magazines they read, and their main source for news. Jurors were also asked if they ever voted in an election in which the defendant was a candidate, and if they or any member of their family or close friends ever campaigned or volunteered for the defendant. *Id.* (Docket Entry No. 61, dated Feb. 8, 2012). If questionnaires were necessary in *Bruno* and *Espada* to impanel an unbiased jury, the need for a questionnaire in a case against a former President of the United States is even stronger. Given the increased political polarization in the eleven years since those cases, it is a virtual certainty that some venirepersons will prejudge the allegations because of President Trump's politics (as already shown in the commentary highlighted above).

District courts have also recognized that heightened protections against bias are warranted when litigants are merely *affiliated* with President Trump. In *United States v. Stone*, No. 19-cr-0018 (ABJ) (D.D.C.), for example, Roger Stone (a conservative lobbyist and longtime friend of President Trump), was charged with lying to Congress about his contacts with WikiLeaks during President Trump's 2016 successful presidential campaign. The Court *sua sponte* ordered the use of a 56-item questionnaire that "posed a number of questions specifically designed to probe potential bias," including, *inter alia*, (i) whether jurors listened to "political commentators on TV or talk radio" and, if so, which ones; (ii) whether jurors or a close friend or family member had ever run for or held political office; and (iii) whether jurors had worked or volunteered for any 2016 presidential campaign. *See United States v. Stone,* 613 F. Supp. 3d 1, at

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 12

12 (D.D.C. Apr. 16, 2020); *see also Stone*, No. 19-cr-0018 (ABJ) (D.D.C.) *at* Dkt. No. 247, Questions 22, 24, and 32.[23]

      Similarly, in *United States v. Manafort*, No. 1:18-cr-0083 (TSE) (E.D.V.A.), the Government filed a motion for a jury questionnaire in the trial of Paul Manafort, the former chairman of President Trump's presidential campaign who was charged with tax evasion and bank fraud. *See* Dkt. No. 87, 122. The Government's motion in *Manafort* identified a consideration that is critical to empaneling a fair jury in this case—namely, that "[w]ritten questionnaires are more private, and encourage honesty, particularly about sensitive issues involving bias and prejudice that are critical in this case." Dkt. No. 87, at 5. Indeed, although jurors' political activities and leanings may be a sensitive and personal topic, it is critical to reveal these biases during the selection process in a case that implicates those issues. A jury questionnaire, which jurors complete in private, has been widely recognized as an effective tool in eliciting candid answers on such issues. *See, e.g.*, *United States v. King*, 140 F.3d 76, 80, 84 (2d Cir. 1998) (affirming district court's use of juror questionnaire to promote juror candor). The *Manafort* Court allowed a juror questionnaire in that case. Dkt. No. 122. This Court should do the same.

      Accordingly, the protocol endorsed in *Skilling* and requested by President Trump—a written jury questionnaire followed by individual sequestered *voir dire*—is essential in this case. It will decrease the likelihood of seating a juror who has been biased by the pretrial publicity or a juror who harbors animus towards the parties.

### III.  A JURY QUESTIONNAIRE AND INDIVIDUAL *VOIR DIRE* ARE NECESSARY TO ELICIT CANDID RESPONSES REGARDING THE PRIVATE AND SENSITIVE ISSUE OF SEXUAL VIOLENCE

      A questionnaire is also necessary to promote candor in cases involving private and sensitive issues. The purpose of *voir dire* is to "ferret out actual or potential biases on the part of potential jurors." *See United States v. Parse*, 789 F.3d 83, 99 (2d Cir. 2015). An inquiry into the past experiences of jurors and jurors' close family members is essential to that process. *See United States v. Rahman*, 189 F.3d 88, 121 (2d Cir. 1999) (approving of *voir dire* that asked "subtle, detailed questions about [jurors'] personal experiences that might have prejudiced them against the defendants"); *Sampson v. United States*, 724 F.3d 150, 167 (1st Cir. 2013) (noting "when a juror has life experiences that correspond with evidence presented during the trial, that congruence raises obvious concerns about the jurors' possible bias." (*citing United States v. Torres*, 128 F.3d 38, 47-48 (2d Cir. 1997)).

