# tacopina seigel trial lawyers

TACOPINA SEIGEL & DEOREO

**JOSEPH TACOPINA**
EMAIL: jtacopina@tacopinalaw.com
www.tacopinalaw.com

275 Madison Avenue, 35th Floor
New York, NY 10016
Telephone (212) 227-8877
Facsimile (212) 619-1028

May 1, 2023

**FILED BY ECF**
Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     <u>Carroll v. Trump</u>, 22 Civ. 10016 (LAK)

Your Honor:

We respectfully submit this letter, on behalf of Defendant Donald J. Trump, to request that the Court grant a mistrial based upon pervasive unfair and prejudicial rulings by the Court; or in the alternative, (1) correct the record for each and every instance in which the Court has mischaracterized the facts of this case to the Jury and (2) allow Defendant's counsel to have greater latitude to cross-examine Plaintiff and her witnesses.

A mistrial should be granted because the Court has: (1) mischaracterized the evidence in favor of Plaintiff; (2) bolstered the testimony of Plaintiff; (3) allowed Plaintiff to testify that Defendant has two tables of lawyers at trial while prohibiting Defendant from fairly clarifying the record by showing that Plaintiff has a comparable amount of lawyers; (4) continuously sustained improper "argumentative" objections of Plaintiff's counsel as to questions using a well-established and accepted looping method of cross-examination; (5) permitted the testimony of the Natasha Stoynoff ("Stoynoff"), without any *voir dire* of the witness, when it is clear that her testimony does not fit within the requirements of Fed. R. Evid. 413(d)(2&5) and should be excluded under Fed. R. Evid. 403; (6) alluded to the potential use of relevant United States statutes as a form of remedy beyond that which might be available from the Court based on Defendant's son, Eric Trump, making completely truthful and non-prejudicial statements about Reid Hoffman's financing of Plaintiff's litigation; and (7) expressed distress with Defendant's counsel for bringing to its attention that someone from Plaintiff's side violated the Court's Protective Order, which led to the world-wide publication of Plaintiff's mock jury results – while not expressing *any* concern that its Protective Order was clearly violated.

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 2

A.  **The Court Mischaracterized the Evidence in Favor of Plaintiff**

    1.    Bergdorf Goodman Surveillance Cameras

The Court clearly mischaracterized the evidence in favor of Plaintiff with respect to the surveillance cameras in Bergdorf Goodman, and did not permit Defendant to question Plaintiff as to whether she even attempted to ascertain whether there was footage showing the parties together. Notably, the Bergdorf Goodman store manager of the women's store during the relevant time period, Cheryl Beall ("Beall")(Ex. A; Tr.[1] at 114:16-21), testified that **she was "certain"** that Bergdorf Goodman had surveillance cameras at all of the entrance/exit doors at the store: "Q. Where did you have security cameras located in Bergdorf in general? | A. The only thing that I can tell you for certain, I know we had them at the -- at all of the doors ...." (*Id.* at 114:16-21).

Therefore, if Plaintiff's story is true, her interactions with Defendant on the ground floor near the entrance door would have been captured on video. If such video existed, that would have significantly corroborated her story. It is Defendant's position that Plaintiff's story is entirely false and that Plaintiff knows it is false. Consequently, proof that Plaintiff never *attempted* to determine if such footage of the parties existed constitutes circumstantial evidence that her accusation is false. Simply put, Defendant maintains that Plaintiff did not seek footage of her alleged rape because no such alleged rape occurred.

Accordingly, Defendant's counsel asked Plaintiff if she made efforts to retrieve such footage. However, the Court shut down that proper line of questioning and alluded in front of the Jury to the possibility that no such surveillance cameras on the first/main floor existed, in direct contravention of the testimony elicited by Plaintiff's own witness, Bergdorf Goodman store manager Cheryl Beall:

> Q. When you were allegedly assaulted in Bergdorf Goodman by Donald Trump and on the first floor with Donald Trump and on the escalators with Donald Trump, you never thereafter, that day, the next day, the next week or ever tried to get the videos that could have existed to support your claim?
>
> MR. FERRARA: I object to the breadth of the question.
>
> THE COURT: Sustained.

