# EXHIBIT A

1   The Court ruled on that.  DNA will not be uttered in this
2   courtroom.

3           THE COURT:  What seems to be the case is that your
4   client is basically endeavoring certainly to speak to his
5   "public," but, more troublesome, to the jury in this case about
6   stuff that has no business being spoken about.

7           MR. TACOPINA:  The jury has been instructed not to
8   read any media or press in this case, right, your Honor, so we
9   have to assume the jury is not going to violate the Court's
10  order.

11          I will do this.  First of all, let's also just put
12  things in context.  A week ago, before this trial started,
13  there was an article which I read again yesterday in reference
14  to -- that was a leak -- not certainly Ms. Kaplan or her
15  office, but somebody leaked the fact that two mock juries had
16  come to a conclusion finding liability.  You talk about
17  prejudicial a week before a trial.  I think that pretty much is
18  the pinnacle of prejudicial.

19          THE COURT:  But you say you are not accusing the
20  plaintiff's team of having done that.

21          MR. TACOPINA:  I'm not accusing Ms. Kaplan, Ms.
22  Crowley, or any of the lawyers on that team.  Somebody from the
23  plaintiff's side did that, whether it was a jury consultant,
24  one of the jurors that they use.  Somebody from that side
25  leaked it.  Certainly it wasn't us.  I'm being consistent with

1    the Court's desires here, and I have a great deal of respect

2    for Ms. Kaplan and I like Ms. Kaplan.   I'm not suggesting she

3    would have done that.   But someone from that world leaked that.

4          THE COURT:   Someone from that world may have been

5    somebody that was picked up off the street and offered whatever

6    they offered these days to sit for a day and give an opinion

7    and leave.   Now, you know how those things work, and you are

8    trying to pin it on the plaintiff.

9          MR. TACOPINA:   No, your Honor.   It's impossible

10   because they knew about the other juries and the other juries.

11   It was not a person that was on the jury who didn't sign a

12   protective order, by the way, and just left.   This individual,

13   if you read the article, which I have read --

14         THE COURT:   I have too.   It says that there were 37,

15   if I have the number right, people brought in and the 37 were

16   all, as I understood the article, in one place at one time and

17   then they were divided into three groups.

18         MR. TACOPINA:   Correct.

19         THE COURT:   Every person in there knew there were

20   three groups.

21         MR. TACOPINA:   Yes.   But every person in there, if

22   they were provided three groups, would have known what the

23   other jurors came to as a conclusion, I would imagine.

24   Hopefully, that was protected, right?

25         THE COURT:   Mr. Tacopina, I have a good imagination

1   too and I can imagine that you are right, and I can imagine the

2   facts are entirely different.

3              MR. TACOPINA:  OK.  I never complained about --

4              THE COURT:  What you are trying to do is to get away

5   from a statement by your client, a public statement that, on

6   the face of it, seems entirely inappropriate.

7              MR. TACOPINA:  Your Honor, I will address that with my

8   client today.  I will.  I assure you.  I will try and prevent,

9   to the degree I have the ability to, any posts regarding that.

10             I'm sorry, your Honor.  I just can't accept the fact

11  that that is inappropriate and a leak about results in a

12  confidential, protective-order, governed mock jury was leaked

13  to the press.

14             THE COURT:  You don't know that it was a leak by

15  anybody who had any obligation to anything in this case.  It

16  may have been, I acknowledge that.  But you could not put a

17  witness on the stand to establish what you are assuming is the

18  case, unless I don't know something.

19             MR. TACOPINA:  You are right.  I'm relying on common

20  sense.  There was information regarding exhibits in there and

21  everything else, but whatever.

22             Again, your Honor, I am just trying to say, there has

23  been things on both sides, if the jury wants to violate the

24  Court's order, that could affect their fair and impartial

25  deliberations.  I will assure you.  There was a protective

1   A.  At Bergdorf Goodman.

2   Q.  What is Bergdorf Goodman?

3   A.  Bergdorf Goodman with is a luxury retail specialty store.

4   Q.  Where is it located?

5   A.  57th and Fifth Avenue.

6   Q.  Now, Ms. Beall, you are testifying today in the case of E.

7   Jean Carroll v. Donald Trump?

8   A.  Yes.

9   Q.  Have you ever spoken with Ms. Carroll before?

10  A.  No.

11  Q.  Have you ever met her before?

12  A.  No.

13  Q.  What was the first time you heard her name?

14  A.  I probably read about it, but the first time I was aware of

15  it was when I was contacted by your office.

16  Q.  Going back to the spring of 1996, what was your job at that

17  point at Bergdorf Goodman?

18  A.  I was the store manager of the women's store.

19  Q.  Had you been working at Bergdorf for a long time by that

20  point?

21  A.  Yes.  Since 1988.

22  Q.  Could you describe, just generally for the jury, what your

23  responsibilities were as store manager?

24  A.  Sure.  As the store general manager, my responsibilities

25  were to operate the store.  It was a daily operations, oversee

1    Q.  Here's my question.  Given the proximity from the fitting

2    room to the main area, if somebody, let's say, screamed from

3    inside a dressing room, would they be heard out in the main

4    area?

5    A.  If they screamed, I guess, depending on the volume, sure.

6    Q.  And if somebody's head was --

7             THE COURT:  Counselor, if a tree falls in the forest

8    and there is no one there to hear, right?  It depends whether

9    somebody is there, doesn't it?

10            MR. BRANDT:  I got an answer, your Honor.

11            THE COURT:  I know you did, but let's not play this

12   kind of game.

13            MR. BRANDT:  I'm not playing a game, your Honor.  I'm

14   trying to ask the witness questions.

