

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,   )
                 )
      Plaintiff,  )
                 )
v.           )
                 )
DONALD J. TRUMP,  )
                 )
     Defendant. )

This Petition applies
to both of the below Case Numbers:

Civil Action No.: 1:20-cv-7311 (LAK)
Civil Action No.: 1:22-cv-10016 (LAK)

**PETITION TO**
**ADDRESS AND REMONSTRANCE**
**THIS COURT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Petition To
Address and Remonstrance
This Court

This is a petition to "address" and "remonstrance" this Court.

The First Amendment, U.S. Constitution, in pertinent part says: "Congress shall make no law respecting ... the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Note that the First Amendment does not create, give or bestow the right to petition, but it recognizes the inherent and natural right to petition the government. This is the same as one petitions, addresses or remonstrances any person, association, organization, corporation, etc., which he owns or has an interest in or is a member of. The most basic unit is the family, and so sometimes the parent will call a family meeting so as to 'air-out' family issues, etc. If one belongs to an organization, if there is a problem, one will bring the issue up at a meeting so as to resolve the issue. If one owns stock in a corporation, and one has an issue, one will write a letter to the CEO, etc., or raise the issue at the stockholder's annual meeting, etc., so as to resolve the

issue or correct the problem.  That is, the right to petition one's Government is a natural, inalienable right, it is We The People who created, own and directly run the Government via the Constitution.

Although there is no such right as the First Amendment right to petition, this is a term people use in a 'slangy' manner to state that they have the right to petition their government, to address or remonstrance it.

This is a petition as a matter of right.  This writer is a Citizen of the State of North Dakota.  As such, this writer wrote and created the Constitution, ("We the People ...").  This writer and petitioner is a Sovereign and an owner of or stake-holder in the Constitution and this United States.

This writer is not an attorney.  This writer is not being paid by anybody to write and submit this petition to address and remonstrate this Court.  He is here to stand up for the Constitution and the rule of law.  He is not here to stand up for Mr. Trump nor Ms. Carroll.  He is here only for the rule of law.

This Court appears to be about to make a decision in favor of either the Plaintiff or the Defendant, most likely the Plaintiff.  But the rule of law says that this Court's decision should be in favor of Trump, and there is a collateral issue in favor of Carroll.

This Address and Remonstrance raises issues that neither party raised but should have raised.

As such, this Sovereign has an interest in seeing to it that this Court rules on the side of the rule of law.

It can be observed that this right to petition this Court for redress of grievance, which grievance is that this Court appears to be about to rule not according to the rule of law, is and has the same effect and purpose as an *amicus curiae* brief, if such were allowed by this Court or the

2

rules of civil procedure. That is, the right or privilege to submit an *amicus curiae* brief is but an exercise of a person "addressing or remonstrating" and so petitioning his government about a point without that person trespassing and becoming a party to that case or committing a tortious interference with the case, because the *amicus* is not a party to that case, other than to suggest/advise/friend the Court to grant the just relief.

This petitioner is aware that this Court allowed an *amicus* to file an *amicus curiae* brief in favor of Carroll, Dkt. 15-16, Carroll I, and that *amicus* was correct to be in favor of Carroll in that the United States had no right to intervene in her case and no right to change the venue of her case. This Addresser and Remonstrancer does address this issue of unconstitutional intervention and venue changing and subrogation by the United States, but does it with an issue perhaps of first impression on this subject of the FTCA or Westfall Act.

As a matter of right, the below "Address and Remonstrance" must be heard by this Court. This Addresser and Remonstrancer asks this Court to hear his below Address and Remonstrance.

This Addresser and Remonstrancer prays that this Court will discover that this Address and Remonstrance is the real friend of this Court and the Constitution.

Reuben Larson
1100 E. Boulevard Ave., #314
Bismarck, N.D. 58501
phone: 701-805-6701

3

TABLE OF CONTENTS

page

Address and Remonstrance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

Staleness of the three claims denies and deprives the defendant
    of his right and ability to defend. . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

The case of Campbell v. Holt, 115 U.S. 620 (1885) provides a 'roadmap'
    as to why the ASA Statute violates Due Process of Law. . . . . . . . . . . . . . . . . . .   11

When the stale rape claim is involved or included,
    then the two defamation claims cannot be sued for. . . . . . . . . . . . . . . . . . .   17

Question:  Must a man's sins be laid to rest? . . . . . . . . . . . . . . . . . . . . . . . .   19

Carroll consented to the coitus.  Carroll lacked outrage. . . . . . . . . . . . . . . . . . .   21

[1] Following are facts of the 'rape', as well as her thoughts,
    as Carroll pled in both Complaints. . . . . . . . . . . . . . . . . . . . . . . . . . .   21

Rule 412, FREv, does not apply here. . . . . . . . . . . . . . . . . . . . . . . . . . .   28

[2] An excerpt from Carroll's book was published
    in the online 'magazine' "The Cut" on June 21, 2019. . . . . . . . . . . . . . . . . . .   30

[3] Carroll gave an interview to NPR on June 22, 2019,
    one day after the "Cut" story broke. . . . . . . . . . . . . . . . . . . . . . . . . . .   34

[4] Carroll gave a news interview
    to Anderson Cooper, CNN, on June 24, 2019. . . . . . . . . . . . . . . . . . .   35

[5] Carroll gave a news interview to the "Slate"
    as part of its "Trumpcast", on June 27, 2019. . . . . . . . . . . . . . . . . . .   38

[6] Carroll gave an interview to "Vanity Fair" on June 28, 2019. . . . . . . . . . . . . .   40

[7] "Vox" writes about this incident on July 10, 2019, by Constance Grady. . . . . . . . .   41

[8] Carroll gave an interview to "The Guardian" on July 13, 2019. . . . . . . . . . . . . .   41

The facts show that Carroll consented. . . . . . . . . . . . . . . . . . . . . . . . . . .   43

Post-penetration rape. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

page

The presumption of innocence applies to a civil case
where the tort charged is also a crime or act of moral turpitude.   . . . . . . . . . . . . . . . .   52

These defamation claims are a shame
on this Court, on the Bar Association, on both parties' Attorneys,
on the Public, and on this Addresser and Remonstrancer.   . . . . . . . . . . . . . . . . . .   60

Trump's conduct, by operation of law, did not and could not
inflict detriment, damage upon Carroll for three reasons.   . . . . . . . . . . . . . . . . . . .   65

[1]  Carroll's cause of action is based upon her 'right' to slander/libel Trump.   . . . . . . .   65

[2]  He who stands on his own right to defend against and to deny, injures no one.   . .   67

[3]  Carroll consented to Trump 'shooting' at her after she shot at him.   . . . . . . . . . . . .   68

Carroll bears the burden to prove causation of her damages.   . . . . . . . . . . . . . . . . . .   70

Is the testimony of the two women
who accused Trump of sexual assault legal evidence.   . . . . . . . . . . . . . . . . . . . . . .   74

Is Carroll's use of 'expert' witness testimony legal evidence of the amount of damages.   78

Rape consists of the outrage to the woman.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   82

Carroll slanders the American People, the voters.   . . . . . . . . . . . . . . . . . . . . . . . . .   85

The U.S. Attorney General was blatantly and outrageously illegal
in removing your case from State Court to Federal Court.
The Westall Act is unconstitutional.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   86

Conclusion   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   106

The two Complaints

Carroll has two actions: {Carroll I}: Carroll v. Trump, Federal civil action number 1:20-cv-07311. This case was first filed in New York State Court on November 4, 2019, New York County Supreme Court civil action number or INDEX NO. 160694/2019.

The claim for Carroll I is for one count of Defamation based on Carroll's accusation that Trump raped her sometime in the fall of 1995 through the spring of 1996, and that Trump defended against and denied, but which defense and denial she claims is a slander/libel.

But this Carroll I case was removed to this Federal Court on September 8, 2020, 'by hook and by crook'.

Carroll's second action, {Carroll II}: Carroll v. Trump, Federal civil action number 1:22-cv-10016, filed in this same Federal Court on November 24, 2022. This action has two counts, Count I for Defamation, based on more or less the same type of words Trump spoke in 2019, but which words for this second action were spoken in 2022, based on the same accusation of rape as for the first action. Count II of this action is an action for the Rape/(battery or sexual battery) itself, which is also the basis for both charges of Defamation.

Carroll claims that the rape occurred sometime in the fall of 1995 through the spring of 1996. Carroll I, Complaint Paragraph 2, 22-23, Dkt. 1-1; and Carroll II, Complaint Paragraph 1, 18-19, Dkt. 1, (Par. 2, 22-23; and 1, 18-19)

This Petitioner writes the below Address and Remonstrance for both cases because they are connected, based on the same issues. And so if this Court accepts this Petition, this should be filed in both cases because the issues apply to both cases.

## ADDRESS AND REMONSTRANCE

Staleness of the three claims
denies and deprives the defendant
of his right and ability to defend.

The two complaints affirmatively plead that the rape claim is stale wherein Carroll pleads that she cannot recall the year, month nor day, and time of day except that it was sometime in the evening of the claimed (sexual) battery.  As such, she pleads herself out of court on the ground that she cannot and so did not plead the cause of action, plead all the required elements to state a claim upon which relief can be granted.

At one time in our history, there were no statutes of limitations.

Note that a statute of limitation really is a statute of outlawry.  That is, an injured person, a victim, a plaintiff is put outside the protection of the law, is outlawed, by not being allowed to seek a remedy according to due process of law in a court of law.  Therefore, it can be said that a statute of limitation can be avoided or defeated if it can be shown that no right of the defendant would be violated if the plaintiff sued beyond the period allowed by a statute of limitation.

However, getting to the issue in these two Carroll complaints:

Quoting:  "In general, by the theory and early practice of the common law, a party who had any legal ground of complaint against another might call the latter to answer in court at such time as suited his convenience.  This privilege, however, it was soon found, might be productive of great inconvenience, and not infrequently of great injustice.  Parties might, and often did, wait till witnesses were dead or papers destroyed, and then proceeded to enforce claims to which at an earlier date a successful defence might have been made.  Titles were thus rendered uncertain, the tenure of property insecure, and litigation fostered.  To prevent these evils, statutes were passed limiting the

time within which a party having a cause of action should appeal to the courts for redress,--hence called statutes of limitation." Bouvier's Law Dictionary, 1914 Edition, defining "limitations".

England enacted the first comprehensive statute of limitations in 1623, which our forefathers brought to this country. Bouvier's, id.

As a note, the above is what the ASA (Adult Survivor's Act) statute, NY CPLR Sect. 214-j, does. It makes it so that Carroll's claim of rape, sexual battery, (and defamation), has no statute of limitations just as it was under the common law prior to 1623.

However, note that the ASA statute has no bearing on Carroll I. With Carroll I, the rape claim upon which the defamation claim is based is past the statute of limitations of five years, former CPLR 213-c, which was in effect as of that time of 1995 or 1996. As such, Carroll I is barred by the statute of limitations which is five years. See *infra* for a discussion of the point of law that the defamation cause of action is barred. (Of course, it is perhaps possible that an argument could be made that the 2022 retroactive ASA Statute could apply retroactively to this 2019 lawsuit.)

If Trump had his records and witnesses and his memory, Trump could prove his denials to the rape accusation by bringing forth an alibi defense. But he cannot do it because Carroll has alleged no date, day, time the rape occurred which an alibi can then rebut.

Second, Trump presumably has lost all his records and witnesses and his memory as to where he was at and with whom he was at on the designated day and time of the rape, and so he cannot rebut, assuming Carroll did plead a specific date, day and time.

These two Complaints deny to Trump his ability to defend against their accusations of defamation and rape because Trump cannot defend against the accusation of rape made against him. Trump presumably has long ago thrown away his records of where he was at and with

8

whom he was with at the time of the claimed rape.  Trump is a businessman, the nature of his business oftentimes entailing having business appointments with others and being elsewhere than in New York City.  And so his executive assistant or secretary perhaps kept an appointment book for him, so as to remind Trump that he had an appointment at a certain time and at a certain place and with whom, whether in his office, at a restaurant, or the other person's office, whether he was in some other state or nation on that day, etc.  All of these records or appointment books are gone or presumably gone.  If Trump had security who 'walked' with him, those witnesses probably are long gone, forgotten who they were, or records of who and when they worked long gone.

But most importantly, Carroll's memory is long gone, she is unable to state a date, day and time of day other than about 6:00 p.m. or the "evening".  And so even if Trump has records and witnesses, and has his memory, they are irrelevant because he has no date, day and time to rebut with an alibi about where he was at and with whom he was with at that time.

Trump is denied his right to defend with an alibi.

Carroll's two Complaints plead themselves out-of-court for two reasons:  The Complaints deny Trump his right to defend, his ability to present an alibi.  And her two Complaints fail to state a claim upon which relief can be granted because she fails to plead a specific date, day and time of the tort.  This is all contrary to the Due Process of Law.  New York Constitution, Article I, Section 6; The Fourteenth Amendment of the U.S. Constitution.


As a note, New York's new 2019 20-year statute of limitations for sexual battery is the same as if there were no statute of limitations because by then witnesses, evidence, and the memories of the plaintiff and defendant will or may be faded or blurred.  This is exemplified by this Carroll case.

Today, in New York there is, in practical effect, no statute of limitations as regards a sexual battery. And so the common law has to be resorted to.

In practical effect, by enacting a 20-year statute of limitations, New York desires and wants to lull victims into not immediately suing, while everyone's memory and records are fresh. And so New York lulls victims into subjecting themselves to a staleness of their claim situation and so lose their remedy. Granted, New York is trying to give everyone a chance to sue, doing this in the name of saying that this is justice! But in reality New York will be depriving a lot of victims of their ability to obtain a remedy. Of course, even if a statute of limitations were a reasonable statute, if, due to the facts of a uniquely particular case the defendant or plaintiff has lost or been denied his witnesses or evidence due to even the (short) passage of time within the reasonable statute of limitations, the defendant still has the due process right to raise staleness in that case.

A 20-year statute of limitations (SOL) is the enemy of justice. A one-year SOL would stimulate people to act right away, while the "hue and cry" is still going on. That would be the advocate of justice, not the opponent of justice.

This Court is without jurisdiction to proceed forward towards judgment in the manner it is proceeding. This is because to proceed forward towards trial and judgment will deny Trump his right and ability to defend, and without a claim upon which relief can be granted. This Court's jurisdiction and any judgment in favor of Carroll is and will be null and void.

A court has several aspects to its jurisdiction: (1) Jurisdiction of the territory, territorial jurisdiction; (2) Jurisdiction over the defendant, *in personam* jurisdiction; (3) subject-matter jurisdiction, jurisdiction of the subject-matter; (4) Jurisdiction to proceed forward towards judgment in the manner it is proceeding; and (5) Jurisdiction to render the judgment rendered.

A violation or usurpation of any one of these elements of jurisdiction renders the case and any judgment null and void, contrary to due process of law.

The case of <u>Campbell v. Holt</u>, 115 U.S. 620 (1885)
provides a 'roadmap'
as to why the ASA Statute violates Due Process of Law.

The statute of limitations in effect in 1995-1996 was and is NY CPLR Sect. 215(3), one year for a battery, and five years for an action for a (sexual) battery, NY CPLR Sect. 213-c. This 213-c statute was amended to twenty years in 2019, and was retroactively repealed in 2022 by the ASA statute.

It is said that a defendant has no right to a statute of limitations, that it is only a privilege given by the State because the State has no duty at common law to enact a statute of limitation, and hence no right of Trump's is affected by a statute which deprives one of the benefit of the bar of the statute of limitation, and so it is 'claimed' that statutes such as the retroactive ASA are legal.

Quoting:
> "The distinction between acquisitive prescription and extinctive prescription.
> "In law prescription is of two kinds: it is either an instrument for the acquisition of property or an instrument of an exemption solely from the servitude of judicial process." See Corpus Juris Secundum, vol. 71, 1951, p. 490. The latter form of prescription is known in English law as "limitation" and is sometimes also called "extinctive prescription." "Limitation" means the extinction of stale claims and obsolete titles. This kind of prescription does not establish in favour of the possessor a new title of ownership which had not been existing before; "it simply extinguishes a former owner's rights to recover possession of the land" and therefore "operates negatively by eliminating the claim of a person having a superior title." On the other hand, that kind of prescription which "is an instrument for the acquisition of property" has a different meaning: "it operates positively, like a conveyance," and is one of the modes of acquiring a new title to property. It is accordingly called "acquisitive prescription." This distinction between the two forms of prescription has also been recognized in international law. ..." Quoting from "Historic Titles in International Law" "Prescription in International Law", Chapter II, page 6, by Yehuda Z. Blum M. Jur. (Jerus.), Ph. D.

11

(Lond), 1965. To read the article, Google: "Prescription in International Law | SpringerLink".

"We do not accept defendants' assertion that the court found a prescriptive easement. The essential difference between prescription and the operation of a statute of limitations is that the former is positive and creates rights while limitation is negative and destroys. *Abel v. Love* (1924), 81 Ind. App. 328, 143 N.E. 515, 520; Dolph v. Mangus, 400 N.E.2d 189, 190-191 (Ind. 1980).

"It is of the nature of the statute of limitations when applied to civil actions, in effect, to mature a wrong into a right, by cutting off the remedy." Humbert v. Trinity Church, 24 Wend. 587, 604 (N.Y. 1840).

"Prescription rests upon the presumption of a past grant inferred from and evidenced by an adverse enjoyment for a period fixed by law. "The essence of the doctrine is, therefore, the enjoyment of the right by the claimant, which enjoyment, creates title. The doctrine of limitations, on the other hand, rests upon no such presumption of a right or title in one other than the true owner of the land; on the contrary, it assumes the title to be in the latter but refuses to allow him to assert it because of his want of possession. ... Prescription is positive and creates; limitation is negative and destroys. The latter can properly be said to create only so far as it destroys a remedy or, as said in the leading case of *Humbert v. Trinity Church* (24 Wend. 587): 'It is of the nature of the statute of limitation * '* * to mature a wrong into a right by cutting off the remedy.'" Sedgwick and Wait, Trial of Title to Land §726. So it is said: "The statute protects the occupant, not for his merit, for he has none, but for the demerit of his antagonist in delaying the contest beyond the period assigned for it, when papers may be lost, facts forgotten, or witnesses dead." Abel v. Love, 81 Ind. App. 328, 342, 143 N.E. 515, 520 (1924).

*"Usucapio constituta est ut aliquis litium finis esset."*--"Prescription was instituted that there might be some end to litigation." Black's Law Dictionary, Revised Fourth Edition, copyright 1968; Bouvier's Law Dictionary, 1914 Edition.

*"Praescriptio est titulus ex usu et tempore substantiam capiens ab auctoritate legis."*--"Prescription is a title by authority of law, deriving its force from use and time." Bouvier's and Black's.

In law prescription is of two kinds: it is either an instrument for the acquisition of property or an instrument of an exemption solely from the servitude of judicial process. The latter form of prescription is known in English law as "limitation" and is sometimes also called "liberative prescription" or "extinctive prescription".

Trump, due to passage of time from 1995 or 1996 and no action by Carroll to enforce her claim until 2019 and 2022, in fact, she affirmatively disclaimed and did not want to take any action at that time nor at any time after, until after she wrote her book and until after Trump denied her accusation in 2019, and so Trump acquired a vested liberty right to an exemption from the servitude of judicial process for any claim based upon the claimed rape, claimed to have occurred in 1995 or 1996.

Trump's vested liberty right to an exemption from servitude of judicial process due to the statute of limitations in effect as of the time of the claimed tort, which was five years after the tort occurred, which claimed tort was sometime in 1995 or 1996, this extinctive or liberative prescription vested in him in the year 2000 or 2001, before the ASA statute was enacted in 2022 and before Carroll's two actions were commenced in 2019 and 2022, this extinctive prescription cannot be taken from him by the retroactive ASA statute, and so the law of extinctive prescription (of five years) in effect at the time of the claimed tort governs. See Barra v. Norfolk Southern Railway Company, 75 AD 3d 821, 825-826, 907 N.Y.S.2d 70 (N.Y. 2010) (This case applying the rule of prescription to an acquisitive prescription cannot be taken from one pursuant to a retroactive statute.) Quoting: "Although a statute is not invalid merely because it reaches back to establish the legal significance of events occurring before its enactment, ... the Legislature is not free to impair vested or property rights. ... where title has vested by adverse possession, it may not be disturbed retroactively by newly-enacted or amended legislation." Franza v. Olin, 73 AD 3d 44, 47, 48, 897 N.Y.S.2d 804 (N.Y. 2010) (Discussing an acquisitive prescription).

An acquisitive prescription is distinguished from an extinctive prescription in that for an acquisitive prescription, title of the property, "not the right to commence an action to determine

title, is obtained upon the expiration of the limitations period." Franza v. Olin, 73 A.D.3d 44, 47,

897 N.Y.S.2d 804 (N.Y. App. Div. 2010).  Whereas an extinctive prescription is simply the

exemption from the servitude of judicial process after the expiration of the (five year) limitations

period for this New York rape (and defamation) case.  But extinctive prescription gives one a

liberty right to be free from or exempt from the servitude of judicial process for Carroll's

forfeited, waived and in her case, affirmatively disclaimed right to timely sue before memories,

witnesses and records were lost by both parties.

