# EXHIBIT B

1   situation, to kill anything that he might think invited the

2   attack.

3           When Trump didn't stop, Ms. Carroll shoved him.  She

4   kicked at him.  She stomped her feet.  She struggled.  She hit

5   him with her purse, tried to knee him off her.  But she

6   couldn't.  He was a big man, had easily a hundred pounds on

7   her.  And he was determined.

8           Trump grabbed her arms with one hand and held her up

9   against the wall.  He took his other hand and jammed it up her

10  dress, pulling down her tights, grabbing her vagina, and

11  pushing his fingers inside her.  He kept his fingers there for

12  a few seconds and then removed his hands and forced his penis

13  inside her.

14          Eventually, Ms. Carroll was able to get her knee up

15  high enough to get Donald Trump off of her.  She pulled up her

16  tights, ran out the dressing room, and fled the store out onto

17  Fifth Avenue.  The whole attack lasted just a few minutes, but

18  it would stay with her forever.

19          During this trial you are going to hear from

20  Ms. Carroll, and she will describe in painstaking and painful

21  detail what happened that evening in Bergdorf.  I expect that

22  you will find her testimony credible and convincing, both

23  because of what she will say and what she will not say.  You

24  will not hear Ms. Carroll embellish her story or try to make it

25  sound better than it is.

1          It was hardly a surprise that Donald Trump and

2     Ms. Carroll were the only people in this area of the sixth

3     floor of Bergdorf's that night, that no one saw them in the

4     minute or two it took them to walk from the escalators to

5     lingerie, and that no one heard, as Ms. Carroll struggled to

6     break free of Trump's brief brutal attack.

7          But there is more.  As I mentioned, Ms. Carroll told

8     two friends about the assault almost immediately after it

9     happened, and you are going to hear from them as well.

10         Ms. Carroll will testify that after she escaped the

11    dressing room, she ran out of the store onto Fifth Avenue.

12    Disoriented, shocked, and not knowing what to do, she pulled

13    out her cell phone -- yes, they had them in the '90s -- and

14    called her friend, Lisa Birnbach, another respected journalist.

15         Ms. Birnbach will testify that when she answered the

16    phone, Ms. Carroll was hyperventilating and was anxious as she

17    reported what just happened.  Ms. Carroll told Ms. Birnbach

18    that she had run into Donald Trump as she was leaving

19    Bergdorf's, that he asked her to help him pick out a gift, that

20    they ended up in the dressing room of the lingerie department,

21    and that Trump pulled down her tights and forced his penis

22    inside her.  You will hear that Ms. Birnbach told Ms. Carroll,

23    in no uncertain terms, E. Jean, you have been raped.  You have

24    to go to the police.  But Ms. Carroll said no.  She was ashamed

25    and she was afraid.  So she made Ms. Birnbach promise never to

N4q2Car2                    Carroll - Direct                    148

1    Q.   How large a family?

2    A.   Mother, father, four children, and a dog and a cat.

3    Q.   Where do you fall in the children?

4    A.   I am the firstborn.

5    Q.   Are you currently married?

6    A.   No.

7    Q.   Why are you here today?

8    A.   I am here because Donald Trump raped me, and when I wrote

9    about it, he said it didn't happen.  He lied and shattered my

10   reputation, and I am here to try to get my life back.

11   Q.   We are going to talk at length about that in a few minutes,

12   but let's first cover a little bit more of your background.

13   Okay?

14   A.   Um-hmm.

15   Q.   Where did you go to college?

16   A.   Indiana University.

17   Q.   Can you give us a sense of what sorts of activities you

18   were involved in?

19   A.   I was in a sorority and I was a cheerleader.

20   Q.   How about beauty pageants?

21   A.   My sorority would nominate me to be in beauty pageants.

22   Q.   I want to show you what's been marked for identification as

23   Plaintiff Exhibit 13.

24           Do you recognize this?

25   A.   Yes.  That's Ms. America on the right and that's my

1  Q.   Why not?

2  A.   I -- the short answer is because Donald Trump raped me.

3  Q.   How did that affect you in a way -- can you describe for

4  the jurors why that assault left you unable to form a romantic

5  connection?

6  A.   What I did was I flirted with Donald Trump.  I laughed with

7  him.  I tried to be -- tried to engage him.  I laughed at his

8  jokes.  I found him charming.  And what happened to me when I

9  was flirting?  I got into serious trouble.  And so I, after

10 that event, I found it's impossible for me -- if I meet a man

11 who is a possibility, it's impossible for me to even -- well,

12 to even look at him and smile.  And in order to fall in love or

13 have dinner with someone, you've got to at least look at them

14 in the eye and smile, and I couldn't -- I couldn't force myself

15 to show a man that I liked that I liked them.  I couldn't do

16 it.  It just led to terrible consequences, hence, I didn't meet

17 anybody.

18 Q.   I'm sorry to ask this so directly, but have you had sex

19 since Donald Trump assaulted you?

20 A.   No.

21 Q.   This person you just described to us as sort of having shut

22 down, is that how you portrayed yourself on television

23 following the assault or in public appearances?

24 A.   No, I have a, I have a, I have a public self, which is

25 vibrant and wanting to help everyone, and always, always upbeat

1    A.  Because he -- Cam didn't -- it was not violent.

2    Q.  Has -- sorry?

3    A.  The incident in Bergdorf's was very violent.

4    Q.  I want to -- for clarification, was the -- you mentioned

5    William Goldman.  Was your relationship with William Goldman

6    before or after Mr. Trump assaulted you?

7    A.  Before.

8    Q.  Have you ever been diagnosed with any mental health

9    conditions such as PTSD or depression?

10   A.  No.

11   Q.  Have you taken any medication for depression or anxiety?

12   A.  No.

13   Q.  Are you a happy person, Ms. Carroll?

14   A.  I am a happy person.  I know it seems strange to hear me

15   after today, but I'm basically a happy person.  But I think I

16   could work on a few things.

17   Q.  How often, if at all, do you think about the assault that

18   night at Bergdorf's?

19   A.  Well, that very night the visions would wash over me.  I

20   couldn't -- it was horrible.  Not only did it happen in

21   Bergdorf, but it happened over and over and over in my mind

22   because I did not have the ability to strike to get the visions

23   out of my head.

24            As I learned to deal with the sudden intrusions, I got

25   better and better at moving them aside.  And so they -- I've

1   Q.   Why did you think he was evil?

2   A.   Because he raped me.

3   Q.   What about his politics?  Do you agree with those?

4   A.   I barely know what they are.

5   Q.   What did you think of him as a president?

6   A.   Oh, I thought he was terrible.

7   Q.   Why didn't you speak publicly about the assault when he

8   first started running for election?

9   A.   My mother was dying in Indiana.  I was at her side with my

10  brothers and sisters.  That was during October.  And I

11  noticed——and I'm sure I'm not the only one——that the more women

12  who came forward to accuse him, the better he did --

13           MR. TACOPINA:  Objection, your Honor.

14  A.   -- in the polls.

15           MR. FERRARA:  Apologies.  There was an objection, your

16  Honor.

17           THE COURT:  I'm sorry.  I didn't hear it at all.

18           MR. TACOPINA:  Sorry.

19           THE COURT:  I'm always listening for Mr. Tacopina's

20  very soft voice.

21           MR. TACOPINA:  It hasn't even been that often.

22           THE COURT:  That is true.

23           What is the objection, Mr. Tacopina.

24           MR. TACOPINA:  The reference, your Honor, on line 24,

25  end of line 24.

1   Q.  Sitting here today, do you recall what he said?

2   A.  Yes.

3   Q.  Can you describe, to the best of your recollection, what

4   you remember.

5   A.  It was surprising because I thought he would deny it

6   because Donald Trump generally denies.

7            MR. TACOPINA:  Objection, your Honor.

8            THE COURT:  Sustained.

9            Rephrase the question, counselor.

10  Q.  Let me do it this way.  Let me show you what has been

11  marked for identification as Plaintiff Exhibit 1.

12  A.  Oh.  Thank you.

13  Q.  Do you recognize this?

14  A.  Yes.

15  Q.  What is this?

16  A.  It's a statement from President Donald J. Trump.

17  Q.  What's the date?  It's at the bottom.

18  A.  June 21, 2019.

19  Q.  Without getting into the substance, is this statement

20  responding to your accusation?

21  A.  Yes.

22            MR. FERRARA:  Plaintiff offers Exhibit 1, your Honor.

23            MR. TACOPINA:  No objection.

24            THE COURT:  Received.

25            (Plaintiff's Exhibit 1 received in evidence)

1              MR. FERRARA:  If we could publish this, please, Mr.

2    Lam.

3              Mr. Lam, if we could zoom into the sort of box -- if

4    we could scroll down a little further.  I am not going to read

5    this, but I am just going to leave for the jury to look at.

6    Q.   I just want to call your attention, Ms. Carroll, to just a

7    few lines in this.

8    A.   Yes.

9    Q.   If we look at the second line down, do you see it says I

10   have never met this person in my life?

11   A.   Yes.

12   Q.   She is trying to sell a new book?

13   A.   Yes.

14   Q.   That should indicate her motivation.

15   A.   Right.

16   Q.   I'd like to call your attention to the bottom.  If anyone

17   has information that the democratic party is working with

18   Ms. Carroll and New York magazine, please notify us as soon as

19   possible.

20   A.   Um-hum.

21             MR. FERRARA:  We can bring that down, Mr. Lam.  Let's

22   bring up Plaintiff's 2.

23   Q.   Do you recognize this?

24   A.   Yes.

25   Q.   What is it?

1    A.   It's an impromptu press conference with President Trump

2    before Marine One, before the helicopter -- before he gets on

3    the helicopter.

4    Q.   What's the date in the front of this document?

5    A.   June 22, 2019.

6    Q.   Would this be the day after?

7    A.   Yes.

8    Q.   Would this be the day after the piece came out in the cut?

9    A.   Yes.

10   Q.   If we turn to --

11             MR. FERRARA:   Mr. Lam if we can turn to the page that

12   has the Bates stamp ending 1800.   That's the one.

13   A.   Um-hum.

14   Q.   On this page does then President Trump address a question

15   about you?

16   A.   Yes.

17             MR. FERRARA:   Your Honor, plaintiff offers 2 with the

18   same caveat that we will endeavor with defense to make sure

19   that we only have in the relevant portions of this exhibit.

20             MR. TACOPINA:   With that agreement, yes, your Honor.

21             THE COURT:   Received on that basis.

22             (Plaintiff's Exhibit 2 received in evidence)

23             MR. FERRARA:   If we could just show the front page,

24   Mr. Lam.   If we could zoom in on the middle, remarks by

25   President Trump, just so the jury can orient themselves, the

1    middle of the page, the date.  If we could now flip to 1800,

2    the bottom question and that response.

3                Is there a way to pull that out?  Thank you so much,

4    sir.

5    A.   Um-hum.

6    Q.   Again, just, to flag a few portions, certainly not to read

7    this all, then President Trump says:  I have no idea who this

8    woman is.

9    A.   Yes.

10   Q.   That you have accused other men of things?

11   A.   Yes.

12   Q.   It's a totally false accusation?

13   A.   Yes.

14   Q.   You see that?

15   A.   Yes.

16               MR. FERRARA:  If we can flip the page to 1801 at the

17   top.

18   A.   Um-hum.

19               MR. FERRARA:  We can now take this down.  Thank you.

20               Why don't we put up, just for the witness.

21   Q.   If I could show you, Ms. Carroll, what's been marked for

22   identification as Plaintiff's Exhibit 3.

23   A.   Yeah.

24   Q.   What is this?

25   A.   This is June 24, 2019.  It is an interview with President

1    Trump by The Hill, the website The Hill.

2            MR. FERRARA:  Your Honor, plaintiff offers Exhibit 3.

3            MR. TACOPINA:  No objection.

4            THE COURT:  Received.

5            (Plaintiff's Exhibit 3 received in evidence)

6            MR. FERRARA:  If we could show this to the jurors,

7    please.

8            MR. TACOPINA:  Your Honor, there is no problem with it

9    going in.

10           MR. FERRARA:  If we can sort of minimize this, and we

11   can turn to the next page.

12   Q.  If we look at the top, calling your attention, Ms. Carroll,

13   there, President Trump is quoted as saying:  You are totally

14   lying.

