UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

E. JEAN CARROLL,                                          Civil Action No.:
                                                          22-cv-10016

                          *Plaintiff,*

        – against –

DONALD J. TRUMP,

                          *Defendant.*
-----------------------------------------------------------------X

---

**DEFENDANT DONALD J. TRUMP'S  MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTION FOR A NEW TRIAL OR REMITTITUR**

---

TACOPINA, SEIGEL & DeOREO
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
Counsel for Defendant Donald J. Trump

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

STATEMENT OF FACTS....................................................................................3

    THE JURY FOUND THAT PLAINTIFF WAS NOT RAPED BY DEFENDANT................3

    EMOTIONAL HARM FROM THE BERGDORF GOODMAN INCIDENT........................5

    DEFAMATION DAMAGES...............................................................................6

ARGUMENT.....................................................................................................12

    POINT I:    THE COURT SHOULD GRANT A NEW TRIAL OR REMITTITUR
                  PURSUANT TO FED. R. CIV. P. 59............................................12

        A.    COMPENSATORY DAMAGES FOR THE BATTERY CLAIM................13

        B.    COMPENSATORY DAMAGES FOR THE DEFAMATION CLAIM........16

        C.    PUNITIVE DAMAGES FOR THE DEFAMATION CLAIM......................22

CONCLUSION.................................................................................................25

## **TABLE OF AUTHORITIES**

**CASES:**

*A.B. v. Staropoli*, No. 08 CIV. 4585 (LMS), 2013 WL 12441525
(S.D.N.Y. Dec. 11, 2013)................................................................................................15-16

*Abel v. Town Sports Int'l, LLC*, No. 09 CIV. 10388 DF, 2012 WL 6720919
(S.D.N.Y. Dec. 18, 2012)....................................................................................................12

*Alla v. Verkay*, 979 F. Supp. 2d 349 (E.D.N.Y. 2013)...................................................17

*Allen v. CH Energy Grp., Inc.*, 58 A.D.3d 1102 (3d Dep't 2009)................................17

*Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34 (2d Cir. 2015)...........17

*Azkour v. Little Rest Twelve*, No. 10-CV-4132 RJS, 2015 WL 1413620
(S.D.N.Y. Mar. 23, 2015)....................................................................................................12

*Bender v. City of New York*, 78 F.3d 787 (2d Cir. 1996)...............................................18

*BMW of North America v. Gore*, 517 U.S. 559 (1996).......................................3, 22, 24

*Cash v. Cnty. of Erie*, 654 F.3d 324 (2d Cir. 2011)......................................................15

*Casmento v. Volmar Constr., Inc.*, No. 20-CV-00944 (LJL), 2022 WL 15773966
(S.D.N.Y. Oct. 28, 2022)....................................................................................................12

*Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573
(S.D.N.Y. 2011)............................................................................................................17-18, 24

*Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987)......................16

*Deborah S. v. Diorio*, 153 Misc. 2d 708 (Civ. Ct. 1992)..............................................16

*Doe v. Green*, No. 17CV1765RAOTW, 2021 WL 2188534
(S.D.N.Y. Apr. 29, 2021)....................................................................................................14

*Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306 (S.D.N.Y. 2018).........................13

*Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, No. 14-CV-3673
(KAM)(JO), 2020 WL 1083771 (E.D.N.Y. Mar. 6, 2020)............................................23

*Estevez-Yalcin v. The Children's Vill.*, No. 01-CV-8784 KMK, 2007 WL 2746807
(S.D.N.Y. Sept. 20, 2007)..................................................................................................16

*Evans v. Metro. Transportation Auth.*, No. 16CV4560FBVMS, 2018 WL 10466833
(E.D.N.Y. Sept. 25, 2018)..................................................................................................15

*Feldman v. Knack*, 56 Misc. 3d 1209(A), 63 N.Y.S.3d 305
(Sup. Ct. Westchester Co. 2017)........................................................................................16

*Feldman v. Knack*, 170 A.D.3d 667 (2d Dep't 2019)..................................................................16

*Fisher v. Mermaid Manor Home for Adults, LLC*, No. 14-CV-3461 (WFK)(JO), 2016 WL
7330554 (E.D.N.Y. Dec. 16, 2016)................................................................................23-24

*Grant v. City of Syracuse*, 357 F. Supp. 3d 180 (N.D.N.Y. 2019)........................................13-14

*Heller v. Louis Provenzano, Inc.*, 303 A.D.2d 20 (1st Dep't 2003).............................................22

*Hurt v. City of New York*, No. 15-CV-7612 (PKC), 2019 WL 5781990
(S.D.N.Y. Nov. 6, 2019)....................................................................................................12

*Jalal v. Shanahan*, No. 16-CV-281 (CBA) (LB), 2018 WL 10466837
(E.D.N.Y. May 10, 2018)...............................................................................................16-17

*Jester v. Hutt*, 937 F.3d 233 (3d Cir. 2019)...........................................................................22

*Johnson v. White*, No. 06CIV2540LAPDF, 2010 WL 11586681
(S.D.N.Y. Nov. 18, 2010)..................................................................................................15

*Koehler v. Metro. Transportation Auth.*, No. 16-CV-03 (AYS), 2023 WL 2499117
(E.D.N.Y. Mar. 14, 2023)..................................................................................................12

*Komatsu v. Ramos*, No. 22-CV-6076 (LTS), 2022 WL 3656323
(S.D.N.Y. Aug. 25, 2022)..................................................................................................12

*Laurie Marie M. v. Jeffrey T.M.*, 159 A.D.2d 52 (2d Dep't 1990),
aff'd, 77 N.Y.2d 981 (1991)...............................................................................................15

*Lindsey v. Butler*, No. 11-CV-9102 (ER), 2022 WL 17849009
(S.D.N.Y. Dec. 22, 2022)...................................................................................................23

*MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546
(S.D.N.Y. 2012).................................................................................................................12

iii

*Mathie v. Fries*, 121 F.3d 808 (2d Cir. 1997)...........................................................................15

*Milfort v. Prevete*, 3 F. Supp. 3d 14 (E.D.N.Y. 2014) ...........................................................24

*Miller v. State*, 110 A.D.2d 627 (2d Dep't 1985)....................................................................16

*Nellis v. Miller*, 101 A.D.2d 1002 (4th Dep't 1984)................................................................17

*Nelson v. Cnty. of Suffolk*, No. 12CV5678DRHAKT, 2019 WL 3976526
(E.D.N.Y. Aug. 22, 2019)..........................................................................................................23

*Norris v. New York City Coll. of Tech.*, No. 07-CV-853, 2009 WL 82556
(E.D.N.Y. Jan. 14, 2009)............................................................................................................24

*Offei v. Omar*, No. 11 CIV. 4283 SAS MHD, 2012 WL 2086294
(S.D.N.Y. May 18, 2012)......................................................................................................14-15

