UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

                    Plaintiff,              New York, N.Y.

             v.                              22 Civ.10016 (LAK)

DONALD J. TRUMP,

                    Defendant.
------------------------------x              Jury Trial

                                             April 25, 2023
                                             9:55 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                             District Judge
                                                  and a Jury


                         APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
     MICHAEL J. FERRARA
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
     Attorneys for Defendant
BY:  JOSEPH TACOPINA
     CHAD D. SEIGEL
     MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
     Attorneys for Defendant
BY:  MICHAEL T. MADAIO


W. PERRY BRANDT
     Attorney for Defendant

1              (In the robing room; Ms. Kaplan, Ms. Crowley, Mr.

2    Tacopina, and Mr. Seigel present)

3              THE COURT:  Be seated.  I gather the jurors are in the

4    room, right?

5              THE DEPUTY CLERK:  No, Judge.  They are not physically

6    in the room yet.  The jury department is getting the list

7    ready.

8              THE COURT:  Fine.  Let's go in the courtroom.  I

9    misunderstood.

10             (Case called)

11             THE DEPUTY CLERK:  Plaintiff, are you ready?

12             MS. KAPLAN:  We are.

13             THE DEPUTY CLERK:  Counsel, please put your appearance

14   on the record.

15             MS. KAPLAN:  On behalf of plaintiff, your Honor, it's

16   myself, Roberta Kaplan; my partners Shawn Crowley and Michael

17   Ferrara from my law firm; and our colleague Matt Craig.  I'm

18   also here with our client E. Jean Carroll and our jury

19   consultant Reiko Hasuike.

20             COUNSEL:  Good morning, your Honor.

21             THE DEPUTY CLERK:  Counsel for defendants, are you

22   ready?

23             MR. TACOPINA:  Yes.  Good morning, your Honor.  Joseph

24   Tacopina for Mr. Trump.  Along with me here, your Honor, to my

25   immediate left is attorney Josh Dubin, who will be assisting me

1    during the jury selection proceedings exclusively.  To his

2    immediate left is Chad Seigel, my partner.  To Mr. Seigel's

3    immediate left is Perry Brandt.  Perry is an attorney who is of

4    counsel to my firm.  Right ahead of me in the seat closest to

5    the jury box is Matt DeOreo, my partner; and to his left is

6    Michael Madaio.

7                THE COURT:  Good morning, all.

8                MR. TACOPINA:  I'm sorry, your Honor to our immediate

9    left is Eric Nelson, who is our IT tech.

10               THE COURT:  The jury department is still in the last

11   phases of getting the panel ready.  The only reason, folks,

12   that we left the bench was because I was misinformed that the

13   jurors were already in the courtroom.  So nothing happened in

14   the robing room.  Whatever is going to happen is going to

15   happen right here.

16               Mr. Tacopina, I understand you have something you

17   wanted to say.

18               MR. TACOPINA:  Your Honor, there are two issues,

19   nothing too substantial, but one is there was a request——and I

20   have shared this with opposing counsel——for a brief *ex parte*

21   discussion regarding sort of logistics that would invoke some

22   attorney work product and defense strategy that I would not

23   want to reveal to either -- to the opposing counsel.

24               Now, what I also said to opposing counsel was that if

25   your Honor, after hearing that, thought it was something that

1   you had to share with opposing counsel, I would have no

2   objection to that at all.  It was just something that I think

3   would help smooth some things along going forward in this

4   trial.  That's one request.

5           The second --

6           THE COURT:  Well, that's fairly straightforward.

7           MR. TACOPINA:  Yes, sir.

8           THE COURT:  I don't do that.

9           MR. TACOPINA:  Okay.  Just making the request, your

10  Honor.

11          THE COURT:  Okay.

12          MR. TACOPINA:  Secondly, this one I'm not sure, I

13  think we spoke to opposing counsel about potentially doing this

14  at sidebar.  It invokes a medical issue regarding a witness.

15          Let me start out by saying this is not a request for

16  an adjournment, because I know how much you love those.  That's

17  not happening.

18          But there is an issue that is substantially --

19          THE COURT:  You know, back when you first appeared in

20  the case, you said if I say we are going to go on April 25, we

21  are going to go on April 25.

22          MR. TACOPINA:  And here we are.

23          THE COURT:  And here we are.

24          MR. TACOPINA:  Here we are.

25          So anyway, your Honor, there is an issue, though,

1    regarding the medical -- dire medical condition of a witness

2    that I think I just want to alert the Court to.  I have spoken

3    to Ms. Kaplan about it, and we are trying to see if there is a

4    way to deal with it.  It's a little premature at this point, so

5    just fronting it now.  I don't know how much you want me to

6    elaborate on the record.  I'm a little concerned about putting

7    all this out in open court because, you know, there are some

8    privacy issues regarding this situation.

9         THE COURT:  Well, look, I can imagine there might be,

10   but what you are really telling me is that we are going ahead

11   today and there may be, down the road, some further discussion

12   about this or there may not be.  Is that about it?

13        MR. TACOPINA:  Yes, sir.

14        THE COURT:  Okay.  Fine.  I'm duly alerted.

15        MR. TACOPINA:  I think that's it, your Honor.

16        THE COURT:  Okay.  I know I received a copy of what I

17   never knew until a month ago was called a deck, but a few

18   graphics that the plaintiff intends to use on opening

19   statement, and they were shared with Mr. Tacopina.

20        Mr. Tacopina, is there anything that you intend to use

21   on openings.

22        MR. TACOPINA:  Yes, your Honor, there is.  There is

23   one photograph.  Let me just be sure of something.

24        (Counsel confer)

25        MR. TACOPINA:  We have one photograph that we intend

1    on using in the opening, your Honor, and we are sharing that

2    with opposing counsel now.

3              MS. CROWLEY:  Your Honor, were you given a copy of the

4    defense --

5              THE COURT:  No.

6              (Pause)

7              THE COURT:  Do we have an issue here or not?

8              MS. CROWLEY:  Just one second, your Honor.

9              MR. TACOPINA:  Your Honor, how would you like us to

10   hand this up to your Honor?

11             THE COURT:  The usual practice is you give it to the

12   courtroom deputy.

13             MR. TACOPINA:  That's what I thought.  Okay.

14             THE COURT:  I am looking at Defendant's Exhibit CV for

15   identification.  Is there any issue about it?

16             MS. CROWLEY:  No, your Honor.

17             THE COURT:  Okay.

18             MR. TACOPINA:  Your Honor, we may have an issue with

19   one -- we just received the exhibits for the opening now.  And

20   by the way, we just exchanged them, as well, so I'm not saying

21   they are late or anything.  We just have one issue.

22             THE COURT:  I thought I was copied on an e-mail to you

23   last night which I saw after dinner.  Isn't that right?

24             MS. CROWLEY:  No, your Honor, that was just to the

25   Court.  We exchanged with defense counsel this morning.

1          MR. TACOPINA:  We are just looking at it for the first

2     time.  There may be an issue.  We don't have to deal with it

3     right this second if you don't want -- if you want to get

4     started with the jury.

5          THE COURT:  Why don't you try and work it out.

6          MR. TACOPINA:  Okay, okay.

7          THE COURT:  There are just one or two more things that

8     I had to say before we bring in the jurors.

9          First, I want you all to understand exactly how this

10    is working.  I don't know the exact size of the panel, but it

11    is in the vicinity of a hundred.  They obviously won't all fit

12    in this room.  We are going to bring approximately 48 into this

13    room, and the remainder will be in the jury assembly room.

14    They will be handed, just the ones in the jury assembly room, a

15    written copy of the questions I am going to put in the course

16    of the *voir dire*.  I will give that to counsel at the same

17    time.  The jurors in the room will not be given the written

18    questions.  They are going to hear them orally.

19         The purpose of handling it that way is that I will

20    instruct the people in the jury assembly room that they are to

21    follow along in the questioning even though they are not in

22    this room and to make note of any questions that they would

23    have answered affirmatively had they been in the room so that

24    when we replace anyone from the live group in the room with

25    people from downstairs, the people who are coming in for the

1    first time can be asked would you have answered yes to anything

2    I have asked so far and, if so, what?  And in that way we avoid

3    repeating the whole *voir dire* with a second group.  So I just

4    wanted to alert you that that's the way it is going to work.

5             Secondly, the first question for the panel is going to

6    be, in substance, this:  Is there anything about the nature of

7    this case or the parties that would make it difficult for you

8    to be entirely fair to both parties and to come to a just and

9    impartial verdict?  And I will ask people to raise their hands

10   if the answer is yes, and my normal practice would be simply to

11   excuse anybody who answers that question yes.

12            Does anybody have a problem with that?  I hear none.

13            MR. TACOPINA:  Your Honor, will that be after the

14   description of the case?

15            THE COURT:  Yes, it will.

16            MR. TACOPINA:  Okay.  Thank you.

17            THE COURT:  Now, just a question of procedure, and I

18   can work with this either way, there sometimes come points in

19   the course of a *voir dire* where a juror gives an answer that at

20   least seems to me grounds for excusal then and there, whatever

21   it is.  You know, the juror is leaving on a jet plane tomorrow,

22   whatever it is, and what I propose to do at that point is

23   simply say one word: "counsel."  And if I hear nothing, you

24   understand I am going to excuse that juror.  If you have an

25   issue about that and you want me to ask more questions or

anything of that sort, then you should let me know.  Okay?

         One more thing, and then we are just about all ready
to go.  I encourage counsel on both sides to inform your
clients and witnesses to please refrain from making any
statements that are likely to incite violence or civil unrest.
I request also that you discuss with your respective clients
and witnesses the need to refrain from making comments or
engaging in conduct that has the potential to jeopardize the
safety or wellbeing of any individuals or the rule of law,
particularly as it applies to proceedings in this courtroom.
Both parties are well aware of the publicity this case has
attracted and likely will continue to attract throughout the
trial, and of my concerns especially with respect to the safety
and privacy of the jurors in this case.

         By making this request now, I am not implying and do
not intend to imply that either party or either party's counsel
has engaged in any misconduct with respect to this trial.  I am
simply making this request to you now, before we get started
with the main events, to try to avoid problems down the road.

         (Court and deputy clerk confer)

         THE COURT:  Okay.  We should have a panel within five
minutes.

         MR. FERRARA:  Michael Ferrara for the plaintiff, your
Honor.

         May I ask how your Honor intends to handle sidebar

1    questioning?  We obviously have a lot of press in the room, and

2    the two things I'm thinking of -- there may be more, but the

3    two things that came to me are, number one, to the extent we

4    are going to talk about -- potentially talk about sexual abuse,

5    that's going to be, of course, very sensitive to some of our

6    jurors.  Even though they are anonymous, they are not going to

7    understand how anonymous they are.

8            THE COURT:  I hope they will by the time I get

9    finished.

10           MR. FERRARA:  So do we but, again, just sort of for a

11   human nature idea.

12           And secondly, to the extent some jurors have strong

13   opinions about the parties in this case, it might be

14   inflammatory for them to express those in front of the other --

15   the rest of the venire.

16           So I just -- those are two things that come to mind

17   for me, but I'm sure the Court has other thoughts as well,

18   perhaps, but I wanted to raise it.

19           THE COURT:  What's the point at the end?

20           MR. FERRARA:  The point, your Honor, is that we do

21   think some questioning should occur at sidebar.  Obviously if

22   the press want to pool and come to the sidebar for certain

23   things, we have no objection.  On the other hand, it is -- the

24   more folks who are there, including if the jury knows they are

25   press, instances of sexual assault may be more difficult to

1    honestly talk about.

2              THE COURT:  Thank you.

3              Mr. Tacopina, anything on that?

4              MR. TACOPINA:  Nothing on that, your Honor.  We do

5    have one --

6              THE COURT:  Okay.

7              MR. DUBIN:  Your Honor, I know that the parties

8    submitted dueling proposed statements of the case.  Would we --

9    is the Court going to provide us in advance with a copy of what

10   the Court intends to read?

11             THE COURT:  No.

12             MR. DUBIN:  Thank you, your Honor.

13             THE COURT:  If you have an objection, I know that the

14   lawyers in this room are capable of making them.

15             MR. DUBIN:  Understood, your Honor.

16             THE COURT:  Okay.  So we are just giving them a couple

17   of minutes to finish being organized.

18             (Pause)

19             THE COURT:  A fair number of jurors have to be moved

20   from the first floor up to here.  It's probably going to take

21   five to ten minutes to be ready to begin the *voir dire*, and so

22   we will be in recess for that period.

23             And for the information of counsel, the mic is going

24   live to the jury assembly room.  It either has or is about to.

25   See you in a few minutes.
                  (Recess)

 1          THE COURT:  Good afternoon.  I am not quite exactly

 2     sure why wound up getting off to a late start, but we did.

 3          We don't move the lectern.  If you move the lectern,

 4     all the little electronic gremlins come out and it's chaos.

 5          If your time estimates are accurate, then we won't get

 6     to testimony this afternoon.

 7          MS. KAPLAN:  Thank you, your Honor.  We will let the

 8     witness know.

 9          MR. TACOPINA:  I think you were looking at me when you

10     were talking about the lectern.  I have spoken to the tech

11     people in here and cocounsel.  The rope is long enough to make

12     it right to here so we are facing the jury.

13          You don't want that at all.

14          THE COURT:  We are not moving it.

15          MR. TACOPINA:  It's perfect right there.

16          THE COURT:  I somehow thought you would see it my way.

17          MR. TACOPINA:  I do.

18          (Jury present)

19          THE COURT:  Folks, sorry about the late start.  We are

20     working on the heat.  There we are.

21          Swear the jury, please.

22          (A jury of nine impaneled and sworn)

23          THE COURT:  Folks, before we go further, now that

24     you've been sworn, I am going to give you some preliminary

25     instructions to guide you in your participation in the trial.

1              As I've already told you, it's going to be your job to
2    find from the evidence what the facts are.  That's up to you
3    alone.  You then have to apply to the facts, as you find them
4    to be, the law that I give to you, and you are obliged to do
5    that.

6              Nothing I may say or do during the course of the trial
7    is intended to indicate what your verdict should be or how you
8    should find the facts.  The evidence from which you are going
9    to find the facts will consist of the testimony of witnesses,
10   documents and other things received into the record as
11   exhibits, and any facts that the lawyers agree upon or that the
12   Court may instruct you to find.  I can't remember the last time
13   I ever did that.  So if that comes up, I'll talk to you about
14   it again, but it hasn't come up for years.

15             Certain things are not evidence and are not to be
16   considered by you.  Let me tell you what they are.  Statements,
17   arguments, and questions by lawyers are not evidence.
18   Objections to questions or to evidence, other evidence, like
19   documents, are not evidence.  The objections are not evidence.

20             Lawyers, of course, have an obligation to their
21   clients to object when they think evidence is being offered
22   that is not properly for your consideration.  If I sustain the
23   objection, you normally won't hear or see the evidence.  If I
24   overrule it, you will hear the answer or see the document,
25   whatever it happens to be, and you will treat it just like

1    anything else.  Every once in a while, somebody is leaping to

2    his feet or her feet to say objection.  The witness blurts out

3    the answer or I can't rule fast enough and you hear something.

4    And if I ultimately conclude that you shouldn't have heard it,

5    I'll tell you to disregard it, and you must disregard it.

6           Anything that I exclude or tell you to disregard is

7    not evidence and you can't consider it.  Anything you may have

8    seen or heard outside the courtroom is not evidence and has to

9    be disregarded too.  You are to decide the case solely on the

10   evidence presented here in this courtroom.

11          There are two kinds of evidence.  One is called

12   direct.  The other kind is called circumstantial.  I am going

13   to talk to you about that more at the end of the trial.

14          In a nutshell, direct evidence is direct proof of a

15   fact because an eyewitness saw it or heard it or whatever,

16   perceived it with his or her own senses.  It could also be the

17   physical qualities of an article, like a book.  You could have

18   the book.  You could tell what color it is, how many pages it

19   has.  That's direct evidence.

