N4RMCAR2

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                    Plaintiff,              New York, N.Y.
 4
              v.                            22 Civ.10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                    Defendant.
 7   ------------------------------x        Jury Trial

 8                                          April 27, 2023
                                            10:50 a.m.
 9
     Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                             and a Jury

13
                              APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21
22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24
     W. PERRY BRANDT
25        Attorney for Defendant
```

1           (Pages 278-307 SEALED)

2           THE COURT:  Good morning, everyone.  Let's bring in

3     the jury.

4           MR. FERRARA:  Your Honor, as the jury comes in, your

5     Honor may remember that defense was kind enough to offer giving

6     us their -- some of their impeachment evidence at the break

7     after the direct.  We would ask your Honor if there is possible

8     to have a slightly longer break at that time so --

9     understanding.

10          THE COURT:  Because we are making such great time.

11    OK.  I take the point.

12          (Jury present)

13          THE COURT:  Good morning, ladies and gentlemen, I know

14    it's no consolation.  I'm sorry we are getting a late start

15    with you.  The lawyers and I have been working on matters

16    related to this case that needed to be addressed before we

17    resumed this morning for the last hour or so, and it just was

18    something that had to be done then.  Sorry for the delay.

19          Ms. Carroll, you are still under oath.

20          Mr. Ferrara you may continue.

21          MR. FERRARA:  Thank you, your Honor.

22    E. JEAN CARROLL, resumed.

23    DIRECT EXAMINATION (cont'd)

24    BY MR. FERRARA:

25    Q.  Good morning, Ms. Carroll.

1    A.  Good morning.

2    Q.  We were talking yesterday about the book you wrote.

3           Do you recall that?

4    A.  Yes.

5    Q.  I am referring to the book in which you discussed Mr. Trump

6    assaulting you.

7           Do you recall that?

8    A.  Yes.

9    Q.  In that book, did you also discuss Les Moonves assaulting

10   you?

11   A.  Yes.

12   Q.  Who is Les Moonves?

13   A.  Les Moonves was the president and CEO of CBS.

14   Q.  What did Mr. Moonves do to you?

15   A.  After an interview with Mr. Moonves, I entered an elevator.

16   He followed me and pushed me up against the wall.

17   Q.  Who, if at all, did you tell about that after it happened?

18   A.  No one.

19   Q.  Was the book the first time you spoke publicly about that?

20   A.  Yes.

21   Q.  How did Mr. Moonves react?

22   A.  Very quietly.  He denied it within a group of other denials

23   that other women had made.

24   Q.  Against Mr. Moonves?

25   A.  Yes.

N4RMCAR2                          Carroll - Direct

1    Q.   Have you sued Mr. Moonves for defamation?

2    A.   No.

3    Q.   Why not?

4    A.   He didn't -- he did not defame me.  He did not call me a

5    liar.

6    Q.   How is Donald Trump different?

7    A.   Donald Trump called me a liar, said I was pulling a scam,

8    said I was a con, I was running a con, that I was a democratic

9    operative, that I had accused other men of rape, that I was in

10   it for the money, that I was in it for the attention.  And Les

11   Moonves stayed quiet.

12   Q.   Let's go back -- I was asking you about some work you've

13   done since *Elle* fired you.

14   A.   Yes.

15   Q.   We are talking about some articles that you had written for

16   the Atlantic.

17            Do you recall that line of questioning?

18   A.   Yes.

19   Q.   Let me ask you, was one of the articles about someone named

20   Natasha Stoynoff?

21   A.   Yes.

22   Q.   Who is Ms. Stoynoff?

23   A.   Ms. Stoynoff is a respected journalist.  She was a reporter

24   for *People* magazine.  And her beat was Donald Trump.

25   Q.   Why did you decide to write an article about Ms. Stoynoff?

N4RMCAR2                           Carroll - Direct

1   A.  Ms. Stoynoff had accused Donald Trump.

2   Q.  Was that interview published?

3   A.  Yes.

4   Q.  Was your interview with -- during your interview, did you

5   discuss Ms. Stoynoff's allegations against Mr. Trump?

6   A.  Yes.

7   Q.  Was that interview an attempt by you to influence her story

8   in any way?

9   A.  Oh, no.  You can't influence Natasha Stoynoff.

10  Q.  How, if at all, did that interview change your recollection

11  of what happened to you?

12  A.  Oh, not at all.

13  Q.  Have you given interviews since your book was published?

14  A.  Yes.

15  Q.  Do you recall some of the interviews you have given?

16  A.  Yes.  The Washington Post, New York Times.  The Daily

17  Beast, CNN, Lawrence O'Donnell, the Anna Sale podcast.

18  Q.  I noticed you coughing.  I know the water on your left is

19  fresh.  I don't know about the water on the right.  Stick with

20  the left.  Perfect.

21          How about Anderson Cooper?

22  A.  Yes.  I did an interview with Anderson Cooper.

23          MR. FERRARA:  May I approach the witness, your Honor?

24          THE COURT:  Yes.

25  Q.  I want to show you what has been marked as Plaintiff's

N4RMCAR2                    Carroll - Direct

1   Exhibit 108.

2            Do you recognize that?

3   A.  Yes.

4   Q.  What is that?

5   A.  This is a DVD that I viewed on April 23, 2023, and it's

6   written Anderson on it.

7   Q.  I am going to come take that back.

8            If you look at the screen in front of you, is this a

9   still from the video?

10  A.  Yes.

11  Q.  Does the video fairly and accurately depict your -- part of

12  your interview with Mr. Cooper?

13  A.  Yes.

14  Q.  Do you recall when the interview took place?

15  A.  Yes, I do.  The story came out on a Friday and this

16  interview was on Monday.

17  Q.  You're saying shortly after your story came out?

18  A.  Yes.

19           MR. FERRARA:  Your Honor, plaintiff offers 108.

20           MR. TACOPINA:  No objection, your Honor.

21           THE COURT:  Received.

22           (Plaintiff's Exhibit 108 received in evidence)

23           MR. FERRARA:  If we could also pull up 108-T just for

24  the witness.

25  Q.  Do you recognize this, Ms. Carroll?

1    A.   Yes.

2    Q.   What is this?

3    A.   This is a transcript of the interview with Anderson Cooper.

4    Q.   Were you able to follow along with this transcript as you

5    watched the video?

6    A.   Yes.

7    Q.   Does it fairly and accurately --

8    A.   It was perfectly accurate.

9    Q.   Transcript of what you recall seeing?

10   A.   Yes.

11           MR. FERRARA:  Plaintiff offers 108-T, your Honor.

12           THE COURT:  Received.

13           (Plaintiff's Exhibit 108-T received in evidence)

14           THE COURT:  Members of the jury, I remind you about

15   what I said concerning transcripts versus recordings of sound

16   and video.  It applies here too.

17           MR. FERRARA:  We can take this down for a moment.  We

18   will come back.

19   Q.   Ms. Carroll, to be clear, is the exhibit I showed you, 108,

20   is that the entire interview or just part of it?

21   A.   That was just a slice.

22   Q.   Before we look at it, let me ask you, do you recall

23   describing rape as sexy when you spoke to Mr. Cooper?

24   A.   No.

25           MR. FERRARA:  If we could play Plaintiff's 108,

 1    please, Mr. Lam.

 2              (Video played)

 3              MR. FERRARA:  We can pause it there.  Thank you so

 4    much, Mr. Lam.

 5    Q.  Ms. Carroll, what did you mean when you said most people

 6    think of rape as sexy?

 7    A.  I meant that rape is used in our culture in entertainment.

 8    For instance, in the Game of Thrones there are nine violent

 9    rapes, and they were used as plot developments to draw in the

10    audience and to attract a larger audience.  I'm talking about

11    even old movies, like *The Fountainhead* with Gary Cooper and

12    Patricia Neal portrayed rape on the screen.  It is everywhere

13    used to attract an audience and they are using it, I think,

14    because it has sexual connotations.

15    Q.  Do you believe rape is sexy?

16    A.  No.  I think rape is one of the most violent and horrible

17    things that can happen to a woman or a man.

18    Q.  Do you believe that what Donald Trump did to you is sexy?

19    A.  No, no.

20    Q.  I want to turn now to the topic of the lawsuit, the

21    lawsuits that you filed.

22    A.  Yes.

23    Q.  Let's go back to November 2019.

24    A.  Yes.

25    Q.  Do you recall suing Donald Trump around that time?

N4RMCAR2                         Carroll - Direct

1   A.  Yes.

2   Q.  What did you sue him for?

3   A.  Defamation.

4   Q.  Why?

5   A.  Because he called me a liar, because he said I had accused

6   other men of rape.  He said I was an operative or in a

7   conspiracy with the democratic party.  He said I was trying to

8   sell a book, so I made up this story.  And he said I was too

9   ugly to rape.  So I sued him.

10  Q.  Did anyone tell you to sue him?

11  A.  No.

12  Q.  When did you get the idea of bringing a lawsuit?

13  A.  It was constant -- when I was doing interviews with

14  journalists, many journalists concluded their interviews by

15  asking me, are you going to sue him?  And I would say I'm

16  thinking about it, but probably not.

17  Q.  Was there any conversation that crystallized the idea for

18  you?

19  A.  Yes.

20  Q.  What was that?

21  A.  I had a conversation with George Conway.

22  Q.  Who is George Conway?

23  A.  George Conway is a republican lawyer.

24  Q.  If you know, do you know Mr. Conway's views on Donald

25  Trump?

N4RMCAR2                     Carroll - Direct

1    A.   George Conway does not like Donald Trump.

2    Q.   When did you meet George Conway?

3    A.   I met him at a party.

4    Q.   Whose party?

5    A.   Molly Jong-fast.

6    Q.   Who Ms. Jong-Fast?

7    A.   She is the well-known respected journalist and podcaster,

8    the daughter of Erica Jong.

9    Q.   Do you recall when the party was?

10   A.   I think it was in July.

11   Q.   Of what year?

12   A.   2019.

13   Q.   Were you struggling financially when you filed the lawsuit

14   in November 2019?

15   A.   No.

16   Q.   Were you -- where were you working then?

17   A.   I was at *Elle* magazine.

18   Q.   Were you hoping to make a large payout from that case?

19   A.   It's not about the money.  It's about getting my name back.

20   Q.   Have you tweeted about the case since you filed?

21   A.   Yes.

22   Q.   I apologize.  For the court reporter's sake, let me finish

23   the question.

24        Have you tweeted about the case since you filed it?

25   A.   Yes.

N4RMCAR2                          Carroll - Direct

1    Q.  Why?

2    A.  I'm a journalist.  From time to time, I report on the case.

3    It's something that I find interesting.  I think a few other

4    people might also.

5    Q.  For my next question, if you could remind the jurors, you

6    currently write for Substack?

7    A.  Yes.

8    Q.  Remind us quickly, what is Substack?  What do you write for

9    Substack?

10   A.  Substack is a way for writers, journalists to reach their

11   readers through newsletters.

12   Q.  Have you encouraged people to subscribe to your Substack in

13   order to get updates from you about this case?

14   A.  Yes.

15   Q.  Why have you done that?

16   A.  I thought people would be interested, and I certainly have

17   received the response that they are very, very interested in

18   this case.

19   Q.  How, if at all, does it help you financially to have

20   additional subscribers to your Substack?

21   A.  It would definitely help financially.

22   Q.  How did you feel when you first filed the case in 2019?

23   A.  Scared, but proud.

24   Q.  Fair to say this is -- would this be the fourth year that a

25   lawsuit has been going on?

N4RMCAR2                          Carroll - Direct

1   A.  Yes.

2   Q.  From the time you filed it to now, have there been

3   important moments along the way?

4   A.  Yes.

5   Q.  How, if at all, have you celebrated some of those moments?

6   A.  I wouldn't call celebrating, but I would call it enjoying a

7   good moment.

8   Q.  How have you enjoyed those good moments?

9   A.  Meet with my friends.  We might have a toast.  And feel

10  that we were happy to be together.

11  Q.  Have some of those been what we think of as parties?

12  A.  Yes.

13  Q.  What sorts of folks would be at some of these parties?  Can

14  you give us a sense?

15  A.  Yes.  Journalists, podcasters, commentators.

16  Q.  How about folks we would think of as celebrities?

17  A.  Yes.

18  Q.  Have you enjoyed the attention you have received from this

19  case?

20  A.  I like attention.  There is no question, I like attention.

21  I don't particularly like attention because I'm suing Donald

22  Trump.  That is not -- getting attention for being raped is

23  not -- it's hard.  Getting attention for making a great

24  three-bean salad, that would be good.

25  Q.  Do you ever regret bringing this lawsuit?

1   A.  About five times a day.

2   Q.  Why?

3   A.  It is -- it doesn't feel pleasant to be under threat.

4   Q.  How do you mean?

5   A.  Well, this morning, for instance, I thought I would just

6   take a peek at my Twitter.  I pretty much stayed away from it.

7   I thought today I would take a look.  There it was again, the

8   onslaught of the liar, slut, ugly, old.  It went on, just

9   rolling, rolling.  It's not a great way to begin the day.  But

10  I couldn't be more proud to be here.

11  Q.  Has anyone reached out to you, Ms. Carroll, about

12  potentially filming a documentary about you?

13  A.  Yes.

14  Q.  About how many people have reached out?

15  A.  Between eight and nine.

16  Q.  How have you responded to those?

17  A.  I ignored their emails.

18  Q.  All of them?

19  A.  No.  One I kept ignoring, and then a friend from *Elle* said,

20  you had better answer Ivy Meeropol emails.

21  Q.  Is Ivy Meeropol a documentarian?

22  A.  Ivy Meeropol is a well-known and greatly respected maker of

23  documentary films.

24  Q.  Are you currently filming a documentary?

25  A.  No.

N4RMCAR2                          Carroll - Direct

1    Q.  Why did you agree in the first place?

2    A.  I was a big admirer of Ivy's work.

3    Q.  Why did you stop filming?

4    A.  Because this lawsuit became very important, and Ivy and I

5    decided together, we should cease.

6    Q.  Have you received any payments for that documentary?

7    A.  No.

8    Q.  I want to call your attention -- I think this is sort of

9    the last topic.  I want to call your attention to October of

10   2022.

11   A.  Yes.

12   Q.  Do you recall, what, if any, additional relevant statements

13   did Donald Trump make at that time?

14   A.  Just when I had managed to get my Substack up and running,

15   get my career a little bit back and feeling that things were

16   going to be OK, Donald Trump posted on social media every

17   single thing that I was suing him for.  He repeated it on

18   October 12 and then added the fact that he thought the justice

19   system in America was broken, and one of the prime examples of

20   the justice system being broken was my suing him.

21   Q.  Let me show you what has been marked for identification as

22   Plaintiff's Exhibit 4.

23        Do you recognize this?

24   A.  Yes.

25   Q.  What is it?

N4RMCAR2                        Carroll - Direct

1   A.  This is Donald Trump's Truth Social piece.

2   Q.  Are you able to see the date?

3   A.  October 12, 2022.

4           MR. FERRARA:  Your Honor, plaintiff offers 4.

5           THE COURT:  Received.

6           (Plaintiff's Exhibit 4 received in evidence)

7           MR. FERRARA:  If we could show that to the jury, Mr.

8   Lam.

9           THE COURT:  Yes.

10          MR. FERRARA:  Thank you.

11          Mr. Lam, maybe we could scroll up and focus right

12  underneath where it says statement by Donald J. Trump.  That

13  probably works.

14  Q.  Is this the statement, Ms. Carroll, where Mr. Trump called

15  your case a con job?

16  A.  Yes.

17  Q.  Where he called the justice system a broken disgrace?

18  A.  Yes.

19  Q.  Just focusing on the middle, again, he says, this woman is

20  not my type?

21  A.  Yes.

22          MR. FERRARA:  I am just giving the jurors another

23  moment to read it, your Honor.  Of course, the jurors will have

24  this as a marked exhibit.

25          Mr. Lam, I will ask that you take this down and we can

1   keep moving.

2   Q.  Are you on Truth Social, Ms. Carroll?

3   A.  Yes.

4   Q.  How did you find out about this statement?

5   A.  I heard from several people that he had posted it.

6   Q.  How, if at all, do you believe this statement affected your

7   reputation?

8   A.  I really thought I was gaining back a bit of ground.  I

9   thought, it's starting to go and I felt, you know, happy that,

10  you know, I was back on my feet, had garnered some readers, and

11  feeling pretty good, and then, boom, he knocks me back down

12  again.

13  Q.  Were you surprised by the statement?

14  A.  Stunned.

15  Q.  Why?

16  A.  Because I'm suing him for saying these very things.

17  Q.  In light of Mr. Trump's October 22 statement, did you file

18  a second lawsuit?

19  A.  Yes.

20  Q.  Is that second lawsuit why we are here today?

21  A.  Yes.  This is why we are here.

22  Q.  What did you sue him for in the second lawsuit?

23  A.  I sued him for defamation of character.

24  Q.  Anything else?

25  A.  Yes.  I also sued him for assault.

1    Q.  Why didn't you sue him for assault in the first lawsuit?

2    A.  Because the time period allowed was -- it had passed, and I

3    could not do it.

4    Q.  What happened that allowed you to do it -- to sue him for

5    assault in the second lawsuit?

6    A.  The state assembly and the state senate passed what they

7    called the Adult Survivors Act, and it gave survivors of sexual

8    assault, sexual abuse, sexual harassment a one-year window to

9    come forward and bring suit against the people.

10   Q.  Had you advocated for passage of that law?

11   A.  Yes.

12   Q.  Why.

13   A.  Because I understand why women, particularly, and some men

14   do not come forward and tell what happened.  It takes sometimes

15   years to get the courage to face the person who hurt you, if at

16   all.  It takes years.  And some maturity and some age.  It

17   takes -- there are many people, reasons why people don't report

18   it, and this act gives us a chance to be heard.

19   Q.  What, if any, I'll call it sort of public response did you

20   experience after Mr. Trump made his October 2022 statement?

21   A.  It was not very nice.

22   Q.  What do you recall?

23   A.  Just a wave of slime.  It was very seedy comments, very

24   denigrating.  Almost an endless stream of people repeating what

25   Donald Trump says, I was a liar and I was in it for the money,

1   can't wait for the payoff, working for the democrats, over and

2   over.  But the main thing was way too ugly.  It is very hard to

3   get up in the morning and face the fact that you're receiving

4   these messages you are just too ugly to go on living,

5   practically.

6   Q.  Let me show you what has been marked for identification as

7   Plaintiff's Exhibit 45.

8           Do you recognize this, Ms. Carroll?

9   A.  Yeah.  I think it was -- it appeared -- yeah.

10  Q.  What is it?

11  A.  It's a tweet.

12  Q.  What is the date?

13  A.  October 13.

14  Q.  Of what year?

15  A.  2022.

16  Q.  Is your name mentioned?

17  A.  I guess that is me.

18          MR. FERRARA:  Your Honor, plaintiff offers 45.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 45 received in evidence)

21          MR. FERRARA:  Mr. Lam, we can publish this for the

22  jurors.  Thank you.

23          If we just focus on the tweet in the upper left, the

24  sort of main tweet.

25  Q.  Ms. Carroll, this was the day after Mr. Trump's statement?

1   A.  Yes.

2   Q.  Does it appear to be a response to Trump, I had nothing to

3   do with E. Jean Carroll?

4   A.  Yes.

5           MR. FERRARA:  I am not going to read this.

6           We can take that down.  Thank you, Mr. Lam.

7           Just for the witness, if you wouldn't mind, sir, if we

8   could show Ms. Carroll what's been marked for identification as

9   Plaintiff's Exhibit 46.

10  Q.  Do you recognize this?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's a tweet.

14  Q.  What's the date?

15  A.  October 20, 2022.

16  Q.  Are you mentioned?

17  A.  Yes.

18          MR. FERRARA:  Plaintiff offers 46, your Honor.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 46 received in evidence)

21          MR. FERRARA:  If we could show that, Mr. Lam.

22  Q.  Is this an example of a tweet in which you are called a

23  liar?

24  A.  Yes.

25          MR. FERRARA:  Let's take this down.

N4RMCAR2                         Carroll - Direct

1          Let's show Ms. Carroll only what's been marked for

2     identification as Plaintiff's 48.

3     Q.  Do you recognize this?

4     A.  Yes.

5     Q.  What is it?

6     A.  It's a tweet.

7     Q.  What's the date?

8     A.  It's down at the bottom.  Let's see.  October 19, 2022.

9     Q.  Does it mention you?

10    A.  Yes.

11             MR. FERRARA:  Plaintiff offers Exhibit 48, your Honor.

12             THE COURT:  Received.

13             (Plaintiff's Exhibit 48 received in evidence)

14             MR. FERRARA:  If we could scroll down a little

15    further, Mr. Lam.  Up.  I just want to see what's on the

16    bottom.  There we go.  Thank you.

17    A.  Yeah.

18             MR. FERRARA:  Could we take a look at Plaintiff's 57,

19    just for the witness.

20             May I just have one moment, your Honor?

21             THE COURT:  Sure.

22             MR. FERRARA:  Let's take this one down for now, if you

23    wouldn't mind, Mr. Lam.  We will come back to that.

24             Let's look instead at what's been marked for

25    identification as Plaintiff's Exhibit 51.

1    Q.  Do you recognize this, Ms. Carroll?

2    A.  Yes.

3    Q.  What is it?

4    A.  It's a tweet.

5    Q.  What is the date?

6    A.  January 15, 2023.

7    Q.  Does it refer to you?

8    A.  Yes.

9           MR. FERRARA:  Plaintiff offers 51, your Honor.

10          THE COURT:  Received.

11          (Plaintiff's Exhibit 51 received in evidence)

12          MR. FERRARA:  May we show this, Mr. Lam.  Thank you.

13          We can take this down, Mr. Lam.  Thank you.

14   Q.  The last exhibit I will show you for now, Ms. Carroll, is

15   what's been marked for identification as Plaintiff Exhibit 53.

16          Do you recognize this?

17   A.  Yes.

18   Q.  What's the date?

19   A.  November 3, 2022.

20   Q.  Does it refer to you?

21   A.  Yes.

22          MR. FERRARA:  Plaintiff offers 53, your Honor.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 53 received in evidence)

25          MR. FERRARA:  If we could show the jury, Mr. Lam.

N4RMCAR2                        Carroll - Direct

1    Maybe we could start at the top.

2    Q.  Is the top tweet from you, Ms. Carroll?

3    A.  Yes.

4          MR. FERRARA:  If we could scroll down to the reply,

5    Mr. Lam.  Scroll a little further.  Thank you.

6    Q.  Ms. Carroll, this says:  If this chick got laid by

7    Mr. Trump, it was likely the last time she was.

8          Do you see that?

9    A.  Yes.

10   Q.  In fact, have you been physical with someone since -- have

11   you had sex since Mr. Trump assaulted you?

12   A.  No.

13   Q.  Do you know any of the people who sent you any of these

14   messages?

15   A.  No.

16   Q.  The exhibits that we have looked at, is that all of the

17   tweet or are these examples?

18   A.  No, no.  These are examples.

19   Q.  How, if at all, were these similar to Tweets or messages

20   you received after Mr. Trump made his initial statements in

21   2019?

22   A.  Can you repeat that?

23   Q.  Sure.  Sorry.

24          These statements all came after the October 2022

25   denial by Mr. Trump?

N4RMCAR2                        Carroll - Direct

1   A.  Yes.

2   Q.  How, if at all, do they compare to tweets or messages you

3   received after Mr. Trump made his first remarks in June of

4   2019?

5   A.  They were equally, equally disparaging and hurtful, but

6   these particularly hurt because I thought I had made it through

7   and here they are again.

8   Q.  Sitting here today, have you stopped -- to this day have

9   you stopped -- to this day are you still receiving messages

10  like this?

11  A.  I looked at my Twitter this morning.  They haven't stopped.

12          MR. FERRARA:  May I just have one moment, your Honor?

13          THE COURT:  Yes.

14          MR. FERRARA:  Nothing further.

15          THE COURT:  Thank you.

16          Is this the point where you and Mr. Tacopina need some

17  time?

18          MR. TACOPINA:  Yes, your Honor.

19          MR. FERRARA:  That would be ideal.

20          THE COURT:  What do you say, 15 minutes, 20 minutes?

21          MR. FERRARA:  That would work.

22          THE COURT:  Fifteen minutes.

23          11:30, folks.

24          (Jury not present)

25          (Recess)

N4r2Car3                        Carroll - Cross

1              (Jury not present)

2              THE COURT:  Okay.  Let's get the jury.

3              (Jury present)

4              THE COURT:  Please be seated, everyone.

5              Members of the jury, are you guys warm enough?

6              JUROR:  Could be warmer.

7              THE COURT:  Andy, let's put out a call for a little

8     more heat, please.

9              All right.  We are now to cross-examination.

10    Mr. Tacopina.

11             MR. TACOPINA:  Thank you, your Honor.

12    CROSS-EXAMINATION

13    BY MR. TACOPINA:

14    Q.  Good afternoon -- good morning, Ms. Carroll.

15             Good morning, Ms. Carroll.

16    A.  Good morning.

17    Q.  There you go.

18             You and I have never spoken before, is that right?

19    A.  Correct.

20    Q.  Now, I'm going to show you something which has been

21    previously marked as Defense Exhibit AA.  Just take a look at

22    that and see if you recognize it, please.

23    A.  Yes.

24    Q.  Okay.  And that's the cover of your book, the *What Do We*

25    *Need Men For?  A Modest Proposal*, correct?

1   A.  Yes.

2           MR. TACOPINA:  And, your Honor, this is a compilation

3   of some excerpts from that book.  We have turned it over to

4   counsel.  I'm going to offer this, subject to any redactions

5   that counsel needs, into evidence at this time.

6           MR. FERRARA:  With that caveat, no objection, your

7   Honor.

8           THE COURT:  All right.  On that basis, received.

9           (Defendant's Exhibit AA received in evidence)

10  BY MR. TACOPINA:

11  Q.  Ms. Carroll, using your own words, the facts you allege in

12  your story you have told here to this jury are odd, correct?

13  A.  Can you repeat that again?

14  Q.  Sure.  Using your own words, the facts you allege in the

15  story you have told here are odd, O-D-D?

16  A.  Ah, yes.  Odd.

17  Q.  In fact, you could agree that your story is inconceivable,

18  correct?

19  A.  Certain parts of this story are difficult to conceive of,

20  yes.

21  Q.  And we will talk about your story and your accusations in a

22  while, but before we get there, you were writing the Ask

23  E. Jean column in *Elle* magazine for 25 years, correct?

24  A.  26 years.

25  Q.  26.

N4r2Car3                         Carroll - Cross

1            And it's fair to say that gave you status in New York,

2    at least you believe that you gave you status in New York,

3    correct?

4    A.  Yes, it did.

5    Q.  And you were fired from *Elle* magazine on December 11, 2019,

6    right?

7    A.  Yes.

8    Q.  And after you lost your job at *Elle* magazine, you felt

9    small and diminished, right?

10   A.  Yes.

11   Q.  And at that point in 2019, you experienced a different way

12   of life, right?

13   A.  Yes.  It was the first time that I had lost something very

14   important to me.

15   Q.  And that's because, in your own words, you then felt like

16   just another person, right?

17   A.  I have never felt like another person, like just another,

18   never like that.

19   Q.  You never felt like that after you lost your job?

20   A.  I felt many things, perhaps for a moment I felt like -- I

21   don't think I feel like just another person.  I don't think

22   there is such a thing as just another person.

23   Q.  Well, you testified yesterday about your interview session

24   with Dr. Lebowitz, your expert witness in this case, right?

25   A.  Yes.

N4r2Car3                         Carroll – Cross

