N512car1

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
    E. JEAN CARROLL,
 3
                Plaintiff,              New York, N.Y.
 4
            v.                          22 Civ.10016 (LAK)
 5
    DONALD J. TRUMP,
 6
                Defendant.
 7  ------------------------------x    Jury Trial

 8                                      May 1, 2023
                                        9:30 a.m.
 9
    Before:
10
                      HON. LEWIS A. KAPLAN,
11
                                        District Judge
12                                        and a Jury

13
                          APPEARANCES
14
    KAPLAN HECKER & FINK LLP
15       Attorneys for Plaintiff
    BY:  ROBERTA A. KAPLAN
16       MICHAEL J. FERRARA
         SHAWN G. CROWLEY
17       MATTHEW J. CRAIG

18
    TACOPINA SEIGEL & DeOREO
19       Attorneys for Defendant
    BY:  JOSEPH TACOPINA
20       CHAD D. SEIGEL
         MATTHEW G. DeOREO
21
22  HABBA MADAIO & ASSOCIATES, LLP
         Attorneys for Defendant
23  BY:  ALINA HABBA
         MICHAEL T. MADAIO
24
25  W. PERRY BRANDT
         Attorney for Defendant
```

N512car1

| 1 | (Pages 461 through 471 sealed) |

1          (Pages 461 through 471 sealed)

2          (In open court; jury not present)

3          THE COURT:  Good morning, everybody.

4          COUNSEL:  Good morning.

5          THE COURT:  I'm about to get the jury.

6          MR. FERRARA:  Just one point, your Honor.  We had

7     concluded on Thursday with some cross-examination about the

8     dress.

9          THE COURT:  About -- oh, yes, yes.

10         MR. FERRARA:  It's plaintiff's position that line of

11    inquiry has been exhausted.  We take -- we understand that

12    there are some legitimate questions around if this had

13    happened, wouldn't you have burned the dress, we understand

14    that idea.  But at this point that has come out, and if defense

15    wants to get into the fact that it was laundered or

16    unlaundered, for instance, we think that simply invites

17    speculation, so we would ask at this point that Mr. Tacopina

18    move on.

19         MR. TACOPINA:  I fronted that with Mr. Ferrara.

20         THE COURT:  You were looking down into your notes and

21    I didn't get what you said.

22         MR. TACOPINA:  And I'm not at a microphone either.

23         THE COURT:  Aside from that, it was clear as a bell.

24         MR. TACOPINA:  I fronted that with Mr. Ferrara, your

25    Honor, so we didn't have any issues going forward.  I would

N512car1

1    actually just ask a few questions when we concluded on Thursday

2    about the dress.  Obviously I'm not asking anything regarding

3    any testing or anything of that nature, simply that the dress

4    still hangs in her closet, that it wasn't washed, it wasn't

5    laundered, and that it was not worn, and it was just kept, and

6    that's the end of the inquiry.

7            MR. FERRARA:  It doesn't still hang in Ms. Carroll's

8    closet for reasons of litigation, so that -- I don't think it

9    is going --

10           THE COURT:  Get to the bottom line.  What's the

11   plaintiff's position?

12           MR. FERRARA:  We would object to further questions

13   about the dress.

14           THE COURT:  At all.

15           MR. FERRARA:  They are either asked and answered or we

16   think they go beyond what is appropriate.

17           THE COURT:  Mr. Tacopina, what would be new in your

18   proposed line of questioning?

19           MR. TACOPINA:  I only asked two questions about the

20   dress, did you throw it out or burn it and what would be new is

21   that -- look.  I'm going based on source material from an

22   article in 2019 where the dress still hangs in her closet.

23   Maybe that's changed.  But the fact is, the dress was kept for

24   two decades by Ms. Carroll.  I just want to bring that out and

25   that it hadn't been washed or laundered, which I think goes to

N512car1

1    the --

2              THE COURT:  We are not going there.

3              MR. TACOPINA:  Okay.

4              THE COURT:  Unless you want to go into your client's

5    history of refusing to furnish a DNA sample for three years.

6              MR. TACOPINA:  Okay.  Well, my client did offer a DNA

7    sample this year, two months after the case was brought, but,

8    your Honor --

9              THE COURT:  Your client offered that DNA sample as

10   part of a *quid pro quo* after all discovery was closed, and

11   let's not relitigate that question.

12             MR. TACOPINA:  I wasn't planning on that.  Just

13   responding to your Honor's statement.

14             Okay.  So then I will just ask about the fact that the

15   dress was kept for the last two decades after the assault,

16   period, without the laundering and washing and whatnot.

17             MR. FERRARA:  Again, your Honor, we think it's asked

18   and answered.  It was asked:  "Even though you didn't keep an

19   account of" -- this is at the transcript from Thursday at

20   454/line 16:  "Now, even though you didn't keep an account of

21   this alleged rape in your diary, you did keep the dress you

22   supposedly wore that day.

23   "A  Yes.

24   "Q  Didn't throw it out?

25   "A  No.  It was a beautiful dress.

N512car1

1    "Q  You didn't burn it.

2    "A   No, I would never burn a beautiful item of clothing."

3               And at that point your Honor concluded the day.

4               THE COURT:  Okay.  It's closed.

5               MR. TACOPINA:  Okay, your Honor.  No problem.  That's

6    fine.

7               THE DEPUTY CLERK:  Shall I get the jury, Judge?

8               THE COURT:  One more second.  The motion that I found

9    on my desk from the defense this morning, has that been filed

10   yet or no?

11              MR. TACOPINA:  Mr. Seigel will be dealing with that.

12              MR. SEIGEL:  It has, your Honor.

13              THE COURT:  It is now denied.

14              Okay.  Get the jury.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury present)
 2     E. JEAN CARROLL, previously sworn, resumed.
 3              THE COURT:  Good morning, everybody.  I hope everybody
 4     had a restful weekend, if damp.
 5              Ms. Carroll, you are still under oath.
 6              Let's proceed.  Mr. Tacopina.
 7              MR. TACOPINA:  Thank you, your Honor.
 8     CROSS-EXAMINATION (continued)
 9     BY MR. TACOPINA:
10     Q.  Ms. Carroll, I would like to talk to you about Bergdorf
11     Goodman and your returning there after the alleged assault.
12     You continued to shop at Bergdorf after that 1995 or '96
13     incident you described, correct?
14     A.  Yes.
15     Q.  Okay.  And you go into changing rooms there when making
16     purchases?
17     A.  No, I don't believe I ever went into a dressing room.
18              MR. TACOPINA:  One second, please, your Honor.
19              I am going to direct counsel's attention to
20     Ms. Carroll's deposition from January 31 of 2023, lines 14-16.
21     I could actually back it up to line 7 for context.
22              THE COURT:  And what page?
23              MR. TACOPINA:  I'm sorry, page 93.
24              THE COURT:  Thank you.
25              MR. TACOPINA:  Counsel, when you are ready, just let
```

1   me know, please.

2              THE COURT:  Do I have a copy of this transcript,

3   folks?

4              (Counsel confer)

5              MR. TACOPINA:  You do, your Honor, but we have an

6   extra.

7              THE COURT:  That would be kind.  Thank you.

8              MR. TACOPINA:  Your Honor, when you are ready.

9              THE COURT:  I'm ready.

10  BY MR. TACOPINA:

11  Q.  Ms. Carroll, you just testified you didn't go into the

12  changing rooms.  I'm going to read to you from your deposition

13  testimony, January 31 of this year, starting at line 7, page

14  93:

15  "Q  You used to go to Bergdorf Goodman.  You testified that you

16  still go to Bergdorf Goodman.  Would you have any issue going

17  to Bergdorf Goodman again as a result of Donald Trump?

18  "A  No.

19  "Q  Did you go into the changing rooms alone?

20  "A  Yes."

21              That was four months ago when you gave that answer,

22  correct?

23  A.  I think I was thinking of the time I accompanied my niece

24  who was choosing a wedding dress, so the whole thing was a

25  changing room.  I may have been thinking of that.  I can't

N512Car1                    Carroll – Cross

1    remember.

2    Q.  Well, the question that you were asked and the answer you

3    gave was, "Did you go into changing rooms alone?" and you said,

4    "Yes."

5    A.  Ah.  I may have been thinking of a time that I am now not

6    recollecting, but what I do recollect buying in Bergdorf are

7    earrings, looking at shoes, strolling through the housewares,

8    picking up a journal as a Christmas present for my friends.  I

9    have -- I don't know what I was thinking about in that

10   deposition.

11   Q.  Okay.

12   A.  I may have been right, and I may be just forgetting it

13   today.

14   Q.  Speaking of which, you just outlined some of the things you

15   purchased at Bergdorf's since 1995 and '96?

16   A.  Yes.

17   Q.  You have made many purchases at Bergdorf Goodman since 1995

18   and '96.

19   A.  I have not made many, but I've certainly made several.

20   Q.  Okay.  Well, for instance, in 1997 you made purchases at

21   Bergdorf Goodman on four different dates?

22   A.  I probably did.

23   Q.  Let me see if I could help you.  I'm going to put up AY for

24   the witness and counsel and the Court, please.  Something will

25   be coming up, Ms. Carroll?

N512Car1                        Carroll - Cross

1    A.  Ah, right.

2    Q.  This is a journal that you prepared or that you maintained?

3    A.  Yes.  This is a QuickBooks report.

4    Q.  And did you -- was this prepared by you or maintained by

5    you?

6    A.  This is maintained by my sister Cande Carol.

7               MR. TACOPINA:  Your Honor, I would offer AY.

8               MR. FERRARA:  Without objection.

9               THE COURT:  Received.

10              (Defendant's Exhibit AY received in evidence)

11   BY MR. TACOPINA:

12   Q.  So this could be displayed, please.

13              So you see right there on AY there are four different

14   purchases?

15   A.  Yes.

16   Q.  Okay.  Basically -- your Honor, could I just have one

17   second?

18              (Counsel confer)

19              MR. TACOPINA:  Apparently there is another page, same

20   exhibit, still AY, second page.  I don't know if there is a way

21   to zoom that a little bit.  Okay.  And that's the second page.

22   BY MR. TACOPINA:

23   Q.  So between 2001 and 2018, you made purchases at Bergdorf

24   Goodman on 23 different dates.  Correct, Ms. Carroll?

25   A.  Yes.

N512Car1                        Carroll - Cross

1    Q.  Okay.  You can take that down.  Thanks.

2                 Now, of course that doesn't include the times you went

3    there perhaps and didn't buy anything?

4    A.  That's true.

5    Q.  So it's clear from this, there was no -- you were not

6    afraid or concerned about going to Bergdorf Goodman after the

7    alleged assault in '95 or '96?

8    A.  No, no.  I made that clear, that Bergdorf's is not a place

9    that I am afraid to enter.

10   Q.  I think you testified just now you mentioned something

11   about an event there where -- an event or an occasion, I should

12   say, where your niece, it was your niece was trying on a

13   wedding dress?

14   A.  She was trying on wedding dresses.

15   Q.  Dresses.  Okay.  And you were there also with Lisa Birnbach

16   that day.

17   A.  Yes.

18   Q.  And you guys were having champagne, correct?

19   A.  Yes.

20   Q.  And it's your testimony that during that occasion while you

21   were in the same store which you claimed to have been raped in

22   alongside the person you claimed to have called immediately

23   following the rape, it's your story the alleged attack never

24   entered your head once?

25                 MR. FERRARA:  Objection to the argumentative portion.

1          THE COURT:  Rephrase it.

2     BY MR. TACOPINA:

3     Q.  Did -- when you were there with Lisa Birnbaum -- Birnbach,

4     sorry.

5          When you were there with Lisa Birnbach that day where

6     you were discussing your niece's wedding dresses and having

7     champagne with Lisa, did the alleged attack ever enter your

8     head?

9     A.  I don't remember it entering my head.  It could have -- a

10    vision could have streaked through my brain while we were

11    there, but this was a very happy occasion, and I wasn't there

12    to remember the time in the dressing room in 1996.

13    Q.  And did you have any discussions with Lisa about --

14    A.  No.

15    Q.  -- the alleged attack?

16    A.  No.

17    Q.  You testified at trial, I think it was on Wednesday, the

18    first day of your testimony, that when Donald Trump was running

19    for president, you couldn't get away from him.  You kept seeing

20    his face, and it was hard.

21    A.  Yeah.

22    Q.  Okay.  You are familiar with the TV show *The Apprentice*?

23    A.  Yes.

24    Q.  It's a reality show that featured Donald Trump as the host

25    or a host?

1   A.  Yes.  I was a big sort of fan of the show.  I was very

2   impressed by it.

3   Q.  As a matter of fact, I think you did a Facebook post once

4   where you said you were a massive fan, right?

5   A.  I had never seen such a witty competition on television.

6   It was about something that was worthwhile, about business

7   plans and business people, ambitious young business people

8   competing to win a job.  The part where who he fired at the

9   end, I didn't watch that part.  I loved the competitions.

10  Q.  Okay.  But you made a Facebook post saying you were a

11  massive——all caps——*Apprentice* fan?

12  A.  That's because two of my friends had appeared on *The*

13  *Apprentice* and I wanted to boost -- I wanted to make it known

14  that I also liked *The Apprentice*.

15  Q.  Okay.  So you liked *The Apprentice* and you watched it, fair

16  to say?

17  A.  It was a very good television show.

18  Q.  And only about a few -- by the way, let me show you AZ to

19  make sure we are talking about the same thing, please.  AZ,

20  Ms. Carroll, is that your Facebook post?

21  A.  Yes.

22  Q.  Okay.

23  A.  What's the date on that?

24  Q.  4/22/12, Ms. Carroll.  It's right on -- I'm sorry, that

25  looks like November -- no, no, that's the day it was printed.

N512Car1                    Carroll - Cross

1    Hold on one second.  It's from 2012.  Hold on.

2              Do you recall the time frame in which you made that

3    post?

4    A.  I think a friend of mine was appearing on the show, which

5    prompted me to do it, but that I'm not sure.

6    Q.  Okay.

7    A.  That I'm not sure.

8    Q.  All right.

9              Now, let me ask you this.  You also made a Facebook

10   post regarding Donald Trump and a sort of a joke.  Do you

11   recall making a joke about Donald Trump on your Facebook post?

12   A.  Mr. Tacopina, I made several jokes about Donald Trump.

13   Q.  Okay.  Then let me show you this one.  This is BA, defense

14   BA, your Honor.

15             Do you recall that Facebook post from August 6, 2012,

16   Ms. Carroll?  And I refer your attention to your post up top.

17   A.  Yes.

18             MR. TACOPINA:  Okay.  I offer, your Honor, BA into

19   evidence.

20             MR. FERRARA:  Your Honor, we don't object to the

21   portion that is simply Ms. Carroll's post, but it is followed

22   by many comments that we think --

23             MR. TACOPINA:  No problem, your Honor.  We agree that

24   that should be redacted.  We will just focus on what's actually

25   highlighted on the screen, and we will leave it up like that.

N512Car1                    Carroll - Cross

1          MR. FERRARA:  That's fine, although it is visible on

2     the screen, your Honor.

3          MR. TACOPINA:  We can take care of that, apparently.

4          Okay, Mike?

5          MR. FERRARA:  Yes, thank you.

6          MR. TACOPINA:  We offer Defendant's Exhibit BA.

7          THE COURT:  BA, as redacted so as to limit it only to

8     Ms. Carroll's post, is received.

9          (Defendant's Exhibit BA received in evidence)

10         MR. TACOPINA:  Please publish to the jury as well.

11         THE COURT:  Yes.

12    BY MR. TACOPINA:

13    Q.  So this is a Facebook post by you from April -- I'm sorry,

14    August 6, 2012, and here you write:  "Would you have sex with

15    Donald Trump for $17,000?  (Even if you could (a) give the

16    money to charity, (b) close your eyes, and he is not allowed to

17    speak.)"

18         So you joked around about having sex with Donald Trump

19    for money in this Facebook post, correct?

20    A.  Yes.

21    Q.  And in 2012 -- 2012 -- let me summarize this question.  In

22    2012, that was about five years before you started writing your

23    story about being raped by Donald Trump.

24    A.  I started that story in December 2017.

25    Q.  So a little over five years.

N512Car1                          Carroll - Cross

1    A.   Um-hmm.

2    Q.   Earlier you made this joke about having sex with Donald

3    Trump for money.

4              THE COURT:  Mr. Tacopina, everybody's got the math

5    down cold and that question was asked just a minute ago.

6              MR. TACOPINA:  Okay, your Honor.

7              THE COURT:  So move on.

8              MR. TACOPINA:  Okay.  We can take that down.

9    BY MR. TACOPINA:

10   Q.   Your book lists the 21 most hideous men you ever

11   encountered.  We discussed that earlier.

12   A.   Mr. Tacopina --

13   Q.   Yes, Ms. Carroll?

14   A.   -- not the 21 that I have ever encountered.  The list

15   included high comedy and dark events.

16   Q.   Okay.

17   A.   It had men who were merely annoying, which I put into it

18   for comic effect to bring out the true evil of the more vile

19   men on the list.  So it's a balanced list.

20   BY MR. TACOPINA:

21   Q.   I understand, Ms. Carroll.  Thank you.

22             And without getting into any details, but it

23   identifies purported attacks that men have made against you.

24   A.   Yes.

25   Q.   And according to you, your book doesn't even include all

N512Car1                          Carroll - Cross

1    the people who sexually assaulted you?

2              MR. FERRARA:  Objection, your Honor.  412.

3              THE COURT:  Members of the jury, please go into the

4    jury room for a minute.

5              (Continued on next page)

1            (Jury not present)

2            THE COURT:  Be seated, folks.

3            Mr. Ferrara.

4            MR. FERRARA:  Your Honor, I don't know where

5     Mr. Tacopina is going here, but we have obviously briefed to

6     the Court the idea that prior sexual assaults, prior sexual

7     experiences.  There is a procedure under 412.  This is very

8     sensitive evidence, and so not knowing where he was going, I

9     objected.

10            THE COURT:  Well --

11            MR. TACOPINA:  That was --

12            THE COURT:  The first question to you, Mr. Ferrara, is

13     forget about where he is going, what about the question that's

14     on the table?

15            MR. FERRARA:  The question that's on the table could

16     potentially elicit other instances in which Ms. Carroll was

17     sexually assaulted that we have moved --

18            THE COURT:  The answers are "yes," "no," or "I don't

19     remember."

20            MR. FERRARA:  I'm not sure it's appropriate even for

21     the jury to have in front of it evidence that there were other

22     people outside of the book who -- first off, even -- some of

23     the sexual assaults in the book have been kept out.  So I don't

24     understand the relevance of sexual assaults outside the book.

25            THE COURT:  Okay.  Just so I am clear, then, your

 1  position is that a "yes" answer is itself barred by 412.

 2  That's your position.

 3          MR. FERRARA:  Potentially.

 4          THE COURT:  Not potentially, is.

 5          MR. FERRARA:  Yes.

 6          THE COURT:  Okay, now Mr. Tacopina.

 7          MR. TACOPINA:  That was the entirety of the question,

 8  your Honor.  And by the way, I did preface it with saying

 9  "without going into any details."

10          THE COURT:  I know, but let's cope with the argument.

11          MR. TACOPINA:  Okay.  I don't think that's 412 at all.

12  I'm discussing, your Honor, her book.  She just testified to

13  this list of 21 most hideous men being both serious and light,

14  paraphrasing Ms. Carroll's words, serious and light, and the

15  list of 21 most hideous men apparently doesn't include all the

16  people that may have assaulted her.  There is nothing more than

17  that.  That was it.  That was the question.  I will tell you

18  the next -- well, the next couple questions.

19          THE COURT:  I appreciate that.  I know what the

20  question is.  What I am looking for is your argument for why it

21  is permissible.

22          MR. TACOPINA:  Well, I don't think it violates 412 at

23  all, and I think the point is her book, which she claims is a

24  list of 21 most hideous men, which was discussed on both direct

25  and cross, you know, identifies purported attacks, and then of

1    course it identifies other people like, you know, who fixed her

2    tire or something like that but doesn't include all the people

3    who had assaulted her.

4              THE COURT:  But what the rule says is, "The following

5    evidence is not admissible in a proceeding involving alleged

6    sexual conduct: (1) evidence offered to prove that a victim

7    engaged in other sexual behavior."

8              Now let me put to one side something that may pop into

9    your head or others.  Although I find it surprising that this

10   should be the case, there are plenty of cases that say that

11   nonconsensual sex, rape, or other nonconsensual sex is other

12   sexual behavior covered by the rule.  In other words, the rule

13   prohibits receipt of evidence offered to prove that a victim

14   engaged in other sexual behavior, consensually or otherwise.

15   Now, with that, why is an answer to this question permissible?

16             MR. TACOPINA:  Your Honor, you know what I will do?

17   The last question -- I assume the Court has the transcript up

18   there?

19             THE COURT:  Well --

20             MR. TACOPINA:  It's gone now, probably.

21             THE COURT:  It's here, it's there.  I will get it

22   back.

23             MR. TACOPINA:  The question before the one that was

24   objected to.

25             THE COURT:  I have it.  The last one was, "And without

1    getting into any details, but it identifies purported attacks

2    that men have made against you," and the answer was "Yes."

3                MR. TACOPINA:  Okay.

4                THE COURT:  And that went to the book, and the book is

5    in evidence, so that's under the heading of no harm, no foul.

6    It's here.

7                MR. TACOPINA:  Right.  So I think and, your Honor, I

8    just want to -- let me first address the issue here that's on

9    the floor.

10               THE COURT:  Good.

11               MR. TACOPINA:  I will withdraw that last question,

12   skip the next two that I had, because it sort of ties in, and

13   just simply ask, based on that last answer that these purported

14   attacks which she identified or said yes to, none of them were

15   ever reported to the police and leave it at that.  I won't ask

16   the other questions.

17               MR. FERRARA:  I believe no objection to that.

18               I just wanted to clear up one thing in case, your

19   Honor, for future -- potential future objections.  The book is

20   not in in its entirety.  The book has other attacks that we

21   accept will come in.  For instance, John Johnson, Les Moonves.

22   So the question Mr. Tacopina asked about the book containing

23   other attacks, we understand, we did not object.  I just wanted

24   to flag our position is just because it is in the book, which

25   again is not entirely in evidence, we would not --

N512Car1                          Carroll – Cross

1              THE COURT:  That had escaped my mind, and I appreciate

2     the update.

3              MR. TACOPINA:  There is nothing obviously outside of

4     the Les Moonves that we are talking about, even though it is in

5     the book, so that's clear.

6              THE COURT:  Fine.  So let's get the jury back and

7     there is no objection to the question you propose to ask.

8              MR. FERRARA:  Correct.

9              (Continued on next page)

N512Car1                         Carroll - Cross

1          (Jury present)

2          THE COURT:  Folks, thanks for bearing with us there.

3     Next question, Mr. Tacopina.

4          MR. TACOPINA:  Yes, your Honor, just to put the next

5     question in context.

6     Q.  Ms. Carroll, I asked you, the last question before the one

7     that we did not complete was that the book identified purported

8     attacks and you said yes, right?

9     A.  Excuse me.  Repeat the question, please.

10    Q.  Your Honor, could I just have it read back the question and

11    answer?

12         THE COURT:  Yes.

13         MR. TACOPINA:  Thank you.

14         (Court and court reporter confer)

15         THE COURT:  "And without getting into any details, but

16    it identifies purported attacks that men have made against

17    you," the witness answered "yes."

18         MR. TACOPINA:  Okay.

19         THE COURT:  Next question.

20         MR. TACOPINA:  I would like to play a snippet from the

21    deposition from October 14, 2022.  I have identified for

22    counsel already it's page 160, 11-13 on the transcript, I'm

23    just going to play that very short video snippet of that

24    testimony.  Counsel?

25         MR. FERRARA:  May I just have one moment, your Honor?

1          (Counsel confer)

2          MR. FERRARA:  No objection your Honor.

3          THE COURT:  Okay.

4          MR. TACOPINA:  Display to the jury it's 162.

5          THE COURT:  I'm sorry.  You said 160 a minute ago.

6          MR. TACOPINA:  That's our exhibit number, okay, that's

7    how we identify it here, your Honor.

8          THE COURT:  I see.  So you are playing an excerpt --

9          MR. TACOPINA:  From the deposition.

10         THE COURT:  -- from the deposition of October 14,

11   2022, and it appears in the transcript of the deposition, for

12   those of us who are following along that way, at page 160/lines

13   11-13 of the transcript.

14         MR. TACOPINA:  Perfect, your Honor.

15         Go ahead.

16         (Video played)

17         MR. TACOPINA:  So one, we need volume.

18         (Video played)

19   BY MR. TACOPINA:

20   Q.  You have in fact, though, called the police on other

21   instances regarding -- not regarding assaults, correct,

22   Ms. Carroll?

23   A.  Mr. Tacopina, I was born in 1943.  I am a member of the

24   silent generation.  Women like me were taught and trained to

25   keep our chins up and to not complain.  The fact that I never

N512Car1                         Carroll - Cross

went to the police is not surprising for someone my age.  We

were not ever trained to call the police, ever.  I would rather

have done anything than call the police.

