N525car1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     E. JEAN CARROLL,
3
                    Plaintiff,              New York, N.Y.
4
               v.                           22 Civ. 10016 (LAK)
5
     DONALD J. TRUMP,
6
                    Defendant.
7    ------------------------------x        Jury Trial

8                                           May 2, 2023
                                            9:50 a.m.
9
     Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                           and a Jury

13
                            APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24

25   W. PERRY BRANDT
          Attorney for Defendant
```

N525car1

1              (Pages 657-677 SEALED by order of the Court)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N525car1

1                    (In open court; jury not present)

2                    THE DEPUTY CLERK:  Shall I get the jury, Judge?

3                    THE COURT:  Yes.  Absolutely.

4                    THE WITNESS:  Shall I sit?

5                    THE COURT:  Yes.  For the moment.  My deputy is out of

6       the room getting the jury, and when he returns he will ask you

7       to stand and be sworn.

8                    THE DEPUTY CLERK:  Jury entering.

9                    (Continued on next page)

N525car1                          Birnbach – Direct

1              (Jury present)

2              THE DEPUTY CLERK:  Please be seated, everyone.

3              THE COURT:  Ms. Crowley, call your next witness,

4    please.

5              MS. CROWLEY:  Thank you, your Honor.  The plaintiff

6    calls Lisa Birnbach.

7    LISA BIRNBACH,

8         called as a witness by the Plaintiff,

9         having been duly sworn, testified as follows:

10             THE DEPUTY CLERK:  Please be seated and pull your

11   chair up to the mic, and if you can please state your name and

12   spell your last name for the record.

13             THE WITNESS:  My name is Lisa Birnbach.

14   B-I-R-N-B-A-C-H.

15             MR. FERRARA:  Your Honor, may I bring up some water

16   for the witness?

17             THE COURT:  Yes.

18             MR. FERRARA:  Thank you.

19             THE WITNESS:  Thank you.

20             MR. FERRARA:  Sure.

21   DIRECT EXAMINATION

22   BY MS. CROWLEY:

23   Q.  Good morning, Ms. Birnbach.

24   A.  Good morning.

25   Q.  What do you do for a living?

```
 1   A.  I'm a writer.

 2   Q.  Where are you from?

 3   A.  I'm from New York City.

 4   Q.  Do you know the plaintiff in this case, E. Jean Carroll?

 5   A.  I do.

 6   Q.  For how long have you known Ms. Carroll?

 7   A.  About 32-33 years I think.

 8   Q.  Did there come a time when Ms. Carroll told you about an

 9   encounter that she had with Donald Trump?

10   A.  Yes.

11   Q.  When was that?

12   A.  I believe it was in the spring of 1996.

13   Q.  Could you describe in just a sentence what Ms. Carroll told

14   you about that encounter?

15   A.  She told me that Donald Trump recognized her outside or

16   right in the doorway of Bergdorf Goodman, asked her to help him

17   shop, and assaulted her upstairs in a dressing room.

18   Q.  Did she tell you this in-person or on the phone?

19   A.  It was on the phone.

20   Q.  About how long after the assault had happened did

21   Ms. Carroll tell you about it?

22   A.  I would say five to seven minutes.

23   Q.  So we are going to come back to that in a little bit but

24   first I would like to talk a bit about your background.  You

25   mentioned that you are a writer.  Have you published stories in
```

N525car1                          Birnbach - Direct

1    magazines?

2    A.   Yes.

3    Q.   Which ones?

4    A.   *New Yorker*, *New York*, *Spy*, *Glamour*, *TV Guide*, *Parade*, and

5    others.

6    Q.   Have you ever worked for any magazines?

7    A.   Yes.   I was an editor at *Spy* and a contributing editor of

8    *Parade*.

9    Q.   What type of magazine is *Spy*?

10   A.   *Spy* was a satirical humor magazine.

11   Q.   Have you written any books?

12   A.   Yes.   I have written about 22.

13   Q.   And just generally speaking, what are your books about?

14   A.   Well, my books are, generally speaking, humorous, and they

15   are non-fiction about the way we live.

16   Q.   Were any of your books political in nature?

17   A.   No.

18   Q.   Now I would like to focus on the time period in the

19   mid-'90s.   What were you doing for work at that time?

20   A.   In the mid-'90s I was a full-time parent, I was a -- I

21   wrote for individual TV shows, variety shows.   I was a host

22   panelist on a VH1 show that I am sure nobody has ever seen

23   called "The Whole Enchilada."   And, I was doing freelance work.

24   Q.   Ms. Birnbach, you testified that you met Ms. Carroll -- you

25   have known Ms. Carroll for about 32 or 33 years, that you met

N525car1                           Birnbach - Direct

1    her around 1990?

2    A.  I think so.  I think I was pregnant with my first child

3    when I met her.

4    Q.  How did you meet?

5    A.  Her best friend at the time was the girlfriend of my then

6    husband's sort of work partner --

7    Q.  And how did that --

8    A.  -- work friend.

9    Q.  And how did that lead you to Ms. Carroll?

10   A.  I think we had a couple of dinners with the other couple in

11   the center.

12   Q.  Had you heard of Ms. Carroll before you met her?

13   A.  I had.  I had admired her writing, her very stylish

14   reporting in *Esquire* and in *Outside* magazine.

15   Q.  Now, in the period in the mid-'90s, what was Ms. Carroll's

16   job?

17   A.  In the mid-'90s Ms. Carroll was writing her column at *Elle*,

18   Ask E. Jean, the advice column, and she was hosting a daily

19   talk show or daily advice show called "Ask E. Jean" for a cable

20   network.

21   Q.  Did you ever appear on the show?

22   A.  I did once.

23   Q.  How would you describe your relationship with Ms. Carroll

24   in the mid-'90s?

25   A.  We were -- we were more work friends.  We became more work

N525car1                    Birnbach - Direct

1   friends, especially when the other couple split up and we

2   didn't have that social fabric in between us.  We -- we were

3   not rare to be women in magazine and media but, you know, we --

4   we were good work friends, I would say.

5   Q.  What work were you doing?

6   A.  You know, interviewing people.  I appeared on TV a lot in

7   those days but, you know, our paths crossed.

8   Q.  What, if any work, did you do with Ms. Carroll during this

9   period in the mid-'90s?

10  A.  We concocted a pilot together with TV producers and

11  directors, a pilot which would have been a movie review show

12  for PBS.

13  Q.  Did the pilot ever run?

14  A.  Thank God, no.

15  Q.  Ms. Birnbach, did you ever meet the defendant in this case,

16  Donald Trump?

17  A.  I have.

18  Q.  Where did you meet him?

19  A.  I met him at a friend's birthday party in 1995.

20  Q.  Who was the friend?

21  A.  Her name was Andrea Eastman.

22  Q.  And who was Ms. Eastman?

23  A.  She was a talent agent at ICM.

24  Q.  Before you met Donald Trump at this birthday party, did you

25  know who he was?

1   A.   Of course.

2   Q.   When you say "of course," what do you mean?

3   A.   He was a fixture in New York tabloid life.

4   Q.   Did you speak with Mr. Trump at the birthday party?

5   A.   Andrea introduced us.

6   Q.   And what did you discuss?

7   A.   She told him I was a writer -- she probably said, because

8   she was an agent, a fabulous writer -- and he said, Who do you

9   write for?  I said, *New York* magazine, and others.  He said,

10  Would you be interested in coming to see Mar-a-Lago?  I want to

11  turn it into a club.  And I said, Sure.

12  Q.   Did you speak to Donald Trump again after the party?

13  A.   Donald Trump called me about once a month for about -- I

14  mean the answer is yes, I did.  He called me about once a month

15  for about five or six months to make sure I was still

16  interested in writing the article.

17  Q.   And did there come a time when you actually wrote the

18  article?

19  A.   Yes.

20  Q.   Did you travel to Mar-a-Lago?

21  A.   I did.

22  Q.   How did you get there?

23  A.   On Mr. Trump's private plane.

24  Q.   When was this?

25  A.   It was January, the end of January 1996.

N525car1                        Birnbach - Direct

1    Q.   Where did you stay when you were down at Mar-a-Lago?

2    A.   I stayed in a bedroom at Mar-a-Lago.

3    Q.   How long did you stay there?

4    A.   I think two nights.

5    Q.   What did you do over the course of two nights and days that

6    you were at Mar-a-Lago?

7    A.   I carried a small tape recorder and lots and lots of

8    cassettes, and I said to him, I'm going to just tape everything

9    you say on a tour of your property, it will be a stream of

10   consciousness.  And so, that's what I did.  And we, *Look at*

11   *this room.  Look at the door knobs.  Look at this gorgeous*

12   *chandelier.*  It was just a tour of the whole place.

13   Q.   After the interview, was your article published?

14   A.   Yes.

15   Q.   Where was it published?

16   A.   In *New York* magazine.

17   Q.   What was it called?

18   A.   It was called *Mi Casa Es Su Casa*.

19   Q.   I would like to show you, the witness, and counsel, what's

20   been marked for identification as Plaintiff's Exhibit 8.  Do

21   you see that on your screen, Ms. Birnbach?

22   A.   Yes.

23   Q.   Do you recognize it?

24   A.   Yes.

25   Q.   What is it?

1  A.  It is the cover of *New York* magazine from February 12,

2  1996.

3  Q.  Is this where your article is published?

4  A.  Yes.

5          MS. CROWLEY:  Your Honor, the plaintiff offers

6  Plaintiff's Exhibit 8.

7          MR. BRANDT:  No objection.

8          THE COURT:  Received.

9          (Plaintiff's Exhibit 8 received in evidence)

10  BY MS. CROWLEY:

11  Q.  If you can focus on the top right of the exhibit, what is

12  the date there?

13  A.  February 12, 1996.

14  Q.  Is that the date the article was published?

15  A.  Yes.

16  Q.  If we can turn to the second page of the exhibit, do you

17  recognize this photograph?

18  A.  Yes, I do.

19  Q.  How do you recognize it?

20  A.  I'm sorry?

21  Q.  How do you recognize it?

22  A.  I recognize it because I stood off to the side when they

23  took that picture.  That is Donald Trump and his daughter

24  Ivanka.

25  Q.  So this photograph was taken during your interview at

1   Mar-a-Lago?

2   A.  Yes.

3   Q.  We can take that down.

4        Mrs. Birnbach, did you hear from Donald Trump again

5   after the article was published?

6   A.  Not directly.

7   Q.  Did you hear from someone else?

8   A.  His assistant called me.

9   Q.  Have you spoken to Donald Trump again since the article was

10  published?

11  A.  No.  I haven't.

12  Q.  OK.  So you testified a few minutes ago that at some point

13  Ms. Carroll called you and told you that Donald Trump had

14  assaulted her.  Where were you when you received this call?

15  A.  I was giving my children dinner in our sort of kitchen area

16  at home.

17  Q.  Do you recall what date you received the call?

18  A.  No.

19  Q.  What year was it?

20  A.  It was 1996.

21  Q.  How do you know that?

22  A.  I know that because I believe E. Jean called me, of all her

23  friends and acquaintances, because she knew I had just been at

24  Mar-a-Lago.

25  Q.  What time of day was it when Ms. Carroll called you?

1   A.  It was sometime between, I would say, 6:00 and 7:00.

2   Q.  How do you know that?

3   A.  Well, I had two kids at the time, and one was 6 and one was

4   almost 3, and that's when they ate.

5   Q.  What was the first thing that Ms. Carroll said when you

6   picked up the phone?

7   A.  She said, Lisa, you are not going to believe what happened

8   to me.

9   Q.  How did she sound?

10  A.  Breathless.  Hyperventilating.  Emotional.  Her voice was

11  doing all kinds of things.

12  Q.  Was she laughing?

13  A.  She may have been a little bit laughing.  It sounded like

14  she had just this surge of adrenaline.

15  Q.  What did she say after she said, Lisa, you are not going to

16  believe what just happened?

17  A.  E. Jean said that she had, after work that day, she had

18  gone to Bergdorf's to look around, and she was on her way

19  out -- and I believe it was a revolving door -- and she said on

20  the other side of the glass from her going in, as she was going

21  out, Donald Trump said to her, *Hey, you're the advice lady.*

22  And she said, *You're the real estate guy.*  And he said, *You're*

23  *so good at advice, you are so smart, why don't you help me pick*

24  *out a present for a friend?*  So she thought she would, it

25  sounded like a funny thing, this guy, who is famous.  And she

1    went back in the store and tried to, in my -- in my memory

2    tried to show him things; Would she like a hat?  Would she like

3    a belt?  What about these sunglasses?  You know, something like

4    that, and he kept rejecting her suggestions and suggested they

5    go upstairs.  They went upstairs, eventually finding themselves

6    in the lingerie department, and there was no one behind the

7    counter but there was a little bodysuit --

8    Q.  Ms. Birnbach, I'm going to stop you here.  What did you

9    think when Ms. Carroll told you that she went with Donald Trump

10   to the lingerie department?

11   A.  I was surprised that she did that.  I thought it was kind

12   of nutty.  I didn't think it was dangerous because, you know, I

13   had just spent a few days with him, he didn't strike me as

14   dangerous.

15   Q.  What did she say happened after they got to the lingerie

16   department?

17   A.  He said, *Why don't you try this on?*  And she, continuing

18   sort of the jokey banter that they had, she said, *Why don't you*

19   *try it on?*  And then the next thing that happened is they were

20   both in the dressing room and he slammed her against the wall.

21   And then, as she was trying to move, he -- he slammed his whole

22   arm, pinned her against the wall with his arm and shoulders,

23   and with his free hand pulled down her tights.  And E. Jean

24   said to me many times, *He pulled down my tights.  He pulled*

25   *down my tights.*  Almost like she couldn't believe it.  She was

N525car1                          Birnbach - Direct

1    still processing what had just happened to her.  It had just

2    happened to her.  *He pulled down my tights.*  And then he

3    penetrated her.

4    Q.  Did she say how he penetrated her?

5    A.  Yes.  She said with his penis.

6    Q.  What did you say after Ms. Carroll described this to you?

7    A.  As soon as she said that -- even though I knew my children

8    didn't know the word -- I ducked out of the room -- my phone

9    was wireless -- and I said, I whispered, *E. Jean, he raped you.*

10   *You --*

11   Q.  What -- I'm sorry.

12   A.  *You should go to the police.  No, no, no, I don't want to*

13   *go to the police.*

14   Q.  That's what she said in response?

15   A.  That's what she said.

16   Q.  What did you say to that?

17   A.  I said, *He raped you.  I will take you to the police.*  And

18   she said, *I don't want to go to the police.  We had a fight.*

19   Q.  Did Ms. Carroll use the word "rape" to describe what had

20   happened?

21   A.  No.

22   Q.  How did she describe it?

23   A.  We fought.  You know, it sounded like a physical fight.

24   She tried to get free from him and she did not like that word.

25   She did not want me to say that word.

1   Q.  What did Ms. Carroll say after you said *I'll take you to*

2   *the police*, or *I will go to the police with you*?

3   A.  She said, *Promise me you will never speak of this again,*

4   *and promise me you will tell no one.*  And I promised her both

5   those things.

6   Q.  How did the call end?

7   A.  She said -- I said, *Please, come here.  I will give you*

8   *dinner.  You can stay here.*  Because she lived out of town.

9   She said, *No, I just want to go home.*

10  Q.  How long, approximately how long did the call last?

11  A.  Three minutes.  Four minutes.

12  Q.  What did you do after you hung up the phone?

13  A.  I think I re-heated my kids' nuggets.

14  Q.  After you got off the phone with Ms. Carroll, did you tell

15  anyone what she had just told you?

16  A.  No.

17  Q.  Did you call the police yourself?

18  A.  No.

19  Q.  Why not?

20  A.  It was her -- it was her life, her story, not my story.

21  She clearly didn't want to tell anybody else what happened and

22  I honored that.

23  Q.  After Ms. Carroll called you and told you that she had been

24  assaulted, did you ever check in with her to see how she was

25  doing?

1   A.  No.

2   Q.  Why not?

3   A.  She asked me never to bring it up.

4   Q.  And in the months and years that followed the phone call,

5   how often, if at all, did you think about what Ms. Carroll told

6   you?

7   A.  I worked to not think about it.

8   Q.  Why?

9   A.  Because I had made a promise to her not to bring it up, not

10  to discuss it, and certainly not tell anybody, so I put it -- I

11  buried it and it, as life went on, it was easier to not think

12  about it.

13  Q.  During this time period in the mid-'90s, was Ms. Carroll

14  the only friend who told you she had been assaulted by men?

15  A.  Hardly.  Hardly.  Especially other women --

16          MR. BRANDT:  Objection, your Honor; relevance, if we

17  are talking about other people.

18          MS. CROWLEY:  Your Honor, I think it is relevant as to

19  why they didn't speak about it again and why Ms. Birnbach

20  didn't tell anyone or think about it.

21          MR. BRANDT:  Your Honor, I think it is extraneous and

22  it is talking about other people who we don't even know who

23  they are.

24          THE COURT:  I will allow it.  I am assuming it is

25  going to be brief.

N525car1                        Birnbach - Direct

1           THE WITNESS:  I would just say that many of my friends

2      in the mid-'90s had been harassed, molested, or been

3      propositioned by people they worked with or worked for.

4      BY MS. CROWLEY:

5      Q.  Now, since the phone call to you -- Ms. Carroll's phone

6      call to you in 1996, had the two of you kept in touch?

7      A.  Yes.

8      Q.  What is your relationship like today?

9      A.  We are very close, close, close friends.

10     Q.  And what made you -- when did you become closer?

11     A.  My -- when my kids first got to know E. Jean, they fell in

12     love with her because she would make pillow forts in our living

13     room when she would come over and we just had a lot of fun

14     together.  And at one point in the last six years E. Jean got

15     very sick and I -- I found myself sort of taking care of her

16     and feeling like I was the friend she could count on.

17     Q.  You said that your kids, as they got older, loved

18     Ms. Carroll.  How old are your kids?

19     A.  They are now in their 20s and 30s.

20     Q.  So around what time period was she making pillow forts with

21     them?

22     A.  Well, it had to have been in the early 2000s.

23     Q.  Did you and Ms. Carroll ever discuss the assault again?

24     A.  Not until 2019.

25     Q.  In this period between 1996, the phone call in 1996 and

N525car1                          Birnbach - Direct

1     2019, did Ms. Carroll discuss her personal life with you?

2     A.  Not too much.  No.

3     Q.  Did she discuss any romantic relationships with you?

4     A.  No.

5     Q.  Did you ever observe Ms. Carroll going on any dates or

6     having any relationships during this period?

7     A.  No, I didn't.

8     Q.  I would like to shift gears for a minute.  Ms. Birnbach,

9     who did you support in the 2016 presidential election?

10    A.  Hilary Clinton.

11    Q.  Are you registered with a political party?

12    A.  I am.

13    Q.  Which one?

14    A.  Democrat.

15    Q.  Have you donated money to political candidates?

16    A.  I have.

17    Q.  Including Hilary Clinton?

18    A.  I have.

19    Q.  Where were you on the night of the 2016 election?

20    A.  In my apartment on West End Avenue with about 25 friends.

21    Q.  Was Ms. Carroll there?

22    A.  Yes.  She was.

23    Q.  As far as you know, were any of these 25 people at your

24    apartment supporters of Donald Trump's candidacy for president?

25    A.  I am sure they weren't.

N525car1                          Birnbach - Direct

1   Q.  During the evening of the election what, if any

2   discussions, did you and Ms. Carroll have about the fact that

3   Donald Trump had assaulted her years before?

4   A.  None.  None whatsoever.

5   Q.  Did you think about the assault that night?

6   A.  I wasn't thinking about the assault that night.

7   Q.  Why not?

8   A.  I was thinking about -- first I was thinking that the

9   candidate I supported was doing well and then I was much, I

10  think, and all my friends, were surprised that Donald Trump

11  won.

12  Q.  Do you remember sharing a particular look with Ms. Carroll

13  during the election night?

14  A.  No.  I don't.

15  Q.  How did you feel when Donald Trump was declared the winner?

16  A.  Surprised and upset.

17  Q.  I would like to direct your attention to February 14, 2018.

18  Do you recall going to a dinner that night?

19  A.  Yes, I do.

20  Q.  Who did you go to dinner with?

21  A.  I went to dinner with E. Jean Carroll, Carol Martin, and my

22  then boyfriend.

23  Q.  Where was the dinner?

24  A.  It was at Carmine's restaurant on Broadway.

25  Q.  Did you know Carol Martin before this dinner?

1   A.   I knew who she was and I think I may have met her once

2   before with E. Jean.  After E. Jean recovered from her illness

3   I think I met her at a dinner, but I didn't really know her,

4   no.

5   Q.   What, if anything, did Ms. Carroll give you during this

6   dinner?

7   A.   She gave each of us a pair of socks that she -- including

8   Michael, and then she gave Carol and me blue envelopes that

9   were sealed and I think had ribbons on them and --

10  Q.   What, if anything, did Ms. Carroll say about what was

11  inside the envelope?

12  A.   I think she said please read this but don't show it to

13  anybody.

14  Q.   Did you ever open the envelope?

15  A.   No.

16  Q.   So you didn't read what was inside?

17  A.   No, I did not.

18  Q.   Why not?

19  A.   Something in the way she said it made me feel like it

20  might -- it might create responsibilities that I wasn't

21  prepared to have at that time.

22  Q.   What do you mean by that?

23  A.   Well, if I had to read it but not tell anybody, you know,

24  it just sounded like it could be something heavy that I wasn't

25  ready for.

N525car1                          Birnbach - Direct

1    Q.  I would like to move forward a little bit and call your

2    attention to April of 2019.  What were you doing for a living

3    during this time?

4    A.  I was writing articles and book reviews.

5    Q.  Did you write any articles about Ms. Carroll?

6    A.  I wrote one in the Talk of the Town section of the *New*

7    *Yorker*.

8    Q.  What was the article about?

9    A.  It was about a New York City walking tour that E. Jean

10   Carroll was leading through the prism of hideous men.  She

11   called it The Hideous Men Walking Tour, or something like that.

12   Q.  Did you go on the tour?

13   A.  I did.

14   Q.  Did Ms. Carroll mention on the tour that Donald Trump had

15   assaulted her?

16   A.  No, she didn't.

17   Q.  What, if any discussions, did you and Ms. Carroll have on

18   the tour about the fact that Donald Trump had assaulted her

19   years before?

20   A.  We had zero conversation about it.  At that point we had

21   never discussed it.

22   Q.  What was the name of the article that you wrote?

23   A.  I don't remember exactly but I think it was -- it had the

24   words "hideous men" in it.

25   Q.  Was it published?

1    A.  It was published in the *New Yorker*.

2    Q.  Now, by this time, April 2019, had you opened the envelope

3    or read what was inside?

4    A.  No, I hadn't.

5    Q.  Did there come a time when you learned that Ms. Carroll was

6    writing a book?

7    A.  Yes.  I knew Ms. Carroll was writing a book.  In 2017 she

8    got a contract, I believe, to write what I thought was a

9    travelogue book, like Travels with Charlie, the Steinbeck, but

10   from a woman's perspective, and she was taking her dog to small

11   towns in America named after women to find out how women were

12   feeling.

13   Q.  And back in 2017, what was your understanding as to whether

14   Ms. Carroll would include descriptions from her own life in the

15   book?

16   A.  I had no reason to believe there was anything about her

17   life in the book.

18   Q.  Did there come a time when you read an excerpt from

19   Ms. Carroll's book?

20   A.  I read -- yes.  Yes.

21   Q.  When was that?

22   A.  The week before her excerpt was printed in *New York*

23   magazine E. Jean sent me a copy of it, by e-mail, asked me to

24   read it, not share it with anyone, and let me know that the

25   fact checkers from the magazine would be calling me to confirm

1   the details that she wrote about.

2   Q.  Do you recall when this was?

3   A.  Early to mid-June of 2019.

4   Q.  Did you read the excerpt?

5   A.  I did.

6   Q.  What was it about?

7   A.  Well, it was about, included the assault by Donald Trump.

8   Q.  And you testified that Ms. Carroll emailed it to you.  Was

9   anyone else included on this e-mail?

10  A.  Carol.  Carol Martin was.

11  Q.  Did the account of the assault in the excerpt generally

12  match your recollection of what Ms. Carroll told you back in

13  1996?

14  A.  Yes.

15  Q.  What, if any notes or edits to the excerpt, did you give to

16  Ms. Carroll?

17  A.  I don't believe I gave her any.

18  Q.  In the excerpt does Ms. Carroll describe the fact that she

19  called a friend right after the assault happened?

20  A.  Yes.  I think so.

21  Q.  Were you mentioned by name?

22  A.  No.  No, I wasn't.

23  Q.  Prior to the excerpt's release, what if any conversations

24  did you have about whether you would be named in the excerpt?

25  A.  After I read the excerpt I called E. Jean and told her how

1    brave she was and what a good piece it was, and I said that

2    I -- or I think it was before the fact-checkers called me, and

3    I said, *Could you please tell the fact checkers I didn't want*

4    *to be named in the piece?* in case they wanted "the friend"

5    identified.

6    Q.  I'm sorry.  You said you didn't want to be named?

7    A.  I did not.

8    Q.  Why not?

9    A.  Well, because by then Donald Trump was president with a

10   following that was -- could be very rude and angry.

11   Q.  I would like to show you what's in evidence as Defendant's

12   Exhibit AJ.

13          If we can just zoom in?

14          Do you recognize this exhibit?

15   A.  Yes.  It's an e-mail that E. Jean sent me.

16   Q.  An e-mail or a text?

17   A.  Oh.  It's a text.  Sorry.

18   Q.  Was this text sent before or after the excerpt Ms. Carroll

19   sent you, the excerpt that was going to be published in *New*

20   *York* magazine?

21   A.  This text came after the excerpt was published.

22   Q.  Who is the "Megan" that Ms. Carroll is referring to in the

23   first sentence?

24   A.  That's Megan Twohey, who is a reporter at the New York

25   Times.

N525car1                          Birnbach - Direct

1   Q.  In the third sentence Ms. Carroll says:  I turned over the

2   entire book to you when I got sick and we agreed you would

3   publish it when I croaked.

4            Do you recall Ms. Carroll giving you a draft of the

5   book?

6   A.  I do.

7   Q.  When was that?

8   A.  That was when she was in the hospital in Orange County, New

9   York, in the intensive care.  She did not send me a draft, she

10  sent each chapter as an e-mail.

11  Q.  Why did she send you those chapters?

12  A.  Because at that point --

13           MR. BRANDT:  I want to object, your Honor.  That calls

14  for speculation.

15           THE COURT:  Sustained.  Sustained.

16  Q.  Where was Ms. Carroll when she sent you those chapters?

17  A.  She was in intensive care.

18  Q.  Did you ever read any of the chapters?

19  A.  I did not.  I was hoping that she would recover and she

20  could finish the book herself.

21  Q.  Ms. Carroll then says:  I copped to the fact that I sent

22  you the proof of the excerpt before it was published with

23  instructions not to forward it, copy it, etc.

24           What is the excerpt that she is referring to?

25  A.  The *New York* magazine chapter.

1           MS. CROWLEY:  We can take that down.  Thank you,

2    Mr. Lam.

3    Q.  You testified you were not named in the *New York* magazine

4    excerpt.  Did there come a time when you agreed to be publicly

5    identified as the friend who Ms. Carroll called after the

6    assault?

7    A.  Yes.

8    Q.  When was that?

9    A.  I don't remember the date but it was not long after.

10   E. Jean invited Carol and me to lunch to meet a few reporters

11   from the New York Times who wanted to write about what happened

12   to her, and over the course of lunch Carol and I were persuaded

13   that we would be more effective if we were real people and not

14   anonymous sources.

15   Q.  And when you say "Carol" you are referring to?

16   A.  Carol Martin.

17   Q.  Were you named in a particular publication?

18   A.  Yes.  In the New York Times.

19   Q.  And was it an article?

20   A.  Well, it was an article by Megan Twohey and it was also --

21   she shared her recorded interview with E. Jean, Carol Martin,

22   and me, with *The Daily*, the New York Times podcast.

23   Q.  You said she interviewed you.  Where did that interview

24   take place?

25   A.  That took place also in my living room.

1    Q.  And who was present for the interview?

2    A.  Ms. Carroll, Ms. Martin, my daughter-in-law was nursing my

3    grandson in the room, and I was there.

4    Q.  Prior to this interview what, if any conversations, had you

5    and Carol Martin had about what Ms. Carroll had told you on the

6    phone back in 1996?

7    A.  Could you repeat the question?

8    Q.  Yes.  I'm sorry.

9         Before this interview in your living room --

10   A.  Right.

11   Q.  What, if any conversations, did you have with Carol Martin

12   about what E. Jean Carroll had said to you on the phone in

13   1996?

14   A.  The only conversation we had was I believe when -- when we,

15   between the lunch with the New York Times people and the actual

16   interview about how our children felt about using our names.

17   Q.  Was the interview published?

18   A.  Yes.

19   Q.  And what about the podcast?

20   A.  It was also published, the next day.

21   Q.  You testified that one of the reasons that you initially

22   did not want to be publicly named was because you were worried

23   about certain of the president's followers.  What, if anything

24   happened, after you were identified publicly as the friend who

25   Ms. Carroll called after the assault?

1  A.  Well, I was active on Twitter in those days, very active,

2  and I received, on my Twitter account and to my website, some

3  pretty awful anti-Semitic messages.

4  Q.  I would like to show you on the screen an image, that can

5  be shown to the jury as well, what is in evidence as

6  Plaintiff's Exhibit 5.

7          Do you recognize this, Ms. Birnbach?

8  A.  Yes.

9  Q.  What is it?

10  A.  It is the cover of E. Jean Carroll's latest book.

11  Q.  Have you read it?

12  A.  Yes.

13  Q.  When did you first read it?

14  A.  I read it about a month after it was published.

15  Q.  As a writer, what did you think of Ms. Carroll's book when

16  you read it?

17  A.  The book made me a bit uncomfortable -- and I never said

18  this to herself -- but the back and forth between some pretty

19  hair-raising experiences in her life with some very breezy

20  travel pieces, it was, you know, it was hard for me to make the

21  transition from the two kinds of writing in the book.

22          MS. CROWLEY:  Can I just have a moment, your Honor?

23          THE COURT:  Yes.

24          (Counsel conferring)

25  BY MS. CROWLEY:

1   Q.  Ms. Birnbach, just yes or no, did Ms. Carroll's book

2   include descriptions of other times, apart from Donald Trump,

3   of other men who had assaulted her?

4   A.  Yes.

5   Q.  Does that include a camp counselor who assaulted her when

6   she was a child?

7   A.  Yes.

8   Q.  Did the book also describe an incident in which she was

9   assaulted by Les Moonves?

10  A.  Yes.

11  Q.  Before you read the book, had Ms. Carroll told you about

12  the assaults by the camp counselor or Les Moonves?

13  A.  No.

14  Q.  Did it surprise you that Ms. Carroll hadn't told you about

15  those incidents?

16  A.  No.

17  Q.  Why not?

18  A.  Ms. Carroll is a very "up" person.  She is not a victim,

19  she doesn't want anybody's pity.  She is somebody who -- and I

20  think it's the way she was raised; instead of wallowing, she

21  puts on lipstick, dusts herself off, and moves on.  I think

22  that's how she's gotten through her life.

23  Q.  Were you identified by name in the book as the friend who

24  Ms. Carroll called after the assault?

25  A.  I don't think I was.

N525car1                          Birnbach - Direct

