N554CAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

E. JEAN CARROLL,

                    Plaintiff,                    New York, N.Y.

          v.                                      22 Civ.10016 (LAK)

DONALD J. TRUMP,

                    Defendant.

------------------------------x          Jury Trial

                                         May 3, 2023
                                         10:05 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                         District Judge
                                            and a Jury

                         APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
     MICHAEL J. FERRARA
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
     Attorneys for Defendant
BY:  JOSEPH TACOPINA
     CHAD D. SEIGEL
     MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
     Attorneys for Defendant
BY:  ALINA HABBA
     MICHAEL T. MADAIO


W. PERRY BRANDT
     Attorney for Defendant

N554CAR1

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning, everyone.

3           MS. KAPLAN:  Good morning, your Honor.

4           THE COURT:  I am asking counsel to remind me that we

5   should not let the day end without discussing the schedule for

6   summations and for charging conference.

7           Okay.  Let's get the jury.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N532Car1                        Lebowitz – Direct

1              (Jury present)

2              THE COURT:  Good morning, folks.  Hope you had a good

3     night.

4              Dr. Lebowitz, you are still under oath.

5              We will proceed.  Ms. Kaplan.

6      LESLIE LEBOWITZ, resumed.

7     DIRECT EXAMINATION

8     BY MS. KAPLAN:

9     Q.  Dr. Lebowitz, we left off yesterday talking about PTSD, and

10    I want to get back to that.

11             But before we get there, do you recall giving some

12    testimony yesterday about something that E. Jean said, E. Jean

13    Carroll said in her testimony at this trial?

14    A.  Yes, but I'm not sure which part of it you are referring

15    to.

16    Q.  Well, let me just ask it this way.  Have you been following

17    in some way E. Jean Carroll's testimony at this trial?

18    A.  I followed some of it.  I was here the day before yesterday

19    observing.

20    Q.  And is that something you have done in other cases?

21    A.  Sure.

22    Q.  Now back to PTSD.  Is there a degree of harm, Doctor, that

23    is necessary in order for someone to be diagnosed with PTSD?

24    A.  Yes, a very high level of harm.  In order to get diagnosed

25    with PTSD, you need to have symptoms in four different

1   categories, and those symptoms need to be intense and

2   disruptive.

3           So in order to meet full criteria for PTSD, you are

4   talking about a pretty severe mental illness, which is often

5   chronic.  It is also the case that people can have symptoms in

6   one or two categories and suffer a lot of negative consequences

7   from that as well.

8   Q.  And in this case, Doctor, did you diagnosis Ms. Carroll

9   with PTSD?

10  A.  I did not.

11  Q.  Did -- does Ms. Carroll have symptoms in any of the four

12  categories you talked about?

13  A.  She does.  She has avoidance symptoms, she has alterations

14  in her thoughts and feelings about herself, and she has

15  intrusions.

16  Q.  Now, Doctor, based on your experience as a psychologist and

17  your reading of the literature, what percentage of people who

18  have experienced trauma then have sufficient symptoms to be

19  diagnosed with PTSD?

20  A.  You know, the data is a little bit complicated because

21  there are so many different kinds of trauma, but it's

22  approximately 20 to 30 percent of people who meet full criteria

23  for posttraumatic stress disorder.

24  Q.  And what about the people in the other 70 to 80 percent,

25  Doctor?

1   A.   There is a larger category of people who have some enduring

2   and painful symptoms but who will never meet full criteria.   In

3   fact, there has been some -- there was some research done a

4   while ago where they looked at the impact of having a few very

5   severe symptoms versus meeting full criteria, and the research

6   was basically making the point that both are quite injurious to

7   a life.   However, we do think about PTSD as being a severe

8   illness.

9   Q.   Now, Mr. Lam, can you put up the second page of the

10  demonstrative.

11             Understanding that every person is different, Doctor,

12  are there broad categories of the ways in which a traumatic

13  effect -- withdrawn.

14             Are there broad categories of the ways in which a

15  traumatic event --

16             THE COURT:   Sorry.   Would you take that a little

17  slower?

18             MS. KAPLAN:   Sure.   I apologize, your Honor.

19  BY MS. KAPLAN:

20  Q.   Are there broad categories, Doctor, of the ways in which

21  trauma can affect a person?

22  A.   Yes.   I think the easiest way to think about it is that

23  what is remarkable about trauma is that it has a capacity to

24  affect all aspects of our functioning.   So it can affect us

25  emotionally, biologically, it can affect how we think about

things, and how we remember things, and it can of course affect

how we behave and experience our lives.  So there is really no

aspect of self that cannot be reached by the impact of a severe

trauma.

Q.  I want to start at the beginning, Doctor.  So, first of

all, what happens to a person's brain when they are

experiencing trauma?

A.  When your brain is flooded with stress hormones, our normal

functioning is altered, and E. Jean actually -- Ms. Carroll

actually described this quite well when she talked about not

feeling like herself, feeling like her thinking was disordered,

feeling that adrenaline was surging through her body and that

it was hard to make sense of things.

          What happens to -- so what happens when you are

flooded with hormones like that, stress hormones, is that what

we call the prefrontal cortex, the control of the prefrontal

cortex is reduced and diminished.  The prefrontal cortex is

basically the part of our brain that we have most associated

with what it means to be human.  It's the part that allows us

to consider alternative courses of action, to plan, to kind of

hold the big picture.  It's really what people mean when they

talk about being thoughtful and using their mental apparatus to

negotiate their lives.  That's kind of the prefrontal cortex.

          That gets radically reduced when you are flooded with

those kinds of hormones.  What happens instead is a much older

N532Car1                    Lebowitz - Direct

part of the brain, the part of the brain that we actually share

with other mammals, it becomes much more active and much more

influential; and what that means is that, rather than being

able to rely the way we usually can on being thoughtful and

evaluating different options and choosing the best one, we fall

back on what are kind of automatic and habitual responses, kind

of like a startle response.  That would be a kind of behavior

that comes from the older part of the brain.  But it also leads

people to essentially not be able to access certain behaviors

that they and other people imagine one would access in a time

of stress and, instead, do things that appear to be illogical

and irrational.

Q.  Mr. Lam, you can take down that page of the demonstrative,

please.

        So you are saying, Doctor -- if I understood you

correctly, you are saying that the impact of the stress

hormones on the prefrontal lobe can have a lot of impacts on a

person's brain, one of which is for them to act in ways that

may seem irrational or illogical.  Is that fair?

A.  Yes.

Q.  Can you give me an example of that, or give the jury an

example of that?

A.  Many, actually.

        The first one that comes to mind is I remember a story

I heard when I was much younger, but it always stuck with me.

1    It was a friend of my mother's was a child in Finland during

2    World War II, and she was holding her mother's hand on a

3    beautiful spring day when bombs began to fall, and the force of

4    the bombs blew her mother's hat off; and rather than doing the

5    obvious, rational thing that we all imagine we would do, which

6    is to scoop her daughter up and run for safety, she dropped her

7    daughter's hand and ran for her hat.

8          This is the kind of thing people do.  People forget

9    how to dial 9-1-1.  They don't scream even if they are being

10   raped in the stacks of the public library, when screaming might

11   actually be helpful.  There are just so many ways that we don't

12   act in the way that we imagine we would.  We fall back on

13   something else.

14   Q.  Now, Doctor, is there a part of the brain that lags behind

15   because of these stress hormones that are flooding the brain

16   during trauma?

17   A.  Yes, and you actually heard a description of this, I think,

18   the day before yesterday.

19         That prefrontal cortex that I just talked about, the

20   thinking, considering part of the brain, is much slower than

21   the automatic part of the brain.  It is much slower to react.

22   So if you think about how quickly you react to threat, you

23   know, your body jumps right away, you can feel that in your

24   body right away, but it takes much longer to figure out what is

25   actually happening.

1        So oftentimes when people suddenly find themselves in

2   a dangerous situation that they didn't anticipate, their body

3   begins to react to the fear, but their mind lags behind in

4   figuring out what is actually going on, and there is something

5   in that lag that may also account for some of the seemingly

6   illogical ways that people respond.

7   Q.  Now, how do the stress hormones that you have been talking

8   about, Doctor, impact how a person remembers the traumatic

9   event after it happens?

10  A.  So they have a huge impact on memory.  Memory is actually a

11  complicated process, and at each stage of that process, what we

12  are feeling and what seems important to us has an influence on

13  what we can code, what we move into long-term storage, and what

14  we are able to access afterwards.

15       And in particular, our -- and there are certain kinds

16  of memory functions that essentially are less expensive than

17  other ones, they use less resources.  So sensory memory,

18  remembering what something smelled like or felt like or sounded

19  like, those are relatively inexpensive for our brain to do.  We

20  have a lot of bandwidth for that.  But remembering, for

21  example, the context of something when it happened, where you

22  were living at the time, what the larger context of your life

23  was, that can actually be much more difficult because that

24  takes essentially more resources for the brain.  And so in

25  times of trauma, what people tend to -- they tend to

1   hyper-attend to certain elements and actually lose other ones.

2        And I want to say two more things about this.  One is

3   that at the beginning of a traumatic event, we are more likely

4   to hyper-encode information.  But the hormones that facilitate

5   that hyper-encoding are actually fairly toxic.  And so it is

6   often the case that by the end of a traumatic event, we are

7   encoding even less.  It is not uncommon, for example, for

8   people -- and I think this is true of E. Jean, of Ms. Carroll,

9   actually.  It's not uncommon for people to remember all kinds

10  of details at the beginning and then not really remember how

11  they got away.

12        Another example that might be helpful to think about

13  is if you think, you know, if you imagine a circumstance where

14  you have left your kid playing on the sidewalk for just a

15  minute while you ran in the house to grab something, and

16  suddenly you hear this terrible screeching of a car and a

17  sickening crash against metal.  You run out of the house and

18  you don't see your child.

19        That feeling, the sound of the screeching tire and

20  that feeling in the pit of your stomach, you are never going to

21  forget that feeling, right?  But you could easily have a

22  situation 15, 20 years later, ten years later, whatever, where

23  you are talking with your spouse about that night, and the

24  conversation goes something like that:  *Do you remember that*

25  *terrible night in Brooklyn?  We weren't in Brooklyn.  We were*

N532Car1                    Lebowitz - Direct

*in Manhattan.  No, we weren't.  We were in Brooklyn.*  And back

and forth with, you know, *It was 19 such-and-such.  No, it was*

*really this year.  No, he was in third grade.  He wasn't.  He*

*was in second grade.  I wouldn't have let him outside.  If he*

*was in second grade.*

          So those kinds of details are context.  They are the

other things.  And our brain doesn't hold onto things that at

the time didn't seem important.  Our brain holds onto the

things that feel emotionally salient in the sense of

life-threatening.  That's what we hang on to and we hang on to

it in a very visceral and physical way.

Q.  People, Doctor, have memory lapses all the time.  So what's

the difference between just a regular memory lapse and what you

have been discussing in terms of memory affected by trauma?

A.  Normal memory fades in part because it's not that

important, because we have other things to remember and it kind

of goes away, because it is woven into the narrative of our

life and it doesn't pop out in any particular way.

          Traumatic memory lingers for a few reasons.  One of

the reasons is that, almost by definition, a traumatic memory

is not woven into the fabric of your life in the same way.  It

often is not well-integrated in the brain, meaning the

different pieces of it are often not woven together very well

in the brain, and instead of being housed in your mind as a

kind of coherent story with a beginning, a middle, and end,

1    with all of the little pieces put together, it may be stored as

2    literally just a smell or just a feeling in your body or just a

3    sound.  And when you reaccess that memory, it may come back,

4    again, not as a story, but as a physical reexperiencing of

5    something.  It's what we call flashbacks, actually.

6    Q.  In the time that you spent with Ms. Carroll, Doctor, did

7    you observe any of these -- this kind of a memory?

8    A.  I did.  There was one point, I think it was sort of a

9    little bit later on in the interview, when I was asking certain

10   types of questions, where she began to squirm in her seat

11   because she was actually reexperiencing Mr. Trump's fingers

12   inside of her, what she alleges to be Mr. Trump's fingers

13   inside of her.

14   Q.  Doctor, what is an intrusive memory?

15   A.  So an intrusive memory is when some part of the traumatic

16   experience, either what it felt like or it felt like in your

17   body or in your emotions, just pierces your consciousness and

18   lands in the middle of your experience and essentially hijacks

19   your attention.  So you have heard descriptions of this in this

20   trial, when Ms. Carroll talked about how she would just be

21   going about her day and, for no reason that she could imagine,

22   suddenly a memory would pop into mind and it was like her day

23   would go on a swerve.

24   Q.  And you may have just answered the question, but just to be

25   clear, Doctor, what, if any, is the connection between

1    intrusive memories and trauma?

2    A.   So intrusive memories are like -- they are like flags that

3    are planted where unresolved and painful traumatic experiences

4    lie.  You know, they are the signal that there is something

5    here that has been too awful to digest like normal experience,

6    and so it lies in memory in essentially an active form and

7    comes into your life unbidden.  It's like you don't choose to

8    think about it; it just enters.

9    Q.   Do people who experience intrusive memories, Doctor, always

10   experience them in the same way?  Now I'm asking from person to

11   person.

12   A.   No.  One person might have nightmares, somebody else might

13   have flashbacks, a third person might simply have an idea that

14   takes control at times that comes from the trauma.

15   Q.   And can one person, Doctor, have different kinds of

16   intrusive memories?

17   A.   Yes, and that's typical.  One person could have -- could

18   experience visceral, you know, physical remembrances, they

19   could experience, you know, the sense of watching the scene

20   roll out like a movie script.  They could have nightmares.

21   They could have fears that they respond to which are

22   essentially some kind of an intrusion, yes.

23   Q.   Ms. Carroll testified the other day in this courtroom,

24   Doctor, that she rarely thinks about Donald Trump but that she

25   has intrusive memories.  Can you explain that to the jury from

1    a psychological perspective?

2    A.   Sure.  So when Ms. Carroll is talking about thinking, she

3    is talking about the activity of her prefrontal cortex.  She is

4    talking about all the moments when she is engaged in a

5    creative, intellectual, thoughtful life.  And most importantly,

6    she is talking about the experience that she has chosen to

7    think about something.  It is volitional.  Right?

8            Whereas when she talks about an intrusion, she talks

9    about something that just enters her mind and takes her away

10   from where she is and essentially hijacks her attention and

11   which she has no control over.  The issue of control here is

12   fundamental, the question of whether you are choosing to think

13   about something or something is just grabbing you.

14   Q.   Now, are there -- as a general matter, Doctor, are there

15   triggers for intrusive memories?

16   A.   I think most of us would assume that there is always some

17   kind of a trigger, but one doesn't always know what it is.

18   Q.   And is it possible -- withdrawn.

19           Can you give the jury an example of someone from --

20   having intrusive memory but not understanding what the trigger

21   is?

22   A.   Sure.  I'm thinking about a veteran who is walking down the

23   street, it's a beautiful day, he's feeling fine, and suddenly

24   he's having a panic attack and he has no idea why.  I happen to

25   know that on the street he was walking down, there is a

1    Vietnamese restaurant and he had combat exposure in Vietnam,

2    and my guess is that it was the smell of Vietnamese food

3    cooking that actually triggered a memory of having been in

4    combat in Vietnam, but he's not aware of it.  We can roll that

5    back and I can make him aware of it, but he didn't know it.

6    Q.   In the minutes after the alleged assault, Doctor,

7    Ms. Carroll has testified that her overwhelming thought was

8    that she was -- she had died but was still alive.  Can you

9    explain that again in psychological terms?

10   A.   Yeah, this is a very interesting description, and it's

11   extremely common to survivors of rape, and it's interesting

12   because it applies even when the victim knows consciously that

13   her life was actually never in danger.  So, for example, if you

14   were to ask Ms. Carroll:  Did you think he was trying to murder

15   you?  She would say:  Oh, absolutely not.  And that's true for

16   many, if not most, women who are raped by men who believe they

17   had reason to trust.  But yet it is incredibly common for

18   people to describe the experience as a mortal threat.  And I

19   think this is because that's what it feels like

20   psychologically.

21        If you think for a moment about what it means to be a

22   person, how you experience your personhood, it starts very,

23   very early in development, right, from the first time a baby

24   starts, you know, throwing their spoon over the high chair

25   through the tantrums of two- and three-year-olds and the

1    independence of adolescence and into, if you will, adulthood.

2    And through all of those transitions, one of the things that is

3    happening is you are consolidating a sense of this is me and

4    that is you, and we are distinguished because I have a boundary

5    and you have a boundary.  I can invite you in and I can push

6    you away.  But we know ourselves as -- we recognize ourselves

7    as people, as fully human because we have boundaries and

8    autonomy.  We can take action.  And what rape does is it so

9    violates that sense of humanity and independence and selfhood

10   than people feel psychologically that they are being killed.

11   They feel at risk.  They feel like their personhood is being

12   murdered, even if they know at some level that they were never

13   in that kind of mortal, physical danger, if that makes sense.

14   Q.  Now, we have been talking about -- mostly about the brain

15   and about emotional reactions.  I want to pause for a second to

16   turn to actual reactions in other parts of the body.

17   A.  Okay.

18   Q.  Can people who have experienced trauma actually feel

19   physical symptoms in other parts of their body?

20   A.  Yes.  When I talk about a visceral remembering, it feels

21   like it's happening right then.  It feels like somebody's hands

22   are on you or in you or in some way it is literally being -- it

23   is literally -- it feels like it's happening in the present.

24   It's one of the hallmarks of trauma is that the past doesn't

25   stay past, it continues to revisit us now.

1    Q.  And in addition to feeling something, like, happening

2    again, Doctor, can people experience common physical pains

3    from --

4    A.  Sure, I mean, there is a couple ways in which this is

5    important, and it becomes very important over the lifespan,

6    which is when you -- you know, when you are intruded upon or

7    when you are struggling to avoid intrusive memories or in any

8    way being revisited by the trauma, it is common to have -- for

9    the stress hormones from that event to also revisit you.  So

10   people can have all kind of physical symptoms at the time, but

11   even if there is not an awareness that that is happening in the

12   present, it is well-documented at this point that there are

13   long-term consequences, specifically a history of serious

14   traumatic events, such as a sexual assault, is -- seems to

15   contribute substantially to the development of a wide range of

16   physical illnesses, including autoimmune diseases, diabetes,

17   cardiovascular problems, musculoskeletal problems.  So in other

18   words, a history of trauma is a risk factor for the development

19   of all kinds of illness down the road, and that's because of

20   the effect of stress hormones on the body.

21   Q.  In the time you spent with Ms. Carroll, Doctor, did you

22   observe her feeling any of these physical symptoms?

23   A.  At the very conclusion of our interview, where we had

24   really gone over everything, and I think she had, because of

25   the amount of time that we had spoken, she had gotten a kind of

1   bird's eye view of her life, she doubled over, holding her

2   stomach and just said I have a really bad stomachache.  And

3   after that, she got actually very sick with pneumonia, and so I

4   didn't speak with her for a while, and then we then met over

5   Zoom to complete the interview.  She mentioned that she still

6   had the stomach ache.

7   Q.  Could you put up, Mr. Lam, the second page of the

8   demonstrative again.

9         I want to turn now, Doctor, to the second category of

10  harm, which is -- responses to trauma, which is changes in

11  thinking.

12        You can take that down, Mr. Lam.

13        I am going to use kind of a fancy term, and I want, if

14  you can, if you can explain it to the jury, Doctor, that would

15  be great.

16        What does the term "schema" or the word "schema" mean

17  in the context of psychology?

18  A.  So we use the word "schema" as a shorthand way of

19  describing how our mind holds all of our knowledge and all of

20  our beliefs and all of our expectations.  And these schemas or

21  these mental maps or internal representations are all kind of

22  interchangeable terms.  They develop over the course of a

23  lifetime, so they kind of layer one on top of each other.  And

24  the thing about a schema, the role of a schema is to both help

25  you interpret what happens to you and respond to it adaptively

1   and in the best way you can.

2          So, for example, we all know that there is danger

3   everywhere, right?  You know, bad things happen.  But you all

4   had to have some kind of operating schema that you could get

5   out of bed this morning and get to the courtroom, and although

6   you know that there is a possibility that you could have gotten

7   shot on the way, that wasn't really the schema you were working

8   with because if you were working with that schema, you probably

9   wouldn't have left your house.  So you work with the schema

10  that it will probably be okay, I'll probably be safe enough,

11  I'll get to the courtroom, I'll listen to testimony all day,

12  and then I will go home and that will probably be okay, too.

13  So that's an example of the fact that even though you have

14  schemas that say, you know, people get shot, like you do know

15  it, but you go forward into the day with the schema that

16  most -- that's going to best facilitate your functioning that

17  day and best fits the data of reality as it seems to you in

18  that moment.  We basically use the most positive, optimistic

19  schemas we can use that seem to match up adequately with

20  reality, and those schemas change, of course.  If something

21  happened, it would change.  So that's kind of how they work.

22  Q.  You just said, Doctor, a schema could affect your

23  functioning that day.  Do people have more than one schema?

24  A.  Yeah, we have multiple schemas.  We all have different ways

25  that we think of ourselves.  You know, I have one experience of

myself when I am testifying, a different one when I am being a

parent, yet another if I'm in a doctor's office.  We all have

different kind of representations of who we are depending on

the circumstance, and those different representations also hold

different feelings.  So it's very common for people, it's

actually, you know, universal for people to both have ways that

they feel good about themselves and ways that they feel bad

about themselves.  We all have a whole host of schemas.

Q.  What, if any, is the relationship between schemas and

feelings?

A.  Yeah, that's a good question.  Schemas are usually thought

about in a kind of cognitive way, you know, what do you

believe, what do you know, but they are also attached to

feelings because, you know, when you think about yourself as

competent or incompetent, that then is attached to certain

kinds of feelings that go with it.

Q.  So how, if at all, Doctor, does experiencing trauma impact

a person's schemas or the way they think about things?

A.  It's one of the profound and enduring ways that trauma does

affect.  So, for example, if we go back to the schema of

safety, if there was a part of your life in which you felt safe

and then something terrible happens, your basic schema for

safety might be shattered or radically changed.

Similarly, if you go forward into the world with the

expectation that you are a person worthy of being respected and

1    treated fairly or appropriately and something happens, somebody

2    powerful denigrates and abuses you, it affects -- it has the

3    power to affect how you think and how you feel about yourself.

4    Q.  Doctor, in connection with the trauma of sexual abuse or

5    sexual assault, what does the phrase self-blame mean?

6    A.  So in this context, self-blame is understood as an

7    irrational attribution of responsibility.  So specifically,

8    even though we all know that nobody can be responsible for the

9    decision of somebody else to commit a crime against you, in

10   sexual assault, it is unbelievably common for people to feel

11   like it was their fault.  Psychologists spend some time

12   thinking about why that is, and one of the primary reasons or

13   one of the primary motivations that seems to drive that kind of

14   self-blame is that the experience of being raped is such an

15   overwhelming and horrifying experience of being rendered

16   helpless and if, in some way -- even if it's not true, even if

17   it's irrational and even if it's harmful long-term, but in the

18   immediate aftermath, if there is some way that you can clutch

19   back control, clutch back a sense of power, people will do it.

