N545car1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      E. JEAN CARROLL,
 3
                      Plaintiff,              New York, N.Y.
 4
               v.                             22 Civ. 10016 (LAK)
 5
      DONALD J. TRUMP,
 6
                      Defendant.
 7    ------------------------------x         Jury Trial

 8                                            May 4, 2023
                                             10:00 a.m.
 9
      Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                             District Judge
12                                             and a Jury

13
                            APPEARANCES
14
      KAPLAN HECKER & FINK LLP
15         Attorneys for Plaintiff
      BY:  ROBERTA A. KAPLAN
16         MICHAEL J. FERRARA
           SHAWN G. CROWLEY
17         MATTHEW J. CRAIG

18
      TACOPINA SEIGEL & DeOREO
19         Attorneys for Defendant
      BY:  JOSEPH TACOPINA
20         CHAD D. SEIGEL
           MATTHEW G. DeOREO
21

22    HABBA MADAIO & ASSOCIATES, LLP
           Attorneys for Defendant
23    BY:  ALINA HABBA
           MICHAEL T. MADAIO
24

25    W. PERRY BRANDT
           Attorney for Defendant
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N545car1

1               (Trial resumed; jury not present)

2               THE COURT:  Good morning.

3               MS. KAPLAN:  Good morning, your Honor.

4               THE COURT:  Does counsel have anything before I call

5   the jury in?

6               MR. TACOPINA:  No, your Honor.

7               THE COURT:  OK.  Let's bring in the jury.

8               THE DEPUTY CLERK:  Jury entering.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N545car1

```
1              (Jury present)

2              THE DEPUTY CLERK:  Please be seated, everyone.

3              THE COURT:  Good morning, folks.  I believe we were in

4    the course of playing excerpts from Mr. Trump's deposition.  Am

5    I right?

6              MS. KAPLAN:  Exactly, your Honor.

7              THE COURT:  And we are going to continue that, yes?

8              MS. KAPLAN:  Yes, your Honor.

9              THE COURT:  Ladies and gentlemen, we are just going to

10   pick up where it was left off yesterday afternoon with

11   Mr. Trump's deposition excerpts.

12             (Video played)

13             THE COURT:  Pause.

14             What's the problem?  We have an AV problem.  Are the

15   images on your screens, folks?

16             JUROR:  Not all of them.

17             THE COURT:  Good now?

18             THE DEPUTY CLERK:  Yes.

19             THE COURT:  OK.  Let's go back like 60 seconds.

20             (Video played)

21             MS. KAPLAN:  Your Honor, just for housekeeping

22   purposes, I think it is already admitted, but we will -- the

23   designation of that video is PX 200, and we will have a

24   corresponding transcript that will be PX 200-T.

25             THE COURT:  I'm not clear what are you saying is
```

N545car1

1    PX 200.

2             MS. KAPLAN:  The video played.

3             THE COURT:  The video deposition designation?

4             MS. KAPLAN:  Correct, your Honor.

5             THE COURT:  Any problem, Mr. Tacopina?

6             MR. TACOPINA:  No, your Honor.

7             THE COURT:  PX- 200 and 200-T are both received.

8             (Plaintiff's Exhibits 200 and 200-T received in

9    evidence)

10            THE COURT:  Members of the jury, the same instruction

11   I gave you previously with respect that was prepared for the

12   DVD or electronic version, the electronic version is what

13   controls.

14            Your next witness?

15            MS. KAPLAN:  Plaintiff calls Carol Martin.

16            THE DEPUTY CLERK:  Ms. Martin, if you would please

17   take the stand?  Right this way, ma'am, and if you could just

18   step around and up on the witness stand?  If you could please

19   remain standing and raise your right hand.

20   FRANCES CAROL MARTIN,

21        called as a witness by the Plaintiff,

22        having been duly sworn, testified as follows:

23            THE DEPUTY CLERK:  Thank you.  Please, be seated.  If

24   you could please state your name and spell your first and last

25   names for the record?

1          THE WITNESS:  Sure.  After I pull the chair up a

2     little bit.  My name is Frances Carol Martin.  F-R-A-N-C-E-S,

3     C-A-R-O-L, M-A-R-T-I-N.

4          THE COURT:  You may proceed, Ms. Kaplan.

5     DIRECT EXAMINATION

6     BY MS. KAPLAN:

7     Q.  Ms. Martin, you just said "Frances Carol Martin."  Is there

8     a name that you go by?

9     A.  Yes; just Carol Martin.

10    Q.  Ms. Martin, do you know the plaintiff in this case?

11    A.  Yes, I do.

12    Q.  For how long have you known her?

13    A.  I think I have known her almost 30 years now.

14    Q.  We are going to come back to Ms. Carroll shortly but I want

15    to ask you background first.  What do you currently do for a

16    living?

17    A.  I'm a retired journalist.

18    Q.  And where did you grow up?

19    A.  Detroit, Michigan.

20    Q.  Where did you go to college?

21    A.  Also in Detroit, Wayne State University.

22    Q.  And what did you get your degree in?

23    A.  It was in journalism and social work; liberal arts, as we

24    called it.

25    Q.  What did you do after college?

1   A.  My first job was with a local NBC television station in

2   Detroit, and then I was a writer for a couple of years at the

3   Detroit Free Press, our local paper.  Then I moved to

4   Washington, D.C. to start a television career as a producer and

5   an on-air personality.

6   Q.  At some point did you get to New York, Ms. Martin?

7   A.  In 1975 I was offered a job at WCBS, Channel 2 here in New

8   York.

9   Q.  And what did you do at WCBS?

10  A.  I was a general assignment reporter, initially.

11  Q.  And did that change?

12  A.  Over the years, yeah.  I worked as a general assignment

13  reporter for the first three years.  I had my first child in

14  1980, and after that I came back and became a part of the

15  regular news team daily.

16  Q.  What do you mean by part of the daily news team?  I'm going

17  to ask you this because some people may be young and don't

18  understand what daily news used to be like.

19  A.  This was 1980, early '80s and the like, and we had, really

20  only three newscasts, ultimately there were four on a regular

21  basis.  I did two of them, 5:00 and 6:00 news anchor with our

22  news team.  We were pretty recognizable back then, we only had

23  13 stations back then I think.

24          MS. KAPLAN:  Mr. Lam, could you show, only for the

25  witness, PX- 128?

N545car1                         Martin - Direct

1   Q.  I want you to look at it, Ms. Martin, but don't say

2   anything to me.  Do you recognize this?

3   A.  I do.

4   Q.  Is your picture in this document?

5   A.  Yes, it is.

6              MS. KAPLAN:  Your Honor I would like to offer PX- 128.

7              MR. TACOPINA:  No objection.  Received.

8              (Defendant's Exhibit 128 received in evidence)

9   BY MS. KAPLAN:

10  Q.  Ms. Martin, does PX- 128 have anything to do with the job

11  you have just been describing at CBS --

12  A.  Yes --

13  Q.  -- Channel 2?

14  A.  -- this was our primary news team.  As you see on there at

15  5:00, 6:00, and 11:00.  I was part of that team.  The late Jim

16  Jensen and Michelle Marsh were also part of our team, also

17  myself and Rolland Smith, and our sportscaster was Warner

18  Wolf -- who everybody remembers -- and the weathercaster was

19  Frank Field.  So, that was the recurring team.

20  Q.  For how long did you work at Channel 2?

21  A.  I was there for almost 30 years.

22  Q.  When did you leave?

23  A.  In 1994.

24  Q.  And where did you go in 1994?

25  A.  I was offered a job at a startup cable news station --

1   well, it wasn't news, it was a cable station in Fort Lee, New

2   Jersey, it was called America's Talking Cable.

3   Q.  And you just said MSNBC.  What was the relationship between

4   America's Talking and MSNBC?

5   A.  The originator of the America's Talking station was the

6   late Roger Ailes, and he ultimately became one of the

7   beginning, I guess he was -- my station, America's Talking

8   cable was the precursor to MSNBC at that time.

9   Q.  And you mentioned Roger Ailes.  Was he your boss?

10  A.  He was.  Yes.

11  Q.  And what show, if any, did you host on America's Talking?

12  A.  I hosted a show called Alive and Wellness.

13  Q.  It seems somewhat self-explanatory, but can you tell me

14  what that show was about?

15  A.  Sure.  It was basically health and wellness issues, mental

16  issues, holistic living.  We had all kinds of guests, people

17  like Deepak Chopra or you could get a guy on the Internet

18  telling you something.

19  Q.  When did that show run?  How many days a week?

20  A.  It was five days a week.

21  Q.  And was the show recorded live?

22  A.  Yes, it was.

23  Q.  Do you recall when it aired?

24  A.  I think about 11:00 in the morning, daily.

25  Q.  Now, just to set the record straight, Ms. Martin, when did

1    that new cable network you have been talking about, America's

2    Talking, start broadcasting?

3    A.  It was July 4th of 1994.

4    Q.  And as of that date were you already working at America's

5    Talking?

6    A.  Yes.  We had begun about a month before.

7    Q.  Did there come a point in time when America's Talking

8    stopped operations?

9    A.  Yes.

10   Q.  And when was that?

11   A.  Two years later on that exact date, actually; July 4th of

12   '96.

13   Q.  Did you work at America's Talking that whole time?

14   A.  Yes, I did.

15   Q.  I think you may have mentioned this but just to make sure

16   it is in, where was the studio for America's Talking located?

17   A.  It was in Fort Lee, New Jersey, just over the George

18   Washington Bridge.

19   Q.  And you mentioned Mr. Ailes, Ms. Martin.  Did Mr. Ailes

20   have his own show on America's Talking at that time?

21   A.  Yes, I believe he does.

22   Q.  Do you remember what it is called?

23   A.  Straight Talk, I'm pretty sure.

24   Q.  And what kind of a show was it?

25   A.  His show was primarily a political show, current events and

1    the like, but he had more specialized guests.

2    Q.  Just to finish your, kind of, work background.  After

3    America's Talking ceased operations, what did you do next?

4    A.  I went to work for about a year and a half at -- the

5    People's Court was being brought back with our former mayor Ed

6    Koch, and I was an in-studio anchor for that show for one year.

7    Q.  Did there come a point in time when you retired,

8    Ms. Martin?

9    A.  I think formally I retired in about 2001.  I haven't worked

10   regularly in television since then.

11   Q.  And so, what do you spend your time doing today?

12   A.  A few projects that come up time to time.  I also have a

13   7-year-old granddaughter, she takes up a lot of time.

14   Q.  And I think you testified at the very beginning that you

15   know the plaintiff E. Jean Carroll in this case?

16   A.  Yes, I do.

17   Q.  For how long have you known her?

18   A.  About 30 years.

19   Q.  And do you recall how you met?

20   A.  Not the exact time, but we did work together at America's

21   Talking.

22   Q.  When you worked together at America's Talking, you already

23   knew each other?

24   A.  Yes, we did.

25   Q.  And any recollection of how you knew each other already?

1   A.  Well, since she was a writer for *Elle* magazine we would

2   occasionally run into each other at media-related events so we

3   met then, and we knew some people in common.

4   Q.  Did there come a point, Ms. Martin, when you and E. Jean

5   Carroll became friends?

6   A.  Closer friends, yes.

7   Q.  When was that?

8   A.  Especially during the America's Talking years, '94 to '96.

9   Q.  And what did Ms. Carroll do at America's Talking?

10  A.  She had a show which was called *Ask E. Jean* and was pretty

11  much based on her advice column.

12  Q.  And how did E. Jean Carroll's show compare to the other

13  shows on the network?

14  A.  I would like to say it was a lot livelier than some, it was

15  totally unpredictable, and it was really all from Jeannie's

16  personality and her advice stance.

17  Q.  And was E. Jean Carroll's show also taped live?

18  A.  Yes, it was.

19  Q.  And when you were -- withdrawn.

20          During the years of America's Talking, how often would

21  you see E. Jean Carroll?

22  A.  Pretty much every day.

23  Q.  During these years, between 1994 to 1996, when you were

24  working at America's Talking, did you see Ms. Carroll outside

25  of work?

1   A.  Yes.

2   Q.  What would you, generally speaking, what would you do

3   together outside of work?

4   A.  We did regular aging women things.  That's the way I like

5   to describe it.  We had lots of lunches, we saw movies

6   together, we went to comedy clubs.  We did things that were

7   enjoyable to both of us.

8   Q.  And during this period when America's Talking was in

9   operation, how would you characterize your friendship with

10  Ms. Carroll?

11  A.  Close.  It was a close friendship, and on certain levels we

12  kept growing closer.

13  Q.  And is your friendship still like that today?

14  A.  I believe so.  I hope so.

15  Q.  Now, Ms. Martin, did there come a time when Ms. Carroll

16  told you about something that had happened to her with

17  Mr. Trump at Bergdorf Goodman?

18  A.  Yes.

19  Q.  And tell me -- I'm going to take this piece by piece, if we

20  can, but tell me what you remember when that first happened.

21  A.  It was an ordinary day, I would say.  I don't remember the

22  day of the week exactly, but we were finishing with our shows

23  after a regular day, I think it was after E. Jean's show

24  because she asked if I was doing anything and could we hang out

25  for a moment at my house.

N545car1                          Martin - Direct

1    Q.  I think you said you don't recall exactly what day it was.

2    A.  What day of the week I don't, no.

3    Q.  In terms of the two-year period at America's Talking, do

4    you have any recollection whether it was closer to the end of

5    that period or closer to the beginning?

6    A.  Somewhere in the middle.  I'm sorry.  I'm not sure.

7    Q.  Where were you when Ms. Carroll said to you, *Let's go to*

8    *your house*?

9    A.  We had driven from the studio in each of our cars, I lived

10   very close to the studio, so we were at my home in the kitchen.

11   Q.  So let me back up.  Where did she tell you that she wanted

12   to go, suggested going to your house?

13   A.  We were still at the station.  We had both completed our

14   day.

15   Q.  And then I take it from what you just said you both went to

16   your house?

17   A.  Yes.

18   Q.  Did you drive separately or together?

19   A.  Separately.

20   Q.  And during this period of time was it rare for Ms. Carroll

21   to come over to your house?

22   A.  No.  Not at all.

23   Q.  Did you and Ms. Carroll subsequently drive to your house?

24   A.  Yes.

25   Q.  How about how far away from the America's Talking studio

N545car1                    Martin - Direct

1   were you living?

2   A.   Only about 10 to 15 minutes I would say.

3   Q.   And did you and Ms. Carroll approximately arrive there at

4   the same time?

5   A.   I think so.  Yes.

6   Q.   And when you got to your house, was anyone else there?

7   A.   No.  I was home alone.

8   Q.   And once you got to the house, where did you go?

9   A.   We went to the kitchen.

10  Q.   And where in the kitchen did you sit, if anywhere?

11  A.   There was an island area where we generally sat.

12  Q.   And do you recall whether you had anything to drink?

13  A.   Something, and I'm not exactly sure what.

14  Q.   OK.  Now I want to take this piece by piece, if we can.

15  Tell me, what do you recall -- appreciating that it was a long

16  time ago, but what do you recall the first thing Ms. Carroll

17  said to you in your kitchen that day?

18  A.   We both just settled in with whatever we were drinking, and

19  I'm sitting at the counter and Jeannie sort of was nestled to

20  my right, as I recall, just sort of leaning in, and she started

21  telling me what had just happened.

22  Q.   And what did she say -- again, taking this piece by piece,

23  what did she say what happened?

24  A.   She introduced it by saying, *You won't believe what*

25  *happened to me the other night*.  As I recall.  And I didn't

1   know what to expect and so, I just turned to her and she said,

2   *Trump attacked me.*

3   Q.  Now let's pause right there, Ms. Martin.  When she said

4   "Trump," did you know who she was referring to?

5   A.  Yeah.  Pretty much.  There was only one that I knew of.

6   Q.  And how did you know who Trump was?

7   A.  Just having lived in New York so long you are sort of part

8   of the landscape for me.

9   Q.  At that point had you ever met Mr. Trump in person?

10  A.  Only in passing at a news event, perhaps.  I do not know

11  him.

12  Q.  And just so the record is clear, when she said "Trump," who

13  did you understand it to be?

14  A.  Donald Trump.  Yes.

15  Q.  What, if anything, at this point in time, did you know

16  about Mr. Trump's politics?

17  A.  Nothing, really.  I knew him as a businessman.  I mean

18  observationally.  I did not think of him as a politician,

19  although I was aware that he often had comments about current

20  events that I would read in the newspaper.

21  Q.  Now, Ms. Carroll says to you that *Trump attacked me.*  Do

22  you recall what you said next, if anything?

23  A.  Yeah.  I was completely floored.  I didn't quite know what

24  was coming next.  She is leaning in to me, and I'm saying, *What

25  are you talking about?*  But the next thing that came to my mind

1    was if she was OK and that's what I asked her.  So I said, *Are*

2    *you OK?*  Because she seemed -- her affect was, I would say,

3    anxious and excitable, but she could be that way sometimes but

4    that part was different in her affect.  But what she was saying

5    didn't make any sense at first.

6    Q.  And when you asked her was she OK, did she respond?

7    A.  She said -- she probably said I don't know.  She kept

8    telling me what happened, *that he attacked me.*  I think she

9    said "pinned me" is what she said and I still didn't know what

10   that meant.

11   Q.  So, to the best of your recollection -- I understand it

12   would be crazy if you could remember every word, but what did

13   she tell you that day about what had happened to her at

14   Bergdorf Goodman?

15   A.  Basically, she backtracked.  I kept asking her to

16   backtrack.  It wasn't a linear conversation, as you would

17   expect, because it was news, it was I didn't know what I am

18   hearing here, and she was clearly agitated, anxious.  And she

19   said she was at Bergdorf's the night before -- probably two

20   nights, if I recall -- and that she ran into Mr. Trump going in

21   one of the revolving doors.  And she said that they started up

22   a conversation.  My sense is that she engaged him, or vice

23   versa, because that's not uncommon for E. Jean.  He recognized

24   her, she recognized him.

25   Q.  And did it surprise you that she told you that she started

1    chatting with Mr. Trump at Bergdorf Goodman?

2    A.  No.  Not at all, no.

3    Q.  Why not?

4    A.  Because that's who she is.  I only would imagine that she

5    saw it as another New York story.  There was a lot of them that

6    she would run upon.

7    Q.  And during that point in time did you shop at Bergdorf

8    Goodman?

9    A.  Occasionally.  Not that often.

10   Q.  And what else did she tell you about what happened once

11   they were inside Bergdorf Goodman?

12   A.  So, she related that they sort of started kibbitzing or

13   talking back and forth, it was apparently friendly, and she

14   said that he was looking for a gift.  And so, she engaged him

15   that way suggesting certain things.  I don't remember all of

16   the things.  But this must have gone on for a few minutes and

17   then, somehow, they started up the stairs -- escalator, she

18   said.

19   Q.  And did she tell you what happened after they got off the

20   escalator?

21   A.  Yeah.  And again, this was disjointed because I would stop

22   and ask her, *What do you mean?  What do you mean?*  And she was

23   explaining as she's going that once they reached a level -- and

24   I don't know Bergdorf's that well, but once they reached a

25   level where there was -- there were dressing rooms, and she

1  said at that point that he attacked her.  Those were the words

2  that I remember but I still said, *What do you mean?  You look*

3  *OK.  You look* -- and she had been at work so I couldn't put it

4  together.  And she didn't use the word "rape," that I recall.

5  I have said that before.  But she said it was a frenzy.  She

6  said, *I was fighting.  I was fighting.*  She kept saying that.

7  Q.  Let me clarify something you said before.  I think you said

8  that she and Mr. Trump were kibbitzing?

9  A.  Yes.  Lack of better word.  They were just bantering, I

10  think it was banter back and forth, talking about what kind of

11  gift, she would suggest something to him, but she said it was

12  friendly.

13  Q.  And when she is telling you what happened in terms of the

14  attack, was she crying?

15  A.  No, she was not.

16  Q.  Was she visibly upset?

17  A.  Yes, she was.

18  Q.  How would you describe her state to the best you can?

19  A.  I think I used the word "frenzy" before.  She was

20  gesturing, she was in a state of remembering, best I could

21  tell, just what had happened, and I think the more she spoke

22  the worse is it got.  At least that's how I was feeling it.

23  Q.  And, Ms. Martin, during this conversation, did you touch

24  E. Jean?

25  A.  Yes.  We would hug.  We would stop and hug in a moment or

1   whatever it took to kind of keep ourselves together while she

2   is telling me.  It was a very disconcerting thing to hear,

3   needless to say.

4   Q.  And during that conversation, Ms. Martin, did Ms. Carroll

5   say anything about what, if anything, she planned to do about

6   the attack?

7   A.  Well, this was the thing.  I said -- I asked her right away

8   had she told anyone because I didn't know at that point, and

9   she did tell me she had called Lisa Birnbach -- who I think has

10  already testified -- but she told me that she called Lisa and

11  Lisa told her immediately, *you've been raped and I'll take you*

12  *to the police*, or words to that effect.  Lisa was very

13  definitive.

14  Q.  At that point in time did you know Lisa Birnbach?

15  A.  Yes, I knew Lisa.

16  Q.  Were you friends?

17  A.  We weren't friends like E. Jean and I are, she was a friend

18  of E. Jean.

19  Q.  And what, if anything, did you say to Ms. Carroll about

20  what she should do in the future?

21  A.  Well, after we had conversed for, I don't know, maybe half

22  an hour, 25 minutes, she explained that she thought she was

23  doing the right thing by not doing anything but she wasn't

24  asking me what I would do.  And so, at some point I just

25  volunteered that I didn't think she should do anything because

N545car1                    Martin - Direct

1    it was Donald Trump and he had a lot of attorneys and I thought

2    he would bury her, is what I told her.

3    Q.  Do you remember anything else about that conversation you

4    had with Ms. Carroll in the kitchen that day?

5    A.  Anything meaning?

6    Q.  Anything that you discussed that you haven't told me about?

7    A.  Well, in terms of my response to her, I have questioned

8    myself more times than not over these years as to why I told

9    her that.  I am not proud that that's what I told her, in

10   truth, but she didn't contest.  This is something I know about

11   E. Jean.  She walked into my house and told me that with what I

12   presume to have been what she knew about herself, how she was

13   handling this event.  She was -- other than that, it was about

14   consolation and friends talking.

15   Q.  Do you think you would give someone that same advice today,

16   Ms. Martin?

17            MR. TACOPINA:  Objection, your Honor.

18            THE COURT:  Sustained.  Sustained.

19            MS. KAPLAN:  I will move on.

20   Q.  About how long did the conversation in your kitchen with

21   Ms. Carroll take place?

22   A.  It was about an hour at that point.  I had a teenage

23   daughter and I figured she would be coming home so we --

24   Q.  Now, you are aware that Ms. Carroll published a book called

25   *What Do We Need Men For*?

1  A.  Yes, I am.

2  Q.  In the years between that conversation and when Ms. Carroll

3  published that book, did you have any further discussions with

4  Ms. Carroll about this incident?

5  A.  We did not.

6  Q.  And why do you think you never discussed it?

7  A.  It is sort of amazing but she didn't ask me not to but it

8  just wasn't something we talked about.

9  Q.  And during those same years, between the conversation in

10  your kitchen and the time she published her book, did you tell

11  anyone else about what E. Jean had told you that day?

12  A.  I did not.

13  Q.  Moving ahead now a couple of decades, did there come a

14  point in time, Ms. Martin, when you learned that in that book

15  Ms. Carroll was going to write about the incident at Bergdorf

16  Goodman?

17  A.  Yes, I did.

18  Q.  And was Trump already president at that time?

19  A.  Yes, he was.

20  Q.  And were you surprised that Ms. Carroll intended to do

21  that?

22  A.  Well, I was, only in that I knew she had written a new book

23  and I knew the content of the book and the premise of the book,

24  I guess, and it was about 11 or 15 of the worse men she had

25  ever met.  And so I knew that was there, I knew she had been on

N545car1                     Martin - Direct

1    the road collecting information, I knew all of that and I never

2    asked her if she was going to add that in, I just didn't.  And

3    then she told me one day that Lisa and I were -- she had

4    dedicated the book to us for, I guess, keeping the covenant, if

5    you want to call it that.

6    Q.   What are you saying when you say "keeping the covenant"?

7    A.   I mean even though she told Lisa, I think, or Lisa told

8    her --

9             MR. TACOPINA:  I'm sorry, your Honor.  I have to

10   object to this.

11            THE COURT:  Just a minute.  Just a minute.

12            No.  Objection overruled.  The question is,

13   essentially, what did you mean by saying keeping the covenant?

14            THE WITNESS:  Should I answer?

15   Q.   You can answer.

16   A.   Yeah.  It just meant that the understanding that I had was

17   that this is private, this is her decision not to go any

18   further, and I was honoring that.  I believed what she was able

19   to choose for her life.

20   Q.   Now, did there come a time, Ms. Martin, when Ms. Carroll

21   gave you a draft hard copy of the chapter that included what

22   had happened at Bergdorf Goodman?

23   A.   Yes.

24   Q.   Can you tell the jury briefly what you remember about that?

25   A.   My recollection is it was an evening, a dinner with Lisa

1   Birnbach and her husband Michael on the Upper West Side and

2   just a dinner, and she brought a sheath of papers that included

3   that chapter, which was I think only about 11 pages or

4   something, out of the book.

5   Q.  After the dinner did you, Lisa, and Ms. Carroll discuss the

6   contents of what was in her book in that chapter?

7   A.  In that chapter alone?  No, we did not.

8   Q.  And did you read the chapter after she gave it to you that

9   night?

10  A.  I didn't read it right away but we had a sense of what it

11  was about because we knew what had happened, so.

12  Q.  Are you aware, sitting here today, Ms. Martin, that at a

13  certain point in time an excerpt from Ms. Carroll's book was

14  published in *New York* magazine?

15  A.  Yes, I am.

16  Q.  When that happened, did you read the excerpt?

17  A.  Yes, I think I did.  Yes.

18  Q.  Let me go back in time.  At any point until that excerpt

19  was published did you say to Ms. Carroll, in words or

20  substance, that you wanted to make changes to what she was

21  writing about in terms of Bergdorf Goodman?

22  A.  No.  I did not.

23  Q.  And at the time the excerpt was published in *New York*

24  magazine, did you have any plan to come forward publicly as one

25  of the two people she told at the time?