---

[23] The inquiry permitted in *Stone* here aligns closely with questions proposed by President Trump. *See, e.g.,* ECF No. 98, Questions 24-26 (inquiring into use of social media sites and news programs); Question 22 (whether jurors had been active in a political campaign for President Trump).

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 13

Here, due to the nature of Plaintiff's allegations, President Trump's constitutional right to uncover potential bias against him requires inquiry into matters of the most private and sensitive nature—namely, jurors' experience with sexual violence or accusations of serious wrongdoing. *See* Exhibit A at Questions 27-34. A written questionnaire and individual *voir dire* are essential to ensuring candid and complete responses to such questions. *See King*, 140 F.3d at, 80, 84 (affirming district court's use of juror questionnaire and individual *voir dire* to ensure juror candor during *voir dire*); *Skilling*, 561 U.S. at 373-74 (district court "brought prospective jurors one by one to the bench" and "homed in on questionnaire answers that raised a red flag signaling possible bias"); Hon. G. Mize & P. Hannaford-Agor, "Building a Better *Voir Dire* Process," *The Judges' Journal*, 47:1 at 1 (2008) ("Written questionnaires are especially useful when questions involve sensitive topics (for example, substance abuse or criminal history) that prospective jurors would understandably feel uncomfortable disclosing orally in a room full of strangers.").

## IV. THE COURT'S ORDER ON AN ANONYMOUS JURY SHOULD BE MODIFIED TO PERMIT COUNSEL TO RESEARCH PROSPECTIVE JURORS

In addition to permitting the use of a jury questionnaire, the Court should modify its orders on an anonymous jury[24] to enable counsel to conduct essential background research on prospective jurors.

In its April 10, 2023 Order, the Court noted that "providing prospective jurors' names to counsel *would not materially aid*, and might even hinder, the empaneling of a fair and impartial jury" and that counsel had "*failed to explain the usefulness*, if any, of access to prospective jurors' names despite the careful and searching voir dire examination to which the venire will be subject." ECF No. 105 at 4 (emphasis added). Accordingly, counsel provides a more fulsome explanation here, and again requests that even if the jurors' identities are kept anonymous from the public, the Court should permit the legal teams for the parties to have access to this information.

### A. The Order on Anonymity Should be Narrowly Tailored

In general, a court "should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991). The empanelment of an anonymous jury "is a drastic measure, and one that should be taken only in limited circumstances." *United States v. Mostafa*, 7 F. Supp.3d 334, 336 (S.D.N.Y. 2014).

---

[24] ECF Nos. 94, 105.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 14

Counsel does not take issue with the Court's view that the public's presumptive right of access is outweighed by the goals of choosing jurors "who can perform their duties free of unwanted media attention, free of inappropriate influence attempts, and free of any fear of harassment or retaliation, regardless of the outcome of the case."[25]  However, President Trump respectfully submits that those goals will be served if juror identities are revealed only to the legal teams for each party, but not the parties themselves.   He therefore requests that the Order be modified to enable the attorneys to conduct necessary background research on potential jurors and evaluate potential challenges and strikes.  Keeping a juror's identity from the public and media, but disclosing them to the parties' attorneys, is a fair balancing of the interests at stake.  The Court can issue an order directing counsel not to share the information with the media or others not involved with jury selection.  The Court can also issue an order prohibiting anyone from contacting jurors.  Such order will squarely address the legitimate concerns raised *sua sponte* by this Court, while protecting President Trump's constitutional rights to a fair and impartial jury.