---

[1] "Tr." refers to pages of the Trial Transcripts, relevant pages of which are attached hereto as Exhibit A.

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 3

    MR. TACOPINA: The breadth. OK.

Q. Did you go back the next day to get -- ask for the video camera footage?

    THE COURT: Sustained. **It assumes there is such a thing**.

    MR. TACOPINA: **Ms. Carroll in fact testified, as did the Bergdorf Goodman witness, that on the main floor there are security cameras, your Honor.**

    THE COURT: Ms. Carroll testified she guessed, and we have had the testimony from **the witness who was at Bergdorf at the time, and she said what she said. We are not going to ask questions based on this kind of statement**.

    MR. TACOPINA: Can I ask this question?

    THE COURT: I don't know yet. I have not heard it.

    MR. TACOPINA: I know you don't know it, so I am going to ask it, and you will let me know.

Q. Did you ever attempt to ascertain whether there is any video footage of you and Donald Trump at Bergdorf Goodman?

    MR. FERRARA: Objection.

    THE COURT: Sustained. I sustained the objection to that question within the last three minutes.

(Ex. A: Tr. at 452:2 - 453:4)(emphasis added).

    2.    <u>Bringing Criminal Charges</u>

The Court expressed to the jury that Carroll could not have Defendant prosecuted for rape because private individuals cannot bring criminal charges. However, the line of questioning related to this issue – and what the jury clearly would have understood from such questioning – was

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 4

Defendant's position that: (1) Plaintiff could have gone to the police to make an accusation or report of rape, which could have led to the procurement of rape charges, and (2) Plaintiff did not do so because the rape never occurred. Thus, Defendant was not trying to confuse the jury by implying (as Plaintiff's counsel incorrectly asserts, *see* quote *infra*) that this is a "a criminal case." Rather, Defendant simply sought to establish that Plaintiff's comment to Lawrence O'Donnell ("O'Donnell") that she did not go to the police to seek a criminal charge because it would have been "disrespectful to women being raped by the border and around the world" was a false excuse designed to conceal her real reason for not doing so, namely that the alleged rape never occurred. The trial testimony on this issue is as follows:

> Q. But, according to you, you wouldn't bring a criminal charge against him because that would be disrespectful to women being raped by the border and around the world?
>
> MR. FERRARA: Objection.
>
> THE COURT: You already asked that question.
>
> MR. TACOPINA: I did not ask this question. I read -- played what she said. I am asking a question about what she said.
>
> **MR. FERRARA: This is not a criminal case, your Honor.**
>
> **THE COURT: Sustained.**
>
> Q. Let me ask you this. How would you -- it's not a criminal case. How would you bringing criminal charges be disrespectful to some people at the border?
>
> MR. FERRARA: Objection.
>
> THE COURT: Sustained. Correct me if I'm wrong, counsel, but I believe in the State of New York private individuals can't bring criminal charges and probably have not been able to do that in at least a century or two.
>
> MR. TACOPINA: No, they can't. They could go to the police department.
>
> THE COURT: That's not what you said, counselor. We have been up and

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 5

> down the mountain on the question of whether she went to the police, so let's move on.
>
> MR. TACOPINA: We have not been up and down the mountain of what we just heard. Can I ask one question?
>
> THE COURT: Move on.
>
> MR. TACOPINA: I guess not.

(Ex. A: Tr. at 449:22 - 450:24)(emphasis added).

Importantly, the phrase "bringing a rape charge" (as opposed to making a report to the police) was used by Defense counsel, because Plaintiff, when interviewed by O'Donnell, discussed that exact phrase in the context of whether she "would consider bringing a rape charge against Donald Trump." (DX-AW in Evidence subject to redactions). And during the O'Donnell interview, clearly both O'Donnell and Plaintiff herself understood – as lay persons would – that the reference to "bringing a rape charge" meant going to the police to file a report. Non-lawyers customarily use the phrase "press charges" when referring to going to the police to get a defendant prosecuted.[2]

Therefore, the Court's hyper-technical interpretation of the phrase "bringing a rape charge" was made simply to protect Plaintiff from further cross-examination, resulting in unfairness to Defendant on a critical issue.