15            THE COURT:  You know where I'm coming from.

16   BY MR. BRANDT:

17   Q.  Let me ask you this question.

18   A.  Okay.

19   Q.  Where did you have security cameras located in Bergdorf in

20   general?

21   A.  The only thing that I can tell you for certain, I know we

22   had them at the -- at all of the doors, but I don't actually

23   know where they would have been in the store.

24   Q.  Let's start with the doors.  So talking about the main

25   entrances and exits to the store?

1    A.   I remember him being -- he was very large, and his whole

2    weight came against my chest and held me up there, and he

3    leaned down and pulled down my tights.

4    Q.   What, if anything, were you doing while that was happening?

5    A.   I was pushing him back.  It was quite clear that I was not

6    going -- I didn't want anything else to happen.  It was quite

7    clear.  I pushed him back.  This arm was pinned down.  This arm

8    had my purse.  Trying to get him back.

9    Q.   At any point during this encounter, do you recall saying

10   no?

11   A.   No, I don't recall saying it.  I may have said it.

12             MR. FERRARA:  Just one moment, your Honor.

13   Q.   At any point during this encounter did you scream?

14   A.   I don't remember screaming.  I'm not a screamer.  I'm a

15   fighter.  I'm much more physical than I am vocal.

16   Q.   What about his head?  What is happening?

17   A.   His head was beside mine breathing.  First, he put his

18   mouth against me.

19   Q.   Do you mean he kissed you?

20   A.   Yes.

21   Q.   Did you kiss him back?

22   A.   No.  I didn't consider it a kiss.  It was such -- it was a

23   shocking thing for him to suddenly put his mouth against mine.

24   I thought what.  What.  What.  No.

25   Q.   Do you think -- based on what you were experiencing, do you

1  believe that if someone had been nearby, they would have been

2  able to hear what was happening in the dressing room?

3  A.  They would have heard the head hitting and definitely would

4  have heard me laughing.

5  Q.  You described Mr. Trump as a -- you described Mr. Trump as

6  sort of, I think, larger than you?

7  A.  Yeah.

8  Q.  Do you recall approximately what the difference or how tall

9  are you?

10 A.  At the time I was five-nine.  Because I'm 79, I have sort

11 of all compacted down due to gravity, but at the time I was

12 five-nine.  I was wearing four-inch heels.  So it put me about

13 level with Donald Trump, who I think is six-two.  I was

14 six-one.  And I weighed at the time about 120, and I believe he

15 weighed about 100 more pounds.

16 Q.  Were you afraid while this was happening?

17 A.  I was in -- this is going to sound strange.  I was almost

18 too frightened to think if I was afraid or not.  I was

19 stamping.  My whole reason for being alive in that moment was

20 to get out of that room.

21 Q.  How were you trying to accomplish that?

22 A.  Stamping and trying to wiggle out from under him.  But he

23 had pulled down my tights and his hand went -- his fingers went

24 into my vagina, which was extremely painful, extremely painful.

25 It was a horrible feeling because he curved, he put his hand

1              (Jury not present)

2              THE COURT:  Give me one minute.

3              Before we bring the jury in, the whole subject of

4    litigation funding is precluded.  I'll make a brief remark

5    about it now.

6              In general, litigation funding is not relevant.  Here

7    I allowed very limited discovery against what seemed to me a

8    remote but plausible argument that maybe something to do with

9    litigation funding arguably was relevant to the credibility of

10   one or two answers by this witness in her deposition.  I gave

11   the defense an additional deposition of the plaintiff, and I

12   gave the defense limited document discovery.

13             On the basis of all that, I have concluded that there

14   is virtually nothing there as to credibility.  And even if

15   there were, the unfair prejudicial effect of going into the

16   subject would very substantially outweigh any probative value

17   whatsoever.

18             I may at some point write in more detail, but I don't

19   promise to do so.  That's the ruling.  The subject is closed.

20             MS. KAPLAN:  One quick matter, your Honor.

21             THE COURT:  Yes.

22             MS. KAPLAN:  It seems highly relevant to what your

23   Honor just said.  I had spoken this morning about the Truth

24   Social post from Mr. Trump.  There were actually at least two

25   of them which I will provide to your Honor after court.

1       Unfortunately, at 1:54 p.m. this afternoon,

2   Mr. Trump's son, Eric Trump, put out a tweet -- this is not

3   Truth Social. This is on Twitter -- that reads: Zoom out.

4   Jean Carroll's legal battle against my father is allegedly

5   being funded, all caps funded, by political activist Reid

6   Hoffman, cofounder of LinkedIn. A civil lawsuit being funded

7   by a billionaire with no direct involvement in the case out of

8   pure hatred, spite, or fear of a formidable candidate is an

9   embarrassment to our country, should be illegal, and tells

10  everything you need to know about the case at hand....

11      In light of the Truth Social posts, in light of this

12  tweet by Mr. Trump's son, we obviously are considering whether

13  any remedy here would be appropriate, your Honor. It seems to

14  us that would be true in any case for a party -- let me put it

15  this way. If Mr. Trump were going to come in and testify, he

16  would not be able to testify about the topics like litigation

17  funding that your Honor has already excluded. For him to be

18  able to do, effectively, the same thing or try to, effectively

19  do the same thing, on Truth Social or have his son do the same

20  thing on Twitter seems to us to be highly inappropriate.

21      We are going to do some research on this. It's just a

22  warning. We may ask your Honor for some form of relief. We

23  have to try to figure out what would be most appropriate

24  overnight.