> Quoting: "By the long and undisturbed possession of tangible property, real or personal, one may acquire a title to it or ownership, superior in law to that of another who may be able to prove an antecedent and at one time paramount title. This superior or antecedent title has been lost by the laches of the person holding it in failing within a reasonable time to assert it effectively, as by resuming the possession to which he was entitled or asserting his right by suit in the proper court. What the primary owner has lost by his laches the other party has gained by continued possession without question of his right. This is the foundation of the doctrine of prescription, a doctrine which, in the English law, is mainly applied to incorporeal hereditaments, but which, in the Roman law, and the codes founded on it, is applied to property of all kinds.  Mr. Angell, in his work of Limitations of Actions, says that the word "limitation" is used in reference to "the time which is prescribed by the authority of the law during which a title may be acquired to property by virtue of a simple adverse possession and enjoyment, or the time at the end of which no action at law or suit in equity can be maintained," and in the Roman law it is called *praescriptio.* "Prescription, therefore," he says, "is of two kinds -- that is, it is either an instrument for the acquisition of property or an instrument of an exemption only from the servitude of judicial process."--unquote from  Campbell v. Holt, 115 U.S. 620, 622-623 (1885).

This *Campbell* case was based upon a repeal or lifting of the statute of limitations, a provision

similar in effect to the ASA revival statute at issue here in Carroll II.


The *Campbell* opinion was based upon the defendant's defense, as well as other reasons the

High Court gave for not applying and discussing the "extinctive prescription" point, but focusing

only on "acquisitive prescription" of property.

"The defendants, both by plea and by prayers for instruction to the jury and in argument before the Commissioners of Appeal, insisted that the bar of the statute, being complete and perfect, could not, as a defense, be taken away by this constitutional provision, and that to do so would violate that part of the Fourteenth Amendment to the Constitution of the United States which declares that no state shall "deprive any person of life, liberty, or property without due process of law. *Campbell*, Id., page 622.

Here, the High Court says that *Campbell's* claim was that the retroactive provision took away his vested property to the defense of the bar of the statute of limitations.

"This writ of error to the state court is founded on that proposition, and we must inquire into its soundness." *Campbell*, Id., page 622.

Here the High Court has narrowed the question or narrowly defined the question on appeal.

"It is not a suit to recover possession of real or personal property, but to recover for the violation of an implied contract to pay money. The distinction is clear, and, in the view we take of the case, important." <u>Campbell v. Holt</u>, 115 U.S. 620, 622 (1885).
"It is much insisted that this right to defense is a vested right, and a right of property which is protected by the provisions of the Fourteenth Amendment. It is to be observed that the words "vested right" are nowhere used in the Constitution, neither in the original instrument nor in any of the amendments to it. We understand very well what is meant by a vested right to real estate, to personal property, or to incorporeal hereditaments. But when we get beyond this, although vested rights may exist, they are better described by some more exact term, as the phrase itself is not one found in the language of the Constitution. *Campbell*, id., page 628.

And so the High Court said that a more exact term than that of a vested property right to the defense of statute of limitation is needed in order to claim that one is being deprived without due process of law.--("... although vested rights may exist, they are better described by some more exact term, as the phrase itself is not one found in the language of the Constitution.").

Trump here has a liberty right of being free from or having an exemption from the servitude of judicial process, an instrument of an exemption from the servitude of judicial process, an extinguishment of Carroll's right to recover for a tort done to her.

The ASA statute deprives him of this vested extinctive or liberative prescriptive right of exemption from the servitude of judicial process.

15

This is contrary to the due process of law provision of the New York Constitution, Article I, Section 6,  and of the Fourteenth Amendment of the U.S. Constitution.  The retroactive ASA statute is unconstitutional, contrary to due process of law.

New York, as regards foreign law, recognizes the validity and applicability of the rule of extinctive prescription.  See <u>AOZORA BANK, LTD. v. Goldman Sachs Group, Inc.</u>,  2015 NY Slip Op 31939(U) (Recognizing foreign law on extinctive prescription.).

It appears to this Petitioner that this extinctive aspect of prescription has not been discussed much, if at all, in American case law.  At least this writer could not find any cases on this, albeit much case law exists on acquisitive prescription.  That is, this Carroll case may be one of first impression which will annul and void a retrospective revival statute such as the ASA statute.

In summation, the case of *Campbell v. Holt,* id., does not rule against Trump, but acts as a guidepost to direct Trump and this Court to the proper highway to take to dismiss the Carroll complaints, to declare the ASA statute unconstitutional.

The basis for the prohibition against retrospective law, that they violate due process, such as the ASA, is when:  "*Nemo potest mutare consilium suum in alterius injuriam.*"--"No one can change his purpose to the injury of another."  Bouvier's.  "No man can change his purpose to another's injury."--Black's.  <u>Dash v. Van Kleeck</u>, 7 Johns. 477, 504 (N.Y. 1811) (Quoting this legal maxim, "the lawgiver cannot alter his mind to the prejudice of a vested right.").

If a statute is expressly a retrospective statute, it will not be legal if it results in prejudice to one.  <u>Phillips v. AGWAY</u>, 88 Misc. 2d 1087, 1089, 389 NYS 2d 977  (NY 1976).

Carroll is barred from this Court to sue for her claimed rape.  And so also for the defamation causes because she is barred from bringing her rape claim into this Court, and because Trump

has an 'immunity', has the vested right to be free from the servitude of judicial process for any claim based on this stale rape accusation.

When the stale rape claim is involved or included,
then the two defamation claims cannot be sued for.

Now the point arises as regards a defamation case where the claimed slander/libel was timely sued for by Carroll.

But the issue here is that her defamation claim is based on that Carroll accused Trump of the tort of sexual battery, rape, the tort itself which Carroll has no right to directly sue for, has no right to bring into court, has no right to bring Trump into court for.

Carroll cannot litigate or sue out the claimed defamation and thereby be allowed to bring her rape claim into court to litigate that her claim of rape is true, that Trump did indeed rape her, and therefore Trump's defenses and denials or calling her a liar, etc., was a slander/libel.

Carroll is barred or forbidden from directly suing Trump for raping her or litigating it.  And that which one is forbidden to do directly, one is forbidden to do indirectly or to accomplish by any other means, such as Carroll suing for defamation which is based on the rape accusation.

*"Quando aliquid prohibetur, prohibetur omne per quod devenitur ad illud."*--"When anything is prohibited, everything by which it is reached is prohibited."  Bouvier's and Black's. *"Quod aliquid prohibetur ex directo, prohibetur et per obliquum."*--"When anything is prohibited directly, it is prohibited indirectly."  Bouvier's Law Dictionary, 1914 Edition, (Bouvier's).  "When anything is prohibited directly, it is prohibited also indirectly."  Black's Law Dictionary, Revised Fourth Edition, copyright 1968, (Black's).  *"Quando aliquid prohibetur ex directo, prohibetur et per obliquum."*--"When anything is prohibited directly, it is also

17

prohibited indirectly." Bouvier's and Black's.   Gonzales v. Armac Indus., 81 NY 2d 1, 9, 595

N.Y.S.2d 360, 611 N.E.2d 261 (N.Y. 1993) (An agreement which enables an employee to do

indirectly that which cannot be done directly, to sue and reach beyond a judgment proof

defendant so as to be able to sue an employer so as to be able to reach into the employer's deep

pockets, cannot be done.).

> "Of course, it would not be rational, logical, moral, or realistic to make any distinction
> between a lawyer acting for the State who violates the ethic directly and one who
> indirectly uses the admissions improperly obtained by a police officer, who is the badged
> and uniformed representative of the State. To do so would be, in the most offensive way,
> to permit that to be done indirectly what is not permitted directly." People v. Hobson, 39
> NY 2d 479, 485, 384 N.Y.S.2d 419, 348 N.E.2d 894 (N.Y. 1976).
> "Every positive direction contains an implication against anything contrary to it, or
> which would frustrate or disappoint the purpose of that provision." People ex rel. Burby
> v. Howland, 155 N.Y. 270, 280, 49 N.E. 775  (N.Y. 1898).

The reader probably has noticed that the maxims of law really are just plain, good 'ol

common sense. Cf. Ventress v. Smith, 35 U.S. (10 Pet.) 161, 175, 9 L.Ed. 382 (1836) (A maxim

of law is "a plain dictate of common sense.").

Since Carroll is forbidden to directly sue for the rape, to bring that cause into court, Carroll is

forbidden to indirectly sue for the rape or bringing it into court by trying and proving that the

rape did occur as a part of her cause of action for defamation and so Trump defamed her, lied

that he did not do it.

Carroll cannot directly bring her rape claim into court, and she cannot do it indirectly by

'backing into' her rape claim by suing for defamation for Trump's defending against and denying

the rape accusation.

As a matter of law, Carroll's two complaints for defamation fail to charge an offense upon

which relief can be granted because she has no proof of rape because she cannot present any

proof of rape because she is debarred from bringing this claim into court.

This court cannot obtain personal jurisdiction of Trump over this rape claim because he is exempt from the servitude of judicial process when this claim is part of the cause of action.

Everything or any means by which her accusation of rape is to be litigated or is brought into court is prohibited.

Question: Must a man's sins be laid to rest?

Another question arises: Can Carroll, long after she had the right to timely sue for rape, accuse Trump of raping her such as Carroll has done in this case.

And so Trump responds to the accusation and instead of reacting as he did, instead sues her and her book publisher, St. Martin's Press, the New York Magazine, The Cut, and her agent, for slander/libel and for publishing it and for aiding and abetting its publishing.

As required by the law of slander/libel, Carroll and her publishers and her agent would have the duty and burden to prove her accusation in her book and magazine article to be true if Trump sued them for libel.

So the question is, would Carroll be entitled to prove her accusation of rape true and so get out from under Trump's slander/libel action (because Trump 'waived' or forfeited his vested extinctive or liberative prescription right by suing her for libel).

The answer is no. Again, this is because anything which is prohibited, everything by which it is reached is prohibited.

Second, Trump would not be waiving his vested liberative prescription. In order for a waiver to exist, one must receive a consideration for the waiver and there would be no consideration given to Trump to waive his right. Nor can there be a forfeiture because Trump did nothing wrong which would warrant the taking or loss of his right. Due process says that one cannot lose one's rights except based on some act, default or wrong he did.

That is, Trump would be able to obtain what would be in effect a default judgment against Carroll and her publishers and agent for her slander/libel.

The point here is that one's sins must be allowed to be laid to rest after a passage of time, or the accuser/slanderer subjects themselves to the possibility of an action for slander, unless there is a privilege which would allow an accuser to accuse the person of his (claimed) sin, which privilege justifies what would otherwise be an actionable slander.

Carroll, under the facts of this case, cannot claim a 'privilege' to slander Trump on the basis that he is a political person. (This is assuming there is a 'privilege' to slander a politician so as to inform the People of his character or lack of. Doesn't even a politician have a right of access to the law to protect himself from a false accusation.).

Even if Carroll has a privilege to slander Trump because he is a politician, Carroll has no privilege in this situation because she did not slander Trump for this reason. Rather, she libeled Trump equally along with libeling a lot of other men, so as to write a book and so make a little or a lot of money, and so as to enhance or proceed with her own career as an author or writer and advice columnist--(albeit this writer thinks that her book or story caused many of her readers to no longer be interested in her advice because her character or her story of her character detracts from the quality of her advice or desire to receive advice from this type of woman who appears to have no boundaries, starting when she was age 7-9 when the same boy twice 'played' with her and she let him do it, did not run away from him and tell her mother, etc.). Her libeling had nothing to do with politics, other than that Trump just happened to be one of her victims, (albeit she may have added Trump to her story so as to add more spice in her book and so increase sales).

This point that one's sins must be laid to rest, as discussed above, is repeated by the below rules of law which support or explain the reason for the law of prescription.

The law of prescription perhaps can be said to be supported or explained by the following concepts: (1) the law will not presume any man's act to be illegal ; (2) upon the doctrine or maxim that '" those who are silent when they should speak shall be silent when they would speak," (3) on a consideration of the hardship which would accrue to parties after time had robbed them of the means of proof, and (4) upon a principle of public policy and convenience which operates to the preservation of the public peace and the quieting of men's affairs or past sins ; and (5) because it can work no prejudice except to those who are guilty of negligence in their affairs; are or may be reasons for a rule underlying the doctrine of extinctive prescription.

The point is that after time has passed, a victim who has not timely sued for the tort should not speak up later and accuse the claimed tort-feasor of the claimed tort.  And if she does do this, she may subject herself to an action for slander or libel, and if she is sued for it, she will be barred from defending the truthfulness of her slander by the prescription against her and in favor of the claimed tort-feasor or by the statute of limitations which operates against her on the underlying tort of rape.


Carroll consented to the coitus.
Carroll lacked outrage.


[1] Following are facts of the 'rape', as well as her thoughts,
as Carroll pled in both Complaints.


(1).  Carroll was a former writer for the comedy show, "Saturday Night Live".  Par. 17 and 13 of the Complaints, Carroll I and II.

(2).  The conduct occurred one evening between the fall of 1995 and the spring of
1996.  Paragraph 22 of the first Complaint dated November 4, 2019 (Carroll I), and Paragraph 18
of the second Complaint dated November 24, 2022 (Carroll II), (Par. 22 and 18).

Carroll said that she was age 52 when the incident occurred.  Par. 28 and 25.

(3).  When Carroll and Trump met at the entrance to the department store, Carroll was struck
by his boyish good looks.  Par. 25 and 22.

(4).  Carroll was surprised but thrilled that Trump would want her advice on picking out a
gift, so she helped Trump in looking for a gift, imagining the funny stories that she might later
recount (using the story to write a comedy skit for Saturday Night Live).--Note that this is her
"thoughts".  Par. 26 and 23.

(5).  Trump and Carroll began searching for a gift that Trump could give to the unnamed
girl.  After looking at handbags, then hats, Trump escalated the flirtation and suggested they go
to the lingerie department and Carroll went with him.  Par. 29-30 and 26-27.

(6).  Trump really escalated the flirtation into intimacy and picked up a see-through bodysuit
in lilac gray, and Trump insisted that Carroll try it on, and Carroll responded that he should try it
on himself, adding that it was his color, and Trump and Carroll went back and forth, teasing and
flirting with each other about who should try on the bodysuit.  Par. 30-31 and 27-28.

(7).  Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on, and Trump
maneuvered Carroll to the dressing room. As they moved, Carroll laughed, thinking to herself
that she would make him put the bodysuit on over his pants." Par. 32-33 and 29-30.

Note that Carroll elaborated on this in the CNN interview with Anderson Cooper, interview
discussed below, saying she thought this would be a good sketch to put on "Saturday Night

Live". Put a sketch on TV about Trump, a married man, (and even if not married), flirting in a dressing room?

Note here that when Carroll testifies about this thought of hers, that Trump put on the bodysuit over his clothes, that if one watches the jury or the public sitting in the courtroom, it will be interesting to see if eyeballs start rolling. For a person of Trump's size back then, he was about 49 years old then, and he weighed about 100 pounds more than Carroll and he was 6'3" tall--Carroll's words, albeit he probably was much slimmer then than he is now at about age 76, to put a flimsy, see-through woman's underwear or bodysuit on, and put it on over his clothes, this should raise images of the expression "if the glove doesn't fit, then acquit", or more likely it may raise a negative image of Carroll's perception of reality or that her mind must be in the clouds, but her laughing shows consent to Trump's intimate flirtation and going into the dressing room. And also would a TV show make a sketch out of an incident about a man who is flirting with another woman, an accusation of Trump being 'unfaithful' with his then wife, a story which might be considered defamatory of Trump with relation to his marriage.

Note that here Carroll pleads her thoughts, what she was thinking. But thoughts are not conduct. One can judge the defendant, Trump, only by the conduct of what occurred, only by what he could see and know, that is, her flirting and laughing. There is no law or fact which says that Trump is God, that he can read and know another's thoughts.

The point here is that Carroll's "thoughts" cannot be used as evidence by the jury to determine that Trump raped her, that Carroll did not consent to the conduct. Another thing about Carroll's "thoughts" is that her "thoughts" do not show the required "outrage" or a sense of boundary because they are thoughts about other things contrary to a boundary or outrage. Here, laughing while being led to the dressing room, and her thinking and knowing they are going to the

dressing room, is contrary to conduct one would expect from a woman who would not want to be exposed to the risk of 'frisky' or more conduct in a private dressing room, which would involve removal of clothing so as to put on a bodysuit. Her thought here is to flirtatiously 'argue' over who is going to try on an underwear or bodysuit which is designed to be put on over naked, bare, unclothed skin, not over a large man, fully clothed. And this is more so as Carroll's book discloses that she has had many one-time sexual encounters with men, that is, she is no innocent, naïve young girl, she was age 52 with lots of sexual escapades with many men.

(8). Trump closed the door of the dressing room, lunged at Carroll, pushing her against the wall, bumping her head quite badly, and putting his mouth on her lips, and Carroll shoved him back. Utterly shocked by Trump's unexpected attack, Carroll burst out in awkward laughter because she says she was shocked, and she hoped that laughter would bruise his ego and cause him to retreat--(her thought). Par. 35-37 and 32-34.

Her laughter shows consent, Trump cannot be judged by her thoughts, her explanation of why she laughed.

Carroll elaborated on this kiss with Anderson Cooper of CNN, saying that she thought that Trump was thinking "... we're just so hot for each other." That is, Carroll says that she thought that Trump thought she was hot for him. But Carroll did nothing to put a damper on this thinking of Trump.

(9). Then Trump seized both of her arms and pushed her up against the wall again, bumping her head a second time. While pinning Carroll against the wall with his shoulder, Trump jammed his hand under her coatdress and pulled down her tights. Trump opened his overcoat and unzipped his pants, and then pushed his fingers around Carroll's genitals and forced his penis inside of her. Par. 38-39 and 35-36.

24

Carroll tells Anderson Cooper that he pulled down her pantyhose/tights with just one hand. Of course, this raises the question of how it could be done with just one hand. Any person who has taken down one's own underwear knows that we generally do it with both hands. And any person who has taken down the pantyhose of his wife or another woman knows that it is difficult/impossible to do it with just one hand, unless one spends a 'lot' of time doing it, pulling down one side, then reaching over to pull down the other side, then pulling down some more on the other side, and back and forth until down far enough below the crotch, down far enough on the thighs, calves or ankles, or off, so as to have 'access'. The hardest part is getting the nylon leg around the thigh down. And down far enough so that Carroll could not initially knee Trump. The facts as pled, and as stated in the book, etc., leave a lot to the imagination as to what occurred or how it occurred.

Note here that Trump "pinned" her against the wall with his shoulder. This raises the question of how is a man able to 'center' his crotch with her crotch while his torso is twisted and off center so that his shoulder is able to be against her upper (middle) chest or shoulder area. Trump may have had his shoulder against her chest or shoulder area at first, but could he still have been able to, with his torso twisted, align his crotch with her crotch. If a person, male or female, a reader of this, stands against a wall, and puts one shoulder against the wall, one is in a very uncomfortable position and strain on the waist so as to align one's crotch with the wall. (Presumably, when Trump inserted himself into her, he put both his hands against the wall so as to keep his balance, or, he grabbed her waist or around her hips so as to be 'together' and to keep his balance.) Since Carroll was able to push away with her hand, this shows that Trump was not holding her hands or arms against the wall with his hands at that time of the coitus. It is up to Carroll to describe in more detail what occurred. This same question arises above with

when Trump kissed her, aligning his lips so as to align with her lips while he has his shoulder against her chest or shoulder.  Again, he may initially have had his shoulder against her chest, but while kissing her!?  The story here is not complete enough.

(10).  Carroll then tried to stomp his foot with her high heels. She tried to push him away with her one free hand (as she kept holding her purse with the other), finally she raised a knee up high enough to push him out and off her, and Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue.  The whole attack lasted two to three minutes.  Par. 40-42 and 37-39.  Note here that Trump did nothing to try to hang on to her, to restrain her so that he could continue.  Note here that Carroll says nothing to Trump to tell Trump no, etc.

(11)  As soon as she was outside Bergdorf's, Carroll pulled her phone out of her purse and called her friend Lisa Birnbach, Carroll was breathless and still reeling from the assault, and she kept laughing, manically— her way of coping with the stress and trauma that she had just experienced.  Carroll recounted to Birnbach how Trump had attacked her in Bergdorf's dressing room.  She told Birnbach how Trump had pulled down her tights and put his penis inside of her.  Par. 43-44 and 42-43.  And Birnbach said that Carroll, in response to Birnbach's claim that it was rape, instead of saying it was rape, Carroll just kept saying he pulled down my tights, and that "we" fought.  Par. 102 and 87.