15   A.  Yes.

16           MR. FERRARA:  If we could go to the third paragraph,

17   please, Mr. Lam, where he says:  I'll say it with great

18   respect.  Number 1, she's not my type.  Number 2, it never

19   happened.  It never happened, OK.

20   A.  Um-hum.

21           MR. FERRARA:  We could take that down.

22   Q.  What do you understand that to mean, Ms. Carroll, that

23   you're not his type?

24   A.  It means that besides me being a liar and a woman out to

25   sell books and an operative of the democratic party and a woman

1    who accuses all sorts of other men for rape.  I'm too ugly to

2    attack, too ugly to rape.

3              (Continued on next page)

1   Q.   I think before I showed you those exhibits, I think you may

2   have said you were surprised by how Mr. Trump reacted?

3   A.   Yeah.

4   Q.   And I will just ask you directly, Ms. Carroll, you had

5   related, you know, an account in which you said that he had

6   raped you.  How did you expect him to respond?

7   A.   I thought he was going to say it was consensual.

8   Q.   Why was what he actually said so much -- why was it worse

9   than him describing it as consensual?

10  A.   He said it didn't happen.  He said it didn't happen.  He

11  was there.  He knows it happened.

12  Q.   Did anyone from then-president Trump's staff reach out to

13  you about your allegations?

14  A.   No.

15  Q.   Did anyone on his behalf ask about your political

16  affiliations?

17  A.   No.

18  Q.   What about your financial situation?

19  A.   No.

20  Q.   What happened after -- what happened to you after Mr. Trump

21  made those statements?

22  A.   People have gone through much worse than being reviled by

23  president Trump for three days, much worse.  I understand that.

24  But, boy, it hit me and it laid me low because I lost -- I lost

25  my reputation.  Nobody looked at me the same.  It was gone.

1   Even people who knew me would look at me with, you know, pity

2   in their eyes and the people who had no opinion now thought I

3   was a liar and hated me.  Oh my God.  The force of hatred

4   coming at me was staggering.

5   Q.   How did it -- how did that hatred, how did it come at you?

6   In what form?

7   A.   People telling me they are reading about it on the

8   Internet, am I E. Jean Carroll; opening up my e-mail and seeing

9   threats against my life; opening up my *Ask E. Jean* letters

10  which are generally -- you know, it's my lifeline, it gives me

11  spirit, reading Ask E. Jean, and they are saying terrible

12  things to me.

13  Q.   Did I hear -- I apologize.

14            How many messages sort of threatening you physically

15  did you receive?

16  A.   Not a lot, but serious threats, around ten.

17  Q.   What was your reaction to receiving in particular those

18  threatening messages?

19  A.   I bought bullets for a gun that I owned.

20  Q.   What did you do with the messages themselves?

21  A.   Oh, I deleted them immediately.

22  Q.   Why did you delete them?

23  A.   Well, they were on my computer.  I thought I could handle

24  it just by getting -- deleting them and never seeing them

25  again.

1   Q.  To be clear, has anyone physically hurt or attacked you

2   since president Trump made those statements?

3   A.  No.

4   Q.  Did you also -- have you also received positive support

5   since --

6   A.  Yes.

7   Q.  Just for the court reporter's sake, I am just going to

8   repeat the question.

9        Have you received positive support since Mr. Trump

10  made those statements?

11  A.  Yes.

12  Q.  In what form has that -- did that take?

13  A.  Loving, heart-swelling letters coming from people all over

14  the country.  You know, it bore me up.  But here's the thing.

15  The vileness and the dirt and the seedy language and people

16  describing what they think I did and why nobody in the world

17  would touch me because of my enormous ugliness, it sort of

18  swamped the heartfelt letters that I was receiving on the other

19  hand.

20  Q.  Sitting here today, are you happy you have spoken publicly

21  about what Mr. Trump did to you or do you regret it?

22  A.  I have regretted this about a hundred times, but in the

23  end, in the end, being able to get my day in court finally is

24  everything to me, so I'm happy.

25  Q.  Are you okay to keep going?  Do you --

1   A.  I'm happy.  This is -- I'm happy.  I'm glad that I got to

2   tell my story in court.

3                MR. FERRARA:  Your Honor, I don't want --

4   Q.  Ms. Carroll, do you want to take a moment?

5   A.  Yes, I'm going to get myself together here in court.  This

6   is my moment.  I'm not going to sit here and cry and waste

7   everybody's time.

8   Q.  So shall I keep going?

9   A.  Yes.

10  Q.  Okay.  How, if at all, do you believe that Mr. Trump's June

11  2019 statements have affected your reputation?

12  A.  I am no longer believed.  I got fired.  I lost my readers.

13  I lost eight million readers.  My magazine work has suffered.

14  The number of letters I receive has gone down.  I am still in

15  their swinging.  I've still got my  Ask E. Jean column on

16  Substack, and I have got 19,000 readers.  But it's been a huge

17  loss, and I'm slowly building it back.

18  Q.  If you don't mind, I'm going to unpack some of what you

19  just said.

20               So I think I heard you say you were fired.

21  A.  Yeah.

22  Q.  From where were you fired?

23  A.  *Elle* magazine.

24  Q.  When did they fire you?

25  A.  They fired me -- they came to my house, a five-member

1   photographic crew, to take my picture for the next two years,

2   and then at the end of the year they fired me.

3   Q.   Do you know why you were fired?

4   A.   Yes.

5   Q.   Why?

6   A.   Because I accused Donald Trump.

7   Q.   Were you able to obtain a new job?

8   A.   No.

9   Q.   What do you do now for work?

10   A.   I have a Substack.

11   Q.   And what is Substack?

12   A.   A Substack is a way for writers to reach their audience,

13   their readers, directly through newsletters.

14   Q.   What was the readership of your column in *Elle* towards the

15   end, sort of the end of the period you were writing that column

16   for *Elle*?

17   A.   Eight million.

18   Q.   What is the readership of your Substack now?

19   A.   It's probably gone down from -- I just said 19,000, it's

20   probably 18,098.  I don't know.  I haven't looked at it today.

21   Q.   Well, how would you compare financially.  How much were you

22   making your last year at *Elle* versus what you are making now at

23   Substack?

24   A.   Well, because I worked -- because the *Elle* column was

25   published once a month and I received $5,000 a month, I think

1   it was $5,000?  Yeah, $5,000 a month.  And now I turn out three

2   columns every week, so I am doing, I don't know, ten times the

3   work, and I still manage to have about the same income.

4   Q.  Might it be a little more?

5   A.  Slightly more, yeah.

6   Q.  Do you pitch work to other publications?

7   A.  Yes.

8   Q.  What other publications have you written for since you left

9   *Elle*?

10  A.  Outside -- no, *Vanity Fair* and *Atlantic*.

11  Q.  I want to ask you a couple of questions about the articles

12  you wrote for *The Atlantic*.

13  A.  Yes.

14  Q.  Are you familiar with a woman named Jessica Leeds?

15  A.  Yes.

16  Q.  Who is Jessica Leeds?

17  A.  Jessica Leeds is a woman my age who came -- who told her

18  story to *The New York Times* about Donald Trump on an airplane

19  in 1980 or 1979.

20  Q.  Have you ever interviewed Ms. Leeds?

21  A.  Yes, I have.

22  Q.  Why?

23  A.  When I told my story, people started to compare me to the

24  other women who have come forward.  And as a journalist, I

25  realize that the other women's stories had not been told in

N4RMCAR2                          Carroll - Direct

1   Q.   Why?

2   A.   I'm a journalist.  From time to time, I report on the case.

3   It's something that I find interesting.  I think a few other

4   people might also.

5   Q.   For my next question, if you could remind the jurors, you

6   currently write for Substack?

7   A.   Yes.

8   Q.   Remind us quickly, what is Substack?  What do you write for

9   Substack?

10  A.   Substack is a way for writers, journalists to reach their

11  readers through newsletters.

12  Q.   Have you encouraged people to subscribe to your Substack in

13  order to get updates from you about this case?

14  A.   Yes.

15  Q.   Why have you done that?

16  A.   I thought people would be interested, and I certainly have

17  received the response that they are very, very interested in

18  this case.

19  Q.   How, if at all, does it help you financially to have

20  additional subscribers to your Substack?

21  A.   It would definitely help financially.

22  Q.   How did you feel when you first filed the case in 2019?

23  A.   Scared, but proud.

24  Q.   Fair to say this is -- would this be the fourth year that a

25  lawsuit has been going on?

N4RMCAR2                         Carroll - Direct

1   A.   Yes.

2   Q.   From the time you filed it to now, have there been

3   important moments along the way?

4   A.   Yes.

5   Q.   How, if at all, have you celebrated some of those moments?

6   A.   I wouldn't call celebrating, but I would call it enjoying a

7   good moment.

8   Q.   How have you enjoyed those good moments?

9   A.   Meet with my friends.  We might have a toast.  And feel

10  that we were happy to be together.

11  Q.   Have some of those been what we think of as parties?

12  A.   Yes.

13  Q.   What sorts of folks would be at some of these parties?  Can

14  you give us a sense?

15  A.   Yes.  Journalists, podcasters, commentators.

16  Q.   How about folks we would think of as celebrities?

17  A.   Yes.

18  Q.   Have you enjoyed the attention you have received from this

19  case?

20  A.   I like attention.  There is no question, I like attention.

21  I don't particularly like attention because I'm suing Donald

22  Trump.  That is not -- getting attention for being raped is

23  not -- it's hard.  Getting attention for making a great

24  three-bean salad, that would be good.

25  Q.   Do you ever regret bringing this lawsuit?

N4RMCAR2                    Carroll - Direct

1   Q.   Why did you agree in the first place?

2   A.   I was a big admirer of Ivy's work.

3   Q.   Why did you stop filming?

4   A.   Because this lawsuit became very important, and Ivy and I

5   decided together, we should cease.

6   Q.   Have you received any payments for that documentary?

7   A.   No.

8   Q.   I want to call your attention -- I think this is sort of

9   the last topic.  I want to call your attention to October of

10  2022.

11  A.   Yes.

12  Q.   Do you recall, what, if any, additional relevant statements

13  did Donald Trump make at that time?

14  A.   Just when I had managed to get my Substack up and running,

15  get my career a little bit back and feeling that things were

16  going to be OK, Donald Trump posted on social media every

17  single thing that I was suing him for.  He repeated it on

18  October 12 and then added the fact that he thought the justice

19  system in America was broken, and one of the prime examples of

20  the justice system being broken was my suing him.

21  Q.   Let me show you what has been marked for identification as

22  Plaintiff's Exhibit 4.

23          Do you recognize this?

24  A.   Yes.

25  Q.   What is it?

N4RMCAR2                          Carroll – Direct

1    A.   This is Donald Trump's Truth Social piece.

2    Q.   Are you able to see the date?

3    A.   October 12, 2022.

4            MR. FERRARA:  Your Honor, plaintiff offers 4.

5            THE COURT:  Received.

6            (Plaintiff's Exhibit 4 received in evidence)

7            MR. FERRARA:  If we could show that to the jury, Mr.

8    Lam.

9            THE COURT:  Yes.

10           MR. FERRARA:  Thank you.

11           Mr. Lam, maybe we could scroll up and focus right

12   underneath where it says statement by Donald J. Trump.  That

13   probably works.

14   Q.   Is this the statement, Ms. Carroll, where Mr. Trump called

15   your case a con job?

16   A.   Yes.

17   Q.   Where he called the justice system a broken disgrace?

18   A.   Yes.

19   Q.   Just focusing on the middle, again, he says, this woman is

20   not my type?

21   A.   Yes.

22           MR. FERRARA:  I am just giving the jurors another

23   moment to read it, your Honor.  Of course, the jurors will have

24   this as a marked exhibit.

25           Mr. Lam, I will ask that you take this down and we can

N4RMCAR2                          Carroll - Direct

1    keep moving.

2    Q.   Are you on Truth Social, Ms. Carroll?

3    A.   Yes.

4    Q.   How did you find out about this statement?

5    A.   I heard from several people that he had posted it.

6    Q.   How, if at all, do you believe this statement affected your

7    reputation?

8    A.   I really thought I was gaining back a bit of ground.   I

9    thought, it's starting to go and I felt, you know, happy that,

10   you know, I was back on my feet, had garnered some readers, and

11   feeling pretty good, and then, boom, he knocks me back down

12   again.