*Parkin v. Cornell Univ., Inc.*, 182 A.D.2d 850 (3d Dep't 1992)..............................................17

*Patterson v. Kummer Dev. Corp.*, 302 A.D.2d 873 (4th Dep't 2003)......................................14

*Perney v. Medical One New York, P.C.*, No. 159080/2019, 2020 WL 8613521
(Sup. Ct. NY Co. Feb. 17, 2020)................................................................................................15

*Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting
Indus. of U.S. & Canada*, 973 F.2d 1050 (2d Cir. 1992).........................................................18

*Rossignol v. Silvernail*, 185 A.D.2d 497 (3d Dep't 1992)......................................................17

*Small v. New York State Dep't of Corr. & Cmty. Supervision*, No. 12-CV-1236S, 2019 WL
1593923 (W.D.N.Y. Apr. 15, 2019)...........................................................................................23

*Smith v. City of New York*, No. 12 CIV. 8131 JGK, 2014 WL 2575778
(S.D.N.Y. June 9, 2014)..............................................................................................................12

*Stampf v. Long Island R. Co.*, 761 F.3d 192 (2d Cir. 2014)................................12-13, 17, 22-23

*Strader v. Ashley*, 61 A.D.3d 1244 (3d Dep't 2009)...............................................................17

*Vargas v. Premiere Staff Agency*, No. 17CIV4280VSBHBP, 2019 WL 10632865
(S.D.N.Y. July 18, 2019)............................................................................................................14

*Xiaokang Xu v. Xiaoling Shirley He*, 147 A.D.3d 1223 (3d Dep't 2017)...............................17

iv

**STATUTES/RULES**

C.P.L.R. § 5501(c)...............................................................................................................13

Fed. R. App. P. 4..................................................................................................................12

Fed. R. Civ. P. 59 .........................................................................................................1, 12, 25

## INTRODUCTION

Defendant Donald J. Trump ("Trump" or "Defendant"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in support of his Motion for a new trial or remittitur pursuant to Fed. R. Civ. P. 59.

## PRELIMINARY STATEMENT

As argued herein, the Court should order a new trial on damages or grant remittitur because contrary to Plaintiff's claim of rape, the Jury found that she was not raped but was sexually abused by Defendant during the 1995/1996 Bergdorf Goodman incident ("Bergdorf Goodman Incident"). Such abuse could have included groping of Plaintiff's breasts through clothing or similar conduct, which is a far cry from rape. Therefore, an award of $2 million for such conduct, which admittedly did not cause any diagnosed mental injury to Plaintiff, is grossly excessive under the applicable case law.

Furthermore, as set forth below, the $2.7 million compensatory damages award for Plaintiff's defamation claim for the October 12, 2022 Truth Social statement ("October 12, 2022 Statement") was based upon pure speculation. This is so because:

(a) Plaintiff did not prove that the damage to her reputation (if any) was caused by the October 12, 2022 Statement and not by Defendant's June 2019 statements about Plaintiff wherein he denied Plaintiff's allegations ("June 2019 Statements"), which are the subject of *Carroll I*– thus creating a double recovery for Plaintiff to the extent she is awarded any damages in *Carroll I*;

(b) Plaintiff's estimate of how many times the October 12, 2022 Statement was viewed on Truth Social and Twitter was totally unreliable because it incredibly ranged from 1.5 million to 5.7 million times, which is an error rate of 74%;

(c) Plaintiff's evidence as to the amount of people who believed the October 12, 2022

1

Statement (and thus thought less of Plaintiff) was based upon pure conjecture, because (i) according to Plaintiff, the people who read and believed the October 12, 2022 Statement were republicans who consistently believed Defendant, and (ii) such individuals likely would have disbelieved Plaintiff's rape accusation regardless of the October 12, 2022 Statement, especially since Defendant already denied Plaintiff's accusations by way of his June 2019 Statements;

(d)    Plaintiff's proposed reputation repair campaign was based on a speculative premise that Trump supporters would have changed their minds about Plaintiff from such a campaign;

(e)    Readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement, because the people who believed the October 12, 2022 Statement would have already made up their minds about Plaintiff's rape allegation from reading the June 2019 Statements;

(f)    The cost estimate for Plaintiff's proposed reputation repair campaign was based upon pure conjecture in that Plaintiff's reputation expert estimated that it would cost anywhere from $368,000 to $2.7 million, which is an error rate of 86%;

(g)    Plaintiff's reputation expert also testified that she did not analyze any of Plaintiff's numerous media appearances where Plaintiff mitigated any reputational harm from Defendant denying the rape allegation or the vast amount of positive support that Plaintiff received from the public after making her accusation against Defendant; and

(h)    Plaintiff's income has only increased since Defendant denied Plaintiff's accusations, which establishes that she has suffered no financial harm.

Lastly, the punitive damages award for Plaintiff's defamation claim violates the due process

standards set forth in the United States Supreme Court case *BMW of North America v. Gore*, 517 U.S. 559 (1996).

## STATEMENT OF THE FACTS

### The Jury Found that Plaintiff Was Not Raped by Defendant

To Plaintiff, this case was always about Defendant allegedly raping her. Indeed, in her Complaint, Plaintiff refers to the incident with Defendant as a "rape" dozens of times. *See* Complaint (Exhibit A[1]) at ¶ 1 (Defendant "forced her up against a dressing room wall, pinned her in place with his shoulder, and raped her."); ¶ 4 ("And she knew that while a woman who accused any man of rape was rarely believed, a woman who accused a rich, famous, violent man of rape would probably lose everything. She therefore reasonably concluded that if she accused Donald Trump of rape he would bury her in threats and lawsuits, and she would probably lose her reputation, not to mention everything she had worked for and achieved."); ¶ 9 ("She decided to describe Trump's rape in a book ...."); ¶ 10 ("He denied the rape."); *see also id.* at ¶¶ 44, 46, 49, 51, 53, 55, 59, 63-64, 68, 69, 70, 76, 78, 80, 87, 96-98, 102, 106-108, 110, 115, 118-119, 122-123, and 125.

Similarly, during trial, Carroll consistently referred to the Bergdorf Goodman Incident as nothing less than a "rape." *See, e.g.,* Tr.[2] at 148:8 ("I am here because Donald Trump raped me."); 216:2 ("Donald Trump raped me."); 233:1-2 ("Q. Why did you think he was evil? | A. Because he raped me."); 318:22-23 ("getting attention for being raped is not -- it's hard"); 334:10 ("Not supposedly. I was raped."); 334: 15-17 ("Q. That's your version, right, Ms. Carroll, that you were raped? | A. Those are the facts."); 408:9-10 ("I'm telling you, he raped me, whether I screamed or not.").

---

[1] All Exhibit references herein refer to the Exhibits attached to the accompanying Declaration of Matthew G. DeOreo.

[2] "Tr." refers to the Trial Transcript. Relevant portions of the Trial Transcript are attached to the DeOreo Declaration as Exhibit B.