20          Circumstantial evidence is just a reference to proving

21   one fact that you don't have definitive evidence of by proving

22   something else that leads logically to an inference in your

23   mind that what you can't see directly or definitively actually

24   exists.

25          There is an old example I'll probably repeat at the

1    end of the trial about weather.  If we were all in here and

2    couldn't see the weather, and we were interested in the

3    weather, whether it had changed since 9:30 this morning, and

4    suddenly people started walking into the courtroom with wet

5    clothes and umbrellas.  The circumstantial evidence is the wet

6    clothes and umbrellas, it tells you by inference, by a logical

7    deduction of your mind, the weather must have changed, because

8    people don't ordinarily walk in here in totally wet clothes.

9    That's all it means, and I'll talk to you about that a little

10   more later.

11          I am not going to give you full instructions on the

12   law now, I'll do that later, but I do think it will be helpful

13   to you to give you a little context here to help you understand

14   the evidence as it comes in, why it's coming in, what it may

15   relate to.

16          But I do that with this caution, this caveat.  That

17   is, to the extent, if any, that my final instructions at the

18   end of the case are different than anything I say now, and they

19   will certainly be more complete and they might even differ in

20   some respect, it's those instructions that matter when you go

21   into the jury room.  That's what you'll apply.  If it's not

22   entirely consistent with what I say now, you will forget what I

23   say now.

24          Let's start out with the fact that this is a civil

25   case.  It's not a criminal case.  It is brought by one private

1    individual, Ms. Carroll, against another private individual,

2    Mr. Trump.  She claims, and he denies, that he injured her in

3    various ways, and she seeks to recover money damages to

4    compensate her for those injuries, alleged injuries.

5           A criminal case, I'm sure you all know, is very

6    different.  It's brought by the government against an

7    individual or occasionally a company for allegedly have broken

8    criminal laws.  And what the government seeks to do in a case

9    like that, if it wins, is to punish the defendant by sometimes

10   sending him to jail, sometimes by a fine, and occasionally in

11   some other way.

12          Here is the important thing or one important thing,

13   anyway.  Sometimes the very same conduct that could be a crime,

14   if the government prosecuted it, also can give a private

15   individual a civil claim for money damages if the person was

16   injured by that conduct.

17          Now, to be clear, again, Mr. Trump has not been

18   charged criminally for the conduct Ms. Carroll alleges, and I'm

19   not expressing any view, one way or the other, as to whether

20   his alleged conduct was or would have been a crime, assuming it

21   happened.  I simply am explaining to you the distinction

22   between the two kinds of cases as background information.

23          Now, as I told you already, Ms. Carroll brings two

24   kinds of claims.  One is for defamation, and I gave you the

25   thumbnail version about defamation earlier, a false statement

1    injurious to somebody's reputation.

2         The other is for something that we lawyers called

3    battery.  We are not talking about the little bunny powering

4    your radio.  We are talking about what is a technical, legal

5    term.  So to avoid any confusion in this case, I want to say a

6    few words about battery in the technical, legal term.  What is

7    it.

8         Generally speaking, the word battery in the context of

9    a civil lawsuit, like this one, refers to the unjustified

10   touching of another person without the consent of the person

11   touched, with intent to cause bodily contact that a reasonable

12   person would find offensive.  The slightest unlawful touching

13   of another person is sufficient.

14        For purposes of civil claims, the law does not draw a

15   line between different degrees of violence.  It totally

16   prohibits all unconsented-to touching from the least to the

17   most violent that a reasonable person would find offensive.  In

18   other words, anything from a gentle but unwanted peck on the

19   cheek to stabbing somebody with a knife could be battery for

20   purposes of a civil case like this one.

21        Now, in this case, as you know, Ms. Carroll claims

22   that Mr. Trump raped and sexually assaulted her.  He denies it.

23   And it will be your job to decide what, if anything, actually

24   happened, but my present point is that rape and sexual assault,

25   although we usually think of them in terms of crimes, are

1    different kinds of battery when you look at them in the context

2    of a civil lawsuit like this one.

3        And one reason I'm explaining this to you is this.

4    Many of you may have heard of something called a statute of

5    limitations, which is an enactment of the legislature that

6    usually imposes a time limit on how soon after some episode

7    takes place somebody has to bring a civil lawsuit for damages

8    if they are ever going to bring it.  There is a clock running,

9    normally.

10        Last year, New York enacted a new statute that, in

11    some circumstances, and for limited period of time, revived the

12    ability to bring a civil lawsuit to recover damages for some

13    kinds of sexual misconduct, and New York has defined the kinds

14    of sexual misconduct for which it temporarily has revived the

15    ability to bring civil lawsuits for damages, and it's done that

16    by referring to criminal law definitions of some sex crimes.

17        Ms. Carroll's battery claim here is not time barred

18    because it has been revived for a limited period.  That's not

19    to say it's a good claim.  It's not to say it happened.  I am

20    not saying anything about that.  I'm just saying there is no

21    statute of limitations issue in this case in the sense in which

22    you normally think of it, perhaps.  Now, it is involved here in

23    the background, but that's a legal matter.  I'll take care of

24    it.  To the extent there are facts at issue, you are going to

25    decide them.  But I just want you to understand what I've just

1    said.

2         In order for Ms. Carroll's battery claim to come

3    within this revival statute, as I just implied, she has to

4    establish that Mr. Trump's conduct, if there was any, came

5    within one of those criminal law definitions that I referred to

6    a minute ago.

7         But as I already mentioned to you, and I'll explain in

8    much greater detail later, that doesn't turn this into a

9    criminal case.  Mr. Trump is not here being prosecuted for any

10   crime, and Ms. Carroll doesn't have to prove him guilty of a

11   crime, and she doesn't have to prove him guilty beyond a

12   reasonable doubt either.  That's the standard of proof in a

13   criminal case.  What she has to do to recover for battery is to

14   prove the essential elements of her battery claim by a

15   preponderance of the evidence.  I'll tell you what those are

16   later on in the case.

17        Now, I talked about the defamation claim, and I'm not

18   going to say much more about that.  The one thing I will say

19   about it now is that in order to win on the defamation claim,

20   Ms. Carroll has to prove several different elements.  I just

21   want to put a place marker in your mind, that on certain of

22   those elements she has to prove her case by clear and

23   convincing evidence, which is a more demanding standard than

24   preponderance of the evidence.  That's all.  Just hold it in

25   the back of your mind.  We will go over all of this later, but

1  just be aware of that.

2         A few words about your conduct as jurors.  As I told

3  you before, and I reiterate now, no research, no looking up

4  anything, no visiting any place.  You are not to do any of that

5  stuff.  You can't go on the web, you can't Google, you can't

6  tweet, period.

7         Until I finish instructing you at the end of the case

8  and say, ladies and gentlemen, you will now retire to

9  deliberate upon your verdict, you are not to discuss the case,

10  even among yourselves, and certainly not with anybody else.

11         I have already talked to you BlackBerries and the

12  Internet and email and tweeting and social media.  All of that

13  is prohibited insofar as it relates to this case.  You just

14  can't do that.  If any of you become aware that anybody on the

15  jury has been communicating on social media, emailing friends

16  about the case, anything like that, you have to let me know

17  through Andy.

18         Finally, do try as hard as you possibly can not to

19  form any opinion until all the evidence is in.  Keep an open

20  mind until you start your deliberations at the end of the case.

21  You are free to take notes if you want to.  Bear in mind in

22  deciding what you want to do that sometimes it's hard to take

23  notes and listen at the same time.  But do whatever makes sense

24  to you.  The notes are for your own personal use.  They are not

25  to be discussed with anyone before you begin your

1    deliberations, and you are not to take them out of the jury

2    room at the end of the day.  You leave them there and Andy will

3    see that they are appropriately safeguarded.

4          If you don't take notes, remember that it's your own

5    individual responsibility to pay attention, to listen to the

6    evidence, and that's regardless of whether you were taking

7    notes.  We depend on the judgment of all of you in reaching a

8    verdict, and you each have a responsibility to remember the

9    evidence.

10         Now, we are going to begin the trial immediately.

11   Each side gets to make an opening statement.  An opening

12   statement is not evidence.  It's not argument.  It's an outline

13   of what that party intends to prove, and it's offered to help

14   you understand what you are about to hear and why.

15         I always think of opening statements as I come to

16   think of trailers at the movies back in the days when we used

17   to go to the movies.  The trailer is basically an ad for some

18   other movie, and they are trying to get you interested and to

19   go see that other movie.  And my experience is that sometimes

20   it's right on the money, and I go see the other movie and it's

21   just what I expected, and sometimes it bears no resemblance to

22   that other movie and it wasn't really a very good guide at all.

23   I just offer that for your assistance and also so that you bear

24   in mind that the opening statements aren't evidence.

25         Once we are done with the opening statements, the

1     plaintiff will present her witnesses.  The defendant has a

2     right to cross-examine them.  Then the defendant will present

3     his witnesses and the plaintiff gets to cross-examine them.

4     Once all the evidence is in, you will hear closing arguments in

5     which the lawyers will summarize and interpret the evidence for

6     you, and I'll give you my instructions and you will retire and

7     deliberate.

8              Just to give you an idea, the opening statements will

9     probably take about three-quarters of an hour or so each.  We

10    will have a break between the plaintiff's and the defendant's,

11    not a long one, but a break.  And then we, at least as current

12    plans are, we will start hearing testimony tomorrow.

13             There we are.

14             Anything else?

15             Ready for openings?

16             MR. TACOPINA:  Yes, your Honor.

17             THE COURT:  Who is opening for the plaintiff?

18             MS. CROWLEY:  I am, your Honor.

19             THE COURT:  Ms. Crowley.

20             MS. CROWLEY:  I'd like to take you back to an evening

21    in the spring of 1996.  E. Jean Carroll, the plaintiff in this

22    case, was leaving the Bergdorf Goodman department store in

23    Manhattan.  But as she was exiting through the revolving doors,

24    she saw Donald Trump coming in the other way.  They recognized

25    each other.  Trump was famous in New York City.  His name was

 1   on a bunch of buildings and his face was often in the tabloids.

 2   And Ms. Carroll was a well-known writer.  She had her own

 3   advice column and a daily TV show.  They'd even met each other

 4   once at a party.

 5          So they started chatting.  Trump asked Ms. Carroll to

 6   help him pick out a gift for a woman.  She agreed, thinking it

 7   would make for a funny story.  They moved through the store

 8   joking and laughing and eventually made their way up to the

 9   lingerie department on the sixth floor.  As usual, it was empty

10   that time of night.

11          Trump walked over to the counter and picked up a lacy

12   body suit.  He tossed it to Mr. Carroll and told her to try it

13   on for him.  She laughed, told him to try it on himself.

14   Wouldn't it be hilarious, she thought, if he put this thing on

15   over his clothes.

16          Still laughing, they moved to the dressing room,

17   Ms. Carroll thinking, he might actually try on this lingerie.

18          But the moment they went inside, everything changed.

19   Suddenly, nothing was funny.  Donald Trump slammed against

20   Ms. Carroll against a wall.  He pressed his lips against her.

21   She struggled to break free but couldn't.  Trump was almost

22   twice her size.  He held down her arm, pulled down her tights,

23   and then he sexually assaulted her.

24          Eventually, Ms. Carroll was able to break free, and

25   she ran out the dressing room and fled the store.  She told two

1    friends right away about the assault.  One told her to call the

2    police.  The other told her not to say a word.  She warned

3    Ms. Carroll that Donald Trump would ruin her life and her

4    career if she spoke up.  In the end, Ms. Carroll swore them to

5    secrecy and feared -- filled with fear and shame, she kept

6    silent for decades.

7           Eventually, though, silence became impossible.  In

8    2017, Ms. Carroll began to write a book about women's

9    perspectives on the men in their lives.  As she wrote, the book

10   turned into more of a memoir, and she started to include some

11   stories from her own life.

12          After writing for a couple of months, Ms. Carroll made

13   the difficult decision to include a chapter describing how

14   Donald Trump had sexually assaulted her years before.  And when

15   an excerpt from that book was published in June 2019, Donald

16   Trump's responsive was explosive.  He was president at the time

17   and, speaking from the White House, he went on the attack,

18   seeking to destroy and humiliate her.  He said that none of it

19   ever happened.  He never met Ms. Carroll.  He had no idea who

20   she was.  He ridiculed her, accusing her of inventing the story

21   to make money to sell a book, to advance some grand political

22   conspiracy.  He even said, Ms. Carroll must be lying because,

23   I'm quoting here, she is not my type, not my type.  We all know

24   what that means.  He was saying she was saying too ugly to

25   assault.

1           Suddenly, Ms. Carroll was all over the headlines.  The

2    most powerful person in the world, as the then-sitting

3    president, with the world's biggest microphone, had branded her

4    a liar and a fraud.  Her reputation as a trusted journalist, a

5    reputation she had spent her whole career building, was damaged

6    badly.  She lost any sense of safety and security.  She became

7    a target for online attacks.  Thousands of people posted

8    messages about her filled with hate and threats.

9           But Donald Trump was not done.  Three years later, in

10   October of 2022, just last fall, he came after her again, with

11   a post on his social media site.  He called her story a con

12   job, a hoax.  He said, once again, she is not my type.  Once

13   again, her inbox was filled with insults and threats.

14          And that is why we are here today, because Donald

15   Trump sexually assaulted E. Jean Carroll in the dressing room

16   of Bergdorf Goodman, and when she spoke publicly about what he

17   had done, he defamed her and tried to ruin her.  This case is

18   Ms. Carroll's chance to clear her name, to pursue justice, and

19   to get her life back.

20          My name is Shawn Crowley and together with my

21   colleagues, Robbie Kaplan, Mike Ferrara, and Matt Craig, I am

22   proud to represent Ms. Carroll in this trial.

23          Members of the jury, as Judge Kaplan said, this

24   opening statement is our opportunity to give you a roadmap of

25   the evidence that you are going to see and hear throughout this

1    trial, evidence that we submit will prove that Donald Trump

2    assaulted Ms. Carroll back in 1996 and that he defamed her when

3    he said she made the whole thing up.

4           You, of course, are going to hear from Ms. Carroll

5    herself.  She will testify about her traumatic encounter with

6    Donald Trump, about her decision to stay silent so long, and

7    about how when she finally did speak publicly, Donald Trump

8    responded with vicious lies meant to destroy her.

9           But this is not a he-said, she-said case.  It's not a

10   he-said, she-said case.  Ms. Carroll is not the only person

11   that you are going to hear from at this trial.

12          You will also hear from many other witnesses who

13   completely corroborate her account, like Ms. Carroll's friends,

14   Lisa Birnbach and Carol Martin, who she told about the assault

15   immediately after it happened and who confirmed every detail of

16   her story.

17          You will hear from two former employees of the

18   Bergdorf Goodman store, two people who Ms. Carroll has never

19   met, never spoken to, but who will back up key details of her

20   account.

21          You will hear from Ms. Carroll's sister, Cande

22   Carroll, who will tell you why it's not surprising that

23   Ms. Carroll remained silent for decades before she revealed

24   what Donald Trump had done to her.

25          You will hear from Roberta Myers, Robbie Myers,

1   Ms. Carroll's former boss and editor-in-chief of L Magazine,

2   where Ms. Carroll worked for decades.  Ms. Myers will tell you

3   about Ms. Carroll's groundbreaking career as a journalist and

4   the integrity that it was built on.

5          You will hear from two experts who will explain the

6   harm that Donald Trump caused Ms. Carroll, including the

7   psychological damage from the assault, and the destruction that

8   Donald Trump's statements caused Ms. Carroll's reputation.

9          You will hear from two other women, Natasha Stoynoff

10  and Jessica Leeds, who will testify that Donald Trump assaulted

11  them in very much the same way he assaulted Ms. Carroll,

12  because that is his MO.