```
1   Q.  Okay.  Do you remember telling her that after you lost your
2   job you felt like just another person?
3   A.  Yes, yeah, you are right.
4   Q.  And you would agree that status is important to you?
5   A.  Yes.
6   Q.  Especially in New York, right, status is everything in
7   New York I think, right, you said?
8   A.  Status is important, yes.
9   Q.  And you testified yesterday about your political
10  alignments.  You have been a member of the democratic party
11  since the days of Bill Clinton, correct?
12  A.  Yes.
13  Q.  And when you found out that Donald Trump had announced he
14  was running for president in 2016, you were almost in
15  disbelief.
16  A.  Not almost in disbelief.  I was in disbelief.
17  Q.  And by your own account you had heartache?
18  A.  Yes.
19  Q.  And by your own account you felt really bad.
20  A.  I felt really bad, yes.
21  Q.  And to be clear, the reason you felt really bad was because
22  you didn't think Donald Trump would be a good presidential
23  candidate.
24  A.  That's right.
25  Q.  And in fact you wrote a book entitled *What Do We Need Men*
```

N4r2Car3                        Carroll - Cross

1    *For*, the one that's up on the screen --

2            MR. TACOPINA:  Your Honor, is it on the screen for

3    everyone in this courtroom?  Could the Court inquire?

4            THE COURT:  Yes.

5            MR. TACOPINA:  The jury as well?  Okay.

6    BY MR. TACOPINA:

7    Q.  Now, that is your book in which you included the story

8    about your supposedly being raped by Donald Trump in a Bergdorf

9    Goodman changing room, right?

10   A.  Not supposedly.  I was raped --

11   Q.  Right.

12   A.  -- by Donald Trump.

13   Q.  That's your version, correct?

14   A.  In Bergdorf.

15   Q.  That's your version, right, Ms. Carroll, that you were

16   raped?

17   A.  Those are the facts.

18   Q.  Okay.  And that's what you included in this book, right?

19   A.  Yes.

20   Q.  And you said yesterday you didn't say anything about the

21   rape when he was running, Mr. Trump, that is, was running for

22   president because you were troubled by the fact he was running

23   for president, but you didn't say anything about it publicly

24   because your mother was dying.  That's what you said yesterday,

25   right?

N4r2Car3                    Carroll - Cross

1    A.  It was one of the reasons.

2    Q.  One of the reasons.  What was any of the other reasons?

3    A.  I was never going to talk about what Donald Trump did,

4    never.

5    Q.  Never, okay.

6           So yesterday when you testified that you didn't want

7    to come forward at this point, even though he was running for

8    president and you claimed he had raped you, you didn't want to

9    do that because one of the reasons you said was your mother was

10   dying, correct?

11   A.  She was on her death bed.  My sisters and brother and I had

12   joined her at the end of September to spend our last weeks

13   together.

14   Q.  And ultimately your mother unfortunately passed away in

15   October of 2016, right?

16   A.  Yes.

17   Q.  For the record.

18   A.  Yes.

19   Q.  I'm sorry.  Yeah.  Okay.

20           And that's a month before the election took place more

21   or less, correct?

22   A.  Yes.

23   Q.  So why didn't you come out with the story after your mother

24   passed away before he was elected?

25   A.  I was in deep, incredible, painful mourning.

N4r2Car3                        Carroll - Cross

1    Q.  How old was your mother when she passed?

2    A.  97.  She would have been 98.

3    Q.  This had nothing to do with the fact that the book wasn't

4    ready yet, did it, Ms. Carroll, the reason you didn't come out

5    at that point?

6    A.  I hadn't conceived of writing a book at that point.

7    Q.  Okay.  Now, you did e-mail an excerpt of your book which

8    you had written to Laurie Abraham on June 13, 2019, right?

9    A.  Repeat the question.

10   Q.  Sure.  You e-mailed an excerpt from your book which you had

11   written to Laurie Abraham on June 13, 2019.

12   A.  If you say I did.  Can you show me the e-mail?

13   Q.  Sure.

14   A.  I e-mail with Laurie Abraham quite a bit.

15   Q.  We can do that.

16   A.  She was my editor.

17   Q.  Okay.  I will show you the e-mail.  We are going to show

18   the witness and counsel Defense Exhibit AD, for identification,

19   which, for you all at the front table, is the June 13, 2019

20   e-mail.  Just that does not get displayed to the jury.

21          THE COURT:  It does not get described as to what it is

22   either at this point.

23          MR. TACOPINA:  Yes, your Honor.

24   BY MR. TACOPINA:

25   Q.  Do you recognize that?

N4r2Car3                         Carroll - Cross

1   A.  Yes.

2   Q.  Okay.  So let me reask the question.  Having reviewed the

3   document on the screen, does it refresh your recollection that

4   you e-mailed an excerpt from the book which you had written to

5   Laurie Abraham on June 13, 2019?

6   A.  It was an excerpt that they had edited and I was fixing

7   various sentences and then mailed it back to them.

8   Q.  One of the things you said to Laurie Abraham was, Here's

9   the excerpt of the book, right?

10  A.  Yeah, the excerpt that they had chosen and edited.

11  Q.  Okay.  The question is, did you e-mail Laurie Abraham an

12  excerpt of your book on June 13, 2019?

13  A.  Yes.

14  Q.  And Laurie Abraham was a senior writer at *New York*

15  magazine, correct?

16  A.  She was -- yes.

17  Q.  You can take that down, by the way.

18          And when you sent Ms. Abraham your excerpt, Donald

19  Trump was in his second year of presidency at that point,

20  right?  June 2019.

21          THE COURT:  I think if you do the math, you got the

22  year wrong.

23          MR. TACOPINA:  I have the year wrong, your Honor?

24          THE COURT:  I don't mean the numerical year, I think

25  the interval.  He would have been inaugurated on January 20,

N4r2Car3                        Carroll - Cross

1    2017.

2              MR. TACOPINA:  Correct.

3              THE COURT:  And he would have finished his second year

4    on January 19, 2019, and June of 2019 would have been his third

5    year.

6              MR. TACOPINA:  You are right, your Honor.  Thank you.

7    BY MR. TACOPINA:

8    Q.  Between the second and third year of his presidency,

9    correct, when you sent that clip -- the excerpt to Ms. Abraham?

10   A.  Yes.

11   Q.  And in your excerpt you explained your motivation for

12   coming forward with your allegations against Mr. Trump.  You

13   wrote, "But now" -- you know what?  Hold on.  Let me do it like

14   this.  I'm going to put up what has been premarked as

15   Defense AF for identification.  I have shared it with

16   co-counsel.  Okay.

17             Your Honor, I am offering, subject to an agreement

18   with counsel, Defense AF into evidence, subject to their review

19   and redactions again.

20             MR. FERRARA:  May I just have one moment to consult

21   with Mr. Tacopina?

22             THE COURT:  Yes.

23             (Counsel confer)

24             MR. FERRARA:  Subject to the caveat regarding

25   redactions.

1          THE COURT:  Subject to the?

2          MR. FERRARA:  Subject to the caveat regarding

3    redactions, no objection.

4          THE COURT:  Received on that basis.

5          (Defendant's Exhibit AF received in evidence)

6          MR. TACOPINA:  Your Honor, we are offering a very

7    limited portion of that that I will ask be displayed to the

8    jury.  If we could just display page 27 only.

9    BY MR. TACOPINA:

10   Q.  What you wrote in your excerpt to Ms. Abraham was that

11   after -- "but now, after two years of watching the man in

12   action, I've become persuaded that he wants to kill me."

13   Right?

14   A.  What is this from?

15   Q.  From your book excerpt that you sent to Ms. Abraham.

16   A.  That's a draft.  I see, but it was never printed.

17   Q.  I understand it's a draft that you sent to Ms. Abraham,

18   correct?

19   A.  I'm not sure.  I haven't seen that.  I haven't -- is this

20   on page 27?

21   Q.  It is.  If you would like, we could provide you with a

22   copy.

23   A.  Could I see the full page 27?  Oh, okay.  Thank you.  Yeah,

24   that's a draft.  We didn't -- I decided to take that out before

25   the excerpt was printed.

N4r2Car3                          Carroll - Cross

1   Q.  Okay.  But for the purpose of our conversation here today,

2   I'm going to ask you about the draft that you ultimately

3   decided to take out.  What you wrote in the draft initially was

4   that, "But now, after two years of watching the man in action,

5   I've become persuaded that he wants to kill me.  He's poisoning

6   my water.  He's polluting my air.  He's cooking my planet.

7   And, as he stacks the courts, my rights over my body are being

8   taken away state by state──I'm afraid that my right to free

9   speech will go next.  So now I will tell you what happened."

10          That's what you wrote in your initial draft, correct?

11  A.  Yes.

12  Q.  That part never made it to the book, did it?

13  A.  No.

14  Q.  And when you are referring to all of this here regarding

15  Donald Trump, that is sort of his political positions on these

16  various topics, correct?

17  A.  Right.

18  Q.  Yesterday you told a story you didn't know what his

19  political positions were at all, right?

20  A.  I'm not 100 percent certain about his political positions.

21  I know generally.

22  Q.  Okay.  You can take that down.  Thank you.

23          You are aware that your friend Carol Martin also had

24  strong feelings against Donald Trump, as you testified to

25  yesterday, correct?

N4r2Car3                      Carroll - Cross

1    A.  Yes.

2    Q.  In fact, on September 23, 2017, she sent you an e-mail

3    mocking him.

4            MR. TACOPINA:  That's an e-mail that's already in

5    evidence through the plaintiff's case.  I don't know if you

6    want us to put it up or you could put it up, but it's

7    Plaintiff's 122.

8            I think they could do it, guys.  You want to do it,

9    Mike?

10           THE COURT:  Let's just have, to the extent we can

11   manage this, one set of exhibits, instead of having two copies

12   of every exhibit.

13           MR. FERRARA:  I think that's what Mr. Tacopina was

14   trying to do, so we are going to show -- we will show the one

15   we put.

16           MR. TACOPINA:  Thank you.

17           THE COURT:  Great.  Thank you.

18   BY MR. TACOPINA:

19   Q.  This is in evidence.  It can be displayed, please.  So this

20   is that e-mail that you were asked about yesterday, correct?

21   A.  Yes.

22   Q.  Okay.  And specifically she wrote you saying, "I don't know

23   much about Namibia, but I know it ain't called Namibia as Orange

24   Crush called it at the UN this week," right?

25   A.  Um-hmm.

N4r2Car3                         Carroll - Cross

1   Q.  And Orange Crush, she was referring to Donald Trump there,

2   right?

3   A.  Yes.

4   Q.  In fact, the subject of the e-mail is "Trump named Sarah

5   Palin Ambassador to Nambia," right?

6   A.  Um-hmm.

7   Q.  In that e-mail, Carol Martin also told you or wrote to you

8   "this has to stop."

9   A.  Um-hmm.

10  Q.  Do you see that?

11  A.  Yeah.

12  Q.  And she said, "As soon as we are both well enough to

13  scheme, we must do our patriotic duty again."

14  A.  Um-hmm.

15  Q.  Right?

16          Now, you responded to that e-mail within a few hours

17  later that afternoon, correct?

18  A.  Um-hmm.

19          THE COURT:  You have to use words, Ms. Carroll.

20          THE WITNESS:  Yes, yes.  Thank you.

21  BY MR. TACOPINA:

22  Q.  And in response to that e-mail, you replied to Carol

23  Martin's e-mail completely and emphatically agreeing with her

24  that Donald Trump had to be stopped and you must do your

25  patriotic duty by any means of scheming, right?

N4r2Car3                         Carroll - Cross

1    A.  Those are not my words.

2    Q.  No.  Your words are all caps "totally" with three

3    exclamation points.

4    A.  Yes.

5    Q.  "I have something special for you when we meet."  Right?

6    A.  Yes.

7    Q.  Now, you were asked about that e-mail by Mr. Ferrara

8    yesterday, and you said you had no -- I quote, you had no idea

9    what she was referring to, right?

10   A.  No, I had -- not -- the only thing I can figure out is a

11   joke sent by Andy Borowitz of the *New Yorker*.  I had no -- I

12   had no recollection of what the something special I had for

13   Carol Martin could possibly be, no idea.

14   Q.  Do you have any recollection of what Carol Martin meant

15   when she said to you, "When we are both well enough to scheme,

16   we must do our patriotic duty here"?

17   A.  No.

18   Q.  No idea?

19   A.  None.

20   Q.  None.  And that's an e-mail only from, what, less than five

21   years ago?

22   A.  Yes.

23   Q.  Now, you recounted conversations with Carol Martin from 28

24   years ago, correct?

25   A.  Yes.

1    Q.   Okay.  But this you have no idea what this means, right?

2    A.   I told Carol Martin what Trump did to me in the dressing

3    room.  Those are facts that I could never forget.  This is an

4    e-mail, among probably hundreds of e-mails between Carol and I,

5    that I have no recollection of, but I suspect it's something

6    funny.  You know, that's not typical Carol Martin language

7    "patriotic duty," so I can't imagine what it is, maybe -- I

8    have no idea.

9    Q.   You remember you had tea with Carol Martin that night at

10   her house 28 years ago, right?

11   A.   Yes.

12   Q.   You remember that detail?

13   A.   Yes.

14   Q.   Had nothing to do with what happened at Bergdorf Goodman,

15   right?

16   A.   I remember the tea and I remember her dog Cisco or Doc

17   being there, right.

18   Q.   And you are a writer, obviously much more versed in the

19   English language than I am.  The word "scheme" means what to

20   you?

21   A.   It is a typical word that Carol and I use, carrying no

22   connotations of evil.  It's just a word we use.

23   Q.   You and Carol Martin use the word "scheme" often?

24   A.   Not often, but it's -- she has very colorful language and

25   so do I.

N4r2Car3                    Carroll – Cross

1   Q.  You produced e-mails in this case, right?

2   A.  Pardon?

3   Q.  You produced e-mails in this case, correct?  For this

4   litigation, you produced your e-mails that were --

5   A.  Yes, I believe we produced many e-mails.

6   Q.  Yes.  Is there any other e-mail that you have ever seen

7   where you and Carol Martin used the word "scheme"?

8   A.  I did not review what was sent in discovery.

9   Q.  We will get to that in a second, but you have no idea what

10  that something special after you said "totally" you were

11  referring to, right, no idea?

12  A.  I had no idea.  Carol and I -- it's one of our traditions

13  to exchange gifts, weird, funny gifts.  She gave me a sun hat.

14  She gave me a clock.  I give her books.  You know, it's just

15  something that we do.

16  Q.  Is that what you are referring to here, a gift?  Now you

17  recall that?

18  A.  I don't recall anything --

19  Q.  Okay.

20  A.  -- about this e-mail.

21  Q.  Okay.

22          Now, to be clear, Carol Martin is the same person you

23  have produced as a witness to support your claim in this case,

24  one of the two people you supposedly told about this purported

25  incident with Donald Trump shortly after it occurred, correct?

N4r2Car3                          Carroll – Cross

A.  Yes.

Q.  Okay.  And Lisa Birnbach is the other person that you

brought forth as your second witness to support that, correct?

A.  Yes.

Q.  Okay.  In connection with the discovery in this case, the

obligations, you turned over your e-mails to counsel, correct?

A.  Yes.

Q.  And you turned over all your e-mails in possession from

2017, correct, in your possession?

          MR. FERRARA:  I'm going, to object to the extent

whether it's within her knowledge, your Honor.

          MR. TACOPINA:  Well, your Honor, there is a basis

that -- I don't want to run afoul of the Court's rules, but

there is a good-faith basis to ask this line of questioning.

It is only a few more.

          THE COURT:  Sidebar.

          MR. TACOPINA:  Yes, sir.

          (Continued on next page)

N4r2Car3                         Carroll - Cross

1          (At the sidebar)

2          MR. FERRARA:  Your Honor, my objection is based on the

3    idea that this is getting into work product.  We were the ones

4    at the end of the day responsible for the production, not

5    Ms. Carroll.  Also, what was produced and was not produced has

6    been litigated.  There have been -- you know, the parties have

7    traded letters and all of the appropriate litigation about

8    this, things were objected to, things were not objected to.  So

9    to hold Ms. Carroll accountable at this point for things that

10   were or were not produced is too late and inappropriate.

11         MR. TACOPINA:  Your Honor, this has nothing to do with

12   any disputes over the appropriateness or what was produced or

13   not, but what was happening here is, in 2017, she gave over her

14   e-mails to counsel, all of them, and there are a vast number of

15   e-mails from 2017.  The one that was not produced was this

16   e-mail, and it comes from her same e-mail address that she sent

17   all the other ones over from.

18         THE COURT:  What one that was not produced?

19         MR. TACOPINA:  The exhibit that's in evidence.  I'm

20   discussing right now the September 23 e-mail, your Honor,

21   PX 122.

22         THE COURT:  I take it this is not a lady who sat

23   around and had a filing cabinet full of 2000 e-mails on paper,

24   right.

25         MR. FERRARA:  That's not how we pulled her e-mail.

1            THE COURT:  How did you do her e-mail.

2            MS. CROWLEY:  We had access to her e-mail.  We ran

3    searches.  We reviewed the e-mails, and we produced responsive

4    e-mails.

5            THE COURT:  Is that disputed?

6            MR. TACOPINA:  Oh, I know they produced responsive

7    e-mails, but the one thing that was not in there——I don't fault

8    them at all——is that one.

9            THE COURT:  Where did it come from?

10           MR. TACOPINA:  From Ms. Martin.

11           THE COURT:  So?

12           MR. TACOPINA:  Yes, we have it, your Honor, but it

13   wasn't produced by her.

14           THE COURT:  Yeah, look.

15           MR. TACOPINA:  It seems it was intentionally left out

16   is what my point was.

17           THE COURT:  You are, and I understand why, but you are

18   attempting to assign responsibility, at least by implication

19   and maybe more directly, to Ms. Carroll personally for the fact

20   that it was not turned over, and what I am given to understand

21   is that she had nothing to do with turning over the e-mails;

22   that she gave counsel access to her electronic account.

23   Counsel --

24           MR. TACOPINA:  Is that right?

25           THE COURT:  Counsel did a search, and who knows why,

N4r2Car3                          Carroll - Cross

1    but whatever it is, it doesn't sound to me like it's her fault.

2              MR. TACOPINA:  That's accurate.  You are right.  That

3    was what happened.  She produced the e-mails to you, and then

4    you turned them over --

5              MS. CROWLEY:  Yeah.

6              MR. TACOPINA:  -- or she gave you the access to the

7    account --

8              MR. CRAIG:  We did a full collection of her inbox, ran

9    a search protocol.  Obviously it was years and years of data.

10   She didn't hand over individual e-mails to us.

11             THE COURT:  I'm sorry.  You did a full what?

12             MR. CRAIG:  We collected her entire e-mail inbox.  We

13   undertook a review.  Ms. Carroll did not hand over specific

14   e-mails to us at a request.

15             MR. TACOPINA:  Your Honor, I'm moving on.  I will pass

16   on that.

17             THE COURT:  Okay.

18             (Continued on next page)

19

20

21

22

23

24

25

N4r2Car3                    Carroll - Cross

1              (In open court)

2              MR. TACOPINA:  Okay, your Honor.

3              THE COURT:  The objection to the last question is

4    sustained.  Go ahead, Mr. Tacopina.

5              MR. TACOPINA:  Thank you.

6    BY MR. TACOPINA:

7    Q.  The book entitled *What Do We Need Men For*, in which you

8    include your rape allegation by Mr. Trump at Bergdorf Goodman,

9    you started writing that book two years after the September 23

10   e-mail we discussed with you and Carol Martin in which you

11   discussed doing your patriotic duty and stopping Donald Trump

12   and scheming two weeks after that e-mail, correct?

13   A.  No.

14   Q.  No?  When did you start writing that book?

15   A.  I went on a trip across the country to towns named after

16   women starting on October 6.

17   Q.  Right.  That's two weeks after that e-mail?

18   A.  I did not start the book.

19   Q.  Well, the first edition -- when you went on this road trip,

20   as you say -- and you mentioned this in the prologue of your

21   book, correct, Ms. Carroll?

22   A.  Into what?

23   Q.  The road trip that you set out for on October 6, it's in

24   the prologue of your book, right?

25   A.  Yes.

N4r2Car3                     Carroll - Cross

Q.  You said you set out on this road trip for purposes of

gathering information for your book, correct?

A.  Yes.

Q.  Okay.  And the first edition of your book was published in

July of 2019.

A.  Yes.

Q.  And even before it was published, you discussed the book

with Carol Martin.

A.  Yes.

Q.  In fact, on June 23, 2019, you text Lisa Birnbach that you

gave her and Carol Martin the chapter about Donald Trump even

before the book was published, correct?

A.  I wanted to make sure that they had no additions,

corrections, and that they gave me permission to print it.  I

would not have printed it if they had not both given me

permission.

Q.  Okay.  Ms. Carroll, my question was this, though.  On June

23, 2019, you text Lisa Birnbach that you gave her and Carol

Martin the chapter about Donald Trump even before the book was

published, yes, right?

A.  Yes.

Q.  And you say you wanted their input before you published it?

A.  Yeah, I did.

Q.  And as you wrote in that text, and I will put it up for you

for your ability to review it, AJ, just for the witness,

N4r2Car3                          Carroll - Cross

1    please, and counsel.

2              By the way, is that the message that you sent to Lisa

3    Birnbach on June 23, 2019?

4    A.  Yes.

5              MR. TACOPINA:  Your Honor, I would offer Defense AJ

6    into evidence.

7              MR. FERRARA:  Without objection.

8              THE COURT:  Received.

9              (Defendant's Exhibit AJ received in evidence)

10             MR. TACOPINA:  Please publish that to everyone.

11   BY MR. TACOPINA:

12   Q.  So what you wrote to or texted to, I should say, Lisa

13   Birnbach was that "I told Megan" -- and, by the way, Megan is

14   *The New York Times* report he recall Megan Twohey, right?

15   A.  Yes.

16   Q.  "I told Megan that I gave you and Carol the chapter at our

17   Carmine's dinner."

18   A.  Yes.

19   Q.  "That neither of you read it.  That I turned over the

20   entire book to you when I got sick, and we agreed you would

21   publish it when I croaked, and you never read it.  I copped to

22   the fact that I sent you proof of the excerpt before it was

23   published with instructions not to forward it, copy it, etc.

24   Are you eating birthday cake?"

25             So you just testified a minute ago that you had sent a

N4r2Car3                        Carroll - Cross

1    copy to Lisa Birnbach and Carol Martin for them to read it and

2    give you back input, correct?

3    A.   Yes.

4    Q.   Here, what you are saying is you told Megan, *The New York*

5    *Times* reporter, something completely untrue, right?

6    A.   No, I told Megan the absolute facts.

7    Q.   Well, what you told Megan, according to you, is that you

8    told Megan that "neither of you"——being Lisa Birnbach and Carol

9    Martin"——read it.   That's your text messages right there,

10   right?

11   A.   Because they never replied.   I gave Carol Martin and Lisa

12   Birnbach hard copies of the chapter.

13   Q.   Um-hmm.

14   A.   I said, If you have any changes, let me know.   I never

15   heard from either one of them.   I assumed——we know what the

16   first three letters of that is——that neither had read it.

17   Q.   Or you could assume that neither had any changes, right?

18   A.   I could also assume that, correct.

19   Q.   But why would you need to tell Lisa Birnbach that you

20   didn't read the book?

21   A.   I --

22   Q.   When you say --

23   A.   -- guess I'm wondering if Carol -- if Lisa had read it.   To

24   this day, I don't know if Carol or Lisa had actually read that

25   chapter.

1   Q.  To this day?

2   A.  To this day.

3   Q.  They are two of your best friends, right?

4   A.  Yeah.

5   Q.  And they will be testifying in this courtroom about the

6   subject matter of that chapter.

7   A.  You will have to ask Carol and Lisa if they read the

8   chapter.  I do not know.

9   Q.  Okay.  But what you did tell Lisa is that you told *The New*

10  *York Times* reporter that neither of you read it.  Right?

11  A.  That's what I was assuming.

12  Q.  And again, you repeat it at the bottom, "and you never read

13  it," right, twice in that one text message?

14  A.  Well, that is -- I was in the hospital, and -- very ill.  I

15  made out a will.  It was very serious.  I appointed Lisa

16  Birnbach as my literary executor, and part of being a literary

17  executor would -- included -- she knew I was working on a book,