          MR. TACOPINA:  Okay, your Honor.  Could I have that

stricken as nonresponsive?  I asked the question --

A.  And I will now answer I did call the police on one

occasion.  I was living in Helen Hayes', who was a respected

American actress -- I think she was called the Queen of

American Stage.  Anyway, I had her house.  I was living in her

old farmhouse.  It was a landmark.  And on Halloween, some kids

went by and hit Helen Hayes' -- Helen Hayes's mailbox.  So I

called the police because I thought they were marring this

famous homestead's mailbox.  I did call the police.  That's the

one and only time in my life I have ever called the police and

it was on behalf of someone else.

          (Continued on next page)

```
 1   BY MR. TACOPINA:
 2   Q.  So it is your testimony you called the police if a mail box
 3   is attacked but not if you are personally attacked or sexually
 4   assaulted?
 5   A.  I would never call about something I was ashamed of.
 6   Listen, I was ashamed of what happened.  I thought it was my
 7   fault.  I would never, never, never go to the police.  Ever.
 8            MR. TACOPINA:  Your Honor, could I just, for the
 9   record, have everything before "I will now answer the question"
10   stricken on that previous answer?
11            MR. FERRARA:  We object.  We think it is context, your
12   Honor.
13            THE COURT:  Pardon?
14            MR. FERRARA:  We think it is context for the answer.
15            THE COURT:  That's why he is objecting.
16            Your application is exactly what, Mr. Tacopina?
17            MR. TACOPINA:  Your Honor, I asked that question about
18   calling the police regarding the mail box and Ms. Carroll
19   started describing sort of the generation she was born in and
20   these other things, and then she said "I will now answer the
21   question."  So, anything before "I will now answer the
22   question." I ask be stricken.
23            THE COURT:  Granted.  The jury is to disregard that.
24   Q.  I think on direct you testified, Ms. Carroll, direct
25   examination by Mr. Ferrara, you testified about your advice
```

N515car2                          Carroll - Cross

1    column and how you would advise readers to report men to the

2    police, when appropriate?

3    A.  Yes.

4    Q.  I would just like to go through a few of those snippets of

5    your columns I have identified to plaintiff's counsel already,

6    and I don't know if you recall them off the top of your head,

7    if not, Ms. Carroll, I can show them to you, but do you recall

8    the column where you -- this, again, is the Ask E. Jean column

9    from May of 1994, where you advised a reader, someone who asked

10   you a question that her assistant had been raped by a man and

11   you told her to call the police and actually gave her the New

12   York Sex Crimes hotline to report rape?

13   A.  I always, in most cases, advised my readers to go to the

14   police.

15          MR. TACOPINA:  OK.  I would like to show you CW,

16   Defendant's Exhibit CW -- I'm sorry, CY, just for Ms. Carroll,

17   please.

18   Q.  That's *Elle*, that was the magazine in which you wrote the

19   Ask E. Jean column?

20   A.  Yes.

21          MR. TACOPINA:  Second page for Ms. Carroll to identify

22   that?  OK, a different second page?

23   Q.  OK.  Again, this is from 1994, it is a magazine, but --

24          MR. FERRARA:  Pardon me, your Honor.

25          MR. TACOPINA:  Yes.

N515car2                         Carroll - Cross

1              (Counsel conferring)

2    BY MR. TACOPINA:

3    Q.  Sorry.  I said 1994, Ms. Carroll.  Mr. Ferrara corrected

4    me; he is right, it was September '98.  This is a column where

5    you told a writer who was talking about her friend getting

6    drunk and ending up at some guy's apartment and woke up lying

7    in bed next to him, and she felt responsible and was worried

8    that she was probably raped, and you advised her to take her to

9    a gynecologist at once, see that she is examined, it is

10   probably too late to obtain evidence of a rape, but she must be

11   tested for venereal disease, hepatitis, HIV, etc., and to call

12   New York City Police Department rape hotline and you gave the

13   number; a compassionate and knowledgeable female detective will

14   talk to your friend.  And, ask I suggest that you speak with

15   the detective, too.  Your own experience has been pretty

16   shattering even if you are a street-grade actress and could

17   hide your feelings, do not speak to the man, the district

18   attorney's office will decide if your friend has enough

19   evidence to bring the charge against him.

20              You wrote that?

21              MR. TACOPINA:  I offer CY, your Honor.

22              MR. FERRARA:  No objection.

23              THE COURT:  Received.

24              (Defendant's Exhibit CY received in evidence)

25              MR. TACOPINA:  Please put up BC for Ms. Carroll alone

N515car2                     Carroll - Cross

1   at this point.

2   BY MR. TACOPINA:

3   Q.  BC, Ms. Carroll, is another one of your advice columns, I

4   think this is the online version, again similar subject matter,

5   it is from August of 2006.  Do you recall that?

6   A.  Yes.

7           MR. TACOPINA:  I offer BC, your Honor.

8           MR. FERRARA:  Your Honor, there is nothing on this

9   exhibit that suggests a date.

10          MR. TACOPINA:  Can you highlight the portion, please?

11          That suggests what, Mike?  A date?

12          MR. FERRARA:  It is an undated document, your Honor.

13   I'm not arguing it, I am simply saying this is --

14          THE COURT:  I've got it.  I think this is probably

15   cumulative anyway.

16          MR. TACOPINA:  OK, your Honor.

17          THE COURT:  Let's at least move on.

18          MR. TACOPINA:  Yeah, yeah.  We will do that.

19   BY MR. TACOPINA:

20   Q.  How about BD?  Take a quick look at BD, Ms. Carroll?

21          MR. TACOPINA:  BD, please?  Not BC.

22   Q.  Similar thing, we are not going to offer it because it

23   doesn't appear to be date stamped, but this is a column where

24   you advised a reader if her boyfriend threatens to beat up her

25   dog, she should call the police?

N515car2                          Carroll - Cross

1   A.  Oh, yeah.  I remember that.

2   Q.  You remember it?

3   A.  Very well.  She wrote back to me just recently and told me

4   what happened.

5   Q.  Let me show you BE.  This nice and clean the date, August

6   30th, 2016, from your Ask E. Jean column.  Do you recall this?

7   A.  Yes.

8              MR. TACOPINA:  I offer BD, your Honor.  It is dated.

9              MR. FERRARA:  No objection.

10             THE COURT:  BD is received.

11             (Defendant's Exhibit BD received in evidence)

12   BY MR. TACOPINA:

13   Q.  So this was in your column:  How do I deal with threatening

14   e-mails from my ex?  And the reader wrote to you that her

15   ex-husband, who lived in Europe, had threatened to expose her

16   past and you replied:  I have spoken with Steven G. Rodriguez

17   an experienced attorney, and you go on to advise at the end of

18   the day, you repeat that he advised that this woman call the

19   police because of threatening e-mails; correct?

20   A.  Yes.

21   Q.  Just a few more.  BG, please?

22             E. Jean column from May of 2017.  Do you recognize

23   that, Ms. Carroll?

24   A.  Yes, I do.

25             MR. TACOPINA:  I offer BG as well, your Honor.

N515car2                         Carroll - Cross

1           MR. FERRARA:  Your Honor, objection.  This is becoming

2      cumulative.

3           THE COURT:  Granted.  Sustained.

4      BY MR. TACOPINA:

5      Q.  Suffice it to say, Ms. Carroll, without going through the

6      rest of these, there were numerous times where you have advised

7      your readers to call the police, report them to the New York

8      City Police Department Sex Crimes Hotline and what not, right?

9      A.  Absolutely.  Yes.

10     Q.  Now, after you wrote your book accusing Donald Trump of

11     raping you, he publicly denied that accusation.  We have been

12     through that, yes?

13     A.  Yes.

14     Q.  And, according to you, he accused you of lying about the

15     rape allegation in order to increase your book sales, carry out

16     a political agenda, and to make money?

17     A.  I think that's the former president's argument.

18     Q.  Right.  That's what I'm saying.  That's what he accused you

19     of lying about --

20     A.  Yes, yes.

21     Q.  -- was the rape allegation to increase book sales, your

22     political agenda, and to make money?

23     A.  Yes.

24     Q.  And you claimed those accusations against you are false?

25     A.  Yes.

N515car2                          Carroll - Cross

1   Q.  And with regard to increasing book sales and making money,

2   you included the story in Bergdorf story in your book to market

3   it and sell it, as you testified to?

4   A.  I didn't include it to market it or sell it.  I included it

5   because I had reached a point in my life, at 76 years old, I

6   was no longer going to be silent.  That's why I included it.

7   Q.  And we went through e-mails earlier, I won't show them to

8   you again, but where you discussed about how you felt really

9   bad about his candidacy, and you were deeply troubled about his

10  presidency, and you felt it was your patriotic duty to stop

11  him?  Do you recall that?

12          MR. FERRARA:  Objection, your Honor.  Compound.

13          THE COURT:  Sustained as to form.

14  BY MR. TACOPINA:

15  Q.  Do you recall testifying earlier about your feelings about

16  Donald Trump and how troubled you were about his presidency?

17  A.  I do not like Donald Trump and I think he was a terrible

18  president.

19  Q.  OK.

20  A.  No question.

21  Q.  And you thought you needed to do your patriotic duty to

22  stop him?

23          MR. FERRARA:  Objection.

24          THE COURT:  Sustained.

25  Q.  Only two months before your October 14th, 2020 deposition,

N515car2                        Carroll - Cross

1    Carol Martin sent you a text message asking if she -- Carol

2    Martin -- could get reimbursed for her expenses to travel from

3    New Jersey to New York to meet a lawyer.

4    A.  Yes.

5          MR. TACOPINA:  I am going to show you BS, please?

6    Publish that to the witness and counsel and the Court.

7    Q.  Do you see that text message?  That's the one I am asking

8    you about; correct, Ms. Carroll?

9    A.  Yes.

10   Q.  Shortly after that you replied, in sum and substance -- we

11   don't have to get into the details of it, but -- you replied,

12   in sum and substance, that you would have that taken care of;

13   correct?

14   A.  I had no idea how it would be taken care of but I wanted to

15   assure Carol, who was worried about the costs of the bridges,

16   the gas, the parking; Carol is on a fixed income and I just

17   wanted to assure her that we would figure it out, and I believe

18   it was figured out.  I think they had a Zoom meeting instead of

19   an in-person meeting so none of these expenses actually were

20   caused to Carol.

21   Q.  OK.  I mean, in fact what you told Ms. Carol is that you

22   would send a car to pick her up?

23   A.  I actually thought that is probably what I would do but I

24   didn't know.

25   Q.  OK.  That's neither here nor there.  That's fine.

1   A.   I'm just guessing.

2   Q.   That's the subject matter of the text message?

3   A.   Carol is on a fixed income and she wanted to --

4           THE COURT:   Look, Ms. Carroll, it would help if you

5   would just answer the question, and Mr. Tacopina, it would help

6   if you were clear when your question was over and what it was

7   asking.

8           MR. TACOPINA:   When I stop talking it is generally

9   over, your Honor, but OK.

10  Q.   OK.   The subject matter of that initial text from Ms. Carol

11  Martin to you was about transportation and arrangements for

12  transportation --

13  A.   Yes.

14  Q.   -- period, right?

15  A.   Yes.

16  Q.   Shortly after you assured her it would be taken care of and

17  whatever you said, Carol Martin replied to you saying:   Thanks

18  for helping with that.   No more chats and texts until further

19  notice.

20          MR. TACOPINA:   Can we take a look at that, please?

21  Q.   You received that from Ms. Martin on August 10, 2022?

22          MR. FERRARA:   Your Honor, we object.   This is hearsay.

23  It is -- the document is not in evidence and we would object to

24  its admission.

25          MR. TACOPINA:   Well, I offer this, your Honor.   It is

1    not being offered for the truth of the matter, it is being

2    offered for the state of mind of Ms. Carroll and Ms. Martin.

3              THE COURT:  How is it relevant to her state of mind?

4              MR. TACOPINA:  To Ms. Carroll's?

5              THE COURT:  Yes.

6              MR. TACOPINA:  Because she replies to this message.

7    There is a statement here about no more chats and texts.

8              THE COURT:  You don't have to -- you know you have got

9    an objection to the document, it is not in evidence, so

10   repeating the substance of what is not in evidence --

11             MR. TACOPINA:  Sorry.

12             THE COURT:  -- is not moving the ball down the field

13   and shouldn't happen.

14             MR. TACOPINA:  It goes to the state of mind of

15   Ms. Carroll, your Honor, specifically the second sentence in

16   that.

17             THE COURT:  Are you telling me that there is going to

18   be a response to this?

19             MR. TACOPINA:  Yes.

20             MR. FERRARA:  May I just have one moment with counsel,

21   your Honor?

22             THE COURT:  Yes.

23             (Counsel conferring)

24             MR. FERRARA:  I agree there is a response.  It is

25   inscrutable to me, your Honor.  We object to this document.

1          THE COURT:  Let me see the response.

2          MR. TACOPINA:  Please show the Court.

3          And your Honor if I can put in context what it is but

4    I'm not going to --

5          THE COURT:  Wait a minute.  Now, what I am looking at

6    on the screen is a whole bunch of different items.  Are these

7    all in a single exhibit or are they different exhibits?

8          MR. TACOPINA:  Single exhibit, your Honor.

9          THE COURT:  What is the exhibit?

10         MR. TACOPINA:  BS.

11         THE COURT:  And what you are offering is the green and

12   the first blue; is that right?

13         MR. TACOPINA:  The first and second blue, your Honor.

14   With just the first blue -- I am not saying anything that is

15   objectionable, but there is apparently an emoji that doesn't

16   show up on a printout.

17         THE COURT:  Thank you.

18         MR. TACOPINA:  An emoji is that little face.

19         THE COURT:  I am stuck in the 18th century, as you

20   know.

21         I don't think this is admissible.  Sustained.

22   BY MR. TACOPINA:

23   Q.  Carol Martin's attorney is named Noam Biale?

24         MR. FERRARA:  Objection.  Relevance.

25         THE COURT:  Sustained.

N515car2                         Carroll - Cross

1    Q.  Was Carol Martin's attorney recommended by your attorney?

2             MR. FERRARA:  Objection.  Relevance.

3             THE COURT:  Sustained.

4    Q.  Let's talk about how you found an attorney; forget who, an

5    attorney in this case.  You first decided to sue Donald Trump

6    after an attorney you met at a house party told you to

7    seriously think about suing him?

8    A.  No.  He didn't tell me to seriously think about suing him,

9    he just laid out the difference between a criminal case and a

10   civil case.

11   Q.  And the attorney we are talking about is George Conway;

12   right?

13   A.  Yes.

14            MR. TACOPINA:  Bear with me one second, Ms. Carroll,

15   and your Honor.

16   Q.  Did Mr. Conway tell you that you should seriously think

17   about suing Donald Trump?

18   A.  No.

19   Q.  No.  OK.  I'm going to read you a portion of your

20   deposition from October 14, 2022.

21            Counsel, page 205, lines 4 through 14.  Let me know

22   when you are ready, please.

23            MR. FERRARA:  No objection.

24   Q.  OK.  So you said Mr. Conway did not tell you to seriously

25   think about suing Donald Trump.  I'm going to read a question

N515car2                          Carroll - Cross

1   and answer from October 14, 2022 deposition:

2   "Q  At what point did you decide to file a lawsuit against the

3   defendant?

4   "A  Well, wherever I went after the story went, people said are

5   you going to sue him?  Are you going to sue him?  And I would

6   say no, no, no.  I'm not going to do it.  I'm just not.  And

7   then I had a conversation with someone who knew the ins and

8   outs, an actual lawyer, and he said you should really think

9   about -- you should really seriously think about this."

10           Do you recall giving that testimony?

11           THE COURT:  We don't ask that question.

12  Q.  Was that true?  Was that testimony true?

13  A.  Yes.  George said you should seriously think about this

14  after he laid out the two various ways.  That is correct.

15  Q.  That is correct.

16           Before that you had no intention of suing Donald

17  Trump, as we just heard?

18  A.  Not really.

19  Q.  And you are aware of George Conway's feelings towards

20  Donald Trump?  You testified to that on direct?

21  A.  Yes.

22  Q.  And after seeing Mr. Conway at this party and talking about

23  suing Donald Trump, only two days later you retained an

24  attorney?

25  A.  I met an attorney two days later, yes.

N515car2                          Carroll - Cross

1   Q.  And was it Mr. Conway who recommended you to the attorney

2   you met?

3   A.  Yes.

4   Q.  And by the way, you met with both Lisa Birnbach and Carol

5   Martin and yourself with your attorney?

6              MR. FERRARA:  Objection.

7              THE COURT:  Ground?

8              MR. FERRARA:  I withdraw the objection, your Honor.

9              THE COURT:  Overruled.

10  A.  We had a dinner together.

11  Q.  Yourself, Lisa Birnbach, Carol Martin?

12  A.  We were invited along with several people.

13  Q.  So my question was you met with Lisa Birnbach and Carol

14  Martin with your attorney?

15  A.  We didn't -- it wasn't an official meeting.  We happened to

16  be along at a dinner.

17  Q.  Wasn't an official meeting.  OK.

18             And, by the way, Lisa Birnbach and Carol Martin are

19  the two women you said you told about the alleged assault in

20  Bergdorf Goodman?

21  A.  Yes.  Yes.

22  Q.  Now, despite -- withdrawn despite -- it is your testimony

23  that you chose to sue Donald Trump because he called you a

24  liar?

25  A.  Yes.

N515car2                          Carroll – Cross

1    Q.  Because you couldn't let that assertion stand?

2    A.  He did more than call me a liar.

3    Q.  And you cannot let that assertion stand?

4    A.  He -- no.  Because he added to that assertion.

5    Q.  I'm going to play from the deposition a very small clip, it

6    is 224, and I will identify it before you play it, please, for

7    counsel, from the October 14, 2022 deposition, page 162, lines

8    12 through 17.

9            Eric, that will be played for everyone when counsel is

10   ready.

11           MR. FERRARA:  No objection.

12           MR. TACOPINA:  Your Honor, may I?

13           THE COURT:  Sure.

14           MR. TACOPINA:  Sure?  OK.

15           (Video played)

16   BY MR. TACOPINA:

17   Q.  So because he called you a liar, you couldn't let it stand

18   and you sued him?

19   A.  Yes.

20   Q.  In your book, "What Do We Need Men For?" you also made

21   accusations against Les Moonves?

22   A.  Yes.

23   Q.  And Les Moonves was the chief -- sorry, the chairman of the

24   board, president, and chief executive officer of CBS?

25   A.  Yes.

N515car2                              Carroll - Cross

1   Q.  One of the largest networks in the country?

2   A.  Yes.

3   Q.  Very powerful man in media?

4   A.  Very.

5   Q.  And, in fact, you listed him, I think, in your most hideous

6   men list?

7   A.  Yes.

8   Q.  That's because, according to you, while you were in your

9   50s, Les Moonves sexually assaulted you while you were in an

10  elevator?

11  A.  Yes.

12  Q.  And in your book you accused him of stepping into an

13  elevator behind you, going at you like an octopus, while having

14  an erection?

15  A.  Yes.  I didn't write those words, "while having an

16  erection," but I did say he went after me like an octopus.

17  Q.  OK.  Well, specifically, did you write in your book that --

18  and it is AA in evidence --

19          MR. TACOPINA:  Just put it up, it is just easier; page

20  186, 13 through 15.

21  Q.  You wrote that:  Moonves, with his arms squirming and

22  poking and goosing and scooping and pricking and pulling and

23  prodding, jabbing, is looking for fissures -- holes, OK -- I

24  don't even know I own.

25          That's what Mr. Moonves moon did to you?

1   A.  Yes.

2   Q.  You can take that down.

3        And Les Moonves denied your accusation against him,

4   publicly?

5   A.  He denied it within -- *New York* magazine called him and his

6   denial ran with the *New York* magazine piece.

7   Q.  Right.  And he said it never happened?

8   A.  Yes.  He said it never happened.

9   Q.  And by saying it never happened, he was calling you a liar?

10  A.  He simply denied it, he didn't call me any names.  He

11  didn't say I was an operative of the democratic party.  He

12  didn't say I was running a scam.

13  Q.  You made public your sexual assault accusation against Les

14  Moonves and he called you a liar?

15  A.  No, he just denied it.

16  Q.  Well, by denying it he said you weren't telling the truth?

17  A.  He didn't call me names, he didn't grind my face into the

18  mud like Donald Trump did.

19  Q.  Now, his denials of your accusations were made publicly?

20  A.  They were made publicly in *New York* magazine.

21  Q.  And, in fact, you said that if a person looks, they could

22  find it online?  His denial?

23  A.  I believe he also -- 12 women had come forward to accuse

24  Les Moonves and he made a denial denying all 12 women at the

25  time so you can find that denial online.

N515car2                    Carroll - Cross

```
 1    Q.  I'm not asking about other women with Mr. Moonves, I'm
 2    asking about you.
 3    A.  You are asking about the denial and that denial you can
 4    find online.  I am included in a batch of denying 12 women.
 5    Q.  Suffice it to say, you didn't sue Les Moonves but you sued
 6    Donald Trump because he called you a liar?
 7              THE COURT:  This certainly sound repetitious, don't
 8    you think?
 9              MR. TACOPINA:  Did I get the Les Moonves part already?
10              THE COURT:  Yes.
11              MR. TACOPINA:  I didn't think I did, but OK.  Your
12    Honor, I don't think I have that on the record, I don't think I
13    did.
14              THE COURT:  Page 310 of the real-time transcript:
15    "Q  Have you sued Mr. Moonves for defamation?
16    "A  No."
17              MR. TACOPINA:  OK, your Honor.  Thank you.
18    BY MR. TACOPINA:
19    Q.  Now, according to you, if Donald Trump had responded to
20    your accusation against him by saying you agreed to have sex
21    with him or that it was consensual, you would not view that as
22    him saying that you were a liar?
23              MR. FERRARA:  Objection.
24              THE COURT:  Ground.
25              MR. FERRARA:  Argumentative.  Speculation.
```

1          THE COURT:  Sustained.

2          MR. TACOPINA:  Let's do this.  I would like to play

3     from the deposition 10/14/22, clip 230, page 165, line 25 to

4     166, line 9.  When counsel is ready, just let me know.  Are we

5     ready?  Are we there?

6          MR. FERRARA:  Just a minute.  No objection.

7          THE COURT:  Go ahead.

8          MR. TACOPINA:  Can I play that, please, for the jury

9     and witness and everyone?

10         (Video played)

11         MR. FERRARA:  Your Honor, we think that the next, that

12    there is at least seven more lines that need to be played, for

13    context, under the rule of completeness.

14         THE COURT:  Page?

15         MR. FERRARA:  166, lines 9 through 15.

16         THE COURT:  Agreed.

17         Play the rest.

18         MR. TACOPINA:  Can we play the rest?  Yes.

19         To what line do you want played?

20         THE COURT:  15.

21         MR. TACOPINA:  15?  OK.  Can you give us a second,

22    because these are clips just of our exhibits.

23         THE COURT:  Sure.

24         MR. TACOPINA:  If we can't play it I will read it,

25    certainly.

1              Mike, do you want me to read it?

2              MR. FERRARA:  Do you prefer to read this?

3              MR. TACOPINA:  Your Honor, to move this along, I am

4    going to read.

5              THE COURT:  Members of the jury, this is what the

6    witness testified to on that occasion after what was just

7    played on the video.

8              (Video played)

9              MR. TACOPINA:  OK Mike?

10             MR. FERRARA:  Yes.  Thank you.

11   BY MR. TACOPINA:

12   Q.  So, Ms. Carroll, so would that have been true if Mr. Trump

13   had, instead of saying it didn't happen, he wasn't there, that

14   if he had said it was consensual, would that have been true?

15             MR. FERRARA:  Objection.  Speculation.

16             THE COURT:  No, it is not speculation.  If Mr. Trump

17   said it had been consensual, would that have been true.

18             MR. TACOPINA:  That's it.

19             THE COURT:  That's the question.

20             MR. FERRARA:  Pardon me.  I misheard it.  Fair enough.

21   BY MR. TACOPINA:

22   Q.  Ms. Carroll?

23   A.  No, it was not consensual.  Not consensual.

24   Q.  That means it would not have been true?

25   A.  But at least it would be Donald Trump admitting he was

1    there.  He was there.

2    Q.  But it would not have been true what he would have said if

3    he had said it was consensual, according to you?

4    A.  No, it was not consensual.

5    Q.  And despite the fact that what he would have said if he had

6    said that, based on your testimony, were not true, you don't

7    know if you would have sued him?

8    A.  I can't say.  That didn't happen.

9              THE COURT:  Wait.  I'm sorry.  What didn't happen?

10             THE WITNESS:  He didn't say it was consensual, he just

11   flatly said it didn't happen.

12   BY MR. TACOPINA:

13   Q.  Now let's forget about what he said for a second, but

14   according to you there could have been just a disagreement over

15   whether you consented or not?

16             MR. FERRARA:  Objection.

17             MR. TACOPINA:  Objection?  I will play the clip then

18   of the deposition.  166, Mike.

19             THE COURT:  Didn't you just play this?

20             MR. TACOPINA:  It is different, your Honor.  It is

21   different.  And I will verify that in one second.