```
1   Q.  Is your name mentioned elsewhere in the book?

2   A.  Yeah.

3   Q.  Where?

4   A.  Well, I'm one of the people she dedicated the book to, and

5   also I think there is a piece in the book or a paragraph or two

6   about the time we went wedding gown shopping with Ms. Carroll's

7   niece Lauren.

8   Q.  Where did you go wedding dress shopping?

9   A.  We went to Bergdorf's.

10  Q.  Did you and Ms. Carroll discuss the fact that Trump had

11  assaulted her when you went wedding dress shopping at

12  Bergdorf's?

13  A.  No.

14  Q.  Did you think about that?

15  A.  I didn't want to think about it and I didn't think about

16  it.  I was thinking about Lauren and, you know, this was kind

17  of a day for her.

18  Q.  And to be clear, Lauren is Ms. Carroll's niece?

19  A.  Her niece; and Lauren's mom was out of town and so we

20  were -- there was a real aunt and a fake aunt.  And we took

21  pictures and we Facetimed with her mom, and it was about Lauren

22  and her excitement about getting married.

23          MS. CROWLEY:  We can take that exhibit down, Mr. Lam.

24  Thank you.

25  Q.  Apart from the New York Times article and podcast, did you
```

1   speak publicly about Ms. Carroll's phone call in any other

2   forum?

3   A.  Yes.  After the New York Times article appeared, which was

4   the same day as *The Daily* was dropped, or aired, or whatever

5   you say, I was really deluged with producers asking me to do

6   interviews and I did one short, I think, five-minute interview

7   with NPR, and several weeks later I was on CNN.

8   Q.  Whose show on CNN?

9   A.  I was on Anderson Cooper's.

10  Q.  Did NPR and CNN reach out to you or did you reach out to

11  them?

12  A.  Oh no.  They reached out to me.

13  Q.  Were you paid for making these appearances?

14  A.  No.

15  Q.  So why did you do them?

16  A.  Because I was telling the truth, because my friend was

17  telling the truth, and I felt strongly that I could be a

18  supportive friend.

19  Q.  You testified that you received many, many requests to be

20  interviewed and to talk on TV about the phone call.  Did you

21  agree to do any other public interviews or broadcasts?

22  A.  Nothing -- nothing on TV or radio.  Many months later

23  E. Jean was invited to be -- to talk about her book at a place

24  called The Wing, which is a -- it is defunct now but it was a

25  women's club, and it was kind of a Q&A, and I did that with

1   her.  And we did another -- we spoke at another event, I was

2   the Q, she was the A, at -- it was called Next Tribe.  They

3   weren't televised, they were in, you know, small rooms.

4   Q.  Generally speaking, what did you and Ms. Carroll talk about

5   at these two events?

6   A.  We talked about her book, we talked about how women and men

7   were feeling -- how women were feeling about men.  We talked

8   about the climate, about the relationships between men and

9   women.  We talked, also, about her life as a journalist.

10  Q.  Were you paid for these appearances?

11  A.  No.

12  Q.  Now, when did you first learn that Ms. Carroll was

13  intending to sue Donald Trump?

14  A.  After she decided to sue Donald Trump.

15  Q.  Was it before or after the lawsuit was filed?

16  A.  I think after.

17  Q.  How did you learn?

18  A.  I believe E. Jean sent me an e-mail or a text about it.

19  Q.  What, if anything, did Ms. Carroll tell you about whether

20  you would be named in connection with the lawsuit?

21  A.  She told me that I would be -- I would be integral.

22  Q.  Have you attended any court appearances in connection with

23  Ms. Carroll's case?

24  A.  I was never in the courtroom before but I did come to one

25  other argument.

1   Q.  Why did you come to that argument?

2   A.  Because it's scary to go to court by yourself.  I now

3   realize how scary.

4   Q.  Apart from the court appearance that you went to with

5   Ms. Carroll, have you listened to any court appearances

6   remotely?

7   A.  I did once.

8   Q.  Where were you when you listened to it?

9   A.  I was in the conference room of your law firm.

10  Q.  Was anyone else present at the time?

11  A.  Yes.  There were a bunch of friends of E. Jean's, most of

12  them lawyers.

13  Q.  Ms. Birnbach, you previously testified that you did not

14  support Donald Trump's candidacy for president.

15  A.  Right.

16  Q.  Have you spoken or written publicly about your feelings

17  toward Donald Trump?

18  A.  I certainly have, yes.

19  Q.  Where?

20  A.  Twitter.  And I used to have a podcast and I spoke -- I

21  mean, I write my opinions so it is just you know, for my --

22  Q.  Have you written your opinions about Donald Trump on

23  Facebook?

24  A.  Yes, probably.  I haven't been on Facebook in a few years,

25  but I probably did.

N525car1                         Birnbach - Direct

1   Q.  You testified that you had a podcast?

2   A.  Yes.

3   Q.  Is it still in existence?

4   A.  No.

5   Q.  What was it called?

6   A.  It was called *Five Things That Make Life Better.*

7   Q.  And when did it run?  What years?

8   A.  From 2018 to, I think, 2021.

9   Q.  What was it about, just generally?

10  A.  It was a weekly show that started with the simple exercise

11  of life is hard, things are bad, what can I be grateful for?

12  Fresh cherries.  The smell of flowers.  A good night's sleep.

13  A hot bubble bath.  Whatever.  You know, it was like that.  And

14  then it became an interview show and all of my guests had to

15  also say their five things, and almost all of them included

16  their dog.

17  Q.  You testified that you would, on occasion, discuss Donald

18  Trump on the podcast.  What sorts of things did you say about

19  him?

20  A.  I am sure I said that I thought he was a bad president.  I

21  am sure I thought -- I'm sure I talked about his self-interest,

22  his profiting from the White House, his appointing cabinet

23  members who were unqualified.  I am sure I suggested he never

24  read a history book or the Constitution.  I'm not a fan.

25  Q.  Have you referred to Donald Trump on your podcast as a

1   narcissistic sociopath?

2   A.   That sounds right.

3   Q.   Have you described him as Vladimir Putin's agent?

4   A.   It is quite possible that I did, yes.

5   Q.   Do you recall when you described Donald Trump that way on

6   your podcast?

7   A.   No.  And actually, a lot of my guests were not fans of

8   Donald Trump as well, so --

9   Q.   You testified that you don't recall when you used --

10  A.   No.

11  Q.   Is there anything that I could show you that might refresh

12  your recollection?

13  A.   If you have something that is a transcript or an excerpt I

14  would appreciate it.

15          MS. CROWLEY:  Mr. Lam, can we pull up, just for the

16  witness and counsel, Plaintiff's Exhibit 164?

17  Q.   If you could take a look at that, don't read it, but look

18  up after you have read the first couple sentences?

19  A.   Oh wow.  OK.  Yeah.

20  Q.   Does that refresh your recollection as to when you said

21  those things about Donald Trump?

22  A.   I said those things on my episode of my podcast right after

23  January 6, 2021.

24  Q.   And what had happened on January 6?

25          MR. BRANDT:  Objection, your Honor.  Irrelevant.

1           THE COURT:  Overruled.

2    Q.  You can answer.

3    A.  What happened was the insurrection at the Capitol, and our

4    government and Constitution and democracy falling apart.

5    Q.  Ms. Birnbach, have you described Donald Trump on your

6    podcast as, *an infection like herpes that we can't get rid of*?

7    A.  I did.

8    Q.  Have you said that you think about him all the time?

9    A.  I did.  When I had a podcast, yes.

10   Q.  And did you say these things before or after you received

11   the excerpt from Ms. Carroll's book that she sent you?

12   A.  Before.  I started saying those things when he assumed the

13   presidency in 2017.

14   Q.  Do you recall saying on your podcast that, *The cult of*

15   *Trump will decline, he will be dealing with a lot of lawsuits*?

16   A.  Yes.

17   Q.  What did you mean by that?

18   A.  Well, there was talk in New York about the Trump

19   organization inflating prices when it was convenient and

20   deflating them to pay taxes.  There were all kinds of things

21   going on with the National Enquirer.  There were -- I mean, the

22   guy had done a lot of bad things and I was hoping that there

23   would be, at some point he would have to account for them.

24   Q.  You testified that your podcast ran from 2018 to 2021.

25   About how many episodes aired of your podcast?

1    A.  I don't really know.  I know -- I think 200.

2    Q.  And what was Mr. Trump's political position during the time

3    that your podcast ran?

4    A.  It started when he was president and it ended after he --

5    he moved out of the White House.  I think it ended in May of

6    2021, so President Biden -- so, Joe Biden was president.

7    Q.  Now, I have just a couple more questions.  I would like to

8    circle back to June 2019 when you received Ms. Carroll's -- the

9    excerpt from Ms. Carroll's book.  To your knowledge, had

10   Mr. Trump announced whether he was running for re-election at

11   that time?

12   A.  I don't know.

13   Q.  How, if at all, did you think that Ms. Carroll's allegation

14   against Trump would affect his chances of getting re-elected?

15          MR. BRANDT:  I will object, your Honor.  Calls for

16   speculation.

17          THE COURT:  Sustained.

18   BY MS. CROWLEY:

19   Q.  Ms. Birnbach, did you receive a subpoena to testify in this

20   trial?

21   A.  No.

22   Q.  You are testifying voluntarily?

23   A.  Yes.

24   Q.  Why?

25          MR. BRANDT:  Objection, your Honor.  That's

1    irrelevant.

2              MS. CROWLEY:  Your Honor, this witness' motives have

3    been repeatedly attacked by the defense counsel.

4              THE COURT:  Overruled.

5    A.   I am here because my friend, my good friend who is a good

6    person, told me something terrible that happened to her, and as

7    a result she lost her employment and her life became very, very

8    difficult.  I am here because I am her friend and I want the

9    world to know that she was telling the truth.

10             MS. CROWLEY:  One moment, your Honor?

11             (Counsel conferring)

12             MS. CROWLEY:  No further questions.

13             THE COURT:  All right.  Thank you.

14             15-minute break.

15             THE DEPUTY CLERK:  Members of the jury, please come

16   this way and bring your notebooks with you.

17             (Recess; continued on next page)

18

19

20

21

22

23

24

25

N522Car2                         Birnbach - Cross

1                  (In open court; jury not present)

2                  THE DEPUTY CLERK:  I will get the jury?

3                  THE COURT:  Yes.

4                  (Jury present)

5                  THE COURT:  All right.  The witness is still under

6      oath.

7                  Mr. Brandt.

8                  MR. BRANDT:  Thank you, your Honor.

9      CROSS-EXAMINATION

10     BY MR. BRANDT:

11     Q.  Ms. Birnbach, I want to follow up on a few of the questions

12     Ms. Crowley asked you.

13                 First, I think you indicated you are registered

14     Democrat, correct?

15     A.  Correct.

16     Q.  And you have made many campaign donations always to

17     Democrats, correct?

18     A.  I think I once gave a little bit of money -- none of these

19     donations are huge, but I think I once gave a little bit of

20     money to a pro-choice Republican.

21                 MR. BRANDT:  Referring to the deposition, your Honor,

22     page 55.

23                 THE COURT:  May I please have the deposition

24     transcript?

25                 MR. BRANDT:  Yes.  Andy has it.

| | |
|---|---|
| 1 | THE COURT:  It was neatly camouflaged.  Go ahead. |
| 2 | MR. BRANDT:  Sure. |
| 3 | Q.  Starting at page 55/line 22, the question was: |
| 4 | "Q  Are you registered" -- |
| 5 | MS. CROWLEY:  Objection, your Honor. |
| 6 | You are reading from the deposition? |
| 7 | MR. BRANDT:  Yes. |
| 8 | MS. CROWLEY:  Can we have a moment? |
| 9 | THE COURT:  Yes. |
| 10 | (Counsel confer) |
| 11 | MR. BRANDT:  No objection? |
| 12 | THE COURT:  I don't know. |
| 13 | MS. CROWLEY:  No objection, your Honor. |
| 14 | THE COURT:  55/22 to where? |
| 15 | MR. BRANDT:  56/7, let's do 56/8. |
| 16 | THE COURT:  All right. |
| 17 | BY MR. BRANDT: |
| 18 | "Q  Are you registered with any political party? |
| 19 | "A  I'm a Democrat. |
| 20 | "Q  And have you ever donated to any political campaigns in the |
| 21 | past? |
| 22 | "A  Yes. |
| 23 | "Q  Which campaigns? |
| 24 | "A  Many. |
| 25 | "Q  And have those all been democratic campaigns? |

N522Car2                          Birnbach - Cross

1    "A  Yes."

2              Did you give that testimony?

3    A.  I did.

4              THE COURT:  That's why the court stenographer was

5    there.

6    Q.  Is that true testimony at the time?

7    A.  Yes.

8    Q.  Thank you.

9              And you donated to Hillary Clinton in 2016, you think?

10   A.  I think so.

11   Q.  And you donated to Joe Biden in 2020?

12   A.  Yes.

13   Q.  And it's fair to say that you are not a fan of Donald

14   Trump, as you said earlier.

15   A.  That's right.

16   Q.  And in fact, one of the things Ms. Crowley asked you was

17   whether you have or had a Facebook page, is that correct?

18   A.  Yes.

19   Q.  And I believe you answered in the affirmative, that you did

20   have a Facebook page.

21   A.  I did.

22   Q.  Do you recall saying in a Facebook post the following:

23   "Does it get worse than Donald Trump?  Could he be more of a

24   slime ball for whom there are no consequences?  Will America

25   survive this administration?  Will we?  Some days I am just not

1   sure.  I'll tell you one thing, in my entire life, I've never

2   felt the hatred that I feel towards this person."

3           Did you make that statement?

4   A.  Yes.

5   Q.  Also, Ms. Crowley asked you about some of your podcasts, is

6   that correct?

7   A.  Yes.

8   Q.  I would like to delve into those in a little more detail.

9           Do you recall doing a podcast with Norm Ornstein?

10  A.  I do.

11  Q.  And did you say there, "President Trump, and I don't like

12  to use those two words together"?  Did you make that statement?

13  A.  Sounds like something I would say.

14  Q.  In that same podcast, did you also say something along the

15  lines of "Throughout the three terrifying years of this

16  presidency"?

17  A.  Yes.

18  Q.  And did you say something along the lines of "Does Trump --

19  is he so delusional that he thinks this is really successful"?

20  Did you make that statement?

21  A.  Sounds like something I would say.

22  Q.  And then do you recall doing a podcast with a Steve

23  Levingston?

24  A.  Yes.

25  Q.  And do you recall make the following statement in that

1   podcast, "Though I feel like Donald Trump and his affiliates

2   have taken up all of our brain, I mean, I do feel for the first

3   time in my life that I think about the president all the time.

4   I should be thinking about my diet.  I should be thinking about

5   my kids more."

6           Did you make that statement?

7   A.  Yes.

8   Q.  Do you recall doing a podcast with a Mr. Kurt Andersen?

9   A.  Yes.  Did you make the following statement there, "Wow,

10  wow.  Well, you know what I mean.  I, as I say every day,

11  because I think about him, as you said, every hour, every day

12  that I'm awake, and unfortunately when I sleep, I think history

13  will be -- I mean, the history books will be written and Bill

14  Barr will be the center of some and Trump will.  I mean, it's

15  unfathomable that he will be treated as anything but a tragic,

16  cataclysmic, self-interested person who is not good for

17  America."

18          Did you say that?

19  A.  I did.

20  Q.  Do you recall doing a podcast with Alexandra Pelosi?

21  A.  I do.

22  Q.  Do you recall making the following statement in that

23  podcast:  "I cannot listen to Donald Trump speak.  I feel like

24  it irritates an infection or he is an infection.  Maybe that's

25  just me.  I just can't wait for this to be over.  And I, I'm

1   saying this because it's not going to be over soon.  No matter

2   what, he'll be president until January.  God help us.  And you

3   know what?  We're going to hear him.  We're going to hear him

4   forever.  He is part of who we are now.  He is like herpes.  We

5   got him, and we can't get rid of him."

6               MS. CROWLEY:  Objection, your Honor.  Asked and

7   answered and 403.

8               THE COURT:  Which part of it?

9               MS. CROWLEY:  The "he's like herpes."

10              MR. BRANDT:  It's appropriate evidence of bias, your

11  Honor.

12              THE COURT:  Oh, really?  I'm glad to know where you

13  are going.

14              MR. BRANDT:  I'm a master of understatement.

15              THE COURT:  Well, you know, look.  What can I say?  If

16  we want to get technical here, this question is a little

17  compound, don't you think?

18              MR. BRANDT:  It is just reading a quote and did she --

19              THE COURT:  I know it is, but we could read the Bible

20  and ask at the end of that, you know, did you say that of some

21  divine figure?

22              MR. BRANDT:  True.  This is a relatively short one.

23  And the question is did the witness make the statements.

24              THE COURT:  I'll allow it.

25              MR. BRANDT:  Thank you, your Honor.

N522Car2                       Birnbach - Cross

1    BY MR. BRANDT:

2    Q.  Two more, Ms. Birnbach.  Do you recall doing a podcast with

3    Chris Whipple?

4    A.  Yes.

5    Q.  And did you make the following comments there, "Yeah, way

6    back when, the cult of Trump, I think, will decline.  My

7    opinion is he is going to be dealing with a lot of lawsuits and

8    he's not going to be so powerful as he thinks he is.  I mean,

9    people think he's going to run for president.  That's total

10   crap.  He won't.  He can't.  He's not a good president."

11        Did you make that statement?

12   A.  Again, sir, it sounds like something I would have said.

13   Q.  And then one more.  Ms. Crowley touched on this.  Do you

14   recall doing a podcast with Noel Casler?

15   A.  Yes.

16   Q.  And did you make the following statement there:  "So look,

17   we know.  We know it all.  He's a madman.  He's a narcissistic

18   sociopath.  He is a malignant sociopath.  He is a demented.  He

19   is a Russian agent.  He is Vladimir Putin's asset.  I don't

20   know.  He's bad.  He's bad.  And God knows what he can do

21   before he leaves."

22        Did you make that statement?

23   A.  Yes.

24   Q.  Now, you also mentioned during your direct examination with

25   Ms. Crowley that you first met Ms. Carroll in the 1990s, is

1    that right?

2    A.  Yes.

3    Q.  And I think you said you have been in touch with her to

4    some degree ever since the '90s, is that right?

5    A.  Yes.

6    Q.  First you were just friends and work colleagues?

7    A.  Yes.

8    Q.  Correct.

9            In fact, you were trying to create a pilot for a

10   public broadcasting show?

11   A.  Yes.

12   Q.  And then later you pitched another pilot to another

13   company?

14   A.  Correct.

15   Q.  And then you were also on the E. Jean talk show on one

16   occasion, is that right?

17   A.  On one occasion.

18   Q.  But today you would describe yourselves as the closest of

19   friends, is that right?

20   A.  Yes.

21   Q.  In fact, in 2019, she recommended you for a job at the

22   *Daily Beast*, correct?

23   A.  Uh-huh, yeah, that is correct.

24   Q.  And you are very close friends until today?

25   A.  Yes.

1    Q.  Now, you talked about this with Ms. Crowley, and I want to

2    bore in a little deeper and this relates to the evening of the

3    2016 election.  So take yourself back in time there.  I think

4    you said you watched the 2016 election at your residence, is

5    that correct?

6    A.  Yes.

7    Q.  And you had, I think you said, 20 or 25 guests in your

8    home.

9    A.  That's right.

10   Q.  And Ms. Carroll was one of the guests in your home,

11   correct?

12   A.  Yes.

13   Q.  And all of the people who were there at the party had voted

14   for Hillary, I think you said, is that correct?

15   A.  I assume that, yes.

16   Q.  And I think you said the evening started well and, as far

17   as you were concerned, the evening ended badly.

18   A.  Yes.

19   Q.  Because Donald Trump won?

20   A.  Right.

21   Q.  And all of the friends who were there were shocked and

22   upset about that, correct?

23   A.  Correct.

24   Q.  And it's your testimony, is it not, that at that night,

25   election night, in your residence, with Ms. Carroll president,

N522Car2                      Birnbach - Cross

1   it never --

2            THE COURT:  I don't think she's even run yet.

3            MR. BRANDT:  Oh.

4            THE COURT:  You promoted her.

5            MR. BRANDT:  Sorry about that.  Present, president,

6   whatever.  Let me start over.  I apologize.

7   BY MR. BRANDT:

8   Q.  Is it your testimony that on that night, at your residence,

9   with Ms. Carroll present, it never came up in your mind the

10  connection between Ms. Carroll and Mr. Trump and the alleged

11  incident at Bergdorf Goodman?

12  A.  That is correct, it did not come up.

13  Q.  It did not enter your mind.

14  A.  I wasn't thinking about it.

15  Q.  And then also a little bit later on I think you mentioned

16  this, there was an article in the *New York Times* that you gave

17  an interview about, correct?

18  A.  Yes.

19  Q.  And you told the reporter there that you had not recalled

20  the alleged incident at Bergdorf Goodman's on election night,

21  correct?

22  A.  I have said I was -- yeah, I mean, that was the -- I know

23  the article you are speaking of, and she understood me

24  correctly as not having thought about it at that point.

25  Q.  And what you told *The New York Times* on that occasion was

1    truthful, you had not remembered any such incident on election

2    night, correct?

3    A.  I wouldn't put it that way, sir.  I would say I wasn't

4    thinking about it.  It was in my brain, but it wasn't -- I

5    wasn't tapping that part of my brain.

6    Q.  Okay.  Well let's go to your deposition, please, and I'm

7    going to start at page 65/line 17.  Actually, starting at line

8    2.  65/2, thank you, to 21.  Let me know when everyone's ready.

9    "Q  Did you tell *The New York Times* that you had forgotten what

10   Ms. Carroll had told you in 1996 on election" --

11              MS. CROWLEY:  Objection, your Honor.

12              THE COURT:  What's the objection?

13              MS. CROWLEY:  It's not an inconsistent statement.

14              THE COURT:  You have to lay a better foundation for

15   this, Mr. Brandt.

16              MR. BRANDT:  Thank you, your Honor.

17   BY MR. BRANDT:

18   Q.  Maybe I misunderstood your testimony, Ms. Birnbach, but did

19   I recall your testimony earlier that on election night you did

20   not remember the Bergdorf incident?

21   A.  I wasn't thinking about it.  I was thinking about what was

22   happening in front of us.

23   Q.  Okay.  Well, that wasn't actually my question.  My question

24   was not whether you were or weren't thinking about it.  My

25   question was did you remember it?

1          THE COURT:  Well, here's what the question actually

2     was.  Let me get to the precise point.

3          Page 45/line 23:  "Is it your testimony that on that

4     night at your residence, with Ms. Carroll president, it never

5     came up in your mind the connection between Ms. Carroll and

6     Mr. Trump and the alleged incident at Bergdorf Goodman?

7     "A  That is correct; it did not come up.

8     "Q  It did not enter your mind?

9     "A  I wasn't thinking about it."

10         MR. BRANDT:  And at page 65 it says doesn't remember,

11    your Honor, which is why I asked the question.

12         THE COURT:  And that's why I'm going to sustain the

13    objection.

14         MR. BRANDT:  Okay.

15         THE COURT:  I should also, just for the sake of

16    completeness, further down the same page in your examination

17    moments ago, you put the following question:  "And what you

18    told *The New York Times* on that occasion was truthful, you had

19    not remembered any such incident on election night, correct?"

20    And the witness answered:  "I wouldn't put it that way, sir.  I

21    would say I wasn't thinking about it.  It was in my brain, but

22    it wasn't -- I wasn't tapping that part of my brain."

23         So the objection is sustained.

24    BY MR. BRANDT:

25    Q.  Sitting here today, Ms. Birnbach, can you say whether or

1    not on that election night evening you did remember it or

2    didn't remember it?

3    A.   I can't answer that question.   I can tell you I wasn't

4    thinking about it.

5    Q.   Now, you do remember it now, is that correct?

6         THE COURT:   Remember what?

7         MR. BRANDT:   The incident at Bergdorf's.

8    A.   Yes.

9    Q.   And is that because Ms. Carroll reminded you of it in 2019?

10   A.   When E. Jean told me she was writing about it, she gave me

11   permission to think about it again, and there are parts of the

12   phone call——remember, it's just a phone call——that I remember

13   vividly.

14   Q.   So that memory came back to you at the time the book was

15   coming out?

16   A.   It didn't come back.   I thought about it again.

17   Q.   In any event, she said that *New York* magazine was going to

18   be excerpting a portion of it and the fact-checkers would be

19   calling you, correct?

20   A.   Yes.

21   Q.   And she even sent you the draft excerpt from the *New York*

22   magazine, correct?

23   A.   Yes.

24   Q.   And afterwards, you made public appearances about the

25   allegations yourself, correct?   I think you testified to that

N522Car2                         Birnbach - Cross

1    with Ms. Crowley.

2    A.  Not right then.  It was at least a month later.

3    Q.  But you did have some public appearances on it.

4    A.  One.

5    Q.  Okay.  Also, you mentioned something in your direct

6    examination about a couple of book events that you attended --

7    A.  Yes.

8    Q.  -- with Ms. Carroll.  Did I understand that correctly?

9    A.  Yes.

10   Q.  And I think you said one was called The Wing, is that

11   correct?

12   A.  Yes.

13           MR. BRANDT:  Could we pull up DI, please, for the

14   Court and counsel, and this is a two-page exhibit.

15   Q.  And can you tell us what it is?

16           THE COURT:  Yes, go ahead.

17   A.  What is it?  It is an e-mail I received from Ms. Carroll

18   about our event at The Wing, which was -- I don't see the date,

19   but it was in October of 2019 or November.

20           MR. BRANDT:  I would offer defendants's Exhibit DI,

21   your Honor.

22           MS. CROWLEY:  No objection.

23           THE COURT:  Received.

24           (Defendant's Exhibit DI received in evidence)

25   BY MR. BRANDT:

N522Car2                          Birnbach - Cross

1   Q.  Just to sum up, Ms. Birnbach, was this a description of a

2   book event that you were going to attend with Ms. Carroll where

3   you -- I think you said you were going to do the Q's and she

4   was going to do the A's, is that right?

5   A.  Yes, yes.

6   Q.  And then I think you mentioned that you had one other such

7   event, is that correct?

8   A.  Yes.

9   Q.  Can we pull up DH, please.  Oh, and -- never mind.

10          And I'm only interested in the bottom half of this

11  exhibit, but before we get there, can you tell us what this is,

12  Ms. Birnbach?

13  A.  This is an e-mail from Ms. Carroll about the other book

14  event which is called Next Tribe.

15  Q.  Okay.  And I think you mentioned Next Tribe earlier in your

16  direct examination, is that correct?

17  A.  Yes.

18  Q.  If you look in the --

19          MR. BRANDT:  I would offer DH, your Honor.

20          MS. CROWLEY:  One moment, your Honor.

21          (Counsel confer)

22          MR. BRANDT:  With redactions, your Honor, I would

23  offer DH.

24          MS. CROWLEY:  With redaction, no objection.

25          THE COURT:  On that basis, received.

1          (Defendant's Exhibit DH redacted received in evidence)

2          MR. BRANDT:  Mr. Nelson, what I would like for you to

3   do, if you look at the middle of the page, there is a thing

4   that says "sent from my iPhone," and below that it says "on

5   September 30th," could we just have the "on September 30th" and

6   below, and publish that to the jury, please.

7   BY MR. BRANDT:

8   Q.  Ms. Birnbach, this exhibit is in evidence, but this is an

9   e-mail from Ms. Carroll to you, correct?

10  A.  Correct.

11  Q.  And just to summarize, it says, "Yes, we're first.  Yes, 15

12  minutes.  Hell, yes.  If you can get copies of *True Prep* to

13  Jeannie or have a bookseller come in and sell them, that would

14  be excellenté.  Jeannie's e-mail is Jeannie@nexttribe.com.  She

15  is the founder."

16          Then continuing on it says, "And even if you can't get

17  20 or 30 books there, we'll talk about your book and my book

18  anyway.  The main thing is to"——and this is in all caps——"sell

19  books!!"  Is that correct?

20  A.  Yes.

21  Q.  And what you were doing was trying to sell Ms. Carroll's

22  books, correct?

23  A.  She was on a book tour.  I mean, correct, and I would say

24  that she really wasn't able to have a book tour, so these two

25  events were about as much as she got to do.

1   Q.  But the purpose of what you were helping her with at this

2   point with her book was to sell books, correct?

3   A.  Well, yes.  That's how writers make money.

4   Q.  And that's what she said here.

5   A.  Yes.

6           MR. BRANDT:  Thank you.  That's all I have.

7           THE COURT:  Okay.  Thank you.

8           Redirect?

9           MS. CROWLEY:  Just one moment, your Honor.

10          THE COURT:  You may proceed.

11          MS. CROWLEY:  Thank you.

12  REDIRECT EXAMINATION

13  BY MS. CROWLEY:

14  Q.  Ms. Birnbach, Mr. Brandt just showed you an e-mail marked

15  DH, where you and Ms. Carroll discussed an event on her book

16  tour.

17  A.  Um-hmm.

18  Q.  You testified that Ms. Carroll was not able to have a book

19  tour?

20  A.  That's right.

21  Q.  What did you mean by that?

22  A.  Well, ordinarily a writer of her fame and renown would go

23  on a several-city or many-city book tour.  I have done that on

24  many occasions.  And you sign books at book stores, you do TV

25  and radio interviews, and so on.  But because of security

1    concerns, Ms. Carroll didn't get to have a tour.

2    Q.   What were the security concerns?

3    A.   That followers of Mr. Trump were harassing --

4           MR. BRANDT:  Objection, your Honor.

5           THE COURT:  Pardon me?

6           MR. BRANDT:  Objection, irrelevant.

7           MS. CROWLEY:  Your Honor, he elicited this testimony.

8           THE COURT:  Yes.  Continue.

9    A.   Should I?

10   Q.   Yes, you can continue.

11   A.   The concern was for her safety because followers of

12   Mr. Trump's were threatening her.

13   Q.   Mr. Brandt asked you several questions on cross-examination

14   about your political affiliation.  Do you recall those?

15   A.   Yes, I do.

16   Q.   As well as your feelings about Donald Trump as the

17   president.  Do you remember those?

18   A.   I do.

19   Q.   When Ms. Carroll called you in 1996 and told you that

20   Donald Trump had just assaulted her, was he known as a

21   political figure?

22   A.   Not at all.

23   Q.   I'm going to show you what's been marked for identification

24   as Plaintiff's Exhibit 133, if you could just display that for

25   the witness and counsel.  And Mr. Lam, if we could focus on the

N522Car2                        Birnbach - Redirect

1  sort of middle of the page.  Yup.

2          Do you recognize this?

3  A.  Yes.

4  Q.  What is it?

5  A.  It's a text conversation between Ms. Carroll and me.

6          MR. FERRARA:  Plaintiff offers Plaintiff Exhibit 133.

7          MR. BRANDT:  No objection.

8          THE COURT:  Received.

9          (Plaintiff's Exhibit 133 received in evidence)

10 BY MS. CROWLEY:

11 Q.  At the top of the screen, there is a text message from

12 Ms. Carroll to you.  There is a text message from Ms. Carroll

13 to you that says, "We could go" -- it starts in the middle.  It

14 says, "We could go to a restaurant near you.  Megan agrees with

15 you.  She didn't like Sardi's."

16          Who is the Megan in the text?

17 A.  It's the reporter from *The New York Times*, Megan Twohey.

18 Q.  And what is the lunch or food discussion that Ms. Carroll

19 is talking about?

20 A.  She is talking about the interview that I had agreed to

21 have on the record with Megan Twohey and Carol Martin.

22 Q.  And you respond, "I'm leaning towards going on the record."

23 What does going on the record mean?

24 A.  Well, it meant that *The New York Times* could use my name

25 and identify me as the person that Ms. Carroll called right

1  after the episode.

2  Q.  You then say, "It wasn't political in 1996 when you told me

3  it was personal."  What did you mean by that?

4  A.  Donald Trump in 1996 was a well-known New York person.  He

5  was not in politics.  He was not near politics.  He was a guy

6  who liked publicity and attention and he was also a known

7  womanizer.  And so I said here what I mean in the deepest part

8  of my heart and my brain.  My friend wasn't raped by a

9  president.  She was assaulted by a guy, a real estate guy, who

10  liked women and harassed a lot of women.  So it wasn't --

11          MR. BRANDT:  Move to strike, your Honor.

12          THE COURT:  Pardon?

13          MR. BRANDT:  Move to strike.  That's not responsive,

14  and goes way beyond the bounds of the question, and it's 403.

15  BY MS. CROWLEY:

16  Q.  The question was what did you mean by it was personal, not

17  political?

18  A.  It was --

19          THE COURT:  Just give me a second, folks.

20          MR. BRANDT:  The last part of the answer.

21          THE COURT:  I can't hear you.

22          MR. BRANDT:  The last part of the answer.

23          THE COURT:  I'm trying to get exactly what the

24  objection is to.  Give me a moment.

25          MR. BRANDT:  Lacks foundation.

N522Car2                         Birnbach - Redirect