20   And one of the ways that people do it is they think, well, if

21   only I didn't do that, it wouldn't have happened.  So

22   therefore, if I don't do that, whatever it is, it will never

23   happen again, and it's a way for people to try to push back

24   against feeling helpless and out of control, by taking the

25   responsibility onto themselves.

1          The problem, of course, with it is that when you take

2     responsibility for something terrible having happened when it

3     actually isn't your responsibility, it makes you feel very bad

4     about yourself and it is also not true, and so it makes it

5     harder to work through the trauma.

6     Q.  Doctor, does a person whose been sexually assaulted

7     actually have to believe at a conscious level that they are to

8     blame for being assaulted?

9     A.  No.  I mean, absolutely not.  I think, you know, this is

10    the -- this is the conundrum of the human mind, which is that

11    there are things that we think and there are things that we

12    feel and they don't always line up.  So, no, people who believe

13    politically and in every way that a woman cannot be responsible

14    for the decision of a man to rape her nonetheless will feel

15    guilty and ashamed and responsible when it happens.

16         It is such a -- it is such a ubiquitous response, it

17    is so common that when I was in graduate school and doing my

18    original research, I once made a list of all the reasons that

19    women blame themselves for being raped because it -- well, I

20    will explain.

21         So on that list, I had people who said, well, I was

22    raped because I was wearing a short skirt, which is the kind of

23    standard one.

24         Somebody else said, I was raped because I was wearing

25    a long skirt.  It caught his attention.

1          Somebody thought she had been raped because she pushed

2     her hair back over her shoulder.

3          Somebody thought she had been raped because she went

4     to a party.

5          Somebody thought she was raped because she didn't go

6     to a party, and it was punishment.

7          And then finally I had a woman who was raped by a

8     stranger in the middle of the night in her house and she said,

9     well, I haven't really figured out what I did yet, but I'm sure

10    I will.  I'm still thinking on it.

11         So all of those are sort of indications of how

12    desperate and how irrational people are to feel some sense of

13    control over their bodies and their lives again.

14    Q.  Mr. Lam, could you put up the second page of the

15    demonstrative, please.

16         I would like to turn now, Doctor, to the third item on

17    this page, which is changes in behavior.  And let me begin by

18    asking, does a person -- this sounds like a crazy thing to say,

19    but does a person learn from trauma?

20    A.  Yes, of course.

21    Q.  You can take that down, Mr. Lam.

22    A.  Of course.  The most striking aspect of what it means to be

23    a person, you know, as a species, is our extraordinary capacity

24    to learn and adapt.  That's why, you know, we live in so many

25    places on the earth and why we are the dominant species.

1         But that extraordinary capacity is also the portal

2    through which trauma harms us.  Trauma can be thought of as

3    essentially an indelible form of learning.  You learn something

4    that you didn't want to know.  It changes how you think about

5    things, it changes your brain, and then you have to adapt to

6    it.

7    Q.  So what, Doctor, does the phrase "avoidant behavior" mean?

8    A.  Avoidant behavior is any kind of action that a person

9    takes—and that can be internal, as in batting away thoughts,

10   or external, as in avoiding certain people or places—that

11   helps them avoid reminders, *i.e.* avoid intrusions, and avoid

12   remembrances of what happened.

13   Q.  And is there a connection between avoidant behaviors and

14   trauma, Doctor?

15   A.  Yes, avoidant behaviors are what we do when we are trying

16   to avoid traumatic memory.

17   Q.  And why do people engage in adaptive -- avoidant behaviors,

18   excuse me?

19   A.  So that they don't have to -- they avoid them in an effort

20   to both stay safe and to avoid a repetition of what happened

21   and also to avoid thinking or feeling about it to the best of

22   their ability.

23   Q.  Now, when someone, Doctor, who has experienced trauma is

24   engaging in avoidant behavior, do they always know that that's

25   what they are doing?

N532Car1                    Lebowitz – Direct

A.  No.  Sometimes they know and sometimes they don't.  And
sometimes they know and they can't get themselves to stop.
Q.  Now, does every person respond to trauma?  I think we may
have touched on this, but does every person respond to trauma
exactly the same way?
A.  No, absolutely not.
Q.  And what explains the variation?
A.  Well, part of it is just that people are different.  Part
of it is that traumas have different meanings, both, you know,
across the board, but also to individual people.

        People are also different over the course of their
lifespan.  What you could manage as an adult you might not be
able to manage as a much younger or a much older person.

        And people also have different strengths and
vulnerabilities.  Some people are more resilient in some ways.

        I think one of the things to just think about also in
terms of trauma is that, you know, we all have some strengths
and some weaknesses, right?  But sometimes when the
circumstances change very unexpectedly, what has been a
strength becomes a weakness, and that can happen also.
Q.  What does the phrase "resilience" mean, Doctor?
A.  Resilience is a way of describing an individual's ability
to kind of bounce back from adversity, and people have
different amounts of resiliency and different amounts of
resiliency for different kinds of situations.  Somebody might

1    be very resilient for certain things and then that resiliency

2    might run out around something else.

3    Q.  And what explains -- what, if any, factors explain

4    differences in resiliency, Doctor?

5    A.  Well, that is still a matter to some extent of open debate,

6    but we know a few things that seem to facilitate the

7    development of resilience.  One is having a warm, supportive

8    family.  The other is being intelligent, attractive, and

9    sociable.  The third is having experiences which are

10   challenging and difficult, but not traumatic.  It sort of

11   builds strength.

12   Q.  I want to turn now to Ms. Carroll, and I know you said it

13   yesterday, but just to remind the jury, what are the ways that,

14   in your view, Ms. Carroll has been negatively impacted by the

15   incident at Bergdorf Goodman?

16   A.  She suffers from intrusions.  She suffered a diminishment

17   in her ability to feel positively about herself in certain

18   ways.  She experiences or manifests avoidance behaviors which

19   have led to an inability to maintain a romantic and intimate

20   life, which has led to deep feelings of loss.

21   Q.  Now, we spoke a bit about schemas in the way someone sees

22   themselves in the world.  How has the incident at Bergdorf

23   Goodman affected Ms. Carroll's schemas, the way she sees

24   herself in the world?

25   A.  Well, partly because she blamed herself for it.  She felt

1   like she was stupid in a way that was hard to shake.  But

2   perhaps even more fundamentally than that, it made her feel

3   like she was worth less than she had been before.  She felt

4   degraded and diminished.  She felt like she had been treated as

5   if she wasn't even a person.  And that, of course, made her

6   feel like she was worth less than a person -- than the person

7   she had been.

8   Q.  Is there any connection between what you just said, Doctor,

9   and Ms. Carroll's reluctance to use words like "rape" or

10  "victim"?

11  A.  Sure.  There is all the connection.  Ms. Carroll, you know,

12  like most of us in many ways, doesn't want to be a victim,

13  doesn't want to be pitied, but perhaps more than most people,

14  she has fiercely identified with being strong, being resilient,

15  being the person who can just march on and overcome thing, you

16  know, stiff upper lip, take an action and put it behind you.

17          And being raped meant, to her, being a victim, being

18  weak, being stupid, being vulnerable, being dirty.  And so

19  there is no part of her that wanted any part of that word to

20  apply to her, and so it was very hard to use it.  Using a word

21  like "fight" is much more attractive because it places her in

22  an active role.  Using a word like "rape victim" suggests that

23  the other person actually dominated in that fight, and that's

24  painful.

25  Q.  Doctor, we have talked about self-blame, but what, if any,

conclusions did you reach about whether Ms. Carroll experiences

self-blame?

A.   Absolutely.  I think for many years, for most of the years,

she just simply blamed herself for the assault, period.  She

just felt like she had done something stupid and that's why it

happened.  She was also afraid of other people blaming her,

which is an understandable fear.

Q.   And moving forward to more recent periods, does she still

at a conscious level believe that she is to blame?

A.   I think, you know, based on the advice she gave other

women, based on, you know, changes in the political landscape,

I think that if you asked her what she believes is true, she

would say, no, a woman can't be responsible.  If you asked her

what do you feel is true, I think she would probably still say,

well, it still feels like it's kind of true.  That's just one

of the ways that humans work.  We don't always feel what we

think.

Q.   Now, we have talked about intrusive memories, and I

apologize if this is slightly repetitive, but what, if

anything, Doctor, did you conclude with respect to whether

Ms. Carroll experiences intrusive memories?

A.   She does.  She experiences intrusive physical remembrances.

She can still feel aspects of the assault.  She can still hear

aspects of the assault.  She remembers the feelings in her

body.  She sometimes sees pieces or all of the experience kind

N532Car1                    Lebowitz - Direct

1    of spooling like a video before her.  She has some night

2    terrors that might be related.  And sometimes just some part of

3    it just pops into her mind unwittingly, you know, without

4    choice.

5    Q.  What, if any, impact do these intrusive memories have on

6    Ms. Carroll day to day?

7    A.  I think there are two ways in which they operate.  On a

8    day-to-day, they come up, they capture her attention, and they

9    diminish her quality of her day.  They infect it with a kind of

10   darkness and a sadness that wouldn't otherwise be there.  But

11   probably the most notable way in which it affects her is

12   that -- is the ways in which she works so hard, so assiduously

13   to avoid feeling the fear, the vulnerability, and the sense

14   that it was her fault, yeah.

15   Q.  During your interviews or your time speaking with

16   Ms. Carroll, are there any examples of her experiencing

17   intrusive memories that come to mind?

18   A.  There was the experience of the fingers that I mentioned.

19   There were several times where she just was clearly feeling in

20   her body what had happened, and those are very uncomfortable

21   times for her.

22   Q.  Is pushing away the intrusive memories that you have

23   discussed, is that a kind of avoidant behavior?

24   A.  It is.

25   Q.  And how is this -- I think you touched on it, but how has

1  this effort to bat them away impacted Ms. Carroll?

2  A.  Well, it takes a lot of mental work.  It's part of what you

3  are doing when you should be doing something else; you are

4  pushing them away.

5       I also think that intrusive memories are what drive

6  avoidant behaviors, and avoidant behaviors have been very

7  prominent in her posttraumatic response.

8  Q.  Now, in terms of intrusive memories——and there is been some

9  testimony about this in this case——at a certain point in time,

10  Donald Trump announces that he is running for president, and so

11  his image is around a lot more than previously.  Can you

12  explain what, if any, impact that had on Ms. Carroll's

13  intrusive memories?

14  A.  Yes.  Well, at first it got much worse.  She had many, many

15  more intrusions and many more physical symptoms in response to

16  the intrusions.  But over time it began to diminish somewhat so

17  she did not feel as inundated with those intrusions.

18  Q.  Is there a scientific explanation for that?

19  A.  Yeah, it's actually -- the basis of probably the most

20  common cognitive behavioral treatment for trauma is called

21  exposure therapy, where you expose somebody to what they are

22  afraid of, what they are trying to avoid.  The idea is that if

23  you do it enough, the brain begins to learn that it is not

24  present.  It is pushed away a little bit, and you become less

25  afraid.  So ironically, the -- Mr. Trump running for president

1    was a kind of real-world exposure treatment.  Suddenly he was

2    everywhere.  She couldn't avoid him.  Her symptoms got much

3    worse initially, which is what happens in exposure treatment,

4    as well.  And then they got somewhat quieter, which also

5    happens in treatment.

6    Q.  What, if anything, Doctor, did you conclude about

7    Ms. Carroll's resiliency?

8    A.  I think she is an extremely resilient person.

9    Q.  And can you explain to the jury why you think she is so --

10   why you think she is so resilient.

11   A.  You know, she never hesitated to take on challenges.  She

12   did all kinds of things that were really remarkable and unusual

13   for a woman in that time, and she had prior adversity that she

14   overcame without any significant diminishment to her life.

15   Q.  And is there anything about her background that explains to

16   you, Doctor, some of that resiliency?

17   A.  Yeah.  She had a warm, loving family.  There was a lot of

18   independence in her childhood, a lot of rough-and-tumble play

19   in her childhood, and her family, her family's culture fostered

20   a lot of grit, a lot of not attending to feelings of

21   vulnerability but, rather, simply coping with them.  So, for

22   example, when kids got hurt or when somebody got bullied or had

23   some kind of an adverse experience, the message from her family

24   was very much take care of that and move on.  It was not

25   discussed.  It was not indulged in any way.

Q.  Apart from batting away -- having to bat away intrusive
memories, does Ms. Carroll engage in avoidant behaviors in any
other ways?

A.  She does.

Q.  How?

A.  The most -- I mean, some avoidant behaviors aren't a
problem.  She avoids certain kinds of media representations,
like rape in the media and things like that, and those aren't a
problem.  Those are perfectly reasonable adaptations.

        The one that is really a problem for her is that
following her encounter with Mr. Trump, she began to shut down
in the presence of any potentially eligible man.  So any man
that was about her age, as Mr. Trump is, and who is seen to be
somebody who she might be able to be interested in, she began
to have this experience that she described as being like a
metal grate over a storefront window just pulling down, and as
it pulled down, her eyes would also get pulled down and her
whole -- and rather than her usual extremely vivacious and sort
of extroverted and playful, interpersonal style, she would find
herself looking at the ground and speaking in monosyllables,
and she hated it.  I don't think in the beginning she really
knew why she was doing it, but it was an uncontrollable
response.  She couldn't stop doing it.  And that closing down,
that shutting down, you know, she is avoiding anything that
reminds her of threat, anything that reminds her of the

1    situation in which she felt so harmed.  But in doing so, she

2    also foreclosed certain possibilities in her life.

3    Q.  Can you provide an example of this, Doctor?

4    A.  One happened during the interview.  She got in the elevator

5    in the hotel and an attractive man about her age got in also.

6    They were both going to get coffee, and rather than engaging in

7    her customary banter, which she would have done had it been a

8    woman getting in the car getting a cup of coffee, she just

9    found herself looking at the ground and unable to speak.  And

10   that day she was very aware of it because we were in the middle

11   of interviewing, and even then she could not control the

12   symptom.

13   Q.  When did Ms. Carroll start engaging in the avoidant

14   behavior that you have just been talking about?

15   A.  After the alleged event with Mr. Trump.

16   Q.  And you touched on this a couple of questions ago, but what

17   is your best understanding of when she first realized this was

18   happening?

19   A.  You know, there are so many times when things flicker in

20   and out of awareness, so you might have a moment where you kind

21   of know it, and then you mostly don't know it.  I don't think

22   she really knew that it was connected until -- potentially even

23   until she wrote the book.  I think she came up with a lot of

24   alternative explanations, which is what people do.  You know,

25   when you see yourself engaging in a behavior that isn't what

1  you want to do and doesn't make sense, the mind makes up

2  alternative explanations.  And so she decided she just hadn't

3  met the right guy yet, you know, she hadn't been lucky, she was

4  getting older.  I think she just -- and I think she just came

5  up with a bunch of explanations, and then I think she didn't

6  hold on to the connection, which is also incredibly common for

7  trauma, that the connection between your current problems and

8  the past traumatic experience, that connection gets buried and

9  people lose it.

10  Q.  And how does Ms. Carroll's avoidant behavior with respect

11  to eligible men her age compare to her romantic patterns before

12  the incident at Bergdorf Goodman?  And again, I don't want you

13  to give any specificity, just very general.

14  A.  It's a very sharp departure.  Actually, it's a complete

15  departure.  Her previous pattern had been to be in a long-term

16  partnership and, when that wasn't happening, to date pretty

17  avidly for a period of time until she found somebody else she

18  wanted to be in a long-term partnership with, and she was very,

19  very social and outgoing, and all of that changed afterwards.

20  Q.  Now, how do you reconcile what you have been saying about

21  avoidant behaviors, Doctor, with the fact that Ms. Carroll

22  continued to shop at Bergdorf Goodman?

23  A.  Well, she didn't feel that Bergdorf Goodman raped her was

24  the primary reason.  The store -- she didn't blame the store.

25  She blamed herself.  The store didn't feel threatening.  I also

1    think that -- yeah, I think that's the primary reason.

2    Q.  You just said she didn't feel that Bergdorf Goodman raped

3    her, but you are also aware, are you not, that Ms. Carroll from

4    time to time would watch *The Apprentice*?

5    A.  Yes.

6    Q.  And how do you reconcile her avoidant behaviors with that?

7    A.  Okay, that sort of links to the other thing I was going to

8    say.  I think anywhere Ms. Carroll could see evidence that she

9    was negatively affected by what happened, she would fight

10   against it.  So to not go back into Bergdorf's would have been

11   really obvious, given how much she loved that store.  To not

12   watch *The Apprentice* in her social and professional circle at

13   the time would have -- would have revealed something, it would

14   have led her to stand out in some way, because there was a lot

15   of excitement about that show in her circles.  So I know she

16   did watch it and she did admire it professionally, but I don't

17   think she watched it anywhere nearly as much and certainly

18   without the kind of pleasure that she would have watched it had

19   that event not happened.  So I think she basically did the

20   minimum where that was concerned.

21   Q.  Are you aware of how Ms. Carroll reacted the first time she

22   saw footage from *The Apprentice*?

23   A.  I am, and it is significant.  So the first time she saw

24   footage, she had gone -- I don't remember which studio it was,

25   but she had gone to a television studio to pitch a new show,

N532Car1                    Lebowitz - Direct

1    and she went with a colleague and they were going to go back

2    and forth and kind of co-pitch the show.  And the producer

3    said, I've got something I want to show you, and he clicked on

4    the trailer for *The Apprentice*.  She became so flooded with

5    feelings, with memories, with feelings, with a sense of panic

6    that she actually lost her capacity to speak, which is

7    something people often talk about in an instance of feeling

8    really flooded and overwhelmed by feelings.  Literally she

9    couldn't find the words and she shut down, and the person she

10   was with needed to pitch the entire show because she was so

11   overwhelmed at that time.

12   Q.  One more question on this, Doctor.  How do you explain the

13   fact that Ms. Carroll kept the dress she wore that day in her

14   closet?

15   A.  I think it's a similar dynamic.  I think that she loves

16   clothes, and that was the most expensive dress she had ever

17   bought.  I think to get rid of it would have been so out of

18   character, it would have been impossible to avoid the

19   realization that she was that negatively affected.

20         I also think at a deeper psychological level I think

21   Ms. Carroll knew that there was a part of her that was stuck

22   there, that was stuck with what the dress represented, that she

23   had lost something that she couldn't get back, and she held on

24   to the dress almost as a way of holding on to the hope that she

25   would one day be able to revisit it and reclaim the part of

1   herself that she had lost.

2          So I think there are a few reasons why she held on to

3   the dress.

4   Q.  During your examination, Doctor, did you discuss with

5   Ms. Carroll a negative experience she had as a young girl with

6   a camp counselor?

7   A.  I did.

8   Q.  How do you know that that experience isn't the cause of the

9   harms that you have been discussing here during your testimony?

10  A.  Well, part of how I know is that there is about more than

11  40 years of active, happy, joyful interactions with men and

12  with the social world after that.  So there is no evidence from

13  her life that that event, although it was painful at the time,

14  that it disrupted her functioning in any serious way.

15  Q.  Did you discuss with Ms. Carroll a negative experience she

16  had with the CBS head Les Moonves?

17  A.  I did.

18  Q.  And how do you know that that experience isn't the cause of

19  the problems that you have been discussing?

20  A.  Well, even though the time span is much shorter because she

21  was an adult with Les Moonves, again, her behavior does not

22  change after that event and she didn't hold herself responsible

23  for it.  But mostly it's because she didn't have any symptoms

24  from it.

25  Q.  Did you discuss with Ms. Carroll her second marriage to a

1   gentleman by the name of John Johnson?

2   A.  I did.

3   Q.  About how much time did you spend discussing that with her?

4   A.  We came back to it several times, about an hour.

5   Q.  And what was your understanding of their relationship?

6   A.  I think Ms. Carroll and Mr. Johnson loved each other a

7   great deal.  I think they had a strong connection.  It was also

8   a somewhat combustive relationship.  Her assessment was that we

9   are not well-suited to be married to each other, but there was

10  a lot of love and respect between them, as well.

11  Q.  And you were aware there was some incidence of violence in

12  that relationship?

13  A.  Yes.  There were three instances of quite serious violence,

14  and it's why the marriage ended.

15  Q.  Sitting here today, Doctor, are you aware that Mr. Trump's

16  expert -- withdrawn.

17         How do you know that the violence in that relationship

18  wasn't the cause of the problems that we have been discussing?

19  A.  Well, there are really two ways I know.  One is, after her

20  marriage ended and the -- kind of the heat was taken out, she

21  and Mr. Johnson continued to be friends, they continued to

22  watch the news together, sometimes there were even periods of

23  intimacy in the year or two after that marriage ended, and that

24  kind of came to a close as she was resuming her normal dating

25  and socializing behavior.  So her pattern after that marriage

1   ended in terms of her social interactions with men were the

2   same as they had been before that marriage, so there was no

3   change in -- there was no sort of discernible or objectively

4   discernible change in her behavior until after the experience

5   with Mr. Trump.

6   Q.  One final question, Doctor.  What is the best way for

7   someone who is not an expert in psychology to make sense of the

8   impact, the psychological impact that the assault at Bergdorf

9   had on Ms. Carroll?

10  A.  Because she was frightened and rendered helpless in a way

11  that had never happened to her before and because she blamed

12  herself and because the meaning of that event and the feelings

13  associated with it were simply too big for her to cope with in

14  her usual ways, it became a stuck point in her life, something

15  that she had to walk around in her day-to-day basis; and, in

16  doing that, in working so hard to stay away from those feelings

17  of helplessness and vulnerability, she gave up one of the great

18  sources of joy and connection in her life, which was the

19  opportunity to be intimate with a man, and that was a huge loss

20  for her.

21          MS. KAPLAN:  No further questions.

22          THE COURT:  All right.  Thank you.  We will take our

23  morning break.  15 minutes, please.

24          (Recess)

25          (Jury not present)

1          THE DEPUTY CLERK:  Should I get the jury?

2          THE COURT:  Yes.

3          MS. KAPLAN:  Could I bring up one housekeeping matter?

4     We appreciate and understand the difficulties with Dr. Nace's

5     health issues, but if we are going to take his testimony

6     tomorrow, someone has to book a flight, board a flight, and

7     then we have to figure out how that impacts our other

8     witnesses.  So we are getting close to the point in time where

9     it will be logistically almost impossible, and I just want to

10    see if we can get a hard date.  They still don't know, and I

11    appreciate that, but we really do need to know very soon.

12         MR. TACOPINA:  So, your Honor, I spoke to Ms. Kaplan

13    just a few minutes ago outside.  I will be making a call at the

14    lunch break to get an update.  It's really day by day.  But, as

15    I said, I will let them know at the end of lunch one way or

16    another what the status is, and we will proceed either way.

17         THE COURT:  Well, I don't understand exactly what that

18    means.  You will proceed either way means that you are going to

19    use him or you are not going to use him, and if the answer is

20    you want to use him and there isn't a flight available to get

21    anybody down there, what's happening in your estimation?

22         MR. TACOPINA:  Yes, your Honor, I just want to say

23    that I think everything we have discussed on this matter has

24    been *in camera*, under seal.  I don't want to get into the issue

25    because it is not --

N532Car1                         Lebowitz - Direct

 1              THE COURT:  No, I think you are absolutely right in

 2      that, and I appreciate and respect that, but we have a

 3      practical problem.