N545car1                         Martin - Direct

```
1    A.  No.

2    Q.  Why not?

3    A.  It was, by then, we are talking about 2019 or so I think

4    when the book was published, and I had a real worry about the

5    climate of the country and the like, and I wasn't sure I wanted

6    to be associated with something that was that difficult to talk

7    about.  Also, there were people in my life, in my family, who

8    were very worried about it.

9    Q.  And why were the people in your life worried about it?

10              MR. TACOPINA:  Objection.

11              THE COURT:  Sustained.

12   Q.  Were you concerned about security issues?

13   A.  I was.

14   Q.  Did you discuss your concerns about security issues with

15   Ms. Carroll?

16   A.  I did.

17   Q.  Did there come a point in time, Ms. Martin, when you did

18   agree to be publicly identified as one of the two people

19   Ms. Carroll told at the time?

20   A.  Yes.

21   Q.  And how did that happen?

22   A.  It primarily, it was a podcast that the New York Times

23   does, *The Daily*, and we were specifically asked if we would

24   participate to talk about the book and to talk about the

25   chapter and the incident, frankly.
```

1   Q.   At that point in time, the time of the New York Times

2   podcast, did you still have those concerns about security?

3   A.   I did, but sort of like the cat was out of the bag.  I

4   mean, I was in the -- Lisa and I had been obviously identified

5   but we weren't written about in the book, per se.

6   Q.   And so, why did you agree to be identified in the New York

7   Times podcast?

8   A.   Well, because by that time not only was it obvious that,

9   again, we were part of the story, but I respected what was

10  talked about.  It was very much sort of like the crucible, for

11  me, anyway, of women's issues that were being discussed.  The

12  #MeToo movement was pretty prominent at that point and I felt

13  that the book itself, maybe that chapter, had something

14  important to say.

15  Q.   Now, sitting here today, Ms. Martin, do you like Donald

16  Trump?

17  A.   Not particularly.

18  Q.   How do you feel about his political positions?

19  A.   Not good at all.

20  Q.   How did you feel when he was elected president?

21  A.   I have used the word devastated and I still feel that way.

22  Q.   Why?

23  A.   My world view is very different than what I think he

24  espouses, as well as some of his -- I'm sorry.

25  Q.   No, you can finish your answer.

N545car1                         Martin - Direct

1   A.  OK -- some of what I presume to be his party.

2   Q.  Just give me a second?

3   A.  Sure.

4           (Counsel conferring)

5   A.  Sorry.  I keep trying to adjust in this chair.  I'm sorry.

6   Q.  Did you discuss your negative views about Mr. Trump with

7   other people?

8   A.  Yes.

9   Q.  And have you ever called Mr. Trump dangerous?

10  A.  Probably.

11  Q.  Have you ever called him malignant?

12  A.  I don't remember that word, but possibly.

13  Q.  Have you ever said that you hate Donald Trump?

14  A.  Not that I am sure of, but possibly.

15  Q.  And did you share your negative views about Donald Trump

16  with Ms. Carroll?

17  A.  Yes.

18  Q.  Do your negative views about Donald Trump, do they have

19  anything to do with your testimony that you just gave in this

20  case?

21  A.  Specifically about the attack or?  No.

22  Q.  Are you testifying in this case because of your negative

23  views about him?

24  A.  Oh.  No.  No, I am not.

25  Q.  Shifting gears a little bit, did you ever come to regret

N545car1                          Martin - Direct

1    the fact that you were publicly identified as one of the people

2    E. Jean Carol told at the time?

3    A.   It became a bit uncomfortable at different times.

4    Q.   And why is that?

5    A.   The more the case spiraled up, is what I can call it, which

6    is to say there was such a -- the climate of the country was

7    changing by the year.  I'm thinking now after the 2020, I think

8    election, it felt more difficult to identify with some things.

9    I still believe, I know what I believe happened to E. Jean, I

10   know what is in the book, I knew all of the above, but it was

11   difficult because people in my family were very concerned about

12   identification.

13   Q.   And in this case, Ms. Martin, did you have to produce

14   documents including texts off your telephone?

15   A.   Yes, I did.

16   Q.   Were you happy about having to do that?

17   A.   Not at all.

18   Q.   Did you have to give a deposition in this case?

19   A.   I did.  Last fall.

20   Q.   Were you happy about having to do that?

21   A.   No.

22   Q.   Did you convey those feelings of unhappiness to

23   Ms. Carroll?

24   A.   Yes.

25   Q.   How did she react?

N545car1                    Martin - Direct

1  A.  Very concerned, always, but what I didn't understand then

2  that I think I understand better now, was that she -- I

3  couldn't see her way forward at that point because there was no

4  adult survivors law, some of the things that have come since,

5  and so it felt like she was just being, well, hammered in a lot

6  of ways, if I could use that word.  She was out there.

7  Q.  Did you and Ms. Carroll remain close friends at this point

8  in time?

9  A.  We did.  We did.  We still are.

10 Q.  I'm going to show you a document that I think has been

11 admitted into evidence as Plaintiff's Exhibit 122.  Do you have

12 that in front of you?

13 A.  Yes, I do.

14 Q.  Now just to set the table, at the bottom of this document

15 there is an e-mail and in that e-mail address Carol --

16 A.  Shenpa.

17 Q.  What is that e-mail?

18 A.  S-H-E-N-P-A.

19 Q.  Is that your e-mail address?

20 A.  Yes, it is.  I hate to have to admit it for everybody.

21          THE COURT:  You might want to change it.

22          THE WITNESS:  Yes, I think so.

23          THE COURT:  And the jury should draw no inference from

24 the fact that I said that.  Obviously e-mails get to be public

25 and that can be undesirable.

1    MS. KAPLAN:  Your Honor, thank you for raising that I

2    am sure, counsel, we will agree to certain appropriate

3    redactions.

4         THE COURT:  Is that agreed?

5         MR. TACOPINA:  Oh sure.  Yes.

6         THE COURT:  OK.

7    BY MS. KAPLAN:

8    Q.  What are you doing in this e-mail, Ms. Martin?

9    A.  This was an e-mail that I suppose was forwarded because

10   that's what I am looking at, this was an incident when I know

11   Mr. Trump, who was president then, was, I suppose doing this --

12   he was at a news conference, as I recall, and he was speaking

13   about what he said was Nambia.  I knew it to be a country in

14   Africa, Namibia, and I found it to be embarrassing.  And so it

15   was picked up, obviously, in the digital news and I sent it

16   ahead to people I knew because it was, I thought, kind of -- I

17   just thought that he should have known better.

18   Q.  And the e-mail that you have is from yourself to yourself.

19   Does that mean there were people who were BCC'd?

20   A.  I think so.  I am pretty sure of that.  I did that a lot.

21   I'm sorry.

22   Q.  No problem.

23        MS. KAPLAN:  Mr. Lam, if you can go up in the e-mail a

24   bit?  Right there is perfect.

25   Q.  Now, the middle part of this page is also an e-mail from

N545car1                         Martin - Direct

1    you?

2    A.  Yes.

3    Q.  And if we go all the way up maybe that will refresh, it is

4    an e-mail exchange with you and Ms. Carroll?

5    A.  Yes.

6    Q.  Now, in that, in the middle e-mail you say:  I don't know

7    much about Namibia, but I know it ain't Nambia as Orange Crush

8    called it at the UN this week?

9    A.  Yes, I do.

10   Q.  Who was Orange Crush?

11   A.  That was probably a nickname for Mr. Trump.

12   Q.  And if you go down, it says:  As soon as we are both well

13   enough to scheme.  Do you see that?

14   A.  Yes, I do.

15   Q.  What do you mean by well enough?

16   A.  I think there were a lot of health issues going on then.

17   That's the best I can get from this date in time.  Not COVID so

18   much, but other things.  And so, it was literally that as soon

19   as we are both well enough to scheme, my meaning -- oh, should

20   I continue?  Continue?

21   Q.  I will ask the question.

22   A.  I'm sorry.

23   Q.  What do you mean by scheme, Ms. Martin?

24   A.  It is basically that we would often talk about ways to

25   change the climate or to work on issues of interest to us as, I

N545car1                         Martin - Direct

1    guess you would call us, very liberal feminist -- if I can use

2    the word -- women.  We had groups of people we talked to, we

3    were on these e-mail threads, and "scheme" had to do with that.

4    Q.  And this middle e-mail we just looked at, does this have

5    anything whatsoever to do with what Ms. Carroll says happened

6    to her at Bergdorf Goodman?

7    A.  No.  It does not.

8    Q.  Now, if you go up in the e-mail there is a response from

9    E. Jean Carroll at the top?

10   A.  Totally that piece, that line?

11   Q.  Correct.

12   A.  Yes.

13   Q.  And she says:  I have something special for you when we

14   meet.

15          Do you see that?

16   A.  Yes, I do.

17   Q.  What was the something special?

18   A.  I'm surmising, because I sort of remember this time frame,

19   that it was a gift that she had for me.

20   Q.  Do you recall what the gift was?

21   A.  Yes; it was for my granddaughter, it was a squirrel.  Not a

22   live squirrel, obviously.

23   Q.  Did Ms. Carroll have a habit of giving you gifts?

24   A.  She did, and they were usually a little unusual, as was

25   this one.  That's the reason that it comes to mind.

N545car1                          Martin - Direct

```
 1   Q.  Now, this e-mail was dated 2017.
 2   A.  Yes.
 3   Q.  When Ms. Carroll first told you about what had happened at
 4   Bergdorf Goodman, did that happen in 2017 or the mid-1990s?
 5   A.  Oh no, the mid-1990s.
 6   Q.  Give me a second?
 7   A.  Sure.
 8           (counsel conferring)
 9   Q.  Before we get to the end, Ms. Martin, the texts that were
10   produced from your phone in this case, did they say, from time
11   to time, negative things about Ms. Carroll?
12   A.  Did my texts say?
13   Q.  Yes.
14   A.  I think so, something I had completely forgotten, but which
15   I spoke to E. Jean about.
16   Q.  And how do you feel about that today?
17   A.  I feel horrible, mostly because the whole episode of having
18   my documents dumped and my e-mails, there might have been 10
19   years worth that we were required to provide for the deposition
20   and it is just the scope of everything personal and private
21   that I felt entitled to say, in truth, and there were times
22   that E. Jean and I spoke about the safety factor and just the
23   escalation of her case and how she was being, what I believed
24   to be, defamed, I will have to use that word, on a regular
25   basis.  A lot of things were coming up.  And I didn't see an
```

1    end game in this, I didn't know where she was going with this,

2    and so I felt I had a lot of things going on in my own life, to

3    be honest, and it was difficult, it was like stacking up, and

4    I -- I was backing off things.

5    Q.  And has your friendship with Ms. Carroll changed as a

6    result of the fact that you said some negative things about her

7    in texts?

8    A.  It is not, because we spoke about it as it was happening.

9    She knew exactly what I was feeling.

10   Q.  Ms. Martin, were you subpoenaed to testify here today?

11   A.  No, I was not.

12   Q.  Are you testifying here voluntarily?

13   A.  Yes, I am.

14   Q.  Were you looking forward to testifying here today?

15   A.  No, I was not.

16   Q.  Can you explain why you are here?

17   A.  I am here because I am here to reiterate and remember what

18   my friend E. Jean Carroll told me -- it has been, well, in the

19   mid-'90s so that's about 27 years ago.  I believed it then and

20   I believe it today.

21             MR. TACOPINA:  Objection, your Honor.  She believes?

22             THE COURT:  Pardon me?

23             MR. TACOPINA:  According to the allegation.

24             THE COURT:  I'm sorry?

25             MR. TACOPINA:  She testified what she believes

N545car1                        Martin - Direct

1   regarding the allegation, that she believes Ms. Carroll.

2   That's completely inappropriate and should be stricken.

3          THE COURT:  I will strike that sentence:  I believed

4   it then and I believe it today.

5          THE WITNESS:  OK.  I'm sorry.

6          THE COURT:  That's all right.

7          MS. KAPLAN:  Nothing further at this point.

8          THE WITNESS:  Thank you.

9          THE COURT:  All right.  We will break for 15 minutes.

10          (Recess; Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N542Car2

1          (Jury not present)

2          THE COURT:  Before we bring the jury in, I just want

3  to make note that I was handed a letter, and while perhaps I

4  should recognize the name, I don't, the sender, but it is

5  somebody who says they are in the press.  I have no reason to

6  doubt that.  I am just careful about what I say.

7          I understand the point, and it has to do with media

8  access to exhibits and the timeliness of access to exhibits.

9  And I would just suggest to the person who wrote me the letter

10  who I assume is here, is that right?  Okay.  Over the lunch

11  break, if you haven't already, talk to the lawyers because

12  that's -- they have got to see this letter and they have to

13  have an opportunity to inform me about it.

14          MS. BEKIEMPIS:  My name is Victoria Bekiempis.  Your

15  Honor, thank you for hearing me.

16          I had reached out to plaintiff's counsel's

17  representatives regarding the provision of the video deposition

18  to the media and was told that trial exhibits would not be

19  provided.  The media understands that in civil litigation it is

20  often up to the parties --

21          THE COURT:  I don't want to hear the merits here.  All

22  right?  If you or any other member of the media has a legal

23  application to make, there is a vehicle for doing it.  I would

24  be happy to hear it at an appropriate time and with the parties

25  having an opportunity to be heard on it.

N542Car2

1            MS. BEKIEMPIS:  Thank you, your Honor.

2            THE COURT:  All right.  Let's get the jury.

3            And make sure the lawyers have a copy of your letter,

4      please.

5            MS. BEKIEMPIS:  Will do.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N542Car2                    Martin - Cross

1          (Jury present)

2          THE COURT:  Everybody ready?  All right.

3   Cross-examination, Mr. Tacopina.

4          MR. TACOPINA:  Thank you, your Honor.

5   CROSS-EXAMINATION

6   BY MR. TACOPINA:

7   Q.  Good morning, Ms. Martin.

8   A.  Good morning.

9   Q.  I think you said you are a registered Democrat?

10  A.  I am.

11  Q.  And you have donated to political campaigns about ten times

12  or so?

13  A.  Perhaps.

14  Q.  You --

15  A.  Small -- I'm sorry.

16  Q.  Go ahead.

17  A.  Small donations.  I just wanted to make that point.

18  Q.  Including Hillary Clinton's campaign?

19  A.  Yes.

20  Q.  Okay.  And you watched the results of the 2016 presidential

21  election with Donald Trump and Hillary Clinton, obviously.

22  A.  Not with them.  I know what you are saying, though.

23  Q.  You watched with those two participants.  Not with them.

24  You weren't with both of them.

25  A.  Okay.

N542Car2                         Martin – Cross

1    Q.  Obviously, I think you just said you were devastated when

2    you learned that Donald Trump won?

3    A.  I was.

4    Q.  I think it's not an overstatement to say you hated this man

5    politically?

6    A.  I try not to use that word.

7    Q.  Disliked this man politically?

8    A.  That would be correct.

9    Q.  You were asked by Ms. Kaplan on your direct examination

10   about having to turn over and produce some text messages and

11   e-mails --

12   A.  Yes.

13   Q.  -- over the years, correct?

14   A.  Yes.

15   Q.  Okay.  Suffice to say you did not expect at the time you

16   were writing those e-mails for those to see the inside of a

17   courtroom.

18   A.  No, certainly not.

19   Q.  They were personal.

20   A.  All of them, yes.

21   Q.  Okay.  And you reviewed those text messages and e-mails

22   before you came here to testify today.

23   A.  For the deposition last fall.

24   Q.  Okay.  I'm going to discuss a few of them with you, okay,

25   Ms. Martin?  I will show them to you.

N542Car2                    Martin - Cross

```
 1    A.   Um-hmm.
 2    Q.   We will go one by one.  All right?
 3    A.   Okay.
 4    Q.   Okay.
 5         Please put up Exhibit EA just for the witness and
 6    counsel and the Court.
 7         Take a look at that, Ms. Martin, if you can.
 8    A.   A little small, but I will do my best.
 9    Q.   He can zoom in a little bit.  See if you can identify it.
10    A.   Okay.
11    Q.   Do you remember sending -- who is Karen Johnson?
12    A.   She is a friend.
13    Q.   Okay.
14    A.   Again, forgive me.  There is no way for her information to
15    be -- there is a phone number on this.
16    Q.   No.  We have agreed, Ms. Martin -- it's a good point.  We
17    have agreed with counsel that information will be redacted
18    before these documents are placed into evidence --
19    A.   Okay.
20    Q.   -- in public filing, okay?
21    A.   Okay.  Thank you.
22    Q.   Don't worry.
23         So you recall sending -- you recall sending Karen
24    Johnson a text message --
25    A.   Yes.
```

N542Car2                          Martin - Cross

Q.   -- on June 2?

A.   Yes.

          MR. TACOPINA:  Okay.  I would offer that, your Honor,

as Defendant's EA.

          THE COURT:  Ms. Carroll.

          MS. KAPLAN:  Objection, your Honor.

          THE COURT:  On the ground?

          MS. KAPLAN:  Hearsay.

          THE COURT:  In what way.  Without getting into what it

says, point me to what sentence.

          MS. KAPLAN:  It's a prior statement of the witness and

he hasn't established inconsistency with anything she said.

          MR. TACOPINA:  I'm not impeaching the witness, your

Honor.

          THE COURT:  Prior inconsistent statement, is that the

theory?

          MR. TACOPINA:  No I'm not impeaching the witness.

          THE COURT:  I'm sorry.  What you just said was I'm

impeaching the witness.

          MR. TACOPINA:  I said I'm not impeaching the witness.

I guess I was soft.

          THE COURT:  And the relevance of it is what?

          MR. TACOPINA:  State of mind, bias, your Honor, this

is the author of these messages.  I want to ask her about them.

          THE COURT:  Overruled, but, you know --

N542Car2                    Martin - Cross

1          MR. TACOPINA:  This will --

2          THE COURT:  -- keep it under control.

3          MR. TACOPINA:  Yes.  Just a few of them and there is a

4    stated reason I could explain at sidebar if your Honor wants

5    ever.

6          (Defendant's Exhibit EA received in evidence)

7    BY MR. TACOPINA:

8    Q.  Anyway this, Ms. Martin, is in evidence.  It's a text

9    message—you can display it before the jury—that basically

10   said "perfect" -- this is you to Ms. Johnson.  "Perfect.  You

11   checking this God awful Trump thing tonight?  Hillary was on

12   fire today.  But this man needs to be put away.  God help us,

13   but he is so unhinged, I think the bubble will burst sooner or

14   later.  At least I pray."

15         Okay.  That was you writing that.

16   A.  Yes, I suppose so if it's here, yes.

17   Q.  Let me show you another one.  Defense Exhibit EB as in

18   "Edward Boy"?

19         THE COURT:  Why don't you just ask if she has said

20   these things.

21         MR. TACOPINA:  Well, there's a few I would like to

22   introduce.  I could do that, your Honor.  I will start with

23   that.  But there are a few that could be introduced.

24   BY MR. TACOPINA:

25   Q.  Let me start like this.  Take a look at that.  It's up on

N542Car2                    Martin - Cross

```
 1   your screen.
 2              Not in front of the jury, correct?
 3              MR. NELSON:  Correct.
 4   BY MR. TACOPINA:
 5   Q.  Did you tell Kari Strong -- who is Kari Strong?  A friend
 6   of yours?
 7   A.  She is a family member.
 8   Q.  Family member.  Okay.
 9              -- on November 29, 2016, that, "I hate this man who is
10   running our world, spreading his stank all over."
11              Do you recall saying that or writing that message?
12   A.  Clearly I did.  It sounds like something I would have said
13   at that point.
14   Q.  Okay.  Take a look at EC.  Do you recall on December 17,
15   2016, writing -- sending an e-mail to Ms. Carroll.  And others,
16   by the way, I think.  This was sent to multiple people, as you
17   will see.  Can you see the e-mail behind it?  The main e-mail
18   behind it with those names on it?
19   A.  Yes, yes.
20   Q.  Okay.  Do you recall sending an e-mail to Ms. Carroll and
21   others with a link to a New York Times article referring to a
22   12-step program for responding to president elect Trump and
23   writing her, "Are you traumatized by the election of Donald
24   Trump?  Here's the program for you."
25              Do you recall that?
```

N542Car2                    Martin - Cross

1   A.  I don't recall writing it, but I'm looking at it, so I

2   acknowledge it.

3   Q.  Okay.  And later that day, Ms. Carroll e-mailed you back

4   saying "This is wonderful, Miss Caroly.  Thank you."

5   A.  Um-hmm.

6   Q.  Do you recall that or do you see it?

7   A.  Yes, I see it.

8   Q.  And you acknowledge that is an e-mail that you received?

9   A.  This was right after the election, correct?

10  Q.  Yes, ma'am.  The date is up there?

11  A.  Yes, that's what I am making reference to.  Excuse me.

12  Yes, I see it.

13  Q.  And Caroly is what, I guess, Ms. Carroll calls you?

14  A.  Yeah.  It's sort of a shortening, yes.

15  Q.  So Defense Exhibit ED.  On November 27, 2016, at 9:27, you

16  sent an e-mail to Ms. Carroll and others with a link to an

17  article and wrote, "One of the most powerful warnings by Joy

18  Reid of MSNBC, bamboozlement warning and already happening.

19  Media normalization of Trumpism.  His poll numbers will

20  improve.  The international community will come around.

21  Melania, Ivanka will be . . . unorthodox but charming, gracious

22  self for huge media fall."

23          THE COURT:  That's not the word.

24          MR. TACOPINA:  "Fail," sorry.  My outline is -- I

25  miswrote that.

N542Car2                    Martin - Cross

1   Q.  "Fail."  "Huge media fail."  Right?

2   A.  Yes, I am looking at it, yes.

3   Q.  And you received that e-mail back from Ms. Carroll later

4   that day saying "Joy is Cassandra."

5   A.  I know what that means.

6   Q.  What does that mean by the way?

7   A.  Cassandra is usually someone who might predict something

8   that's coming, at least as I know it to be --

9   Q.  Okay.

10  A.  -- in the future.  So she is speaking, I think, of Joy

11  Reid, who had written the other.

12          May I add something, though, or not?

13  Q.  Sure, sure.

14  A.  Only that this was typically the way many communications

15  went between me and my set of friends, especially right after

16  the 2016 election.  I think I used the word "devastated."  This

17  is a reflection of how we were feeling.

18  Q.  Okay.  I'm going to show you what's been marked as Defense

19  Exhibit EE.  And that is an e-mail you sent to Ms. Carroll and

20  others with an article about Donald Trump's daughter Ivanka

21  taking his seat during a G20 meeting with world leaders and you

22  wrote, "I know you guys either saw this or whatever.  But it's

23  just too much, as Charles Blow's Twitter comments say, I don't

24  know, bad as it all is, how this thing of the two junior

25  grifters just sashaying into meeting with world leaders and

N542Car2                    Martin - Cross

```
 1   nobody objects???  I gotta stop trying to be informed on
 2   whazzup in the world.  It makes me physically sick.  How will
 3   it ever end???"
 4          Do you recall sending that e-mail to Ms. Carroll and
 5   others?
 6   A.  I'm looking at it, so I'm sure, if that was my name.
 7          MR. TACOPINA:  Your Honor, I would offer this as EE.
 8          MS. KAPLAN:  No objection, your Honor.
 9          THE COURT:  EE is received.
10          (Defendant's Exhibit EE received in evidence)
11   BY MR. TACOPINA:
12   Q.  Show you EF now.
13   A.  I'm sorry?
14   Q.  I'm going to show you another exhibit, EF, EF.
15          And by the way, that last e-mail, let me harken back
16   to it a second.  The two junior grifters you were referring to,
17   who was that let me ask you that?
18   A.  It would have been Ivanka and Jared, I think, if that's who
19   I referred to.  Yeah, Ivanka takes her father's seat.
20   Q.  Okay.  So you were talking about his daughter and his
21   daughter's husband.
22   A.  Correct.
23          MS. KAPLAN:  I apologize for interrupting.  On EE we
24   don't object, but there are going to be some redactions that
25   need to be made.  I assume that's okay with you, Mr. Tacopina.
```

N542Car2                    Martin - Cross

1          I will show you.

2          MR. TACOPINA:  Please.

3          (Counsel confer)

4          THE COURT:  There are certainly a lot of e-mail

5  addresses on it.

6          MR. TACOPINA:  All of those, by the way, your Honor,

7  just so you know, I think we have discussed this, every single

8  e-mail address, including Ms. Carroll, the witness or anyone

9  else's, will be redacted.  There is also a top portion of this

10  e-mail, exhibit, rather, that we have agreed to redact that has

11  nothing to do with the conversation we just discussed with the

12  witness.

13          THE COURT:  Let's just get on with it.

14  BY MR. TACOPINA:

15  Q.  Okay.  Show you EF now.  Take a look at EF.  This is an

16  August 3 -- there is EF.  That's the big one that we will zoom

17  in for you a little bit.  That's an August 3, 2017 e-mail sent

18  to Ms. Carroll and others with a link to *The New York Times*

19  article about then White House Chief Strategist Stephen Bannon

20  and then Attorney General Jeff Sessions and you wrote, "Hi.

21  This will be in weekend *New York Times Magazine* released today.

22  A warning.  One of the most frightening deep dives into what is

23  happening right now under Trump-Sessions-Bannon.  Long read,

24  but necessary.  I had no idea the plot was so thick and

25  demonic.  God help us.  Sorry to sound so panicked."

N542Car2                    Martin - Cross

1              Do you recall sending that e-mail?

2    A.  I'm looking at it, so I suppose I did, yes.

3    Q.  And Ms. Carroll sent you back a response saying, again,

4    "Thank you, Ms. Caroly."  Do you see that?

5    A.  Yes, yes.

6              MR. TACOPINA:  Your Honor, I'm going to offer EF.

7              MS. KAPLAN:  Again, subject to appropriate redactions,

8    your Honor.

9              MR. TACOPINA:  Yes, of course.

10             THE COURT:  Received.

11             (Defendant's Exhibit EF received in evidence)

12   BY MR. TACOPINA:

13   Q.  I'm going to show you Defendant's EG.  I won't offer all of

14   them.  You mentioned someone named Helen Young an article about

15   Donald Trump telling -- saying that Japanese dignitaries, he

16   never knew there were so many countries until he was elected

17   and you wrote, "Oh my God, make it stop."  I'm sorry.  You sent

18   a link.

19             THE COURT:  Counselor.

20             MR. TACOPINA:  Okay.

21   A.  Yes.

22   Q.  You sent a link that talked about -- well, the link is from

23   Raw Story, says "Watch Trump tells Japanese dignitaries he

24   never knew there were so many countries until he was elected,"

25   and you send to -- you get a response from Helen Young saying,

1   "Oh my God, make it stop," correct?

2   A.   Yes.

3   Q.   Okay.  Defense Exhibit EH, April 12, 2018, you sent an

4   e-mail to Ms. Carroll and others with *The New York Times*

5   article about Donald Trump issuing an order demanding an

6   evaluation of the Postal Service's finance and writing, "He is

7   out of his freaking mind.  This is terrifying."  Right?

8   A.   I said that?

9   Q.   Okay.

10  A.   I'm sorry.  I'm reading it right now.

11  Q.   It's okay, Ms. Martin.  Let me know when you are done.

12  A.   So many of these, if I may, are obviously forwards of

13  stories that were written with our comments attached.