Courts in this district have has been reluctant to order an anonymous jury in a case regarding alleged terrorist activities. *See Mostafa*, 7 F. Supp. 3d at 334 (S.D.N.Y. 2014) (rejecting government motion for an anonymous jury in the trial of defendant alleged to have engaged in hostage-taking and conspiracy to provide and conceal material support and resources to terrorists).  And courts around the country have routinely permitted counsel and/or the parties to access jury lists while preserving anonymity to the general public.  *See, e.g.*, *United States v. Mathis*, 932 F.3d 242 (5th Cir. 2019) (noting district court's decision did not interfere with the ability to conduct a thorough *voir dire* examination where counsel was given full access to all juror information, and the defendants were permitted to review redacted juror questionnaires); *United States v. Sanchez*, 74 F.3d 562, 565 (5th Cir. 1996) (rejecting government's argument that district court's use of anonymous jury was harmless error because the court otherwise conducted extensive *voir dire*, noting in part "information such as was redacted here yields valuable clues for purposes of jury selection"); *United States v. Peoples*, 250 F.3d 630, 635 (8th Cir. 2001) (noting in capital case that "all parties were provided a list of the names and places of residence of each member of the venire" but the court ordered "the panel members be identified in court by numbers rather than name."); *United States v. Lee*, 886 F.2d 998 (8th Cir., 1989) (noting counsel for defendants on trial for 23 counts related to sale of narcotics were provided with the names of jurors who were otherwise sequestered and kept anonymous from general public); *United States v. Black*, 483 F. Supp.2d 618, 621 (N.D. Ill. 2007) (noting in Conrad Black's highly publicized criminal fraud trial that the court disclosed names and addresses of jurors and alternates to the parties but did not make that information publicly available); *United States v. Sampson*, 297 F. Supp. 2d 340, 341 (D. Mass. 2003) (balancing parties' need for information and potential juror's interest in privacy by ordering list of jurors sealed as to general public and permitting disclosure

---

[25] Apr. 10, 2023 Order, ECF No. 105, at 3.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 15

to counsel and their agents to be used solely for the purpose of selecting a jury). This Court
should do the same.

### B. *Permitting Counsel to Conduct Background Research on Jurors Mitigates Risks of Mistrial – Especially in High Profile Cases*

Permitting counsel to conduct background research on jurors will protect against the risk
of a mistrial. This is especially important in high-profile cases like this one. It is well
documented that in high-profile cases, jurors will often misrepresent themselves to get on a jury.
Time and again, juror research in such cases has uncovered disqualifying background
information that was not disclosed by jurors.

For example, the case of Harvey Weinstein is currently on appeal, in part because a juror
was not honest during *voir dire* about the nature of a novel she authored that involved themes of
sex and "predatory older men," and thereby avoided removal from the venire for cause.[26]
Overnight research in the Weinstein case also allowed the defense to uncover that a prospective
juror had tweeted, "[i]f anyone knows how a person might hypothetically leverage serving on the
jury of a high-profile case to promote their new novel . . . dm me please." After the defense
alerted the court to their findings, the court instructed the prospective juror to retain a lawyer,
return to the courtroom at a later date, and be ready to argue why he should not be found in
contempt. The juror was told he faced a fine and up to 30 days in jail.[27]

In Michael Avenatti's 2020 criminal trial, the defense uncovered, through overnight
research, that a prospective juror had extensive connections with the corporate victim in the
case—Nike. This juror had hundreds of posts on Facebook and Twitter referencing Nike in a
positive way—all of which were presented to the court. This led to the juror being dismissed for
cause after Judge Gardephe noted "there are too many connections between him and Nike such
that I'm not comfortable with him being on the jury." *See United States v. Avenatti*, No. 19-cr-
373 (S.D.N.Y.), Jan. 20, 2020 Trial Tr. at 387:2-4.

The appeal of the conviction of Ghislaine Maxwell, currently pending before the Second
Circuit involves a juror's failure to disclose his own history of sexual abuse during jury

---

[26] James Queally, *Harvey Weinstein appeals New York sexual assault conviction*, LOS ANGELES
TIMES, April 5, 2021, https://www.latimes.com/california/story/2021-04-05/harvey-weinstein-
appeals-new-york-sexual-assault-conviction; *People v. Harvey Weinstein*, APL No. 22-112
(N.Y.), Br. for Def.-Appellant, Jan. 10, 2023, at 62 *et seq*.