3. The Jonathan Swift Reference

When Defendant's counsel elicited testimony from Plaintiff that her book contained reference to all men in this country being sent to Montana and retrained, the Court, in order to bolster the testimony of Plaintiff, chose to essentially testify himself as to why such commentary was a satire due to Jonathan Swift's work *A Modest Proposal*:

> Q. Okay. At one point I think in your book you propose we should dispose of all men?

---

[2] *See, e.g.* https://www.merriam-webster.com/dictionary/press%20charges ("Press charges ... to take legal action against someone : to officially accuse someone of a crime").

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 6

> A. Into Montana.
>
> Q. Into Montana?
>
> A. Yeah, and retrain them.
>
> Q. So retrain. So all the men here in this courtroom, in this country, all get shuffled off to Montana and get retrained.
>
> A. You understand that that was said as a satire.
>
> Q. Ah. Okay.
>
> THE COURT: It comes from Jonathan Swift's A Modest Proposal 700 years ago, right?
>
> THE WITNESS: Yes.
>
> THE COURT: Let's move on.
>
> MR. TACOPINA: Thank you, your Honor.

(Ex. A: Tr. at 360:4-17).

After Carroll testified that the above-referenced notion of disposing and retraining of all men was a satire, the Court interjected in a manner that corroborated such testimony by stating such notion derived from Swift's *A Modest Proposal*. Rather than addressing the subject of men, Swift's "proposal [was] to 'solve' the problem of Irish poverty by killing and eating Irish children. See Jonathan Swift, A Modest Proposal (1729)." *Farah v. Esquire Mag.*, 736 F.3d 528, 536 (D.C. Cir. 2013). That said, if Plaintiff wished to elicit testimony about a three-hundred year old book that did not address the subject matter of her own book, she could have done so on re-direct. It was not for the Court to provide evidence from the Bench to corroborate Plaintiff's position in a way that suggested to the Jury favoritism of any one party.

4. <u>There Was No One on the Sixth Floor</u>

During defense counsel's cross-examination of Beall, the Court further bolstered Plaintiff's

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 7

position in this case by expressing a corroborative view to the jury that there was no one on the sixth floor of Bergdorf Goodman at the time of the alleged rape:

> Q. Here's my question. Given the proximity from the fitting room to the main area, if somebody, let's say, screamed from inside a dressing room, would they be heard out in the main area?
>
> A. If they screamed, I guess, depending on the volume, sure.
>
> Q. And if somebody's head was -
>
> > THE COURT: **Counselor, if a tree falls in the forest and there is no one there to hear, right? It depends whether somebody is there, doesn't it?**
> >
> > MR. BRANDT: I got an answer, your Honor.
> >
> > THE COURT: I know you did, but let's not play this kind of game.
> >
> > MR. BRANDT: I'm not playing a game, your Honor. I'm trying to ask the witness questions.
> >
> > THE COURT: You know where I'm coming from.

(Ex. A: Tr. at 138:1-15)(emphasis added).

Whether the sixth floor of a popular New York City department store was empty of all human presence at the time of the alleged rape is a key issue in dispute. Thus, it was proper for Defense counsel to ask Beall about whether a scream emanating through a dressing room door of the lingerie department could be detected in the main area. Indeed, Plaintiff herself subsequently testified on direct that her laughter and her head hitting the wall was loud enough for persons nearby to hear: "Q. Do you think – based on what you were experiencing, do you believe that if someone had been nearby, they would have been able to hear what was happening in the dressing room? | A. They would have heard the head hitting and definitely would have heard me laughing." (Ex. A: Tr. at 179:25-180:4).