25      THE COURT: That's up to you.

 1            Mr. Tacopina.

 2            MR. TACOPINA:  Your Honor --

 3            THE COURT:  I am not asking for a response.  I was

 4    addressing you.  I am not offended.  Don't worry.  I'm

 5    addressing you.

 6            I said something this morning about your client,

 7    perhaps now sailing in harm's way, conceivably with his son, if

 8    the report I just heard is true.

 9            Remedies that might be available from this Court may

10    not be the only relevant remedies.  If I were in your shoes,

11    I'd be having a conversation with the client.

12            MR. TACOPINA:  Can I just respond now.  You did

13    address me.  We discussed the earlier post this morning.  I

14    heard you and I made my response and my record on that.  I

15    don't need to expound on that further.

16            As far as the tweet from Eric Trump, his son, I will

17    address everything with the appropriate parties.

18            Let me just say this.  This was before your ruling

19    about five minutes ago.  In that tweet there is absolutely

20    nothing offensive or anything even remotely prejudicial.  It

21    was stating a fact that there is -- he actually used the word

22    alleged funding by Reid Hoffman, who hates his father.  That's

23    a fact.  All those things are a fact.  Reid Hoffman posted it

24    himself.  Eric Trump didn't do anything wrong.  Everything he

25    said was true.  I am just pointing out, it was before your

 1    ruling.

 2              THE COURT:  Eric Trump isn't before me, so you don't

 3    have to defend Eric Trump.  I am simply suggesting to you that

 4    there are some relevant United States statutes here and

 5    somebody on your side ought to be thinking about them.

 6              MR. TACOPINA:  I've been thinking about them.

 7              THE COURT:  Good.

 8              MR. TACOPINA:  Since our chat this morning.

 9              THE COURT:  Good.

10              Let's get the jury.

11              (Jury present)

12              THE COURT:  Thank you.  The witness is reminded she is

13    still under oath.

14              You may continue, counselor.

15              MR. FERRARA:  Thank you, your Honor.

16    Q.  We were talking before we broke, Ms. Carroll, about Donald

17    Trump winning the 2016 presidential race.

18              Do you recall where you were when you learned that he

19    had won?

20    A.  Yes.  I was at Lisa Birnbach's apartment.

21    Q.  That's the same Ms. Birnbach we spoke about earlier?

22    A.  Yes.

23    Q.  What, if anything, did the two of you discuss that night

24    regarding the assault?

25    A.  Well, she -- it was -- Lisa had thrown a big party, and

N4RMCAR2                          Carroll - Direct

1   Q.   Have you sued Mr. Moonves for defamation?

2   A.   No.

3   Q.   Why not?

4   A.   He didn't -- he did not defame me.  He did not call me a

5   liar.

6   Q.   How is Donald Trump different?

7   A.   Donald Trump called me a liar, said I was pulling a scam,

8   said I was a con, I was running a con, that I was a democratic

9   operative, that I had accused other men of rape, that I was in

10  it for the money, that I was in it for the attention.  And Les

11  Moonves stayed quiet.

12  Q.   Let's go back -- I was asking you about some work you've

13  done since *Elle* fired you.

14  A.   Yes.

15  Q.   We are talking about some articles that you had written for

16  the Atlantic.

17           Do you recall that line of questioning?

18  A.   Yes.

19  Q.   Let me ask you, was one of the articles about someone named

20  Natasha Stoynoff?

21  A.   Yes.

22  Q.   Who is Ms. Stoynoff?

23  A.   Ms. Stoynoff is a respected journalist.  She was a reporter

24  for *People* magazine.  And her beat was Donald Trump.

25  Q.   Why did you decide to write an article about Ms. Stoynoff?

N4RMCAR2                    Carroll - Direct

1    A.  Yes.

2    Q.  What did you sue him for?

3    A.  Defamation.

4    Q.  Why?

5    A.  Because he called me a liar, because he said I had accused

6    other men of rape.  He said I was an operative or in a

7    conspiracy with the democratic party.  He said I was trying to

8    sell a book, so I made up this story.  And he said I was too

9    ugly to rape.  So I sued him.

10   Q.  Did anyone tell you to sue him?

11   A.  No.

12   Q.  When did you get the idea of bringing a lawsuit?

13   A.  It was constant -- when I was doing interviews with

14   journalists, many journalists concluded their interviews by

15   asking me, are you going to sue him?  And I would say I'm

16   thinking about it, but probably not.

17   Q.  Was there any conversation that crystallized the idea for

18   you?

19   A.  Yes.

20   Q.  What was that?

21   A.  I had a conversation with George Conway.

22   Q.  Who is George Conway?

23   A.  George Conway is a republican lawyer.

24   Q.  If you know, do you know Mr. Conway's views on Donald

25   Trump?

N4r2Car3                    Carroll - Cross

1  a nuisance.  That's sort of the premise of your book, right?

2  A.   It's -- my premise is the women who write to me at Ask

3  E. Jean are finding men to be a nuisance.

4  Q.   Okay.  At one point I think in your book you propose we

5  should dispose of all men?

6  A.   Into Montana.

7  Q.   Into Montana?

8  A.   Yeah, and retrain them.

9  Q.   So retrain.  So all the men here in this courtroom, in this

10  country, all get shuffled off to Montana and get retrained.

11  A.   You understand that that was said as a satire.

12  Q.   Ah.  Okay.

13          THE COURT:  It comes from Jonathan Swift's *A Modest

14  Proposal* 700 years ago, right?

15          THE WITNESS:  Yes.

16          THE COURT:  Let's move on.

17          MR. TACOPINA:  Thank you, your Honor.

18  BY MR. TACOPINA:

19  Q.   So the book premise talks about the purpose of -- the

20  premise that in order to support your position you drove to

21  these towns that you said were named after women and you asked

22  people in each town what do we need men for, right?