(12).  "He raped you," Birnbach kept repeating, expressing her opinion on the nature of the conduct.  She begged Carroll to go to the police and offered to accompany her. Still in shock and reluctant to think of herself as a rape victim, Carroll did not want to speak to the police. She told Birnbach that it was just a few minutes of her life and that it was over. She implored Birnbach never to tell anyone what had happened.  Carroll drove home and crawled straight into bed.  Par. 45-46 and 44-45.

Note that this admission is not what she is claiming now for the rape, that now it is 'something', it caused her much trauma, anxiety, etc.

(13). Several days later Carroll confided in a second friend, Carol Martin, and this time Carroll did not laugh. Nobody laughed. Par. 47 and 46.

(14). Carroll blamed herself. She called herself "stupid." She told herself that she "deserved it" for agreeing to go lingerie shopping with Trump. She struggled with the guilt that, somehow, though she had fought to protect herself from his attack, it was her fault that Trump had raped her because she had entered that Bergdorf dressing room. Par. 50 and 49.

Here Carroll admits that she assumed a risk that something more than flirtatious 'frisky' conduct might occur, that she consented to the risk that sexual contact would occur. Again, her past life of one-time sexual encounters belies any claim of no consent or no knowledge that sexual contact likely would occur.

(15). Carroll described the attack in detail in her book, and her language was specific.. Par. 75-76 and 76-77.

(16) Carroll pled that the reason she did not say anything about it before was because she did not want to receive death threats, being driven from my home, being dismissed, being dragged through the mud, and joining the sixteen women who've come forward with credible stories about how the man grabbed, badgered, belittled, mauled, molested, and assaulted them, only to see the man turn it around, deny, threaten, and attack them, never sounded like much fun. Also, I'm a coward." Par. 78 and 79.

But note that none of this was not and could not have been her reason for not coming forward back in 1995 or 1996. Trump was not a politician back then. None of the women had accused Trump back then. Her reason for not coming forward back then is because she made a conscious

choice not to come forward back then, this even though initially her one friend begged her to come forward, this right after, minutes after the incident occurred.  Carroll's second friend whom she talked to several days later gave her different advice, saying that Trump will bury her in attorneys, etc.  But Carroll had already made up her mind before talking to her second friend.

The above are facts as pled in the two Complaints.


Following are some of the facts as Carroll wrote in her book
and in the New York Magazine and its online "Cut",
and facts which Carroll gave in various news interviews
made after the "Cut" appeared online and the story broke, became public.

Rule 412, FREv, does not apply here.


As respects to what Carroll has revealed about her sex life, this is all a matter of public record because she put it out to the public of her own will and volition, so as to write and sell a book and make some money from the sales and from writing the magazine article.  And she then did news interviews to promote her book and also to put her name and story out to the public because she accused a President of raping her and she felt this was good for her 'fame' and her then status of being an advice writer and good for the "Me Too" philosophy and attitude prevalent in today's society.

The point here is, any relevance or applicability of any prohibition and procedural rules contained in Rule 412, FREv are annulled, are not applicable, if indeed any of the following facts otherwise come within the ambit of Rule 412.

This is because Carroll has put her sex life out to the public, and any limiting rules of procedure contained in Rule 412 no longer apply because she knows about this already and knows that this could be used because she herself has publicized it and used it to profit from

it. That is, she is already prepared to explain or rebut any admission against her interest her public writings and statements reveal. And so the reasons for having the prohibitions of Rule 412 and its procedural rules no longer apply or exist. She cannot be embarrassed or prejudiced by what she herself voluntarily revealed, so as to profit from it.

The common law rule of law applies of: *"Cessante ratione legis, cessat et ipsa lex."*--"The reason of the law ceasing, the law itself also ceases."--Black's Law Dictionary. "When the reason of the law ceases, so does the law itself."--Bouvier's Law Dictionary.

This Addresser and Remonstrancer quotes her public statements in the context to show that she has failed to state a claim upon which relief can be granted because all of her public admissions and statements show that she consented and had no outrage, and none of her conduct shows a lack of consent and having an outrage.

Any judgment of rape will be void because there will be no admissible or legal evidence of lack of consent nor evidence of outrage.

Remember, her thoughts at the time of the alleged rape are not legal evidence against Trump because he can be judged only by what he knew, what he saw, heard.

Further, Carroll's story given at trial of lack of consent and of outrage will be perjury because she did not tell the whole story, she only told the story she wanted the jury to hear.

Remember, one must tell the truth, the whole truth, and nothing but the truth.

The whole truth means the whole story, not just what is of self-interest. The reason for the whole story is that if it is told then one would know that one should not have made the accusation in the first place, one should not have sued in the first place. One would know there is no probable cause.

Nothing but the truth means that one should tell only the truth, one is not to add other things, lies or irrelevant facts but added so as to make the defendant guilty.

The point here is a plaintiff cannot just tell part of the story and then say it is up to the defendant to try to get the whole story out so as to show the accusation is without merit.

That is, if the plaintiff does not tell the whole story in her case-in-chief, she is guilty of perjury because she did not speak the whole truth, done so as to try to make the defendant guilty/liable. She abuses the right of a defendant to put on a defense by making the defendant introduce the whole story to prove lack of guilt when the plaintiff bears the burden to prove her accusation. A defendant need only show this perjury should the plaintiff not tell the whole story.

[2]  An excerpt from Carroll's book,
published in the online 'magazine' "The Cut" on June 21, 2019.
Carroll wrote this article for "The Cut" and for "The New York" magazine.

This rape allegation first 'broke' in the news when "The Cut", an online vertical 'magazine' which promotes the New York Magazine and which generates extra revenue for the magazine and broadens the readership of some of New York's articles, published excerpts of Carroll's book on June 21, 2019, and the New York Magazine appeared on newsstands on June 24, 2019, and Carroll's book went on sale on July 2, 2019. Par. 79-80 and 80-81 of the two Complaints. A copy of this "Cut" article accompanies this Petition. Also, a copy of this online article was also filed with the Court. (Note that this is not "The New Yorker Magazine". That is a different magazine.)

To read this "Cut" article, Google: "First person June 21, 2019", do not use the quotation marks, then click on the top link. Or Google: "An excerpt from E. Jean Carroll's "What do we need men for?""

30

The June 21, 2019 article in "The Cut" told several of the stories of Carroll's 'violent' sexual experiences, including Trump's.

(A) Carroll's first story is when she was about age 7 or 8, wherein a boy, age about 7-9, put a stick or stone up into her vagina, which caused her to bleed. Carroll described this as "I learned that an object could be shoved up the place where I tinkled." And on another day or about a year later, the same boy told her "I'm going to shove this up you again". She replied "I don't want to". But she stayed there, did not leave, and so he pulled up her dress and put a "light blue-velvet shade fabric and it looked fluffy, like a bunched-up hairnet", and the boy "crammed" it down her pants. Carroll did not object or run away from the boy.

Carroll had no 'boundaries'. Carroll left the cloth in her panties until she went to bed and she pulled down her pants "And there it still was, the wadded-up thing." Carroll does not write that she reported these incidents to her parents. Carroll wrote that she and this boy played many ferocious games, hooking each other with fishhooks, holding each other underwater, dumping hot embers on each other's heads, etc. Carroll's parents and the boy's parents were close friends.

(B) Carroll wrote about Hunter S. Thompson who kept yelling "off with your pants" as he sliced the leggings from her body with a long knife while in his hot tub. She calls this sexual experience an "adventure".

(C) Carroll writes about the boy in college who called her a prick tease, and Carroll says this 'compliment' "is paid to every girl at some point or other in 1961". The boy grabbed Carroll and they fall to the ground. The boy straddles her. He pushes her sweatshirt up to her neck. Carroll's reaction to this is that she says to the boy, "I don't want to wrestle, get off". The boy pulls out a jackknife. She says "Get off". He pushes her bra up over her breasts. The boy then uses both hands to open the knife, and Carroll is able to roll out from under him and runs

away from him because he was no longer using his hands to hold her arms down, this while Carroll is on her back and he is straddling her.  She says nothing about it later, no police, etc.

Carroll writes that while the boy was straddling her, she was lying on the ground on her back, after he had pushed her sweatshirt up to her neck, that she had the thought that if she "could have foreseen the circumstance of a boy throwing me down and pushing my sweatshirt up to my chin, I would not have worn a padded bra.  A padded bra makes a girl look like she lacks something."

(D)  Carroll writes that she was a cheerleader in college, and she describes a promotional photo of her cheerleading, the university used this photo in advertisements to promote the school, wherein she is stretched out, right arm pointing upward with a pom-pom in her hand and her left leg pointing backward, an otherwise innocent, wholesome looking cheerleading photo.  But Carroll describes it as "cheerleading skirt aswirl, legs split like the atom."  This photo is in the article.

(E)  Carroll writes about the Trump experience.  Carroll says that she is surprised about how good looking Trump is.  And that when they met at the department store in 1995 or 1996, she writes that Trump "looks prettier than ever".  She says she is "charmed".  She wrote that Trump greeted a Bergdorf sales attendant.  And when she told Trump she was age 52, Trump responded by saying "You're so old", he laughing while saying this.  He was around age 49.  They go to the lingerie section, and Trump picks up a "lacy see-through bodysuit of lilac gray".  And he says "Go try this on", and she responds with "You try it on", laughing while saying it.  And she continues to laugh when she says "It goes with your eyes" and throwing the lingerie back at Trump, and she laughs when she says "But its your size" And Trump takes her arm and says "Let's put this on" while heading to the dressing room.  And Carroll is laughing during this time

and thinking "This is going to be hilarious" and "I'm gonna make him put this thing on over his pants".

Carroll writes that the moment the dressing-room door is closed, he lunged at me, pushes me against the wall, hitting my head quite badly, and puts his mouth against my lips. And she starts laughing again. And as Trump "jams his hand under her coat dress and pulls down her tights," Carroll writes that she kept on laughing, and that Trump opens his overcoat, unzips his pants, and forcing his fingers around my private area, thrusts his penis inside her. It turns into a colossal struggle, and she tries to stomp his foot, tries to push him off with one hand while holding her purse with the other, and finally gets her knee up high enough to push him off, and she opens the door and runs out. She writes that she does not believe he ejaculates (because she writes that the whole episode lasts no more than three minutes).

Carroll wrote in her book and New York Magazine, The Cut, that if there had been surveillance camera footage in the dressing room, she wrote that "The struggle might simply have read as "sexy"." Carroll wrote that the department store has confirmed that it no longer has the security tapes from that time.

Carroll writes that Birnbach begged her to go to the police.

Carroll wrote that she has never had sex with a man since the Trump incident when she was age 52, and she writes that she does not know whether its due to her age, whether its due to the fact that she has not met anyone fascinating enough to feel "the sap rising", or if its due to the Trump incident. But in her Complaint, she says it is due to Trump.

Carroll wrote about her 1997 experience with Les Moonves, CEO of CBS, when she was in her 50's, noted that Moonves denies her accusation. And she wrote that Trump denies the accusation against him. The point here is that it appears that the New York Magazine must have

contacted these two men before publishing the story on June 21, 2019.  Carroll also mentions the names of Matt Lauer, Bill O'Reilly, and Charlie Rose, people on whose TV shows she was on many times.  She does not say that she had a sexual experience with these men, but inclusion of their names in this article infers she may have had.  It is not known if these men were contacted before the article was published.

Carroll also writes about the man "who tries to kill his rich wife by putting poison in her shampoo"!

The above are facts as taken from "The Cut", which was published on June 21, 2019, which has excerpts from Carroll's book telling about some of her (violent) sexual experiences.


[3]  Carroll gave an interview to NPR
on June 22, 2019, one day after the "Cut" story broke.


To read this June 22, 2019 NPR interview, Google:  "E. Jean Carroll interview June 21, 2019 NPR", or Google:  "'It Hurt. And It Was Against My Will': Trump Accuser Stands By Her Story".  The interview is by Lulu Garcia-Navarro.  A copy of this interview accompanies this Petition.


Carroll said that "Trump asked her to try on a see-through bodysuit in the lingerie department. She said she joked that he should try it on instead.  And that's where I got into trouble, because we went into the dressing room and he closed the door and that was it."

She said "it was a very short incident" and that "to me it's just disrespectful to say, to use the word rape, although it hurt and it was against my will."

Carroll said that "I had adrenaline pouring through my body," she said. "The idea that anyone, including me, could make a decision at that point about going to the police ... that was almost a second assault on my brain."

[4]  Carroll gave a news interview
to Anderson Cooper, CNN, on June 24, 2019.

To read a transcript of this news interview on CNN, Google:  "E. Jean Carroll CNN interview Anderson Cooper", or Google:  "Interview with columnist E. Jean Carroll who accuses ... CNN".  Do not use the quotation marks.  A copy of this transcript accompanies this Petition.  A copy is also filed with the Court.

Carroll said that she was the most attractive woman in Bergdorf's in that one bit of time.  She says that "We were having a high old time.  You remember Donald Trump. Hail-fellow-well-met, walking up and down the streets of New York, greeting everybody.  Everybody liked him."  "... he was Shakespearean. He was great.  You'd love to see him on the street."  She says she was "enchanted" that he asked her to help him pick out a present.  She says the bodysuit is "a filmy see-through bodysuit in lilac gray."  She says she was "joshing" with Trump when each was telling the other to put on the body suit:  "I used to be a writer at "Saturday Night Live." I see an entire sketch of making Donald Trump put this filmy thing over his pants. That is what I'm thinking. I'm not thinking I think it's -- I was laughing as I said it. He said, well -- he went like this. And I walked in stupidly --".  "Donald Trump is going to put on a filmy body suit? It's like oh, I couldn't -- so he -- let's go in the dressing room. I thought I'm going to make him put the pants on. Walked in.  And the minute I was in there he shut the door and pushed me up against the wall and bang -- banged my head on the wall and kissed me. It was so shocking. I

couldn't -- of course, I started laughing again. Because --". Carroll tells Anderson Cooper that

she laughed when Trump kissed her "Because it was a way of--if it was at all erotic, if a man is

laughed at it usually will make him--and he put his shoulder against me to hold me against the

wall. And at that point I realized that I was in a very difficult situation.". And Carroll responds

to Cooper's question of did Trump say anything after he kissed you, and her answer

was: "No. No. It was just like we're going to do this thing, we're just so hot for each

other. Why would I even try to think what he was thinking. Anyway, so, he pushed -- you know

-- he pushed me -- held me with his shoulder and I was wearing a coat dress and tights. And he

pulled down the tights." She says Trump pulled down her tights with one hand, not two. "And

that was when it turned serious. I realized that this was--this was--this was a fight." She says

Trump is 6'3", and she was about 6'1" in her high heel shoes, and so she says they were about

even in height.. And she says "And down go the tights. And it was against my will. And it hurt.

And it was a fight." This was said in reference to the penetration by Trump. And she says that

was when she started "stamping her feet", that this stamping was the reason why the coitus was

just a brief period of time. And then she says "I should never have done it." "That was just a

dumb thing to go into a dressing room with a man that I hardly know. And have him shut the

door. And then be unable to stop him." And she says she does not feel like a victim because "I

was not thrown on the ground and ravished. Which the word "rape" carries so many sexual

connotations. This was not -- this was not sexual. It just hurt. It just --". "I think most people

think of rape as being sexy." "They think of the fantasies." "You're fascinating to talk

to." Carroll says this last bit while Anderson Cooper tries to stop the interview because Carroll

said that people think of rape as being sexy. And Cooper was eventually able to then break to a

commercial.

Note here that before entering the dressing room, Trump asked Carroll "He said, well -- he went like this." The point here is that Trump asked Carroll if she wanted to enter, he did not pull or push her in, and so he said "Well" and he apparently waived his hand in a manner such as one would invite another into a room or into one's house, etc.--One would have to watch the video of this interview. The point here is that Trump apparently was 'testing' her consent here, just as he tested her consent when he escalated the flirtation by picking up the underwear/bodysuit, etc.

After the commercial break, Carroll says that her 'rape' did not cause her to "I didn't suffer, Anderson. I did not suffer. I didn't lose my job. I wasn't beaten. You know, I just don't use the -- ". Carroll says that when she telephoned Birnbach, that one of the first things Birnbach said to her is: "E. Jean, stop laughing, this is not funny." Carroll said "I was laughing as soon as she (Birnbach) got on the phone apparently. I don't remember it." In response to Cooper's question if she thought she should go to the police after Birnbach had tried to get her to go to the police, Carroll says: "No. I just didn't want the rigmarole. I just didn't want to do it. And like many, many other women, a lot of women, it's a personal choice. Do you want to go to the police? Every woman has to decide for herself."

Commentary: Granted, it is a woman's right whether to go to the police, or not. But then where is the evidence of the outrage of the woman, of the lack of consent.

Carroll laughed about the encounter with Trump when she called Birnbach, apparently because it was a funny experience to her, because she "won", she got off the the "ledge" after she went "rock climbing".--(See the below "Slate" interview.) She was not outraged or in a state of outrage. Birnbach had to tell Carroll it was not funny, but that apparently was because Carroll had not told her the whole story, her flirtation with Trump, her consent, that she had made Trump think that Carroll was hot for him just as he was hot for her.

From the Anderson Cooper CNN interview on June 24, 2019, three days after this story went public.

[5]  Carroll gave a news interview to the "Slate"
as part of its "Trumpcast", on June 27, 2019.

To read this "Slate" interview, Google:  "I didn't see it as a crime.  I saw it as my mistake.
June 27, 2019  by Virginia Heffernan and Dahlia Lithwick."

This was published on the "Slate".  Slate is a daily magazine on the web and podcast network, owned by Graham Holdings Company.  Graham Holdings Company is a diversified American conglomerate holding company. Headquartered in Arlington County, Virginia, and incorporated in Delaware, it was formerly the owner of The Washington Post newspaper and Newsweek magazine.

"E. Jean Carroll: Listen, I will admit to you, I was flirting my brains out. I thought that choosing a handbag or getting a present for a young woman, which he asked me to advise him about, was, you know, I was thrilled. I thought how hilariously funny this whole thing was going to be. I had made jokes, accompanied him through the handbags, through the hats. I went up with him on the escalator when he suggested lingerie, and I thought it was getting juicier and more delicious, because it was such a great scene. So, yeah."

Virginia Heffernan: I think Jia Tolentino had a piece about the different reactions to sexual assault, that you're either too game or you're not game enough, and you were definitely in the game category and I identify that that was the sort of spirit of the age: that you were just

throwing off the shackles, you were just in it for the adventure, and that's true.  Carroll: The adventure, that's true."

And in response to the question if it was a crime, Carroll said:  "Carroll: I didn't see it as a crime. I saw it as my mistake."

"... with me, I was banged up against a wall and I quickly learned that it was not as funny, and I knew I was in a fight, yeah."

"Carroll: Yeah, then I stopped, because my idea of it was to make him put on a bodysuit, this scrawny little bodysuit, and that left my head, and then I was ... but even then, I didn't think it was a crime. I just thought, Get the hell out of here, E. Jean, you idiot. You know how you're ... you guys have both been at rock climbing, and you get caught out on a ledge and you think, How the hell did I get here?"  "You know? You just really screwed up and that was basically my feeling until the adrenaline poured through. My thing was to get out of it.  It wasn't to call it a word or anything like that. It was to get out of it."

Note about interviewers' comment made in Slate.

Carroll and Lithwick, the interviewers, said that women in rape cases do not need to fight back, and they say that Carroll can use the word "fight", not "rape", and that this is ok because other people should not judge the woman based on the words they use to describe the situation.

This may be true to a certain degree, but it would be dependent on the facts of the case.

This is because the issue is proving that a rape occurred.  There needs to be evidence that there was no consent and there needs to be evidence of outrage, that it was against the will of the victim.  Without this evidence rape cannot be proven.  The issue is a matter of evidence, not a 'law' that the woman must fight back or use certain words in describing what happened.  With no evidence of force and so evidence of resistance, with no evidence of outrage, with no evidence of

39

lack of consent, the case cannot be proven that Trump used force, a force needed in order for him to have coitus with her against her will and claimed lack of consent and against her outrage. That is, the issue here is a failure of proof. It is the responsibility of the plaintiff to show the elements of rape, it is not the function of the courts nor the prerogative of the jury to engage in speculation as to what might have happened in order to remedy a failure of proof. Cf. Hartford Ins. Co. v. County of Nassau, 46 NY 2d 1028, 1030, 416 N.Y.S.2d 539, 389 N.E.2d 1061 (NY 1979).

End of the article from the "Slate", June 27, 2019.


[6] Carroll gave an interview to "Vanity Fair" on June 28, 2019.


To read the article, Google: "e jean carroll vanity fair june 28, 2019 Keziah Weir". Do not use the quotation marks. The title of the article is: "How Has E. Jean Carroll's Life Been Since Accusing Donald Trump? "Fabulous. Buoyant."", by Keziah Weir. A copy accompanies this Petition.

Carroll's 21 stories "include three men who attempted to or succeeded in throwing her to the ground and molesting her, all before she turned 15." This is in addition to the boy who 'played' with her two times when she was about age 7-9.