13   Q.   Were you surprised by the statement?

14   A.   Stunned.

15   Q.   Why?

16   A.   Because I'm suing him for saying these very things.

17   Q.   In light of Mr. Trump's October 22 statement, did you file

18   a second lawsuit?

19   A.   Yes.

20   Q.   Is that second lawsuit why we are here today?

21   A.   Yes.   This is why we are here.

22   Q.   What did you sue him for in the second lawsuit?

23   A.   I sued him for defamation of character.

24   Q.   Anything else?

25   A.   Yes.   I also sued him for assault.

1   *For*, the one that's up on the screen --

2           MR. TACOPINA:  Your Honor, is it on the screen for

3   everyone in this courtroom?  Could the Court inquire?

4           THE COURT:  Yes.

5           MR. TACOPINA:  The jury as well?  Okay.

6   BY MR. TACOPINA:

7   Q.  Now, that is your book in which you included the story

8   about your supposedly being raped by Donald Trump in a Bergdorf

9   Goodman changing room, right?

10  A.  Not supposedly.  I was raped --

11  Q.  Right.

12  A.  -- by Donald Trump.

13  Q.  That's your version, correct?

14  A.  In Bergdorf.

15  Q.  That's your version, right, Ms. Carroll, that you were

16  raped?

17  A.  Those are the facts.

18  Q.  Okay.  And that's what you included in this book, right?

19  A.  Yes.

20  Q.  And you said yesterday you didn't say anything about the

21  rape when he was running, Mr. Trump, that is, was running for

22  president because you were troubled by the fact he was running

23  for president, but you didn't say anything about it publicly

24  because your mother was dying.  That's what you said yesterday,

25  right?

N4RMCAR4                     Carroll - Cross

1   you were still trying to come up with an explanation for your

2   story as why you did not scream.

3   A.   I wasn't coming up with a story.  It's usually -- I would

4   say more than usually under discussion when a woman is raped

5   and she doesn't scream.  It's usually discussed, why didn't she

6   scream.  Why didn't you scream, E. Jean?  Why didn't you

7   scream?  It's what a woman -- you better have a good excuse why

8   you didn't scream.  Because if you didn't scream, you weren't

9   raped.  I'm telling you, he raped me, whether I screamed or

10  not.

11  Q.   You need a minute, Ms. Carroll?

12  A.   No.  You go right on.

13  Q.   Aside from you not being a screamer, another reason you

14  gave for possibly not screaming was because you were wondering

15  if the pressure Donald Trump's shoulder placed against your

16  chest interfered with your ability to scream, correct?

17  A.   It could be.  I don't need an excuse for not screaming.

18  Q.   OK.

19          Despite that, you certainly wish your story included

20  you having screamed?

21  A.   Of course I do.  More people would have believed me if I

22  had screamed.

23  Q.   Aside from not being a screamer, and perhaps his chest was

24  interfering with your ability to scream, along the same lines

25  at some point you prepared a list of questions -- list of

N512Car3                    Carroll — Cross

1   A.   I meant the story was so funny, shopping with Donald Trump

2   in Bergdorf's, it was such a meaty, juicy, hilarious story.   I

3   was looking forward to actually going out soon and telling

4   everybody the story, perhaps writing about it.   It was just —

5   it was such a New York story, and such a happy story, and then

6   of course it turned tragic.

7   BY MR. TACOPINA:

8   Q.   Now, you first you heard the judge describe the two

9   different lawsuits.   In the first lawsuit you sued Donald Trump

10  in November of 2019.

11  A.   Yes.

12  Q.   And during the course of that lawsuit, in 2021 you started

13  writing a blog on Substack.

14  A.   Yes.

15  Q.   And you make money from your blog based on your

16  subscribers?

17  A.   Yes.

18  Q.   In fact, from that blog you make $70,000 a year or did.

19  A.   Yes.

20  Q.   And you agree that's certainly successful for a Substack

21  blog.

22  A.   Yes.

23  Q.   You talked about a documentary with that famed documentary

24  producer Ivy, it's Meeropol, right?

25  A.   Yes.

N512Car3                    Carroll - Cross

1   BY MR. TACOPINA:

2   Q.   Okay.  So what you were saying was that obviously you were

3   making more money with your Substack podcast than you had done

4   previously?

5   A.   Yes.

6   Q.   Okay.  And the reason you were able to make more money with

7   your podcast following your accusations against Donald Trump is

8   because of the number of people who subscribed to your podcast.

9               MR. FERRARA:  Objection.

10              THE COURT:  Overruled.

11  A.   In part, yes.

12  Q.   Now, it would be fair to say, Ms. Carroll, that your life

13  has been fabulous since your book came out.

14  A.   That is what I like my life to appear to be.

15  Q.   Okay.  As a matter of fact, that's what you said, correct,

16  in the past?

17  A.   I say it quite a bit.  That is how I want people to

18  perceive me.  Underneath my private self is another thing

19  altogether.

20  Q.   Well, you were going on all these TV shows and podcasts

21  after the allegations came out and, for example, in December of

22  2019, you -- that was one month after you filed your initial

23  lawsuit against Donald Trump, right?  December 2019?

24  A.   Yes.

25  Q.   Yeah.  So you appeared on a podcast called the Maris

N512Car3                    Carroll - Cross

1    Review, BV.

2            Please show it to the witness.

3            Do you remember the Maris Review podcast?

4    A.   Yes.

5    Q.   We don't have to play that now.  It's okay.  Take it down.

6            During that podcast, you confirmed that your life had

7    been fabulous since the book came out, right?

8            THE COURT:  Sustained as to form.

9            MR. TACOPINA:  Yeah.

10   BY MR. TACOPINA:

11   Q.   During that podcast, you confirmed or you stated that your

12   life had been fabulous since the book came out.

13   A.   I always say my life is fabulous.  No matter who asks me,

14   what time of day, I will always reply it's fabulous.

15   Q.   Except in this courtroom in front of this jury?

16   A.   In this courtroom I am being forced to tell the truth.

17   Q.   So all these TV shows and all these podcasts and in your

18   book where you say how great your life is, that's all lies?

19   A.   No.  I want -- if I walked in the courtroom today and you

20   said:  Hi, E. Jean.  How are you?  I would have said:  Fine.

21   I'm fabulous.  It is my -- it is the way I present myself to

22   the world.  It's E. Jean the writer, E. Jean the advice

23   columnist.  I am the one, rightly or wrongly, I see myself as

24   solving other people's problems.  That is what my Substack is.

25   That is what I have done for almost 29 years.  So I always say

N512Car3                    Carroll - Cross

1   I'm fine.  The column is not called E. Jean Asks Other People

2   For Their Advice.  It's called Ask E. Jean.  I put up a front.

3   Q.  Right.  I'm not talking --

4   A.  That's what I said.

5   Q.  -- about your column, your advice column, Ms. Carroll, I'm

6   talking when you go on TV or radio or interviews or podcasts

7   and are asked about the incident with Donald Trump, you always

8   say that you are fabulous now.

9   A.  Of course I do.

10  Q.  Okay.

11  A.  I don't want anyone to know I suffered.  I did not and

12  still don't, unfortunately, during this trial I have to reveal

13  what is actually going on, but up until now, I would be ashamed

14  to know -- let people know what is actually going on.

15  Q.  You also explain on that podcast that you were receiving

16  lots of support --

17  A.  Um-hmm.

18  Q.  -- since your book came out?

19  A.  Um-hmm.

20  Q.  Yes?

21          THE COURT:  Please answer with words.

22  A.  Yes.

23  Q.  And you confirm you were receiving lots of love?

24  A.  Yes.

25  Q.  In fact, you were receiving several invitations to parties

N512Car3                    Carroll - Cross

1   relating to your litigation against Donald Trump.

2   A.   One or two parties, yes.

3   Q.   I am going to show you what's been marked as BW, a text

4   message -- well, just take a look at it, BW, please, for the

5   witness and counsel.

6            Before -- let me ask you this question first,

7   Ms. Carroll, before you read all that.

8            Do you recall sending a text message to Carol

9   Martin --

10  A.   Yes.

11  Q.   -- about invitations to parties.

12           Okay I'm going to offer BW, your Honor?

13           MR. FERRARA:   Just one moment, your Honor, please.

14  A.   Um-hmm, um-hmm, um-hmm, yes.

15           THE COURT:   There is no question yet, Ms. Carroll.

16           THE WITNESS:   Oh.

17           MR. FERRARA:   No objection.

18           MR. TACOPINA:   Okay.

19           THE COURT:   BW is received.

20           (Defendant's Exhibit BW received in evidence)

21  BY MR. TACOPINA:

22  Q.   Please display to the jury as well.

23           In a November text message to Carol Martin -- you

24  called her, by the way, Caroly?

25  A.   Caroly.

N515car4                    Carroll - Cross

1  42 West agency in July of 2019 discussing sort of a road trip?

2  Bookings?

3  A.  Oh no.  NPR is for radio interviews, it was not a road

4  trip.

5  Q.  OK, for the radio interviews?

6  A.  It was just from my cabin.  It was not a road trip, I was

7  going to sit in my cabin and talk to NPR stations.

8  Q.  In different cities?

9  A.  In different cities.  It didn't come off.

10  Q.  In any event, you had -- you were interested in doing NPR

11  interviews for all different cities, I guess?

12  A.  Yes, and it turned out it couldn't be done.

13  Q.  OK.  OK.

14        You can take that down, please.

15        You kept track of all the attention you were getting

16  regarding your story coming out, your book and what not, with

17  Google Alerts about yourself?

18  A.  Yes, I had Google Alerts; yes.

19  Q.  And that started out around June 21, 2019?

20  A.  No.  I've always had Google Alerts.

21  Q.  After your article appeared in The Cut, that's again the

22  first time the story appeared publicly?

23  A.  Yes.

24  Q.  You received a lot of positive letters?

25  A.  Yes.

1           MR. TACOPINA:  Okay.

2    BY MR. TACOPINA:

3    Q.   Question to you Ms. Carroll during your deposition:

4    "Q   During the two decades that followed, how would you say the

5    alleged attack impacted your life?

6    "A   Well, four or five years ago, I would have told you it had

7    no effect.  I'm as good as new.  This is great.  I'm fine.  I

8    rarely think of it.  But I've come to understand that the rape

9    changed my life, which is shocking for me."

10          THE COURT:  I'm sorry to interrupt, Mr. Tacopina, but

11   you misread a word.

12          MR. TACOPINA:  I did?

13          THE COURT:  Start from "I'm fine."

14          MR. TACOPINA:  Line 5, your Honor?

15          THE COURT:  No, "I'm fine."

16   BY MR. TACOPINA:

17   Q.   "I'm fine.  I rarely think of it.  But I've come to

18   understand that that rape changed my life, which is shocking

19   for me to now understand.

20   "Q   When you say four or five years ago, do you remember when

21   you started this lawsuit?

22   "A   No.  Before that.  Before that.  I'm talking about the time

23   before this.

24   "Q   Before the lawsuit?

25   "A   No, before I wrote the book, before anything.  I was just

N512Car5                      Carroll - Cross

1    living my life as a normal person."

2              THE COURT:   You skipped a word.

3    BY MR. TACOPINA:

4    "A   No, before I wrote the book, before anything.   When I was

5    just living my life as a normal person."

6              MR. TACOPINA:   What line am I going to, by the way?

7              THE COURT:   You finished.

8              MR. TACOPINA:   Mike, what line was that?

9              THE COURT:   4.

10             MR. TACOPINA:   That's it?   Okay.   That's it, then.

11             THE COURT:   Is there a question?

12             MR. TACOPINA:   Yes.

13   BY MR. TACOPINA:

14   Q.   So in the decades that followed the alleged attack, you

15   thought things were fine.

16   A.   No, I didn't.

17   Q.   Well, you just heard your testimony that --

18             THE COURT:   Sustained.

19             MR. TACOPINA:   Okay.

20   Q.   In fact, according to you, you rarely thought of this

21   supposed rape by Donald Trump?