The same holds true for Plaintiff's opening and summation. *See* Tr. 31:12-13 ("forced his penis inside her"); 34:22-23 ("You will hear that Ms. Birnbach told Ms. Carroll, in no uncertain terms, E. Jean, you have been raped."); 1242:8 ("Trump then removed his hand and shoved his penis inside her."); 1243:3-7 ("Ms. Birnbach told you that upon hearing what had happened, she left the kitchen so her kids wouldn't be able to overhear her, and told Ms. Carroll, in no uncertain terms, E. Jean you have been raped."); 1249:22-25 ("Remember when Mr. Trump's lawyers asked Dr. Lebowitz whether or not screaming would be consistent with a rape? Here is what she said. She said that not screaming would not only be absolutely consistent with being raped ...."); 1251:22-23 ("Dr. Lebowitz also testified to you about how Ms. Carroll processed the rape ....");  1258:18-20 ("[D]id you see anything suggesting that they all agreed to come up with a lie that Donald Trump raped E. Jean Carroll."); 1283:3-6 ("And there is no greater service that a citizen can do in this country than what you are being asked to do now, consider whether an accusation as heinous as a claim of rape has merit."); 1389:19-21 ("It is weird that Ms. Carroll told her friend she had been raped and her friend never asked about it again for 20 years. The truth is often weird."); 1396:22-23 ("If someone accused you of rape and you didn't do it, you would run to the courtroom ...."); 1397:7-8 ("And you should draw the conclusion that that's because he did it, because he raped Ms. Carroll ...."); 1400:19-20 ("Ms. Birnbach wouldn't have interviewed Trump had she just been told that he had raped her friend ...."); 1405:19-20 ("Is the defense saying that because Ms. Carroll was raped she could never be happy again?"); 1407:1-2 ("[I]t feels like the defense has this idea of the perfect rape victim ....").

However, the Jury found that Defendant did not rape Plaintiff but that Defendant "sexually abuse[d]" Plaintiff, which, according to the Court's jury instructions, could have been a groping of her breasts through the clothes. (Tr. 1418:3 - 1419:8; 1472:17-18).

In other words, the Jury simply did not believe Plaintiff's rape accusation.

**Emotional Harm from the Bergdorf Goodman Incident**

Plaintiff testified that she has suffered no diagnosed injury from the Bergdorf Goodman Incident, has been happy since the incident and described her life as "fabulous":

> Q. Have you ever been diagnosed with any mental health conditions such as PTSD or depression?
>
> A. No.
>
> ***
>
> Q. Are you a happy person, Ms. Carroll?
>
> A. I am a happy person. I know it seems strange to hear me after today, but I'm basically a happy person.
>
> ***
>
> Q. During that podcast, you confirmed or you stated that your life had been fabulous since the book came out.
>
> A. I always say my life is fabulous. No matter who asks me, what time of day, I will always reply it's fabulous.

(Tr. 225:8-16; 551:11-14; *see also* 270:20 - 271:2; 551:17 - 552:9; 645:20 - 646:12).

Plaintiff also testified that before publically accusing Defendant of rape in her book, she was "as good as new. This is great. I'm fine. I rarely think of it. *** I'm fine. I rarely think of it." (Tr. 610:3-9; 610:17-611:1).

Plaintiff's emotional harm expert, Dr. Leslie Lebowitz, similarly testified that Plaintiff did not suffer from any "thought disorder, character disorder, or major mental illness. She struck me as unusually vivacious and extroverted." (Tr. 835:5-11). Dr. Lebowitz also did not diagnose Plaintiff with post-traumatic stress disorder ("PTSD"), anxiety, or major depression and testified that Plaintiff is a "extremely resilient person." (Tr. 853:8-10; 880:6-14; *see also* 907:15-20; 918:12 - 919:5; 946:14 -

5

947:5).  Dr. Lebowitz also testified that Plaintiff's lack of romantic partners could have been caused by "something else other than the alleged Bergdorf Goodman incident ...." (Tr. 925:10-17).

**Defamation Damages**

   The crux of Plaintiff's defamation claim was that Trump allegedly defamed Plaintiff when he denied raping her.  *See* Complaint (Exhibit A) at ¶¶ 96 & 98 ("In the October 12 statement, Trump falsely stated that he did not rape Carroll. *** In the October 12 statement, Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a "hoax," "scam," or ploy to increase her book sales."); Tr. 320:21 - 321:21.  As noted above, the Jury found that Defendant did not rape Plaintiff, and thus, the portions of the defamation claim based upon an alleged rape failed.

   Plaintiff also testified that Trump defamed her when he denied the Bergdorf Goodman Incident in his June 2019 Statements, damages for which were not part of this trial as they are the subject of *Carroll I.  See Carroll I* Complaint (Exhibit C); Tr. at pp. 262-270.  However, Plaintiff testified that she was greatly harmed by the June 2019 Statements, including the loss of her reputation and job at Elle magazine, and also because she allegedly received death threats due to the June 2019 Statements, which caused her to purchase bullets for her gun for protection:

> Q. What happened after -- what happened to you after Mr. Trump made those statements?
>
> A. People have gone through much worse than being reviled by president Trump for three days, much worse. I understand that. But, boy, it hit me and it laid me low because I lost -- I lost my reputation. Nobody looked at me the same. It was gone. Even people who knew me would look at me with, you know, pity in their eyes and the people who had no opinion now thought I was a liar and hated me. Oh my God. The force of hatred coming at me was staggering.
>
> Q. How did it -- how did that hatred, how did it come at you? In what form?
>
> A. People telling me they are reading about it on the Internet, am I E. Jean Carroll; opening up my e-mail and seeing threats against my life; opening up my Ask E. Jean

letters which are generally -- you know, it's my lifeline, it gives me spirit, reading Ask E. Jean, and they are saying terrible things to me.

Q. .... How many messages sort of threatening you physically did you receive?

A. Not a lot, but serious threats, around ten.

Q. What was your reaction to receiving in particular those threatening messages?

A. I bought bullets for a gun that I owned.

*** 

Q. Okay. How, if at all, do you believe that Mr. Trump's June 2019 statements have affected your reputation?

A. I am no longer believed. I got fired. I lost my readers. I lost eight million readers. My magazine work has suffered. The number of letters I receive has gone down. I am still in their swinging. I've still got my Ask E. Jean column on Substack, and I have got 19,000 readers. But it's been a huge loss, and I'm slowly building it back.

(Tr. 268:20 - 269:19; 271:10-17; *see also* Tr. at 271:18 - 273:10).

However, Plaintiff never distinguished the harm caused by the June 2019 Statements and the October 12, 2022 Statement. Therefore, the jury award for the purported harm caused by the October 12, 2022 Statement is based upon pure speculation, and the jury very clearly must have awarded Plaintiff compensatory damages for the alleged harms caused by the June 2019 Statements, namely the alleged loss of reputation and her job, as well as receiving death threats.