13         You are going to hear Donald Trump say that in his own

14  words.  You will hear him bragging about doing almost the same

15  thing he did to Ms. Carroll to other women.

16         That is just some of the evidence and the testimony

17  that you are going to hear over the course of this trial,

18  evidence showing that Donald Trump assaulted E. Jean Carroll

19  and then lied over and over again when she came forward.

20         I am going to describe that a little bit more in a

21  minute, but first I'd like to step back and talk a little bit

22  about Ms. Carroll.  As I mentioned, you are going to hear her

23  testify under oath in this trial.  She is going to take that

24  witness stand.  She will tell you that she grew up in rural

25  Indiana and always dreamed of becoming a writer, and she worked

1   hard at achieving that dream for decades.

2           She sold her first piece of writing at 36, moved to

3   New York City, and lived the life she'd always imagined.  She

4   wrote countless articles and had her own advice column called

5   Ask E. Jean, which became one of the longest-running advice

6   columns in history.  She wrote five books, was an Emmy

7   nominated writer for Saturday Night Live in the mid '90s, and

8   even had her own TV show, also called Ask E. Jean, which ran on

9   national TV.

10          By this time, in the mid 90s, she married and divorced

11  twice, but she still had good relationships with her

12  exhusbands.  She continued to date and socialize and live her

13  life.

14          But in the spring of 1996, she ran into Donald Trump

15  in the Bergdorf Goodman clothing store, and what happened next

16  would change her life forever.  You will hear Ms. Carroll

17  testify about it.  She will tell you that she finished filming

18  her TV show in Fort Lee, New Jersey, at about 5 p.m. that day,

19  just as she did every day, and she headed into the city to do a

20  little shopping at Bergdorf's.  She described how she spent a

21  little time looking for something that she had been wanting,

22  but she find it, so she headed toward the exit on 58th Street.

23          But as she got to the revolving door, she saw Donald

24  Trump coming in.  As I said, Trump was a familiar face in New

25  York City at the time.  Not as famous as he is today.  This was

1    pre Apprentice and decades before he would run for president.

2    But in Manhattan he was well known for his real estate ventures

3    and for the lavish lifestyle that he led.

4         Ms. Carroll recognized him and Donald Trump recognized

5    her as well.  As I said, they met at least once before.  And

6    Ms. Carroll was a well-known writer at the time who had a TV

7    show modeled after her advice column that ran twice every

8    weekday on national TV.

9         When Trump saw her coming toward that revolving door,

10   he held up his hand to stop her.  He said:  Hey, you're that

11   advice lady.  Ms. Carroll replied:  Hey, you're that real

12   estate tycoon.  Trump told Ms. Carroll that he was stopping for

13   a present for a woman, and he had enlisted her as the advice

14   lady to help him pick something out.  Ms. Carroll agreed.  She

15   thought it would be something to laugh about with her friends

16   later, how she helped Donald Trump pick out a present for a

17   woman.

18        Off they went through the store.  She suggested a

19   handbag, a hat, and eventually Trump suggested they go look at

20   lingerie.  They took the escalators up to the sixth floor and

21   walked to the lingerie section.  It was empty when they got

22   there.  Trump walked to the counter and picked up a body suit.

23   He tossed it to Ms. Carroll, told her to try it on.

24   Ms. Carroll played along.  She tossed it back.  She said:  You

25   try it on.  It's your color.  They went back and forth laughing

1   until Mr. Trump took her by the arm and led her to a dressing

2   room.  They went inside.

3           Now, let me pause here for a second and address what

4   some of you may be thinking.  Why on earth would Ms. Carroll

5   let Donald Trump lead her to a dressing room?  You will hear

6   that Ms. Carroll has asked herself that question many, many

7   times over the last three decades.

8           In fact, it's one of the reasons that she waited so

9   long to speak publicly, because she blamed herself for what

10  happened.  She thought, how could she have been so stupid to go

11  into a dressing room with Donald Trump.  Honestly, that's a

12  question that one might ask with the benefit of hindsight.

13          But that is not what Ms. Carroll was thinking that

14  night at Bergdorf's in 1996.  To her, the situation was

15  harmless and funny.  Her friends would laugh later when she

16  told them about this random encounter.  And the truth is, she

17  didn't see Donald Trump as a threat back then.  She knew him as

18  a character, a man about town.  She actually thought she could

19  trust him.  But she was wrong.

20          Immediately after they got into the dressing room,

21  Mr. Trump banged the door closed and lunged at her.  He pushed

22  her against the wall and pressed his mouth to hers.  Her head

23  slammed against the wall.  Ms. Carroll will tell you that she

24  was shocked.  With a sense of fear and panic, she laughed and

25  resisted, trying to get him to back off, trying to diffuse the

1    situation, to kill anything that he might think invited the

2    attack.

3              When Trump didn't stop, Ms. Carroll shoved him.  She

4    kicked at him.  She stomped her feet.  She struggled.  She hit

5    him with her purse, tried to knee him off her.  But she

6    couldn't.  He was a big man, had easily a hundred pounds on

7    her.  And he was determined.

8              Trump grabbed her arms with one hand and held her up

9    against the wall.  He took his other hand and jammed it up her

10   dress, pulling down her tights, grabbing her vagina, and

11   pushing his fingers inside her.  He kept his fingers there for

12   a few seconds and then removed his hands and forced his penis

13   inside her.

14             Eventually, Ms. Carroll was able to get her knee up

15   high enough to get Donald Trump off of her.  She pulled up her

16   tights, ran out the dressing room, and fled the store out onto

17   Fifth Avenue.  The whole attack lasted just a few minutes, but

18   it would stay with her forever.

19             During this trial you are going to hear from

20   Ms. Carroll, and she will describe in painstaking and painful

21   detail what happened that evening in Bergdorf.  I expect that

22   you will find her testimony credible and convincing, both

23   because of what she will say and what she will not say.  You

24   will not hear Ms. Carroll embellish her story or try to make it

25   sound better than it is.

1          You will even hear her admit things that don't

2   necessarily help her case.  Ms. Carroll is going to

3   acknowledge, for example, exactly when the assault happened.

4   She doesn't recall the exact day or month.  But she will

5   testify that she believes it was a Thursday, because that's the

6   only night of the week that Bergdorf stayed open past 6 p.m.

7   And she is fairly certain that it was the spring because she

8   remembers what she was wearing, a black wool dress, but no

9   coat.  So it was not too hot, but also not cold enough for a

10  jacket.

11         While Ms. Carroll doesn't remember exactly when this

12  happened, she remembers almost every detail of what happened,

13  and her testimony alone will be enough for you to find Donald

14  Trump liable in this case.

15         But let me be clear.  This case does not rest solely

16  on Ms. Carroll's testimony.  Ms. Carroll's testimony is enough,

17  but you don't have to rely on it alone to find Mr. Trump

18  liable, because there will be so much more.  Let me give you

19  just a couple of examples.

20         As I mentioned, I expect that Ms. Carroll is going to

21  testify that the floor with the lingerie department was

22  basically deserted the night she was there with Donald Trump.

23  I wouldn't blame you if you thought that's odd, that a whole

24  floor of a department store in New York City was empty.

25         So you will also hear from two people who worked at

1    that same exact department store back in 1996, Cheryl Beall and

2    Bob Salerno.  Ms. Beall was the assistant manager of Bergdorf

3    Goodman, and Mr. Salerno was the chief of operations.

4            Now, they are both going to tell you straight up they

5    did not know about the assault when it happened.  In fact, they

6    didn't even know who Ms. Carroll was until fairly recently, and

7    they have never met or spoken with her.  But their testimony is

8    extremely important because it completely confirms every detail

9    that Ms. Carroll will tell you about Bergdorf's on the night of

10   the assault.

11           I expect Ms. Beall will testify that her office was on

12   the sixth floor, right next to the laundry department.  Her

13   description of that section's layout of the dressing rooms

14   matches what Ms. Carroll will describe.  In fact, you are going

15   to see the floor plans from back in 1996.  Ms. Beall and

16   Mr. Salerno will also testify that Bergdorf stayed open late on

17   Thursday night, the night Ms. Carroll believes the assault

18   happened.  They will confirm that while the store was often

19   empty in the evenings, it was dead on Thursdays and that was

20   particularly true for higher floors like the sixth, because

21   there were so few shoppers.  There were also very few sales

22   attendants.  So they will explain that only one or two

23   employees covered the whole sixth floor in the evening.  So it

24   was common for some sections, like lingerie, to be completely

25   unattended.

1         It was hardly a surprise that Donald Trump and

2    Ms. Carroll were the only people in this area of the sixth

3    floor of Bergdorf's that night, that no one saw them in the

4    minute or two it took them to walk from the escalators to

5    lingerie, and that no one heard, as Ms. Carroll struggled to

6    break free of Trump's brief brutal attack.

7         But there is more.  As I mentioned, Ms. Carroll told

8    two friends about the assault almost immediately after it

9    happened, and you are going to hear from them as well.

10        Ms. Carroll will testify that after she escaped the

11   dressing room, she ran out of the store onto Fifth Avenue.

12   Disoriented, shocked, and not knowing what to do, she pulled

13   out her cell phone -- yes, they had them in the '90s -- and

14   called her friend, Lisa Birnbach, another respected journalist.

15        Ms. Birnbach will testify that when she answered the

16   phone, Ms. Carroll was hyperventilating and was anxious as she

17   reported what just happened.  Ms. Carroll told Ms. Birnbach

18   that she had run into Donald Trump as she was leaving

19   Bergdorf's, that he asked her to help him pick out a gift, that

20   they ended up in the dressing room of the lingerie department,

21   and that Trump pulled down her tights and forced his penis

22   inside her.  You will hear that Ms. Birnbach told Ms. Carroll,

23   in no uncertain terms, E. Jean, you have been raped.  You have

24   to go to the police.  But Ms. Carroll said no.  She was ashamed

25   and she was afraid.  So she made Ms. Birnbach promise never to

1   speak of it again.

2            Ms. Carroll couldn't stop thinking about what

3   happened.  So a day or two later, when she saw her close friend

4   Carol Martin at work, she decided she had to tell her what had

5   happened too.  As Ms. Carroll and Ms. Martin will both

6   describe, they met in Ms. Martin's kitchen that evening, still

7   in shock, Ms. Carroll described what Donald Trump had done to

8   her.  You will hear that Ms. Martin gave Ms. Carroll exactly

9   the opposite advice as she had gotten the day before.  Ms.

10  Martin told Ms. Carroll to tell no one and do nothing.  In her

11  view, Trump was way too powerful.  He had hundreds of lawyers,

12  and he would bury Ms. Carroll if she came forward.

13           Ms. Carroll took that advice, and the evidence will

14  show that Ms. Birnbach and Ms. Martin respected their friend's

15  wishes not to talk about the attack.  For more than two

16  decades, they didn't tell a soul, didn't speak about it again,

17  and neither did Ms. Carroll.  Instead, she tried to move on.

18           Listen.  I understand that this decision that

19  Ms. Carroll made to keep quiet for so long, it may be difficult

20  for many of us to understand, especially in today's world.

21  It's hard to get why someone who had been hurt so badly would

22  do nothing about it.

23           But this was nearly three decades ago.  The evidence

24  will show that it was a different world for women, especially

25  single women who were trying to make successful careers in the

1    public spotlight.

2            Ms. Carroll was born in 1943.  You'll hear from her

3    sister, Cande, who will tell you a bit about their lives

4    growing up.  She will tell you that she and E. Jean were

5    members of what she calls the

6    post-World-War-II-grin-and-bear-it generation.  In their family

7    they were taught never to complain, keep their chins up, put on

8    a smile, and move forward.  That's what Ms. Carroll's family

9    did when bad things happened to them and that's what she did

10   when Donald Trump assaulted her.  Back then, to Ms. Carroll,

11   staying silent felt like the only choice she had to move on

12   with her life.

13           And as she will tell you, she blamed herself for what

14   happened.  She thought she should have known that Donald Trump

15   could be violent toward women.  She should have noticed the

16   sixth floor of the store was empty.  She shouldn't have joked

17   with him about lingerie.  In her mind, for many years, what

18   happened was her fault.  You are going to hear that that's

19   actually pretty common.

20           Dr. Leslie Lebowitz, a clinical psychologist and

21   trauma specialist, is going to testify in this trial in a

22   couple of days, and she will explain to you that there is

23   actually nothing unique about Ms. Carroll's decision.

24           (Continued on next page)

25

         1              MS. CROWLEY:  Many victims of sexual assault wait

         2    years or decades to share what happened to them, and some never

         3    do.  Dr. Lebowitz will describe how she spent many hours

         4    meeting with Ms. Carroll.  She will explain how Ms. Carroll

         5    blames herself for what happened and how the guilt and

         6    embarrassment she feels have tormented Ms. Carroll and for a

         7    long time kept her from speaking up.  Ms. Carroll will testify

         8    about this herself.  How could she share with the world that

         9    she had been dumb enough to go into a dressing room with Donald

        10    Trump.  How could she describe what he had done to her?

        11              For many, many years she couldn't.  So she stayed

        12    silent.  She focused on her career.  She moved forward.  But

        13    the memory of what Donald Trump did to her back in 1996 stayed

        14    with her.  And as time passed, it became a harder and harder

        15    memory for her to suppress.

        16              You will hear that in 2017 Ms. Carroll took a road

        17    trip, interviewing women for a book that she was working on.

        18    She wanted to talk to women across the country and ask them

        19    about their perspectives—good and bad—about the men in their

        20    lives, then she read about them.  The same day that she set out

        21    on this road trip, a flood of women publicly shared that they

        22    had been sexually assaulted by a famous Hollywood film

        23    producer.  Other women soon followed, sharing their own stories

        24    of being sexually assaulted by powerful men.

        25              As Ms. Carroll listened to these women, she started to

1    catalog her own experiences with men throughout her life and,

2    sadly, they weren't all positive.  Other men had hurt her,

3    including one of her former husbands.  She decided that it was

4    finally time to write about these experiences.

5         As someone who had spent her whole career giving

6    advice to women, often about bad things that had happened to

7    them, it was time to share some things that had happened in her

8    own life, so she started to make a list of men who had

9    mistreated her.  The evidence will show that at first she did

10   not include Donald Trump on that list.  She thought about it

11   for a long time.  She understood the gravity of accusing the

12   then-president of the United States of sexual assault, and she

13   was afraid.  She worked on her book for months before she

14   decided to include him, to tell her whole truth.

15        You will hear that about two weeks before the book was

16   published in June 2019, *New York Magazine* ran an excerpt of the

17   book that included the story of the assault.  This was the

18   first time that Ms. Carroll spoke publicly about the fact that

19   Donald Trump had assaulted her.

20        The backlash was swift and brutal, much worse than

21   anything she had imagined.  Donald Trump, president at the

22   time, immediately denied the assault, but he went much further

23   than that.  Over the course of three days, Trump issued a

24   series of false denials and vicious and baseless attacks.  He

25   told reporters and the world that he had never met Ms. Carroll,

 1    had no idea who she was.  He claimed he was never in Bergdorf

 2    that day.  He accused her of making up a story to sell a book

 3    or carry out some political agenda.  He threatened that she

 4    would pay dearly for her false accusations.  He said:  I'll say

 5    it with great respect.  She's not my type.  Ms. Carroll was too

 6    ugly for him to assault.

 7            Suddenly Ms. Carroll was front page news, branded a

 8    liar and a fraud by the president of the United States.

 9    Speaking from the White House, Trump used the most powerful

10    platform on earth to lie about what he had done, attack

11    Ms. Carroll's integrity, and insult her appearance.  The

12    White House is a place where presidents have signed laws,

13    declared wars.  So is it any wonder that when Donald Trump

14    spoke, many people around the world listened, believed what he

15    told them?  Of course not.  The evidence will show that when

16    president Trump called E. Jean Carroll a liar, people listened

17    and her hard-earned reputation as a writer and a journalist

18    took a serious hit.