18  and she agreed, with tears rolling down both of our faces, that

19  she would publish it if I died.

20  Q.  Okay.  My question was about the highlighted portions where

21  you repeat in one text message "and you never read it"?

22  A.  I'm telling you the story about being in the hospital

23  because Lisa didn't read it because she didn't remember my

24  passwords to get in to the book.

25  Q.  So you know definitively now that Lisa did not read it,

1    correct?

2    A.  She didn't read the draft that I was working on.  She

3    couldn't have.

4    Q.  Okay.  So when you assumed she didn't read it before, you

5    have a recollection now that she did not read it, correct?

6    A.  I never knew.  You are going to have to ask Carol and Lisa

7    whether they read that -- the chapter that I gave them at

8    Carmine's.

9    Q.  I will, but I'm asking you if you know that they read it or

10   not?

11   A.  I don't know.  I have no idea.

12   Q.  Okay.  And then you say, "I copped to the fact that I sent

13   you the proof of the excerpt before it was published with

14   instructions not to forward it, copy it, etc.," right?

15   A.  This is another few pages.  This is the actual edit of the

16   excerpt I sent to Carol and Lisa few days before it was to be

17   published in *New York* magazine.

18   Q.  Right.  And when you say you copped to that fact, what does

19   that mean?

20   A.  That means I told Megan that I had sent Carol and Lisa a

21   finished proof of the excerpt before it was published.

22   Q.  Okay.  You can take that down by the way.  Thank you.

23           Now, even though you discussed your unpublished

24   chapter about Donald Trump with Carol and Lisa, you supposedly

25   spoke to them shortly after the alleged rape and they couldn't

1  give you a specific date of the alleged incident, either,

2  right?

3  A.  No.

4  Q.  They couldn't.

5  A.  No.

6  Q.  You couldn't.

7  A.  No.

8  Q.  No one.

9  A.  I wish to heaven we could give you a date.  I wish we could

10  give you a date.

11  Q.  In fact, they couldn't even tell you the year, whether it

12  was 1995 or 1996?

13  A.  Oh, no, no.  Lisa believes that because she published a

14  sort of a bombshell *New York* magazine piece about Mar-a-Lago

15  being opened as a club and Donald Trump had personally invited

16  Lisa to come down to do the story of the opening of the club,

17  *New York* magazine published it February -- in February.  I'm

18  not quite sure of the date.  Lisa believes she never would have

19  accepted that assignment if it had happened before she went

20  down to Florida.  So that places it definitely in 1996.

21  Q.  Okay.  And certainly you or them couldn't tell you whether

22  it was the fall or the spring.  You have testified to that?

23  A.  No, Lisa believes that it was in the spring of '96 because

24  of the *New York* magazine articles.  She swears up and down that

25  she would never go if she had heard about what Trump did to me

N4r2Car3                    Carroll - Cross

1    in Bergdorf's.

2    Q.  We will get a chance to talk to Lisa little bit later but

3    I'm asking you now, Ms. Carroll.

4          That's -- regarding this alleged time frame that you

5    provide over the course of the fall of 1995 or the spring of

6    1996, you don't know obviously, fair to say, the exact date of

7    this incident?

8    A.  I wish I did.

9    Q.  I know.

10         You never identified a day of the week of this

11   incident, correct?

12   A.  Correct.

13   Q.  Except at trial yesterday you, for the first time -- and I

14   think your lawyer asked you in your book and your deposition

15   you had mentioned you could never recall the day.  For the

16   first time yesterday at trial you said it has always been in

17   the back of your mind that it was a Thursday, but you never

18   said it because you weren't sure, right?

19   A.  Right.

20   Q.  Right.

21         Well, you were never sure of the year either, right,

22   Ms. Carroll?

23   A.  Right.

24   Q.  But you gave two years there, right?

25   A.  Right, and I -- yeah.

N4r2Car3                        Carroll - Cross

1   Q.  You weren't sure the season, but you took a guess at that,

2   as well, correct?

3   A.  Yes.

4   Q.  But the day of the week, Thursday, that you were pretty

5   sure of, you never said it before yesterday, correct?

6   A.  I said it out loud.  All along I've been thinking it

7   probably was a Thursday.

8   Q.  All along, but you never verbalize that anywhere in your

9   book or in --

10  A.  No.

11  Q.  -- all the interviews you have done, right?

12  A.  I try to stick to the facts in the book.  That was a

13  probability and I didn't print it.

14  Q.  And when you were deposed, how about when you were deposed?

15  You didn't mention Thursday either, right?

16  A.  No.  I didn't mention a lot of things when I was deposed.

17  Q.  Well, you were talking about the date of when this happened

18  or the time frame, and you guessed on years and seasons, but

19  not the date, correct?

20  A.  Yeah.

21  Q.  Okay.

22          By the way, you consistently testified that you

23  thought it was either the fall of 1995 or spring of '96, right?

24  A.  Consistently.

25  Q.  Except yesterday you did say the fall of '94 and the spring

1   of '95, right?

2   A.  I tried to correct it.  I said -- I caught myself.  I

3   caught myself.  I realized I said it and I said, excuse me, I

4   meant in '95-'96.

5   Q.  And in fact that's your best guess, right, the fall of '95

6   or winter of '96?

7   A.  No, my best guess is the spring of '96, but I am also

8   saying it possibly could have been in the fall of '95.

9   Q.  Well, you are saying your best guess is the spring of '96

10  now because of what your friend Lisa -- Carol Martin told you?

11  A.  No, what Lisa told me about the *New York* magazine.

12  Q.  Lisa, I'm sorry, Lisa, you are right.  You are saying your

13  best guess is now '96 because of what Lisa told you about the

14  *New York* magazine piece, right?

15  A.  Yes, yes.

16  Q.  Because your independent recollection, aside from what

17  someone else told you, was that you were not sure, either '95

18  or '96, right?

19  A.  Right.

20  Q.  Okay.  And until publishing your book in 2019, which

21  included your rape story about Donald Trump, you hadn't

22  publicly disclosed this purported attack for 23 or 24 years,

23  right?

24  A.  Right.  I was never going to talk about it.

25  Q.  And in fact, in your book, you state that men are becoming

N4r2Car3                    Carroll - Cross

1    a nuisance.  That's sort of the premise of your book, right?

2    A.  It's -- my premise is the women who write to me at Ask

3    E. Jean are finding men to be a nuisance.

4    Q.  Okay.  At one point I think in your book you propose we

5    should dispose of all men?

6    A.  Into Montana.

7    Q.  Into Montana?

8    A.  Yeah, and retrain them.

9    Q.  So retrain.  So all the men here in this courtroom, in this

10   country, all get shuffled off to Montana and get retrained.

11   A.  You understand that that was said as a satire.

12   Q.  Ah.  Okay.

13           THE COURT:  It comes from Jonathan Swift's *A Modest*

14   *Proposal* 700 years ago, right?

15           THE WITNESS:  Yes.

16           THE COURT:  Let's move on.

17           MR. TACOPINA:  Thank you, your Honor.

18   BY MR. TACOPINA:

19   Q.  So the book premise talks about the purpose of -- the

20   premise that in order to support your position you drove to

21   these towns that you said were named after women and you asked

22   people in each town what do we need men for, right?

23   A.  Yes, I had --

24   Q.  Okay.  As part of that road trip, you would only eat in

25   cafés named after women?

N4r2Car3                          Carroll - Cross

1    A.  Yes.

2    Q.  Listen to music only sung by women?

3    A.  Yes.

4    Q.  Drink wines named for women only?

5    A.  Yes.

6    Q.  Only read books written by women?

7    A.  Yes.

8    Q.  And only wear clothes designed by women?

9    A.  Yes.

10   Q.  Okay.  And during this road trip that you took, you were

11   keeping a list called the most hideous men of my life, right?

12   A.  Yes.

13   Q.  Was that satire or was that serious?

14   A.  That was dead serious.

15   Q.  That was dead serious.  Okay.  All right.  So the most

16   hideous men of your life list was dead serious, right?

17   A.  Yes.

18   Q.  And the list ultimately identified 21 men you considered to

19   be hideous.

20   A.  Again, the list had lighter moments, for instance, two guys

21   who drove by me in a truck and yelled something physically

22   impossible for me to perform with my dog, those two guys made

23   the list.

24   Q.  Now, but you just said that list was dead serious.  It was

25   not dead serious, then?

N4r2Car3                    Carroll - Cross

1   A.  The list can be dead serious with lighter moments.

2   Q.  Okay, but somehow that -- those men made it on to your dead

3   serious list of 21 men, correct?

4   A.  They made it on.

5   Q.  The mechanic who put --

6   A.  Yes.

7   Q.  -- your wheel on the wrong way --

8   A.  Yes.  He made the list.

9   Q.  -- he was one of the 21 most --

10  A.  Yes, because he later cost me $2,000 to have that fixed.

11  Q.  I guess some man who wouldn't let you park in an empty

12  parking lot, he was one of the most hideous men in your life

13  also?

14  A.  That's right.

15  Q.  Okay.  All right.  Now, it's your contention that you

16  didn't decide to include Donald Trump on that list until you

17  were already four or five weeks into writing the book, right?

18  A.  Yes.

19  Q.  In fact, you claimed that it wasn't until four or five

20  weeks into writing the book about the hideous men and why women

21  don't need men that you decide to first write about the alleged

22  incident at Bergdorf Goodman with Donald Trump, right?

23  A.  Yes.

24  Q.  And this is a book you desperately want and/or need to

25  sell, correct?  After you had begun drafting it, you wanted it

1  to do well, correct?

2  A.  Yes, I would like to sell the book I'm writing, yes.

3  Q.  And you thought that adding to your book the story about

4  being sexually assaulted by Donald Trump inside of a dressing

5  room in a department store would be a major element of your

6  book, right?

7  A.  I thought people would be interested.  It turned out I was

8  wrong.

9  Q.  And again, after you compiled your hideous men list and

10 four or five weeks into writing the book, Donald Trump then

11 became part of your book, right?

12 A.  He became part of the book and he -- his chapter was moved

13 around in the book.  He was not permanently fixed in the book

14 until the very end.

15 Q.  You obviously thought and you were told, I think you

16 testified, by your publisher that you thought including the

17 story about Donald Trump in your book while he was still

18 president would help sell the book obviously?

19 A.  I thought so.  I was wrong.

20 Q.  But you thought so, correct?

21 A.  Well, of course.

22 Q.  Okay.

23      And you said in fact you knew people would be

24 interested in the book when it mentioned Donald Trump, right?

25 A.  Yes, and again I was wrong.

N4r2Car3                          Carroll – Cross

1    Q.  Okay.  And a book proposal, just so we understand a book

2    proposal, argues why your book is marketable and will sell

3    copies, right?

4    A.  Yes.

5    Q.  And your Donald Trump Bergdorf Goodman story was the focal

6    point of your proposal, correct?

7    A.  It was a highlight definitely.

8    Q.  And writing the book is not the same as getting a publisher

9    or getting monetary advance or selling copies, right?

10   A.  Repeat the question, please.

11   Q.  Well, let me withdraw the question and ask the question

12   actually in English.  How about that?

13          When you set out to write a book, some of the things

14   that you could do is you get a publisher, right?

15   A.  Yes.

16   Q.  Okay.  You get a monetary advance in some --

17   A.  Yes.

18   Q.  -- instances.

19   A.  Sometimes.

20   Q.  Right?

21          And then hopefully you sell copies.

22   A.  Yes.

23   Q.  Okay.  And obviously you discussed with your publisher that

24   your Donald Trump story was critical to all of that, right?

25   A.  I don't think it was critical.  It was certainly a part of

1    the book.

2    Q.  As you were writing chapters for your book and getting

3    ready for your book proposal, you had to send an e-mail to your

4    agent, right?

5    A.  Yes.

6    Q.  And in fact you sent a written book proposal by e-mail to

7    Sarah is it Lazin?

8    A.  Lazin.

9    Q.  On March 7, 2018, right?

10   A.  I don't -- I'm not sure of the date.

11   Q.  Let me show you something that may or may not be able to

12   refresh your recollection, identification only, AN, please.

13         Just read that to yourself, Ms. Carroll.  When you are

14   done, let me know.

15   A.  Um-hmm, yes.

16   Q.  Do you recall sending an e-mail to Sarah Lazin on March 7,

17   2018, about your proposal?

18   A.  Now that I see this, yes.

19   Q.  And what you said to -- and she, again, is your literary

20   agent?

21   A.  Yes.

22   Q.  And you said that you will have to figure out a way for

23   this proposal not to get into the wrong hands as it could set

24   off its own little firestorm, right?

25   A.  I didn't say firestorm.

N4r2Car3                        Carroll - Cross

Q.  Little storm.  I'm sorry, right, little storm.

          And what you meant by that, obviously, was that the
disclosure of your proposal could set out a little storm
because it included the story about Bergdorf Goodman and Donald
Trump, right?

A.  Yes.

Q.  And you wrote that your book -- you wrote that your book
was a written -- written by an advice columnist, growing tired
of being impartial, finally lets loose and recalls the
grabbing, shoving, pestering, pinching, harassing, and mauling
by men in her own life, including being sexually assaulted by
president Trump in Bergdorf Goodman, correct?

A.  This is another exhibit?  What is this?

Q.  This, actually, is another exhibit.  You are right.  I was
asking you a question, but what's on the screen—hopefully just
for the witness, correct?—is another exhibit, but I was asking
you that question.  I don't know if you needed your
recollection refreshed.

          THE COURT:  Is there a pending question?

          MR. TACOPINA:  There is.

Q.  Did you write in your -- that your book in your proposal
was written by an advice columnist who, growing tired of being
impartial, finally lets loose, recalls the grabbing, shoving,
pestering, pinching, harassing, and mauling by men in her own
life, included being sexually assaulted by president Trump in

N4r2Car3                    Carroll - Cross

1   Bergdorf's?

2   A.   I certainly wrote that.  I'm not sure if it made it into

3   the final draft.  This is an early draft, I suspect.

4   Q.   Okay.  And in that proposal, you didn't mention any other

5   men other than Donald Trump who was the president of the

6   country at the time, correct?

7   A.   I -- I don't recall.

8   Q.   Okay.  Now, for two decades -- you can take that down,

9   thanks.

10          For two decades, Ms. Carroll, you never called the

11   police and never revealed this story in your hundreds of

12   columns, correct?

13          MR. FERRARA:  I just object to the compound nature.

14   It is two questions.

15          THE COURT:  Sustained.

16          MR. TACOPINA:  Okay, okay.

17   BY MR. TACOPINA:

18   Q.   In two decades, you never called the police, correct?

19   A.   Correct.

20   Q.   Okay.  In two decades, you never revealed this story in

21   your hundreds of advice columns, correct?

22   A.   Correct.

23   Q.   Only when you were trying to get a publisher and sell your

24   book did this story come out, correct, for the first time?

25   A.   The story came out not because I was writing a book.

N4r2Car3                         Carroll - Cross

1   Q.  My question was timing.  Only when you were trying to get

2   your publisher, and it may just be coincidence, but only when

3   you were trying to get a publisher and get money to sell your

4   book did the story come out for the first time?

5   A.  The story came out because in October, the first day I

6   started on my road trip, *The New York Times* published their

7   bombshell about Harvey Weinstein, and when that happened,

8   across the country women began telling their stories, and I was

9   flummoxed at, wait a minute, can we actually speak up and not

10  be pummeled?  Woman after woman stood up.  I thought, well,

11  this may be a way to change the culture of sexual violence.  I

12  said -- the light dawned.  I thought we can actually change

13  things if we all, if we all tell our stories.  And I thought,

14  by God, all right, this may be the time.

15  Q.  This may be the time.  Okay.  So it was the Harvey

16  Weinstein and all the women that came forward against him that

17  caused you to sort of leap into action and expose your

18  decades-old allegation, right?

19  A.  It caused me to realize that staying silent does not work.

20  It doesn't work.  If women speak up, we have a chance of

21  limiting the harm that happens.

22  Q.  And the women in the Harvey Weinstein ordeals all went to

23  the police, correct?

24  A.  No.

25  Q.  They didn't go to the police?

N4r2Car3                        Carroll - Cross

1   A.  I have no -- I don't know the details.

2   Q.  Do you know where Harvey Weinstein lives right now?

3          MR. FERRARA:  Objection.

4          THE COURT:  Sustained.

5   Q.  Do you know if Harvey Weinstein is in jail?

6          THE COURT:  Sustained.

7   Q.  I'm going to go back to my question again, which really is

8   about timing.  I understand you gave us the reasons why you

9   came out with it when you came out with it.  My simple question

10  is when you were trying to sell your book and get money for

11  your book is when you first mentioned the story about Donald

12  Trump in Bergdorf Goodman at that same time, correct?

13  A.  Yes.

14  Q.  And you got a $70,000 advance to write your book, right?

15  A.  Yes.

16  Q.  You may have even have gotten a signing bonus, correct?

17  A.  Didn't, I don't think I did.

18  Q.  You don't think you did?

19  A.  I'm not sure.

20  Q.  Well, do you recall testifying previously that you may have

21  gotten a signing bonus?

22  A.  I -- I don't know.

23  Q.  You don't know?

24  A.  I don't know what a signing bonus is.

25  Q.  I'm sorry, Ms. Carroll.  Did you just say you don't know

N4r2Car3                        Carroll – Cross

1    what a signing bonus for a book advance is?

2    A.   Yeah, I have no idea.

3    Q.   I'm going to play a --

4    A.   I --

5    Q.   Hold on.

6           MR. TACOPINA:  I'm going to notify counsel, your

7    Honor, I plan on playing a portion of the deposition, a video

8    portion, very small, from the October 14, 2022 deposition from

9    a transcript that's page 158/lines 11-18.  Let me know when you

10   are ready.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Counsel, it would have been really helpful

2      if the binder I had been given had page numbers in it.

3           MR. TACOPINA:  I'm sorry.  I thought you had a copy of

4      the transcript in front of you.

5           THE COURT:  I was just directed to something else by

6      mistake.  Let me see what I have.

7           MR. TACOPINA:  OK, your Honor.

8           MR. FERRARA:  We have two extra copies, if your Honor

9      would like them.

10          MR. TACOPINA:  We gave the copies as well this

11     morning, your Honor.

12          MR. FERRARA:  Just for ease --

13          THE COURT:  Let's just see if I have it.

14          I do have it.  Is there any objection or not?

15          MR. FERRARA:  No, your Honor.

16          THE COURT:  Let me just say to the jury, depositions

17     are testimony taken in cases like this, all civil cases, pretty

18     much before trial.  They consist of questions by lawyers and

19     answers by the witness under oath.  They can be used in some

20     circumstances in trials.  Judges are not present when they are

21     taken, so the judge has to rule on any objections there may be

22     when the case comes to trial.

23          In this case, the deposition was taken on October 14

24     of last year, and the witness was under oath at the time.

25          Read the testimony, sir.

1          MR. TACOPINA:  Your Honor, for this one I am going to

2     play the video clip.

3          THE COURT:  OK.

4          MR. TACOPINA:  It is consistent with that line of

5     testimony.  Whenever you are ready, give me a look.  That means

6     everyone is going to see it.

7     Q.  Ms. Carroll, you just testified you don't know what a

8     signing bonus is.  Please look at your video deposition.

9          (Video played)

10    Q.  That was you, right?

11    A.  That was me.

12    Q.  So six months ago you knew was that a signing bonus was to

13    the point where you brought it up in an answer, right?

14         THE COURT:  Counselor.

15         MR. TACOPINA:  Yes, your Honor.

16         THE COURT:  Just a moment.

17         I withdraw the comment.

18         Go ahead and answer the question, please, Ms. Carroll.

19    A.  I like that I pictured myself as a baseball player with

20    getting a signing bonus.  I guess I did at that time, but I was

21    a little confused, I see, by this clip.  I am going:  I don't

22    know, did I, did I.  It's basically the same answer.  I don't

23    know that I got extra money.  It's the same answer.  I don't

24    know if I got extra money.

25    Q.  You say it's the same answer.  You testified about a minute

N4RMCAR4                          Carroll - Cross

1    ago here before this jury that you don't know what a signing

2    bonus was, correct?

3           MR. FERRARA:  Objection, your Honor.  Asked and

4    answered.

5           THE COURT:  Sustained.

6    Q.  You started talking about this Donald Trump Bergdorf

7    Goodman story as part of the campaign to sell your book, and

8    you talked to *New York* magazine as part of your prepublication

9    publicity, correct?

10   A.  Yes.

11   Q.  In fact, this Donald Trump story was the single most

12   important part of your prepublication -- publicity focus,

13   right?

14   A.  It grew into that.

15   Q.  Grew into that.

16          Before your book was available for purchase,

17   Ms. Carroll, you chose to release your allegations against

18   Donald Trump in an article appearing in The Cut, correct?

19   A.  Yes.

20   Q.  And The Cut is, I guess, an online version of *New York*

21   magazine?

22   A.  No.  The Cut is a section of New York magazine.  It's a

23   vertical, one of their verticals online also.

24   Q.  And that article was published in The Cut on June 21, 2019,

25   correct?

1    A.  Yes.

2    Q.  And you saw that yesterday.  I think that was put into

3    evidence, in part, by the plaintiff, by you, correct?

4    A.  Yes.

5    Q.  And that article was actually an edited version of your

6    book, right?

7    A.  Yes.  It contained several brief -- it was a combination of

8    chapters.

9    Q.  And you approved the edits for the cut piece, correct?

10   A.  Yes.

11   Q.  Let's now talk about your story involving Donald Trump and

12   Bergdorf Goodman.

13            THE COURT:  Given that you're changing gears, ladies

14   and gentlemen, lunchtime.  2:00, please.

15            (Jury not present)

16            (Luncheon recess)

17

18

19

20

21

22

23

24

25

N4RMCAR4                         Carroll - Cross

                              AFTERNOON SESSION

1                                  2:10 p.m.

2

3              (In open court)

4              THE COURT:  Good afternoon, everybody.

5              Please bring in the jury.

6              (Jury present)

7              THE COURT:  Ms. Carroll, you are still under oath.

8              Members of the jury, I hope you enjoined your

9    delicious repast.

10             Mr. Tacopina, you may proceed.

11             MR. TACOPINA:  Thank you, your Honor.

12   BY MR. TACOPINA:

13   Q.  Mr. Carroll, I left off with you by saying that I want to

14   discuss your story regarding Bergdorf Goodman and Donald Trump.

15             You met Donald Trump at that event briefly in 1987?

16   A.  Yes.

17   Q.  That was over 35 years ago, as we sit here today, correct?

18   It was a long time ago.

19   A.  Yeah, right.

20   Q.  When you met him at that event, you weren't alone at the

21   time, right?

22   A.  No.

23   Q.  That meeting happened --

24             THE COURT:  Just a second.  The question was:  You

25   weren't alone, right?  And you answered no, which raises the

N4RMCAR4                         Carroll - Cross

1    question of whether he is not right or whether you weren't

2    alone.

3    Q.  When you met him, Donald Trump, in 1987, you were not alone

4    at the time?

5    A.  That's correct.

6    Q.  That meeting happened within a group of people?

7    A.  There were four of us.

8    Q.  Right.

9         You, your husband, John Johnson; Donald Trump, and his

10   wife Ivana?

11   A.  Yes.

12   Q.  And you spoke for about five minutes, five or six minutes?

13   A.  Yes.

14   Q.  During that group conversation you spoke with Ivana?

15   A.  Yes.

16   Q.  And you actually had in your possession a photograph that

17   was snapped of that brief encounter, correct?

18   A.  Yes.

19   Q.  And you kept that photograph of you with Donald Trump for

20   two decades, right?

21   A.  It was in a scrapbook.

22   Q.  Whose scrapbook?

23   A.  My scrapbook.

24   Q.  I said, you kept that photograph of you with Donald Trump

25   for two decades?