22             THE COURT:  166?

23             MR. TACOPINA:  Hold on one second, your Honor?  You

24   know what, your Honor?  It is a different clip.  It is a

25   different exhibit number but it is the same clip, you are

1    right.  You are right.

2    Q.  So, Ms. Carroll, if we understand your story correctly, it

3    is your testimony that -- well, withdrawn.

4              According to what you just testified to, what you

5    heard, your testimony in the deposition, you said that it would

6    have been him saying it happened and then we could have

7    disagreed and then I could have vehemently said no, I did not

8    consent.

9              So, do you think there was perhaps just a disagreement

10   between you and Mr. Trump?

11             MR. FERRARA:  I object to this.  I think it is

12   confusing.  I think it is irrelevant.  I don't understand their

13   defense to be consent.  I think this is irrelevant.

14             THE COURT:  Sustained.

15             MR. TACOPINA:  OK.

16   BY MR. TACOPINA:

17   Q.  The story, Ms. Carroll, the story that you testified to

18   about what happened in the Bergdorf changing room back in 1995

19   or 1996, could that somehow be viewed as consensual?

20   A.  No.

21             MR. FERRARA:  Objection.  Objection.

22             THE COURT:  Sustained.

23             MR. TACOPINA:  Your Honor, I'm going to get into an

24   area that I just want to front with the Court.  We are moving

25   along here.  Are we taking a morning break?  Would now be a

N515car2                          Carroll – Cross

1    decent time to do it or do you want me to plow ahead here?

2              THE COURT:  If you want to take our break here we will

3    take our break here.  15 minutes.

4              MR. TACOPINA:  Thank you, your Honor.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              (Recess)

3              THE COURT:  OK.  So what evidentiary treats do we

4       have?

5              MR. TACOPINA:  Thank you.  Your Honor, the first one

6       is resolved, it is a question.  I just didn't want the Court to

7       hear it and think we were going in a different direction.

8       Mr. Ferrara and I discussed it so it is just a short question.

9              The one issue is this, that we are going to have an

10      objection on, is I'm going into the witness' interview of

11      Natasha Stoynoff, who is one of the other defense witnesses,

12      she did a verbatim transcript of that interview that she did.

13             THE COURT:  Well, I have heard you say, or in writing,

14      characterize it as a verbatim transcript.  Whether that --

15             MR. TACOPINA:  Ms. Carroll said it was in her --

16             THE COURT:  I have seen it.

17             MR. TACOPINA:  OK.

18             THE COURT:  I suspect it isn't, but --

19             MR. TACOPINA:  OK.

20             THE COURT:  -- whatever.

21             MR. TACOPINA:  A transcript anyway.  But we want to

22      use relevant portions, obviously not the whole thing.  We are

23      going to offer it subject to redaction, and the relevant

24      portions are the questioning by Ms. Carroll of Ms. Stoynoff

25      regarding what occurred with Trump, Donald Trump.  And if you

N515car2                          Carroll - Cross

1   look at the parts we are going to be offering --

2            THE COURT:  I don't have it up here, so.

3            MR. TACOPINA:  OK.  Sorry.

4            THE COURT:  I mean, it is somewhere in the computer,

5   I'm sure.

6            MR. TACOPINA:  We will get you another copy.  It is

7   Exhibit no. BT.

8            THE COURT:  You may want Ms. Carroll out of the room.

9            MR. TACOPINA:  I thought she was.

10            THE COURT:  She was, but she is sneaking up on you.

11            Would you wait in the witness room, please,

12   Ms. Carroll?

13            MR. TACOPINA:  Your Honor, we have it here but what we

14   can do to make it easier, we can show you on the screen the

15   clips we intend on using from this --

16            THE COURT:  We will try.

17            MR. TACOPINA:  OK.  There you go.  So anyway, your

18   Honor, this is an interview where she's questioning

19   Ms. Stoynoff regarding what happened with Donald Trump

20   regarding this experience.  There was going to be a hearsay

21   objection.  The hearsay objection -- I am pressing the button.

22            This is an interview where she is questioning

23   Ms. Stoynoff about what happened with her and Donald Trump and,

24   as the Court knows, Ms. Stoynoff will be a witness here.  So we

25   are not offering this for Natasha Stoynoff's statement on the

1   truth of the subject but what she said.  We are offering it to

2   show, to put in context Ms. Carroll's statements which the jury

3   could construe as an effort to influence Ms. Stoynoff's

4   testimony, specifically that sexual contact occurred.  It is

5   Ms. Carroll's statements that we want to introduce here.  And

6   while not dispositive of the rule -- as I said, Ms. Stoynoff is

7   going to testify -- what is important is Ms. Carroll's

8   statements, not offering Ms. Stoynoff's statements for the

9   truth of the matter, she will be here to testify, but

10  Ms. Carroll's statements.  She is continually attempting to get

11  Ms. Stoynoff to say there was grinding and she continually

12  refuses that sort of notion three times and that's the clips of

13  BT that we are going to play.  That's the only portions of the

14  transcript.

15            THE COURT:  So what is on the screen --

16            MR. TACOPINA:  Let's start with the first one.  OK,

17  this is the first one.  Let me know when you are done, your

18  Honor.

19            THE COURT:  Mr. Ferrara?

20            MR. TACOPINA:  There is more, your Honor, by the way.

21            THE COURT:  Does that mean there is more to this

22  first, what you are calling the first one?

23            MR. TACOPINA:  This is just all one interview, it is

24  just broken up on different slides and it is not that long.

25  There is a few more attributions, two more, I think, two more

1    slides.  Would you like to see them all?

2                THE COURT:  What I am not understanding -- and whoever

3    is operating the equipment would simply stop changing what's in

4    front of me every day, that would be helpful.

5                MR. TACOPINA:  It is definitely not me.

6                THE COURT:  No, I understand.  All right.

7                Now, if I had hard copy then I could know what page

8    you are talking about and what parts and we could have a

9    record, but these --

10               MR. TACOPINA:  You will have a hard copy.  One second.

11               THE COURT:  These electronic flashings are not much of

12   a help.

13               MR. TACOPINA:  OK.

14               THE COURT:  Thank you.  All right.  So I now have in

15   front of me something marked Defendant's Exhibit BT for

16   identification.  What is the first thing you want to raise with

17   me?

18               MR. TACOPINA:  Page 20 to 21, your Honor.

19               THE COURT:  The entirety?

20               MR. TACOPINA:  No.  That's the whole thing, it is

21   these snippets.  What is in front of you right now is 20

22   through 21 on the screen.  The snippets of page 20 to 21.

23               THE COURT:  No, it is not.

24               MR. TACOPINA:  It is not?

25               THE COURT:  I mean, what is on the screen is a

1   significantly modest subset of what I am looking at on 20 and

2   21 of the hard copy.

3           MR. TACOPINA:  That's why we are not offering the

4   entire transcript because, subject to redaction, only using the

5   relevant portions meaning this portion.  So, you are right, it

6   is -- that's why we didn't give up the whole thing.  So, if you

7   look at the end of page 20, and there are no lines here but the

8   fourth attribution from the bottom on page 20 on the hard copy,

9   your Honor.

10          THE COURT:  OK.  I see that.

11          MR. TACOPINA:  All the way to --

12          THE COURT:  To the phrase "doing that" on page 21?  Is

13  that the first thing I am to focus on?

14          MR. TACOPINA:  Yes, your Honor.

15          THE COURT:  OK.

16          Mr. Ferrara?

17          MR. FERRARA:  Your Honor, we don't object to questions

18  about this.  I, myself, elicited on Ms. Carroll's direct,

19  generally speaking, this interview so we understand that the

20  defense is entitled to ask some questions around whether

21  Ms. Carroll was trying to influence Ms. Stoynoff's story.  We

22  understand that.  This exhibit is confusing, it contains

23  hearsay.  We think the exhibit should not come in, though we

24  understand that the defense is entitled to ask questions around

25  this.

1                MR. TACOPINA:  Well, but the exhibit would come in

2       only subject to redaction, your Honor.  The only thing that --

3                THE COURT:  That doesn't help because subject to

4       redaction means what?  It means someday somebody is going to

5       take some unspecified something out of it.  I got that.

6                MR. TACOPINA:  The only thing we are offering are the

7       slides we are showing on the screen -- and there are how many

8       in total, please?

9                We will do the same thing, I will identify the page

10      and the line.

11               THE COURT:  This is tremendously confusing.

12               Look.  You are going to have Ms. Stoynoff on the

13      stand, right?

14               MR. TACOPINA:  Yes, your Honor.

15               THE COURT:  And you are perfectly at liberty to ask

16      her whether she had interviewed with Ms. Carroll, yes?

17               MR. TACOPINA:  That's not the point, though.  The

18      point is not that she had interviewed, it is that Ms. Carroll,

19      this is Ms. Carroll's document --

20               THE COURT:  And -- and -- you are entitled to ask her,

21      whether during the course of the interview, Ms. Carroll said

22      thus and such or asked thus and such.  Right?

23               MR. TACOPINA:  Sure.

24               THE COURT:  And I guess she says yes, no, or I don't

25      remember.

N515car2                          Carroll - Cross

1           MR. TACOPINA:  And if she says no, I can't impeach

2    with Ms. Carroll's document.  Ms. Carroll created this.

3           THE COURT:  Yes.  Well, it is rather a joint creation,

4    just like the transcript of this trial is a joint creation.

5           MR. TACOPINA:  I will say that Ms. Carroll created the

6    document that purports to show the words of the interview.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  I don't see why you are not just entitled
2     to establish through Ms. Carroll that she interviewed this,
3     that she raised the question of what happened between
4     Ms. Stoynoff and Mr. Trump, and then ask her whether in the
5     course of it she asked Ms. Stoynoff whether Mr. Trump behaved
6     in a certain way.  And if she says yes, I don't know what we
7     are fooling around with this document for.  And if she says no,
8     then you may be able to impeach her with the document, maybe,
9     depending on foundation.  And if she doesn't remember, you
10    could refresh her recollection with it.
11         What's wrong with that?
12         MR. TACOPINA:  I would have to -- it's not about just
13    did she speak to her and ask her about this or that.  I would
14    ask specific questions like:  Did you ask her if he -- if
15    Ms. Stoynoff recalled Trump grinding against you?  And she told
16    you:  Riding?  And you said:  No, grinding.  And she said:
17    Grinding, oh, Lord.
18         I would like to -- what's important here, your Honor,
19    is the attempts to put words in Ms. Stoynoff's mouth.
20         THE COURT:  So this --
21         MR. TACOPINA:  I think it's a party admission, I would
22    imagine.  She wrote it in the transcript.  We can't -- I don't
23    see why this wouldn't be able to go in on that basis alone.
24    This was authored by the witness.  It's a party opponent
25    admission, and it is just a narrow --

1          THE COURT:  Part of your problem with that is that if

2     Ms. Carroll says that Ms. Stoynoff says the light was green,

3     that's an admission at the first level, but it can't come in

4     for what Ms. Stoynoff said the light was.

5          MR. TACOPINA:  Right, which is why that portion is not

6     being offered for the truth of the matter.  What's being

7     offered is Ms. Carroll's own words in this interview which has

8     to be put into context by the answers.  But the words of

9     Ms. Carroll, which I think it would be fair to argue or a jury

10    could construe as an effort to influence the answers of

11    Ms. Stoynoff, and if you read the entire four slides that we

12    have, I believe that's a fair impression you can get.

13         THE COURT:  I will look at your slides.  So I have

14    looked at the first one.

15         MR. TACOPINA:  Second.

16         THE COURT:  What you have up here is the entirety of

17    page 21?

18         MR. TACOPINA:  I know.  This will be the next one.

19         THE COURT:  Where will I find it in the transcript or

20    whatever it is?

21         MR. TACOPINA:  Hold on one second.  Page 22-23, is

22    that what I am being told?  Yes, the bottom of page 22, going

23    into 23, obviously it continues.

24         THE COURT:  What do you mean "obviously it continues"?

25         MR. TACOPINA:  The slide.  It cuts off at a word.  The

1     next slide will capture the entire sentence.

2              THE COURT:  So where is the rest of it?

3              MR. TACOPINA:  Next.  There you go.

4              THE COURT:  And what page of this document will I find

5     this part on?

6              MR. TACOPINA:  37.

7              THE COURT:  37.  You jump from 22 to 37 for context?

8     I'm lost.

9              MR. TACOPINA:  It's not -- it's not context.  There's

10    things in here about wine and other witnesses now on 22.

11             THE COURT:  We have now taken 20 minutes trying to

12    figure out what it is you are trying to put in.  Because you

13    haven't got the electronics figured out.

14             MR. TACOPINA:  Well, could I do this, then, your

15    Honor, I could show her the document, the entirety of BA -- BT.

16    I could ask her if she recognizes it, what she recognizes it to

17    be, I could offer it subject to redaction and play only the

18    four snippets of slide regarding questions about her insisting

19    to Ms. Stoynoff that she must have been grinded against.

20    That's what this is all about, her attempts to influence

21    Ms. Stoynoff's testimony.

22             THE COURT:  I understand what you are trying to do,

23    but with no disrespect to your staff, whoever is responsible

24    for it, it isn't put together, and we have now spent 20 minutes

25    because of that.

N512Car3                        Carroll - Cross

1              MR. TACOPINA:  Your Honor, it will actually be very

2     quick when I do this.  I'm asking about one, two, three

3     attributions.

4              THE COURT:  And I'm still trying to find out what the

5     second one is in its entirety.

6              MR. TACOPINA:  I'm going to read it to you.

7              THE COURT:  I know that it starts on page 22 at the

8     bottom.

9              MR. TACOPINA:  If your Honor doesn't mind, I will just

10    read you the three things I'm going to use:

11             Question by Ms. Carroll:  Do you recall him grinding

12    against you?

13             Answer by Ms. Stoynoff:  Riding?

14             THE COURT:  This starts at what page?

15             MR. TACOPINA:  This is back earlier.  This is the page

16    20-21.

17             Can you guys jump in, Chad or Eric, when the judge

18    asks what page, please let him know, because you have that

19    there and I don't.

20             THE COURT:  The second one starts at page 22, second

21    attribution from the bottom, and as nearly as I got in that

22    last long colloquy is it ends someplace on page 31.

23             MR. TACOPINA:  No.

24             THE COURT:  Only I don't know where.

25             MR. TACOPINA:  No the second slide is simply this,

N512Car3                          Carroll - Cross

1    this.  This is the second slide.

2              THE COURT:  So it ends --

3              MR. TACOPINA:  At the word "superiors."

4              THE COURT:  -- on page 23.

5              MR. TACOPINA:  Correct, at the word "superiors."  "It

6    was just at" is not part of the question, and we could remove

7    that or whatever.  I don't think it is prejudicial.  So we

8    would just highlight it like that.  That's the second one.

9              I only have one more.

10             THE COURT:  All right.  Let's go to that one.

11             MR. TACOPINA:  Okay.  Third one.  The third one starts

12   with this.  This is the entire and last side.

13             THE COURT:  What page is this?

14             MR. TACOPINA:  This is page 37.

15             THE COURT:  37.  Okay.  I know what I am buying on my

16   Lotto tickets.

17             MR. TACOPINA:  This is the third and last one, your

18   Honor.

19             THE COURT:  It starts at page 37.

20             MR. TACOPINA:  And ends at page 37.

21             THE COURT:  Give me a hint on where on the page?

22             MR. TACOPINA:  All right.  I'm going to do that.

23             MR. SEIGEL:  It's the second attribution to "E."

24   Midway down on page 37.

25             THE COURT:  Part way through that attribution.

1          MR. TACOPINA:  Yes.

2          MR. SEIGEL:  Beginning with "so when he takes."  The

3     first word.

4          MR. TACOPINA:  But the attribution that -- the core we

5     are asking about "when he pushed you up against the door,"

6     that's where it starts, because there is more about the

7     professor in there.  That's a hearsay witness.  That's not --

8     we cut that out.

9          THE COURT:  All right.  Now, thank you for that.  Now

10    I understand what you are trying to do.

11         Mr. Ferrara.

12         MR. FERRARA:  Your Honor, we continue to think that

13    the right way to do this is through questioning.  I will say if

14    your Honor disagrees with us, there is other context that we

15    think is important, and I wasn't able to compare.  But if we

16    were to go -- if I could ask Mr. Tacopina to go back to the

17    excerpt that goes from page 22 to 23, for instance, I just

18    candidly want to see if I have an objection here.

19         MR. TACOPINA:  That one, Mike?

20         MR. FERRARA:  Yes.  Thank you.  If we can just pause

21    here for one second.

22         So for instance, your Honor, this ending it here

23    suggests -- and I understand, I take Mr. Tacopina's point that

24    it would not be for the truth and your Honor would instruct the

25    jury to that effect, but the reason this is very confusing and

N512Car3                          Carroll - Cross

1    the jurors have had difficulty -- might have difficulty with it

2    is they end it at "I would have told my superiors."  Which

3    suggests Ms. Stoynoff did not tell people what had happened.

4    But the sentences immediately after this, the rest of this

5    response, Ms. Stoynoff goes into who she did tell --

6              MR. TACOPINA:  That's fine.

7              MR. FERRARA:  -- for example.

8              THE COURT:  Let me add a little more than that,

9    Mr. Ferrara.

10             MR. FERRARA:  Again, we understand that --

11             THE COURT:  We understand that you understand his

12   point.

13             MR. FERRARA:  We think that the use of the exhibit is

14   a mess, that it gets into a lot of Ms. Stoynoff's prior

15   statements that should not, of course, come in for the truth

16   but that will be very confusing, and Ms. Stoynoff's statements

17   do not go to Ms. Carroll's intent or what Ms. Carroll was

18   trying to do.  So we think that the use of the exhibit is

19   inappropriate and confusing.  We understand the questions will

20   be asked.

21             MR. TACOPINA:  Ms. Carroll's statements go to

22   Ms. Carroll's intent and Stoynoff's statements are not being

23   offered for the truth, and Ms. Stoynoff is going to testify and

24   I don't think any of this is going to be in dispute when she

25   testifies either, but --

N512Car3                    Carroll - Cross

1              THE COURT:  Look we have now spent at least 30 minutes
2      on this.  I don't see why -- I recognize what you are trying to
3      do.  Your point is that in the course of talking to
4      Ms. Stoynoff about what had happened to Ms. Stoynoff,
5      Ms. Carroll asked her three times whether, among the things
6      that Mr. Trump did to her, was grinding his body in some way
7      against her.  Got it.  Okay?  And your interpretation of that,
8      that you want to argue to the jury, is that means that
9      Ms. Carroll was trying to suggest that Ms. Stoynoff
10     quote/unquote remembered that that happened.  She was trying to
11     put words in the witness's mouth.  And looking at the document
12     BT for identification, I think—and I want you to correct me if
13     I got this wrong—it is at least arguable, maybe even
14     inescapable, but at least arguable that she asked three times
15     at three different places in this discussion that question is
16     because she never got a straight answer.
17             MR. TACOPINA:  Oh.
18             THE COURT:  She got at page 21 "I don't recall."  At
19     page 22, she got first "I don't remember if he did. . . I don't
20     think he did," with a rationale for why if he had done she
21     would have behaved differently.
22             MR. TACOPINA:  Right.
23             THE COURT:  And then at page 30 -- whatever the other
24     one was.
25             MR. TACOPINA:  7.

N512Car3                         Carroll - Cross

1          THE COURT:  37, she got:  "If he did, I can't remember

2     it.  It's possible, but I can't remember it.  I'm trying to

3     think.  I didn't tell anybody that."

4          MR. TACOPINA:  That was the final one.

5          THE COURT:  Right.  That was the final one.

6          MR. TACOPINA:  And the first one started with, "Was he

7     grinding against you" and she said the first time, "I don't

8     recall him doing that."  So that's not "I have no

9     recollection."  It's "I don't recall him doing that" was the

10    first one.  The second one is I "don't remember if he did, but

11    if he had" -- well, your Honor just --

12         THE COURT:  Yeah, right.  So I get your point, and I

13    hope you got mine.  So I think you are entitled to go into it.

14         Now we are talking about how?  In a way that will not

15    be confusing and take three times as much time.

16         MR. TACOPINA:  Right.

17         THE COURT:  If not much more than the game is worth,

18    and I don't mean to suggest it's a game in any kind of

19    frivolous way.

20         MR. TACOPINA:  I know what you mean.

21         THE COURT:  I wouldn't suggest it's satire.  It seems

22    to upset you, and I didn't suggest that to begin with.  But

23    there we are.

24         MR. TACOPINA:  I'm just going to put the bottle in my

25    mouth so I don't speak right now.

1            Your Honor, could I --

2            THE COURT:  Just a minute.

3            MR. TACOPINA:  -- ask you something that might help?

4    Could I literally hand you the two pages of my questions

5    regarding this.

6            THE COURT:  No, no, no, no.  I'm done reviewing cross

7    outlines.

8            MR. TACOPINA:  Okay.  I think you would understand

9    where we are going with this and how quickly we can get there

10   if I did it this way.

11           THE COURT:  You are not going to do it this way.  I

12   think the way to do this is by questions to Ms. Carroll, and if

13   you have to use the document to refresh and maybe even to

14   impeach on a very targeted way, we will cope with it.  But this

15   is no more than a five-minute proposition.

16           MR. TACOPINA:  I think it's going to take a lot longer

17   that way than if I just show these three slides, but I will do

18   whatever your Honor please.

19           THE COURT:  That's what we are going to do.

20           MR. TACOPINA:  Okay.

21           THE COURT:  Let's get the jury.

22           (Continued on next page)

23

24

25

N512Car3                         Carroll - Cross

1           (Jury present)

2           THE COURT:  Again, members of the jury, sorry for the

3    longer than expected interruption, but I think we have resolved

4    some things that will save a fair amount of time.  And although

5    I hesitate to make any predictions, I just want you to know

6    that we are on or ahead of schedule in terms of the duration of

7    the trial.  Every hour that equation -- that estimate changes,

8    but we are not doing badly at all.

9           Okay.  Ms. Carroll, you are still under oath.

10          Mr. Tacopina.

11          MR. TACOPINA:  Thank you, your Honor.

12   BY MR. TACOPINA:

13   Q.  Ms. Carroll, as far as you say you can recall it that you

14   were assaulted more than several times?

15   A.  Yes.

16   Q.  And the only alleged assaulter that you ever brought a

17   lawsuit against is Donald Trump?

18   A.  Yes.

19   Q.  And he is I think the only person you ever sued?

20   A.  Ever.

21   Q.  Ever.

22          And during the same month you filed your lawsuit

23   against Donald Trump, in November of 2019, you posted a

24   question on Twitter:  Why isn't a rape allegation worth an

25   impeachment inquiry?  Do you recall that?

1              MR. FERRARA:  Object to relevance.

2              THE COURT:  Just a moment.

3              Overruled.

4     BY MR. TACOPINA:

5     Q.  Do you recall that, Ms. Carroll?

6     A.  I don't recall it, but I probably said it.

7     Q.  Okay.  On direct examination when Mr. Ferrara was

8     questioning you, you testified that you did not attempt to

9     influence Natasha Stoynoff when you questioned her.

10    A.  I don't believe I tried to influence her.

11    Q.  Before bringing this lawsuit against Donald Trump for

12    allegedly raping you, you interviewed Natasha Stoynoff on June

13    22, 2020.

14             MR. FERRARA:  Objection.

15             THE COURT:  What's the ground?

16             MR. FERRARA:  If your Honor and perhaps if

17    Mr. Tacopina looks at the question, I think it misstates the

18    date, it's the "before bringing."

19             THE COURT:  This is to form.  Rephrase the question.

20    BY MR. TACOPINA:

21    Q.  Before bringing this, the battery assault lawsuit

22    against --

23             THE COURT:  Might it not be useful at this point to

24    clarify?

25             THE WITNESS:  Hmm, yes.

1          THE COURT:  You know what I am talking about, number

2    one and number two.

3          MR. FERRARA:  In terms of an instruction, your Honor?

4          THE COURT:  In some way.

5          MR. TACOPINA:  Okay.  We will figure it out.  You want

6    us to get together to --

7          THE COURT:  No.  Maybe we can do it now.

8          MR. TACOPINA:  Okay, sure.

9          THE COURT:  Members of the jury -- and if counsel has

10   any objection to my doing it?

11         MR. TACOPINA:  It's okay.

12         THE COURT:  Okay.

13         Members of the jury, there are two lawsuits between

14   Ms. Carroll and Mr. Trump.  This is one of them.  The first

15   lawsuit was brought in 2019.  That's not the one we are dealing

16   with.  It's still alive, but you don't have to worry about why

17   or where or whatever.  That was brought solely for alleged

18   defamation that Mr. Trump allegedly committed in 2019.  At that

19   time, Ms. Carroll could not have sued him for allegedly raping

20   her for legal reasons.

21         The legal context changed.  It changed in November of

22   2022.  She at that time gained the right to sue him for the

23   rape, the alleged rape.

24         In addition, Mr. Trump had issued a statement that you

25   have already seen in October of 2022 in which Ms. Carroll

1  contends Mr. Trump libeled her or defamed her again.  That's

2  this case.  You are not concerned with the first case.  You

3  just need to know, for example, for the context of some

4  questions that it is out there, and it is not your job and

5  don't worry about that.