```
 1              THE COURT:  Members of the jury will disregard the
 2    part of the answer that came after the phrase "a guy, a real
 3    estate guy."
 4    BY MS. CROWLEY:
 5    Q.  Ms. Birnbach, Mr. Brandt asked you a question -- questions
 6    about several statements that you made about Donald Trump the
 7    president on your podcast.  Do you recall those?
 8    A.  Yes.
 9    Q.  Fair to say that you were not a supporter of Donald Trump
10    for president?
11    A.  That is fair.
12    Q.  Would you lie to prevent Donald Trump from being president?
13    A.  Never.
14    Q.  Would you give public interviews about an untrue story in
15    order to prevent Donald Trump from being president?
16    A.  No, of course not.
17    Q.  Would you walk into court and perjure yourself in order to
18    prevent Donald Trump from being president?
19    A.  Never in a million years.
20              MS. CROWLEY:  One moment, your Honor.
21              (Counsel confer)
22              MS. CROWLEY:  Nothing further.
23              THE COURT:  Thank you.
24              Anything else, Mr. Brandt?
25              MR. BRANDT:  Just briefly, your Honor.
```

N522Car2                          Birnbach - Recross

1    RECROSS EXAMINATION

2    BY MR. BRANDT:

3    Q.  Ms. Birnbach, I think what you just said in response to

4    Ms. Crowley was back in 1996 Mr. Trump was not a political

5    figure, correct?

6    A.  Correct.

7    Q.  But in 2019, when these allegations surfaced and

8    Ms. Carroll's books came out and she gave interviews and you

9    gave interviews, he was a political figure, correct?

10             MS. CROWLEY:  Objection to form.

11             THE COURT:  Rephrase it, counselor.

12             MR. BRANDT:  Sure, your Honor.

13   BY MR. BRANDT:

14   Q.  In 2019, he was a political figure, correct?

15   A.  Yes.

16   Q.  He was president.

17   A.  Yes.

18             MR. BRANDT:  That's all I have.  Thank you.

19             THE COURT:  All right.  Thank you.

20             Anything else?

21             MS. CROWLEY:  Nothing further.

22             THE COURT:  Ms. Birnbach, you are excused.  Thank you.

23             THE WITNESS:  Thank you.

24             (Witness excused)

25             THE COURT:  Next witness.

1           MR. FERRARA:  The plaintiff calls Jessica Leeds.

2    JESSICA LEEDS,

3        called as a witness by the plaintiff,

4        having been duly sworn, testified as follows:

5           THE COURT:  Mr. Ferrara.

6           MR. FERRARA:  Thank you, your Honor.

7    DIRECT EXAMINATION

8    BY MR. FERRARA:

9    Q.  Good morning, Ms. Leeds.

10   A.  Good morning.

11   Q.  Where do you live?

12   A.  I live in Ashville, North Carolina.

13   Q.  How old are you?

14   A.  81.

15   Q.  Briefly, could you describe your education?

16   A.  I have not gotten a degree from college, but I've got the

17   college courses.

18   Q.  Are you currently working?

19   A.  No, I'm retired.

20   Q.  What did you do before you retired?

21   A.  I was a stockbroker.

22   Q.  Where did you work as a stockbroker?

23   A.  I worked for about 30 years for a company by the name of

24   Hornblower down in the Wall Street area, 20 Broad.

25   Q.  Have you ever met the defendant in this case, Donald Trump?

1    A.  Yes.

2    Q.  Where did you meet him?

3    A.  I met him first on an airplane in I think 1979 or '8.

4    Q.  Where were you flying to and from?

5    A.  I was flying into New York.  I can't remember whether it

6    was from Dallas or from Atlanta.

7    Q.  How often were you flying around that time?

8    A.  At that time I was working for a newsprint company as a

9    traveling sales representative, and I was basically traveling

10   three weeks out of four.

11   Q.  Do you recall what month that particular flight was?

12   A.  I believe it was like September.

13   Q.  What time of day was the flight?

14   A.  It was midday because I can remember the lights from the

15   sun were still streaming into the airplane.

16   Q.  How old would you have been at that time?

17   A.  37.

18   Q.  I want to show you what's been marked for identification as

19   Plaintiff's Exhibit 18.  What is -- do you recognize this?

20   A.  Yes.

21   Q.  What is that?

22   A.  That's a picture of me on Lake Michigan in '79.

23             MR. FERRARA:  Plaintiff offers 18.

24             MR. TACOPINA:  No objection.

25             THE COURT:  Received.

1              (Plaintiff's Exhibit 18 received in evidence)

2    BY MR. FERRARA:

3    Q.  Is this how you looked around the time of the flight where

4    you met Mr. Trump?

5    A.  No.  At that time I was wearing my hair quite long.

6    Q.  On the flight your hair would have been long?

7    A.  Yes.

8    Q.  We can bring that down.  Thank you.

9              So where -- when you boarded the plane, where were you

10   sitting?

11   A.  I was sitting in the back part of the coach.

12   Q.  Did your seat change?

13   A.  Yes.

14   Q.  What happened?

15   A.  The stewardess came down the aisle, one of the stewardesses

16   came down the aisle and asked me if I would like to come up to

17   first class.

18   Q.  What did you say?

19   A.  Yes, of course.

20   Q.  So where did you -- where were you seated at that point?

21   A.  So I came up and it was the first seat on the right side of

22   the bulkhead.

23   Q.  If you wouldn't mind, just so that we can picture it,

24   how -- what was the layout of the first class cabin like on

25   that flight?

N522Car2                          Leeds - Direct

1   A.   It was on the left side, towards the front of the airplane,

2   there were three rows, and on the right side, because of the

3   bulkhead took up one row, there was only two rows.

4   Q.   So is this a plane that would have had one aisle down the

5   middle or two aisles?

6   A.   No, it had one aisle.

7   Q.   And so, again, just to make sure we understand it, so

8   there -- and how many seats per row per side in first class?

9   A.   Two.

10  Q.   So on the left side of the aisle, as you are facing the

11  front of the plane, it would be three rows of two seats?  Do I

12  have that right?

13  A.   No, just two rows on either side of the aisle.

14  Q.   Okay.  So which row were you -- which seat were you in?

15  A.   I was in the aisle seat in the first two seats facing the

16  bulkhead.  The bulkhead was right in front of us.

17  Q.   How many other people were -- did you -- if you are recall,

18  how many other people were seated in first class on that

19  flight?

20  A.   I seem to recall that it was full.

21  Q.   Who -- so who, if anyone, was sitting next to you?

22  A.   When I got up there and sat down, the gentleman sitting by

23  the window introduced himself as Donald Trump.  We shook hands.

24  Q.   Before we talk about your interaction with Mr. Trump, were

25  there flight attendants in the first class cabin?

 1   A.  There was one flight -- the flight attendant who had asked

 2   me to come up.

 3   Q.  And were any women seated in first class other than you?

 4   A.  No.

 5   Q.  So at the time of this flight, when he introduced himself,

 6   did you know who Mr. Trump was?

 7   A.  No.  I was working out of Connecticut, living in

 8   Connecticut, and so I wasn't aware of the social scene or the

 9   real estate scene in New York City.

10   Q.  What, if any, conversation did the two of you have?

11   A.  I don't remember anything substantial.  It was just chat.

12   Q.  Did there come a time when that changed?

13   A.  Well, what happened was they served a meal, and it was a

14   very nice meal, as Braniff was -- was -- reputation to do, and

15   it was cleared and we were sitting there when all of a sudden

16   Trump decided to kiss me and grope me.

17   Q.  What led to that?  Was there conversation?

18   A.  There was no conversation.  It was like out of the blue.

19   Q.  Do you recall saying anything that would have suggested to

20   Mr. Trump that that was an invited advance?

21   A.  Not at all.

22   Q.  What did you -- so describe, if you would, what he did

23   exactly.

24   A.  Well, it was like a tussle.  He was -- his hands and -- he

25   was trying to kiss me, he was trying to pull me towards him.

N522Car2                          Leeds - Direct

He was grabbing my breasts, he was -- it's like he had 40

zillion hands, and it was a tussling match between the two of

us.  And it was when he started putting his hand up my skirt

that that kind of gave me a jolt of strength, and I managed to

wiggle out of the seat and I went storming back to my seat in

the coach.

Q.  What -- were you saying anything as this was happening?

A.  I don't think there was a word or a sound made by either

one of us.

Q.  What about -- did you scream or yell?

A.  No.

Q.  What about the other people -- did -- were you able to see

whether other people were reacting in the cabin?

A.  I can remember thinking that the people behind us must have

thought something was going on because the chair was wiggling

around, and I can remember the guy sitting across the aisle

from me, his eyes were like saucers.  But -- and I can remember

thinking where is the stewardess?  Why doesn't someone come and

help me?  And then I realized nobody was going to help me, I

had to do it myself, and that's when I got the strength to get

up and get out.

Q.  Why didn't you yell or shout or sort of exclaim something

to draw attention to what was happening?

A.  Well, in my head, I think I called him a name, but, no,

not -- it never occurred to me to yell out.

1    Q.  Why not?

2    A.  I don't know.

3    Q.  How long did that -- how long did Mr. Trump sort of -- was

4    he grabbing and groping you?

5    A.  Well, it seemed like forever, but it probably was just a

6    few seconds.

7    Q.  Did you later give -- since this encounter, have you given

8    interviews about it?

9    A.  Yes.

10   Q.  Do you recall saying in an interview that it lasted

11   significantly longer than a few seconds?

12   A.  I think the first time somebody asked me that, in fact I

13   think it was Anderson Cooper's program, he -- I said something

14   about 15 minutes, but it couldn't -- it just seemed like

15   forever, but it was seconds.

16   Q.  Sorry, I think you testified that you went back to your

17   seat in the back, is that right?

18   A.  Correct.

19   Q.  Who, if anyone, did you tell what had happened while you

20   were still on the plane?

21   A.  I didn't tell anybody.

22   Q.  Why not?

23   A.  It never occurred to me to tell anybody.

24   Q.  What about when the flight landed?  Did you tell anyone on

25   the -- in the plane's crew?

N522Car2                         Leeds - Direct

1   A.   I did stay on the airplane until everybody had left because

2   I didn't want to take the chance of running into him again out

3   in the terminal, but, no, I didn't complain to the stewards, I

4   didn't complain to the airline people.   I just got in my car

5   and drove home.

6   Q.   Who did you tell, let's say, at work immediately after the

7   incident?

8   A.   I did not tell anybody at work because I didn't think they

9   would be interested in my experience.

10  Q.   Why not?

11  A.   At that time, in that place, in the work environment, men

12  basically could get away with a lot.   And that's sort of where

13  I put it.

14  Q.   Did there come a time when you decided to speak publicly

15  about what Mr. Trump had done to you?

16  A.   Yes, when it became apparent to me that he wanted to run

17  for president, I started telling everybody.   I didn't think he

18  was much of a businessman, but I thought even less of him as a

19  person.   So I started -- I started off telling my family,

20  telling my children, telling my friends, my neighbors, my book

21  club.   I told everybody and anybody who would listen to me.

22  Q.   Why was it important to you to do that?

23  A.   Because I thought that he was not the kind of person we

24  wanted as president.

25  Q.   I think we mentioned this, you mentioned Anderson Cooper.

1   Have you -- did there come a point in time where you did some,

2   we will say, media appearances?

3   A.   Oh, yeah, there was quite a scrim.

4   Q.   How did those come about?

5   A.   Well, after the *Times* story, which was published October

6   12, there were a bunch of reporters sitting outside my

7   apartment building, and one of them who managed to get past the

8   doormen -- they were very protective of me, but one of them got

9   past the doorman and it happened to be the booker for Anderson

10  Cooper.  Well, since it had been Anderson Cooper who had asked

11  Trump the question during the debate that he had had with

12  Hillary, which Trump denied that he had ever, ever groped or

13  been inappropriate to a woman, that so infuriated me that I

14  agreed to be on his show.

15  Q.   You mentioned a *New York Times* story.  What was *The New*

16  *York Times* story?

17  A.   Well, after the debate where Trump denied that he had

18  had -- been aggressive towards any woman, I was so angry that I

19  didn't sleep well, and the next morning I woke up and I opened

20  my door and there was my *New York Times* sitting at the door,

21  and I picked it up and I said, I know what I'll do?  I'll write

22  a letter to the editor.  I'll tell my story in that letter.

23  And I sat down and I wrote a letter and I didn't proofread it,

24  I didn't -- I just sent it off.  And then I went out and I came

25  back and my phone was ringing, I picked it up and this lady

1   introduced herself as Megan Twohey from *The New York Times*, and

2   she said very kindly, we can't print your letter, but I would

3   like to send over a reporter and you can tell your story to

4   him.

5           So, sure enough, a reporter showed up.  We talked for

6   most of the day.  And then they said, well, we would like to

7   take some pictures.  Okay.  So they came with a photographer

8   and they took some pictures.  And then they said, we would like

9   to do a video.  Okay.  So we did a video.

10          And the video came out on a Wednesday, and then it was

11  Thursday morning that they printed my story.  It -- I don't

12  know if you have ever had the experience of picking up a

13  newspaper and seeing your face on the front page.  It was, wow,

14  I was amazed.

15  Q.  I want to show you what's been marked for identification as

16  Plaintiff's Exhibit 26.

17          MR. FERRARA:  May I approach the witness, your Honor?

18          THE COURT:  Yes.

19  Q.  Do you recognize that?

20  A.  Yes.

21  Q.  What is that?

22  A.  This is the debate that he --

23  Q.  Is -- I'm sorry to cut you off.

24  A.  This is the debate where Anderson Cooper asked him if he

25  had harassed a woman physically.

N522Car2                      Leeds – Direct

1   Q.  So just to back up two beats, is that a DVD?

2   A.  Yes.

3   Q.  And how do you know that what you just described is on the

4   DVD?

5   A.  My signature is on it and the date.

6   Q.  Were you able to view it before testifying?

7   A.  Yes.

8           MR. FERRARA:  Your Honor, plaintiffs offer 26.

9           MR. TACOPINA:  Objection.

10          THE COURT:  What's the objection?

11          MR. TACOPINA:  Relevance.  We're going to offer a

12  presidential debate into evidence for the jury to see a

13  presidential debate?  She testified she watched it.  She can

14  talk about her reactions to it.  But offering the debate into

15  evidence --

16          THE COURT:  Is it an excerpt or is it a larger?

17          MR. FERRARA:  It is an excerpt, your Honor, which is

18  the point that Ms. Leeds was just making that she saw.

19          THE COURT:  How long is the excerpt?

20          MR. FERRARA:  Maybe a minute 45 seconds?

21          (Video played)

22          THE COURT:  Hold it.

23          MR. FERRARA:  Your Honor, if it would be helpful, I

24  was going to show, just for the witness, Plaintiff's 26T which

25  is a transcript which we could look at to get a sense of the

```
 1    length.

 2              THE COURT:  Okay.

 3              MR. FERRARA:  So 2 minutes 27 seconds.  I was off by a

 4    minute.

 5              MR. TACOPINA:  Is there some more?

 6              MR. FERRARA:  Yes.  We can scroll down, Mr. Lam.

 7    Thank you so much.

 8              THE COURT:  All right, Mr. Tacopina now tell me the

 9    objection.

10              MR. TACOPINA:  What's that, your Honor?

11              THE COURT:  Now tell me the objection.

12              MR. TACOPINA:  I'm just reading the last part.

13              THE COURT:  Take your time.

14              MR. FERRARA:  Sorry, Mr. Lam, could we -- thank you so

15    much.

16              THE COURT:  And remind me, Mr. Ferrara, did I rule on

17    this pretrial?

18              MR. FERRARA:  I don't believe there has been a motion

19    on this.

20              (Counsel confer)

21              MR. TACOPINA:  Just that snippet, we have no objection

22    to just that snippet being played.

23              THE COURT:  Plaintiff's 26 is received.

24              MR. TACOPINA:  Limited to just that portion that was

25    on the screen.
```

1          THE COURT:  I don't know what that means.

2          MR. TACOPINA:  Well --

3          MR. FERRARA:  That's all that's on the disk, your

4    Honor.

5          THE COURT:  Okay.  So 26 and the transcript 26T are

6    both received.

7          Members of the jury, as to the transcript, I say the

8    same thing I have said to you before.  That's to help you

9    listen to the video.  It's the video that controls.  Okay.

10   Let's go.

11         MR. FERRARA:  Thank you.

12         Mr. Lam, if we could play Plaintiff's 26.

13         (Plaintiff's Exhibit 26, 26T received in evidence)

14         (Video played)

15         MR. FERRARA:  Thank you, Mr. Lam.

16   BY MR. FERRARA:

17   Q.  Ms. Leeds, did you watch that debate live?

18   A.  Yes.

19   Q.  What was your reaction?

20   A.  I was furious.

21   Q.  Why?

22   A.  Because he was lying.

23   Q.  How did you know?

24   A.  The experience I had with him, stories I had heard from

25   other people.

1            MR. TACOPINA:  Objection, your Honor.

2            THE COURT:  Strike stories she heard from other

3     people.

4     BY MR. FERRARA:

5     Q.  I'll ask another question, Ms. Leeds.

6            Let me ask a few questions about -- just to finish

7     this idea of media appearances.  Do you recall sitting here

8     today other -- I think you mentioned Anderson Cooper and *The*

9     *New York Times*.  Any other media appearances that you recall?

10    A.  There were -- there seemed to be a lot of interest, which I

11    found very surprising.  There was foreign press, there was a

12    group even from Japan and France, and a couple more appearances

13    on CNN and MSNBC.

14    Q.  Were you compensated for any of those appearances?

15    A.  No.

16    Q.  Why did you do them?

17    A.  Well, first of all, it would never occur to me to be paid,

18    that this was a financial kind of thing.  This was something I

19    felt that I wanted to tell people so that they could make an

20    informed decision.

21    Q.  What public response did you experience after you spoke

22    publicly about what Mr. Trump had done to you?

23    A.  Well, my kids would not let me listen to any messages on my

24    phone message machine.  I do not have a social presence.  I

25    don't do Facebook.  I don't do any of that.  What I experienced

1   was the phenomena of people saying to me, Thank you very much,

2   and you are so brave, and that basically continues to this day.

3   Q.  Do you recall -- I want to ask you a few questions about

4   how, if at all, Mr. Trump responded.  Do you recall when the

5   *New York Times* ran your story?

6   A.  Well, right after the debate.  It was the week after the

7   debate.  I think it was October 12.

8   Q.  Of 2016?

9   A.  Of 2016.

10  Q.  Do you know whether Mr. Trump ever responded?

11  A.  I heard that during a rally -- not a rally, but one of his

12  appearances right after that that he said something about that

13  he acknowledged that somebody on an airplane was making a claim

14  against him, but look at her, I would never make a pass at her,

15  which was a reflection of the fact that he is now looking at

16  a -- well, then, 76-year-old woman as opposed to a 38-year-old

17  woman.

18          MR. FERRARA:  May I approach, your Honor?

19          THE COURT:  How much longer do you expect to be on

20  direct?

21          MR. FERRARA:  Maybe ten more minutes, your Honor.

22          THE COURT:  Lunch break.  2:00, folks.

23          (Luncheon recess)

24

25

1                    A F T E R N O O N   S E S S I O N

2                              2:00 p.m.

3            THE COURT:  Bring in the jury.

4            MR. TACOPINA:  Your Honor, there is going to be an

5    issue coming up that I should have fronted earlier but it is an

6    objection to something they're going to be putting in.  Is it

7    possible to have a side bar once they're seated?

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N525car3                          Leeds – Direct

1          (Jury present)

2          THE COURT:  Members of the jury, while you were

3   walking in the lawyers told me they need to seed me at side

4   bar.  Please bear with us for a minute.

5          (Continued next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          MR. TACOPINA:  First of all, thank you for not ratting

3   me out to the jury that it was me.  You said "lawyers" in a

4   very generic tone and so I appreciate that.

5          Mr. Ferrara had just mentioned something they wanted

6   to introduce -- and it will actually cover two witnesses, it

7   will save the objection for the next witness -- basically it is

8   denials by Trump to the claim that Ms. Leeds is making, and

9   then tomorrow it will be the same thing, the claim that

10  Ms. Stoynoff is making.  And I said, my objection is it is

11  not -- there is no defamation claim against them, they want to

12  put it in for modus operandi evidence.

13         THE COURT:  I don't understand.

14         MR. TACOPINA:  OK.  They intend on introducing

15  evidence by way of video -- I think?

16         MR. FERRARA:  Correct.

17         MR. TACOPINA:  -- where Donald Trump will say this

18  lady on the airplane is not telling the truth, sum and

19  substance.  Same thing tomorrow.

20         THE COURT:  Well, didn't we already get that this

21  morning?

22         MR. FERRARA:  We have -- this morning we had Ms. Leeds

23  testified to Donald Trump responding to her allegations, she

24  was aware of this campaign speech.  I would like to play the

25  campaign speech.  Our -- it is not hearsay.  Our theory of

1   relevance is that just that when -- essentially, when Donald

2   Trump assaults a woman and she comes forward, he denies it and

3   then he says that she is too ugly to sexually assault.  And he

4   has done it with Ms. Carroll, we are going to prove he did it

5   with Ms. Leeds, and we are going to prove he did it with

6   Ms. Stoynoff.  So that is essentially the modus operandi.

7            MR. TACOPINA:  It is sort of a bootstrapping argument.

8            THE COURT:  It is looping.

9            MR. TACOPINA:  I never should have used the word that

10  in that letter, but yes, it assumes that an assault happened

11  and I think that is still an issue that is up in the air for

12  the jury.  So, he said, When he assaults someone, he denies it.

13  Well, maybe he didn't assault someone and denies it.

14           THE COURT:  Well, the evidence he is proposing to

15  offer is not evidence as to whether or not it happened except

16  to the extent that Trump says it didn't.

17           MR. TACOPINA:  Yeah.

18           THE COURT:  They're not offering it for the truth of

19  Trump's statement, they're offering it for the fact that he

20  said it.

21           MR. TACOPINA:  I understand.  Just -- they have, on

22  the record, that she heard that Trump denied it.  I don't think

23  they should be able to play his speech denying it and, you

24  know, whatever he says about it directly.  I mean, I think

25  that's in evidence and, again, there is no defamation claim

N525car3                              Leeds – Direct

1   here.

2           THE COURT:  And you are agreeing it is not hearsay, it

3   is in evidence, it is stipulated.

4           MR. TACOPINA:  It's stipulated?

5           THE COURT:  Well, I am asking you.

6           MR. TACOPINA:  What she testified to, she testified to

7   without objection.

8           THE COURT:  That's not what I am asking you.

9           MR. TACOPINA:  OK.  What are you asking me?

10          THE COURT:  I am asking you whether you are prepared

11  to stipulate that Trump denied it publicly.

12          MR. FERRARA:  Your Honor, respectfully, that would not

13  go to our --

14          MR. TACOPINA:  Sure.

15          MR. FERRARA:  That does not go the whole way towards

16  what we are trying to do.

17          Donald Trump denied -- forcefully denied Ms. Carroll's

18  allegations.

19          THE COURT:  Right.

20          MR. FERRARA:  What we want to show is that there are

21  two other credible sexual assaults that he committed, or

22  assaults that he committed, and that he did the exact -- he

23  denied them in the exact same way which undercuts --

24          THE COURT:  The exact same way how?

25          MR. FERRARA:  He is going to say, *This is crazy.*  With

N525car3                          Leeds - Direct

1   respect to Ms. Leeds there is a suggestion that it is a

2   democratic, some conspiracy to bring him down, and he is going

3   to say, *Look at her, she's not my type*, etc.  And I don't

4   remember the exact words but it is similar with Ms. Stoynoff.

5   And so, the idea is it undercuts his denial of Ms. Carroll

6   because he is doing it the same way multiple times.

7            THE COURT:  I will allow it.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N525car3                          Leeds - Direct

1              (In open court)

2              THE COURT:  OK, Ms. Leeds.  You are still under oath.

3              Mr. Ferrara, you may proceed.

4              MR. FERRARA:  Waiting for the court reporter, your

5    Honor.

6              THE COURT:  Always a good idea.

7    BY MR. FERRARA:

8    Q.  Ms. Leeds, before we took a break you were testifying about

9    Mr. Trump's response to you speaking publicly and I wanted

10   to -- your Honor, if I may approach -- I want to show you

11   what's been marked for identification as Plaintiff's Exhibit

12   31.  Do you recognize that?

13   A.  Yes.

14   Q.  What is that?

15   A.  It's a disk of the rally that Trump spoke at.

16   Q.  Let me -- and is this the -- how do you know?

17   A.  I remember seeing it when he had a rally and it was

18   reported to me that he had made some remarks about me being

19   somebody on an airplane.

20   Q.  I asked you a bad question.  I apologize.

21             I just meant is that a DVD you have had the

22   opportunity to review before?

23   A.  Yes.

24   Q.  And how do you recognize it?

25   A.  I have my signature on it, and date.

1    Q.  Let me also show you what's been marked for identification

2    as Plaintiff's Exhibit 31T-like-tango.  Ms. Leeds, before you

3    testified, did you have an opportunity to look at this

4    transcript while you followed along with the video on

5    Plaintiff's Exhibit 31?

6    A.  Yes.

7    Q.  Does this transcript fairly and accurately depict what was

8    said on that, in that video?

9    A.  Yes.

10            MR. FERRARA:  Your Honor, plaintiffs offer 31 and 31T.

11            THE COURT:  They are received.

12            (Plaintiff's Exhibits 31 and 31T received in evidence)

13            THE COURT:  Ladies and gentlemen, same instructions

14   about the transcript I have given previously.

15            MR. FERRARA:  I will just, your Honor, approach, and

16   retrieve that exhibit.

17            Thank you, Ms. Leeds.

18            Mr. Lam, if we could bring up 31 for the -- thank you,

19   and play this exhibit?  Thank you.

20            (Video played)

21            MR. FERRARA:  We can take that down, Mr. Lam.  Thank

22   you.

23   Q.  Ms. Leeds, who do you understand Mr. Trump to be referring

24   to?

25   A.  I believe I was the only person who had this story so I

N525car3                         Leeds - Direct

1  thought it was me.

2  Q.  What did you understand him to mean when he said you would

3  not be his first choice?

4  A.  This is why I gave the Times a picture of me at the time

5  that I would have met Trump, so that -- because I knew he could

6  not imagine making a pass at a 78-year-old woman.

7  Q.  I want to ask -- change topics for a moment, Ms. Leeds.  I

8  want to ask a few more questions about your sort of political

9  views.  Do you consider yourself politically active?

10  A.  Yes.

11  Q.  In what ways?

12  A.  Well, since my grandmother was a suffragette I vote in

13  every election whether I know the issues or not.  I contribute

14  some to candidates that I like.  And, yes, I try to watch it

15  and read and educate myself on the issues.

16  Q.  Are you registered with a political party?

17  A.  Yes, I am.

18  Q.  Which one?

19  A.  Democratic.

20  Q.  Can you give us a sense of which candidates or, you know,

21  you recall contributing to?

22  A.  Well, I contributed to Raphael Warnock in Atlanta in

23  Georgia, and to Stacey Abrams.  I contributed to whoever was

24  running against Susan Collins and I don't remember her name.

25  Locally, in North Carolina, I have contributed to several

1   candidates there.

2   Q.  Have you ever contributed to Hilary Clinton?

3   A.  No, I never did.

4   Q.  Do you recall ever testifying about wanting a button or

5   getting a button from her?

6   A.  Oh yeah, because my daughter is quite involved with

7   politics in North Carolina, yes.  I have gotten buttons.  We

8   voted.

9   Q.  How much did you have to give --

10  A.  They just gave them out, there was no cost.

11  Q.  Have you ever donated to a republican candidate?

12  A.  No.

13  Q.  Are you familiar with the plaintiff in this matter, E. Jean

14  Carroll?

15  A.  She contacted me about an article she was writing several

16  years after -- after that election.

17  Q.  Had you met Ms. Carroll before?

18          THE COURT:  I'm sorry.  Which election?

19  A.  The Trump-Clinton election, so while Trump was president.

20  Q.  Had the two of you met?

21  A.  Only on Zoom.

22  Q.  Do you recall when that was?

23  A.  Well, I had moved to North Carolina in 2019 so it was, I

24  think, in the summertime of 2019.

25  Q.  Are you familiar with her allegations in this matter?