 4              MR. TACOPINA:  Yeah, which will be resolved today.

 5      When I say one way or another, either we will schedule it for

 6      tomorrow or we won't schedule it at all.

 7              THE COURT:  So does somebody get on an airplane now or

 8      not?

 9              MR. TACOPINA:  Right.  That's what I said I would let

10      them know after the lunch break.  I have no phones.

11              THE COURT:  Look, Ms. Kaplan, what is the latest you

12      can know in order to get somebody on an airplane?

13              MS. KAPLAN:  Lunchtime, your Honor, but I would prefer

14      to hear at the beginning of lunchtime, rather than the end of

15      lunchtime, so we can see what flights are available.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

N535CAR2                          Lebowitz – Cross

1                 THE COURT:  You can see what flights are available

2       now.

3                 MR. TACOPINA:  I'm trying.  I'm really trying.

4                 THE COURT:  I'm not questioning that.  I'm not

5       questioning that.

6                 MR. TACOPINA:  Yes.

7                 THE COURT:  All right.  Let's cut the baby in

8       quarters.  1:15.  OK?  Fish or cut bait.  Can you do that?

9                 MR. TACOPINA:  If we break a few minutes before 1:00?

10      Because I have to go down and get the phone, your Honor.

11                THE COURT:  Yes.  And we will break a few minutes

12      before 1:00, we will break at quarter to 1:00.

13                MR. TACOPINA:  Yes.

14                THE COURT:  We will deal with it.

15                All right let's go.  Get the jury.

16                THE DEPUTY CLERK:  Jury entering.

17                (Continued on next page)

18

19

20

21

22

23

24

25

N535CAR2                          Lebowitz - Cross

1             (Jury present)

2             THE COURT:  OK.  Mr. Siegel, cross-examination.

3             MR. SIEGEL:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. SIEGEL:

6    Q.  Good morning, Dr. Lebowitz.

7    A.  Good morning, Mr. Siegel.

8    Q.  You were hired by Ms. Carroll's attorneys to evaluate her

9    in this case; correct?

10   A.  Yes.

11   Q.  And also to prepare an expert report; right?

12   A.  Yes.

13   Q.  To testify on her behalf at a prior deposition on March

14   14th of this year?

15   A.  Yes.

16   Q.  And, of course, to testify at this trial?

17   A.  That is correct.

18   Q.  And you are being paid $600 an hour for the services you

19   are rendering on Ms. Carroll's behalf?

20   A.  That is correct also.

21   Q.  You interviewed Ms. Carroll sometime around Thanksgiving of

22   last year?

23   A.  I believe that is when the interviews began.

24   Q.  And during that interview process you prepared

25   contemporaneous notes of what Ms. Carroll said to you; is that

N535CAR2                      Lebowitz - Cross

1   right?

2   A.  Yes.

3   Q.  In fact, as she spoke to you, you were quickly typing what

4   she said; right?

5   A.  Yes.

6   Q.  And incorporating what was conveyed to you by Ms. Carroll,

7   you then prepared an expert report containing your opinions in

8   this case?

9   A.  Yes.

10  Q.  Now, as an expert witness, you understand that the

11  materials you prepare in connection with the case may be relied

12  upon in a court; right?

13  A.  Yes.

14  Q.  So when you prepare those materials you want to be as

15  complete and accurate as possible; is that right?

16  A.  Yes.

17  Q.  And you certainly make it a point not to omit any

18  information you deem important, right?

19  A.  Not that I deem important.

20  Q.  Now, on direct you testified about the supposed ways

21  Ms. Carroll has been negatively impacted by the alleged

22  incident at Bergdorf Goodman and what allegedly being raped

23  meant to Ms. Carroll.  You are not offering an opinion in this

24  case --

25          THE COURT:  I'm sorry, counselor.  This is sounding

1    compound.

2            MR. SIEGEL:  I will rephrase.

3    Q.  Ms. Carroll -- excuse me -- Dr. Lebowitz, on direct you

4    testified about, these are your words:  The ways Ms. Carroll

5    has been negatively impacted by the alleged incident at

6    Bergdorf Goodman; is that right?

7    A.  Yes.

8    Q.  And you also testified about what allegedly being raped

9    meant to Ms. Carroll; is that right?

10   A.  Yes.

11   Q.  Now, just to be clear, you are not offering an opinion in

12   this case on whether the alleged sexual assault in fact

13   occurred; is that correct?

14   A.  That is correct.

15   Q.  Your opinions are simply assuming that it did; is that

16   right?

17   A.  My opinions are focused on the observable consequences of

18   that event, not on assessing the rape, the event itself.

19   Q.  So in answer to my question are you assuming, for purposes

20   of your opinion, that the alleged rape occurred?

21   A.  I'm not opining about that.

22   Q.  So you have no opinion one way or the other?

23   A.  Well, that's different.

24   Q.  You just testified that you are not offering an opinion in

25   this case on whether the alleged sexual assault occurred;

1   right?

2   A.   That is correct.

3   Q.   And, to be clear, you have no independent knowledge of

4   whether that alleged sexual assault occurred or not; right?

5   A.   That is correct.

6   Q.   Let's -- withdrawn.

7        Your opinions in this case are based upon the accuracy

8   and truth of what Ms. Carroll told you; right?

9   A.   Yes.

10  Q.   If Ms. Carroll made up this entire event, that would be a

11  problem for your report and opinion; right?

12  A.   Yes.

13  Q.   Likewise, if Ms. Carroll falsely told you about her

14  feelings, that would render your report and opinion unreliable;

15  correct?

16  A.   Yes.

17  Q.   And if Ms. Carroll falsely told you about her alleged

18  symptoms, that also would render your report and opinion

19  unreliable; correct?

20  A.   Yes.

21  Q.   Now, on direct you testified that Ms. Carroll:

22  "Experiences intrusive physical remembrances and can still feel

23  aspects of the assault.  She remembers the feelings in her

24  body, she sometimes sees pieces of the experience kind of

25  spooling like a video before her."

N535CAR2                          Lebowitz - Cross

1              Now, that opinion is based on the accuracy and

2      truthfulness of what Ms. Carroll told you, correct?

3      A.   Yes.

4      Q.   Dr. Lebowitz, you are familiar with the term "malingering"

5      in a forensic or psychological aspect?

6      A.   I am.

7      Q.   And what malingering means is lying, correct?

8      A.   Yes.

9      Q.   That means lying about a symptom, yes?

10     A.   Yes.

11     Q.   Lying about a feeling?

12     A.   Yes.

13     Q.   Lying about a cause?

14     A.   Sure.

15     Q.   And of course lying about an event; is that right?

16     A.   Yes.

17     Q.   Now, you understand that Ms. Carroll has a vested interest

18     in the outcome of this case, right?

19     A.   I'm not sure what you mean by vested, but she certainly

20     cares very much about the outcome of the case; yes.

21     Q.   That's what I meant.

22              You understand that, right?

23     A.   Yes.

24     Q.   OK.

25              Would it be fair to say that she may have presented

N535CAR2                          Lebowitz – Cross

her symptoms and experiences in a way that would benefit her

case?

A.   I don't believe she did that.  Actually, I think that she

is so averse to being symptomatic and to being vulnerable that

there have been many times where she has actually presented

herself in ways that run exactly counter to, for example, my

conclusions that she was injured.

Q.   Based on your experience, though, in light of that

statement, you would agree that if someone falsely accuses

another of misconduct, it is conceivable they might be hesitant

to provide fabricated details relating to that accusation?

A.   I'm not sure that I have -- I'm not sure that is within my

expertise.

Q.   I want to direct your attention to your deposition

testimony on March 14th, 2023.

              THE COURT:  Can I have a copy, please?

              MR. SIEGEL:  Sorry, your Honor.

              THE COURT:  Did you have a page and line?

              MR. SIEGEL:  Yes, your Honor.  Thank you.  Page 202,

line 23 through line 203.

              THE COURT:  These pages only have about 25 lines on

them.

              MR. SIEGEL:  I'm sorry.  I misspoke.  Thank you, your

Honor.  Page 202, line 23, through page 203, line 4.

              MS. KAPLAN:  We don't see any inconsistency, your

1    Honor.

2              THE COURT:  Sustained.

3    BY MR. SIEGEL:

4    Q.  Dr. Lebowitz, let's talk about your evaluation methods in

5    this case, the ones that you relied upon in forming your

6    opinion.  You conducted an unstructured, open-ended inquiry; is

7    that right?

8    A.  Yes.

9    Q.  And what that basically means is that you had a long

10   conversation with Ms. Carroll and asked her largely open-ended

11   questions?

12   A.  Yes.

13   Q.  And during that conversation you asked about circumstances

14   in her life and how they affected her; right?

15   A.  I did.

16   Q.  And you did that to assess her symptoms and experiences,

17   correct?

18   A.  Yes; to understand who she was as a person and how what had

19   happened to her what it had meant to her.  All of the above,

20   yes.

21   Q.  And during that process you didn't use any objective

22   psychological instruments or tests to corroborate what she told

23   you; correct?

24   A.  That is true.

25   Q.  Now, on occasion you have used psychological instruments

N535CAR2                         Lebowitz - Cross

1    alongside open-ended inquiries in connection with lawsuits you

2    have been involved in?

3    A.   On occasion.

4    Q.   And you are familiar with the Minnesota Multiphasic

5    Personality Inventory, or MMPI, as it is called; right?

6    A.   I am, but that is not an instrument I have relied on or

7    used.

8    Q.   Well, it is a formal assessment instrument used to assess

9    whether someone is malingering; right?

10   A.   It is used to assess a lot of things.  It does have a

11   malingering -- a scale that is relevant for malingering, yes.

12   Q.   And there are, in fact, other texts other than the MMPI

13   that are available to specifically assess malingering?

14   A.   Yes.

15   Q.   In this case you could have sought the aid of a

16   neuropsychologist -- I think you said you don't do this

17   yourself -- but you could have sought --

18              THE COURT:  Let's try the question again, please.

19              MR. SIEGEL:  Fine.

20   Q.   In this case, Dr. Lebowitz, you could have sought the aid

21   of a neuropsychologist to help you administer any of these

22   tests for malingering; correct?

23   A.   Theoretically.

24   Q.   Well, in reality you could have made that recommendation if

25   you wanted to; correct?

1    A.  Sure.

2    Q.  You didn't do that here, right?

3    A.  That's right.

4    Q.  So, for purposes of forming your opinion in this case, you

5    essentially took Ms. Carroll's word for it; correct?

6                MS. KAPLAN:  Objection.

7                THE COURT:  Sustained.

8                MR. SIEGEL:  I will rephrase it.

9    Q.  Dr. Lebowitz, for purposes of forming your opinion in this

10   case, you relied upon Ms. Carroll presumably giving you

11   truthful and accurate information, correct?

12   A.  Yes.

13   Q.  And you did that without any objective measures to

14   corroborate what she was telling you; right?

15               Withdrawn.  I will rephrase it.

16               You did that without any objective tests or

17   instruments to corroborate what she told you?

18   A.  I did not give her any standardized psychological tests or

19   paper and pencil screening devices; that is true.

20   Q.  Let's look at some of the things that Ms. Carroll told you

21   during the interview.  Ms. Carroll told you she believed she

22   lost her job because Donald Trump called her a liar; correct?

23   A.  Yes.

24   Q.  I think you said you were in court two days ago when

25   Ms. Carroll testified in this courtroom on May 1st?

N535CAR2                        Lebowitz - Cross

1   A.  I can't remember that, I have to think about it.  I was

2   here the last day that she was on the stand for

3   cross-examination.  I wasn't here for direct.

4   Q.  And during that cross-examination did you hear Ms. Carroll

5   testify in this courtroom that her editor in chief at *Elle*,

6   Nina Garcia, loathed her for publishing her story about Donald

7   Trump in *New York* magazine?

8   A.  I did hear her say -- I'm not sure if that's exactly what I

9   heard but something like that.

10  Q.  OK.  Ms. Carroll never told you when you were interviewing

11  her that her editor in chief loathed her for publishing her

12  story in a competitor magazine, did she?

13  A.  No.

14  Q.  Do you recall writing in your report that Ms. Carroll lives

15  with a higher level of chronic fearfulness than she did before

16  Donald Trump's denunciation?

17  A.  Yes.  Yes.

18  Q.  And as to whether Ms. Carroll felt safe walking down a

19  street after Donald Trump said she lied, you concluded that,

20  before it began to subside, Ms. Carroll simply felt frightened

21  and overwhelmed and could not eat or sleep well.  Is that

22  right?

23  A.  Yes, but I think you are conflating a few different things

24  which I would like to clarify.

25              In the immediate aftermath --

N535CAR2                    Lebowitz - Cross

1    Q.  Dr. Lebowitz, I am sure you will have an opportunity to --

2              MS. KAPLAN:  No.  You just asked her the question.

3    She hasn't answered the question.

4              MR. SIEGEL:  She answered my question.

5              MS. KAPLAN:  She did not answer it.

6              MR. SIEGEL:  I will repeat it then.

7              MS. KAPLAN:  No.  You don't get to repeat it.

8              MR. SIEGEL:  Your Honor?

9              THE COURT:  Ms. Kaplan, you don't get to argue --

10             MS. KAPLAN:  Sorry, your Honor.

11             THE COURT:  -- with opposing counsel.

12             Do you have something to say to me?

13             MS. KAPLAN:  Yes, your Honor.  I think she should be

14   permitted to answer the question.

15             THE COURT:  Mr. Siegel, why not?

16             MR. SIEGEL:  It calls for yes, or no and I thought I

17   got a response.

18             THE WITNESS:  And I said that you were misrepresenting

19   it.

20             THE COURT:  Let's leave it right there.  Move ahead,

21   Mr. Siegel.

22             MR. SIEGEL:  Thank you, your Honor.

23   BY MR. SIEGEL:

24   Q.  I want to show you what's in evidence as Exhibit CJ, it's a

25   text from E. Jean Carroll to another person on June 27, 2019.

1            Eric?  You can publish it, it is in evidence.

2            Dr. Lebowitz, I want to direct your attention to the

3     highlighted portion.

4     A.  OK.

5     Q.  That reads:  Do not worry.  I have been walking these great

6     New York streets the last six days alone, and at night, all day

7     long, and receive nothing but thanks and thumbs up.  It is the

8     exact opposite of concern.

9            This was a text message from E. Jean Carroll.  Do you

10    see that?

11    A.  I do.

12           MR. SIEGEL:  Take it down, Eric.

13           THE COURT:  Was there going to be a question or was

14    that a vision test?

15           MR. SIEGEL:  Actually, I thought put more words in but

16    I will try to ask it quicker.

17    Q.  The date of the text was June 24, 2019.  Do you see that?

18    A.  I do.

19    Q.  And that is only three days after Donald Trump first said

20    that E. Jean Carroll lied on June 21, 2019; is that right?

21    A.  I will take your word for that.

22    Q.  Well, you read Ms. Carroll's complaint in this case, right?

23    A.  Yes.

24    Q.  Now, did Ms. Carroll tell you about this text message or

25    its content during your interview?

1   A.  No.

2   Q.  Now, on direct you testified extensively about intrusion

3   and said that when you were questioning Ms. Carroll, she began

4   to squirm and told you it was because she was supposedly

5   re-experiencing Donald Trump's fingers in you.

6           Do you recall that testimony?

7   A.  Yes.

8   Q.  All right.  You obviously --

9           MS. KAPLAN:  Objection, your Honor.  I think the

10  question is misphrased.  I don't think he meant to say "in

11  you."

12          THE COURT:  Well, it's objectionable as to form in any

13  case at least.

14          MR. SIEGEL:  All right.

15  BY MR. SIEGEL:

16  Q.  Dr. Lebowitz, do you recall your testimony on direct a

17  short while ago about this intrusive episode that you described

18  Ms. Carroll experiencing during the interview where she began

19  to squirm?

20  A.  I do.

21  Q.  During that you obviously couldn't see what was in her mind

22  at that point, right?

23  A.  Right.

24  Q.  And you never used objective instruments to test if what

25  she was telling you was a lie; right?

1            MS. KAPLAN:  Objection, your Honor.

2            THE COURT:  Sustained as to form.

3   Q.  When Ms. Carroll, as you described it, squirmed, you didn't

4   use any objective psychological instruments or tests to

5   determine the cause of her squirming, did you?

6            MS. KAPLAN:  Objection, your Honor.

7            THE COURT:  What's the objection?

8            MS. KAPLAN:  There is no foundation for this; if there

9   are any objective psychological instruments or tests to

10   determine squirming.

11            THE COURT:  How about that?

12            MR. SIEGEL:  She's the expert and can speak to that.

13            THE COURT:  Is that what you are doing?  Are you

14   asking her whether there are objective tests, whether she

15   considers them valid, why she used them, why she didn't use

16   them, if there are any?  Is that what you intend to do here?

17            MR. SIEGEL:  I thought she already addressed, your

18   Honor, that there are tests available to determine the

19   lingering but I will explore it, your Honor, if need be.

20            THE COURT:  Well, if that's what you want to do.

21   BY MR. SIEGEL:

22   Q.  So, Dr. Lebowitz, earlier in your testimony you said that

23   there is objective tests, psychological tests that can be used

24   to determine whether someone is lying; right?

25   A.  I agreed that there are some psychological tests that

N535CAR2                    Lebowitz - Cross

people sometimes use to try to assess whether somebody is
telling the truth.  Like all psychological tests there are
problems, sometimes they're accurate and reliable, sometimes
they're not.

Q.   And in this instance you didn't use any of those
psychological tests to determine if what Ms. Carroll was
conveying to you, as she squirmed, was truthful; right?

A.   There are no psychological tests to evaluate whether or not
somebody is having an internal experience of a flashback.  The
so-called objective tests for assessing whether or not somebody
is suffering from something like an intrusion or a flashback
would be something like, for example, the
clinician-administered PTSD scale, which is literally a series
of questions in which you ask the person whether they're having
certain kinds of symptoms.  It is considered structured and
reliable and valid because if two people give the same test,
their answers tend to correlate, and because it lines up very
specifically with the DSM -- the Diagnostic Manual's --
description of post-traumatic stress.  But even when using what
is arguably the gold standard way to evaluate PTSD and to
evaluate flashbacks and effects on schemas and all the rest, it
is simply a series of questions.  The point of the structure of
the exam is to make sure you ask all the possible questions to
assess whether or not somebody may or may not have symptoms
that lead them to be diagnosed with a particular thing.  But,

N535CAR2                       Lebowitz - Cross

1   it is still a series of questions that one person asks another.

2   Q.  Thank you, Dr. Lebowitz.

3        So you didn't use any psychological test to determine

4   whether or not Ms. Carroll's explanation to you for her

5   squirming was truthful; right?

6        MS. KAPLAN:  Objection.

7        THE COURT:  Sustained.

8   Q.  You just mentioned there is symptoms of PTSD?

9   A.  I do.

10  Q.  You agree that Ms. Carroll does not have PTSD; correct?

11       THE COURT:  I think the answer was actually quite a

12  bit more elaborate than your purported summary of it,

13  counselor.

14       MR. SIEGEL:  Then I will ask it this way.

15  Q.  You had testified in the midst of that statement that there

16  are tests available to assess PTSD; correct?

17  A.  I did.

18  Q.  OK.

19       Does Ms. Carroll have PTSD?

20  A.  No.  That's why I didn't give her that test.

21  Q.  OK.

22       Now, during your interview, Ms. Carroll told you she

23  has intrusive images that have been ongoing since the alleged

24  rape; correct?

25  A.  She did.

N535CAR2                    Lebowitz - Cross

1   Q.  Now I want to show you Defendant's Exhibit AA in evidence,

2   it is Ms. Carroll's book, page 244, lines 22 through 23.

3           MR. SIEGEL:  You can publish it.

4           MS. KAPLAN:  No.  We need to see it first.

5           MR. SIEGEL:  I'm sorry.  It is in evidence, but that's

6   fine.

7           MS. KAPLAN:  I am being told there is a redaction

8   issue.

9           MR. SIEGEL:  It is fine.  This was already shown to

10  Ms. Carroll.  That's fine.

11          THE COURT:  Mr. Siegel, let's both of you cut off the

12  byplay.  And that is addressed to Ms. Carroll, too.  If

13  somebody has something to say, say it to me and not just go at

14  each other.

15          MS. KAPLAN:  I apologize, your Honor.  We wanted to

16  see because apparently there are still some redaction issues.

17          THE COURT:  Are there or are there not, Mr. Siegel?

18          MS. KAPLAN:  No issue, your Honor.

19          MR. SIEGEL:  Thank you.

20          THE COURT:  No?  All right.

21  BY MR. SIEGEL:

22  Q.  Dr. Lebowitz, this is a portion of Ms. Carroll's book and I

23  will just read it to you.  It says:  Indeed, before 2015, when

24  the man began appearing in the papers and on TV daily, I rarely

25  thought of it.  When he forced himself on the notice of the

1    entire nation, I, like everyone else, tweeted jokes about him,

2    complained to friends that America was going to hell in a

3    handbasket and so on.  I am fine.  I can't explain it, but I

4    never suffered.

5            Reading that you would agree that -- we can take that

6    down -- saying she has been having these intrusive images since

7    the event itself, and saying in her book "I rarely thought of

8    it," are inconsistent in terms of content; is that correct?

9    A.  No.

10   Q.  I want to direct your attention to your deposition

11   testimony, March 14, 2023, pages 136, lines 20 to 25.  When

12   everyone is ready.

13           THE COURT:  You want lines 20 to 23?

14           MR. SIEGEL:  20 to 25, your Honor.

15           THE COURT:  In other words --

16           MS. KAPLAN:  No.

17           MR. SIEGEL:  I promise I will get to that next portion

18   immediately after.

19           THE COURT:  Oh no, no, no.  There is an objection.

20   Ms. Kaplan is on her feet.

21           MS. KAPLAN:  Yes, your Honor.  We think it needs to go

22   to page 137, line 8.

23           MR. SIEGEL:  Happily, your Honor.  Can I proceed?

24           THE COURT:  Yes.

25           MR. SIEGEL:  Thank you.

N535CAR2                      Lebowitz - Cross

 1  BY MR. SIEGEL:

 2  Q.  Dr. Lebowitz, I direct your attention to your deposition --

 3  A.  I can't see it, if that's what you want me to do.

 4  Q.  Sorry.

 5          THE COURT:  Mr. Siegel, you are going to have to get

 6  this together.  This has been going on for several days.

 7          MR. SIEGEL:  The tech person is putting it on the

 8  screen now, your Honor.  Or, to speed this along, I can just

 9  read it to her, if that's OK.

10          THE COURT:  Whatever you want to do, Mr. Siegel.

11          MR. SIEGEL:  Thank you very much, your Honor.

12  BY MR. SIEGEL:

13  Q.  OK.  Ah, there we are.  So, Dr. Lebowitz, do you see here

14  the question to you --

15          THE COURT:  Just read it.  I know she can see it.  We

16  all know she can see it.

17          MR. SIEGEL:  I wanted to make sure it was on her

18  monitor, your Honor, but fair enough.