14  Q.   Yes.

15  A.   I don't quite understand why that wasn't my prerogative to

16  make these comments.

17  Q.   I'm not saying it's not your prerogative, Ms. Martin.

18  A.   I don't understand why they are being offered as evidence.

19  Q.   Yeah, you just don't have to understand it, unless the

20  Court rules otherwise.  I'm just going to ask you some

21  questions and you can give me honest answers.  Okay?

22  A.   Thank you.

23  Q.   Defense Exhibit EI.  That's a September 4, 2018 e-mail, and

24  that's an e-mail from you, again, to a group of people all who

25  will be redacted by way of identification of e-mail addresses,

N542Car2                    Martin - Cross

1   saying, "Guys, this is, there are no words.  I don't mean to

2   keep sending this awful dark stuff, but we need to know our

3   enemy inside and out.  This made my head spin."

4           And that was in reaction to a *Washington Post* story by

5   a journalist regarding a telephone call between Donald Trump

6   and Bob Woodward, correct?

7   A.  Apparently so, yes.

8           MS. KAPLAN:  Objection, your Honor.  Just I think this

9   is getting cumulative.

10          MR. TACOPINA:  No, your Honor.  There is a very

11  specific reason.  And if you want a sidebar.  There's not many

12  more of these e-mails, but there is a reason.

13          THE COURT:  Look.  I don't want a sidebar.  If

14  somebody is asking for one, I will consider it.

15          MR. TACOPINA:  Okay.

16          THE COURT:  I like to have trials without any

17  sidebars.  It's quicker.

18          MR. TACOPINA:  Okay.  I'll just scoot ahead, then.

19  BY MR. TACOPINA:

20  Q.  I'm going to show you EJ.  This is a March 19, 2020

21  e-mail -- I'm sorry, this is a text message, not an e-mail,

22  back to your friend Karen Johnson that we talked about before

23  saying, relevant portions, "I cannot bear to listen to Trump.

24  I feel unsafe under his rule."

25          Do you recall sending Karen that message?

N542Car2                          Martin - Cross

1    A.  I suppose so.

2    Q.  When you say you suppose so, you are not doubting that

3    that's your words in your text message, are you?

4    A.  No, I'm not doubting it.

5    Q.  EK, Defense Exhibit EK.  There's two more on this section,

6    and then we will move on to something else.  November 20, 2020,

7    you text someone named Pat Barbarito?

8             THE COURT:  Do you have to go into the names of these

9    individuals?

10             MR. TACOPINA:  No.

11   Q.  You text someone saying, "I hate Donald Trump more than

12   words.  He deliberately abandoned us."

13             Do you recall saying that?

14   A.  Not that day, but it was probably what I was feeling.

15   Q.  And, again, you don't dispute the authenticity or those

16   words, do you?

17   A.  I suppose it was in the dump that was taken, right?

18   Q.  From your phone.

19   A.  Yes.

20   Q.  Your text messages.

21   A.  Yes.

22   Q.  And another text message, Defense Exhibit EL, this is you

23   texting another friend of yours and saying in relevant portions

24   of this text message, "I can't believe Trump on golf course

25   today.  Miles-long food lines, millions without jobs, refusing

```
 1   to sign the legislation to help.  I despise this man.  He can't
 2   be gone soon enough."  Do you recall saying that to your
 3   friend?
 4   A.  That was in 2020, is that right?
 5   Q.  That was December 24, 2020, Christmas Eve of 2020.
 6   A.  So that was after the election of 2020.
 7   Q.  Yes.
 8   A.  That's what I meant at that point, yes.
 9   Q.  Now you can take that down.
10          You worked for America's Talking, I think you said,
11   between June of '94 and July of '96, about two years?
12   A.  Correct, yes.
13   Q.  And you worked with Ms. Carroll there?
14   A.  Yes.
15   Q.  And before working together at that cable news channel,
16   it's fair to say you only knew her marginally?
17   A.  No, I knew her better than marginally.
18   Q.  Okay.  Were you friends?
19   A.  We were friends, yes.
20   Q.  So you would run into her—I think you said this before—on
21   various social occasions or social functions that you were both
22   involved in with the media industry and whatnot?
23   A.  Yes.  I also knew her -- I should say I lived in an
24   apartment with her ex-husband, so we knew each other that way,
25   although they were not married at that moment, but I knew her
```

N542Car2                    Martin - Cross

1   that way.

2   Q.  Okay.  And after the America's Talking cable network ceased

3   to exist, you never worked together again with Ms. Carroll?

4   A.  No.

5   Q.  Now, you would still -- despite that, you still became very

6   close friends and stayed in touch regularly, correct?

7   A.  Yes.

8   Q.  And you and E. Jean Carroll regularly e-mailed each other

9   in 2016 and 2017 about Donald Trump.

10  A.  About the election and Donald Trump.

11  Q.  And Donald Trump.  Okay.  I'm going to show you Defense

12  Exhibit EM.  This is, again, between you and Ms. Carroll now.

13  That is an e-mail from November 11, 2016, and you sent an

14  e-mail to Ms. Carroll with the subject "Retweet by Full Frontal

15  on Twitter.  Watch the link on Lizzo.  You will feel

16  Trumpfree."

17          Why are you laughing?

18  A.  I'm trying to put it together in my head, and when I see

19  Lizzo, I'm assuming it is going to be something about the

20  entertainer Lizzo.  I'm not sure, though.  I haven't read it

21  yet.

22  Q.  The relevant portion I just want to read you from this

23  e-mail is:  Jeannie, how are you feeling (about apocalypse

24  today)?  Three days in, and I feel worse.  Seeking solutions.

25  Lots of petitions out there.  Electoral college thing.  Sending

N542Car2                    Martin - Cross

1    you two thought pieces.  Something had to happen to stop this

2    train.

3              Do you recall sending this e-mail to Ms. Carroll?

4              MS. KAPLAN:  Just one clarification, your Honor.  I

5    think it says "the train" rather than "this train."

6              MR. TACOPINA:  What did I say?

7              MS. KAPLAN:  "This train."  No big deal.

8    BY MR. TACOPINA:

9    Q.  Anyway, do you recall sending this e-mail?

10   A.  Yes, I suppose so.

11             MR. TACOPINA:  Okay.  Your Honor, I offer this as EM

12   in evidence, Defense Exhibit EM.

13             MS. KAPLAN:  No objection, your Honor.

14             THE COURT:  Received.

15             (Defendant's Exhibit EM received in evidence)

16   BY MR. TACOPINA:

17   Q.  Another -- this is between you and Ms. Carroll now.  I'm

18   just going to focus on that.  You sent her an e-mail on

19   January 6, with a link to an article appearing to reference in

20   parens -- well, "all the terrifying things that Donald Trump

21   did lately," and there is a link to an article under it that

22   basically says the same thing in the link, correct?

23             THE COURT:  Did you identify an exhibit?

24             MR. TACOPINA:  I'm sorry.  I think I did, your Honor.

25   But if not, it's EN, Defense Exhibit EN.  Actually, you are

N542Car2                         Martin - Cross

1  right, your Honor.  I did not.

2  BY MR. TACOPINA:

3  Q.  Do you remember sending that?

4  A.  This is the one that said:  This is horrifying, but I had

5  to pass it along?

6  Q.  Yes.

7  A.  Yes.

8  Q.  "At least we are not alone in this fresh hell"?

9  A.  Yes.

10           MR. TACOPINA:  I'm offering EN, your Honor.

11           THE COURT:  Received.

12           (Defendant's Exhibit EN received in evidence)

13  BY MR. TACOPINA:

14  Q.  Again, just you and Ms. Carroll, further in this EN, same

15  exhibit EN, which is in evidence—and you can publish that,

16  Eric, obviously—Ms. Carroll wrote you back -- please go back

17  to the -- Ms. Carroll wrote you back, "Thank you, Miss Carol.

18  I'm still trying to pull myself together after reading the

19  *Times* revelation Friday night that the Russians handed Trump

20  the election because Putin was terrified of Hillary!"

21           Do you recall the substance of that e-mail

22  conversation or basically what it reads it says?

23  A.  I have to say it was probably one of many, especially

24  looking at the time stamp.

25  Q.  And we are going to go through a few more just between you

N542Car2                          Martin - Cross

1    and Ms. Carroll.  Defense Exhibit EO, I will show you, it is

2    January 10, 2017, and that is an e-mail you sent to Ms. Carroll

3    with a link to an article by e-mail with the subject "What is

4    the Donald Trump Golden Shower Allegation About?  Glad You

5    Asked."  And Ms. Carroll e-mail you back at 11 p.m. that night

6    saying "I'm in heaven."  And that same night, about eight

7    minutes later, you replied, "I don't think I can sleep.  Dreams

8    of peeing during impeachment.  Too much smoke here/fire very

9    nearby."

10           Do you recall that e-mail?

11   A.  Attempt at humor, sorry.

12   Q.  Okay.  Whatever it is.

13           MR. TACOPINA:  I am offering EO, your Honor.

14           MS. KAPLAN:  No objection, your Honor.

15           THE COURT:  Pardon me?

16           MS. KAPLAN:  No objection.

17           THE COURT:  Received.

18           (Defendant's Exhibit EO received in evidence)

19   BY MR. TACOPINA:

20   Q.  EP, Ms. Martin, is a March 14, 2017 e-mail to Ms. Carroll

21   with a link to a *New York Times* article and the subject *"New*

22   *York Times* Kirschner's Trump-in-law's near $400 million deal

23   with a Chinese firm," and you write to Ms. Carroll, "Dear God,

24   make this stop."

25   A.  That was from me to Jean.

N542Car2                    Martin - Cross

1          THE COURT:  There is no question yet, ma'am.

2          THE WITNESS:  Oh, I'm so sorry.

3    Q.  Do you recall that?

4    A.  Yes.  I'm looking at it.  Yes.

5          MR. TACOPINA:  Let me just -- let me offer.  This is

6    EP?  EP.  I will offer EP, your Honor.

7          MS. KAPLAN:  No objection.

8          THE COURT:  Received.

9          (Defendant's Exhibit EP received in evidence)

10   BY MR. TACOPINA:

11   Q.  I would like to show you a government exhibit

12   now—government, it's normally where I live—but plaintiff's

13   exhibit, PX 122.  You were shown this on questions by

14   Ms. Kaplan earlier.  I want to talk to you about it for a

15   minute.  This is in evidence already as PX 122.

16         That's the e-mail that you sent to Ms. Carroll back on

17   September 23, 2017.  Do you want some water, by the way,

18   Ms. Martin?

19   A.  I have some.

20   Q.  Oh, you have some?

21   A.  Yeah.

22   Q.  September 23, 2017, right?  This is the Namibia topic we

23   discussed earlier.

24         When you say -- let's go just right to the point here.

25   You say, "As soon as we are both well enough to scheme, we must

1    do our patriotic duty again."

2              Do you know what the definition of "scheme" is?

3    A.  I think I do.

4    Q.  What do you think it is?

5    A.  It's a plan, to put a plan together.

6    Q.  Okay.

7    A.  That's how I think of a scheme.

8    Q.  That's how you think of a scheme.  Is it a secret plan?

9    A.  No, not necessarily.

10   Q.  Okay.  So, anyway, the plan you were going to put together

11   to do your patriotic duty with Ms. Carroll was what?

12   A.  Was generally what we would work on for some of those

13   causes I just mentioned.  This was right after the election of

14   Mr. Trump.  I'm looking at the date on here.  So this was a

15   very typical conversation about the kinds of energy that we put

16   toward democratic causes, some of the things that I'm

17   interested in, anyway.

18   Q.  This was specifically regarding Donald Trump, though.

19   That's, of course, Donald Trump.

20   A.  Yes.

21   Q.  When you say, We are going to scheme or as soon as we are

22   both well enough to scheme, we must -- we must do our patriotic

23   duty again, do you have anything in particular you were

24   referring to there, aside from just supporting democratic

25   causes?

N542Car2                    Martin - Cross

1   A.  Supporting democratic causes.

2   Q.  That's the scheme?

3   A.  That's the scheme.

4   Q.  But you had been supporting democratic causes all along,

5   right?

6   A.  But it's still -- it's still a plan.

7   Q.  It's still a plan.

8   A.  Yes.

9   Q.  Okay.  And in response to that—I think you have seen this

10  also—Ms. Carroll in all caps "totally" with three exclamation

11  points "I have something special for you when we meet."

12  A.  Yes.

13  Q.  And to you this something special was a stuffed squirrel?

14  A.  Well, I believe so.

15  Q.  Yeah.  Now, you testified previously in this litigation via

16  deposition, right?

17  A.  Yes, yes.

18  Q.  When did you remember that "I have something special for

19  you when we meet" was a stuffed squirrel?

20  A.  I only put it together with the timeline.

21  Q.  With the timeline?

22  A.  Yes.

23  Q.  Okay.  When did you put it together, that timeline?

24  A.  I can't really tell you.

25  Q.  After the deposition but before the trial?

N542Car2                    Martin - Cross

1    A.  Are you speaking of the deposition I gave to your --

2    Q.  Yes.

3    A.  Back in October.

4    Q.  In October.

5            So it was after October and before today?

6    A.  I'm not sure, sir.

7    Q.  Okay.

8    A.  I really don't know.

9    Q.  Well, you didn't talk about that something special in the

10   scheme e-mail being a stuffed squirrel in your deposition, did

11   you?

12   A.  I don't know.

13   Q.  Okay.  All right.  You can take that down.  Thanks.

14           So it's your testimony that Ms. Carroll told you she

15   was sexually assaulted.

16   A.  Yes.

17   Q.  And this happened at your house?

18   A.  Yes, the discussion.

19   Q.  The discussion.  The discussion.  That was not a clear

20   question.  The discussion.

21   A.  Yeah.

22   Q.  And it's your testimony that Ms. Carroll told you she was

23   sexually assaulted this one and only time.  She never had

24   mentioned that to you before, being sexually assaulted, right?

25   Let me rephrase that question.

1              This was the first time Ms. Carroll had ever mentioned
2    to you that she had been sexually assaulted?
3    A.  I think so.
4    Q.  You think so?
5    A.  I think so.
6    Q.  Would that be something you would likely forget if
7    Ms. Carroll told you she was sexually assaulted another time?
8    A.  No, but I think what you are speaking about in 1996, in
9    that time frame, we weren't closer before that, we weren't as
10   close as we could have been if we were speaking about something
11   like that.
12   Q.  Okay.
13   A.  I didn't know her that way until she told me about the
14   attack by Mr. Trump.
15   Q.  How about after you became close?  Did she tell you about
16   any other sexual assaults?
17   A.  No.
18   Q.  No?  Okay.
19              Did the name Les Moonves ever come up to you?
20   A.  I know who that is.
21   Q.  From Ms. Carroll?  Did she ever mention him to you?
22   A.  From the book.  I knew about it from her book and I knew
23   vaguely.
24   Q.  What do you mean?  You knew vaguely what?  I'm sorry.
25   A.  I knew vaguely about some charges that had been brought

N542Car2                        Martin - Cross

1   against Mr. Moonves at some point.  I couldn't give you a year.

2   I had heard it in the media circles.

3   Q.  That's a different question.  My question was did

4   Ms. Carroll ever -- before the book came out ever mention to

5   you anything about --

6   A.  I don't think we had --

7   Q.  -- Les Moonves?

8   A.  -- that discussion.

9   Q.  Okay.  Now, this was obviously an important conversation

10  you had with Ms. Carroll.

11  A.  Yes, yes.

12  Q.  And you were shocked --

13  A.  Yes.

14  Q.  -- by it.

15  A.  Yes, I was.

16  Q.  And it involved Donald Trump, someone who you knew well of.

17  You knew he was a very famous person in New York?

18  A.  From the e-mails, well, yes, not at that point, obviously

19  there weren't e-mails, but --

20  Q.  No.  I'm not talking about the e-mails we just went

21  through.  I'm just saying you knew who Donald Trump was.

22  A.  Yes.

23  Q.  You were a journalist in New York --

24  A.  Absolutely.

25  Q.  -- obviously, right?

N542Car2                          Martin - Cross

1    A.  Absolutely.

2    Q.  Back in '95 or '96.

3    A.  Yes.

4    Q.  But you don't know the date she supposedly told you this?

5    A.  Oh, no, I couldn't give you an exact date.

6    Q.  Now, how about a year?  Can you give me an exact year?

7    A.  It was either '95 or '96.

8    Q.  Do you know the month the conversation with you and

9    Ms. Carroll happened in your house?

10   A.  I'm sorry, I can't.  I was saying I didn't make -- I didn't

11   memorialize it.  I didn't write it down anywhere.

12   Q.  Okay.  Okay.  And it's your story that before Ms. Carroll

13   supposedly told you she was attacked by Donald Trump, she

14   didn't make a specific request to speak to you?

15   A.  I'm sorry.  I don't understand.

16           MS. KAPLAN:  Objection to the form, your Honor.

17           MR. TACOPINA:  One second.  I will rephrase that.

18   BY MR. TACOPINA:

19   Q.  How did you -- what was the watershed event that got you to

20   your house that night?  Was it a request by Ms. Carroll to

21   speak to you or did you just all decide to go have coffee or

22   something at your house?

23   A.  She asked what I was doing.  It was not an unusual request.

24   She said let's go -- do you have some time?  Let's go to your

25   house, or something, words to that effect.  There was no

N542Car2                    Martin - Cross

1    watershed.  I didn't know what she wanted to talk about.  It

2    could have been nothing, based on our past gatherings.

3    Q.  Okay.  So it's your testimony today that she requested to

4    go to your house to discuss something?

5    A.  Yes, yes.

6             MR. TACOPINA:  I'm going to read, your Honor, from,

7    and counsel, the deposition, page 30.

8             MS. KAPLAN:  This is Ms. Martin's deposition?

9             MR. TACOPINA:  Yes, of course.

10            Page 30.  It's a little -- there are some objections,

11   so it starts at line 8 and I guess I will go to 21 for

12   completeness.

13            THE COURT:  Give me a moment.

14            MR. TACOPINA:  And the relevant lines for impeachment

15   purposes are 18 and 19, your Honor.

16            MS. KAPLAN:  Objection, your Honor.  I don't see any

17   inconsistency.

18            THE COURT:  Nor do I.  Sustained.

19            MR. TACOPINA:  Okay.

20   BY MR. TACOPINA:

21   Q.  Anyway, it's -- Ms. Martin, it's your testimony that before

22   you got to your house and had that conversation, did you know

23   specifically what Ms. Carroll wanted to speak to you about?

24   A.  No, I did not.

25   Q.  Now, at the time of this supposed conversation at your

N542Car2                        Martin - Cross

1   house, you were married to Joseph Terry?

2   A.  Yes.

3   Q.  Okay.  And according to you, your conversation with

4   Ms. Carroll happened in your home after the end of the work

5   day?

6   A.  Yes, of our work day, yes.

7   Q.  Your work day.  No one else was in the house at that point?

8   A.  No, they were not.

9   Q.  Now, according to you, Ms. Carroll told you that she felt

10  physically okay that day, right?

11  A.  If those were the words.  I can't -- I can't be absolutely

12  sure if those were her words.  I'm looking at her and I assumed

13  she seemed okay and she was frazzled.

14  Q.  Okay.  Did she tell you she was physically okay that day?

15  A.  I -- maybe in so many words.  I'm sorry I can't give you an

16  exact --

17  Q.  It's okay.  I'll go to the deposition, page 33/lines 12

18  through 15.

19            THE COURT:  Any objection?

20            MS. KAPLAN:  None, your Honor.

21            THE COURT:  Go ahead.

22  BY MR. TACOPINA:

23  Q.  Okay.  This is -- well:

24  "Q  What was your advice?

25  "A  Because she said" -- I'm sorry.  Withdrawn.  "Because she

N542Car2                         Martin - Cross

1    had said she felt physically okay that day and she wasn't sure

2    what to do, I advised her not to do anything."

3              Was that truthful testimony in October?

4    A.  I think so.

5    Q.  Okay.  Now the other reason you said also, just to complete

6    the record, here you -- I just read you your testimony where

7    you said you advised her not to do anything because she said

8    she felt physically okay.

9              THE COURT:  Let's please get to a question.

10             MR. TACOPINA:  It is.  I had to set it up with that,

11   your Honor.

12   Q.  You also said that --

13             THE COURT:  No.  Questions don't get set up.  We are

14   not serving dinner in a restaurant.  Let's go on.

15             MR. TACOPINA:  Then, you know what?  We will skip that

16   question.

17   BY MR. TACOPINA:

18   Q.  It's your testimony that after Ms. Carroll first told you

19   about this alleged incident, you spoke to her again about it

20   before her book was published.

21   A.  Before her book was published.

22   Q.  Before her book was published, right around the time her

23   book was published.

24   A.  Yes.

25   Q.  Okay.  That was about 24 years later?

N542Car2                    Martin - Cross

1   A.  I think so.

2   Q.  Next time you had a conversation about your friend being

3   attacked in Bergdorf Goodman by Donald Trump, 24 years later,

4   right?

5           THE COURT:  Argumentative.  Sustained.  And counselor,

6   for your information --

7           MR. TACOPINA:  Yes, sir.

8           THE COURT:  -- the definition of an argumentive

9   question in *Black's Law Dictionary* is "a question in which the

10  examiner interposes a viewpoint under the guise of asking a

11  question."  So go on.

12          MR. TACOPINA:  Thank you.

13  BY MR. TACOPINA:

14  Q.  So you testified, you testified in your deposition that you

15  didn't even discuss Ms. Carroll's book with her containing her

16  Donald Trump Bergdorf Goodman story before it came out in 2019,

17  correct?

18  A.  I think that's correct, yes.  I didn't know she was going

19  to include that story.  That would be the reason.

20  Q.  Now, The Daily podcast that you did, that was yourself,

21  Ms. Carroll, and Ms. Birnbach.

22  A.  Yes.

23  Q.  Okay.  I didn't hear you.

24          And do you remember the date of that Daily podcast?

25  A.  Not really.  I'm only guessing June of 20 -- I can't guess.

N542Car2                    Martin - Cross

1   I'm not certain.

2   Q.  It was around the time Ms. Carroll's book was published,

3   obviously?

4   A.  That's correct, yes.

5   Q.  Okay.  And before suing Donald Trump, Ms. Carroll informed

6   you she was going to file a lawsuit against him.

7   A.  She was working on the New York Adult Victims of Survivors

8   Act and I knew that she was working in that realm.  I did not

9   know exactly what she was going to do.

10  Q.  According to you, it was up to the point where you were

11  deposed in October of last year, you never spoke with any of

12  Ms. Carroll's attorneys about her allegations.

13  A.  No, I did not.

14  Q.  However, in August of 2022, you at least were contacted by

15  an attorney who linked you up with your current attorney, Noam

16  Biale?

17  A.  Yes, that's correct.

18  Q.  That was one of Ms. Carroll's attorney who linked you up

19  with your current attorney?

20          MS. KAPLAN:  Objection, your Honor.

21          THE COURT:  I don't understand the question.  Let's

22  start with that.

23          MR. TACOPINA:  Okay.

24          THE COURT:  Please don't answer.

25  Q.  Who linked you up with your current attorney, Mr. Biale?

N542Car2                    Martin - Cross

1    A.  Well, that would be E. Jean's attorney, but I didn't see it

2    as a link-up.

3    Q.  Who referred you to your attorney?

4    A.  I was told that I had to have my own representation.

5    Q.  Now, on August 10, I would like to show you Defense Exhibit

6    BS.

7            And Robbie, it is the redacted portion we discussed.

8            MS. KAPLAN:  I wasn't given a copy.  Do you have a

9    copy?

10   BY MR. TACOPINA:

11   Q.  Anyway, Ms. Martin, before you look at that, let me ask you

12   a question.  Do you recall a text exchange between you and

13   Ms. Carroll about arranging transportation, coming into the

14   city for either a meeting or something you had regarding her

15   case?

16   A.  Vaguely.

17   Q.  Vaguely.  Okay.

18           And in response to that Defense BS, if you could

19   please blow it up a little bit for Ms. Martin, you said,

20   "Thanks for helping on that.  No more chats and texts until

21   further notice."

22           What did you mean by that?

23   A.  Nothing nefarious, I can tell you that.  I'm not sure.

24   Q.  Okay.  Okay.

25           MR. TACOPINA:  Your Honor, we will offer BS with the

N542Car2                     Martin - Cross

1    appropriate redactions agreed upon by counsel.

2              THE COURT:  Any objection?

3              MS. KAPLAN:  Subject to appropriate redactions, your

4    Honor, no objection.

5              THE COURT:  Received on that basis.

6              (Defendant's Exhibit BS received in evidence)

7    A.  I'm still reading that text.  Is that okay?

8    Q.  Sure, you could read it.

9    A.  "No more chats.  Update from Noam"——that would be my

10   representative——"is upsetting," and I'm not sure what I meant

11   by that.  I'm really not.

12             THE COURT:  And conversations with your counsel,

13   except in unusual circumstances, are private.

14             THE WITNESS:  Okay.

15   BY MR. TACOPINA:

16   Q.  Okay.  Anyway --

17   A.  Ah.  I know what this was about.

18   Q.  Okay.  Well, there is not a question, and I don't want to

19   get into conversations with you and your counsel.

20   A.  This is -- okay.

21   Q.  Okay?

22   A.  This is not with my counsel.

23   Q.  I know.  This is a text message from you to E. Jean, right?

24   A.  Yes.

25   Q.  And in that message, do you know what the "no more chats

N542Car2                    Martin - Cross

```
1   and texts until further notice" is about?
2   A.  Now I do.
3   Q.  What is that?
4   A.  It had to do with the fact that I was going to have to
5   retain Mr. -- Noam as my, I guess you would call it counsel for
6   this ongoing because at that point the case was going -- she
7   was filing a case against Mr. Trump.  At this point they were
8   going to subpoena me.  That's what I know this means, because I
9   said I can fill them in on addresses, have to let them in at
10  the gate.  I've never been subpoenaed in my life.  I didn't
11  know what to expect.  But I was told someone would be coming to
12  subpoena me for this case.
13  Q.  Okay.  Okay.  Is that it?
14  A.  Is that it?
15  Q.  Yes.  I'm saying that's what you wanted to say?
16  A.  Regarding this text, yes, uh-huh.
17  Q.  Okay.  Thank you.
18          I'm going to show you Defense Exhibit CR.  That is a
19  text between you and Ms. Carroll on August 2, 2022, that you
20  wrote.
21  A.  Ah.
22  Q.  "Expect some day" -- I guess your attorney expects some day
23  in September and there you are referring to I guess your
24  deposition where you would be testifying about this case in a
25  deposition?
```

N542Car2                        Martin - Cross

1      A.  Yes.

2      Q.  Okay.  And you told Ms. Carroll in this August 2, 2020

3      text, "You, me, Miss Lisa," which is Birnbach I guess?