[27] *See* "Weinstein Judge Lectures Would-be Juror Over Bad Tweet," VARIETY, Mar. 10, 2020,
*available at* https://variety.com/2020/biz/news/harveyweinstein-juror-howard-mittelmark-tweet-
court-judge-1203528690/.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 16

selection.[28]  The New York Court of Appeals upheld the Appellate Division's vacating the murder conviction of Robert Neulander after it was discovered that a juror who voted to convict had exchanged hundreds of text messages with friends and family during the trial, with some messages relating to a preferred outcome of the trial.[29]  In Palm Beach County, Florida, the conviction of John Goodman for manslaughter while driving under the influence was overturned because a juror did not disclose the material fact of the juror's wife's DUI conviction.[30]

     *United States v. Parse*, 789 F.3d 83, 111 (2d Cir. 2015), is particularly instructive here. There, following a trial before Judge Pauley, the jury convicted defendant Parse and three of his co-defendants of numerous financial fraud and tax evasion charges.  One of the jurors, Catherine Conrad, had repeatedly lied during *voir dire* regarding her level of education, place of residence, criminal history, and other matters.  *Id.* at 87-90.  Judge Pauley granted a motion for a new trial as to Parse's three co-defendants, but held that Parse had waived his right to an impartial jury because his attorneys had sat on background research collected before and during trial that suggested Conrad's *voir dire* answers were false.  *Id.* at 101.  In reversing Judge Pauley's ruling and vacating Parse's conviction, the Second Circuit noted "an impartial jury is one in which all of its members, not just most of them, are free of interest and bias," and "had no difficulty with the ruling of the district court in the present case that the jury empaneled to hear the case against these defendants was not an impartial jury."  *Id.* at 111.  The result in *Parse* was that a three-month trial, with 41 witnesses and some 1,300 exhibits, was undone by the falsehoods of one juror during *voir dire*—***falsehoods that could have been uncovered by thorough background research and prompt action by the parties***.

     This case, like many of the examples above, presents a risk that jurors will misrepresent themselves in order to be selected for service.  Given this risk, enabling counsel to conduct jury research is critical to protect against juror misconduct and to reduce the chances of a mistrial.

---

[28] Aaron Katersky, *Ghislaine Maxwell asks appeals court to overturn conviction, says 'Kabuki theater' prevented fair trial*, February 28, 2023, https://abcnews.go.com/US/ghislaine-maxwell-asks-appeals-court-overturn-conviction-kabuki/story?id=97540570; *United States v. Ghislaine Maxwell*, No. 22-cr-1426 (S.D.N.Y.), Br. for Def.-Appellant, Feb. 28, 2023, ECF No. 59 at 63 *et seq.*

[29] Ed Shanahan, *After Juror Exchanged 7,000 Texts, Murder Verdict Is Overturned,* N.Y. TIMES, October 31, 2019, https://www.nytimes.com/2019/10/31/nyregion/robert-neulander-wife-murdered.html; *People v. Neulander*, 34 N.Y.3d 110 (2019).

[30] *See State v. Goodman*, No. 502010CF005829AXXXMB, 2013 WL 2127070, at *6 (Fla. Cir. Ct. May 3, 2013) (Order granting motion for new trial); *DeMartin v. State*, 188 So.3d 87 (Fla. DCA 2016) (juror was convicted on two counts of contempt for misconduct that involved conducting a "drinking experiment" and failing to disclose during *voir dire* that his ex-wife had been arrested for DUI).