Given these circumstances, the Court's harsh admonishment of counsel for asking such questions was improper. As an initial point, opposing counsel did not object to defense counsel's

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 8

questioning on this topic. Additionally, the Jury could readily construe the Court's commentary about "a tree fall[ing] in the forest" as its view that no one was present on the sixth floor at that time. And lastly, to the extent the Court had any concern with the phraseology of a question posed, unjustifiably accusing defense counsel of playing "game[s]" in front of the Jury was an unfair means of addressing it. The Court's doing so again suggested to the Jury a favoritism of one party over another.

**B.   Amount of Attorney's at the Counsel Tables**

The Court allowed Plaintiff to testify that Defendant has two tables of lawyers at trial while prohibiting Defendant from fairly clarifying the record by showing that Plaintiff has a comparable amount of lawyers:

> Q. But one of the reasons Carol Martin told you not to tell the story to anyone and one of the reasons you have testified that you never told the story to anyone was because of Donald Trump's power.
>
> A. I was afraid Donald Trump would retaliate, which exactly is what he did. That's exactly. One of my biggest fears came absolutely true.
>
> Q. Okay.
>
> A. He has two tables full of lawyers here today. It came absolutely true.
>
> Q. We have about the same amount of lawyers. Not everyone is a lawyer, Ms. Carroll, but regardless of that -
>
> THE COURT: Come on, Mr. Tacopina, let's move along.
>
> MR. TACOPINA: Yes, sir.

(Ex. A: Tr. at 435:3-16).

Plaintiff's testimony about Defendant having "two tables full of lawyers" conveyed to the Jury the wrongful impression that she is somehow disadvantaged in these legal proceedings by a lack of resources, which could not be further from the truth. Plainly, testimony about Defendant's counsel at this trial is irrelevant and prejudicial, as it risks evoking unwarranted sympathy for

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 9

Plaintiff from the Jury. Yet, when defense counsel sought to minimize such prejudice, the Court interjected and expressed its dissatisfaction with that effort. In doing so, the Court inequitably conveyed to the Jury an apparent endorsement of Plaintiff's view.

C. **Baseless Argumentative Objections**

By way of continuously sustaining improper "argumentative" objections of Plaintiff's counsel, the Court has prohibited Defendant's counsel from using a well-established and accepted method of cross-examination, namely "looping." Simply put, looping is based on evidence in the record (*i.e.* answers to questions just prior to the looping question), while argumentative questions are not:

> Once you get an affirmation of a fact or phrase contained in your leading question, that new fact can then be reinforced by the rhetorical device of looping. The new fact is used in the next question, without re-asking the fact, by attaching the looped fact to a safe fact in the next question. While the who, what, when, where and how questions are still important at the deposition, these words should seldom be used during the cross-examination at trial.

*W. Russell Corker, Cross-Examination in the Modern Era*, N.Y. St. B.J., March 2019, at 28, 32; *see also Timothy B. Walthall, The Secrets of Cross-Examination How to Avoid the Pitfalls at Trial, Litigation*, Summer 2018, at 26, 29 ("Looping. Another tool used effectively with leading questions is the technique known as "looping." Looping is easy to describe, to explain, and to demonstrate. By looping, we merely repeat an important or operative term or theme elicited in the testimony in a number of follow-up questions. Cross-examiners want short storytelling statements from their witnesses. Trial lawyers know that not everything that is said is of equal importance; not all facts are created equal. Also, the jury has a short attention span and quickly forgets. Finally, we know there are themes that are extremely important to the story we are telling. These are the themes that we want the jurors to remember. We help them to remember what we deem important by looping questions."); *compare Phipps v. McDowell*, No. EDCV181302PAJEM, 2019 WL 4920961, at *21 (C.D. Cal. Aug. 16, 2019)("The prosecutor's questions were based on the testimony of prior witnesses and did not refer to matters not in the record. With a couple of possible exceptions, her questions did not constitute 'a speech to the jury masquerading as a question' and 'not seeking to elicit relevant testimony.' [*People v.*] *Chatman*, 38 Cal.4th [344] at 384 [(2006)] (defining 'argumentative question').").