23  A.   Yes, I had --

24  Q.   Okay.  As part of that road trip, you would only eat in

25  cafés named after women?

N4RMCAR4                      Carroll - Cross

1                          AFTERNOON SESSION

2                              2:10 p.m.

3            (In open court)

4            THE COURT:  Good afternoon, everybody.

5            Please bring in the jury.

6            (Jury present)

7            THE COURT:  Ms. Carroll, you are still under oath.

8            Members of the jury, I hope you enjoined your

9    delicious repast.

10           Mr. Tacopina, you may proceed.

11           MR. TACOPINA:  Thank you, your Honor.

12   BY MR. TACOPINA:

13   Q.  Mr. Carroll, I left off with you by saying that I want to

14   discuss your story regarding Bergdorf Goodman and Donald Trump.

15           You met Donald Trump at that event briefly in 1987?

16   A.  Yes.

17   Q.  That was over 35 years ago, as we sit here today, correct?

18   It was a long time ago.

19   A.  Yeah, right.

20   Q.  When you met him at that event, you weren't alone at the

21   time, right?

22   A.  No.

23   Q.  That meeting happened --

24           THE COURT:  Just a second.  The question was:  You

25   weren't alone, right?  And you answered no, which raises the

N4RMCAR4                    Carroll - Cross

1   question of whether he is not right or whether you weren't

2   alone.

3   Q.  When you met him, Donald Trump, in 1987, you were not alone

4   at the time?

5   A.  That's correct.

6   Q.  That meeting happened within a group of people?

7   A.  There were four of us.

8   Q.  Right.

9           You, your husband, John Johnson; Donald Trump, and his

10  wife Ivana?

11  A.  Yes.

12  Q.  And you spoke for about five minutes, five or six minutes?

13  A.  Yes.

14  Q.  During that group conversation you spoke with Ivana?

15  A.  Yes.

16  Q.  And you actually had in your possession a photograph that

17  was snapped of that brief encounter, correct?

18  A.  Yes.

19  Q.  And you kept that photograph of you with Donald Trump for

20  two decades, right?

21  A.  It was in a scrapbook.

22  Q.  Whose scrapbook?

23  A.  My scrapbook.

24  Q.  I said, you kept that photograph of you with Donald Trump

25  for two decades?

N4RMCAR4                          Carroll — Cross

1   A.   Yes.

2   Q.   And because that photograph was taken before iPhones and

3   all these things, it was a physical photograph, like the

4   traditional?

5   A.   Yes.

6   Q.   You made it a point when submitting your book proposal that

7   we talked about to include within that book proposal the

8   photograph that we just discussed, correct, of Donald Trump?

9   A.   Yes.

10         MR. TACOPINA:   Could you put up PX-12, please.   It's

11   in evidence.

12   Q.   Just to be clear, this is the photograph we are talking

13   about, correct?

14   A.   Yes.

15   Q.   That's the encounter, right?

16   A.   Yes.

17   Q.   That, by the way, is your exhusband, John Johnson, who you

18   described strangled you three times, correct?

19   A.   Yes.

20   Q.   And that brief encounter happened either at one or two

21   parties, right?

22   A.   Yes.

23   Q.   I think it was maybe the NBC television party where you

24   worked or an ABC party where your exhusband, John Johnson,

25   worked?

N4RMCAR4                    Carroll - Cross

1   A.   Yes.

2   Q.   You don't remember for sure which one it was when you met

3   Donald Trump, right?

4   A.   No.

5   Q.   You also don't recall where the party was hosted?

6           THE COURT:   I'm sorry.   It's the same problem.

7           MR. TACOPINA:   I just realized that.   You're right,

8   your Honor, absolutely.

9   Q.   You also don't recall where the party was hosted?

10  A.   I can picture the room, but I don't remember where the room

11  was.

12  Q.   And you don't remember the subject matter that you

13  discussed?

14  A.   It was various subjects.   Quickly, it was a lilting, quick,

15  juicy, interesting conversation that I don't remember what the

16  topics were.

17  Q.   Do you remember that it was a juicy conversation, but you

18  don't remember what was juicy about it?

19  A.   That's right.

20  Q.   In fact, you don't even remember who else you spoke to at

21  the party.

22  A.   No.   I had memories of speaking to people, probably, at

23  this party, but I can't absolutely say for certain that it was

24  this party.

25  Q.   After that party where you had this quick conversation of

N4RMCAR4                    Carroll - Cross

1    five minutes between the four of you -- and it seemed like a

2    bunch of people right behind you as well.

3           Is that right, Mr. Carroll?

4    A.   I think they are shoving through to go around us.

5    Q.   In any event, after that, you never had any phone calls or

6    communications with Donald Trump, correct?

7    A.   Correct.

8    Q.   I mean up until the time you say you met him in Bergdorf.

9    And you never exchanged any letters or anything with him,

10   correct?

11   A.   No.  You are right.

12          MR. TACOPINA:  You can take that down.  Thank you.

13   Q.   In fact, after the party and before the alleged incident at

14   Bergdorf Goodman, the only other interaction you claim to have

15   had with Donald Trump was in either '94 or '95, right?

16   A.   Yes.

17          MR. FERRARA:  Objection.

18          THE COURT:  Sustained.  '94, '95.

19          MR. TACOPINA:  Judge -- let me do that again.

20   Q.   Before the alleged incident at Bergdorf Goodman, the only

21   other interaction you claim to have had with Donald Trump was

22   in 1994 or 1995, before?