In this Vanity Fair article, Carroll says that she consulted with her "partner" before deciding to write her book  She started to write in 2017--Par. 65 and 66 of the two Complaints, Carroll I & II. As a note, Carroll gave a deposition in which she swore that she has not been involved in any relationship since the Trump incident in 1995-96. So this partner needs to be discovered and clarified.

Carroll has a cat named "Vagina T. Fireball".

[7] "Vox" writes about this incident on July 10, 2019, by Constance Grady.

To read this article, Google: "what do we need men for review: e. jean carroll's book vox". A copy of just pages 1 & 3 of this article accompanies this Petition. Vox Media owns Vox, and owns the New York magazine, The Cut, and others. Vox is a news and opinion website. Vox is Latin for voice. This was not an interview, this article simply repeats what other interviews and Carroll's book said.

Carroll's book also lists herself on the list of hideous men: "She puts herself on the list for flashing a male college professor during a lecture."

[8] Carroll gave an interview to "The Guardian" on July 13, 2019.

To read the article, Google: "e jean carroll July 13, 2019 the guardian".--Do not use the quotation marks. The article was written by Ed Pilkington. Or Google: "I accused Donald Trump of sexual assault. Now I sleep with a loaded gun".

Carroll has a cat named Vagina T. Fireballs.

Carroll went to her former boyfriends' homes to write a book about them, so she moved in with the men and their wives! Quoting: "She further mined that theme with a book, The Loves Of My Life, in which she tracked down former boyfriends and moved in with them and their wives. "Oh God, I got on the wives' nerves," she recalls."

41

(This is a person with no boundaries, in this case disturbing marriages so as to write a book and make a little money off of this disturbance, because it is all an "adventure", a "game", because the flirtation is great, I'll always do that even though this 'rock climbing' may put me out on a ledge which has no way off, and so if I am able to get off I laugh because it is funny because I won. This Petitioners comment, but quoting Carroll.)

Quoting Carroll from the Guardian: "Has she resisted calling it rape because she has conflicting feelings about the alleged attack? "The flirtation is great, I'll always do that," she says. "But going in the room – that was where I screwed up." She blames herself for that? "Oh yeah. If I hadn't gone into the dressing room, it wouldn't have happened. You and I wouldn't be here having this conversation." I want to be sure of what she's saying to me. A woman can go into a dressing room with a man and then walk out at will, I say. "No. No. I don't think a woman will ever be able to walk into a small enclosure with a man like that. Ever, ever, ever. I don't care if they infused every man's brain with #MeToo, you won't be safe. It's like you won't be safe shooting up heroin, you won't be safe driving at 120 miles per hour with the lights out." But rape is the man's responsibility. "No. It's the responsibility of the woman, too. It's equal. Men can't control themselves."--unquote.

Note here that Carroll subconsciously is really saying the law, that she consented to engagement/coitus with Trump, leading Trump to believe she was consenting, and so because she continued to consent or make Trump think she was consenting, she recognizes that she screwed up when she went into the dressing room with Trump because she knew why they were going to the dressing room, to have coitus, she had made Trump think she wanted to do this. She consented. And, as she said after Trump 'forcibly' kissed her, Trump was thinking they both were "hot" for each other, and she said "What are we doing?"

Quoting from this Guardian article: "There's one line in the book that is stark and startling, and comes just after she describes kneeing Trump away from her and fleeing. She writes: "I've never had sex with anybody ever again." I read that sentence to her. Again, she demurs. "It's just a fact. I think it's because of my age, and that I haven't been lucky enough to meet somebody." But she wrote that line clearly implying that her celibacy was connected to Trump. She stops and thinks. "You make your own luck, it's true. I wasn't bold enough to say, yes, it was because of him." So will she say it now, in this wooded idyll where she is safe? "I think it's half-and-half. I haven't met the guy, but meeting the guy is about being open to it.""--unquote.

End of the facts of this case.

The facts show that Carroll consented.

Everything Carroll said happened shows consent, even Carroll's reaction to when the first woman she called, Lisa Birnbach, told Carroll it was rape and Carroll would not respond with rape, but she hesitated, saying "Eh", then she said that he pulled down her tights/pantyhose, which may infer rape but is not rape because in consensual situations a man oftentimes will unclothe the woman. And every rape involves a fight, but every fight does not involve a rape. In Carroll's case, her fight was to get out from her consent because she realized she had put herself out on a ledge from their "rock-climbing", and because it hurt, Carroll did not receive the sensual pleasure she was expecting.

Carroll described her fight in the dressing room as being "sexy" if it had been observed or been on camera.

Carroll said that she stomped her feet, trying to stomp on Trump's foot. Then she tried to push him away with her one hand. Trump was not pinning her arms or hands to the wall at that time as he was having coitus and so had his arms and hands elsewhere, around her waist or hips, or propping himself with his hands on the wall so that he does not fall into Carroll or to keep his balance, etc., so that he can have coitus comfortably. If Trump had been pinning her arms and hands against the wall she would not have been able to try to push him away with her one arm, (she was holding her purse in her other hand). Then Carroll was able to get one knee up high enough to push him off.

Carroll stomped her feet, trying to stomp on Trump's feet, and she then tried to push away with her one arm and hand, then she was able to bring her knee up and so then was able to get out from Trump and leave the room.

This is the struggle in the dressing room after Trump inserted himself into her, which she says would have looked "sexy".

Since only conduct can be judged, not Carroll's thoughts, the stomping of her feet, the movement of her hips, would or could be understood by Trump as Carroll trying to enhance her ability to derive sensual pleasure from the coitus or to speed up to the moment of her pleasure faster, more so because she never verbalized any resistance to his coitus to make Trump think otherwise. Remember, the struggle was "sexy" looking. And she had been laughing and intimately flirting and came into the room with him voluntarily. And after he roughly kissed her, she laughed, not protesting.

And then her pushing with her hand and then she finally kneed him and pushed away from him and so then easily broke away from the coitus, not claiming that Trump fought to keep it going, not claiming that she yelled for help, not claiming that she verbally told Trump she did

not want to do this, except that she had laughed.  In one of her depositions, if this writer recalls correctly, she did say that she said "What are we doing" or "What is going on" after Trump kissed her.  This statement is simply Carroll affirming with Trump that they were both on the same page.  It is not a statement of "no" or protest, etc.

Carroll's pushing with her hand and then getting her knee up and pushing him, Carroll not making any verbal statements or vocalizing anything, leads one to think that Carroll had 'finished', that she had gotten her 'jollies' and so she was done, that she was 'satisfied', and that she was not going to wait and let Trump get his 'jollies', get his satisfaction.  That is, she got done and she did not even stop to say "Slam bam, thank you Mister".  She just left right away.

That is, Trump may have thought that he got 'conned', got the short end of the deal.  Remember, it is not the prerogative of men to get satisfaction and then leave.  Women also do this.  Further, Trump's pushing her against the wall and she bumping her head, and Trump temporarily holding her hands or arms against the wall with his hand, and Trump temporarily using his shoulder against her simply means that Trump was in a hurry, that he was rough with her, rough sex, perhaps fulfilling a woman's 'fantasy ravishment' which some sometimes think about or sometimes even ask for or hint at that that is what they want their husband to do sometimes.  That is, this conduct of Trump does not mean that he used the requisite force so as to accomplish a rape, an irresistible force against the woman, a force which a woman cannot physically resist and overcome nor verbally resist and overcome.

The point is, Trump's pushing her against the wall and slamming her head against the wall, Carroll's stomping of the feet and the kneeing and pushing away does not mean that a rape occurred.  It takes more facts than this.  In fact, these facts show consent, and by operation of law must be presumed to show consent unless Carroll can present direct evidence otherwise.  (Even

if the preponderance of the evidence is the standard of proof, the facts which Carroll states show consent, not outrage nor lack of consent.)

Of course, as Carroll says, and she speaks the truth, although she flirted with Trump, flirting to the extent of an intimate flirting via the bodysuit, she should not have gone into the dressing room. She did not have a boundary and so she led Trump to think she was consenting and that she was even "hot" to do it.

Note that flirting is fun, because it tells one that they "still have it", are still attractive and desirable to others, it makes one feel good. But one must have a boundary, that one will not go too far with the flirting, etc. This boundary is dependent on whether one would be outraged if one had sex, this outrage could be due to one's moral standard or other reason which defines why a woman would have outrage. That is, having a boundary and outrage are 'interchangeable' terms, each is dependent on the other. Yes, Carroll is the better lawyer than the lawyers. She spoke the truth when she said she should not have gone into the dressing room because she knew she had let Trump think that she was willing, (but she is 'confused' because everybody is telling her it is rape). It is just that she does not know how to put it in legal terms, which is the job of an attorney, to translate their client's story into legal terms. Of course, the job of a judge is the same, to translate the facts before him, put it in legal terms and so declare what is the law of that case. In this case, the law is that no rape occurred, this based 100% on what Carroll has pled in her Complaints and, although it may not be needed to determine this case, also what Carroll said in her book, her New York Magazine and "The Cut" article, and in her other news interviews done in 2019. Just what she pled in her Complaints alone show that she did not plead all the requisite facts to show rape, an irresistible force by Trump, that she did not consent, that she had

outrage, that her and Trump's conduct in the dressing room is not clear and convincing evidence for all the elements for rape.

All of the facts pled in the two Complaints and facts which Carroll should have pled but did not (because they do not exist), plus what Carroll said in various news interviews done shortly after her accusation became public in 2019, and what she wrote in her book, state that Carroll consented to the conduct.  There is not one single fact which shows lack of consent and an outrage on her part, even the fact of her stomping her feet when the coitus started, and her finally kneeing him and pushing him away so as to stop the copulation.

Certainly, Carroll had her thoughts and explanations.  But this is not admissible evidence against Trump, only conduct is evidence.  Trump can be judged only by what he knew, not by her thoughts which he could not have known about.

As regards judging the case by the choice of words the woman uses, the lack of use of the word "rape" may be judged as that the woman did not have the requisite outrage to the invasion of her intimacy, of her virtue, etc., and that she knew she consented.  But she had to fight because she consented to the situation and so she had to fight to get out of that which she had consented to and that which she had made Trump think that she was hot for him.  And she also had to fight because something made her withdraw her consent, in this case Carroll said because it hurt after Trump penetrated her, it was not sexy, she got no sensual pleasure from the 'ravishment'.

Carroll used the word ravishment in the CNN Interview in the sense of a rape fantasy, a ravishment, a sexual fantasy.  Carroll uses ravishment in the sense of a fulfillment of a fantasy, a "take me", as is used in paperback love novels written for women, which some women like to read.  Sometimes one's wife (or other woman) will tell or infer to their husband to "take me".--

47

Women need their husband to do this sometimes because they need to know that their husband still thinks that she is desirable to him, etc., keeping in mind that it is the man's usual role to take the initiative, albeit men sometimes want their wife to take the initiative so that they know that their wife still wants them. What Carroll says does not show the elements of lack of consent and the element of outrage. Carroll said at the end of her "Slate" interview that this case was different because she "was a grown-up at the time", that is, that her many prior (violent) sexual experiences should have taught her a lesson about going too far with men, about flirting too far, as Carroll said, this was an "adventure", a game. Note that Carroll did not start trying to hit Trump's foot with her high heels, did not start stomping until after Trump penetrated her, and she felt pain, not sensual pleasure, apparently because of her age, she had 'dried up', her mind and spirit was willing, but her body was no longer functioning, or because her mind and spirit was not willing and so her body was not functioning, but she realized that "she had been rock-climbing with Trump and suddenly found herself out on a ledge", and so she realized she had 'teased' and 'encouraged' Trump to this point, made him think she was consenting, and so it was her fault she was out on this ledge, Trump did not force her to go rock-climbing. And so since she was a grown-up she should have been more careful instead of leading Trump along. Certainly Trump needed no leading, but the facts show that Trump made sure Carroll was consenting.

Every fact and conduct Carroll said, her entire story, shows consent and a lack of outrage.

And even if the incident occurred, which most people probably believe--it is normal human nature to believe this type of accusation and more so in this case where the only real 'proof' is that so many women have said they had either a consensual or non consensual sexually oriented

encounter with Trump, and Trump's own words, which is why this type of stale case is so dangerous, it is ripe for abuse.

As a reminder that Carroll's thoughts relating to lack of consent cannot be used and introduced against Trump:

Carroll made no verbal nor conduct communication, much less a clear indication to Trump of lack of consent. Trump can be judged only according to, quoting:

> ""circumstances under which ... the victim clearly expressed that he or she did not consent to engage in [the sexual] act, and a reasonable person in the actor's situation would have understood such person's words and acts as an expression of lack of consent to such act under all the circumstances" (... addresses "so-called date rape or acquaintance rape situations [where] there [might] be consent to various acts leading up to the sexual act, but at the time of the act, the victim clearly says no or otherwise expresses a lack of consent" *(People v Newton*, 8 NY3d 460, 463 [2007] ... Accordingly, the statutory provision requires the victim to have "clearly expresse[d] an unwillingness to engage in the sexual act in such a way that a neutral observer would have understood that the victim was not consenting" ..." <u>People v. Worden</u>, 22 NY 3d 982, 984-985, 3 N.E.3d 654, 980 N.Y.S.2d 317 (NY 2013).

### Post-penetration rape

Just to elaborate a little bit more: with regard to post-penetration rape, it must be observed that the common law says that a withdrawal of consent after the intercourse has started does not make the subsequent continued intercourse rape.

The reason for this is because the woman consented to her womanhood being 'invaded', that is, she was ok with or desired having the man 'know' her, so any subsequent withdrawal of consent after intercourse has started, could not be based on an outrage that her womanhood was invaded, but rather she withdrew her consent for a different reason. And so the common law says that a during-intercourse withdrawal of consent does not make any subsequent continued intercourse rape, albeit it might constitute another (lesser) offense of battery, etc.

But this lesser offense generally cannot be. Why? Because the woman consented to the intercourse which involves the touching of the body, a battery, she took on the risk that the man might want to continue until he is 'satisfied'. The difference between battery and sex is that the purpose of battery is to be mean to the victim, whereas the purpose of sex is to 'satisfy' the sexual urgings of the man, as well as of the woman, it is to get sensual pleasure for the man as well as to give sensual pleasure to the woman or that the woman does it to get sensual pleasure for herself regardless of the man's need, or vice versa.

This (lesser) battery offense may not be provable simply because when the woman initially consented to having the sex, she also assumed the risk that the man by that time would not quit or quit right away. Quoting:

> "The essence of the voluntary social companion defense is that the victim voluntarily induced the performance of the ultimate sexual act by (1) being voluntarily present as a social companion, and (2) permitting sexual contact, short of the sexual act, itself, to occur. The theory of the defense is that by permitting any sexual contact to occur in the context of a present voluntary social relationship, the victim has led the defendant to believe there is willing consent to the performance of the ultimate sexual act or has so aroused the defendant that the performance of the sexual act is a reasonably expectable consequence of the victim's conduct.". State v. Reed, 459 A.2d 178, 180-181 n.1 (Me. 1983).

Also, in a rape case, battery may not be allowed to be charged as a lesser included offense because the purpose for having the rape offense is different from the purpose for having the battery offense, they do not relate to the protection of the same interest. And so battery is not a lesser included offense of rape.

The reason for this is that the rape offense exists to protect women from forcible sexual intercourse--the essence of the crime of rape is the outrage and injury to the feelings of the woman by the forcible taking of her sexual 'privacy', love, intimacy, etc., while the purpose of the crime of battery is to protect a person from the unwanted, forceful touching of one's body and resulting offensive contact or physical injury or harm to one's body, such as a bruise, broken

nose, cut-off hand, or even just a touching of one's body, etc.  See <u>Ballard v. United States</u>, 430 A.2d 483, 485-486 (<u>Dist.Col.App</u>. 1981).  The essence of the crime of rape is not the fact of intercourse, (the touching, the battery) but the injury and outrage to the feelings of the woman by the forceful sexual penetration of her person. It is a crime radically different from assault and battery although the latter offence is incidental to it.  <u>Commonwealth v. Goldenberg</u>, 338 Mass. 377, 384, 155 NE 2d 187, 191-192 (Mass. 1959).

See a discussion of cases talking about this point in the recent 2007 case of <u>Baby v. State</u>, 172 Md.App. 588, 617, 916 A. 2d 410, 427 (Md. 2007) (This 2007 case upheld the common law rule that during intercourse, if the woman withdraws her consent for whatever reason, that such continued coitus is not rape.).

It must be noted that when one reads the cases which say that a continued coitus is rape do not address the fact that the essence of rape is the outrage to the person and feelings of the woman, but discuss other issues not on point with what distinguishes rape from battery, for having the rape offense as opposed to simply charging a battery.

Note that this "Baby", id., case, page 428-429, did discuss the California case of <u>People v. Vela</u>, 172 Cal.App.3d 237, 218 Cal.Rptr. 161 (1985), that cases have belittled and downplayed the "Vela" statement that "the outrage experienced by a female who has withdrawn her consent is not of the same magnitude as that resulting from the initial non-consensual violation of [the victim's] womanhood.", and so there is no rape.  This belittling is based on the non-recognition that "not of the same magnitude" meant that the reason for rescinding the consent was different from that of being outraged by the man 'knowing' her, and second, that if there was no sense of privacy/outrage at the initial intercourse, how can there be a sense of privacy/outrage later, and by consenting to intercourse and having it, the woman who later wants to stop assumed the risk

51

the man might want to finish it or continue it and so the man might try to hang on to her so that she cannot withdraw, that is, the woman consented to the continued intercourse because she assumed this risk.  Remember the purpose of sex is to satisfy the person, and so the man might want to continue it to get this satisfaction.

The point of when is it a battery being committed following consensual penetration is if the man stays in the woman after the woman has made it clear that she is in pain, she is hurting.  But if no pain then no battery, even though she wants 'out' for another reason and so his continued touching of her is not wanted, because she consented to the pleasurable aspect of sex and consented that the man might want to continue to get his pleasure.

Battery means an injury, an infliction of pain.  Battery also means an unwanted touching.  But with consensual sex the woman has already consented to any continued sex and so cannot complain about the touching because she assumed the risk there might be continued touching, continued sex.

The presumption of innocence applies to a civil case
where the tort charged is also a crime or act of moral turpitude.

The presumption of innocence rule applies to a civil case as well as to a criminal case when the civil case charges what otherwise is a criminal act or act of moral turpitude.

What is the standard for the burden of proof for a civil accusation of rape.

It is not the preponderance of the evidence standard.  It is the clear and convincing evidence which is the level of proof standard required by law for a civil rape action and a libel based on rape.  It is because the presumption of innocence rule applies to a civil action of what otherwise

would be criminal conduct or acts of moral turpitude which raises the burden of proof up to the clear and convincing evidence standard.

Anything less than direct evidence of sex forced on Carroll over her resistance and over her outrage must be presumed to be innocent conduct because of the rule of presumption of innocence. This means that the Plaintiff must produce direct evidence to show that Trump's conduct was rape. Why is this?

Equivocal evidence, circumstantial evidence, evidence which fits within the preponderance of evidence standard, which is evidence that a particular fact or event was more likely than not to have occurred, is all evidence which only raises a presumption of fact that the act or event occurred. That is, this type of evidence raises only a presumption of fact.

A presumption of fact is a fact which could exist or could have occurred, not what exists and did occur. Trump will be found liable based only on that he could have raped her, not that he did rape her!

But the rule is that the presumption of innocence cannot be rebutted by a presumption of fact, does not allow the presumption of any fact against it. "[The] presumption of innocence does not allow the presumption of any fact against it." <u>Persons v. State</u>, 90 Tenn. (60 Pickle) 291, 295, 16 S. W. 726, 727 (1891).

A fact is something which is, which exists, which has occurred.

A presumed fact or a presumption of a fact is not a fact, it does not exist, it did not occur, it is just that the presumed fact is something that might have or could have occurred, could exist, could be.

And so a fact, something which did occur, does exist, cannot be rebutted or overcome or disproved by something which does not exist, which did not occur, but which could exist or

could have occurred.  And so only direct evidence can be used to prove liability/guilt when the

presumption of innocence applies.