22   A.   Well, I -- when I say the word "think," that is a process

23   that I believe when I plan, when I write, I'm thinking of

24   concepts.   I didn't mention that I have intrusions.   That's not

25   thinking to me.   I had the images coming into my head.   That's

N515car6                    Carroll - Recross

1    A.   Yes.

2    Q.   Is this similar to other communications you received after

3    Mr. Trump's October 2022 statement?

4    A.   Unfortunately.

5             MR. FERRARA:  May I have a moment, your Honor?

6             THE COURT:  Yes.

7             MR. FERRARA:  Nothing further.

8             THE COURT:  Is there going to be anything further,

9    Mr. Tacopina?

10            MR. TACOPINA:  Yes, your Honor.

11            THE COURT:  How long?

12            MR. TACOPINA:  Not too long.

13            THE COURT:  Define not too long.

14            MR. TACOPINA:  Like a third of the ground that

15   Mr. Ferrara covered, so 5, 10 minutes.

16            THE COURT:  OK.  Go ahead.

17            MR. TACOPINA:  Thank you.

18   RECROSS EXAMINATION

19   BY MR. TACOPINA:

20   Q.   You were asked by Mr. Ferrara just now, I think the first

21   question was you were asked about how you feel finding

22   happiness finally and you said that you feel good.  Do you

23   remember that question?

24   A.   Yes.

25   Q.   But, earlier you said that your happiness was just a public

```
     N515car6                    Carroll - Recross
```

 1  persona.  So, are you happy or are you not happy now?

 2  A.   I'm happy.

 3  Q.   OK.

 4  A.   With undertones.

 5  Q.   Happy with undertones?

 6  A.   Of -- of --

 7  Q.   OK.  Shall I go on?

 8  A.   Of unhappiness.

 9  Q.   The answer is you are happy with undertones of unhappiness?

10  A.   Yes.  It goes up and down, it is not always totally buoyant

11  and gleeful and happy.  There are times when I feel unhappy, of

12  course.

13  Q.   You testified on redirect that you were astonished that in

14  2023 someone would ask you about not screaming.  Do you

15  remember saying that?

16  A.   Yes.

17  Q.   Do you understand, Ms. Carroll, that I'm not judging what

18  is the appropriate reaction for any true rape victim, I was

19  questioning the fact that you gave four different answers for

20  not screaming?

21           THE COURT:  Sustained.  The jury will disregard that

22  remark.

23  Q.   Well, the reason you gave for not screaming was, one, you

24  are not a screamer.

25  A.   Right.

N522Car4                    Lebowitz - Direct

1    her professional work, her intimate relationships, her dating

2    life, the adversity that she's encountered, and we talked about

3    what she alleges happened with Mr. Trump and what happened

4    after that.

5    Q.   Now, how would you -- after spending all that time with

6    Ms. Carroll, how would you describe her as a person?

7    A.   Well, in the interview I found her open and forthcoming,

8    very easy to engage, not particularly introspective.  I didn't

9    think she had any signs of thought disorder, character

10   disorder, or major mental illness.  She struck me as unusually

11   vivacious and extroverted.

12   Q.   Are you being paid for your work in this case, Doctor?

13   A.   I am.

14   Q.   And can you explain how much?

15   A.   I am being paid $600 an hour.

16   Q.   Now, I said I would come back to it, and I am coming back

17   to it already, Doctor.  What makes something traumatic?

18   A.   I think that the simplest overarching way to think about

19   this is it has to do with what it feels like and what it means

20   to us.  Those two things—what it feels like and what it

21   means—have the -- can initiate a whole cascade of

22   psychological and biological responses that shape our responses

23   to a traumatic event.  I think it will be clearer if I give you

24   an example.

25            So, for example, if you think about a potentially

N532Carl                    Lebowitz - Direct

1   categories, and those symptoms need to be intense and

2   disruptive.

3           So in order to meet full criteria for PTSD, you are

4   talking about a pretty severe mental illness, which is often

5   chronic.  It is also the case that people can have symptoms in

6   one or two categories and suffer a lot of negative consequences

7   from that as well.

8   Q.  And in this case, Doctor, did you diagnosis Ms. Carroll

9   with PTSD?

10  A.  I did not.

11  Q.  Did -- does Ms. Carroll have symptoms in any of the four

12  categories you talked about?

13  A.  She does.  She has avoidance symptoms, she has alterations

14  in her thoughts and feelings about herself, and she has

15  intrusions.

16  Q.  Now, Doctor, based on your experience as a psychologist and

17  your reading of the literature, what percentage of people who

18  have experienced trauma then have sufficient symptoms to be

19  diagnosed with PTSD?

20  A.  You know, the data is a little bit complicated because

21  there are so many different kinds of trauma, but it's

22  approximately 20 to 30 percent of people who meet full criteria

23  for posttraumatic stress disorder.

24  Q.  And what about the people in the other 70 to 80 percent,

25  Doctor?

1    was a kind of real-world exposure treatment.  Suddenly he was

2    everywhere.  She couldn't avoid him.  Her symptoms got much

3    worse initially, which is what happens in exposure treatment,

4    as well.  And then they got somewhat quieter, which also

5    happens in treatment.

6    Q.  What, if anything, Doctor, did you conclude about

7    Ms. Carroll's resiliency?

8    A.  I think she is an extremely resilient person.

9    Q.  And can you explain to the jury why you think she is so --

10   why you think she is so resilient.

11   A.  You know, she never hesitated to take on challenges.  She

12   did all kinds of things that were really remarkable and unusual

13   for a woman in that time, and she had prior adversity that she

14   overcame without any significant diminishment to her life.

15   Q.  And is there anything about her background that explains to

16   you, Doctor, some of that resiliency?

17   A.  Yeah.  She had a warm, loving family.  There was a lot of

18   independence in her childhood, a lot of rough-and-tumble play

19   in her childhood, and her family, her family's culture fostered

20   a lot of grit, a lot of not attending to feelings of

21   vulnerability but, rather, simply coping with them.  So, for

22   example, when kids got hurt or when somebody got bullied or had

23   some kind of an adverse experience, the message from her family

24   was very much take care of that and move on.  It was not

25   discussed.  It was not indulged in any way.

N535CAR2                          Lebowitz – Cross

1     it is still a series of questions that one person asks another.

2     Q.   Thank you, Dr. Lebowitz.

3            So you didn't use any psychological test to determine

4     whether or not Ms. Carroll's explanation to you for her

5     squirming was truthful; right?

6            MS. KAPLAN:  Objection.

7            THE COURT:  Sustained.

8     Q.   You just mentioned there is symptoms of PTSD?

9     A.   I do.

10    Q.   You agree that Ms. Carroll does not have PTSD; correct?

11           THE COURT:  I think the answer was actually quite a

12    bit more elaborate than your purported summary of it,

13    counselor.

14           MR. SIEGEL:  Then I will ask it this way.

15    Q.   You had testified in the midst of that statement that there

16    are tests available to assess PTSD; correct?

17    A.   I did.

18    Q.   OK.

19           Does Ms. Carroll have PTSD?

20    A.   No.  That's why I didn't give her that test.

21    Q.   OK.

22           Now, during your interview, Ms. Carroll told you she

23    has intrusive images that have been ongoing since the alleged

24    rape; correct?

25    A.   She did.

N535CAR2                    Lebowitz - Cross

1   her statements.

2   Q.  But she told you she didn't watch the show a lot, right?

3           MS. KAPLAN:  Objection, your Honor.  Asked and

4   answered.

5           THE COURT:  Sustained.

6   Q.  Now, in addition to not diagnosing Ms. Carroll with

7   post-traumatic stress disorder, you also didn't diagnose her as

8   having anxiety; correct?

9           THE COURT:  Rephrase the question, counselor.  Stop

10  making your argument as part of the question.

11          MR. SIEGEL:  OK.

12  Q.  Did you diagnose Ms. Carroll with post-traumatic stress

13  disorder?

14  A.  I did not.

15  Q.  Did you diagnose her as having anxiety?

16  A.  I did not.

17  Q.  Did you diagnose her with major depression?

18  A.  I did not.

19  Q.  There is absolutely no psychological, psychiatric, or

20  therapeutic diagnosis that Ms. Carroll suffers from which may

21  have been caused by her alleged Bergdorf Goodman incident; is

22  that right?

23          MS. KAPLAN:  Argumentative, your Honor.

24          THE COURT:  I will allow it.

25  A.  If I understand your question correctly, you are asking me

N535CAR2                    Lebowitz - Cross

1   does Ms. Carroll meet diagnostic criteria for a major mental

2   illness.  The answer to that is no.  She does have symptoms

3   that fit within the rubric of post-traumatic stress disorder

4   but she does not have enough to meet the full criteria for what

5   is essentially a disabling and a chronic mental illness.

6   Q.  OK, so my question was:  There is absolutely no

7   psychological psychiatric or therapeutic diagnosis that

8   Ms. Carroll suffers from which may have been caused by her

9   alleged Bergdorf Goodman incident; is that right?

10           MS. KAPLAN:  Asked and answered and argumentative,

11   your Honor.

12           THE COURT:  Sustained.

13   Q.  A separate question, Dr. Lebowitz.  Would you agree that

14   there is no clinical diagnosis to corroborate Ms. Carroll's

15   allegation in this case?

16           MS. KAPLAN:  Objection, your Honor.

17           THE COURT:  Sustained, at least as to form.

18           MR. SIEGEL:  All right.

19   Q.  Dr. Lebowitz, is there a clinical diagnosis to support

20   Ms. Carroll's allegation in this case?

21           MS. KAPLAN:  Objection, your Honor.

22           THE COURT:  Rephrase.

23           MR. SIEGEL:  I will do it one more time.

24           THE COURT:  The problem is the word "clinical."

25           MR. SIEGEL:  OK.  Fair enough.  Thank you.

N535CAR2                        Lebowitz - Cross

1          (In open court)

2          THE COURT:  Next question, please.

3          MR. SIEGEL:  Thank you very much.

4   BY MR. SIEGEL:

5   Q.  Dr. Lebowitz, based on what Ms. Carroll told you, you

6   concluded that the alleged incident at Bergdorf Goodman is the

7   cause of her inability to engage in romantic and sexual

8   partners; correct?

9   A.  I did.

10  Q.  But you would agree that it is possible something else

11  other than the alleged Bergdorf Goodman incident may have

12  caused Ms. Carroll's supposed inability to engage with

13  potential romantic partners, correct?

14  A.  In psychology it is -- it is always possible.  We can only

15  ever say that things are within a certain degree of certainty.

16  We can't even say the sun is definitely going to rise tomorrow

17  as a psychologist so of course there is always a possibility.

18  Q.  Are you aware that Ms. Carroll appeared on a podcast

19  entitled *UnStyled* in August of 2019 in which she said:  Well,

20  after the episode in Bergdorf's I never had sex again, but I

21  think it wasn't because of him.  I think it was just that I

22  didn't have the luck to meet that person that would cause me to

23  be desirous again.

24  A.  If I am remembering this material correctly, I think she

25  also at some point acknowledged that one creates one's own luck

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N532Car3                        Lebowitz - Redirect

1    whom were depressed and some who weren't.  The people who were

2    depressed were assessed using a clinical interview.  They were

3    then given a test.  The idea being that if a clinician thought

4    you were depressed and you came up depressed on this test, then

5    the test is a pretty good indication of being depressed.  But

6    the gold standard is typically an in-depth clinical interview.

7            THE COURT:  I will let the answer stand, but you can

8    recross on it if you wish.

9    BY MS. KAPLAN:

10   Q.  I take it from what you just said, Dr. Lebowitz, you tend

11   not to use these kinds of tests very often?

12   A.  I don't use them very often.  I use them on occasion, but

13   not very often.

14   Q.  And in this case, did you reach a conclusion as to whether

15   tests like that would have been helpful or not?

16   A.  I did.

17   Q.  And what was the conclusion you reached?

18   A.  I didn't feel like they were going to add any valuable

19   information in this situation.

20   Q.  And can you explain why, Doctor?

21   A.  Sure.  I have assessed for trauma and PTSD so many times

22   that I actually know what the questions would be.  And it was

23   my assessment that although Ms. Carroll had some of the

24   symptoms in pretty severe form, she didn't have enough symptoms

25   in enough category to meet criteria for a full diagnosis of

N532Car3                    Lebowitz - Redirect

1   PTSD.  On the basis of my interview, I also didn't think she

2   had a major depressive disorder, a major anxiety disorder, or

3   any other form of significant mental illness.  So there was no

4   reason to do a test.  It would have just told me what I already

5   knew.