Moreover, Plaintiff's reputation expert, Professor Ashlee Humphreys, testified about the purported harm caused by Defendant's June 2019 Statements:

Q. Why did you look at material that was published or written about Ms. Carroll prior to June 2019?

A. So, in June 2019 Mr. Trump made a series of statements that impacted her reputation and I felt it was important to account for some of that change prior to October 12th.

Q. Can you describe what you observed about Ms. Carroll's reputation prior to June 2019 as compared to after June 2019?

7

A. So, when I looked at the materials from before June 2019, that means I looked at reviews of her books, media coverage of her, even Amazon reviews of her books that were before that, just reader responses to it. I kind of first got a glimpse of that and found, you know, she was known as kind of like a sassy dating advice columnist, a real truth-teller a journalist, who gave trusted advice on dating and living in the city. And then after, I looked at the social media posts from June through October, and then I looked at media posts from after October.

Q. And you described Ms. Carroll's reputation prior to June 2019. How did that compare to the reputation that you observed after, immediately after June 2019?

A. So, after June 2019, you know, of course there was a lot more volume of statements about her and they contained pretty negative associations including that she was a liar, the perpetrator of a scam, a hoax. Things like that.

(Tr. 1129:15 - 1130:12).

Additionally, Professor Humphreys compared Plaintiff's reputation before the June 2019 Statements and after the October 12, 2022 Statement, and thus Professor Humphreys necessarily included the purported harm from the June 2019 Statements into her damages analysis:

So, one thing in my analysis that I noticed is, prior to the June 2019 statement, there were, of course, many positive associations of her but the volume was relatively small. After the October 12 statement there was a huge volume of associations associated with her, some of those were positive, but then a huge volume, a very large number, tens of thousands of those associations were really negative.

(Tr. 1135:2-8).

During summation, Plaintiff argued to the Jurors that they should look to Professor Humphreys's testimony when deciding the amount to award for reputational harm for Defendant's "public statements," which necessarily includes the June 2019 Statements for the reasons stated above:

So what is the level of damages? I'm not going to stand here and tell you exactly how much you should award E. Jean Carroll in damages, but there are a few things that you can consider in coming to that conclusion.

First of all, Professor Humphreys told you about the millions of people that heard and likely believed Donald Trump's public statements about E. Jean Carroll. What is the price for having to live your life in shame and to lose your good name because Donald Trump lied and told millions of people that you are a liar?

8

(Tr. 1272: 8-17).  Consequently, the jury's speculative award for reputational harm created a double recovery for Plaintiff to the extent she is awarded any damages in *Carroll I*.

Professor Humphreys also testified that her analysis was so uncertain that she could not narrow her estimate as to how many times the October 12, 2022 Statement was viewed on Truth Social and Twitter to anything more specific than somewhere "between 1.5 million and 5.7 million times," which is an error rate of 74%. (Tr. 1125:17 - 1126:8).

Professor Humphreys then testified that the people who read and believed the October 12, 2022 Statement were "republicans [who] typically believe Mr. Trump."  (Tr. 1133:18 - 1134:4).  Those persons likely would not have had a high opinion of Plaintiff regardless of the October 12, 2022 Statement, because Plaintiff was attacking a political figure that they highly favored. Consequently, Professor Humphreys did not take into consideration the fact that Trump's supporters likely would never have supported or believed Plaintiff regardless of Trump's response to her rape accusation, and that Plaintiff's reputation with such supporters would not have changed due to the October 12, 2022 Statement. This is especially so because Defendant already denied Plaintiff's accusations by way of his June 2019 Statements.

Moreover, Professor Humphreys testified that in order to repair Plaintiff's reputation with such Trump supporters, Plaintiff would have to pay for the cost of a reputation repair campaign, which is "a campaign to put out positive messages about" Plaintiff. (Tr. 1136:1-13; 1136:25 - 1137:6).  However, Professor Humphreys did not explain how existing Trump supporters would have changed their minds about Plaintiff due to positive messages about Plaintiff, especially since Defendant already denied Plaintiff's allegations in the June 2019 Statements.  In fact, Professor Humphreys testified that she has never even done a reputation repair campaign before, so her analysis on this subject should be given little weight. (Tr. 1136:14-16).

9

Professor Humphreys further testified that the June 2019 Statements already existed as of the October 12, 2022 Statement, and that readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement. (Tr. 1149:2 - 1150:3). She also testified that she does not know if the people who believed the October 12, 2022 Statement had already made up their minds about Plaintiff's rape allegation from reading the June 2019 Statements. (Tr. 1150:4-19).

Therefore, Professor Humphreys's testimony about changing the minds of Trump supporters (the target of the reputation repair campaign) is pure speculation. It is not surprising then that her cost estimate for such a campaign was equally based upon pure conjecture in that she estimated that it would cost anywhere from $368,000 to $2.7 million (Tr. 1139:20 - 1141:21), which is an error rate of 86 percent.

Professor Humphreys also testified that she did not analyze any of Plaintiff's numerous media appearances where Plaintiff mitigated any reputational harm from Defendant denying Plaintiff's allegations. (Tr. 1148:8 -19; 1152:13- 1153:11).

In this regard, Plaintiff herself testified that she received a vast amount of positive support from the public after making her accusation against Defendant:

> Q: After your article appeared in The Cut, that's again the first time the story appeared publicly?
>
> A: Yes.
>
> Q: You received a lot of positive letters?
>
> A: Yes.

(Tr. 568:21-25; *see also* Tr. 270:4-14; 552:15 - 553:2).

Importantly, Professor Humphreys conceded the positive support that Plaintiff received on social media after the rape allegation but did not factor such support into her analysis of the harm allegedly caused by the October 12, 2022 Statement. (Tr. 1154:3-13).  Accordingly, if the positive social media posts about Plaintiff far outweighed the negative posts, Professor Humphreys did not measure that. (*Id.*).

Plaintiff also testified that her income increased since leaving Elle magazine due to her business with Substack[3]:

> Q:     Well, how would you compare financially. How much were you making your last year at Elle versus what you are making now at Substack?
>
> A:     Well, because I worked - because the Elle column was published once a month and I received $5,000 a month, I think it was $5,000? Yeah, $5,000 a month. And now I turn out three columns every week, so I am doing, I don't know, ten times the work and I still manage to have about the same income.
>
> Q:     Might it be a little more?
>
> A:     Slightly more, yeah

(Tr. 272:21 - 273:5; *see also* 317:12-21; 547:15-19; 550:2-5).  Furthermore, Plaintiff never argued lost income to the Jury.  Therefore, there can be no credible dispute that Plaintiff did not suffer any financial harm from the October 12, 2022 Statement, and Professor Humphreys did not factor that into her analysis.

---

[3] "Substack is a way for writers to reach their audience, their readers, directly through newsletters." (Tr. 272:11-13).