19            And three years later, in October of last year, he saw

20    fit to drag her name through the mud again.

21            Posting on the social media site Truth Social, Trump

22    told his millions of followers that Ms. Carroll's story was a

23    con job and a hoax, and he couldn't help himself, he said it

24    again:  She's not my type.  The evidence will show that

25    millions and millions of people saw this post.  His supporters

 1    latched on to his messages and barraged her with threatening

 2    e-mails and tweets.  Here are a few of them.  I will give you a

 3    minute to read them, and you are going to see many more

 4    throughout this trial.

 5         (Pause)

 6         MS. CROWLEY:  After Donald Trump's statements in

 7    October and the tweets and threats that followed, Ms. Carroll's

 8    reputation took another major hit.  You are going to hear from

 9    Robbie Myers, the former editor in chief of *Elle Magazine* where

10    Ms. Carroll worked for 25 years.  Ms. Myers will tell you that

11    Ms. Carroll was a beloved writer.  She was celebrated for her

12    ability to write powerfully while sticking to the facts.

13    Ms. Myers will explain how Ms. Carroll revolutionized advice

14    columns and how her readers trusted her.  This was ruined when

15    Donald Trump went after her.  She lost readers and fans.

16         You will also hear from Professor Ashlee Humphreys,

17    who is an expert in sociology and communications.  She is going

18    to testify about how far Trump's statements spread, how much

19    damage they caused, and how much it would cost to repair

20    Ms. Carroll's reputation.

21         So Ms. Carroll decided she had to fight back.  She

22    filed this lawsuit to hold Donald Trump accountable for what he

23    did to her in that dressing room and for what he did years

24    later when he attacked her integrity and lied about her to the

25    whole world.  She filed this lawsuit to restore her good name.

1              Members of the jury, that's just some of the evidence

2     that you are going to hear throughout this trial, evidence

3     proving that Donald Trump assaulted E. Jean Carroll and then

4     defamed her.

5              But you are also going to hear that Ms. Carroll is not

6     the only woman that Donald Trump has done this to.  In fact,

7     you are going to hear him say that in his own words.  You are

8     going to see a video of Trump chatting about women with a TV

9     host behind the scenes back in 2005.  He didn't know it at the

10    time, but there was a hot mic that caught what he was saying.

11    You are going to hear it.  You are going to hear him say:  "you

12    know, I'm automatically attracted to beautiful women.  I just

13    start kissing them.  It's like a magnet, just kiss.  I don't

14    even wait."  He said, "And when you're a star, they let you do

15    it.  You can do anything.  Grab them by the pussy.  You can do

16    anything."  Those are Donald Trump's words.  You will hear

17    them.

18             Now, listen, I expect that when Mr. Trump's lawyer

19    speaks to you in a few minutes, he is going to tell you that

20    Ms. Carroll is lying, that she made this whole thing up, and

21    when he does that, I would ask you to think about what Donald

22    Trump himself admitted when he thought no one was listening,

23    what he bragged about, "Just start kissing them.  I don't even

24    wait.  I can do anything.  Grab them by the pussy."  This was

25    not locker room talk.  It's exactly what he did to Ms. Carroll

1   and to other women.  You are going to hear from Jessica Leeds

2   and Natasha Stoynoff, two other women who Trump sexually

3   assaulted in a remarkably similar way.

4          First, Ms. Leeds.  The evidence will show that Donald

5   Trump assaulted Jessica Leeds on an airplane in 1979.  She was

6   seated next to him in the first class cabin.  After they made

7   small talk and finished their meals, Trump lunged at her, he

8   pressed his body against her, tried to kiss her, grabbed her

9   breasts, and started to put his hand up her skirt, exactly as

10  he did to Ms. Carroll.  Thankfully, before he could get any

11  further, Ms. Leeds wriggled away and fled to the back of the

12  plane.

13         Now, Ms. Leeds is a few years older than Ms. Carroll

14  and is very much a product of the same generation.  Like

15  Ms. Carroll, for a very long time, she didn't tell a soul what

16  happened.  She didn't want to risk losing her job or being

17  humiliated for coming forward.  But in 2016, Ms. Leeds watched

18  the presidential debate and she heard Donald Trump say that he

19  had never kissed a woman without her consent.  She knew she

20  couldn't stay silent any longer.  After Ms. Leeds spoke

21  publicly, Trump attacked her.  He called her a liar.  He told

22  the world that she was not his type.  Sound familiar?

23         You will also hear from Natasha Stoynoff.  She was a

24  reporter for *People* magazine.  In December of 2005,

25  Ms. Stoynoff traveled down to Mar-a-Lago to write a story about

```
 1    Trump's one-year wedding anniversary.  The evidence will show
 2    that Ms. Stoynoff -- Mr. Trump led Ms. Stoynoff to an empty
 3    room, claiming that he wanted to show her something there.  As
 4    soon as they got inside, Trump closed the door, grabbed
 5    Ms. Stoynoff's shoulders, pushed her against the wall, and
 6    started kissing her.  Fortunately, Trump was interrupted before
 7    he could do more.
 8               In 2016, Ms. Stoynoff also shared her story publicly.
 9    And guess what happened next?  Trump called her a liar, denied
10    the attack, and insulted her appearance.  "Go look at her," he
11    said.  "I don't think so."
12               Three women, one clear pattern.  Start with a friendly
13    encounter in a semi public place.  All of a sudden pounce,
14    kiss, grab, grope.  Don't wait.  When you are a star, you can
15    do anything you want.  And when they speak up about what
16    happened, attack.  Humiliate them.  Call them liars.  Call them
17    too ugly to assault.  That is what Donald Trump did to Natasha
18    Stoynoff, what he did to Jessica Leeds, what he did to E. Jean
19    Carroll.
20               Members of the jury, we will present overwhelming
21    evidence that Ms. Carroll is telling the truth.  You will hear
22    it from Ms. Carroll herself, from Lisa Birnbach, Carol Martin,
23    Cande Carroll, from Robbie Myers, Natasha Stoynoff, Jessica
24    Leeds, from the two former Bergdorf Goodman employees.
25    Together they add up to one conclusion:  Ms. Carroll is telling
```

1    the truth.

2                But Donald Trump himself, Trump himself will give you

3    another reason to find for Ms. Carroll here.  The evidence will

4    show that he has told lie after lie in this case, and those

5    lies are even more evidence that Ms. Carroll's sworn testimony

6    will be the truth.  I will describe just a few examples of what

7    you are going to hear throughout this trial.  First, you are

8    going to hear Trump lie about Bergdorf's, the store where the

9    assault took place.  You see, a couple of months ago, Trump

10   testified under oath in this case in what's called a

11   deposition.  You are going to hear some of that testimony

12   during this trial.  You are going to see it on video.  One

13   thing that you will hear Trump say under oath is that he almost

14   never shopped at stores like Bergdorf Goodman; that he never

15   went to stores like that, and certainly never bought gifts

16   there.  But the evidence will show that is completely untrue.

17   Both Ms. Beall and Mr. Salerno, who worked at Bergdorf Goodman

18   in the mid 1990s, will testify that they saw him at the store

19   on multiple occasions, and that is not surprising as because,

20   as you will hear, Bergdorf was located directly across the

21   street from Trump Tower, where Mr. Trump was living and working

22   at the time.

23               Next, you will hear Trump lie about not knowing

24   Ms. Carroll.  That is not true.  There is photographic evidence

25   of the two of them together at an event, engaged in

1    conversation.  The evidence will show that this is Donald Trump

2    with his back to you.  He is facing E. Jean Carroll.  She is

3    standing next to her husband at the time, and Trump is standing

4    next to his wife, Ivana Trump.  This photo was taken only a few

5    years before the assault.  So Donald Trump and Ms. Carroll

6    definitely met.  And as I mentioned, Ms. Carroll was well known

7    in New York in the '90s.  She was a famous writer who had an

8    advice column and her own daily TV show.  Trump didn't know

9    Ms. Carroll?  Not true.

10            Another lie.  That Ms. Carroll was not Donald Trump's

11   type.  Donald Trump has said this many times.  I didn't assault

12   her because she is not my type.  But that is also not true.  As

13   you will see on video, when Trump was shown this photograph at

14   his deposition late last year, he looked at it for a moment, he

15   pointed to Ms. Carroll, and he said, unprompted, it's Marla,

16   yeah, it's Marla, my wife.  You will hear that Marla was Marla

17   Maples, Donald Trumps second wife.  She appears nowhere in this

18   photo.  To be clear, at his deposition just a few months ago,

19   Donald Trump pointed at Ms. Carroll, the woman he has declared

20   over and over again is not his type, and he mistook her for

21   Marla Maples, his second wife, a former model who admitted

22   in -- he admitted in that same deposition was exactly his type.

23   What will this tell you?  It will tell you that Ms. Carroll was

24   also exactly his type, the type of beautiful woman who he was

25   so automatically attracted to he just started kissing and did

1    whatever he wanted to.

2           Donald Trump has said:  I've never met E. Jean

3    Carroll.  I never went to Bergdorf's.  She's not my type.  As

4    the evidence will show, these are lies, and they are just some

5    of the lies that you will hear from Donald Trump throughout

6    this trial.

7           I am going to sit down in a minute, but before I do, I

8    want to say a word about what you are going to be asked to

9    decide at the end of this trial, once you have heard from all

10   of the witnesses and the evidence is in.  As Judge Kaplan told

11   you and as he will explain in more detail before you

12   deliberate, Ms. Carroll brought two claims against Donald

13   Trump, so there will be two claims that you need to decide.

14          The first claim, as Judge Kaplan described, is for

15   what's called battery, and that has to do with what happened in

16   the Bergdorf Goodman dressing room back in 1996.  I expect that

17   Judge Kaplan will instruct you that battery covers a range of

18   conduct, from forcibly grabbing or groping someone without

19   their consent to rape.  If you find that Donald Trump did any

20   one of those things, he is liable for battery.

21          Ms. Carroll's second claim, as Judge Kaplan said, is

22   for defamation.  That has to do with the harm that Donald Trump

23   did to Ms. Carroll's reputation and good name.  The key

24   question for that claim is whether Trump was lying in that

25   October 2022 Truth Social post that you saw, whether he was

1    lying when he said he never met Ms. Carroll and claimed that

2    she made the whole thing up.

3           Now, as you consider the evidence over the next week

4    or so, I would ask you to remember that this is not a criminal

5    case.  As Judge Kaplan explained, you are not being asked to

6    decide whether anyone committed a crime beyond a reasonable

7    doubt.  This is a civil case, so you will be asked if it is

8    more likely than not that Donald Trump groped or assaulted

9    Ms. Carroll.  That's one of the questions that you will have to

10   answer, more likely than not.  When you consider the evidence,

11   it will be clear what the answer is.  Donald Trump sexually

12   assaulted Ms. Carroll.  And it will be clear that years later,

13   after Ms. Carroll came forward and spoke the truth, Donald

14   Trump lied and defamed her.

15          Members of the jury, at the end of this trial, we are

16   going to have a chance to speak to you again.  We will go

17   through the evidence and explain to you how it all supports

18   only one conclusion here:  Donald Trump is liable on both

19   counts.

20          THE COURT:  Thank you.  We will take a ten-minute

21   break.

22          (Jury not present)

23          THE COURT:  Bring in the jury.

24          (Jury present)

25          THE COURT:  Members of the jury, one slight scheduling

1   adjustment.

2          We are going to start trial every day at 10:00 because

3   I am told the logistics of getting you screened and into the

4   building take more time than usual, which of course makes

5   sense, so I am going to ask you to be here at 9:00, not 10:00.

6   It will get you into the building in time to start at 10:00.

7   You are going to get some breakfast and you will get a cup of

8   coffee and then we will proceed at that point.

9          Okay.  Mr. Tacopina.

10         MR. TACOPINA:  Thank you, your Honor.

11         Counsel, ladies and gentlemen of the jury:

12         In this country the one thing that cannot be

13   compromised, that can never be bent, that must always be

14   absolute, that must never be wielded based on the whims of

15   those who seek to abuse it is the justice system.  It is our

16   defense against all tyranny.  It is what gives you the citizens

17   of this country the ability to defend against oppression, it

18   can never be compromised, regardless of who the defendant is

19   and regardless of how much apathy you may feel toward a

20   particular defendant.

21         People have very strong feelings about Donald Trump

22   one way or the other, very strong feelings.  That's fact.  And

23   it's okay to feel however you feel.  You can hate Donald Trump.

24   It's okay.  But there is a time and a secret place for that,

25   for you to express those feelings.  It's called a ballot box

1  during an election, not here in a court of law.  Because to do

2  so in a court of law would make one no better than those who

3  would seek to bend the rule of law for their own personal

4  agendas.  We must all strive to be better than that, to protect

5  all of us, all of us in this country.

6          And while no one is above the law, no one is also

7  beneath the law.  Politicians don't make this country great.

8  Jurors do.  My fear in this case is not the evidence, it's not

9  the facts at all.  Because if you follow your solemn oaths as

10  jurors and apply the law to the facts as the judge will

11  instruct you later, justice will be served.  What is paramount

12  in this courtroom is the rule of law and that every defendant,

13  regardless of his name, be protected for the sake of all of us.

14  The judge early on said it in his instructions.  It is the

15  bedrock of our country.  It is the bedrock of our country.

16  What you are all doing right now is very serious stuff.  It

17  protects all of us.

18          With that in mind, the evidence will show you what

19  E. Jean Carroll is doing is an affront to justice.  The

20  evidence will show you that she is abusing the system by

21  advancing a false claim of rape for money, for political

22  reasons, and for status.  And in doing so, in doing so, she is

23  really minimizing true rape victims, real rape victims.  She is

24  exploiting their pain and their suffering.  She is capitalizing

25  on their stories.  The evidence is going to show you this loud

1   and clear.  After you hear the evidence in this case, you

2   cannot let her profit from her abuse of this process and her

3   attempts to deceive you.

4         Ladies and gentlemen, my name is Joe Tacopina.  I was

5   introduced earlier.  I, along with Chad Seigel, Perry Brandt,

6   Matthew DeOreo and Mike Madiao, have the privilege of

7   representing Donald Trump.

8         Nobody is above the law, but nobody is beneath it.  We

9   all have to be treated the same way.  Even if you hate Donald

10  Trump -- and, again, I don't get into anyone's politics.  We

11  don't even know.  That's fine.  But you have to do your jobs

12  here and treat him the way any of us would want to be treated

13  and uphold that rule of law.

14        This case must be decided on the evidence and only the

15  evidence.  And I want to talk to you about the evidence, ladies

16  and gentlemen, right now.  I want to talk to you about E. Jean

17  Carroll's story.  Her story is that in some unknown season in

18  either 1995 or 1996——see I heard today it was 1996, but she has

19  testified previously sometime in 1995 or 1996, more than 25

20  years ago, she was violently raped in a dressing room in the

21  lingerie section of Bergdorf Goodman.

22        I also heard today that now it was on a Thursday.  And

23  we heard from the opening that there is going to be evidence

24  that Thursday is a dead day in Bergdorf Goodman.  I don't think

25  there is a dead day in Bergdorf Goodman, but maybe Thursday is

1    a lighter day, so all of a sudden we are hearing today that

2    this must have occurred on a Thursday.  You will hear E. Jean

3    Carroll's stories from the beginning when she started coming up

4    with this in 2017.  There was no reference to a Thursday.  This

5    upscale department store in midtown Manhattan on Fifth Avenue,

6    during normal store hours, after she thought he, Donald Trump,

7    was going to try a very pretty, petite, see-through, one-piece

8    bodysuit for a woman over his suit pants.

9         It all comes down to do you believe the unbelievable.

10   That's what this case is going to come down to.  Do you believe

11   the unbelievable?  Nothing else you will hear in this courtroom

12   matters, nothing else.

13        I have heard the opening statement already where they

14   are talking about other women making accusations, who will come

15   in here, from 1979, another woman making another accusation.