```
 1   A.  Yes.

 2   Q.  And because that photograph was taken before iPhones and

 3   all these things, it was a physical photograph, like the

 4   traditional?

 5   A.  Yes.

 6   Q.  You made it a point when submitting your book proposal that

 7   we talked about to include within that book proposal the

 8   photograph that we just discussed, correct, of Donald Trump?

 9   A.  Yes.

10         MR. TACOPINA:  Could you put up PX-12, please.  It's

11   in evidence.

12   Q.  Just to be clear, this is the photograph we are talking

13   about, correct?

14   A.  Yes.

15   Q.  That's the encounter, right?

16   A.  Yes.

17   Q.  That, by the way, is your exhusband, John Johnson, who you

18   described strangled you three times, correct?

19   A.  Yes.

20   Q.  And that brief encounter happened either at one or two

21   parties, right?

22   A.  Yes.

23   Q.  I think it was maybe the NBC television party where you

24   worked or an ABC party where your exhusband, John Johnson,

25   worked?
```

N4RMCAR4                              Carroll - Cross

1    A.  Yes.

2    Q.  You don't remember for sure which one it was when you met

3    Donald Trump, right?

4    A.  No.

5    Q.  You also don't recall where the party was hosted?

6             THE COURT:  I'm sorry.  It's the same problem.

7             MR. TACOPINA:  I just realized that.  You're right,

8    your Honor, absolutely.

9    Q.  You also don't recall where the party was hosted?

10   A.  I can picture the room, but I don't remember where the room

11   was.

12   Q.  And you don't remember the subject matter that you

13   discussed?

14   A.  It was various subjects.  Quickly, it was a lilting, quick,

15   juicy, interesting conversation that I don't remember what the

16   topics were.

17   Q.  Do you remember that it was a juicy conversation, but you

18   don't remember what was juicy about it?

19   A.  That's right.

20   Q.  In fact, you don't even remember who else you spoke to at

21   the party.

22   A.  No.  I had memories of speaking to people, probably, at

23   this party, but I can't absolutely say for certain that it was

24   this party.

25   Q.  After that party where you had this quick conversation of

N4RMCAR4                          Carroll - Cross

1  five minutes between the four of you -- and it seemed like a

2  bunch of people right behind you as well.

3          Is that right, Mr. Carroll?

4  A.  I think they are shoving through to go around us.

5  Q.  In any event, after that, you never had any phone calls or

6  communications with Donald Trump, correct?

7  A.  Correct.

8  Q.  I mean up until the time you say you met him in Bergdorf.

9  And you never exchanged any letters or anything with him,

10 correct?

11 A.  No.  You are right.

12         MR. TACOPINA:  You can take that down.  Thank you.

13 Q.  In fact, after the party and before the alleged incident at

14 Bergdorf Goodman, the only other interaction you claim to have

15 had with Donald Trump was in either '94 or '95, right?

16 A.  Yes.

17         MR. FERRARA:  Objection.

18         THE COURT:  Sustained.  '94, '95.

19         MR. TACOPINA:  Judge -- let me do that again.

20 Q.  Before the alleged incident at Bergdorf Goodman, the only

21 other interaction you claim to have had with Donald Trump was

22 in 1994 or 1995, before?

23         THE COURT:  I'll allow the question.  The witness

24 should listen to it.

25 A.  I thought I corrected '94 or '95 yesterday.

N4RMCAR4                         Carroll - Cross

1    Q.  Ms. Carroll, I am not talking about the alleged incident at

2    Bergdorf Goodman.  You said that's '95, '96, right?  That's

3    where we're at.  Yes?

4    A.  OK.

5    Q.  I'm talking about a year before that, the other encounter

6    you had with Donald Trump.

7    A.  You mean the wave across the street?

8    Q.  Yeah, that's what I mean.

9    A.  I couldn't put it before '94 or '95.  I said sometime

10   between '87 and '95, '96.

11   Q.  '87.  OK.  Hold on one second.

12   A.  Possibly.  It had to be sometime within --

13   Q.  Give me one second.  I am just going to look at something,

14   Ms. Carroll.

15           MR. TACOPINA:  I am going to read -- direct everyone's

16   attention -- I will just read it, your Honor.  I am not going

17   to post it.  As soon everybody is ready.

18           Deposition, page 50 of Ms. Carroll from October 14,

19   2022, line 19 through line 9, for the purpose of this question:

20   Page 50, line 19 to page 51, line 9.

21           THE COURT:  Just give me a minute.

22           Go ahead.

23           MR. TACOPINA:  Counsel, are you ready?

24           MR. FERRARA:  Yes.  Thank you.

25   Q.  You testified under oath in a deposition, Ms. Carroll,

1  that:

2  "Q. Following the conversation, can you please tell me any

3  other time you met with Donald Trump?

4  "A. He said hello to me one time on the street, waved.

5  "Q. When was that?

6  "A. '94 or '95.

7  "Q. When was that?  Was that in New York?

8  "A. Yes.

9  "Q. Do you remember where in New York?

10  "A. Yeah.  He was standing on the side of Fifth Avenue where

11  the Trump building is, and I was across the street on Fifth

12  Avenue."

13          You gave that answer to that question under oath,

14  correct, Ms. Carroll?

15  A.  Yes.

16  Q.  And that was truthful?

17  A.  Yes.

18  Q.  My question was, other than the party and before Bergdorf

19  Goodman, the only other time you claim to have interacted with

20  Donald Trump was in 1994 or 1995, right?

21  A.  Yes.

22  Q.  And that was this incident we just described where he's on

23  one side of Fifth, you're on the other, right?

24  A.  Yes.

25  Q.  And you think he may have waved to you from across the

N4RMCAR4                     Carroll - Cross

1    street in traffic?

2    A.  Yes.

3    Q.  And it's your sworn testimony that Donald Trump waved at

4    you across traffic, even though he only met you briefly at a

5    party eight or nine years earlier and hadn't had any

6    interactions with you since, correct?

7              MR. FERRARA:  Objection.

8              THE COURT:  Sustained.  Argumentative.

9    Q.  Well, you testified that the party was 1987, so that's

10   eight or nine years earlier than '94 or '95, right?

11             THE COURT:  We can all do the math.

12   A.  Yes.

13             Let's move it along.  Everybody can subtract 84 from

14   93, or whatever it is.

15             MR. TACOPINA:  Thanks, your Honor.

16   Q.  Other than that, math that we can all do, you hadn't any

17   other interactions with him since, correct?

18   A.  Yes.

19   Q.  And you are not even sure really if he was waving at you,

20   right, Ms. Carroll?

21   A.  I turned around to see if anyone was standing behind me.  I

22   didn't see anyone.  So I waved back.

23   Q.  It seemed to you that he was waving at you, but, as you

24   have said previously, you can't say with certainty whether he

25   was waving at you or someone else, right?

N4RMCAR4                          Carroll – Cross

1   A.   That's right.

2   Q.   Let's talk about Bergdorf Goodman for a minute.

3        You would agree that Bergdorf Goodman is a store of

4   perfections?

5   A.   Yes.

6   Q.   In fact, the store's perfections are well known?

7   A.   Yes.

8   Q.   You would agree that the store is also posh?

9   A.   Yes.

10  Q.   Meaning it's upscale, right.  OK.

11       The store is also gracious?

12  A.   Particularly gracious, yes.

13  Q.   Meaning its employees are courteous and attentive.  In

14  fact, in this regard you would agree that the store is novel?

15  A.   Many stores aim to have -- to be gracious.

16  Q.   When I asked you about gracious, I'm saying, when you said

17  gracious, you mean that its employees are courteous and

18  attentive, correct?

19  A.   By gracious I mean they are warm and inviting and conducive

20  to shopping.

21  Q.   And its level of service and attention to customers is

22  strikingly unique and resembles nothing else.

23       You said that, right?

24  A.   Yes.

25  Q.   In fact, it is your belief that because Bergdorf Goodman is

N4RMCAR4                        Carroll - Cross

1     such an upscale store, it even refers to its customers as

2     clients, right?

3     A.   I don't think I said that, but I certainly agree with it.

4     Q.   Is it your testimony that you have not used clients in

5     regards to Bergdorf Goodman's customers?

6     A.   I am not sure if I did or not.  I don't know.

7     Q.   On the day you claim to have seen Donald Trump at Bergdorf

8     Goodman you were alone when you went into the store, right?

9     A.   Yes.

10    Q.   And you don't recall with any clarity of what you went

11    there to buy that day, correct?

12    A.   No.

13              THE COURT:  No, it's not correct or --

14              THE WITNESS:  No.  That's correct.  I don't remember

15    what I was shopping for.

16              MR. TACOPINA:  Sorry, your Honor.

17    Q.   When you were leaving Bergdorf Goodman that day you

18    supposedly saw Donald Trump coming in?

19    A.   Yes.

20    Q.   And at the time you were separated by a door?

21    A.   Yes.

22    Q.   In your book, which you published in 2019, you don't recall

23    whether it was a revolving door or just a regular hinge door,

24    correct?  Is that correct?

25    A.   Yes.

N4RMCAR4                    Carroll - Cross

1   Q.  Now, as you sit here today, are you definitive that it was

2   a revolving door?

3   A.  As I sit here today, I know it's a revolving door.

4   Q.  As you sit here today, you know it's a revolving door.  OK.

5           MR. TACOPINA:  Let's put up AA in evidence.  For

6   reference, it's the book, page 245, lines 5 through 8.

7   A.  When I wrote the book --

8           THE COURT:  There is no question yet, Ms. Carroll.

9           MR. TACOPINA:  Only for counsel and the witness.

10          THE COURT:  Is there a question.

11          MR. TACOPINA:  Yes.

12  Q.  You just testified that you are certain it is a revolving

13  door as you sit here today.

14          In your book, on page 245 --

15          MR. TACOPINA:  Counsel, can I proceed?

16          MR. FERRARA:  Yes.  Thank you.

17          MR. TACOPINA:  Please display to the jury as well.

18          AA in evidence, this is from page --

19          THE COURT:  Is AA in evidence?

20          MR. TACOPINA:  AA in evidence, your Honor, page 245,

21  lines 5 through 8.

22  Q.  You write in your book, in relevant portions:  I am going

23  out the revolving door and one of New York's most famous men is

24  coming in the revolving door, or it could have been a regular

25  door at the time.  I can't recall.

1   A.  When I wrote the book --

2            THE COURT:  There is no question yet, Ms. Carroll.

3   Q.  This is from your book back in 2019, right?

4   A.  Yes.

5   Q.  Correct.

6            And today, despite what you wrote in your book, today

7   it's your testimony that not that you can't recall, that you

8   are sure it was a revolving door.

9   A.  Yes.

10  Q.  What cleared up your memory on that?

11  A.  I went to Bergdorf's.

12  Q.  When?

13  A.  In 2019, perhaps when the book was accomplished.

14  Q.  So after you published the book where you say you can't

15  recall if it was a revolving or regular door, you went to

16  Bergdorf's to check it out?

17  A.  Yes, I did.

18  Q.  You would agree that 2019 is more than 20 plus years from

19  1995 or 1996, right?

20  A.  Yes.

21  Q.  And you are certain that Bergdorf would never have changed

22  their doors?

23  A.  No, I'm not certain.  I was never sure about the door when

24  I wrote the book.  Not sure about the door.  I could see him.

25  I couldn't remember whether it was a revolving door or

N4RMCAR4                    Carroll – Cross

1   push-in-and-out door.

2   Q.  You wrote the book in 2019?

3   A.  I wrote it in 2018.

4   Q.  Again, my question is, you became sure that it was a

5   revolving door in 2019?

6   A.  Yes.

7   Q.  Because you went there 20 something years after the alleged

8   incident?

9   A.  Yes, I did.

10  Q.  According to you, as you were coming out of the store, he,

11  from the outside, held his hand up?

12  A.  Yes.

13  Q.  And he did that, obviously, while he was still outside and

14  on the other side of the door?

15  A.  Yes.

16  Q.  And you stayed inside the store?

17  A.  Yes.

18  Q.  You didn't come out at any particular point; you waited for

19  him?

20  A.  No.  He went like this, so I stopped.

21  Q.  OK.

22          And at the time of this supposed interaction, your

23  story is that Donald Trump didn't have any security with him at

24  all?

25  A.  None that I could see.

N4RMCAR4                    Carroll - Cross

1   Q.  In fact, according to you, just like yourself, he was

2   alone?

3   A.  I believe he was.

4   Q.  As far as you know, you can't identify anybody by name who

5   saw this supposed interaction between you and Mr. Trump?

6   A.  No.

7          THE COURT:  I'm sorry to interrupt again.  Does that

8   mean, Ms. Carroll, that the statement that you can't identify

9   anybody or saw it is not correct or that it is correct?

10         THE WITNESS:  I could not identify anyone who was in

11  the store at the time or outside with Donald Trump at the time.

12         THE COURT:  Mr. Tacopina, I would hope you would

13  phrase your questions in a way that we don't have to keep doing

14  this.

15         MR. TACOPINA:  Sure, your Honor.

16         THE COURT:  Thanks.

17  Q.  According to you, at that moment upon seeing -- the moment

18  he saw you in Bergdorf Goodman he said to you, hey, you're that

19  advice lady?

20  A.  Yes.

21  Q.  And you responded by saying, hey, you're that real estate

22  tycoon?

23  A.  Yes.

24  Q.  And around this period of time, from 1995 to 1996, Donald

25  Trump was a well-known public figure?

N4RMCAR4                          Carroll - Cross

1   A.  Yes.

2   Q.  He was a man about town who could make television

3   appearances and was entertaining?

4   A.  Yes.

5   Q.  And you yourself called him one of New York's most famous

6   men?

7   A.  Oh, absolutely.

8   Q.  It's your story that the people in the store recognized him

9   at the time?

10  A.  Yes.  Two people in the store.

11  Q.  One was a customer who was sort of gaping at him, correct?

12  A.  Yes.

13  Q.  And, according to you, a sales attendant recognized Donald

14  Trump also?

15  A.  Yes.

16  Q.  It's your story that no sales attendant at Bergdorf tried

17  to help him?

18  A.  No.  That is -- no sales assistant tried to help him.

19  Q.  According to you, after Donald Trump saw you through a

20  door, stopped you, supposedly recognized you after speaking to

21  you for a few minutes eight or nine years earlier, he asked you

22  to help him buy a present?

23          MR. FERRARA:  Objection to the argumentative portion

24  of the question, your Honor.

25          THE COURT:  Sustained.  Rephrase.

N4RMCAR4                      Carroll - Cross

1    Q.  After Donald Trump saw you, he asked you to help him buy a

2    present?

3    A.  Yes.

4    Q.  And after Donald Trump called you old, according to you, he

5    got the idea of shopping for lingerie?

6    A.  It was several minutes after we met he said -- I questioned

7    him who the present was for.  He said a girl.  I offered him

8    the idea of a handbag.  I offered him the idea of a hat.  I

9    told him every woman would love a hat.  And he picked up a hat.

10   And it was a very pleasant, sort of jovial time discussing

11   presents.

12   Q.  He, in fact, asked you to help him buy the lingerie?

13   A.  Then he said the word.  He didn't say can you help me

14   buy -- he said:  I know.  Lingerie.

15            THE COURT:  Hold up a minute, Mr. Tacopina.

16            Go ahead.

17            MR. TACOPINA:  Thank you.

18   Q.  You have a specific memory of him using the word lingerie,

19   specifically that word?

20   A.  I had a memory of him saying lingerie.  And then, as I was

21   writing, I thought, he also could have said underwear or

22   another word for lingerie.  I believe that he said:  I know.

23   Lingerie.

24   Q.  It's your testimony that when you were writing you realized

25   maybe it wasn't lingerie but some other word that he said?

1   A.  It all meant the same thing.  It all meant ladies'