6            Any objection to that, Mr. Tacopina?

7            MR. TACOPINA:  That was perfect, your Honor.

8            THE COURT:  *Wunderbar*.

9            MR. FERRARA:  Agreed, your Honor.

10           THE COURT:  Okay.  Let's go.

11  BY MR. TACOPINA:

12  Q.  Before bringing this lawsuit, the one that's before the

13  jury against Donald Trump, you interviewed Natasha Stoynoff on

14  June 22, 2020.

15  A.  Yes.

16  Q.  And you prepared a transcript of that interview.

17  A.  Yes.

18  Q.  And during that interview, even though Natasha Stoynoff

19  repeatedly told you that she didn't recall Donald Trump

20  grinding against her, you repeatedly try to get her to say that

21  she did.

22  A.  I didn't get her to try to say that she did.  I just asked

23  her to try to think if it was a possibility.

24  Q.  Well, you asked Ms. Stoynoff at one point:  Do you recall

25  him grinding against you?

1            And she said:  Riding?

2            And then you responded with:  Grinding.

3            And she said, her response was:  Grinding?  Oh, God.

4            And you then said:  He was pushing you, you said.

5            And Ms. Stoynoff replied to you:  That's a question I

6    never thought I would hear.

7            You then said to Ms. Stoynoff:  He had me pressed up

8    against the wall, and I was aware of that.  That's what you

9    said to Ms. Stoynoff.

10            And Ms. Stoynoff said:  Right.  I don't recall him

11    doing that?

12            MR. FERRARA:  Objection, your Honor.

13            THE COURT:  Sustained.

14            Oh, no.  Withdraw my ruling.  Go ahead, counselor.

15            MR. TACOPINA:  Okay.  So overruled on that one.

16            THE COURT:  Yes.

17    BY MR. TACOPINA:

18    Q.  Do you recall saying that to Ms. Stoynoff or having that

19    colloquy, that question and answer?

20    A.  Yes, I do.

21    Q.  Okay.  After that exchange, you continued to press the

22    issue and you --

23            THE COURT:  Sustained as to form.

24            MR. TACOPINA:  Yes, sir.

25    BY MR. TACOPINA:

N512Car3                          Carroll - Cross

1    Q.  After that exchange, it went on, you subsequently asked

2    Ms. Stoynoff, question:  You shook your head and pushed back.

3    Now think, did he grind against you?

4              And Ms. Stoynoff answered:  I don't remember if he

5    did.  And the reason I don't think he did is because I feel as

6    though if he had done anything more serious, more sexual that

7    had to do with sex parts, I would have told my supervisors.

8              Do you remember that part of the interview?

9    A.  Clearly.

10             MR. FERRARA:  Your Honor, we would ask for an

11   instruction that Ms. Stoynoff's responses are not for the truth

12   of the matter.

13             THE COURT:  Yes, of course.

14             Members of the jury, Ms. Stoynoff's responses as just

15   read to you and as may be read to you further from this

16   discussion are not admissible for the truth of what

17   Ms. Stoynoff said.  You may consider them for the fact that

18   they were said to Ms. Carroll because they shed light on what

19   Ms. Carroll did and why she did it.

20             MR. TACOPINA:  Thank you, your Honor.

21   BY MR. TACOPINA:

22   Q.  And the last part of the interview, even though you just

23   heard what Ms. Stoynoff said twice --

24             THE COURT:  Sustained.

25             MR. TACOPINA:  Okay.

1   BY MR. TACOPINA:

2   Q.  You went on to ask her:  But when he pushed up against you,

3   when he pushed you up against the door, are you quite sure he

4   didn't grind against you?  If his tongue was going down your

5   throat, I think his pelvis was against you.

6          Ms. Stoynoff replied:  I think my hands went up

7   immediately, so there was space.

8          Your question:  Yes, but your hands were like this,

9   holding her hands and pushing.  And then they are like this,

10  because he is pushing against you.  You see?  You are like

11  this.  And then his weight, his big obesity comes at you, so

12  your hands are thrust back.  So I don't think he would be able

13  to try and thrust his tongue unless he is pressing his hips

14  against you.

15         Ms. Stoynoff replies:  If he did, I can't remember.

16  It's possible, but I can't remember it.  I'm trying to think.

17  I didn't tell anybody that.  I don't remember being asked about

18  it.

19         Do you recall that portion of the interview?

20  A.  Yes, I do.

21  Q.  Okay.  Let's move on to another topic.

22         You appeared on numerous media outlets following the

23  release of your book, Ms. Carroll?

24  A.  Yes.

25  Q.  And in fact Anderson Cooper's producer contacted you to

N512Car3                        Carroll - Cross

1    arrange an interview with him?

2    A.  Yes.

3    Q.  And Anderson Cooper is a host on CNN?

4    A.  Yes.

5    Q.  And that happened only a couple of days after your story

6    about Donald Trump and Bergdorf Goodman appeared online in The

7    Cut?

8    A.  Yes.

9    Q.  And again The Cut is the online version of *New York*

10   magazine, right?

11   A.  The Cut is part of *New York* magazine, yes.

12   Q.  And you actually did appear on Anderson Cooper.

13   A.  Yes.

14   Q.  And there was an interview conducted by Anderson Cooper's

15   show, by Anderson Cooper himself, on CNN?

16   A.  Yes.

17   Q.  And that was June 24, 2019?

18   A.  Yes.

19   Q.  I'm just going to show you something that's been marked as

20   Defense Exhibit CC, just for yourself to take a look at.

21           And that's a screenshot of the Anderson Cooper

22   interview from June 24, 2019.

23   A.  Yes.

24   Q.  Okay.

25           MR. TACOPINA:  Your Honor, and we worked out this with

N512Car3                        Carroll - Cross

1    counsel, we are offering Defense CC into evidence.

2                MR. FERRARA:  Without objection.

3                THE COURT:  Okay, CC is received.

4                (Defendant's Exhibit CC received in evidence)

5                MR. TACOPINA:  Your Honor, it's about an eight-minute

6    clip that I would like to play for the jury at this point.

7                THE COURT:  Okay.

8                (Court and court reporter confer)

9                THE COURT:  The question is what's going on the

10   transcript.  Okay?  The question boils down to this:  Does the

11   transcript at this point say "video played" or are we expecting

12   the court stenographer to get the verbatim exchange in what

13   happened on the video?

14               MR. TACOPINA:  I would be more than fine with saying

15   "video played" because the exhibit itself is in evidence.

16               MS. KAPLAN:  Same.

17               THE COURT:  Okay.  That's what we are doing.

18               MR. TACOPINA:  Big smile on the court reporter's face,

19   by the way.

20               THE COURT:  Big smile.

21               MR. TACOPINA:  Big smile.

22               Okay.  We will play CC, and then I will ask some

23   questions about it.  Please take a look, and this is for

24   Ms. Carroll and the jury, as well.  Okay?  Make sure there is

25   enough volume, please, and let's let it go.

N512Car3                    Carroll - Cross

1            (Video played)

2    BY MR. TACOPINA:

3    Q.  Okay, Ms. Carroll --

4            THE COURT:  Is this the whole thing?

5            MR. TACOPINA:  That's the whole thing, your Honor,

6    yes.

7    BY MR. TACOPINA:

8    Q.  Now, that last line that you just said, that most people

9    think of rape as being sexy, is that something you believe?

10   A.  I think most people think of rape as being sexy because in

11   our culture we are saturated with entertainment shows which

12   continually show rapes to gather an audience.  For instance,

13   Game of Thrones showed between nine -- they showed graphically,

14   in detail, nine rapes and over 50 attempted rapes and actual

15   rapes just in the one show Game of Thrones.  Rape is everywhere

16   in our entertainment world, and it is used because it excites

17   people and draws an audience.  Hence I said I think most people

18   think of rape as being sexy.

19   Q.  You are comparing television rape scenes to real life rape

20   scenes?

21   A.  No, I was not.  To me, rape is the most horrible, violent

22   act that can be done against a woman or a man.

23   Q.  When you were speaking to Anderson Cooper and you said you

24   think that most people think that rape is sexy, you weren't

25   talking about television rapes.  He was asking you about what

N512Car3                          Carroll - Cross

1  happened to --

2  A.  No.  I'm just -- I was talking about the culture in

3  general.  Anderson Cooper's audience, I was -- I assume a lot

4  of people think of rape as being sexy.

5  Q.  And you used the word "fight," not "rape" to describe what

6  happened to you in that interview because sexual violence is in

7  every country and every strata of society and you just feel

8  that so many women are undergoing sexual violence and that

9  yours was short, you got out, you are happy now, and you are

10  moving on.  Do you stand by that statement?

11  A.  I felt, I felt humble that I was aware of how much sexual

12  violence there is in the world.  I felt lucky to have gotten

13  out alive and was able to tell my story.  And at the time, when

14  I wrote the book, I don't think I used the word "rape."  I was

15  very -- I just very uncomfortable using the word because when I

16  use the word these intrusions and the visions would come up

17  into my head.  So I just -- I liked the word "fight" because it

18  gave -- it gave me action.  I felt I took action, and it wasn't

19  something done to me.  I got away.  So I used the word "fight."

20  Q.  Okay.  And after you made that comment that we discussed

21  about how you characterized rape being sexy, Anderson Cooper

22  said let's take a short break, and then you went to commercial

23  break, right?

24  A.  No.  I said "think of the fantasies."

25  Q.  Right, and then you said "you are fascinating to talk to"

N512Car3                        Carroll - Cross

1   also, but right after that portion he took a break.

2   A.  Yes.

3   Q.  Okay.  And I would like to play from your deposition clip

4   425.  It's EJC-425.  It's from the deposition of October 14,

5   2022, page 203/line 19 to page 204/line 7, and I will play the

6   video clip of that when everyone is ready.

7           THE COURT:  Page and lines again, please.

8           MR. TACOPINA:  203, your Honor, 203/line 19 to

9   204/line 7.

10          MR. FERRARA:  We object to this portion, your Honor.

11          THE COURT:  Ground.

12          MR. TACOPINA:  It's the deposition.

13          MR. FERRARA:  I understand.  On relevance and

14  speculation grounds.

15          THE COURT:  No.  Overruled.

16          MR. TACOPINA:  Mike, are you guys ready?

17          MR. FERRARA:  Yes, thank you.

18          MR. TACOPINA:  You can play 245, clip 245.

19          (Video played)

20  BY MR. TACOPINA:

21  Q.  And lastly one thing you said on that interview,

22  Ms. Carroll, is that you would be -- you thought this initial

23  part of your story about meeting Donald Trump and the lingerie

24  banter back and forth, you were going to be able to dine out on

25  this story forever.  What did you mean by that?

N512Car3                         Carroll - Cross

```
 1   A.  I meant the story was so funny, shopping with Donald Trump
 2   in Bergdorf's, it was such a meaty, juicy, hilarious story.  I
 3   was looking forward to actually going out soon and telling
 4   everybody the story, perhaps writing about it.  It was just --
 5   it was such a New York story, and such a happy story, and then
 6   of course it turned tragic.
 7   BY MR. TACOPINA:
 8   Q.  Now, you first you heard the judge describe the two
 9   different lawsuits.  In the first lawsuit you sued Donald Trump
10   in November of 2019.
11   A.  Yes.
12   Q.  And during the course of that lawsuit, in 2021 you started
13   writing a blog on Substack.
14   A.  Yes.
15   Q.  And you make money from your blog based on your
16   subscribers?
17   A.  Yes.
18   Q.  In fact, from that blog you make $70,000 a year or did.
19   A.  Yes.
20   Q.  And you agree that's certainly successful for a Substack
21   blog.
22   A.  Yes.
23   Q.  You talked about a documentary with that famed documentary
24   producer Ivy, it's Meeropol, right?
25   A.  Yes.
```

N512Car3                         Carroll - Cross

1   Q.  Okay.  And you start to engage with Ivy Meeropol about

2   doing a documentary on your story?

3   A.  No, on my life.

4   Q.  On your life.

5   A.  Yes.

6   Q.  Okay.  And of course that came after the story that you

7   told about Donald Trump became public.

8   A.  Yes.

9   Q.  All right.  And you paused that documentary project.

10  A.  Yes.

11  Q.  Right.  Because you were told it was not a good look for

12  this trial.

13  A.  No.

14  Q.  No?  Why did you pause it?

15  A.  I didn't pause it.  Ivy decided that during this trial she

16  would not be engaging with me in any way as to not interfere.

17  Q.  Okay.  So you agreed to resume the documentary project

18  after the trial is done.

19  A.  We have never agreed to that.

20  Q.  Okay.  Now, in fact, you have appeared on the podcast

21  CheerLEADING for Democracy which premiered on September 9,

22  2021?

23  A.  I, I don't -- I -- if you say.

24  Q.  We will show you something.  We are going to show --

25  A.  I'm not sure what.

N512Car3                        Carroll - Cross

1    Q.  Can we get a screenshot for BU?

2    A.  Oh, okay.  This was a Midas Brothers.

3    Q.  I'm sorry, what?

4    A.  The Midas Brothers.

5    Q.  The Midas Brothers.  That's CheerLEADING for Democracy.  Do

6    you recall appearing on that podcast?

7    A.  Yes.

8              MR. TACOPINA:  I offer BU, your Honor.  I'm going to

9    play a relevant portion that plaintiff already has.

10             MS. KAPLAN:  We have no objection to the portion that

11   I discussed with defense counsel prior to this moment.

12             (Counsel confer)

13             MR. FERRARA:  No objection, your Honor.

14             THE COURT:  And I take it the agreement is this is an

15   excerpt from this podcast?

16             MR. FERRARA:  Correct.

17             THE COURT:  Mr. Tacopina?

18             MR. TACOPINA:  Yes, your Honor.

19             THE COURT:  Okay.  BU is received.

20             (Defendant's Exhibit BU received in evidence)

21   BY MR. TACOPINA:

22   Q.  We are going to play a snippet from that podcast,

23   Ms. Carroll.

24             Go ahead.

25             (Video played)

N512Car3                        Carroll - Cross

1    BY MR. TACOPINA:

2    Q.  Okay.  So what you were saying was that obviously you were

3    making more money with your Substack podcast than you had done

4    previously?

5    A.  Yes.

6    Q.  Okay.  And the reason you were able to make more money with

7    your podcast following your accusations against Donald Trump is

8    because of the number of people who subscribed to your podcast.

9            MR. FERRARA:  Objection.

10           THE COURT:  Overruled.

11   A.  In part, yes.

12   Q.  Now, it would be fair to say, Ms. Carroll, that your life

13   has been fabulous since your book came out.

14   A.  That is what I like my life to appear to be.

15   Q.  Okay.  As a matter of fact, that's what you said, correct,

16   in the past?

17   A.  I say it quite a bit.  That is how I want people to

18   perceive me.  Underneath my private self is another thing

19   altogether.

20   Q.  Well, you were going on all these TV shows and podcasts

21   after the allegations came out and, for example, in December of

22   2019, you -- that was one month after you filed your initial

23   lawsuit against Donald Trump, right?  December 2019?

24   A.  Yes.

25   Q.  Yeah.  So you appeared on a podcast called the Maris

N512Car3                    Carroll - Cross

 1  Review, BV.

 2            Please show it to the witness.

 3            Do you remember the Maris Review podcast?

 4  A.  Yes.

 5  Q.  We don't have to play that now.  It's okay.  Take it down.

 6            During that podcast, you confirmed that your life had

 7  been fabulous since the book came out, right?

 8            THE COURT:  Sustained as to form.

 9            MR. TACOPINA:  Yeah.

10  BY MR. TACOPINA:

11  Q.  During that podcast, you confirmed or you stated that your

12  life had been fabulous since the book came out.

13  A.  I always say my life is fabulous.  No matter who asks me,

14  what time of day, I will always reply it's fabulous.

15  Q.  Except in this courtroom in front of this jury?

16  A.  In this courtroom I am being forced to tell the truth.

17  Q.  So all these TV shows and all these podcasts and in your

18  book where you say how great your life is, that's all lies?

19  A.  No.  I want -- if I walked in the courtroom today and you

20  said:  Hi, E. Jean.  How are you?  I would have said:  Fine.

21  I'm fabulous.  It is my -- it is the way I present myself to

22  the world.  It's E. Jean the writer, E. Jean the advice

23  columnist.  I am the one, rightly or wrongly, I see myself as

24  solving other people's problems.  That is what my Substack is.

25  That is what I have done for almost 29 years.  So I always say

N512Car3                    Carroll - Cross

1    I'm fine.  The column is not called E. Jean Asks Other People

2    For Their Advice.  It's called Ask E. Jean.  I put up a front.

3    Q.  Right.  I'm not talking --

4    A.  That's what I said.

5    Q.  -- about your column, your advice column, Ms. Carroll, I'm

6    talking when you go on TV or radio or interviews or podcasts

7    and are asked about the incident with Donald Trump, you always

8    say that you are fabulous now.

9    A.  Of course I do.

10   Q.  Okay.

11   A.  I don't want anyone to know I suffered.  I did not and

12   still don't, unfortunately, during this trial I have to reveal

13   what is actually going on, but up until now, I would be ashamed

14   to know -- let people know what is actually going on.

15   Q.  You also explain on that podcast that you were receiving

16   lots of support --

17   A.  Um-hmm.

18   Q.  -- since your book came out?

19   A.  Um-hmm.

20   Q.  Yes?

21          THE COURT:  Please answer with words.

22   A.  Yes.

23   Q.  And you confirm you were receiving lots of love?

24   A.  Yes.

25   Q.  In fact, you were receiving several invitations to parties

1    relating to your litigation against Donald Trump.

2    A.  One or two parties, yes.

3    Q.  I am going to show you what's been marked as BW, a text

4    message -- well, just take a look at it, BW, please, for the

5    witness and counsel.

6            Before -- let me ask you this question first,

7    Ms. Carroll, before you read all that.

8            Do you recall sending a text message to Carol

9    Martin --

10   A.  Yes.

11   Q.  -- about invitations to parties.

12           Okay I'm going to offer BW, your Honor?

13           MR. FERRARA:  Just one moment, your Honor, please.

14   A.  Um-hmm, um-hmm, um-hmm, yes.

15           THE COURT:  There is no question yet, Ms. Carroll.

16           THE WITNESS:  Oh.

17           MR. FERRARA:  No objection.

18           MR. TACOPINA:  Okay.

19           THE COURT:  BW is received.

20           (Defendant's Exhibit BW received in evidence)

21   BY MR. TACOPINA:

22   Q.  Please display to the jury as well.

23           In a November text message to Carol Martin -- you

24   called her, by the way, Caroly?

25   A.  Caroly.

N512Car3                    Carroll - Cross

1    Q.  Caroly with a Y.  Okay.

2             You say:  "We have several invitations.  Molly Jong

3    Fast has invited you, Lisa, me, Mary Trump, Joyce Vance, Katie

4    Phang, Jen Taub, and Margaret Sullivan to dinner on December 2,

5    the night before the court hearing!  It's going to be a whoop.

6    Then on December 3, Mary Trump is inviting you, me, and Lisa to

7    breakfast with Joyce, Katie, and Jen, who are all staying at

8    her digs in SoHo.  Then we gather" -- "then we all go together

9    to Robbie and Joshua's office and gather in the Ruth Bader

10   Ginsburg conference room on the 63rd floor of the Empire State

11   Building and listen to the hearing being piped in.  We can't go

12   to court because of COVID rules.  Only Robbie and Joshua are

13   permitted in court.  But the Ruth Bader Ginsburg conference

14   room is much better.  Lots of food.  So that's the plan.

15   Dinner December 2nd, the night before, at Molly's; breakfast

16   the next morning at Mary's in SoHo; then we all go to Robbie's

17   office to listen to the hearing.  Can't wait!"

18             THE COURT:  Is there a question?

19             MR. TACOPINA:  Yes.

20   Q.  Is that celebrating, Ms. Carroll?

21   A.  It was coming together for a good moment, yes.

22   Q.  And I'm going to show you another -- you can take that

23   down, please.  Another message which was an e-mail you

24   received.  It is CS.  Okay.  And I will direct your attention.

25   Okay.  Do you recognize that?

N512Car3                    Carroll - Cross

1   A.  Yes.

2   Q.  That's an e-mail you received from Kathy Griffin?

3   A.  Yes.

4   Q.  Okay, on November 30 --

5   A.  Yes.

6   Q.  -- '21.

7           MR. TACOPINA:  I offer that, your Honor.

8           MR. FERRARA:  Your Honor, we object to the

9   out-of-court statements.

10          MR. TACOPINA:  Well, let me do this.

11          MR. FERRARA:  I am just looking at it.  I apologize,

12  your Honor.  It is not a short e-mail.

13          MR. TACOPINA:  I think maybe I could solve this, your

14  Honor.

15          THE COURT:  Are you withdrawing the question?

16          MR. TACOPINA:  Yes, I will withdraw it and try

17  something else.

18          THE COURT:  Okay.

19          MR. TACOPINA:  That might make this a little easier

20  without even having to offer this.

21  BY MR. TACOPINA:

22  Q.  Ms. Carroll, in sum and substance, this refers to a watch

23  party that you had for your case.

24  A.  Yes.  We are gathering because we are very hopeful.  These

25  are my friends.  They are supporting me.  I am -- I am happy to

N512Car3                              Carroll – Cross

1    reread these e-mails.  I had forgotten.  Yes.

2                (Continued on next page)

```
 1   BY MR. TACOPINA:
 2   Q.  So, again, my question was, this refers to a watch party
 3   you were having for your case?
 4   A.  Yes.
 5   Q.  OK.
 6   A.  Yes.
 7           MR. TACOPINA:  I don't need to offer this, your Honor.
 8   We can take that down.
 9           THE COURT:  OK.
10   Q.  Now, as you said on direct testimony, especially in New
11   York, status is everything?
12   A.  Status is important in New York, that's for sure.
13   Q.  And you would agree that you had a lot of media exposure
14   since coming forward with your story about Donald Trump?
15   A.  I had some media exposure, you know, so.
16   Q.  Well, we have already talked about several podcasts you
17   have been on, we are not playing them all now:  UnStyled,
18   hosted by Christene Barberich?
19   A.  Yes.
20   Q.  The Maris Review, which we just saw?
21   A.  Yes.
22   Q.  CheerLEADING for Democracy?  The Meidas guys?
23   A.  Yes.
24   Q.  There are numerous other podcasts, the New York Times Daily
25   podcast?
```

N515car4                          Carroll - Cross

1  A.  Yes.

2  Q.  *Trumpcast*, an interview with E. Jean Carroll?

3  A.  Yes.

4  Q.  *Women Who Travel*, which is a Conde Nast podcast?

5  A.  Yes.  That was about traveling with my dog.

6  Q.  Right; Author E. Jean Carroll on her Feminist Road Trip

7  Across America?

8  A.  Yes.

9  Q.  And again, that was after your accusation came out?

10  A.  It was after the book came out.

11  Q.  After the book came out.

12  A.  Yes.

13  Q.  Another podcast: *By the Book*, Bonus Episode, Speaking out

14  and Giving Advice from E. Jean Carroll?

15  A.  Most of this was book publicity.  When you publish a book

16  you gotta get on a few podcasts and let people know.  It is

17  part of bringing out a book.

18  Q.  I'm not quarreling, I am just asking.

19  A.  OK, yes.

20  Q.  These are some of the podcasts, right?

21         Another one was *All Ears* with Abigail Disney?

22  A.  Yes.

23  Q.  And that's just a podcast that we have just named which you

24  have been a guest on.  You have also been featured in numerous

25  television interviews, we have talked about some of them

1   already; right?

2   A.  A few.

3   Q.  Lawrence O'Donnell on MSNBC?

4   A.  Yes.

5   Q.  Alisyn Camerota on CNN?

6   A.  Yes.  Yes.

7   Q.  Anderson Cooper on CNN?

8   A.  Yes, it was.

9   Q.  You saw that?

10  A.  I had a book just come out.  I was -- it's a good thing

11  when your book comes out to talk to people and let them know I

12  have a book out which is about my life.

13  Q.  OK.

14          MSNBC Chris Matthews also?

15  A.  Yes.

16          THE COURT:  Mr. Tacopina, how much longer with this?

17          MR. TACOPINA:  This whole thing?

18          THE COURT:  This list of the names you find a basis to

19  add here.

20          MR. TACOPINA:  Just a few more questions, your Honor.

21  That's it.

22          THE COURT:  All right.

23  BY MR. TACOPINA:

24  Q.  After taping your interview on CNN on June 24, 2019, that

25  was the Alisyn Camerota one, you went to a party in Brooklyn

N515car4                          Carroll - Cross

1   where your friends and former editors had gathered to toast you

2   with your favorite bottle of Chartreuse, which was your

3   favorite?

4   A.   That was a great night.  All my old friends were there.

5   Q.   OK.

6        And your friends and editors wanted to know how you

7   were doing and you told them all you were having a ball?

8   A.   I always say -- it's: "I'm fine."  "I'm having a really

9   good time."