```
 1   A.  I think at that time that I was aware that she had written
 2   a book, and yes.
 3   Q.  How would you describe your relationship with Ms. Carroll
 4   today?
 5   A.  An acquaintance but not a friend.
 6   Q.  Before I sit down, did you ever encounter Mr. Trump again
 7   after he assaulted you on the plane?
 8   A.  As a matter of fact, yes, I did.
 9   Q.  When was that?
10   A.  Well, when I first got to New York in '81 I got a job at
11   the Humane Society of New York on 59th Street, and they were
12   holding a fundraiser, a gala, at Saks Fifth Avenue, for all of
13   their designers, and I was asked to man the table that
14   distributed the table number for each guest.  And I had a nice
15   dress and so there I was, on what I considered just a New York
16   event evening at Saks Fifth Avenue, and everybody was dressed
17   up to the nines.  And I got to meet Bill Blass, and Geoffrey
18   Beene, and Donna Karan, and even Gloria Vanderbilt and a whole
19   bunch of designers.  And while I was handing out the table
20   chips, Trump and his very, very pregnant wife Ivana, came up to
21   the table.  And I looked at him and I thought, boy, I remember
22   you.  I didn't say anything but it went through my head.  And
23   as he took the chip from my hand he looked at me and he said, *I*
24   *remember you.  You're that cunt from the airplane*.  Well, it
25   was like a bucket of cold water had been thrown over my head.
```

N525car3                          Leeds - Cross

1   It was like suddenly a crowded room became empty and I was

2   standing there all by myself.  He took the chip, he walked

3   away.  Very shortly after that I gathered my stuff and I went

4   home.  And that's where I -- that's -- that was my last

5   dealings with Mr. Trump.

6              MR. FERRARA:  Can I have one moment, your Honor?

7              (Counsel conferring)

8              MR. FERRARA:  Nothing further.

9              THE COURT:  All right.  Cross-examination.

10             MR. TACOPINA:  Thank you, your Honor.

11             THE COURT:  Mr. Tacopina.

12  CROSS-EXAMINATION

13  BY MR. TACOPINA:

14  Q.  Ms. Leeds, good afternoon.

15  A.  Good afternoon.

16  Q.  You just testified you are a registered democrat?

17  A.  Correct.

18  Q.  Very passionate about politics?

19  A.  Yes.

20  Q.  And you didn't tell anyone about supposedly being assaulted

21  by Donald Trump for almost 40 years, not a single person;

22  correct?

23  A.  Correct.

24  Q.  And you held it in for those 40 years until he was running

25  for president?

N525car3                          Leeds - Cross

1    A.  Correct.

2    Q.  And in the years prior to 2016 you had watched Donald Trump

3    in the news and you knew that he was previously talking about

4    running for president?

5    A.  Correct.

6    Q.  You didn't take him seriously at first?

7    A.  Correct.

8    Q.  It was only when it became apparent to you that he was

9    actually running for president did you start telling your

10   story?

11   A.  That is correct.

12   Q.  And it was only then when you saw Donald Trump was

13   seriously running for president that you started telling

14   stories about him to anyone who would be patient and listen?

15   A.  Correct.

16   Q.  And that would include your book club?

17   A.  Correct.

18   Q.  Neighbors?

19   A.  Yes.

20   Q.  Your son?

21   A.  Yes.

22   Q.  Who is a republican, by the way?

23   A.  Who is a republican.

24   Q.  You guys still talk to each other?

25   A.  Absolutely.

N525car3                          Leeds - Cross

1   Q.  And you watched the debate, I think we saw a little snippet

2   of it --

3   A.  Yes.

4   Q.  -- with Ms. Clinton in 2016?

5   A.  Yes.

6   Q.  And you watched with a neighbor who was also passionate

7   about politics?

8   A.  That is correct.

9   Q.  And suffice it to say, you didn't like Donald Trump's

10  behavior or mannerisms in the debate?

11  A.  Even watching it today it infuriates me.

12  Q.  And, in fact, you and your neighbor were very angry, to use

13  your words I think you said, *What an asshole that man is.*

14  A.  Correct.

15  Q.  And you were so angry during the debate that you were

16  jumping up and down in front of your TV?

17  A.  That is correct.

18  Q.  And you were so angry during that debate you were later

19  tossing and turning and didn't even sleep that night?

20  A.  That is correct.

21  Q.  So following the debate, the following morning, you decided

22  to write that letter to the editor of the New York Times about

23  your story involving Donald Trump?

24  A.  Correct.

25  Q.  And I think you said you sent it out so hastily you didn't

N525car3                          Leeds - Cross

1    even proofread it?

2    A.  Correct.

3    Q.  And you got that immediate response that you told about,

4    from Ms. Twohey --

5    A.  Correct.

6    Q.  -- from the Times?

7           And that's how your story went public?

8    A.  Correct.

9    Q.  Now, you went public with your story in October 2016, a

10   month before the election?

11   A.  Correct.

12   Q.  And you did an interview with NPR about your story?

13   A.  Correct.

14   Q.  And in the interview with NPR you said you had great

15   difficulty thinking Donald Trump might be president for the

16   next four years?

17   A.  Correct.

18   Q.  You did an interview with the New York Times as well, or I

19   think that was part and parcel to your initial story coming

20   out; right?

21   A.  Correct.

22   Q.  And you told them that telling your story you were hoping

23   that that would make a difference in the election.

24   A.  Correct.

25   Q.  Hoping it would obviously influence the election against

1   Donald Trump?

2   A.  Correct.

3   Q.  And then you went on CNN and spoke with Anderson Cooper?

4   A.  Correct.

5   Q.  And that was October 13th, 2016?

6   A.  Yes.

7   Q.  And the very next day you gave that interview with NPR on

8   October 14th, with Audie Cornish?

9   A.  Correct.

10  Q.  And again, in order to tell your story about Donald Trump?

11  A.  Correct.

12  Q.  Even after Donald Trump was elected, during his presidency,

13  you hoped the story would lead to a congressional investigation

14  of him?

15  A.  Not that I recall saying.

16  Q.  OK.  You don't remember saying in your NPR interview, the

17  one entitled -- not NPR.  Actually, you did another interview,

18  *Democracy Now!*?

19  A.  Yes.

20  Q.  And do you recall in the *Democracy Now!*, that was with Amy

21  Goodman?

22  A.  Correct.

23  Q.  Do you recall saying that you were now calling for a

24  congressional investigation of Mr. Trump?

25  A.  I don't think I said I was calling.  I don't remember it

1    that well.  I do -- would think that I would wish that there

2    would be some sort of hearing on him.

3              MR. TACOPINA:  OK.  Do we have that clip ready to go?

4    Do we?  Before that I'm going to direct counsel's attention to

5    the transcript -- does the Court have one too?

6              MR. DeOREO:  No.  I can hand one up.

7              MR. TACOPINA:  Please do.

8              Mike, do you have the transcript?

9              (Counsel conferring)

10   BY MR. TACOPINA:

11   Q.  Ms. Leeds, were you looking for your story to have it --

12   let me withdraw that last question and let me ask you this.

13             Were you looking for your story to have an impact on

14   Donald Trump's presidency?

15   A.  That would be far beyond my expectations.

16   Q.  OK.

17             Would it be fair to say that as you sit here today you

18   certainly don't want to see Donald Trump regain the presidency?

19   A.  True.

20   Q.  OK.

21             Now, let's just talk about your story on the airplane,

22   Ms. Leeds.  Just a few minutes ago I think -- and after

23   watching the video of the denial by Donald Trump where at the

24   end he said it wouldn't be my first choice --

25             THE COURT:  I'm sorry.  Can we get to a question,

1  please?

2          MR. TACOPINA:  I'm creating a context, your Honor.

3          THE COURT:  Let's get to the question.

4  BY MR. TACOPINA:

5  Q.  Here is the question.  You used the words, in response to

6  that, *You couldn't imagine him making a pass at a 78-year-old*

7  *woman.*  Do you remember saying that?

8  A.  Yes.

9  Q.  So what he did to you on the plane, was that a pass?

10 A.  No.

11 Q.  Why did you use the words, *You couldn't imagine him making*

12 *a pass at a 78-year-old woman*?

13 A.  Well, to talk about a physical confrontation is not easy

14 and it's more common for men to make passes, which are more

15 benign, so it's a matter of relegating him, putting it down a

16 little notch.

17 Q.  OK, but you are testifying here about what you claim was an

18 assault by Donald Trump in front of this jury.

19 A.  That's true.

20 Q.  OK.

21          And you subsequently called it a pass to put it down a

22 notch?

23 A.  Yes.

24 Q.  So you think this took place in 1979, this airplane

25 incident?

N525car3                         Leeds – Cross

1    A.  I believe so.

2    Q.  Can you give us an exact date so we can check Mr. Trump's

3    records or the airline records?

4    A.  No.  I really can't.  It's too far.

5    Q.  And your story, you were on an airplane flying into

6    LaGuardia Airport in Queens?

7    A.  Correct.

8    Q.  And you don't recall exactly where it was coming from, one

9    or two potential locations; right?

10   A.  Correct.

11   Q.  And a flight attendant asked you if you would like to move

12   to first class from coach and you gladly accepted?

13   A.  Yes.

14   Q.  And you were seated next to a man who was sitting against

15   the window?

16   A.  Correct.

17   Q.  So you had the aisle seat?

18   A.  Correct.

19   Q.  And it's your story that the man shook your hand and

20   introduced himself as Donald Trump?

21   A.  Correct.

22   Q.  Did you introduce yourself to him as well as Jessica Leeds?

23   A.  Yup.

24   Q.  And at the time you had no idea who Donald Trump was?

25   A.  That's true.

1    Q.  As far as you know he was some random guy sitting next to

2    you on a plane?

3    A.  He was some random guy setting next to me on a plane.

4    Q.  After your introductions you both had your meals on the

5    plane?

6    A.  Correct.

7    Q.  And while you were eating you didn't speak to one another?

8    A.  I don't recall any conversation that went while we were

9    eating, no.

10   Q.  OK.  Other than, *Hi, I'm Donald Trump*, and, *Hi, I'm Jessica*

11   *Leeds*, you don't recall any words exchanged between the two of

12   you, do you?

13   A.  I know we chatted but I don't remember what we chatted

14   about.

15   Q.  OK.

16           To be clear, this was a commercial plane with other

17   passengers on it?

18   A.  Yes.

19   Q.  And it is your story that after you were done eating, the

20   flight attendant cleared your tray tables and this man suddenly

21   attacked you?

22   A.  Correct.

23   Q.  It is your story this man grabbed you with his hands, tried

24   to kiss you, grabbed your breasts, and pulled you towards him?

25   A.  Correct.

1  Q.  And pulled himself onto you?

2  A.  It's not -- no, not onto me but he was leaning-in to me,

3  pushing me against the back of the seat.

4  Q.  OK.  And then according to you he, at one point, put his

5  hand on your knee?

6  A.  He started putting his hand up my skirt.

7  Q.  OK, on your leg and up your skirt?

8  A.  Correct.

9  Q.  And that's when -- and is that the story, the complete

10 story of the interaction you described as kind of a struggle?

11 A.  Yeah.

12 Q.  And you said that, at trial, that the incident probably

13 lasted just a few seconds?

14 A.  Probably.

15 Q.  Now, of course I think you also testified that you went on

16 Anderson Cooper and said that the struggle went on for 15

17 minutes?

18 A.  Yeah.

19 Q.  And Anderson Cooper said, *Gee, that was a long time*,

20 correct?

21 A.  He was correct, that is a long time.  And it did not go on

22 for 15 minutes.

23 Q.  So when you initially came public with the story your

24 rendition was this assault lasted 15 minutes?

25 A.  I was never asked how long it went on so I never put a time

N525car3                          Leeds - Cross

1    frame on it until Anderson Cooper asked me.  It never occurred
2    to me to think it was any longer.  It was kind of just coming
3    out with a number.
4    Q.  So when you said 15 minutes, that was just your guess at
5    that moment?
6    A.  That is correct.
7    Q.  And during the struggle you described you don't ever
8    recalling telling the man to stop, or say no, or anything like
9    that?
10   A.  I don't think there was a word exchanged between us.
11   Q.  OK.
12           And when you say between us, that would also
13   include -- you answered my next question -- the man didn't say
14   anything to you either?
15   A.  Correct.
16   Q.  You describe the alleged interaction as a silent pantomime?
17   A.  Yes.
18   Q.  And it is your story that your seat was juggling while you
19   were engaged in the struggle?
20   A.  Yes.
21   Q.  And, according to you, the struggle was seen by another
22   passenger right across the aisle from you?
23   A.  That is correct.
24   Q.  Because you were exposed, so to speak, in the sense that
25   you were in the aisle seat?

N525car3                              Leeds - Cross

1   A.  Correct.

2   Q.  It is your testimony that the passenger never said anything

3   or came to your aid?

4   A.  Correct.

5   Q.  Likewise, no flight attendant said anything or came to your

6   aid?

7   A.  Correct.

8   Q.  And according to you, you realize that no one was going to

9   help you?

10  A.  Correct.

11  Q.  And I think you said at trial, on direct testimony, it

12  never occurred to you to ask for help or ring the stewardess

13  bell or anything like that?

14  A.  I don't think I could have reached the stewardess bell.  I

15  was busy.

16  Q.  You said it never occurred to you to call out for help?

17  A.  No.  I made no noise, no, I don't recall any noise.  I

18  don't remember asking, even when I got up, saying anything.  I

19  know what went through my head, but I don't know if I said it.

20  Q.  And that's at that point when this man's hand, according to

21  you, started going up your skirt, you said I don't need this

22  and you got up?

23  A.  Yes.

24  Q.  And it is your story, as you told the New York Times, if

25  the man had just stuck with the upper part of your body, you

1  might not have gotten that upset?

2  A.  True.

3  Q.  So, according to you, it was only when he eventually

4  started bringing his hands towards your knee and up your thigh

5  that you said I don't need any more of this and got up?

6          THE COURT:  Sustained.

7  A.  Yes.

8          THE COURT:  The word knee has come only from your

9  lips, Mr. Tacopina.

10          MR. TACOPINA:  The word knee?

11          THE COURT:  Yes.

12  BY MR. TACOPINA:

13  Q.  So, according to you, it is only when he eventually started

14  putting his hands up your skirt that you said I don't need

15  this, and got up?

16  A.  Yes.

17  Q.  And to do that -- you were in the aisle -- you basically

18  had to get out of your chair and leave, right?

19  A.  I had to wiggle my way out.  I had to exert a certain

20  amount of force that up until that moment I didn't think I had.

21  Q.  OK.  When you got up out of your chair, was he grabbing at

22  you?

23  A.  Yes.

24  Q.  To bring you back?

25  A.  Yes.

N525car3                              Leeds - Cross

1   Q.  So he was standing up at this point and lunging for you?

2   A.  Yup.

3   Q.  From the window seat into the aisle?

4   A.  Yes.

5   Q.  And no one said a word?

6   A.  No one.

7   Q.  Including you?

8   A.  Including me.

9   Q.  Give me one second, please.

10          Once you got back to your seat you didn't say anything

11  to the other passenger that you were sitting next to to

12  describe what had just happened?

13  A.  No.

14  Q.  You didn't say anything to the flight attendant in the back

15  of the plane?

16  A.  No.

17  Q.  And it is your story that you didn't say anything to anyone

18  about this when you returned to your seat at all?

19  A.  At all.

20  Q.  And even after the plane landed, you didn't say anything

21  about it to the airline personnel?

22  A.  No.

23  Q.  I think you said, on direct testimony, it didn't occur you

24  to report it to the airline?

25  A.  That is correct.

N525car3                           Leeds - Cross

1   Q.  You didn't say anything about that to your family?

2   A.  No.

3   Q.  You didn't say anything about it to your friends?

4   A.  No.

5   Q.  Of course, at that time you didn't know who that man was?

6   A.  I knew he was Donald Trump.

7   Q.  Based on his introduction?

8   A.  Correct.

9   Q.  So, did you remember his name over the last 40 years?

10  A.  Yes.

11  Q.  So, ever since he introduced himself you remembered his

12  name?

13  A.  Correct.

14  Q.  So, when you got back to wherever home was at the time, I

15  think Connecticut maybe?

16  A.  Correct.

17  Q.  Did you try and find out who Donald Trump was?

18  A.  No.

19  Q.  When is the next time you heard that name?

20  A.  When I moved to New York in '81.

21  Q.  In '81.  OK.

22          In '79 you were working as a sales person for that

23  paper company, I think Bowater?

24  A.  Bowater, yes.

25  Q.  Bowater.

N525car3                              Leeds - Cross

1              And in that position you had to travel all over the

2     United States?

3     A.   Correct.

4     Q.   And you had traveled by air and you would experience flight

5     delays and airlines losing luggage and whatnot, correct?

6     A.   Correct.

7     Q.   And you consider those circumstances to be the rigors of

8     travel?

9     A.   Correct.

10    Q.   In addition to not saying anything to the other passenger

11    or the flight attendant or the airline personnel when you

12    landed, and your family, you also didn't say anything to your

13    co-workers?

14    A.   Correct.

15    Q.   And, likewise, you didn't mention it to your boss?  Your

16    superior?

17    A.   Correct.

18    Q.   And the reason you didn't say anything to your boss is

19    because you didn't want to explain about the -- to use your

20    words -- the rigors of travel?

21    A.   Correct.

22    Q.   So it is your testimony that getting sexually assaulted on

23    a plane is sort of just rigors of travel?

24    A.   Yes.

25    Q.   OK.

N525car3                              Leeds – Cross

1              Now, after this event, three years later you say you

2        were at a gala, I think it was the Humane Society gala?

3        A.   Yes; the Humane Society of New York.

4        Q.   And Donald Trump was there, you saw him there?

5        A.   Yes.

6        Q.   And he supported that society, you said?

7        A.   Yes.

8        Q.   And it was held at Saks Fifth Avenue?

9        A.   Correct.

10       Q.   And your task that evening was to distribute the people

11       their table assignments?

12       A.   Correct.

13       Q.   And you had a chance to meet a number of very famous people

14       there.  I think you rattled some off before?

15       A.   Yes.

16       Q.   And then you saw Donald Trump with his pregnant wife at the

17       time?

18       A.   Correct.

19       Q.   And they came up to you to get their table assignment.

20       They were together?

21       A.   Correct.

22       Q.   And it is your testimony that Donald Trump, standing there

23       next to his pregnant wife said to you, *I remember you.  You're*

24       *the cunt from the airplane*?

25       A.   Yes.

N525car3                          Leeds - Cross

1  Q.  Right in front of his pregnant wife?

2  A.  Correct.

3  Q.  And, according to you, not only was his pregnant wife

4  there, it was a crowded scene around that table as well?

5  A.  Correct.

6  Q.  And that was from a few-second interaction from the

7  airplane that he remembered you, apparently?

8  A.  Apparently.

9  Q.  Now, according to you when you were on that plane -- and

10  this is three years earlier?

11  A.  Correct.

12  Q.  You were wearing a brown tweed, single-breasted, very

13  corporate-looking business suit?

14  A.  Correct.

15  Q.  At the charity gala you were wearing what I think you

16  described as a spectacular yellow ball gown?

17  A.  Correct.

18  Q.  Soon after that flight you had discussed that you had cut

19  your hair from long to short?

20  A.  Correct.

21  Q.  So at this charity gala you had -- your hair was short

22  already at this point?

23  A.  Correct.

24  Q.  But even though your hair was short, not long, you were

25  dressed differently, a few years had passed, it is your

N525car3                          Leeds - Cross

1    testimony that Donald Trump remembered you from the plane?

2              MR. FERRARA:  Objection.  Argument.

3              THE COURT:  Sustained.

4    Q.  When Donald Trump made that comment to you, your hair was

5    different than it was on the plane; correct?

6    A.  Correct.

7    Q.  Your dress, obviously, was very different?

8    A.  Correct.

9    Q.  And the interaction on the plane was a few seconds?

10   A.  I sat with him for several hours before they served a meal.

11   Q.  Oh, several hours?

12   A.  Yes.

13   Q.  So, in that conversation did he ask you any personal

14   information about you?

15   A.  No more so than anybody else had a casual conversation.

16   Q.  OK.

17   A.  It was casual.

18   Q.  And you recall that you did an interview with *Democracy*

19   *Now!*, I guess.  What type of interview was that, *Democracy Now!*

20   Was that a video interview?

21   A.  No.  I went to their studio.

22   Q.  In studio.

23        You said that, to Democracy Now!, *We women remember in*

24   *exquisite detail when it happened, how it happened, where it*

25   *happened, how they got out of it, and how they got home.*

N525car3                          Leeds - Cross