19          THE COURT:  I thought you were just going to read it

20  because it is not on the monitor.  I don't know what you are

21  doing.  You just told me you were going to read it.

22          MR. SIEGEL:  I am, but it just came up on the screen

23  after I heard that.

24          THE COURT:  Either way.  Just get with it.

25  BY MR. SIEGEL:

1   Q.  So, question to you:

2   "Q  So there is no inconsistency for her saying that she's been

3   having these ongoing intrusive images since the event herself

4   and then her saying in her book I rarely thought of it?

5   "A  They are –– they are inconsistent in terms of content.

6   They are consistent with her psychologically, you know, we

7   don't all say the same thing depending on our social

8   environment, right?  We say something different in a more

9   intimate setting than we say in a more public setting.  We

10  present ourselves differently in those circumstances.  So, it

11  is consistent with that, even if the actual content doesn't

12  line up perfectly."

13          Dr. Lebowitz, was that truthful testimony?

14  A.  It was absolutely truthful testimony and –– and I'm going

15  to have to –– you are going to just have to give me a moment.

16  OK?

17          When Ms. Carroll made clear during her testimony which

18  I –– which is correct, is that there is a difference in terms

19  of thinking and intrusions.  What I am saying here, I'm just

20  not parsing it that –– that clearly.  So –– she is continuing

21  to think of him but she is pushing it away very hard.  What she

22  is also doing in her book –– first of all, she is making a

23  distinction between thinking and intrusions which she has done

24  here in the court, and there is a distinction between her

25  public persona and her private suffering.  That is what is

1    being revealed here.

2    Q.  Dr. Lebowitz, would you agree with me now that those two

3    statements are inconsistent in terms of content?

4    A.  I would not agree with you that they are different in any

5    way than is truthful or meaningful is what I am saying.

6    Q.  In light of what you just read, it is your position that

7    these two statements, that she has been having intrusive images

8    since the event herself and in her book I rarely thought of it,

9    are consistent with Ms. Carroll's psychology; is that right?

10   A.  They are consistent with Ms. Carroll psychologically and

11   they are also consistent with her testimony that she makes a

12   distinction between thinking about things, i.e., choosing to

13   think about something, and being inflicted with an intrusion.

14   It is all consistent with that.

15   Q.  OK.

16        And what you mean by they're consistent with

17   Ms. Carroll psychologically is that people may say something

18   different in a more intimate setting than they say in a more

19   public setting; is that correct?

20   A.  Yes, and that they are particularly consistent with who she

21   is since she is, more than average, resistant to being seen as

22   somebody who has been hurt or is vulnerable or injured.  So

23   they're both consistent with the more general human impulse to

24   say, *Yeah, I'm fine*, when they may not be, but it is more

25   specific to her, which is she is more like that than most

1    people.

2    Q.  I want to show you Ms. Carroll's deposition testimony on

3    October 14, 2022.

4            MR. SIEGEL:  Your Honor, page 145, lines 10 through

5    19.

6            Robbie?

7            MS. KAPLAN:  Do you have a copy?  We have got it.

8            MR. SIEGEL:  Just let me know when you are ready.

9    Robbie, is that OK?

10           MS. KAPLAN:  Yes.

11           MR. SIEGEL:  Thank you.

12           Eric, can you display it to the witness?

13           I will speed this along, your Honor.

14   Q.  On October 14, 2022 Ms. Carroll testified, as follows:

15   "Q  During the two decades that followed, how would you say the

16   alleged attack impacted your life?

17   "A  Well, four or five years ago I would have told you it had

18   no effect, I'm as good as new.  This is great, I'm fine.  I

19   rarely think of it.  But I have come to understand that that

20   rape changed my life, which is shocking for me to now

21   understand."

22           Now, that was Ms. Carroll's statement in a sworn

23   deposition, not her book.  It is on the screen now before you.

24   A.  Yes.

25   Q.  And you would agree that a deposition is not the equivalent

N535CAR2                       Lebowitz – Cross

1   of a book, right?

2            MS. KAPLAN:  Objection.

3            THE COURT:  Sustained.

4            MR. SIEGEL:  We can take that down.

5   Q.  On direct you testified about avoidance, and you explained

6   that avoiding things -- withdrawn -- that avoidances, avoiding

7   things, people, and places help a person avoid reminders of

8   trauma; is that right?

9   A.  Yes; and also one can avoid internal experiences as well;

10  thoughts, feelings.

11  Q.  And you would agree that psychologically seeing certain

12  things, people, and places connected to trauma can cause

13  someone to think about that trauma; right?

14  A.  Sometimes, of course.

15  Q.  Now, as for your report, and as I think you testified

16  today, you concluded that Ms. Carroll's harms are manifested

17  and pronounced avoidance behaviors which reflect ongoing

18  fearfulness related to the alleged assault; right?

19  A.  Yes.

20  Q.  In fact, based on what Ms. Carroll told you, you concluded

21  that she's tried very hard to not think about the alleged

22  Bergdorf Goodman incident as much as possible; right?

23  A.  Yes.

24  Q.  Now, Ms. Carroll told you that she doesn't typically keep

25  things in her closet that she doesn't wear, right?

N535CAR2                          Lebowitz - Cross

1    A.  Correct.

2    Q.  And she also told you that she has a small closet, right?

3    A.  Yes.

4    Q.  But you are aware that Ms. Carroll kept the dress she says

5    she wore during the alleged incident for over 20 years; right?

6    A.  I am.  I discussed it earlier.

7    Q.  Right.  You testified on direct you think Ms. Carroll kept

8    the dress because she had lost something she couldn't get back

9    and held on to the dress almost as a way of holding on to hope.

10          Do you recall that testimony on direct?

11   A.  Yes.  I testified that there were likely more than one

12   reason why the dress was still in her closet and that was my

13   thought about what one of those reasons might be.

14   Q.  Dr. Lebowitz, I think you said that you took

15   contemporaneous notes, you were typing quickly as you spoke to

16   Ms. Carroll?

17   A.  Yes.

18   Q.  And, in fact, Ms. Carroll didn't tell you that that was the

19   reason she kept the dress, right?

20   A.  No.  That is my psychological assessment.

21   Q.  Right.

22   A.  That is not something that she said in that way.

23   Q.  Right.  The reason she told you she kept the dress is

24   because it was expensive; right?

25   A.  Yes.

N535CAR2                         Lebowitz - Cross

Q.  And as you sit here today, you don't have any independent

knowledge as to whether or not she actually wore that dress

over the years since the mid-1990s; do you?

            MS. KAPLAN:  Objection.

            THE COURT:  What is the relevance of that?

            MR. SIEGEL:  She is claiming that Ms. Carroll engaged

in avoidance behaviors and our position is keeping the dress

for 20 years she claims she was raped in isn't consistent with

that.

            THE COURT:  Why don't you ask that question.

            MR. SIEGEL:  She is testifying, your Honor, as to her

belief as to why Ms. Carroll kept the dress.  I am just asking,

based on that opinion, whether or not she has any independent

knowledge as to whether or not Ms. Carroll wore that dress.

Because I think that would affect her opinion.

            THE COURT:  OK.  Let's ask her that.

            MR. SIEGEL:  Fine.  Thank you very much, your Honor.

BY MR. SIEGEL:

Q.  So, Dr. Lebowitz, do you have any independent knowledge as

to whether or not Ms. Carroll actually wore that dress over the

years since the mid-1990s?

A.  Of course not.

Q.  No.

            Ms. Carroll told you she watched *The Apprentice* a few

times, right?

1   A.   She did.

2   Q.   She told you she didn't watch it a lot; right?

3   A.   That's correct.

4   Q.   Are you aware that Ms. Carroll testified, at this trial,

5   two days ago, on May 1, that she watched *The Apprentice* and was

6   "a big sort of fan of the show"?

7   A.   I am.

8   Q.   Now, again, you took contemporaneous notes of Ms. Carroll's

9   interview of you -- excuse me -- Ms. Carroll's interview by

10  you?

11          MS. KAPLAN:   Asked and answered, your Honor.

12          THE COURT:   Sustained.

13  Q.   When you spoke to Ms. Carroll, did she ever tell you that

14  she was "a big sort of fan of the show"?

15  A.   Yes, she did, actually.

16  Q.   She did.   And it is your testimony that she told you that

17  even though, according to you, she only told you she watched it

18  a few times?

19  A.   She told me that she thought it had amazing production

20  values, that there was a, like, kind of a brand-new idea, and

21  that she appreciated the artistry, if you will, of the show

22  from a professional point of view.   She told me that.

23  Q.   Right.   Did she tell you that she posted on social media

24  that she was a massive fan of the show?

25  A.   No, that is not inconsistent.   She is exuberant in most of

1   her statements.

2   Q.  But she told you she didn't watch the show a lot, right?

3           MS. KAPLAN:  Objection, your Honor.  Asked and

4   answered.

5           THE COURT:  Sustained.

6   Q.  Now, in addition to not diagnosing Ms. Carroll with

7   post-traumatic stress disorder, you also didn't diagnose her as

8   having anxiety; correct?

9           THE COURT:  Rephrase the question, counselor.  Stop

10  making your argument as part of the question.

11          MR. SIEGEL:  OK.

12  Q.  Did you diagnose Ms. Carroll with post-traumatic stress

13  disorder?

14  A.  I did not.

15  Q.  Did you diagnose her as having anxiety?

16  A.  I did not.

17  Q.  Did you diagnose her with major depression?

18  A.  I did not.

19  Q.  There is absolutely no psychological, psychiatric, or

20  therapeutic diagnosis that Ms. Carroll suffers from which may

21  have been caused by her alleged Bergdorf Goodman incident; is

22  that right?

23          MS. KAPLAN:  Argumentative, your Honor.

24          THE COURT:  I will allow it.

25  A.  If I understand your question correctly, you are asking me

1    does Ms. Carroll meet diagnostic criteria for a major mental

2    illness.  The answer to that is no.  She does have symptoms

3    that fit within the rubric of post-traumatic stress disorder

4    but she does not have enough to meet the full criteria for what

5    is essentially a disabling and a chronic mental illness.

6    Q.  OK, so my question was:  There is absolutely no

7    psychological psychiatric or therapeutic diagnosis that

8    Ms. Carroll suffers from which may have been caused by her

9    alleged Bergdorf Goodman incident; is that right?

10          MS. KAPLAN:  Asked and answered and argumentative,

11   your Honor.

12          THE COURT:  Sustained.

13   Q.  A separate question, Dr. Lebowitz.  Would you agree that

14   there is no clinical diagnosis to corroborate Ms. Carroll's

15   allegation in this case?

16          MS. KAPLAN:  Objection, your Honor.

17          THE COURT:  Sustained, at least as to form.

18          MR. SIEGEL:  All right.

19   Q.  Dr. Lebowitz, is there a clinical diagnosis to support

20   Ms. Carroll's allegation in this case?

21          MS. KAPLAN:  Objection, your Honor.

22          THE COURT:  Rephrase.

23          MR. SIEGEL:  I will do it one more time.

24          THE COURT:  The problem is the word "clinical."

25          MR. SIEGEL:  OK.  Fair enough.  Thank you.

1    Q.  Dr. Lebowitz, there is no psychological, psychiatric or

2    therapeutic diagnosis to support Ms. Carroll's allegation in

3    this case; is that correct?

4               MS. KAPLAN:  Your Honor, may we have a side bar?

5               THE COURT:  OK.

6               (Continued next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At side bar)

2           MS. KAPLAN:  So, the issue, your Honor, is I want to

3    know what he is asking.  Is he asking is there a diagnosis that

4    supports her damages from something?  Or is he asking is her

5    diagnosis, of course, that it actually happened?  I'm not aware

6    there is any diagnosis that we have already talked about that

7    would support the truth of whether something happened or not.

8           That's the problem I am having with the question.

9           THE COURT:  Well, and there is the further problem and

10   that is I don't know what a therapeutic diagnosis could

11   possibly be.

12          MR. SIEGEL:  I can remove that word, your Honor.

13          THE COURT:  I am sure you could.

14          MR. SIEGEL:  Tell me if this would be sufficient:

15   There is no psychological or psychiatric diagnosis to

16   corroborate Ms. Carroll's allegation in this case.

17          MS. KAPLAN:  What allegation?

18          THE COURT:  Pardon?

19          MS. KAPLAN:  What allegation?  The fact that the

20   assault happened?  Or the fact that she has damage from the

21   assault?

22          MR. TACOPINA:  The Bergdorf Goodman incident.

23          MR. SIEGEL:  Yes.

24          THE COURT:  I'm sorry?

25          MR. TACOPINA:  Sorry.  I was just answering.

1          MR. SIEGEL:  OK.  Your Honor, I will try it again.

2          So, there is no psychological or psychiatric diagnosis

3     to corroborate Ms. Carroll's claim that she was raped at

4     Bergdorf Goodman.

5          MS. KAPLAN:  I don't think there is foundation for

6     that.  I think he hasn't established there would be a diagnosis

7     to corroborate whether something happened or not.

8          THE COURT:  Why isn't that right, Mr. Siegel?

9          MR. SIEGEL:  Sorry, your Honor.

10          THE COURT:  How could there be a psychological or

11     psychiatric diagnosis that would corroborate what happened at

12     Bergdorf Goodman?

13          MR. SIEGEL:  Because she is testifying that assuming

14     this occurred -- withdrawn.

15          If someone is violently raped in any location, it is

16     conceivable they may actually suffer from some type of mental

17     disorder as a result.  That mental disorder would, therefore,

18     corroborate their claim of rape.

19          THE COURT:  Maybe.  Maybe not.

20          MR. SIEGEL:  That's true.  Maybe.  Maybe not.

21          THE COURT:  But she has already testified that there

22     is no major psychologic disorder under the DSM-whatever-number.

23          MR. SIEGEL:  Yes.

24          MR. TACOPINA:  Let me ask this question.  The judge

25     had a problem with the word "clinical."  I'm sorry.  In other

1    words, there is no diagnosis, take out "clinical" to

2    corroborate Ms. Carroll's allegation in this case.  I think --

3    should I not be part of this?  I don't think I should be part

4    of this.

5              THE COURT:  That's number one, but we will pass over

6    that.

7              MR. TACOPINA:  All right.  Thank you.

8              THE COURT:  Because you are smiling.  And so am I.

9              MR. TACOPINA:  And you are too.

10             THE COURT:  The record will reflect.

11             No.  You are trying -- there this wonderful old Mainer

12   joke.  A guy walks up to the general store and was obviously

13   lost and he asked these two guys sitting on the stoop, how do

14   you get to Millinocket?  Isn't this the way the joke goes?  And

15   there is a lot of talk with a heavy Maine accent, and after 15

16   minutes one of the guys on the stoop says:  *You can't get to*

17   *Millinocket from here.*

18             I don't think you can get to where you want to go from

19   here.

20             MR. SIEGEL:  Why don't you ask that last question?

21             MR. TACOPINA:  Just move on.  We will start here.

22             MS. KAPLAN:  One more issue, your Honor, and I didn't

23   want to ask for a side bar, but we have an issue now.  He asked

24   her whether she took -- she gave her the MMPI.

25             THE COURT:  Yes.

1          MS. KAPLAN:  Dr. Nace didn't give her the MMPI.

2          THE COURT:  So?

3          MS. KAPLAN:  I don't know whether he is testifying or

4     not.  That's the problem.  I would ordinarily say: *Isn't it*

5     *true that Mr. Trump's expert also didn't give her that test?*

6     But I'm trying to be careful of the fact that they may not even

7     be putting him in.

8          MR. TACOPINA:  Which you will know before you get up

9     for redirect.

10          THE COURT:  You mean this cross is going to continue

11     that long?

12          MR. TACOPINA:  Well, it is only 15 more minutes.  But

13     you won't be done with your redirect.

14          THE COURT:  Look.  Let's just try to move ahead.

15          MR. SIEGEL:  I will, your Honor.

16          MR. TACOPINA:  That problem will be resolved, Robbie.

N535CAR2                           Lebowitz – Cross

1          (In open court)

2          THE COURT:  Next question, please.

3          MR. SIEGEL:  Thank you very much.

4  BY MR. SIEGEL:

5  Q.  Dr. Lebowitz, based on what Ms. Carroll told you, you

6  concluded that the alleged incident at Bergdorf Goodman is the

7  cause of her inability to engage in romantic and sexual

8  partners; correct?

9  A.  I did.

10  Q.  But you would agree that it is possible something else

11  other than the alleged Bergdorf Goodman incident may have

12  caused Ms. Carroll's supposed inability to engage with

13  potential romantic partners, correct?

14  A.   In psychology it is -- it is always possible.  We can only

15  ever say that things are within a certain degree of certainty.

16  We can't even say the sun is definitely going to rise tomorrow

17  as a psychologist so of course there is always a possibility.

18  Q.  Are you aware that Ms. Carroll appeared on a podcast

19  entitled *UnStyled* in August of 2019 in which she said:  Well,

20  after the episode in Bergdorf's I never had sex again, but I

21  think it wasn't because of him.  I think it was just that I

22  didn't have the luck to meet that person that would cause me to

23  be desirous again.

24  A.   If I am remembering this material correctly, I think she

25  also at some point acknowledged that one creates one's own luck

1   and her avoiding behavior precluded her from creating the luck

2   that she needed to meet somebody and I think that is what she

3   is saying there.

4   Q.  And you are drawing that conclusion based on an assumption

5   that what she told you was correct; true?

6   A.  No, I am basing that on my memory, which I hope is

7   accurate, of what she actually said in that podcast or some of

8   her materials, that one creates one's own luck in creating

9   context for that.

10  Q.  I understand but I'm not -- in forming your opinion as to

11  her psychological condition on that issue you're relying upon

12  the accuracy of what Ms. Carroll told you, correct?

13  A.  I am a little confused by your question.  I'm sorry.

14  Q.  OK.  Let me reframe it.

15          Everything you are testifying to here today, including

16  what you just said, is based on the accuracy of what

17  Ms. Carroll told you; correct?

18  A.  It is actually based on two things.  It is based on what

19  she told me viewed through the lens of what I understand

20  research and clinical work about trauma has taught us over the

21  last 40 years, and also my clinical experience.  So, when

22  somebody tells me something I don't receive it like a video

23  recording, I filter it through the lens of what I know about

24  people and behavior and trauma in general.  So there is really

25  two forces at work here, right?  One is what is she telling me;

and then, secondarily, does this make sense, is this consistent

with what we know more generally about how people work and how

trauma affects people.  So, there is two factors at work here.

Q.  Did you hear the portion of the podcast where she said:  I

think it wasn't because of him?

A.  I didn't hear the podcast but I think I read a transcript

of it.

Q.  You are aware that Ms. Carroll has claimed she experienced

sexual assaults before this alleged Bergdorf Goodman incident;

is that right?

A.  I am.

Q.  But you don't attribute the symptoms you found to any of

those past incidents?

A.  No.

Q.  You are aware that Ms. Carroll testified in her 2022

deposition that she was sexually abused by a girl scout leader

when she was a child?

A.  I am.

Q.  And according to you there is no evidence that that

experience affected her functioning?

A.  There is no evidence it affected her functioning.  I think

that it -- she thought about it and it was a painful event in

her life.  We all have pain, though, that doesn't necessarily

affect our functioning.  There is no evidence it affected her

functioning as far as I could discern.

N535CAR2                    Lebowitz - Cross

1   Q.  In preparation for your evaluation and testimony you read

2   her January 31st, 2023 deposition; correct?

3   A.  No.  I think the timing of that doesn't work.

4   Q.  OK.  Have you ever heard -- withdrawn.

5         Are you aware that Ms. Carroll testified at a

6   deposition on January 31st, this year, that she never claimed

7   to be traumatized by any of the --

8         THE COURT:  Sustained.  Look.  There is a rule about

9   how you are to do this and that isn't it.

10  Q.  Dr. Lebowitz, did you read Ms. Carroll's January 31st, 2023

11  deposition?

12  A.  I think so but I am not positive.  I would have to look at

13  it.  I'm not sure.

14        MR. SIEGEL:  OK.  Can you show it to her?

15        Your Honor, may I approach?

16        THE COURT:  For what purpose?

17        MR. SIEGEL:  To show her the deposition to refresh her

18  recollection.

19        THE COURT:  As to whether she has read it?  Fine.

20        MS. KAPLAN:  Can you tell us what line -- your Honor,

21  can you ask him to tell us what lines?

22        THE COURT:  I'm sorry.  I couldn't understand you,

23  Ms. Kaplan.

24        MS. KAPLAN:  We are asking about what part of the

25  deposition he --

N535CAR2                          Lebowitz - Cross

1              THE COURT:  At the moment we are trying to find out if

2      the witness remembers ever having read it.

3              MS. KAPLAN:  Sorry, your Honor.

4              THE WITNESS:  I think I have seen it.

5              THE COURT:  Have you read it?

6              THE WITNESS:  I think so.  I couldn't swear to it, but

7      I think so.

8              THE COURT:  A little louder so the jury can hear.

9              THE WITNESS:  I think I have read it.

10     BY MR. SIEGEL:

11     Q.  OK.  Do you recall --

12             THE COURT:  This is not a memory quiz.  There was a

13     reporter.

14             MR. SIEGEL:  OK.

15     Q.  I want to direct your attention to page 65, lines 3 through

16     10.

17             (Counsel conferring)

18             THE WITNESS:  Yes.

19             THE COURT:  I appreciate the conference but is there

20     going to be a question?

21             MR. SIEGEL:  Yes.

22             MR. TACOPINA:  They're working on it.

23             MR. SIEGEL:  We will resolve this amongst ourselves,

24     your Honor.

25             (Counsel conferring)

1          THE COURT:  Folks, *tempus fugit*.  I apologize for the

2     Latin.  Time is flying.

3          MR. SIEGEL:  I think I can move this along.

4     Q.  I just want to direct your attention to page 65 -- you can

5     read it to yourself -- lines 3 through 10 and I will ask you

6     one question after you do.

7     A.  OK.

8          MS. KAPLAN:  Your Honor, can we have a side bar,

9     please?

10         MR. SIEGEL:  Robbie --

11         THE COURT:  There is not even a question yet.  Do we

12    need a side bar?

13         MR. SIEGEL:  I don't think so, your Honor.

14         MS. KAPLAN:  OK.

15    BY MR. SIEGEL:

16    Q.  Dr. Lebowitz, Ms. Carroll said she was traumatized by Cam;

17    is that correct?

18    A.  Yes.

19    Q.  Now, do you recall documenting in your notes, that you took

20    contemporaneously when interviewing Ms. Carroll, that she can

21    experience back pain if she is just thinking about Cam?

22    A.  Yes.

23    Q.  So Ms. Carroll told you she experiences physical

24    manifestation of pain just from thinking about Cam; right?

25    A.  Yes.

N535CAR2                        Lebowitz - Cross

1    Q.  Do you think that is an important fact when evaluating

2    Ms. Carroll's emotional condition?

3    A.  It is certainly a fact that I considered when evaluating

4    the effect of Cam on Ms. Carroll; yes.

5    Q.  You didn't include that in your report though, correct?

6    A.  That's true.

7    Q.  Now, you testified about -- coming to the end here -- some

8    of the behavior Ms. Carroll supposedly exhibited during this

9    alleged rape such as not screaming; right?