4      A.  Yes, yes.

5      Q.  "Definitely," and that's all caps, "definitely have to sit

6      together and chat before then, depending on Lisa's recovery, of

7      course."

8            Do you see that?

9      A.  Yes, I do.

10           MR. TACOPINA:  I offer CR, your Honor, Defense CR in

11     evidence.

12           MS. KAPLAN:  Subject to redactions, your Honor.

13           THE COURT:  Received on that basis.

14           MS. KAPLAN:  No objections.

15           (Defendant's Exhibit CR received in evidence)

16     BY MR. TACOPINA:

17     Q.  You could publish that, by the way.

18           So before testifying under oath in this case for your

19     deposition, Ms. Martin, you told Ms. Carroll that there was a

20     definite need for you, her, and Lisa to all get together,

21     correct?

22     A.  I see it here, but I think I know what the implication is

23     from that word "definitely."

24     Q.  Well, my question was simply, before testifying under oath,

25     you told Ms. Carroll that there was a definite need for you,

N542Car2                    Martin - Cross

 1    Lisa, and Ms. Carroll to get together before your deposition,
 2    correct?
 3    A.  I am looking at it.  I do not remember it, but I'm sure I
 4    must have said it or texted it, excuse me.
 5    Q.  I would like to show you Defense Exhibit ER and this is a
 6    text—you take a look at it, we will zoom in on the relevant
 7    portion—that you sent to a friend, without identifying the
 8    friend, I guess, where you expressed your awareness that
 9    Ms. Carroll was planning to sue Donald Trump for rape?
10    A.  Yes.
11    Q.  And that it's gone to another level and something you can't
12    relate to?
13    A.  Yes.
14    Q.  And lastly, that you think this quest has become -- no
15    sorry.  Lastly, for her, meaning Ms. Carroll, sadly you think
16    this quest has become a lifestyle.
17    A.  Yes.
18    Q.  Do you recall saying that?
19    A.  I'm reading it.  I know what I meant or I should say I
20    remember when it was written.
21            MR. TACOPINA:  Okay, your Honor.  We would offer this
22    defense exhibit.  It's ER?  ER.
23            MS. KAPLAN:  No objection, your Honor, subject to
24    redaction.
25            THE COURT:  Same ruling.

1              (Defendant's Exhibit ER received in evidence)

2     BY MR. TACOPINA:

3     Q.  When you say it's become a lifestyle for Ms. Carroll, what

4     did you mean?

5     A.  I have to preface this with another comment I made a little

6     earlier, which had to do with my own what I called stacking up

7     in my own life.  There were some things going on right here in

8     this time period that I know why I was as you might call it

9     hyperbolic if you would like about certain things.  The point

10    that you made, it's gone to another level, the lifestyle issue,

11    lifestyle is a word I use.  Perhaps I used it wrong in this

12    case, according to what I think you are implying.

13    Q.  I'm --

14    A.  It had nothing to do with her -- forgive me.  I don't

15    mean --

16    Q.  I'm not implying anything.  I'm just asking you what you

17    meant.

18    A.  Lifestyle didn't mean she has a lifestyle that she is

19    growing up.  I know about what I have been -- what I am

20    assuming you are --

21    Q.  Okay, in this text message you have talked about, I guess,

22    to whoever you are writing to.  Was Pat your friend?  Is that

23    who Pat was?

24    A.  She is a friend, yes.

25    Q.  She, I'm sorry, she.

N542Car2                     Martin - Cross

1         And basically, you know, she had responded, I guess,

2    to Ms. Carroll's text, and you said you are not being cynical.

3    You are just telling the truth.  Right?

4    A.  Yes.

5    Q.  All right.  Next, I am going to show --

6         MR. TACOPINA:  That's offered already?  That's in?  I

7    offered it.

8         MS. KAPLAN:  I believe so.

9         MR. TACOPINA:  Next, Robbie, this is the one I'm not

10   going to offer but just show the witness.

11        MS. KAPLAN:  What's the letters?

12        MR. TACOPINA:  BW.

13   A.  Oh, I know what this is, too.

14   Q.  So, Ms. Martin, here's another one.  This is, I guess, a

15   text message you sent to your daughter in which you were

16   venting.  This is not being offered into evidence, so don't

17   worry about it.

18   A.  I'm not sure I'm seeing the right one.  "This came in two

19   weeks ago Thanksgiving."

20        MR. TACOPINA:  Well, is this all of BW, guys, that we

21   have?  Let's do this.  That is not it.  I need the full one.

22   Q.  But I can read from your deposition about this message.  We

23   are not going to offer the message anyway.

24   A.  This is December 1 of '21.

25   Q.  December 1 --

1    THE COURT:  Ms. Martin, please wait for a question.

2    THE WITNESS:  Sorry.

3    MR. TACOPINA:  Bear with me one second, your Honor.

4    BY MR. TACOPINA:

5    Q.  Okay, counsel, page 64 of Ms. Martin's depositions, lines

6    11 through 17.  This actually might make it a little easier.

7    THE COURT:  Let's just wait a minute.

8    Any objection?

9    MS. KAPLAN:  Your Honor, for completeness, we think it

10   should go to 25.

11   THE COURT:  You are proposing to read 11 to 17.

12   MR. TACOPINA:  I was proposing 11 to 17.  They want me

13   to go to 25.

14   THE COURT:  Yes.  I heard that part.  The text is not

15   in and you are not offering it, right?

16   MR. TACOPINA:  Correct.

17   THE COURT:  I don't understand the relevance.

18   MR. TACOPINA:  Your Honor, there is a reason we are

19   not offering this text that both parties agreed to.

20   THE COURT:  But now the question is -- all right.  You

21   agreed to that.

22   MR. TACOPINA:  She testified to this text in her

23   deposition, and so I want to ask her questions.

24   THE COURT:  Not in the page -- well, maybe.  I see.  I

25   see what you are saying.  Go ahead, Mr. Tacopina, 11 to 17.

N542Car2                         Martin - Cross

 1   Q.  Ms. Martin --

 2            MR. TACOPINA:  Take this down please.

 3   Q.  Ms. Martin, I'm just going to read you a question from the

 4   deposition.  This is:

 5   "Q  Mr. Swift showed you a text message that you sent to your

 6   daughter I believe it was on December 1, 2021?"

 7            Answer by you:  "Yes."

 8   "Q  And you testified in substance that you were venting to

 9   your daughter, correct?

10            Answer by you:  "Yes."

11            Do you recall being asked that question?

12   A.  Vaguely.

13   Q.  Okay.

14   A.  I think so.

15            THE COURT:  It's stenographically recorded,

16   Mr. Tacopina.

17            MR. TACOPINA:  Yes, I know.  I'm trying to bring her

18   back to her recollection back to that Q and A.  I know it is

19   stenographically recorded.

20   A.  This is during the deposition you are speaking of.

21   Q.  Yes, ma'am.

22            THE COURT:  Next question.

23   Q.  You expressed your state of mind about Ms. Carroll to your

24   daughter that Ms. Carroll was acting a little scary.  Do you

25   recall saying that?

N542Car2                          Martin - Cross

1    A.  Possibly, yes.

2    Q.  And that she was turning this transaction, your word, into

3    a lifestyle.  Do you recall saying that?

4    A.  I don't, but if it's on a text, I suppose I did.

5    Q.  And that she was loving the adulation?

6    A.  Is this on my screen?  It's not.

7    Q.  Okay.  It's not.

8    A.  It's all right.

9    Q.  Do you remember saying that Ms. Carroll loves the

10   adulation?

11            THE COURT:  Let's just wait for a question, okay?

12            THE WITNESS:  Yes.

13   Q.  We can show you this text.

14            MR. TACOPINA:  Again, we are not offering it, your

15   Honor.

16            (Pause)

17            MR. TACOPINA:  Can we show the text or can we not show

18   the text?  Here we go.  Okay.

19   Q.  So the questions were, from the text message, again,

20   just --

21            THE COURT:  This is?

22            MR. TACOPINA:  A text from December 1.

23            THE COURT:  Does it have an exhibit designation?

24            MR. TACOPINA:  It does, your Honor.  BW.

25            THE COURT:  All right.

1            MR. TACOPINA:  BW.  Thank you, your Honor.

2   BY MR. TACOPINA:

3   Q.  Okay.  So let's just focus right here.  The three questions

4   I just asked you from that text exchange or the text message

5   you sent to your daughter, that Ms. Carroll was acting a little

6   scary -- "E is acting a little scary."  Do you see that?  Can

7   you highlight that?

8   A.  Yes.  I'm sorry.

9   Q.  Do you see that?

10  A.  I do.

11  Q.  And E. is Ms. Carroll, correct?

12  A.  Yes, yes.

13  Q.  And you go on to say "she is definitely turning this whole

14  never-ending transaction into a lifestyle."  Correct?

15  A.  I'm reading that, yes.

16  Q.  I know you are reading it.  That's what you sent to your

17  daughter, right?

18  A.  Yes.

19  Q.  And then you say, "She is loving the adulation."  "E. Jean

20  is loving the adulation."  Do you see that down there?

21  A.  Yes.  I'm sure.  I don't think --

22  Q.  "We are all her cheerleaders."

23  A.  Yes.

24  Q.  Okay.  You can take that down, I think.  No.  Just one more

25  question on that.  I'm sorry.

N542Car2                         Martin - Cross

1          And you say that at some point that Ms. Carroll was in

2     too deep and you were just not there for it.

3          Highlight that part, please.  It is in the middle

4     here, guys.  I did it?  Oh.  I could do that?  If I touch the

5     screen everyone can see that?  Oh, cool.  Okay.

6          Do you see what I just underlined with my finger?

7     A.  Oh, I'm sorry.  I was reading this.  What did you say?

8     Q.  "In too deep.  I'm just not there for it."

9     A.  Um-hmm.

10    Q.  And you are talking about, again, Ms. Carroll is in too

11    deep and you are just not there for it?

12    A.  I think so.

13    Q.  You can take that down.

14         MR. TACOPINA:  And it's not being offered, your Honor.

15    Q.  After you --

16         THE COURT:  Mr. Tacopina, how much longer do you

17    expect to be with the witness?

18         MR. TACOPINA:  Not much, your Honor.

19         THE COURT:  Define that.

20         MR. TACOPINA:  Well . . .

21         (Counsel confer)

22         MR. TACOPINA:  Your Honor, maybe -- probably no more

23    than ten minutes, maybe less, but can we just break and then I

24    will just finish right after lunch?  We have another exhibit.

25    I want to make sure it is ready to go.  Or if you want me to go

N542Car2                         Martin - Cross

```
 1   ahead, whatever you want me to do.
 2           THE COURT:  Look, the jury wants to have lunch, a lot
 3   of people want to have lunch, and we will have lunch.  However,
 4   you are telling me that you are going to finish right after
 5   lunch, and I think it's fair to say.
 6           MR. TACOPINA:  I am telling you that.
 7           THE COURT:  And you are telling the jury that, too,
 8   right?
 9           MR. TACOPINA:  I'm telling the jury right after lunch.
10           THE COURT:  I don't mean literally, literally.
11           MR. TACOPINA:  Literally within a ten-minute range.
12           THE COURT:  It's ten minutes to 1.  Let's say 2:10,
13   and we will then see what "right after lunch" means.
14           (Luncheon recess)
15
16
17
18
19
20
21
22
23
24
25
```

N545car3                          Martin - Cross

1              A F T E R N O O N   S E S S I O N

2                          2:10 p.m.

3              THE COURT:  Good afternoon.

4              The jury, please?

5              (Jury present)

6              THE DEPUTY CLERK:  Please be seated, everyone.

7              THE COURT:  OK.  Just before we start the questioning,

8    with respect to the two letters I have from members of the

9    press, Ms. Bekiempis and Mr. Lee, the parties shall respond to

10   these no later than Saturday noon, and the press may respond no

11   later than Sunday at 5:00.

12             In one respect I am prepared to rule on this now.

13   There are some sealed files from something earlier this week,

14   April 27 and May 1, and conceivably another short part but I'm

15   not certain of the date because the cover is not on the copy

16   that I have.  I will make those publicly available but not

17   until there is a verdict and the jury is discharged.  I find

18   that any earlier disclosure risks very substantial damage to

19   the ability to have a decision by the jury unaffected by

20   inappropriate outside materials.  And, I reserve the right to

21   elaborate on that finding.

22             Let's go.  The witness is still under oath.

23   Mr. Tacopina.

24             MR. TACOPINA:  Thanks, your Honor.

25   BY MR. TACOPINA:

N545car3                         Martin - Cross

1    Q.  Good afternoon again, Ms. Martin.  I'm going to show you

2    Defendant's Exhibit EX, it is right in front of you, and just

3    take a look at that portion, and that's just a text message

4    that you sent to your friend Pat on December 2 of 2021; right?

5    A.  Yes.

6    Q.  And the subject matter, in sum and substance, Ms. Martin,

7    is basically after Ms. Carroll filed her lawsuit against Donald

8    Trump, you attended a party relating to her lawsuit?

9    A.  Yes.

10   Q.  OK.  You just mentioned in this text message some of the

11   people who were there, Preet Bharara and Mary Trump and Kathy

12   Griffin.  And Kathy Griffin was that comedian who stirred up

13   some controversy holding up a severed Donald Trump replica head

14   or something?  Is that who she is?

15   A.  That is who she is.

16   Q.  And you wrote that -- discussed your interaction with

17   people at the party in sum and substance; right?

18   A.  Yes.

19   Q.  And that was a party after the lawsuit was filed?  After

20   Ms. Carroll filed her lawsuit against Donald Trump?

21   A.  Yes.

22           MR. TACOPINA:  OK.  Thank you.  You can take that

23   down.

24   Q.  Ms. Carroll published her book around July of 2019;

25   correct, Ms. Martin?

N545car3                    Martin - Cross

1    A.  Yes.

2    Q.  And it is your testimony that before her book was

3    published, you didn't tell a single person that you had a

4    friend who was supposedly raped by Donald Trump?

5    A.  Not to my recollection.

6    Q.  And even though you were married at the time that this

7    supposed conversation with Ms. Carroll happened at your home,

8    it is your story that you didn't even tell your husband that a

9    work colleague, that you became friends with, was raped by

10   Donald Trump?

11   A.  That is my recollection.

12   Q.  Even during the election period, 2016, when he was running

13   in the election, it was something you obviously felt strongly

14   about you said; correct?

15   A.  The 2016 election.

16   Q.  2016, yes.

17   A.  Yes.

18   Q.  And even during that election you supposedly -- not

19   supposedly -- withdrawn -- you never said a word that Donald

20   Trump supposedly raped your friend?

21   A.  During that election?

22   Q.  Yes, during the election when you were sitting with other

23   people and discussing the election with other people?

24   A.  I do not recall ever saying that.

25          MR. TACOPINA:  OK, Ms. Martin.  Thank you very much

1    for your time today.  OK?

2                THE WITNESS:  OK.

3                THE COURT:  All right.  Thank you.

4                Redirect.  You may proceed.

5                MS. KAPLAN:  Thank you, your Honor.

6    REDIRECT EXAMINATION

7    BY MS. KAPLAN:

8    Q.  Ms. Martin, do you recall that -- we are going to put it

9    up.

10               MS. KAPLAN:  Let's put up Defendant's Exhibit CR.  I

11   think it is in evidence.

12               Can you guys put it up?

13               MR. TACOPINA:  Yeah, sure.

14   Q.  I want to focus at the bottom.  Let me try, as they're

15   putting it up, to focus you, Ms. Martin.  Do you recall

16   Mr. Tacopina showing you a text -- and now you have it up in

17   front of you -- from August 2022 in which you are talking about

18   sitting together to chat with Lisa Birnbach and E. Jean

19   Carroll?

20   A.  Yes.  I'm looking at it.

21   Q.  And the deposition that you gave in this case, do you

22   recall, was in October 2022?

23   A.  Yes.

24   Q.  Between the date of this text, which is August 2022, and

25   your deposition, which is October 2022, did the three of you --

N545car3                          Martin - Redirect

1   meaning E. Jean Carroll, Lisa Birnbach, and yourself -- ever

2   sit down together to talk about your deposition testimony?

3   A.  I don't have a recollection of that.

4   Q.  Now, do you recall that Mr. Tacopina read some questions

5   and answers that you gave at your deposition in October?

6   A.  Yes.

7   Q.  And some of that testimony was about venting to your

8   daughter about this case, E. Jean's case?

9   A.  Yes.

10  Q.  And isn't it true -- withdrawn.

11          Do you recall giving this testimony at your

12  deposition?  I'm just going to read it.

13          THE COURT:  Page?

14          MS. KAPLAN:  Excuse me, your Honor.  It is page 65.

15          THE COURT:  Lines, please?

16          MS. KAPLAN:  Lines 2 through 11.

17          MR. TACOPINA:  2 through 11?

18          MS. KAPLAN:  Yes.

19          MR. TACOPINA:  Your Honor, I would object to that.

20  It's what we discussed earlier.

21          MS. KAPLAN:  Your Honor, I think it is appropriate

22  testimony.  First of all, for the rule of completeness in terms

23  of the testimony, it is follow-up to the questions and answers

24  that were asked at the deposition.

25          THE COURT:  What was the Q&A he put in?

1          MS. KAPLAN:  He put in Q&A from page 64 --

2          MR. TACOPINA:  11 through 17, your Honor.

3          THE COURT:  And you propose to read what?

4          MS. KAPLAN:  I propose to read -- actually, I will

5    make it clearer, I can make it 18 to 25 and then 1 --

6          THE COURT:  Sorry.

7          MS. KAPLAN:  18 to 25 on page 64, just completing it,

8    and then 1 through 11 on page 65.

9          MR. TACOPINA:  Your Honor, we have no problem with 18

10   through 25, they think that completes it -- they didn't ask me

11   to complete it before -- but 1 through 11 -- or 2 through 11, I

12   should say, is objectionable.  It is something we objected to

13   before and the Court sustained.

14         THE COURT:  Not exactly.

15         MR. TACOPINA:  OK.  Not exactly.

16         THE COURT:  You can go through 65, line 7.

17         MS. KAPLAN:  OK.

18         THE COURT:  I sustain the objection as to 8 through

19   11.

20         MS. KAPLAN:  OK.  Got it.

21   BY MS. KAPLAN:

22   Q.  So, I'm going to read the Q&A that followed the Q&A that

23   Mr. Tacopina read to you.  Let me just read two sentences from

24   what you read so you have the context.

25   "Q  You testified in substance" -- starting at line 15, your

N545car3                         Martin - Redirect

1    Honor -- "that you were venting to your daughter, correct?

2    "A   Yes.

3    "Q   Because you felt that E. Jean's case was dragging on too

4    long?

5    "A   I felt that there were -- you want me to answer?

6    "Q   Yes.  I think just yes or no.

7    "A   Dragging on too long is not -- I felt that perhaps things

8    wouldn't turn out as well as we all hoped and I was cautious.

9    I was worried.

10   "Q   When you were venting to your daughter in this text

11   exchange, did you have any reason to doubt whether E. Jean's

12   allegation that Donald Trump raped her was true?

13   "A   I did not have any reason to doubt that, that it was true."

14            Do you recall that testimony at your deposition?

15   A.   Yes.  Yes.

16   Q.   Now, Mr. Tacopina asked you a series of questions about

17   text messages, both with Ms. Carroll and your friends, other

18   friends; correct?

19   A.   Correct.

20   Q.   And he showed you a number of messages in which I think it

21   is fair to say you were venting frustration in those text

22   messages, correct?

23   A.   Correct.

24   Q.   And was it uncommon for you to complain about friends to

25   other friends when they were on your nerves?

N545car3                          Martin - Redirect

1    A.  "Uncommon" is a tough word.  I would say no, it was not

2    uncommon.  It could happen.

3    Q.  And is there anything that you recall saying in those texts

4    about E. Jean Carroll that you would not say to her face?

5    A.  No.  There really wasn't.

6    Q.  Now, you testified that after getting a subpoena in this

7    case you produced a whole bunch of texts and e-mails; right?

8    A.  Yes.

9    Q.  And you reviewed those e-mails before they were produced,

10   correct?

11   A.  Yes.

12   Q.  And in those e-mails you were venting sometimes about this

13   case; correct?

14   A.  Yes.

15   Q.  And in those e-mails you were venting sometimes about

16   E. Jean, correct?

17   A.  Yes.

18   Q.  And you used words like "scary"; correct?

19   A.  Yes.

20   Q.  You used words like "I don't relate"; correct?

21   A.  I -- I -- yes.

22   Q.  And you used a word like "narcissistic" to describe

23   Ms. Carroll; correct?

24   A.  I did.

25   Q.  And in any of those texts or messages that Mr. Tacopina

N545car3                      Martin - Redirect

1   showed you, did you ever express any doubt about that what

2   Ms. Carroll had told you in the mid-1990s wasn't true?

3   A.  No, I did not.

4            THE COURT:  I think you have a double negative.

5            MS. KAPLAN:  Withdrawn.  Withdrawn, your Honor.  I

6   did.

7   Q.  In any of those messages did you express any doubt about

8   what Ms. Carroll had told you in the mid-1990s?

9   A.  I did not.

10  Q.  In any of those texts do you say you didn't believe her?

11  A.  No, I did not.

12  Q.  In any of those texts do you say something like, *I wish I*

13  *hadn't agreed to go along with this made up story*?

14  A.  Oh no.  Not at all.

15  Q.  In fact, you said the opposite; right?

16           MR. TACOPINA:  Objection to the leading, your Honor.

17           MS. KAPLAN:  Withdrawn, your Honor.

18  Q.  I want to show you a document that's been marked for

19  identification as PX- 148, and I believe this was shown to you

20  by Mr. Tacopina on cross.  Do you recall that?

21  A.  Yes.  I'm trying -- OK, it was to Pat.

22  Q.  And the text at the bottom is the one Mr. Tacopina showed

23  you --

24  A.  Oh, yes --

25  Q.  -- and you are talking about hating Donald Trump more than

N545car3                         Martin - Redirect

1    words; correct?

2    A.   -- yes.

3    Q.   Do you recall he asked you some questions about that and

4    you gave some answers?

5    A.   Yes.

6    Q.   Now, why don't you look at the text above, and in the text

7    above you are talking about the case; is that correct?  This

8    case?

9    A.   Yes.

10   Q.   And you are talking about going to a proceeding, a hearing

11   in this case; correct?

12   A.   Yes.

13   Q.   And you say -- and I'm going to apologize for my use of

14   language -- I will try to be more subtle but you say:  "I'm

15   thinking how the -- f-word -- this is happening from a simple

16   chat with a friend 25 years ago."  Correct?

17   A.   Yes.

18   Q.   What was the simple chat 25 years ago that you were

19   referring to there?

20   A.   It was when she told me about the attack from Donald Trump.

21   I'm pretty sure that's what I was referring to.

22   Q.   Now, Mr. Tacopina showed you a whole bunch of other texts

23   and e-mails, correct?

24   A.   Yes.

25   Q.   And in those texts and e-mails you talked about hating

N545car3                        Martin - Redirect

1    Donald Trump?

2    A.   Yes.  Yes, I did.

3    Q.   You talked about despising Donald Trump?

4    A.   Yes.

5    Q.   And I think it is fair to say you talked about disliking

6    Donald Trump?

7    A.   Yes.

8    Q.   OK.

9          And you also -- he showed you an e-mail, it is DX EM

10   that said, in which you said:  Something has to happen to stop

11   the train.

12         Do you recall that --

13   A.   Yes.

14   Q.   -- that e-mail?

15         And he showed you another e-mail that said:  At least

16   we are not alone in this fresh hell.

17         Do you recall that e-mail?

18   A.   Yes.

19   Q.   And he showed you a third e-mail that said:  Dear God, make

20   this stop.

21   A.   Yes.

22   Q.   Do you recall that e-mail?

23   A.   Yes.

24   Q.   Ms. Martin, you wanted to stop the train; correct?

25   A.   The train being?

N545car3                    Martin - Recross

 1    Q.   The Trump presidency.

 2    A.   The Trump presidency, yes, I did want it to; yes.

 3    Q.   Would you be willing to lie in this courtroom -- withdrawn.

 4             Would you be willing to lie to stop the Trump train?

 5    A.   No, I would not.

 6    Q.   Would you be willing to commit perjury to stop the Trump

 7    train?

 8    A.   No, I would not.

 9    Q.   Would you be willing to lie to get out of this fresh hell,

10    as you described it?

11    A.   No, I would not.

12    Q.   And, finally, Ms. Martin, would you be willing to commit

13    perjury, which is lying under oath, to make this stop?

14    A.   Under no circumstances.  No, I would not.

15             MS. KAPLAN:  Nothing further, your Honor.

16             THE COURT:  Thank you.

17             Mr. Tacopina?

18             MR. TACOPINA:  Yes, your Honor.  Just a couple.

19    RECROSS EXAMINATION

20    BY MR. TACOPINA:

21    Q.   So, Ms. Martin, you say you would have said anything that

22    you said in the messages that you heard here in court today,

23    that you had sent to other friends about Ms. Carroll, you would

24    have said any of that to her face?

25    A.   Yes.

N545car3                    Martin - Recross

1   Q.  OK.  That she was a narcissist?

2   A.  Yes.  We have had that discussion.

3   Q.  She was scary?

4   A.  I don't know exactly what I meant on that, but yes.

5   Q.  You would have said to her that she has turned this

6   transaction into a lifestyle?  You would have said that to her

7   face, right?

8   A.  In those exacts words?

9   Q.  Ms. Kaplan just asked you would you have said anything that

10  you said in the texts and e-mails to Ms. Carroll's face, and

11  you said "yes."

12  A.  Yes.  The answer is yes.

13  Q.  And "turning this transaction into a lifestyle," you would

14  have said this to her face?

15  A.  Yes.

16  Q.  OK.  Ms. Kaplan just went on to ask you about a series of

17  things that in these messages between you and Ms. Carroll

18  about, you know, the things you discussed with each other.

19  A.  Yes.

20  Q.  And the question ultimately was did you ever express any

21  doubt about Ms. Carroll's story in those messages.  Do you

22  remember that question?

23  A.  I --

24  Q.  From Ms. Kaplan, going through the messages just between

25  you and Ms. Carroll.

N545car3                          Martin - Recross

1   A.  Oh, yes, just a moment ago.

2   Q.  Just a moment ago, between you and Ms. Carroll, all the

3   things you discussed, and Ms. Kaplan said did you ever call her

4   a liar?  Did you ever express any doubt?

5           THE COURT:  Counsel, that is so long.  If you have a

6   question, let's narrow it.

7   BY MR. TACOPINA:

8   Q.  Did you ever express in any of those messages that she was

9   a liar?  And you said "no," right?