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 17

### C.    *Jury Research Is an Expected Part of Competent Representation*

Courts have acknowledged that using the internet to conduct background research on prospective jurors is a "rudimentary practice" during jury selection. *Stone*, 613 F.Supp.3d at 43; *see also Carino v. Muenzen*, No. A-5491-08T1, 2010 WL 3448071, at *10 (N.J. Super. Ct. App. Div. Aug. 30, 2010) (trial judge erred in preventing counsel from using the internet during jury selection). Indeed, some bar associations have opined that professional standards of competence and diligence may *require* such research. Just weeks after Judge Pauley conducted a post-conviction evidentiary hearing in *Parse*, the New York City Bar Association stated in Formal Opinion 2012-2:

> Just as the internet and social media appear to facilitate juror misconduct, the same tools have expanded an attorney's ability to conduct research on potential and sitting jurors, and clients now often expect that attorneys will conduct such research. Indeed, *standards of competence and diligence may require doing everything reasonably possible to learn about the jurors who will sit in judgment on a case*.

NYCBA Comm. on Ethics Formal Op. 2012-2 (emphasis added).

Similarly, in 2014, the American Bar Association recognized the "strong public interest in identifying jurors who might be tainted by improper bias or prejudice," and therefore opined that it was proper for counsel to research "a juror's or potential juror's Internet presence, which may include postings by the juror or potential juror in advance of and during a trial. . . ." *See* Standing Committee on Ethics and Professional Responsibility, Formal Op. 466 at 1-2, Am. Bar Ass'n. (2014); *see also* New York State Bar Association, Dec. 8, 2015 Report of the Social Media Committee of the Commercial and Federal Litigation Section, at 15 ("[I]t is not only permissible for trial counsel to conduct Internet research on prospective jurors, but [] it may even be expected.").

Accordingly, to balance the parties' need to empanel an impartial jury with jurors' interest in being free from harassment, counsel respectfully requests the Court make the juror names available to the attorneys for the parties and those working for the attorneys, which may only be viewed by them and solely for the purpose of selecting a jury in this case. Doing so will permit counsel a reasonable opportunity to conduct this important background research so that President Trump's constitutional right to a fair trial is preserved. It will also reduce the risk of a mistrial should background research reveal an issue that could have been addressed prior to selection of that juror.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 18

## V.    THE COURT SHOULD IMPLEMENT A FOUR-STEP PROTOCOL FOR THE JURY SELECTION PROCESS

President Trump respectfully submits for the Court's consideration the following protocol for jury selection:

- **Step 1 (distribution and collection of the questionnaire):** Jurors assemble in court and the written questionnaire is distributed to be filled out in the courtroom. Jurors are excused as they complete the questionnaire and are instructed to return in one week. The collected questionnaires are photocopied and distributed to counsel and the Court. Defense counsel agrees to take responsibility for the distribution, collection, and copying of all questionnaires, to relieve the Court of any significant administrative burden or cost.

- **Step 2 (agreed upon for-cause challenges):** A week after the questionnaires are completed, the jurors return to court after counsel have independently reviewed the questionnaires and conferred on which jurors should be excused for cause. These jurors can be quickly identified and reviewed by the Court for excusal.

- **Step 3 (disputed for cause challenges and individualized follow-up):** Counsel identify for the Court remaining jurors on which they cannot agree should be excused for cause. The Court can rule on those disputes after the Court and counsel conduct an individualized *voir dire* of those jurors to the extent necessary. The remaining jurors will represent a qualified venire from which a jury can be rapidly selected.

- **Step 4 (peremptory challenges):** The parties exercise their peremptory challenges.

TACOPINA SEIGEL & DEOREO

Honorable Lewis A. Kaplan
April 14, 2023
Page 19

## CONCLUSION

For the foregoing reasons, President Trump respectfully requests that the Court grant his Motion for a Written Jury Questionnaire and Modifications to this Court's Order dated April 10, 2023, consistent with the protocol proposed herein.

Respectfully submitted,

/s/ Joseph Tacopina
Joseph Tacopina, Esq.
Alina Habba, Esq.
*Co-Counsel to Donald J. Trump*

cc: All Counsel (By ECF)