In this regard, it should be noted that Defendant has a Seventh Amendment right to cross-

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 10

examination, and unjustified interference with Defendant's cross-examination should not be tolerated. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970)("The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases.")(Black, J., concurring); *see also Melvin v. Car-Freshener Corp.*, 453 F.3d 1000, 1004 (8th Cir. 2006)(holding same); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 128 (3d Cir. 1980)(holding same).

    Some examples of the Court sustaining improper argumentative objections are below:

    Q. And it's your sworn testimony that Donald Trump waved at you across traffic, even though he only met you briefly at a party eight or nine years earlier and hadn't had any interactions with you since, correct?[3]

    MR. FERRARA: Objection.

    THE COURT: Sustained. Argumentative.

***

    Q. According to you, after Donald Trump saw you through a door, stopped you, supposedly recognized you after speaking to you for a few minutes eight or nine years earlier, he asked you to help him buy a present?[4]

    MR. FERRARA: Objection to the argumentative portion of the question, your Honor.

    THE COURT: Sustained. Rephrase.

---

[3] This question was based upon facts in the record, namely that Plaintiff claims to have met Defendant at a party in 1987 (Ex. A: Tr. at 375:13 -379:4) and then had no interactions or communications with Defendant until 1994 or 1995 (Ex. A: Tr. 379:5-16), when she claims that he waved at her on the street (Ex. A: Tr. 380:5-381:17).

[4] This question was based upon facts in the record, namely that (1) Plaintiff claims that Defendant saw her through the glass door, and recognized her and stopped her with his hand (Ex. A: Tr. 387:10-388:20); and (2) according to Plaintiff, Defendant last spoke to her (for a few minutes) in 1987 (Ex. A: Tr. 375:13-379:4).

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 11

\*\*\*

Q. It's your testimony that in one of New York's most prestigious department stores, there was not a salesperson or a customer or employee on the sixth floor?[5]

MR. FERRARA: I am going to object.

THE COURT: Objection sustained.

You get to make a closing argument in this case, counselor, and this isn't the time for it.

Q. Because Bergdorf Goodman is such an attentive, upscale store, you would agree it doesn't make sense that a sales attendant would not be present in the lingerie department when you were supposedly there with Donald Trump?[6]

MR. FERRARA: Objection.

THE COURT: Sustained.

MR. TACOPINA: Can I understand the basis of that, your Honor.

THE COURT: Yes. It's argumentative. It's repetitive and it's inappropriate.

\*\*\*

Q. So to be clear, it's your testimony that even though at the time she wasn't your closest friend and you never confided anything like this to her before, you thought

---

[5] This question was based upon facts in the record, namely that Bergdorf Goodman is a prestigious store. (Ex. A: Tr. 383:3-384:3).

[6] This question was based upon facts in the record, namely that Bergdorf Goodman is attentive and upscale. (Ex. A: Tr. 383:3-384:3).

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 12

> your first call when you left Bergdorf Goodman should be to her?[7]
>
> MR. FERRARA: Objection. Argumentative. Asked and answered.
>
> THE COURT: Sustained.
>
> \*\*\*
>
> Q. And as a result, you have no medical records showing physical injuries from this colossal battle you have described?[8]
>
> A. I have -
>
> MR. FERRARA: Objection, your Honor.
>
> THE COURT: Sustained. Argumentative. The answer is stricken.

(Ex. A: Tr. at 382:3-8; 389:19-25; 394:16-395:7; 421:23 - 422:3; 436:13-18).

**D.**   **Natasha Stoynoff's Testimony**

The preceding illustrations demonstrate an unfairness to Defendant that has plagued these proceedings to date. Amongst the most glaring examples of such unfairness is the Court's willingness to admit the unduly prejudicial testimony of Natasha Stoynoff ("Stoynoff") pursuant to Fed. R. Evid. 413(d)(2&5), without any *voir dire* of the witness as sought by Defendant. (ECF No. 142). This is so because, as Defendant presented to the Court, Stoynoff told Plaintiff in an interview (conducted and recorded by Plaintiff) that Trump, during the alleged 2005 Mar-a-Lago incident (*i.e.* ten years after the alleged Bergdorf Goodman incident), never touched or attempted to touch her genitals or anus, which is required under Rule 413(d)(2&5)("contact, without consent, between any

---

[7] This question was based upon facts in the record, namely that Lisa Birnbach was not one of Plaintiff's closest friends, and Plaintiff never previously confided to her personal information such as Plaintiff being abused. (Ex. A: Tr. 421:1-16).