23          THE COURT:  I'll allow the question.  The witness

24   should listen to it.

25   A.   I thought I corrected '94 or '95 yesterday.

N4RMCAR4                    Carroll - Cross

1   Q.  Ms. Carroll, I am not talking about the alleged incident at

2   Bergdorf Goodman.  You said that's '95, '96, right?  That's

3   where we're at.  Yes?

4   A.  OK.

5   Q.  I'm talking about a year before that, the other encounter

6   you had with Donald Trump.

7   A.  You mean the wave across the street?

8   Q.  Yeah, that's what I mean.

9   A.  I couldn't put it before '94 or '95.  I said sometime

10  between '87 and '95, '96.

11  Q.  '87.  OK.  Hold on one second.

12  A.  Possibly.  It had to be sometime within --

13  Q.  Give me one second.  I am just going to look at something,

14  Ms. Carroll.

15          MR. TACOPINA:  I am going to read -- direct everyone's

16  attention -- I will just read it, your Honor.  I am not going

17  to post it.  As soon everybody is ready.

18          Deposition, page 50 of Ms. Carroll from October 14,

19  2022, line 19 through line 9, for the purpose of this question:

20  Page 50, line 19 to page 51, line 9.

21          THE COURT:  Just give me a minute.

22          Go ahead.

23          MR. TACOPINA:  Counsel, are you ready?

24          MR. FERRARA:  Yes.  Thank you.

25  Q.  You testified under oath in a deposition, Ms. Carroll,

N4RMCAR4                    Carroll - Cross

1    that:

2    "Q. Following the conversation, can you please tell me any

3    other time you met with Donald Trump?

4    "A. He said hello to me one time on the street, waved.

5    "Q. When was that?

6    "A. '94 or '95.

7    "Q. When was that?  Was that in New York?

8    "A. Yes.

9    "Q. Do you remember where in New York?

10   "A. Yeah.  He was standing on the side of Fifth Avenue where

11   the Trump building is, and I was across the street on Fifth

12   Avenue."

13        You gave that answer to that question under oath,

14   correct, Ms. Carroll?

15   A.   Yes.

16   Q.   And that was truthful?

17   A.   Yes.

18   Q.   My question was, other than the party and before Bergdorf

19   Goodman, the only other time you claim to have interacted with

20   Donald Trump was in 1994 or 1995, right?

21   A.   Yes.

22   Q.   And that was this incident we just described where he's on

23   one side of Fifth, you're on the other, right?

24   A.   Yes.

25   Q.   And you think he may have waved to you from across the

N4RMCAR4                     Carroll - Cross

1    street in traffic?

2    A.   Yes.

3    Q.   And it's your sworn testimony that Donald Trump waved at

4    you across traffic, even though he only met you briefly at a

5    party eight or nine years earlier and hadn't had any

6    interactions with you since, correct?

7            MR. FERRARA:   Objection.

8            THE COURT:   Sustained.   Argumentative.

9    Q.   Well, you testified that the party was 1987, so that's

10   eight or nine years earlier than '94 or '95, right?

11           THE COURT:   We can all do the math.

12   A.   Yes.

13           Let's move it along.   Everybody can subtract 84 from

14   93, or whatever it is.

15           MR. TACOPINA:   Thanks, your Honor.

16   Q.   Other than that, math that we can all do, you hadn't any

17   other interactions with him since, correct?

18   A.   Yes.

19   Q.   And you are not even sure really if he was waving at you,

20   right, Ms. Carroll?

21   A.   I turned around to see if anyone was standing behind me.  I

22   didn't see anyone.   So I waved back.

23   Q.   It seemed to you that he was waving at you, but, as you

24   have said previously, you can't say with certainty whether he

25   was waving at you or someone else, right?

N4RMCAR4                    Carroll - Cross

1   A.   That's right.

2   Q.   Let's talk about Bergdorf Goodman for a minute.

3        You would agree that Bergdorf Goodman is a store of

4   perfections?

5   A.   Yes.

6   Q.   In fact, the store's perfections are well known?

7   A.   Yes.

8   Q.   You would agree that the store is also posh?

9   A.   Yes.

10  Q.   Meaning it's upscale, right.  OK.

11       The store is also gracious?

12  A.   Particularly gracious, yes.

13  Q.   Meaning its employees are courteous and attentive.  In

14  fact, in this regard you would agree that the store is novel?

15  A.   Many stores aim to have -- to be gracious.

16  Q.   When I asked you about gracious, I'm saying, when you said

17  gracious, you mean that its employees are courteous and

18  attentive, correct?

19  A.   By gracious I mean they are warm and inviting and conducive

20  to shopping.

21  Q.   And its level of service and attention to customers is

22  strikingly unique and resembles nothing else.

23       You said that, right?

24  A.   Yes.

25  Q.   In fact, it is your belief that because Bergdorf Goodman is

N4RMCAR4                    Carroll — Cross

1    such an upscale store, it even refers to its customers as

2    clients, right?

3    A.   I don't think I said that, but I certainly agree with it.

4    Q.   Is it your testimony that you have not used clients in

5    regards to Bergdorf Goodman's customers?

6    A.   I am not sure if I did or not.  I don't know.

7    Q.   On the day you claim to have seen Donald Trump at Bergdorf

8    Goodman you were alone when you went into the store, right?

9    A.   Yes.

10   Q.   And you don't recall with any clarity of what you went

11   there to buy that day, correct?

12   A.   No.

13          THE COURT:  No, it's not correct or --

14          THE WITNESS:  No.  That's correct.  I don't remember

15   what I was shopping for.