First, it is interesting to note that the presumption of innocence rule had its genesis in civil

cases, not criminal cases.  Quoting:

> "The common law presumption of innocence emerged independently of the rule
> requiring proof beyond a reasonable doubt. The presumption first appears in private
> disputes, e.g., Williams v. East India Co., 3 East 192, 102 Eng. Rep. 571 K.B. (1802); R.
> v. Hawkins, 10 East 211, 103 Eng. Rep. 755 (1808), as a rationale for requiring the
> plaintiff to prove a negative proposition, e.g., as in Williams, that the defendant failed to
> warn plaintiff that he was transporting a combustible item on plaintiff's ship. The rule that
> the prosecutor had to prove his case beyond a reasonable doubt developed independently.
> See L. MACNALLY, THE RULEs OF EVIDENCE ON PLEAS OF THE CROWN 398
> (1811). In the 1850's, American judges began to equate the presumption with the rule on
> the prosecutor's burden of persuasion. Patterson v. State, 21 Ala. 571 (1852), State v.
> Tibbetts, 35 Maine 81 (1852). English and American commentators recognized the link
> in the decades following. 1 S. GREENLEAF, A TREATISE ON THE LAW OF
> EVIDENCE § 29 (2d ed. 1814) (the first edition, published in 1842, discussed the
> presumption of innocence (at 39) without relating it to the degree of proof required in
> criminal cases). J. STEPHEN, A DIGEST OF THE LAW OF EVIDENCE, art. 94
> (1876), 1 P. TAYLOR, TREATISE ON THE LAW OF EVIDENCE 133
> (1887)." Quoting from footnote 2:  George P. Fletcher, "Two Kinds of Legal Rules: A
> Comparative Study of Burden-of-Persuasion Practices in Criminal Cases", 77 YALE L. J.
> 880, 880 note 2 (1968).
> "When misconduct or crime is alleged, whether in a criminal or civil suit, whether in a
> direct proceeding to punish an offender or in some collateral matter, the accused is
> presumed to be innocent until proven guilty." Freeman v. Blount, 172 Ala. 655, 662, 55
> So. 293 (1911).  "The presumption of innocence and of freedom from purposes and
> conduct immoral applies in civil as well as in criminal cases, ... That the presumption is
> evidentially effective in civil cases, where criminal conduct is imputed, is sustained by
> many decisions ..."  Freeman v. Blount, Id., page 663.

The evidence must be "clear and convincing" to overcome the presumption that Trump's

conduct is innocent conduct.  A preponderance of the evidence standard is insufficient.

> "Where the presumption of innocence is a factor in a civil proceeding, the evidence
> necessary, in degree, to repel the presumption,' must be "clear" — must be
> "satisfactory.""  Freeman v. Blount, Id., page 663.  A deed "will not be impeached for
> forgery or falsity ... unless the evidence to that end is clear and convincing, "reaching a
> high degree of certainty, leaving upon the mind no fair, just doubts.""  Freeman v.
> Blount, Id., page 664.

In the State of New York, the New York rules of evidence recognize that a "clear and convincing" standard is needed to overcome the presumption of innocence of what would otherwise be criminal conduct.  Quoting:

> "In some instances, the law sets forth the "higher" standard of persuasion: "clear and convincing" evidence (Prince, supra § 3-104). "The clear and convincing evidence standard is satisfied when the party bearing the burden of proof has established that it is highly probable that what he or she has claimed is actually what happened" (*Home Ins. Co. of Ind. v Karantonis*, 156 AD2d 844, 845 [3d Dept 1989]; see *Green v William Penn Life Ins. Co. of N.Y.*, 12 NY3d 342, 347 [2009] [presumption against suicide requires evidence that shows suicide to be "highly probable"]; *Murtagh v Murtagh*, 217 AD2d 538, 539 [2d Dept 1995]."--Unquote.  Quoting from page 8 of the Notes to New York's Rule 3.01 Rule of Evidence for presumptions in civil proceedings, Subdivision (3), the last page, page 8, and last paragraph of the Note.

The case of Mutual Life Ins. Co. v. Maddox, cited below, was a civil case wherein the Life Ins. Co. argued that the presumption of innocence (of having committed suicide) was to be treated as other presumptions of law have been treated, that is, of being merely one of shifting the burden of proof from one party to the other party.  Quoting this "Maddox" case where this was claimed but was repudiated:

> "The proof tending to show suicide was entirely circumstantial. The court charged the jury that there was a presumption against suicide. It refused a special written charge to the effect that "such presumption is not evidence and cannot be treated as evidence by the jury in reaching a verdict." It is urged by appellant that this court give careful consideration to this question and follow in line with the weight of modern authority to the effect that the particular presumption referred to, that of innocence of crime, is of the same nature as other presumptions, which this court has denominated administrative and not evidentiary in nature and spend their force when evidence is offered; that the office of such presumption is to shift the burden of going forward with the evidence. This court has adopted that theory of the effect of certain presumptions not relating to crime nor other acts of moral turpitude." Unquote, Mutual Life Ins. Co. v. Maddox, 221 Ala. 292, 293 (Ala. 1930).

Trump has the presumption of innocence in these civil actions for rape and defamation based on rape which presumption is a fact which exists at and during his civil trial.  That the presumption of innocence is a fact is because a presumption of law 'creates' or is a

fact.  See <u>Gordon v. State</u>, 110 So. 2d 329, 332 (Ala. 1958) ("The presumption of innocence, in

the case of <u>Chaney v. State</u>, 178 Ala. 44, 59 So. 604, 605, calls the presumption "a fact in the

case * * * not [to] be disregarded.".").

>"This legal presumption of innocence is to be regarded by the jury, in every case, as
>matter of evidence, to the benefit of which the party is entitled."" <u>Coffin v. United States</u>,
>156 US 432, 459 (1895).
>"The fact that the presumption of innocence is recognized as a presumption of law and
>is characterized by the civilians as a *presumptio juris*, demonstrates that it is evidence in
>favor of the accused. For in all systems of law legal presumptions are treated as evidence
>giving rise to resulting proof to the full extent of their legal efficacy.  Concluding, then,
>that the presumption of innocence is evidence in favor of the accused introduced by the
>law in his behalf, ...  the presumption of innocence is one of the instruments of proof,
>going to bring about the proof, ..." <u>Coffin v. United States</u>, 156 US 432, 460(1895).

Since the Complaint(s) in these Trump civil cases plead that Trump committed criminal

conduct or conduct of a moral turpitude, the rule of presumption of innocence creates a fact or is

a fact which a court cannot ignore.

>"... it is clear that the failure to instruct them in regard to it, [*the presumption of
>innocence*], excluded from their minds a portion of the proof created by law, and which
>they were bound to consider. "The proofs and the proofs only" confined them to those
>matters which were admitted to their consideration by the court, and among these
>elements of proof the court expressly refused to include the presumption of innocence, to
>which the accused was entitled, and the benefit whereof both the court and the jury were
>bound to extend him. <u>Coffin v. United States</u>, id., page 461.  (Comment in italics and
>brackets added by this writer.)

It is error for a trial court to not consider the fact that Trump is presumed by operation of law

that he is innocent, that his conduct is presumed to be innocent conduct unless there is direct

evidence to show otherwise.

The presumption of innocence rule in a civil case is not a presumption which merely shifts the

burden of persuasion to the defendant.  <u>Gordon v. State</u>, 110 So. 2d 329, (Ala. 1958), which held,

quoting from page 333:

>"We think that the decisions of this court firmly fix the rule as stated by Greenleaf and
>in the Coffin Case as the law of this state.  We cannot therefore apply to the presumption

of innocence, either in a criminal or civil case, the mere administrative features of those presumptions intended only to shift the burden of proceeding with the evidence. We think this presumption of innocence is a substantive right and not merely a technical incident of the trial wrought for administrative purposes, and that it should at no time be treated as having spent its force until the evidence is sufficient in the judgment of the jury to overcome it. [221 Ala. 292, 128 So. 385]."--citing the civil case of Mutual Life Ins. Co. of New York v. Maddox, 221 Ala. 292, 128 So. 383, 385 (1930). Gordon v. State, id., page 333.

The clear and convincing standard of proof is required in New York for a civil case for sex related offenses. See the civil case of People v. Mingo, 12 N.Y.3d 563, 571, 883 N.Y.S.2d 154, 910 NE 2d 983 (NY 2009) (Correction Law § 168-n (3) directs that "[t]he State shall appear by the district attorney. . . who shall bear the burden of proving the facts supporting the determinations sought by clear and convincing evidence. Required by statute/rule.).--The fact that this is required by statute means nothing negative because the statute codifies the common law.

Where a crime is charged in the civil case, the higher standard of proof is required in New York. See Woodbeck v. Keller, 6 Cow. 118, 119-120 (N.Y. 1826) (One "must give evidence of the same strength as would be necessary to convict of perjury on a criminal prosecution."); same Clark v. Dibble, 16 Wend. 601, 603 (N.Y. 1837).

> "The presumption of the innocence of a defendant prevails in a civil action where a judgment against him will establish his guilt of a crime. *Wilcox v. Wilcox*, 46 Hun, 32-40; *Ferry Co. v. Moore* (N. Y. App.) 6 N. E. 293." Grant v. Riley, 15 App. Div. 190, 44 N.Y.S. 238, 239 (N.Y. 1897).
> "In such action, the jury must, on a plea of the truth of the libel, consider the plaintiff as innocent of the crime until his guilt is established by evidence sufficient to produce an abiding conviction of his guilt]." BAKER v. KANSAS CITY TIMES CO., 2 F. 465, 467, Fed. Cas. Number 773, (Cir.Ct. W. D. Mo. 1879).

But there is error in some New York cases wherein the party asked for the presumption of innocence rule to apply, but (contradictorily) also said that the standard of proof should simply be preponderance of the evidence, and so error entered in New York case law. And so it was

said that: "We long ago held that the presumption of innocence is not indulged in a civil action because of the lesser burden of proof *(Kurz v Doerr*, 180 N.Y. 88, 91-92)." <u>Reed v. State of New York</u>, 78 NY 2d 1, 9, 571 N.Y.S.2d 195, 574 N.E.2d 433 (NY 1991).

The error here is that there can be no presumption of innocence where the burden of proof is simply preponderance of the evidence, because this standard of proof is itself little more than a presumption of fact or requires only a presumption of fact to render a judgement. Whereas the presumption of innocence is a presumption of law, which creates a fact of innocence. The presumption of innocence, this fact, cannot be rebutted with a presumption of a fact. The error in New York law was that the court in "*Kurz v. Doerr*", id., took advantage of the party's error wherein he asked that the presumption of innocence be applied in his case, but then contradictorily said that the burden of proof could be preponderance of the evidence, which burden would then allow only a presumption of fact to rebut the fact of innocence, rendering the presumption of innocence into meaninglessness.

And so this fact of innocence stands unless and until the plaintiff brings forth direct evidence to prove the crime/tort. And so for civil purposes, the burden of proof is clear and convincing evidence.

The presumption of innocence is a rebuttable presumption of law, *presumption juris et de jure*, where the law so strongly supports the presumption that it is held to be certain in judicial proceedings, against such a presumption no proofs are admitted except the evident truth, that is, direct evidence, not equivocal evidence.

One will see other cases which say that the presumption of innocence as probative evidence is not applicable in civil cases. See, for example, <u>Lilienthal's Tobacco v. United States</u>, 97 U.S. 237, 267 (1877), which case makes this point, but in the context of a civil action based on

negligence, which is not of a criminal or moral turpitude nature.  That is, this type of case is not authority to say the presumption of innocence does not apply in a civil case.

The presumption of innocence traces its lineage to long ago.  In Roman times the reason for the presumption of innocence is illustrated by a case wherein, quoting:

> "Ammianus Marcellinus relates an anecdote of the Emperor Julian which illustrates the enforcement of this principle in the Roman law.  Numerius, the Governor of Narbonensis, was on trial before the emperor, and, contrary to the usage in criminal cases, the trial was public. Numerius contented himself with denying his guilt, and there was not sufficient proof against him. His adversary, Delphidius, "a passionate man," seeing that the failure of the accusation was inevitable, could not restrain himself, and exclaimed, "Oh, illustrious Caesar, if it is sufficient to deny, what hereafter will become of the guilty?" to which Julian replied, "If it suffices to accuse, what will become of the innocent?".  <u>Coffin v. United States</u>, 156 U.S. 432, 455 (1895).

This is the same situation in these Carroll v. Trump rape/defamation accusations.  Carroll will protest that if her mere accusation, her story is not enough, what will become of this evil man, Trump.  All Carroll has is her word, her accusation, her veracity supported by two people in whom she confided, nothing more, no facts, no evidence that the two even met, much less that he raped her.  She may have had the evidence at one time, but her decision to not pursue the rape at that time destroyed or lost that evidence.

However, Carroll's entire story says that she consented to having coitus, assuming she and Trump did have the sexual encounter, did fornicate, did commit adultery.

Carroll does have the two people to whom she told the story right after, but their testimony only goes to Carroll's veracity that her and Trump did have an encounter, but their testimony will also say that Carroll thought it was a funny experience, only a fight, not a rape.  Note that Carroll says that laughing is her way of handling stress, but this is not evidence because all Birnbach saw was her conduct of laughing, that Carroll's laugh was how one laughs at something that is funny.  Carroll's laughing in such a way that Birnbach thought that Carroll was laughing because

the episode was funny, is consistent with that Carroll thought it was funny because she got out of it after having consented to it all, because it was her "mistake", not a crime--as she said. It was funny because it was all an "adventure", she was "game". She was laughing because she was "rock climbing and found herself out on a ledge, but she was able to get off the ledge right away".

So in hindsight her adventure was funny because it ended with no trauma, no harm to herself after she went rock climbing with Trump and found herself out on a ledge with no apparent way off it. The fact that Carroll told her two friends, and that Birnbach thought she laughed because what happened was funny, and not was traumatic, and the fact that Carroll, even though encouraged to describe what happened as rape, did not call it rape but rather said he pulled down her pantyhose and called it a fight is consistent with Carroll's saying that the experience was like going rock-climbing and suddenly finding oneself on a ledge with no way off it, and so it is funny because she "won" the "game", she did get off the ledge with no harm to herself, no trauma.

These defamation claims are a shame on this Court,
on the Bar Association,
on both parties' Attorneys,
on the Public, and on this Addresser and Remonstrancer.

Carroll accuses Trump of raping her.
She shoots at Trump, trying to murder his good name.
Trump defends and denies it.
He shoots back at Carroll in self-defense of his good name.
Carroll was trying to murder him, she consented to being shot back at.

Yet the 2019 and 2022 defamation actions have survived up to now and during trial because nobody says she consented to being shot back at with a scatter gun, with a medley of statements

to emphasize that Trump denies it!  That these defamation claims have survived this obviousness is a shame on all.

What does Carroll think, that she can accuse Trump of being a rapist, and then profit from it, make money from it, by writing a book and promoting more sales of the book by getting a magazine and its online promotional website to publish the accusation, and not provoke Trump to defend against it and deny it by saying she made up the story so as to make some money, so as to sell more copies of her book, by calling it a fiction, or that she was paid to do it, was a hired assassin for political purposes.  Even if Trump's denial is untrue, that is, he did rape her, what did you think, Carroll, that he is going to admit it!

Suppose Trump, at a party, whispered an indecent proposal in Carroll's ear.  So to defend her honor, she turns around and slaps Trump.  Would she say that Trump would then have the right to sue her for battery, for her slapping him.  Of course not, because Trump invited, consented to being slapped.  Trump took the risk that she might defend her virtue, her honor and her wholesome good name, and so slap him.  Trump took the gamble that she either would accept his lewd proposition to fornicate or commit adultery if either was married, or that she might merely giggle at it, or that she might defend herself against his treating her as being nothing more than a whore and so slap him to let him know that she is not a whore, not that kind of woman.

Really, come-on.

Really, Judge, why have these defamation cases been able to survive this long, since 2019 (for the first case)!  Really, New York State Judge!

Really, prosecution attorney(s), what were you thinking, taking on this case!

Really, all, the many of you, defense attorneys thinking of, not raising this simple point of fact/law!

But yes, you did raise consent in your summary judgment motion.  See Dkt. 109, Carroll

I.  But you (erroneously) raised it in the context that Carroll intentionally wrote her book and

intentionally used the New York Magazine and its The Cut so as to intentionally provoke, solicit

or elicit Trump to speak against the rape accusation (so that she could sue Trump for

defamation).  In your deposition of Carroll, you asked her if she intentionally solicited Trump's

reaction, of course, she denied that she intentionally solicited his reaction.  Certainly, perhaps

you do have a strong argument that Carroll intentionally elicited Trump's reaction, a jury might

go for it.  You have a strong argument because Carroll herself says that she knew Trump was

going to react in this way, because of how he has reacted to the other women.  However, this

Court has not yet ruled on your motion for summary judgment, and instead 'adjourned' this issue

in Carroll I.  You have not raised consent to the defamation in Carroll II.  But also the judge

should have ruled on your summary judgment motion, not 'adjourned' it, because your issues in it

would carry over to Carroll II.  But note also that the jury also probably will say that Carroll did

not intend to solicit a reaction from Trump so as to sue Trump for defamation.  Common sense

tells one that.  She just wanted to promote her book, to sell more books, make more money.  In

fact, it appears an attorney had to talk Carroll into suing.

Did Carroll intentionally solicit or elicit Trump's reaction.  It is highly probable the jury will

say no.  The facts say no.  "Intentionally elicit" is a not needed factor to claim consent because

the law recognizes that consent usually will be a constructive consent.

To illustrate:  When a robber robs a bank and gets shot, he cannot claim attempted murder

and thereby sue for such (or if he dies his wife sues).  This is because he consented to being shot,

he assumed the risk he might get shot.  Now, certainly, he did not intend to get shot, he did not

intentionally elicit someone to shoot him, he did not ask someone to shoot him, in fact, he did

not want to be shot, but his conduct of robbing means that he assumed the risk of being shot, he consented to being shot. He gave a constructive consent. His actions/conduct speak louder than his intent and desire to not get shot. And so the robber cannot sue the one who shot him because he consented to being shot. (Of course, the one who shot the bank robber also has the defense of self-defense of others, of the bank. But note, self-defense and consent are one and the same thing, albeit consent is a broader term, covers more 'area', more legal issues besides self-defene.)

It is error to say that Carroll intended to solicit or elicit Trump's reaction (so that she could sue him for slander/libel) in order to show consent on her part. The case, "Sleepy's", which Trump's attorneys cited for intentional elicitation of words or reaction from one so as to sue them, is a highly unusual situation, not an ordinary situation.

Really, Bar Association. Many attorneys and law professors have publicly spoken up in favor of the law suits, but this writer has not seen one news article where an attorney spoke up and said that Carroll consented to Trump's reaction when she slandered/libeled him, and therefore she can not sue for the defamation because she consented to it. It seems like all of 'Bardom', all of 'LegalEagledom' is explicitly out to get Trump, or at least remain silent and so let him fall to injustice. Nobody is going to put their finger in the dam so as to save the rule of law, so as to save justice for all, even for the obnoxious and crude.

Really, Public, including this Petitioner, what were you thinking of for not speaking up about this case or speaking up sooner. Would we want to be treated this way by our attorneys and by our judges and courts. Somebody slanders you, calls you a rapist, and so you bite back. Then they get to sue you simply because you defended and denied! Let's say you did in fact rape her, yes, she can sue you for rape, but not for defamation because you denied it. (Of course, in this Carroll case, she cannot sue for the rape because her claim is stale.)

Really, all you, about 1,327,910 million lawyers out there, why have not one of you spoken up about this travesty of justice, this perverted law, this rape on the law. Aren't you the people who are supposed to know the law? And where are all the about 30,000 state and about 1,770 federal judges who are supposed to judge and know right versus wrong, know the law. Where are all the first-year law school students who go to law school because they have the high and honorable motive to seek justice for people, why have none of them spoken up about this very public case and its obvious issue of consent, something one does not even need to go to Law School class 101 to learn because we all know this by instinct and common sense.

Carroll's Complaints for defamation are a shame and an embarrassment on this Court, on the Bar Association, and on the Public. They actually are an indictment of the state of our legal system, our Courts, and of us, the Public.

This Petitioner was shocked when he read the case of "Clinton v. Jones", 520 U.S. 681, 685-686 (1997) as part of his research for this Address and Remonstrance, wherein he learned that Paula Jones, as one of her causes of action, sued Bill Clinton (and Danny Ferguson, a State Highway patrolman), for defamation for defending against her allegation of sexual harassment. How long has this suing one for exercising their right to defend been going on?

And shame on this Petitioner, this Addresser and Remonstrancer, as soon as he read the first newspaper stories about Carroll suing Trump for defamation because she slandered/libeled him, he knew that she could not sue because she consented to him shooting back at her slander, and because one has a right to shoot back, an inalienable right to self-defense, to defend and deny. He should have written about this right away. But he waited until it became painfully and shamefully clear that nobody else was going to do it. So this lowly citizen has to stand up for right, for the rule of law, play Hans Brinker and put his finger in the hole in the dam against

perverted law, stop the rape of the law (and so the rape of Trump).  Shame on this writer.  Shame on all.  Shame on this Nation.  At church on Sunday, April 23, 2023, this Petitioner was reminded of James 4:17, which says that:  "Therefore to him that knoweth to do good, and doeth it not, to him it is sin."  This is a sin on all the lawyers, on all the judges, on all the People, on this Nation, on all who know but are keeping silent.  What about Congress, many want to enact a statute which puts the President above the rule of law, shame on them for thinking that way.  They put politics, party, above the rule of law.  Why aren't all the lawyers in Congress instead advocating for the rule of law, for justice, so that Presidents and former Presidents don't have to be subjected to suits such as this shamefully obviously illegal case.  Why haven't any spoken up about this obvious illegality.