6   Q.  And during your examination of Ms. Carroll, I take it you

7   asked her a lot of questions?

8   A.  I did.

9   Q.  And is there an overlap, Doctor, between the questions you

10  asked her and the kinds of questions you would find on the

11  tests that you have been talking about?

12  A.  Yeah.  The way I structure an interview is the first part

13  of it, and that can be quite a lengthy part, the questions are

14  very open-ended.  I just want someone to tell me about their

15  life and their experiences in their own words.  If I hear

16  things that make me think there is more information that needs

17  to be gotten on that particular issue, then I may ask some more

18  structured and some more specific questions.

19       So with Ms. Carroll, you know, I'm sure my opening

20  question about the alleged event was, you know, what happened

21  and how do you -- you know, how did it affect your life.  But

22  at some point I would have asked her more specific questions

23  about the quality of her intrusions, her avoidance behaviors.

24  I would have followed up with the kinds of questions that I

25  would be asking if I was doing a more structured exam.

N545car3                         Humphreys - Direct

1   A.   Sure.  So, for the people that you see in yellow here,

2   those are more just typical people and so I didn't use that

3   high a rate, I used a rate of 1 percent for them, just assuming

4   that they're going to have a 1 percent impression rate, and

5   everybody who saw their Tweets are just going to be typical

6   people, too, and so those people also will have a 1 percent

7   impression rate.

8   Q.   So you assume that for the average person only about 1

9   percent of their followers would see the Tweet in which they're

10  Retweeting Donald Trump's statement?

11  A.   That's correct.

12  Q.   Were you able to determine the total amount of impressions

13  of Donald Trump's statement on Twitter, on the 13 Twitter

14  accounts?

15  A.   Yes.  So I calculated the impressions for each account and

16  then I added those up.

17  Q.   And how did you calculate the number of TruthSocial

18  impressions from Donald Trump's post?

19  A.   So, for TruthSocial it's pretty much just like Twitter, and

20  yet it hasn't been studied quite as much.  We also didn't have

21  full access to the Retweeting information, and so because it is

22  structurally similar to Twitter, I used the same impression

23  rate, that 6 percent rate.

24  Q.   And what were the total number of social media impressions

25  of Twitter and TruthSocial from the statement?

N545car3                    Humphreys - Direct

1  A.  So, when you add those up, then you get a high estimate of

2  5.7 million impressions and a low estimate of 1.5 million

3  impressions.

4  Q.  So, just to be clear, that means that a total of between

5  1.5 -- or the statement, Donald Trump's October 12th statement,

6  was viewed between 1.5 million and 5.7 million times on Twitter

7  and TruthSocial?

8  A.  That's right, yes.

9  Q.  You also calculated television impressions from Donald

10 Trump's statement.  How did you do that?

11 A.  For that I needed to know what TV shows aired the statement

12 and there is a service where basically anything that is spoken

13 on television gets transcribed into text, and so you can search

14 that text for key portions of the statement.  And so, I

15 basically used that database to search for the statement to

16 find which programs aired the statement.

17 Q.  How many programs aired the statement?

18 A.  Five programs.

19 Q.  Which stations aired the statement?

20 A.  So the statement appeared on MSNBC and Fox News.

21 Q.  Once you identified the five programs that aired the

22 statements, what did you do next?

23 A.  After that I needed to know how many people were actually

24 watching the program when this statement was aired, and for

25 that I used a service called Neilsen that measures audiences,

1     The first part was the qualitative part where I went

2   through and I read a lot of the social media feedback that

3   occurred sort of directly in response to the statement, these

4   were kind of comments made on Tweets and Retweets of the

5   statement itself, to assess if there had been reputational harm

6   and to try to understand what that was.  And then I did a kind

7   of quantitative analysis where I wanted to understand how many

8   people, how many of those impressions were actually likely to

9   believe the statement or were receptive to it.

10  Q.   So I want to talk briefly about the first, the qualitative

11  analysis.  Can you explain how you did that?

12  A.   Sure.  So, I started by looking at material about

13  Ms. Carroll that was written and published about her prior to

14  June 2019.

15  Q.   Why did you look at material that was published or written

16  about Ms. Carroll prior to June 2019?

17  A.   So, in June 2019 Mr. Trump made a series of statements that

18  impacted her reputation and I felt it was important to account

19  for some of that change prior to October 12th.

20  Q.   Can you describe what you observed about Ms. Carroll's

21  reputation prior to June 2019 as compared to after June 2019?

22  A.   So, when I looked at the materials from before June 2019,

23  that means I looked at reviews of her books, media coverage of

24  her, even Amazon reviews of her books that were before that,

25  just reader responses to it.  I kind of first got a glimpse of

N545car3                    Humphreys - Direct

1    that and found, you know, she was known as kind of like a sassy

2    dating advice columnist, a real truth-teller a journalist, who

3    gave trusted advice on dating and living in the city.  And then

4    after, I looked at the social media posts from June through

5    October, and then I looked at media posts from after October.

6    Q.   And you described Ms. Carroll's reputation prior to June

7    2019.  How did that compare to the reputation that you observed

8    after, immediately after June 2019?

9    A.   So, after June 2019, you know, of course there was a lot

10   more volume of statements about her and they contained pretty

11   negative associations including that she was a liar, the

12   perpetrator of a scam, a hoax.  Things like that.

13   Q.   And how did you or what did you observe about Ms. Carroll's

14   reputation after June 2019 as compared to -- withdrawn.

15        What did you determine about Ms. Carroll's reputation

16   prior to the October 12, 2022 statement by Donald Trump as

17   compared to after October 12th?

18   A.   So, what I noticed is that those meetings existed after

19   June 2019, but the frequency of the posting with those

20   associations had started to decline.  However, after the

21   statement on October 12th, the frequency of the negative

22   associations, the volume of them again escalated.

23   Q.   What did you conclude about whether Donald Trump's October

24   12th statement affected Ms. Carroll's reputation?

25   A.   So, given the timing and the fact that they were in kind of

N545car3                    Humphreys - Direct

1   would believe them, who found, were receptive to some of those

2   claims.

3   Q.  And why is that a necessary step in your analysis?

4   A.  So that's really important because I need to figure out,

5   well, how much would it cost to repair the reputational damage.

6   And I only need to estimate the costs for those people who

7   likely believed the statement.

8   Q.  How did you go about figuring out the number of people who

9   saw Mr. Trump's October 12th statement who likely believed it?

10  A.  Right.  So, not all of those impressions believe the words

11  of Mr. Trump.  Right?  And so, it was kind of a two-step

12  process to figure that out.  There is a poll, a non-partisan

13  polling service that can tell you for every publication what

14  percent of the readers are a democrat or republican, but of

15  course not all republicans believe Mr. Trump.  And so, I used

16  another poll to understand, well, of those republicans, what

17  percent of those were likely to have believed him.

18  Q.  And what did you determine was the percent of republicans

19  for each publication who likely believed Mr. Trump's statement,

20  believed Mr. Trump?

21  A.  So, for each publication I took the percent of republicans,

22  and then of those republicans took how many republicans

23  typically believe Mr. Trump and then came up with the

24  percentages that you see here on the right.  And so, I used the

25  percentage for each publication.  Those came up to an average

N545car3                         Humphreys - Direct

1  of 21 percent.

2  Q.   So, to be clear, the 21 percent is the percentage of

3  republicans who viewed the statement who likely believed it?

4  A.   Yes.   I would call those receptive impressions.

5  Q.   What was the next step in your analysis?

6  A.   So, the next step was to take the number of impressions

7  that I had from that first step, which was a lot of

8  impressions, and then discount it by only the impressions where

9  people were receptive to the statement.   And so, that gives you

10  an estimate, a high and low estimate for each type of media,

11  and then you can add those up.

12  Q.   And what did you, when you alleged it up, what did you get?

13  A.   So, on the low end we have 3.7 million receptive

14  impressions and on the high end you have 5.6 million receptive

15  impressions.

16  Q.   And just to summarize, does that mean that between

17  3.7 million and 5.6 million people saw Mr. Trump's statement

18  and likely believed it?

19  A.   That's correct.

20  Q.   To your knowledge -- we saw some examples of negative

21  commentary that Ms. Carroll received after the October 12

22  statement.   To your knowledge, did Ms. Carroll receive any

23  positive response following Donald Trump's statement?

24  A.   Yes, she did.

25  Q.   How, if at all, did your analysis account for the positive

1  response that she received?

2  A.  So, one thing in my analysis that I noticed is, prior to

3  the June 2019 statement, there were, of course, many positive

4  associations of her but the volume was relatively small.  After

5  the October 12 statement there was a huge volume of

6  associations associated with her, some of those were positive,

7  but then a huge volume, a very large number, tens of thousands

8  of those associations were really negative.

9  Q.  How, if at all, do positive responses or comments offset

10  negative responses?

11  A.  I would say in terms of reputation, they don't.  So, if you

12  imagine, like, at the place where you work, if 20 percent of

13  your colleagues think that you stole money where you work,

14  let's say you have a hundred colleagues and 20 of them think

15  that you stole money, that still has an impact on your work

16  life and your day-to-day reputation, and so I think that

17  20 percent is still important.

18                  (Continued on next page)

19

20

21

22

23

24

25

N542Car4                    Humphreys - Direct

1   Q.   Now, in addition to analyzing how many people saw

2   Mr. Trump's statement and how many people who saw the statement

3   likely believed it, did you conduct any other analysis in your

4   work in this case?

5   A.   Yes.  So the last stage was to figure out, okay, for those

6   receptive impressions, those who might have believed the

7   statement, how much would it cost to repair Ms. Carroll's

8   reputation for those people?

9   Q.   How do you repair someone's reputation after a statement?

10   A.   Yeah, so you can run a campaign to put out positive

11   messages about that person.

12   Q.   Is that called a reputational repair campaign?

13   A.   Yes.

14   Q.   Have you ever yourself executed a reputational repair

15   campaign?

16   A.   No, I have not.

17   Q.   How do you know about it?

18   A.   So I teach them every quarter to my students who go on to

19   have jobs in executing reputational repair campaigns.

20   Q.   Can you explain how a reputational repair campaign works?

21   A.   Yes.  So first you need to identify where to place the

22   messages.  What media does your target audience, the people's

23   whose mind you want to change, what media do they use?  Where

24   do they get their information?

25   Q.   So to be clear, the target audience here is that 21 percent

N542Car4                    Humphreys - Direct

1    or the people that you determined saw Mr. Trump's statement and

2    likely believed it?

3    A.   That's right.

4    Q.   And your campaign sends positive messages or corrective

5    messages to those people to try to change their minds?

6    A.   That's correct.

7    Q.   Can you give -- did you design a particular reputational

8    repair campaign for Ms. Carroll in this case?

9    A.   Yes, I did.

10   Q.   Can you give us some examples of corrective messages that

11   you would use as part of a reputational repair campaign for

12   Ms. Carroll?

13   A.   Yes, so what the campaign would look like is it would place

14   these positive messages where people get their news, and it is

15   important that you place them with a trusted source because

16   this audience, almost any audience only believes information

17   coming from people they trust, right?  So it could look like a

18   social media influencer sharing a message about a great piece

19   Ms. Carroll wrote for *Harper's* and how much they liked it, how

20   funny or witty it was.  It would be positive messages like

21   that.

22   Q.   And how did you determine where those messages would be

23   placed?

24   A.   So here I used the same poll that I did in the second step

25   to learn where does this audience get their news.

N542Car4                    Humphreys - Direct

1  corrective messages there, were there any other considerations

2  in your analysis?

3  A.   Yes.  So the final consideration was how many times to show

4  people the message.  Nobody's mind is really changed from

5  seeing a message one time, especially if it is kind of counter

6  to what you already believe.  And so psychology tells us that

7  you need to show people a message three or five times in order

8  to change their beliefs.

9  Q.   Did you consider how much it would cost to run corrective

10  messages about Ms. Carroll one time?

11  A.   Yes, I did.

12  Q.   Why?

13  A.   So the one-time number would assume that a prior campaign

14  had been run.  You know, you don't want to hit people over the

15  head with the message if you have already shown them the

16  message.  And so I included the one-time in case a prior

17  campaign had been run.