11

**ARGUMENT**

**POINT I**

**THE COURT SHOULD GRANT A NEW TRIAL OR REMITTITUR
PURSUANT TO FED. R. CIV. P. 59**[4]

Remittitur or a new trial is appropriate where a jury's award is "entirely out of proportion to the plaintiff's injury [and was] motivated by sympathy rather than by evidence of harm." *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 560-61 (S.D.N.Y. 2012) (citing *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.,* 746 F. Supp. 2d 575 (S.D.N.Y. 2010)). Whether a jury's award is excessive is a question of law for the Court to decide. *See, e.g., Koehler v. Metro. Transportation Auth.*, No. 16-CV-03 (AYS), 2023 WL 2499117, at *15 (E.D.N.Y. Mar. 14, 2023).[5]

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014)

"'A federal court, in reviewing the amount of damages awarded on a state law claim, must apply New York law.'" *Hurt v. City of New York*, No. 15-CV-7612 (PKC), 2019 WL 5781990, at *11 (S.D.N.Y. Nov. 6, 2019)(quoting *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006)). "Under

---

[4] Even though Defendant already filed his Notice of Appeal, this Court still has jurisdiction to decide this motion. *See Komatsu v. Ramos*, No. 22-CV-6076 (LTS), 2022 WL 3656323, at *1 n. 1 (S.D.N.Y. Aug. 25, 2022)("Rule 4 of the Federal Rules of Appellate Procedure ... provides that, if a plaintiff files a Rule 59 or Rule 60 motion within 28 days after entry of judgment, a notice of appeal does not become effective until the district court disposes of the motion, even if the notice of appeal was filed first. *See* Fed. R. App. P. 4(a)(4)(B)(i). The Court therefore has jurisdiction to consider Plaintiff's motion."); *Azkour v. Little Rest Twelve*, No. 10-CV-4132 RJS, 2015 WL 1413620, at *1 (S.D.N.Y. Mar. 23, 2015)(holding same); *Smith v. City of New York*, No. 12 CIV. 8131 JGK, 2014 WL 2575778, at *1 n.1 (S.D.N.Y. June 9, 2014)(holding same).

[5] "Rule 59, not Rule 50, is the proper vehicle for motions to reduce damage awards ...." *Casmento v. Volmar Constr., Inc.*, No. 20-CV-00944 (LJL), 2022 WL 15773966, at *9 n. 5 (S.D.N.Y. Oct. 28, 2022)(citing cases); *see also Abel v. Town Sports Int'l, LLC*, No. 09 CIV. 10388 DF, 2012 WL 6720919, at *35 (S.D.N.Y. Dec. 18, 2012)("Defendant's further alternative motion under Rule 59(e) for remittitur is granted.").

New York law, a court 'shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.'" *Stampf*, 761 F.3d at 204 (quoting C.P.L.R. § 5501(c)).

"This standard requires a more exacting review than the 'shocks the conscience' standard generally applied by federal courts, and is less deferential to a jury verdict." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018)(quotations omitted). Moreover, in "determining whether an award deviates materially from what would be reasonable compensation, district courts compare the jury's award to awards allowed in analogous cases involving similar types of injuries." *Id.* (quotations omitted).

A.      **Compensatory Damages for the Battery Claim**

In summation, Plaintiff argued that she should be compensated for living a life since early 1996 without companionship: "What is the price for decades of living alone without companionship, for having no one to cook dinner with, no one to walk your dog with, no one to watch TV with, and for feeling for decades like you are dirty and unworthy?" (Tr. 1272:22 - 1273:1).

Therefore, Plaintiff was seeking damages for loss of consortium, which "includes such items as loss of support services, companionship, society, sexual relations, and solace." *Grant v. City of Syracuse*, 357 F. Supp. 3d 180, 195 (N.D.N.Y. 2019). According to New York law, such awards should "fall within a 'low six-figure range'":

> A review of comparable awards shows that such awards often fall within a "low six-figure range". *Okraynets v. Metropolitan Transp. Authority*, 555 F.Supp.2d 420, 440 (S.D.N.Y. 2008); *see also Walsh v. State of New York*, 232 A.D.2d 939, 648 N.Y.S.2d 816 (1996) (upholding a $ 185,000 on a wife's derivative claim); *DeLeonibus v. Scognamillo*, 238 A.D.2d 301, 656 N.Y.S.2d 275 (1997) (upholding a $ 275,000 loss of consortium claim); *Kirby v. Turner Constr. Co.*, 286 A.D.2d 618, 730 N.Y.S.2d 314 (2001) (reducing a $700,000 jury award for loss of consortium to $300,000); *Kirschhoffer v. Van Dyke*, 173 A.D.2d 7, 577 N.Y.S.2d 512 (1991) (reducing a $ 1.8 million jury award for loss of consortium to $ 400,000).

*Grant*, 357 F. Supp. 3d at 196; *see also Patterson v. Kummer Dev. Corp.*, 302 A.D.2d 873, 874 (4th Dep't 2003)(awarding plaintiff's wife $260,000 for loss of society and companionship).

An award in the "low six-figure range" is also consistent with awards in favor of plaintiffs whose intimate parts were groped by a defendant, which is what the jury decided happened in this case. *See Doe v. Green*, No. 17CV1765RAOTW, 2021 WL 2188534, at *2 (S.D.N.Y. Apr. 29, 2021)(Award of $350,000 for the following sexual assault: "Green entered Plaintiff's cell alone—the door had remained open—and assaulted her by grabbing, pushing, and restraining her against her cell wall; kissing, biting, and licking Plaintiff's upper body, including her exposed breasts; and putting his hand down Plaintiff's shorts and fondling her genitalia and groin."), report and recommendation adopted, 2021 WL 2188148 (S.D.N.Y. May 28, 2021); *Vargas v. Premiere Staff Agency*, No. 17CIV4280VSBHBP, 2019 WL 10632865, at *2 (S.D.N.Y. July 18, 2019)(Award of $30,000 for the following sexual assault: "As plaintiff was changing, Guzman came back into the locker room and put his hand down plaintiff's pants and groped her vagina and buttocks. When plaintiff pushed Guzman away, Guzman then grabbed her and forcefully groped her breasts and tried to kiss her."), report and recommendation adopted sub nom., 2020 WL 5663412 (S.D.N.Y. Sept. 23, 2020); *Offei v. Omar*, No. 11 CIV. 4283 SAS MHD, 2012 WL 2086294, at *1 (S.D.N.Y. May 18, 2012)(Award of $250,000 for the following sexual assault: "Mr. Omar announced 'oh Doris, I like you' and proceeded to seize her in a bear hug, kiss her on the lips and the neck, squeeze her breasts and rub his clothed penis against her. Ms. Offei asked him to stop, telling him that she was a married woman, and that she had come to the room only to deliver the tissue boxes. As she tried to escape, he blocked her way and grabbed her again from behind, once more kissing her and seizing her breasts. She pleaded with him to leave her alone, but he persisted for at least a brief period, urging her to give him her phone number so that they could 'text,' and squeezing her buttocks as she headed for the door."), report and recommendation