16   That's not for you to decide here.  Those people have never

17   made a claim.  No one has ever told the police, including

18   Ms. Carroll.  No one.  Because that would require a real

19   investigation.  No one has ever done that.  But they want you

20   to focus on anything but the E. Jean Carroll story because it

21   is so incredible and so unbelievable.  In her own words it's

22   unbelievable.

23        They want to focus on this lewd conversation that they

24   put up on the screen from 20 years ago where Donald Trump said

25   something, foolishly about, you know, if you are a celebrity

1    you can do this, and it was called locker room talk.  I heard

2    Ms. Crowley——in a very good opening statement, by the way——say,

3    oh, no, it's not locker room talk.  It is locker room talk.  It

4    is foolish, but it's locker room talk.  It's not an admission

5    of anything certainly.  It wasn't referring to having done it.

6    But that's what they want you to focus on, exactly what they

7    want you to focus on, anything but.  The only thing you have to

8    decide in this case, anything but the E. Jean Carroll story.

9    Focus on everything else.  Because if you lay your focus on

10   that story, justice will be served very quickly.

11        You know, they put up tweets.  All the evidence you

12   have seen so far, the 25-year-old quote, tweets from some

13   unknown random person who may or may not be a Donald Trump fan

14   who attacked Ms. Carroll's allegation on social media, nothing

15   to do with Donald Trump, that's the evidence they put up so

16   far.

17        They said that the Bergdorf Goodman witnesses will

18   confirm every detail of the assault.  Mark those words.  They

19   just said the Bergdorf Goodman witnesses will confirm every

20   detail of the assault.  What are they going to confirm?  That

21   there was a lingerie department?  That there was a dressing

22   room?  How does that confirm a rape, that there was a dressing

23   room in the lingerie department in Bergdorf Goodman?  There was

24   no question about that.  Donald Trump was just never there.

25        The only real question for you to answer at this trial

1    is do you believe the unbelievable?  And as to that answer, you

2    will see even E. Jean Carroll herself will admit her story is

3    unbelievable.  She will admit her story is unbelievable, but

4    you're supposed to believe it.  Just buckle in and listen to

5    this story and all the attempted explanations for the

6    unexplainable.

7         Opening statements, as the judge indicated, are the

8    lawyers giving you a preview of how we believe the evidence

9    will unfold in this case, but it's more than that.  It's more

10   than that.  It's a promise to you.  It's a promise to you that

11   what we say is going to be proven is proven or what we say is

12   going to be disproven is disproven.  It is a promise.

13        It's not like a politician's promise, you know, those

14   politicians when they run for office, they promise the moon and

15   the stars and unemployment will go down and taxes will go down

16   and the economy will get better and, based on those promises,

17   you vote for them.  And then after the promises and after the

18   vote, then you see if they kept their promise or not.  That's

19   not this.  That's a politician's promise.

20        This is, we make you promises and I am making to you

21   right now these promises.  You get to then see if I have kept

22   my promise, if she has kept her promise, and then you vote.

23   That's what's important.  Because there was a lot of facts left

24   out, as the evidence will show, in the plaintiff's opening

25   statement, a lot of important facts, and the evidence will show

 1    you that.

 2          You heard a little bit about Ms. Carroll's story, but

 3    let's talk about the details of it and more importantly the

 4    lack of details.  You will learn that E. Jean Carroll can't

 5    tell you the date she claims to have been raped.  I mean,

 6    pretty important event in anyone's life.  She can't tell you

 7    the date that she claims to have been raped.  She can't tell

 8    you the month that she claims to have been raped.  She can't

 9    tell you the season.  She can't even tell you the year that she

10    claims to have been raped by Donald Trump.  Not even the year.

11          The evidence will show you that E. Jean Carroll can't

12    do any of those things because her story isn't true.  She

13    doesn't want to give Donald Trump the opportunity to provide an

14    alibi or present witnesses to refute her claim likes, oh, it

15    happened on October 12, 1995, huh, let's see where anyone was

16    on October 12, 1995.  No.  See, we can't provide an alibi or

17    refute a claim because there is no date, there is no season,

18    they don't even know the year.

19          Instead, what you will learn, she simply said that she

20    was raped on some unknown date 27 or 28 years ago.  Trust me,

21    27 or 28 years ago.  So as the evidence will show you, her

22    story is that on some unknown date 27 or 28 years ago, she was

23    about to exit Bergdorf Goodman department store in Manhattan

24    and she saw Donald Trump in the street through the other side

25    of the door.  According to Ms. Carroll's story, she then saw

1    Donald Trump on the other side of that door hold up his hand,

2    so she stopped inside and waited for him to enter; and when he

3    did, she said Donald Trump said, Hey, you are that advice lady,

4    and they made a big deal of that picture that they showed where

5    they had some encounter a while back.  They actually said they

6    met at an event.  No, they didn't meet at an event.  That photo

7    that they showed you——and the evidence will make this loud and

8    clear——was a brief meeting in a line of people at a big gala, a

9    group setting.  It wasn't like an event, a private event.  It

10   was at some big theater.  There was some event at a theater,

11   and you are going to hear more about it.  There were hundreds

12   of people there.  Donald Trump was, as they said, one of the

13   most famous men in New York at that time.  He had a book.  His

14   name was all over buildings.  He was a tabloid figure.  His

15   wife Ivana was there.

16          So in that group setting, with hundreds of people,

17   many of whom went to shake his hand and say hello, Ms. Carroll

18   and her then husband John Johnson, who was a news journalist,

19   who, by the way, in that photograph you can see that's who

20   Donald Trump is talking to, he is actually putting his hand

21   towards John Johnson, that was eight or nine years before the

22   Bergdorf Goodman incident.  That five-minute encounter, it

23   wasn't a few years ago -- a few years prior, as they said.  It

24   was eight or nine years before the Bergdorf Goodman encounter.

25   They never spoke and they never spoke since that event.  It was

1  a hi, how are you doing?  Mr. Trump is talking to John Johnson,

2  who is a famous news reporter.  I think he was an anchor for

3  Channel 11 News in the city.  So of course he doesn't remember

4  meeting one of hundreds of people at some gala eight or nine

5  years earlier in a five-minute encounter when he testified last

6  year, which would now be over 30 years ago.  Of course he

7  doesn't remember meeting her.  Maybe she remembers meeting him.

8          E. Jean Carroll's story continues.  Upon seeing him,

9  she said, Hey, you are that real estate tycoon.  And when --

10  this is her story.  And when he came in, she went shopping with

11  him in Bergdorf Goodman to help him buy lingerie, women's

12  lingerie, obviously.

13          She will tell you in this time period, around '95 or

14  '96, how famous Donald Trump was, that people recognized him in

15  the store, that a Bergdorf Goodman associate actually

16  recognized him.  And this was the women's Bergdorf Goodman, by

17  the way.  There is two Bergdorf Goodmans.  There is a men's one

18  and on the other side is the woman's one.  The women's one is

19  mostly populated by women, and Donald Trump obviously stood out

20  for a lot of reasons, including the fact that he was a man.

21  But he is in that store and, as she tells it, they traveled up

22  to the sixth floor, taking escalators along the way, but she

23  didn't see another single person anywhere in that store.

24  Bergdorf Goodman in the middle of the day, open.  Not a

25  customer, not a sales attendant, not a soul.  The evidence will

1   show you that she claims that not one person, as they rode the

2   escalator, as they got off the escalator on to the sixth floor,

3   as they walked into the lingerie section, while they were in

4   the lingerie section, not one person was there.  It was like

5   the *Walking Dead*, like the place was abandoned.

6          Now, on the entire floor -- and I heard in the opening

7   statement they said, oh, on Thursdays it is usual that it is

8   empty, usual.  First of all, Thursday is a new fact we will get

9   to that during this trial, but employees are going to be there.

10  Employees are going to be there with merchandise.

11         You are going to hear about this Bergdorf Goodman

12  store.  It's a store of perfections it is so posh and upscale

13  it refers to its customers as clients.  I go to Zara, I'm a

14  customer.  Go to Bergdorf Goodman, you're a client.  It's a

15  little different.

16         And yet E. Jean Carroll will tell you that not one

17  salesperson attended to Donald Trump while he was shopping on

18  the sixth floor.  Instead, what you will hear from her is that,

19  in this posh, upscale store, there were simply three or four

20  boxes of merchandise left unattended on the counter and

21  alongside one little separate piece of lingerie just left

22  alone, and that Donald Trump, according to her, picked up a

23  piece of lingerie and, after some discussion, E. Jean Carroll

24  thought that Donald Trump was going to try the lingerie on over

25  his pants.  As she said, the story is unbelievable.

1            E. Jean Carroll will describe that lingerie, according

2    to her, was very pretty, petite, see-through, lilac, grayish

3    blue, one-piece bodysuit with lace.  Donald Trump is sort of a

4    tall man, 6' 2" or so, in '95 or '96, he weighed at least 225

5    pounds, and he was supposed to fit this piece of lingerie,

6    women's lingerie, over his pants.

7            But according to E. Jean Carroll, she went into the

8    dressing room with Donald Trump -- and, by the way, I don't

9    know if they said this in the opening, but she walked in first.

10   So she goes first into the dressing room where she thinks he is

11   going to try on a small piece of women's lingerie over his

12   pants.  This is her story.

13           So she will tell you that the dressing room door was

14   not only unlocked, but it was also open, and she will tell you

15   herself how odd that is, what an odd fact that was.  This is

16   going to be from her testimony, Ms. Carroll's testimony.

17   Because the dressing room doors at Bergdorf Goodman, she will

18   tell you, are usually closed and locked, and that they usually

19   remained closed and locked until a client wants to try

20   something on.  But according to E. Jean Carroll's story, not

21   this time.  As luck would have it, one door was completely

22   unlocked and wide open.  And on this occasion, the dressing

23   room door just happened to be unlocked and open.  She and

24   Donald Trump could enter without assistance.  And that's what

25   she claims they did.

1          Her story continues.  As soon as she stepped into the

2     dresser room, the locker room where you try on women's

3     lingerie, Donald Trump, without locking the door——according to

4     her, he didn't lock the door——he lunged at her, immediately

5     shoving her up against the wall twice.  It was so hard that

6     E. Jean Carroll banged her head, causing it to hurt.  She

7     claims the noise was so loud that someone in the next dressing

8     room could have easily heard it.  She claims the noise was so

9     loud that, had a sales attendant been on the floor, they would

10    have heard it.

11         E. Jean Carroll will tell you that Donald Trump put

12    his mouth on hers.  She understood at that point that this was

13    a battle, that this was a fight.  And so how did she supposedly

14    respond to this battle-fight-combat?  Well, in her own words

15    she will tell you how she responded.  She laughed.  She

16    laughed.  Normal thing to do you just got hurt, some guy who is

17    100 pounds more than you weighs -- you know, 6' 2", pounding

18    her head against the wall, and she realized she is in a battle

19    and her reaction is to laugh.  Laugh.

20         Well, her story continues.  An unlocked dressing room

21    of an upscale Manhattan department store, Donald Trump pulled

22    down E. Jean Carroll tights, forcibly restrained her, violently

23    raped her for up to as long as three minutes.  If I didn't

24    speak for three minutes, you would see how long three minutes

25    is.  But for up to three minutes.

1            Now, during that time she said she tried to stomp on

2    his foot, she tried to push him back and, with her tights still

3    pulled down, restricting the movement of her legs, somehow she

4    managed to get her knee up high enough to push this man, who

5    weighed more than 100 pounds than her, off of her, all while

6    balancing on high heels.

7            Ladies and gentlemen, you are going to hear from

8    E. Jean Carroll that during this colossal battle her tights

9    never ripped.  She never let go of her purse that she was

10   holding as she was getting violently raped.  She held on to her

11   purse.  That hand could have been used for something else, but

12   instead she held on to her purse.  And she never screamed, not

13   once, never screamed.

14           In fact, according to E. Jean Carroll, after managing

15   to escape from Donald Trump, while afraid that he may be coming

16   after her and chasing her, what did she do?  It's her story

17   that she rode the escalator down six floors, didn't seek help

18   from anyone inside the store, and it's her story that after

19   leaving the dressing room, again, not a customer, not a sales

20   attendant, not a security person, not a single soul was

21   anywhere to be seen in this New York City department store.  Of

22   course not, because they would be called witnesses.  According

23   to E. Jean Carroll, she just walked out of the store.

24           Ladies and gentlemen, E. Jean Carroll cannot produce

25   any objective evidence to back up her claim because it didn't

1    happen.  Objective evidence not just her word in this

2    unbelievable story.  The evidence will show you she can't

3    produce a single record showing injuries.  The evidence will

4    show you that she never went to a medical doctor or even a

5    therapist.  She never sought to preserve any video from the

6    department store because they had video on that floor to

7    protect from theft.  Never sought to preserve that.  That would

8    have made this a pretty easy, quick trial.  Pop in the video

9    and let's see what happened.

10             You will learn that she was an avid writer.  You will

11   hear about what a glorious writer she was and that she kept a

12   diary.  And she never wrote in her diary anything about

13   supposedly being raped by Donald Trump in her personal diary.

14   There was absolutely -- no police report will be produced in

15   this courtroom documenting her claim.

16             The evidence will show you that E. Jean Carroll was an

17   advice columnist to women, advice columnist to women who

18   regularly advised her readers to report men to the police if

19   they so much as threatened violence.  If they talk to you

20   harshly or you are worried that they were threatening violence,

21   call the police.  You are going to learn in fact that E. Jean

22   Carroll once called the police on teenagers who had vandalized

23   her mailbox.  She called the police when they vandalized her

24   mailbox, but apparently not when she was violently raped.

25             What else are you going to learn?  You are going to

1   learn that E. Jean Carroll, from her own story, supposedly,

2   after being raped, she decided to keep the dress she allegedly

3   wore in that rape.  She never wore it again, never washed it,

4   and she stored that dress in her closet for almost 25 years.

5           You are going to learn that during those two decades

6   E. Jean Carroll says she never told anyone about this alleged

7   rape other than those two people you heard about Lisa Birnbach

8   and Carol Martin, and we will talk plenty about them.

9           So what does E. Jean Carroll say about Lisa Birnbach

10  and Carol Martin?  You will hear from her that she called Lisa

11  Birnbach from her cell phone immediately upon leaving Bergdorf

12  Goodman.  That's what she is going to testify to and that's

13  what was said in the opening.  And immediately after being

14  raped by Donald Trump, she told -- she called Lisa Birnbach and

15  told Carol Martin in person within the days that followed.  But

16  the evidence will show you that is simply not true.

17          Ms. Birnbach, according to the E. Jean Carroll story,

18  when she received the call, she said, Jean, you have been

19  raped.  And according to Ms. Carroll, she said it hadn't dawned

20  on me that I was raped until Lisa Birnbach told me that I was

21  raped.  Let that swivel around in your brain for a second.  It

22  didn't dawn on me, the evidence will show, that I was raped

23  until my friend told me that I was raped.

24          You are going to learn that Ms. Birnbach and

25  Ms. Martin were not E. Jean Carroll best friends in 1995 or '96

1   and that she would not have told either one of them this story

2   at that time.  You will learn that she didn't, which is why the

3   evidence will show you that both Lisa Birnbach and Carol

4   Martin, over the course of about 25 years, never told another

5   person that Donald Trump raped their friend.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. TACOPINA:  He never told another person, even when

2    Donald Trump became president in 2016.  Jeez.  That guy became

3    president.  He raped my friend.

4          Who would make up a story like this, and who would go

5    along with it?  The evidence will show you, people with a

6    political vent, people with a financial motive, and people who

7    desire to be in the spotlight.  That's who would make up a sick

8    story like this.

9          And the evidence will show you that E. Jean Carroll,

10   Lisa Birnbach, and Carol Martin hated Donald Trump, loathed

11   Donald Trump politically, not because anyone got raped.  But

12   just politically they hated him.  And you will see the evidence

13   with your own eyes, folks, proof positive, that they schemed to

14   hurt Donald Trump politically, schemed, proof positive, my

15   promise to you.