2   undergarments.  I'm pretty sure he said lingerie.  I put that

3   in the book.  I think I also put in the book he could have said

4   underwear.  But he definitely suggested ladies' undergarments.

5   Q.  According to you, you agreed to go with Donald Trump and

6   help him buy lingerie?

7   A.  Yes.  I was delighted.  I thought, the story was shaping up

8   to be quite hilarious.

9   Q.  At that point it's your story that you and Donald Trump

10  left the ground floor to go to the lingerie department?

11  A.  Yes.

12  Q.  You took the escalator up?

13  A.  Yes.

14  Q.  I believe it was the sixth floor, correct?  You believe it

15  was the sixth floor?

16  A.  Yes.

17  Q.  It seemed like you were on the escalators for a long time.

18  A.  He was a big talker, so the time went pretty quickly.

19  Q.  My question was, did it seem like you were on the

20  escalators for a long time?

21  A.  Yes.  But the time went quickly.

22  Q.  Even though you were on the escalators a long time, but the

23  time went quickly, going about six flights in a New York City

24  department store, it's your story you didn't see a single other

25  person in the entire store as you did?

1   A.  I was not looking for other people.  I was engaged in a

2   very interesting conversation with Donald Trump talking about

3   maybe at one time he was thinking of buying Bergdorf's.  He's a

4   very engaging conversationalist.  So I was not looking around.

5   I was probably paying more attention to the conversation.

6   Q.  Would it be accurate to say you didn't see another person

7   in that store as you were going up the escalator?

8   A.  I was not looking for other people.  I did not -- I did not

9   form an opinion either way whether there are other people.

10  Q.  You didn't.

11          I am going to read you from your sworn testimony.

12          MR. TACOPINA:  Before I do, I'll alert everyone where

13  we are going:  October 14, 2022, page 105, lines 5 through 10.

14          MR. FERRARA:  No objection.

15          THE COURT:  Go ahead.

16  Q.  When you say you didn't form an opinion one way or the

17  other i there were other people, you were asked this question

18  on October 20, '22 under oath --

19          THE COURT:  Mr. Tacopina, I put out an order about ten

20  days ago.

21          MR. TACOPINA:  I have it.

22          THE COURT:  Good.  Let's stick to it.

23          MR. TACOPINA:  OK.

24          THE COURT:  Just read the testimony.

25  Q.  "QUESTION:  At any point after you went on the escalator,

1   did you speak to any other staff members at Bergdorf?

2   "A. No.  We didn't see any other people.  We did not see

3   anybody going up the escalator."

4          You gave that testimony under oath a few months ago,

5   right?

6          THE COURT:  That's why the court reporter was there,

7   took it down.  We are not going to have that colloquy back and

8   forth.  That's what I said in the order.

9   Q.  Was the testimony you gave truthful?

10  A.  Yes.

11  Q.  In October?

12  A.  Yes.  We didn't see anybody else.  I didn't know what he

13  saw, but I didn't see anybody else.

14  Q.  It's not that you don't recall one way or another.  You can

15  sit here affirmatively testifying you did not see anyone else,

16  correct?

17  A.  I was not concentrated on it.  Because I was not

18  concentrated on looking around, I did not see anyone.

19         THE COURT:  Mr. Tacopina, you have your answer.  Let's

20  move along.

21         MR. TACOPINA:  I'm moving on, your Honor.  I am moving

22  on.

23  Q.  Once you got to the sixth floor of the lingerie floor,

24  after getting off the escalator, you say you and Donald Trump

25  walked to the lingerie section.

N4RMCAR4                        Carroll - Cross

1   A.  Yes.

2   Q.  And it's your story while on the sixth floor you didn't see

3   any customers there?

4   A.  No, I didn't see any customers.

5   Q.  It is your claim you didn't see a single person in any of

6   the departments you walked through on that floor?

7   A.  I didn't see anybody.  We went past cruise wear.  Could

8   have been bathing suits.  I think it was cruise wear.  I didn't

9   see any people.

10  Q.  It's your story that you didn't see any customers on the

11  entire sixth floor?

12  A.  Didn't see any.

13  Q.  Aside from customers, you also didn't see any sales

14  attendants?

15  A.  Did not see any.

16  Q.  It's your testimony that in one of New York's most

17  prestigious department stores, there was not a salesperson or a

18  customer or employee on the sixth floor?

19          MR. FERRARA:  I am going to object.

20          THE COURT:  Objection sustained.

21          You get to make a closing argument in this case,

22  counselor, and this isn't the time for it.

23  Q.  Because Bergdorf Goodman is such an attentive, upscale

24  store, you would agree it doesn't make sense that a sales

25  attendant would not be present in the lingerie department when

1    you were supposedly there with Donald Trump?

2              MR. FERRARA:  Objection.

3              THE COURT:  Sustained.

4              MR. TACOPINA:  Can I understand the basis of that,

5    your Honor.

6              THE COURT: Yes.  It's argumentative.  It's repetitive

7    and it's inappropriate.

8              MR. TACOPINA:  I never asked if she thought it ever

9    made sense.

10             THE COURT:  I'm sorry, Mr. Tacopina.  We are going to

11   move on.  In this courtroom, the ruling is the ruling, not the

12   start of an argument.

13   Q.  You'd agree that story about no one being on the sixth

14   floor is inconceivable, correct?

15   A.  It's hard to imagine that there would not be a sales

16   attendant in Bergdorf's.  It's surprising.

17   Q.  The word you used to describe that lack of sales attendants

18   or anyone close was inconceivable, correct?

19   A.  Yes.

20   Q.  Inconceivable --

21   A.  Cannot be imagined.

22   Q.  Unbelievable, correct?

23   A.  Yes, that's what it means.

24   Q.  Now, the quality of merchandise and the cost of merchandise

25   at Bergdorf Goodman is relatively expensive compared to a

N4RMCAR4                        Carroll - Cross

1  Bloomingdale's or something, no offense to Bloomingdale's,

2  correct?

3  A.  I think it is, yes.

4  Q.  And you'd agree that in Bergdorf Goodman a single piece of

5  lingerie could easily costs hundreds and hundreds of dollars?

6  A.  Yes.

7  Q.  And lingerie, some pieces of lingerie are skimpy, things

8  that could easily be concealed and shoplifted.

9  A.  I don't know.

10  Q.  You don't know if they are skimpy --

11  A.  I know some of them are skimpy, yes, that's a good word.

12  Q.  But it's your story that in this posh, upscale store, there

13  were simply three or four boxes of merchandise left unattended

14  by the checkout counter in the lingerie section?

15  A.  There are three or four boxes.  I don't know if there is

16  anything in them.  But there was a bodysuit on the counter.

17  Q.  Next to the three or four boxes?

18  A.  Yes.

19  Q.  Unattended?

20  A.  Absolutely unattended.

21  Q.  According to you, Donald Trump picked up that piece of

22  lingerie next to the three or four boxes and said to you:  Go

23  put this on?

24  A.  Yes.  He said:  Go try this on.

25  Q.  Go try this on.

1          Based on your own story, Donald Trump told you to go

2     try on the lingerie, correct?

3     A.   Yes.

4     Q.   He didn't ask to go into a changing room with you, did he?

5     A.   No.

6     Q.   And in response to Mr. Trump telling you to go try on the

7     lingerie, it's your story that you thought you could get him to

8     try it on?

9     A.   No.  My story is, I told him that it was his color.

10    Q.   Before you told him it was his color, you told him that he

11    should go try on the lingerie?

12    A.   Yeah.  I had no intention of putting on any lingerie, but I

13    thought it was terrifically funny that he was holding it up in

14    the air, and this is really a beautiful piece of lingerie, see

15    through.  And it struck me as suddenly funny if I could get him

16    to put it on.  If he's talking about trying on lingerie, maybe

17    he should be the one to put it on.

18    Q.   You thought that would be a story you could tell your

19    friends at dinner?

20    A.   That's exactly what I thought.

21    Q.   And the lingerie, is that see through, very pretty, lilac,

22    grayish blue, one-piece bodysuit with lace?

23    A.   Yes.

24    Q.   And Donald Trump is about six foot three inches?

25    A.   I think so.

N4RMCAR4                          Carroll - Cross

1   Q.   You say he weighed 100 pounds more than you, so

2   approximately 225 pounds back in 1995 or '96?

3   A.   That's what makes it so comical.  If Donald Trump weighed

4   130 and was five foot eight, there would be no humor in it.

5   But Donald Trump being a large, tall, very manly man, it made

6   it twice as funny, the idea of Donald Trump putting this

7   lingerie on over his pants.

8   Q.   It's your claim that that was your plan, to get this large

9   man to put on a not-so-large, see-through lace bodysuit over

10  his suit pants?

11  A.   That was what I was thinking in my mind.  It just struck me

12  as very funny.  If a man tells me to go put on some lingerie,

13  my natural instinct is to tell him to go put on the lingerie.

14  I was just turning everything around.

15  Q.   In order to get Donald Trump to try on this lingerie over

16  his clothes, it's your story that you tossed it at him and told

17  him it goes with his eyes?

18  A.   No.  It was bluish.

19  Q.   It's your testimony you told him it was his size?

20  A.   Yes.

21  Q.   Obviously, it wasn't his size.  You were just kidding.

22  A.   No.  When you're having funny joshing, back and forth, I

23  didn't think any of it was serious.  I had written a similar

24  scene on Saturday Night Live and got nominated for an Emmy for

25  the very thing of a man getting dressed in front of a mirror.

1   The idea was, to me, hilarious.

2   Q.  You wrote a scene for Saturday Night Live about a man

3   putting on lingerie over a suit?

4   A.  About a man getting dressed in the bathroom, and he was

5   wearing his underwear.

6   Q.  Over his suit?

7   A.  No.  It was just a man in his bathroom falling in love with

8   himself in front of the mirror.

9   Q.  To you that's a similar scene as Donald Trump, in the

10  middle of Bergdorf Goodman, with his suit on, trying on a piece

11  of women's lingerie?

12  A.  That's how my mind works.  That's how comedy is born.  You

13  take two opposite things, you put them together, and it makes a

14  new scene.  That's where comedy comes from.

15  Q.  Did that ask it ever air on Saturday Night Live?

16  A.  Yes.

17  Q.  When was that?

18  A.  1987, William Shatner played the role.

19  Q.  According to you -- by the way, there was no woman involved

20  in that skit; it was just one person alone in a bathroom?

21  A.  No, no.  Nora Dunn was playing his wife and was making very

22  unflattering comments as he was falling in love with himself in

23  front of the mirror.

24  Q.  Are you done?

25  A.  Yeah.

N4RMCAR4                        Carroll - Cross

```
1    Q.  At that point of the story you say that you picked out

2    often unattended sales counter or he picked out.

3            Who picked out the lingerie, you or him?

4    A.  He snatched it up.  There was no picking out.  There were

5    no other items to choose from.  He just picked it up.

6    Q.  And then you went with him into the dressing room, correct?

7    A.  He said:  Let's go put this on.  I had no concept about how

8    this was going to turn out.  I thought this funny conversation

9    would continue.

10   Q.  According to you, you went into the dressing room first.

11   A.  That's because he had me -- made the manly gracious

12   gesture, after you, or some people say, ladies first.

13   Q.  You say he held you by the arm and brought you into the

14   dressing room?

15   A.  I'm not saying he hold me.  I'm saying he had me by the

16   arm.  I thought it was a friendly, steering sort of -- sort of

17   steering me that way, hand on the elbow as a man guides a woman

18   through a hallway or upstairs.

19   Q.  In your previous testimony had you mentioned that he had

20   guided you with his arm on your arm into the locker room or

21   changing room?

22   A.  I am not sure.

23   Q.  Now, once you got into the changing room, you went first.

24   You were in there first, right?

25   A.  Yes.
```

N4RMCAR4                          Carroll - Cross

1   Q.  And the dressing room door was open and unlocked.

2   A.  Yes.

3   Q.  As you described, that was an odd thing?

4   A.  Yes, it was odd.

5   Q.  That's because Bergdorf's dressing room doors are usually

6   closed.

7   A.  I think most department stores keep their dressing room

8   doors closed.

9   Q.  I'm asking about Bergdorf Goodman:  So Bergdorf Goodman

10  dressing room doors are usually closed?

11  A.  Yes.  It struck me as odd.

12  Q.  Usually the way that works is, they remain closed and

13  locked until a client wants to try something on and a sales

14  attendant will unlock the door and let them in?

15  A.  Yes.

16  Q.  For the sake of this story, you'd agree that the dressing

17  room door being opened at that moment, to use your word, was an

18  amazing happenstance?

19  A.  I was surprised, yes.

20  Q.  Is that what an amazing happenstance means?

21  A.  Amazing, yeah.

22  Q.  And your plan, again, was, once inside, to get Donald Trump

23  to try this lingerie on over his clothes, not under it?

24  A.  The last thing I wanted to see is Donald Trump taking off

25  his clothes.  I wanted to put it on over his clothes and,

1    frankly, I didn't really expect that to happen.  I just

2    expected the sort of the joshing to continue.  We would walk in

3    the dressing room, turn around and walk out.

4    Q.  So you walked into the dressing room not really expecting

5    him to try on the lingerie --

6    A.  I pictured in my mind as the most hilarious image of him

7    putting it on over his pants.  I didn't have a minute to think

8    any further because he slammed the door and thrust me up

9    against the wall.  So my thinking about what was going to

10   happen was overcome with what actually did happen.

11   Q.  But the plan was at least to enter that dressing room, to

12   have him try that lingerie on over his suit, not under it, yes?

13   A.  That's what I was picturing.  I didn't have a plan.  I

14   didn't want the scene to stop.  It was, you know, very funny.

15   I didn't want to be the one to call the end to it.

16   Q.  At that time still you saw no one on that floor account,

17   correct?

18   A.  No.  I saw no one.

19   Q.  Why did you have to go in a dressing room for this?  If

20   there was no one on this floor, he wasn't taking off these

21   clothes, he was just putting this lingerie over his clothes,

22   why did you have to go to a dressing room for him to do that?

23   A.  I don't know.  Making it all funnier.

24   Q.  All the funnier?

25   A.  There are mirrors in dressing rooms.  That's why you go

N4RMCAR4                    Carroll - Cross

1    into a dressing room.  There are mirrors.

2    Q.  It's your story that once you stepped into the dressing

3    room, the door banged closed and Donald Trump pushed you up

4    against the wall?

5    A.  Yes.

6    Q.  He didn't look the door behind him, you said, correct?

7    A.  No.

8    Q.  Instead --

9           THE COURT:  Not correct or it is correct?  Sorry, Mr.

10   Tacopina.  You're the one putting the questions.

11   Q.  Is it correct that he didn't lock the door behind you?

12   A.  He did not look the door.

13   Q.  And, instead, he immediately pushed you up against the wall

14   so hard that you banged your head?

15   A.  Yes.

16   Q.  According to you, it was so hard that it hurt?

17   A.  Yes.

18   Q.  It's your story that he pushed you a second time?

19   A.  Yes.  Because I pushed back.  After he pushed me into the

20   first, I pushed back.

21   Q.  And that caused you to hit your head again.

22   A.  Yes.

23   Q.  It is also your testimony you didn't feel like Donald Trump

24   was trying to hurt you, you said, correct?  I'm sorry.

25   Withdrawn.