10  Q.   OK.

11  A.   It was a great night.

12  Q.   By the way, at that party you handed over a small box to

13  the hostess who organized it, which was a gift from Bergdorf

14  Goodman?

15  A.   Which I had bought that day, yes.

16  Q.   At Bergdorf Goodman?

17  A.   Yes, at Bergdorf Goodman; earrings.

18        MR. TACOPINA:  Your Honor, the last three I'm just

19  going to mention -- I'm not going to play but mention.

20  Q.   In addition to the TV interviews we just mentioned, you

21  were also featured on other videotaped interviews like AM Joy

22  on MSNBC?

23  A.   Yes.

24  Q.   *New York* Magazine YouTube channel?

25  A.   Yes.  Yes.

N515car4                     Carroll - Cross

1    Q.  Now, Ms. Carroll, during your testimony here before this

2    jury, several times you became upset and emotional, you cried.

3    A.  Yes.

4    Q.  That has never happened to you before on any of these

5    television appearances or in your full-day deposition, where

6    you became emotional and cried in describing this incident;

7    right?

8    A.  I don't believe I did, no.

9    Q.  Now, all of this attention you were getting, we just listed

10   a whole host of these shows and what not that you were on, you

11   wanted more still?  More publicity?

12   A.  Yes.  I had just published a book and -- yes.

13   Q.  OK.  I'm going to show you what has been marked as CG,

14   which is an e-mail from you to Tara Fitzpatrick.  That's the

15   first page, Ms. Carroll.  When you have a chance to look at

16   that, let me know.

17   A.  Yes.

18   Q.  OK.  Second?

19            Do you recall that e-mail?

20   A.  Yes.

21            MR. TACOPINA:  OK.  I offer CG, your Honor, into

22   evidence.

23            MR. FERRARA:  Just looking at it for the first time,

24   your Honor.

25            MR. TACOPINA:  It was produced by you, Bates

1    stamped --

2              THE COURT:  Mr. Tacopina, that's unnecessary.

3              MR. TACOPINA:  I am identifying the Bates stamp

4    number.  Sorry, your Honor.

5              MR. FERRARA:  Your Honor, from what we can tell we

6    have no objection, but the e-mail --

7              THE COURT:  Then from what I can tell you have no

8    objection.

9              MR. FERRARA:  Well, the e-mail is cut off, your Honor.

10             THE COURT:  I see.

11             MR. FERRARA:  I apologize.  I'm not suggesting that

12   Mr. Tacopina did anything to the document, I just do not recall

13   the rest.

14             THE COURT:  Mr. Tacopina, is there more to this?

15             MR. TACOPINA:  No, no more to it.

16             MR. FERRARA:  May I have a moment.

17             THE COURT:  How come it ends in the middle of a

18   sentence?

19             (Counsel conferring)

20             MR. FERRARA:  No objection, your Honor.

21             THE COURT:  Received.

22             (Defendant's Exhibit CG received in evidence)

23   BY MR. TACOPINA:

24   Q.  Can we display that to the jury, please, going back to the

25   first page?  I'm not sure what's on it.

N515car4                          Carroll - Cross

1          OK, so this is an e-mail on July 18, 2019, that you

2     sent to Tara Fitzpatrick, Allan Mayer, Shari Culpepper

3     regarding schedule.  And just before I ask you, those three

4     individuals were who?

5     A.   They were 42West.

6     Q.   And 42West is a public relations and marketing firm that

7     you had hired?

8     A.   They're a crisis management firm, also a PR firm.

9     Q.   PR firm, right.

10          And what you write in this e-mail to them that you

11    took care of the large press, New York Times -- next page,

12    please -- the Washington Post, CNN, MSNBC, NBC Nightly News,

13    etc. --

14          THE COURT:  Mr. Tacopina, the reason this is in

15    evidence --

16          MR. TACOPINA:  Yes.

17          THE COURT:  -- is that so you don't have to read it

18    out loud.

19          MR. TACOPINA:  I won't read the whole thing.  There is

20    one pertinent part.  You are right.  I'm sorry.

21    BY MR. TACOPINA:

22    Q.   After you describe the large, so to speak, news that you

23    brought in, you say that 42West is not living up to its

24    phenomenal reputation in getting me more radio, digital

25    podcasts, and blogs.

1            So you were upset with 42West for not getting you more

2    press?

3    A.  Well, I was upset because there had been a storm about my

4    accusation against President Trump and my feelings were hurt

5    that nobody cared about the book, oddly enough.  I thought the

6    book was pretty good.  It was about what women actually thought

7    about men.  And I was completely innocent, I thought, perhaps

8    we could -- I was asking for maybe a few more NPR interviews,

9    some podcasts and some blogs to get the word out about the

10   actual book.  The book was not selling.  The book was a dud.

11   It was an absolute dud and I was a little frustrated.  I

12   thought, this is a good book.  Wait until they hear what these

13   women have to say.  It is funny.  It is great.  Don't you want

14   to know what women actually think about men?  So, I talked to

15   42West.  NPR, I suggested NPR stations across the country.  I

16   had videos of the interviews of the women.  I had all sorts of

17   great stuff, but the book was a dud.

18   Q.  OK.

19            THE COURT:  Mr. Tacopina, do you have more than

20   another five or 10 minutes for the whole examination?

21            MR. TACOPINA:  Oh yes, sir.  Yes, sir.

22            THE COURT:  OK.  We will break for lunch here.  2:00.

23            (Continued on next page)

24

25

```
 1                    (Jury not present)

 2                    THE COURT:  Counsel, remain for a minute.  I have

 3       something to take up with you.

 4                    Be seated, folks.

 5                    MR. FERRARA:  Shall we excuse the witness, your Honor?

 6                    THE COURT:  Not necessarily.

 7                    As exhibits are coming in, Andy has to get hard copy

 8       to be marked admitted so that we have a record, and I'm advised

 9       that both sides are way behind.

10                    MR. FERRARA:  Yes.  That is -- if there is fault it is

11       on both parties.  We are working on the redactions, that is

12       largely what -- and we may have to take up a few issues with

13       your Honor but I will say we are working to really try to

14       resolve those problems.

15                    THE COURT:  Good.  Success on your heads.  Let's get

16       that wrapped up.  That's fine.  Thank you.  See you at 2:00.

17                    (Luncheon recess)

18                    (Continued on next page)

19

20

21

22

23

24

25
```

1                   A F T E R N O O N    S E S S I O N

2                                2:15 p.m.

3            THE COURT:  OK.  Let's get the jury in.

4            How much longer, Mr. Tacopina?

5            MR. TACOPINA:  Without obviously knowing whether I am

6     going to have to impeach or not, I would say less than an hour.

7            THE COURT:  OK.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Good afternoon, folks.

3              Ms. Carroll, you are still under oath.

4              You may continue.

5              MR. TACOPINA:  Thank you, your Honor.  Your Honor, I

6    neglected -- I showed the witness an exhibit but neglected to

7    offer it so I'm going to do that now again real quick.

8              Can we pull up BV, please?  We identified it earlier.

9              MR. FERRARA:  No objection.

10             THE COURT:  Received.

11             (Defendant's Exhibit BV received in evidence)

12   BY MR. TACOPINA:

13   Q.  You saw that earlier but that's the podcast of *The Maris*

14   *Review*?

15   A.  Yes.

16             MR. TACOPINA:  Thank you.  You can take that down.

17   Please put up CH for the witness?

18   Q.  Ms. Carroll, this is an e-mail that you had sent to --

19             THE COURT:  Don't do that.  You understand --

20             MR. TACOPINA:  Sorry.

21             THE COURT:  -- it is not in evidence.

22   BY MR. TACOPINA:

23   Q.  Do you recognize that, Ms. Carroll?

24   A.  Yes.

25   Q.  And did you send an e-mail to Shari Culpepper from your

N515car4                         Carroll - Cross

1   42 West agency in July of 2019 discussing sort of a road trip?

2   Bookings?

3   A.   Oh no.   NPR is for radio interviews, it was not a road

4   trip.

5   Q.   OK, for the radio interviews?

6   A.   It was just from my cabin.   It was not a road trip, I was

7   going to sit in my cabin and talk to NPR stations.

8   Q.   In different cities?

9   A.   In different cities.   It didn't come off.

10   Q.   In any event, you had -- you were interested in doing NPR

11   interviews for all different cities, I guess?

12   A.   Yes, and it turned out it couldn't be done.

13   Q.   OK.   OK.

14         You can take that down, please.

15         You kept track of all the attention you were getting

16   regarding your story coming out, your book and what not, with

17   Google Alerts about yourself?

18   A.   Yes, I had Google Alerts; yes.

19   Q.   And that started out around June 21, 2019?

20   A.   No.   I've always had Google Alerts.

21   Q.   After your article appeared in *The Cut*, that's again the

22   first time the story appeared publicly?

23   A.   Yes.

24   Q.   You received a lot of positive letters?

25   A.   Yes.

N515car4                         Carroll - Cross

1   Q.  And you told Dr. Lebowitz -- that's the doctor who was

2   hired as your expert?

3   A.  Yes.

4   Q.  You told Dr. Lebowitz, after coming forward with your

5   story, you were concerned about being harmed?

6   A.  Yes.

7   Q.  You sent a text message to Carol Martin on June 27, 2019 --

8   actually let me put up CJ.  CJ.

9          Do you recognize that, Ms. Carroll?

10  A.  This is a letter to Carol Martin's daughter Courtney.

11  Q.  Directing your attention --

12          THE COURT:  Is it a letter you wrote?

13          THE WITNESS:  This is a letter -- Carol Martin's

14  daughter Courtney was very concerned.

15          THE COURT:  Forget about what Courtney was concerned

16  or not concerned.  Is this something you wrote?

17          THE WITNESS:  Yes.

18          MR. TACOPINA:  I offer this CJ into evidence.

19          THE COURT:  Any objection?

20          MR. FERRARA:  No objection, your Honor.

21          THE COURT:  Received.

22          (Defendant's Exhibit CJ received in evidence).

23  BY MR. TACOPINA:

24  Q.  Your Honor, I was just informed -- and to be fair to

25  counsel -- the version that we, counsel agreed upon, the bottom

1   three attributions were in there.  So this will be received

2   subject to redaction, it is just the first lengthy text message

3   that is signed by E. Jean.

4           THE COURT:  Is that agreeable?

5           MR. FERRARA:  Yes, it is.  I ask that it be sort of --

6           MR. TACOPINA:  It won't be shown.

7           MR. FERRARA:  That's fine.

8           THE COURT:  OK.

9           MR. TACOPINA:  OK.  This is the portion that's in.

10  Please publish to the jury?

11          THE COURT:  Yes.

12  BY MR. TACOPINA:

13  Q.  So, after telling your -- nothing.  Strike that.  Not

14  after.

15          You just testified that you had told Dr. Lebowitz that

16  you were concerned for being harmed after your story came

17  out --

18          THE COURT:  I'm sorry.  Clarify the time.  You say you

19  just testified.  Does that mean contemporaneous with this

20  e-mail or contemporaneous with something else?

21  BY MR. TACOPINA:

22  Q.  My last question and your last answer was that I had asked

23  you, had you told Dr. Lebowitz, your expert in this case, that

24  after coming forward with your story your concern about being

25  harmed, and you said yes.

1    A.  Yes.

2    Q.  Now I'm going to show you this text message, which is in

3    evidence, to Carol Martin, the relevant portion.  To Carol

4    Martin:  Do not worry.  I have been walking these great New

5    York streets the last six days ALONE -- in all caps -- and at

6    night, all day long, and receive nothing but thanks and thumbs

7    up.  It is the opposite of concern.

8           MR. FERRARA:  Your Honor, I don't have a problem with

9    that.  It is just that Mr. Tacopina characterized it as to

10   Ms. Martin, I believe it was to her daughter.

11          THE COURT:  Rephrase.

12   BY MR. TACOPINA:

13   Q.  OK.  This, in fact, was a text message that you had sent to

14   Carol Martin, correct, and then to pass on to her daughter?

15   A.  No.

16   Q.  This was directed to her daughter?

17   A.  Yes.  I wrote directly to her daughter.

18   Q.  So, with that adjustment in my question, that this was sent

19   to Ms. Martin's daughter, what you wrote there was true?

20   A.  Yes.  That -- I was talking about New York streets.  I was

21   worried about where I lived up in Orange County.

22   Q.  You can take that down.

23          Ms. Carroll, as you sit here today, you know there was

24   a Law & Order episode that features a woman --

25          MR. FERRARA:  Objection, your Honor.  Objection.

1            THE COURT:  Come to side bar.

2            MR. TACOPINA:  Pardon me?

3            THE COURT:  Come to side bar.

4            MR. TACOPINA:  Yes.

5            (Continued next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          THE COURT:  OK.  What's going on.

3          MS. CROWLEY:  Your Honor, just one second?

4          MR. FERRARA:  Sorry, your Honor.

5          MR. TACOPINA:  What is going on, your Honor, is two

6    things.  There is an e-mail about the -- I was going to inquire

7    about regarding the TV show Law & Order, it is relevant for the

8    reasons I will explain.  The second before I did that I was

9    just asking if she had any independent knowledge of this show.

10   Law & Order, in 2012, did a TV show in which the episode

11   featured a woman getting raped in the Bergdorf Goodman lingerie

12   dressing room in 2012.

13         Ms. Carroll received an e-mail, responded to an e-mail

14   from someone saying that you should be aware that there is this

15   Law & Order episode from 2012.

16         THE COURT:  When does this Law & Order episode air?

17         MR. TACOPINA:  2012.  Originally.  It may have been

18   repeats.

19         MR. SIEGEL:  Originally.  It was on repeats.

20         MR. TACOPINA:  So, this lady is just telling her that

21   this aired in 2012 and had a character talking about being

22   raped in a Bergdorf Goodman lingerie dressing room.

23   Ms. Carroll replied saying:  I haven't seen it but this happens

24   all the time with Law & Order stories -- which indicates she

25   watches Law & Order -- also, there are 200 scripted shows a

1    year on TV, this kind of thing is bound to show up.  Indeed,

2    I'm surprised this plot is not seen more often.

3            So, we are offering that, obviously --

4            THE COURT:  OK.

5            MR. TACOPINA:  -- not for the truth, but for her

6    response that is relevant.

7            THE COURT:  I get it.

8            What is the objection?

9            MR. FERRARA:  Your Honor, we think she is

10   demonstrating here that she does not know about this episode.

11   Mr. Tacopina wants to use it to impeach her, that she made this

12   up, modeled it on this episode which is seven years before her

13   book came out.  We think under 402 and 403 it should be kept

14   out.

15           THE COURT:  No, no, no.  I will allow it.

1              (In open court)

2              MR. TACOPINA:  OK.

3              THE COURT:  Go ahead.

4              MR. TACOPINA:  Thank you.

5    BY MR. TACOPINA:

6    Q.  So my initial question was, as you sit here today, you know

7    that there was a Law & Order episode from 2012 that featured a

8    woman getting raped in the Bergdorf Goodman lingerie dressing

9    room; correct?

10   A.  I am aware, yes.

11   Q.  I would like to show you what's been marked Defendant's

12   Exhibit CK.  For purposes of identification let's leave the

13   whole thing up.

14             Ms. Carroll, take a look at that and let me know when

15   you are done.

16   A.  Oh.  Yes.

17   Q.  OK.  Do you recall that e-mail exchange?

18             THE COURT:  Let's first find out whether she can

19   identify, without saying what it is, Mr. Tacopina.

20             MR. TACOPINA:  Right.

21   Q.  Can you identify that?

22   A.  Yes.  I remember receiving this e-mail.

23             MR. TACOPINA:  I would offer that as Defendant's

24   Exhibit CK, your Honor.

25             MR. FERRARA:  No objection, your Honor.

1          THE COURT:  It is received.

2          (Defendant's Exhibit CK received in evidence)

3    BY MR. TACOPINA:

4    Q.  You can put that up, please, and display it with the

5    Court's permission.

6          The first e-mail in this exhibit, there was two, an

7    e-mail to you, and then your response was on June 23rd, 2019,

8    from a woman named Grace Brophy, who wrote to warn you that a

9    Law & Order SVU episode entitled "Theater Tricks" aired in 2012

10   and had a character speaking of a fantasy that he rapes a woman

11   in a Bergdorf Goodman dressing room in the lingerie department.

12   You then replied, on July 23, 2019:  I haven't seen it, but

13   this happens all the time with Law & Order stories.  Also,

14   there are 200 scripted shows a year on TV.  This kind of thing

15   is bound to show up.  Indeed, I'm surprised this sort of plot

16   is not seen more often.

17         Now, because you said this happens all the time with

18   Law & Order stories, can I assume that means that you watch

19   Law & Order?

20   A.  I am a big fan of Law & Order but not Law & Order SVU, it

21   is too violent.  I like Law & Order, though.

22   Q.  And despite claiming that you were surprised this sort of

23   plot is not seen more often -- withdrawn.

24         What did you mean by you were surprised that this sort

25   of plot is not seen more often?

N515car4                         Carroll - Cross

1   A.  Well, I hadn't seen it and I have yet to see it.  Somebody

2   dreaming of -- the Law & Order writers are very good about

3   keying into the psyche of their viewers, and one of the most

4   frequent fantasies of both men and women is -- as we have

5   discussed before -- unfortunately, rape.  So, I just expressed

6   my surprise that this kind of plot is not seen more often about

7   fantasy.

8   Q.  Fantasy of getting raped in the lingerie section of the

9   Bergdorf Goodman department store?

10  A.  That was amazing to me.

11  Q.  What do you mean amazing?  I assume amazing coincidence?

12  A.  Yes.  Astonishing.

13  Q.  Astonishing.

14          So five years before you came out with your story, an

15  astonishing coincidence that Law & Order --

16          MR. FERRARA:  Objection.

17          THE COURT:  Sustained.

18  Q.  Just go back to that first e-mail for one second, I want to

19  make one thing clear, please, the first e-mail to Ms. Carroll

20  on the same exhibit.  The other e-mail, please; CK.

21          Ms. Carroll, just to be clear, the writer, Ms. Brophy

22  at some point writes:  Perhaps the writer of the episode,

23  Marygrace O'Shea, is one of the friends that you told?

24          To be clear, you don't know who Marygrace O'Shea is?

25  A.  No.

N515car4                         Carroll - Cross

1  Q.  And you never told her anything about the Bergdorf Goodman

2  incident?

3  A.  No.  I told no one.

4  Q.  OK.  You can take that down.

5        You were fired from *Elle* magazine on December 11,

6  2019?

7  A.  Yes.

8  Q.  And it is your testimony that *Elle* magazine fired you

9  because Donald Trump called you a liar?

10  A.  Yes.

11  Q.  In fact, you don't blame *Elle* magazine for your

12  termination, according to you?

13  A.  I understood.  I was angry about it and hurt.  And I was

14  forlorn.  And I was going to miss my readers.  But, yes, they

15  let me go after 27 years.

16  Q.  And no one from *Elle* magazine told you that you were being

17  fired from *Elle* magazine because you were being branded a liar

18  by Donald Trump?

19  A.  No, they did not tell me that.

20  Q.  Did not tell you that.

21        In fact, you are aware that *Elle* magazine has publicly

22  stated that the decision not to renew your contract was a

23  business decision that had nothing to do with politics?

24  A.  Well, I think they're right when they say it is a business

25  decision, because when one of their --

1              MR. FERRARA:  Your Honor, I object to this question.

2              THE COURT:  Sustained.  The jury will disregard the

3    question and the suggestion that *Elle* magazine issued a

4    statement or what it said.  There is no evidence of that.

5              MR. TACOPINA:  Your Honor, if I can direct the Court

6    attention and counsel's attention to the deposition of October

7    14, 2022, page 183, lines 10 to 21.

8              THE COURT:  Give me a minute.

9              MR. TACOPINA:  Yes, sir.

10             THE COURT:  You said 193?

11             MR. TACOPINA:  183, your Honor.

12             THE COURT:  OK.

13             MR. TACOPINA:  183, lines 10 to 21.

14             MR. FERRARA:  Same objection, your Honor.

15             THE COURT:  Same ruling.  Sustained.

16             MR. TACOPINA:  Yes.

17   BY MR. TACOPINA:

18   Q.  Regardless, you were very surprised by your termination in

19   December of 2019?

20   A.  I thought they were calling me to invite me to their

21   Christmas party.

22   Q.  Yet four months earlier, on August 1, 2019, you sent an

23   e-mail to your agent, Sarah Lazin?

24   A.  Yes.

25   Q.  Telling her that after Nina Garcia -- who I think you

1    testified on direct is the head of *Elle* magazine?

2    A.  Yes, she was the editor in chief.

3    Q.  So you sent an e-mail to Sarah Lazin that after Nina Garcia

4    took over at *Elle*, the magazine cut your pay in half from

5    $10,000 a column to $5,000 a column?

6    A.  That was being done across the board at magazines, they

7    were cutting back on salaries and pages.

8    Q.  In fact, in August of 2019, before your firing in December,

9    you were looking to get out of your contract with *Elle*

10   magazine?

11   A.  I was looking for other work at other magazines as an

12   advice columnist, true.

13   Q.  OK, but you were looking for other work.  You were looking

14   to get out of your contract with *Elle* magazine?

15   A.  I had my contract checked by a lawyer, yes.

16   Q.  And you told your agent, Sarah, that *The Atlantic* was

17   interested in sort of stealing you and your advice column from

18   *Elle*?

19   A.  Yes.

20   Q.  And you were considering it?

21   A.  Yes, I was considering it.  Yes.

22   Q.  And that's because *Elle* cut your salary in half?

23   A.  Yes.

24   Q.  And left you without an editor?

25   A.  Yes.

1   Q.  And didn't run your column in July of 2019?

2   A.  Didn't run it, and they also cut my column pages from two

3   pages to one.

4   Q.  OK.

5   A.  They also hid the column in the magazine and kept -- in

6   magazines you get a pride of placement with the most

7   interesting piece of writing in what we call the "well".  The

8   well is where the beautiful pictures are and that's usually

9   where the Ask E. Jean column resided, but when the new folks

10  came in, the Ask E. Jean column was found in a different place

11  every month so nobody could find the column.  They also buried

12  me online.

13  Q.  And you complained to your agent that Nina Garcia, the

14  editor in chief at *Elle*, loathed or hated you because you

15  published your book excerpt in *New York* magazine?

16  A.  They were not happy.

17  Q.  And that's the book excerpt that obviously featured the

18  story about Donald Trump and Bergdorf Goodman?

19  A.  Yes.

20  Q.  And you agree that Nina Garcia, the editor in chief of

21  *Elle*, is a well respected editor in the magazine world?

22  A.  Nina is extremely respected.  And also, she was the star of

23  project run way.  Nina Garcia is a brilliant editor in chief.

24  Q.  And you told your agent that Nina really loathes you?

25  A.  Nina got very, very angry at me for publishing the excerpt

N515car4                          Carroll - Cross

1    in *New York* magazine.

2    Q.  OK, but did you use the word "loathe" in describing how

3    Nina felt about you to your agent?

4    A.  I am sure I did.

5    Q.  OK.

6          Now, you testified at trial on direct that you were

7    fired from *Elle* magazine because Donald Trump accused you or

8    defamed you?

9    A.  Because he called me a liar and my entire column rested on

10   the foundation that readers were able to trust that I would

11   tell them the truth.

12   Q.  OK.

13   A.  So, when the president of the United States called me a

14   liar for three straight days, I took a huge hit.  My

15   trustworthiness was exploded.  It was like -- just crumbled,

16   the foundation on which the whole column had rested for 27

17   years.

18   Q.  OK.  In your August e-mail, August 2019 e-mail to your

19   agent, you said that the reason that Nina hated or loathed you

20   was because you published your excerpt in *New York* magazine.

21   A.  Yes.

22   Q.  By that point Donald Trump, who had already called you a

23   liar, nearly a month and a half earlier on June 21, 2019?

24   A.  Yes.

25   Q.  When explaining -- withdrawn.

N515car4                      Carroll - Cross

1          Nowhere in the e-mail to your agent do you say that

2     the reason that Nina Garcia hates you or loathes you -- I'm

3     sorry, loathes you -- is because Donald Trump called you a

4     liar?

5     A.  I don't put it in an e-mail but she hated me and loathed

6     me.  You can use both words.

7     Q.  OK.  So nowhere in the e-mail that she hated and you

8     loathed you do you write that that's because Donald Trump

9     called you a liar?

10    A.  Sarah and I had talked on the phone and I was distraught

11    that the readers would no longer trust me.  You don't -- you

12    can't write to an advice columnist if you can't trust what she

13    is going to tell you is the true, best advice, and I didn't

14    have that foundation any longer.

15    Q.  Well, but my question is regarding the e-mail you sent to

16    your agent Sarah, about why it was that Nina Garcia

17    loathed/hated you, the only reason you cited in that e-mail was

18    because your book excerpt was published in *New York* magazine?

19    A.  Yes.  I put it in an e-mail because Sarah and I had been on

20    the phone talking about the foundation being pulled away from

21    me when the president called me a liar.

22    Q.  No, actually -- you know what?  Let's do that, please put

23    up CL.

24          Take a look at CL.  And what is that?  Do you

25    recognize that, I should say.

N515car4                           Carroll - Cross

A.  Oh.  Right.

Q.  Is that the e-mail that we have been discussing?

A.  Right.

          MR. TACOPINA:  I offer Defendant's Exhibit CL, your

Honor, into evidence.