1            Do you remember saying that?

2   A.  Yes, I do.

3   Q.  And it is your view that those details are remembered

4   regardless of how long ago it occurred?

5   A.  Yes.

6   Q.  In fact, you think those circumstances stay with an actual

7   victim of abuse with excruciatingly clear detail?

8   A.  Yes, I do.

9   Q.  OK.

10           In terms of when this supposed assault occurred, on

11  October 13th, 2016, you told Anderson Cooper during an

12  interview that it happened in '79 and that is still your best

13  estimate; correct?

14  A.  Correct.

15  Q.  You were interviewed, I think you mentioned, by Ms. Carroll

16  a few years back?

17  A.  Yes.

18  Q.  And you told her it was either -- you recall telling her it

19  was either 1979 or 1980?

20  A.  When asked, I was making a quick remembrance.

21  Q.  Just a few more things, Ms. Leeds.

22           With regard to your story about Donald Trump on the

23  commercial plane, is it fair to say you can't name one witness

24  who saw what happened to you?

25  A.  Absolutely not.

N525car3                          Leeds – Redirect

1    Q.  And not a single person can corroborate your story?

2    A.  That is correct.

3    Q.  And you testified earlier, we don't have to go through it

4    again, that you hadn't told anyone on the plane or thereafter?

5              THE COURT:  Let's not go through it again.

6              MR. TACOPINA:  I said we are not going to go through

7    it again, but.

8              THE COURT:  But you are going through it again, so

9    let's move on.

10             MR. TACOPINA:  OK.

11   BY MR. TACOPINA:

12   Q.  Ms. Leeds, this last thing.  You have no claim or cause of

13   action against Donald Trump in front of this jury; correct?

14   A.  Correct.

15   Q.  And you have never sued Donald Trump?

16   A.  Correct.

17   Q.  You never reported him to the police?

18   A.  Correct.

19             MR. TACOPINA:  Ms. Leeds, thank you for your time.

20             THE COURT:  Thank you, Mr. Tacopina.

21             Mr. Ferrara.

22             MR. FERRARA:  Thank you, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. FERRARA:

25   Q.  Ms. Leeds, fair to say you don't remember the date that

1    this, that Mr. Trump assaulted you on a plane?

2    A.  No.

3          THE COURT:  I'm sorry.  No, it is not fair to say

4    that?  Or no, you don't remember the date?

5          MR. FERRARA:  Sorry.

6          THE WITNESS:  I don't remember the date.

7          THE COURT:  Thank you.

8    BY MR. FERRARA:

9    Q.  Nevertheless, do you remember vividly every single thing

10   that happened during that encounter?

11   A.  Yes, I do.

12   Q.  Why didn't you tell your bosses what had happened?

13   A.  It was -- if I had gone in and complained about what had

14   happened, my feeling was that my boss would say to me, *Well,*

15   *that's really too bad.  How about lunch?*  I didn't think I

16   would get any sympathy.  I didn't want any sympathy.  I did

17   not -- I wanted this job, it was a good paying job.

18   Q.  So -- I didn't mean to interrupt you, Ms. Leeds.

19   A.  It just never occurred to me.  This was in the late '70s,

20   women didn't complain about situations in their workplace.

21   Q.  Can you help us understand why you would think of a sexual

22   assault like this as a rigor of travel?

23   A.  Most of the jobs that I held -- no, all of the jobs I held

24   over the years have been in male-dominated fields and the

25   banter between co-workers and myself, the men that I worked

1    with, was frequently sexual in nature.  And that was just part

2    of the workplace.

3             In traveling around the United States I was frequently

4    asked to go up to first class and I met with some men and it

5    was almost always 99 percent men in first class.  I would chat

6    with them and a lot of them would ask me to go to dinner or

7    would ask impertinent questions and it was just part of the

8    daily activity of the travel.

9    Q.  Why did you refer to what happened on the plane as

10   Mr. Trump making a pass at you?  Why did you use that word?

11   A.  Again, it's a matter of when you start talking about

12   somebody being physically aggressive.  It's hard, it's not easy

13   to think about it again, and the most usual behavior was a pass

14   and it was just instinctively trying to put it into a less

15   painful memory.

16   Q.  So, for clarity, do you consider what Donald Trump did on

17   the plane to be a pass?

18            MR. TACOPINA:  Objection to the leading.  She just

19   gave an answer to that question as well.

20            THE COURT:  Overruled.

21   Q.  You may answer, Ms. Leeds.

22   A.  Could you ask the question again?

23   Q.  Of course.

24            Do you consider what Donald Trump did on that plane to

25   have been a pass?

N525car3                          Leeds - Redirect

1   A.  No.

2   Q.  If you recall, do you remember why you cut your hair during

3   that period of time?

4   A.  Well, for the same reason I stopped wearing skirts; it was

5   trying to remove as much attention to my femininity as I could.

6   Q.  Why?

7   A.  I didn't want to draw attention to myself.

8   Q.  Ms. Leeds, are you making this up because you hate Donald

9   Trump?

10  A.  No, I am not making it up.

11  Q.  Would you walk into this courtroom and commit perjury for a

12  political reason?

13  A.  No.

14  Q.  Mr. Tacopina asked you about a statement you made about

15  wanting to share your story to make a difference in the

16  election.  Do you recall that question?

17  A.  Yes.

18  Q.  As part of that interview, did you also say that you wanted

19  to share your story to make a difference in society's view of

20  women?  Do you recall saying that?

21  A.  Yes.

22  Q.  To make a difference -- sorry -- to change some of the

23  behavior, the sexual behavior between men and women in both

24  directions?  Do you remember saying that?

25  A.  Yes.

N525car3                          Leeds - Redirect

1    Q.  Ms. Leeds, is there any doubt in your mind who assaulted

2    you on that plane?

3    A.  None.

4    Q.  Who was it?

5    A.  Donald Trump.

6    Q.  Why did you find it less upsetting when he had his hands

7    above your skirt than when they went into your skirt, when his

8    hand went into your skirt?

9    A.  That's sort of the demarcations -- I mean, people -- men --

10   would frequently pat you on the shoulder and grab you or

11   something like that and you just -- it is not serious and you

12   don't -- you don't -- but when somebody starts to put their

13   hand up your skirt, you know they're serious and this is not

14   good.

15   Q.  Did you invite any of the physical contact on that flight,

16   Ms. Leeds?

17   A.  I don't think I did.  I don't know what he perceived, I

18   don't know why he perceived that I was -- that I was available.

19   I personally thought he was just bored.  But, the fact remains

20   that he physically assaulted me.

21            MR. FERRARA:  Nothing further.

22            THE COURT:  Thank you.

23            Mr. Tacopina.

24            MR. TACOPINA:  Nothing, your Honor.

25            THE COURT:  Thank you, Ms. Leeds.  You are excused.

 1     Thank you very much.

 2               (Witness excused)

 3               Next witness.

 4               MS. CROWLEY:  The plaintiff calls Robert Salerno.

 5     ROBERT SALERNO,

 6          called as a witness by the Plaintiff,

 7          having been duly sworn, testified as follows:

 8               THE DEPUTY CLERK:  Please, be seated.  Sir, if you can

 9     please state your name and spell your last name for the record?

10               THE WITNESS:  My name is Robert Salerno.

11     S-A-L-E-R-N-O.

12               THE DEPUTY CLERK:  Thank you.

13               THE COURT:  You may proceed, Ms. Crowley.

14               MS. CROWLEY:  Thank you, your Honor.

15     DIRECT EXAMINATION

16     BY MS. CROWLEY:

17     Q.  Good afternoon, Mr. Salerno.

18     A.  Good afternoon.

19     Q.  Are you currently employed?

20     A.  No.

21     Q.  Are you retired?

22     A.  Yes.

23     Q.  What did you do before you retired?

24     A.  Going back from the beginning after graduating from grad

25     school, I went to work for Abraham & Strauss as a trainee,

1     worked my way up to become a buyer and went into the operating

2     side, then went to Coopers & Lybrand, which is now

3     Pricewaterhouse Coopers as their first retail consultant.

4     Spent a lot of time there.  Became a partner, practice leader,

5     and got tired of traveling six and a half days a week, and went

6     to Bergdorf Goodman as senior VP of admin for a few years.

7     Left that, and then became a kind of "hired CEO" for designers

8     and various businesses.  And, I have also taught at FIT, taught

9     retail management leadership.

10    Q.  What is FIT?

11    A.  Fashion Institute of Technology.

12    Q.  For those of us who may not be familiar with those names,

13    are those all within the retail industry?

14    A.  Abraham & Strauss was part of Federated, it is now owned by

15    Macy's, the enemy at the time.  Coopers & Lybrand is

16    Pricewaterhouse Coopers, that's a large accounting firm.

17    Q.  Now, focusing on the mid-1990s, where were you working

18    during that period?

19    A.  I was at Bergdorf Goodman.

20    Q.  What is Bergdorf Goodman?

21    A.  Bergdorf Goodman is a large luxury speciality store.

22    Q.  Mr. Salerno, you are testifying today in the case E. Jean

23    Carroll v. Donald Trump.  Have you ever met Ms. Carroll before?

24    A.  No.

25    Q.  Have you ever spoken with her?

N525car3                         Salerno - Direct

1   A.  No.

2   Q.  When was the first time that you heard her name?

3   A.  I don't know, maybe a year or so ago.  I'm not sure.

4   Q.  Have you ever met the defendant Donald Trump?

5   A.  No.

6   Q.  Have you ever seen him in person?

7   A.  Yes.

8   Q.  Where?

9   A.  In the store, in Bergdorf's.

10  Q.  We will come back to that in a few minutes, but first,

11  where is Bergdorf's located?

12  A.  The corner of 57th and Fifth Avenue.

13  Q.  I would like to show you what's been marked for

14  identification as Plaintiff's Exhibit 170.

15          MS. CROWLEY:  If we could put that on the screen,

16  Mr. Lam?

17  Q.  Do you recognize this, Mr. Salerno?

18  A.  Yes.

19  Q.  What is it?

20  A.  It looks like a map of midtown Manhattan.

21  Q.  Does this map accurately depict the area around 58th Street

22  and Fifth Avenue?

23  A.  Yes.

24          MS. CROWLEY:  Plaintiff offers Plaintiff's Exhibit

25  170.

1           MR. SIEGEL:  No objection.

2           THE COURT:  Received.

3           (Plaintiff's Exhibit 170 received in evidence)

4   BY MS. CROWLEY:

5   Q.  Do you see Bergdorf's on that map?

6           MS. CROWLEY:  Can you take that down?

7   Q.  Did you draw that?

8   A.  No.  I have no way.

9           MS. CROWLEY:  You can put the map up without --

10  Q.  Could you identify -- and I think you can actually draw on

11  the screen -- where you see Bergdorf Goodman?

12  A.  Use my finger?  OK.  Yes.  Here it is.

13  Q.  Is the --

14  A.  I drew it.

15          THE DEPUTY CLERK:  Is it there?

16          THE WITNESS:  Yes.

17          THE DEPUTY CLERK:  It is on his screen but not ours.

18          MS. CROWLEY:  Oh, it is?

19          Is it possible to display that to the jury, Mr. Lam?

20  Q.  We can come back to this.  Actually, you know what?  Let's

21  make this easier.  Could you just identify, using the cross

22  streets, where Bergdorf Goodman is on this map?

23  A.  Yes.  Bergdorf's is on the west side of Fifth Avenue

24  between 57th and 58th Street.

25  Q.  And do you see Trump Tower on this map?

N525car3                          Salerno - Direct

1   A.  Yes.

2   Q.  Can you describe where it is?

3   A.  Trump Tower is on Fifth Avenue on the east side, basically

4   on the corner of 56th and Fifth.

5   Q.  So, roughly across the street from Bergdorf?

6   A.  Roughly.  I could see it from my office.

7          MS. CROWLEY:  You can take this down, Mr. Lam.

8   Q.  When did you begin working at Bergdorf?

9   A.  It was sometime in '95.

10  Q.  What was your title when you started working there?

11  A.  I started there as a consultant and got hired as senior VP

12  of administration.

13  Q.  When did you get hired as senior VP?

14  A.  I think it was January.

15  Q.  Of which year?

16  A.  '96 it would have been.

17  Q.  What does it mean to be a senior VP of administration?

18  A.  The simplest way is I was responsible for everything that

19  wasn't creative, so I had under my responsibility

20  alterations -- alterations, store design and construction,

21  finance, systems, security, logistics, housekeeping.

22  Q.  You testified that that included overseeing security in the

23  store?

24  A.  Yup.  They reported to me.

25  Q.  How long were you in the role, this role, Mr. Salerno?

1  A.  About three years, I believe.

2  Q.  I would like to talk a little bit about Bergdorf's.  How

3  many floors, in this period in the mid-'90s, how many floors

4  did Bergdorf Goodman have?

5  A.  There is 10 floors, in total, going up; and then there is a

6  basement.

7  Q.  And how many of those floors were accessible to customers?

8  A.  Eight of them.

9  Q.  I'm sorry.  You said eight?

10  A.  Eight of them, yes.

11  Q.  Were all eight of those floors accessible by escalator?

12  A.  Yes.

13  Q.  During the time that you worked at Bergdorf, was the store

14  open every weekday?

15  A.  Yes.

16  Q.  What were the store hours on weekdays at the time?

17  A.  I believe it was 9:30 to about 6:00, and Thursday nights we

18  were open late, until about 8:00.

19  Q.  Why did the store stay open late on Thursday nights?

20  A.  I would like to say it was for people who came to buy their

21  clothes that they were going to use to go out on the weekends,

22  plus it is tradition in retail to be open on Thursday nights,

23  going way back, because that's when people got paid.  And

24  husbands and wives would go shopping for furniture or for

25  mattresses or a variety of things.  So, traditionally, stores

1   were open late on Thursdays.  In Bergdorf's case it was more --

2   since we didn't sell furniture, it was more for people who were

3   going out Friday night, or Saturday, or Sunday.

4   Q.  In the time that you worked at Bergdorf, did the store get

5   busy on occasion?

6   A.  Did the store -- generally -- well, depends on how you

7   define "busy."  For Bergdorf's, yeah, we would have busier

8   periods.

9   Q.  What do you mean by "for Bergdorf's, yeah"?

10  A.  Well, for Bergdorf's it wasn't -- Bergdorf's is not Macy's

11  or Saks.  We didn't have tons of people going through the door,

12  huge customer counts.  It was much more genteel, quieter.

13  Q.  Were certain seasons busier than others at Bergdorf?

14  A.  Yeah, fall, particularly September-October when the new

15  lines were launched; and then Christmas.

16  Q.  What about the spring?

17  A.  Spring was not that busy.

18  Q.  Which floors were generally the busiest?

19  A.  Well, the first floor, because it was accessible, and then

20  the fifth floor because we had a nice cafe up there.  And the

21  fifth floor was, I guess you would call it, relatively

22  moderate, for Bergdorf.

23  Q.  What about the sixth floor?

24  A.  Not very busy.

25  Q.  What about in the evenings?

N525car3                          Salerno - Direct

1    A.  Not very busy.

2    Q.  And what about on Thursday evenings?

3    A.  Well, Thursday evenings, other than maybe Christmastime,

4    Thursday evenings weren't that busy.

5    Q.  Now, you testified a minute ago that as part of your role

6    as VP of administration you oversaw the store security.  Did

7    Bergdorf's have security cameras at that time in the '90s,

8    mid-'90s?

9    A.  We only had a few.

10   Q.  And where were they located?

11   A.  I think it was the employee entrance, the loading dock.  We

12   might have had one in furs.  And we might have had fine

13   jewelry; I don't recall.

14   Q.  What floor was furs on?

15   A.  Two.

16   Q.  And what about fine jewelry?

17   A.  The main floor.

18   Q.  The main floor?

19   A.  Yes.

20   Q.  Were there security cameras on the sixth floor?

21   A.  I don't believe so.

22   Q.  How, if at all, were the security cameras monitored?

23   A.  Well, they really weren't.  They were just, if you think of

24   the technology back in the '90s, if anybody here remembers what

25   VCRs were -- videotapes -- that's kind of what we had, totally

1   unlike now.

2   Q.  And based on your knowledge as head of security, were these

3   videotapes -- the footage on these videotapes, maintained?

4   A.  Well, first of all, I wasn't head of security.  Security

5   reported to me.

6   Q.  I apologize.

7   A.  Let's be clear.  I think the tapes were maintained and they

8   might have been used if we had a case of taking somebody to

9   court, they might use it for evidence.  But it really wasn't a

10  big deal, totally unlike now.

11  Q.  How long were the videotapes maintained?

12  A.  I don't recall.  Not very long.  They didn't last long, the

13  quality wasn't very good.

14  Q.  And what happened after videotapes were no longer

15  maintained?

16  A.  They probably were destroyed or taped over.

17  Q.  What, if any security guards, were in Bergdorf in the

18  mid-'90s?

19  A.  We had perimeter door security, we had guards at the

20  loading dock and at the employee entrance, and we had two

21  undercover people that kind of floated through the store.

22  Q.  When you say "undercover" you mean they were not in

23  uniform?

24  A.  They were not in uniform.

25  Q.  And were there two uniformed guards on each floor or

1    through out the whole store?

2    A.   No.   There were two staff the whole time, we might just

3    have one on at any given time, and they floated around the

4    store.

5    Q.   In 1996, what floor was the lingerie section located on?

6    A.   I believe it was on the sixth floor.

7    Q.   And how big was the lingerie department?

8    A.   I don't recall the square footage, it wasn't that large.

9    Q.   To your knowledge, what percentage of the store's revenue

10   did it earn through lingerie sales?

11   A.   Oh, less than one percent.

12   Q.   I'm going to show you an exhibit that is in evidence now as

13   Plaintiff's Exhibit 22, and this is a construction blueprint of

14   the sixth floor of Bergdorf from 1995.  Is this blueprint

15   generally consistent with your recollection of the layout of

16   the store back in 1996, the layout of the sixth floor back in

17   1996?

18   A.   Yes.

19   Q.   Do you see the lingerie department in this blueprint?

20   A.   Yeah.  I believe it is called "Intimate," by the way.

21   Q.   And I think now you may be able to actually circle on the

22   screen.

23   A.   So, it is up here.

24   Q.   Indicating the upper left quadrant of the exhibit.

25                  Do you see where the lingerie fitting rooms are on

N525car3                         Salerno - Direct

1   this blueprint?

2   A.  Not quite sure.  They might be over on the side.

3   Q.  Can you describe the layout of the fitting rooms,

4   Mr. Salerno?

5   A.  Generally our fitting rooms, totally unlike what you would

6   see at The Gap or any other store, our fitting rooms tended to

7   be larger because the sale was actually closed in the fitting

8   room with the salesperson.  Now, with Intimate, it was less so.

9   With the designer floors it was more salesperson, the customer,

10  and occasionally a fitter, so you need a large enough room.

11  Every fitting room had -- was carpeted.  It was a comfortable

12  space.  You had places for customers to hang their bags, to

13  hang their coats, to put a bench to sit on.  Some of the finer

14  fitting rooms, like on the fourth floor, at that time we had

15  fax machines -- if you remember what fax machines were.  When I

16  went there Jackie Kennedy used to come in and have lunch and do

17  business, do her editing in the fitting room.

18          So it was more than just a place where you were

19  crammed in to try on clothes.

20  Q.  Focusing on the fitting rooms in the lingerie section, how

21  many people could fit inside?

22  A.  I don't recall offhand.  At least two.  I can't imagine

23  more than that.

24          MS. CROWLEY:  Mr. Lam, could you just zoom in on the

25  left side of the blueprint?

N525car3                         Salerno – Direct

1    Q.  Do you see the lingerie section a little bit more clearly,

2    Mr. Salerno?

3    A.  Yes, ma'am.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  What, if anything, do you recall about whether the fitting

2   room doors locked?

3   A.  Generally they had locks.  The salespeople had keys on

4   little elastic bands around their wrist.  But most of the time,

5   a lot of times, the doors were not locked.  They didn't -- they

6   kept them open, they propped them open.  So occasionally they

7   would be locked, sometimes not.  I would go through and close

8   them just because I'm anal like that.

9   Q.  And Mr. Lam, if we could just zoom out so we can see the

10  full sort of left-hand side of the screen.

11          Do you see the escalators in this blueprint,

12  Mr. Salerno?

13  A.  Yes, ma'am.

14  Q.  Could you circle them?

15  A.  They are in the center of the store.

16  Q.  Were the escalators open or were there walls around them?

17  A.  There were walls around them.  There were structural walls.

18  Q.  So when you were riding on the escalators, was it possible

19  to see the floor around you?

20  A.  Not to the left and right.  When you came down the

21  escalator, went up the escalator, you would see the floor area

22  in front of you.

23  Q.  Mr. Salerno, what role, if any, did you have in deciding

24  where different departments were located in the store?

25  A.  I was part of a group, a team.