10   A.  Yes.

11   Q.  And it is your opinion that such behavior, not screaming,

12   would be consistent with a rape, correct?

13   A.  Absolutely.

14   Q.  But you would agree that screaming is also consistent with

15   a rape, right?

16   A.  I think screaming, under those circumstances, is an

17   excellent response to being sexually assaulted.  I also happen

18   to know, both from research and from 40 years of clinical work,

19   that it is one of the least likely things that actually occur.

20   Q.  But you agree with me that screaming would be consistent

21   with a rape, correct?

22   A.  Sure.  Some people scream.  That's a good idea.

23   Q.  Dr. Lebowitz, when you were deposed on March 14 of this

24   year, you couldn't think of any reactions by a person claiming

25   rape that would not be consistent with that claim; correct?

N535CAR2                    Lebowitz - Cross

1             THE COURT:  I'm sorry?

2             THE WITNESS:  There is a lot of negatives in that

3    question.

4             MS. KAPLAN:  Object to the form.

5             THE COURT:  Rephrase it.

6    BY MR. SIEGEL:

7    Q.  You testified at your deposition in this case on March 14,

8    2023; correct?

9    A.  Yes.  I will take your word for that, yes.

10   Q.  And you were asked whether you could think of any reactions

11   by a person claiming rape that would not be consistent with

12   that claim, right?  That would be inconsistent with a claim of

13   rape?

14            MS. KAPLAN:  Your Honor, if we can get a page number,

15   please?

16            MR. SIEGEL:  Sure.

17   A.  I don't remember the context of that exchange and I would

18   have to have it in context before I can answer it because I

19   don't remember that specific sentence from my deposition.

20   Q.  Sure.

21            Page 154, Robbie, line 20, through 155, line 2.

22            MS. KAPLAN:  OK, we have the context.

23   Q.  Dr. Lebowitz --

24            THE COURT:  There is an objection on the record.  Has

25   it been addressed?

1            MS. KAPLAN:  We lost the question on our screen.  If

2     the court reporter can read it back?

3            THE COURT:  I don't want it read back.  Get the

4     transcript.  Well, indeed it is on the screen.

5            THE WITNESS:  I see the question but I actually need

6     the context for it.

7            THE COURT:  Doctor, hold it for a minute.

8            THE WITNESS:  OK.

9            THE COURT:  Is the objection being pressed or not?

10           MS. KAPLAN:  No.  We withdraw the objection, your

11     Honor.

12           THE COURT:  OK.  Go ahead.

13           MR. SIEGEL:  Thank you.

14     BY MR. SIEGEL:

15     Q.  I direct your attention to line 20 through -- what is on

16     your screen, line 20 of page 154, to line 2 on page 155?

17     A.  I don't have it on my screen.

18           THE COURT:  Line 2 is not on her screen.

19           MS. KAPLAN:  And that, your Honor, we do think she

20     needs more context.

21           MR. SIEGEL:  We will put up the whole thing.

22           THE COURT:  Is that an objection or not?

23           MS. KAPLAN:  It is an objection, your Honor.

24           THE COURT:  And what other context are we talking

25     about?

1           MS. KAPLAN:  So, she goes on to answer the question.

2           THE COURT:  Could you just give me the page and line

3     for context?

4           MS. KAPLAN:  All the way to 156, line 7.

5           MR. SIEGEL:  Your Honor, that's not responsive and it

6     doesn't put it in context.

7           THE COURT:  I'll be the judge of that.  Let me read

8     it.  I agree with Mr. Siegel.

9           What is your question, Mr. Siegel?

10          MR. SIEGEL:  Thank you, your Honor.

11    BY MR. SIEGEL:

12    Q.  Dr. Lebowitz, on March 14, 2023, you were asked this

13    question and gave this answer:

14    "Q  Are there any reactions to a rape that are not consistent

15    with the victim actually being raped?

16    "A  There may be.  I can't call any to mind at this moment, but

17    there may be."

18          Was that truthful testimony?  Oh, I'm sorry --

19    A.  Yes.

20    Q.  OK.  Now, you said that all of Ms. Carroll's behavior and

21    feelings as she conveyed them to you are consistent with being

22    raped; correct?

23    A.  They were consistent with who she is and with being raped.

24    There was nothing inconsistent.

25    Q.  OK.  But if what she told you is false, then all of her

N535CAR2                     Lebowitz - Cross

1   alleged behavior and feelings that she conveyed to you would

2   have to be inconsistent with her having been raped; is that

3   correct?

4          MS. KAPLAN:  Objection to form, your Honor.

5   A.  I think what is getting lost here --

6          THE COURT:  Wait.  There is an objection.

7          THE WITNESS:  Sorry.

8          THE COURT:  The objection is sustained.

9   Q.  Dr. Lebowitz, you are not offering an opinion in this case

10  on whether Ms. Carroll was raped, right?

11  A.  I am not.

12  Q.  And I think you said you have no independent knowledge of

13  whether that happened or not?

14  A.  That is correct.

15         MR. SIEGEL:  Thank you.  I have nothing further.

16         THE COURT:  OK.  Thank you.

17         Will there be redirect?

18         MS. KAPLAN:  There will, your Honor.

19         THE COURT:  OK.  2:00, folks.

20         (Luncheon recess; continued on next page)

21

22

23

24

25

N532Car3

|   |   |
|---|---|
| 1 | A F T E R N O O N    S E S S I O N |
| 2 | 2:00 p.m. |
| 3 | (Jury not present) |
| 4 | THE COURT:  Where are we on schedule? |
| 5 | MS. KAPLAN:  Your Honor, so we have a report to make. |
| 6 | Dr. Nace will not be testifying, and then in terms of giving |
| 7 | you -- sorry -- |
| 8 | THE COURT:  Go ahead. |
| 9 | MS. KAPLAN:  In terms of the agenda, today we will |
| 10 | finish Dr. Lebowitz, we will put on E. Jean Carroll's sister, |
| 11 | we will put on Natasha Stoynoff, and then, in the remaining |
| 12 | time——if there is remaining time——we will start the Trump |
| 13 | deposition designations. |
| 14 | I think we resolved -- we have been talking.  I think |
| 15 | we may have resolved any remaining objections there, which |
| 16 | would be good, and then tomorrow will be Carol Martin, Ashlee |
| 17 | Humphreys, Robbie Myers and, depending how we go today, that |
| 18 | may not even take up the whole day tomorrow. |
| 19 | THE COURT:  Okay.  Thank you. |
| 20 | MS. KAPLAN:  If that's helpful. |
| 21 | THE COURT:  Very helpful.  Thank you. |
| 22 | And given the conclusion on Dr. Nace -- |
| 23 | MS. KAPLAN:  I will waive the issue, your Honor.  I'm |
| 24 | not going to ask any questions. |
| 25 | THE COURT:  You are waiving redirect? |

N532Car3

1          MS. KAPLAN:  No, not redirect.  The question we talked

2    at sidebar I won't ask.

3          THE COURT:  Okay.

4          MR. TACOPINA:  Your Honor, just so you understand --

5    I'm sorry.

6          THE COURT:  And then we are done, right, done defense

7    case?

8          MR. TACOPINA:  Correct.

9          THE COURT:  Okay.

10          MR. TACOPINA:  Your Honor, there is an issue that Mike

11    and I were discussing.  I just want to raise it.  As far as I

12    understand, as far as Dr. Nace is concerned, it became an

13    impossibility for him to be able to go tomorrow, so -- for

14    various reasons that we have discussed in the back.  So we are

15    not -- we are just going to move forward.

16          THE COURT:  Is it a scheduling issue or ultimate

17    health issue?

18          MR. TACOPINA:  Health issue.

19          THE COURT:  Okay.  Because depending on what the facts

20    are——and we don't have to get into them——I could have had some

21    flexibility if I needed it.

22          MR. TACOPINA:  Yeah, your Honor, practically speaking,

23    I don't think that would work out.  I appreciate what you just

24    said, by the way.  I appreciate that a lot.  But I just don't

25    think it's, practically speaking, going to be useful to do

N532Car3

 1    that.

 2                THE COURT:  Okay.

 3                MR. TACOPINA:  So thank you, though.

 4                THE COURT:  All right.

 5                MR. TACOPINA:  Just one issue real quick, your Honor.

 6    During the testimony of Ms. Stoynoff, the plaintiff plans on

 7    introducing the Billy -- what should we call it?  Billy Bush

 8    tape?  Mike?

 9                MR. FERRARA:  Yes.

10                MR. TACOPINA:  The Billy Bush tape, let's call it

11    that.

12                THE COURT:  You can call it whatever you want.

13                MR. TACOPINA:  What would you like to call it, your

14    Honor?

15                THE COURT:  We all know what you are talking about.

16                MR. TACOPINA:  Anyway, so I would object to them

17    putting it in through Ms. Stoynoff, because obviously it is

18    subject to connection, authentication, but they are going to

19    play it later today during the deposition transcript --

20    deposition -- video depositions that have been designated

21    for --

22                THE COURT:  So therefore, if I understand you

23    correctly, it's going to come in today.

24                MR. TACOPINA:  It's going to come in today later, but

25    I don't think it should be played twice.  It's not -- obviously

N532Car3

1    it's not authenticated at this point.  It would have to only

2    come in subject to connection.  I think he could ask about it,

3    but playing it twice in two hours I think is --

4              THE COURT:  That's a separate question, but you don't

5    seriously contend that it isn't authentic, right?

6              MR. TACOPINA:  Oh, no, not seriously.

7              THE COURT:  All right.  I consider only serious

8    objections.

9              MR. TACOPINA:  Right.

10             THE COURT:  Right?  There is no issue as to

11   authenticity, right?

12             MR. TACOPINA:  Yes, right.

13             THE COURT:  Okay.  All right.  I understand your other

14   point.  We will deal with it if it becomes necessary.

15             MR. TACOPINA:  Thank you, your Honor.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Good afternoon.  Members of the jury, a

3    little scheduling progress report.

4              Based on what the lawyers have told me thus far——and

5    bearing in mind that I am not in the insurance-writing

6    business, things change in cases——I think you can reasonably

7    expect to get the case early next week.

8              Okay.  Dr. Lebowitz, you are still under oath.

9              Ms. Kaplan, any redirect?

10             MS. KAPLAN:  Yes, your Honor.

11   REDIRECT EXAMINATION

12   BY MS. KAPLAN:

13   Q.  Dr. Lebowitz, during your cross-examination by Mr. Seigel,

14   there were a series of questions, and I'm going to try to

15   refresh you.  You said you wanted to clarify something, so I'm

16   going to give you that opportunity.

17             Mr. Seigel asked you this question:  Do you recall

18   writing in your report that Ms. Carroll lives with a higher

19   level of chronic fearfulness than she did before Donald Trump's

20   denunciation?  You answered:  Yes, yes.  And then he asked you,

21   as to whether Ms. Carroll felt safe walking down a street after

22   Donald Trump said she lied, you concluded that it began to

23   subside -- you concluded that it began to subside.  Ms. Carroll

24   simply felt frightened and overwhelmed and could not eat or

25   sleep well, is that right?  And you said, yes, but I think you

are conflating a few different things which I would like to

clarify.

          Do you recall that testimony?

A.   I do.

Q.   Would you please clarify -- let the jury know what you

wanted to clarify.

A.   Sure.  Right after Mr. Trump denounced Ms. Carroll, she had

a period of time in which she felt really terrified.  She was

having trouble eating, she was having trouble sleeping.  I

think she lost five pounds in a very short period of time.  It

was a short period of time where she felt really inundated with

hateful e-mails and she was fearful.  That did subside.  And in

general I don't think Ms. Carroll has ever been fearful on the

streets of New York.  New York is a place that she feels safe

and feels actually supported by.

          Where the fear has been relevant and enduring is alone

in her home, in her cabin, where she sleeps with a loaded gun

to this day because she was afraid that Mr. Trump's

denunciation of her and his invitation for people who knew

something about her to come forward might invite people to seek

her out and harm her.  And that fear, you know, she doesn't

experience it, you know, as a kind of daily throb of fear

because she has a loaded gun, but she did learn how to shoot

effectively and she does continue to sleep with a loaded gun by

her bed, which suggests to me the presence of some ongoing

N532Car3                          Lebowitz - Redirect

1    fearfulness.

2    Q.  Dr. Lebowitz, do you recall that Mr. Seigel asked you a

3    number of questions about psychological tests or instruments?

4    A.  I do.

5    Q.  And just to set the groundwork there, could you explain to

6    the jury what is a psychological instrument or the

7    psychological instruments you were talking about, what do they

8    look like, how are they administered?  That was very compound.

9    A.  That's okay.

10           THE COURT:  Yes, it was.  Let's try again.

11           MS. KAPLAN:  Yeah.

12   Q.  Can you explain to the jury how a psychological instrument

13   like that is administered?

14           THE COURT:  Could we maybe even let's find out what it

15   is?

16           MS. KAPLAN:  Withdrawn.

17   Q.  Could you please tell us what a psychological instrument

18   is, Dr. Lebowitz?

19   A.  Well, there are lots of different kinds, first of all.  The

20   kinds that I was being asked about are -- Mr. Seigel mentioned

21   the MMPI, and he mentioned -- referred to some screening

22   instruments.  So there are a lot of tests where it is

23   basically -- let's start with the first one.  There are these

24   things called paper-and-pencil tests.  You have probably seen

25   them in your doctor's office, where you sit down and you get

1    like nine questions that are basically finding out, have you

2    been depressed, have you been anxious, how much are you

3    drinking?  So they are very straightforward.  They are usually

4    yes/no answers, or maybe you have the Likert scale, where you

5    can answer like 1 to 5 about how much you agree with the

6    statement.  But they are very straightforward.  They ask you

7    are you having trouble sleeping?  Are you sad most of the time?

8    They are questions like that.  They are -- I'm not really sure

9    why they are called objective, because they rely entirely on

10   the individual's self-report, and the truth is that it is a lot

11   easier to present yourself in a way that you want to present

12   yourself when you are being asked a yes/no question on a piece

13   of paper.  It is much harder to present yourself in a certain

14   kind of way in the course of a long conversation.  But aside

15   from that, that's -- those are one kind of test, the

16   paper-and-pencil test.

17           The MMPI, which he referred to, is a more complicated

18   test where you are asked lots and lots and lots of questions,

19   550 questions, actually, and they are all true/false.  So do

20   you read car mechanics magazines?  I have headaches often.  I

21   am sad most of the time.  Those kinds of questions like that.

22   You either say it is true about you or it is false about you.

23           There is the idea that people with certain personality

24   traits will tend to answer questions in a similar way.  So you

25   can get like a profile of somebody's personality and that can

also include symptom measures and indications of psychological

disorder like psychosis or character disorder, antisocial

personality, and one of the scales on that test, which is what

I was asked about today, it's called the F scale, but it's

basically -- there are a couple of the subscales which try to

get at whether or not people are being truthful.  How they try

to get at it is that they assume that if you endorse lots and

lots and lots of symptoms, you might be faking bad.  Of course

the problem with that is sometimes people have lots and lots of

symptoms, but at any rate that would never be a problem for

Ms. Carroll.

          And there are some other subscales on there.  I don't

use the test I'm not very familiar with it.  But there are some

other ways that they try to see whether or not people are being

consistent and so they are most likely to be truthful.

          The thing about all these tests, though, that is

important to understand is they are basically trying to figure

out do you look more like one category of people or more like

another category of people?  And they are entirely dependent on

your ability to both understand the question accurately and

your willingness to answer it truthfully.

          But you get a number when you are done, and sometimes

people feel that numbers are more objective than descriptions,

and I think that might be -- I think that may be one of the

reasons why they are considered objective.

1            The other reason is that there is the idea that if you

2    give the same test to the same person twice, they will probably

3    answer it in the same way, so there is the idea that that makes

4    it a reliable test.

5            And all of these tests are validated against, for

6    example, a clinical interview.  So if I give you a test for

7    depression and you get a number on there that is –– looks like

8    you are depressed, we believe that it is accurate because when

9    they were developing the test, they would always pair that

10   finding with an actual interview.  But in general, people have

11   more faith in the accuracy and the validity of an in-depth

12   interview than they ever do on a screening, on a screening

13   test.

14           MR. SEIGEL:  Your Honor, objection to what people in

15   general have more faith in.

16           THE COURT:  Explain that answer, Doctor, so that I can

17   make a ruling.

18           THE WITNESS:  Sure.  When tests are being developed,

19   you have to figure out whether or not they are valid, which

20   just means is this test assessing the thing it purports to be

21   assessing.  So if you are looking at a test like the Beck

22   Depression Inventory, which is like 9 or 20 –– a series of

23   questions about whether or not you are depressed, the way they

24   figured out that it was a pretty good paper-and-pencil measure

25   for depression is they gathered a cohort of people, some of

1    whom were depressed and some who weren't.  The people who were

2    depressed were assessed using a clinical interview.  They were

3    then given a test.  The idea being that if a clinician thought

4    you were depressed and you came up depressed on this test, then

5    the test is a pretty good indication of being depressed.  But

6    the gold standard is typically an in-depth clinical interview.

7              THE COURT:  I will let the answer stand, but you can

8    recross on it if you wish.

9    BY MS. KAPLAN:

10   Q.  I take it from what you just said, Dr. Lebowitz, you tend

11   not to use these kinds of tests very often?

12   A.  I don't use them very often.  I use them on occasion, but

13   not very often.

14   Q.  And in this case, did you reach a conclusion as to whether

15   tests like that would have been helpful or not?

16   A.  I did.

17   Q.  And what was the conclusion you reached?

18   A.  I didn't feel like they were going to add any valuable

19   information in this situation.

20   Q.  And can you explain why, Doctor?

21   A.  Sure.  I have assessed for trauma and PTSD so many times

22   that I actually know what the questions would be.  And it was

23   my assessment that although Ms. Carroll had some of the

24   symptoms in pretty severe form, she didn't have enough symptoms

25   in enough category to meet criteria for a full diagnosis of

1   PTSD.  On the basis of my interview, I also didn't think she

2   had a major depressive disorder, a major anxiety disorder, or

3   any other form of significant mental illness.  So there was no

4   reason to do a test.  It would have just told me what I already

5   knew.

6   Q.  And during your examination of Ms. Carroll, I take it you

7   asked her a lot of questions?

8   A.  I did.

9   Q.  And is there an overlap, Doctor, between the questions you

10  asked her and the kinds of questions you would find on the

11  tests that you have been talking about?

12  A.  Yeah.  The way I structure an interview is the first part

13  of it, and that can be quite a lengthy part, the questions are

14  very open-ended.  I just want someone to tell me about their

15  life and their experiences in their own words.  If I hear

16  things that make me think there is more information that needs

17  to be gotten on that particular issue, then I may ask some more

18  structured and some more specific questions.

19          So with Ms. Carroll, you know, I'm sure my opening

20  question about the alleged event was, you know, what happened

21  and how do you -- you know, how did it affect your life.  But

22  at some point I would have asked her more specific questions

23  about the quality of her intrusions, her avoidance behaviors.

24  I would have followed up with the kinds of questions that I

25  would be asking if I was doing a more structured exam.

```
 1
```
Q.  Doctor, how debilitated -- you have used that word today I
```
 2
```
believe.  How debilitated does someone have to be to be
```
 3
```
diagnosed with PTSD?
```
 4
```
A.  It is considered a severe and a disabling illness.  When,
```
 5
```
for example, we used to evaluate veterans, combat veterans for
```
 6
```
PTSD, PTSD is -- it's considered a service-related injury.  So
```
 7
```
if you have posttraumatic stress disorder, you are entitled to
```
 8
```
a certain level of disability payments.  If you have partial
```
 9
```
PTSD, you are also entitled to disability payments, but not as
```
10
```
much as full-blown PTSD.
```
11
```
        We considered full-blown PTSD to be a disabling
```
12
```
illness in which somebody in all likelihood would not be able
```
13
```
to work and would need as much support as the military could
```
14
```
provide.  We also gave compensation for partial PTSD because it
```
15
```
was understood that that, too, represented a cost to people's
```
16
```
lives, and that's a situation they deserved to be compensated
```
17
```
for.
```
18
```
Q.  So I understand, Doctor, with full PTSD, at least in the
```
19
```
context of veterans, they -- the assumption is they are so
```
20
```
debilitated they cannot work, is that fair?
```
21
```
A.  Pretty much, yeah.
```
22
```
Q.  And what do you mean by partial PTSD?
```
23
```
A.  I mean that somebody, you know, could, like Ms. Carroll,
```
24
```
have severe avoidance behaviors and some intrusions and some
```
25
```
decrements to herself self-esteem, but that it didn't reach the

1    level where it has diminished her functioning or so intrusive

2    in her life that she meets full criteria.  She just doesn't.

3    Q.  Now, you testified at the very beginning, I believe,

4    Doctor, that there have been two categories, as I recall, where

5    you have been asked to give opinions and that you haven't given

6    them.  Let me take them one by one.

7         The first one, as I understand it, is when you get a

8    call, someone describes the case to you, and you don't even get

9    engaged because you don't believe you can provide the opinion

10   that's asked for.  Did I get that right?

11   A.  Yes.

12   Q.  And can you again, without revealing any confidential

13   information, can you give the jury a sense of what happens

14   there that leads you to reach that decision?

15   A.  Well, it could be a situation in which somebody has engaged

16   in some really bad behavior of some kind, you know, maybe

17   financial or criminal or assaultive, and the lawyer might have

18   the idea that the information they have about this person's

19   life or their childhood that indicates they have a trauma

20   history, that that might be a compelling explanation for that

21   behavior, and I might not agree.  I might think that, based on

22   information I am being presented with, that there is a good

23   chance I won't agree, and so they might want to find a

24   different expert.  That's one kind of situation.

25   Q.  And could you describe the second situation that's come up?

1   A.  The second situation has come up in the context of a

2   prosecutor—there were a couple in the military, I think; there

3   may have been some civilian ones—where a prosecutor has wanted

4   to retain me to testify as to damages in the process of

5   prosecuting somebody for rape, and there have been instances

6   where I didn't feel like there was adequate information for me

7   to rely on and/or I did not find the material compelling enough

8   to feel confident to participate in that kind of a prosecution.

9   Q.  So just so I understand, in the second category of cases,

10  you are asked to provide an opinion as to whether a person

11  suffered psychological consequences from a sexual assault?

12  A.  Yeah, there are certain places—New Mexico is one and it

13  sometimes happens in the military—where, in order to prosecute

14  for certain levels of sexual assault, there needs to be an

15  indication that the victim was damaged.

16          MR. SEIGEL:  Objection.  Relevancy.

17          THE COURT:  Overruled.

18  A.  There needs to be information that the victim was damaged,

19  otherwise you have to bring a lesser charge.  So sometimes I'm

20  asked to participate in those cases.  But what has happened on

21  a couple of occasions is that after interviewing the victim,

22  either I thought that while she might have had an -- a bad

23  experience, I was not compelled that the person who was being

24  charged had actually intended to rape them or I felt like the

25  victim was too impaired in the sense that she was psychotic or

1    she had too severe a character disorder for me to feel

2    confident in relying on what she was telling me about her

3    experience, and so in not knowing and not being certain enough,

4    I chose not to participate in those cases.

5    Q.  Now, Doctor, in the course of your work, your many years as

6    working as a psychologist, have you had occasion to deal with

7    people who you believe were exaggerating their symptoms?