10  A.  Yes.  Correct.  Yes.

11  Q.  Again, the message between you and Ms. Carroll, did you

12  ever express that you had any doubt?  And you said "no"?

13  A.  Correct.

14  Q.  In any of those messages, did you ever say anything that

15  called into question her story?  And you said "no" right?

16  A.  Not that I can recall.

17  Q.  OK.  In any of those messages did you ever allude to Donald

18  Trump as a rapist?

19  A.  No.  I don't believe so.

20          MR. TACOPINA:  Thank you.  No further questions.

21          THE COURT:  Thank you.

22          Ms. Kaplan.

23          MS. KAPLAN:  Nothing further, your Honor.

24          THE COURT:  Ms. Martin, thank you.  You are excused.

25          THE WITNESS:  Thank you.

N545car3                                Humphreys – Direct

1              (Witness excused)

2              THE COURT:  Next witness.

3              MS. CROWLEY:  Plaintiff calls Professor Ashlee

4    Humphreys.

5              THE DEPUTY CLERK:  Ma'am, if you would please take the

6    stand?  Right this way.  Please remain standing and raise your

7    right hand for a moment.

8    ASHLEE HUMPHREYS,

9         called as a witness by the Plaintiff,

10        having been duly sworn, testified as follows:

11             THE DEPUTY CLERK:  Please state your name and spell

12   your first and last names for the record.

13             THE WITNESS:  Sure.  My name is Ashlee Humphreys.

14   A-S-H-L-E-E; the last name is Humphreys, H-U-M-P-H-R-E-Y-S.

15             THE COURT:  You may proceed, Ms. Crowley.

16   DIRECT EXAMINATION

17   BY MS. CROWLEY:

18   Q.  Good afternoon, Professor Humphreys.  What is your current

19   profession?

20   A.  I'm a professor of marketing and integrated marketing

21   communication.

22   Q.  Where?

23   A.  At Northwestern University.

24   Q.  How long have you been on the faculty at Northwestern?

25   A.  Since 2008, so about 14 years.

N545car3                         Humphreys - Direct

1   Q.  Have you been asked to perform work on behalf of the

2   plaintiff E. Jean Carroll in this case?

3   A.  Yes, I have.

4   Q.  On what topic?

5   A.  So I was asked to assess the extent of exposure to a

6   statement.

7   Q.  Whose statement?

8   A.  The statement of Mr. Trump.

9   Q.  And if you could possibly pull the microphone a little bit

10  closer?

11  A.  Yes.

12  Q.  In the course of that work, did you prepare a report that

13  describes the work and any conclusions that you reached?

14  A.  I did.

15  Q.  Professor Humphreys, where did you go to college?

16  A.  I went to Northwestern University.

17  Q.  Did you perform any graduate studies?

18  A.  I did.  I have my Ph.D in marketing.

19  Q.  From where?

20  A.  Also from Northwestern University.

21  Q.  And now that you are on the faculty -- sorry, what was your

22  Ph.D in?  Did you say that?

23  A.  It was in marketing with a focus on cultural sociology.

24  Q.  And now that you are on the faculty at Northwestern, what

25  do you teach?

N545car3                              Humphreys - Direct

1   A.  I teach digital, social, mobile media, as well as marketing

2   strategy.

3   Q.  Are you familiar with the term "reputational repair"?

4   A.  Yes, I am.

5   Q.  What is it?

6   A.  So, reputational repair is when someone makes a concerted

7   effort, usually through marketing communications, to repair

8   their reputation or create positive associations associated

9   with them.

10  Q.  Is that one of the topics that you teach your students at

11  Northwestern?

12  A.  Yes, it is.

13  Q.  In addition to teaching, do you engage in research?

14  A.  Yes, I do.

15  Q.  Are you currently engaged in any?

16  A.  Yes, I am.

17  Q.  What are you researching?

18  A.  So, right now I'm revising my book on social media.  I have

19  a couple projects, one is about French wine.  The other is

20  about the early days of online news and online journalism.

21  Q.  Have you authored any books?

22  A.  I have.

23  Q.  How many?

24  A.  One book.

25  Q.  What was it called?

1    A.   *Social Media:   Enduring Principles.*

2    Q.   In the course of your work in academia, have you published

3    articles?

4    A.   Yes, I have.

5    Q.   About how many?

6    A.   I have published about, I would say about 15 articles.

7    Q.   And, just generally, what are those articles about?

8    A.   So they're about a wide range of topics, but generally I

9    study how new industries become socially accepted and how they

10   deal with issues of stigma.

11   Q.   Are those articles peer-reviewed?

12   A.   Yes, they are.

13   Q.   Have you made any presentations in the course of your work?

14   A.   Yes, I have.

15   Q.   About how many?

16   A.   So if you combine academic conferences and invited talks, I

17   have given over 50 presentations.

18   Q.   Where were those presentations?

19   A.   So there are places throughout the world and throughout the

20   country.

21   Q.   Aside from this case, have you ever been engaged as an

22   expert witness in any other cases?

23   A.   Yes, I have.

24   Q.   How many times?

25   A.   Four previous cases.

1    Q.  In those cases were you retained by the defendant or the

2    plaintiff?

3    A.  By the plaintiff.

4    Q.  Have you ever testified in court before?

5    A.  No, I haven't.

6    Q.  Have you testified in depositions?

7    A.  Yes, I have.

8    Q.  Generally speaking, what kinds of opinions did you offer in

9    these other cases?

10   A.  So I generally do two types of cases, one type of case I do

11   marketing and kind of deceptive marketing practices.  The other

12   type of case I do is defamation, usually on social media.

13   Q.  Professor, are you being paid for your work in connection

14   with this case?

15   A.  Yes, I am.

16   Q.  How much?

17   A.  So I am paid $500 for preparation of the report, and then

18   I'm paid $850 for trial testimony.

19   Q.  And that's per hour?

20   A.  That's right.  Correct.

21   Q.  Based on your experience, are those rates fairly standard

22   for experts in your field?

23   A.  Yes, they are.

24   Q.  Professor Humphreys, you testified that you were asked by

25   the plaintiff, E. Jean Carroll, to do work in this case.  Can

N545car3                           Humphreys - Direct

1    you describe generally what the nature of that work was?

2    A.  Sure.  So, the nature of the work was to look at a

3    statement that was posted on social media and to understand the

4    spread of that statement, how many people saw it, how broadly

5    did it spread, then to look at the impact that statement might

6    have had on Ms. Carroll's reputation, if any, and finally to

7    estimate, well, how much would it cost to repair that

8    reputation.

9    Q.  And you testified, I believe, that the statement was by the

10   defendant Donald Trump?

11   A.  That's right.  Yes.

12   Q.  Did anyone assist you in your work?

13   A.  Yes.

14   Q.  Who?

15   A.  I was assisted by four research assistants.

16   Q.  Why did you use research assistants in this case?

17   A.  So, in this case there was quite a bit of social media data

18   which had to be collected and cleaned and sorted.

19            MS. CROWLEY:  Can I have a moment, your Honor?

20            THE COURT:  Sure.

21            (Counsel conferring)

22            MS. CROWLEY:  Thank you.

23   Q.  Professor, did you help prepare a slide deck summarizing

24   the work that you did and the conclusions that you reached in

25   connection with this case?

N545car3                          Humphreys - Direct

1  A.  Yes, I did.

2  Q.  And would that deck assist the jury in understanding your

3  testimony today?

4  A.  Yes.

5  Q.  I'm going to put it up on the screen.  Is this the deck

6  that you prepared?

7  A.  Yes, it is.

8  Q.  If we could just publish that to the jury, Mr. Lam?

9          MR. BRANDT:  No objection.

10         THE COURT:  Is there an exhibit -- it is Plaintiff's

11  Exhibit 43, I see.  OK.

12  BY MS. CROWLEY:

13  Q.  You testified a minute ago that your work involved

14  assessing damage to Ms. Carroll's reputation as a result of a

15  statement by Donald Trump.  I'm showing you on this slide

16  what's been received in evidence as Plaintiff's Exhibit 4.  Is

17  this the statement that you focused on in your analysis in this

18  case?

19  A.  Yes, it is.

20  Q.  What was the date of that statement?

21  A.  The date is October 12, 2022.

22  Q.  And where was that statement posted?

23  A.  It was posted on the social networking site called

24  TruthSocial.

25  Q.  Prior to your work on this case, were you familiar with

1    TruthSocial?

2    A.   Yes.

3    Q.   What is it?

4    A.   So TruthSocial is a social networking site where people

5    have profiles.  It is a lot like Twitter, it has the same

6    structure as Twitter where somebody has a profile and people

7    can follow that person, and the followers or some of them see

8    the message that is posted.

9    Q.   Does Donald Trump have a profile on TruthSocial?

10   A.   Yes, he does.

11   Q.   Do you know about how many followers he has?

12   A.   I believe he has 4.7 million followers.

13   Q.   So, just in broad strokes, could you explain how you went

14   about figuring out how, if at all, Mr. Trump's October 12, 2022

15   statement affected Ms. Carroll's reputation?

16   A.   Sure.  So the first step in the process was to figure out

17   how widely was the statement seen, how many times did it appear

18   to people.  And that I call the impressions model.

19         The next step was to figure out, OK, people saw the

20   statement but did it have an impact on Ms. Carroll's

21   reputation?  So for that I first did a qualitative analysis

22   where I looked at what was the response on social media, what

23   did people say in response when they were Retweeting or

24   circulating the statement, and then I also wanted to know,

25   well, what percentage of those people likely believed the

1  statement, were they receptive to the statement.  And that I

2  call the impact analysis.

3          And then, finally, I needed to know, OK, for those

4  people who might have been receptive to the statement, how much

5  would it cost to repair Ms. Carroll's reputation.

6  Q.  And in your experience, is this a standard way -- fairly

7  standard way to measure reputational harm by experts in your

8  field?

9  A.  Yes, it is.

10  Q.  So, I would like to talk first about some basic concepts.

11  What is a reputation?

12  A.  So, a reputation, we all have a reputation, we develop it

13  through our life, our friendships, our work.  It allows us to

14  kind of be a member of society to build trust with people.  So,

15  we all have reputations and, of course, if we are more famous

16  or well known, that reputation can also exist amongst people we

17  don't know in the media and in the public sphere.

18  Q.  Explain how reputation can be damaged.

19  A.  So, a reputation can be damaged when there emerge negative

20  associations that kind of undermine that reputation that might

21  cause people to mistrust you or think you are a bad person or

22  things like that.

23  Q.  And how, if at all, can a reputation that's been damaged be

24  repaired?

25  A.  So, reputation can be repaired through sort of strategic

1    concerted efforts to build positive associations back to that

2    person.

3    Q.   Is it always possible to repair damage to a reputation?

4    A.   No, not always.

5    Q.   What happens if a reputation is not repaired?

6    A.   So, if a reputation isn't repaired, you know, those

7    negative associations can follow someone throughout their life;

8    particularly on social media, those negative associations, they

9    can kind of hang around forever.

10   Q.   So we are going to talk about that more in a minute but

11   first you testified that the first analysis that you performed

12   in connection with your work in this case was creating, I think

13   what we called, it was an impression model.  What is an

14   impression?

15   A.   So, an impression is one person seeing a message one time.

16   Q.   What does it mean for something to have a high number of

17   impressions?

18   A.   So, if something has a high number of impressions it means

19   that it was shown many times, likely to many people.

20   Q.   In conducting this analysis what, if any observations, did

21   you make about whether Donald Trump's October 12 statement

22   spread from TruthSocial to other forms of media?

23   A.   Yes.  So Mr. Trump initially posted his statement on

24   TruthSocial, but it then made it to other media and other types

25   of media.  So, for example, some people took a screenshot of

N545car3                        Humphreys - Direct

1    the statement and posted it on Twitter, and so it circulated

2    there.   It circulated on -- through news articles, through

3    online web articles by being directly quoted.   It was in print

4    articles.   And then, it also appeared directly on television.

5    Q.   And did you calculate the number of impressions of Donald

6    Trump's statement on each of these forms of media?

7    A.   Yes.

8    Q.   And just so we are clear, that means that you found the

9    number of times that the statement was viewed on each of these

10   sources of media?

11   A.   Yes.   That's right.

12   Q.   So let's start with the web, the Internet.   Can you tell

13   us, can you explain how you calculated the number of times

14   Donald Trump's October 12 statement was viewed on the web?

15   A.   Sure.   So, I started with a list of articles that were

16   outlined in the complaint to this case.

17   Q.   What is the complaint?

18   A.   The complaint is kind of the initial document that outlined

19   the allegations against Mr. Trump.

20   Q.   And how many articles were cited in the complaint?

21   A.   So, initially in the complaint I think there were over

22   about 60 articles.

23   Q.   Did you use all of them in your analysis?

24   A.   No, I didn't.

25   Q.   How many did you consider?

1   A.  So, I ultimately considered 17 articles.

2   Q.  And how did you include or what analysis did you, what

3   criteria did you use to select those 17?

4   A.  Yes.  So the ones that I chose to count featured the

5   statement prominently, it related to the headline, it might

6   have appeared in the first half of the article.  It was a

7   prominent part of those 17 articles.

8   Q.  What were some of the websites where those articles, those

9   17 articles were posted?

10  A.  Right.  So, as you can see here it appeared widely across a

11  diverse range of websites including news magazines like

12  Newsweek, Huffington Post, other traditional papers like the

13  Washington Post, Denver Post, and then also on the online

14  websites of Fox News and ABC.

15  Q.  After you identified the 17 articles on these websites,

16  what did you do next?

17  A.  So, next I needed to know how many people visit that

18  website and for that I used a service that will tell you how

19  many page views, how many people have gone to that website.

20  Q.  Does the fact that a person visits a website necessarily

21  mean they read the article that is posted there?

22  A.  Not necessarily, and so I corrected for that.

23  Q.  How did you do that?

24  A.  So, I used something called a bounce rate, which is

25  basically the percent of people who bounce off the site.  They

N545car3                          Humphreys - Direct

1   go to the site but don't click anything or scroll down.

2   Q.  So you deducted that bounce rate from the total number of

3   people who visited these sites?

4   A.  That's right.

5   Q.  And after you did that that, what did you determine was the

6   total number of web impressions from Donald Trump's October

7   12th statement?

8   A.  So, for web impressions I added those up and it came out to

9   5.1 million impressions.

10  Q.  And just to be clear, that means that there were

11  5.1 million times that people saw Donald Trump's statement on

12  the web?

13  A.  That's right.

14  Q.  You testified that you also calculated the social media

15  impressions of Donald Trump's statement and I believe you said

16  you considered Twitter and TruthSocial?

17  A.  Correct.

18  Q.  Why did you only consider those two social media sites?

19  A.  So, for TruthSocial, that was the initial place that the

20  statement was posted.  For Twitter, it is a very transparent

21  platform and so you can see exactly how many people have

22  Retweeted, how many followers people have, that kind of thing.

23  Q.  Which TruthSocial posts did you consider in this analysis?

24  A.  So I only considered the October 12th post.

25  Q.  Mr. Trump's?

N545car3                         Humphreys - Direct

1   A.   Trump's October 12th post.

2   Q.   Which Twitter post did you consider?

3   A.   So, I considered Twitter posts that connected to those news

4   articles that I counted in the first analysis that contained

5   the statement in the post itself, the Twitter post, and then I

6   also counted any Twitter post that directly screenshotted the

7   statement itself.

8   Q.   How many Twitter posts was that?

9   A.   Oh, so that was 13 Twitter posts total.

10  Q.   And just to be clear, a Twitter post is also called a

11  Tweet?

12  A.   That's correct.

13  Q.   Do you see on the slide before you, are those the 13 Tweets

14  that you considered?

15  A.   Yes.

16  Q.   Were the 13 Tweets, did they come from 13 different Twitter

17  accounts or did they come from one Twitter account?

18  A.   Yes, there were 13 accounts in total.

19  Q.   What were some of those accounts?

20  A.   Right, so as you can see here they're accounts like Fox

21  News or Newsweek.  New York Daily News, from very prominent

22  podcasters like Ron Filipkowski, but also more typical

23  individuals, and you can see the Twitter handles here.

24  Q.   The right-hand column in this chart says "Followers."  What

25  does that mean?

N545car3                        Humphreys - Direct

A.   The followers are the number of people who follow that
account on Twitter.

Q.   So using these 13 Tweets, how did you calculate the number
of impressions from Donald Trump's statements on Twitter?

A.   So, to calculate the number of impressions, you have to
keep in mind that not all of your followers see what you Tweet.
There are many reasons that people might not sign on that day,
they may subscribe to a lot of accounts, and that information
might be crowded out, so actually only a fraction of your
followers see what you Tweet and so you have to take a series
of deductions.  So, hypothetically, you know, if you have a
hundred followers, the first deduction you have to consider is
a bot.

        So, a bot is an account or a follower who would follow
you and just kind of, it is in a computer, it Retweets what you
Tweet.  So if you are Fox News you could have a follower that
is just a bot that Retweets what you Tweet so I took those out.
And computer science research tells us that about 12 percent of
your followers are bots and so I subtracted those.  So, if you
subtract that, then that leaves you with, hypothetically, about
87 followers.  But then you need to make another cut for some
of the reasons that I mentioned because people may not sign on
that day, etc.  So, the benchmark in marketing is thought to be
20 percent, that 20 percent of your followers see what you
Tweet, so that would leave you with about 17 followers.

1    Alternatively, computer science gives us a formula or

2    a way to calculate how many people would see your Tweet if you

3    have other information about it.  So, if you know how many

4    times it has been Retweeted, how many followers those people

5    have, things like that, then you can basically use a formula to

6    calculate how many impressions your Tweet got using that

7    formula, and that comes out to anywhere from 6 percent of your

8    followers to as low as 1 percent of your followers, for a

9    typical person.

10   Q.  Turning to the slide on the screen, and if you could use

11   the first row, would you walk us through how you calculated the

12   number of impressions from Donald Trump's statement on the Fox

13   News account?

14   A.  Sure.  So, for Fox News, for example, they have

15   22.4 million followers.  The total followers includes the

16   followers who saw the original quote because it was Retweeted,

17   so you include those Retweets as well.  And then you take the

18   deductions that I mentioned:  The bots, the 12 percent, and the

19   impression rate which is either 6, 1, or 20 percent.  And so,

20   for Fox News that would leave you with a low estimate of

21   778,000 people impressions on the low end, or on the high end

22   3.9 million impressions.

23   Q.  It looks like you calculated high and low impressions for

24   the first four Twitter accounts on the chart but not for the

25   last nine.  Can you explain why you did that?

1    A.   Sure.  So, for the people that you see in yellow here,

2    those are more just typical people and so I didn't use that

3    high a rate, I used a rate of 1 percent for them, just assuming

4    that they're going to have a 1 percent impression rate, and

5    everybody who saw their Tweets are just going to be typical

6    people, too, and so those people also will have a 1 percent

7    impression rate.

8    Q.   So you assume that for the average person only about 1

9    percent of their followers would see the Tweet in which they're

10   Retweeting Donald Trump's statement?

11   A.   That's correct.

12   Q.   Were you able to determine the total amount of impressions

13   of Donald Trump's statement on Twitter, on the 13 Twitter

14   accounts?

15   A.   Yes.  So I calculated the impressions for each account and

16   then I added those up.

17   Q.   And how did you calculate the number of TruthSocial

18   impressions from Donald Trump's post?

19   A.   So, for TruthSocial it's pretty much just like Twitter, and

20   yet it hasn't been studied quite as much.  We also didn't have

21   full access to the Retweeting information, and so because it is

22   structurally similar to Twitter, I used the same impression

23   rate, that 6 percent rate.

24   Q.   And what were the total number of social media impressions

25   of Twitter and TruthSocial from the statement?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N545car3                          Humphreys - Direct

```
1    A.  So, when you add those up, then you get a high estimate of
2    5.7 million impressions and a low estimate of 1.5 million
3    impressions.
4    Q.  So, just to be clear, that means that a total of between
5    1.5 -- or the statement, Donald Trump's October 12th statement,
6    was viewed between 1.5 million and 5.7 million times on Twitter
7    and TruthSocial?
8    A.  That's right, yes.
9    Q.  You also calculated television impressions from Donald
10   Trump's statement.  How did you do that?
11   A.  For that I needed to know what TV shows aired the statement
12   and there is a service where basically anything that is spoken
13   on television gets transcribed into text, and so you can search
14   that text for key portions of the statement.  And so, I
15   basically used that database to search for the statement to
16   find which programs aired the statement.
17   Q.  How many programs aired the statement?
18   A.  Five programs.
19   Q.  Which stations aired the statement?
20   A.  So the statement appeared on MSNBC and Fox News.
21   Q.  Once you identified the five programs that aired the
22   statements, what did you do next?
23   A.  After that I needed to know how many people were actually
24   watching the program when this statement was aired, and for
25   that I used a service called Neilsen that measures audiences,
```

1    that measures exactly how many people are watching the program

2    at that time.

3    Q.  And how many people watched Donald Trump's or viewed Donald

4    Trump's October 12th statement on television?

5    A.  So, if you add that up, that is 7 million impressions.

6    Q.  Finally, you testified that you also calculated print

7    impressions from Donald Trump's statement.  Can you explain how

8    you did that?

9    A.  Yes.  So, there is a database where you can search all

10   print news articles and so I, again, searched for the statement

11   and I found one print article.

12   Q.  Where was that article published?

13   A.  That was in the Washington Post.

14   Q.  And what was -- how did you determine the total number of

15   impressions from the Washington Post article?

16   A.  So, here there is a service that measures how many readers

17   every article has, and the circulation rate for the Washington

18   Post was 159,000 people.

19   Q.  After looking at all of these forms of media, were you able

20   to estimate the total number of impressions of Donald Trump's

21   October 12th statement?

22   A.  Yes, I was.

23   Q.  And what was your final estimate?

24   A.  So the final estimate, when you add up across all the

25   media, was between 13.7 million and 18 million impressions.

Q.  Are there any impressions that your analysis didn't

consider or didn't take into account?

A.  Yes.  So there are quite a few things I left out.  I didn't

count articles that weren't cited in the complaint.  I didn't

count articles where -- that might have paraphrased the

statement but included the same meaning.  I didn't include, for

example, the Associated Press -- AP -- had an article, it was

widely circulated, I think 137 articles in various local

publications.  I didn't count those just because it was too

hard to find those numbers.  There are things on social media

that I didn't include, certain platforms like Facebook or

Reddit.  I didn't include paraphrases on Twitter.  I didn't

include video platforms like YouTube.  And then, I also didn't

include radio, podcasts, and then just word-of-mouth, one

person telling another.

Q.  So, was your estimate of total number of times that Donald

Trump's statement was viewed or heard likely an overcount or

undercount?

A.  It was an undercount.

Q.  Now, after calculating the total number of times that the

statement was viewed, what did you do next?

A.  So, after I calculated how many times the statement was

viewed, I needed to understand, *Well, did it harm Ms. Carroll's*

*reputation?  What impact did it actually have*?  And that had

two parts.

```
 1              The first part was the qualitative part where I went
 2    through and I read a lot of the social media feedback that
 3    occurred sort of directly in response to the statement, these
 4    were kind of comments made on Tweets and Retweets of the
 5    statement itself, to assess if there had been reputational harm
 6    and to try to understand what that was.  And then I did a kind
 7    of quantitative analysis where I wanted to understand how many
 8    people, how many of those impressions were actually likely to
 9    believe the statement or were receptive to it.
10    Q.  So I want to talk briefly about the first, the qualitative
11    analysis.  Can you explain how you did that?
12    A.  Sure.  So, I started by looking at material about
13    Ms. Carroll that was written and published about her prior to
14    June 2019.
15    Q.  Why did you look at material that was published or written
16    about Ms. Carroll prior to June 2019?
17    A.  So, in June 2019 Mr. Trump made a series of statements that
18    impacted her reputation and I felt it was important to account
19    for some of that change prior to October 12th.
20    Q.  Can you describe what you observed about Ms. Carroll's
21    reputation prior to June 2019 as compared to after June 2019?
22    A.  So, when I looked at the materials from before June 2019,
23    that means I looked at reviews of her books, media coverage of
24    her, even Amazon reviews of her books that were before that,
25    just reader responses to it.  I kind of first got a glimpse of
```

that and found, you know, she was known as kind of like a sassy

dating advice columnist, a real truth-teller a journalist, who

gave trusted advice on dating and living in the city.  And then

after, I looked at the social media posts from June through

October, and then I looked at media posts from after October.

Q.  And you described Ms. Carroll's reputation prior to June

2019.  How did that compare to the reputation that you observed

after, immediately after June 2019?

A.  So, after June 2019, you know, of course there was a lot

more volume of statements about her and they contained pretty

negative associations including that she was a liar, the

perpetrator of a scam, a hoax.  Things like that.

Q.  And how did you or what did you observe about Ms. Carroll's

reputation after June 2019 as compared to -- withdrawn.

      What did you determine about Ms. Carroll's reputation

prior to the October 12, 2022 statement by Donald Trump as

compared to after October 12th?

A.  So, what I noticed is that those meetings existed after

June 2019, but the frequency of the posting with those

associations had started to decline.  However, after the

statement on October 12th, the frequency of the negative

associations, the volume of them again escalated.

Q.  What did you conclude about whether Donald Trump's October

12th statement affected Ms. Carroll's reputation?

A.  So, given the timing and the fact that they were in kind of

1    direct response to his statement, as well as the particular

2    language, words like "liar" etc., I concluded that there was a

3    relationship.

4    Q.  And where did you observe this language and the particular

5    words like "liar"?

6    A.  So these were in social media posts on Facebook, Twitter.

7    Places like that.

8    Q.  Turning to the next slide on the screen, are these some

9    examples of some of the Twitter comments that you observed?

10   A.  Yes.

11   Q.  What are the dates of these posts?

12   A.  So, these occur October 13th, October 19th, October 20th.

13   Q.  Do you see the post that says:  I know for a fact

14   Mr. President wouldn't touch that ugly Bitch with your dick.

15   A.  Yes.

16   Q.  How, if at all, does that post relate to the substance of

17   Mr. Trump's October 12th statement?

18   A.  So what you can see here, this is in response, or it is

19   called a quote Tweet to the initial statement that you see --

20   you see Mr. Trump's statement below -- and this is sort of

21   typical, often people would rephrase what he had said or used

22   some of the same terms, but sometimes in more vulgar language.

23   Q.  And do you see the post that says:  Nearly everybody and

24   their mother knows that woman a liar.

25   A.  Yes.

1    Q.  How does that post relate to the substance of Mr. Trump's

2    October 12th statement?

3    A.  So, in this post and many of the others the language, the

4    terms were associated or contained in his statement and not in

5    Ms. Carroll's initial allegation.

6    Q.  Are these some of the Facebook posts that you reviewed?

7    A.  Yes.

8    Q.  And what are the dates of these posts?

9    A.  So these occurred directly afterwards as well, October

10   13th, October 19th.