[8] This question was based upon facts in the record, namely that Plaintiff never went to a medical provider for purported injuries (Ex. A: Tr. 436:1-12) arising from the alleged struggle, which Plaintiff described as "colossal." (Ex. A: Tr. 414:12-15).

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 13

part of the defendant's body--or an object--and another person's genitals or anus."). Indeed, Plaintiff never even disputes those facts. *See* ECF Nos. 142, 143, 153.

Stoynoff's testimony amounts to extraordinarily prejudicial propensity evidence. Yet, in order to support its admission, the Court improperly resorted to bootstrapping other prejudicial propensity evidence, namely (1) Jessica Leeds's allegation (which predates the alleged Bergdorf Goodman incident by approximately 15 years), and (2) the Access Hollywood recording (constituting mere words and not conduct). To be clear, Stoynoff will testify only that Defendant kissed her, which, irrespective of the Court's bootstrapping, does not satisfy the requirements for her testimony under Fed. R. Evid. 413(d)(2&5). Moreover, the fact that the Court, in the first place, needed to engage in bootstrapping as a prerequisite for its decision to admit Stoynoff's testimony highlights such testimony's lack of probative value. That consideration becomes even more significant given that Stoynoff's claim is a far cry from a violent rape. Accordingly, such evidence should clearly be excluded under Fed. R. Evid. 403 ("probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury").

In light of the foregoing, the Court's unwillingness to conduct even a brief *voir dire* of Stoynoff only serves to further highlight the unjust manner in which Defendant is being treated throughout these proceedings.

E.   **Alluding to the Use of Extra-Judicial Remedies**

On April 26, 2023, Plaintiff's counsel notified the Court that Eric Trump "put out a tweet" concerning Reid Hoffman's ("Hoffman") litigation funding of Plaintiff's lawsuit and stated that Plaintiff was considering requesting remedies for such tweet:

> Unfortunately, at 1:54 p.m. this afternoon, Mr. Trump's son, Eric Trump, put out a tweet -- this is not Truth Social. This is on Twitter -- that reads: Zoom out. *Jean Carroll's legal battle against my father is allegedly being funded, all caps funded, by political activist Reid Hoffman, cofounder of LinkedIn. A civil lawsuit being funded by a billionaire with no direct involvement in the case out of pure hatred, spite, or fear of a formidable candidate is an embarrassment to our country, should be illegal, and tells everything you need to know about the case at hand....*

> In light of the Truth Social posts, in light of this tweet by Mr. Trump's son, we obviously are considering whether any remedy here would be appropriate, your Honor.

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 14

(Ex. A: Tr. at 241:1-13)(emphasis added).

    Initially, it must be noted that Eric's Trump's tweet was either factually accurate or pure protected opinion. For instance, days prior to Eric Trump's tweet, Hoffman admitted in his post on LinkedIn that: "[I]n addition to E. Jean Carroll, grantees I have supported include …. *** While Trump's legal team has characterized my support of Carroll's lawsuit as 'secret,' I want to be clear that I've never taken any steps to hide the financial support that I have provided to this lawsuit after it started." (Ex. B).

    It also cannot be disputed that Hoffman has no "direct involvement in the case" and is adverse politically to Defendant. (Ex. C: "Amid the advertiser boycott of Facebook, one of the Democratic Party's biggest megadonors, Reid Hoffman, is exploring ways to launch a similar boycott of President Trump and his White House. *** 'Frankly, on the political side, one of the things I've been thinking about trying to go stimulate for the next month is an anti-Trump boycott,' Hoffman said in an interview on Tuesday with Anne-Marie Slaughter, the head of New America.").