16          MR. TACOPINA:  Sorry, your Honor.

17   Q.   When you were leaving Bergdorf Goodman that day you

18   supposedly saw Donald Trump coming in?

19   A.   Yes.

20   Q.   And at the time you were separated by a door?

21   A.   Yes.

22   Q.   In your book, which you published in 2019, you don't recall

23   whether it was a revolving door or just a regular hinge door,

24   correct?  Is that correct?

25   A.   Yes.

N4RMCAR4                    Carroll - Cross

1    push-in-and-out door.

2    Q.   You wrote the book in 2019?

3    A.   I wrote it in 2018.

4    Q.   Again, my question is, you became sure that it was a

5    revolving door in 2019?

6    A.   Yes.

7    Q.   Because you went there 20 something years after the alleged

8    incident?

9    A.   Yes, I did.

10   Q.   According to you, as you were coming out of the store, he,

11   from the outside, held his hand up?

12   A.   Yes.

13   Q.   And he did that, obviously, while he was still outside and

14   on the other side of the door?

15   A.   Yes.

16   Q.   And you stayed inside the store?

17   A.   Yes.

18   Q.   You didn't come out at any particular point; you waited for

19   him?

20   A.   No.   He went like this, so I stopped.

21   Q.   OK.

22          And at the time of this supposed interaction, your

23   story is that Donald Trump didn't have any security with him at

24   all?

25   A.   None that I could see.

N4RMCAR4                    Carroll - Cross

1    Q.   In fact, according to you, just like yourself, he was

2    alone?

3    A.   I believe he was.

4    Q.   As far as you know, you can't identify anybody by name who

5    saw this supposed interaction between you and Mr. Trump?

6    A.   No.

7           THE COURT:   I'm sorry to interrupt again.  Does that

8    mean, Ms. Carroll, that the statement that you can't identify

9    anybody or saw it is not correct or that it is correct?

10          THE WITNESS:   I could not identify anyone who was in

11   the store at the time or outside with Donald Trump at the time.

12          THE COURT:   Mr. Tacopina, I would hope you would

13   phrase your questions in a way that we don't have to keep doing

14   this.

15          MR. TACOPINA:   Sure, your Honor.

16          THE COURT:   Thanks.

17   Q.   According to you, at that moment upon seeing -- the moment

18   he saw you in Bergdorf Goodman he said to you, hey, you're that

19   advice lady?

20   A.   Yes.

21   Q.   And you responded by saying, hey, you're that real estate

22   tycoon?

23   A.   Yes.

24   Q.   And around this period of time, from 1995 to 1996, Donald

25   Trump was a well-known public figure?

N4RMCAR4                    Carroll - Cross

1    A.   Yes.

2    Q.   He was a man about town who could make television

3    appearances and was entertaining?

4    A.   Yes.

5    Q.   And you yourself called him one of New York's most famous

6    men?

7    A.   Oh, absolutely.

8    Q.   It's your story that the people in the store recognized him

9    at the time?

10   A.   Yes.   Two people in the store.

11   Q.   One was a customer who was sort of gaping at him, correct?

12   A.   Yes.

13   Q.   And, according to you, a sales attendant recognized Donald

14   Trump also?

15   A.   Yes.

16   Q.   It's your story that no sales attendant at Bergdorf tried

17   to help him?

18   A.   No.   That is -- no sales assistant tried to help him.

19   Q.   According to you, after Donald Trump saw you through a

20   door, stopped you, supposedly recognized you after speaking to

21   you for a few minutes eight or nine years earlier, he asked you

22   to help him buy a present?

23              MR. FERRARA:   Objection to the argumentative portion

24   of the question, your Honor.

25              THE COURT:   Sustained.   Rephrase.

N4RMCAR4                        Carroll - Cross

1   A.   Yes.

2   Q.   And it's your story while on the sixth floor you didn't see

3   any customers there?

4   A.   No, I didn't see any customers.

5   Q.   It is your claim you didn't see a single person in any of

6   the departments you walked through on that floor?

7   A.   I didn't see anybody.  We went past cruise wear.  Could

8   have been bathing suits.  I think it was cruise wear.  I didn't

9   see any people.

10  Q.   It's your story that you didn't see any customers on the

11  entire sixth floor?

12  A.   Didn't see any.

13  Q.   Aside from customers, you also didn't see any sales

14  attendants?

15  A.   Did not see any.

16  Q.   It's your testimony that in one of New York's most

17  prestigious department stores, there was not a salesperson or a

18  customer or employee on the sixth floor?

19          MR. FERRARA:   I am going to object.

20          THE COURT:   Objection sustained.

21          You get to make a closing argument in this case,

22  counselor, and this isn't the time for it.

23  Q.   Because Bergdorf Goodman is such an attentive, upscale

24  store, you would agree it doesn't make sense that a sales

25  attendant would not be present in the lingerie department when

N4RMCAR4                    Carroll - Cross

1    you were supposedly there with Donald Trump?

2              MR. FERRARA:  Objection.

3              THE COURT:  Sustained.

4              MR. TACOPINA:  Can I understand the basis of that,

5    your Honor.

6              THE COURT:  Yes.  It's argumentative.  It's repetitive

7    and it's inappropriate.

8              MR. TACOPINA:  I never asked if she thought it ever

9    made sense.

10             THE COURT:  I'm sorry, Mr. Tacopina.  We are going to

11   move on.  In this courtroom, the ruling is the ruling, not the

12   start of an argument.

13   Q.  You'd agree that story about no one being on the sixth

14   floor is inconceivable, correct?

15   A.  It's hard to imagine that there would not be a sales

16   attendant in Bergdorf's.  It's surprising.