Trump's conduct, by operation of law, did not and could not
inflict detriment, damage upon Carroll for three reasons.

[1]  Carroll's cause of action
is based upon her 'right' to slander/libel Trump.

In order for Carroll to state a claim upon which relief can be granted, to state a cause of action for slander or libel, she must show that a right of hers was injured, suffered harm, loss or detriment, and that her detriment was caused by Trump.

Quoting:  "The term "right of action" or "cause of action" has been defined by this court as the act on the part of the defendant which gives the plaintiff his "cause of complaint."  ...  That

is, (1) there must be legal right in plaintiff, (2) a corresponding duty on the part of defendant and (3) an attendant breach of that duty with (4) resultant harm to plaintiff." Giltner v. Stark, 252 N.W.2d 743, 745 (Iowa 1977).

"No one, legally speaking, is injured or damnified unless some right is infringed." Auburn & Cato Plank Road Co. v. Douglass, 9 N.Y. 444, 447 (N.Y. 1854).

Does Carroll have a right to accuse Trump of raping her. No. Not under any circumstance does one have a right to accuse another. Making an accusation is always a slander/libel.

Every person has the right to be free from defamation, has the right to protection from defamation. No one has the right to defame another.

She has the right to sue for the rape, or to go to the police and tell them about it, or to make "hue and cry" at the time of the rape, but her accusation is still a slander/libel. Making an accusation is never a right under any circumstance, albeit if done under proper circumstances, it may be a qualifiedly privileged or absolutely privileged statement and so she could not be held liable as a tortfeasor. Any accusation, even if made to the police, or made during "hue and cry", etc., even if privileged, is still a slander/libel. It is just that the privilege may give one protection from liability for making the accusation. But making the accusation itself is always a slander/libel.

Her complaint claims a right to a book and a right to her career and to her good name and damage to such.

Even though Carroll has a right to her to her book, she has no right to abuse this right so as to libel another. She also alleges that her career and personage or character or integrity or good name was damaged by Trump, but her right to a career and her personage and good name does not include a right to defame another.

As a matter of law, Carroll's claim that she was damaged must fail because she has pleaded no right which could be damaged.

Her complaint fails to state a cause of action.

This Court is without jurisdiction to render a judgment of guilt/liability against Trump, or it is without jurisdiction to proceed forward towards judgment, to proceed further with this case because she has no cause of action which would entitle her to a judgment in her favor.

[2]  He who stands on his own right<br>to defend against and to deny, injures no one.

Trump's words are defenses and denials to Carroll's accusation of rape.  As such, his words spoken in the exercise of his right of self-defense inflicted no legal harm or loss upon Carroll or her career, etc.

People have the inalienable, natural right, in fact duty to themselves, to defend against and deny an accusation.  One has the natural, inalienable right to self-defense, to protect one's good name (even to protect a 'bad' name).

As a matter of law, Trump's defenses and denials inflicted no legal harm on Carroll.  This is true even if Trump is lying, was malicious, etc.  It is even if his lies inflicted actual harm on Carroll.

*"Neminem laedit qui jure suo utitur."*--"He who stands on his own rights injures no one."  Bouvier's and Black's.

*"Nullus videtur dolo facere qui suo jure utitur."*--"No man is to be esteemed a wrong-doer who avails himself of his legal right."  Bouvier's.  "No one is considered to act with guile who uses his own right."  Black's.  <u>American Ins. Co. v. Griswold</u>, 14 Wend., 399, 492 (N.Y. 1898)

("In doing so he has only exercised a right which he had. *Nullus videtur dolo jacere, qui jure suo utitur*.").

> Quoting: "Where there is a legal right to do a certain act, the motive which induces the exercise of the right is of no importance. ..... *Nullus videtur dolo facere, qui suo jure utitur*. The act complained of having been fully stated, and being one which the law permitted, whatever advantage it gave the plaintiffs could be neither unjust nor unfair, and these epithets are therefore of no effect." <u>Fisher, Brown & Co. v. Fielding</u>, 67 Conn. 91 (1895).
> Quoting: "The cases are rather numerous which hold that if an act be lawful, no one can claim to be damaged by it because either bad faith or even malicious purpose and intent inspired it. The motive with which a lawful act is done, is immaterial. *Nullus videtur dolo facere qui suo jure utitur*. ... means: "No one is considered to act with guile who uses his own right." Black's Law Dictionary 1068 (6th ed. 1990)."--unquote. <u>Venture Holdings Ltd. v. Carr</u>, 673 A. 2d 686, 691 note 10 (D.C. 1996).
> Quoting: "The cases are rather numerous which hold that if an act be lawful, no one can claim to be damaged by it because either bad faith or even malicious purpose and intent inspired it. The motive with which a lawful act is done, is immaterial. *Nullus videtur dola facere qui suo jure utitur*." <u>Gans v. Delaware Terminal Corp.</u>, 23 Del. Ch. 69, 75, 2 A.2d 154, 156 (Del.1938).
> *"Actus legis nemini facit injuriam."* "The act of the law does no one an injury." Bouvier's. "The act of the law does injury to no one." Black's. "[I]t is well settled that no one can complain of the lawful doing of that which the person doing it or causing it to be done has a legal right to do." <u>Seaton v. Western Auto Supply Co.</u>, 609 S.W.2d 207, 210-211 (Mo. 1980).

*"Qui jure suo utitur, nemini facit injuriam."*--"He who uses his legal rights harms no one." Bouvier's and Black's. <u>Carson v. Western R. Co.</u>, 8 Gray 423, 424, 74 Mass. 423, 424 (Mass. 1857) (*"Qui jure suo utitur neminem lædit."*--"He who exercises his legal rights harms no one.").

Any injury to Carrol is a *"damnum absque injuria".*--"Loss without injury."


      [3]  Carroll consented to Trump 'shooting' at her after she shot at him.


This brings us to the third point of law as to why Carroll could not be injured by Trumps words, why consent to the defendant's conduct, to being injured is a bar to bringing the action.

Carroll accused Trump of sexual battery, of rape.  Carroll slandered Trump, (and others).  Trump reacted and denied this accusation and slander/libel, and, using Carroll's claim, slandered Carroll back.  Carroll tried to kill Trump's good name.  Trump shot back.

Carroll's conduct, her accusation, instigated or provoked Trump into doing this.  That is, Carroll consented to being denied, to being slandered back by Trump, to being shot back by Trump.

That which one consents to is not an injury in law, is not a *de jure* injury, albeit it may be an injury in fact, a *de facto* injury.

*"Volenti non fit injuria."*--"He who consents cannot receive an injury."  Bouvier's and Black's.  <u>Poole v. Lutz and Schmidt</u>, 273 Ky. 586, 589, 117 S.W.2d 575, 576 (Ky. 1938).

*"Nulla iniuria est, quæ in volentem fiat"*--"There is no wrong done to the willing."

This common law defense of *volenti non fit injuria* is applied as "to one who is willing, no harm is done". This doctrine provides a defense where the injuries to the plaintiff result from an activity that the plaintiff willingly entered into, notwithstanding the risks involved in doing so. *Volenti non fit injuria* is Latin for "to a willing person, it is not a wrong." This legal maxim holds that a person who knowingly and voluntarily risks danger cannot recover for any resulting injury. This principle was the common-law basis for the assumption of the risk doctrine.

*"Volenti non fit injuria.* One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball."  <u>Scala v. City of New York</u>, 200 Misc. 475, 478 (N.Y. 1951).  Even a forgetfulness of the fact that Trump might bark back is a risk assumed by Carroll.  <u>Scala</u>, id., page 481.  People full well know that if you say something mean about another, that that other person might retort in likewise manner.

"Consent is a bar to a recovery for defamation under the general principle of *volenti non fit injuria* or, as it is sometimes put, the plaintiff's consent to the publication of the defamation confers an absolute immunity or an absolute privilege upon the defendant." <u>Teichner v. Bellan</u>, 7 AD 2d 247, 251, 181 N.Y.S.2d 842 (N.Y. 1959).

"The doctrine of assumption of risk lies in the maxim *volenti non fit injuria*. Based as it is upon the plaintiff's assent to endure a situation created by the negligence of the defendant, it relieves the defendant from performing a duty which might otherwise be owing to the plaintiff. Where the plaintiff has assumed the risk of harm through the acts or omissions of the defendant, it matters not that the plaintiff was free from contributory negligence. In such case no breach of duty by the defendant is shown and consequently no negligence". <u>Franco v. Zingarelli</u>, 72 AD 2d 211, 219, 424 N.Y.S.2d 185 (N.Y. 1980).

Carroll bears the burden to prove causation of her damages.

The question is, did Trump cause her loss, her reduction in readership and letters to her, or was it her own writings and story. And did Trump cause her to lose interest or be unable to be 'romantic' with men, and to be shunned or avoided by her friends.

Carroll released her story at the same time that Trump (claimedly) defamed her.

Just because Trump defended does not mean that his conduct caused the loss or harm. She may have caused her own loss of readership and letter-writers, etc.

The public, her readers, friends, etc., may judge her and look at her and say because of what she wrote, and so judge her and not like what they see for one reason or another, and so do not want her advice and so do not write her letters, do not want to associate with her,

etc. Remember, she has an extraordinary lengthy history of violent sexual encounters. People may look at that and wonder what kind of woman is this. Do I want advice from this type of person. How and why does she get in these situations. Even her story of Trump, I am going into the dressing room and get him to put this filmy, see-through bodysuit on over his large frame, and over his clothes! Really!

Perhaps her readers and the public feel that just as she consented to her first rich boy pulling down her underpants, that she consented to Trump pulling down her tights. Carroll did not express outrage at being raped when she telephoned her friend but instead thought everything was funny.

Maybe Carroll lost readership or letter writers to her because her 'customers' just didn't like Carroll's story, starting with when she allowed the little boy to put something in her vagina which caused her to bleed, and apparently Carroll made no protest, did not go running to her mother and tell her. And her readers may wonder what happened when her mother did the laundry and saw the panties with blood on it.

Of course, from a purely legal view, because Trump exercised his right to defend and that the operation of the law inflicts no legal injury, and because she consented to Trump defending, her detriment is "*damnum absque injuria*".

Carroll also pleads that this experience with Trump has damaged her in that she has not been with a man since. Par. 54 and 54-55, Carroll I and II. Here again she has to prove causation.

In Carroll's deposition, she says that she has not been with a man since she was married to her husband, John Johnson. They got divorced in 1990. The Trump incident was in 1995 or 1996. Also, in her "Vanity Fair" interview, she said she consulted her partner about whether she

should write her book.  Her book was released to the public on July 2, 2019.  But in her deposition she said she had not been in any type of relationship since Trump.

Carroll bears the burden to show the cause of her "female sexual dysfunction", whether it is age related, physiological, or whether it is psychological due to the Trump incident.  Of course, in her interviews and in her book, she says she does not know the reason.  Just because she says she has no desire to be with a man does not mean that Trump caused it back in 1995 or 1996 when she was age 52.

Quoting from her Guardian interview:   "There's one line in the book that is stark and startling, and comes just after she describes kneeing Trump away from her and fleeing. She writes: "I've never had sex with anybody ever again." I read that sentence to her.  Again, she demurs. "It's just a fact. I think it's because of my age, and that I haven't been lucky enough to meet somebody."  But she wrote that line clearly implying that her celibacy was connected to Trump. She stops and thinks. "You make your own luck, it's true. I wasn't bold enough to say, yes, it was because of him." So will she say it now, in this wooded idyll where she is safe? "I think it's half-and-half. I haven't met the guy, but meeting the guy is about being open to it.""

One point, besides the fact she does not know the reason for her lack of desire for a relationship, is that she says she "wasn't bold enough to say ..."  At trial, this Court must not let her "boldness" in asserting and insisting upon her claims to obscure the fact that mere bold insistence on something is not proof of the fact being claimed.  The jury must distinguish bold, naked insistence from proof, from facts which show causation of damages, from facts needed to show rape, etc.

She has said, posting it on Twitter, that the reason Elle fired her is because Trump denied her accusation.

But she cannot use her own claim to prove this damage or detriment because of the "Best Evidence Rule", which is a rule which says that it should be what "Elle" says why they fired her, not what she says why.

The Best Evidence Rule is a rule which says that the evidence which will most likely speak the truth should be used.

The "Best Evidence Rule" simply says a litigant should present the best evidence available, the likely most truthful evidence available, to prove the point. It applies to any evidence, not just to documents, photos, etc. As it relates to documents, photos, etc., the Best Evidence Rule has been codified at Rules 1001-1008, F.R.Ev. But the common law makes it applicable to all evidence, that the best evidence available, the most likely truthful evidence available, to prove a fact should be used.

Carroll's reason why she was fired is presumed to be self-serving and so not a reliable reason why she was terminated from Elle.

Since Elle terminated her, Elle's reason is the reason why she was terminated, it is the best evidence available as to why she was terminated, not Carroll's reason. Carroll did not fire herself. Carroll cannot speak for Elle and say this is why you fired me.

Of course, Carroll has the right to dispute Elle's reason if she has the evidence to dispute it.

Elle says they fired her because they felt they could not move forward with an 'employee' who was not loyal to them, who uses a competitor to promote her book instead of using Elle. See the depositions of Carroll and the New York Times story, cited below. Further, Elle issued a public statement which said they dismissed her for reasons not connected to what Trump said. Read the New York Times article on this, dated February 21, 2020. Google: "What Happened Between E. Jean Carroll and Elle Magazine?"

Reading the Times article, it appears that not only her disloyalty, but also financial considerations at that time were the reason for her termination, but it mostly was her disloyalty.

Note that this New York Times article said that "By Thursday, Ms. Carroll said she had received inquiries from four other publications asking if she would consider writing for them."

As regards causation, Carroll bears the burden to prove causation of her detriment. The fact of her age and that it is well known that women 'dry up' the same as men have ED present a big obstacle to Carroll's sudden insistence that she suffered psychological harm from Trump, not to mention that Carroll repeatedly stated that she does not know the reason for her lack of desire.

### Is the testimony of the two women
### who accused Trump of sexual assault legal evidence.

Carroll is planning to introduce the stories of two women, Natasha Stoynoff and Jessica Leeds, who have accused Trump of assaulting them in a sexual manner. These accusations have not been proven to be true, have not been tried. It has not been tried and proven true that Trump had sexual contact with them, and second, that if he did have this contact, that it was without their consent.

Quoting: "The Court should also admit the testimony of two other women whom Trump sexually assaulted in a similar way. Their testimony is admissible because a sexual assault is a "factual premise" of Carroll's claim, and because their testimony evidences Trump's *modus operandi* of forcing himself on nonconsenting women."--Quoting from page 1 (and pages 4-10) of Carroll's February 16, 2023 memorandum In Limine on allowing the two women to testify, Dkt. 134, Caroll I. Also see Carroll II, Dkt. 73. Carroll claims these two witnesses' testimony is relevant evidence.

74

A fact is something which exists, which occurred, is true.  Is a false 'fact', an untrue 'fact', a not known if true 'fact', a fact?

An accusation of a fact is a not known if it occurred, it is not known if it is true.  An accusation of a fact is not fact.  It is yet be determined.

These two women's testimony is not fact because their accusations have not been proven to be fact, that is, proven to be true, to have actually occurred.  An accusation must first be tried and determined in court to say that the conduct actually happened, actually occurred.  And so then it is fact.

A Court has jurisdiction to render judgment based only on fact, not based on something not fact, not based on a lie, not based on something not known to be true, not known to have actually occurred.

The reason for this is because the law arises from facts.  *"Ex facto jus oritur."--"*The law arises from the facts."  Bouvier's and Black's Law Dictionaries.

"Until the facts really existing, as to each tract of land, are ascertained with accuracy, the legal conclusion cannot be drawn with any degree of correctness. *Ex facto oritur jus.*"  Attorney General v. GRANTEES UNDER THE ACT OF APRIL 1792, 4 US 237, 244 (1802).  "For jurors are to try the fact, and the judges ought to judge according to the law that ariseth upon the fact, for *ex facto jus oritur.*"  Mitchell v. Harmony, 54 US 115, 144 (1852) (Dissenting opinion).  "The fallacy underlying the defendant's premises is that neither the trustee nor the Court was required to limit himself to the naked ultimate legal issue, stripped of its factual context and background. *Ex facto jus oritur.*  That important and novel legal questions should not be decided in a vacuum is a brocard."  United States v. Birrell, 262 F. Supp. 97, 99 (S.D.N.Y. 1967).  "The judgment should be based upon a consideration of relevant facts, actual or

possible—*Ex facto jus oritur*. That ancient rule must prevail in order that we may have a system of living law." <u>Adams v. Tanner</u>, 244 U.S. 590, 600, 37 S. Ct. 662, 666, 61 L. Ed. 1336 (1917) (dissenting opinion), overruled in part by *Ferguson v. Skrupa*, 372 U.S. 726, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963).   "A rational basis for decision consists of a permissible finding of fact and a correct application of the law.[15] A decision on any other basis is not in accordance with law and is subject to modification or reversal on review.[16]  Every tax decision is controlled by some principle of law, which arises out of the facts.[17] *Ex facto jus oritur*." <u>West v. Commissioner of Internal Revenue</u>, 150 F. 2d 723, 727-728 n. 17 (5th Cir. 1945).

One can be convicted based only on fact, not speculation or innuendo or non-fact. *Ex facto jus oritur*. See <u>W & J SLOANE, INC. v. United States</u>, 408 F. Supp. 1392, 1393 (Cust.Ct. 1976) ("It is axiomatic in the law to state that the legal conclusion is dictated by the facts of the particular case. The thought is expressed well by the Latin maxim *ex facto jus oritur*.")  <u>Tosh v. Buddies Supermarkets, Inc.</u>, 482 F. 2d 329, 330 (5th Cir. 1973) ("Finding that the case turns on its singular facts, we affirm. *Ex facto jus oritur*."); <u>Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, etc.</u>, 137 F. 2d 176, 179 (5th Cir. 1943) ("In the same petition it is argued that the facts upon which the court's conclusion was based "applied to only a few of the appellants' employees and never applied to a great many employees". Passing over the inconsistency of these statements, it is only necessary to say that if the facts on which our opinion is based apply only to a few of appellants' employees, then the law as we have declared it affects only those few, because the law arises out of the facts: *Ex facto jus oritur*."); <u>Atlanta Flooring & Insulation Co. v. Russell</u>, 146 F. 2d 884, 887 (5th Cir.  1945) ("... but to expect courts to decide cases without sufficient facts may be likened to requiring the ancients to make brick without straw. *Ex facto jus oritur*."); <u>Abbott v. United States</u>, 287 F. 2d 573, 576 (Ct. Cl. 1961) ("There is an old

maxim, full of wisdom, which reads: *Ex facto jus oritur*. We think it would not be realistic to impute to Congress an intent to afford the same benefits to reserve officers as were intended to be given to regular officers."); Heath v. Stevenson, Dist. Court, D. South Carolina 2016, C.A. No. 8:15-cv-02342-TMC-JDA, ) ("This legal framework and foundation being firmly in place, the Court is compelled to look at the facts in regard to this case sub-justice because the law arises from facts (*Ex Facto Oritur Jus*)."); Walker v. City of Kansas City, Mo., 911 F. 2d 80, 97 (8th Cir. 1990) (Concurring opinion) ("I am satisfied that, as stated above, the facts of the case automatically invoke application of the Twenty-first Amendment. As the old maxim says, the law arises from the facts — *ex facto oritur jus.*"); Grace v. State, 231 Ga. 113, 119, 200 SE 2d 248 (Ga. 1973) ("Let us first turn to a discussion of the facts in this case and then proceed to review the legal issues and law arising from these facts. *Ex facto oritur jus.*").

This Court has jurisdiction to render the judgment rendered based only on fact, not based on an accusation, something which is not fact.


In line with the above point, evidence is not relevant if it is not true or not known if it is true, because false evidence or not known if true is the same as no evidence and so cannot be relevant.

When the accusations of the two women is not substantiated by other evidence to show truthfulness, that it occurred, it is not relevant because to be relevant, the testimony must be true, must be proved by some quantum of evidence. State v. Kringstad, 353 N.W.2d 302, 311 (N.D. 1984).

The unsubstantiated testimony or unproven testimony/accusations of the two women cannot be introduced because it is not known if their accusations are true. They are not fact.

Further, F.R.Ev. Rules 413 and 415 state that in a civil case in which a defendant is accused of a sexual assault, the court may, quoting, "admit evidence that the defendant committed any other sexual assault".

This Rule of Evidence is clear and specific. It says that only sexual assaults, only facts, meaning assaults which are known to be true, which have occurred, can be admitted. Certainly this rule cannot be said to say that false or untrue claims or not known if true claims of sexual assault may be admitted.

This Rule says that "evidence of other sexual assault" may be admitted. It does not say that "evidence of other accusations of sexual assault" may be admitted.

The Rule itself is clear. The English language is clear. Statutory construction is clear. The common law and due process of law does not presume that Congress or a Legislature or a Court made rule will allow false evidence or evidence not known to be true to be used to prove one liable/guilty in a civil trial.