18  Q.   To your knowledge had a prior reputational repair campaign

19  been run for Ms. Carroll?

20  A.   No.

21  Q.   So was the estimate for cost of only showing corrective

22  messages one time a realistic estimate in this case?

23  A.   I don't think that campaign would be effective in changing

24  attitudes.

25  Q.   Using the chart on this slide, can you walk us through how

N542Car4                    Humphreys - Direct

1   you calculated the cost to run positive messages about

2   Ms. Carroll on broadcast TV?

3   A.   Sure.  So on broadcast TV, as you can see here, you would

4   spend about 30 percent of your impressions, you would want to

5   get 30 percent of your impressions from broadcast TV.  And an

6   impression for a thousand impressions, it would cost you $16.

7   And so you basically do the math on that and that comes out to

8   spending a hundred and thirty-three hundred thousand dollars.

9            (Court reporter confers)

10  A.   A hundred and thirty-three hundred thousand dollars.

11           THE COURT:  133,000, right?

12           THE WITNESS:  A hundred and thirty-three hundred

13  thousand dollars.

14  Q.   I think $133,000, right?

15  A.   Oh, sorry, 133,000.

16  Q.   And how much would it cost to place corrective messages

17  about Ms. Carroll using Facebook insurance influencers?

18  A.   So for Facebook influencers, you want to get 7 percent of

19  your total impressions there.  But remember what I said about

20  impressions.  So, you know, the number of followers that

21  somebody has on Facebook, you have to take the impression rate

22  of like 5 percent of those people are going to see the post.

23  And so you would shoot to get, at the end of the day, 1.9

24  million impressions and it costs $25 per thousand impressions,

25  which would leave you with $988,000.

N542Car4                         Humphreys - Direct

1   Q.   After calculating the amount it would cost to place

2   corrective messages on each type of media, were you able to

3   determine how much it would cost to place corrective messages

4   on all these types of media?

5   A.   That's right.  So I calculated for each type of media how

6   much it would cost and I added that up.

7   Q.   And what was the number?

8   A.   So the final number at the high end was $2.7 million.

9   Q.   What was the next step in your analysis?

10  A.   So the final step was to apply this logic to kind of my

11  previous -- my low impressions estimate and my high impressions

12  estimate for each level of frequency—for one, three, and five

13  times.

14  Q.   And what was the range, the cost range to run a

15  reputational repair campaign for Ms. Carroll following the

16  October 12 statement?

17  A.   So at the low, low end it would be three hundred and

18  sixty-eight thousand dollars, hundred thousand dollars and on

19  the high end it would be $2.7 million but, again, I don't think

20  the low campaign would be effective if no campaign had been run

21  previously.

22  Q.   So to summarize, Professor Humphreys, what was your

23  conclusion about how far or how wide Mr. Trump's statements

24  spread?

25  A.   So my conclusion about how wide it spread in the

N542Car4                          Humphreys - Cross

1    BY MR. BRANDT:

2    Q.   Now, we have had some discussion about this previously, but

3    there are actually two cases, correct?

4    A.   That's right.

5    Q.   And you were retained as an expert by Ms. Carroll in two

6    cases, correct?

7    A.   Correct.

8    Q.   And the first case chronologically related to statements

9    made by Mr. Trump in June of 2019, correct?

10   A.   That's correct.

11   Q.   And as I recollect your first report, you said that those

12   statements were widely published at the time, correct?

13   A.   Yes.

14   Q.   And following that time, there were appearances by

15   Ms. Carroll and others on news shows and interviews and

16   podcasts and articles, is that correct?

17   A.   I did not study those as part of my report.

18   Q.   So you didn't look at any of that?

19   A.   I did not look at her activities, no.

20   Q.   Okay.  We will come to that in a little bit.

21         But did you at least come to the conclusion that there

22   had been widespread publication of the June 2019 statements?

23   A.   Yes.

24   Q.   And the statement that you looked at in the second case was

25   only the October 2022 statement, correct?

N542Car4                    Humphreys - Cross

1  A.   That's right.

2  Q.   To borrow a phrase, would you agree that the horse was kind

3  of out of the barn between 2019 and 2022 on these issues?

4  A.   Could you say what you mean by a horse being out of the

5  barn?  How do you mean?

6  Q.   Sure.  There had already been publication of Mr. Trump's

7  position on these issues for three and a half years prior to

8  October of 2022, correct?

9  A.   Correct.  Three statements had already been published.

10  Q.   So that was already out in the public domain, correct?

11  A.   That's correct.

12  Q.   And then one thing I understood you to say in your direct

13  testimony—and I wrote it down, and correct me if I am

14  wrong—that you said people's minds typically aren't changed by

15  a one-time statement.  Did I get that down correctly?

16  A.   That's true if they already hold an attitude.  If it's a

17  counter-attitudinal message, yes.

18  Q.   Okay.  And I think that's consistent with your deposition

19  testimony, that typically one statement is not going to change

20  somebody's mind, correct?

21  A.   Not -- yeah, if they have a prior attitude, it will not

22  change someone's mind.

23  Q.   And in this particular case, what you are focused on is a

24  single statement, which is Mr. Trump's statement in October of

25  2022, correct?

N542Car4                    Humphreys - Cross

1    A.  That's correct.

2    Q.  A single statement, correct?

3    A.  That's correct.

4    Q.  And to follow your logic, people aren't going to change

5    their minds over one statement.

6    A.  You know, we don't know if these are the same people.

7    That's underdetermined.  His statement might have been seen by

8    new people.

9    Q.  Okay.  You don't know, do you?

10   A.  I think it's very likely that this statement was seen by

11   some new people.

12   Q.  Okay, but you actually, going back to your testimony

13   previously, all of your numbers are estimates, are they not?

14   A.  They are estimates that are grounded in peer-reviewed

15   social science research.

16   Q.  Sure, but you don't know exactly who may have seen the

17   Truth Social post, correct?  You can't name the however many

18   million people that you talk about, correct?

19   A.  Correct.  That information is not available to me.

20   Q.  Right.  And similarly, you talked about the other media,

21   like the publish media, the television media, you don't know

22   who read those newspapers, who saw those TV shows, correct?

23   A.  That's correct.  That information is not available.

24   Q.  And again, you are not a mind reader, and so you don't know

25   whose mind was or wasn't influenced by anything they read,

N542Car4                        Humphreys – Cross

1    impressions to ones that quote that statement correctly on

2    Truth Social, correct?

3    A.   That's not correct.

4    Q.   Okay.  Would you agree with me that most of the people who

5    are on this Truth Social platform would be people favorable to

6    president Trump?

7    A.   That's likely true.

8    Q.   And someone who is predisposed to think well of Mr. Trump

9    would be more likely to believe something he said, and the flip

10   side is someone who is predisposed to believe Ms. Carroll would

11   be predisposed to believe what she said, correct?

12   A.   Yes, that's fair.

13   Q.   And I think you also said this a minute ago.  I want to

14   make sure I understand it.  You did not analyze the impact of

15   anything Ms. Carroll said following the June 2019 statements,

16   correct?

17   A.   That's correct.  I was focused on the damage of Mr. Trump's

18   statement.

19   Q.   Okay.  So, for example, she gave an interview on Anderson

20   Cooper one day.  You didn't assess what the impact of that

21   interview was to the viewing public, correct?

22            MS. CROWLEY:  Objection, your Honor.

23            THE COURT:  Overruled.

24   Q.   You may answer the question.  I can reask it if you would

25   like.

N542Car4                    Humphreys - Cross

1   A.   That would be great if you could.

2   Q.   There is evidence in the record that Ms. Carroll appeared

3   on the Anderson Cooper show on MSNBC.  As I understand what you

4   have told us, you did not analyze the impact of that message on

5   the public, correct?

6   A.   That was not in the -- that was prior to the October 12

7   statement, so no.

8   Q.   And then similarly, you did not assess the impact of

9   Ms. Carroll's book that was published out to the public,

10  correct?

11  A.   Correct.  It was not focused on Ms. Carroll's statements.

12  Q.   And then excerpts from that book were published in the *New

13  York* magazine and in The Cut.  As I understand your testimony,

14  you didn't try to estimate the impact of that publication,

15  correct?

16          MS. CROWLEY:  Objection, your Honor.  This is asked

17  and answered.

18          THE COURT:  Why not, counselor?

19          MR. BRANDT:  I was talking about a different

20  publication.

21          MS. CROWLEY:  I believe he asked whether she analyzed

22  any of Ms. Carroll's statements, and the witness testified that

23  she didn't.

24          THE COURT:  Sustained.

25          MR. BRANDT:  Okay.

N542Car4                    Humphreys - Cross

1    One other question on that line, your Honor, and I

2    don't mean to cross your boundary.

3    Q.  Is it correct that you didn't analyze any positive comments

4    on social media about Ms. Carroll that were made by others?

5    A.  That's not correct.

6    Q.  Okay.  Did you look at positive statements about her on

7    social media?

8    A.  Yes.  So I did see a number of positive statements during

9    my qualitative analysis.

10   Q.  Did you measure those?

11   A.  No.  My goal here was to measure the reputational harm.

12   Q.  Okay.  So you saw it, but you didn't measure it.

13   A.  Correct.

14   Q.  So as I understand your testimony, all you did was measure

15   the negative impact and you didn't look at any positive impact.

16   A.  So I did look at the positive impact in my qualitative

17   analysis.

18   Q.  Did you measure it?

19   A.  It didn't cause reputational harm and so those statements

20   didn't require correction.

21   Q.  Okay.  So fair enough.  Let me ask you this question.  Did

22   you undertake to see whether or not there had been any campaign

23   undertaken by Ms. Carroll to mitigate any alleged damage from

24   the October 2022 statement?

25   A.  No.  To my knowledge there wasn't one.

N585car2                    Summation - Ms. Kaplan

1   shoes with her 4-inch high heels.  She also tried to hit him

2   with her purse, trying to do anything to make him stop.  Trump

3   pinned her against the wall with his shoulder.  At the same

4   time he reached up under her dress and he pulled down her

5   tights.  He grabbed her by the pussy or vagina -- I apologize

6   for my language -- and then he shoved his fingers inside her.

7   You heard Ms. Carroll describe how incredibly painful that was.

8   Trump then removed his hand and shoved his penis inside her.

9   Continuing to fight, Ms. Carroll was finally able to get a knee

10  up high enough to push Trump off of her.  Terrified and

11  stunned, she opened the dressing room door and escaped.  She

12  fled through the store and out onto the Fifth Avenue exit.  The

13  whole attack happened quickly, a few minutes at most, but it

14  would stay with Ms. Carroll forever.

15          In the immediate aftermath of the attack, as you

16  heard, E. Jean Carroll told two separate people what happened.

17  She called her friend Lisa Birnbach from the sidewalk on Fifth

18  Avenue outside the Bergdorf Goodman and she told her friend

19  Carol Martin a day or two later.  You saw and heard both of

20  them in this courtroom.  Let's talk first about Ms. Birnbach.

21          She told you that she received a phone call from

22  Ms. Carroll in the spring of 1996 when she was giving her kids

23  dinner.  Ms. Birnbach said when she picked up the phone,

24  E. Jean Carroll sounded agitated like she was hyperventilating.

25  Lisa Birnbach told you that E. Jean proceeded to tell her that

1   she had gone into a dressing room with Donald Trump, that he

2   pushed her up against the wall, he hit her head and pulled down

3   her tights and forced himself inside her.  Ms. Birnbach told

4   you that upon hearing what had happened, she left the kitchen

5   so her kids wouldn't be able to overhear her, and told

6   Ms. Carroll, in no uncertain terms, E. Jean you have been

7   raped.  The fact that she left the kitchen, by the way, is a

8   very telling detail, it is the kind of detail that someone

9   doesn't make up.

10          Ms. Birnbach also told Ms. Carroll to tell the police,

11   to go to the police, she even offered to go with her.  But as

12   Lisa Birnbach testified, E. Jean Carroll said she didn't want

13   to go to the police and she made Lisa promise never to tell

14   anyone about it ever again.  Lisa Birnbach agreed to that.  As

15   she explained it to you, it was E. Jean Carroll's story, it was

16   her secret, it was not Lisa Birnbach's story or secret to tell,

17   so she promised not to tell anyone and she kept that secret for

18   two decades.  Let's now go to Carol Martin.