adopted, 2012 WL 2086356 (S.D.N.Y. June 8, 2012); *Johnson v. White*, No. 06CIV2540LAPDF, 2010 WL 11586681, at *1–2 (S.D.N.Y. Nov. 18, 2010)(Award of $25,000 for the following sexual assaults: "White placed her hands on Plaintiff's 'groin,' made derogatory comments about the size of Plaintiff's penis, and requested that they spend the weekend together and that Plaintiff have sex with her. **** White 'squeezed on Plaintiff's button' and stated that Plaintiff was going to be forced to have sex with her. *** White unzipped his pants, pulled out his penis, and asked him if she could suck on it. *** White allegedly fondled his 'button,' showed him her underwear, and told him to put his hand down her pants to smell her odor.*** White allegedly grabbed Plaintiff's 'groin area' and threatened to have him sent back to prison if he complained again to her supervisor."); *Laurie Marie M. v. Jeffrey T.M.*, 159 A.D.2d 52, 54 (2d Dep't 1990), aff'd, 77 N.Y.2d 981 (1991)(Award of $100,000 for the following sexual assault: "The defendant admitted rubbing and touching the plaintiff's breasts and genital area and having her rub and touch his genitals."); *Evans v. Metro. Transportation Auth.*, No. 16CV4560FBVMS, 2018 WL 10466833, at *1 (E.D.N.Y. Sept. 25, 2018)($25,000 award for "unwelcome comments of a sexual nature, rubb[ing] [of] groin against [plaintiff's] leg, and grop[ing] [of] her breasts"); *Perney v. Medical One New York, P.C.*, No. 159080/2019, 2020 WL 8613521, at *4 (Sup. Ct. NY Co. Feb. 17, 2020)(award of $100,000 for the fondling of genitalia).

Furthermore, a $2 million award for the groping of intimate parts is far more than New York juries or courts have awarded victims of rape (including children raped by adults multiple times) who have suffered significant diagnosed injuries, such as PTSD. *See Cash v. Cnty. of Erie*, 654 F.3d 324, 328 (2d Cir. 2011)(Awarding $500,000 to plaintiff who was forcibly raped in confinement by sheriff's deputy); *Mathie v. Fries*, 121 F.3d 808, 810–11 (2d Cir. 1997)(Awarded $250,000 to a former inmate who was handcuffed to a pipe and forcibly raped by a corrections officer); *A.B. v. Staropoli*, No. 08 CIV. 4585 (LMS), 2013 WL 12441525, at *7 (S.D.N.Y. Dec. 11, 2013)(Awarding minor plaintiff

$600,000 for repeatedly being raped by soccer coach over for two years and suffering from anxiety, depression, and a severe eating disorder); *Estevez-Yalcin v. The Children's Vill.*, No. 01-CV-8784 KMK, 2007 WL 2746807, at *3 (S.D.N.Y. Sept. 20, 2007)(Awarding $500,000 each to two plaintiffs who were forcibly raped as young boys by an adult causing one plaintiff to have a "prognosis [that was] extremely poor with a high risk that he will harm others or will himself be incarcerated" and the other to suffer "significant psychological distress ... requiring intensive and long term psychotherapy with a mental health professional."); *Feldman v. Knack*, 170 A.D.3d 667, 667 (2d Dep't 2019)(Awarding $450,000 to plaintiff who was forcibly raped by her psychotherapist and suffered from post traumatic stress disorder and depressive disorder )[6]; *Miller v. State*, 110 A.D.2d 627 (2d Dep't 1985)(Awarding $400,000 to student who was raped in her dormitory); *Deborah S. v. Diorio*, 153 Misc. 2d 708, 716 (Civ. Ct. 1992)(Awarding $100,000 to plaintiff who was raped at knife point for one to two hours), aff'd, 160 Misc. 2d 210 (App. Term 1994).

Therefore, the Jury's $2 million award was clearly motivated by sympathy rather than by evidence of harm, and the Court should grant a new trial as to compensatory damages for the battery claim, or grant a remittitur of such award to an amount no more than $400,000.

**B.**   **Compensatory Damages for the Defamation Claim**

New York courts have consistently held that compensatory damages awards of $100,000 or less for defamation claims are appropriate. *See Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987)(affirming jury award of $15,000 for injury to reputation for magazine publishing a defamatory statement that plaintiff was offering sexual favors to the public); *Jalal v. Shanahan*, No. 16-CV-281 (CBA) (LB), 2018 WL 10466837, at *6 (E.D.N.Y. May 10, 2018)(Awarded $10,970 in compensatory damages for tenant making false accusations on television that landlord was promiscuous

---

[6] *See also Feldman v. Knack*, 56 Misc. 3d 1209(A), 63 N.Y.S.3d 305 (Sup. Ct. Westchester Co. 2017).

and unchaste and harassed tenant and stole $400,000 of tenant's property); *Xiaokang Xu v. Xiaoling Shirley He*, 147 A.D.3d 1223, 1224 (3d Dep't 2017)(Award of $5,000 in compensatory damages for defendant making online postings falsely accusing plaintiff of abuse, cruel and inhumane treatment, theft of trade secrets, fraud and perjury); *Allen v. CH Energy Grp., Inc.*, 58 A.D.3d 1102, 1104 (3d Dep't 2009)(Award of compensatory damages of $50,000 for defendant falsely accusing plaintiff of defecating on the sidewalk, which led to his loss of employment); *Strader v. Ashley*, 61 A.D.3d 1244, 1247 (3d Dep't 2009)(Award of $26,800 for defendant falsely accusing plaintiff of theft, which was reported in newspapers and caused Plaintiff to lose his job); *Parkin v. Cornell Univ., Inc.*, 182 A.D.2d 850, 852 (3d Dep't 1992)(Award of $10,000 for defendant falsely accusing plaintiff of theft, which was reported in the media); *Rossignol v. Silvernail*, 185 A.D.2d 497 (3d Dep't 1992)(Reducing compensatory damages from $800,000 to $85,000 for a plaintiff who was falsely accused of sexually abusing a child); *Nellis v. Miller*, 101 A.D.2d 1002, 1002 (4th Dep't 1984)(finding that a compensatory damages award of $150,000 [and reducing it to $5,000] was "shockingly excessive" for a defamatory news release stating that plaintiff was terminated as undersheriff for "unprofessional conduct causing internal strife within the Department").