16         In September 2017, Carol Martin sent an email to E.

17   Jean Carroll attacking Donald Trump politically, saying in this

18   email to her friend, E. Jean Carroll, one of the two outcry

19   witnesses, this has to stop, referring to Donald Trump.  As

20   soon as we are both well enough to scheme, we must do our

21   patriotic duty again, one.  Two, E. Jean Carroll replies to

22   that email.  She says:  Totally, all caps, three exclamation

23   points.  We need to scheme now.

24         She then says something very telling.  I have

25   something special to tell you about when we meet.  I have

something special for you when we meet.  Sure enough, within

weeks of that email exchange, where they talk about scheming

and Ms. Carroll telling her, I have special for you when we

meet, within weeks of that, E. Jean Carroll, an author, started

writing a book which included a story about her being raped by

Donald Trump decades earlier, on some unknown date in some

unknown year, in a dressing room at Bergdorf Goodman while

trying on women's lingerie.

          And you are going to learn that E. Jean Carroll, Lisa

Birnbach, and Carol Martin colluded to get their story

straight, colluded about this made-up story.  You are going to

see evidence that made it clear that they were trying to get

everything together.

          But the devil is in the details, they say, and you'll

see for yourselves that their stories don't synch up.  The

absurdities of their stories and the inconsistencies within

them will reveal their lies and their true intentions.  Watch

them during this trial.  They will not be hard to spot.

          Now, during this trial you are going to hear that Lisa

Birnbach, Carol Martin, just like their friend, E. Jean

Carroll, can't tell you when Donald Trump, one of New York's

most famous people, according to E. Jean Carroll, supposedly

raped her.  They can't tell you either.  They can't remember

the month, the date, the season, the year.  And the evidence

will show you that's not just a coincidence.  They all somehow

1    forgot all that.  That's not a coincidence.

2            Instead, you will see that no one in this courtroom

3    will ever be able to tell you when this alleged rape occurred,

4    because it never did.  They won't even be able to tell you the

5    year, because it never did.

6            Proof will make it clear that E. Jean Carroll were

7    wrote her story about Donald Trump to sell a book, which it

8    did, hurt him politically, and to inject herself in the

9    spotlight.  Again, I'm telling you this as a promise to you

10   that once the evidence is in, you will see this, and we will

11   talk again during the summations.

12           The evidence will show you that following the

13   publication of her story about being raped by Donald Trump, her

14   life was never better.  A woman who claims to be raped, in

15   painful and painstaking details, I think that was the words I

16   heard on the opening statement of the plaintiff, painful and

17   painstaking details, will tell you her life has never been

18   better.  You will hear in her own words that she has been

19   fabulous, that she has received lots of positive support, she

20   is making more money, and she is appearing on podcasts and

21   television now, ever since this revelation of this painful and

22   painstaking rape allegation.  Painful and painstaking pain

23   allegation.

24           Just to talk about it was painful, I heard Ms. Crowley

25   say in her opening statement.  Talking about it was very

1   painful.

2          Fortunately, she went on television, and she went on

3   CNN.  And she talked to Anderson Cooper about her claim that

4   she was raped.  You will be able to watch that video, that

5   interview.  You will be able to witness her bizarre behavior

6   and hear the stranger things she says in that video, and you

7   will be able to see her basking in the spotlight, having the

8   absolute time of her life.  She became a celebrity and loved

9   every minute of it.

10          This is from her.  These are her words.  The evidence

11  will show you that E. Jean Carroll fabricated a story about

12  Donald Trump while he was president, then made that story the

13  center of her life and her lifestyle.  In fact, you are going

14  to hear how that lifestyle led to this very lawsuit.  You will

15  learn that after E. Jean Carroll published her false story

16  being raped by Donald Trump, he denied it and he called her a

17  liar in 2019, called her a liar again in 2022.  I'm sorry.

18  2022.  Plaintiff said he exploded and attacked her.  He dragged

19  her name through the mud by calling her a liar.

20          She falsely alleged that he raped her.  She called him

21  a rapist.  Of course he exploded.  Of course he attacked her.

22  She is falsely accusing him of rape to make money to sell a

23  book because she hated him politically and because she wanted

24  to become a celebrity, which she has become, by the way, based

25  on this allegation.

1          Evidence will show you that E. Jean Carroll was in

2     fact lying because she was never raped by Donald Trump in a

3     Bergdorf Goodman shopping store in the woman's lingerie

4     changing room in the middle of the day.

5          And you are going to learn that while she was at a

6     party, E. Jean Carroll -- she is now on the party circuit, she

7     was invited to every party -- while at a party, E. Jean Carroll

8     met an attorney named George Conway, and George Conway was a

9     political critic of Donald Trump, and spoke to her about suing

10    Donald Trump.  E. Jean Carroll said:  I didn't want to sue him.

11    Before she met George Conway at this party, a very harsh

12    opponent, political opponent of Donald Trump, E. Jean Carroll

13    had not even thought of suing Donald Trump, but he convinced

14    her to, and he recommended --

15          MS. CROWLEY:  Objection, your Honor.

16          THE COURT:  Sustained.

17          MR. TACOPINA:  The evidence will show you that after

18    that conversation, Ms. Carroll went and hired Ms. Kaplan.

19          MS. CROWLEY:  Objection, your Honor.

20          THE COURT:  Sustained.

21          The jury will disregard that.

22          MR. TACOPINA:  Along those lines, you are going to

23    hear that one of the witnesses in this case, in this case, for

24    Ms. Carroll has said that if Donald Trump has to deal with so

25    many lawsuits, he won't be able to run for office, and here we

1    are.

2          You'll also learn that as part of her continuing

3    effort to synch up their stories with respect to her litigation

4    against Donald Trump, E. Jean Carroll, Lisa Birnbach, Carol

5    Martin all got together, all got together and discussed the

6    story.  But the evidence will show you in this courtroom,

7    because their story is not true, it doesn't match up.  They

8    don't match up.  It's all a lie because Donald Trump never

9    raped E. Jean Carroll.  Even calling her a liar was the truth.

10   He never raped her and he never defamed her.  Because of that,

11   despite her effort to profit from her lies in this courtroom,

12   E. Jean Carroll has not suffered emotional or financial harm

13   from being raped or being defamed by Donald Trump.  Quite to

14   the contrary.  Quite to the contrary.

15         Ladies and gentlemen, Ms. Carroll brought this case

16   and the burden remains on her to prove it at all times.  She

17   brought this claim, and you'll see that's a burden she cannot

18   carry.

19         As the trial unfolds, you will see our defense, our

20   defense.  Our defense will come out through their witnesses.

21   That's where our defense is come will from, their witnesses

22   through cross-examination, as the judge mentioned earlier.

23   That's when, after they testify under questioning by

24   plaintiff's counsel, we get to question them.  That's where our

25   defense is in this case.  It's coming out through the

1    questioning of their witnesses.  That's our entire defense.

2    That and some sworn testimony from Donald Trump that you are

3    going to see.

4            Why is that so?  Because it did not happen, because

5    there are no witnesses to call to prove a negative.  Other than

6    saying I didn't do it, which he said he is being sued for, he

7    has denied it.  There is nothing else he could say.  He wasn't

8    there.  He didn't do it.

9            You are going to hear from Donald Trump in his

10   under-oath video deposition questioned by the same lawyers who

11   are here today.  In his sworn testimony there is the same thing

12   if he were here saying the same thing.  I didn't do it.  I

13   didn't do it.  Because there is no more for him to add.  There

14   is absolutely nothing more for him to add.  He can't add

15   anything more, which is why I don't want to distract from the

16   focus of her story.

17           This is about her claim, which he has vigorously

18   denied.  You are going to see him vigorously deny it.  At

19   times, by the way, when he vigorously denies that on video, you

20   are going to hear he gets angry, says some snarly things.

21   That's understandable.  He is being falsely accused of rape.

22   But you -- the focus -- you have to decide if you believe this

23   story or not.  That's it.  All this other window dressing and

24   noise is to distract you from her story, because that's all you

25   need to decide, do you believe it or not.  E. Jean Carroll is

1    going to tell you how her story falls apart, from her own

2    words, her own voice, her own podcasts, her videos and her

3    book.

4          At the end of this case we are going to ask you to do

5    what American juries have been asked to do for well over 200

6    years, which is decide the case on the evidence alone, just the

7    evidence.  Not politics, not personalities; just on the

8    evidence.

9          If you just apply your God-given common sense and your

10   sound judgment and your street smarts, which I think we have an

11   abundance here, E. Jean Carroll will not be able to deceive you

12   with her story.  You have to listen to it.  When you look at

13   that story, your intelligence and your integrity -- your

14   integrity will carry the day.  It will not let her profit from

15   an abuse of our justice system.

16         With that, I'll end on this one photograph, just one

17   photograph I want you to see.  You are going to see this

18   photograph again during trial.  That is a photograph of E. Jean

19   Carroll with a man posing as her alleged rapist while she gives

20   a walking tour.  As a matter of fact, the name of the walking

21   tour she is giving for profit is Most Hideous Men in New York

22   City Walking Tour.  And she has a prison jump suit on.  And she

23   is giving this walking tour related to the sale of her book.

24         And as she is walking around New York City for the

25   Most Hideous Men in New York Walking Tour, and, sure enough,

1    she stops in front of Trump Tower, see's a man there who is

2    posing as her alleged rapist as she is wearing a headset and

3    smiling from ear to ear.  Imagine seeing a guy who was

4    disguised and dressed as your rapist and you see that person 20

5    something years later and you're smiling from ear to ear.  It

6    is said that a picture is worth a thousand words.  You will see

7    during this trial why this picture is worth so many more.

8              Ladies and gentlemen, thank you for indulgence.  Thank

9    you for your time.

10             Your Honor, thank you very much.

11             THE COURT:  Thank you.

12             Ladies and gentlemen, we will see you tomorrow

13   morning.  Remember, be in, please, by 8 and we will start

14   testimony at -- I said 9.  Didn't I.?  Did I say 9?  We are

15   going to start testimony at 10.

16             The jury department folks are in the back.  Andy will

17   give you the time you need to be here when you go into the jury

18   room.  There are a lot of cooks making this stew, getting you

19   in and out, folks.  They don't all talk to me.

20             Counsel remain, please.

21             (Jury not present)

22             THE COURT:  Mr. Tacopina, in light of what you said a

23   few minutes ago, I take it you are now telling my that

24   Mr. Trump will not testify live in this case.  Is that correct

25   or not correct?

1          MR. TACOPINA:  The answer is, I am not sure, your

2    Honor.  That's the honest answer.  You can look at me that way.

3    That's the answer.

4          THE COURT:  Here is what you said.  Our defense will

5    come out through our witnesses.  That's where our defense is

6    coming from, their witnesses.  That's when, after they testify

7    under questioning by plaintiff's counsel we get to question

8    them.  That's where our defense is in this case.  It's coming

9    through the questioning of their witnesses.  That's our entire

10   defense, that and some sworn testimony from donned Trump is

11   what the transcript says, you are going to see, referring to

12   the deposition.  You then talk about the deposition and then

13   you said, because there is nothing more for him to add.  There

14   is absolutely nothing for him to add.

15         Look, I have represented clients who don't tell me

16   until the last minute what they want to do.  This is not a

17   circumstance in which you can just keep the entire apparatus

18   that goes with an appearance by him hanging in total

19   uncertainty.

20         MR. TACOPINA:  We do not mean to do that, your Honor.

21         THE COURT:  I appreciate that you do not mean to do

22   that, but the time has come.  I don't mean this minute, but you

23   are going to have to tell me this week.

24         MR. TACOPINA:  We are just waiting on a couple of

25   rulings from your Honor, and I will tell you that.

1                Again, you did point something out.  There are certain

2   clients who have desires, and I understand.  I will abide by

3   whatever order you give me.  It will be this week.

4                THE COURT:  This week.

5                MR. TACOPINA:  Yes, sir.

6                THE COURT:  Fish or cut bait.

7                MR. TACOPINA:  Fish or cut bait.

8                THE COURT:  Obviously, if something totally unforeseen

9   happens, exceptions can be made.  But this is, in light of what

10  you just said, beginning to look like a very unnecessary

11  imposition on a lot of people.

12               MR. TACOPINA:  Imposition?

13               THE COURT:  On security, on court staff.  You follow?

14               MR. TACOPINA:  I follow.  I wouldn't even take us down

15  that road.

16               Your Honor, my intention, based on what I believe the

17  current state of the rulings are and the testimony, and I

18  hadn't see -- I know there was a ruling last night or today.  I

19  don't have my phone.

20               THE COURT:  There was a ruling on the deposition

21  designations.

22               MR. TACOPINA:  That's sort of one of the X factors.

23               THE COURT:  I commend it to your attention.

24               MR. TACOPINA:  Your Honor, I want to make sure the

25  Court didn't think I was running afoul of any of the rulings.

1    I cut out parts of my opening based on your order.  I was

2    simply -- I was not addressing -- when I talked about

3    Mr. Conway, I wasn't addressing litigation funding at all.

4            THE COURT:  I understand that.  But I also ruled that

5    we are not having any attacks on opposing counsel and all of

6    that.

7            MR. TACOPINA:  I wasn't attacking -- I have great much

8    for Ms. Kaplan and them.  I wasn't -- it was how she decided

9    she wanted to sue because initially she said --

10           THE COURT:  And you said all that.

11           MR. TACOPINA:  Then you struck it.

12           THE COURT:  I didn't strike anything.  I sustained an

13   objection.  You got your George Conway story.

14           MR. TACOPINA:  Thank you.

15           THE COURT:  Ms. Kaplan.

16           MS. KAPLAN:  One thing, your Honor, much more in the

17   manner of housekeeping, the parties have submitted an

18   instruction to you about the 2019 defamation case.  We

19   obviously don't need a decision right now, but you might want

20   to think about giving that after Ms. Carroll testifies to

21   better explain to the jury.  We just wanted to put that on your

22   radar screen.

23           THE COURT:  It is on my radar screen.

24           Mr. Tacopina, do you have anything to say about that?

25   I have a letter from your side.  I'm sorry.  I'm looking at the

1   wrong letter.  But you saw Ms. Kaplan's letter of yesterday

2   about an instruction in relation to Carroll 1.

3          MR. SEIGEL:  Your Honor, if I may, I can address that

4   it is our position that this jury shouldn't be placed in a

5   position to speculate on issues.

6          THE COURT:  Should or should not?

7          MR. SEIGEL:  Should not be in a position to have to

8   speculate regarding issues of presidential immunity or the fact

9   that this defendant was seeking to avoid litigation based on

10  his status as president.  It's not an issue in this case and it

11  could evoke potential negative reactions from this jury.  They

12  don't need to hear it.  It's simply enough to say, I think,

13  that based on various arguments that were raised, that issue is

14  not for them to decide.

15         THE COURT:  You would rather have them speculate that

16  the reason the other case hasn't been resolved is because it

17  has no merit, or something like that?

18         MR. SEIGEL:  Not that it has no merit.  There are

19  various issues that are still pending right now.  The fact that

20  the case is pending would suggest that in fact it may or may

21  not have merit.

22         MS. KAPLAN:  That's exactly our concern, your Honor.

23  I agree with Mr. Seigel that we don't want the jury to

24  speculate, and that's why we put this language in because we

25  think if there is no explanation, that's exactly what they will

1    do.

2             THE COURT:  The proposal from the other side, to the

3    extent there is, in my understanding, any objection to it is to

4    these two lines.

5             Mr. Trump defended that lawsuit in part on the ground

6    that he could not be sued because he was president at the time

7    he made those statements.  Those issues, a reference to, in

8    part, on the ground remain unresolved.

9             Now, the statement is entirely accurate, isn't it?

10            MR. SEIGEL:  Your Honor, yes, it is accurate.  But

11   that doesn't mean it should go to this jury.