```
 1              It's also your testimony that you said that you don't
 2      feel that Donald Trump was trying to hurt you?
 3      A.  I didn't think so.  I was very confused.  I thought maybe
 4      it was a mistake.  The first push, I thought, he couldn't have
 5      meant that.  I thought he had made a mistake.  I thought that's
 6      very strange, that I thought it was a mistake.  Yeah.
 7      Q.  In any event, with regard to the noise from the alleged
 8      assault, it is your story that you heard a bang when you hit
 9      your head?
10      A.  Yes.
11      Q.  According to you, the bang was so loud that if someone was
12      in the dressing room next door they would have heard it?
13      A.  Yes.
14      Q.  According to you, the bang was so loud, if there were a
15      sales attendant outside the dressing rooms they would have
16      heard it?
17      A.  Yes.
18      Q.  So, based on your own account, Donald Trump was trying to
19      attack you quietly so others couldn't hear.
20      A.  I don't think he was thinking about what noise was being
21      made.
22      Q.  It's only after that second push into the wall it's your
23      story that you realized at this point the situation was
24      serious?
25      A.  Yes.
```

1  Q.  It's your testimony that when Donald Trump, this big and

2  heavy man, lunged at you and banged your head against the wall

3  so hard it hurt, you still didn't think it was serious at that

4  point?

5  A.  I was trying to figure out what the hell was going on.

6  This is a man.  This is Donald Trump.  I thought I knew him.

7  We had just been laughing 12, 15 seconds before.  And here I am

8  being pushed up against the wall.  I had no idea.  It took me

9  several seconds to process what the heck was going on.  It

10  didn't make any sense.  It didn't make any sense at all.

11           Then he put his mouth against mine.  Then I

12  understood.  OK.

13  Q.  In fact, you viewed what went on in that dressing room as a

14  fight.

15  A.  Yes.

16  Q.  In fact, in response to this supposedly serious situation

17  that you viewed as a fight, where you got physically hurt, it's

18  your story that you not only didn't scream out, but you started

19  laughing?

20  A.  I did not scream.  I started laughing.  That is right.  I

21  don't think I started laughing.  I think I was laughing going

22  into the dressing room, and I think I laughed pretty

23  consistently after the kiss to absolutely throw cold water on

24  anything he thought was about to happen.  Laughing is a very

25  good -- I use the word weapon -- to calm a man down if he has

1   any erotic intention.

2   Q.  According to you, after Donald Trump had you against the

3   wall, he pulled your tights down?

4   A.  Yes.

5   Q.  It's your story that at some point you felt his penis

6   inside of you?

7   A.  Yes.

8   Q.  But before that, it's your sworn testimony that you felt

9   his fingers, what you said was rummaging around your vagina?

10  A.  It's an unforgettable feeling.

11  Q.  Now, when you say rummaging around your vagina, that's

12  different than inserting a finger inside your vagina.

13  A.  At first he rummaged around and then he put his finger

14  inside me.

15  Q.  In your book you wrote that he was forcing his fingers

16  around my private area and then thrust his penis halfway

17  completely, I'm not certain, inside me.  Is that accurate?

18  A.  Yes.

19  Q.  And this attack or this fight, based on your word, this

20  fight that you were in, could have taken as long as three

21  minutes?

22  A.  From entering the dressing room to my leaving it, I don't

23  think it could be any more than three minutes.  I may be wrong.

24  I didn't have a stopwatch, but it was about three minutes.

25  Q.  Even though you understood you were in the middle of this

1     supposed battle, you never screamed at Donald Trump or screamed

2     for help?

3     A.   I'm not a screamer.

4     Q.   You said that yesterday, I'm not a screamer, right?

5     A.   I'm not a screamer.  Here is the thing.  I was too much in

6     a panic to screech.  I was fighting.

7     Q.   When you're fighting and being sexually assaulted and

8     raped, because you are not a screamer, as you describe it, you

9     wouldn't scream?

10    A.   I'm not a screamer.  You can't beat up on me for not

11    screaming.

12    Q.   I'm not beating up on you.  I'm asking you questions,

13    Ms. Carroll.

14    A.   No.  Women who come forward, one of the reasons they don't

15    come forward is because they are always asked why didn't you

16    scream.  Some women scream.  Some women don't.  It keeps women

17    silent.

18    Q.   And, according to you, this attack wasn't taking place in

19    some secluded place in the middle of nowhere in a forest.  That

20    was in a crowded department store in New York City.

21    A.   Yes.  Not crowded, though.

22    Q.   Right.  The inconceivable part, right?

23            MR. FERRARA:  Objection, your Honor.

24            THE COURT:  Sustained.

25    Q.   When you spoke with Dr. Lebowitz after filing your lawsuit,

N4RMCAR4                         Carroll - Cross

1   you were still trying to come up with an explanation for your

2   story as why you did not scream.

3   A.  I wasn't coming up with a story.  It's usually -- I would

4   say more than usually under discussion when a woman is raped

5   and she doesn't scream.  It's usually discussed, why didn't she

6   scream.  Why didn't you scream, E. Jean?  Why didn't you

7   scream?  It's what a woman -- you better have a good excuse why

8   you didn't scream.  Because if you didn't scream, you weren't

9   raped.  I'm telling you, he raped me, whether I screamed or

10  not.

11  Q.  You need a minute, Ms. Carroll?

12  A.  No.  You go right on.

13  Q.  Aside from you not being a screamer, another reason you

14  gave for possibly not screaming was because you were wondering

15  if the pressure Donald Trump's shoulder placed against your

16  chest interfered with your ability to scream, correct?

17  A.  It could be.  I don't need an excuse for not screaming.

18  Q.  OK.

19           Despite that, you certainly wish your story included

20  you having screamed?

21  A.  Of course I do.  More people would have believed me if I

22  had screamed.

23  Q.  Aside from not being a screamer, and perhaps his chest was

24  interfering with your ability to scream, along the same lines

25  at some point you prepared a list of questions -- list of

1  answers to questions you thought you might be asked about your

2  story.

3          Do you recall that?

4  A.  What?

5  Q.  Did you prepare a list of answers to questions you thought

6  you might be asked about your story?

7  A.  I absolutely think of answers that I may should prepare

8  myself on.

9  Q.  I am going to show you, just you, what has been marked as

10  Defense Exhibit AR.

11          What did you say, oh?

12  A.  Oh.  Surprise.  Where are my glasses?  I have lost my

13  glasses.  OK.

14          MR. FERRARA:  Your Honor.  I don't mean to interrupt.

15  I think Ms. Carroll's glasses were here.  May I approach?

16          THE WITNESS:  Thank you.

17  Q.  Ms. Carroll, I am going to direct your attention to the

18  second embolden question.

19  A.  OK.

20          THE COURT:  Is this in evidence?

21          MR. TACOPINA:  It's not yet, your Honor.

22          THE COURT:  Then we are not going to have any

23  discussion of what's in it.

24          MR. TACOPINA:  That she didn't recall something.  I'll

25  offer defendant's AR into evidence.

N4RMCAR4                      Carroll - Cross

1            MR. FERRARA:  May I just have one moment?

2            MR. TACOPINA:  Subject to redaction, of course.

3            MR. FERRARA:  May I just have one moment, your Honor?

4            THE COURT:  Yes.

5            MR. FERRARA:  Subject to Mr. Tacopina's caveat, no

6       objection.

7            THE COURT:  Received on that basis.

8            (Defendant's Exhibit AR received in evidence)

9            MR. TACOPINA:  Just put that one block up, though.

10           You can display that.

11           Your Honor, I don't know if the jury has it.  I

12      certainly --

13           THE COURT:  I think they do.  Is it on your screen,

14      folks?

15           MR. TACOPINA:  It was on that one.  OK.  Thank you.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

BY MR. TACOPINA:

Q.  So that's a question that you anticipate being asked and
that question was why didn't you scream?

A.  Right.

Q.  And you wrote down "too much adrenaline powering through me
to think to scream."  Do you see that?

A.  Yeah.

Q.  So that's the third potential reason why you didn't scream
you have testified to.

A.  It's another reason why I didn't scream.

Q.  Now, according to this, screaming would have been a purely
voluntary action you need to think about before doing?

A.  Mr. Tacopina, if I was going to make up a lie, I would have
lied when I was writing this and say I screamed my head off.  I
didn't.  When I came forward, I told the truth.  I said I
didn't scream.  We could probably come up with more reasons I
didn't scream, but I did not scream.  I did not scream.

Q.  Well, Ms. Carroll, the reason why you wrote that you wish
you had screamed was why?  Why did you write you wish you had
screamed?

A.  Because more people would have believed me.

Q.  How about more people may have heard you and helped you?
Is that a possibility?

A.  No, I didn't want to make a scene.

Q.  Oh.  So you didn't scream while you were getting violently

N4r2Car5                    Carroll - Cross

1  raped because didn't you want to make a scene?

2          MR. FERRARA:  Objection, your Honor.

3          THE COURT:  Overruled.

4  Q.  You could answer.

5  A.  Repeat your question.

6  Q.  Sure.  So you didn't scream while you were getting

7  violently raped because you didn't want to make a scene.

8  A.  That's right.  That's probably why I didn't scream.

9  Q.  Okay.

10          Now, with the specifics to the rape allegation, Donald

11  Trump, you said, had his penis inside of you while your tights

12  were obviously still down?

13  A.  Yes.

14  Q.  And to be clear, it's your story that Donald Trump did not

15  take off your tights?

16  A.  No, no, just pulled down.  They were still above the knees.

17  Q.  They were above the knees.

18  A.  Um-hmm.

19  Q.  And because your tights were above the knees, you couldn't

20  get your knee up?

21  A.  I couldn't get it all the way up.  I finally got it up,

22  though.

23  Q.  Okay.

24          And it's your story that you tried to stomp on his

25  foot.

1   A.  Yes.  That didn't work.

2   Q.  According to you, Donald Trump had his hands on your arms.

3   A.  Briefly, but mainly he was holding me against the wall with

4   the weight of his shoulder.

5   Q.  And it's your story you tried to get your arms up to push

6   him back.

7   A.  Yes, this hand had to be -- I was a little pinned because

8   his shoulder was right here, so this arm was pretty much inert,

9   but I could move it a little bit and go like this.  This arm

10  was almost completely free.

11  Q.  And according to you, you did push him back.

12  A.  I hit him back with my knee up.

13  Q.  Okay.

14          And while all this was happening, your purse was still

15  in one of your hands.

16  A.  Yeah, I know.  Yeah.  I never let go of my purse.

17  Q.  What kind of purse was it?

18  A.  It was a Coach -- a square bag with stand-up handles.

19  Q.  It had stand-up handles on it.

20  A.  Um-hmm.

21  Q.  Okay, so stand-up handles are the solid fixtures, the hard

22  handles?

23  A.  Yeah, and they are leather stand-up.  The leather stood up,

24  too.

25  Q.  Leather stand-up handles.  Okay.

1        You never hit him with your purse, did you?

2    A.   I went like this, yeah.

3    Q.   You did hit him with your purse.

4    A.   I believe I did.

5    Q.   Okay.  When did you recall that fact, Ms. Carroll, hitting

6    him with your purse?

7    A.   I've always recalled that fact.

8    Q.   And you mentioned that when you were giving your television

9    interviews about this case or your video deposition?

10   A.   I'm not sure if I did.

11   Q.   Okay.

12        You describe what was going on in there as a

13   colossal -- "in there" being in the locker room, changing room,

14   a colossal struggle.

15   A.   To me it was a colossal struggle.

16   Q.   And despite this colossal struggle while you were being

17   violently raped, you -- for as long as three minutes, you never

18   let go of your purse.

19   A.   No, I never did.

20   Q.   And at one point it's your testimony you managed to get

21   your knee up and push Donald Trump off of you by yourself.

22   A.   Yes.

23   Q.   And even though the tights or your panties were above your

24   knees?

25   A.   Yeah.  I could -- they are tights because they are

N4r2Car5                        Carroll - Cross

1   stretchy.  Tights are amazingly -- I wasn't wearing control top

2   hose.  I was wearing tights, which are extremely stretchy.

3   Q.  And what portion of your knee came in contact with what

4   portion of his body?  Or let me withdraw and rephrase.

5            Your knee came in contact with what portion of his

6   body?

7   A.  Can I stand up?

8   Q.  If that would help.

9            MR. TACOPINA:  Your Honor, is that okay?

10            THE COURT:  Yes, go ahead.

11   A.  Right about here.

12   Q.  So it went to his -- just for the record, you are

13   indicating your right hip?

14   A.  About hip level.

15   Q.  That's at your height, right, when you --

16   A.  We were basically the same height, because I was wearing

17   four-inch heels and I was 5' 9" at the time so 6' 1".

18   Q.  So you are saying that you got your knee up to his -- it

19   would be waist, as high as his waist?

20   A.  No, below his waist.

21   Q.  Below his waist.

22            And you just said something.  Four-inch heels.  It's

23   your story you did this while you were balancing on four-inch

24   heels, you said?

25   A.  I can dance backwards and forwards in four-inch heels.  I

1   can raise one leg in heels.

2   Q.  Well, you are not dancing here, you are --

3   A.  No, it was -- fighting, as you know, required -- well, you

4   worked out all the time.  We have read about it.  You

5   understand with the feet.

6   Q.  All right.  Let me ask a question.  That will get me in

7   trouble if I do.  I won't respond to that.  So I'm just going

8   to move on.

9       But the fact is the entire time you were wearing

10  four-inch heels?

11  A.  The entire time, yes.

12  Q.  So just to make sure I understand the story and then we

13  will move on, this man was almost twice as large as you,

14  weighed 100 pounds more than you, right?

15  A.  Not twice as large.  He weighed probably over a hundred

16  more pounds than I.

17  Q.  How tall are you?

18  A.  I was at the time 5' 9".

19  Q.  5' 9".  Are you talking about with your heels or --

20  A.  No.  With my heels I was 6' 1".

21  Q.  Okay.  And this man who was, as you said, more -- probably

22  more than a hundred pounds.  Just so I understand the story

23  correctly, as your tights were pulled down, you were able to

24  get one knee up, after fighting for as much as three minutes

25  against a man who was much heavier than you, while being

1   sexually penetrated without ever letting go of your purse --

2   A.  Yeah.

3   Q.  -- you somehow managed to get your knee up --

4            MR. FERRARA:  Objection.

5            THE COURT:  Sustained.

6   BY MR. TACOPINA:

7   Q.  After that occurred, you pulled your tights back up and

8   walked out of Bergdorf Goodman wearing those tights?

9   A.  I wore the tights.  They did not come off.

10  Q.  Okay.  And you pulled them back up, right, Ms. Carroll?

11  A.  I pulled them up, yes.

12  Q.  And those tights never ripped during this colossal

13  struggle, correct?  I'm sorry, your Honor.

14           Those tights never ripped during this colossal

15  struggle?

16  A.  I don't believe they did.

17  Q.  And it's your testimony that you don't know if Mr. Trump

18  ejaculated?

19  A.  Are -- I couldn't see what was going on.

20  Q.  After you claimed to have pushed Donald Trump off of you,

21  you turned and got out of the dressing room?

22  A.  Yes.

23  Q.  You didn't say anything to him?

24  A.  No.

25  Q.  And in fact, even at that point, you still didn't scream

1   for help while you were outside the dressing room either for

2   the same reasons you gave before—we won't go through them

3   again—correct?

4   A.  I did not scream.

5   Q.  And according to you, you were afraid he may have been

6   coming after you.

7   A.  Yes.

8   Q.  In fact, it's your story you were fearful he would follow

9   you and maybe grab you.

10  A.  Yes.

11  Q.  But according to your story, you still didn't seek help

12  from anyone in the store?

13  A.  Yes, I didn't.  No, I didn't.

14  Q.  And it's your story you took the escalator down six floors?

15  A.  Yes.

16  Q.  And, again, during this period, the aftermath, it's your

17  story that you still did not see anyone in the store, a

18  customer in the store after you left the dressing room?

19  A.  I wasn't looking for people.  I was looking to get out.

20  Q.  And it's your -- in fact, it's your story you didn't see a

21  single soul in the store after you left the dressing room?

22  A.  I don't think I did.

23         MR. TACOPINA:  One second your Honor.

24         THE COURT:  How much longer do you expect to be?

25         MR. TACOPINA:  Oh, a bit, a bit.

N4r2Car5                         Carroll – Cross

1             THE COURT:  We will take a --

2             MR. TACOPINA:  You want to take a break?  I don't even

3    know what time it is.

4             THE COURT:  It's quarter after three.

5             MR. TACOPINA:  You want to take a break now?

6             THE COURT:  15 minutes.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Okay, folks.  Let's get the jury back.

3          (Jury present)

4          THE COURT:  Okay, Mr. Tacopina.  You may continue.

5          MR. TACOPINA:  Thank you, your Honor.

6   BY MR. TACOPINA:

7   Q.  Ms. Carroll, you said you left Bergdorf Goodman without

8   seeking any help from employees or security at that point,

9   correct?

10  A.  Yes.

11  Q.  And instead, according to you, you just walked out of the

12  store and called Lisa Birnbach?

13  A.  Yes.

14  Q.  And your testimony is that you did that on a cell phone.

15  A.  Yes.

16  Q.  And on that same cell phone, obviously, you could have

17  easily called 9-1-1.

18  A.  Yes, I could have easily called 9-1-1.

19  Q.  But you didn't.  Instead you called Ms. Birnbach.

20  A.  Yes.

21  Q.  At this time you knew Ms. Birnbach for about four or five

22  years?

23  A.  Yes.

24  Q.  And --

25  A.  Six years probably.

1  Q.  And at that time she certainly wasn't your closest friend.

2  A.  She was a close friend, not my closest.

3  Q.  Prior to this alleged incident at Bergdorf, you didn't

4  speak to her overly often.

5  A.  Not overly often, that is correct.

6  Q.  In fact, you can't even name another personal matter you

7  confided in with -- in with her prior to this alleged incident.

8  A.  Oh, no.  We had many conversations.  We discussed her

9  breaking up with a certain person.

10 Q.  That's her talking to you, confiding in you, right?

11 A.  Yes.

12 Q.  My question was, you can't name another personal matter of

13 yours that you confided in her prior to this alleged incident?

14 A.  Well, I believe when she was confiding in me, I would

15 return the confidence with -- confiding with her with whatever

16 I was going through.  I just don't remember it.

17 Q.  Okay.

18       You certainly can't say definitively that prior to

19 this alleged incident at Bergdorf you ever shared any other

20 instances with Ms. Birnbach in which you felt abused in your

21 past either sexually or otherwise?

22 A.  I don't think I did.

23 Q.  So to be clear, it's your testimony that even though at the

24 time she wasn't your closest friend and you never confided

25 anything like this to her before, you thought your first call

N4r2Car5                    Carroll - Cross

when you left Bergdorf Goodman should be to her?

              MR. FERRARA:  Objection.  Argumentative.  Asked and
answered.

              THE COURT:  Sustained.

BY MR. TACOPINA:

Q.  You thought your first call when you left Bergdorf Goodman
should be to Ms. Birnbach?

A.  She was exactly the person I needed to talk to.

Q.  And in your story it's because Ms. Birnbach was supposedly
hilarious?

A.  And still is the funniest person I know.

Q.  Okay.  And according to you, if Lisa Birnbach had laughed
after you told her you had been sexual assaulted, you would be
okay, home free?

A.  I thought it would put -- I had thought it would let me
know it was not as bad as I probably knew it was.  I would feel
better if Lisa laughed and said, that is funny, then I would
have felt better.

Q.  So it was a possibility in your mind that you were going to
describe a violent sexual assault to your good friend against
you that had just taken place and Lisa would have laughed and
said, oh, that is funny?

A.  I was going to tell her the story, which I thought was
hilarious, and then I got to the point where I had to tell Lisa
that he pulled down my tights, and before I said that, Lisa had

1    to tell me to stop laughing.  My mind -- I think I was slightly

2    disordered and disoriented.

3    Q.  You just said, Ms. Carroll, that you were going to tell

4    Lisa the story that you thought was hilarious?

5    A.  Yes.

6    Q.  So you thought the story of being raped --

7    A.  No, no.

8    Q.  -- by Donald Trump --

9    A.  No, I don't think that story was -- I don't think that

10   story was hilarious.  I thought that story was tragic.  I

11   wanted to tell Lisa because I hoped Lisa would tell me, oh, no,

12   E. Jean, it's okay, it's okay, it's all right.

13   Q.  I understand, Ms. Carroll, but you just testified that you

14   were going to tell her the story which you thought was

15   hilarious.

16              MR. FERRARA:  Objection.