          MR. FERRARA:  There are certainly portions of this

that are admissible, others perhaps not, your Honor.  I'm happy

to discuss with defense counsel.  I think he wants to show a

portion that is admissible we have no objection to.

          THE COURT:  What part?

          MR. FERRARA:  It is a discussion between Ms. Carroll

and her agent and her agent is on the chain.  I would just want

to look at it more closely.

          THE COURT:  Why don't you do that.

          MR. TACOPINA:  Take a look, because I plan on using

the whole thing.

          MR. FERRARA:  OK.  Thank you for the time.  No

objection.

          THE COURT:  Received.

          (Defendant's Exhibit CL received in evidence)

BY MR. TACOPINA:

Q.  Ms. Carroll, this is the e-mail that we have been

discussing that you sent to your agent Sarah Lazin and talking

about why Nina loathed you, and you say it is because you

published the book excerpt in *New York* magazine?

1   A.   Yes.

2   Q.   Nowhere in this e-mail do you say that Nina loathed you

3   because Donald Trump called you a liar; do you?

4   A.   No.   I talked about -- with Sarah on the phone, and I put

5   it in this e-mail about the publishing of the excerpt.

6   Q.   Oh.   So in the e-mail you said that she loathed you because

7   you published the excerpt in a competitor magazine?

8   A.   Yes.

9   Q.   But yet you had a separate phone call with Sarah?

10   A.   Oh, yes.   Many separate phone calls, yes.

11   Q.   Now, at one point you saw Nina Garcia sent a message saying

12   that they weren't going to renew your contract because they

13   didn't feel it set the right precedent?

14        MR. FERRARA:   Objection.   Objection, your Honor.   I do

15   not believe Ms. Carroll is on the e-mail that Mr. Tacopina

16   is --

17        THE COURT:   Just let me... the question is did you see

18   such a message?

19        MR. TACOPINA:   Yes.

20        THE WITNESS:   I'm sorry.   What?

21        MR. TACOPINA:   Sure.   Let me just reread the question.

22        MR. FERRARA:   Your Honor, the question should be

23   framed prior to this litigation.

24        THE COURT:   Fair point.   Rephrase.

25   BY MR. TACOPINA:

1   Q.  Prior to this litigation, had you seen an e-mail in which

2   Nina Garcia sent out a message stating that the reason they

3   weren't going to renew your contract is because they didn't

4   feel it set the right precedent by keeping you?

5   A.  I don't remember seeing that.

6   Q.  OK.

7           MR. FERRARA:  Objection.  I move to strike the

8   question which has the -- which embeds a premise, your Honor.

9           MR. TACOPINA:  A question is not evidence.

10          THE COURT:  The jury is reminded that it is only the

11  witness' answers that are evidence, not the questions.

12  BY MR. TACOPINA:

13  Q.  Ms. Carroll, since you don't remember seeing that, I'm

14  going to see if I can refresh your recollection just by showing

15  to you, Ms. Carroll.

16  A.  OK.

17  Q.  Ms. Carroll, I will show you something.  Take a look at it.

18  When you are done, let me know?

19  A.  Have me see it?

20          MR. TACOPINA:  261, and the whole thing please, at

21  first?

22          THE COURT:  What is it.

23          MR. TACOPINA:  Oh, deposition testimony.  I'm sorry.

24  Ah.  This is just to refresh the witness' recollection, your

25  Honor.

1          THE COURT:  OK, but there has to be a record of what

2     you are showing her.

3          MR. TACOPINA:  Yes.  I'm going to do that right now, I

4     misstated it.

5          Is there a way to put up the deposition testimony for

6     Ms. Carroll or I could give her a hard copy?

7          187, line 25, Mike, to 189, line 12.  I'm just going

8     to show it to the witness to see if it refreshes her

9     recollection.  You know what?  I am just going to give her

10    mine.

11    Q.  So I will direct your attention to the bottom of that page,

12    line 25, it is just one line, and then when you are done, look

13    up, and I will move it -- there we go.  Just read that page.

14    A.  Yes.  Editor in chief here?

15         THE COURT:  No.

16    Q.  No, no.  To yourself.

17         Scoot up a little bit for the whole page?

18         And when you are done, look up, Ms. Carroll.

19    A.  Uh-huh.

20    Q.  And then just scoot up to the next page, please, to line

21    12?  Right there.

22    A.  OK.

23         MR. FERRARA:  Your Honor, I would ask that the defense

24    show Ms. Carroll the rest of this, of page 189.

25         MR. TACOPINA:  To refresh her recollection?

N515car4                        Carroll - Cross

1          MR. FERRARA:  Yes.

2          MR. TACOPINA:  I can show her what I would like but I

3   will show her the rest of 189.

4          Go ahead.

5   A.  Yes.

6   Q.  OK, Ms. Carroll.  Does that refresh your recollection as to

7   whether or not -- I'm not going to re-describe it, it was

8   objected to before, but does that refresh your recollection

9   seeing the message, that we discussed previously, from *Elle*?

10  A.  Yes.

11  Q.  It does?  OK.

12         And that was that, they didn't feel prepared to move

13  forward?

14         MR. FERRARA:  Objection, your Honor.  May we approach?

15         THE COURT:  All right.

16         (Continued next page)

17

18

19

20

21

22

23

24

25

1           (At side bar)

2           THE COURT:  Mr. Ferrara.

3           MR. FERRARA:  Your Honor, at her deposition, which

4    Mr. Tacopina just showed to the witness, she describes being

5    shocked about seeing an e-mail, which is entirely hearsay, in

6    which employees or people who run *Elle* magazine discuss,

7    outside of Ms. Carroll's presence -- she is not on the

8    e-mail -- they discuss potentially why they fired her.  It is

9    hearsay.  And the deposition makes clear when she says, when

10   the witness at the deposition, says on page 189 at line 16:

11   This is a shocking e-mail for me because what precedent are

12   they talking about?  Does anybody know?  It is clear she has

13   never seen it other than the litigation.  Answering honestly

14   today, yes, she has, at her deposition, but it is not an e-mail

15   that Ms. Carroll is competent to get into evidence, it is

16   hearsay.

17          THE COURT:  Mr. Tacopina?

18          MR. TACOPINA:  I'm not offering the e-mail, your

19   Honor, just the sort of the summary content that she was

20   aware --

21          THE COURT:  You are not offering it for the truth,

22   only for its content?

23          MR. TACOPINA:  No.  For the -- I have an idea.

24   Whenever I am having trouble when I make an argument, I'm going

25   to withdraw the offer of this and move on.

N515car4                          Carroll – Cross

1            THE COURT:  OK.  Sounds like a good plan.

N515car4                          Carroll - Cross

1              (In open court)

2              THE COURT:  Question is withdrawn.

3              MR. TACOPINA:  Yes, I withdraw that, your Honor.

4    BY MR. TACOPINA:

5    Q.  The book excerpt that you did not give to *Elle* but to *New*

6    *York*, you received $7,000 for that?

7    A.  I did not receive it.

8    Q.  Somebody received $7,000?

9    A.  My publisher.

10   Q.  Your publisher.

11             And you didn't even tell *Elle* magazine, your employer

12   at the time, that you decided to give an exclusive to *New York*

13   magazine after the fact?

14   A.  Right.

15   Q.  At that point you worked at *Elle* magazine for over two

16   decades?

17   A.  Yes.

18   Q.  You testified -- excuse me.

19             You testified a short while ago being an advice

20   columnist rests on your ability to be trusted?

21   A.  Yes.

22   Q.  And you testified at trial Thursday, page 253, line 25 to

23   254, line 3 --

24             If you want to look at it, Mike, I'm going to ask a

25   question.

1             MR. FERRARA:  Sorry.  Thank you.

2             THE COURT:  Just a minute.

3             MR. FERRARA:  Thank you.

4   BY MR. TACOPINA:

5   Q.  Ms. Carroll, you testified at trial, on direct examination

6   by Mr. Ferrara, that if you were writing Ask E. Jean for *Elle*

7   magazine, was the question, why did you not publish this

8   excerpt in *Elle* magazine as well?  And your answer was:

9   Because *Elle* magazine would never have published this excerpt.

10            Do you recall giving that answer at trial?

11  A.  Yes.

12            THE COURT:  I'm sorry.  What page and line are we at?

13            MR. TACOPINA:  Sorry, your Honor?

14            THE COURT:  Page and line.

15            MR. TACOPINA:  Trial testimony, page 253, line 25 to

16  254, line 3.

17            THE COURT:  OK.  Thank you.

18  BY MR. TACOPINA:

19  Q.  That's your testimony before this jury, that *Elle* would

20  never publish that?

21  A.  Never.  They would never publish it.

22  Q.  I'm going to play you defense 268, it is from your

23  deposition.  Before we play it --

24            THE COURT:  I'm sorry.  Defense 268?  Defendant's

25  exhibits have letters.

N515car4                         Carroll - Cross

1              MR. TACOPINA:  It is a deposition, your Honor.  I'm

2    sorry.  That's our identification.  I'm going to give page and

3    line of the deposition right now.  OK?  It is deposition from

4    October 14, 2022; page 192, line 25, to 193, line 13.

5              MR. FERRARA:  Your Honor, we object to the hearsay in

6    this deposition transcript.

7              MR. TACOPINA:  Goes to Ms. Carroll's state of mind,

8    your Honor.

9              THE COURT:  Sustained.

10   BY MR. TACOPINA:

11   Q.  Well, was it your understanding that *Elle* magazine was

12   disappointed that you were not giving the exclusive to them?

13             MR. FERRARA:  If her understanding is based on

14   hearsay, we object.

15             MR. TACOPINA:  It is her state of mind.

16             THE COURT:  How is it relevant?

17             MR. TACOPINA:  Because she testified at this trial

18   that *Elle* would not have published that.

19             THE COURT:  That's her state of mind today.

20             MR. TACOPINA:  Right.  I want to inquire about her

21   state of mind in October.

22             THE COURT:  I don't get it.  I don't get it.

23             MR. TACOPINA:  I hate to ask you if we can approach

24   again.  Are you going to let me if I do?

25             THE COURT:  But I may not release you at the end.

N515car4                          Carroll – Cross

1              MR. TACOPINA:  Mr. Siegel will go up there.

2              THE COURT:  That's OK.  You can go up, too.

3              (Continued next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At side bar)

2              THE COURT:  Once more, with feeling.

3              MR. TACOPINA:  He is going to try.

4              MR. SIEGEL:  I will give it a shot.  So, she testified

5    at this trial --

6              THE COURT:  That *Elle* would never have published it.

7              MR. SIEGEL:  Right.

8              THE COURT:  Right.

9              MR. SIEGEL:  That was her understanding.  However, her

10   understanding --

11             THE COURT:  Well, I don't know if she said it was her

12   understanding but she certainly said that.  I'm not saying she

13   didn't say it was her understanding, but there is a difference.

14             MR. SIEGEL:  OK.  So, she testified in a contrary way

15   in October of 2022, expressing her understanding that *Elle*

16   would have published the article and was disappointed that she

17   did not give them the exclusive.

18             THE COURT:  Who is *Elle* magazine?

19             MR. SIEGEL:  It's her employer.

20             THE COURT:  Well, yeah.  There is a hearsay rule

21   involved here too, isn't there?

22             MR. SIEGEL:  We can --

23             THE COURT:  I mean, you know, if I want to know

24   President Biden's state of mind, I don't get it from a postal

25   delivery worker.

N515car4                        Carroll - Cross

1            MR. SIEGEL:  OK.  So we can reframe the question by

2     asking who it is that she spoke to?

3            MR. TACOPINA:  Here is the thing, your Honor.  When

4     she testified on direct that *Elle* would have never published

5     that, that was also based on hearsay, right?

6            THE COURT:  No.  Not necessarily.  It is just her

7     opinion.

8            MR. SIEGEL:  Right, but it would be an opinion based

9     on information she received from others.

10           THE COURT:  How do you know?  How do you know?  Maybe

11    that was just her opinion.

12           MR. TACOPINA:  Can I ask her her opinion in October of

13    2022?

14           THE COURT:  I want to understand what the relevance

15    is.  That's my problem.

16           MR. TACOPINA:  The relevance is her opinion changed.

17    In October 2022 it was that *Elle* was mad that they couldn't

18    publish it.  In April of 2023 it is *Elle* would have -- her

19    opinion is *Elle* would have never published it.

20           MR. SIEGEL:  Here is the significance with respect to

21    this trial.  She was claiming that she was damaged --

22           THE COURT:  I'm sorry.  One lawyer on a side.

23           MR. SIEGEL:  I'm sorry.

24           Tag me in?

25           THE COURT:  Who is doing this?

1              MR. SIEGEL:  I'll take it from here.

2              MR. TACOPINA:  I'll be quiet.

3              MR. SIEGEL:  So, she is claiming at this trial that

4    she suffered professional harm as a result of Donald Trump

5    calling her a liar.

6              THE COURT:  Right.  Right.

7              MR. SIEGEL:  OK.  So what she testified on direct, the

8    reason *Elle* terminated her had nothing to do with the fact that

9    she gave her story to a competitor.  That's what she testified

10   to here.  However, she testified in October that *Elle* was in

11   fact disappointed she did not give them the story.  It

12   contradicts her testimony at this trial.

13             THE COURT:  Well, it might, unless it is the janitor

14   who told her that they were disappointed, for example.

15             MR. SIEGEL:  OK.

16             THE COURT:  Mr. Ferrara?

17             MR. FERRARA:  Your Honor, there is a way to do this.

18   They could have called a witness who would come in and testify

19   about why Ms. Carroll was fired.

20             THE COURT:  Yes, but respond to the point we are

21   dealing with, not what they could have done.

22             MR. FERRARA:  That's the point of the hearsay rule,

23   your Honor.  This is -- Ms. Carroll is testifying to things

24   other people said that we cannot test, that we don't know who

25   said it, where they got the idea, etc.  Ms. Carroll testified

N515car4                        Carroll - Cross

1   why she believes that she was fired and it was based on things

2   like what the piece was about and its length and things of that

3   nature.  This is not responsive to that.  It was not hearsay on

4   direct and there is no percipient witness who can testify.

5          THE COURT:  My sense of this is, first, that I think

6   it is probably hearsay, or at least that the hearsay problem

7   has not been overcome.  But, more basically, I think this is

8   403.  This is confusing, it is not important, even if it is

9   relevant, it has, in many respects, been covered already, so

10  let's just move on.

11         MR. SIEGEL:  OK, your Honor.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  See, Mr. Tacopina?  I let you go.

3           MR. TACOPINA:  Thank you, your Honor.  I appreciate

4   that.

5   BY MR. TACOPINA:

6   Q.  I would like to move on to a different topic, Ms. Carroll,

7   regarding some damages that you may claim to have sustained as

8   the cause of this incident.  You testified about Mr. Johnson

9   your ex-husband, we are not going to talk about that again, but

10  that was your last significant relationship?  Yes?

11  A.  Yes.  I dated one -- seriously one fellow after John, yes.

12  Q.  You have testified that every once in a while you would go

13  out on dates?

14  A.  Yes.

15  Q.  You wanted to meet people?

16  A.  Yes.

17  Q.  When you testified -- and Mr. Ferrara asked you this

18  question, not me -- you said that you hadn't had sex since the

19  alleged incident at Bergdorf Goodman with Mr. Trump?

20  A.  That's right.

21  Q.  And you testified at trial -- I am going to read it, your

22  Honor, it is page 215, line 21, to 216, line 2.

23          Are you OK, Mike?

24          MR. FERRARA:  Yes.

25  Q.  Mr. Ferrara was asking you a question, in part he says:  I

1    think we had finished discussing the assault and sort of your

2    immediate steps that you took.  Looking sort of further out,

3    have you had any romantic relationship since the assault?

4              Answer by you:  No.

5              Question:  Why not?

6              Answer by you, in front of this jury:  I -- the short

7    answer is because Donald Trump raped me."

8              You gave that testimony just a few days ago?

9    A.   Yes.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  And was that truthful testimony?

2   A.  Yes.

3   Q.  Okay.  I'm going to show you AQ, which I don't believe is

4   in evidence, Mike, but let me know.  It is not in evidence.

5           MR. TACOPINA:  Your Honor, can I approach counsel just

6   to tell him something?

7           (Counsel confer)

8           MR. TACOPINA:  Could we put up that screenshot right

9   there for Ms. Carroll, please, what you have there, Eric, Chad.

10          THE COURT:  What is the problem with the exhibits,

11  Mr. Tacopina?

12          MR. TACOPINA:  I don't know, your Honor, but here we

13  are.

14          We are here.  May I ask?  Okay.

15  BY MR. TACOPINA:

16  Q.  Ms. Carroll, that is the unstyled podcast you were on

17  with --

18  A.  Yes.

19  Q.  -- Christine Barberich?

20  A.  Yes.

21          MR. TACOPINA:  So this is defense AQ, which I will

22  offer subject to redaction.  It is one snippet that is being

23  played.

24          MR. FERRARA:  I apologize, your Honor.  What we have

25  been handed as AQ is a -- okay.  I think that's -- I think I

1   understand.  We understand.  Unstyled.  No objection to this

2   much.

3         THE COURT:  To what much?  Is there a paper copy of

4   this so I can be brought into the loop here?

5         MR. TACOPINA:  Hold on.  We are going to give

6   you . . .

7         (Counsel confer)

8         MR. TACOPINA:  The good news is this will be the last

9   time we are going to be doing this, your Honor, so . . .

10         (Counsel confer)

11         THE COURT:  Is somebody going to give me a paper copy

12   or not?

13         MR. TACOPINA:  I have one for your Honor.

14         THE COURT:  Thank you.

15         MR. TACOPINA:  It's actually opened.

16         THE COURT:  So what you have given me is like pages

17   and pages and pages.

18         MR. TACOPINA:  Your Honor, I had it opened, two pages.

19   We are going to give you this.  It is highlighted.  We will

20   give you a highlighted version.  This is the only part that we

21   are offering from AQ.

22         MR. FERRARA:  There is no objection to that portion,

23   your Honor.

24         THE COURT:  Okay.  So what I understand is that I have

25   a transcript marked AQ for identification and it is in excess

1    of 39 pages long and what you are proposing to do is to play on

2    the AV system, is that right?

3               MR. TACOPINA:  Yes, your Honor.

4               THE COURT:  The portion of a video that corresponds to

5    page 25 -- excuse me, page 36/line 25, beginning with the word

6    "I" as in ice cream, to page 37/line 6.  Right?

7               MR. TACOPINA:  Correct.

8               THE COURT:  Okay.

9               MR. TACOPINA:  May I do that?

10              THE COURT:  Yes, you may.

11              MR. TACOPINA:  So it is offered.  It was received,

12   your Honor?  Yes, sir?

13              THE COURT:  I thought I heard no objection, right?

14              MR. TACOPINA:  Right.  Just making sure it is

15   received.

16              MR. FERRARA:  Your Honor, just I think it is page

17   36/line 21, which I believe is the beginning.

18              THE COURT:  That's not what's highlighted in what I

19   have.  I know these are picky details but, you know, this is

20   court.

21              (Counsel confer)

22              MR. FERRARA:  We would not object if the portion is

23   played from line 21 on page 36 for completeness.

24              MR. TACOPINA:  I agree with him.  We are going to play

25   lines 21 to line 6.

1          THE COURT:  Through 37/line 6.  All right.  That much

2     is received.

3          (Defendant's Exhibit AQ 36:21-37:6 received in

4     evidence)

5          MR. TACOPINA:  Okay, Ms. Carroll.

6          Are we ready?  Apparently we are ready.

7          (Audio played)

8     BY MR. TACOPINA:

9     Q.  Okay.  So you would agree what you said in that podcast is

10    quite different from what you said to this jury?

11         THE COURT:  First of all, my understanding was that

12    you stopped before the end of the excerpt you said you offered.

13         MR. TACOPINA:  Did we do that?

14         THE COURT:  Yes, you did.

15         MR. TACOPINA:  Eric, can you play the rest of the

16    excerpt?

17         I'm going to read the rest of it in.  Where did we

18    stop.  Mike?

19         (Counsel confer)

20         MR. TACOPINA:  I'm going to read it.

21         THE COURT:  Members of the jury, what Mr. Tacopina is

22    about to do, as I understand, is going to read to you the rest

23    of what he said he was going to play, and it's received.

24         MR. TACOPINA:  Yes, your Honor.

25         Okay.  This is just a lot of fun.  So, Mike, I'm going

1    to start with "my desire for desire was killed."

2    Q.  This is the continuation, Ms. Carroll, "but I think if I

3    had met someone, had the good luck to meet somebody, I think I

4    would have been" -- why are you standing?

5          MR. FERRARA:  I apologize, your Honor.  Mr. Tacopina,

6    I would just ask that Mr. Tacopina read the whole thing from

7    21 --

8          MR. TACOPINA:  Okay.  I will do that.

9          MR. FERRARA:  -- through to the end.

10         MR. TACOPINA:  I will do that.  The problem is -- oh,

11   so page 36.

12   Q.  Okay.  I'm going to read it all, Ms. Carroll, sorry.

13         Your answer in this podcast was:  Well, after the

14   episode in Bergdorf's, I never had sex again, but I think it

15   wasn't because of him.  I think it was I just didn't have the

16   luck to meet that person that would cause me to be desirous

17   again.  I think maybe in that dressing room my desire for

18   desire was killed, but I think if I had met somebody, had the

19   good luck to meet somebody, I think I would have been revived

20   again.  I think the desire would have been boiled up again.  I

21   just think I've been unlucky.  Who knows?  Maybe I'll walk out

22   here on 26th Street and boom."

23         Okay, Mr. Ferrara, Mike?

24         MR. FERRARA:  Yes.  Thank you.

25   BY MR. TACOPINA:

N512Car5                         Carroll - Cross

1    Q.  So, Ms. Carroll, you heard yourself say in that podcast

2    that you don't think the reason you have not had sex again

3    since the Bergdorf incident was because of him, meaning Donald

4    Trump.

5    A.  I heard myself say that, yes.

6    Q.  Okay.

7    A.  May I add?

8    Q.  No.  I'm not asking anymore questions on that.  We are

9    going to move right along.  Okay?  Did you want to say

10   something else, though?

11   A.  No.  Go ahead.

12   Q.  Okay.  Now, I'm going to move on.  All right.  Your

13   original lawsuit, the one that the judge said, the first

14   lawsuit was filed in November 2019, only sought damages for

15   your alleged defamation.

16   A.  Yes.

17   Q.  Okay.  And by contrast, your current lawsuit, the one

18   containing the battery, not only seeks damages for defamation,

19   but also seeks emotional damages for your alleged rape.

20   A.  Yes.

21   Q.  And the first edition of your book was July 2019.

22   A.  Yes.

23   Q.  Years before you could sue for emotional injuries stemming

24   from the alleged rape.

25   A.  Yes.

1   Q.  And in your book with regard to the emotional state

2   following the alleged rape, you wrote -- you know what?  It is

3   in evidence.  AA.  Let's just put that up.

4           MR. TACOPINA:  Mike, it's page 244/lines 23 to 28, but

5   it's in evidence as Defense AA.  You can publish that.

6           MR. FERRARA:  I would just ask to see, for the witness

7   and the parties, your Honor, what exactly Mr. Tacopina --

8           MR. TACOPINA:  It is already in evidence, but we could

9   do that.  It's AA.  Put up page 244/lines 23 to 28.  That's it.

10          MR. FERRARA:  No objection.

11          MR. TACOPINA:  Okay.  You can publish that to the

12  jury, as well, please.  It is.  Okay.

13          So in your book with regard to your emotional state

14  following the alleged rape you wrote, "Indeed, before 2015,

15  when the man began appearing in the newspapers -- in the papers

16  and on TV daily, I rarely thought of it.  When he forced

17  himself on the notice of the entire nation, I, like everyone

18  else, tweeted jokes about him, complained to friends that

19  America was going to hell in a handbasket, and so on.  I am

20  fine.  I can't explain it, but I never suffered."

21          At trial, in explaining that, you said that that was

22  the public E. Jean.

23  A.  Yes.

24  Q.  Not the private E. Jean.

25  A.  Yes.

1   Q.  And so this was from your book.

2   A.  Yes.

3           THE COURT:  We have established.

4   Q.  So was the book in part untruthful?

5   A.  No, the book was written -- no, it was truthful.  The book

6   was truthful.  I just did not reveal my -- my deep self.  I

7   didn't reveal that.  I kept something back.

8   Q.  Well, you would agree this is more than keeping something

9   back.  This is saying completely the opposite, that you are

10  fine and you never suffered?

11          MR. FERRARA:  Objection.  Argumentative.

12          THE COURT:  Sustained.

13  BY MR. TACOPINA:

14  Q.  Well, how about when you, aside from television and your

15  book and advice columns and whatnot and podcasts, how about in

16  your deposition when you testified there, Ms. Carroll, was that

17  the public E. Jean Carroll or the private E. Jean Carroll?

18          MR. FERRARA:  Objection.

19          THE COURT:  Sustained.

20  Q.  Okay.  Before filing your rape cause of action, you

21  testified at a deposition on October 14 that we have heard

22  about from 2022 with respect to your first defamation claim.