```
 1   Q.  To your knowledge, why was the lingerie section located in
 2   the corner of the sixth floor?
 3   A.  Lingerie was a destination department.  You know, we
 4   weren't Victoria's Secret or Aerie or some of the other
 5   intimate apparel stores.  So if you were shopping for lingerie,
 6   you came there deliberately.  You came there deliberately, so
 7   you didn't put it in a high traffic area.  You put it kind of
 8   out of the way because you new people would find it or be taken
 9   there by the salespeople.
10   Q.  And to be clear, the lingerie section sold women's
11   clothing?
12   A.  Yes.
13   Q.  Did you ever observe men in that section?
14   A.  Yes.
15   Q.  To your knowledge, were there always sales attendants in
16   every department in the store?
17   A.  No.
18   Q.  Why not?
19   A.  Well, selling in Bergdorf's at that time was very
20   different.  We encouraged our salespeople to work with a
21   customer.  So if you came in and bought, I don't know, a
22   blouse, they would take you to a similar designer department or
23   they would walk you around the store.  So there were times when
24   you didn't have salespeople there.  They would be off taking
25   you to buy a handbag or shoes to go with that outfit.
```

N522Car4                           Salerno - Direct

| | |
|---|---|
| 1 | MS. CROWLEY:  And just so the record is clear, your |

1            MS. CROWLEY:  And just so the record is clear, your

2    Honor, I believe when I asked where the escalators were,

3    Mr. Salerno circled the dead center of the exhibit.

4            THE COURT:  So indicated.

5    BY MS. CROWLEY:

6    Q.  Mr. Salerno, you testified that you saw Donald Trump in

7    Bergdorf.  When was that?

8    A.  I don't recall.  Sometime when I was there.

9    Q.  When you were working there?

10   A.  Yeah, when I was working there.

11   Q.  How did you recognize him?

12   A.  I've seen his face in *Women's Wear*.

13   Q.  And do you recall how many times you saw him in the store?

14   A.  Maybe one or two.  I can't remember.

15           MS. CROWLEY:  One moment, your Honor.

16           (Counsel confer)

17           MS. CROWLEY:  Nothing further.

18           THE COURT:  Okay.  Do you expect to be long, whoever

19   is going to do the cross?

20           MR. SEIGEL:  No, your Honor.

21           THE COURT:  All right.  We will do it live.

22           MR. SEIGEL:  In an abundance of caution, if you want

23   to take a break now.

24           THE COURT:  I know what that means.

25           15 minutes.

N522Car4                         Salerno - Direct

1              (Recess)

2              (Jury not present)

3              THE COURT:  Get the jury.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                (Jury present)

 2                THE COURT:  The witness is still under oath.

 3     Mr. Seigel, is it?

 4                MR. SEIGEL:  Yes.  Thank you, your Honor.

 5     CROSS-EXAMINATION

 6     BY MR. SEIGEL:

 7     Q.  Good afternoon, Mr. Salerno.

 8     A.  Good afternoon.

 9     Q.  Bergdorf Goodman has a men's store and a women's store, is

10     that right?

11     A.  That's correct.

12     Q.  And which store did you work in?  Where was your office?

13     A.  My office was in the top of the women's store.

14     Q.  And the two buildings——the men's store and the women's

15     store——were located across the street from each other?

16     A.  That's correct.

17     Q.  Now, you testified on direct to seeing Donald Trump in the

18     store and you mentioned women's wear.  Just for clarity, is

19     women's wear different than the lingerie department?

20     A.  Yes and no.  I'm not quite sure of the question.

21     Q.  Well, is there a department in Bergdorf Goodman dedicated

22     to just women's wear, for instance, gowns, ballroom, ballroom

23     dresses, things of that nature?

24     A.  Yeah.

25                THE COURT:  Sustained as to form.

N522Car4                          Salerno - Cross

1    A.  The answer is yes.

2              THE COURT:  Mr. Salerno, when I say sustained, that

3    means stop, don't answer.

4              THE WITNESS:  Okay.

5              THE COURT:  The answer is stricken.  Put another

6    question.

7              MR. SEIGEL:  Thank you.

8    BY MR. SEIGEL:

9    Q.  So Mr. Salerno, is the women's wear department different

10   than the lingerie department?

11   A.  There are multiple women's wear departments.

12   Q.  And specifically do you recall where you saw Donald Trump

13   in the mid '90s, which department?

14   A.  I might have seen him on the main floor and I might have

15   seen him on the fifth floor.

16   Q.  Okay.  And do you remember if you saw him with anyone?

17   A.  I can't recall.

18   Q.  Now, you had discussed the hours that Bergdorf Goodman was

19   open on direct when you were there.  And you mentioned that the

20   store was open late on Thursday nights.  Would the reason that

21   the store would be kept open because there would be more

22   traffic particularly on that night than on other nights?

23   A.  There generally was more traffic on Thursday nights.

24   Q.  Okay.  And --

25              THE COURT:  Than on other nights.

1          THE WITNESS:  Than on other nights.

2          THE COURT:  And the other nights it was closed.

3          THE WITNESS:  During Christmas.

4          THE COURT:  So, Mr. Seigel, let's try to --

5          MR. SEIGEL:  Let me clarify that.

6    BY MR. SEIGEL:

7    Q.  So as the senior vice president of administration, is it

8    your understanding at Bergdorf Goodman that if no one were in

9    the store or it didn't have sufficient traffic to justify

10   remaining open, the store would not have been open on Thursday

11   night later?

12         MS. CROWLEY:  Objection to form.

13         THE COURT:  Sustained.

14         MR. SEIGEL:  Okay.

15   Q.  I think you testified on direct that the store was open on

16   Thursday nights to accommodate people who were, for instance,

17   going out on Friday and Saturday and wanted to purchase

18   merchandise?

19   A.  That's correct.

20   Q.  And Bergdorf Goodman is, I think you said, a luxury

21   specialty store?

22   A.  That's correct.

23   Q.  Based on your experience, did the store pride itself on

24   providing exceptional customer service?

25   A.  Absolutely.

N522Car4                    Salerno - Cross

1    Q.  And also on providing personalized shopping experiences to

2    its customers?

3    A.  Yes.

4    Q.  In fact, I think the store referred to its customers as

5    clients rather than customers, is that right?

6    A.  Generally, yes.

7    Q.  And this is in line with the store's emphasis on providing

8    exceptional personalized service, is that right?

9    A.  That is correct.

10   Q.  And also creating a luxury shopping experience for its

11   clientele.

12   A.  That's right.

13   Q.  And based on your understanding, the use of the term

14   "client" by Bergdorf's is meant to suggest a more exclusive and

15   personalized relationship between the store and its customers.

16   Is that right?

17   A.  That's correct.

18   Q.  In fact, did the store sales associates refer to themselves

19   as personal shoppers?

20   A.  Some did, some didn't.

21   Q.  And those that did, was that meant to further emphasize the

22   personalized service and attention given to each client who

23   shops at Bergdorf's?

24              MS. CROWLEY:  Objection.

25              THE COURT:  Sustained.

1  Q.  Mr. Salerno, what's your understanding as to why sales

2  associates were referred to as personal shoppers?

3          MS. CROWLEY:  Objection.

4          THE COURT:  Sustained.

5  Q.  Because the store was focused on service, salespeople might

6  follow or accompany clients to assist them with their

7  personalized shopping experiences, is that right?

8          MS. CROWLEY:  Objection.

9          THE COURT:  Sustained.

10          First of all, this is all repetitious; and, secondly,

11  the questions are not in appropriate form.

12          MR. SEIGEL:  Let me ask it this way, then.

13  BY MR. SEIGEL:

14  Q.  Mr. Salerno, would salespeople personally assist clients in

15  their shopping experiences?

16  A.  Yes.

17  Q.  And how would they do that?

18  A.  Any number of ways, from simple showing garments, to

19  coordinating garments and product, to taking them around to

20  other floors, to show, as I said, handbags that go with or

21  shoes that go with a garment or a coat that goes with a

22  garment, depending on their style and taste.

23  Q.  And when you worked there in the mid 1990s, how many

24  employees would work in Bergdorf Goodman on a given day?

25  A.  I don't know that I can answer that.  Our total head count

N522Car4                          Salerno - Cross

1   was probably around 6 or 700.

2   Q.  6 or 700 employees?

3   A.  Right, but they weren't all working there at the same time.

4   Q.  Let's say on a Thursday night, do you have an idea

5   approximately how many employees might work in that store?

6   A.  No.

7            THE COURT:  Does he have an idea?  Is that where we

8   are?

9            MR. SEIGEL:  All right.

10  Q.  Can you approximate how many employees would work in the

11  store on a Thursday night when you were there?

12  A.  No.

13  Q.  Now, Bergdorf Goodman cared about the appearance of its

14  departments, is that right?

15  A.  Yes.

16  Q.  You certainly didn't want to leave, for instance, on the

17  sixth floor merchandise just lying around loose.

18  A.  Yes.

19  Q.  Is that right?

20  A.  That's correct.

21  Q.  And you would agree that lingerie at Bergdorf's is an

22  expensive item, is that right?

23  A.  I would think so.

24  Q.  Could it also be a high margin item?

25  A.  I don't think the margin percentage was much different than

N522Car4                          Salerno - Cross

1  other luxury items.

2  Q.  Okay.  But you would agree that lingerie could be easily

3  shoplifted?

4  A.  I don't think so.

5  Q.  And why is that?

6  A.  Could it be?  Are you asking hypothetical?

7  Q.  I'm asking why is it that lingerie at Bergdorf Goodman

8  could not be easily shoplifted?

9          MS. CROWLEY:  Objection.

10          THE COURT:  I don't think there is a basis for saying

11  it couldn't be easily shoplifted or that it could.

12          Next question.

13  BY MR. SEIGEL:

14  Q.  Mr. Salerno, as the vice president, senior vice president

15  of administration, I think you said that you were responsible

16  for security?

17  A.  Yes, sir.

18  Q.  Did you interact with security?

19  A.  Yes.

20  Q.  And during your interactions, did the topic of shoplifting

21  ever come up?

22          MS. CROWLEY:  Objection.

23          THE COURT:  Sustained.

24  Q.  Were you familiar with any protocols at Bergdorf Goodman

25  relating to shoplifting?

N522Car4                      Salerno - Cross

1    A.  I'm not sure I understand what you mean.

2    Q.  Okay.  Did Bergdorf Goodman implement any policies while

3    you were there to lessen or safeguard against shoplifting?

4    A.  Yes.

5    Q.  And what were those policies?

6    A.  That's a response -- well, responsibility of everybody in

7    the store, not just security.  We prosecuted anyone we caught

8    shoplifting.  We had security tags on certain items.  I'm

9    trying to remember what else.  I'm not sure what you mean by

10   policies.

11   Q.  Okay.  Would the store take measures to safeguard against

12   shoplifting, for instance, watching customers or clients to

13   ensure that they did not take items?

14             MS. CROWLEY:  Objection.

15             THE COURT:  Sustained.

16   Q.  Did Bergdorf Goodman take any measures to ensure that

17   clients would not steal merchandise?

18             MS. CROWLEY:  Objection.

19             THE COURT:  Sustained.

20   Q.  You talked about personal shoppers and personalized sales

21   experiences.  Would sales associates accompany clients to

22   dressing rooms?

23   A.  Yes.

24   Q.  And were there locks on the doors, specifically on the --

25   let's deal with the sixth floor dressing rooms in the lingerie

1   department.  Were there locks on the door for the changing

2   room?

3   A.  I don't recall specifically, but I would guess so.

4   Q.  And did the sales associates have keys required to unlock

5   those doors?

6   A.  Yes.

7   Q.  Now, with regard to security, you had mentioned that there

8   were, I think you said, undercover security that floated

9   throughout the store?

10  A.  That's correct.

11  Q.  And essentially what they would do was keep an eye out for

12  any suspicious activity?

13  A.  Yes.

14  Q.  And they were also responsible for documenting anything

15  suspicious or inappropriate?

16  A.  I don't think they documented it unless something occurred.

17  Q.  Okay.  And you mentioned security cameras on the ground

18  floor.  In addition to those security cameras, I think you

19  mentioned that there was --

20          THE COURT:  Do you mean to be say camera singular or

21  cameras --

22          MR. SEIGEL:  Let me clarify.

23          THE COURT:  -- plural?

24          MR. SEIGEL:  Thank you.

25  Q.  So, Mr. Salerno, was there -- at least let's start with

1   this.  Was there at least one security camera on the ground

2   floor at Bergdorf Goodman when you were there?

3   A.  I believe so.

4   Q.  Okay.

5   A.  At the employee entrance.

6   Q.  At the employee entrance?

7   A.  And the loading dock.

8   Q.  Okay.  So we have at least two cameras now.

9   A.  Yup.

10  Q.  What about on the front door where clients would come in

11  and out?  Would there be cameras there?

12  A.  I don't think so.

13  Q.  Okay.  But would there be a security guard stationed on the

14  ground floor?

15  A.  We had security guards at every door.

16  Q.  And the security guard on the ground floor, was he in

17  uniform?

18  A.  No.  Well, define uniform.

19  Q.  You tell me.  I'm not sure.  What was he dressed like?

20  A.  He was dressed like you.

21  Q.  Okay.

22  A.  In a blue blazer.

23  Q.  And he was stationed at the front door?

24  A.  They were, yes.

25  Q.  Oh, there were multiple security guards?

N522Car4                    Salerno - Cross

1    A.   Sure.  We had multiple doors.

2    Q.   Ah.

3             THE COURT:  How many at each door?

4             THE WITNESS:  One.

5             THE COURT:  Thank you.

6    BY MR. SEIGEL:

7    Q.   And I think you had said there was also a camera on the

8    ground floor in the jewelry department?

9    A.   There might have been in fine jewelry.  I don't recall.

10   Q.   And you had made reference to I guess back in the day there

11   were VCR tapes, is that how this surveillance footage was

12   stored?

13            MS. CROWLEY:  Objection.

14            THE COURT:  What's the objection?

15            MS. CROWLEY:  "Back in the day."

16            THE COURT:  Sustained.

17            MR. SEIGEL:  Okay.  Let's clarify.

18   BY MR. SEIGEL:

19   Q.   When you were there in the mid to late '90s, the security

20   footage was recorded on VCR videotapes?

21   A.   Correct.

22   Q.   And you had -- you said they were probably destroyed after

23   a period of time, but you don't know that for a fact, do you?

24   A.   I don't.

25   Q.   And at a bare minimum, you know that if someone wanted to

1  request that footage and provide it to the police, let's say,

2  within a day or a week, it would be available, is that right?

3  A.  That's generally.  In all the times we were there, we

4  barely used it.

5  Q.  But nonetheless, it was there if police needed to retrieve

6  it, is that correct?

7  A.  That's correct.

8          MR. SEIGEL:  Thank you very much.

9          THE COURT:  Thank you.

10          Anything else?

11          MS. CROWLEY:  Just briefly, your Honor.

12  REDIRECT EXAMINATION

13  BY MS. CROWLEY:

14  Q.  Mr. Salerno, Mr. Seigel asked you about how many employees

15  worked at Bergdorf when you were there.  Do you recall that?

16  A.  Yes.

17  Q.  And I believe you estimated that the head count was about 6

18  to 700, is that right?

19  A.  That's right.

20  Q.  Did all of those 6 to 700 people work out on the floor?

21  A.  No.

22  Q.  Could you describe the different positions?

23  A.  Well, my alterations department for men's and women's, we

24  had about I think it was close to 200 people, seamstresses,

25  fitters, tailors, you know, people you need in alterations

1    department.  They were not on the floor.

2            My logistics people, the people who moved stock,

3    received trucks, they generally weren't on the floor.

4            The systems people were not on the floor.  They were

5    in the systems area.

6    Q.  And Mr. Seigel also asked you about Thursday nights and

7    sales attendants on Thursday nights.  Do you recall those

8    questions?

9    A.  Vaguely, yes.

10   Q.  How many -- about how many sales attendants would be out on

11   a floor on a Thursday evening?

12   A.  I can't -- I can't recall.  I don't know.

13   Q.  Were there more or less --

14           MR. SEIGEL:  Objection, your Honor.  He says he

15   doesn't recall.

16           THE COURT:  Overruled.

17   BY MS. CROWLEY:

18   Q.  Were there more or less than there were during peak hours

19   during the day?

20   A.  We staff it much less.

21   Q.  You were also asked several questions on cross about how

22   sales attendants interacted with customers in the store.  Do

23   you recall those questions?

24   A.  Yes.

25   Q.  And I believe you testified that they were -- sales

1    attendants were trained to give personal attention to certain

2    clients, customers?

3    A.  To every client that wanted it.  Some people don't want --

4    some people don't want personal attention.  Others do.

5    Q.  Were sales attendants trained to follow customers around a

6    store?

7    A.  They were trained -- I'm not sure "followed" is the correct

8    way.  They don't tail people, like some stores you go into and

9    they latch on to you like a fly.  Bergdorf's doesn't work like

10   that or didn't work like that.

11   Q.  How, if at all, were salespeople, sales attendants trained

12   to interact with celebrities or famous people who came in the

13   store?

14   A.  Well, everybody, including my staff, was -- the culture was

15   not to -- basically ignore and not pay attention to

16   celebrities.  The reason they shop in the store was because

17   they didn't want to be approached for autographs and people

18   oohing and aahing.  So you kind of gave them their distance,

19   everybody—my housekeeping staff, my logistics staff, everybody

20   had that.

21   Q.  You were also asked questions by Mr. Seigel about the men's

22   and women's store at Bergdorf's, correct?

23   A.  Correct.

24   Q.  And you testified that you worked in the women's store.

25   A.  My office was in the women's store.  I had responsibility

N522Car4                        Salerno – Recross

1    for both.

2    Q.  To be clear, did you see Donald Trump in the men's store or

3    the women's store?

4    A.  I believe it was in the women's store.

5             MS. CROWLEY:  Thank you.

6             THE COURT:  Thank you.

7             Mr. Seigel, anything else?

8             MR. SEIGEL:  Just briefly, your Honor.

9    RECROSS EXAMINATION

10   BY MR. SEIGEL:

11   Q.  Mr. Salerno, you just testified that the sales associates

12   were trained to, when necessary, give distance to, for

13   instance, celebrities.  That doesn't mean to not attend to them

14   or ensure that any of their needs are met, does it?

15            MS. CROWLEY:  Objection to the form.

16            THE COURT:  Sustained as to the form.

17            MR. SEIGEL:  Okay.  Let me reframe it.

18   BY MR. SEIGEL:

19   Q.  Mr. Salerno, would the sales associates at Bergdorf Goodman

20   make an effort to ensure that the needs of its

21   clientele——celebrity or otherwise——are met?

22   A.  I would hope so.

23   Q.  And that is something that you required of your employees?

24   A.  I would hope so, yes.

25            MR. SEIGEL:  Okay.  Thank you very much.

1              THE COURT:  Thank you.  You are excused, Mr. Salerno.

2              (Witness excused)

3              THE COURT:  Next witness.

4              MS. KAPLAN:  Plaintiff calls to the stand Dr. Leslie

5     Lebowitz.

6      LESLIE LEBOWITZ,

7           called as a witness by the plaintiff,

8           having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MS. KAPLAN:

11    Q.  Good afternoon, Dr. Lebowitz.  Dr. Lebowitz, what is your

12    current job?

13    A.  I'm a clinical psychologist in private practice.

14    Q.  And could you explain what does it mean to be a clinical

15    psychologist?

16    A.  Sure.  It means that I went to school for about seven

17    years.  During that time I spent about four years doing course

18    work in psychology, spent about seven years learning how to do

19    clinical work, psychotherapy, and how to assess people, and at

20    the same time spent the same amount of time learning how to do

21    research and how to think about the question of how do we know

22    what we know, what constitutes reliable and valid information.

23    At the end of that time, you are required to do your own piece

24    of independent research, which I did, and after that you do an

25    internship, which is an intensive clinical year, and after that

1   you do some postgraduate clinical hours that are supervised,

2   and then you have a doctorate in psychology.

3   Q.  And I think you mentioned this, Doctor, but as a clinical

4   psychologist, do you see patients?

5   A.  I do.

6   Q.  And that's as part of a private practice?

7   A.  It is.

8   Q.  And for how long have you been doing that?

9   A.  Since about 1992, I think.

10   Q.  And with respect to your practice as a clinical

11   psychologist, do you have any particular specialization?

12   A.  I do.  I have a specialization in psychological trauma.

13   Q.  We are going to talk a lot about that today and probably

14   tomorrow, Doctor, but just at the outset, can you explain to

15   the jury what you mean when you say trauma?

16   A.  Yeah.  I mean some kind of an event that is so painful and

17   emotionally overwhelming or difficult in terms of what it means

18   that we can't cope with it using our normal capacity to cope

19   with difficult things.  And because we can't manage it in our

20   usual way, it has the ability to harm us long term.

21        And there's all kinds of events which are potentially

22   in that category, things like natural disasters or manmade

23   disasters, combat is in that category, rape and sexual assault

24   and other forms of interpersonal violence are in that category,

25   traumatic loss.  Those are all things that have the power to

1    harm us because they exceed our capacity to cope.

2    Q.  I'm going to ask Mr. Lam to put up the first page of the

3    demonstrative exhibit and I'm going to ask you some questions,

4    Doctor, about your background.

5             So could you tell the jury, you kind of talked about

6    it generically at the beginning, but what precisely was your

7    education after high school?

8    A.  I have a bachelor's degree from Oberlin College and then a

9    master's and a doctorate from Duke University.

10   Q.  And for how long have you been working in the area of

11   trauma as you just described it to the jury?

12   A.  Well, I really started in graduate school in about 1984.

13   Q.  And can you tell the jury, starting in graduate school,

14   what kind of work were you doing in connection with trauma?

15   A.  My research was oriented towards trauma, so, for example, I

16   interviewed about 30 women who were victims of some kind of

17   sexual assault for my dissertation.  We also tried to figure

18   out how best to help those people.  So we treated victims both

19   individually and in group treatment throughout my graduate

20   career.  And then eventually we wrote some of that material up

21   in papers to be published.

22   Q.  And Doctor, after you got -- you received your doctorate

23   and graduated from graduate school, what did you do next in the

24   field of trauma?

25   A.  I did two things.  I became a faculty member at the

1    University of Massachusetts Boston where I started their first

2    graduate and undergraduate courses in trauma and supervised

3    graduate students.  But I also began to work collaboratively

4    with people at a place called the Victims of Violence program,

5    which was a treatment facility in Boston, and they wanted help

6    trying to figure out how best to evaluate the treatment they

7    were providing, so I worked with them in doing that.

8    Q.  And at the Victims of Violence program, Doctor, was that in

9    connection with a particular hospital?

10   A.  Yeah, it was affiliated with the Cambridge Hospital and

11   Harvard University and it was run by two women, a Dr. Mary

12   Harvey and a Dr. Judith Herman.

13   Q.  You mentioned Dr. Judith Herman.  Does she herself have any

14   kind of importance in the field of trauma?

15   A.  Yes.  She wrote one of, arguably, the most seminal books in

16   the field.  It was a very important early book.  She recently

17   wrote a new one, but she was pivotal in helping the field get

18   started actually.

19   Q.  And was Dr. Herman connected to any medical school?

20   A.  Harvard Medical School.

21   Q.  And when was it when you were working during this time with

22   Dr. Herman that the Victims -- for the Victims of Violence

23   program, what years?

24   A.  I think it was 1991 through '97.

25   Q.  And did you also -- have you had any experience, Doctor,