8    A.  Yes, on occasion.

9    Q.  And could you give the jury again, without revealing

10   anything confidential, what kinds of signals or clues would

11   lead you to that conclusion?

12   A.  Well, it used to come up occasionally in the Veterans

13   Administration at the National Center because there was such a

14   high level of compensation for full-blown PTSD that sometimes

15   people would come in and it would seem that they had memorized

16   the checklist and they could tell you this laundry list of

17   symptoms.  But if you stood back and engaged them in a longer,

18   more freewheeling and open-ended interview, the rest of the

19   story didn't attach to those symptoms in a way that was

20   plausible.  So sometimes it happened there.

21          I have interviewed people who are, you know, are so

22   hyperbolic about everything that it is hard to discern what is

23   actually true, where the real pain is.

24          I think I might need a follow-up question I think I

25   lost my train of thought.

1    Q.   That's okay, Doctor.

2           Based on the time you spent with E. Jean Carroll,

3    sitting here today, do you have an opinion whether she is

4    someone who exaggerates or minimizes adversity?

5    A.   Oh, she is, without question, somebody who minimizes

6    adversity, and that is to be -- and it is -- in general, she is

7    a pretty effusive and ebullient person, so she has -- you know,

8    she is expressive, but when it comes to adversity, it is hard

9    for her to even give it voice, much less exaggerate anything.

10   She is a minimizer.

11   Q.   Doctor, you recall that Mr. Seigel asked you a bunch of

12   questions about malingering.  Do you recall that?

13   A.   He did.

14   Q.   What is malingering?

15   A.   It is lying or misrepresenting your symptoms or your

16   experience in some way.

17   Q.   And he asked you a bunch of questions about -- withdrawn.

18          Sitting here today, Doctor, do you have an opinion one

19   way or the other -- I know it wasn't in your report, but do you

20   have an opinion one way or another as to whether Ms. Carroll

21   was malingering?

22   A.   I do.

23          MR. SEIGEL:  Objection.

24          MS. KAPLAN:  I think he opened the door, your Honor.

25          MR. SEIGEL:  Your Honor, could we approach?  Sidebar?

1            THE COURT:  I can't hear you.

2            MR. SEIGEL:  Could we have a sidebar on this?

3            THE COURT:  Yes.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N532Car3                          Lebowitz - Redirect

1           (At the sidebar)

2           THE COURT:  Mr. Seigel, I take it the objection is not

3      to the question that was asked and answered, but to the one you

4      fear comes next.

5           MR. SEIGEL:  It's a question -- that's correct, your

6      Honor.

7           THE COURT:  Okay.

8           MR. SEIGEL:  Which goes to the ultimate conclusion in

9      this case.  I think that Ms. Carroll intends to ask her if she

10     believes Ms. Carroll's claim.

11          MS. KAPLAN:  So, your Honor, I would not have ever

12     raised it and our report didn't raise it specifically, but then

13     on cross he asked a whole bunch of questions geared -- and I

14     could get it from the transcript -- geared to the whole issue

15     that she couldn't tell one way or the other whether she was

16     malingering or not, therefore trying to suggest in the mind of

17     the jury that this whole thing could be made up and that she

18     could have pulled the wool over the doctor's eyes, as well.

19          THE COURT:  I would like to see the transcript you are

20     relying on, Ms. Carroll.

21          MS. KAPLAN:  Okay.  We will get it, your Honor.

22          (Pause)

23          (Continued on next page)

24

25

1             (In open court)

2             THE COURT:  Members of the jury, this may take more

3    than two minutes, so into the jury room, please.

4             And you I think, Dr. Lebowitz, should leave as well.

5             (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Jury and witness not present)

 2          THE COURT:  We are waiting for some hard copy

 3   transcript of what the lawyers are discussing, but let's get

 4   started if we can.  Over to you, Ms. Kaplan, I think.

 5          And just for the sake of clarity to those who were not

 6   at the sidebar, I said to Mr. Seigel, and he confirmed that I

 7   was correct, that the objection was not to the question that

 8   was actually asked and answered——if, namely, whether

 9   Dr. Lebowitz had an opinion as to whether Ms. Carroll was

10   malingering——but to the question that he expected would follow,

11   which is "and what was that opinion."

12          So that's what I think we are discussing, yes?

13          MS. KAPLAN:  Yes.  So I can start reading some

14   excerpts, if that would be helpful, your Honor.

15          THE COURT:  You can start.  But I didn't get the rest

16   of the sentence.

17          MS. KAPLAN:  I can start reading some excerpts from

18   the screen, if that would be helpful, your Honor.

19          THE COURT:  It would also be helpful to get page

20   numbers, which I hope correspond on my screen and yours.

21          MS. KAPLAN:  We believe it was page 46/line 1 through

22   47/line 12.

23          THE COURT:  I have read that part.  I don't see that

24   it is right on point or anything.  He was just asking what

25   evaluation methods, unless our pagination is different.

1          MS. KAPLAN:  I think our pagination is wrong.  Do you

2    want me to read it out loud?

3          THE COURT:  Sure.

4          MS. KAPLAN:  Okay.  He says:  "Now, that opinion is

5    based on the accuracy and truthfulness of what Ms. Carroll told

6    you, correct?"

7          THE COURT:  If you give me one minute.

8          MS. KAPLAN:  I'm sorry, your Honor?

9          THE COURT:  No, it's not your problem, it's mine.  I

10   can do a key word search and catch up to you in a minute.

11         So in my transcript I'm at page 72, so go ahead.

12         MS. KAPLAN:  I'm going to start over, your Honor,

13   because I can't remember where I left off.

14   "Q  Now, that opinion is based on the accuracy and truthfulness

15   of what Ms. Carroll told you, correct?

16   "A  Yes.

17   "Q  Dr. Lebowitz, you are familiar with the term 'malingering'

18   in a forensic or psychological aspect?

19   "A  I am.

20   "Q  And what 'malingering' means is lying, correct?

21   "A  Yes.

22   "Q  That means lying about a symptom?  Yes?

23   "A  Yes.

24   "Q  Lying about a feeling?

25   "A  Yes.

1   "Q  Lying about a cause?

2   "A  Sure.

3   "Q  And of course lying about an event, is that right?

4   "A  Yes.

5   "Q  Now, you understand that Ms. Carroll has a vested interest

6   in the outcome of this case, right?

7   "A  I'm not sure what you mean by 'vested,' but she certainly

8   cares very much about the outcome of the case, yes.

9            "That's what I meant.  You understand that."

10           THE COURT:  You've got to interpose the Q and the A if

11   you are going to read it.

12           MS. KAPLAN:  I'm sorry, your Honor.

13   BY MS. KAPLAN:

14   "Q  That's what I meant.  You understand that, right?

15   "A  Yes.

16   "Q  Okay.  Would be fair to say that she may have presented her

17   symptoms and experiences in a way that would benefit her case?

18   "A  I don't believe she did that.  Actually I think that she is

19   so adverse to being symptomatic and to be vulnerable that there

20   have been many times where she has actually presented herself

21   in ways that run exactly counter to, for example, my

22   conclusions that she was injured.

23   "Q  Based on your experience, though, in light of that

24   statement, you would agree that if someone falsely accuses

25   another of misconduct, it is conceivable that they may be

1   hesitant to provide fabricated details relating to that

2   accusation?

3   "A   I'm not sure that I have.  I'm not sure that is within my

4   expertise."

5            And then I can go on.  He refers to just some

6   deposition testimony about that.

7            THE COURT:  Which you want to read or don't want to

8   read?

9            MS. KAPLAN:  I only see pieces at a time, your Honor.

10           THE COURT:  So is this the sum and substance of what

11  you are talking about?

12           MS. KAPLAN:  He also asked about malingering, test for

13  malingering, gets her to say she didn't conduct in another

14  section.

15           THE COURT:  Right.  Well, right, and she just said

16  that all over again.

17           MS. KAPLAN:  Correct.

18           THE COURT:  Okay.  Mr. Seigel.

19           MR. SEIGEL:  Your Honor, I didn't ask her for her

20  opinion as to whether or not Ms. Carroll was telling the truth

21  or if she believed her.  To the contrary.  I asked two

22  questions preceding that colloquy that was just put up

23  beginning with, "You are not offering an opinion in this case

24  on whether the alleged sexual assault in fact occurred,"

25  followed by, "You have no independent knowledge of whether that

1    alleged sexual assault occurred or not."  This does not open

2    the door for her ultimate opinion.

3              THE COURT:  This is a much smaller problem, if it's a

4    problem at all, than meets everybody's eyes.  I quite agree

5    that it would not be appropriate for Dr. Lebowitz and

6    presumably any other expert——but I don't have to go there——to

7    give an opinion as to whether or not another witness in the

8    case had told the truth in court.  I think that's common ground

9    and at least it's my view and that's the law in this court.

10             Now, Mr. Seigel, with great respect, I certainly know

11   that you probably did not want to elicit an opinion -- let me

12   strike that and come back to the next point.

13             There is, at least arguably, a distinction between an

14   opinion as to whether a witness testified falsely in court and

15   whether a psychologist or other mental health professional

16   concluded that a witness in the course of an examination by the

17   mental health professional was malingering, that is,

18   exaggerating or lying to the mental health professional for

19   whatever reason.  It could be exaggeration, it could be

20   presenting an all-false account of what allegedly happened, but

21   that's concept number two.

22             Concept number three, you asked this question and got

23   this answer, Mr. Seigel:

24   "Q  Would it be fair to say that she may have presented her

25   symptoms and experiences in a way that would benefit her case?

1    "A   I don't believe she did that."

2              The opinion, unless I am misinterpreting this, that

3    you are trying to prevent her from giving came out of her mouth

4    in response to your question this morning.  Am I mistaken?

5              MR. SEIGEL:  That's what she says in response to that

6    question, your Honor.

7              THE COURT:  Okay.  So what's the dispute?

8              MR. SEIGEL:  The dispute is, I am not asking her in

9    that question whether she formed a belief as to whether

10   Ms. Carroll was telling the truth about her accusation.

11             THE COURT:  Where and when?

12             MR. SEIGEL:  Whenever.

13             THE COURT:  Here or in exaggerating or misrepresenting

14   yourself to the doctor?  Not that I think it matters in this

15   case, by the way.

16             MR. SEIGEL:  It would be to the doctor, your Honor.

17             THE COURT:  Okay.

18             MR. SEIGEL:  And here.  It is just in general, your

19   Honor.  But I think would it be -- well, it is moving up the

20   screen.  But I don't ask her --

21             THE COURT:  The answer you don't want to hear you

22   already elicited, isn't that true?  And if it's not, why isn't

23   it?

24             MR. SEIGEL:  Your Honor, I am not asking whether or

25   not this witness was in fact malingering or lying.  I'm just

1    asking if she may have done that.  That's it.  May have

2    presented her symptoms and experiences in a way, not that this

3    happened or didn't happen.

4            THE COURT:  Well, you know, "may have" is -- well, I'm

5    going to try to suppress my inherent bent toward irony.

6            You said, "Would it be fair to say she may have

7    presented her symptoms and experiences in a way that would

8    benefit her?"  She didn't say no.  She may not have done that

9    in the sense of, no, she most certainly didn't do that or it's

10   certainly impossible that she did that.  She said "I don't

11   believe she did that."

12           You said:  "Might she have done it?"

13           She said:  "I don't think she did it."

14           Isn't that the import of what that testimony is?

15           MR. SEIGEL:  Her answer is not responsive to the

16   question.

17           THE COURT:  Ah, but that objection wasn't made and no

18   motion to strike it was made.  And if we took out all the

19   unresponsive answers in this record, it would be a lot shorter

20   all around, like in every trial, by the way.

21           MR. SEIGEL:  Nor am I asking her here for her opinion

22   on the ultimate conclusion.

23           THE COURT:  Well, what do you think this was?  "I

24   don't believe she did that."  That's not her opinion?

25           MR. SEIGEL:  No, exaggeration of --

1          THE COURT:  She didn't say:  I don't believe that is

2     engraved on the tablets that came down with Moses.  She didn't

3     say that.

4          MR. SEIGEL:  Did she believe she exaggerated her

5     symptoms, not whether or not this event occurred, whether or

6     not there was an alleged rape.  She doesn't speak to that here.

7          THE COURT:  Do you think "experiences" might cover the

8     alleged rape?

9          MR. SEIGEL:  Not on the ultimate issue in this case,

10    your Honor, no.

11         THE COURT:  Nobody has asked her that.

12         MR. SEIGEL:  Right.

13         THE COURT:  Except you.  Well, maybe you didn't

14    either.

15         MR. SEIGEL:  I did not.

16         THE COURT:  But you got the answer.

17         MR. SEIGEL:  No, I did not there.

18         THE COURT:  But this is a tempest in a teapot.  The

19    record is what the record is, and that's what it's going to be.

20         MR. SEIGEL:  Your Honor, this is experiences which

21    could be, as well, post the allegations.  I'm not talking about

22    the alleged rape here.  On this record --

23         THE COURT:  Mr. Seigel, with all due respect, the

24    issue here is not what you were talking about.  The issue is

25    that the answer you are now objecting to prospectively is in

1     this record now and I hear no basis for it going away.

2              MR. SEIGEL:  Your Honor, when you are dealing with the

3     fundamental issue as to whether or not an expert can opine on

4     the ultimate issue in the case, I think the record with respect

5     to opening the door would have to be greater than a general

6     conclusory statement.

7              THE COURT:  Mr. Seigel, with all due respect, we are

8     not talking about opening the door.  I know that's what

9     Ms. Carroll said at the sidebar.  The problem with it is that

10    the door has opened and closed and the horse is out of the

11    barn.  That's the problem.

12             MR. SEIGEL:  Your Honor, "I don't believe she did

13    that" refers, based on that question and answer, that to

14    whether or not she presented her symptoms and some general

15    conclusory reference to experiences.

16             THE COURT:  Like how she liked the baseball game.

17             MR. SEIGEL:  Your Honor, experiences how she would be

18    potentially post --

19             THE COURT:  I'm not going to argue this with you

20    further because we have reached the point of diminishing

21    returns.  The issue before me and the reason the jury is in the

22    other room while we are having this discussion has to do with

23    the fact that counsel asked if Dr. Lebowitz had an opinion, if

24    my memory serves, on the subject of whether Ms. Carroll was

25    malingering.  Do I remember the question?  And she said she had

1    an opinion, right?  Do we all agree that's what happened?  Or

2    do I have to get it out of the transcript?

3              MR. SEIGEL:  Your Honor, to the contrary, she actually

4    said. . .

5              (Counsel confer)

6              MR. TACOPINA:  I think you are right, your Honor.

7              THE COURT:  Yes.  Thank you, Mr. Tacopina, and we are

8    both right, you and I, because --

9              MR. TACOPINA:  Even a broken clock works twice a day.

10             THE COURT:  Exactly so.  Or as I read somewhere last

11   night, even a blind squirrel finds an acorn once in a while.

12             MR. TACOPINA:  Oh, you read that.

13             THE COURT:  I did read that last night.

14             MR. TACOPINA:  We will see about that.

15             THE COURT:  We will see about that.

16             MR. TACOPINA:  Sure will.

17             THE COURT:  Okay.  But that was the question.  She

18   said:  I do.  You, Mr. Seigel, objected.  There was no pending

19   question, of course, but you objected, and we do that all the

20   time.  Lawyers do that all the time.  They object

21   prospectively.  So when we got to the sidebar I said, You are

22   really objecting to the next question, aren't you?  And you

23   said yes, and we had a discussion at the sidebar.  And

24   Ms. Carroll said, You opened the door, Mr. Seigel, right?

25             MR. SEIGEL:  Yes.

N532Car3                     Lebowitz – Redirect

1          THE COURT:  And I have now looked at the transcript

2     and she has read some of it back, and I am saying it doesn't

3     matter whether you opened the door, the answer is already in

4     the record for whatever it means.  What it means is a matter

5     for argument, and you win, Mr. Seigel.  The next question will

6     not be asked or answered.

7          MR. SEIGEL:  I learned to remain quiet when I won.

8          MR. TACOPINA:  It didn't feel like a win.  I would say

9     it didn't feel like a win.

10          THE COURT:  You know, it doesn't quite fit here, but

11     the first lead lawyer in a case I tried, I hate to tell you how

12     many decades ago, once said to me that when the judge has ruled

13     your way, it's time to be quiet and get out of the courtroom.

14          Now, I realize you are not so happy with the ruling,

15     but there it is.

16          Okay.  Let's get the jury back.

17          MS. KAPLAN:  Thank you, your Honor.

18          THE COURT:  Somebody should tell Dr. Lebowitz.

19          MS. KAPLAN:  Oh, yes.

20          (Continued on next page)

21

22

23

24

25

```
 1                (Jury and witness present).

 2                THE COURT:  Thanks, folks.

 3                Ms. Carroll, you may proceed.

 4                MS. KAPLAN:  No further questions, Dr. Lebowitz.

 5                THE COURT:  All right.  Any recross?

 6                MR. SEIGEL:  Yes, your Honor.

 7    RECROSS EXAMINATION

 8    BY MR. SEIGEL:

 9    Q.  Dr. Lebowitz, you testified on redirect about asking

10    Ms. Carroll open-ended questions about what happened and how it

11    affected her life, correct?

12    A.  Yes.

13    Q.  Okay.  You have no independent knowledge of whether this

14    alleged sexual assault occurred or not, correct?

15    A.  That's correct.

16    Q.  And your opinion in this case is based upon the accuracy

17    and truth of what Ms. Carroll told you.  Yes?

18    A.  Yes, in the context of what I know about psychology and

19    trauma, yes.

20                MR. SEIGEL:  Thank you very much.  Nothing further.

21                THE COURT:  Thank you.

22                Anything else, Ms. Carroll?

23                MS. KAPLAN:  Nothing, your Honor.

24                THE COURT:  Thank you, Dr. Lebowitz.  You are excused.

25                (Witness excused)
```

1            THE COURT:  Next witness.

2            MR. CRAIG:  Plaintiff calls Cande Carroll.

3   CANDE CARROLL,

4        called as a witness by the plaintiff,

5        having been duly sworn, testified as follows:

6            THE COURT:  You may proceed, counselor.

7   DIRECT EXAMINATION

8   BY MR. CRAIG:

9   Q.  Good afternoon, Ms. Carroll.

10           Ms. Carroll, are you related to E. Jean Carroll?

11  A.  Yes.  We are sisters.

12  Q.  Are you older or younger?

13  A.  I'm younger, four years.

14  Q.  And are you currently employed?

15  A.  I am retired.

16  Q.  Where do you live?

17  A.  Most of the year I live in Cocoa Beach, Florida, and a few

18  months of the year, maybe four, four and a half months, I live

19  in Denville, New Jersey.

20  Q.  Do you have any children?

21  A.  I do.  I have one son.

22  Q.  And where does he live?

23  A.  He lives in Denville, New Jersey, with his family.

24  Q.  And do you have any grandchildren?

25  A.  I do.

N532Car3                          C. Carroll - Direct

1    Q.  How many?

2    A.  There is one living there.  He is eight years old.

3    Q.  And where did you grow up, Ms. Carroll?

4    A.  I grew up, my first five years in Huntertown, Indiana, and

5    then the rest of my childhood and teen years were in

6    Fort Wayne, Indiana.

7    Q.  Did you live with your parents?

8    A.  I did.

9    Q.  And who were your parents?

10   A.  My mother was Betty McKinney.  My father was Thomas F.

11   Carroll, Jr.

12   Q.  In addition to E. Jean, do you have other siblings?

13   A.  I do.  I have a younger sister Barbara, six years younger;

14   and ten years younger than Barbara is Thomas Carroll.

15   Q.  And did you grow up with your siblings?

16   A.  I did.

17   Q.  And so you fall second in the birth order?

18   A.  Yes.

19   Q.  And what was your father's profession?

20   A.  He owned furniture stores in Fort Wayne.

21   Q.  What was your mother's profession?

22   A.  She was a homemaker, and after my sister Barbara was well

23   into elementary school, she worked at the Allen County public

24   library.

25   Q.  And are your parents still living?

N532Car3                        C. Carroll - Direct

1   A.  They are not.

2   Q.  How would you describe your relationship with your parents

3   growing up?

4   A.  It was a loving family.

5   Q.  Did you consider your relationship to be open?

6   A.  No, not particularly.

7   Q.  And what do you mean by not particularly?

8   A.  We didn't talk about personal things much.

9   Q.  How often, if ever, would you talk about issues in romantic

10  relationships?

11  A.  Never.

12  Q.  Talk to them about issues in your dating life?

13  A.  No.

14  Q.  Are there any sorts of negative experiences you would share

15  with them?

16  A.  Not exactly that I would share with them.

17  Q.  And what do you mean by not exactly that you would share

18  with them?

19  A.  Ask me that again.

20  Q.  What do you mean by not exactly that you would share with

21  them?

22  A.  I wouldn't have brought anything to their attention.

23  Q.  Do you mean that sometimes they would become aware of

24  negative experiences?

25  A.  Yes.

1  Q.  Can you give us an example of what you mean by that?

2  A.  I would say they were fairly protective and I had a

3  negative experience when I was -- it was probably fall of my

4  senior year in high school.

5  Q.  And what was that negative experience?

6              MR. BRANDT:  Your Honor, objection.  Relevance.

7              THE COURT:  Mr. Craig.

8              MR. CRAIG:  I believe it will give some context in

9  this sort of short line of questioning about her family, your

10  Honor.

11             MR. BRANDT:  Again, your Honor, I think the experience

12  of the witness has been related to the issue here.

13             THE COURT:  Certainly on the present record,

14  sustained.  You can.  Try to lay a foundation.

15  BY MR. CRAIG:

16  Q.  Ms. Carroll, when did you speak with -- did you speak with

17  your parents about negative experiences?

18  A.  Rarely, if ever.

19  Q.  And why is that?

20  A.  I was private.

21  Q.  And how would you describe your family environment when it

22  came to sharing negative things?

23  A.  We were private.  We were private.

24              (Continued on next page)

25  BY MR. CRAIG:

N535car4                          C. Carroll - Direct

1   Q.  And how, if at all, did your parents teach you to be

2   private about negative things?

3   A.  They didn't really teach me.  I would say probably just by

4   example.

5   Q.  And how, if at all, did your parents teach you to portray

6   yourself publicly?

7   A.  Oh.  Always with a positive attitude.

8   Q.  And how would your parents communicate that message?

9   A.  If we were -- if I was on my way out the door for maybe a

10  challenge at school, or a contest of some kind, or a speech, my

11  dad would always say "smile."

12  Q.  And how often would your dad say that?

13  A.  Many days a week.

14  Q.  And what about your mother?  Would she say that as well?

15  A.  She didn't necessarily say that but she was behind it all

16  the way.

17  Q.  When you were growing up in Indiana, were you and E. Jean

18  close?

19  A.  Not particularly.  We shared a room.

20  Q.  Did you speak at all about personal problems when you were

21  growing up?

22  A.  Never.

23  Q.  How did your relationship with E. Jean change as you got

24  older?