11   Q.  And do you see the post that says:  How much money get paid

12   for this hoax?

13   A.  Yes.

14   Q.  How does that post relate to the substance of Trump's

15   October 12th statement?

16   A.  So that, again, just paraphrases or parrots a claim made in

17   his statement.

18   Q.  Were these posts similar to other comments and posts that

19   you reviewed?

20   A.  Yes, I would say they were typical.

21   Q.  Having determined that Donald Trump's October 12th

22   statement had a negative impact on Ms. Carroll's reputation,

23   what was the next step in your analysis?

24   A.  So, the next step was to figure out, of the number of

25   impressions, how many of those impressions were to people who

1  would believe them, who found, were receptive to some of those

2  claims.

3  Q.   And why is that a necessary step in your analysis?

4  A.   So that's really important because I need to figure out,

5  well, how much would it cost to repair the reputational damage.

6  And I only need to estimate the costs for those people who

7  likely believed the statement.

8  Q.   How did you go about figuring out the number of people who

9  saw Mr. Trump's October 12th statement who likely believed it?

10 A.   Right.  So, not all of those impressions believe the words

11 of Mr. Trump.  Right?  And so, it was kind of a two-step

12 process to figure that out.  There is a poll, a non-partisan

13 polling service that can tell you for every publication what

14 percent of the readers are a democrat or republican, but of

15 course not all republicans believe Mr. Trump.  And so, I used

16 another poll to understand, well, of those republicans, what

17 percent of those were likely to have believed him.

18 Q.   And what did you determine was the percent of republicans

19 for each publication who likely believed Mr. Trump's statement,

20 believed Mr. Trump?

21 A.   So, for each publication I took the percent of republicans,

22 and then of those republicans took how many republicans

23 typically believe Mr. Trump and then came up with the

24 percentages that you see here on the right.  And so, I used the

25 percentage for each publication.  Those came up to an average

N545car3                         Humphreys - Direct

1    of 21 percent.

2    Q.  So, to be clear, the 21 percent is the percentage of

3    republicans who viewed the statement who likely believed it?

4    A.  Yes.  I would call those receptive impressions.

5    Q.  What was the next step in your analysis?

6    A.  So, the next step was to take the number of impressions

7    that I had from that first step, which was a lot of

8    impressions, and then discount it by only the impressions where

9    people were receptive to the statement.  And so, that gives you

10   an estimate, a high and low estimate for each type of media,

11   and then you can add those up.

12   Q.  And what did you, when you alleged it up, what did you get?

13   A.  So, on the low end we have 3.7 million receptive

14   impressions and on the high end you have 5.6 million receptive

15   impressions.

16   Q.  And just to summarize, does that mean that between

17   3.7 million and 5.6 million people saw Mr. Trump's statement

18   and likely believed it?

19   A.  That's correct.

20   Q.  To your knowledge -- we saw some examples of negative

21   commentary that Ms. Carroll received after the October 12

22   statement.  To your knowledge, did Ms. Carroll receive any

23   positive response following Donald Trump's statement?

24   A.  Yes, she did.

25   Q.  How, if at all, did your analysis account for the positive

N545car3                          Humphreys - Direct

1    response that she received?

2    A.  So, one thing in my analysis that I noticed is, prior to

3    the June 2019 statement, there were, of course, many positive

4    associations of her but the volume was relatively small.  After

5    the October 12 statement there was a huge volume of

6    associations associated with her, some of those were positive,

7    but then a huge volume, a very large number, tens of thousands

8    of those associations were really negative.

9    Q.  How, if at all, do positive responses or comments offset

10   negative responses?

11   A.  I would say in terms of reputation, they don't.  So, if you

12   imagine, like, at the place where you work, if 20 percent of

13   your colleagues think that you stole money where you work,

14   let's say you have a hundred colleagues and 20 of them think

15   that you stole money, that still has an impact on your work

16   life and your day-to-day reputation, and so I think that

17   20 percent is still important.

18              (Continued on next page)

19

20

21

22

23

24

25

1  Q.  Now, in addition to analyzing how many people saw

2  Mr. Trump's statement and how many people who saw the statement

3  likely believed it, did you conduct any other analysis in your

4  work in this case?

5  A.  Yes.  So the last stage was to figure out, okay, for those

6  receptive impressions, those who might have believed the

7  statement, how much would it cost to repair Ms. Carroll's

8  reputation for those people?

9  Q.  How do you repair someone's reputation after a statement?

10  A.  Yeah, so you can run a campaign to put out positive

11  messages about that person.

12  Q.  Is that called a reputational repair campaign?

13  A.  Yes.

14  Q.  Have you ever yourself executed a reputational repair

15  campaign?

16  A.  No, I have not.

17  Q.  How do you know about it?

18  A.  So I teach them every quarter to my students who go on to

19  have jobs in executing reputational repair campaigns.

20  Q.  Can you explain how a reputational repair campaign works?

21  A.  Yes.  So first you need to identify where to place the

22  messages.  What media does your target audience, the people's

23  whose mind you want to change, what media do they use?  Where

24  do they get their information?

25  Q.  So to be clear, the target audience here is that 21 percent

1    or the people that you determined saw Mr. Trump's statement and

2    likely believed it?

3    A.   That's right.

4    Q.   And your campaign sends positive messages or corrective

5    messages to those people to try to change their minds?

6    A.   That's correct.

7    Q.   Can you give -- did you design a particular reputational

8    repair campaign for Ms. Carroll in this case?

9    A.   Yes, I did.

10   Q.   Can you give us some examples of corrective messages that

11   you would use as part of a reputational repair campaign for

12   Ms. Carroll?

13   A.   Yes, so what the campaign would look like is it would place

14   these positive messages where people get their news, and it is

15   important that you place them with a trusted source because

16   this audience, almost any audience only believes information

17   coming from people they trust, right?  So it could look like a

18   social media influencer sharing a message about a great piece

19   Ms. Carroll wrote for *Harper's* and how much they liked it, how

20   funny or witty it was.  It would be positive messages like

21   that.

22   Q.   And how did you determine where those messages would be

23   placed?

24   A.   So here I used the same poll that I did in the second step

25   to learn where does this audience get their news.

1   Q.  And what did you find out?

2   A.  So for this audience, about 21 percent get news from cable

3   TV, 29 percent, almost 30 percent comes from broadcast TV, and

4   then the rest is divided amongst podcast, radio, also social

5   media platforms like Facebook and Twitter.

6   Q.  Once you determined where the target audience——meaning

7   people whose minds you want to change——get their news, what did

8   you do next?

9   A.  So the next step was to figure out, well, how much does it

10  cost to buy messages on these media?  And for things like cable

11  TV, that's pretty straightforward.  There are published

12  advertising rates.  For influencers, now it is also pretty

13  straightforward.  There are a range of influencers, and you can

14  find out, well, how much would it cost to pay something called

15  a micro-influencer, somebody who has a medium following, you

16  can find those rates.

17  Q.  What is an influencer?

18  A.  So an influencer is someone who has a relatively large

19  social media following, and they are not just like style

20  influencers, as you might think of them.  They exist now for

21  many different categories and across the political spectrum.

22  So there are -- there can be -- there are liberal social media

23  influencers, there are conservative social media influencers.

24  Q.  So apart from identifying where the target audience gets

25  their news and then figuring out how much it would cost to run

1    corrective messages there, were there any other considerations

2    in your analysis?

3    A.  Yes.  So the final consideration was how many times to show

4    people the message.  Nobody's mind is really changed from

5    seeing a message one time, especially if it is kind of counter

6    to what you already believe.  And so psychology tells us that

7    you need to show people a message three or five times in order

8    to change their beliefs.

9    Q.  Did you consider how much it would cost to run corrective

10   messages about Ms. Carroll one time?

11   A.  Yes, I did.

12   Q.  Why?

13   A.  So the one-time number would assume that a prior campaign

14   had been run.  You know, you don't want to hit people over the

15   head with the message if you have already shown them the

16   message.  And so I included the one-time in case a prior

17   campaign had been run.

18   Q.  To your knowledge had a prior reputational repair campaign

19   been run for Ms. Carroll?

20   A.  No.

21   Q.  So was the estimate for cost of only showing corrective

22   messages one time a realistic estimate in this case?

23   A.  I don't think that campaign would be effective in changing

24   attitudes.

25   Q.  Using the chart on this slide, can you walk us through how

1  you calculated the cost to run positive messages about

2  Ms. Carroll on broadcast TV?

3  A.  Sure.  So on broadcast TV, as you can see here, you would

4  spend about 30 percent of your impressions, you would want to

5  get 30 percent of your impressions from broadcast TV.  And an

6  impression for a thousand impressions, it would cost you $16.

7  And so you basically do the math on that and that comes out to

8  spending a hundred and thirty-three hundred thousand dollars.

9             (Court reporter confers)

10 A.  A hundred and thirty-three hundred thousand dollars.

11            THE COURT:  133,000, right?

12            THE WITNESS:  A hundred and thirty-three hundred

13 thousand dollars.

14 Q.  I think $133,000, right?

15 A.  Oh, sorry, 133,000.

16 Q.  And how much would it cost to place corrective messages

17 about Ms. Carroll using Facebook insurance influencers?

18 A.  So for Facebook influencers, you want to get 7 percent of

19 your total impressions there.  But remember what I said about

20 impressions.  So, you know, the number of followers that

21 somebody has on Facebook, you have to take the impression rate

22 of like 5 percent of those people are going to see the post.

23 And so you would shoot to get, at the end of the day, 1.9

24 million impressions and it costs $25 per thousand impressions,

25 which would leave you with $988,000.

N542Car4                          Humphreys - Direct

1   Q.  After calculating the amount it would cost to place

2   corrective messages on each type of media, were you able to

3   determine how much it would cost to place corrective messages

4   on all these types of media?

5   A.  That's right.  So I calculated for each type of media how

6   much it would cost and I added that up.

7   Q.  And what was the number?

8   A.  So the final number at the high end was $2.7 million.

9   Q.  What was the next step in your analysis?

10  A.  So the final step was to apply this logic to kind of my

11  previous -- my low impressions estimate and my high impressions

12  estimate for each level of frequency——for one, three, and five

13  times.

14  Q.  And what was the range, the cost range to run a

15  reputational repair campaign for Ms. Carroll following the

16  October 12 statement?

17  A.  So at the low, low end it would be three hundred and

18  sixty-eight thousand dollars, hundred thousand dollars and on

19  the high end it would be $2.7 million but, again, I don't think

20  the low campaign would be effective if no campaign had been run

21  previously.

22  Q.  So to summarize, Professor Humphreys, what was your

23  conclusion about how far or how wide Mr. Trump's statements

24  spread?

25  A.  So my conclusion about how wide it spread in the

N542Car4                        Humphreys - Direct

1   impressions analysis was that it had between 13.7 million

2   impressions and 18 million impressions.

3   Q.  And again, that was the number of times that the October 12

4   statement was viewed?

5   A.  Correct.

6   Q.  And what was your conclusion about how many people who saw

7   that statement likely believed it?

8   A.  So my conclusion there was that about on average 21 percent

9   of people were likely to believe it, and that gives you between

10  3.7 million and 5.6 million impressions.

11  Q.  And what was your conclusion as to how much it would cost

12  to repair Ms. Carroll's reputation amongst the target audience,

13  the people who saw the statement and likely believed it?

14  A.  So on the low, low end it would be three hundred and

15  sixty-eight hundred thousand dollars, and on the high end it

16  would be 2.7 million.

17          THE COURT:  Did you mean to say 368,000?

18          THE WITNESS:  Yes.

19  Q.  And 2.7 million?

20  A.  That's right.

21          MS. CROWLEY:  One moment, your Honor.

22          (Counsel confer)

23          MS. CROWLEY:  No further questions.

24          THE COURT:  Let's take our break.  15 minutes.

25          (Recess)

1     (Jury not present)

2          THE COURT:  Okay, folks.  Is there something?

3          MS. CROWLEY:  Yes, just super briefly, your Honor.  We

4     have the cross of this witness and then a very, very short

5     witness after that.  We have spoken to defense counsel.  If

6     your Honor would indulge us and the jury would be okay with it,

7     if we go a little bit past 4:30 we could all be here so that we

8     could get that witness done.  We then have two brief

9     evidentiary just matters to bring up with your Honor about two

10    documents that we would like to put into evidence, so we will

11    not be prepared to rest today until those issues are resolved.

12    We would propose, if we can resolve those issues, we could rest

13    first thing Monday morning before summations.

14         THE COURT:  What are the evidentiary issues?

15         MS. CROWLEY:  One relates to a stipulation that we are

16    sort of hashing out relating to Ms. Carroll's testimony about

17    her diaries and the other relates to a book authored by

18    Mr. Trump that we would like to introduce.

19         THE COURT:  What book?

20         MS. CROWLEY:  It's called *Think Like a Billionaire,*

21    and we just want to -- we would like to introduce a small

22    portion where he talks about shopping and giving gifts from

23    Bergdorf's.

24         THE COURT:  What's the problem with that,

25    Mr. Tacopina?

1    MR. TACOPINA:  That hasn't been authenticated, your

2    Honor.  There is a process.

3          THE COURT:  It hasn't been authenticated?

4          MR. TACOPINA:  Authenticated, yes.

5          THE COURT:  Has it been published?

6          MR. TACOPINA:  It's been published, but there is a

7    coauthor.  You asked me what the problem is?  Here's the

8    problem.  There is a coauthor.  It's a long book, and there are

9    sections.  And they want to introduce a particular paragraph in

10   the book.  I don't know the process of how this book was

11   written.  They had a chance to depose Mr. Trump.  They asked

12   him about shopping in Bergdorf Goodman and elsewhere.  They did

13   not ask --

14         THE COURT:  Does somebody have the book here?

15         MS. KAPLAN:  I do, your Honor.

16         MR. TACOPINA:  What I was saying, your Honor, is they

17   didn't ask them about this book or this passage they want to

18   introduce.  I don't know what the process was.  I don't know if

19   the coauthor wrote this part or not.  I don't know if a ghost

20   writer wrote it.  But this has never been presented to the

21   defendant at his deposition to authenticate, like the Billy

22   Bush video was, for example.

23         MS. KAPLAN:  I can respond, your Honor, if you would

24   like.

25         MR. TACOPINA:  And we don't know that it's actually

N542Car4                      Humphreys - Direct

1    his statement.  Yes, it's his book, but there is a coauthor.

2              THE COURT:  Yeah, yeah.  Now I understand.  I have

3    looked at it.

4              All right, let's get the jury in.  We will worry about

5    this later.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2              THE COURT:  Okay, cross-examination, Mr. Brandt.

3              MR. BRANDT:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. BRANDT:

6    Q.  Professor Humphreys, first, you understand that one of the

7    underlying issues here is an alleged incident that supposedly

8    occurred at Bergdorf Goodman in the mid 1990s, correct?

9    A.  Yes, I understand.

10   Q.  Obviously you weren't there, correct?

11   A.  That's correct.

12   Q.  And so you have personal -- no personal knowledge of what

13   did or didn't happen on that date, correct?

14   A.  That's correct.

15   Q.  Okay.  What you were here today to testify about was a post

16   made on Truth Social in October of 2022, correct?

17   A.  That's correct.

18              THE COURT:  Could we please skip the obvious?

19              MR. BRANDT:  We will, your Honor.

20   BY MR. BRANDT:

21   Q.  And as I understand it, Professor Humphreys, what your

22   opinion is based on is assessing the amount needed to repair

23   Ms. Carroll's reputation because the post said she wasn't

24   telling the truth, is that correct?

25   A.  I'm sorry.  Could you say it again?

1    Q.  Sure.  I will try again.

2             As I understand your testimony, it is about the

3    reputational damage occasioned to Ms. Carroll because the

4    statement said she wasn't telling the truth about the Bergdorf

5    Goodman situation, correct?

6    A.  So my purpose here was to estimate the cost to repair her

7    reputation caused by the impact of Mr. Trump's statement.

8    Q.  Okay.  But the damage to reputation goes to the issue of

9    alleging she wasn't telling the truth, correct?

10            THE COURT:  It's a little more elaborate than that,

11   isn't it, counsel?

12            MR. BRANDT:  I was trying to sum it up, your Honor.

13            THE COURT:  Yeah, I know you were.

14   BY MR. BRANDT:

15   Q.  Well, I will ask another question.  Let me flip it around,

16   Professor Humphreys.

17            In your professional opinion, is there an adverse

18   reputational impact to someone whose been falsely accused of

19   rape?

20   A.  I'm not sure -- that's not what I assessed in my report.

21   Q.  No, I'm asking you, in your professional opinion, if

22   someone is falsely accused of rape, is there reputational

23   damage in that situation?

24            MS. CROWLEY:  Objection, your Honor.

25            THE COURT:  Sustained.

BY MR. BRANDT:

Q.   Now, we have had some discussion about this previously, but there are actually two cases, correct?

A.   That's right.

Q.   And you were retained as an expert by Ms. Carroll in two cases, correct?

A.   Correct.

Q.   And the first case chronologically related to statements made by Mr. Trump in June of 2019, correct?

A.   That's correct.

Q.   And as I recollect your first report, you said that those statements were widely published at the time, correct?

A.   Yes.

Q.   And following that time, there were appearances by Ms. Carroll and others on news shows and interviews and podcasts and articles, is that correct?

A.   I did not study those as part of my report.

Q.   So you didn't look at any of that?

A.   I did not look at her activities, no.

Q.   Okay.  We will come to that in a little bit.

     But did you at least come to the conclusion that there had been widespread publication of the June 2019 statements?

A.   Yes.

Q.   And the statement that you looked at in the second case was only the October 2022 statement, correct?

1   A.   That's right.

2   Q.   To borrow a phrase, would you agree that the horse was kind

3   of out of the barn between 2019 and 2022 on these issues?

4   A.   Could you say what you mean by a horse being out of the

5   barn?  How do you mean?

6   Q.   Sure.  There had already been publication of Mr. Trump's

7   position on these issues for three and a half years prior to

8   October of 2022, correct?

9   A.   Correct.  Three statements had already been published.

10  Q.   So that was already out in the public domain, correct?

11  A.   That's correct.

12  Q.   And then one thing I understood you to say in your direct

13  testimony——and I wrote it down, and correct me if I am

14  wrong——that you said people's minds typically aren't changed by

15  a one-time statement.  Did I get that down correctly?

16  A.   That's true if they already hold an attitude.  If it's a

17  counter-attitudinal message, yes.

18  Q.   Okay.  And I think that's consistent with your deposition

19  testimony, that typically one statement is not going to change

20  somebody's mind, correct?

21  A.   Not -- yeah, if they have a prior attitude, it will not

22  change someone's mind.

23  Q.   And in this particular case, what you are focused on is a

24  single statement, which is Mr. Trump's statement in October of

25  2022, correct?

N542Car4                          Humphreys - Cross

1    A.  That's correct.

2    Q.  A single statement, correct?

3    A.  That's correct.

4    Q.  And to follow your logic, people aren't going to change

5    their minds over one statement.

6    A.  You know, we don't know if these are the same people.

7    That's underdetermined.  His statement might have been seen by

8    new people.

9    Q.  Okay.  You don't know, do you?

10   A.  I think it's very likely that this statement was seen by

11   some new people.

12   Q.  Okay, but you actually, going back to your testimony

13   previously, all of your numbers are estimates, are they not?

14   A.  They are estimates that are grounded in peer-reviewed

15   social science research.

16   Q.  Sure, but you don't know exactly who may have seen the

17   Truth Social post, correct?  You can't name the however many

18   million people that you talk about, correct?

19   A.  Correct.  That information is not available to me.

20   Q.  Right.  And similarly, you talked about the other media,

21   like the publish media, the television media, you don't know

22   who read those newspapers, who saw those TV shows, correct?

23   A.  That's correct.  That information is not available.

24   Q.  And again, you are not a mind reader, and so you don't know

25   whose mind was or wasn't influenced by anything they read,

1    correct?

2    A.  I'm sorry, could you say it again?

3    Q.  Yeah, sure.  I mean, point of fact is you don't know what

4    went on in any particular individual's mind as to whether the

5    statement by Mr. Trump changed their mind, didn't change their

6    mind, was read, ignored, or anything, correct, any particular

7    person.

8    A.  On the individual level, no.

9    Q.  In fact, what you have done is just come up with estimates,

10   correct?

11   A.  I would say they are not -- they are actually not

12   estimates.  They are taken from the real data, right?  So we

13   know how many people were watching a show.  We know how many

14   people read the newspaper.  Those things aren't estimates.

15   Those are real facts.  Those are numbers.

16   Q.  Agree with that, but again, going back to my point, you

17   don't know what was going on in the mind of those readers or

18   listeners or viewers, correct?

19   A.  Correct.

20   Q.  Also, just to make sure we are clear, Truth Social, as I

21   understand it, was a platform that was at least founded in part

22   by Mr. Trump, is that correct?

23   A.  That's correct.

24   Q.  And you limited your analysis of -- withdrawn.

25            You limited your analysis of the social media

N542Car4                    Humphreys – Cross

1    impressions to ones that quote that statement correctly on

2    Truth Social, correct?

3    A.    That's not correct.

4    Q.    Okay.  Would you agree with me that most of the people who

5    are on this Truth Social platform would be people favorable to

6    president Trump?

7    A.    That's likely true.

8    Q.    And someone who is predisposed to think well of Mr. Trump

9    would be more likely to believe something he said, and the flip

10   side is someone who is predisposed to believe Ms. Carroll would

11   be predisposed to believe what she said, correct?

12   A.    Yes, that's fair.

13   Q.    And I think you also said this a minute ago.  I want to

14   make sure I understand it.  You did not analyze the impact of

15   anything Ms. Carroll said following the June 2019 statements,

16   correct?

17   A.    That's correct.  I was focused on the damage of Mr. Trump's

18   statement.

19   Q.    Okay.  So, for example, she gave an interview on Anderson

20   Cooper one day.  You didn't assess what the impact of that

21   interview was to the viewing public, correct?

22           MS. CROWLEY:  Objection, your Honor.

23           THE COURT:  Overruled.

24   Q.  You may answer the question.  I can reask it if you would

25   like.

N542Car4                        Humphreys - Cross

1   A.   That would be great if you could.

2   Q.   There is evidence in the record that Ms. Carroll appeared

3   on the Anderson Cooper show on MSNBC.  As I understand what you

4   have told us, you did not analyze the impact of that message on

5   the public, correct?

6   A.   That was not in the -- that was prior to the October 12

7   statement, so no.

8   Q.   And then similarly, you did not assess the impact of

9   Ms. Carroll's book that was published out to the public,

10  correct?

11  A.   Correct.  It was not focused on Ms. Carroll's statements.

12  Q.   And then excerpts from that book were published in the *New*

13  *York* magazine and in The Cut.  As I understand your testimony,

14  you didn't try to estimate the impact of that publication,

15  correct?

16          MS. CROWLEY:  Objection, your Honor.  This is asked

17  and answered.

18          THE COURT:  Why not, counselor?

19          MR. BRANDT:  I was talking about a different

20  publication.

21          MS. CROWLEY:  I believe he asked whether she analyzed

22  any of Ms. Carroll's statements, and the witness testified that

23  she didn't.

24          THE COURT:  Sustained.

25          MR. BRANDT:  Okay.

```
 1              One other question on that line, your Honor, and I
 2      don't mean to cross your boundary.
 3      Q.  Is it correct that you didn't analyze any positive comments
 4      on social media about Ms. Carroll that were made by others?
 5      A.  That's not correct.
 6      Q.  Okay.  Did you look at positive statements about her on
 7      social media?
 8      A.  Yes.  So I did see a number of positive statements during
 9      my qualitative analysis.
10      Q.  Did you measure those?
11      A.  No.  My goal here was to measure the reputational harm.
12      Q.  Okay.  So you saw it, but you didn't measure it.
13      A.  Correct.
14      Q.  So as I understand your testimony, all you did was measure
15      the negative impact and you didn't look at any positive impact.
16      A.  So I did look at the positive impact in my qualitative
17      analysis.
18      Q.  Did you measure it?
19      A.  It didn't cause reputational harm and so those statements
20      didn't require correction.
21      Q.  Okay.  So fair enough.  Let me ask you this question.  Did
22      you undertake to see whether or not there had been any campaign
23      undertaken by Ms. Carroll to mitigate any alleged damage from
24      the October 2022 statement?
25      A.  No.  To my knowledge there wasn't one.
```

N542Car4                          Humphreys - Cross

1    Q.   There was no effort to mitigate.  I want to make sure I

2    understand your answer.

3    A.   As far as I know, there was no reputational repair

4    campaign.

5    Q.   Okay.  And the bottom line, as I understand your testimony,

6    is people predisposed to believe Ms. Carroll were most likely

7    to continue to believe her and people who were predisposed to

8    believe Mr. Trump would be predisposed to believe him, correct?

9    A.   Could you say what you mean by predisposed?

10   Q.   Yeah, more likely to.  I will reask the question.  Thank

11   you.

12         People who tended to believe Mr. Trump would be more

13   likely to believe the October 22 statement and people who were

14   more likely to believe Ms. Carroll would be more likely not to

15   believe the statement, correct?

16         MS. CROWLEY:  Objection, your Honor.  Asked and

17   answered.

18         THE COURT:  Yes, I think so.

19         MR. BRANDT:  I tried to reask it in a better way.

20         THE COURT:  Yes, but you did ask it earlier and got an

21   answer.

22         MR. BRANDT:  Okay.

23         Thank you very much.

24         THE COURT:  Okay.  Any --

25         MS. CROWLEY:  One minute.

N542Car4                         Humphreys - Redirect

1           THE COURT:  Okay.  Thank you.

2    REDIRECT EXAMINATION

3    BY MS. CROWLEY:

4    Q.  Professor Humphreys, Mr. Brandt just asked you several

5    questions about whether you know who actually saw Donald

6    Trump's October 12 statement.  Do you recall those?

7    A.  Yes, I do.

8    Q.  And you testified that you don't know exactly who saw the

9    statement, correct?

10   A.  In terms of identifiable names, I can't tell you the names

11   of those people.

12   Q.  But you were able to estimate how many people -- how many

13   people saw the statement, correct?

14   A.  That's right.

15   Q.  And I believe you testified that between 13 and 18 million

16   people saw the statement?

17   A.  That's correct.

18   Q.  And of the people who saw it, you testified that between

19   3.7 million and 5.6 million likely believed it.

20   A.  That's right.

21   Q.  Mr. Brandt also asked you several questions about the work

22   you did in connection with Ms. Carroll's first lawsuit,

23   correct?

24   A.  That's right.

25   Q.  And there you were asked to analyze the harm that Donald

N542Car4                     Humphreys - Redirect

1   Trump's June 2019 statements caused to Ms. Carroll's

2   reputation?