    Therefore, there was simply nothing wrong with Eric Trump's constitutionally protected free speech in the form of a tweet. Nonetheless, the Court expressed otherwise, warning of the potential use of certain Federal statutes to impose remedies that might be extra-judicial in nature:

> I said something this morning about **your client, perhaps now sailing in harm's way, conceivably with his son**, if the report I just heard is true.
>
> Remedies that might be available from this Court may not be the only relevant remedies. If I were in your shoes, I'd be having a conversation with the client.
>
> ***
>
> Eric Trump isn't before me, so you don't have to defend Eric Trump. I am simply suggesting to you that there are **some relevant United States statutes** here and somebody on your side ought to be thinking about them.

(Ex. A: Tr. at 242:6-10 and 243:2-5)(emphasis added).

    Although the Court did not identify what "relevant United States statutes" to which it was referring, the notion that any statutes would be appropriate to impose a remedy for the tweet at issue is highly inappropriate and incendiary. Consequently, the Court's comments in this regard reflect

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 15

a predisposition which is underlying its unfair treatment of Defendant in this matter.

**F.      Violation of the Court's Protective Order**

Although the Court readily accused defense counsel of playing "game[s]" in front of the Jury based on a brief line of proper questioning, it expressed no concern, as set forth below, about "[s]omebody from the plaintiff's side" violating its Protective Order, despite the fact results of a mock trial relating thereto were leaked to the press.[9] To the contrary, with respect to the violation of the Protective Order, the Court only expressed dissatisfaction with defense counsel for bringing it to the Court's attention:

> MR. TACOPINA: The jury has been instructed not to read any media or press in this case, right, your Honor, so we have to assume the jury is not going to violate the Court's order.
>
> I will do this. First of all, let's also just put things in context. A week ago, before this trial started, there was an article which I read again yesterday in reference to -- that was a leak -- not certainly Ms. Kaplan or her office, but somebody leaked the fact that two mock juries had come to a conclusion finding liability. You talk about prejudicial a week before a trial. I think that pretty much is the pinnacle of prejudicial.
>
> THE COURT: But you say you are not accusing the plaintiff's team of having done that.
>
> MR. TACOPINA: I'm not accusing Ms. Kaplan, Ms. Crowley, or any of the lawyers on that team. Somebody from the plaintiff's side did that, whether it was a jury consultant, one of the jurors that they use. Somebody from that side leaked it. Certainly it wasn't us. I'm being consistent with the Court's desires here, and I have a great deal of respect for Ms. Kaplan and I like Ms. Kaplan. I'm not suggesting she would have done that. But someone from that world leaked that.
>
> THE COURT: Someone from that world may have been somebody that was picked

---

[9] https://www.dailymail.co.uk/news/article-11960889/Trump-rape-accuser-E-Jean-Carrolls-lawyers-secretly-staged-test-trial-Manhattan.html

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 16

>   up off the street and offered whatever they offered these days to sit for a day and give an opinion and leave. Now, you know how those things work, **and you are trying to pin it on the plaintiff.**
>
>   MR. TACOPINA: No, your Honor. It's impossible because they knew about the other juries and the other juries. It was not a person that was on the jury who didn't sign a protective order, by the way, and just left. This individual, if you read the article, which I have read –
>
>   THE COURT: I have too. It says that there were 37, if I have the number right, people brought in and the 37 were all, as I understood the article, in one place at one time and then they were divided into three groups.
>
>   MR. TACOPINA: Correct.
>
>   THE COURT: Every person in there knew there were three groups.
>
>   MR. TACOPINA: Yes. But every person in there, if they were provided three groups, would have known what the other jurors came to as a conclusion, I would imagine. Hopefully, that was protected, right?
>
>   THE COURT: Mr. Tacopina, I have a good imagination too and I can imagine that you are right, and I can imagine the facts are entirely different.

(Ex. A: Tr. at 109:11 -111:2) (emphasis added).

As set forth in the above-quoted colloquy, instead of saying a single word to Plaintiff for her side's clear violation of the Protective Order, the Court only challenged Defendant's counsel on this subject, who had absolutely nothing to do with this violation. This circumstance speaks volumes about the Court's treatment of the respective parties in this case.