17   Q.  The word you used to describe that lack of sales attendants

18   or anyone close was inconceivable, correct?

19   A.  Yes.

20   Q.  Inconceivable --

21   A.  Cannot be imagined.

22   Q.  Unbelievable, correct?

23   A.  Yes, that's what it means.

24   Q.  Now, the quality of merchandise and the cost of merchandise

25   at Bergdorf Goodman is relatively expensive compared to a

1          You never hit him with your purse, did you?

2   A.   I went like this, yeah.

3   Q.   You did hit him with your purse.

4   A.   I believe I did.

5   Q.   Okay.  When did you recall that fact, Ms. Carroll, hitting

6   him with your purse?

7   A.   I've always recalled that fact.

8   Q.   And you mentioned that when you were giving your television

9   interviews about this case or your video deposition?

10  A.   I'm not sure if I did.

11  Q.   Okay.

12         You describe what was going on in there as a

13  colossal -- "in there" being in the locker room, changing room,

14  a colossal struggle.

15  A.   To me it was a colossal struggle.

16  Q.   And despite this colossal struggle while you were being

17  violently raped, you -- for as long as three minutes, you never

18  let go of your purse.

19  A.   No, I never did.

20  Q.   And at one point it's your testimony you managed to get

21  your knee up and push Donald Trump off of you by yourself.

22  A.   Yes.

23  Q.   And even though the tights or your panties were above your

24  knees?

25  A.   Yeah.  I could -- they are tights because they are

N4r2Car5                    Carroll - Cross

1  Q.  And at that time she certainly wasn't your closest friend.

2  A.  She was a close friend, not my closest.

3  Q.  Prior to this alleged incident at Bergdorf, you didn't

4  speak to her overly often.

5  A.  Not overly often, that is correct.

6  Q.  In fact, you can't even name another personal matter you

7  confided in with -- in with her prior to this alleged incident.

8  A.  Oh, no.  We had many conversations.  We discussed her

9  breaking up with a certain person.

10  Q.  That's her talking to you, confiding in you, right?

11  A.  Yes.

12  Q.  My question was, you can't name another personal matter of

13  yours that you confided in her prior to this alleged incident?

14  A.  Well, I believe when she was confiding in me, I would

15  return the confidence with -- confiding with her with whatever

16  I was going through.  I just don't remember it.

17  Q.  Okay.

18        You certainly can't say definitively that prior to

19  this alleged incident at Bergdorf you ever shared any other

20  instances with Ms. Birnbach in which you felt abused in your

21  past either sexually or otherwise?

22  A.  I don't think I did.

23  Q.  So to be clear, it's your testimony that even though at the

24  time she wasn't your closest friend and you never confided

25  anything like this to her before, you thought your first call

N4r2Car5                          Carroll - Cross

1    when you left Bergdorf Goodman should be to her?

2              MR. FERRARA:  Objection.  Argumentative.  Asked and

3    answered.

4              THE COURT:  Sustained.

5    BY MR. TACOPINA:

6    Q.   You thought your first call when you left Bergdorf Goodman

7    should be to Ms. Birnbach?

8    A.   She was exactly the person I needed to talk to.

9    Q.   And in your story it's because Ms. Birnbach was supposedly

10   hilarious?

11   A.   And still is the funniest person I know.

12   Q.   Okay.  And according to you, if Lisa Birnbach had laughed

13   after you told her you had been sexual assaulted, you would be

14   okay, home free?

15   A.   I thought it would put -- I had thought it would let me

16   know it was not as bad as I probably knew it was.  I would feel

17   better if Lisa laughed and said, that is funny, then I would

18   have felt better.

19   Q.   So it was a possibility in your mind that you were going to

20   describe a violent sexual assault to your good friend against

21   you that had just taken place and Lisa would have laughed and

22   said, oh, that is funny?

23   A.   I was going to tell her the story, which I thought was

24   hilarious, and then I got to the point where I had to tell Lisa

25   that he pulled down my tights, and before I said that, Lisa had

N4r2Car5                    Carroll - Cross

1   A.   I don't -- no, I did not want to tell my story.  I did not

2   want to -- I was ashamed of myself.

3   Q.   But one of the reasons Carol Martin told you not to tell

4   the story to anyone and one of the reasons you have testified

5   that you never told the story to anyone was because of Donald

6   Trump's power.

7   A.   I was afraid Donald Trump would retaliate, which exactly is

8   what he did.  That's exactly.  One of my biggest fears came

9   absolutely true.

10  Q.   Okay.

11  A.   He has two tables full of lawyers here today.  It came

12  absolutely true.

13  Q.   We have about the same amount of lawyers.  Not everyone is

14  a lawyer, Ms. Carroll, but regardless of that --

15            THE COURT:  Come on, Mr. Tacopina, let's move along.

16            MR. TACOPINA:  Yes, sir.

17  BY MR. TACOPINA:

18  Q.   So instead you waited for Donald Trump to become arguably

19  the most powerful man in the world, president of the

20  United States of America, to tell your story to everybody.

21  A.   I waited until other women -- I was not a pioneer.  I'm a

22  follower.  I saw other women coming forward after Harvey

23  Weinstein and I thought who am I?  Who am I not to stay silent?

24  Also, I was 78 or 79.  I just thought I've been silent too

25  long.

N4r2Car5               Carroll - Cross

1   Q.  In the decades preceding your lawsuit, you certainly never

2   told any doctors ever about the supposed incident?

3   A.  No.

4   Q.  And after supposedly being raped by Donald Trump you never

5   saw a medical doctor or got an evaluation?