Carroll likewise seeks to use these two women's testimony pursuant to Rule 404(b), FREv., which says that "evidence of any other crime, wrong, or act may be admissible for another purpose ...". For the same reasons as stated above, Rule 404 does not allow these two women's accusations to be introduced. They need to be true either because they were previously litigated, or, according to "Kringstad", id., because they are substantiated.

The two women should not be allowed to testify.

Is Carroll's use of 'expert' witness testimony<br>legal evidence of the amount of damages

Carroll claims that Trump's exercise of his right to defend against her slander/libel action caused her detriment.

As part of her proof she is invoking the aid of an 'expert' witness, Professor Ashlee Humphreys, to assess the effect of Trump's statements on Carroll's reputation, that is, to assess the amount of the detriment, loss or damage to Carroll.  Page 10-11 of Carroll's February 16, 2023 memorandum, Dkt. 134, Carroll I.

Let us assume Carroll has suffered a loss.

This college professor, expert witness, says that Carroll was damaged because a certain huge percentage of Americans will no longer read Carroll's advice column in Elle.  This professor says that Carroll had a readership of about 4.5 million Elle readers.  Yet Elle has a subscription of only 339,151 in the United States.  The point here is that when damages are not determined by the facts, but are determined by theory, that then the coffee spilt did not burn just the part of the one body it touched, but that it burned, not only that body, but the body of about a third or half of the people in America who were not in the car with the woman when the woman bought coffee at McDonald's.)  This writer was not aware that the courts were determining damages by using innuendo and theory, by using 'expert' testimony!  He was shocked.

Elle publishes 12 months a year, once each month in the United States, except during Covid, only 10 times a year.  Elle counts a total of 21 million readers worldwide, not just in the U.S., publishing its magazine in 45 countries, an average of 466,666 readers per country.  For example, France, where Elle originated from and is officially headquartered, has a readership of 800,000.  Its readership in France by the 1960's was 800,000.  Today, Elle, which is published weekly in France, has 383,985 paid subscriptions in France.  Elle came to the United States in 1985.  By 1991, its magazine sales in the U.S. were on a decline.  Subscriptions account for 73% of readers.  In the U.S., Elle at one time had a paid circulation of 404,037 in 2010, in 2019, it had a paid circulation of 339,151.  This information is from Wikipedia.

Carroll's expert witness, Ashlee Humphreys, to show the amount of detriment, uses as evidence 67 pages of messages posted online of negative comments about Carroll or about her case, albeit at least one posted that she is suing too late, which is a correct statement of law. Dkt. 116-13, Carroll I,  20-cv-07311-LAK.

These online comments apparently are used to show that Carroll is shunned and avoided, or would not buy her book or write her letters, etc.

To show detriment, Carroll must show that it is her friends, family, work associates, her local community, and future employers who do not want to have anything to do with her or look at her with a negative eye.  These 67 pages of online negative statements are from people who never heard of her until she made an issue of it with her book, lawsuit, etc.  The point is, is it because of what Trump said or what she said/did.  Secondly, she cannot claim damages from strangers shunning her, people who do not, did not, and will not have contact with her, will not affect her life one iota.  Now if she feels shunned by these strangers, then it is because she was seeking fame from her stories, something she brought on herself, not to mention that seeking fame from her story of her sex life is horrible because her fame does not result from something she has achieved which has helped humanity.  But telling about her sex life is bringing on herself the comments against her.  Men wrote that she is ugly, are they saying this because Trump said it, or because they saw her photo on the first page of "The Cut" article, which is not a fair photo of her because she was younger then, 1995-1996.  Carroll called herself the most beautiful woman in the Department Store at that moment in time, this is all well and good, but likewise, are not others entitled to express their opinion about her, especially because she is making an issue out of it.  Men wrote that they do not believe her stories, that nobody has that many horrible sex experiences in their life.  Here Carroll says the law of damages means that one's slander/libel of

other men must be believed, and since these online commentators do not believe her, that therefore she is damaged!    Second, it appears that many of the comments are motivated by 'politics', pro-Trumpers, not necessarily because of what Trump said.    Plus, none of these comments are comments of shunning, but are comments of lack of believability of her story, not just about Trump, but about all the men because it just is not reasonable that one woman could have that many negative sexual experiences over a lifetime.

Further, this writer read Ashlee Humphries' Memorandum and other exhibits wherein Humphries says that Trump's statements were read, seen or heard by a certain percentage of the American population, implying that Carroll's detriment is great because so many people know about her story and Trump's denials.    (But this writer cannot, as he writes this, locate this document now on the Docket sheets.    Why, he does not know, unless they were 'changed' so that now no one can read them online unless one purchases the document on PACER.)    But the point is that the readership of Elle Magazine is only a small fraction of the American population.    Just because so many people have a negative opinion of Carroll's story does not mean that she lost all those as readers of Elle.

Plus, as Carroll said in one of her interviews, she was disappointed that her book was not displayed 'front and center' in book retail stores.    That was a decision the book stores made, not Trump.

The point here is that Carroll is claiming detriment because the people think negative thoughts of her.    But this is from people whom Carroll never had prior contact with, nor will have contact with in the future.    That is, Carroll cannot claim a loss of that which she never had.

One cannot lose what one never had in the first place.

Plus, Carroll said that she had four job offers by Thursday. This was 'long' after Trump said his words in June of 2019. See the New York Times article, dated February 21, 2020, cited above. Carroll was terminated from Elle in December 2019.

It is astounding to this Petitioner to learn that courts are allowing "pie in the sky" to be detriment, to learn that "experts" can give theories and statistics, and that this is the amount of damages, that this is fact.

Rape consists of the outrage to the woman.

The common law says that the essence of the crime of rape, (which distinguishes it from being a battery,) is the outrage to the person and feelings resulting from the nonconsensual violation of her womanhood, (of the taking of her intimacy, privacy, love, virtue, honor, sanctity, dignity, etc.). The People v. Vela, 172 Cal. App. 3d 237, 243, 218 Cal.Rptr. 161 (1985). Note that California has codified this common law rule.

The New York case of People v. Liberta, 64 NY 2d 152, 169 n. 14, 485 N.Y.S.2d 207, 474 N.E.2d 567 (N.Y. 1984), cites to Ballard v United States, 430 A2d 483, 486 (D.C. 1981) which Ballard case says at page 486 that the essence of the crime of rape is the the injury and outrage to the feelings of the woman by the forceful penetration of her person; and footnote 14 of "Liberta" quotes the common law codification to make the point that "the essential guilt of rape consists in the outrage to the person and feelings of the female".

"The essence of the crime (of rape) is not the fact of intercourse but the injury and outrage to the feelings of the woman by the forceful penetration of her person. It is a crime radically different from assault and battery although the latter offence is incidental to it." Commonwealth

v. Goldenberg, 338 Mass. 377, 384, 155 NE 2d 187, 191-192 (Mass. 1959).

"The essential guilt of rape consists in the outrage to the person and feelings of the female." State v. Kirk, 211 NW 2d 757, 758 (ND 1973) (Quoting the statute as it existed then.) The entire North Dakota criminal code was repealed in 1973, and the new code did not include this element of outrage. But the common law still stands, requires it.

Rape is a battery, but to distinguish the two, rape is the outrage to the woman of forceful sexual intercourse, of the taking of her love, honor, dignity, privacy, invasion of her womanhood, etc. The difference between battery and rape is that a battery is done to be mean, to cause damage to the body of the victim, to hurt, bruise, break a bone, etc. Whereas sexual intercourse is done for pleasure for the man as well as for the woman, it involves a touching of the other's body, but for purposes of pleasure, not to be mean. So the essential guilt of rape is the outrage to the person and feelings of the woman from the violent and forceful penetration of the person of the female for the purpose of sexual intercourse. An assault and battery is the intentional and unjustified use of force upon the person of another, rape's essence is the felonious and violent penetration of the person of the female, and so the two crimes are fundamentally different in nature and distinct in legal character; assault and battery is and always has been a crime of a lower punishment, whereas rape historically has been a capital offence. Commonwealth v. McCan, 277 Mass. 199, 203 (Mass. 1931). That is, if the woman is outraged, she will not let the man get his sexual satisfaction and so will resist his attempt, that is, the man will have to exercise a violence and force, a violent force great enough to overpower her resistance. If there is no evidence of outrage, no evidence of a force great enough to overpower her outrage and resistance, then rape cannot be proven.

Evidence of outrage at the invasion of her womanhood is essential because although outrage may not be a specific statutized element to the cause of action for rape, it is the reason for having a crime of rape, to protect the woman from being sexually invaded, as opposed to it being a crime of battery, and so it is a common-law required element of rape which must be charged and proven, this even though a rape statute may not charge it.  (Prior to the 1970's or before, many states' statutes also charged that outrage was to be shown in order to prove rape.  Some state's statutes today still charge outrage in them.)

When there is no evidence of outrage then there is no rape, because when the reason for having the rape offense ceases, (as opposed to the conduct being a simple battery), then the rule itself ceases.  The common law rule is stated as:  *"Cessante ratione legis, cessat et ipsa lex."*-- "The reason of the law ceasing, the law itself also ceases."--Black's Law Dictionary.  "When the reason of the law ceases, so does the law itself."--Bouvier's Law Dictionary.  Funk v. United States, 290 U.S. 371, 384 (1933) (Quoting:  "One of its [the common law] oldest maxims was that where the reason of a rule ceased, the rule also ceased, and it logically followed that when it occurred to the courts that a particular rule had never been founded upon reason, and that no reason existed in support thereof, that rule likewise ceased, ...".).

It can readily be understood that the common law rule of: "the reason of the law ceasing, the law itself ceases."--"*cessante ratione legis, cessat ipse lex.*", has nothing to do with the power of courts to change or abrogate or annul a law.  It has to do, not with a nullification of a rule, but with a factual situation that renders the rule not applicable to the particular case.  Rogers v. Tennessee, 532 U.S. 451, 474, 121 S. Ct. 1693, 1706–07, 149 L. Ed. 2d 697 (2001) (Dissenting opinion.).

Since there is no evidence of outrage by Carroll, then the rape charge ceases, the case must be dismissed for failure to state a claim upon which relief can be granted. That is, the Court is without jurisdiction to render the judgment rendered or to be rendered, that of rape, that Trump committed rape because no outrage was pleaded or proven.

Of course, all the facts show consent to sexual activity, and so there is no battery because Carroll consented and took the risk that her body would be touched for purposes of sexual activity. Her consent to sexual contact is also a consent to her body being touched.


Carroll slanders the American People, the voters.


Carroll wrote in her book that Trump gained more favor, became more popular in the eyes of the voters every time another woman accused him of a sexual encounter with them.

This casts the American voters in a shameful, false light. This says that the American voters are more likely to vote for Trump because he is a sexually licentious and illicit man, a whore, a man-whore. This says the American voters favor immorality, and will desire to put an immoral man into an office which requires integrity and morality. It says Trump gained votes, not lost votes, because the voters are immoral.

The rule of the common law says that we are to presume our neighbor is innocent, is a moral person. "*In favorem vitae, libertatis, et innocentiae omnia praesumuntur.*"--"In favor of life, liberty, and innocence, every presumption is made." Black's. <u>Gordon v. State</u>, 110 So. 2d 329, 334 (Ala. 1958) (Applying this maxim on rehearing).

Carroll's accusation accuses the American voter and public of desiring and favoring immorality, of being immoral, of favoring immoral politicians, of saying I am going to vote for the man because he has been a fornicator.  This is slanderous.

Trump presumptively loses from these accusations.

Talking to Carroll

The U.S. Attorney General was blatantly and outrageously illegal
in removing your case from State Court to Federal Court.
The Westfall Act is unconstitutional.

Carroll I, Carroll's first action for defamation, was moved from the New York State Court to this U.S. District Court on September 8, 2020, by the then Attorney General of the United States.  Dkt. 1, Carroll I.

This was done pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2679(d)(2).  This Subsection is also called the "Westfall Act", but the Westfall Act is simply an amendment of the Federal Tort Claims Act.  The FTCA is at Chapter 171 of Title 28, written in 10 Sections, 28 U.S.C. Sections 2671-2680.  To read these statutes, Google:  "tort claims procedure", and click on the top link.

Looking at the rule of *respondeat superior*:  This rule says that an employer is liable for any wrong done by his employee if the employee was performing his job duty, for example, having an auto accident while delivering something for his employer.  But The common law will not presume an intentional tort, such as assault and battery, slander or libel, rape, false arrest, etc. to be a part of any person's job or would be authorized by one's employer.  The reason for this is because the law presumes every man will lead an innocent life, not going around punching others

86

in the face, etc., nor telling one's employee to go do it. The law will not presume any person's job entails the job of committing an intentional tort.

So under the rule of *respondeat superior*, an employer is never responsible for, never made liable for an employee's intentional tort.

Vicarious liability applies for intentional torts. Vicarious means acting through another. An employer is vicariously liable for an employee's intentional tort only under certain rare situations, such as when committing the tort furthers the employer's interest or was done at the instigation or with the aid of the employer, when the employer was in some manner involved in helping to commit it or ratifies it.

So Trump's (claimedly) slanderous words, which were said intentionally, which are an intentional tort, are not within the scope of authority of a President's job duty. The Constitution, which is the President's job description, does not ask or order or authorize or condone the President to slander people.

The purpose of the FTCA is to allow the citizen to sue the employer, the Government, the United States, on the same basis and under the same rule of the common law of *respondeat superior* as one would sue an employer in the private sector under the common law.

This is why 28 U.S.C. 2672, 2674, 2675 and 2679(b) say in pertinent part: "... any claim for money damages against the United States for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred...". 28 U.S.C. 2674, titled "Liability of United States", says: "The United States shall be liable, respecting the provisions of this title relating to tort

claims, in the same manner and to the same extent as a private individual under like circumstances, ...".  Section 2675 says:  "... a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, ...".  Section 2679(b) is similar.

The FTCA simply makes the employer, the Government, the United States, liable at common law just as a private employer is for the wrongs of his employee.  It gives an immunity to no one, but was enacted so as to remove any prior immunity the United States may have claimed and make the United States liable.  See Section 2674, quoted above, "The United States shall be liable ...".

In 1946, Congress enacted the FTCA so as to make the Government, the United States, liable under the common law rule of *respondeat superior* just as any private employer was liable under the common law of *respondeat superior*.  So the citizen can now sue the United States according to the common law just as he could sue any private employer for the wrong of its employee.

Prior, one could not sue the United States under the *respondent superior* theory.  That is, the purpose of the FTCA was to make the United States liable, not to give it an immunity.

Under the common law, if an employee did a wrong while on the job, that is, while acting within the scope of his authority or job duty, the person can sue the employee and the employer.

But in 1988, Congress enacted The Westfall Act, which amended or abrogated the common law rule of *respondeat superior*, but only as it related to suing government employees, and said that whenever a government employee is sued, that the Government, the United States would or may assume all liability for the employee's wrong, and that the employee would be dropped off the action and the United States would be the defendant, this as opposed to the common law that

both the employee and United States--the employer, would be or could be the defendants.  Generally, when suing a private employee and employer, the employer will usually pick up the 'tab' for the employee's share and so pay all the damages.  And if the employer would not, the employee, as the defendant, would then move the Court to bring the employer in as an involuntary defendant or third-party defendant so as to make the employer also liable.  So this change in the FTCA, Section 2679(d), the Westfall Act, perhaps was not that big a change, not that objectionable, if at all because the Government has deep pockets, whereas in the private sector the employer may not always have such deep pockets and so the plaintiff collects from both the employee and employer.  Note that there is no mention of an immunity for the United States.  In fact, it is the opposite, to make or let the United States to be wholly liable for the government employee's liability or share of liability he did for the wrong he committed.

Since an intentional tort cannot be sued for under *respondeat superior*, the FTCA, the last Section, 28 U.S.C. 2680(h), says that "The provisions of this chapter (171) and section 1346(b) of this title (28) shall not apply to -- Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights", cannot be sued for pursuant to the FTCA, Chapter 171 of Title 28, 28 U.S.C. 2671-2680.  This is just repeating what the common law says.

But note also that this last Section also says that the United States will be liable for the intentional torts of some of its employees if certain situations exist.--Vicarious liability type situations as mentioned above.--In reality the United States is here ratifying those torts committed by the FBI, U.S. Marshalls, etc.

All this is the purpose of the FTCA, except that after it was amended in 1988 by the Westfall Act, the employee is no longer liable, the Government will pay the employee's share of the damages, except for punitive or exemplary damages which the employee is liable for, and so the United States will be substituted for Trump, will be the defendant.

Carroll, you sued Trump simply under the common law rule for suing for an intentional tort, just as one would sue any person, government employee or not.

You were not, nor could you have sued pursuant to the FTCA. It would be contrary to law, illegal, for you to try to sue pursuant to the FTCA, so as to try to also sue the United States.

But in your case, Carroll, the AG (Attorney General) moved your case to this Federal Court and substituted or subrogated Trump for the United States so as to force you to sue the United States, saying that you can sue the United States according to the FTCA!


This substitution of defendant and change of jurisdictions and venue by the Attorney General of the U.S. from the State Court to this Federal Court was based on [1] the (unfounded) claim that Trump was employed by the Government, the United States; and by [2] the unfounded claim that his speaking his words about Carroll's rape accusation are within the scope of his duties as an employee (assuming he were an employee of the United States), and by [3] ignoring that you sued Trump for defamation, an intentional tort, that Trump's words were slanderous, something which one cannot bring within the ambit of the FTCA, something which one cannot sue an employer for under the common law of *respondeat superior*, and which the FTCA statute, Section 2680(h) specifically and plainly says cannot be done because this accords with the common law of *respondeat superior*. Scope of authority or scope of office or scope employment simply means one's job duties or acting within one's job duties or doing one's job duties.

Trump's good name or lack of and his personal life and character are not part of his job description or specific duties owed to the Government or owed to any employer. They are political issues or 'outside' issues, not legal duties owed, as defined by law, to the Government, to make the Government work, to move forward with the purpose of Government, to get the Government's job done. This is also true with respect to jobs in the private sector. The factory worker's job duty is to see to it that the factory manufactures what it is supposed to manufacture. Talking about his ex-wife's lawsuit against him is not part of his job duties, this even though the people he is talking to about it may be interested in it.

Granted, Trump's character and good name and personal life is and should be of great concern to We The People, but that is a (political) issue which concerns We The People, not the President's duties owed to the Government to get the job done.

Trump's words and conduct were not part of his job duties owed to the Government, the United States, which the FTCA requires before it can be applied to the case.

Carroll, if you worked for somebody, and if, while you were on the job, and you were talking to your friends or co-workers and telling them about the lawsuit your ex-lover or ex-husband was suing you about, your employer would yell at you and tell you to get back to work, and he probably would yell at you and tell you to quit talking to your friends about that lawsuit between you and your ex-husband, and get back to work.

Trump's talking about your lawsuit was not part of his job which is to see to it that Government does what it is supposed to do. Trump's talking was not within the scope of his employment, (falsely assuming he is an officer/employee of the Government).

Second, the President and members of Congress are an employee of We The People, not of the United States, not of the Government.

What is an employee?  An employee is anyone who performs services for you is your employee if you can control what will be done and how it will be done.  An employee is a person whom you hire to work for you.

We The People are the employer of those We elect, of those We hire.  We The People created and own the 'association', the 'company', the Government.  We hire, via an election or vote, the Board of Directors, the Members of Congress, and We hire, via a vote, the CEO, the President of the 'company'.  We The People control what these people, our employees will do via the Constitution, which is our directions and dictates to them as to what their job or contract is to do.

Note that as regards the Members of Congress, each Member of Congress is an employee of each State and the People of that State because We The People agreed that each State gets to hire its own proportionate share of the Board of Directors of the 'company'/association as opposed to all of the We The People hiring the Board of Directors.

But this definition of employee of the People may not be considered to be 'perfect' as describing the President and Congress because there are employees and there are independent contractors who work for one and are hired by one.  Certain factors may define a worker as an independent contractor instead of being an employee.  For example, not relying on the business as the sole source of income, Congress was at one time only part-time, and even today Congress takes breaks at their pleasure albeit most of their time today is consumed working for the People.  The President's and Congressman's job is for a limited period of time, a contract period of time, and so he may or perhaps will have income coming to him from other sources, which he can go back to after his contract period with the People is over.  The President and Congress

people get to decide to work at their own pace, and they retain a degree of control and independence about how to do their job. While the independent contractor is his or her own boss, work obviously stays within the definitions of oral or written contract and adheres to certain requirements, in this case, the Constitution.

But the point here is that however the situation or status is defined for the President and Members of Congress, they are not "Officers or Employees of the Government" as the word employee is defined at the common law and so do not come within the terms of the FTCA statute, 28 U.S.C. 2671 through 2680. (Although not pertinent to this case, it is also questionable or probable that the Cabinet level Officers and other Officers under the Cabinet Officers are also not officers or employees of the Government. The Officers appointed/hired by the President probably are employees/private contractors of the President, not of the Government.)