19          A day or two after the attack at Bergdorf Goodman,

20   E. Jean approached her good friend Carol Martin, who was

21   actually her closer friend at the time, at the America's

22   Talking offices in New Jersey.  They decided that they would

23   talk at Ms. Martin's house which is only 10 minutes away, by

24   car, from work.  After work they each drove their own cars to

25   Ms. Martin's house and they went in the house and sat down at

N585car2                    Summation - Ms. Kaplan

1   people forget how even to dial 911.  Dr. Lebowitz gave you a

2   great example of this.

3           Remember what she told you about her mother's friend

4   who was a child in Finland during World War II?  She told the

5   story that this woman was with her mother as a child and bombs

6   were falling.  The force of a bomb blew away the mother's hat.

7   Instead of grabbing her daughter's hand and running to safety,

8   the mother ran after her hat.  That mother loved her child.  In

9   that moment she didn't consciously choose to run after her hat,

10  she wouldn't have expected to do that and she probably wouldn't

11  be able to explain to you sitting here today why she did it.

12  That's the brain chemistry of a person experiencing trauma.

13          Now, you heard Donald Trump's lawyers repeatedly ask

14  Ms. Carroll why she was laughing when she got first pushed up

15  against the wall.  They repeatedly asked her why she didn't

16  scream.  They acted as if Ms. Carroll's response was unusual,

17  unheard of, implausible.  But you now understand why those

18  reactions are consistent with the behavior of someone who is

19  experiencing trauma.  Dr. Lebowitz explained it to you.  People

20  have really strange, really unexpected responses to traumatic

21  situations all the time.

22          Remember when Mr. Trump's lawyers asked Dr. Lebowitz

23  whether or not screaming would be consistent with a rape?  Here

24  is what she said.  She said that not screaming would not only

25  be absolutely consistent with being raped, but based on her

1   that too -- may later disagree about what exactly the date was

2   when that happened or even what house they were living in at

3   the time.

4          Think about how that explains E. Jean Carroll's

5   testimony here.  She remembers certain things from her

6   encounter with Donald Trump in vivid, technicolor detail.  She

7   remembers the back and forth about trying on the bodysuit in

8   the lead-up to the assault.  She remembers the gifts they were

9   talking about, the hat that she said Donald Trump petted and

10  the handbag that they looked at on the first floor.  She

11  remembers distinctly some of the exact words they exchanged.

12  *Hey, you're that advice lady.*  She remembers exactly how it

13  felt to have Trump's fingers inside her.  And -- I find this

14  part really telling -- she remembers the sound of Trump's heavy

15  breathing as he was facing the wall next to her neck.  But

16  Ms. Carroll does not remember exactly how she got out of the

17  store and she has made no secret of the fact she doesn't

18  remember the exact date.  She remembers -- just like

19  Dr. Lebowitz said, she remembers certain things vividly and

20  other things not so much.  Again, that's exactly what you would

21  expect to see in someone who has survived trauma.

22          Dr. Lebowitz also testified to you about how

23  Ms. Carroll processed the rape and how that contributed to her

24  decision not to talk about it for so many years.  She said

25  that -- Dr. Lebowitz said that E. Jean Carroll experienced what

1  using the word rape.  But as we heard Dr. Lebowitz explain,

2  E. Jean's refusal to call what happened to her rape or to

3  identify herself as a victim does not mean that she was not

4  sexually assaulted.

5         Now, another way that Donald Trump responds to all of

6  this is by trying to get you to believe in the big lie.  What

7  do I mean when I say the big lie?  I mean that Mr. Trump's

8  lawyers need you to find that not only E. Jean Carroll, but

9  also Lisa Birnbach and Carol Martin are all lying, that they

10  are all part of some part of coordinated conspiracy, that they

11  somehow joined forces and agreed to come up with a story about

12  an assault that happened nearly 30 years ago simply because

13  they hate Donald Trump.  I'm sorry.  Seriously?  That's just

14  ridiculous.

15         First of all, there is no evidence -- not a shred --

16  that any such conspiracy exists.  No testimony.  No documents.

17  Nowhere in all of those pages of e-mails and texts between

18  E. Jean Carroll, Lisa Birnbach, and Carol Martin did you see

19  anything suggesting that they all agreed to come up with a lie

20  that Donald Trump raped E. Jean Carroll.  In fact, you saw the

21  opposite of that.  You heard Ms. Martin read from a text she

22  sent to a friend in 2021 -- a friend, so it is not Lisa

23  Birnbach and she is not texting E. Jean Carroll -- another

24  friend, in which she expressed frustration that she was dealing

25  with the publicity from this case and she suggested that that

N582Car3                    Summation - Ms. Kaplan

1       At this point, I believe that my review of the

2   evidence has shown you that it is very clear that Donald Trump

3   did in fact sexually assault E. Jean Carroll in the spring of

4   1996 and that he defamed her in 2022 after she told the truth

5   about what he had done.

6       Because Donald Trump did both of these things, the law

7   allows you to compensate E. Jean Carroll for the harm that she

8   suffered.  So what is the level of damages?  I'm not going to

9   stand here and tell you exactly how much you should award

10  E. Jean Carroll in damages, but there are a few things that you

11  can consider in coming to that conclusion.

12      First of all, Professor Humphreys told you about the

13  millions of people that heard and likely believed Donald

14  Trump's public statements about E. Jean Carroll.  What is the

15  price for having to live your life in shame and to lose your

16  good name because Donald Trump lied and told millions of people

17  that you are a liar?

18      In addition, Dr. Lebowitz told you that the assault

19  caused E. Jean Carroll to lose something extremely important to

20  her and, frankly, to all of us, her ability to pursue romantic

21  relationships, her ability to pursue intimacy, and perhaps most

22  importantly, companionship.  What is the price for decades of

23  living alone without companionship, for having no one to cook

24  dinner with, no one to walk your dog with, no one to watch TV

25  with, and for feeling for decades like you are dirty and

1  unworthy?  Once again, ladies and gentlemen, that's your issue

2  to decide.  I'm not going to put a number on that for you.

3        As the judge will instruct you, the law allows you to

4  award damages for these considerations and others that he will

5  read to you tomorrow.  Ultimately, you should consider the

6  evidence and pick the number you think is right.  But please

7  remember, for E. Jean Carroll, this lawsuit is not about the

8  money.  As she told you on the stand, this lawsuit is about

9  getting her name back.  That's why we all are here.

10        Ultimately, I know that you will deliver a verdict

11  based on the evidence you have seen and heard.  You watched

12  Ms. Carroll right here in this courtroom as she delivered

13  incredibly courageous, consistent, clear testimony over two

14  days.  You watched the other fact witnesses sit before you and

15  also provide compelling testimony that corroborated what

16  E. Jean Carroll had said, sometimes down to the smallest

17  detail.  Taken together, the overwhelming weight of the

18  evidence establishes two things:  One, Donald Trump sexually

19  assaulted E. Jean Carroll in a dressing room in the lingerie

20  department at Bergdorf Goodman in the early spring of 1996;

21  and, two, Donald Trump defamed E. Jean Carroll after she spoke

22  up publicly about what had happened.  That is what the evidence

23  in this case establishes.  But I think you already know that.

24        On behalf of our whole team, on behalf of my brave

25  client, E. Jean Carroll, for whom it has been such a privilege

N582Car3                    Summation - Mr. Tacopina

1    given yourself to this important, important case, and this

2    commitment.

3           And there is no greater service that a citizen can do

4    in this country than what you are being asked to do now,

5    consider whether an accusation as heinous as a claim of rape

6    has merit, to serve on a jury, to weigh the evidence fairly and

7    impartially, and to safeguard our rights and the legal process.

8           And with that in mind, I want to remind you what I

9    said in my opening.  I said that one thing in this country that

10   cannot be compromised, that cannot be bent, that must always be

11   absolute, that should not be wielded by the -- based on the

12   whims of someone who would seek to abuse it is the justice

13   system.  It's our defense against all tyranny.  It's what gives

14   you, the citizens of this country, the ability to defend

15   against oppression and defend yourselves.

16          People have very strong feelings about Donald Trump.

17   That's obvious.  One way or the other.  That's a fact.  And

18   however you feel about it is okay.  We didn't even ask you that

19   when we picked you as jurors.  It's okay however you feel about

20   him.  I said this before.  You could hate Donald Trump.  It's

21   okay.  But there is a time and a secret place to do that.  It's

22   called a ballot box during an election.  It's not here.

23   Because to do so in a court of law would make one no better

24   than those who would seek to bend the rule of law for their own

25   personal agendas.  We must all strive to be better than that,

1    But I was telling you how the defense wants it both

2    ways and so they want you to believe that these three people

3    are in this conspiracy but at the same time Mr. Tacopina showed

4    Carol Martin all those texts where Ms. Martin said some mean

5    things about Ms. Carroll and you remember them, Mr. Tacopina

6    went over them.  Ms. Martin called Ms. Carroll narcissistic, a

7    little scary.  She wrote that Ms. Carroll's lawsuit had gone to

8    another level that she had she couldn't relate, she was just

9    not there for it.  You saw it.

10    So, the question is if Ms. Martin was in a secret

11    scheme with Ms. Carroll, why in the world is she complaining to

12    random friends about it?  Which is it?  Are they in grand

13    scheme to take down the president, or is Ms. Martin gossiping

14    to friend and calling E. Jean names?  The defense argument

15    doesn't pass the smell test.

16    Or, remember what Lisa Birnbach told you.  She said

17    that after Ms. Carroll told her about the assault she never

18    checked in with Ms. Carroll about it.  She worked not to think

19    about it.  It is weird, right?  It is weird that Ms. Carroll

20    told her friend she had been raped and her friend never asked

21    about it again for 20 years.  The truth is often weird.  But

22    here is my point:  No one lies like this.  If Ms. Birnbach was

23    in a conspiracy with Ms. Carroll and was willing to commit

24    perjury and lie to you, she would tell you she thought about

25    the assault often.  She would tell you that she frequently

N585car6                    Rebuttal - Mr. Ferrara

1    cross-examination of Ms. Carroll as evidence that she lied

2    because Mr. Tacopina's client, Donald Trump, never took the

3    witness stand at all.  He didn't even show up in court.  And in

4    his attempt to make an excuse for his client's decision not to

5    attend this trial, Mr. Tacopina pointed out that Mr. Trump was

6    deposed.  And you saw that.  You also saw that Ms. Carroll was

7    deposed, twice, by some of the same lawyers in this courtroom.

8         Mr. Tacopina claims that it was enough that Trump was

9    deposed once over seven months ago.  But then why wasn't it

10   enough that Ms. Carroll was also asked questions at her

11   deposition?  Why did Mr. Tacopina have to spend nearly two full

12   days asking her questions during this trial if her deposition

13   was enough?  Because that's not how this works.

14        Respect for the justice system.  It was Ms. Carroll

15   who respected the justice system enough to walk into this

16   courtroom, swear an oath, look all of you in the eye, and

17   subject herself to two days of cross-examination.  Donald Trump

18   did not do that.  He could not do that.

19        Mr. Tacopina said to you minutes ago that you need

20   cross examination in your search for the truth.  And we

21   couldn't agree more.  What does that tell you?  What does your

22   common sense tell you?  If someone accused you of rape and you

23   didn't do it, you would run to the courtroom, look the jurors

24   in the eye, and tell them it never happened.  Mr. Trump didn't

25   do that.  Ms. Carroll was here every day, testified for over

1   two days, hour after hour of cross-examination.  Not Trump.

2   Didn't want to answer our questions.

3          Mr. Tacopina criticizes Ms. Carroll's testimony

4   because she showed up, she swore an oath, and told you what

5   happened, and meanwhile, Donald Trump was nowhere to be found;

6   didn't come into the courtroom, didn't take the witness stand.

7   And you should draw the conclusion that that's because he did

8   it, because he raped Ms. Carroll and he didn't want to testify

9   about it.

10         Now, I mentioned that Mr. Tacopina has, at times,

11  cherry-picked portions of the transcript to show you throughout

12  his summation and I gave you one example and I want to come

13  back to a couple more.

14         Again, he is a good lawyer, he has the transcript, and

15  he showed it to you when it suited him to do that but he, at

16  times, did not give you the full context because it would hurt

17  his case to show you that so I will do it.