Furthermore, a Court should grant remittitur when the jury award is based upon speculation. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015)("[O]ur detailed assessment of the trial evidence bearing on damages convinces us that the jury's inclusion in its award of $900,000 for the lost developer's fee was impermissibly speculative."); *Stampf v. Long Island R. Co.*, 761 F.3d 192, 208 (2d Cir. 2014)(Reducing $100,000 of compensatory damages to $20,000 because the $100,000 award was based upon speculation); *Alla v. Verkay*, 979 F. Supp. 2d 349, 376 (E.D.N.Y. 2013)(granting remittitur because the "damages award [was] rooted in speculation"); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 577 (S.D.N.Y. 2011)(granting remittitur because

the compensatory damages award was "unduly speculative and would arguably constitute a 'windfall'").

Remittitur is also appropriate when the jury award provides a plaintiff with a double recovery.

*See Bender v. City of New York*, 78 F.3d 787, 795 (2d Cir. 1996)("[W]e deem the excessiveness of the

aggregate award to be plain error, especially since it so likely results from impermissible duplication.

*** [T]o remedy that excessiveness, at least down to the level of the amount unchallenged by

appellants, we will reverse the judgment and order a new trial unless Bender agrees to remit $150,000.

If the remittitur is not made, we leave to the District Court, on remand, the determination of whether

the new trial should be limited to a retrial of the damages issues."); *Phelan v. Loc. 305 of United Ass'n*

*of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*, 973 F.2d 1050,

1063–64 (2d Cir. 1992)("A plaintiff may not recover twice for the same injury. *** [Plaintiff] has [not]

directed us to any evidence that he did not fully recover in the NLRB proceeding for back pay damages

between February 27, 1985 and June 3, 1985, the date on which the jury concluded damages ceased.

Accordingly, the back pay award against Patrick Quinn should be set off in full to prevent a double

recovery.").

Here, the general compensatory damages for the defamation claim should be no more than

$100,000, and no more than $368,000 (the low estimate provided by Professor Humphreys) for the

reputation repair campaign. This is so for multiple reasons as detailed above in the Statement of Facts,

which establish that the jury awards in this case for these categories of damages were speculative and

based upon alleged harms caused by the June 2019 Statements.

**First**, the overall essence of Plaintiff's defamation claim was that Defendant allegedly defamed

Plaintiff when he denied her rape allegation. *See* Complaint (Exhibit A) at ¶¶ 96 & 98.  As noted above,

the Jury found that Defendant did not rape Plaintiff, and thus, the portions of the defamation claim

based upon an alleged rape failed.  Accordingly, all that was left of Plaintiff's defamation claim was

that Defendant defamed Plaintiff by stating that "he had no idea who Carroll was" (Complaint [Exhibit A] at ¶ 97), which is far less damaging to Plaintiff's reputation than accusing Plaintiff of lying about the alleged rape.

**Second**, Plaintiff testified that Defendant libeled her when he denied the Bergdorf Goodman Incident in his June 2019 Statements, and damages for such alleged defamation cannot be part of the jury award because they are the subject of *Carroll I*. *See Carrol I* Complaint (Exhibit C); Tr. at pp. 262-270. Specifically, Plaintiff testified that she suffered significant harm from the June 2019 Statements, including substantial damage to her reputation, losing her position at Elle magazine, and receiving death threats (causing her to purchase bullets for her gun for protection). (Tr. 268:20 - 269:19; 271:10 - 273:10). Importantly, Carroll did not even attempt to separate the harm caused by the June 2019 Statements and the October 12, 2022 Statement. While the Jury was not permitted to award compensatory damages for the June 2019 Statements, it clearly must have done so, which makes its award speculative and duplicative of any compensatory damages awarded in *Carroll I*.

**Third**, Professor Humphreys testified about the purported harm arising from the June 2019 Statements and even compared Plaintiff's reputation before the June 2019 Statements and after the October 12, 2022 Statement, but did not do a comparison between her reputational harm before and after the October 12, 2022 Statement. (Tr. 1129:15 - 1130:12; 1135:2-8). Therefore, Professor Humphreys must have included the alleged harm from the June 2019 Statements as part of her damages analysis.

**Fourth**, during summation, Plaintiff argued that the Jury should look at Professor Humphreys's testimony for determining an amount to award for reputation harm for Defendant's "public statements" in general, which must include the June 2019 Statements for the reasons set forth above. (Tr. 1272:8-17).

**Fifth**, Professor Humphreys testified that she could not narrow her estimate as to how many times the October 12, 2022 Statement was viewed on Truth Social and Twitter to anything more specific than somewhere "between 1.5 million and 5.7 million times," which is an error rate of 74%. (Tr. 1125:17 - 1126:8). Such an analysis is thus pure speculation.

**Sixth**, Professor Humphreys testified that the people who read and believed the October 12, 2022 Statement were "republicans [who] typically believe Mr. Trump." (Tr. 1133:18 - 1134:4). Plaintiff's reputation with such persons (people who typically believe Defendant) likely would not have been positive regardless of the October 12, 2022 Statement, because Defendant already denied Plaintiff's accusations in the June 2019 Statements and Plaintiff was attacking a political figure that such persons heavily supported. Consequently, Professor Humphreys did not take into consideration the fact that Trump's supporters likely would never have supported or believed Plaintiff regardless of the October 12, 2022 Statement, and that Plaintiff's reputation with such supporters would not have changed due to such statement.

**Seventh**, Professor Humphreys testified that in order to repair Plaintiff's reputation with such Trump supporters, Plaintiff would have to pay for the cost of a reputation repair campaign, which is "a campaign to put out positive messages about" Plaintiff. (Tr. 1136:1-13; 1136:25 - 1137:6). However, Professor Humphreys did not explain how existing Trump supporters would have changed their minds about Plaintiff from merely seeing positive messages about Plaintiff. Professor Humphreys also testified that she has never done a reputation repair campaign before, and thus, her opinion on this issue should be given little weight. (Tr. 1136:14-16).

**Eighth**, Professor Humphreys testified that (a) the June 2019 Statements already existed as of the October 12, 2022 Statement, and that readers of the June 2019 Statements likely would not have changed their minds about the rape allegation after reading the October 12, 2022 Statement (Tr. 1149:2

- 1150:3); and (b) she does not know if the people who believed the October 12, 2022 Statement had already made up their minds about Plaintiff's rape allegation from reading the June 2019 Statements. (Tr. 1150:4-19).

Therefore, Professor Humphreys's testimony about changing the minds of Trump supporters (the target of the reputation repair campaign) is pure speculation. Additionally, her testimony only supports the argument that the October 2022 Statement did not cause Plaintiff any harm in addition to any harm that was caused by the June 2019 Statements, because people already had made up their minds as to the veracity of Plaintiff's accusations as of the June 2019 Statements.

**Ninth**, Professor Humphreys's cost estimate for such a campaign was equally based upon pure conjecture in that she estimated that it would cost anywhere from $368,000 to $2.7 million (Tr. 1139:20 - 1141:21), which is an error rate of 86 percent. This is especially troublesome since Professor Humphreys testified that she has never done a reputation repair campaign before. (Tr. 1136:14-16).