12            THE COURT:  And the reason it shouldn't is why?

13            MR. SEIGEL:  The concern, your Honor, is this jury may

14   have a negative reaction to the fact that the defendant is

15   using his status as a former president in order to, in laymen's

16   terms, avoid a lawsuit.  They don't need to hear that fact.

17            THE COURT:  You are here urging that Mr. Trump

18   truthfully denied the allegations, yes?  I think that's what I

19   listened to for the last quite eloquent 45 minutes.

20            MR. SEIGEL:  Of course, your Honor.

21            THE COURT:  Right.

22            Why isn't it fair game for the other side to say,

23   well, maybe he doesn't want to meet the facts head on?

24            MR. SEIGEL:  Your Honor, he is meeting the facts head

25   on by defending this particular litigation.

1          THE COURT:  By defending the other one either.

2          MR. SEIGEL:  Your Honor, the problem with that is

3    that -- the problem with that, your Honor, is that it invites

4    the jury to find that he's not addressing the facts head on and

5    is in fact using his status as a president in order to avoid a

6    litigation which could evoke a negative reaction.  It's not

7    something that this jury needs to hear.

8          It's also, your Honor, something that -- it's also

9    something that touches on advice of counsel.

10         THE COURT:  It touches on advice of counsel.  How does

11   it do that?

12         MR. SEIGEL:  Your Honor, if the defendant in that

13   litigation is taking a particular course based on information

14   that is provided to him by his counsel to best dispose of the

15   litigation, it touches on advice of counsel.  But the Justice

16   Department also was involved in that, your Honor.  There is a

17   host of issues.

18         THE COURT:  You are telling me --

19         MR. SEIGEL:  Fair enough.

20         THE COURT:  I was here.

21         MR. SEIGEL:  That's true.  I only read about it.

22         Your Honor knows --

23         THE COURT:  It is back before me, Justice Department

24   notwithstanding.

25         MR. SEIGEL:  Your Honor, if this instruction is going

```
1   to be given to the jury, then we should be in a position to

2   have to explain to them the Westfall Act.  It just complicates

3   the issues.  I think it's simply enough for the jury to hear

4   that that matter is still pending based on a variety of issues,

5   and you can instruct them that they are not to consider that.

6   The only consideration for them is this case.

7              THE COURT:  I'll think about it.

8              MR. SEIGEL:  Thank you.

9              THE COURT:  But there are arguments both ways on this,

10  I think.

11             Anything else this evening?

12             MS. CROWLEY:  Not from us, your Honor.

13             THE COURT:  Thank you.

14             If another attorney is going to speak, I'll have

15  everybody sit down and have the court reporter back at his

16  station

17             MR. DeOREO:  I apologize for interrupting you.

18             THE COURT:  It's all right.  Let's just get on with

19  it.

20             MR. DeOREO:  It's a pure housekeeping.  If plaintiff

21  testifies tomorrow, we need to use audio.  If we use audio,

22  there is going to be a foundation of authenticity issue that we

23  don't want -- we are inclined that we don't want to have the

24  audio or video or both played to the jury until you decide

25  whether we can use it.
```

1            THE COURT:  Of course.  But I am glad you raised it,

2    because I got that letter this morning.  Of course it would

3    have been a lot better if I had gotten it several days ago,

4    because it raises a bunch of issues.

5            The first issue is, where is the transcript of the

6    audio?  We try lots of cases with lots of audio in this court,

7    and the U.S. Attorney's Office, without fail, provides the

8    Court with a transcript, even if there is a fight about who is

9    speaking; even if there is a fight about audibility, to the

10   extent they can transcribe it, all of that stuff.

11           My first question is, do you have any transcripts?

12           MR. DeOREO:  Sometimes the CNN has provided

13   transcripts of their own videos.

14           THE COURT:  I'm sorry?

15           MR. DeOREO:  CNN has provided transcripts of their own

16   audios or videos.

17           THE COURT:  What videos are we talking about and where

18   are the transcripts?  I don't have videos and I don't have

19   transcripts.  What am I supposed to rule on?

20           MR. DeOREO:  Your Honor, your pretrial order

21   specifically says we don't have to identify exhibits for

22   cross-examination, which we have not done.  If we had done

23   that, we would have been forfeiting our right to impeach.

24           Your Honor, these videos speak for themselves.  They

25   are not unclear.  You can hear them.  You can see them.  If the

1   witness is saying that I didn't say that, then they can say

2   that. I don't know any rule that says you can't use an audio

3   tape without a transcript. I have never seen that before.

4           THE COURT: I don't know any rule that requires the

5   United States of America, when they prosecute cases, based on

6   wiretaps, that they have to furnish a transcript, but it's done

7   in every case.

8           MR. DeOREO: These aren't wiretaps. They are publicly

9   on the Internet.

10          THE COURT: I don't know what they are, Mr. DeOreo. I

11  don't know what they are.

12          MR. DeOREO: It's the witness' own choice. They go on

13  to an -- on a podcast or on CNN. They are not being secretly

14  recorded. Sometimes it's their own podcast. Lisa Birnbach,

15  it's her own website. She puts it out there. It's not a

16  secret recording that someone, it's a -- it's not a murky

17  recording. They are not surreptitious. These are recordings

18  that they put on on their own websites or they went onto CNN.

19  We are not claiming that it's some hidden camera with -- or

20  some hidden recording device.

21          THE COURT: You write me a letter within 24 hours of

22  jury selection, maybe less, and you talk about audios that are

23  not specified. All of the stuff about CNN, I believe, I'm

24  hearing for the first time, and I don't know what I'm dealing

25  with. That's what I'm saying to you.

1             MR. SEIGEL:  Your Honor, if I may, I apologize.

2    You're absolutely right.  The items were not referenced because

3    they are intended --

4             THE COURT:  Impeachment material.  Got that.  Of

5    course.

6             MR. SEIGEL:  You are right, your Honor.

7             Just for clarification, so you do know, they are audio

8    and/or video recordings of various witnesses which these

9    witnesses made.  They would be available to listen to them,

10   watch them, without first publishing them to the jury, and they

11   can authenticate them.

12            The reason the letter was submitted was in an

13   abundance of caution to alert the Court of the plan for the

14   witness to be able to authenticate it without the juror or jury

15   first hearing it.  We have done this before in other matters.

16   We find that headphones are very efficient.  We will bring

17   enough.  We have it set up.  We just wanted to alert the Court.

18            THE COURT:  Mr. Ferrara.

19            MR. FERRARA:  Your Honor, there is one video that I'm

20   pretty sure I know what defense counsel is referring to, and I

21   believe it's the video of Ms. Carroll on Anderson Cooper,

22   because we understood.

23            THE COURT:  That sounds like it might be familiar.

24            MR. FERRARA:  Fair enough.

25            Because we understand that they want -- we anticipate

1    that they would play that.  We plan to play that and to impeach

2    her ourselves under, I believe it's 607.  We will have a

3    transcript prepared of the brief part of that tape that we

4    actually intend to play.

5              THE COURT:  This is the enjoyed it.

6              MR. FERRARA:  It involves some color being given to

7    the word -- whether people find rape sexy.  There are only a

8    few lines that are relevant, and we will make a transcript of

9    that by tomorrow.

10             THE COURT:  How much of your problem does that solve?

11             MR. SEIGEL:  Not very much, your Honor.  There is a

12   lot of audio and video from these witnesses.

13             THE COURT:  Let me hear from Mr. Ferrara.

14             MR. FERRARA:  The other video, we will authenticate

15   these without the use of video.  We will use the old-school

16   method of, Ms. Carroll has seen it on a disk, she has initialed

17   the disk.  I will hand her the disk.  She will describe what is

18   on the desk in a way --

19             THE COURT:  But you're talking about what you're

20   intending to use, not what they are intending to use.

21             MR. FERRARA:  We don't need the use of the headsets

22   for that.

23             Then there is one other video.  In this video this is

24   our -- they are both our exhibits, but this is an exhibit that

25   we have always intended to use, which is Donald Trump appearing

1    on Roger Ailes' show.  The reason we are -- the reason we are

2    introducing it is the idea being that Mr. Trump was -- Mr.

3    Ailes and Ms. Carroll shared a set, essentially.  They were in

4    a similar studio area.  We are going --

5                THE COURT:  Where, when?  What are we talking about?

6                MR. FERRARA:  We are going to establish that.  We will

7    authenticate that, your Honor.  If defense objects, of course

8    your Honor can deal with it, and we are happy to.

9                THE COURT:  But you're talking about what you intend

10   to use.

11               MR. FERRARA:  Sorry.  I just wanted your Honor to know

12   we will also provide a video of the sort of first -- we will

13   provide a transcript of the first sort of ten seconds of that.

14               THE COURT:  But his problem is not with what you

15   intend to use.  It's with what he might want to use.

16               MR. FERRARA:  I stood up, your Honor, because I

17   thought maybe the Anderson Cooper might help them.  Number 2, I

18   just wanted to flag that we have a similar issue that we will

19   cite.

20               THE COURT:  Let's get back to you.

21               How much other stuff?

22               MR. SEIGEL:  Your Honor, there is -- the plaintiff has

23   appeared on numerous podcasts and on televised programs.  This

24   is -- a large part of it would be for impeachment purposes.  If

25   she adopts the statements that she makes, we may not have to

1    use it, but there is a voluminous amount.  I think with the

2    system that we have in mind we can do so efficiently.  For

3    instance, Ms. Carroll, if you can put the headphones on.  Your

4    Honor would have a set.  Opposing counsel would have a set.  I

5    am going to play a 20-second clip.  Tell me if you recognize

6    this.  Is that your voice?  Did you say that?  That would be

7    sufficient to authenticate it.  Very good.  We can take the

8    headphones off and then publish it to the jury once it is

9    submitted.  Only if we need to, your Honor.  It would

10   essentially be the equivalent of producing a tangible piece of

11   evidence to the witness and showing it to her.

12            THE COURT:  Where is the record evidence of what the

13   witness authenticated if you do it that way?

14            MR. SEIGEL:  If she authenticates it, it's burned onto

15   a CD.

16            THE COURT:  It's on a CD.

17            MR. SEIGEL:  That we have done, yes.

18            Unfortunately, because we don't have the opportunity

19   that opposing counsel has to sit down with the plaintiff and

20   say, listen to this and do you recognize this --

21            THE COURT:  No.  But you have already identified the

22   excerpts that you think you want to use.

23            MR. SEIGEL:  Yes.

24            THE COURT:  Right.

25            MR. SEIGEL:  That's right, your Honor.

1           THE COURT:  You have the ability to come in here with

2    storage media.

3           MR. SEIGEL:  Yes.

4           THE COURT:  One excerpt per storage medium, yes.

5           MR. SEIGEL:  Yes, your Honor.  We will do that.

6           THE COURT:  Let's just walk through it because all I'm

7    trying to do is to understand what it is you're talking about

8    and figure out how I can have an acceptable record.

9           MR. SEIGEL:  Sure.

10          THE COURT:  Ms. Carroll says on the stand, and I'm

11   making it up.  You know, this is hypothetical.  It was really

12   at Neiman Marcus in Dallas, right, and now you have got some

13   recording in which she said it was in Nordstrom's in

14   Minneapolis, and now what do you want to do with that

15   recording?

16          MR. SEIGEL:  We want to play it for everyone in the

17   courtroom in this well, excluding the jury, and ask Ms. Carroll

18   if she --

19          THE COURT:  If that's her voice.  If she recognizes

20   it.  Did she say those things.  Yes?

21          MR. SEIGEL:  That's right.

22          THE COURT:  If you get the answers you hope to get,

23   then you want to offer it in evidence and we have whatever we

24   have in relation to that.

25          MR. SEIGEL:  Right.

```
 1              THE COURT:  It either comes in or it doesn't.

 2              MR. SEIGEL:  Yes.

 3              THE COURT:  What you, I think, are really proposing,

 4   and correct me if I'm wrong, because I'm trying to walk through

 5   this with you, is to save the time of the jury being walked

 6   back to the jury room while the audio is played aloud in the

 7   courtroom and you ask your authentication questions.  What you

 8   want to do is, you want the jury to sit there and everybody

 9   else is sitting with ear muffs listening to something the jury

10   can't hear.  And the jury then, assuming for the sake of

11   argument that it doesn't get in eventually, is listening to

12   Ms. Carroll's answers, verbal answers to your questions that

13   the jury has heard about a tape that they have not heard and

14   may never hear, and we may then have a discussion about whether

15   you can use it with the jury sitting here.

16              That's the plan?

17              MR. SEIGEL:  We would do it in this fashion and just

18   say, Ms. Carroll, we are going to play an audio for you, tell

19   me if you recognize your voice, and she could authenticate it

20   that way.  It's no different than saying, Ms. Carroll, we want

21   you to look at this document.  We will just identify as an

22   audio.  Or we could actually -- that would be one way to do it,

23   your Honor.

24              THE COURT:  I appreciate the imagination and maybe I'm

25   just not sufficiently imaginative, but I'm certainly
```

1    traditional.  I think we have been excusing the jury from those

2    kinds of discussions for several hundred years and that's what

3    we are going to do here.  OK?

4              MR. SEIGEL:  OK.

5              One second, your Honor.

6              THE COURT:  Do you have a problem, Mr. Tacopina?  Am I

7    missing something?

8              MR. TACOPINA:  I am getting something explained to me

9    from the person that runs all this stuff.  I'm missing a lot

10   right now.

11             THE COURT:  I don't think so.

12             MR. SEIGEL:  We are having our own little powwow here

13   trying to figure out --

14             THE COURT:  I understand, I appreciate that.

15             MR. SEIGEL:  We were trying to find an efficient way

16   to do this without having to excuse the jurors.  We thought the

17   headset might work.  We will defer, obviously -- this goes

18   without saying, we are deferring to your Honor, however you see

19   best to do this.

20             My hope is, along with my colleagues, that if we ask

21   the witness if she made certain statements on a podcast, she

22   will just accept them knowing that we have that.  But if she

23   doesn't, then we will have to do what your Honor suggested.

24             THE COURT:  I may be mistaken.  You know what this

25   material is.  I don't.  I have not heard any direct testimony

1    yet either, which matters here, right.  But I have a feeling,

2    just a feeling, instinct, 50 years doing this, that you are

3    making more out of this than may be warranted.  You get a

4    statement from the stand and you are telling me this is

5    principally an impeachment problem, right?

6              MR. SEIGEL:  Yes.

7              THE COURT:  So you want to impeach with a prior

8    inconsistent statement.

9              Now, under the rules, as I remember them, I have not

10   reread them this week, but as I remember them, you have to lay

11   a foundation even to begin thinking about that, right?

12             MR. SEIGEL:  That's correct.

13             THE COURT:  You have to say to the witness, didn't you

14   on such and such occasion say in substance or in words X,

15   right?

16             MR. SEIGEL:  Yes.

17             THE COURT:  Do we agree?

18             MR. SEIGEL:  Yes.

19             THE COURT:  If the witness says yes, OK, no harm, no

20   foul, no jury excused, no problem.  If the witness says, I

21   don't remember, then you have problem number 2.

22             Problem number 2 then becomes, how do you deal with

23   the issue of refreshment of recollection?  Now, that presents a

24   somewhat different problem than impeachment.  Because there

25   you're permitted to refresh a witness' memory or attempt to do

 1    so, essentially with anything.

 2              MR. SEIGEL:  Right.

 3              THE COURT:  So there I don't see the device that I was

 4    seeing earlier, putting aside the electronics for a minute,

 5    with there being no record of what you are using to impeach.

 6    Assuming the electronics work out, then you say, all right, put

 7    on your headset, I am going to play for you -- you can't even

 8    say what you are doing, right?  Because you got the jury there.

 9              MR. SEIGEL:  Right.

10              THE COURT:  I may circle back to this in a minute.

11    But you are going to say, just listen.  Is your memory now

12    refreshed?  Answer:  No.  Hypothetically.