17              THE COURT:  Sustained.  That isn't even close,

18   Mr. Tacopina.

19              MR. TACOPINA:  Oh, it is very close, your Honor.  I am

20   looking at the transcript.

21              THE COURT:  I'm looking at the transcript, too.  What

22   she said was, "I was going to tell her the story, which I

23   thought was hilarious, and then I got to the point where I had

24   to tell Lisa that he pulled down my tights, and before I said

25   that, Lisa had to tell me to stop laughing," and so forth.

N4r2Car5                          Carroll - Cross

1                MR. TACOPINA:   Okay.  Can I ask a question based on

2      that?

3                THE COURT:   Now -- I don't know what the question is.

4                MR. TACOPINA:   Can I try?

5      Q.  Okay.  You just heard the Judge read accurately from the

6      transcript, which is, "I was going to tell her the story, which

7      I thought was hilarious."

8                Up to that point of what you just testified to, what

9      story were you going to tell Lisa that you thought was

10     hilarious?

11     A.  Let me rephrase that.  "Which I thought was hilarious"

12     should read "which I hope was hilarious."  I wanted her to tell

13     me -- if Lisa laughed, I would have felt so much better.  I was

14     disoriented.  I had adrenaline flowing through me.  I called

15     Lisa Birnbach and she told me exactly apparently what I really

16     called her about.

17     Q.  And when she told you, it's your story that she told you

18     that she had been raped, and that shocked you.

19     A.  Repeat the question, please.

20     Q.  Sure.  I will break it down, actually, into two questions.

21               According to you, Ms. Birnbach shocked you on the

22     phone.

23     A.  When I heard the words, when Lisa said, "he raped you,"

24     those were the words, those were the words that brought the

25     reality to my forefront of my mind.

N4r2Car5                    Carroll - Cross

1  Q.  Okay.  And that's what shocked you that she had told you

2  that you had been raped.

3  A.  I don't like the word, to hear the word, Lisa Birnbach

4  saying the word "rape," was -- the two -- Lisa Birnbach, funny,

5  kind, warm, telling me I had been raped, that -- even though I

6  had just been, it's hard -- when something horrible happens to

7  you, it's hard to grasp what happened.

8  Q.  In fact, Ms. Carroll, it's your sworn testimony that before

9  speaking to Ms. Birnbach it didn't occur to you that you had

10  been raped.

11  A.  My mind was disordered.  I was so full of adrenaline, I am

12  not even aware of my thinking process.  It's flowing.  It's

13  pumping.  I had enough strength to get out.  I was happy to be

14  alive.

15  Q.  Had it occurred to you, before Lisa Birnbach told you you

16  were raped, that you had been raped?

17  A.  Well, obviously I would have come to that conclusion

18  myself.  I guess I just needed to tell somebody the story.

19  Q.  Okay.  I'm not asking you what conclusion you would have

20  come to eventually.  My question is just this one.  Before Lisa

21  Birnbach had told you you had been raped, had it occurred to

22  you that you had been raped?

23          MR. FERRARA:  Your Honor, objection.  I think it's

24  been answered.

25          THE COURT:  Sustained.

N4r2Car5                    Carroll - Cross

1   BY MR. TACOPINA:

2   Q.  According to you, even when Ms. Birnbach told you that you

3   had been raped, you couldn't stop laughing after she said that

4   to you.

5   A.  I may have laughed at that point really not to hear what

6   she just said.  I may have.  I'm not clear when I stopped

7   laughing.

8           MR. TACOPINA:  One second, please, your Honor.

9           (Pause)

10          MR. FERRARA:  May I just have one moment, your Honor?

11  I apologize.

12          (Counsel confer)

13          MR. FERRARA:  Your Honor, after conferring with

14  counsel, the way we are seeing the transcript is that

15  Ms. Carroll said:  "I may have.  I made clear when I stopped

16  laughing."  We heard, "I may have.  I'm not clear when I

17  stopped laughing."

18          THE COURT:  I'm not sure where you are reading back to

19  me from.

20          MR. FERRARA:  Line 4.

21          THE COURT:  You are reading from something other than

22  line 4 on my page.

23          MR. FERRARA:  We can circle back to it, your Honor.

24          THE COURT:  Okay.

25          MR. FERRARA:  Now it appears as line 13.  No.  That's

N4r2Car5                         Carroll - Cross

1   me.  I'm sorry, your Honor.  I'll stop.  I'm not helping.

2              THE COURT:  Next question, Mr. Tacopina.

3              MR. TACOPINA:  I'm actually going to put up what's

4   been received into evidence as Defense AA of the book.  It's

5   page 242, line 5.  Even though it is in evidence, I am going to

6   give counsel just a minute to get it.

7              MR. FERRARA:  Thank you.

8              MR. TACOPINA:  Please put that up.  It is in evidence,

9   so display it for the jury, as well, please.

10             Your Honor, I don't see it on this screen, so I don't

11  know if that means -- okay.  Thank you, thank you.

12  BY MR. TACOPINA:

13  Q.  Okay.  Just go to that --

14             THE COURT:  This is something else on the screen now.

15             (Pause)

16             MR. TACOPINA:  AA, there we go.  AA in evidence.  This

17  is page 242 of the book, last line of paragraph 5.

18             THE COURT:  Okay.

19  BY MR. TACOPINA:

20  Q.  This is when -- from your book, Ms. Carroll, when

21  Ms. Birnbach is telling you that you were raped --

22  A.  Right.

23  Q.  -- "go to the police.  I'll go with you."  And she said

24  several time "E. Jean, I don't think this is funny

25  because——this is one of the strangest facts of all——I could not

N4r2Car5                      Carroll - Cross

1    stop laughing."

2            Do you recall that now?

3    A.  Right.

4            MR. TACOPINA:  Okay.  You can take that down.

5    BY MR. TACOPINA:

6    Q.  And like you just said, that's one of the strangest facts

7    of all.

8    A.  Yeah, absolutely.

9    Q.  How long did this phone call with Ms. Birnbach last, if you

10   know?

11   A.  No, I don't know.

12   Q.  And she advised you to go to the police, Ms. Birnbach?

13   A.  Yes.

14   Q.  And you told her that you weren't going to the police?

15   A.  I said no way.

16   Q.  And because you didn't get the answer you were hoping for

17   from Ms. Birnbach or the reply or the response to make you feel

18   okay, you felt unbalanced?

19   A.  Yes.

20   Q.  And according to you, you didn't sit down or get water or

21   do anything to take care of yourself at that particular moment?

22   A.  I got in my car and drove home.

23   Q.  And you didn't call anyone else.

24   A.  No.

25   Q.  You first sued Donald Trump on November 4, 2019,

1    Ms. Carroll?

2    A.  I what?

3    Q.  You first sued Donald Trump on November 4, 2019.

4    A.  Yes.

5    Q.  Okay.  And four months before your litigation, on June 23,

6    2019, you texted Lisa Birnbach and gave her and Carol Martin --

7    telling her that you had given them that book chapter about

8    Donald Trump before it was published.  That's already in

9    evidence.  We talked about it before.  You recall?

10   A.  Yes.

11   Q.  And in that text, you stated that you discussed that

12   excerpt with both Lisa Birnbach and Carol Martin.

13   A.  Yes.

14   Q.  Now, it's your testimony that after telling Ms. Birnbach

15   that you were raped by Donald Trump on the day it allegedly

16   happened, you never spoke with her about it again prior to your

17   litigation nearly 25 years later.

18             MR. FERRARA:  Objection, mischaracterization.

19             MR. TACOPINA:  What part, Mike?

20             MR. FERRARA:  One moment, your Honor.

21             (Counsel confer)

22   BY MR. TACOPINA:

23   Q.  Ms. Carroll, aside from the e-mail interactions before the

24   book came out --

25   A.  Right.

N4r2Car5                          Carroll - Cross

1    Q.  -- you had never spoken to Ms. Birnbach about what

2    allegedly happened that day, again, prior to your litigation

3    nearly 25 years later.

4    A.  I believe I spoke to her about it probably once or twice in

5    June, July, August, and September.

6    Q.  Of what year?

7    A.  Of 2019.

8    Q.  Okay.  So aside from June of 2019, we will go back to the

9    earliest date, since either '95 or '96 up until June of 2019,

10   you have never had a conversation with Lisa Birnbach --

11   A.  No.

12   Q.  -- about the alleged rape --

13   A.  No.

14   Q.  -- by Donald Trump at Bergdorf Goodman?

15   A.  No.

16   Q.  So it's your story, then, that even though Lisa Birnbach

17   told you to go to the police, she never circled back with you

18   even once about the alleged incident to see if you did.

19   A.  No.  I made it clear I was not going to the police.

20   Q.  Okay.  And so you drove home after speaking to Lisa

21   Birnbach that day.

22   A.  Yes.

23   Q.  And it's your story that other than Ms. Birnbach, you

24   didn't speak to any other friends that night about supposedly

25   being raped at Bergdorf Goodman?

N4r2Car5                         Carroll - Cross

1   A.  No, I did not.

2   Q.  And likewise you didn't speak to any family members about

3   it.

4   A.  No.  I would never tell my family.  Never.  Never.  Or any

5   other authority ever.

6   Q.  And it's your testimony that you just went straight home.

7   A.  Yes, I did go right straight home.

8   Q.  And according to you, after you got home, you don't

9   remember taking a shower that night.

10  A.  I don't think I did.

11  Q.  You don't think you took a shower that night.  Okay.

12  A.  No, I don't remember doing it.

13  Q.  According to you, after twice banging your head hard, you

14  felt pain on your head.

15  A.  Yes.

16  Q.  Right?

17          But according to you, you didn't check your head to

18  see if you had any injuries that night?

19  A.  I think I felt it.  I think it hurt.  I don't remember

20  looking at it in the mirror or anything.  I may have.  I don't

21  remember.

22  Q.  And you also didn't take any medication that night?

23  A.  I'm not a big person for taking medication, but I may have

24  taken an Advil or aspirin.  I don't know.

25  Q.  And you still had pain the next day when you woke up?

1    A.  Oh, yeah.

2    Q.  You didn't -- obviously didn't go to the hospital.

3    A.  No.

4    Q.  Didn't go to a doctor.

5    A.  No.

6    Q.  Didn't call out sick from work.

7    A.  No.  And I still felt -- felt my vagina still hurt from his

8    fingers.

9    Q.  And so despite that feeling that you just described and all

10   the other things, the day after you just went to work.

11   A.  Right straight to work just to prove to myself that I was

12   going to go on and life goes on and that's how I do it.  I get

13   up the next day and I go on.

14   Q.  And it's your story that either that day or the day after

15   you told Carol Martin at work about the alleged incident at

16   Bergdorf Goodman?

17   A.  Yes.

18   Q.  And even as far back as the mid 1990s——I think you

19   testified to this yesterday, Ms. Carroll——that Ms. Martin

20   didn't like Donald Trump?

21   A.  Carol Martin had done a -- she was an anchorwoman in

22   New York --

23   Q.  I'm just asking you if that -- Mike, is there a reason?

24   You want it to approach?

25             MR. FERRARA:  I think the witness was answering the

N4r2Car5                          Carroll - Cross

1    question.

2              MR. TACOPINA:  No.  Can I have a second with counsel,

3    please?

4              (Counsel confer)

5              MR. TACOPINA:  Your Honor, I'm just going to ask the

6    witness for a yes or no on that.  I discussed with counsel,

7    trying to avoid any issues.

8    BY MR. TACOPINA:

9    Q.  But you were aware as far back as the mid '90s that Carol

10   Martin did not like Donald Trump?

11   A.  Yes.

12   Q.  In fact, it's your testimony that you gave Carol Martin a

13   few details right there and then while still at work?

14   A.  Yes, I did.

15   Q.  And according to you, after you gave Ms. Martin a few

16   details about what supposedly happened, she told you let's talk

17   about it at my house tonight.

18   A.  Yes.

19   Q.  And I think you described you went to her house that night?

20   A.  Right.

21   Q.  Correct?

22   A.  Right.

23   Q.  And told her supposedly what happened at Bergdorf Goodman

24   that night?

25   A.  Yes, actually it was in the early evening, not even at

N4r2Car5                          Carroll - Cross

1   night.

2   Q.  Okay.  Do you remember the time?

3   A.  It was right after work, 5 or 6.

4   Q.  Okay.  And according to you, after hearing your story,

5   Ms. Martin told you to tell no one about it.

6   A.  Emphatically.

7   Q.  Emphatically.

8          And it's your testimony you took Ms. Martin's advice

9   not to go to the police?

10  A.  That's the advice I wanted, and so that's the advice I

11  followed.

12  Q.  So after speaking to Ms. Martin, you never told anyone else

13  about this alleged attack apart from that related to this

14  litigation and subsequently the book that came out in 2019,

15  correct?

16  A.  That's correct.

17  Q.  Now, the reason, I think you testified yesterday, was Carol

18  Martin told you not to go to the police because Donald Trump

19  was powerful?

20  A.  Yes.

21  Q.  And you were frightened of Donald Trump at the time.

22  A.  He was not only powerful, he was rich, he was famous, and,

23  as Carol put it, he has 200 lawyers.

24  Q.  And because of him being powerful, you didn't go to the

25  police.  You didn't want to tell your story.

N4r2Car5                    Carroll - Cross

1   A.  I don't -- no, I did not want to tell my story.  I did not

2   want to -- I was ashamed of myself.

3   Q.  But one of the reasons Carol Martin told you not to tell

4   the story to anyone and one of the reasons you have testified

5   that you never told the story to anyone was because of Donald

6   Trump's power.

7   A.  I was afraid Donald Trump would retaliate, which exactly is

8   what he did.  That's exactly.  One of my biggest fears came

9   absolutely true.

10  Q.  Okay.

11  A.  He has two tables full of lawyers here today.  It came

12  absolutely true.

13  Q.  We have about the same amount of lawyers.  Not everyone is

14  a lawyer, Ms. Carroll, but regardless of that --

15            THE COURT:  Come on, Mr. Tacopina, let's move along.

16            MR. TACOPINA:  Yes, sir.

17  BY MR. TACOPINA:

18  Q.  So instead you waited for Donald Trump to become arguably

19  the most powerful man in the world, president of the

20  United States of America, to tell your story to everybody.

21  A.  I waited until other women -- I was not a pioneer.  I'm a

22  follower.  I saw other women coming forward after Harvey

23  Weinstein and I thought who am I?  Who am I not to stay silent?

24  Also, I was 78 or 79.  I just thought I've been silent too

25  long.

1    Q.   In the decades preceding your lawsuit, you certainly never

2    told any doctors ever about the supposed incident?

3    A.   No.

4    Q.   And after supposedly being raped by Donald Trump you never

5    saw a medical doctor or got an evaluation?

6    A.   No, no.

7    Q.   Never went to a psychiatrist?

8    A.   No.

9    Q.   Never went to a psychologist?

10   A.   No.

11   Q.   No doctors whatsoever.

12   A.   No.

13   Q.   And as a result, you have no medical records showing

14   physical injuries from this colossal battle you have described?

15   A.   I have --

16            MR. FERRARA:  Objection, your Honor.

17            THE COURT:  Sustained.  Argumentative.  The answer is

18   stricken.

19   BY MR. TACOPINA:

20   Q.   As a result, do you have any medical records showing

21   physical injuries from the story?

22   A.   No.

23   Q.   You have no photographs of any physical injuries.

24   A.   No, I never took any photographs.

25   Q.   You are not aware of anyone who saw any physicals injuries

N4r2Car5                         Carroll - Cross

1   on you?

2   A.   They couldn't be seen.  You can't see inside my vagina as I

3   am driving home.  No, you can't see it.

4   Q.   How about the head?  You said your head --

5   A.   No.  My hair would cover it.  It was probably a bump on the

6   back.  I could feel the bump, but that's covered.

7   Q.   Did you show Carol Martin the bump?

8   A.   No.

9   Q.   No, you didn't.

10  A.   Well --

11          THE COURT:  There is no question.

12  A.   I don't know.

13          THE COURT:  Ms. Carroll, there is no question.

14          THE WITNESS:  Okay.

15  BY MR. TACOPINA:

16  Q.   And you never went to the police to report this alleged

17  incident?

18          MR. FERRARA:  Objection.  Asked and answer.

19          THE COURT:  Mr. Tacopina --

20          MR. TACOPINA:  Did I ask that already?

21          THE COURT:  I'm out -- well, I'm not going to be

22  guilty of hyperbole, but plenty.

23          MR. TACOPINA:  Okay, your Honor.

24  BY MR. TACOPINA:

25  Q.   Well, let me ask you this question anew.  You would agree

N4r2Car5                        Carroll - Cross

1   that not reporting this alleged attack to the police is a very

2   odd fact, to use your words?

3   A.  No, that's not an odd fact.  As a matter of fact, it --

4   many women do not go to the police.  I understand why.

5   Q.  Okay.  So it's not an odd fact that you didn't report it to

6   the police.

7   A.  No, it's not.  It's the usual fact.

8          MR. TACOPINA:  Put up AA in evidence, please.

9   Q.  It's from your book, Ms. Carroll, page 242, lines 9-12.

10  Actually, let's get counsel get situated.  AA in evidence, page

11  242, lines 9-12.

12         MR. FERRARA:  Just one moment, your Honor.

13         (Counsel confer)

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    MR. TACOPINA:  We are OK.

2    Q.  This is in evidence, Ms. Carroll?

3    A.  Yes.

4    Q.  You just said it wasn't odd that you didn't go to the

5    police.  This is from your own book:  There are several facts,

6    however.  I will try to make them as unsexy as possible so as

7    not to turn up -- what is that word?

8    A.  Gonadal.

9    Q.  What does that mean?

10   A.  A glow comes from the male gonads.

11   Q.  The gonadal glow of his base, facts that are so odd that I

12   want to clear them up now before we start.  Did I report the

13   attack to the police?  No.

14        In your book, you say you want to clear up this odd

15   fact that you did not report this to the police.  Now, do you

16   agree that it is odd that you didn't report this to the police?

17   A.  I think it appears odd to you.

18   Q.  I didn't write this book, Ms. Carroll.

19        MR. FERRARA:  Objection.

20   A.  I am employing many --

21        MR. FERRARA:  I have an objection.  I just wanted to

22   the witness to finish her answer.

23        THE COURT:  Let her finish the answer.

24        MR. TACOPINA:  Yes, sir.

25   A.  There is a group of facts here.  To many readers, they will

N4RMCAR6                          Carroll - Cross

1   appear odd, and I wanted to set matters straight before I told

2   the story, and I wanted people to know right up front I did not

3   report the attack.

4   Q.  But you would agree, as a writer, the way you write this is

5   not that some people may think this is odd.  You write that

6   there are facts that are so odd I want to clear them up now

7   before we start?

8              MR. FERRARA:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10  Q.  These are your words in this exhibit, correct?

11             THE COURT:  Sustained.

12  Q.  You mentioned yesterday when you testified that there were

13  threats that were made to you after the story came out,

14  especially death threats, right?

15  A.  Yes.

16  Q.  Did you report those death threats to the police?

17  A.  No.

18  Q.  Any law enforcement authority?

19  A.  No.

20  Q.  You just bought bullets?

21  A.  Yes.

22  Q.  Today you said you feel you were under threat and then some

23  tweets -- I think there were tweets that were sent to you,

24  tweeted at you, whatever the terminology is, or displayed in

25  court.

N4RMCAR6                        Carroll - Cross

1   A.   Um-hum.

2            THE COURT:  You need to answer with words.

3            THE WITNESS:  Yes.  I'm sorry.

4   A.   Yes.

5   Q.   Do you have any tweets where anyone threatened you?

6   A.   Yes.  But in the early days, I will just delete those to

7   get them out of my sight.

8   Q.   When is the early days?  Can you fix that time period?

9   A.   Within days of when it was first revealed on June 21 in The

10  Cut.

11  Q.   You said you opened your Twitter this morning because you

12  testified yesterday and you saw all this horrific stuff?

13  A.   And I opened it again today just to check.

14  Q.   Were there any threats today?

15  A.   No.

16           MR. TACOPINA:  Your Honor, can I have one second with

17  counsel?

18           THE COURT:  Yes.

19           MR. TACOPINA:  Your Honor, I think we have to approach

20  on something, an issue.

21           THE COURT:  All right.

22           (Continued on next page)

23

24

25

1            (At sidebar)

2            MR. SEIGEL:  There is a dispute over one of the audios

3    that we seek to play.  It's of an interview --

4            MR. TACOPINA:  Television interview on CNN.

5            MR. SEIGEL:  -- on June 24, 2019 of Ms. Carroll.

6    During it she was asked whether or not she would go to the

7    police and was advised --

8            THE COURT:  Slower.

9            MR. SEIGEL:  She was asked whether she would go to the

10   police, given that the mayor at the time expressed an interest

11   in investigating this.  And she said it was her understanding

12   that the statute of limitations had run, so she could not

13   bring a claim.  That's the first transcript.

14           The transcript we do not have a dispute on is of an

15   interview two days earlier in which he was advised that the