23  Yes?

24  A.  Yes.

25  Q.  Okay.  And during that deposition, it was your testimony

N512Car5                           Carroll - Cross

1  that, before 2017, you would have said that this alleged rape

2  had no effect on you in the decades that followed.

3                MR. FERRARA:  Your Honor, may we just have a page?

4                MR. TACOPINA:  Sure.

5                THE COURT:  Of course.

6                MR. TACOPINA:  Page 145.

7                THE COURT:  Read the testimony.

8                MR. TACOPINA:  You want me to read the testimony?

9                THE COURT:  No.  I want you to start by giving us the

10  page.  I'm sorry for interrupting, but you are going to have

11  to --

12                MR. TACOPINA:  Yes, your Honor, you are right.  Page

13  145/lines 10 through 19, start there.

14                THE COURT:  Okay.

15  BY MR. TACOPINA:

16  Q.  I'm sorry.  I'm going to read to you from 10 to 19 --

17                MR. FERRARA:  Your Honor, we think for completeness it

18  should be 10 to 24, your Honor.  In fact, your Honor, to be

19  honest, it should go to 146/line 4.

20                THE COURT:  Mr. Tacopina.

21                MR. TACOPINA:  Whatever you desire, your Honor.

22                THE COURT:  It's not my desire.

23                MR. TACOPINA:  I would like to read from 10 to 19.

24                THE COURT:  I sustain Mr. Ferrara's point.  You go to

25  146/line 4.

1              MR. TACOPINA:  Okay.

2    BY MR. TACOPINA:

3    Q.   Question to you Ms. Carroll during your deposition:

4    "Q   During the two decades that followed, how would you say the

5    alleged attack impacted your life?

6    "A   Well, four or five years ago, I would have told you it had

7    no effect.  I'm as good as new.  This is great.  I'm fine.  I

8    rarely think of it.  But I've come to understand that the rape

9    changed my life, which is shocking for me."

10             THE COURT:  I'm sorry to interrupt, Mr. Tacopina, but

11   you misread a word.

12             MR. TACOPINA:  I did?

13             THE COURT:  Start from "I'm fine."

14             MR. TACOPINA:  Line 5, your Honor?

15             THE COURT:  No, "I'm fine."

16   BY MR. TACOPINA:

17   Q.   "I'm fine.  I rarely think of it.  But I've come to

18   understand that that rape changed my life, which is shocking

19   for me to now understand.

20   "Q   When you say four or five years ago, do you remember when

21   you started this lawsuit?

22   "A   No.  Before that.  Before that.  I'm talking about the time

23   before this.

24   "Q   Before the lawsuit?

25   "A   No, before I wrote the book, before anything.  I was just

1    living my life as a normal person."

2              THE COURT:  You skipped a word.

3    BY MR. TACOPINA:

4    "A   No, before I wrote the book, before anything.  When I was

5    just living my life as a normal person."

6              MR. TACOPINA:  What line am I going to, by the way?

7              THE COURT:  You finished.

8              MR. TACOPINA:  Mike, what line was that?

9              THE COURT:  4.

10             MR. TACOPINA:  That's it?  Okay.  That's it, then.

11             THE COURT:  Is there a question?

12             MR. TACOPINA:  Yes.

13   BY MR. TACOPINA:

14   Q.  So in the decades that followed the alleged attack, you

15   thought things were fine.

16   A.  No, I didn't.

17   Q.  Well, you just heard your testimony that --

18             THE COURT:  Sustained.

19             MR. TACOPINA:  Okay.

20   Q.  In fact, according to you, you rarely thought of this

21   supposed rape by Donald Trump?

22   A.  Well, I -- when I say the word "think," that is a process

23   that I believe when I plan, when I write, I'm thinking of

24   concepts.  I didn't mention that I have intrusions.  That's not

25   thinking to me.  I had the images coming into my head.  That's

1    something entirely different, the intrusions of the day in

2    Bergdorf Goodman.

3    Q.  Okay.  The question you were asked during the deposition

4    was how this impacted your life, this attack, and you didn't

5    narrow it down to when you think about it.  You just said:  I

6    rarely think of it, but I understand that it's come -- you

7    understand that rape -- the rape -- that that rape has changed

8    your life?

9    A.  When I say rarely think, when I actually think of what

10   happened as a concept and review it.  I'm not talking about the

11   hideous, vile intrusions that rise up through my head, whether

12   I want them or not.  I have come to believe and to understand

13   that I was not fine.  That I put on the -- I put on the

14   pleasant, you know, go-get-'em face that I have always had.

15   Q.  And it's your story that your perception only started to

16   change in 2017.

17            MR. FERRARA:  Objection.

18            THE COURT:  Does that purport to be a summary of the

19   testimony you read?

20            MR. TACOPINA:  That just purports to be a question.  I

21   could read it from the transcript of the deposition, your

22   Honor.  I'm just asking a question, but I will cite page --

23            THE COURT:  Let's rephrase it.

24            MR. TACOPINA:  Okay.

25   BY MR. TACOPINA:

1   Q.  Is it true that your perception only started to change in

2   2017?

3   A.  My perceptions were changing a little bit all of the time,

4   like everyone's.  Everyone's perceptions undergo daily change.

5   I was living through that and I was coming to understand some

6   very terrible things that I didn't want to face, did not want

7   to face.

8   Q.  And that perception really started to change with the Me

9   Too movement and Harvey Weinstein coming out.

10  A.  It changed -- it was one story, the Harvey Weinstein story.

11  Q.  By the way, Ms. Carroll, you have never been diagnosed with

12  anxiety or depression?

13  A.  No.

14  Q.  You have never taken an antidepressant or other medication

15  to cope --

16  A.  No.

17  Q.  -- with any of the alleged emotional distress from

18  supposedly being assaulted by Donald Trump?

19  A.  No.

20  Q.  No doctor has ever recommended that you take an

21  antidepressant or any type of prescription drug?

22  A.  No.

23  Q.  In fact, in the years since 1995, you never saw a mental

24  health professional.

25  A.  I have never seen a mental health professional.

1   Q.  Okay.

2   A.  I wish I had?

3           THE COURT:  Mr. Tacopina, are we near the end or not?

4           MR. TACOPINA:  We are getting close, your Honor.  We

5   are.

6           THE COURT:  Define "close."  I want to know if we

7   should take a break.

8           MR. TACOPINA:  Ten or 15.

9           THE COURT:  We will take a break.

10          See you in 15 minutes.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N512Car5                        Carroll - Cross

1                    (Jury not present)

2                    MR. TACOPINA:  Less than 10.

3                    THE COURT:  You said by lunch.  You said by lunch.

4                    MR. TACOPINA:  Things got a little complicated with

5      the . . .

6                    THE COURT:  Yeah.

7                    MR. TACOPINA:  Did I say by lunch?

8                    THE COURT:  Yeah, you did.

9                    MR. TACOPINA:  I didn't eat yet, your Honor.

10                    THE COURT:  That's okay.  I want to keep you hungry.

11                    Maybe if you make it in 10 your colleague will get you

12      some Kansas City ribs for dinner.

13                    MR. BRANDT:  That I will do.

14                    (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Okay, folks.  Mr. Tacopina.

3              MR. TACOPINA:  Thank you, your Honor.

4    BY MR. TACOPINA:

5    Q.  The reason, Ms. Carroll, you never saw a mental health

6    professional in these past decades is because you feel you are

7    happy, well adjusted, and that your life is going well.

8              MR. FERRARA:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10   BY MR. TACOPINA:

11   Q.  After filing your cause of action for the battery case,

12   this one, on November 24, 2022, when you began seeking

13   emotional damages for the alleged rape by Donald Trump, you

14   testified again in another deposition on January 31 of this

15   year, 2023.

16   A.  Yes.

17   Q.  And that was after you met with Dr. Lebowitz?

18   A.  Yes.

19   Q.  And Dr. Lebowitz is a psychologist, right?

20   A.  Yes.

21   Q.  And he is the one hired for this litigation to support your

22   claim of emotional damages for the alleged rape?

23   A.  She.

24   Q.  She.  I'm sorry.

25   A.  Yes.

```
 1   Q.  And during your deposition on January 31 of this year, it

 2   was your testimony that the alleged rape was an underlying

 3   theme of your life?

 4              THE COURT:  Look, if you are going to quote testimony,

 5   you are going to quote testimony.

 6              MR. TACOPINA:  Okay, I was . . .

 7              Page 19 of the January 31, 2023 deposition transcript.

 8   Line 25, on page 19, Mike, to line 11 on page 20.

 9              MR. FERRARA:  No objection.

10              MR. TACOPINA:  Okay.

11              THE COURT:  I'm sorry.  What did you say, Mr. Ferrara?

12              MR. FERRARA:  No objection, your Honor.

13              THE COURT:  Go ahead and read it.

14              MR. TACOPINA:  Okay.

15   BY MR. TACOPINA:

16   "Q  How have you worked to push memories away of the alleged

17   incident in your" -- "alleged incident in your complaint with

18   Donald Trump?

19   "A  It's an ongoing project.  It's an underlying theme of my

20   life.  It -- a vision or a -- a word or a -- an image or a

21   piece of tape or just a flash of a photo will occur in my mind,

22   and I will bat it away, and if it comes back, I -- I have to

23   consciously shove it away, and then I continue with my day."

24              And that was truthful testimony.

25   A.  Yes.
```

1    Q.  Now -- withdrawn, withdrawn.

2            You testified on January 31, 2023, that you start

3    experiencing -- I'm asking in general in the deposition,

4    experiencing images arising in your head shortly after you left

5    Bergdorf?

6    A.  Yes, very shortly.

7    Q.  And during that same deposition, you testified that these

8    episodes started to occur less often in 2016?

9    A.  I had to learn how to handle so many images of Donald Trump

10   coming at me across all media because he declared for the

11   presidency in 2015.  So I had to get used to seeing him

12   everywhere.

13   Q.  I am going to show you what is marked as Defense Exhibit

14   CU, Ms. Carroll.

15           (Counsel confer)

16           THE COURT:  Could we just move this along now.

17           MR. TACOPINA:  We are going to be done in a second,

18   your Honor.  We have moved a lot along.

19           THE COURT:  A second?  Okay.

20           MR. TACOPINA:  A minute?

21           (Counsel confer)

22   BY MR. TACOPINA:

23   Q.  Defense Exhibit CU, Ms. Carroll, is before you.

24           MR. TACOPINA:  Please turn the slide.  We are

25   redacting something, your Honor, at the plaintiff's request,

```
 1    properly.
 2              THE COURT:  Am I to get a copy of this now?
 3              MR. FERRARA:  I am familiar with it, your Honor.  I
 4    can hand mine up.
 5              THE COURT:  Thank you.
 6              MR. TACOPINA:  Okay?  All right.
 7              Your Honor, we are redacting the bottom two
 8    attributions, but Defendant's Exhibit CU, please show
 9    Ms. Carroll, the second page.  Okay.
10              THE COURT:  This is in evidence, I take it, yes?
11              MR. TACOPINA:  It is in evidence as PX 121, your
12    Honor, without -- the photo is in evidence but without the
13    Instagram posting and without the attribution below, so we are
14    putting this in.
15              THE COURT:  All right.
16              MR. TACOPINA:  Okay.  As a matter of fact, I would
17    offer it, your Honor, to make this a little easier, offer it as
18    Defense CU.
19              THE COURT:  Received as redacted.
20              (Defendant's Exhibit CU redacted received in evidence)
21              MR. TACOPINA:  Please publish to the jury.
22    BY MR. TACOPINA:
23    Q.  So this you were asked about on your direct testimony.
24    After claiming to be raped by Donald Trump, you started this --
25    at some point after you started this hideous men walking tour
```

1    in New York City.

2    A.  Yes.

3    Q.  And what was the walking tour?

4    A.  The walking tour was I noticed that in New York, New York

5    has the best walking tours in the whole world.  You can have a

6    walking tour to look at homes of gangsters, a walking tour to

7    see the homes of famous writers, a walking tour to see the

8    homes of famous murderers, and I thought it might be

9    instructive to have a walking tour visiting the buildings where

10   hideous men resided and the men who mistreated women.

11   Q.  Okay.

12   A.  But it turned out that the men were rarely mentioned.  What

13   I zeroed in on were the women who stood up to them.

14   Q.  Okay.  But if I were to join you on your walking tour,

15   where would we be going?

16   A.  You would be starting out at Tiffany's, where even up to

17   the '90s, the executive women who worked at Tiffany's were not

18   allowed to speak up at meetings.  They were told not to be

19   aggressive until Paula Smith decided that she would speak up at

20   a meeting and they tried to fire her.

21            THE COURT:  Ms. Carroll, please, the hour grows late.

22            THE WITNESS:  Okay.

23            THE COURT:  The question is if Mr. Tacopina were to

24   join you, where would you be going.

25            THE WITNESS:  Okay, we would be going to Tiffany's

N512Car5                     Carroll - Cross

1   first.

2   BY MR. TACOPINA:

3   Q.   Then?  Where else?

4   A.   Then to NBC, Rockefeller Center; and then to -- we would

5   cross over Sixth Avenue and go to Fox News and then -- for Bill

6   O'Reilly; then we would go to CBS.

7   Q.   Anywhere else?

8   A.   That's roughly an outline, and then to the place where

9   Studio 54 was, yes.

10  Q.   Okay.

11  A.   That's a rough outline.  There were stops along the way.

12  Q.   And you posted this picture of yourself standing next to a

13  man wearing a Donald Trump mask holding a banner --

14  A.   Yes.

15  Q.   -- on your tour you post that on your Instagram.

16  A.   Yes.

17  Q.   Okay.  And you are smiling.

18  A.   Yes.

19  Q.   You were having a fabulous time there?

20  A.   It was a very instructive tour.

21          MR. TACOPINA:  Your Honor --

22  Q.   By the way, what's -- why the orange jumpsuit?

23  A.   It was my way of saying some of these hideous men, some of

24  the men on the tour were, for instance, Weinstein, Cosby, they

25  had yet to be put in jail, so for this particular tour, I wore

 1    an orange jumpsuit.

 2              MR. TACOPINA:  Okay.  Your Honor, last thing, I'm just

 3    going to play a snippet of what's already in evidence, Defense

 4    Exhibit BV.  But for you, I prepared a special transcript that

 5    just has the front, the exact line we are playing, and the

 6    certification?

 7              THE COURT:  I'm honored.

 8              MR. TACOPINA:  That's special for you, your Honor.

 9              Here, here.

10              MR. FERRARA:  Thank you so much.

11    BY MR. TACOPINA:

12    Q.  Okay.  This is in evidence.  It is BV.  Ms. Carroll, I'm

13    just going to plea you a snippet of your podcast interview from

14    the Maris Review from December 2019.  Okay?

15    A.  All right.

16    Q.  All right.  Let's go.  Nope.

17              (Audio played)

18              MR. TACOPINA:  Thank you.  No further questions, your

19    Honor.

20              THE COURT:  Thank you.  Redirect.

21              MR. FERRARA:  Thank you, your Honor.

22              THE COURT:  Mr. Ferrara.

23    REDIRECT EXAMINATION

24    BY MR. FERRARA:

25    Q.  Good afternoon, Ms. Carroll.

N512Car5                      Carroll - Redirect

1   A.   Good afternoon, Mr. Ferrara.

2   Q.   So Mr. Tacopina there just played an excerpt of an

3   interview in which you said you were fabulous.  You heard that?

4   A.   Yes.

5   Q.   He played several other examples of you being interviewed

6   saying you were great.  Do you recall those?

7   A.   Yes.

8   Q.   About enjoying positive moments in the case.

9   A.   Yes.

10  Q.   Do you recall those questions?

11  A.   Yes.

12  Q.   Have you also had negative moments throughout the case?

13  A.   Yes, but I never mention them.

14  Q.   Ms. Carroll, do you believe there is a right way for a

15  person to live their life as someone who has been raped?

16  A.   No.

17  Q.   Do you believe there is anything wrong with a person who

18  has been raped finding happiness later in life?

19  A.   No.

20          MR. TACOPINA:  Objection to the form of that question.

21          THE COURT:  To the form?

22          MR. TACOPINA:  Yes.  First of all, it's leading.

23          THE COURT:  Sustained.

24  BY MR. FERRARA:

25  Q.   Have you -- how do you feel about having found some

1    happiness later in your life, Ms. Carroll?

2    A.  I feel, uh, I feel good.  I feel good about it.  It took

3    some -- yeah, that's the goal of all of us in this courtroom,

4    just to find a little bit of happiness.

5    Q.  How, if at all, has bringing this lawsuit given you a sense

6    of control over your life?

7    A.  Instead of living with the feeling of shame, which I've

8    always covered up and living with the feeling that I caused

9    this horrible thing to happen, by telling my story, I started

10   to take a little bit of control, and it's been a long way, and

11   this is a very satisfying moment for me to be here to answer

12   your questions.

13   Q.  Ms. Carroll, help us understand why you said in those

14   interviews that you were fabulous but in this courtroom you

15   have testified to real harm flowing from the assault?

16   A.  If anyone on the street came up to me before -- as I was

17   coming in today and said, E. Jean, how are you?  I would say,

18   I'm fine.  I am fabulous.  It's just the way I answer people.

19   I don't -- I don't want to tell -- I don't want to tell people

20   horrible things.  I want them to know that I feel fine and how

21   are they?  When I meet someone -- and when someone asks me how

22   I am, I am more concerned with the person who is asking.  I

23   don't want to upset their day.  I don't want to, as I said,

24   unload on them.

25   Q.  So Mr. Tacopina asked you about a podcast in which you said

1  that your desire for desire was killed.  Do you recall that?

2  A.  Yes.

3  Q.  I believe you said in that podcast that if you met the

4  right person again, maybe the desire would have boiled up

5  again.  Do you remember that?

6  A.  Yes.

7  Q.  Has it?

8  A.  Well, that's -- that's the thing about luck.  You make your

9  own luck in this life.  I believe in luck.  I really am a

10  strong believer in success.  People who are successful have a

11  lot of luck.  But here's the thing.  I was killing my own luck.

12  I was getting in the way of my own luck.  I made sure I wasn't

13  lucky.  I just made sure I didn't meet the person because I

14  didn't allow myself to flirt or smile at a possible romantic

15  partner.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1   BY MR. FERRARA:

2   Q.   Why not?

3   A.   Because smiling and flirting got me into a heck of a lot of

4   trouble.

5   Q.   What are you referring to, Ms. Carroll?  Just to clarify.

6   A.   Donald Trump, in the dressing room, at Bergdorf.

7   Q.   I apologize in advance, I might jump around a little bit,

8   Ms. Carroll.

9        Mr. Tacopina showed you a text message that you sent

10  to Carol Martin's daughter.  Do you recall those questions?

11  A.   Yes.

12  Q.   Why was it important to you to reassure Ms. Martin's

13  daughter regarding safety?

14  A.   Ms. Martin's daughter, her -- Ms. Martin's daughter's

15  daughter was in nursery school and her daughter felt really

16  unsafe and wanted to withdraw, take her child out of nursery

17  school because she was worried -- frantic -- that her child

18  would be hurt because her mother was going on the record as the

19  second woman I told.  And I wanted to reassure her that I

20  thought she would be safe, that I felt safe.  And I did feel

21  safe in New York.  New York is the best place in the world, I

22  felt very safe here.

23       So when I told her, look, I can walk the streets, you

24  are fine, go ahead.  I wanted her to keep her daughter in

25  school.

1  Q.  You were also asked some questions about an e-mail to you

2  regarding an episode of a television show.  Do you recall that?

3  An episode of SVU.  Do you recall that?

4  A.  Yes.

5  Q.  Have you ever seen that episode?

6  A.  Never.

7  Q.  Had you ever seen it or heard of it before you wrote your

8  book?

9  A.  Never.

10  Q.  Sitting here today, do you have any idea what actually

11  happens in that episode of television?

12  A.  No.

13  Q.  Are you making up your accusation based on what happened in

14  a popular TV show?

15  A.  No.  No.

16  Q.  Mr. Tacopina showed you, I believe it was Defendant's

17  Exhibit AJ, which was a text you sent to Lisa Birnbach on June

18  23, about giving her a chapter of the book at Carmine's.  Do

19  you recall this?

20  A.  Yes.

21  Q.  I want to show you what's been marked for identification as

22  Plaintiff's Exhibit 103.  Do you recognize this, Ms. Carroll?

23  A.  Yes.

24  Q.  Is this an e-mail from you to Lisa Birnbach and Francis

25  Martin?

1    A.  Yes.  Carol Martin, yes.

2    Q.  Sorry, that name, that is Carol Martin?

3    A.  Yes.

4    Q.  What is the date of this?

5    A.  June 9, 2019.

6    Q.  Does it concern the dinner at Carmine's?

7            THE COURT:  Are you offering this?

8            MR. FERRARA:  Your Honor I just was establishing the

9    relevance with the Court before I did.

10   A.  Yes.  I mentioned I handed Carol an --

11           MR. FERRARA:  I apologize, I don't mean to cut you off

12   Ms. Carroll.  I only wanted to briefly establish the relevance.

13           I offer Plaintiff's Exhibit 103.

14           MR. TACOPINA:  Can I see the rest of it?

15           MR. FERRARA:  Sure.

16           MR. TACOPINA:  No objection.

17           THE COURT:  Received.

18           (Plaintiff's Exhibit 103 received in evidence)

19           MR. TACOPINA:  Mr. Lam, can you show that to the

20   jurors?

21   BY MR. FERRARA:

22   Q.  I want to call your attention to the sort of first main

23   paragraph where you describe giving each an early hard copy of

24   a portion of the book when we dined at Carmine's.  And, of

25   course, neither of you read it.

N515car6                          Carroll - Redirect

1           Do you see that?

2   A.  Uh-huh.

3   Q.  Do you recall whether this was two weeks before the exhibit

4   that Mr. Tacopina showed you regarding the reporter?  Do you

5   recall?

6           MR. TACOPINA:  Your Honor, it is a leading question

7   but I'm loathe to object, but.

8           THE COURT:  But what?  Sorry?

9           MR. TACOPINA:  I'm objecting.  It is a leading

10  question, so.  I am objecting.

11          THE COURT:  Sustained as to form.

12  BY MR. FERRARA:

13  Q.  Do you recall, Ms. Carroll, sitting here today, when you

14  sent this e-mail in relation to the text you sent in

15  Defendant's Exhibit AJ?

16  A.  AJ is, what was it?  What was AJ?

17          MR. FERRARA:  Can we show, can I enlist your help,

18  Mr. Tacopina, to show the witness Defendant's Exhibit AJ?

19          Your Honor, I withdraw it.  The exhibit speaks for

20  themselves.  I withdraw it.  I apologize for the delay.  We can

21  move on.  We can bring this down.  Thank you.

22  Q.  Ms. Carroll, Mr. Tacopina asked you why you didn't scream

23  during the encounter.  Do you recall that?

24  A.  Yes.

25  Q.  Why did those questions affect you the way they did?

N515car6                        Carroll - Redirect

1  A.  It was startling to me that in 2023 a woman would be asked

2  if she screamed.

3           MR. TACOPINA:  Your Honor, I object to that.  Ask that

4  be stricken.

5           THE COURT:  Overruled.

6  Q.  Mr. Tacopina also asked about laughing during the assault.

7  Do you remember that?

8  A.  Yes.

9  Q.  Have you ever tried to hide the fact that you laughed

10 during the assault, Ms. Carroll?

11 A.  No.  No.

12 Q.  He also asked you many times about not having gone to the

13 police.  Do you recall those questions?

14 A.  Yes.  Yes.

15 Q.  Have you ever tried to hide that you did not go to the

16 police?

17 A.  No.  I wanted women to know I did not go to the police

18 because many women do not go to the police.

19 Q.  Ms. Carroll, how old was -- if you know, how old was

20 Mr. Trump when he assaulted you?

21 A.  He was two or three years younger than me.  So, I was 52,

22 so he was 49 or 50.

23 Q.  Mr. Tacopina asked, showed you some of your advice columns

24 in which you gave advice to readers who go to the police, for

25 instance.

1   A.  Yes.

2   Q.  Do you recall those?

3   A.  Yes.

4   Q.  Why didn't you take your own advice, Ms. Carroll?

5   A.  Because Donald Trump was a very powerful -- first of all, I

6   wouldn't go to the police.  I just wouldn't go to the police.

7   It was too shameful to go to the police.  Donald Trump had too

8   much power, he knew everybody in New York.  I didn't think the

9   police would take me seriously.  I thought it was my fault.  I

10  just wouldn't go to the police.  Women my age just put our

11  chins up, took our licks, and went right on.  That's how we

12  were trained.  We weren't told to go to the police.  As it

13  turns out, I have looked this up, according to the National

14  Institute --

15           MR. TACOPINA:  Objection, your Honor.

16           THE COURT:  Sustained.

17           THE WITNESS:  OK.

18  Q.  Mr. Tacopina also asked you, Ms. Carroll, about your not

19  having sued Les Moonves.  Do you remember those questions?