1    working with people who experience trauma in the military?

2    A.  I have.  In the -- I have two separate encounters like

3    that.  After I left the university, I went to work for a place

4    called the National Center for Posttraumatic Stress Disorders

5    which was run out of the -- it was run out of the Veterans

6    Administration, and this was a specialized facility within the

7    VA that was dedicated to assessment, research, and treatment of

8    service-connected difficulties.

9           I worked in two parts of the National Center.  They

10   had just started for the first time something called the

11   women's health sciences division, which was beginning to look

12   at the needs of female service members, and I worked there and

13   was pivotal in putting the question of whether or not people

14   have been sexually traumatized into their assessment protocols.

15   And then after about a year, I went over to what was called the

16   behavioral sciences division, which was the portion of the

17   National Center that was primarily treating male combat

18   veterans.  And in both places I did a mixture of assessment,

19   treatment, supervision, and collaborated on some research.

20   Q.  And just to put this, again, in the context of time, what

21   years were you doing that work, Doctor?

22   A.  That was really in 1994 to 1996.

23   Q.  And there has been a bit of a complaint, Doctor.  If you

24   could maybe move the microphone closer to your mouth, that

25   would be great.

N522Car4                    Lebowitz - Direct

1   A.  Is this better?

2   Q.  Much better.

3   A.  Okay.

4   Q.  I think you said that at the National Center for

5   Posttraumatic Stress Disorders you worked with combat veterans.

6   Can you put a little bit more meat on the bones of what you

7   were doing there?

8   A.  Yeah, the National Center was charged with both assessing

9   people and trying to evaluate when people had service-related

10  posttraumatic stress disorders or other service-related

11  difficulties, but they were also charged with trying to figure

12  out how to best treat people who had had combat exposure.  So

13  we were doing both.  There is a lot of research going on there

14  and a lot of treatment and training of up-and-coming clinicians

15  and researchers.

16  Q.  In addition or separate from the work that you did with the

17  National Center for Posttraumatic Stress Disorders, did you

18  have any other experience, Doctor -- have you had any other

19  experience working with people in the military?

20  A.  Yeah, in the early 2000s, Congress mandated that each

21  branch of the service come up with a way to address the problem

22  of sexual assault within the military, and I was asked to write

23  the psychological part of the curriculum for the Air Force and

24  to help train them on how to respond to men and women who were

25  coming forward and saying that they had been sexually

1  assaulted.

2          So I developed a curriculum, did the initial training

3  in Montgomery, but then after that, for about the next ten

4  years, trained in a variety of military bases around the

5  country.  I continued to train in Montgomery, but we also -- I

6  also trained at other places around the country for about the

7  next ten years.

8  Q.  And did you have occasion, Doctor, to do any work with

9  anyone connected later to the National Center for Post -- that

10  was a bad question.  Withdrawn, your Honor.

11          Did you come later to work with anyone connected with

12  the National Center of Posttraumatic Stress Disorders?

13  A.  I did.  A number of years later, one of the scientists I

14  had worked with at the National Center and myself and two other

15  people began to work on a treatment protocol, kind of

16  innovative treatment protocol to try to help -- initially

17  started focusing on U.S. Marines, but it's broadened since

18  then, but to try to help men and women who were still in active

19  duty to see whether or not we could help them essentially get a

20  little bit ahead of some of the stress problems that they were

21  having that were related to combat injuries, psychological

22  combat injury.

23  Q.  And when did you do that work, Doctor?

24  A.  I started that work in 2007.  I participated in developing

25  the treatment protocol and in supervising the first couple of

1   clinical trials.  My involvement ended in about 2016, and it is

2   still ongoing.

3   Q.  I think you touched on this, Doctor, but I take it you have

4   also had occasion to teach psychology at the college or

5   university level?

6   A.  I have.  I was a faculty at University of Massachusetts at

7   Boston where I taught graduates and undergraduates.  They had a

8   clinical program there, so I also supervised the research and

9   clinical work of graduate students.  And after I left the

10  university, I have continued to lecture in colleges and

11  universities.  Sometimes I do trainings.  I taught the peer

12  counselors at Harvard for many years.  So I have taught on and

13  off, but I haven't worked as a full-time faculty member since

14  then.

15  Q.  And have you published academic articles in your field,

16  Doctor?

17  A.  I have.

18  Q.  And I'm going to ask you a technical term and then I'm

19  going to ask you to explain it.  Were those articles peer

20  reviewed?

21  A.  They were.

22  Q.  And what does it mean for an article to be peer reviewed?

23  A.  So for an article to be peer reviewed means that you have

24  submitted it to a journal that requires that and what that

25  journal does is they remove your name and any kind of

1   identifying information that connects you to the article and

2   then they send it to other people in the field who have

3   expertise in that particular issue and they then review it

4   independently and make a recommendation to the editor as to

5   whether or not it should be published.

6   Q.  And how many articles or peer-reviewed articles, Doctor,

7   have you had published?

8   A.  About 17.

9   Q.  And have you also had occasion to serve as an expert

10  consultant or witness in legal cases, Doctor?

11  A.  I have.

12  Q.  And for how long have you been doing that?

13  A.  Since 1994.

14  Q.  And what kinds of cases have you worked on?

15  A.  I have worked in civil cases, such as this, I have worked

16  in military cases, and I have worked in regular criminal cases.

17  Q.  And when you served as an expert consultant or witness in

18  those cases, what side of the V have you worked for?

19  A.  It depends.  In -- you know, I work in cases where my

20  expertise in trauma is relevant, so in civil cases, I am

21  typically on the plaintiff's side.  In criminal cases, I could

22  be on either side depending on the situation.

23  Q.  And has there ever been an occasion, Doctor, where you

24  declined to provide the expert opinion that you were engaged or

25  asked to give?

1    A.  Of course.

2    Q.  And can you explain?

3    A.  Well, this comes up in one of two ways.  It's not uncommon

4    for an attorney to call me because they think that trauma might

5    actually be an important part of the story that they are trying

6    to tell, but I don't find it compelling, and so those kinds of

7    requests tend to end before I am engaged.

8           Sometimes -- this is less often, but sometimes I'm

9    hired but what I find is not considered to be helpful by the

10   attorney and then I might not continue to work in that case.

11   Q.  About how many times have you been engaged but then you

12   didn't continue to work on the case?

13   A.  At least five or six, maybe more.

14   Q.  And have you -- withdrawn.

15          In those occasions, Doctor, without giving me any

16   information about the particular case, can you explain why you

17   didn't proceed further in those cases?

18   A.  A couple of them, a few of them were prosecutions for rape

19   and -- but I did not feel confident that what had happened met

20   that criteria.  Some of them were murder cases where the lawyer

21   was hoping that trauma might be the best explanation for

22   somebody's behavior, but I thought that there might be an

23   explanation, for example, that they might have a character

24   disorder.  There could be some other explanation that was more

25   primary, so in those cases I also didn't continue.

1   Q.   Have you testified before, as you are doing today, Doctor,

2   as an expert witness in a courtroom?

3   A.   I have.

4   Q.   And approximately how many times have you done that?

5   A.   I would say about a dozen.

6   Q.   And in all those cases, were you qualified to testify as an

7   expert?

8   A.   I was.

9   Q.   Now, in this case, Doctor, were you asked to provide an

10  opinion, an expert opinion, on behalf of plaintiff, E. Jean

11  Carroll?

12  A.   I was.

13  Q.   And what were you asked to do?

14  A.   I was asked to evaluate whether Ms. Carroll had been harmed

15  by the alleged events that occurred with Mr. Trump; and, if she

16  had been, in what ways.

17  Q.   And briefly, because we're going to spend a lot of your

18  testimony talking about this, but briefly, did you form an

19  opinion?

20  A.   I did.

21  Q.   And again briefly, Doctor, what was that opinion?

22  A.   There were three dominant ways that I felt that she had

23  been harmed.  She has suffered from painful, intrusive memories

24  for many years; she endured a diminishment in how she thought

25  and felt about herself; and, perhaps most prominently, she

1  manifests very notable avoidance symptoms which have curtailed

2  her romantic and intimate life and caused profound loss.

3  Q.  We are going to talk about those things much more, Doctor,

4  but I want to set the table a bit.

5        In order to form the opinion you just summarized, what

6  steps did you take?

7  A.  I interviewed Ms. Carroll.  I did what is called an

8  unstructured clinical interview, which is essentially a very

9  free-ranging conversation that occurs over many hours in which

10  I simply ask the person about their life, about what happened,

11  about what it meant to them.

12  Q.  And is it your typical practice, Doctor, to conduct an

13  unstructured interview as you have just described?

14  A.  It is.

15  Q.  And are there other ways that other experts in your field

16  form opinions in your field that's different than an

17  unstructured clinical interview?

18  A.  There are.  There are highly structured interviews like,

19  for example, if you are trying to figure out whether somebody

20  does or does not have a particular diagnosis, there are some

21  formal instruments that you can use.  There is paper and pencil

22  testing where you give somebody a series of questions on a

23  piece of paper and they answer them for you.  There is other

24  kinds of psychological testing that people can do.  Or you

25  could do a highly structured interview to try to assess, you

1    know, essentially whether somebody is in a particular category

2    or not.

3    Q.  So why as a general practice, Doctor, do you prefer to do

4    an unstructured clinical interview?

5    A.  I think that if you really want to understand an

6    individual, then you have to ask them about themselves and you

7    have to talk to them about your life -- their lives.

8            You know, what a more structured assessment will do is

9    it will tell you whether somebody is in a particular category,

10   but it doesn't tell you very much, or anything necessarily,

11   about how what they have experienced has played out in their

12   lives, how it has affected them, and it doesn't tell you very

13   much about who they are.

14           Two people can have the same symptom but it may affect

15   them differently and it may affect their lives differently.

16   And so that's one reason why you want to ask somebody about

17   that.

18           The other reason it is helpful to do an unstructured

19   interview is that everybody has a different way of talking and

20   thinking about themselves and their experiences, and it takes a

21   while to listen to somebody's language and to their

22   characteristic ways of describing themselves until you feel

23   like you are actually understanding what they are trying to

24   communicate.  I think you actually had -- I think there was

25   even an example of it yesterday.  I watched a little bit of the

testimony, and there was a moment when Ms. Carroll says -- I
think she is asked whether she was frightened, and she says,
No, I was too panicked to be afraid.  And it was such an
interesting comment because if you were assessing her with a
formal measure, with a paper and pencil measure, and you said,
Were you frightened, she would have said, No.  But since it was
a conversation and she could say, I was too panicked to be
frightened, if you are in an interview situation, you can say,
Well, what did you mean by that?  What do you mean by panic?
What does panic mean for you?  And then the person might say
something like, Well, I couldn't think at all.  I didn't feel
like myself.  I felt like my heart was racing.  I couldn't
catch my breath.  I felt like my stomach had turned to jello.
So then I, as a clinical psychologist, would know that actually
she was profoundly frightened, but that's just not the language
that she attaches to it.  She calls it something else.  But you
can only figure that out if you are actually having a
conversation with somebody.

          The other reason why an unstructured interview, and
especially a lengthy one, is helpful is that you want to hear
not only how people typically present themselves, you know,
essentially what they lead with, but you want the opportunity
to hear what the missing pieces are, what they don't usually
talk about or what's difficult or painful to talk about.  And
you even want to give them the opportunity to reveal things

1    that they may not be particularly aware of.  And all of that

2    takes time and all of it requires that the person be given the

3    opportunity to just talk and reveal themselves.

4    Q.  Doctor, is there anything about plaintiff E. Jean Carroll

5    that, to your mind, made an unstructured clinical interview

6    appropriate?

7    A.  Yeah, pretty much everything about her, actually.  For one

8    thing, while she is a very smart and intelligent woman, she is

9    not a particularly psychologically minded or introspective

10   person.  You know, she is not somebody who spends a lot of time

11   thinking about how she feels.  So if I'm interested in exactly

12   that question, which is how she feels, it's going to take a

13   little bit of time to get to it because in a sense she is

14   exploring it in a new way for herself as well.  So that takes a

15   while.

16          And she is also somebody who -- she is action oriented

17   more than anything else, and none of us are particularly aware

18   of the things that we avoid.  It's hard to ask somebody what

19   you avoid because, by definition, you are avoiding it, so you

20   are not thinking about it very much.  And if you want to be

21   able to evaluate whether or not there are important things that

22   people avoid, especially if those are things that people feel

23   ashamed about, you need to have the opportunity to have that

24   kind of conversation.

25   Q.  For how long did you spend with Ms. Carroll in an

1  unstructured interview setting?

2  A.  I think altogether it was 20 to 22 hours.

3  Q.  And that sounds like a long time, Doctor.  How does that

4  compare to other cases in which you have been retained?

5  A.  I think that's about in the middle for me, actually.

6  Q.  And what topics, generally speaking, did you discuss with

7  Ms. Carroll during that interview?

8  A.  Well, we started with her --

9  Q.  Let me interrupt myself.  22 hours, you didn't do that in

10  one day, I take it.

11  A.  No.

12  Q.  Can you explain --

13  A.  Yeah.

14  Q.  -- what those hours entailed in terms of how you scheduled

15  it?

16  A.  Yeah.  We had three long in-person interviews and then a

17  few much shorter ones over Zoom.

18  Q.  And going back to my last question, what topics, generally

19  speaking, did you cover during those 22 hours?

20  A.  We covered, you know, everything that I thought would

21  inform my understanding of who she was and how she got to this

22  point.  So we talked about her childhood, her family, her

23  culture and socialization and upbringing, how emotions and

24  things like that were managed in her family.  We talked about

25  her development from early childhood until now, talked about

1   her professional work, her intimate relationships, her dating

2   life, the adversity that she's encountered, and we talked about

3   what she alleges happened with Mr. Trump and what happened

4   after that.

5   Q.  Now, how would you -- after spending all that time with

6   Ms. Carroll, how would you describe her as a person?

7   A.  Well, in the interview I found her open and forthcoming,

8   very easy to engage, not particularly introspective.  I didn't

9   think she had any signs of thought disorder, character

10  disorder, or major mental illness.  She struck me as unusually

11  vivacious and extroverted.

12  Q.  Are you being paid for your work in this case, Doctor?

13  A.  I am.

14  Q.  And can you explain how much?

15  A.  I am being paid $600 an hour.

16  Q.  Now, I said I would come back to it, and I am coming back

17  to it already, Doctor.  What makes something traumatic?

18  A.  I think that the simplest overarching way to think about

19  this is it has to do with what it feels like and what it means

20  to us.  Those two things—what it feels like and what it

21  means—have the -- can initiate a whole cascade of

22  psychological and biological responses that shape our responses

23  to a traumatic event.  I think it will be clearer if I give you

24  an example.

25          So, for example, if you think about a potentially

nontraumatic event but which is painful, so consider, for

example, losing a loved one, losing your partner of many years

after a long illness.  So that's something that is incredibly

painful, it is really, really sad, and also it requires that

how you think about yourself in the world has to adjust.  If

you have always thought of yourself as a married person, if

that person's always been by your side, your whole idea -- we

are going to call it a schema later on, but your whole sense of

what it means to be you is going to have to adjust in some

important ways.  So what happens in the aftermath of a loss

like that is you need to essentially process the emotions and

get used to the changes.

          In the case of a normal loss, there is a lot of social

support for that.  People bring food, they bring company and

support.  There are often religious or social institutions that

help you -- that kind of help hold you through that process.

And over time, what you expect is that the intense grief

becomes less sharp and you still might feel it sometimes, but

you also become able to think about the loss in other sorts of

ways.  You remember the person with humor, with fondness, with

love, and with sadness, and you get used to being without them

and life goes on without -- ideally, life goes on without any

kind of psychological injury.

          If you contrast that to the challenge that is posed by

a traumatic loss, so let's say a more traumatic situation might

N522Car4                          Lebowitz - Direct

be let's say you've got a 16-year-old daughter and she wants

the keys to the car.  You have a fight with your partner about

whether or not that's a good idea.  You win the fight and your

daughter takes the car.  As a result of that, she is brutally

murdered.  Now you have a very different situation.  Because

every time you walk towards your grief about your daughter, you

are confronted with horrifying imagery related to the loss,

imagery that has the power to kind of shut you down.  Also,

when people try to bring comfort, perhaps you feel guilty and

ashamed about your choice to give her the keys, and that makes

you unable to take that kind of comfort from other people, and

so you withdraw from those sources of social support.  Maybe

you hate yourself because you fought for the keys for her and

now she died.

        So in that sort of a situation, what that event means,

which is you feel bad about yourself now, you are pulling

yourself away from your community, and you can't quite get to

the natural process of working through those feelings because

it is so horrifying that you close down.  When that happens, we

get stuck and in that place of stuckness, traumatic pain can

endure, unfortunately indefinitely in one form or another,

causing symptoms.

        (Continued on next page)

N525car3                          Lebowitz - Direct

1    BY MS. KAPLAN:

2    Q.  And when you say indefinitely, Doctor, how long can someone

3    be stuck in the sense that they're suffering from negative

4    consequences from trauma?

5    A.  The tragedy is that there is no time limit on it.

6            In general, if people are unable to in some way

7    resolve a traumatic event, in other words they can't come to a

8    way to understand it that allows them to feel OK about

9    themselves and OK about other people and adequately safe in the

10   world, and if they can't process the feelings, the consequences

11   can last for the rest of their lives.

12   Q.  Doctor, can someone who is experiencing negative

13   psychological symptoms or consequences for trauma still be

14   successful in other areas of their life?

15   A.  Of course.

16   Q.  Can you give an example for the jury?

17   A.  Sure.  You know, potentially traumatic events are extremely

18   common.  Probably most people in this courtroom have

19   encountered some adversity in their lives.  And, you know, many

20   times we are able to meet that adversity successfully and go

21   on.  It is also true that many people are injured by some kind

22   of traumatic event in their life, but that doesn't mean they

23   don't get up in the morning and go to work, that they don't

24   make dinner for their kids, that they don't show up for their

25   friends' birthday parties, that they don't continue to be

1    potentially quite successful professionally.

2            You know, humans are complicated and there is a lot of

3    different parts to what we are and so it is possible to have

4    one part of your life go down or be injured and have many other

5    parts continue to be successful.

6    Q.  Doctor, is a person experiencing negative symptoms or

7    psychological responses to trauma always aware that that's

8    what's going on?

9    A.  No.

10   Q.  Why?

11   A.  There is a -- well, you know, for one thing, there is an

12   awful lot in our minds that we are not aware of.  Some, you

13   know, a lot of scientists argue that most of what is happening

14   at any point in time we are not aware of.  But, more than that,

15   you know, it is one of the hallmarks of trauma that if you can

16   resolve it, it is likely for part of it to essentially go

17   underground in your psyche, and from that underground position

18   continue to influence your thoughts, your perceptions, your

19   feelings, and your behaviors.

20   Q.  Can you give an example, Doctor, for the jury, of how

21   someone may be experiencing trauma and acting on it but not

22   being aware that that's what is happening?

23   A.  Sure.  I can give you one that you may well have observed

24   in your life.

25           So, I am thinking about somebody who is a great

1   parent.  Right?  A really warm, supportive, very accepting

2   parent, but for whatever reason, when his oldest son gets to be

3   about 14 or 15, he finds himself just overreacting to him, just

4   hectoring him, nagging him, feeling afraid that he is not going

5   to be OK, just like he is on him like white on rice, and in a

6   way that is clearly not helpful, that is kind of relentless.

7   And after these kind of moments where he loses his perspective

8   and is obsessive with this kid, he backs away saying, yeah, I

9   didn't need to say the same thing to him for 45 minutes

10  straight.  Why didn't I drop it?  But he isn't able to drop it

11  and he keeps doing it.  If you know something about his

12  upbringing, what might be visible to you, as an observer, is

13  that he is after his kid for the very same qualities that were

14  problematic for him as a kid that caused him to be traumatized

15  as a child.  But that isn't in front of mind for him and so it

16  is influencing his re-activity to his kid and makes him act in

17  ways that are uncharacteristic but he is not really aware of

18  it.  And even when he has some awareness of it, he can't pull

19  it back in the moment, it has become automatic.

20  Q.  Doctor, is there a diagnosis that is most commonly

21  associated with adverse psychological consequences from trauma?

22  A.  There is a few.  Depression is very common, as are mood

23  disorders, in general; any kind of anxiety disorder, and

24  substance abuse are the diagnoses that often attend to trauma.

25  But the most frequently associated one and the only one for

N525car3                         Lebowitz – Direct

1    which you actually have to have had a traumatic event is a

2    diagnosis that is called post-traumatic stress disorder, or

3    that we sometimes refer to as PTSD.

4              THE COURT:  This is a good place to stop.

5              Folks, we will see you at 10:00 tomorrow.

6              Counsel, remain please.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N525car3