25  A.  When E. Jean graduated from high school, she took a job in

N535car4                          C. Carroll - Direct

1    Madison, Wisconsin, and so we were no longer sharing a room and

2    so from that time on we became close.

3    Q.  Did you speak about personal problems then when she moved

4    out of the house?

5    A.  No.

6    Q.  Now, I want to direct your attention to the early 1990s.

7    At that time how much did you speak with your sister E. Jean?

8    A.  Most days.

9    Q.  What accounts for that change?

10   A.  We were working together, she was writing a biography of

11   Hunter S. Thompson and I was working with her doing research,

12   transcription.

13   Q.  And how long did you work with her on that book?

14   A.  Probably through 1993.

15   Q.  Did you continue working with her in any capacity after

16   that?

17   A.  I did.  I -- we created a website as a place to, where I

18   could curate her advice columns and articles she had written

19   for other publications.

20   Q.  Did you work with her on any additional projects?

21   A.  Other than -- other than specific articles which came one,

22   by one, by one, no, not until 2002.

23   Q.  And what happened in 2002?

24   A.  E. Jean came up with an idea for an online dating site and

25   I worked with her on that project.  We were partners.

N535car4                              C. Carroll - Direct

1   Q.  In this period in the early 1990s to the 2000s, did you

2   speak with E. Jean about personal problems?

3   A.  No.

4   Q.  Did you speak with her about difficult experiences in your

5   personal lives?

6   A.  Not really.  I had had a significant breakup with a

7   boyfriend in 2000 and I spoke with her about that.

8   Q.  And are you aware that your sister E. Jean has accused

9   Donald Trump of sexually assaulting her?

10  A.  Yes, I am aware of that.

11  Q.  And when did you learn about that?

12  A.  In 2019.

13  Q.  And how did you learn about her accusation?

14  A.  An excerpt from a book she was writing appeared in *New York*

15  magazine.  I believe it was *New York* magazine.

16  Q.  And how did you learn about that book excerpt?

17  A.  As I recall, she sent an e-mail to the entire family.  One

18  e-mail to the entire family with a link to the article.

19  Q.  After you received that link, did E. Jean ever explain to

20  you why she hadn't told you about the sexual assault

21  previously?

22  A.  I don't recall that she did.

23  Q.  Did you ever ask?

24  A.  I don't think I did.

25  Q.  Why not?

1     A.  It seemed to be explained in the article.  But I can't

2     remember specifically how.

3     Q.  Did it surprise you that E. Jean had not told you about the

4     sexual assault before?

5     A.  No.

6     Q.  Why not?

7     A.  She just wouldn't have.  We didn't talk about those things.

8     Q.  And, in 2019, how would you describe your relationship with

9     E. Jean?

10    A.  It was close.

11    Q.  Were you surprised that you learned about E. Jean's

12    accusation against Donald Trump via e-mail?

13    A.  No.

14              No further questions, your Honor.

15              THE COURT:  Thank you.  Cross-examination.

16              MR. BRANDT:  Thank you, your Honor.

17              THE COURT:  Thank you, Mr. Brandt.

18    CROSS EXAMINATION

19    BY MR. BRANDT:

20    Q.  Ms. Carroll, W. Perry Brandt.  I just have a few questions

21    you following up on the prior questioning.

22              So, E. Jean Carroll is your older sister by four

23    years; is that correct?

24    A.  Yes, that's correct.

25    Q.  And you grew up together, correct?

1   A.  Correct.

2   Q.  And I think you said this on your direct examination but

3   correct me if I am wrong, you actually shared a bedroom with

4   her?

5   A.  We did.

6   Q.  And for how many years did you share a bedroom?

7   A.  From my birth until 1961, approximately.

8   Q.  So I'm guessing about 14, 15 years, give or take?

9   A.  Yes.

10  Q.  So you actually shared a bedroom with E. Jean Carroll for

11  14-15 years, give or take?

12  A.  I believe so.

13  Q.  And then I think you said she moved away?

14  A.  Yes.

15  Q.  She moved away.  But I think you also said that after you

16  both were adults you continued to stay in touch; correct?

17  A.  Yes.

18  Q.  And your relationship was close; correct?

19  A.  Yes.

20  Q.  And I think you said in the 1990s you were in almost daily

21  contact with her; correct?

22  A.  Yes.

23  Q.  And you did this book, worked on a book with her I think

24  you said?

25  A.  I did research and transcriptions for her on that book.

1   Q.  And I think you said going forward, in about 2002, you and

2   she founded the greatboyfriends.com website?

3   A.  Yes.  That's right.  I don't think I said greatboyfriends,

4   but that was the name of it, yes.

5   Q.  But anyway, to make a long story short, during the 1990s

6   you were in close contact with her, correct?

7   A.  Yes.

8   Q.  And you had a close personal relationship, correct?

9   A.  Yes.

10  Q.  And I think you said you talked almost daily, correct?

11  A.  Most days.

12  Q.  And the first you ever heard about any alleged sexual

13  assault on your sister by Donald Trump wasn't until 2019?

14  A.  I believe so, yes.

15  Q.  That's the first you ever heard and you heard by e-mail?

16  A.  The e-mail was a link to the article.

17  Q.  OK.  And that's the first you had ever been told by your

18  sister, over all those years since the 1990s; correct?

19          MR. CRAIG:  Objection.  Asked and answered?

20          THE COURT:  I think so.  Sustained.

21          MR. BRANDT:  Thank you.

22          Thank you very much.

23          THE COURT:  Any further examination?

24          MR. CRAIG:  Nothing further, your Honor.

25          THE COURT:  Thank you, Ms. Carroll.  You are excused.

N535car4

1          THE WITNESS:  Thank you.

2          (Witness excused)

3          THE COURT:  Who is the next witness?

4          MR. FERRARA:  Plaintiff calls Natasha Stoynoff.

5          THE COURT:  The direct you estimate is how long?

6          MR. FERRARA:  30 to 40 minutes.

7          THE COURT:  Let's take our break here.

8          (Recess)

9          THE COURT:  Let's get the jury, please.

10         MR. TACOPINA:  Your Honor, we are at the point where
11   we have an issue that we fronted. I know you don't prefer
12   fronted.  We advanced to the Court --

13         THE COURT:  Well, I am perfectly neutral about the
14   word.  I just never used it that way.

15         MR. TACOPINA:  We had advanced to the Court
16   previously, Mr. Ferrara and I, it is about the issue of that
17   the Billy Bush tape being played twice.  So while we are not
18   contesting authenticity, seriously or otherwise, it is going to
19   be played in the deposition -- designated deposition testimony
20   that is coming in this afternoon.  I don't think it should be
21   played twice because this witness is going to testify that she
22   saw it and heard it but it is going to be played -- the next
23   witness is basically depositions, it is going to be played
24   there.

25         THE COURT:  Do you have something to say about this,

N535car4

1   Mr. Ferrara?

2           MR. FERRARA:  It depends on whether your Honor is

3   inclined to -- your Honor, in other words -- yes, your Honor.

4   I think it is perfectly appropriate for us to play it.  We have

5   seen defense put multiple pieces of evidence in front of

6   different witnesses.  We haven't objected.  It is appropriate.

7   There are two things we want the jury to do while they watch

8   the video two different times and we think the evidence comes

9   in differently.  It is part of Ms. Stoynoff's story that she is

10  going to explain, it is part of the steps she took in her life,

11  and then it is also something that we showed to Mr. Trump in

12  his deposition and we would like the jury to see his reaction

13  to it at that time as well.

14          THE COURT:  Look.  I understand the point, but the

15  fact of the matter is that there has been so much repetition in

16  this trial.  And it's, in effect, relevant for two different

17  reasons.  How long is it?

18          MR. FERRARA:  A minute and 57 seconds.

19          THE COURT:  I think we can all tolerate a minute and

20  57 seconds.

21          Bring the jury in, please.

22          What is our best time estimate on this witness?

23          MR. FERRARA:  I have about maybe 35 or 40 minutes.

24          MR. TACOPINA:  20.

25          THE COURT:  Thank you.

N535car4

1                    (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1           (Jury present)

2                 THE COURT:  Call your next witness, Mr. Ferrara.

3                 MR. FERRARA:  Plaintiff calls Natasha Stoynoff to the

4       stand.

5                 THE DEPUTY CLERK:  Please rise and raise your right

6       hand.

7       NANCY STEVENS,

8           called as a witness by the Plaintiff,

9           having been duly sworn, testified as follows:

10                THE DEPUTY CLERK:  Please be seated, and if you could

11      please state your name and spell your first and last names for

12      the record.

13                THE WITNESS:  Nancy Stevens.  N-A-N-C-Y S-T-E-V-E-N-S.

14      DIRECT EXAMINATION

15      BY MR. FERRARA:

16      Q.  So, good afternoon.  Let's clear up some confusion right

17      off the bat.  Do you go by any other names?

18      A.  Yes.  I also go by Natasha Stoynoff.

19      Q.  Why is that?

20      A.  Because that is my professional name.  It is my family's

21      original name.  And I started using it professionally and

22      always meant to legally change it but just never got around to

23      it.

24      Q.  Is that the name you prefer?

25      A.  I prefer it.

1    Q.  So I will call you Ms. Stoynoff.

2              Where do you live?

3    A.  I live in Canada right now.

4    Q.  What do you to for a living?

5    A.  I'm an author and freelance journalist.

6    Q.  Just briefly, could you describe some of your recent

7    projects?

8    A.  Yes.  I have written.  I just finished my 16th book,

9    they're usually memoirs.  Some of them are celebrity memoirs.

10   I am also a freelance magazine journalist.  I do feature

11   stories and cover stories, usually with actors and musicians.

12   And, I am currently working on two TV pilots.

13   Q.  I want to call your attention to the year 1992.  Where did

14   you work at that time?

15   A.  I was living in Toronto then and I was working for the

16   Toronto Sun, I had a column, and I also started freelancing for

17   *People* magazine there.

18   Q.  At some point did you leave Toronto as part of your work

19   with People?

20   A.  Yes.  I moved to New York in summer of '97.

21   Q.  What was your role at *People* at that time, 1997?

22   A.  I was on-contract for a year at the magazine and I did a

23   combination of entertainment stories and human interest

24   stories.  I was a reporter.

25   Q.  What does it mean to be on-contract?

N535car4                          Stevens - Direct

1    A.  It's -- it is like a step below being on-staff somewhere.

2             So, I think contracts are for a certain amount of

3    time.  You can have a six-month contract.  I had a year

4    contract.  Almost like a work-for-hire situation.

5    Q.  And so then, on-staff is like being a full-time employee?

6    A.  Yes.

7    Q.  Did there come a point where you were on-staff at *People*

8    magazine?

9    A.  Yes.

10   Q.  When was that?

11   A.  The summer of 1998 I went on full-staff.

12   Q.  How long did you work on full-staff for *People* magazine, or

13   until what year?

14   A.  Until the end of 2009.

15   Q.  Can you give us a sense of what you worked on during your

16   time at *People* magazine?

17   A.  Yes.  Mostly entertainment stories interviewing actors and

18   musicians, and of course news stories as well, and human

19   interest.  But mostly entertainment.

20   Q.  Are you familiar with the term "beat"?  B-E-A-T.

21   A.  Yes, I am.

22   Q.  What does that mean in your profession?

23   A.  At the magazine, reporters are given what we call beats,

24   which means that we concentrate on a certain actor or TV show

25   so that we are the ones who do those interviews over and over.

1    For example, one of my beats was the *Sex and The City*

2    television show, so when we had to interview the actors or

3    director or anything related to the show, I was often -- I was

4    one of the main ones to do those interviews.  And this is a way

5    to build rapport with the celebrities and with their publicists

6    and so everyone is familiar with each other and feel

7    comfortable with each other.

8    Q.  Were you ever on a beat involving Donald Trump?

9    A.  Yes.

10   Q.  When were you on -- what beat was that?

11   A.  The Trump beat.  I was on the Trump beat.

12   Q.  Do you recall what years you were on that beat?

13   A.  Yes.  It probably started, I think *The Apprentice* began in

14   2004, so it might have started around then.  2003, 2004.

15   Q.  What kind of stories would you cover involving Mr. Trump?

16   A.  I did an *Apprentice* cover.  I did a story on his wedding to

17   Melania, I went down to Mar-a-Lago, his home in Florida for

18   that, and all sorts of anything in between.  I also did other

19   Trump-related stories.  I did a story on Ivana's wedding -- I

20   can't remember who her husband was -- and I believe I did a

21   story on Melania for something, I just can't remember what it

22   was either.

23   Q.  When you reported on those stories, what sorts of

24   interactions would you have with Mr. Trump?

25   A.  Well, I would be interviewing him on the phone, in-person,

1   often at his home on Fifth Avenue, at his home in Mar-a-Lago,

2   sometimes at events, sometimes on the set of *The Apprentice*.

3   Q.  Let me call your attention to the sort of end of 2005, late

4   December 2005.  Did you have occasion to cover a story

5   involving Mr. Trump and his family at that time?

6   A.  Yes, I did.

7   Q.  What story was that?

8   A.  This was a story that we were working on about his -- first

9   year anniversary and the arrival of their baby Barron.

10   Q.  Do you want to take a moment?

11   A.  I'm all right.

12   Q.  Sorry.  To whom was Mr. Trump married then?

13   A.  He was married to Melania.

14   Q.  I want to show you what's been marked for identification as

15   Plaintiff's Exhibit 9.  Do you recognize this?

16   A.  Yes.

17        (Continued on next page)

18

19

20

21

22

23

24

25

N532Car5                         Stevens - Direct

```
1    Q.  What is it?

2    A.  This is a story I reported when I went down to Mar-a-Lago

3    at the end of 2005.

4              MR. FERRARA:  Plaintiff offers 9, your Honor.

5              MR. TACOPINA:  No objection.

6              THE COURT:  Received.

7              (Plaintiff's Exhibit 9 received in evidence)

8    BY MR. FERRARA:

9    Q.  Mr. Lam, we could show this to the jury, please.  Thank

10   you.

11             And so this photo that we are looking at sort of on

12   the right side of the screen, was that taken at Mar-a-Lago?

13   A.  Yes.

14   Q.  We can take that down, Mr. Lam.  Thank you.

15             Do you recall when that was published?

16   A.  Yes, sometime in January 2006.

17   Q.  Did you -- how does it work?  Did you write this article?

18   A.  For that article, I reported it and I believe there was

19   another writer who wrote it.  So that means I went down and

20   interviewed everybody, wrote it all out, sent it to the

21   magazine, and then there was another staff writer who kind of

22   put it together.  His name is on there as well.

23   Q.  Let me also show you what's been marked for identification

24   as Plaintiff's Exhibit 17.  Do you recognize this?

25   A.  Yes.
```

N532Car5                          Stevens – Direct

1    Q.   What is it?

2    A.   This is a group photo that was taken when I was down at

3    Mar-a-Lago doing all the interviews for that anniversary story

4    I mentioned.

5              MR. FERRARA:  Plaintiff offers 17.

6              MR. TACOPINA:  No objection.

7              THE COURT:  Received.

8              (Plaintiff's Exhibit 17 received in evidence)

9    BY MR. FERRARA:

10   Q.   Let's just take a look quickly here.  If we sort of look,

11   the second person from the left, as we look at the photo, who

12   is that?

13   A.   That's me.

14   Q.   Who is to your left in the photo, to our right?

15   A.   Donald Trump.

16   Q.   And sort of in front of him in the gold?

17   A.   His wife Melania.

18   Q.   Who were the other folks in the photo?

19   A.   Someone -- there is a photographer, and someone there is

20   the makeup artist, and I'm not sure who the other three are.

21   They were part of the crew somehow, with makeup, hair, or

22   photos.

23   Q.   Do you recall when this photo was taken?

24   A.   It was taken the day I was there doing interviews, December

25   27th, 2005.

N532Car5                      Stevens - Direct

1   Q.  We can take that down.  Thank you, sir.

2            What was your itinerary for this trip to Mar-a-Lago?

3   A.  I arrived the evening of the 26th, checked into a hotel,

4   and then I was there for most of the day at Mar-a-Lago on the

5   27th, and then I left the next day.

6   Q.  So how does it work when you are conducting interviews in a

7   setting like this?  Are they prescheduled or is it sort of grab

8   folks as they are available?  How did it work during that sort

9   of that day you were there?

10  A.  In this instance, when you are doing the photo shoot at the

11  same time as trying to interview people, you try to sort of

12  work together, and I would try to grab whoever I could

13  interview, whether it is Donald or Melania, in between photo

14  shoots.  So sort of ten minutes here, 15 minutes there, grab

15  one, grab another, and at the end of the day the point was to

16  have them together to have a little bit of banter between

17  husband and wife.

18  Q.  So at some point did you interview Mr. Trump that day?

19  A.  Yes, several times.

20  Q.  And at another point did you interview Mr. Trump and

21  Mrs. Trump together?

22  A.  Yes.

23  Q.  Was there a break in between those interviews?

24  A.  Yes, there was.

25  Q.  What happened during that break?

1    A.  When we were preparing to -- when I was preparing to

2    interview them together, Melania had just finished a photo

3    shoot by the pool and she was going to go upstairs and change

4    and get ready for the next photo shoot, and so we were on a

5    little bit of a break, and Donald said, I would like to have

6    you seen this really great room, this painting in this really

7    great room.  There is this really great room we've got.  Have

8    you seen it?  I can't remember his exact words, something like

9    that.  And I said, No, I haven't.  And -- so he led the way to

10   show me this room.

11   Q.  So let me ask you a question just to back up really

12   quickly.  So where were you conducting the interview of this

13   sort of one-on-one interview of Mr. Trump?  Where were you

14   conducting that?

15   A.  So while she was doing the photo shoot by the pool, we were

16   all in the backyard.  She is by the pool doing the photo shoot,

17   and we are sitting in a little area closer to the back doors

18   that has couches and tables and that's where I'm -- I was

19   talking to him.

20   Q.  How many people were around at that point?

21   A.  Well, all the people in that photo you showed and probably

22   lots of staff going in and out, so I guess in total maybe 20

23   people were sort of back and forth.

24   Q.  So where did you go with Mr. Trump after he said, I want to

25   show you this room?

N532Car5                         Stevens - Direct

```
 1   A.  So we -- I followed him, and we went in through these back
 2   doors and down a hall, as I recall it, and turned right into a
 3   room.
 4   Q.  Who was with you at that point?
 5   A.  As I recall, just he and I.
 6   Q.  So what happened next?
 7   A.  So we -- we walked into a room, and I'm looking in this
 8   room, and I went in first and I'm looking around, I'm thinking,
 9   wow, really nice room, wonder what he wants to show me, and
10   he -- I hear the door shut behind me.  And by the time I turn
11   around, he has his hands on my shoulders and he pushes me
12   against the wall and starts kissing me, holding me against the
13   wall.
14   Q.  Was anyone else in the room at this time?
15   A.  Nobody else.
16   Q.  What did you -- how did you react?
17   A.  I started -- I tried to push him away.
18   Q.  Had you -- had anything been said up until that point when
19   you walked into the room?  Did he say anything or did you say
20   anything?
21   A.  No, not that I recall.
22   Q.  Did you say anything to invite that conduct?
23   A.  No.
24   Q.  So what -- I think you said you tried to shove him away.
25   What happened?
```

1    A.  He came toward me again, and I tried to shove him again.

2    Q.  What was he doing sort of -- what was he doing with, let's

3    say, the rest of his face or body?

4    A.  Well, he was kissing me and, you know, he was against me

5    and just holding my shoulders back.

6    Q.  Did you -- what, if anything, did you say while this was

7    happening?

8    A.  I didn't say words.  I couldn't.  I tried.  I mean, I was

9    just flustered and sort of shocked and I -- no words came out

10   of me.  I tried, though.  I remember just sort of mumbling.

11   Q.  Did you tell him to stop?

12   A.  I couldn't say the words.

13   Q.  Did you scream?

14   A.  No.

15   Q.  How long -- do you recall how long that went on for?

16   A.  A few minutes.

17   Q.  How did it end?

18   A.  A butler came into the room.

19   Q.  Sorry?  You said the butler, was that the person -- was

20   that the person's actual title or is that --

21   A.  That was his title.  The butler or head butler was my

22   contact for the day.  So when I went there in the morning, he

23   is the person I called.  He is the person who took me around.

24   He is the person who sort of was coordinating things for me

25   while I was there.

1   Q.   What did the butler do?

2   A.   Came to tell us that Melania was finished changing, it was

3   time to go back to the couch area and resume the interviews.

4   Q.   How did Mr. Trump react when the butler came in?

5   A.   He stopped doing what he was doing.

6   Q.   Were you able to perceive whether the butler saw what had

7   been happening?

8   A.   I don't know if he saw, but to my mind, I gave him a kind

9   of a "get me out of here" look, and I felt like he understood.

10   Q.   So what happened, what happened next?

11   A.   The butler led us back to the couch area, and Melania was

12   on her way, and Trump said a few things to me.

13   Q.   What did he say to you?

14   A.   He said, Oh, you know we are going to have an affair, don't

15   you?  You know, don't forget what -- don't forget what Marla

16   said, best sex she ever had.  We are going to go for steak, we

17   are going to go to Peter Luger's.  We're going to have an

18   affair.

19   Q.   What was the reference to Marla?  What was that?

20   A.   Marla Maples, his second wife, was quoted on the cover of

21   the *Daily News* or the *New York Post*, I think, as saying that

22   Donald Trump was the best sex she ever had.

23   Q.   What did you say in response to any of this?

24   A.   I had trouble speaking.  I was so shocked and flustered at

25   what had just transpired and what was transpiring that, like, I

1    couldn't get words out.  I was just like choked up.  I couldn't

2    answer him.

3    Q.  At some point did Marla return -- sorry, pardon me, at some

4    point did Melania return?

5    A.  Yes.

6    Q.  And what happened at that point?

7    A.  So they -- she sat down next to him and then he suddenly

8    was very doting on her, and I was to continue the interview,

9    which I did.

10   Q.  How were you able to continue the interview after what had

11   just happened?

12   A.  Well, it was not easy, but I had my questions with me.  I

13   sort of went on autopilot, and I just knew I had to go back

14   with my work done.  So I really went on kind of an autopilot

15   thing.

16   Q.  What happened after the interview?

17   A.  I was there for a little longer, probably observing the

18   next photo shoot, and then I went back to my hotel.

19   Q.  Had -- let me do this.  Mr. Lam, if we could go back to

20   Plaintiff's Exhibit 17.

21          This is the photo of you all.  Ms. Stoynoff, do you

22   know whether this photo was taken before or after Mr. Trump

23   assaulted you?

24   A.  I don't recall.

25   Q.  Are you smiling in this photo?

1   A.  Yes.

2   Q.  Do you think you could have been smiling standing next to

3   Mr. Trump had it been taken after the assault?

4   A.  Yes, I do, because I was trying to pretend that nothing had

5   happened.

6   Q.  Were you able to do that?

7   A.  I tried.  I'm not sure if it worked.  But I was trying my

8   best.

9   Q.  Thank you, Mr. Lam, we can take that down.

10          Before this incident, how many times had you

11   personally interviewed Mr. Trump?