3   A.   Yes.

4   Q.   And you calculated how much it would cost to repair

5   Ms. Carroll's reputation in connection with those June 2019

6   statements?

7   A.   Yes, I have done that.

8   Q.   And was that cost higher or lower than --

9           MR. BRANDT:  Objection, your Honor.  This is not that

10   case.  Irrelevant.

11           MS. CROWLEY:  I believe Mr. Brandt asked several

12   questions about the work that Professor Humphreys did in this

13   case, and I think it is relevant when he was suggesting that

14   that work didn't affect the analysis in this case.

15           MR. BRANDT:  That was only to set a demarcation line,

16   your Honor.  I was very careful not to ask anything about that

17   opinion.

18           MS. CROWLEY:  I'm not going to ask any specifics about

19   the opinion, just how it compared.

20           MR. BRANDT:  Well, she is.  Excuse me, your Honor, but

21   she is trying to get a number or something out or a final

22   answer and I --

23           THE COURT:  She just said she is not trying to get a

24   number out.  She said higher or lower, yes?  Or did I miss

25   something?

1              MR. BRANDT:  Well, I think even higher or lower is

2      getting a number out.

3              THE COURT:  Look, members of the jury, the question of

4      whether there was any adverse effect by virtue of the 2019

5      statements and, if there was, how much adverse effect is not at

6      issue in this case.  It is not for you to determine.

7              With that instruction, I will allow an answer to the

8      question as it was asked.

9              MS. CROWLEY:  May I ask it again?

10             THE COURT:  You may ask it again.

11     BY MS. CROWLEY:

12     Q.  Was the cost that you estimated to repair Ms. Carroll's

13     reputation following Trump's June 2019 statements higher or

14     lower than the cost that you estimated it would take to repair

15     her reputation following the October 12 statement?

16     A.  It was higher.

17     Q.  Why was it higher?

18     A.  So that statement generated considerably more impressions

19     and considerably more receptive impressions.

20     Q.  And how did that factor into the analysis that you did on

21     the cost following the October 12 statement?

22     A.  So here I only looked at the reputational harm from the

23     October 12 statement.

24             MS. CROWLEY:  Thank you, your Honor.  Nothing further.

25             THE COURT:  Thank you.

```
 1              Anything else, Mr. Brandt?

 2              MR. BRANDT:  Nothing further.

 3              THE COURT:  Thank you.  You are excused, Professor.

 4              (Witness excused)

 5              THE COURT:  Next witness.

 6              MS. CROWLEY:  The plaintiff calls Roberta Myers.

 7              THE COURT:  Ladies and gentlemen, if it's not a huge

 8    problem we may go a little later than 4:30.  If it's a serious

 9    problem for anybody, just raise your hand.  No hands raised.

10     ROBERTA MYERS,

11         called as a witness by the plaintiff

12         having been duly sworn, testified as follows:

13              THE COURT:  You may proceed, counsel.

14              MS. CROWLEY:  Thank you, your Honor.

15    DIRECT EXAMINATION

16    BY MS. CROWLEY:

17    Q.  Good afternoon, Ms. Myers.

18    A.  Good afternoon.

19    Q.  Are you currently employed?

20    A.  No.

21    Q.  Are you retired?

22    A.  No.

23    Q.  What do you do for a living?

24    A.  I'm a consultant and I'm on several boards and I'm a board

25    member, and I do occasional projects from time to time.
```

1   Q.  Were you previously employed?

2   A.  Yes.

3   Q.  Where were you employed?

4   A.  My last job I was the editor in chief of *Elle*.

5   Q.  Of *Elle* magazine?

6   A.  The Elle brand, yes.

7   Q.  What is the Elle brand?

8   A.  Well, it's a -- it's a brand for women who care about many

9   things.  I mean it's essentially considered a fashion magazine,

10  but we also cover a lot of different things.

11  Q.  When were you the editor in chief at *Elle*?

12  A.  From 2000 to 2017.

13  Q.  Did you ever hold any other positions at *Elle*?

14  A.  Yes, I actually worked at *Elle*, I was the editor in chief

15  of the magazine named *Mirabella* before I went to *Elle*, and the

16  first time I worked at *Elle* I was an assigning editor, so it

17  was several years before that.

18  Q.  What is an assigning editor?

19  A.  Somebody who works with writers, you know, just sort of

20  develops stories and come up with ideas, and then you are

21  responsible for where that story goes throughout the process.

22  Q.  When were you an assigning editor at *Elle*?

23  A.  In 1993?

24  Q.  Through when?

25  A.  1995.

1    Q.  Where did you start your career?

2    A.  At *Rolling Stone*.

3    Q.  Have you worked at other magazines?

4    A.  Yes, when I left -- should I keep talking?  Okay.  When I

5    left *Rolling Stone*, I went to *Interview* and I worked for Andy

6    Warhol.  After that I worked at *Seventeen* magazine for about

7    six years.  I worked at a magazine called *In Style*.  I worked

8    with NBC to create a magazine.  It was a one-year project.

9    Then I went to *Elle*, and then *Mirabella* and then back to *Elle*

10   as editor in chief.

11   Q.  So in total how many years did you work in the magazine

12   industry?

13   A.  34, 35 years.

14   Q.  Do you know the plaintiff in this case, E. Jean Carroll?

15   A.  I do.

16   Q.  How do you know her?

17   A.  Well, we worked together.  She wrote a column for *Elle* for

18   a very long time and, so I met her professionally.

19   Q.  Are you friends?

20   A.  Yeah, we are friends, um-hmm.

21   Q.  Have you ever met the defendant in this case, Donald Trump?

22   A.  I have.

23   Q.  Where did you meet him?

24   A.  I was on one episode of *Celebrity Apprentice*, but I was not

25   a celebrity.  I was not an apprentice.  I was the person who

N542Car4                          Myers - Direct

1    was giving the contestants the challenge.

2    Q.   When was this?

3    A.   It was sometime between 2000 and 2003 or 2004.

4    Q.   And did you interact with Donald Trump while you were

5    participating in the filming of that episode of *The Apprentice*?

6    A.   I did.

7    Q.   Have you spoken with Donald Trump since then?

8    A.   No.

9    Q.   Did you support Donald Trump's candidacy for -- in the 2016

10   presidential election?

11   A.   No.  I voted for the Democrat.

12   Q.   And what about the 2020 election?

13   A.   No.

14   Q.   Are you registered with any political party?

15   A.   Yes.

16   Q.   Which one?

17   A.   I'm a Democrat.

18   Q.   Have you donated to political campaigns?

19   A.   I have.

20   Q.   Democrat or Republican?

21   A.   Both.

22   Q.   You testified that you were the editor in chief of *Elle* for

23   about 17 years.  Can you just describe generally what your

24   responsibilities were in that role?

25   A.   Well, as editor in chief, you are responsible for all of

1  the content that goes in the magazine and also on the website.

2  So that includes -- I worked for a fashion magazine, so that

3  includes knowing what's going on with the fashion shoots, where

4  the clothes are coming from.  We worked on beauty, and we had a

5  very robust features department, and that's where the reporting

6  and the writing sort of sat.

7  Q.  During what years were you editor in chief at *Elle*?

8  A.  2000 to 2017.

9  Q.  What types of articles did *Elle* publish during that period?

10  A.  Well, I mean, it was very broad in that, you know, we --

11  like, again, we wrote about fashion, we wrote about beauty, but

12  we also wrote about really where modern women were right, you

13  know, at that point in time, and what was important to them,

14  things that they might be facing.  You know, but also, I mean,

15  we covered books, we covered -- we did a lot of popular

16  culture.  We had -- you know, we worked with celebrities.  We

17  worked with musicians.  So it was very broad.

18  Q.  Was *Elle* a political magazine?

19  A.  No.

20  Q.  During your tenure at *Elle*, did the magazine ever endorse

21  political candidates?

22  A.  No.

23  Q.  Why not?

24  A.  Well, that wasn't really our role, meaning we felt that it

25  was important to report about people who were in politics or

1  report about certain political actions and things like that,

2  but, you know -- and we also would profile a lot of people,

3  but, you know, usually women from all over the canvas of what

4  you considered political issues.

5  Q.  What, if any, role did you have as editor in chief in

6  deciding what stories to run in *Elle*?

7  A.  That was my role.  I decided everything.

8  Q.  Was *Elle* a weekly or monthly or daily publication?

9  A.  Monthly.

10  Q.  What, if any, role did you have in deciding who would write

11  the stories that ran every month?

12  A.  That was my job, too, everybody.

13  Q.  What kind of writers worked at *Elle* during the time you

14  were editor in chief?

15  A.  Good ones.  Reporters, essayists, you know, people who

16  worked for other important magazines, which is to say, we tried

17  to have a pretty wide berth when it came to how many different

18  kinds of writers.

19  Q.  You testified that you first met Ms. Carroll when the two

20  of you were working at *Elle*.  Do you recall when that was?

21  A.  I remember it being about when I first started as assigning

22  editor, so that would have been '92, '93.

23          But, you know, I'm sure that we were in the same

24  spaces and we were in the same industry.  We sort of traveled

25  with the same people.  We probably ran into each other at

1   *Esquire* magazine or maybe at *Rolling Stone*, but I didn't really

2   get to know her until we started working together.

3             (Continued on next page)

N545car5                          Myers - Direct

1    BY MS. CROWLEY:

2    Q.   What was Ms. Carroll's role at the time when you met her

3    when you were working at *Elle*?

4    A.   She was a columnist for *Elle* and one of the longest

5    standing columnists for *Elle*.

6    Q.   What was her column about?

7    A.   It was about the state of women then and, you know -- I

8    mean it was really about everything, but it was --

9    legitimately, we called it an advice column but we got letters

10   from all over the country, probably hundreds and thousands.

11   One thing I will say is we didn't always see those letters

12   because they were writing to her and she never revealed the

13   name of whomever it was that was writing, but it was clear that

14   she wasn't just answering the question of the person who wrote

15   in but really talking about women and the things that they

16   face, generally.

17   Q.   What was the name of Ms. Carroll's column?

18   A.   Ask E. Jean.

19   Q.   How often did you interact with Ms. Carroll when you were

20   editor in chief?

21   A.   Regularly.

22   Q.   In what capacity?

23   A.   Well, as the final say on what goes into the magazine.

24   Q.   Did you edit her columns before they appeared every month?

25   A.   If I needed to.

N545car5                         Myers - Direct

1   Q.  Were you friends with Ms. Carroll outside of work during

2   the time you were editor in chief at *Elle*?

3   A.  I would say we were friendly but we had very different

4   lives and are both really busy.  We didn't hang out.  There

5   were often -- there would be events and parties and, I mean,

6   E. Jean had her own very strong following and she would, if we

7   did an event, a lot of people would come to see her and listen

8   to her read or talk about her column.

9   Q.  Did Ms. Carroll ever talk with you about her personal life

10  when the two of you worked together at *Elle*?

11  A.  Rarely.

12  Q.  During the time period you were editor in chief at *Elle*,

13  did you ever observe Ms. Carroll go out on any dates?

14  A.  No.

15  Q.  Did Ms. Carroll ever tell you that she had been sexually

16  assaulted by Donald Trump?

17  A.  No.

18  Q.  When did you first learn about the assault?

19  A.  When it came out in *New York* magazine.

20  Q.  Returning to your tenure at *Elle* magazine, you testified, I

21  believe, that you reviewed Ms. Carroll's column before it was

22  published every month?

23  A.  Yes.

24  Q.  Did you ever have any problems with the accuracy of her

25  work?

1   A.  Never.

2   Q.  Did you ever have any other issues with her columns?

3   A.  Well, I mean, I would occasionally edit them or make

4   suggestions.  I mean, I will say, you know, it is interesting

5   because E. Jean is first and foremost a journalist.  I mean,

6   that's where she came up.  She had a career that I would have

7   liked to have had.  I mean, *Saturday Night Live*, she worked for

8   *Rolling Stone* at one point.  She worked for *Esquire*, meaning

9   her work is grounded in reporting and fact-checking.  She knows

10  what she is doing as a journalist but, you know, you would

11  answer individuals' questions, as E. Jean did.  You are telling

12  them in a sense what to think about and sometimes what to do,

13  right?  So, you know, the only time we really beefed, as my

14  kids would call it, was sometimes she would give very short

15  answers and people -- women -- often wrote in about their

16  relationships and they're having a problem with this, with

17  their mother, or whatever, but I remember when women would

18  write questions about, well, my boyfriend is kind of mean to me

19  or I'm having trouble with my husband, or I'm being abused; she

20  would write, in all caps:  THROW HIM OUT.  GET RID OF HIM.

21  And, you know, I was sort of -- I would talk to her about it,

22  talk to her editor about it and say, listen, it is not that

23  easy for a lot of women to just throw them out so could you do

24  a little more reporting, like put some nuance around how to

25  help women who may be going through this and can't kick him

1    out?  Right?

2    Q.  You testified, I believe, that Ms. Carroll's columns were,

3    I believe you said, grounded in facts.  What do you mean by

4    that?

5    A.  Well, that she -- I mean, if somebody wrote a tough

6    question -- I mean, some of them are humorous and funny but

7    most of them were kind of tough and she would do the reporting,

8    she would reach out to the experts in that particular area.

9    She had many different editors sort of suggesting things that

10   they knew about this particular thing.  I mean, she took it

11   very seriously, as she should, because people actually

12   sometimes did what she often said they should do.

13   Q.  What, if any role, did you have as editor in chief in

14   determining how much Ms. Carroll was paid for her columns?

15   A.  All of it.

16   Q.  Did the amount that she was paid change during the time

17   that you were editor in chief?

18   A.  Yes.

19   Q.  How did it change?

20   A.  I gave her a raise.

21   Q.  Why did you give her a raise?

22   A.  Because she was worth it.  Because she was very important

23   to the brand.  She brought with her an audience that I think

24   started back when she worked for Roger Ailes, meaning -- but

25   also, they loved her.  I mean, the readers loved her.

1   Q.  How would you describe Ms. Carroll as a writer?

2   A.  Spirited.  Smart.  Funny.  Beloved.  And also, she's a

3   truth-teller.

4   Q.  In your 30-plus years in the magazine industry, did you

5   have occasion to review other advice columns?

6   A.  Review is a little strong, meaning I saw that other people

7   were trying to be just like her.

8   Q.  How did Ms. Carroll compare to other advice columns?

9   A.  Well, I think she was particularly honed in on the issues

10  and questions that women had about their role, their bigger

11  role in society, and I think E. Jean wanted for every one of

12  them to have what they wanted and more of what they needed.

13  Q.  While you were editor in chief, how did Ms. Carroll's

14  advice column fit into the magazine as a whole?

15  A.  Well, you know, I would call it, like, a destination

16  column, which meant that readers would pick it up and they

17  would go to that because they loved it and they wanted to see

18  it again.

19  Q.  What impact, if any, did Ms. Carroll's advice column have

20  on the genre of advice columns as a whole?

21  A.  Well, I think it has been noted by people other than me

22  that, you know, she was so popular and was so entertaining and

23  smart that other -- our competitors would also try to launch

24  something similar because if they can do it, we can do it.

25  Q.  Did Ms. Carroll's column run the entire 17 years that you

1  were editor in chief?

2  A.  Yes.

3  Q.  When you left *Elle* magazine in 2017, was Ms. Carroll's

4  column -- was Ms. Carroll still writing her column for *Elle*?

5  A.  Yes.

6  Q.  How would you describe the column's popularity at the

7  moment you left *Elle* magazine?

8  A.  Huge.  I mean her -- because her reach went just beyond

9  print or digital or website, it went beyond that.  You know,

10  she was often a guest on television, other brands would also

11  cover her.  She was constantly getting -- I was constantly

12  getting requests to have people interview her, to videotape her

13  and put it on their own websites.

14          MS. CROWLEY:  One moment, your Honor?  Nothing

15  further.

16          THE COURT:  Thank you.

17          Cross-examination.

18          MR. BRANDT:  Yes, your Honor.  Thank you.

19  CROSS EXAMINATION

20  BY MR. BRANDT:

21  Q.  Just a few questions, Ms. Myers.  I think you said this

22  previously but you left *Elle* in 2017; correct?

23          You need to say yes or no.  Sorry.

24  A.  Yes.

25  Q.  And this was when your contract was up; correct?

N545car5                           Myers - Cross

1    A.  Well, I had another year left on my contract.

2    Q.  Did you leave voluntarily?

3    A.  No.

4    Q.  Involuntarily?

5    A.  Yes.

6    Q.  And then I think you said that Ms. Carroll was still at the

7    magazine when you left; is that right?

8    A.  Yes.

9    Q.  And she was on a yearly contract; is that right?

10   A.  I believe so.

11   Q.  So it renewed every year?  Or the parties would renew it

12   every year?

13           MS. CROWLEY:  Objection.

14   A.  I don't know --

15           THE COURT:  Just a moment, please.

16           MS. CROWLEY:  This witness would have no basis to know

17   that.

18           MR. BRANDT:  I'm sorry.  I couldn't hear.

19           MS. CROWLEY:  He is asking about after she left *Elle*.

20           MR. BRANDT:  Oh.  I'm talking about -- I'm sorry.  Bad

21   question.

22           THE COURT:  Isn't the contract in evidence?  Or at

23   least a contract?

24           MS. CROWLEY:  Ms. Carroll's contract from 2019 is in

25   evidence.

N545car5

1          MR. BRANDT:  And I'm trying to get the earlier period,

2     your Honor.

3          THE COURT:  Ask your question again, please.

4          MR. BRANDT:  Sure.

5     BY MR. BRANDT:

6     Q.  Was there a new contract every year with Ms. Carroll?

7     A.  That's what I don't exactly remember.  We could have done

8     two years at one point.

9     Q.  OK.  Fair enough.  But there was a contract, in any event?

10    A.  Yes.

11    Q.  In any event --

12         THE COURT:  Or more than one contract, yes?

13         THE WITNESS:  Yes.

14    Q.  Contracts, in any event.

15         And you left prior to her leaving *Elle* in 2019;

16    correct?

17    A.  Correct.

18    Q.  And you have no personal knowledge as to why she may have

19    left *Elle*; correct?

20    A.  Right.

21         MR. BRANDT:  That's all I have.  Thank you.

22         THE COURT:  Thank you.

23         MS. CROWLEY:  Nothing further.

24         THE COURT:  You are excused.  Thank you.

25         (Witness excused)

N545car5

1              THE COURT:  Let me see counsel at side bar.  I am

2    assuming there are no more witnesses?

3              MS. CROWLEY:  That's correct, your Honor.

4              THE COURT:  All right.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N545car5

```
1              (At side bar)
2              THE COURT:  OK.  Where exactly are we?  Plaintiff?
3              MS. CROWLEY:  We are done with our witnesses.
4              THE COURT:  I can't hear.
5              MS. CROWLEY:  I apologize, your Honor.  We are done
6    with witnesses.  We just have the two issues I mentioned before
7    the break.
8              THE COURT:  And I want to know, first of all with
9    respect to Plaintiff's Exhibit 56 for identification, exactly
10   what is the defendant's problem?
11             MR. TACOPINA:  Well, let's start with the fundamental
12   problem which there is a legal process -- I know your Honor is
13   a very big stickler for the rules -- this has not been
14   authenticated.  How does this become authenticated is the
15   problem.  I'm not stipulating to this coming in because there
16   is something in there that they want to introduce that I don't
17   know if it's Donald Trump's words.  I don't know if it's
18   Meredith McIver's words or a ghost writer's words.  In books,
19   my understanding is that happens all the time.  They had a
20   chance to ask him about that book and that passage they wanted
21   to introduce at the deposition.
22             THE COURT:  I'm not interested in if they had a chance
23   to ask him about it.
24             MR. TACOPINA:  You asked me what my problem is, that's
25   part of my problem.
```

N545car5

```
 1          THE COURT:  Well, I'm telling you that that is not a
 2   legal obstacle to its coming in.
 3          MR. TACOPINA:  OK.  Fine.
 4          THE COURT:  So let's focus on the law, and let me get
 5   my rule book.  Sorry, Mr. Tacopina, but I actually follow them.
 6          MS. CROWLEY:  That might be the wrong rule book, I
 7   this you have the criminal code.
 8          THE COURT:  Yes, I know; but I'm not looking for the
 9   statutes, I'm looking for the rules of evidence and they're in
10   both books.
11          MS. KAPLAN:  Sorry, your Honor.
12          THE COURT:  Come on, team.
13          MS. KAPLAN:  901(b) (5).
14          MR. TACOPINA:  Who is the other team?
15          MS. KAPLAN:  (b)(4).  Excuse me, your Honor.
16          THE COURT:  You're all a team.
17          901(c)(5) is what you are relying on, counsel?
18          MS. KAPLAN:  We are relying on -- we are relying on
19   (b)(4), your Honor.
20          THE COURT:  (d)(4).
21          MS. KAPLAN:  (b)(4).
22          THE COURT:  Well, let's come to rest on it.
23          MS. KAPLAN:  (b)(4).
24          THE COURT:  OK.  901(a) says that to satisfy the
25   requirement of authentication or identifying an item of
```

N545car5

evidence, the proponent must produce evidence sufficient to

support a finding that the item is what the proponents claim.

The proponent claims that Plaintiff's Exhibit 56 is a book by

Donald Trump with Meredith McIver.

          Do we agree so far, Mr. Tacopina?

          MR. TACOPINA:  Yes.

          THE COURT:  OK.  So the jury could find that this is a

book by Mr. Trump with Meredith McIver.

          Now, (d)(4) says.  The following are examples only,

not a complete list of evidence, that satisfies the

requirement.  And (b)(4) reads:  The appearance, contents,

substance, internal patterns, or other distinctive

characteristics of the item, taken together with all the

circumstances.

          MS. KAPLAN:  I can give you some more of those if you

like, your Honor.

          THE COURT:  Yes, please.

          MS. KAPLAN:  So the book, first of all, is written in

the first person.  The very first page it begins:  In my

previous book, I shared some of my favorite techniques for

running a profitable business and becoming a TV mega star, and

it goes on and on the book is written in the first person.

          Two, we have financial disclosure forms from 2023 and

2021 we can hand up where he is getting profits, money,

recording money from this very book.

N545car5

1          Third, your Honor, while Mr. Tacopina is correct that

2     I didn't ask about this book in his deposition, I did ask him

3     about another book called *Think Big, Make It Happen In Business*

4     *And Life* that was also written with a co-author, it was by

5     Donald Trump and Bill Zanker, and at his deposition he adopted

6     everything in that book as his own, I can give you the cites

7     for that.

8          In addition, your Honor, I have another case before

9     Judge Schofield, McCoy v. Trump, in which I have showed him

10    probably a half dozen of his books, again all written with

11    co-authors, all of which he adopted as his own statements.

12         Obviously, if he had shown up for cross, we would have

13    crossed him with his book but we are not going to have that

14    opportunity.

15         THE COURT:  What do you say to that, Mr. Tacopina?

16         MR. TACOPINA:  I just stand by my original position,

17    your Honor.  We don't know if it is a statement of a party

18    opponent.  Yes, it is his book in the sense he sold it, he made

19    money from it, but we don't know the process of it.  Did he

20    write every word?

21         THE COURT:  Look.  If it comes in there is no question

22    that the defendant can call witnesses on that subject.  No

23    question.

24         MR. TACOPINA:  Again, just back to my --

25         THE COURT:  And, you know, I can think of a couple.

N545car5

|     |     |
| --- | --- |
| 1 | MR. TACOPINA:  OK.  Back to my original point, it is |
| 2 | there is no evidence that it is a party opponent statement. |
| 3 | Despite the title of the book, there is a co-author and a ghost |
| 4 | writer. |
| 5 | THE COURT:  But we are talking about authentication, |
| 6 | that's what you said first. |
| 7 | MR. TACOPINA:  It is. |
| 8 | THE COURT:  That's all I'm dealing with now. |
| 9 | MR. TACOPINA:  OK.  So how do you authenticate that |
| 10 | that's Donald Trump's words? |
| 11 | THE COURT:  That's not what authentication means.  Am |
| 12 | I wrong about that? |
| 13 | MR. TACOPINA:  Well, what is being authenticated?  The |
| 14 | book? |
| 15 | THE COURT:  Yes. |
| 16 | MR. TACOPINA:  Or the words they want to introduce in |
| 17 | the book? |
| 18 | THE COURT:  The book.  The book has a cover, dust |
| 19 | jacket, and words. |
| 20 | MR. TACOPINA:  Right, and the words inside, we have no |
| 21 | idea if they're his words, his co-author's words or -- |
| 22 | THE COURT:  How about the line that says:  Copyright |
| 23 | 2004, by Donald J. Trump.  Do you think that's relevant? |
| 24 | MR. TACOPINA:  Not really. |
| 25 | Judge, what do you want me to tell you?  I have an |

N545car5

1    argument here.  This was not asked in the deposition, she asked

2    about every other book in the deposition, not this book.

3            MS. KAPLAN:  I asked about one.

4            MR. TACOPINA:  I just don't get this --

5            THE COURT:  Mr. Tacopina, should I strike --

6            MR. TACOPINA:  No, I'm not going to stipulate.

7            THE COURT:  I'm not asking you to stipulate, I'm

8    trying to make a correct ruling.  And if I struck from the

9    record every answer to a question that you got in this trial

10    that you didn't ask the witness about in deposition, we would

11    cut half the case.

12            MR. TACOPINA:  I know but it is an exhibit, it is

13    different, your Honor.  It is different.  I understand what you

14    are saying, I do, but it is different.  It is an exhibit, a

15    book that was written with someone else.  What if Ms. McIver

16    wrote that portion of it?  Ms. McIver had to write something.

17    Right?  Who knows?  I'm not saying she did or didn't, I am just

18    saying there is a process.  I can argue that.

19            THE COURT:  Let's go one step further, all right?

20    Let's suppose, for the sake of argument, that it is authentic.

21    Within the meaning of Rule 901 is there any other objection to

22    it?

23            MR. TACOPINA:  Under the meaning of 901 I don't know

24    if this is inconsistent, quite frankly, your Honor, but I am

25    back to what I said recently which is I don't know how they

N545car5

1    establish it is a statement by party opponent and therefore it
2    would be hearsay.
3            THE COURT:  This has his name on it, it says by Donald
4    Trump.
5            MR. TACOPINA:  Yes.  It also says with Maureen McIver.
6    Maybe Maureen wrote that portion.
7            MS. KAPLAN:  The passage, relevant passages were also
8    written in the first person.
9            MR. TACOPINA:  Everything is written in the first
10   person.
11           MS. KAPLAN:  I understand.  So, it is intended to be
12   Mr. Trump, obviously.
13           MR. TACOPINA:  Yes.
14           THE COURT:  Let's go to the other issue you have for a
15   moment.
16           MR. TACOPINA:  That one is pretty easily, I think
17   resolved.
18           MS. KAPLAN:  That's Mr. Ferrara's, your Honor.
19           MR. FERRARA:  So, your Honor, the other issue is we
20   have a stipulation and as Mr. Tacopina said, we are in close
21   agreement.  The stipulation that we propose would be something
22   along the lines of the following, Mr. Tacopina doesn't agree to
23   every word, we are flexible:  Plaintiff E. Jean Carroll --
24   sorry, your Honor.  To back up, it relates to Ms. Carroll
25   having said that she produced diaries, and she said there were

N545car5

1    no -- she never put anything negative in her diaries.  So we

2    went back, we looked at her diaries --

3           MR. TACOPINA:  Mike, can we make one thing clear for

4    the record?  She said she produced the diaries to me.