**G.     Relief Sought**

While Defendant recognizes that the Court has discretion with respect to evidentiary matters, there comes a point where the cumulative effect of its one-sided rulings manifests a deeper leaning towards one party over another. Moreover, such a finding is buttressed when the Court openly expresses favoritism in its remarks to the parties as described above. Here, despite the fact trial

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 17

testimony has been underway for only two days, the proceedings are already replete with numerous examples of Defendant's unfair treatment by the Court, most of which have been witnessed by the Jury. In light of these circumstances, Defendant requests a mistrial. Notably, such relief is appropriate "when a court finds there is 'manifest necessity' for such an order." *Stinson v. United States*, No. 3:13-CV-427 JBA, 2014 WL 6930974, at *3 (D. Conn. Dec. 8, 2014). "The types of situations that constitute 'manifest necessity' are too varied to be captured by a precise formula." *Ramchair v. Conway*, No. 04 CV 4241 (JG), 2005 WL 2786975, at *10 (E.D.N.Y. Oct. 26, 2005). "Indeed, the manifest necessity standard is certainly among those more general standards, the application of which over time demands a substantial element of judgment." *Id.* "There is no bright-line rule to determine what circumstances constitute manifest necessity. Instead, the inquiry is necessarily fact intensive." *Pearson v. Rock*, No. 12-CV-3505 NGG LB, 2015 WL 4509610, at *13 (E.D.N.Y. July 24, 2015).

Alternatively, in an effort to salvage these proceedings and level the landscape, we respectfully request that the Court correct the record in those instances outlined above during which the Court has mischaracterized the facts of this case and/or prevented defense counsel from doing so. Additionally, if this trial does proceed, Defendant requests that the Court allow defense counsel to have greater latitude to cross-examine Plaintiff and her witnesses.

In a similar vein, so as to enable Defendant to fairly defend against Plaintiff's accusations, defense counsel should be permitted to cross-examine her concerning third-party litigation funding now that she has opened the proverbial door during her direct examination. By way of background, Plaintiff's Complaint in this case did not allege that the October 12, 2022 Statement accused her of being a democratic operative (in fact she removed the "political operative" language of the October 12, 2022 statement from her Complaint) (Complaint [ECF No. 1] at ¶¶ 92, 96-98). However, following the Court's decision on the issue of third-party litigation funding (Ex. A:Tr. at 240:3-19), Plaintiff testified at trial that the October 12, 2022 Statement defamed her by calling her a "Democratic operative":

> Q. What did you sue him for?
>
> A. Defamation.
>
> Q. Why?
>
> A. Because he called me a liar, because he said I had accused other men of rape. He said **I was an operative or in a conspiracy with the democratic party**. He said I

TACOPINA SEIGEL & DEOREO

Hon. Lewis A. Kaplan
May 1, 2023
Page 18

>   was trying to sell a book, so I made up this story. And he said I was too ugly to rape. So I sued him.

***

>   Q. How is Donald Trump different [than Les Moonves]?
>
>   A. Donald Trump called me a liar, said I was pulling a scam, said I was a con, I was running a con, **that I was a democratic operative**, that I had accused other men of rape, that I was in it for the money, that I was in it for the attention. And Les Moonves stayed quiet.

(Ex. A: Tr. at 315:2-9; 310:6-11 )(emphasis added).

Given that Plaintiff – through her own direct testimony – has affirmatively accused Defendant *in this case* of defaming her for being a "democratic operative," she has now opened the door to the issue of litigation funding. Consequently, in order to defend himself against that accusation, Defendant should be permitted to confront Plaintiff about it during cross-examination.

**H.     Conclusion**

Based on the reasons set forth above, the defense respectfully requests that the Court grant a mistrial; or in the alternative, (1) correct the record for each and every instance in which the Court has mischaracterized the facts of this case to the Jury and (2) allow Defendant's counsel to have greater latitude to cross-examine Plaintiff and her witnesses.

We thank the Court for its consideration.

Respectfully submitted,

Joseph Tacopina

cc:     All counsel by ECF