6   A.  No, no.

7   Q.  Never went to a psychiatrist?

8   A.  No.

9   Q.  Never went to a psychologist?

10  A.  No.

11  Q.  No doctors whatsoever.

12  A.  No.

13  Q.  And as a result, you have no medical records showing

14  physical injuries from this colossal battle you have described?

15  A.  I have --

16          MR. FERRARA:  Objection, your Honor.

17          THE COURT:  Sustained.  Argumentative.  The answer is

18  stricken.

19  BY MR. TACOPINA:

20  Q.  As a result, do you have any medical records showing

21  physical injuries from the story?

22  A.  No.

23  Q.  You have no photographs of any physical injuries.

24  A.  No, I never took any photographs.

25  Q.  You are not aware of anyone who saw any physicals injuries

449

1   A.  I am not sure what the context was.  Was I talking about

2   childhood events?

3          MR. TACOPINA:  You guys have that clip?

4          MR. FERRARA:  I don't think we do.  I apologize if I'm

5   wrong, but I don't have it here.

6          Apologies.  One moment, your Honor.

7          MR. TACOPINA:  We will come back to it, your Honor, if

8   need be.  We will straighten this out.

9   Q.  You said that you think about what Cam did every day?

10  A.  In some form it glances through my mind.  Maybe not

11  absolutely every day, but it's frequent.

12  Q.  And you acknowledged in that podcast that Cam, you came to

13  learn, was arrested years later?

14  A.  Yes.

15  Q.  And you recognize that after Cam supposedly abused you he

16  may have abused other girls prior to his arrest, correct?

17         MR. FERRARA:  Objection.

18         THE COURT:  Sustained.

19  Q.  According to you, Donald Trump is a brutal and dangerous

20  man?

21  A.  Yes, he is.

22  Q.  But, according to you, you wouldn't bring a criminal charge

23  against him because that would be disrespectful to women being

24  raped by the border and around the world?

25         MR. FERRARA:  Objection.

N4RMCAR6                    Carroll - Cross

1           THE COURT:  You already asked that question.

2           MR. TACOPINA:  I did not ask this question.  I read --

3     played what she said.  I am asking a question about what she

4     said.

5           MR. FERRARA:  This is not a criminal case, your Honor.

6           THE COURT:  Sustained.

7     Q.  Let me ask you this.  How would you -- it's not a criminal

8     case.  How would you bringing criminal charges be disrespectful

9     to some people at the border?

10          MR. FERRARA:  Objection.

11          THE COURT:  Sustained.  Correct me if I'm wrong,

12    counsel, but I believe in the State of New York private

13    individuals can't bring criminal charges and probably have not

14    been able to do that in at least a century or two.

15          MR. TACOPINA:  No, they can't.  They could go to the

16    police department.

17          THE COURT:  That's not what you said, counselor.  We

18    have been up and down the mountain on the question of whether

19    she went to the police, so let's move on.

20          MR. TACOPINA:  We have not been up and down the

21    mountain of what we just heard.

22          Can I ask one question?

23          THE COURT:  Move on.

24          MR. TACOPINA:  I guess not.

25    Q.  According to you, security cameras must have picked you and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4RMCAR6                          Carroll - Cross

1            MR. TACOPINA:  Sure.

2    Q.   When you were allegedly assaulted in Bergdorf Goodman by

3    Donald Trump and on the first floor with Donald Trump and on

4    the escalators with Donald Trump, you never thereafter, that

5    day, the next day, the next week or ever tried to get the

6    videos that could have existed to support your claim?

7            MR. FERRARA:  I object to the breadth of the question.

8            THE COURT:  Sustained.

9            MR. TACOPINA:  The breadth.  OK.

10   Q.   Did you go back the next day to get -- ask for the video

11   camera footage?

12           THE COURT:  Sustained.  It assumes there is such a

13   thing.

14           MR. TACOPINA:  Ms. Carroll in fact testified, as did

15   the Bergdorf Goodman witness, that on the main floor there are

16   security cameras, your Honor.

17           THE COURT:  Ms. Carroll testified she guessed, and we

18   have had the testimony from the witness who was at Bergdorf at

19   the time, and she said what she said.  We are not going to ask

20   questions based on this kind of statement.

21           MR. TACOPINA:  Can I ask this question?

22           THE COURT:  I don't know yet.  I have not heard it.

23           MR. TACOPINA:  I know you don't know it, so I am going

24   to ask it, and you will let me know.

25   Q.   Did you ever attempt to ascertain whether there is any

N4RMCAR6                    Carroll - Cross

1    video footage of you and Donald Trump at Bergdorf Goodman?

2             MR. FERRARA:  Objection.

3             THE COURT:  Sustained.  I sustained the objection to

4    that question within the last three minutes.

5    Q.  You are a writer, Ms. Carroll?

6    A.  Yes.

7    Q.  And you wrote every day for 18 years at a period of time

8    when you were married to Steve Byers?

9    A.  I was still in the -- I was pitching to magazines, and I

10   refused -- everybody said no, no, no, and nobody wanted my

11   work.  They didn't like my ideas.  And I kept at it until I got

12   my foot in the door.

13   Q.  You, early on in life, dedicated yourself to becoming a

14   writer?

15   A.  Yes.

16   Q.  And writing was important to you?

17   A.  Yes.  It's the way I process my life.

18   Q.  And you kept a diary?

19   A.  I've always diaries.

20   Q.  Despite the fact that you're clearly an avid writer who

21   kept a diary, you never made a diary entry contemporaneously

22   memorializing this alleged rape by Donald Trump in your diary?

23   A.  No.  I don't write about negative.

24   Q.  You would put in your diary things like, threw the ball for

25   the dog?