Note that 28 U.S.C. 2671 defines that an "employee of the government" "includes officers or employees of any federal agency, ...". But it does not define or say who are the officers and employees which are employees. It leaves this definition up to the common law definition. That is, the common law determines if the President and Congressmen are employees or officers of the government. And so, as found above, they are not officers or employees of the government, but of the People.

Again, as a reminder, We The People created, own and finance this association/company/Government. Preamble, U.S. Constitution. We hire them, we dictate the terms of their job duties or contract duties.

The President is an employee/private contractor of We the People, not of the Government.

So here is what the Attorney General (AG), acting through his 'alter-egos', did to your case, Carroll.

You were suing Trump for defamation, an intentional tort, a tort which does not come within the ambit of the FTCA, which is specifically, plainly and clearly stated to be prohibited from coming within the ambit of the FTCA. You could not have sued Trump and his employer, the United States, (assuming he is a Government employee) for Trump's slander/libel/defamation of you by saying that the FTCA authorizes you to sue the United States in addition to suing Trump.

But the AG simply made a decree, an edict, nakedly declared that you were suing Trump because his slanderous words were his job duty to say and so he was acting within the scope of his office or employment. See "The Notice of Removal", Dkt. 1, page 2, paragraph 4, Carroll I, wherein he says that Section 2679(d)(2) says he can do this!

And so the AG, acting through James Toughey, Jr., said that, quoting: "Pursuant to 28 U.S.C. 2679 ... I hereby certify, on the basis of the information now available with respect to the incidents alleged in the complaint, that Donald J. Trump was acting within the scope of his office as President of the United States at the time of his alleged conduct." See his Certification, Dkt. 1-2, Exhibit B. He said no more. He gave no reason why. This is a naked claim or statement on his part. It is an edict, a decree.

The AG's Exhibit A is a copy of your Complaint, Dkt. 1-1, at page 26 of your Complaint. You plainly and clearly say that you are suing Trump for defamation, and his words relate to his private affairs, your lawsuit, have nothing to do with seeing to it that the purpose of government is being done.

Yet the AG says you can sue Trump and his employer, the Government, because the FTCA authorizes it, because Trump's committing his intentional tort, defamation, his words spoken

about you and your lawsuit, is within the scope of his employment, is a job duty of his owing to the Government!

Their Notice of Removal, Dkt. 1, at page 2, Par. 3, says that: "... 28 U.S.C. § 2679, provides that suit against the United States shall be the exclusive remedy for claims for damages for the negligent or wrongful act or omission of an employee of the government occurring within the scope of his office or employment. 28 U.S.C. § 2679(b)(1)." They quote the statute here. This is true, you can sue the United States for the negligent or wrongful act or omission of an employee, unless it is an intentional tort/wrong, such as slander or libel.

They blatantly ignore that your action is for an intentional tort, that Trump's words relate to something which has nothing to do with his job duty to see to it that the Government does what it is supposed to do according to the Constitution.

Their Certification and Notice of Removal is totally unfounded. They state no reason why they say what they say. It is a lie.

Trump's words or talking about denying an accusation of rape and defamation is not part of his job duty owed to the Government. Second, they knew that a tort for slander/libel, an intentional tort, could not be brought within the ambit of the FTCA. The statute itself, Section 2680(h) specifically states this. You cannot do it, nor can they under the terms of the Westfall Act, the FTCA.

Their Notice of Removal and Certification was a naked lie.

Then, Carroll, you know what they were planning on doing. They were hoping to get the Court to agree that Trump was an officer, an employee of the Government, and that his talking about your lawsuit was part of his job duty owed to the Government, which is to see to it that the

Government does what it is supposed to do, just as a factory worker's job duty is to see to it that the factory manufactures what it is supposed to.

And then have your lawsuit thrown out on the ground that you cannot sue for slander/libel because 28 U.S.C. 2680(h) forbids it, forbids an action for defamation, and so the United States has an immunity. And this after they said that your slander/libel action, an intentional tort, could be brought within the parameters of the FTCA!

Carroll, they were hoping that this is what they would be able to do because this has been done before, because Courts have said that this can be done! They cited five court cases which say this! See their Memorandum of Points and Authorities, Dkt. 3-1, pages 4-5. Yes, Carroll, judges do this!

Carroll, they say they can bring your action within the ambit of the FTCA, and so they do it with their Certification, then throw it out because you cannot bring your action within the ambit of the FTCA!

These are the people you are dealing with. This is your Government at work.


It is interesting that one defamation case where this was done, cited by the Attorney General to support his position that Trump's statements were made within the scope of his employment, statements made to the public, said, quoting the case: "Applying that law, it is clear that the tweets were made in furtherance of the interests of Defendants' employers. ... They were calculated to serve the interests of Defendants' constituents (i.e., employers) by informing them ..." Does 1-10 v. Haaland, _ F.3d _, _, 2020 WL 5242402, at page 8 (6th Cir. 2020) (Saying, recognizing and admitting that a Congressperson's employer is their constituents/The People, but ignoring that the FTCA applies only to employees of the Government, does not apply to

employees of the People/constituents.).  This "Doe" case is cited by the Attorney General as a reason to do what he is doing to you.  See page 4, Dkt. #3-1, Carroll I.

Second, the "Doe" trial court said that:  "However, because the United States has not waived its immunity to libel and slander suits, id. § 2680(h), the defamation claim could not proceed against the United States either."  "Doe", id., page 2-3.  Here the trial court threw out the case, not by saying that an intentional defamation action cannot be brought within the ambit of the FTCA, but couches his language in different terms that the United States has not waived its immunity to being liable for an intentional tort, using different words to make it 'look' legal and to obfuscate the law.

However, the purpose of Congress enacting the FTCA was to remove any immunity the United States said it had prior to its enactment, when the law suit was based upon the *respondent superior* theory, so as to make the United States liable just as any private employer would be liable.

But this "Doe" case, to conclude its ruling, on its last page, page 8, bottom paragraph, says:  "That the United States has not waived its immunity to libel suits is of no moment.  ...  ("If ... an exception to the FTCA shields the United States from suit, the plaintiff may be left without a tort action against any party.")."  And so the Appellate Court avoided ruling on the truth by saying it "is of no moment" ..."

The "Doe" case concluding "That the United States has not waived its immunity to libel suits is of no moment" is a twisting of what the FTCA statute does, that an intentional tort such as slander/libel/defamation, rape, battery, and other intentional torts cannot be sued for under the doctrine of *respondeat superior*.  For this "Doe" case, the intentional tort being sued for was slander/libel committed by the two Congresspersons, just as in your case.

And so the "Doe" case was dismissed, Carroll, just as the U.S. Attorney General was and is trying to do to your case against Trump.  To read this "Doe" case, just Google:  "Does 1-10 v. Haaland, _ F.3d _, _".  You do not need to add the underlining.

The "Doe" case says that the slanderous words said by the Congressmen were within the scope of their employment by the People, their constituents, then throws out the case because the slanderous words, defamation, is an intentional tort, something which is not within the scope of anybody's employment, nor within the Government's employment.

Second, the "Doe" case spoke the truth when it said the Congressmen were employees of the People/constituents, but then ignored that and jumped into the terms of the FTCA which applies only to employees of the Government, the United States.

This "Doe" case said the Congresspersons conduct of defamation was part of their job duty, then dismissed the case because their conduct of defamation is not part of their job duty!

In the last case cited by the A.G. in Carroll's case, Operation Rescue Nat. v. United States, 975 F. Supp. 92, 94-95 (D. Mass. 1997), in a political speech, U.S. Senator Kennedy said that Operation Rescue, an anti-abortion group, had a policy of firebombing and even murder.  So they sued Kennedy for defamation in a state court.  So pursuant to the "FTCA", the United States Attorney for Massachusetts certified that Senator Kennedy was acting within the scope of his employment when he made the remarks, that is, it was his job duty to say false things about others, then the United States Attorney removed the case to federal court where the United States was substituted for Senator Kennedy as the defendant, as contemplated by the FTCA, and because the FTCA does not provide a remedy against the United States for the employee's slanderous words, the case was dismissed!

Carroll, the Attorney General (A.G.) arbitrarily, capriciously and unreasonably trespasses into your case and moves it into Federal Court simply via edict and decree, based on the lie that Trump's talking about your lawsuit, defaming it, is his job duty to do because talking about your lawsuit sees to it that the Government is doing what it is supposed to do according to the Constitution!

The AG knows that talking about your lawsuit and saying slanderous words has nothing to do with seeing to it that the Government is doing what it is supposed to do. His citation of the bad, evil court cases does not justify lying.

The McDonald's cashier knows that her talking about her divorce with her attorney over the phone while you wait to place your order has nothing to do with her scope of employment with McDonalds, has nothing to do with her job duty to serve you so that McDonalds can sell a hamburger and so make some money. Yet the AG, if he were the owner of that McDonald's store, would be happy with his cashier because she was doing her job duty, talking on the phone while you waited for service and eventually you left without buying anything because you ran out of patience!

Maybe this writer should say that this is the truth and so slander the AG because this is how the AG would react if he owned the store,--But note, it would not be slander because nobody would believe this about the AG if I said this. ""There can be no defamation unless the recipient of the communication believes it to be defamatory, i.e., the plaintiff is defamed in the recipient's eyes." L. Eldredge, The Law of Defamation 44 (1978)." Little v. Spaeth, 394 N.W.2d 700, 706 (N.D. 1986). Trump's words were not slander against you because the hearer or reader of his words knew he was defending against your accusation.

In your case, Carroll, as well as in the "Doe" case, etc., the A.G. should never have even intervened nor even considered intervening and moving the case out of State Court and into Federal Court. Carroll, do you see the 'rape' the A.G. is doing to you and your case. The A.G. in your case, and the "Doe", id. case and in the other cases cited by the AG, all did the same thing. So in your case, they switched Trump out from your case and inserted the United States, and then saying that the U.S. is immune, when in truth the case does not come within the terms of the FTCA, should not have been brought under the auspices of the FTCA, should not have been put within the context of a *respondeat superior* type of action.

Carroll, what they are doing to your case is like if you had signed an agreement that when you die the doctors can harvest your organs and give them to people who need them. And so they come and grab you, take you to the hospital and kill you, so that they can harvest your organs early, and so it all was legal. But the lie is that they did not wait until you died, but they killed you so as to 'legally' harvest your organs. They say it is legal, but based on their lie because they killed you, did not wait for you to die. The AG, and the court cases he cited, say it is legal, but based on their lie that Trump's words and conduct were his job duty when they were not and so putting you within the FTCA, and then dismissing your case because the FTCA says you should not have brought your case within the parameters of the FTCA.


As a note, it appears that probably the Attorney General and his agents, Dkt. 1, 1-2, 3, 3-1 through 3-5, etc., in Carroll I, have subjected themselves to being sued by Carroll for malicious use of process. Or Carroll should give consideration to sue for tortious interference with her sovereign right to seek remedy for her 'claimed' tort in New York State Court. Or sue them for slander of title to your lawsuit and right to sue in State Court.

The fact that Carroll's action against Trump will be or should be dismissed should not detract from the detriment she suffered from the tortious interference from the Attorney General in her seeking of her remedy.--Justice is the issue here and no one should have to put up with interference in one's affairs from one's Government.

Now for more comment on the illegality of all this:

28 U.S.C. 2679(d)(2) says that the Attorney General can [1] automatically, arbitrarily intervene in your case and that [2] he can change the venue of your case to a different court and to a different jurisdiction 'foreign' to the State of New York. And it provides [3] that the United States automatically shall be substituted for Trump as defendant, that the United States shall automatically, arbitrarily be subrogated for Trump.

This provision violates the Separation of Power Principle between the Federal Government and the Judicial Branch of the State Government in that Congress, the statute, has assumed the judicial function of the State Court and determined that the Attorney General has the right to intervene in your case, to trespass into your case. Carroll should have been allowed to first respond to their intervention and Removal request and then have the State Court decide if the Attorney General can intervene, and if the case should be moved to a different venue and to a different jurisdiction.

It also violates Due Process of Law in that it provides that it is to be done "arbitrarily, capriciously, and unreasonably", without probable cause, without any cause except by mere decree, edit, or say-so. See Dkt. 1-2, the mere edict and decree or say-so of the Certificate of the Director of the Torts Branch of the Department of Justice.

Being arbitrary, capricious and unreasonable violates Due Process of Law. In this case it allowed the AG to do trespass on your case. And it allowed him to just blatantly lie, and to make that lie the law of the case as respects your New York case.

28 U.S.C. 2679(d)(2) is unconstitutional because it assumes the State Judicial Branch judicial function of determining [1] whether the United States shall be allowed to intervene in the action, and [2] whether a change of venue and jurisdiction should be allowed, and [3] whether the United States should be allowed to subrogate and substitute itself for the liability of the government employee.

This entire statute violates the Separation of Power Principle which exists between the Federal Government and the Judicial Branch of the New York State Government.

In other words, the Federal Government, the United States, via Congress, has officially, by policy, viciously authorized the invasion and trespass upon the judicial functions of the Judicial Branches of the States. And they have thereby also viciously invaded and trespassed upon a Citizen's right to sue in the New York State Court, and the right of the citizen to direct the course of their case.

They have predetermined that another person, the United States, should be allowed to intervene, and have predetermined that a case should change venue, (and should be allowed to subrogate itself for the defendant).

They have predetermined that you can sue pursuant to the *respondeat superior* theory, and then say you cannot sue pursuant to that theory, when in truth you never were allowed to sue pursuant to that theory.

Under due process of law, the United States, if this is what they feel is right, has the right to file a motion to intervene, and ask to be subrogated for the defendant, and ask that the venue be

changed.  That is, the U.S. does have a due process remedy at the common law.  They don't need these Westfall statutes.  Further, if the defendant feels his employer, the Government, should pay for his conduct, the defendant, Trump, could have moved to make the U.S. an involuntary defendant or a third-party defendant.

But instead of due process of law, instead of the common law, the U.S. and the AG willfully and maliciously use and abuse this statute so as to achieve a result the due process forbids, the taking of Carroll's right to seek redress for the wrong she claims Trump did to her.

Yikes!  Talk about being raped.  Carroll, the Attorney General really wanted to rape you, really wanted to rape your right to seek redress!  And doing this under pretext of law, under color of law!  Carroll, this is like what it is said the four-letter acronym F--- came from, "Fornicate Under Command of the King".  It is said or it is lore or gossip that at one time soldiers would write this, making it look like an official document from the King, as an order to women, that they had to yield to the desires of the soldiers.  And so the women would either yield, or, knowing it was fake, use it as an excuse to say they had to yield.  Carroll, they are holding up their 'document' and saying they get to do it to you.

Carroll, Trump is 'nothing'.  Your Government raping you, now that is something.  You like to write books and magazine articles about how bad us men are or can be, done in a "female chauvinistic type manner" or "war between the sexes" spirit.  Maybe this will stimulate your writer's 'hormones' and get you to write a magazine article or book about how bad the legal system can be, how 'rapist' it can be.

Carroll, after you read the rest of this Petition to this Court, you may think I am against you.  NO.  I am against injustice.  I am in favor of the rule of law.  I am not in favor of Trump

nor of you, just in favor of justice. Certainly, your action against Trump needs to be dismissed. This will be justice for the rule of law and therefore for Trump. But you need justice too. Investigate, ask for advice, then sue the Attorney General and his servants/employees. The Attorney General holds the Office of the Attorney General. As such, he is liable for all that he does, in this case tortuously interfering with your right to seek a remedy. Now, people will say, but it was not the Attorney General who filed the paperwork in your case, etc. That guy did it, not the Attorney General. No, the reason the Attorney General is also liable, including the other people, is because it was his job to perform all, 100% of the duties and functions of that Office and Position. Now, certainly we know that no one man can do all that work, so the Attorney General is authorized to hire the help he needs. But that does not mean that he is not liable to you. It is his job to see to it that all his servants/employees/agents are bonded to him, so that if they do something wrong he is indemnified for their wrong, unless, of course, he told them to do what they did, then the bonding company would not need to pay him. Every Officer, the Secretary of the Treasury, the Attorney General, Secretary of Education, etc. is liable for what their employees do. This is why each Officer has to be very careful to not only himself operate within the law when dealing with a citizen such as you, but also make it clear to his employees or subordinates that if they are not sure they are doing right, that they should consult him first before they interact with the citizen.

Carroll, I am on your side, not because I am on your side, but because I am on the side of the rule of law. But, also, the rule of law says that your action against Trump must be dismissed.

Repeating, Carroll, you got raped on this. But because law is oftentimes a 'mystery' to most people, you don't even know that you got raped. But be honest with yourself--I'll bet that when you first heard about what the Attorney General was going to do, I bet you got really upset and

worried. I bet you thought "how can this be", it does not make sense. I bet you thought "how can an employee of the government rape me or have sex with me before he even works for the government, then slander'/libel me while working for the government, and then be immune"! Yes, Carroll, in truth you knew you were being 'raped', it is just that that you couldn't put a name to what they were doing to you, to describe what they were doing to you, because the law is a mystery to you as it is to most people.

Carroll, read what the AG said to justify his conduct on page 4 of his Memorandum of Points and Authorities, Dkt. 3-2, citing the cases: Basically, it comes down to that when the President or Congressperson talks to the media, and it interests them or the public, then I guess that this means that if the press asks a government employee (the President) what his wife is making for supper, and he replies "beef stroganoff", that the President is upholding the Constitution, is performing his job duty to the Government. Certainly, the Press, and maybe even the People, may be or are interested in what his wife is going to cook for supper and so it is a public interest. But that is not a performance of one of his Presidential job duties as it relates to being a government employee. If you or I did this at work, our boss would yell, quit talking to your friends and telling them what your wife is cooking for supper and get back to work.

This is the state of your and our Judicial system, and the state of the Bar Association, etc.


As a final good note for you, Carroll, not only are you entitled to sue the Attorney General and the people involved in the paperwork they filed in your case, but this time you can also go for what lawyers like to call "deep pockets" and sue the United States, not because of the rule of *respondeat superior*, but because they authorized and encouraged and ratified their tort of trespass, invasion and interference with your right to seek redress in State Court. It became the

policy of the United States, via their enactment of 28 U.S.C. 2679(d)(2), to order or authorize or ratify their Officers and employees to trespass and interfere, that is, the United States aided and abetted and ratified the trespass, acting arbitrarily, capriciously, unreasonably, and unconstitutionally, depriving you of your rights without due process of law, contrary to the due process of law provision of the New York State Constitution and the same clause of the Fifth Amendment of the U.S. Constitution, (and there may be issues relating to the Ninth or Tenth Amendments of the U.S. Constitution). The United States ratifies and sanctions this type of conduct against you because even the Federal Judicial Branch, the Federal courts, have sanctioned, endorsed and authorized these torts against the Citizens. Carroll, they want to steal your right to seek redress in State Court, to murder your case based upon their lie that Trump's talk about your case is his job duty to do.

They slander your lawsuit, saying you are suing and should be suing because Trump's slanderous talk about you is a doing of his job duty of seeing that the Government is accomplishing its purpose.

Carroll, your law suit cannot be eligible to be within the terms of the FTCA, of the rule of *respondeat superior*, then once they put you in it, not be eligible to be within the terms of the FTCA, not be eligible to be within the terms of the rule of *respondeat superior*!


Conclusion


Wherefore, this Addresser and Remonstrancer hopes that this Address is and will be of value to this Court as this Court seeks to do right by the rule of law.

106

This writer is well aware that the trial is going on, and perhaps may be over by the time this is received in the mail. He started on this before the trial started. But he is ashamed of himself for having waited to write this because now the trial is going on. But these issues can be raised because they go to the jurisdiction of this Court to render the judgment rendered or to be rendered. These issues will make the judgment void if judgement is rendered for Carroll before this reaches this Court.

> "An *amicus* brief should normally be allowed when a party is not represented competently or is not represented at all, ... or when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." Ryan v. Commodity Futures Trading Com'n, 125 F.3d 1062, 1063 (7th Cir. 1997).
> "The usual rationale for *amicus curiae* submissions is that they are of aid to the court and offer insights not available from the parties. ... The circumstances under which courts consider an *amicus* brief to be an aid to the court are limited: "[a]n *amicus* brief should normally be allowed when a party is not represented competently or is not represented at all, when the *amicus* has an interest in some other case that may be affected by the decision in the present case . . . or when the *amicus* has unique information or perspective." Soos v. Cuomo, 470 F. Supp. 3d 268, 284 (N.D.N.Y. 2020).

This petition raises issue(s) not raised by Trump, and the last issue was not raised by Carroll, and so there is justice.

This Addresser and Remonstrancer prays that this Court will hear this petition, and so discover that this Address and Remonstrance is the friend of this Court, of the Constitution, and of justice for all in this case.


Dated this 5th day of May, 2023.


Reuben Larson
1100 E. Boulevard Ave., #314
Bismarck, N.D. 58501
phone: 701-805-6701