18         He put up a slide with a line of testimony from page

19  605 of Ms. Carroll's testimony.  Here is what he showed you.

20  Ms. Carroll saying I never had sex again but I think it wasn't

21  because of him.  Here is what he left out, let's add in the

22  rest of it.

23         And then, he also didn't show you the rest of the

24  context Ms. Carroll gave on page 625.

25         Do we have that, Mr. Lam, too?

N585car6                          Rebuttal - Mr. Ferrara

1    she's the first to admit she really isn't sure.  But I am

2    surprised that Mr. Tacopina made such a big deal of this in

3    both his opening and his closing.  It's no secret that

4    Ms. Carroll can't pin down the date this happened.  She told

5    you she wishes she could.  She understandably has been asked

6    when it happened over and over in interviews and in this

7    courtroom.  So, is it any wonder that she obsessively racks her

8    brain every day for any and every honest detail she has in her

9    memory about what happened, about when this happened?  That she

10   never gives up trying to remember that?  Of course not.

11            And that's what you saw on the witness stand, a woman

12   trying her best to tell you what she remembered and what she

13   didn't.  She shouldn't be criticized for that.

14            Ms. Kaplan walked you through the timing so I'm not

15   going to belabor it but just briefly, Ms. Carroll remembers the

16   assault happened in fall of '95 or spring of '96.  When you add

17   in the detail about Lisa Birnbach interviewing Donald Trump in

18   early 1996, it made sense that it was the spring of '96, both

19   because Ms. Birnbach wouldn't have interviewed Trump had she

20   just been told that he had raped her friend, and also because

21   it makes sense that Ms. Carroll called Ms. Birnbach because

22   Ms. Carroll was thinking about how Ms. Birnbach had just

23   interviewed Trump.  So that all makes sense.  And then you

24   factor in that Ms. Carroll going to Bergdorf's after she

25   finished her show and the time of day she called Ms. Birnbach,

N585car6                    Rebuttal - Mr. Ferrara

1    locker room talk but you know from the evidence in this case

2    that it's definitely not locker room talk when Donald Trump

3    says it because you heard from three witnesses who said he did

4    exactly that:  Ms. Carroll, Jessica Leeds, and Natasha

5    Stoynoff.  They all described Trump grabbing them and kissing

6    them without warning.  And he didn't deny what he said.

7           So, one last thing on this.  The *Access Hollywood*

8    video is from 2005.  The recording is from 2005 and it became

9    public in 2016.  2005, the year Trump talked about grabbing

10   women by their genitals, that was the same year he assaulted

11   Natasha Stoynoff.  That video is a confession.

12          Now, the defense spent some time talking about how

13   Ms. Carroll had said she's fine, or great, or fabulous, on many

14   occasions since the assault.  Ms. Kaplan talked about this, how

15   Ms. Carroll minimizes difficulties.  And you heard testimony

16   from Dr. Lebowitz and Ms. Carroll's sister Cande explaining why

17   Ms. Carroll does that, why she has such a hard time checking in

18   deeply with her own emotions.  But I also will admit I just

19   don't get the argument.  Is the defense saying that because

20   Ms. Carroll was raped she could never be happy again?  That she

21   can never shop in Bergdorf Goodman's again?  That can't be the

22   argument, right?  If I get mugged outside of my office, am I

23   supposed to never go to work again because it is too

24   triggering?  If a loved one passes away and you manage to get

25   on with your life and find happiness again, does that mean you

N585car6                    Rebuttal - Mr. Ferrara

1   herself, and it feels like the defense has this idea of the
2   perfect rape victim and in their version it goes something like
3   this:  The perfect rape victim doesn't flirt.  The perfect rape
4   victim screams.  The perfect rape victim never goes back to
5   where they were raped.  The perfect rape victim tells the
6   police but otherwise never discusses the rape publicly.  The
7   perfect rape victim burns whatever clothes they were wearing.
8   The perfect rape victim never laughs again, never jokes around.
9   The perfect rape victim never again has success in their
10  career.  The perfect rape victim never looks at their rapist
11  again.  The perfect rape victim never tries to hold their
12  rapist accountable, never gets their day in court.  And, the
13  perfect rape victim is never happy again.

14          That's the defense's out-of-date, out-of-touch view.
15  It is as wrong as it is offensive.  Dr. Lebowitz explained to
16  you why it is wrong.  For example, she talked about victims who
17  don't scream, even if they're being raped in the stacks of the
18  public library.  That's at page 857 of the transcript.  But you
19  also know it is wrong because you heard from three victims of
20  sexual assault in this case, three of Donald Trump's victims
21  and they told you the same thing.  Ms. Carroll couldn't process
22  what was happening and was extremely confused when Trump
23  attacked her.  That's what she told you, that's at page 177.
24  Jessica Leeds told you that when Trump started groping her on
25  the airplane she didn't scream or shout and to this day she

N592Car1                    Charge

1    the second of the three alternative bases for the battery

2    claim.

3          The second theory of battery corresponds to something

4    called sexual abuse.  Sexual abuse has two elements.  In order

5    to establish that Mr. Trump sexually abused her, Ms. Carroll

6    must prove each of two elements by a preponderance of the

7    evidence.

8          The first element is that Mr. Trump subjected

9    Ms. Carroll to sexual contact.

10          The second element is that he did so without

11    Ms. Carroll's consent by the use of forcible compulsion.

12          So let me define "sexual contact" for you.  Sexual

13    contact for this purpose means any touching of the sexual or

14    other intimate parts of a person for the purpose of gratifying

15    the sexual desire of either person.  It includes the touching

16    of the actor by the victim, as well as the touching of the

17    victim by the actor, and the touching may be either directly or

18    through clothing.

19          Now, I just used the term or the phrase "sexual or

20    intimate part" in defining sexual contact.  For this purpose, a

21    "sexual part" is an organ of human reproduction.

22          So far as intimate part is concerned, the law does not

23    specifically define which parts of the body are intimate.

24    Intimacy, moreover, is a function of behavior and not just

25    anatomy.  Therefore, if any touching occurred, the manner and

N592Carl                    Charge

1   circumstances of the touching may inform your determination

2   whether Mr. Trump touched any of Ms. Carroll's intimate parts.

3   You should apply your common sense to determine whether, under

4   general societal norms and considering all the circumstances,

5   any area or areas that Mr. Trump touched, if he touched any,

6   were sufficiently personal or private that it would not have

7   been touched in the absence of a close relationship between the

8   parties.

9        I mentioned also that the touching, if any, of any

10  sexual or intimate parts must have been for the purpose of

11  gratifying the sexual desire of either party.  Sexual

12  gratification is a subjective determination that may be

13  inferred from the nature of the acts committed and the

14  circumstances in which they occurred.  There is no requirement

15  that actual gratification occur, but only that the touching, if

16  there was any, was for that purpose.

17       The second element of this theory is forcible

18  compulsion.  I defined that for you a couple of minutes ago

19  when I told you the elements of rape, and here, as there, it

20  means intentionally to compel by the use of physical force.

21       If you find that Ms. Carroll has proved by a

22  preponderance of the evidence both of the two elements that I

23  just referred to, the two elements of sexual abuse, then you

24  will answer "yes" to Question 2.  If you answer yes to Question

25  2, I instruct you that Mr. Trump thus committed battery against

N592Car2

1    happen in that event.

2              All right.  Let's get the jury.

3              (Jury present; 3:04 p.m.)

4              THE COURT:  Jurors all present.

5              Members of the jury, who is the foreperson?

6              (Juror 81 stands)

7              THE COURT:  Yes, ma'am.  Has the jury in fact reached

8    a verdict?

9              THE FOREPERSON:  We have.

10             THE COURT:  Would you please pass the envelope to

11   Andy.  Thank you.

12             (Pause)

13             THE COURT:  The clerk will publish the verdict.

14             THE DEPUTY CLERK:  As to battery, did Ms. Carroll

15   prove, by a preponderance of the evidence, that (1) Mr. Trump

16   raped Ms. Carroll?  Answer:  No.

17             Question 2.  Did Mr. Trump sexually abuse Ms. Carroll?

18   Answer:  Yes.

19             Question 4.  Ms. Carroll was injured as a result of

20   Mr. Trump's conduct?  Answer:  Yes.

21             Dollar amount that would fairly and adequately

22   compensate her for injury --

23             THE COURT:  "For that injury."

24             THE DEPUTY CLERK:  For that injury or those injuries.

25   $2 million.

N592Car2

1    Question 5.  Mr. Trump's conduct was willfully or

2  wantonly negligent, reckless, or done with a conscious

3  disregard of the rights of Ms. Carroll, or was so reckless as

4  to amount to such disregard?  Answer:  Yes.

5    How much, if any, should Mr. Trump pay to Ms. Carroll

6  in punitive damages?  Answer:  $20,000.

7    As to defamation, did Ms. Carroll prove, by a

8  preponderance of the evidence, that, Question 6, Mr. Trump's

9  statement was defamatory?  Answer:  Yes.

10    Did Ms. Carroll prove, by clear and convincing

11  evidence, that, as to Question 7, Mr. Trump's statement was

12  false?  Answer:  Yes.

13    Question 8.  That Mr. Trump made the statement with

14  actual malice?  Answer:  Yes.

15    Did Ms. Carroll prove, by a preponderance of the

16  evidence, that, Question 9, Ms. Carroll was injured as a result

17  of Mr. Trump's publication of the October 12, 2022 statement?

18  Answer:  Yes.

19    If "yes," answer a dollar amount for any damages other

20  than reputation repair program.  $1 million.

21    If "yes," insert a dollar amount for any damages for

22  the reputation repair program only.  $1,700,000.

23    Question 10.  In making the statement, Mr. Trump acted

24  maliciously, out of hatred, ill will, spite, or wanton,

25  reckless, or willful disregard of the rights of another?

1    Answer:  Yes.

2           If "yes," how much, if any, should Mr. Trump pay to

3    Ms. Carroll in punitive damages?  $280,000.

4           THE COURT:  And it has affixed to it the juror

5    numbers.

6           Is there a request for a poll, Mr. Tacopina?

7           MR. TACOPINA:  Yes, your Honor.

8           THE COURT:  Poll the jury, please, Andy.

9           THE DEPUTY CLERK:  Juror No. 10, in seat no. 1, is

10   that your verdict?

11          JUROR 10:  Yes.

12          THE DEPUTY CLERK:  Juror No. 37, is that your verdict?

13          JUROR 37:  Yes.

14          THE DEPUTY CLERK:  Juror No. 39, is that your verdict?

15          JUROR 39:  Yes, it is.

16          THE DEPUTY CLERK:  Juror No. 44, is that your verdict?

17          JUROR 44:  Yes.

18          THE DEPUTY CLERK:  Juror No. 48, is that your verdict?

19          JUROR 48:  Yes.

20          THE DEPUTY CLERK:  Juror No. 58 --

21          JUROR 58:  Yes, it is.

22          THE DEPUTY CLERK:  -- is that your verdict?

23          JUROR 58:  Yes, it is.

24          THE DEPUTY CLERK:  Thank you.

25          Juror No. 77, is that your verdict?

N592Car2

1    JUROR 77:  Yes.

2    THE DEPUTY CLERK:  Juror No. 80, is that your verdict?

3    JUROR 80:  Yes.

4    THE DEPUTY CLERK:  Juror No. 81, is that your verdict?

5    JUROR 81:  Yes.

6    THE DEPUTY CLERK:  Verdict unanimous, your Honor.

7    THE COURT:  Thank you.

8    Is there any reason why the verdict should not be

9    filed and recorded and judgment entered?

10    Ms. Kaplan.

11    MS. KAPLAN:  None from our side, your Honor.

12    THE COURT:  Mr. Tacopina.

13    MR. TACOPINA:  No, your Honor.

14    THE COURT:  The judgment will be filed and recorded.

15    Any reason why the jury shouldn't be discharged at

16    this time?

17    MS. KAPLAN:  None for plaintiff, your Honor.

18    MR. TACOPINA:  No, your Honor.

19    THE COURT:  Members of the jury, you have done an

20    important and a hard task.  I never comment on jury verdicts

21    because I respect the role of the jury.  It is the bedrock of

22    the system.

23    When I first began practicing law in New York, there

24    was a then very elderly and distinguished judge of this Court

25    who at least two members of the United States Supreme Court