**Tenth**, Professor Humphreys also testified that she did not analyze any of Plaintiff's numerous media appearances where Plaintiff enhanced her reputation with regard to her allegations against Defendant. (Tr. 1148:8 -19; 1152:13- 1153:11). In fact, Plaintiff conceded that she received a vast amount of positive support from the public after making her accusation against Defendant. (Tr. 270:4-14; 552:15 - 553:2; 568:21-25). Even though Professor Humphreys admitted that Plaintiff received positive support from the public after the rape allegation, she did not factor such support into her analysis of the harm allegedly caused by the October 12, 2022 Statement. (Tr. 1154:3-13). Accordingly, her analysis of reputational harm is pure speculation. (*Id.*).

**Eleventh**, Plaintiff also testified that she has made more money after leaving Elle magazine because of her successful business with Substack. (Tr. 272:21 - 273:5; *see also* 317:12-21; 547:15-19;

550:2-5). Therefore, Plaintiff clearly has suffered no financial harm from the October 12, 2022

Statement, and Professor Humphreys did not factor that into her analysis.

Therefore, the Jury's $2.7 million award for Plaintiff's defamation claim was clearly motivated

by sympathy rather than by evidence of harm, and the Court should grant a new trial as to compensatory

damages for the defamation claim, or grant a remittitur of such award to an amount no more than

$100,000 for general compensatory damages and $368,000 for the reputation repair campaign (the low

end estimate for such a campaign according to Professor Humphreys).

**C.**     **Punitive Damages for the Defamation Claim**

Under New York law, punitive damages must be reviewed by a court under the due process

standards set forth in the United States Supreme Court case *BMW of North America v. Gore*, 517 U.S.

559 (1996). *See, e.g., Heller v. Louis Provenzano, Inc.*, 303 A.D.2d 20, 23 (1st Dep't 2003).

The *Gore* due process standards are as follows:

> The Supreme Court outlined three "guideposts" to facilitate its review of state court
> punitive damage awards: (1) the degree of reprehensibility of the defendant's conduct,
> (2) the ratio of punitive damages to the actual harm inflicted, and (3) "the difference
> between this remedy and the civil penalties authorized or imposed in comparable cases."
> *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809
> (1996).

*Stampf v. Long Island R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014).

"The third guidepost—'the difference between the punitive damages awarded by the jury and

the civil penalties authorized or imposed in comparable cases'—is not instructive ... for defamation, a

common law tort." *Jester v. Hutt*, 937 F.3d 233, 241 n. 1 (3d Cir. 2019).

Furthermore, a ratio of 1:1 or less is appropriate here because there is a very low degree of

reprehensibility, if any. *See Stampf*, 761 F.3d at 211 ("In any event, the ratio of the jury's award of

punitive damages to the compensatory award (as reduced) is 1:1, which does not 'raise a suspicious

judicial eyebrow.'")(quoting *Gore*, 517 U.S. at 582).

This is so because Defendant's conduct with regard to the October 12, 2022 Statement is barely reprehensible, if at all, because he was defending himself against a false accusation of rape. Again, the Jury found that Defendant did not rape Plaintiff, and Plaintiff has always portrayed the Bergdorf Goodman Incident as nothing less than a rape.

Therefore, Defendant's conduct is clearly no worse than other defendants against whom punitive damages awards have been rendered in the amount of $50,000 or less. *See Lindsey v. Butler*, No. 11-CV-9102 (ER), 2022 WL 17849009 (S.D.N.Y. Dec. 22, 2022)(punitive damages award of $50,000 for an officer forcibly shaving plaintiff-arrestee's face which violated plaintiff's religious beliefs); *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, No. 14-CV-3673 (KAM)(JO), 2020 WL 1083771, at *24 (E.D.N.Y. Mar. 6, 2020)(awarding plaintiff-employee $10,000 each in punitive damages against defendant-employer for defendant subjecting plaintiff's to involuntary religious practices); *Nelson v. Cnty. of Suffolk*, No. 12CV5678DRHAKT, 2019 WL 3976526, at *18 (E.D.N.Y. Aug. 22, 2019)(awarding punitive damages totaling $21,000.00 against two detectives for allowing the prosecution of plaintiff to continue even though they knew that charges were false as early as the date of plaintiff's arraignment); *Small v. New York State Dep't of Corr. & Cmty. Supervision*, No. 12-CV-1236S, 2019 WL 1593923, at *14 (W.D.N.Y. Apr. 15, 2019)(awarding $50,000 in punitive damages for defendant's sexual harassment of plaintiff, including "unrebutted evidence of his harassing behavior, including leaving notes on Small's car, accusing Small of being with other men, filing false charges against her at work, and acting in a manner to cause the need for Small to obtain a protective order against him, all during the period when he claims to have minimized his contact with her"); *Fisher v. Mermaid Manor Home for Adults, LLC*, No. 14-CV-3461 (WFK)(JO), 2016 WL 7330554, at *1 (E.D.N.Y. Dec. 16, 2016)(award of $50,000 in punitive damages for defendant-employer using "an

23

Instagram photo comparing Plaintiff[-employee], an African American Home Health Aid, to a fictional chimpanzee from the movie Planet of the Apes," otherwise creating a racially hostile work environment for plaintiff and retaliating against plaintiff after plaintiff complained); *Milfort v. Prevete*, 3 F. Supp. 3d 14, 26 (E.D.N.Y. 2014)(awarding $5,000 of punitive damages against police officer who "unjustly targeted and falsely arrested" plaintiff); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 580 (S.D.N.Y. 2011)(awarding $50,000 in punitive damages for defendant's retaliatory conduct which violated federal and state discrimination statutes and "was certainly reprehensible"); *Norris v. New York City Coll. of Tech.*, No. 07-CV-853, 2009 WL 82556, at *7 (E.D.N.Y. Jan. 14, 2009)(award of $25,000 in punitive damages where defendant "acted intentionally and with knowledge that his conduct would violate [plaintiff's] rights").

Consequently, the Jury's $280,000 punitive damages award for Plaintiff's defamation claim clearly violated due process under *Gore*, and the Court should grant a new trial as to such punitive damages, or grant a remittitur of such award to an amount no more than $50,000.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant his Motion for a new trial or remittitur pursuant to Fed. R. Civ. P. 59 to the amounts set forth above, with such further and other relief as the Court deems just and equitable.

Dated: New York, New York
         June 8, 2023

                         TACOPINA, SEIGEL & DeOREO

                         By: _____
                              Joseph Tacopina, Esq.
                              Chad Seigel, Esq.
                              Matthew G. DeOreo, Esq.
                              275 Madison Ave., Fl. 35
                              New York, New York 10016
                              Tel: (212) 227-8877
                              Fax: (212) 619-1028
                              jtacopina@tacopinalaw.com
                              cseigel@tacopinalaw.com
                              mdeoreo@tacopinalaw.com
                              *Counsel for Defendant Donald J. Trump*

25