13              I don't offhand remember the answer to the question

14    of, can you then offer the inconsistent statement?  But I'll

15    certainly know it by tomorrow.

16              MR. SEIGEL:  Yes, you will.  We will help in that

17    regard.

18              THE COURT:  I'm sure you will.

19              Suppose, hypothetically, the answer is, yes, but you

20    have taken it completely out of context.  Now where are we?

21              MR. SEIGEL:  We can have an entire recording -- we

22    will have the full clip available, and we can provide it to

23    opposing counsel as well.

24              THE COURT:  With transcript, no transcript?  Because

25    it may become very important for me to have the transcript at

1    that point.

2            MR. SEIGEL:  Right.  There are no transcripts.  These

3    are live podcasts, online that we pulled clips of.

4            THE COURT:  Didn't somebody say a minute ago that CNN

5    did transcripts?

6            MR. SEIGEL:  CNN -- that's fair.  CNN itself, the

7    Anderson Cooper.

8            THE COURT:  Anderson Cooper is not going to be a

9    problem.

10           MR. SEIGEL:  Right.  There is a transcript of that

11   online as well.  They provide it.

12           But these are podcasts on various websites that are

13   not at all well known, and there are no transcripts that were

14   produced for those.  They are just clips that are 15 seconds

15   long, 20 seconds long and I think, if anyone were to hear them,

16   they are sort of self-contained.  They are not out of context.

17           THE COURT:  How does anybody know that?

18           MR. SEIGEL:  You'd have to hear it.  I understand.

19   Certainly the witness would.

20           THE COURT:  And maybe the judge too.

21           MR. SEIGEL:  Of course.  That's why we have headsets

22   for everyone.

23           THE COURT:  You've got a 15-second thing you've got

24   off some yenevelt website.  How do I know it's complete?

25           MR. SEIGEL:  We will have the entire recording

1   available, and we could go back or back as far as anyone deems

2   necessary or ahead as far as anyone deems necessary.

3           THE COURT:  I can just see how efficient this is.

4           I am going to think some more about it.

5   Provisionally, I think it's kind of problematic, but we will

6   see.  It may depend very much on the precise context in which

7   the question arises.

8           Mr. Ferrara.

9           MR. FERRARA:  Your Honor, appreciate the Court

10  thinking through this.  I'll just flag, completely understand,

11  of course, why defense counsel does not want to share this with

12  us beforehand.

13          THE COURT:  Right.  I'm not quarreling with that.

14          MR. FERRARA:  Understood.  We may be in a position,

15  your Honor, because, again, if it's a document, to your Honor's

16  point, about completeness, we can rifle through a document much

17  more quickly than we can rifle through an audio recording to

18  make sure we don't believe that, under completeness, some other

19  portion should be offered or it's not taken out of context or

20  make some other objection.  We may -- I apologize in advance --

21  be asking the Court for more time to do that.

22          Number 2, there are sensitive 412 issues in this case

23  which certain portions that might be played, that might be a

24  little ahead or a little behind that could implicate issues

25  that we briefed for your Honor, and we don't want -- I don't

1   think anyone is suggesting we inadvertently want something to

2   be played for the jury or to go back to the jury that

3   implicates an issue that your Honor has not ruled on.

4           THE COURT:  Sure.  Let me suggest this.  I think all

5   these smart people at the front and back table ought to put

6   their heads together about this.  I am not suggesting that the

7   defense has any obligation at all to tip your hand as to what

8   the material is.  I think maybe if you talk about this a little

9   more, you may make all of us smarter.

10          Now, the equipment you want to bring in is what

11  exactly?

12          MR. SEIGEL:  Can our IT person respond to this?

13          THE COURT:  Of course.

14          MR. SEIGEL:  Thank you very much, your Honor.  It is

15  above my pay grade and knowledge.

16          MR. NELSON:  Your honor, I took the liberty last night

17  of taking a photograph of the materials that we would like to

18  bring in, and I would be happy to provide this to the Court so

19  you'll have a better understanding of what we are talking

20  about.

21          Also, your Honor, I spoke with William, your IT

22  person, and explained to him, in the event that we are allowed

23  to do this, the way it would be set up.

24          THE COURT:  I don't know William.

25          MR. NELSON:  One of your IT people here with the

1   Court.

2           In addition, your Honor, I also asked counsel, in the

3   event that they would need to play something, that they would

4   have full use of it as well.

5           THE COURT:  I am sure they are very eager.

6           I appreciate being given this photograph of a roll of

7   duct tape, seven pairs of earphones, and a great big black box

8   that looks like it ought to be on Mission Impossible, and may

9   either be a stereo system or a way to blow up the Kremlin.  I

10  don't know what it is.  How could I possibly know.

11          MR. NELSON:  Your Honor, if I may, one thing it will

12  do, it will not be played through the court system.  In order

13  words, the jury will not hear anything that is being played.

14          THE COURT:  I understand.

15          What is this black box supposed to do?

16          MR. NELSON:  There is actually two devices in there,

17  your Honor.  The one that has got all the knobs on it, it's

18  actually a Mackie sound board that would be sitting to my left

19  over here.  I would be able to control the audio levels with

20  that.  The other box, the elongated box on top of it, is a

21  distribution amp where all the headphones would then plug into.

22  It would come out of my computer into that Mackie sound board.

23          THE COURT:  Does it have any network access?

24          MR. NELSON:  No, sir, none whatsoever.

25          THE COURT:  Does it have any wireless communication

1    capability?

2            MR. NELSON:  None whatsoever, your Honor.

3            THE COURT:  Physically you may bring it in, which is

4    not to say you may use it.

5            MR. NELSON:  Understood, your Honor.

6            THE COURT:  It certainly would deliver to the jury, if

7    it were used, I take it, one message loud and clear, which is

8    that the defense argues that something the jury may not hear

9    and possibly should never hear is inconsistent with the

10   witness' testimony.  It is, we say she is a liar, look at the

11   black box device.  Isn't it?

12           MR. NELSON:  To a degree, your Honor.

13           THE COURT:  To a degree.  How much of a degree?

14           MR. NELSON:  I'll say this.  All audio podcasts,

15   everything that would be heard by the witness and by counsel

16   and yourself, they were actually a screenshot from the site

17   that they were taken from.

18           THE COURT:  What does that mean?

19           MR. NELSON:  Essentially, your Honor, whatever website

20   it was from, whatever podcast it may have been, whose ever show

21   it was on, it is identified because it was recorded as a video,

22   so you can see what is being played, even from an audio

23   podcast.

24           THE COURT:  That makes it worse.

25           MR. TACOPINA:  No.  I think that makes it better, your

1    Honor.  In case there is a recollection that needs to be

2    refreshed regarding being on John Smith's podcast, the John

3    Smith podcast, it may refresh her recollection if she saw the

4    screenshot of the actual podcast page.

5              THE COURT:  You could also have a piece of paper on

6    which is typed John Smith's podcast, and you could show her the

7    piece of paper and say, have you looked at the piece of paper?

8    Has that refreshed your recollection?

9              MR. TACOPINA:  Rather than identifying what that piece

10   of paper is, it would be of no consequence at all to anyone.

11             THE COURT:  So what you want to do is you want to

12   display to the jury something, the authenticity of which --

13             MR. TACOPINA:  I wouldn't display it to the jury, your

14   Honor.

15             THE COURT:  Who are you displaying it to?

16             MR. TACOPINA:  The witness.

17             THE COURT:  And you are going to do that through the

18   headsets in the --

19             MR. TACOPINA:  No.  That one would be on the screen.

20             THE COURT:  On whose screen?

21             MR. TACOPINA:  The witness' screen.

22             THE COURT:  I thought he just said this wouldn't

23   involve using the court system.

24             MR. TACOPINA:  Not that big thing you have there with

25   the plugs and the headsets.

1          THE COURT:  There is only one screen in front of the

2     witness.

3          MR. TACOPINA:  That one.

4          THE COURT:  One.  It is connected to the Court's

5     system.

6          MR. TACOPINA:  Can we show exhibits the way we showed

7     the photo before or they showed their things?  Can't we show

8     exhibits through the court system without the jury seeing it?

9          THE COURT:  Yes.

10          MR. TACOPINA:  That's what I meant, if that helps.  I

11     don't know if it helps.

12          THE COURT:  I am not sure if it does or not.

13          MR. TACOPINA:  This might not ever happen.  It may not

14     come to fruition, but I just don't know how to impeach a

15     witness.  I have done a lot of these.  If I say, you said this

16     on a certain date, hopefully, we won't even have to play the

17     thing.  The witness says:  Yes, I recall that.

18          THE COURT:  Right.  We are agreed on that. If we get

19     past that is where it begins to get a little narley, doesn't

20     it?

21          MR. TACOPINA:  It would give the witness, obviously,

22     the refuge that if they don't recall anything, they don't get

23     impeached because we can't --

24          THE COURT:  If that's true, as a matter of law, that's

25     true, no matter what the source of the impeaching statement is.

```
 1              MR. TACOPINA:  No, no.  I misspoke.  If we are not
 2    able to authenticate it's a podcast, for example, if we are not
 3    able to let the witness hear her voice on the podcast, how
 4    would we either impeach or refresh the recollection of that
 5    witness?
 6              THE COURT:  Well, refresh is the easy part.
 7              MR. TACOPINA:  Yes, I agree.
 8              THE COURT:  Mr. Ferrara, do you want to make a
 9    contribution or not?
10              MR. FERRARA:  I think it circles back to what your
11    Honor said.  You could have a transcript.  You could hand the
12    transcript up.
13              THE COURT:  We are here on Tuesday afternoon and there
14    aren't any transcripts.
15              MR. FERRARA:  We are going to have transcripts
16    tomorrow.  I don't see --
17              THE COURT:  You are not going to have it from them.
18              MR. TACOPINA:  The transcript doesn't solve it.  How
19    can you hear her voice on a transcript?
20              MR. FERRARA:  Unless the Court -- it's another step.
21    In other words, it's one thing to say, Ms. Carroll, do you
22    recall saying something on such and such occasion?  If
23    Ms. Carroll says, I don't recall, it's much easier to put the
24    transcript portion that would refresh her recollection.
25              THE COURT:  Of course.
```

1        MR. FERRARA:  I'm not suggesting that defense has to

2    transcribe every recording she has ever done in its entirety.

3    We can certainly at least have some portion of a transcript.

4        THE COURT:  Why can't you do that, Mr. Tacopina?

5        MR. TACOPINA:  Let me read your question.

6        MR. NELSON:  Your Honor, while he is doing that, I

7    need to clarify one thing and hopefully help the Court.  It's

8    not a static image being recorded off the screenshot.  Two

9    things it does.  It identifies the mark of where the audio

10   starts and where the audio ends, because the audio bar on the

11   podcast, it is moving as the video is playing or as the audio

12   and video is playing.

13       THE COURT:  That bar begins at 000 at the point where

14   you started recording it off the podcast and stops at whatever

15   the end point is of what you elected to record.  Is that right?

16       MR. NELSON:  It is, your Honor.  But, in addition to

17   that, I have the full clip of what that portion was taken from.

18   If opposing counsel needs to hear something else, I could then

19   play something for them from the full podcast, few seconds

20   before, few seconds after, wherever they want me to go.

21       THE COURT:  Do we know how long any of these podcasts

22   are?

23       MR. TACOPINA:  The clips we plan on using are

24   relatively brief, obviously.

25       THE COURT:  I'm confident of that.

1           Are they 12-second clips out of a 22-second podcast

2    cost, or are they 12-second clips out of a 15-minute audio

3    segment with Ms. Carroll on it, or whoever the witness is?

4    Seems to me that makes a difference.

5           (Continued on next page)

1              MR. TACOPINA:  Should I?

2              THE COURT:  Yes, please.

3              MR. TACOPINA:  I don't think you are asking what I'm

4    being told, which is, there is no clip that's more than a

5    minute long.  But that's not what you are asking.  You are

6    asking, outside of that clip, how long is that podcast.

7              THE COURT:  Exactly.

8              MR. TACOPINA:  Yes.  So the answer is --

9              THE COURT:  You don't know.

10             MR. TACOPINA:  -- they are different.  They are all

11   different.

12             THE COURT:  They are all different.  Right.  So go

13   back to the one that I have a little bit of and only a little

14   bit of familiarity with, which is the Anderson Cooper one,

15   which I understand is not going to be a problem.

16             MR. TACOPINA:  Right.

17             THE COURT:  Just take that.

18             MR. TACOPINA:  For an example.

19             THE COURT:  She was on the Anderson Cooper show doing

20   that interview, as I remember the briefing, before and after a

21   commercial break, right?

22             MR. TACOPINA:  Yes.

23             THE COURT:  So would I be right in guessing she was on

24   that show for 15 minutes, 30 minutes, something like that?

25             MR. TACOPINA:  I think eight.

1          THE COURT:  Eight.

2          MR. TACOPINA:  Eight or nine.

3          THE COURT:  Okay.

4          And suppose you now have a nine-second clip that you

5    want to use for refreshment or impeachment.  Now, what are we

6    supposed to do when the other side says, How do I know it's

7    complete?  How do I know she doesn't say in a portion that the

8    defense chose not to record the opposite of what they are

9    playing?  How do I know any of that?

10         (Counsel confer)

11         MR. TACOPINA:  Your Honor, the only thing I can think

12   to expedite this a little bit is, after the direct of

13   Ms. Carroll -- giving it to them before the direct, obviously,

14   for example, they are going to play the CNN video now in their

15   case in chief under 607.  After the direct, after the direct, I

16   will give them the complete disks of podcasts.  Maybe we could

17   take a little break and they, the team, could sort of listen,

18   make sure that's the full thing, because we are giving the full

19   thing.  As an officer of the court, I represent --

20         THE COURT:  You are going to give them the complete so

21   they can sit there for 40 minutes listening to everything,

22   including what you don't intend to use, or are you going to

23   give them everything and discretely flag what you intend to

24   use?  Because obviously you see the point of that.

25         MR. TACOPINA:  I mean honestly, look, I have complete

1    confidence -- if it's after the direct, I will give it to the

2    lawyers, both the complete and the portion we intend to use,

3    just so they have it, as long as it is not discussed with --

4    and I will take their representation.

5            THE COURT:  Of course.

6            Does that work?

7            MR. FERRARA:  So after direct, understanding at the

8    point which we can no longer speak with Ms. Carroll about the

9    substance of her testimony, we would receive the entirety of --

10   so let's say there is Defense Exhibit 1 for impeachment, we

11   would receive the entirety of Defense Exhibit 1 recording plus

12   an indication of what portion they think they will have to use

13   to refresh or impeach Ms. Carroll.

14           THE COURT:  That's what I understand.

15           MR. FERRARA:  I think that will work.

16           MR. TACOPINA:  I will do that, of course, with the

17   understanding that they are --

18           THE COURT:  Now -- go ahead.  I didn't mean to

19   interrupt.

20           MR. TACOPINA:  I said, yes, I propose that.  I think

21   that's the easiest.  And again, I will accept their

22   representation that they won't share the portion of the videos

23   with the witness.

24           THE COURT:  Of course.  We have good lawyers here.  I

25   have confidence in all of them.

1          Okay.  We have spent about an hour on this.  I think

2     it was useful to do it.  I appreciate that defense counsel were

3     trying to do something that they thought would be efficient,

4     and I understand why that thought dawned, and I am appreciative

5     of that.  And I think everybody ultimately has gotten to a

6     place that makes sense, and good, that's what I want to see

7     from responsible counsel, and I see it.

8          MR. TACOPINA:  Thank you, your Honor.

9          THE COURT:  Okay.  It's been a long day.  Have a very

10    good evening, everybody.

11         COUNSEL:  Thank you, your Honor.

12         (Adjourned to Wednesday, April 26, 2023, at 10:00

13    a.m.)

14

15

16

17

18

19

20

21

22

23

24

25