16   statute of limitations did not run.

17           We are seeking to introduce the audio of the second

18   transcript that I referenced, the one on June 26 -- excuse

19   me -- June 24, which actually it's the earlier interview, in

20   which he learns the statute of limitations had not run, and

21   nonetheless she gives that as an explanation for why --

22           THE COURT:  You lost me.

23           MR. SEIGEL:  She does two interviews.

24           The first interview, the one that we are having a

25   dispute over -- excuse me.  I'm a little backwards here.  The

first interview, that we don't have a dispute over, she is told

that the statute of limitations had run.  She is aware of that

fact.  And she gives an alternative explanation for why she

doesn't bring a criminal claim.

THE COURT:  She gives who?

MR. SEIGEL:  The interviewer.  She doesn't cite the

statute of limitations.  The dispute that we are having

relates --

THE COURT:  Why she doesn't bring a claim for what?

MR. SEIGEL:  Criminal charge for rape.

THE COURT:  You're saying she had earlier in the

interview she thought that the statute had run?

MR. SEIGEL:  Right.  When she was advised earlier that

it hadn't.

MR. TACOPINA:  In an interview two days earlier, which

is the next exhibit.

MR. SEIGEL:  I can read it into the record.

The interviewer says to her:  I guess the reason I'm

asking is because the mayor of New York City, Mayor Bill

DeBlasio, who of course is running against President Trump, has

said that if you were to bring a case forward, if you -- he

will pursue it.  He will have the New York City Police

Department pursue it.  So do you want to pursue this legally?

Ms. Carroll responds:  This, the greatest police

department in the world.  The detectives are great in New York.

1    The thing is, it's past the time.  Its experts -- I've been

2    talking to experts -- experts, and they say that we've passed

3    the legal --

4          Ms. Camerota, the interviewer, says:  The statute of

5    limitations.

6          Ms. Carroll says:  Yes.  Thank you.

7          The interviewer continues:  Yes.  There was a statute

8    of limitations in place at the time that this happened in late

9    '95 or '96.  That has since changed.  And Mayor DeBlasio, when

10   he heard your story, said that he would pursue on your behalf

11   an investigation.

12         We redacted portions relating to the dress pertaining

13   to the DNA, so we took that out.

14         Ms. Carroll continues:  I'd consider it, but the

15   experts are telling me that --

16         And the interview says:  You consulted lawyers?

17         And she says:  Yeah.  Well, they've written to me.  I

18   have never consulted a lawyer in my life.  It's not something I

19   would do.  They have, you know, emailed me to tell me that, you

20   know, this, as you say, the statute of limitations is passed

21   because I don't know the legal -- I don't know -- I don't want

22   to say -- because I don't know what it is.

23         Notwithstanding that, on June 24, two days earlier,

24   she appears during an interview where she hears from a

25   prosecutor --

1              THE COURT:  I'm sorry.  What about a prosecutor?

2              MR. SEIGEL:  She is told in the interview two days

3      earlier that the statute of limitations was revived.  It's no

4      longer moribund and she can bring a claim.  During that

5      interview she doesn't cite the statute of limitations as a

6      basis for not going forward.  She gives an alternate

7      explanation.

8              THE COURT:  To wit.

9              MR. SEIGEL:  This one is not in dispute, but she

10     claims in this interview that it would be disrespectful for her

11     to bring a criminal charge.

12             MR. TACOPINA:  This is not in dispute.  Only the first

13     one is putting in context the inconsistency, your Honor.

14             MR. SEIGEL:  That's right.

15             MR. FERRARA:  Your Honor, our objections are on 402

16     and 403 grounds.

17             As to 403, if your Honor is this confused, imagine how

18     much confusion the jury is going to be under.  We think that

19     this particular exhibit, the one that we object to, which is

20     AB, discusses criminal investigations and that we don't want

21     the jury thinking this is a criminal case.

22             We think that Ms. Carroll is arguably responding to

23     questions about whether a criminal case could be brought.  She

24     is saying candidly, I don't know.  She is being candid about

25     it.

1            If they want to ask her about AW, we have no

2   objection.  We have an objection to AB, given it discusses

3   criminal investigations and the like.

4            MR. SEIGEL:  I just want to respond briefly and say,

5   first of all, once the transcript is read, it clears it up.  I

6   understand without the transcript trying to explain it, just

7   asking questions, it's certainly confusing, but the transcript

8   puts this in context.

9            MR. TACOPINA:  The video would put it in context.

10           MR. SEIGEL:  That's true.

11           Two, it goes to credibility.

12           THE COURT:  No.  403.  This is ridiculous.  Total

13  confusion.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. SEIGEL:  Can I proceed?

3              THE COURT:  Sure.

4    Q.  Ms. Carroll -- let me withdraw.

5              You did an interview on MSNBC with a host named

6    Lawrence O'Donnell in June of 2019, correct?

7    A.  Yes.

8              MR. TACOPINA:  Can you put the cover page up for

9    Ms. Carroll or the screenshot of the video.

10             That's Chris Matthews.  It is AW.

11             THE COURT:  If you can't do this, let's move on to

12   something else.

13             MR. TACOPINA:  I think we can.  It's here.  Just stop

14   it.

15   Q.  That's a screenshot from the interview you did with

16   Lawrence O'Donnell on the Last Word on MSNBC, correct?

17   A.  Yes.

18             MR. TACOPINA:  Your Honor, we would offer this,

19   Exhibit AW, into evidence.

20             THE COURT:  Is there any objection?

21             MR. FERRARA:  Subject to certain discussions with

22   counsel about redactions, no.

23             THE COURT:  Received.

24             (Defendant's Exhibit AW received in evidence)

25             MR. TACOPINA:  I would like to play AW for the jury at

N4RMCAR6                        Carroll - Cross

1   this point from the beginning.

2               (Video played)

3   Q.  Do you recall that interview?

4   A.  Yes.

5   Q.  And you stand by what you said there?

6   A.  I looked -- I remember what was going on.  I had read a

7   news story that day about hundreds of women at the border who

8   had no protection who are being attacked by men.  It was

9   uppermost in my mind.  I felt bad for them.  I felt helpless.

10  I couldn't help them.  I said this out of sympathy.  At the

11  time I had no intention of bringing a lawsuit.

12  Q.  You appeared on August 12, 2019 on a podcast called

13  UnStyled and spoke to its host, Christine Barberich?

14  A.  Yes.

15  Q.  About that camp counselor who you testified to who

16  supposedly sexually abused you?

17  A.  Yes.

18  Q.  That camp counselor was that person named Cam?

19  A.  Yes.

20  Q.  That person was identified as hideous man number 6 in your

21  book?

22  A.  Yes.

23  Q.  You told Christine Barberich on this podcast that being

24  sexually abused by Cam had more of an effect on you than any

25  other person that abused you?

1    A.  I am not sure what the context was.  Was I talking about

2    childhood events?

3              MR. TACOPINA:  You guys have that clip?

4              MR. FERRARA:  I don't think we do.  I apologize if I'm

5    wrong, but I don't have it here.

6              Apologies.  One moment, your Honor.

7              MR. TACOPINA:  We will come back to it, your Honor, if

8    need be.  We will straighten this out.

9    Q.  You said that you think about what Cam did every day?

10   A.  In some form it glances through my mind.  Maybe not

11   absolutely every day, but it's frequent.

12   Q.  And you acknowledged in that podcast that Cam, you came to

13   learn, was arrested years later?

14   A.  Yes.

15   Q.  And you recognize that after Cam supposedly abused you he

16   may have abused other girls prior to his arrest, correct?

17             MR. FERRARA:  Objection.

18             THE COURT:  Sustained.

19   Q.  According to you, Donald Trump is a brutal and dangerous

20   man?

21   A.  Yes, he is.

22   Q.  But, according to you, you wouldn't bring a criminal charge

23   against him because that would be disrespectful to women being

24   raped by the border and around the world?

25             MR. FERRARA:  Objection.

N4RMCAR6                        Carroll - Cross

1          THE COURT:  You already asked that question.

2          MR. TACOPINA:  I did not ask this question.  I read --

3   played what she said.  I am asking a question about what she

4   said.

5          MR. FERRARA:  This is not a criminal case, your Honor.

6          THE COURT:  Sustained.

7   Q.  Let me ask you this.  How would you -- it's not a criminal

8   case.  How would you bringing criminal charges be disrespectful

9   to some people at the border?

10          MR. FERRARA:  Objection.

11          THE COURT:  Sustained.  Correct me if I'm wrong,

12   counsel, but I believe in the State of New York private

13   individuals can't bring criminal charges and probably have not

14   been able to do that in at least a century or two.

15          MR. TACOPINA:  No, they can't.  They could go to the

16   police department.

17          THE COURT:  That's not what you said, counselor.  We

18   have been up and down the mountain on the question of whether

19   she went to the police, so let's move on.

20          MR. TACOPINA:  We have not been up and down the

21   mountain of what we just heard.

22          Can I ask one question?

23          THE COURT:  Move on.

24          MR. TACOPINA:  I guess not.

25   Q.  According to you, security cameras must have picked you and

1   Donald Trump up at the 58th Street entrance of the store?

2   A.  I was guessing that they must have picked -- got a shot of

3   us, yes.

4   Q.  You wrote that in your book, right?

5   A.  Yes.

6   Q.  So according to you and your book, you therefore would have

7   been filmed on the ground floor of Bergdorf Goodman with Donald

8   Trump?

9   A.  Yes.

10  Q.  According to you, cameras could have also captured you

11  going up the escalator?

12  A.  Yes.

13  Q.  And it's your testimony that cameras could have filmed you

14  walking into the lingerie department?

15  A.  Could have, yes.

16          THE COURT:  Assuming there were any, right,

17  Ms. Carroll?

18          THE WITNESS:  I have never, your Honor, been able to

19  verify if there were cameras in the dressing room or in the

20  lingerie department.

21  Q.  The reason you have never been able to verify that is

22  because you never tried to get any videos that would have

23  existed to support your claim?

24          MR. FERRARA:  Objection.  Can we have a time period,

25  your Honor?

1          MR. TACOPINA:  Sure.

2     Q.  When you were allegedly assaulted in Bergdorf Goodman by

3     Donald Trump and on the first floor with Donald Trump and on

4     the escalators with Donald Trump, you never thereafter, that

5     day, the next day, the next week or ever tried to get the

6     videos that could have existed to support your claim?

7          MR. FERRARA:  I object to the breadth of the question.

8          THE COURT:  Sustained.

9          MR. TACOPINA:  The breadth.  OK.

10    Q.  Did you go back the next day to get -- ask for the video

11    camera footage?

12         THE COURT:  Sustained.  It assumes there is such a

13    thing.

14         MR. TACOPINA:  Ms. Carroll in fact testified, as did

15    the Bergdorf Goodman witness, that on the main floor there are

16    security cameras, your Honor.

17         THE COURT:  Ms. Carroll testified she guessed, and we

18    have had the testimony from the witness who was at Bergdorf at

19    the time, and she said what she said.  We are not going to ask

20    questions based on this kind of statement.

21         MR. TACOPINA:  Can I ask this question?

22         THE COURT:  I don't know yet.  I have not heard it.

23         MR. TACOPINA:  I know you don't know it, so I am going

24    to ask it, and you will let me know.

25    Q.  Did you ever attempt to ascertain whether there is any

1    video footage of you and Donald Trump at Bergdorf Goodman?

2              MR. FERRARA:  Objection.

3              THE COURT:  Sustained.  I sustained the objection to

4    that question within the last three minutes.

5    Q.  You are a writer, Ms. Carroll?

6    A.  Yes.

7    Q.  And you wrote every day for 18 years at a period of time

8    when you were married to Steve Byers?

9    A.  I was still in the -- I was pitching to magazines, and I

10   refused -- everybody said no, no, no, and nobody wanted my

11   work.  They didn't like my ideas.  And I kept at it until I got

12   my foot in the door.

13   Q.  You, early on in life, dedicated yourself to becoming a

14   writer?

15   A.  Yes.

16   Q.  And writing was important to you?

17   A.  Yes.  It's the way I process my life.

18   Q.  And you kept a diary?

19   A.  I've always diaries.

20   Q.  Despite the fact that you're clearly an avid writer who

21   kept a diary, you never made a diary entry contemporaneously

22   memorializing this alleged rape by Donald Trump in your diary?

23   A.  No.  I don't write about negative.

24   Q.  You would put in your diary things like, threw the ball for

25   the dog?

N4RMCAR6                         Carroll - Cross

1    A.  Yeah, basically.  You have -- in discovery I turned over

2    many diaries.  You can see -- I threw the ball for the dog you

3    will probably see, I don't know, 400 times.

4    Q.  In your diary you would write, threw the ball --

5    A.  For the dog.

6    Q.  You said the reason you didn't put bad things in your diary

7    is because you were superstitious?

8    A.  Yes.

9    Q.  And superstitious in what regard, Ms. Carroll?

10   A.  I always felt if I wrote something bad, I'd have to think

11   about it.  If I write it, I'm thinking about it.  It would -- I

12   don't want to think about bad things.

13   Q.  But you wrote a book about the worst thing that ever

14   happened to you.

15   A.  I thought it was time not to be silent.

16   Q.  Now, even though you didn't keep an account of this alleged

17   rape in your diary, you did keep the dress you supposedly wore

18   that day?

19   A.  Yes.

20   Q.  Didn't throw it out?

21   A.  No.  It was a beautiful dress.

22   Q.  You didn't burn it?

23   A.  No.  I would never burn a beautiful item of clothing.

24            THE COURT:  We are going to break here for the day.

25   We will return on Monday at 10:00.

N4RMCAR6

1            Counsel remain, please.

2            Members of the jury, please do not discuss the case

3    with anyone, including among yourselves.  Have a great weekend.

4            (Jury not present)

5            THE COURT:  Where are you going with this, Mr.

6    Tacopina?

7            MR. TACOPINA:  Where am I going with this?  That she

8    saved the dress, still hangs in her closet.  The witness is

9    right here, your Honor, but I guess that's OK.

10           THE COURT:  If you object, that's fine.  She can leave

11   the room.  You're right.

12           MR. TACOPINA:  I think so.

13           THE COURT:  Please leave the room, Ms. Carroll.

14           MR. FERRARA:  She is just collecting her bag, your

15   Honor.

16           MR. TACOPINA:  One of the things she has repeated is

17   that these bad things, she wants them out of her mind, out of

18   her head.

19           By the way, let me start out by saying, if you think I

20   am going anywhere near DNA or anything like that, I am not.

21           THE COURT:  That's what I wanted to find out.

22           MR. TACOPINA:  Your Honor, I'm actually shocked that

23   you think I would run afoul of the Court's order that's so

24   clear.  I didn't mention it in my opening.  I have no intention

25   of eliciting that.

N4RMCAR6

| 1 | THE COURT:  That's why I sent everybody out, just so

2 | that I could be sure.  Because once that bell rings, there is

3 | no way to unring it.

4 | MR. TACOPINA:  I'll read you my questions, if you'd

5 | like.

6 | THE COURT:  You don't have to read me your questions.

7 | You tell me you are not going near it.  I accept that you are

8 | not going near it.

9 | MR. TACOPINA:  Just about the fact that she kept the

10 | dress, didn't get rid of the dress.

11 | THE COURT:  Sentimentality.  I understand.

12 | How long do you expect to be on Monday.

13 | MR. TACOPINA:  I'm more than halfway through my

14 | outline, which was shorter than Mr. Ferrara's outline.  I

15 | think -- again, it depends if I have to impeach or not impeach.

16 | Things have moved a little bit in the last bit.  That's why we

17 | got to these tapes that we didn't expect to get to before we

18 | had to address it with you.

19 | THE COURT:  I think it would go a lot faster if we cut

20 | out the repetition and if we stopped asking argumentative

21 | questions.

22 | MR. TACOPINA:  Your Honor, honestly, I'm at a loss

23 | because I've done this once or twice in my life.  I know how

24 | your Honor wants to run this courtroom, and I understand your

25 | rules and I respect you.  I know that you're by the book in

N4RMCAR6

1    every way, shape, or form.  I crafted every question in a

2    way -- if something sounded argumentative, I didn't mean to be.

3    I was summarizing her statements.  I don't know what one

4    question I asked that was argumentative.

5              THE COURT:  There were more than one.

6              MR. TACOPINA:  Really?

7              THE COURT:  Oh, yes.  I sustained objections whenever

8    they were made to them.

9              MR. TACOPINA:  For example, the last round of

10   questions that you sustained an objection on was, to me -- I'm

11   at a loss for what was the fact that she didn't go to the

12   police about this man that she thinks is dangerous and brutal.

13   Even though I asked if she didn't go to the police before, it's

14   in regards to the questioning about Donald Trump.

15             THE COURT:  The fact that she didn't go to the police

16   is about as notorious a fact as the Yankees have not won the

17   World Series in years.

18             MR. TACOPINA:  The Mets more.

19             THE COURT:  The Mets more.  I'll give you the Mets

20   too.

21             But everybody knows it.  It's on the table, it's a

22   fact, and you will do your best with it, for what it's worth.

23   But to do it 20, 30 times, enough already.

24             MR. TACOPINA:  OK.  I know you don't really mean 20,

25   30 times.  I know you're just --

N4RMCAR6

1        THE COURT:  Yes.  My wife always tells me that I'm
2   guilty of hyperbole, and I try to catch myself whenever I get
3   launched into it.
4        I have to correct something in the record.  I said for
5   Jonathan Swift and *A Modest Proposal* --
6        MR. TACOPINA:  What was that.
7        THE COURT:  Several centuries ago, not 700 years ago.
8   We will correct the record on that.
9        MR. TACOPINA:  Can we just leave the record alone.
10       THE COURT:  Jonathan Swift was an English writer of
11   considerable note.  I was forced to learn this when I was in
12   college.  And he wrote a book, a play, an article, I couldn't
13   tell you today called, *A Modest Proposal*, and it was about how
14   to solve some dreadful social problem affecting the British
15   then empire, and I frankly don't remember what the problem was
16   or what his absolutely ludicrous suggestion was, but it was one
17   that any reasonable-thinking person would have thought was
18   absolutely unthinkable.  And, therefore, when he spoke about a
19   modest proposal, what he was speaking about was in a sense of
20   irony and sarcasm, and I commend it to you because the very
21   first time I ever looked at the cover of this lady's book, it
22   brought back nightmares of Jonathan Swift.
23       MR. TACOPINA:  Judge, do you remember that great scene
24   in *My Cousin Vinny* where he said --
25       THE COURT:  You're from Brooklyn, and I'm from Staten

N4RMCAR6

1    Island.  If either one of us didn't remember every scene in *My*

2    *Cousin Vinny*, there would something seriously wrong with us.

3              MR. TACOPINA:  The Judge said too:  Your Honor, for

4    the witness and only the witness.

5              THE COURT:  Absolutely.

6              Enough of *My Cousin Vinny*.  Enough of Jonathan Swift.

7              Everybody have a good weekend.

8              Before you go off to try to do that, I'm genuinely

9    appreciative of the cooperation among counsel.  I don't know

10   where we would be without that.  I appreciate it.

11             Thank you.  Have a great weekend.

12             (Adjourned to May 1, 2023, at 10:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

E. JEAN CARROLL

Direct By Mr. Ferrara  . . . . . . . . . . . 308

Cross By Mr. Tacopina  . . . . . . . . . . . 330


                    PLAINTIFF EXHIBITS

Exhibit No.                                    Received

  108   . . . . . . . . . . . . . . . . . . . 312

  108-T  . . . . . . . . . . . . . . . . . . . 313

  4   . . . . . . . . . . . . . . . . . . . . 321

  45  . . . . . . . . . . . . . . . . . . . . 324

  46  . . . . . . . . . . . . . . . . . . . . 325

  48  . . . . . . . . . . . . . . . . . . . . 326

  51  . . . . . . . . . . . . . . . . . . . . 327

  53  . . . . . . . . . . . . . . . . . . . . 327


                    DEFENDANT EXHIBITS

Exhibit No.                                    Received

  AA   . . . . . . . . . . . . . . . . . . . . 331

  AF   . . . . . . . . . . . . . . . . . . . . 339

  AJ   . . . . . . . . . . . . . . . . . . . . 352

  AR   . . . . . . . . . . . . . . . . . . . . 410

  AW   . . . . . . . . . . . . . . . . . . . . 447