20  A.  Say that again?

21  Q.  Mr. Tacopina asked about the fact that you have not sued

22  Les Moonves.  Do you recall that?

23  A.  Yes.

24  Q.  What did Les Moonves do to you?

25  A.  He pushed up against me in an elevator.

N515car6                    Carroll - Redirect

1  Q.  Did he rape you?

2  A.  No.

3  Q.  Mr. Tacopina asked when you recalled the fact that you hit

4  Mr. Trump with your purse.  Do you remember that question?

5  A.  Yes.

6  Q.  I believe you testified you have always recalled that fact.

7  Do you remember saying that?

8  A.  Yes.

9  Q.  I want to show the witness a page of her January 31, 2023

10  deposition, page 42, lines 18 and 19, and this will be just for

11  the -- we can actually -- Mr. Lam, if we can go back to the

12  full image?

13        MR. TACOPINA:  Your Honor, I would object to this on

14  hearsay grounds.  She is not a party opponent, obviously, to

15  them, of course.

16        THE COURT:  Sorry.  I'm confused.  This is a

17  deposition of the witness?

18        MR. TACOPINA:  Of her, yes.

19        MR. FERRARA:  It is a prior consistent statement, your

20  Honor.

21        THE COURT:  To rebut an accusation of recent

22  fabrication.

23        MR. FERRARA:  Yes, your Honor.

24        THE COURT:  Members of the jury, what you are about to

25  see, according to counsel, is testimony that the witness gave

1    in January 2023.  It is not to be considered for the truth of

2    what she said but the suggestion, as I recall it -- and you

3    will remember and your memory will control -- the suggestion

4    was made in opening statement and on cross-examination that

5    Ms. Carroll came up with the assertion that she hit Mr. Trump

6    with the purse only recently.  This is offered to show

7    plaintiff claims that she said that on January 31, 2023, at

8    least.

9    BY MR. FERRARA:

10   Q.  Before we show the jurors the relevant portion,

11   Ms. Carroll, at this point, for clarity, at this point in the

12   deposition, are you testifying about some of the flashbacks

13   that you told us about?

14   A.  Yes.

15            MR. FERRARA:  Mr. Lam, if we can highlight and publish

16   for the jury page 42, line 18 and 19?

17   Q.  Was that truthful testimony, Ms. Carroll?

18   A.  Yes.

19            MR. FERRARA:  We can take that down, Mr. Lam.  Thank

20   you.

21   Q.  Ms. Carroll, Mr. Tacopina spent some time talking about the

22   hideous men list.  Do you remember that?

23   A.  Yes.

24   Q.  How many men are on the list, Ms. Carroll?

25   A.  21.

1  Q.  How old are you?

2  A.  Almost 80.

3  Q.  How many men have you met in your life?

4  A.  Thousands.

5  Q.  And how many of those are not hideous?

6  A.  Thousands are not hideous.  Most of them are pretty, pretty

7  wonderful guys.

8  Q.  Do you recall, Mr. Tacopina also asked you if you ever

9  testified before that Mr. Trump guided you into the dressing

10  room by your arm.

11        Do you recall that?

12  A.  Yes.  I think I do.

13  Q.  I want to show you -- I want show the witness the October

14  24, 2023 deposition, page 111, line 17 to 22.

15        THE COURT:  I think you misspoke as to the year.

16  2022.

17        MR. FERRARA:  Oh.  Pardon me, your Honor.  I did. it

18  is the October 2022 deposition, page 111, line 17 to 22.  Your

19  Honor, I believe, without objection, we would like to show this

20  to the jury.

21        MR. TACOPINA:  Your Honor, yes, with the same

22  instruction as before.

23        THE COURT:  Yes.

24        Members of the jury, you may consider this bit of

25  testimony you are about to be shown for the same purpose as the

1    prior piece, not for the truth of the matter, it is to rebut a

2    suggestion of recent fabrication.

3              MR. FERRARA:  If we can publish that?

4              THE COURT:  Yes.

5              MR. FERRARA:  Thank you, Mr. Lam.

6    Q.  Was that truthful testimony, Ms. Carroll?

7    A.  Yes.

8    Q.  To be clear -- I just want to be totally clear and fair --

9    you are not suggesting he was dragging you by the arm?

10   A.  No.  It was just a light tug on the elbow.

11             MR. FERRARA:  We can take that down.  Thank you.

12   Q.  Do you recall Mr. Tacopina asked you whether it had

13   occurred to you before your call with Lisa Birnbach that you

14   had been raped?  Just do you recall that line of questioning.

15   A.  I do recall the line of questioning, yes.

16   Q.  And he asked you about your statement when Lisa said he

17   raped you brought the reality to the forefront of your mind.

18   Do you remember saying that?

19   A.  Yes.

20   Q.  Ms. Carroll, was there ever a doubt in your mind about what

21   had happened in that dressing room?

22   A.  My -- oh.  Where I am sitting here today was there ever a

23   doubt?  No.  No doubt.  But the seconds, the minutes following

24   it I -- it was -- the floods through my body, I guess it is

25   adrenaline, my overwhelming thought was I had died and was

N515car6                          Carroll - Redirect

1    somehow still alive.  That was -- really.  It took me minutes,

2    well seconds, and then minutes.  And even when Lisa said it, it

3    took a real effort for me to take it in.

4    Q.  Was -- sorry.

5    A.  Yes.  Lisa is the one who focused my brain for that moment.

6    It was Lisa saying that.

7    Q.  Was there ever any doubt in your mind that Mr. Trump had

8    penetrated you with his fingers and penis?

9    A.  Oh, never a doubt about that.

10   Q.  Was there a doubt in your mind that you tried to shove him

11   away?

12   A.  Oh, no.  There was never a doubt about that.

13   Q.  Was there ever a doubt in your mind regarding whether you

14   had consented to this, to what he had done to you?

15   A.  Never.  The minute that door shut I -- there was no

16   consent.

17   Q.  Was there ever a doubt in your mind that you hit him in the

18   head with your purse?

19   A.  I believe I hit him in the head with my purse that year.

20   Q.  Was there ever a doubt in your mind that you tried to fight

21   him off?

22   A.  No.  Never.  That's how I got out.

23   Q.  Before you spoke to Ms. Birnbach how, if at all, have you

24   processed all of that information?

25   A.  Before I had?

1    Q.   Before.

2    A.   I hadn't processed.  I was just happy to somehow find

3    myself alive when I thought I had been killed.  It was just --

4    it's almost impossible, it seemed like the whole front of my

5    head had been wiped out.  I couldn't think.  I could --

6    whatever I did, I did the right thing because I got out.  So,

7    it was going to take my brain a few minutes to catch up with my

8    body.  My body did the right thing, my body got out, so it

9    took -- I was a little behind on putting it together.

10   Q.   Mr. Tacopina asked you a few questions about your contract

11   with *Elle* magazine.  Do you remember those?

12   A.   Yes.

13   Q.   Is there a difference between trying to get out of your

14   contract with *Elle* versus being fired?

15   A.   Yes.

16   Q.   What is that?  What is the difference?

17   A.   Well, I loved *Elle*.  And when they cut me, cut down my

18   pages and when my readership started falling after the

19   president called me a liar, I was feeling a little bereft, so I

20   thought, well, let's see what else -- maybe I can move the

21   column to a magazine that would, you know, really love my

22   readers as much as I did.  So, yes, I thought, *Listen, E. Jean,*

23   *let's move on.  Let's move on.*  So I talked to The Atlantic.

24   Q.   When you lost your job at *Elle* magazine, what other parts

25   of your life did you lose as a result?

N515car6                        Carroll - Redirect

1  A.  I -- it is strange.  I always thought of myself as Ask E.

2  Jean, the female Don Quixote righting wrongs.  I know it sounds

3  crazy seeing me at 79 thinking I can right wrongs, but it

4  changed how I -- you know, jobs are important.  Each one of us

5  are -- what we do for a living is important and to have it

6  taken away was devastating.  I really didn't recover for about

7  a year.

8  Q.  Mr. Tacopina also showed you a joke you made about having

9  sex with Donald Trump for money.  Do you recall that?

10 A.  Yeah.  Yes, I do.

11 Q.  Why do you joke about difficult things in your life?

12           MR. TACOPINA:  Objection.

13           THE COURT:  Overruled.

14           MR. TACOPINA:  Your Honor, it's -- OK.  Leading but --

15 OK.

16           THE COURT:  No, it wasn't, actually.  It was as

17 open-ended a question as I can imagine.

18           MR. TACOPINA:  Well, yes, your Honor, except the

19 question that precedes it doesn't mention -- or the answer has

20 nothing to do with difficult things in her life but -- it

21 assumes a fact that has not been testified to before that she

22 jokes about things in her life.

23           THE COURT:  Well, all right.  Rephrase it.

24 BY MR. FERRARA:

25 Q.  Ms. Carroll, why did you joke about having sex with Donald

1  Trump?

2  A.  For thousands of years if women haven't laughed at what men

3  have done to them we just couldn't go on.  It is a way of

4  dealing with terrible things.  You laugh, and when you laugh

5  you lift your spirits just for maybe a second, maybe for a

6  minute, maybe for a half day.  When you laugh it makes you feel

7  better.  It's much better to laugh at something, I think, than

8  to cry about something.  I just -- laughter picks up my

9  spirits, that's it.  That's my -- I may have a dark comic view

10  of what occurred but that's my way of dealing with it, that's

11  my way of lifting my spirits.

12  Q.  Mr. Tacopina also asked you about a number of TV shows that

13  you have appeared on since you spoke publicly about Donald

14  Trump assaulting you.  Do you remember those questions?

15  A.  Yes.

16  Q.  Ms. Carroll, was your TV show, *Ask E. Jean*, was that show

17  on TV before or after you spoke publicly about Mr. Trump

18  assaulting you?

19  A.  Before.

20  Q.  How many years was it on?

21  A.  It was on from '94 to '96.

22  Q.  How many days a week did it air?

23  A.  It aired five days a week, twice a day.

24  Q.  For how long did you write for Saturday Night Live?

25  A.  A year.  1987.

1   Q.  Were you on other TV programs before you spoke publicly

2   about Mr. Trump assaulting you?

3   A.  Yes.

4   Q.  Why was it important to you to speak publicly about what

5   Mr. Trump had done to you?

6   A.  Because I had been silent for 76 years.  It was just time.

7   I was sick of staying silent.  It was just time.  It was time.

8   76 years is a long time to stay silent.

9   Q.  Were you spreading lies about Mr. Trump during those

10  appearances?

11  A.  No.

12  Q.  Mr. Tacopina asked why, during those TV appearances,

13  whether you had cried.  Do you recall that?

14  A.  Yes, I remember.

15  Q.  Were you asked during those appearances, Ms. Carroll,

16  repeatedly, why you didn't scream?

17  A.  I was -- I was rarely asked any detail about the attack.

18  Q.  Were you asked during those appearances to discuss, in

19  depth, the shame that you feel?

20  A.  No.

21  Q.  Were you called a liar on any of those TV appearances?

22  A.  No.

23  Q.  Were you asked the difference between what it feels like to

24  have a man rummage around in your vagina versus insert his

25  fingers in your vagina?  Were you ever asked that question on

```
 1   any of those TV appearances?

 2   A.  No.  Never.

 3          MR. FERRARA:  Your Honor, I have a few more questions

 4   which turn on one last exhibit which I have discussed with

 5   defense counsel and I don't know if -- I will just --

 6          (Counsel conferring)

 7          MR. FERRARA:  Your Honor, I have a few more questions

 8   including an exhibit and I believe we would like to approach to

 9   discuss one potential redaction to the exhibit before I show it

10   to the jurors.

11          THE COURT:  Very well.

12          (Continued next page)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (At side bar)

2              MR. TACOPINA:  Close.

3              THE COURT:  Maybe.

4              MR. FERRARA:  For the record, I'm referring to what's

5     been marked for identification Plaintiff's Exhibit 57, this is

6     an e-mail, and your Honor is holding an unredacted copy and we

7     have a redacted copy.  The unredacted version is Plaintiff's

8     Exhibit 50 and the redacted copy is Plaintiff's Exhibit 57.  We

9     would like to redact the reference to --

10             THE COURT:  Yes, I know.

11             MR. FERRARA:  -- *Who names their cat vagina?  A whore,*

12    *that's who.*  We believe it is 412 and basis to redact.

13             MR. TACOPINA:  I don't think it is basis to redact.

14    I'm not going to question her about it but this is an e-mail

15    they're introducing from -- who is it from?

16             MR. FERRARA:  She doesn't know who.

17             MR. TACOPINA:  Somebody who harassed her?

18             MR. FERRARA:  Yes.

19             MR. TACOPINA:  OK.  So, someone who harassed her.  If

20    we are going to get into the harassment from an individual who

21    is unknown --

22             THE COURT:  I'm confused.  It is an e-mail from what?

23             MR. FERRARA:  This is one of the e-mails that

24    Ms. Carroll will testify she received after Mr. Trump made his

25    October 2022 denial.  It is part of the sort of hate mail, it

1    goes to damages.  We do not -- we think that it is -- that the

2    idea of Vagina T. Fireball, there is improper inference that

3    flows under 412 that Ms. Carroll is some sort of -- he is

4    calling her a whore, etc.  We think that that is inappropriate.

5           THE COURT:  It is out under 403, 412, and 402.

6           MR. FERRARA:  Thank you, your Honor.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Let's go.

3    BY MR. FERRARA:

4    Q.  I want to show you one more document and I believe it's

5    marked for identification as Plaintiff's Exhibit 57.  Do you

6    recognize this?

7    A.  It's very recognizable.

8    Q.  Is this an e-mail to you?

9    A.  Yes.

10   Q.  What is the date?

11   A.  October 13, 2022.

12   Q.  Just remind us what date -- do you recall when Mr. Trump

13   posted his denial on TruthSocial about you?

14   A.  October 12, 2022.

15          MR. FERRARA:  Plaintiff offers 57, your Honor.

16          THE COURT:  Received.

17          (Plaintiff's Exhibit 57 received in evidence)

18   BY MR. FERRARA:

19   Q.  If we can publish this, Mr. Lam, to the jury?  Thank you.

20          Do you know who Steph C. is, Ms. Carroll?

21   A.  No.

22   Q.  Do you see it says:  You are going to get hurt very badly.

23   A.  Yes.

24   Q.  And at the end:  Better end the bullshit quick, bitch.

25          Do you see that?

N515car6                          Carroll - Recross

1   A.  Yes.

2   Q.  Is this similar to other communications you received after

3   Mr. Trump's October 2022 statement?

4   A.  Unfortunately.

5           MR. FERRARA:  May I have a moment, your Honor?

6           THE COURT:  Yes.

7           MR. FERRARA:  Nothing further.

8           THE COURT:  Is there going to be anything further,

9   Mr. Tacopina?

10          MR. TACOPINA:  Yes, your Honor.

11          THE COURT:  How long?

12          MR. TACOPINA:  Not too long.

13          THE COURT:  Define not too long.

14          MR. TACOPINA:  Like a third of the ground that

15  Mr. Ferrara covered, so 5, 10 minutes.

16          THE COURT:  OK.  Go ahead.

17          MR. TACOPINA:  Thank you.

18  RECROSS EXAMINATION

19  BY MR. TACOPINA:

20  Q.  You were asked by Mr. Ferrara just now, I think the first

21  question was you were asked about how you feel finding

22  happiness finally and you said that you feel good.  Do you

23  remember that question?

24  A.  Yes.

25  Q.  But, earlier you said that your happiness was just a public

N515car6                          Carroll - Recross

1  persona.  So, are you happy or are you not happy now?

2  A.  I'm happy.

3  Q.  OK.

4  A.  With undertones.

5  Q.  Happy with undertones?

6  A.  Of -- of --

7  Q.  OK.  Shall I go on?

8  A.  Of unhappiness.

9  Q.  The answer is you are happy with undertones of unhappiness?

10 A.  Yes.  It goes up and down, it is not always totally buoyant

11 and gleeful and happy.  There are times when I feel unhappy, of

12 course.

13 Q.  You testified on redirect that you were astonished that in

14 2023 someone would ask you about not screaming.  Do you

15 remember saying that?

16 A.  Yes.

17 Q.  Do you understand, Ms. Carroll, that I'm not judging what

18 is the appropriate reaction for any true rape victim, I was

19 questioning the fact that you gave four different answers for

20 not screaming?

21         THE COURT:  Sustained.  The jury will disregard that

22 remark.

23 Q.  Well, the reason you gave for not screaming was, one, you

24 are not a screamer.

25 A.  Right.

1  Q.  You also said that Donald Trump's chest interfered with

2  your screaming?

3  A.  I guess I did.

4  Q.  Do you recall saying that you had too much adrenaline to

5  think to scream?

6  A.  That makes sense.

7  Q.  OK.  And then lastly you said you didn't scream because you

8  didn't want to make a fuss?

9  A.  I'm sure all -- you can have many reasons for not

10  screaming.

11  Q.  You understand that's what I was asking you about?

12  A.  Yes.

13       THE COURT:  Now, look.  You understand that that's not

14  an appropriate question so move on.

15       MR. TACOPINA:  OK, your Honor.  I thought based on the

16  answer it was but I'm sorry, I will move on.

17       THE COURT:  Mr. Tacopina, you get to have a closing

18  argument in this case and it is after I instruct the jury.

19       MR. TACOPINA:  OK.  Fine.

20       THE COURT:  Or before, actually, but...

21  BY MR. TACOPINA:

22  Q.  In evidence is Defendant's Exhibit AR that was already

23  introduced into evidence, subject to redaction, but the portion

24  we have shown before we will show again.  Ms. Carroll, you

25  prepared questions, you recall, when you were getting ready for

N515car6                    Carroll - Recross

1    your book proposal, questions that would come up about your

2    story; correct?

3    A.  Yes.

4    Q.  OK.

5    A.  I was asked to do that and I did it.

6    Q.  Someone asked you to prepare questions that you thought

7    would come up and you did?

8           MR. FERRARA:  Your Honor, recross is not an

9    opportunity to show exhibits again from cross-examination.

10          MR. TACOPINA:  I am doing it for limited purpose.  If

11   I could show the exhibit?  I am not showing the exhibit out of

12   the blue.

13          THE COURT:  So what exactly is the objection,

14   Mr. Ferrara?

15          MR. FERRARA:  Repetitive.  403.  Asked and answered.

16          MR. TACOPINA:  Not what I'm about to ask.  I will show

17   it.

18          THE COURT:  You may show her and then we will see what

19   the question is.

20          MR. TACOPINA:  Sure.

21   BY MR. TACOPINA:

22   Q.  Defendant's Exhibit AR in evidence, the questions that you

23   prepared in anticipation of the question you would be asked for

24   your book, please display --

25          Do you want ME to display to the witness, your Honor?

1    It is in evidence but just to the witness?

2            THE COURT:  No.  If it is in evidence you can display

3    it.

4    BY MR. TACOPINA:

5    Q.  This is what was shown before, page 10.  Do you see that

6    middle question?

7    A.  Yes.

8    Q.  That was one of the questions that you had prepared in

9    anticipation of being asked when you were telling your story,

10   correct?

11   A.  I expected they would ask me if I screamed.

12   Q.  OK.  "Why didn't you scream?"  So, it wasn't so astonishing

13   to you, when you were preparing this for your book

14   presentation, that someone might ask you why you didn't scream;

15   correct?

16           MR. FERRARA:  Objection.

17           THE COURT:  Ground?

18           MR. FERRARA:  Argumentative.

19           THE COURT:  Sustained.  Sustained.

20           MR. TACOPINA:  OK.

21   Q.  To summarize, you anticipated you would be asked that

22   question --

23           THE COURT:  You just said that.  Would you please stop

24   the repetition?

25           MR. TACOPINA:  OK.  All right.  Thanks.

N515car6                          Carroll - Recross

1   Q.  And lastly, regarding your conversation with Ms. Birnbach

2   that you were asked about during your redirect examination by

3   Mr. Ferrara, he asked you:  Was there ever a doubt in your mind

4   what happened in that dressing room?

5            Do you remember being asked that question?

6   A.  Yes.

7   Q.  And you said:  No.

8            I'm going to play you from the deposition of October

9   2022, pages 137, lines 19 through 22.

10           Mike, let me know when you are ready; page 137, line

11  19 to 22.

12           MR. FERRARA:  No objection.

13           MR. TACOPINA:  We will play that.  Go ahead.

14           (Video played)

15           MR. TACOPINA:  OK, the video didn't come but it was

16  the audio of the deposition and it was fine.

17           Thank you, Ms. Carroll.

18           THE COURT:  Mr. Ferrara, anything else?

19           MR. FERRARA:  Nothing further, your Honor.

20           THE COURT:  Ms. Carroll, you are excused.  Thank you.

21           Ladies and gentlemen, tomorrow morning, 10:00 for the

22  jury.  And thank you, all.

23           (Continued on next page)

24

25

1              (Jury not present)

2              THE COURT:  You can step down, Ms. Carroll.

3              THE WITNESS:  Thank you.

4              (Witness excused)

5              THE COURT:  Be seated, folks.

6              Mr. Ferrara?

7              MR. FERRARA:  I know it will surprise your Honor to

8      hear, but there was one objection I did not make that I wanted

9      to raise with the Court.  It was during Mr. Tacopina's

10     questions regarding George Conway.  We did not want to call

11     attention to this.  Many of Mr. Tacopina's questions were

12     perfectly acceptable, we understand that Mr. Conway is an

13     appropriate area to ask about.  He asked one question that we

14     thought went too far and did not want to call attention to and

15     was subject of *in limine* which was that Mr. Conway introduced

16     Ms. Carroll to her lawyer.  We think the choice of counsel was

17     briefed and is out, we think that goes to choice of counsel.

18     We ask that it be stricken.  We are not going to ask for an

19     instruction, but we ask there be no argument that George

20     Conway, for example, introduced Ms. Carroll to Ms. Kaplan, for

21     example, as part of some conspiracy, etc., etc.

22             MR. TACOPINA:  That is specifically why I didn't

23     actually identify Ms. Kaplan.  I just said "a lawyer," "he

24     introduced you to a lawyer," even though I knew it was

25     Ms. Kaplan.

1              THE COURT:  Let me take a look.

2              MR. FERRARA:  Sure, your Honor.  I believe the court

3      reporter was kind enough to mark where this occurred.

4              (Record read)

5              THE COURT:  So, it is the last question and answer?

6              MR. FERRARA:  Correct, your Honor.

7              THE COURT:  May I hear the last question and answer

8      again, please.  And that was from today?

9              OFFICIAL REPORTER:  Yes, your Honor.

10             (Record read)

11             THE COURT:  Mr. Tacopina?

12             MR. TACOPINA:  Yes, your Honor.  I stand by that

13     question.  I think it is an appropriate question because

14     Mr. Conway introduced Ms. Carroll to an attorney and I

15     specifically did not mention Ms. Kaplan.  I had no intention of

16     arguing Ms. Kaplan is part of any democratic conspiracy, or

17     anyone at that table, so that's why I sort of made it bland

18     when I said "an attorney."

19             THE COURT:  Look.  I have three things to say about

20     that.  Based on the representation by Mr. Tacopina that there

21     will be no such argument for the rest of this case about

22     Mr. Conway and how the lawyer got together with Ms. Carroll, I

23     don't think I have a problem going forward.  And going

24     backward, there is a contemporaneous objection rule for a

25     reason and the plaintiff made a decision not to do it

N515car6                         Carroll - Recross

1    contemporaneously -- not for me to judge whether it was a good

2    idea or bad idea.  And, in any case, they're not seeking, as I

3    understand it, to have it stricken at this point, or are you?

4              MR. FERRARA:  I was asking for it to be stricken.

5              THE COURT:  I'm not going to strike it in light of the

6    representation.

7              MR. FERRARA:  Understood.

8              THE COURT:  OK.  Anything else?  Anything else?  No?

9    OK.

10             (Adjourned to May 2, 2023 at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                            Page

 3    E. JEAN CARROLL

 4   Cross By Mr. Tacopina  . . . . . . . . . . 476

 5   Redirect By Mr. Ferrara  . . . . . . . . . 622

 6   Recross By Mr. Tacopina  . . . . . . . . . 645

 7                       PLAINTIFF EXHIBITS

 8   Exhibit No.                             Received

 9    103   . . . . . . . . . . . . . . . . . 628

10    57   . . . . . . . . . . . . . . . . . . 644

11                       DEFENDANT EXHIBITS

12   Exhibit No.                             Received

13    AY   . . . . . . . . . . . . . . . . . . 479

14    BA   . . . . . . . . . . . . . . . . . . 484

15    CY   . . . . . . . . . . . . . . . . . . 497

16    BD   . . . . . . . . . . . . . . . . . . 499

17    CC   . . . . . . . . . . . . . . . . . . 543

18    BU   . . . . . . . . . . . . . . . . . . 549

19    BW   . . . . . . . . . . . . . . . . . . 553

20    CG   . . . . . . . . . . . . . . . . . . 562

21    BV   . . . . . . . . . . . . . . . . . . 567

22    CJ   . . . . . . . . . . . . . . . . . . 569

23    CK   . . . . . . . . . . . . . . . . . . 576

24    CL   . . . . . . . . . . . . . . . . . . 584

25    AQ 36:21-37:6  . . . . . . . . . . . . . 604
```

CU redacted   . . . . . . . . . . . . . . . 619