```
 1                    (Jury not present)

 2                    THE COURT:  Doctor, you can step down now.

 3                    THE WITNESS:  Thank you.

 4                    (Witness steps down)

 5                    THE COURT:  Please be seated, folks.

 6              Lest I forget, let me say for the benefit of both

 7     sides, I do not permit the tendering of a proposed expert in

 8     front of a jury.  You just ask the next question.  You have

 9     clearly gone past that, but for the benefit of the defense

10     also, you just ask your questions.  If there is an objection, I

11     will rule.

12              Where are we?  What is happening next?  How long do

13     you expect to be with this witness?

14                    MS. KAPLAN:  So I think maybe another 45 minutes to an

15     hour.  Some of these concepts, as you probably noticed, are

16     hard to understand, so I am taking them in baby steps but I

17     think I can be done in 45 minutes to an hour, on direct.

18                    THE COURT:  How long on cross do we expect?

19                    MR. SIEGEL:  Maybe an hour, if that.

20                    THE COURT:  And you are going to cross-exam

21     Mr. Siegel; is that right?  Yes?

22                    MR. SIEGEL:  Yes.

23                    THE COURT:  And then who comes after the doctor?

24                    MS. KAPLAN:  Next we have Ms. Carroll's sister Cande

25     Carroll.
```

N525car3

1            MR. TACOPINA:  Sorry.  You say next?

2            THE COURT:  How long?

3            MS. KAPLAN:  Very short, your Honor; 25 minutes max.

4            THE COURT:  What is the defense case on cross?

5            MR. BRANDT:  Shorter.

6            THE COURT:  And then after?

7            MS. KAPLAN:  Then we have Natasha Stoynoff.  That

8    would be about the same as Ms. Leeds.

9            THE COURT:  Which was what?

10            MS. KAPLAN:  Very good question, your Honor.  My

11    colleague is saying 45 minutes.

12            MR. FERRARA:  45 minutes.

13            THE COURT:  Defense, how long do you think you were?

14    Not very long.

15            MR. TACOPINA:  No, but my cross should be four or five

16    hours, at the most.

17            THE COURT:  On a 45-minute direct?

18            MR. TACOPINA:  I was just kidding, your Honor.

19            THE COURT:  Hmm?

20            MR. TACOPINA:  I was just kidding.  A little levity in

21    the process.  That's all.

22            THE COURT:  It would have been levity but-for the

23    prologue.

24            MR. TACOPINA:  Same thing.  Same thing as the Leeds

25    cross and Ms. Leeds, as you saw, was very --

N525car3

| | |
|---|---|
| 1 | THE COURT:  So maybe an hour and a half with |
| 2 | Ms. Stoynoff. |
| 3 | MS. KAPLAN:  Then we have Carol Martin, your Honor. |
| 4 | THE COURT:  Yes. |
| 5 | MS. KAPLAN:  That is about an hour. |
| 6 | MR. TACOPINA:  That, no joking, that might be just a |
| 7 | little bit longer.  That's the second witness, but not much |
| 8 | longer. |
| 9 | MS. KAPLAN:  Then we have expert Ashlee Humphreys? |
| 10 | THE COURT:  Yes. |
| 11 | MS. KAPLAN:  And we have Robbie Myers.  Robbie Myers |
| 12 | will be very short, she was an editor -- |
| 13 | THE COURT:  How long with Humphreys, all told? |
| 14 | MS. KAPLAN:  Hour and a half, I'm being told. |
| 15 | THE COURT:  And on defense? |
| 16 | MR. SIEGEL:  Half hour. |
| 17 | MS. KAPLAN:  Robbie Myers is very short, correct?  20 |
| 18 | minutes, I'm told. |
| 19 | THE COURT:  Other side? |
| 20 | MR. BRANDT:  10, 20 minutes. |
| 21 | THE COURT:  OK. |
| 22 | MS. KAPLAN:  The only thing I left out, your Honor, |
| 23 | are the Trump designations.  We were going to kind of fit them |
| 24 | in where and when appropriate and I think -- how long is the |
| 25 | tape?  45 minutes, your Honor. |

N525car3

1          THE COURT:  OK.  Defense case, if any?

2          MR. TACOPINA:  Your Honor, we were just speaking about

3  that at the break.  We have Dr. Nace, you know that issue we

4  discussed.

5          THE COURT:  Yes, I know.

6          MR. TACOPINA:  So we are working that out.  I am

7  thinking -- Robbie, does it look like Thursday -- it is five

8  more witness, Robbie, after this one?  Five more witnesses?  Is

9  that right?

10         MS. KAPLAN:  I'm terrible at math but I think that

11  sounds about right.

12         Is that right?

13         We assume, given the pace we were going today, your

14  Honor, that we should done by early or midday Thursday, so that

15  would leave time for Dr. Nace do it the rest of Thursday

16  afternoon.

17         MR. TACOPINA:  Your Honor, I spoke to Andy about the

18  potential of doing Zoom -- not a Zoom but Teams, a virtual

19  examination where Ms. Kaplan's firm would send someone to where

20  he is and we would do the same with us, we would do it by

21  virtual.

22         THE COURT:  Well, we have to know.

23         MR. TACOPINA:  Your Honor, I understand, but it is

24  completely day by day.  I spoke to the doctor yesterday --

25         THE COURT:  I got that, but what I am really asking

N525car3

1    you is barring that he can't do it at all, you want to do it by

2    remote and you want -- you are thinking you would do it

3    Thursday afternoon.

4                    MR. TACOPINA:  Exactly.

5                    THE COURT:  OK.  So, Andy is right here, I think.

6                    THE DEPUTY CLERK:  Yes.

7                    THE COURT:  He keeps a low profile.  So, you have your

8    answer to that.

9                    THE DEPUTY CLERK:  Yes.

10                   THE COURT:  And that's it, right, Mr. Tacopina?  Or

11   not.

12                   MR. TACOPINA:  That is it.

13                   THE COURT:  So Mr. Trump is not going to be coming.

14                   MR. TACOPINA:  Correct, your Honor.

15                   THE COURT:  OK.  You know, it is his call.  You

16   understand that.  I understand that.  He understands that,

17   right?

18                   MR. TACOPINA:  Correct.  Of course.

19                   THE COURT:  OK.  Anything else we need to talk about

20   this afternoon?

21                   MR. TACOPINA:  Your Honor, there is one thing, maybe

22   we can discuss it amongst ourselves and come back to you

23   tomorrow.  Just on Ms. Carroll's sister, I'm just not sure of

24   the scope of the testimony.  My understanding is it is going to

25   be something along the lines of "she would never have told us."

N525car3

1    Ms. Carroll already testified to that.  I don't know if it's an

2    appropriate or even permissible witness if that's the scope of

3    it and maybe we can discuss it amongst ourselves a little bit

4    more.

5            THE COURT:  That may be a good idea because you don't

6    know the questions yet and I can't very well rule on

7    objections.

8            MR. TACOPINA:  I didn't expect you to rule right now,

9    I am teeing it up a little bit.  That's all.

10            THE COURT:  OK.  I have learned from both of you in

11    this case is what you are doing is fronting it, an expression I

12    many never heard before until here.

13            OK.  I think that takes care of that and I will let

14    you know whether I will be prepared to do charging conference

15    on Friday or on Monday in the next day or so.

16            MS. KAPLAN:  Thank you, your Honor.

17            (Adjourned to May 3, 2023 at 9:30 a.m.)

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                               Page

 3    LISA BIRNBACH

 4    Direct By Ms. Crowley  . . . . . . . . . . . 679

 5    Cross By Mr. Brandt  . . . . . . . . . . . . 715

 6    Redirect By Ms. Crowley  . . . . . . . . . . 731

 7    Recross By Mr. Brandt  . . . . . . . . . . . 736

 8     JESSICA LEEDS

 9    Direct By Mr. Ferrara  . . . . . . . . . . . 737

10    Cross By Mr. Tacopina  . . . . . . . . . . . 763

11    Redirect By Mr. Ferrara  . . . . . . . . . . 783

12    ROBERT SALERNO

13    Direct By Ms. Crowley  . . . . . . . . . . . 788

14    Cross By Mr. Seigel  . . . . . . . . . . . . 804

15    Redirect By Ms. Crowley  . . . . . . . . . . 815

16    Recross By Mr. Seigel  . . . . . . . . . . . 818

17     LESLIE LEBOWITZ

18    Direct By Ms. Kaplan . . . . . . . . . . . . 819

19                          PLAINTIFF EXHIBITS

20    Exhibit No.                                Received

21    8   . . . . . . . . . . . . . . . . . . . . 686

22    133   . . . . . . . . . . . . . . . . . . . 733

23    18   . . . . . . . . . . . . . . . . . . . . 739

24    26, 26T  . . . . . . . . . . . . . . . . . . 749

25    31 and 31T . . . . . . . . . . . . . . . . . 759
```

1   170    . . . . . . . . . . . . . . . . . 791

2                          DEFENDANT EXHIBITS

3   Exhibit No.                              Received

4   DI   . . . . . . . . . . . . . . . . 728

5   DH redacted   . . . . . . . . . . . . . . 730