12   A.  I would say eight, nine, ten times, something like that.

13   Q.  Had he ever tried anything like this before?

14   A.  Never.

15   Q.  Had he ever been inappropriate before?

16   A.  No, just asking me out for dinner, that sort of thing, but

17   nothing physical.

18   Q.  What was different about this occasion?

19   A.  It was the first and only time I had ever been in a room

20   alone with him.

21   Q.  That night, the night he assaulted you, did you tell anyone

22   about what had happened?

23   A.  Yes.

24   Q.  Who did you tell?

25   A.  I spoke to my journalism professor, my former journalism

1   professor, and I told him and that night or in the morning I

2   spoke to one of my dearest friends, a film producer in

3   Los Angeles, Marina.

4   Q.  What about when you returned to New York?  Did you tell

5   anyone?

6   A.  Yes.  As soon as I went to the office, as soon as I got to

7   the office, I told my next superior up what had happened.

8   Q.  Did you tell the -- so and you are talking about your next

9   superior up at *People* magazine?

10  A.  Yes.

11  Q.  Did you tell, let's say, like, the executives, let's say,

12  the folks who run *People* magazine?  Did you tell them what had

13  happened?

14  A.  I didn't tell anyone higher than my next superior, who was

15  my dearest friend, as well.

16  Q.  Why didn't you tell anyone higher than your next sort of

17  one level up?

18  A.  I told other colleagues, but no one higher, because I was

19  ashamed and humiliated to what had happened.  I went through

20  the whole thing about what did I do?  And I was worried what

21  would happen if I told them.  I was worried that they would

22  kill the story and then Trump would try and get revenge on me

23  and try and destroy me.  And I was also worried that they would

24  be concerned about sending me out on other interviews; that,

25  you know, why -- and I didn't want to cause trouble.  I just

N532Car5                         Stevens - Direct

1  did not want to cause trouble for the magazine.

2  Q.  I want to ask you a couple of questions about the story,

3  but let me just -- I want to ask one other question about the

4  assault.  Before the butler came into the room, did Mr. Trump

5  do anything to you that suggested he was going to stop on his

6  own?

7  A.  No.

8  Q.  So let's talk about the story.  Did this one-year

9  anniversary story run as planned?

10 A.  Yes, it did.

11 Q.  How were you -- why did you allow that to happen given what

12 he had done?

13 A.  Well, the only way to stop him would have been to tell my

14 top editors, which is something I definitely did not want to

15 do.

16 Q.  How, if at all, did that encounter in the room, how if at

17 all did that appear in the story that ran?

18 A.  The encounter in the room did not appear in the story.

19 Q.  How, if at all, did your work at *People* magazine change

20 after Mr. Trump assaulted you?

21 A.  Well, the main reason I immediately went to my superior is

22 to tell her that I never wanted to interview Donald Trump again

23 and to take me off the Trump beat, and she did.

24 Q.  How, if at all, did the assault affect how you conduct

25 interviews going forward in your career?

1    A.  Well, I have to say that what happened -- how do I describe

2    this?  It really kind of had a profound effect on me.  It's

3    funny, even though something can last a few minutes, it can

4    really affect you.  And I think for me, professionally, I come

5    from Canada, Canadians are known to be very kind and nice

6    people, I believe.  And I think for a long time I was trying to

7    say to myself you are too nice, don't smile so much, don't be

8    so kind, don't -- I'm known as a very nice journalist, nice

9    reporter.  Like when I interview people, I try to make them

10   feel comfortable and have a nice conversation.  Other

11   journalists are often very more interrogating.  That's not my

12   style.  But I told myself that should be my style.  Maybe I

13   shouldn't be so nice.  Maybe just being a person smiling and

14   nice brought that on to me.  So that affected my interview

15   style for a while.

16   Q.  To be clear, Ms. Stoynoff, do you believe sitting here

17   today that you did anything to invite what Donald Trump did to

18   you that day?

19   A.  No.

20   Q.  Did you ever see Mr. Trump again?

21   A.  Yes.

22   Q.  Where?

23   A.  A few months later, I'm not sure the month, we had a mutual

24   friend, Oleg Cassini, the fashion designer, he had passed away,

25   and he had a memorial, and both Donald and I were speaking at

1    the memorial.  Oleg was a friend of mine.

2    Q.  Did you have any kind of private conversation or say

3    anything to Mr. Trump that day?

4    A.  Oh, no.  I stayed away from him.

5    Q.  What about members of his family?

6    A.  Yes.

7    Q.  What do you recall?

8    A.  A couple of months later, later that year, in 2006, I'm

9    estimating here, I was walking down the street by Trump Tower

10   in New York, and I was with a friend of mine who was visiting

11   from Toronto, and we were walking right by Trump Tower, and we

12   saw Melania come out with baby Barron from the residence.

13   Q.  Did the two of you chat?

14   A.  Yes.

15   Q.  What was said?

16   A.  I said, Melania.  She said, Natasha, why don't I see you

17   anymore?  Because they were used to me doing all the stories.

18   And then, of course, what happened was there was the baby

19   story, there was this story, there was that story and it wasn't

20   me.  So it was noticeable to her.  And we just chatted for a

21   little bit, and she introduced me to Barron, and that was

22   pretty much it.

23   Q.  Did you tell her the truth about why she didn't see you

24   anymore?

25   A.  No.

N532Car5                          Stevens - Direct

1    Q.  Do you recall what you said?

2    A.  Do -- I didn't --

3    Q.  Do you recall what you said in response to her question,

4    Why don't we see you anymore?

5    A.  Oh.  I don't recall exactly.  I probably just made up,

6    well, I miss you, something like that.  But I'm not exactly

7    sure.

8    Q.  I want to ask a few questions.  I want to ask you a few

9    questions about your politics, if that's okay, Ms. Stoynoff.

10           Would you describe yourself as a politically active

11   person?

12   A.  Not at all.

13   Q.  Are you registered with a political party in the

14   United States?

15   A.  I am not.

16   Q.  Do you vote in the United States?

17   A.  I think -- well, I became an American citizen in my mid

18   thirties, and I think I have only voted in maybe three

19   elections.

20   Q.  When you --

21   A.  Not that I didn't want to vote for more, but I just didn't.

22   Q.  Were those presidential elections or other elections?

23   A.  They were presidential elections.

24   Q.  Do you recall who you voted for?

25   A.  I recall twice for President Obama.  I can't remember what

1   the third election was.  I can't recall what it was, but I

2   think I did vote a third time.

3   Q.  Did you vote for Hillary Clinton when she ran against

4   Donald Trump?

5   A.  I did not.

6   Q.  Do you recall, have you ever voted for any conservative

7   candidates in Canada?

8   A.  Yes, I have.

9   Q.  Do you express your political views on Twitter at times?

10  A.  Well, I don't really know enough about American politics to

11  discuss them or express my political views.  I don't -- I

12  express more my feelings on the person.  I can't really discuss

13  policy well, I'm sorry to say.

14  Q.  Let me ask you a more specific question.  What did you

15  think of Donald Trump as a president?

16  A.  I thought he was terribly unfit.

17  Q.  Do you -- have you tweeted about Donald Trump?

18  A.  I'm certain I have.

19  Q.  For example, have you called him an enemy of the people?

20  A.  I don't recall, but that sounds like something I might say.

21  Q.  Were you happy or sad when he was voted out of office?

22  A.  Happy.

23  Q.  Do you know -- just in terms of the other party in this

24  case, do you know the plaintiff, E. Jean Carroll?

25  A.  Yes.

N532Car5                        Stevens - Direct

1   Q.  How would you describe your relationship with Ms. Carroll?

2   A.  We are friends.  We are new friends.

3   Q.  Has Ms. Carroll ever interviewed you?

4   A.  Yes, she has.

5   Q.  When was that?

6   A.  In the summer of 2020 she began a series for *The Atlantic*

7   magazine on several women who had been hurt by Donald Trump.

8           MR. FERRARA:  Your Honor, I'm happy to move to strike

9   that last portion of Ms. Stoynoff.  I did not mean to elicit

10  it.

11          THE COURT:  The jury will disregard everything after

12  "in the summer of 2020."

13  BY MR. FERRARA:

14  Q.  Just focusing on the interview that Ms. Carroll did with

15  you, Ms. Stoynoff, did she -- she interviewed you about your

16  experience with Donald Trump?

17  A.  Yes.

18  Q.  What did -- on that topic, what -- do you recall what the

19  two of you discussed?

20  A.  Well, we talked about the incident and she also asked me

21  about my background and my current professional world and my

22  life.

23  Q.  Did anything about that interview or doing that interview

24  with Ms. Carroll change your recollection of what had happened

25  between you and Donald Trump?

N532Car5                    Stevens - Direct

```
 1   A.  No.
 2   Q.  At any point in that interview, did you believe that
 3   Ms. Carroll was trying to influence your memory of what had
 4   happened?
 5   A.  No, not at all.
 6   Q.  Have you followed developments -- are you aware that
 7   Ms. Carroll has sued Donald Trump?  That's why you are here?
 8   A.  Yes.
 9   Q.  Have you followed the case?
10   A.  Yes.
11   Q.  Have you at times expressed public support for Ms. Carroll?
12   A.  I'm sure I have.
13   Q.  All right.  So I want to turn back now to you and your
14   life, sort of, as you -- sort of what developed after all of
15   this.
16          Let's go back to October 2016.  Did you publish an
17   essay in People magazine around that time?
18   A.  Yes, I did.
19   Q.  What was that essay about.
20   A.  It was about the incident at Mar-a-Lago that happened
21   between Donald and me.
22   Q.  Was that the first time you had spoken publicly about
23   Donald Trump assaulting you?
24   A.  Yes.
25   Q.  Why did you write that essay?
```

1    A.  I wanted to warn the American people and the

2    *Access Hollywood* tape had come out the week before, I think,

3    and it horrified me.  And then he did a debate the following

4    week with Hillary Clinton, and Anderson Cooper asked him, Have

5    you ever kissed a woman without consent?  And he said no.  And

6    I thought if I was a voter -- I was a voter, but I would want

7    to know if the candidate I was about to vote for was lying like

8    this about hurting women.

9            MR. FERRARA:  May I approach, your Honor?

10            THE COURT:  Yes.

11   Q.  Ms. Stoynoff, I want to show you what's been marked for

12   identification as Plaintiff's Exhibit 25.

13            Do you recognize that?

14   A.  Yes.

15   Q.  What is that?

16   A.  It is the *Access Hollywood* clip that you showed me.

17   Q.  And how do you know?

18   A.  I initialed and dated it.

19   Q.  Let me also, if we could, put up on the screen, Mr. Lam,

20   for the witness, what's been marked for identification as

21   Plaintiff's Exhibit 25T.

22            Do you recognize this, Ms. Stoynoff?

23   A.  Yes, it's the transcript of the *Access Hollywood* tape.

24   Q.  Were you able to follow along with this transcript while

25   you watched the video?

1   A.  Yes.

2   Q.  Does the transcript fairly and accurately depict what is

3   said on the video?

4   A.  Yes, it does.

5   Q.  Your Honor, plaintiff offers 25 and 25T.

6        MR. TACOPINA:  Your Honor, obviously without waiving

7   anything previous, objections we have, no objection.

8        THE COURT:  But there is no authenticity issue,

9   correct?

10        MR. TACOPINA:  I'm even talking about before the

11   trial, your Honor, but correct.  No authenticity issue.

12        THE COURT:  Okay.  25 and 25T are received.

13        (Plaintiff's Exhibits 25, 25T received in evidence)

14        THE COURT:  Members of the jury, 25T, the transcript,

15   is received on the same basis as all the other transcripts.

16   It's the recording that is evidence.

17        MR. FERRARA:  Your Honor, may I?  For this, I printed

18   copies I would like to ask to hand out to the jurors, and I can

19   hand them up and I have plenty.  May I hand the jurors some

20   copies of the transcript?

21        THE COURT:  Yes.

22        MR. FERRARA:  Thank you.

23   BY MR. FERRARA:

24   Q.  Mr. Lam, we can take this off the screen.  We can take down

25   25T.  I think folks have copies.  And if we could, let's play

1    Plaintiff's 25.

2              (Video played)

3    BY MR. FERRARA:

4    Q.   Thank you, Mr. Lam.  We can bring that down.

5              You also -- sorry, Ms. Stoynoff, do you recall seeing

6    at least a part of that tape sort of when it first aired?

7    A.   Yes.

8    Q.   Do you recall when that was?

9    A.   Yes.  It -- I think it aired -- first aired Friday

10   afternoon, and I saw it almost immediately.

11   Q.   What was your reaction when you saw that?

12   A.   A combination of sick to my stomach and a little bit of --

13   I don't know if this is the right word, but relief.  Because I

14   actually for the first time thought to myself, oh, he does this

15   to a lot of women.  It's not just me.  It's not just something

16   I did.  And then the horrifying part to me was that I

17   worried -- I worried that because I didn't say anything at the

18   time, other women were hurt by him.  So I had some regret

19   there.

20   Q.   Ms. Stoynoff, you also mentioned a debate that you watched.

21   A.   Yes.

22   Q.   Let me -- Mr. Lam, if we could just bring up what is in

23   evidence as Plaintiff's Exhibit 26, and if we can just bring up

24   the first image.

25              Ms. Stoynoff, is this the debate that you were

1  referring to?

2  A.  I believe so.

3  Q.  Anderson Cooper was asking questions, is that the one?

4  A.  Yes, this looks like the one.

5  Q.  We don't have to play this again, but we can bring that

6  down.  Thank you, Mr. Lam.

7        How did you feel when you saw that debate?

8  A.  Well, *People* magazine had asked me if I wanted to write

9  something about what happened.  By this time they knew, the top

10  editors now knew.  And after that *Access Hollywood* tape came

11  out they asked me if I wanted to write something, and I said,

12  you know what?  He's got a debate next week.  Let me see what

13  he says.  If he comes clean, if he is honest——because I know he

14  will be asked about it——I'm not writing anything.  And let me

15  see what he says.

16        So when I saw it and Anderson Cooper asked him, Have

17  you ever kissed a woman without consent, and he said no, I

18  thought to myself, you liar.  I just felt really upset that he

19  was lying to the American people.

20  Q.  Do you recall the date that your essay was published in

21  *People* magazine?

22  A.  Yes, October 12, 2016.

23  Q.  Did Mr. Trump respond?

24  A.  I believe his attorneys got in touch with the magazine and

25  gave some sort of denial and he, he said something on his

N532Car5                    Stevens - Direct

1    campaign trail and I think on Twitter.

2    Q.  Let me show you --

3            MR. FERRARA:  If I may approach, your Honor?

4    Q.  I want to show you what's been marked for identification as

5    Plaintiff's Exhibit 29.  Do you recognize that?

6    A.  Yes.

7    Q.  What is that?

8    A.  This is the -- this is him on the campaign trail, a clip of

9    what he said about me.

10   Q.  How do you know?

11   A.  You showed this to me previously, and I initialed it.

12   Q.  Let me also show you what's been marked for identification

13   as Plaintiff's Exhibit 29T.  Do you recognize this?

14   A.  Yes.  This is a transcript of this clip.

15   Q.  Were you able to follow along while you watched the video?

16   A.  Yes.

17   Q.  Does it fairly and accurately depict what is said on the

18   video?

19   A.  Yes.

20           MR. FERRARA:  Your Honor, plaintiffs offer 29 and 29T.

21           MR. TACOPINA:  No objection, your Honor.

22           THE COURT:  Received.

23           (Plaintiff's Exhibits 29, 29T received in evidence)

24           THE COURT:  Same instruction regarding 29T, the

25   transcript.

1          MR. FERRARA:  Mr. Lam, if we could bring up 29,

2    please, and we could play this.  Thank you.

3          (Video played)

4    BY MR. FERRARA:

5    Q.  Ms. Stoynoff, did Mr. Trump assault you in a public area?

6    A.  No, we were alone in the room.

7    Q.  Why wasn't it part of the story that was published about

8    the one-year anniversary?

9    A.  That's just a crazy question.  Because if my top editors

10   knew what had happened, the story just would have been killed.

11   That just would not be part of a "wedding, we are having a

12   baby, we are having a happy marriage" story.

13   Q.  What did you understand Mr. Trump to be saying when he

14   said, Look at her, I don't think so?

15   A.  I am assuming he means that I am unattractive.

16          MR. FERRARA:  May I have one moment, your Honor?

17          (Counsel confer)

18          MR. FERRARA:  Nothing further, your Honor.  Thank

19   you.

20          THE COURT:  All right.  Thank you.

21          Cross-examination, Mr. Tacopina.

22          MR. TACOPINA:  Yes.

23          MR. FERRARA:  Your Honor, just quickly, I might just

24   retrieve the exhibit from the witness stand.

25          THE COURT:  All right.

N532Car5

1    CROSS-EXAMINATION

2    BY MR. TACOPINA:

3    Q.   Good afternoon, Ms. Stoynoff.

4    A.   Good afternoon, Mr. Tacopina.

5    Q.   Mr. Seigel, you have no legal claim against Donald Trump

6    before this jury, correct?

7    A.   You mean am I suing him?

8    Q.   You have no legal claim against Donald Trump before this

9    jury?

10   A.   No, I don't have anything --

11   Q.   Thank you.

12           MR. TACOPINA:  No further questions.

13           THE COURT:  Okay.  Anything else?

14           MR. FERRARA:  No, your Honor.

15           THE COURT:  You are excused, Ms. Stoynoff.  Thank you.

16           (Witness excused)

17           THE COURT:  What's next?

18           MS. KAPLAN:  Next we are going to play the deposition

19   designations from Mr. Trump's deposition.

20           THE COURT:  From Mr. Trump's deposition.  Okay.

21           This is sworn testimony given by Mr. Trump.  Counsel

22   will announce the date.

23           May I have a transcript, please?

24           MS. KAPLAN:  Yes, you may, your Honor.

25           October 19, 2022, your Honor.

N532Car5

1                   (Video played)

2                   MR. TACOPINA:  Judge, we have to stop this for a

3    second, please.

4                   THE COURT:  Stop it.  What's the problem?

5                   MR. TACOPINA:  It's my understanding that this was --

6    that you haven't ruled on this particular portion.

7                   MS. KAPLAN:  I spoke to Mr. Brandt who said he is no

8    longer asserting relevancy.

9                   MR. TACOPINA:  Okay.  That was still pending, the

10   ruling.  That's fine, your Honor.

11                  THE COURT:  Go ahead.

12                  (Video played)

13                  THE COURT:  Let's pause right there.

14                  We are going to break for the day, but I still want to

15   talk to counsel afterward.

16                  Ladies and gentlemen, 10:00 tomorrow morning.

17                  (Continued on next page)

18

19

20

21

22

23

24

25

N532Car5

1          (Jury not present)

2          THE COURT:  Okay.  You can all be seated, please.

3          I just want to talk to you a little bit more about the

4     schedule.  It looks to me like we are on target to finish

5     probably after lunch tomorrow, is that about right?

6          MS. KAPLAN:  I agree, your Honor.

7          THE COURT:  Okay.  So far as -- let's go back to

8     summations.  I know I asked you this probably the day before

9     yesterday, but I can't find my note, frankly.  What are your

10    thoughts about duration of summations? Ms. Carroll.

11         MS. KAPLAN:  Your Honor, I think, I'm trying to -- I'm

12    not 100 percent sure it's what I told you, but I think it's

13    what I told you, that we were thinking two hours for closing

14    and then about an hour for rebuttal.

15         THE COURT:  And Mr. Tacopina.

16         MR. TACOPINA:  Approximately two and a half hours,

17    your Honor, give or take.

18         THE COURT:  Okay.  Then I'm going to propose the

19    following.  I will have the draft charge ready for you to

20    either pick up or—if you give us e-mail addresses where you

21    want it sent—sent to you 8:00 Monday morning.  We will have

22    the charge conference here 9:00 Monday morning, and then,

23    assuming everybody's here, jury I mean, we will go into

24    summations at 10:00 on Monday morning.  We will shorten the

25    lunch hour, and we will hope to get all the summations done, if

N532Car5

1   I have computed right, before we are done for the day, and

2   maybe even -- well, no, I take that back.  That doesn't work.

3   Here is what I am trying to accomplish.  I think it will take

4   an hour to deliver the charge approximately.  So if we can

5   finish the summations on Monday, then I will charge Tuesday

6   morning, and the jury would go to deliberations immediately.

7             Any thoughts, objections, issues?

8             MS. KAPLAN:  None on our side, your Honor.

9             THE COURT:  Okay.  Now, if people run over time, it

10  may be necessary to shift all or part of the rebuttal into

11  Tuesday morning, and I suspect nobody wants to do that.  But

12  that's within your control, not mine.

13            MS. KAPLAN:  Yes, we understand, your Honor.

14            THE COURT:  Mr. Tacopina, you got that?

15            MR. TACOPINA:  I have it, yes, sir.

16            THE COURT:  Okay.  I don't really expect the charge is

17  going to be very controversial, but there it is.

18            Mr. Seigel, you were rising.

19            MR. SEIGEL:  On a separate matter if we are done with

20  scheduling.

21            THE COURT:  Separate matter.

22            MR. SEIGEL:  If we are done with scheduling.

23            THE COURT:  Mr. Craig, were you jumping up on

24  scheduling?  Sorry.  You are not Mr. Craig, forgive me.  I will

25  get to know everybody by the time we are finished.

N532Car5

1              Okay.  What is it, Mr. Seigel?

2              MR. SEIGEL:  Thank you, your Honor.

3              For purposes of the record, I don't want to belabor

4    this.  I know there has been extensive motion practice on this.

5    We just wanted to renew our objection with regard to

6    Ms. Stoynoff as it pertains to Rule 413 and move to strike her

7    testimony, given our position that her testimony does not

8    satisfy the threshold for admissibility under Rule 413.

9              THE COURT:  Denied.  The question for admissibility is

10   whether a jury reasonably could find that there was a sexual

11   assault on her, actual or attempted, and my conclusion is that

12   the jury so could find.  They are certainly not obliged to find

13   it, but they certainly could find it based on her testimony and

14   all the other evidence of record.

15             Okay.  Thank you.

16             COUNSEL:  Thank you.

17             (Adjourned to Thursday, May 4, 2023, at 10:00 a.m.)

18

19

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2    Examination of:                            Page

 3     LESLIE LEBOWITZ

 4    Direct By Ms. Kaplan . . . . . . . . . . . . 852

 5    Cross By Mr. Siegel  . . . . . . . . . . . . 892

 6    Redirect By Ms. Kaplan . . . . . . . . . . . 940

 7    Recross By Mr. Seigel  . . . . . . . . . . . 967

 8     CANDE CARROLL

 9    Direct By Mr. Craig  . . . . . . . . . . . . 968

10    Cross By Mr. Brandt  . . . . . . . . . . . . 975

11    NANCY STEVENS

12    Direct By Mr. Ferrara  . . . . . . . . . . . 981

13    Cross By Mr. Tacopina  . . . . . . . . . . .1009

14                       PLAINTIFF EXHIBITS

15    Exhibit No.                             Received

16     9   . . . . . . . . . . . . . . . . . . . 986

17     17   . . . . . . . . . . . . . . . . . . . 987

18     25, 25T   . . . . . . . . . . . . . . . . .1004

19     29, 29T   . . . . . . . . . . . . . . . . .1007

20

21

22

23

24

25
```