5           MR. FERRARA:  I don't remember the exact word, but I

6    certainly agree with Mr. Tacopina that the jury could be left

7    with the misimpression that the defense has the diaries and

8    they do not.  We are happy to try to clear that up.  The

9    stipulation we are proposing, which doesn't go to that

10   particular issue directly but goes to the idea that she did not

11   ever record anything negative in the diary, which we think we

12   understand they are entitled to impeach, says:  E. Jean Carroll

13   has diaries for the years 2020, 2021, and 2022.  Each is

14   between approximately 234 and 266 pages in length, with

15   multiple short entries on each page, including the following

16   three entries:  November 9 --

17          THE COURT:  Look, look, look.  I'm not negotiating a

18   stipulation.  This is all very interesting, but.

19          MR. FERRARA:  The matter was simply were we going to

20   leave in the three specific entries or give a more general

21   sense of it.

22          THE COURT:  None of my business.

23          MR. FERRARA:  Understood.  That was the issue.

24          THE COURT:  OK.  Fine.  It is none of my business.

25          What is your application now?

N545car5

1          MR. FERRARA:  Well, I think if you give us.

2          THE COURT:  And how does it affect the timing here?

3    That's what I want to know.

4          MR. FERRARA:  I honestly think in 10 minutes we could

5    figure out something we can agree to, and then the application

6    would be that your Honor give a very brief three-sentence

7    instruction that defense counsel, along the lines of defense

8    counsel does not have the diaries for reasons that are entirely

9    appropriate in the litigation.  That's what we ask.

10          THE COURT:  And if we take the 10 minutes and you get

11    that, what happens next?

12          MR. FERRARA:  Plaintiff would introduce the

13    stipulation with the instruction, we would then potentially

14    introduce the book, or not, depending on your Honor's ruling,

15    and then we would rest and be done.

16          THE COURT:  And then what happens with you?

17          MR. TACOPINA:  OK.  It is late and I generally tend to

18    say things that are trying to be funny when it is late so I am

19    not going to do that.  Perhaps we can move on summations,

20    have -- the charge conference happens in the morning, so we do

21    that and go right to summations, despite what anyone may have

22    read.

23          THE COURT:  So notwithstanding whatever we have read

24    in the papers --

25          MR. TACOPINA:  I understand.

N545car5

1           THE COURT:  -- you are telling me now that your client

2    will not testify in this case, that you will rest once this

3    book issue and the stipulation is resolved, that he is not

4    going to change his mind?  That's what you are telling me?

5           MR. TACOPINA:  I am telling you that.

6           THE COURT:  And you are representing to me, as an

7    officer of the court, that he has authorized you to do that and

8    to make an irrevocable commitment?

9           MR. TACOPINA:  Yes.  He is not testifying, Judge.  We

10   are summing up on Monday.

11          THE COURT:  We will see.

12          MR. TACOPINA:  I'm sorry?

13          THE COURT:  I said we will see.

14          I'm going to send the jury home and we will not have

15   the charge conference first thing in the morning.  We will come

16   in to open court and we will find out if the plaintiff is going

17   to rest and then we will find out what you are going to do.

18          MR. TACOPINA:  I am going to rest.  I'm telling you

19   right now, I'm going to rest.

20          THE COURT:  I understand.

21          MR. TACOPINA:  OK.

22          THE COURT:  And that may well prove to be the case but

23   I will wait and see.

24          MR. TACOPINA:  And then --

25          THE COURT:  And I'm not implying dishonesty on your

N545car5

1   part.

2              MR. TACOPINA:  No, I know you're not.  I know you're

3   not.  I know you're not.  I know you understand what I am

4   dealing with.

5              THE COURT:  Look.  I have issues, too, which is to run

6   this trial fairly and appropriately, not to waste the jury's

7   time or anybody else's time, and to make sure both sides,

8   including your client, have a fully fair trial.

9              MR. FERRARA:  Your Honor, I just -- there is no

10  suggestion that Mr. Trump has not had a fully fair trial and

11  the idea --

12             THE COURT:  Oh really?

13             MR. FERRARA:  Your Honor has bent over backwards to

14  accommodate Mr. Trump and his schedule.

15             MR. TACOPINA:  Schedule?  His schedule hasn't been an

16  issue.

17             MR. FERRARA:  To accommodate Mr. Trump.  And I wonder

18  about the idea that we will be wondering of the possibility,

19  all weekend, that he is going to come in and testify.

20             MR. TACOPINA:  Mike, I just told you he is not.

21             THE COURT:  Listen.  I don't know if he is.  I trust

22  Mr. Tacopina's word as being what he knows as of now --

23             MR. TACOPINA:  As an officer of the court.

24             THE COURT:  -- but things in life change.  And the

25  last time I was in a trial courtroom with you, Mr. Ferrara, I

N545car5

1    believe, was in a case that you well remember and you had been

2    assured that the defendant would not take the stand, and at the

3    last second he was called.

4              MR. FERRARA:  Yes, your Honor.  That was a criminal

5    case --

6              THE COURT:  Yes, it was.

7              MR. FERRARA:  -- it has different kind of rights that

8    attach, and we think at this point Mr. Trump has waived his

9    ability to come into this court and testify.

10             THE COURT:  We will leave that sufficient to the day.

11             MR. TACOPINA:  Your Honor, can I just ask -- we can do

12   it outside the presence of the jury -- so when you say we are

13   not going to do the charge conference Monday morning, let's for

14   a second assume normality.  Let's assume we resolve this issue,

15   you rule on that, they rest, I rest.  Let's assume nobody is

16   testifying on Monday.  I just want to understand the schedule.

17   Will we do charge conference then?

18             THE COURT:  If they rest tonight and you rest

19   tonight --

20             MR. TACOPINA:  Tonight?

21             THE COURT:  Yes.

22             MR. FERRARA:  Can we have 10 minutes to try to work

23   this out before your Honor sends the jury.

24             THE COURT:  I will do that.

25             MR. TACOPINA:  OK.

N545car5

1          THE COURT:  If they rest tonight and you rest

2     tonight --

3          MR. TACOPINA:  We will have to make some motions

4     obviously quickly, Rule 50.

5          THE COURT:  And I can reserve the motion for you.

6          MR. TACOPINA:  OK.  Perfect.

7          THE COURT:  And then I will make up my mind.  I am not

8     forecasting.  All right?  Thank you.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N545car5

1              (In open court)

2              THE COURT:  We need a recess of about 10 minutes to

3    find out exactly what happens next, if anything.  OK?  See you

4    in 10 minutes.

5              THE DEPUTY CLERK:  Would the jury please come this

6    way?  Bring your notebooks with you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N545car5

1          (Jury not present)

2          (Recess)

3          THE COURT:  Have you resolved the stipulation issue?

4          MR. FERRARA:  We have.

5          THE COURT:  OK.  I am going to sustain Mr. Tacopina's

6  objection to Plaintiff's Exhibit 56, without prejudice to the

7  right of the plaintiff to review the offer in the event

8  Mr. Trump, for any reason, testifies in this case.

9          Bring the jury in, please.

10         MR. TACOPINA:  Your Honor, the motions I should make

11  out of the presence later?

12         THE COURT:  Yes.

13         THE DEPUTY CLERK:  Jury entering.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

N545car5

1          (Jury present)

2          THE DEPUTY CLERK:  Please be seated, everyone.

3          THE COURT:  Ladies and gentlemen, I can't tell you how

4    much that I, and the lawyers, appreciate your patience and

5    indulgence.

6          Is there any other evidence on behalf of the

7    plaintiff?

8          MR. FERRARA:  Yes, your Honor.  Plaintiff is prepared

9    to offer a stipulation, an agreed upon stipulation at this

10   time.

11         THE COURT:  Members of the jury, you are about to hear

12   a stipulation, which is a fancy word for an agreement between

13   Ms. Carroll's team and Ms. Carroll on one hand, and Mr. Trump

14   and his team on the other.  The facts to which they stipulate

15   are deemed established for this case's purposes and you must

16   accept them as true.

17         Counsel.

18         MR. FERRARA:  Thank you, your Honor.

19         It is hereby stipulated and agreed, by and between

20   plaintiff E. Jean Carroll and defendant Donald J. Trump, by and

21   through their undersigned counsel that:

22         Plaintiff E. Jean Carroll produced diaries for the

23   years 2020, 2021, and 2022.  Each is between approximately 234

24   and 266 pages in length with multiple short entries on each

25   page, including the following three entries, all from 2020, one

N545car5

1    in which she says she is distraught by political developments;

2    one in which she mentions the death of her brother-in-law; and

3    one in which she mentions hurting her back.

4             During her testimony, Ms. Carroll suggested that

5    defense counsel was in possession of these diaries.  In fact,

6    Ms. Carroll made these diaries available to her counsel for

7    discovery, but they were not produced to defense counsel for

8    appropriate legal reasons not relevant to this trial.

9             It is further stipulated and agreed that this

10   stipulation may be received in evidence as a plaintiff's

11   exhibit at trial.

12            Your Honor, plaintiff's offer this stipulation, which

13   is marked as 78.

14            THE COURT:  Mr. Tacopina, so stipulated?

15            MR. TACOPINA:  Stipulated, your Honor; yes.

16            THE COURT:  Plaintiff's Exhibit 78 is received.

17            (Plaintiff's Exhibit 78 received in evidence)

18            THE COURT:  Any other evidence on behalf of the

19   plaintiff?

20            MS. KAPLAN:  No, your Honor.  Plaintiff rests her

21   case.

22            THE COURT:  All right.

23            Ladies and gentlemen, we will almost certainly resume

24   with you at 10:00 on Monday morning.

25            Now, Andy, do you have contact information or do we

N545car5

1  want to call them?

2          Give me one second just to figure out how to let you

3  know if things change.

4          THE DEPUTY CLERK:  Judge, the jury clerk has provided

5  me a number, I can print it out for the jurors, and you can

6  tell them when to call in.

7          THE COURT:  OK, ladies and gentlemen, that's how we

8  are going to handle it.  You are to call in to the number Andy

9  will give you before you go home after 10:00 p.m. on Sunday.

10  And unless you hear on that number something different, we will

11  see you at 10:00 on Monday morning.

12          Thank you very much.  Have a great weekend.

13          THE DEPUTY CLERK:  Jury, please come this way.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

N545car5

```
1                    (Jury not present)

2                    THE DEPUTY CLERK:  Please be seated, everyone.

3                    THE COURT:  Mr. Tacopina, any motions?

4                    MR. TACOPINA:  Yes, your Honor, a Rule 50 motion for

5       judgment as a matter of law in favor of the defendant Mr. Trump

6       and the argument would be that they have not presented legally

7       sufficient evidence to find for the plaintiff.

8                    THE COURT:  Anything else you want to elaborate on

9       there?

10                   MR. TACOPINA:  No, your Honor.

11                   THE COURT:  Motion is denied.

12                   Now, does the defendant wish to present a case or do

13      you now rest?

14                   MR. TACOPINA:  We rest, your Honor.

15                   THE COURT:  All right.  Now, Mr. Tacopina, I know it

16      is not perhaps an everyday occurrence to do so but I'm going to

17      ask you some questions about that.

18                   MR. TACOPINA:  Sure.

19                   THE COURT:  As I think we covered previously, first of

20      all, the legal effect of your decision that Mr. Trump waives

21      his right to testify in his defense in this case; is that

22      right?

23                   MR. TACOPINA:  Yes, sir.

24                   THE COURT:  And have you communicated with him

25      personally?
```

N545car5

1           MR. TACOPINA:  Yes, sir.

2           THE COURT:  About that?

3           MR. TACOPINA:  Yes, sir.

4           THE COURT:  And you are representing to me, as an

5    officer of the court, that he has personally, after consulting

6    with you and being advised by counsel, elected voluntarily to

7    waive his right to testify in this case?

8           MR. TACOPINA:  Yes, sir.

9           THE COURT:  How recently have you spoken to him about

10   that?

11          MR. TACOPINA:  Two minutes before I came in to court

12   this morning.

13          THE COURT:  Now, any other inquiry the plaintiff would

14   like me to make in this circumstance?

15          MS. KAPLAN:  Nothing further, your Honor.

16          THE COURT:  Let me go a little further.

17          I am absolutely committed in this case, as in every

18   case, to ensure, to the best of my ability, that every party

19   has a full and fair opportunity to pursue or defend against a

20   claim asserted by or against that party.  In the interest of

21   justice, I will allow, until 10:00 p.m. on Sunday, the making

22   of a motion on behalf of Mr. Trump to re-open his case for the

23   purpose, and the sole purpose, of testifying as a witness in

24   this case.  I am not saying that I will grant it.  If it is

25   made, I will consider it, and I will give him appropriate

N545car5

1    consideration in all the circumstances.  He has a right to

2    testify, which has been waived, but if he has second thoughts I

3    will at least consider it, and maybe -- we will see what

4    happens.  But I want it to be clear if such a motion is to be

5    made, it is to be made on papers, it is to be filed with the

6    Clerk of the District Court over the CM/ECF System.  If no such

7    motion is filed by 10:00 p.m. Sunday, that ship has irrevocably

8    sailed.

9              Do you understand?

10             MR. TACOPINA:  Yes, sir.

11             THE COURT:  Will you communicate that, please, to

12   Mr. Trump?

13             MR. TACOPINA:  I will, and I thank your Honor for that

14   consideration.  But, I will communicate that.

15             THE COURT:  OK.

16             MS. KAPLAN:  Your Honor, I am hesitant to say this,

17   but at 10:00 p.m. Sunday night, that's not a lot of time for us

18   to respond.  Could we make it a little bit earlier?

19             MR. TACOPINA:  I am good with 10:00 a.m.

20             THE COURT:  You are good with 10:00 a.m.?

21             MR. TACOPINA:  I'm good with how about 5:09 on

22   Thursday, if you would like.

23             THE COURT:  5:00 p.m. on Sunday?  All right?

24             MR. TACOPINA:  Sure.  Sure, your Honor.

25             MS. KAPLAN:  Yes.

N545car5

1          THE COURT:  5:00 p.m. on Sunday is the deadline.

2          MS. KAPLAN:  Thank you, your Honor.

3          THE COURT:  Now, one more thing, just give me a

4     moment.

5          As I am sure, Mr. Tacopina, you are aware, and

6     probably everybody in this courtroom is aware, there have been

7     news reports out of the British Isles -- I guess they're still

8     called -- all day, attributing to Mr. Trump various statements

9     with respect to his possible presence here before this trial

10    ends.  I won't attempt to summarize them any further or comment

11    in any way on the substance.  But I have taken the precautions

12    I have just taken in light of those statements.

13         Anything else, folks?

14         MS. KAPLAN:  Nothing for plaintiff, your Honor.

15         MR. TACOPINA:  Yes.

16         THE COURT:  Yes.

17         MR. TACOPINA:  OK.  Scheduling.  Can I move on to just

18    the scheduling issue?

19         THE COURT:  Sure.

20         MR. TACOPINA:  Your Honor, I was thinking about this

21    overnight and wanted to make sure, with all the caveats we just

22    discussed, of course, but I plan on us moving forward as we

23    discussed yesterday, as far as the schedule is concerned.  I am

24    going to ask the Court to impose a two-hour limit on both sides

25    for summations and I will tell you why.

N545car5

            A rebuttal summation, while I understand is

appropriate, is verbose, which is not an hour long summation.

I have never heard of an hour-long summation.

            THE COURT:  Oh, you haven't been here as long as I

have.

            MR. TACOPINA:  Yes, sir.  I was going to say it is a

fact, but I didn't mean it like that.  Yes, I haven't been here

as long as you have.  But, I don't think it is fair that the

plaintiff should get 33 percent more time, in other words three

hours to our two hours.  And this also goes to making sure we

get all the summations in on Monday, because the one thing that

can't happen and I think would be unfair, is if they do their

first summation, I do my summation, the jury goes home, and

they have the night to craft their rebuttal summation and the

jury hears that alone on Tuesday and then gets the case.  So I

ask we have two hours each or maybe two and a half hours and

short lunch?  Because I was doing the math, I think it would

still work, if we shorten lunch to an hour.  Or, in the

alternative, we do their summation Monday, and then I could do

mine Tuesday morning, with their rebuttal Tuesday morning to

follow.

            Yes.  That's my request, either to give us a time

limit, which I will abide by; obviously I said initially mine

would be two and a half hours.  If the Court is not inclined do

that I would ask then perhaps give us two and a half hours each

N545car5

```
1   and shorten the lunch because that could still do it, if we
2   just take a one-hour lunch break on Monday, it will get us
3   right to about 5:00.
4            THE COURT:  You are forgetting the bathroom breaks.
5            MR. TACOPINA:  No, I actually added them in, your
6   Honor.  I have five and a half hours with bathroom breaks.
7            THE COURT:  Let me hear from the other side.  And I
8   want you both to know that I have been thinking about all of
9   this, for precisely these reasons, for a couple of days.
10            MR. TACOPINA:  Thank you, your Honor.
11            MS. KAPLAN:  So, your Honor, we obviously have no
12   issue with both sides having the same amount of time total and
13   then it would be up to our side to divide it up between opening
14   and rebuttal.  We think we could get -- you know, Ms. Carroll
15   is, as your Honor well knows, is alleging a case about facts
16   that occurred a long time ago and --
17            THE COURT:  I'm sorry.  She is?
18            MS. KAPLAN:  Alleging facts about something that
19   occurred a long time ago.
20            THE COURT:  That has not escaped my notice.
21            MS. KAPLAN:  And so, we think our task on opening -- I
22   mean on closing, excuse me, your Honor, is a serious one.  We
23   think we could get it done in two hours and 45 minutes, if
24   necessary, but we take both the closing and the rebuttal
25   seriously and are willing to work within the same total amount
```

N545car5

1    of time as defendant, obviously.

2              THE COURT:  So, if he gets two hours and you get two

3    hours for your closing and rebuttal, you are OK?

4              MS. KAPLAN:  No.  Two hours I think is too short.  We

5    would need a minimum, negotiating against myself, your Honor

6    but I think we would need minimum two and a half hours and we

7    would allocate that between the two.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N542Car6

1          MR. TACOPINA:  As long as -- your Honor, two and a

2     half hours is fine, as long as we could take a condensed lunch

3     break.  The point is, I think you understand, I don't want --

4          THE COURT:  You don't want the rebuttal alone the

5     second day.  I understand that.

6          MR. TACOPINA:  Yes.

7          THE COURT:  It does happen all the time, but I

8     understand it.

9          MR. TACOPINA:  Thank you.

10         THE COURT:  So if I understand here, you are both

11    agreeable to two hours for the plaintiff's closing, two hours

12    for the defense closing, and 30 or 45 minutes for the rebuttal.

13         MR. TACOPINA:  I think what Ms. Kaplan said, we should

14    both be allowed the same amount of time.  I'm not saying I'm

15    going to use two hours and 45 minutes.  I prefer not to.  I

16    mean, maybe two and a half hours, then.  But if they are going

17    to be two hours and 45 minutes, I could be two and a half and

18    maybe even less.  I haven't gone through this quite yet.  We

19    have been a little busy for the last few days.

20         THE COURT:  Have you now?

21         MR. TACOPINA:  I think I could try and get it

22    between -- you know, two and a half to two hours, if they want

23    two hours 45, that's fine.  I think Ms. Kaplan agreed we should

24    both be allowed the same amount of time.  I'm not worried so

25    much about that, as long as it is close.

N542Car6

1          THE COURT:  Let me get out my slide rule.  You don't

2     remember what that is, I know.

3          MR. TACOPINA:  Your what?

4          THE COURT:  My slide rule.

5          MR. TACOPINA:  I know what a slide rule is.

6          THE COURT:  Okay, good.  I don't want to show my age

7     or anything.

8          (Pause)

9          MR. TACOPINA:  Your Honor, I know you have your slide

10     rule.  I have a suggestion.  I did some math.

11          THE COURT:  Good.  You may be quicker at it.

12          MR. TACOPINA:  So if we start at 10 and do the

13     two-hour summation of the plaintiff, that takes us to 12.  And

14     I'm going to -- we will count, first, there is going to be some

15     more time for breaks.  If we take a one-hour lunch from 12 to

16     1, we can go from 1 to let's call it 3:30 or 3:15.  Even with

17     breaks, if they start at 4, yeah, if they start at

18     4:00—because that's the half hour on breaks in there

19     somewhere—and go to 4:30, we will get it done --

20          MR. FERRARA:  And your Honor --

21          MR. TACOPINA:  -- with a cushion.

22          MR. FERRARA:  I don't want the night.  I will be ready

23     to go at the end of the day on Monday.

24          MR. TACOPINA:  That's what I am saying.  With those

25     breaks, with the cushion, if they go 10 to 12, we take a

N542Car6

1  one-hour lunch break, I go, and with the breaks building in

2  half hour of breaks in there from morning to afternoon, they

3  should be able to go from 4 to 4:30 for the rebuttal.  So we

4  will both have two and a half hours.  I might not use it all,

5  but at least that will get it all done Monday.

6          MS. KAPLAN:  We agree, your Honor, that that should

7  work.

8          THE COURT:  So give me the times.  Plaintiff's

9  principal.

10          MR. TACOPINA:  10 to 12.

11          THE COURT:  Two hours.

12          Defendant's principal.

13          MR. TACOPINA:  1:00 to 3:15 or 3:30, 3:30.  We still

14  have the time.

15          THE COURT:  Hours and minute, please.

16          MR. TACOPINA:  Two hours and a half.

17          THE COURT:  Rebuttal.

18          MR. TACOPINA:  4 to 4:30, 30 minutes.

19          THE COURT:  Everybody all right with that?

20          MS. KAPLAN:  Yes, your Honor.

21          MR. TACOPINA:  Yes.

22          THE COURT:  So be it.

23          Now, let's just hope that the jury is on time, that we

24  don't have traffic, that we don't have a media event outside

25  for anybody, and we will go from there.

N542Car6

1           MS. KAPLAN:  One more item, I thought.

2           MR. TACOPINA:  Ed Sheeran is gone.

3           THE COURT:  I didn't know that.  Who won.

4           MR. TACOPINA:  Ed Sheeran.

5           THE COURT:  I've been a little busy.

6           MS. KAPLAN:  One more point, your Honor.  I thought I

7    might raise this now.

8           In terms of the request that's been made by various

9    media outlets for exhibits, we have no issue with that.  The

10   delay has simply been making sure that everything was properly

11   redacted, and we are working through that with defendant.  And

12   once they are ready we, at least, have no issue.

13          THE COURT:  All right.  Look, the media needs to

14   understand that I certainly don't have a problem in principle

15   with it.  Obviously I don't want anybody's e-mails in the

16   public world——e-mail addresses is what I mean; I don't mean

17   e-mails——or phone numbers or Social Security numbers or

18   whatever else.  That's my only concern.  It's the parties'

19   concerns.  But here's a biggie, and that is that my entire

20   staff is in this room, and there is not much I can do to

21   facilitate this other than say work it out, and I am hoping you

22   will do that quickly.

23          Okay.  Anything else today?

24          MR. TACOPINA:  The charge conference issue, your

25   Honor.

N542Car6

```
1        THE COURT:  Well, once I know where we are, I know
2   whether to call the jury off for 10:00.  So unless --
3        MR. TACOPINA:  In any event, why would we call the
4   jury off for 10:00?
5        THE COURT:  Well, if there is a motion made, you say
6   no, and know in your heart you mean no, but I don't know the
7   unknowable, and I am just leaving open the possibility I
8   mentioned.  Without saying I would grant it or deny it, your
9   client has got to know that it is not totally closed, even
10  though, as a matter of law, he has waived it voluntarily and
11  now publicly through counsel.
12       MR. TACOPINA:  If we don't make a motion by 5 p.m. on
13  Sunday -- is it 5 p.m.?
14       THE COURT:  Yes, then the charge conference is as we
15  previously scheduled.
16       MR. TACOPINA:  9 a.m., and we will have the copies
17  available by 8 a.m.
18       THE COURT:  Yes.  If you get with John Hammel or Aditi
19  here and make sure everybody knows what e-mail address you want
20  it to.
21       MR. TACOPINA:  Okay.  Thank you, your Honor.
22       THE COURT:  Thank you.  Have a good weekend.
23       (Adjourned to Monday, May 8, 2023)
24
25
```

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    FRANCES CAROL MARTIN

4    Direct By Ms. Kaplan . . . . . . . . . . . .1019

5    Cross By Mr. Tacopina  . . . . . . . . . . .1051

6    Redirect By Ms. Kaplan . . . . . . . . . . .1098

7    Recross By Mr. Tacopina  . . . . . . . . . .1106

8    ASHLEE HUMPHREYS

9    Direct By Ms. Crowley  . . . . . . . . . . .1109

10   Cross By Mr. Brandt  . . . . . . . . . . . .1146

11   Redirect By Ms. Crowley  . . . . . . . . . .1156

12    ROBERTA MYERS

13   Direct By Ms. Crowley  . . . . . . . . . . .1159

14   Cross By Mr. Brandt  . . . . . . . . . . . .1171

15                        PLAINTIFF EXHIBITS

16   Exhibit No.                             Received

17    200 and 200-T  . . . . . . . . . . . . . .1018

18    78   . . . . . . . . . . . . . . . . . . .1191

19                        DEFENDANT EXHIBITS

20   Exhibit No.                             Received

21    128  . . . . . . . . . . . . . . . . . . .1021

22    EA   . . . . . . . . . . . . . . . . . . .1055

23    EE   . . . . . . . . . . . . . . . . . . .1059

24    EF   . . . . . . . . . . . . . . . . . . .1061

25    EM   . . . . . . . . . . . . . . . . . . .1067
```

1    EN    . . . . . . . . . . . . . . . . . .1068

2    EO    . . . . . . . . . . . . . . . . . .1069

3    EP    . . . . . . . . . . . . . . . . . .1070

4    BS    . . . . . . . . . . . . . . . . . .1083

5    CR    . . . . . . . . . . . . . . . . . .1085

6    ER    . . . . . . . . . . . . . . . . . .1087

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25