N582CAR1

1 UNITED STATES DISTRICT COURT
  SOUTHERN DISTRICT OF NEW YORK
2 -------------------------------x
  E. JEAN CARROLL,
3
                  Plaintiff,              New York, N.Y.
4
          v.                              22 Civ.10016 (LAK)
5
  DONALD J. TRUMP,
6
                  Defendant.
7 -------------------------------x        Jury Trial

8                                         May 8, 2023
                                          9:10 a.m.
9
  Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                          District Judge
12                                           and a Jury

13
                            APPEARANCES
14
  KAPLAN HECKER & FINK LLP
15      Attorneys for Plaintiff
  BY:  ROBERTA A. KAPLAN
16     MICHAEL J. FERRARA
       SHAWN G. CROWLEY
17     MATTHEW J. CRAIG

18
  TACOPINA SEIGEL & DeOREO
19      Attorneys for Defendant
  BY:  JOSEPH TACOPINA
20     CHAD D. SEIGEL
       MATTHEW G. DeOREO
21

22 HABBA MADAIO & ASSOCIATES, LLP
        Attorneys for Defendant
23 BY:  ALINA HABBA
       MICHAEL T. MADAIO
24

25 W. PERRY BRANDT
        Attorney for Defendant

N582CAR1

```
 1                  (Trial resumed; jury not present)

 2                  THE COURT:  Good morning, everyone.

 3                  COUNSEL:  Good morning, your Honor.

 4                  THE COURT:  We will mark as, I believe, Court Exhibits

 5      A and B the circulation draft of the verdict form and the

 6      proposed jury instructions.

 7                  Does plaintiff have any objections to the verdict

 8      form?

 9                  MS. KAPLAN:  Your Honor, my partner Mr. Matz  will

10      speak on behalf of plaintiff.

11                  THE COURT:  Okay.

12                  MR. MATZ:  Your Honor, plaintiffs have no objection to

13      the verdict form.

14                  THE COURT:  Thank you.

15                  Who on your side, Mr. Tacopina, should I be

16      addressing?

17                  MR. BRANDT:  Me, your Honor.

18                  THE COURT:  Mr. Brandt.

19                  MR. BRANDT:  We have no objections to the verdict

20      form.  We have some comments on the instructions themselves,

21      but no objection to the verdict form.

22                  THE COURT:  Thank you.

23                  All right.  We will turn to the instructions.  We do

24      this by sections.  Page 1/line 1 through page 8/6.

25                  Anything from the plaintiff?
```

1        MR. MATZ:  Yes, your Honor.

2        On page 5, your Honor, the first full paragraph, the

3    final sentence, where the Court defines for the jury an aspect

4    of sexual abuse.  The draft as currently written states, "It

5    includes the touching of the actor by the victim, as well as

6    the touching of the victim by the actor, whether directly or

7    through clothing, and also as the emission of ejaculate by the

8    actor upon any part of the victim, clothed or unclothed."

9        We would respectfully request that the Court consider

10   deleting that final clause of that sentence which refers to the

11   emission of ejaculate, since it's not at issue in this case and

12   could potentially confuse the jury.

13       THE COURT:  Thank you.

14       Mr. Brandt?

15       MR. BRANDT:  We think the Court's instruction is fine

16   as is, your Honor.

17       THE COURT:  But what's your response to the --

18       MR. BRANDT:  Well, I think your definition was a good

19   definition, and so I think it should stand as is.

20       THE COURT:  I'm going to strike the sentence or the

21   portion of the sentence on the ground indicated by Mr. Matz.

22       Anything else on that section from either side?  Okay.

23   Hearing none, we will move on.

24       I think the last part that I indicated was at issue

25   previously was page 8/line 6, so page 8/line 8 through page 9.

N582CAR1

```
1            Plaintiff?

2            MR. MATZ:  No objections, your Honor.

3            THE COURT:  Mr. Brandt?

4            MR. BRANDT:  Nothing, your Honor.

5            THE COURT:  Thank you.

6            Page 10/line 1 through page 12.

7            Plaintiff?

8            MR. MATZ:  Nothing, your Honor.

9            THE COURT:  Mr. Brandt.

10           MR. BRANDT:  Yes, your Honor.

11           On page 12, the third bullet point, one of the items

12   for consideration of punitive damages is "Mr. Trump's financial

13   condition and the impact your punitive damages award, if any,

14   would have on Mr. Trump."

15           As I recollect, there has been no evidence introduced,

16   and plaintiff has already rested, but no evidence was

17   introduced about his financial condition.

18           THE COURT:  Mr. Matz.

19           MR. MATZ:  Your Honor, this is part of the standard

20   jury instruction, and there has been substantial evidence in

21   the case that Mr. Trump is a real estate tycoon and a former

22   president, as well as the president of a social media company,

23   and we believe the jury has a sufficient basis from which to

24   form beliefs as to his financial condition.

25           THE COURT:  In addition to which he testified in
```

N582CAR1

1   deposition that he was or could be regarded as a star, and I

2   believe that there are other references.

3           Overruled, Mr. Brandt.

4           Okay.  That takes care of the battery count.

5           Page 13/line 1 through page 16/line 5.

6           Mr. Matz.

7           MR. MATZ:  Yes, your Honor.  We did have just one

8   proposed modification to the instructions, specifically at the

9   top of page 13, the third line on the page, the second

10   sentence, where it says, "The next set of questions and the

11   verdict form questions 6 through 10 deal with Ms. Carroll's

12   defamation claim in relation to Mr. Trump's October 12, 2022

13   statement."  Because the statement as it's being given to the

14   jury in these instructions excludes portions of the original

15   statement that refer to tangential matters, like Peekaboo James

16   and all of that stuff, and because the original statement is in

17   evidence in full, we are just slightly concerned that the jury

18   may be a bit confused about the relationship between the full

19   statement and the portions that we are saying are defamatory.

20   So I would respectfully propose one very slight addition at the

21   beginning, which would be after the word "statement" at the end

22   of that sentence, it would say "specifically, the portions of

23   that statement either about or of and concerning Ms. Carroll,"

24   so that there is no confusion in their minds that this is about

25   the portions of the statement that don't have to do with her.

N582CAR1

1          THE COURT:  Okay.  Thank you.

2          Mr. Brandt.

3          MR. BRANDT:  I have a problem with the phraseology "of

4    and concerning Ms. Carroll," because that's one of the things

5    the jury is supposed to find is whether the statements were of

6    and concerning her.  So if there was some other way we could

7    phrase that, that would be fine.

8          MR. MATZ:  Your Honor, how about the phrase "about

9    Ms. Carroll"?

10          MR. BRANDT:  That's okay.

11          THE COURT:  Point me to where you would like the

12    language and give me the language.

13          MR. MATZ:  The court reporter probably knows it better

14    than I do at the moment.

15          THE COURT:  But we're not going to do that.

16          MR. MATZ:  So it's on the top of 13, at the end of the

17    first sentence of subsection D, following the word "statement,"

18    perhaps an em dash or a comma, "specifically the portions of

19    that statement about Ms. Carroll."

20          MR. BRANDT:  Again, I think that's fine, your Honor.

21          THE COURT:  Thank you, Mr. Brandt.  I will do that.

22          Anything else with respect to this section from the

23    plaintiff?

24          MR. MATZ:  No, your Honor.

25          THE COURT:  Mr. Brandt.

1        MR. BRANDT:  No.

2        THE COURT:  Thank you.

3        Page 16/line 8 through page 17/line 16.

4        MR. MATZ:  Nothing from plaintiff, your Honor.

5        MR. BRANDT:  And nothing from defendant.

6        THE COURT:  Thank you.

7        Page 17/line 18 through page 19/line 10.

8        MR. MATZ:  Once again, nothing from plaintiff.

9        MR. BRANDT:  Again, your Honor, just the bullet point

10  about Mr. Trump's financial condition, we would object on that,

11  but I understand the Court's prior ruling.

12       THE COURT:  Thank you.  I reiterate it.

13       Page 19/line 12 through page 22/line 7.

14       MR. MATZ:  No objections from plaintiff.

15       MR. BRANDT:  Nothing, your Honor.

16       THE COURT:  Thank you.

17       Page 22/line 9 through page 24/line 17.

18       MR. MATZ:  No objection from plaintiff, your Honor.

19       MR. BRANDT:  And, your Honor, on page -- starting on

20  page 22 and continuing on to page 23, under the subheading 4(b)

21  "Evidence of Sexual Assault on Other Persons," we have already

22  briefed this in detail, but I just wanted to note, under Rule

23  of Evidence 413(d), the evidence regarding other person is

24  supposed to involve genital contact, and that is not in these

25  instructions.  So we would object to the instruction unless it

N582CAR1

1    talks about there having been touched the genitals of Ms. Leeds

2    or Ms. Stoynoff.

3           THE COURT:  Mr. Matz.

4           MR. MATZ:  Your Honor, we believe the instruction is

5    properly given.  Rule 104 of the Federal Rules of Evidence

6    recognized that in some statements the admissibility of

7    evidence may be conditional by the finding of a particular fact

8    by the jury.  Here, the instruction makes clear that the jury

9    must find certain facts before it may consider in any way the

10   evidence concerning Ms. Stoynoff.  And in describing the facts

11   that the jury must find, it defines what the term "sexual

12   assault" means and it defines it appropriately.

13          I would note that genital contact is actually not a

14   requirement of Rule 413(d), contrary to the statement by

15   defense counsel.  And the Court's instructions at the bottom of

16   page 23 and the top of page 24, both in the definition of

17   "sexual assault" and the definition of the term "attempt," are

18   consistent with the Court's opinions, which are the law of the

19   case, and they are also consistent with binding precedent that

20   defines how Rule 415 applies and Rule 413 apply in this

21   context.

22          THE COURT:  Thank you.

23          Why not, Mr. Brandt?

24          MR. BRANDT:  Just the reasons stated, your Honor, that

25   we have already briefed on this.

N582CAR1

1            THE COURT:  I'm sorry.  I don't understand.

2            MR. BRANDT:  I'm sorry.  Just, in our view, it

3    requires the touching of the genitals of either Ms. Leeds or

4    Ms. Stoynoff.

5            THE COURT:  What do you do with the word "attempt"?

6            MR. BRANDT:  Well, again, there is no evidence of

7    attempt.

8            THE COURT:  Overruled.

9            Page 24/line 20 through page 25/line 4.

10           MR. MATZ:  No objection, your Honor.

11           MR. BRANDT:  And your Honor, we also object to this

12   section about the *Law & Order* exhibit and testimony.  This was

13   the subject of briefing over the weekend.  We think the exhibit

14   CK, Defendant's Exhibit CK was admitted without objection and

15   is in for all purposes and can be used on that basis.

16           THE COURT:  Well, I read the briefing over the

17   weekend; and, Mr. Brandt, I know that you certainly didn't

18   write it, and I'm not asking who did, but the assertions that

19   were made on behalf of the defendant in that briefing, I

20   conclude, took some liberties with the record, and specifically

21   this.  When Mr. Tacopina, on cross-examination of Ms. Carroll,

22   first began to refer to a *Law & Order* episode, there was an

23   objection from the plaintiff, and I brought counsel to the

24   sidebar.

25           I asked Mr. Tacopina what was going on, in other

1  words, why are we talking about a TV show, or words to that

2  effect, and here's what he said:  "What is going on, your

3  Honor, is two things.  There is an e-mail about the -- I was

4  going to inquire about regarding the TV show *Law & Order*.  It

5  is relevant for the reasons I will explain.  The second before

6  I did that, I was just asking if she had any independent

7  knowledge of the show*.  Law & Order* in 2012 did a TV show in

8  which the episode featured a woman getting raped in the

9  Bergdorf Goodman lingerie dressing room in 2012.  Ms. Carroll

10  received an e-mail, responded to an e-mail from someone saying

11  that you should be aware that there is this *Law & Order* episode

12  from 2012."  It is Mr. Tacopina speaking.

13          I asked when the *Law & Order* episode aired.

14          Mr. Tacopina replied:  "2012 originally, and there may

15  have been repeats."

16          Mr. Seigel, on behalf of the defendant, interjected

17  that it was on repeats.

18          So then we get to the important part.  Mr. Tacopina

19  said the following:  "So this lady is just telling her" --

20  referring to the lady who had written the e-mail to

21  Ms. Carroll, and the e-mail we are talking about is one of two

22  messages contained in Exhibit, I believe it is CK.  "So this

23  lady is just telling her"——referring to Ms. Carroll——"that this

24  aired in 2012 and had a character talking about being raped in

25  a Bergdorf Goodman lingerie dressing room.  Ms. Carroll replied

N582CAR1

1    saying, I hadn't seen it, but this happens all the time with

2    *Law & Order* stories, which indicates that she watches

3    *Law & Order*.  Also, there are 200 scripted shows a year on TV.

4    This kind of thing is bound to show up.  Indeed, I'm surprised

5    this plot is not seen more often."

6          Still continuing quoting Mr. Tacopina, "So we are

7    offering that obviously."

8          I said, "Okay."

9          Mr. Tacopina then said——and this is what is not

10   referred to at all in the defendant's briefing over the

11   weekend——"not for the truth, but for her response.  That is

12   relevant."

13         And I said:  "I get it.  What's the objection?"

14         And Mr. Ferrara for the plaintiff essentially said, We

15   think under 402, which is relevance, and 403, undue prejudice,

16   it should be kept out.

17         And I said, "No, I will allow it."

18         That was the end of the sidebar.

19         So the matter was left at the end of the sidebar that

20   the plaintiff wanted to offer this e-mail exchange not for the

21   truth of what was said in the e-mail by the person who

22   initiated the communication with Ms. Carroll, but only for

23   Ms. Carroll's response to that e-mail.

24         We then resumed testimony and Mr. Tacopina showed

25   Ms. Carroll the e-mail train, I guess is what you call it, the

1   two e-mails on one piece of paper, and she identified it, said

2   she had seen it, said she had received it.

3       And subsequently Mr. Tacopina said, "I would offer

4   that," referring to the e-mail train, "as Defendant's Exhibit

5   CK, your Honor."  and Mr. Ferrara, for the plaintiff, said, "No

6   objection."

7       Now, why was there no objection?  There was no

8   objection because there was no hearsay objection to be made

9   because Mr. Tacopina had represented at the sidebar that the

10  e-mail exchange was being offered not for the truth of the

11  matter stated, but only for the purpose of showing

12  Ms. Carroll's response to the first e-mail.  That being the

13  case, there was no occasion to object, the relevancy objection

14  had been overruled at sidebar, and we proceeded.

15      In light of that history, I overrule the objection to

16  page 24/lines 20 to page 25/line 4, and it would have been

17  helpful if, in making the briefing over the weekend, the

18  plaintiffs had seen fit to acknowledge in the letter that the

19  document had been offered not for its truth, rather than

20  telling me that the document had been received for all

21  purposes, which is manifestly incorrect.

22      MS. KAPLAN:  Point of clarification, your Honor.  For

23  the transcript, I think you said the "plaintiffs" there and you

24  meant the "defendants."

25      THE COURT:  Where?

N582CAR1

1          MS. KAPLAN:  In the statement you just stated about

2     what you would have wanted to see in the letter.

3          THE COURT:  You are correct.  I have now looked at the

4     transcript, and where I said the plaintiffs have seen fit to

5     acknowledge in the letter, that should say "the defendant."

6          That reminds me of another transcript correction,

7     going back days, having to do with the fact that I made a

8     reference days ago to a work by Jonathan Swift, and I said that

9     it was a publication several hundred years ago, and the record

10    says 700 years ago, and I said several.

11         MR. MATZ:  No objection, your Honor.

12         THE COURT:  Okay.  Thank you.  I'm sure my English

13    literature teacher in high school rests more comfortably

14    wherever she may be.

15         Page 25/line 6 through page 27/line 17.

16         Plaintiff?

17         MR. MATZ:  No objection, your Honor.

18         THE COURT:  Defendant?

19         MR. BRANDT:  No objection, your Honor.

20         THE COURT:  Page 27/line 19 through the end of the

21    circulation draft.

22         Plaintiff?

23         MR. MATZ:  No objections, your Honor.

24         THE COURT:  Mr. Brandt?

25         MR. BRANDT:  No objection, your Honor.

N582CAR1

```
 1              THE COURT:  Okay.  Thank you all for being prepared
 2      and doing this efficiently.
 3              Is there anything else that can usefully be
 4      accomplished before the jury is ready to go?
 5              MS. KAPLAN:  Not from plaintiff, your Honor.
 6              MR. BRANDT:  Not from defendant.
 7              THE COURT:  Okay.  I thank you, and I will see you
 8      when we have a jury ready to go.
 9              (Recess)
10              THE COURT:  Good morning again.  Let's bring in the
11      jury.
12              (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

N582CAR1

1           (Jury present)

2           THE COURT:  Good morning, everyone.  I hope you

3    enjoyed this beautiful weekend, and good for you for being on

4    time because that enables us to move forward even a little

5    ahead of schedule.

6           Before I turn it over to the lawyers, let me just tell

7    you a little bit about the schedule.  You are going to hear

8    closing arguments now from both sides.  The plaintiff goes

9    first, the defendant goes second, and the plaintiff has an

10   opportunity for a comparatively short rebuttal.

11          I anticipate that the plaintiff will be about two

12   hours, the defendant will be a little bit more than that, and

13   the rebuttal will be somewhere like a half hour.

14          We are going to order you lunch early because if we

15   start right now, it will probably be close to noon and we will

16   have a lunch break.  We will at some convenient points during

17   the day have bathroom breaks.

18          I expect we will finish the closing arguments today,

19   and tomorrow morning first thing I will instruct you on the

20   law.  It will probably take anywhere from 50 minutes to an hour

21   and ten minutes, something like that, and then you will get the

22   case to decide.

23          Now, let me just remind you of something I said much

24   earlier in the trial.  You are not to discuss the case even

25   among yourselves, let alone with anybody else, until after I

N582Car1                    Summation - Ms. Kaplan

 1  instruct you on the law tomorrow and tell you to retire and

 2  begin your deliberations.

 3          Secondly, it remains extremely important that you have

 4  no contact with anything that may be in the press or on social

 5  media or anything like that relating to the case or with anyone

 6  on the outside at all.

 7          With all of that, I'm done giving you my thoughts, and

 8  we are now going to hear closing argument on behalf of

 9  Ms. Carroll.

10          Ms. Kaplan.

11          MS. KAPLAN:  Thank you, your Honor.

12          Good morning.

13          I want to start by mentioning something that

14  Mr. Tacopina spent quite a bit time talking about during his

15  opening argument a couple of weeks ago, the importance of our

16  justice system and the rule of law.

17          On this point, I agree completely with Mr. Tacopina.

18  In this country, even the most powerful person can be held

19  accountable in court.  No one—not even a former president—is

20  above the law.

21          I agree with Mr. Tacopina that that's a big part of

22  what makes our country great.  Your job is to uphold that core

23  principle, to find the facts, and reach a verdict based on the

24  evidence before you.  That's all that we can or should ask you

25  to do.

N582Car1                    Summation - Ms. Kaplan

1              Did any of you happen to notice, though, that what

2      Mr. Trump said about that in his key October 12 defamatory

3      statement about E. Jean Carroll on Truth Social that is in as

4      Plaintiff's Exhibit 4?  In that post, he actually insulted the

5      justice system.  In the end, in this case, you must hold him to

6      account in this court for what he's done.

7              Now let me explain to you why.

8              The plaintiff in our case, E. Jean Carroll, is truly

9      one of a kind.  Having grown up in Indiana, she pulled herself

10     up by her own bootstraps and achieved amazing success as a

11     journalist and advice columnist here in New York City.  As you

12     saw for yourselves, she is smart, she is funny, she is

13     beautiful and, most of all, she is courageous.  As her good

14     friend Lisa Birnbach told you from that stand, E. Jean is the

15     kind of person who puts on lipstick, dusts herself off, and

16     moves on.

17             Ms. Carroll testified here for more than two full

18     days.  She described in detail what Donald Trump did.  Even

19     when she was asked the most difficult and arguably offensive

20     questions, like whether having someone rummage around her

21     vagina is different from having someone insert a finger, she

22     answered them calmly and patiently.

23             But you also saw E. Jean Carroll express real emotion

24     on the stand.  Those were the tears of a woman laying out the

25     most private, the most sensitive, the most difficult parts of

1    her life, answering question after question after question

2    about why she didn't scream.  You saw for yourselves.  E. Jean

3    Carroll wasn't hiding anything.  Her testimony was credible, it

4    was consistent, and it was powerful.

5             Now let's compare that to Donald Trump.  You haven't

6    heard much from Donald Trump in this case, but what you did

7    hear supports our version of what happened.  Here are two very

8    important examples.

9             First, as you know, when Ms. Carroll first came

10   forward to tell the story of how Mr. Trump assaulted her at

11   Bergdorf Goodman, he denied it by saying that he had never met

12   Ms. Carroll, he had no idea who she was, and that she "wasn't

13   his type."  He repeated that claim on the social media platform

14   Truth Social in the post you just saw.  He then said it again

15   when he was deposed in this case under oath, as you saw in the

16   video last week:  I wouldn't have assaulted Ms. Carroll,

17   Mr. Trump insisted, because she's not my type.  In other words,

18   she wasn't attractive enough for me to sexually assault.

19            But you also saw what happened when Mr. Trump was

20   shown this photograph at his deposition.  Let's watch again.

21            (Video played)

22            MS. KAPLAN:  What did Mr. Trump do after I showed him

23   that photograph?  He looked at it for a moment, pointed to

24   Ms. Carroll and then said, completely unprompted by me, "It's

25   Marla.  That's Marla, yeah.  That's my wife."  He was

1    referring, of course, to his second wife, Marla Maples.

2              Just to be clear——I think we all know this——this is

3    not a photograph of Marla Maples.  This is a photograph of

4    E. Jean Carroll, her then husband John Johnson, Donald Trump,

5    and Mr. Trump's first wife, Ivana Trump.

6              But Mr. Trump pointed to Ms. Carroll, the woman he

7    supposedly said was not his type, and mistook her for Marla

8    Maples.  Ms. Carroll's hair-do at the type was similar in both

9    cut and color to Ms. Maples.  She was exactly his type.

10             And believe it or not, he repeated it twice.  He only

11   corrected himself when his own lawyer, realizing the problem it

12   created for him in this case, jumped in to tell him that he had

13   gotten it wrong.  Realizing what he had done, Donald Trump then

14   did what he always does.  He made up an excuse for why he made

15   the mistake.  He said that the photograph was blurry.  But

16   that's the photograph, ladies and gentlemen.  It's the same

17   photograph I showed him in that room at Mar-a-Lago, and you

18   know for yourselves that it is not at all blurry.

19             The truth is that E. Jean Carroll, a former

20   cheerleader and Miss Indiana, was exactly Donald Trump's type.

21             What else did you hear from Donald Trump?  You also

22   heard that he did almost the exact same thing he did to

23   Ms. Carroll to other women.  You heard him say it in his own

24   words.

25             (Video played)

1    MS. KAPLAN:  Here is what he said:  "You know, I'm

2   automatically attracted to beautiful women.  I just start

3   kissing them.  It's like a magnet.  Just kiss.  I don't even

4   wait.  And when you're a star, they let you do it.  You can do

5   anything.  Grab them by the pussy.  You can do anything.  Just

6   start kissing them.  Don't even wait.  You can do anything.

7   Grab them by the pussy."

8       What is Donald Trump doing here?  Telling you in his

9   very own words how he treats women.  It's his *modus operandi*,

10  or MO.

11      You heard Jessica Leeds and you heard Natasha Stoynoff

12  tell you how he used this exact same MO or playbook with them.

13  He kissed them without their consent.  He grabbed them.  He

14  didn't wait.

15      Now let's put these two things together.  First we are

16  looking at the photograph -- the photograph that I showed you

17  earlier, Donald Trump confirmed that E. Jean Carroll, who was

18  then in her late forties or early fifties, was exactly his

19  type, the sort of woman he found attractive.

20      Second, on the *Access Hollywood* tape, he told you what

21  he automatically does when he sees women he finds attractive.

22      The evidence in this case establishes overwhelmingly

23  that Trump followed this same playbook when he attacked

24  Ms. Carroll at Bergdorf Goodman.  He pushed her up against the

25  wall and he started kissing her.  He didn't wait.  He grabbed

1    her, using his words, "by the pussy."

2            But Donald Trump went even further than that.

3    Remember how on the *Access Hollywood* tape he said that if

4    you're a star they let you do it, you can do anything?  You

5    just saw that.  What did Donald Trump say about that when I

6    asked him about it at his deposition?  He said that for

7    millions of years unfortunately or fortunately——those are his

8    words——stars like him could get away with sexually assaulting

9    women.

10           Let's listen.

11           (Video played)

12           MS. KAPLAN:  Unfortunately or fortunately?  He

13   actually used the word "fortunately" to describe stars grabbing

14   women?  Let that sink in for a moment.  Who would say

15   "fortunately" to describe the acts of sexual assault?  I know

16   who.  Someone who thinks of themselves as a star, someone who

17   thinks it's a good thing that stars can grab women by the

18   pussy.  That's who Donald Trump is.  That is how he thinks, and

19   that is what he does.  He thinks stars like him can get away

20   with it.  He thinks he can get away with it here.

21           Before I get to the rest of the case, let me say one

22   more thing.  You have heard from many witnesses during this

23   trial.  You have heard from E. Jean Carroll herself; from

24   Ms. Carroll's two friends, Lisa Birnbach and Carol Martin; from

25   two Bergdorf Goodman employees, Cheryl Beall and Bob Salerno;

1     from two other women sexually assaulted by Donald Trump,

2     Natasha Stoynoff and Jessica Leeds; and from Ms. Carroll's

3     former editor and sister.  Each of these nine witnesses

4     presented factual evidence that supports E. Jean Carroll.  You

5     also heard from two experts——Dr. Leslie Lebowitz, who testified

6     about what happens to someone when they experience trauma; and

7     Professor Ashlee Humphreys, who testified about the damage to

8     Ms. Carroll's reputation.  Even I can do this math.  That adds

9     up to 11 witnesses who testified under oath in this courtroom.

10            What do they have on the other side?  Donald Trump and

11    only Donald Trump.  He had no fact witnesses to support any

12    part of his story, no one to back up a single thing he said.

13    And you only saw him on video.  He didn't even bother to show

14    up here in person.

15            In other words, as my partner Shawn Crowley said in

16    her opening argument a couple of weeks ago, this is not a "he

17    said/she said" case.  It's not what Donald Trump says versus

18    only what E. Jean Carroll says.  Instead, it's what Trump says

19    versus what every single one of those 11 witnesses said when

20    they testified in that chair over there.

21            And on top of that, as I just explained, much of what

22    Donald Trump says actually supports our side of the case.  In a

23    very real sense, Donald Trump here is a witness against

24    himself.  And there is a very good reason for that.  Donald

25    Trump knows what he did.  He knows that he sexually assaulted

1    E. Jean Carroll.

2            Now, as you know, Mr. Trump's lawyer made a promise to

3    you during his opening statement that he would prove that each

4    and every step in Ms. Carroll's account was totally

5    unbelievable.  Turns out he wasn't able to keep that promise.

6            Let me just begin by giving you one obvious example of

7    that kind of a broken promise.  I thought I would use something

8    simple like the Bergdorf Goodman dressing room doors.

9            Mr. Tacopina told you during his opening that

10   Ms. Carroll's account of the sexual assault by Donald Trump is

11   not believable because the dressing room doors at Bergdorf

12   Goodman were always closed.  But you now know that that simply

13   isn't true.  Both Cheryl Beall and Bob Salerno told you that it

14   was common for dressing room doors at Bergdorf Goodman to be

15   left open.  You can see for yourselves on the screen what they

16   said.

17           Let's now turn to Ms. Carroll's account of what

18   happened that day in the spring of 1996, when things turned

19   from funny to tragic, as she described it.  You will hear that

20   every single aspect of what she has said is backed up or

21   corroborated by other evidence.

22           Let me start with the date.  There has been a lot of

23   talk in this case about the date.  We can now be pretty sure

24   that the attack happened on a Thursday evening in the early

25   spring of 1996.  Let me pause here for a minute.  I will

1    explain this more later, but the word "probably" is very

2    important here because it is consistent with our burden of

3    proof.  All you need to find is that it is more probable than

4    not that Mr. Trump did what E. Jean said he did.

5             So how do we know it was spring of 1996?  Well, first

6    of all, E. Jean Carroll knows that the assault happened on a

7    day that she was filming her E. Jean television show at the

8    America's Talking network.  That network, as you heard, only

9    existed from July 1994 to July 1996.  So we know for sure that

10   it has to be within those two years.

11            Next, Ms. Carroll told you that she was wearing a wool

12   dress with tights that day, but no coat.  That means the

13   weather was cool enough for her to wear a warm dress, but not

14   cold enough for her to need a coat.

15            We also know that her friend Lisa Birnbach published a

16   magazine article about Donald Trump in February 1996.  You see

17   it there on the right side of your screen.  And we also know

18   that Ms. Birnbach never would have agreed to go down to

19   Mar-a-Lago to interview Donald Trump if Ms. Carroll had already

20   told her about the sexual assault.  So that means the attack

21   must have happened after this article was published on February

22   12, 1996.

23            There is more.  Lisa Birnbach also explains that when

24   E. Jean Carroll called her immediately after the attack, she

25   was giving her two young kids dinner, so it must have been

between 6 and 7 p.m.  And here's what's crucial.  Ms. Carroll,

in turn, said that it was already pretty dark outside when she

was on Fifth Avenue calling Ms. Birnbach.  It is now early May.

Think about when the sun set last night, think about when it

set a month ago, and think about when the sunset a month before

that.  It had to have been early spring.

Ms. Carroll also told you that she has long suspected

the attack happened on a Thursday.  Why Thursday?  As you heard

from the Bergdorf Goodman witnesses, Thursday was the only day

when the store was open after 6 p.m.  It makes sense that the

attack would have happened on a Thursday since, as Ms. Carroll

testified, she drove to the store after she finished filming

her TV show in Fort Lee around 5 p.m.  If the store had closed

at its regular time the other days of 6 p.m., she wouldn't have

had enough time to drive to New York City, go into the store,

shop, come back out, meet Mr. Trump, etc.

Now it is true that Ms. Carroll cannot recall the

precise date of the attack.  If it was a Thursday in the early

spring of 1996, there are about a handful of days that it could

have happened.  Donald Trump wants you to think that this is a

huge weakness in Ms. Carroll's case, but it's not.  That's

because when Donald Trump assaulted Ms. Carroll, she wasn't

thinking about the date.  She was trying to come to grips with

the fact that she was being attacked, and she was desperately

trying to fight him and get away.  The details of the attack

1  itself—where it happened, how it felt—she remembers all that

2  with great detail, but she can't specify the date.  You heard

3  Dr. Lebowitz talk about this during her testimony, and I'm

4  going to come back to that later.

5          Going back to her narrative, as Ms. Carroll testified,

6  after leaving work in New Jersey, she drove across the

7  GW Bridge and down to Bergdorf Goodman on 58th Street and

8  Fifth Avenue.  She parked her car on 58th Street in the garage

9  and entered the store at the 58th Street entrance across the

10  park, really, from the Plaza Hotel.

11          She spent some time looking for whatever it was that

12  she had wanted to buy.  She doesn't remember what it was.  She

13  didn't find it, and was about the leave the store through the

14  58th Street entrance.

15          Ms. Carroll told you that just as she was leaving the

16  store, she noticed Donald Trump coming in the other way through

17  the glass doors.  Trump held up his hand like this to stop her

18  and said, Hey, you're that advice lady.  Ms. Carroll, E. Jean

19  Carroll, in kind, responded, Hey, you're that real estate

20  tycoon.  In other words, they recognized each other.

21          Let me now talk about that.

22          Donald Trump was a familiar person in New York City at

23  this time, definitely not as famous as he is today, but he was

24  fairly well known.  He was known for his real estate projects,

25  like Trump Tower, and his love life was routinely featured on

1    the pages of New York City tabloids, so it was no surprise that

2    Ms. Carroll recognized Donald Trump.  But it's also no surprise

3    that Trump recognized Ms. Carroll.

4            Bear with me.  I'm going to take you through this step

5    by step.

6            First of all, you already know that Trump and Carroll

7    had met each other at least once before.  You saw this

8    photograph of them and their spouses talking at a party and

9    laughing at a party in the late '80s.

10           But more importantly, remember what Donald Trump

11   called E. Jean Carroll when he ran into her?  He called her

12   "that advice lady."  Why would he say that?  Well, Donald Trump

13   loves to watch TV.  He admitted during his deposition that he

14   watched *Good Morning America* and *The Today Show*, two shows that

15   E. Jean Carroll regularly appeared on at that time.  We also

16   know that Donald Trump was friends with Roger Ailes,

17   Ms. Carroll's boss at the America's Talking network.

18           During Ms. Carroll's testimony, you saw a video of

19   Roger Ailes and Donald Trump on Roger Ailes' talk show, which

20   was called *Straightforward* in November 1995.  Remember that?

21           (Video played)

22           MS. KAPLAN:  Okay.  So how do we know this was

23   November 1995?  Because in the video, Donald Trump talks about

24   being the grand marshal of a parade that took place on November

25   10, 1995, the Veterans Day parade which he admitted during his

N582Car1                        Summation - Ms. Kaplan

1    deposition.  You heard that on his deposition video.  And I bet

2    you were wondering when we showed you this video why in the

3    world we were showing it to you.  The reason is because the

4    Ailes talk show was filmed at the very same New Jersey studio

5    where E. Jean's advice show was also filmed, and it was filmed,

6    we now know, only a few months prior to the day that Mr. Trump

7    and Ms. Carroll ran into each other at Bergdorf

8    Goodman——November, early spring.  Trump may well have seen

9    E. Jean somewhere at the studio when he taped that show.

10           But that's not all.  As Ms. Carroll told you, the

11   Roger Ailes show reran on TV every weeknight at midnight

12   immediately following the rerun of her show, which started at

13   11 p.m.

14           Now I'm going to have to take people back in time a

15   bit.

16           (Continued on next page)

N585car2                      Summation - Ms. Kaplan

1              MS. KAPLAN:  Remember -- and I apologize for the

2     younger members of the jury life -- remember, this was the

3     mid-1990s, way before today's world of streaming, of YouTube,

4     of all that stuff.  Back then, in the old days, if you wanted

5     to watch a TV show you figured out what time it ran, you put

6     the channel on to the right channel, and you waited for it to

7     start.  Sometimes you might catch the last few minutes of the

8     previous show.  As a result, if Donald Trump wanted to watch

9     his friend Roger Ailes' show, including the episode that he was

10    featured on, that's what he would have to do.  He would have to

11    turn his TV to the America's Talking channel, wait for Roger

12    Ailes' show to start, and unless he did that at the exact right

13    moment, he would have seen the end of E. Jean's show.

14             Going back to the timeline -- that's why we know that

15    Donald J. Trump knew who E. Jean Carroll was that day.  Let me

16    go back to the timeline.

17             As E. Jean Carroll explained, she and Donald Trump

18    stopped to chat just inside the 58th Street doorway of the

19    store.  Mr. Trump told Ms. Carroll that he was shopping for a

20    present for a woman and he asked her as the advice columnist to

21    help him pick something out.  Let's pause again to show how and

22    why the evidence confirms this.

23             As you recall, Donald Trump claimed during his

24    deposition that he almost never went to Bergdorf Goodman.  This

25    is classic Donald Trump, his testimony gets stronger and

1  stronger, his denials get stronger and stronger as testimony

2  goes on.

3           Let's watch.

4           (video played)

5           MS. KAPLAN:  But we now know that that is not true.

6  Robert Salerno, the former Bergdorf Goodman employee testified

7  here, under oath, that he, himself, actually saw Donald Trump

8  at Bergdorf Goodman in the mid-1990s.  Ms. Beall testified that

9  she once saw him right outside the store on the corner.  And

10 that's not at all surprising.  Remember, Bergdorf Goodman was a

11 block away from Trump Tower and only diagonally across the

12 street from the Plaza Hotel, which Donald Trump used to own.

13 It obviously makes sense that he would shop there from time to

14 time.

15          Going back to Ms. Carroll's account.  E. Jean at first

16 suggested that he buy the woman a handbag, then a hat.  Those

17 departments were both on the ground floor where there were only

18 a few other people, as would be typical on a Thursday after

19 6:00.  You heard both Ms. Beall and Mr. Salerno testify that

20 Thursdays weren't busy and there were far fewer sales than at

21 peak times.

22          Ms. Carroll explained when she testified that a couple

23 people in the store did in fact recognize Donald Trump, one of

24 them was a sales attendant who smiled but didn't say anything

25 to them.  This, too, is supported by the evidence.  As

1    Ms. Beall told you, sales attendants were trained not to say

2    anything when famous people came into the store, especially

3    when a famous man was in with a woman who was not his wife.

4    Mr. Salerno told you the staff were trained to basically ignore

5    and not pay attention to celebrities.

6         Going back to the narrative.  Trump eventually said

7    that he wanted to go look at lingerie.  They took the escalator

8    up to the sixth floor, Ms. Carroll testified that she didn't

9    notice anyone else as they rode up.  Mr. Trump's lawyers seemed

10   fixated on this point when they questioned E. Jean Carroll.

11   They tried to make it seem like she was saying that there was

12   no one else in the whole entire store but that's not what she

13   said.  She said that she and Donald Trump were so engaged in a

14   playful, funny, back and forth, that she didn't notice anyone

15   else.  Maybe there were people on the other floors, maybe there

16   were people on the escalators going down, but Ms. Carroll

17   didn't notice them and that makes sense.

18        Also, as Mr. Salerno told you, there were walls around

19   the escalators at Bergdorf Goodman, meaning that you couldn't

20   see sideways out from the elevator as you went up.  This

21   further explains why Ms. Carroll would not have noticed anyone

22   else as they traveled up to the sixth floor or even as she went

23   back down after the attack.

24        OK.  Back to what happened.  As Ms. Carroll told you,

25   she and Donald Trump rode the escalator up to the lingerie

N585car2                    Summation - Ms. Kaplan

1   department on the sixth floor, turned left, and walked through

2   a few other sections before arriving at lingerie.

3   Ms. Carroll's description of the layout of the sixth floor is

4   completely consistent both with the architectural drawings you

5   saw -- and you have one in front of you, PX- 24 -- and with the

6   testimony of the Bergdorf witnesses.  In particular -- am I

7   going to be able to trace on this, Mr. Craig or Mr. Lam?

8           In particular, Ms. Beall, whose office was on the same

9   floor over here, told you that if you were coming up the

10  elevator on the sixth floor, this is what you would have to do.

11  You would come up here, you would go around, around here, and

12  you would go in here and the lingerie department was right

13  there.  That fits with Ms. Carroll's description; a left off

14  the escalator, then continue on, bearing right, until you

15  arrive at lingerie.

16          Ms. Carroll told you that she didn't see anyone on the

17  sixth floor and that the lingerie department was basically

18  empty when they got there; no customers, no sales attendants.

19  Another issue that Mr. Trump's team made a big deal out of in

20  both his opening statement and during his cross-examination of

21  Ms. Carroll, Mr. Tacopina tried to use Ms. Carroll's own words

22  to challenge the idea that the lingerie department could

23  possibly have been empty.  But you and yourselves have actually

24  heard from the people who would know -- Ms. Beall and

25  Mr. Salerno.  What did they say?  Ms. Beall told you that on

1  Thursday evenings, traffic in the lingerie department was very,

2  very low.  Mr. Salerno told you that sales in the lingerie

3  department were less than 1 percent of Bergdorf Goodman's total

4  revenue.  He added that Thursday evenings in the spring would

5  be especially slow since spring, unlike the time before

6  Christmas, was not a busy season for the store.  And they both

7  explained that because there were so few shoppers on Thursdays,

8  there were also very few sales attendants.  And the few sales

9  attendants who were there were not, as Trump's team seems to

10  suggest, glued to a particular place or department.  They were

11  encouraged to wander around the floor to help customers, to

12  help restock, and they, of course, were allowed to take breaks.

13         Both Mr. Salerno and Ms. Beall testified that it would

14  not have been unusual for the lingerie department to have been

15  left completely unattended on a Thursday evening.  Ms. Carroll

16  told you that once they got to the lingerie department,

17  Mr. Trump made his way over to the display counter and picked

18  up a see through lilac-grey bodysuit and he tossed it at

19  Ms. Carroll and told her to try it on.  The fact that the body

20  suit was sitting on the counter is supported by Ms. Beall who

21  told you that items would often be displayed on tables or on

22  the top of cabinets and that there was a cabinet -- let me make

23  sure I get this right -- a cabinet or a vitrine, as she called

24  it, right there in the middle of the lingerie department as you

25  walked in.  Ms. Carroll testified that after Trump tossed her

the body suit, she tossed it back to him saying to him, *You try it on, it's your color,* joking that it matched his eyes.

Mr. Trump's lawyers seem to have a very hard time understanding what is going on here.  Mr. Trump, of course, was a very large man wearing a business suit.  Did Ms. Carroll really expect him to try on a piece of women's lingerie over his suit?  But I think we understand what was happening.  This was a combination of humor and flirting.  As Ms. Carroll explained, you take two opposite things, Donald Trump and a piece of women's lingerie, you put them together and you get comedy.  It was a joke.  Ms. Carroll could see the joke in her mind's eye as she did what she used to be a writer at Saturday Night Live.  Had she worked out the technicalities of how Mr. Trump was going to pull the bodysuit over his pants?  Of course not.  That wasn't the point.  The point was that it was funny.

Tragically, ladies and gentlemen, that's when things suddenly took a very, very dark turn.  Mr. Trump guided Ms. Carroll by her arm in the direction of the dressing room.  They entered the room and he then immediately shut the door, a door that the Bergdorf Goodman employees told you would have locked automatically.  You heard Ms. Carroll testify about how much she regrets going into that dressing room with Donald Trump that day, how she has asked herself time after time after time why she allowed herself to get caught up in that

1  situation.  She testified that for many years and, indeed, I

2  think to this day, she feels embarrassed, ashamed, and above

3  all stupid, and that she blamed herself for what happens next.

4  As you heard from Dr. Lebowitz, she still does.

5          How could she have agreed to go into the dressing room

6  with Donald Trump?  That's a question one might ask today with

7  the benefit of hindsight, just as Ms. Carroll has asked it over

8  and over again.  But that's not what Ms. Carroll was thinking

9  in the spring of 1996.  To her the situation was harmless, it

10  was funny.  She trusted Donald Trump.  She didn't see him as a

11  threat the way some women might view him today.  He was known

12  as a playboy, a man about town, but not as a man who abused or

13  assaulted women.

14          As soon as they entered the dressing room, Trump

15  suddenly pounced.  He closed the door, he lunged at

16  Ms. Carroll, he pushed her against the wall causing her to hit

17  her head backwards against the wall and he pressed his mouth

18  against hers.  Ms. Carroll told you that she was shocked.  She

19  laughed, actually, in fear and panic, trying to get back to the

20  way things were before, trying to kill anything that was sexy

21  or erotic about what was going on.  She pushed back at Trump,

22  trying to get him off her but at first she couldn't.  She

23  weighed at the time only 120 pounds, he weighed at least a

24  hundred pounds more than she did.  She continued fighting,

25  pushing, and kicking at him.  She tried to stomp him on his

N585car2                    Summation - Ms. Kaplan

shoes with her 4-inch high heels.  She also tried to hit him

with her purse, trying to do anything to make him stop.  Trump

pinned her against the wall with his shoulder.  At the same

time he reached up under her dress and he pulled down her

tights.  He grabbed her by the pussy or vagina -- I apologize

for my language -- and then he shoved his fingers inside her.

You heard Ms. Carroll describe how incredibly painful that was.

Trump then removed his hand and shoved his penis inside her.

Continuing to fight, Ms. Carroll was finally able to get a knee

up high enough to push Trump off of her.  Terrified and

stunned, she opened the dressing room door and escaped.  She

fled through the store and out onto the Fifth Avenue exit.  The

whole attack happened quickly, a few minutes at most, but it

would stay with Ms. Carroll forever.

          In the immediate aftermath of the attack, as you

heard, E. Jean Carroll told two separate people what happened.

She called her friend Lisa Birnbach from the sidewalk on Fifth

Avenue outside the Bergdorf Goodman and she told her friend

Carol Martin a day or two later.  You saw and heard both of

them in this courtroom.  Let's talk first about Ms. Birnbach.

          She told you that she received a phone call from

Ms. Carroll in the spring of 1996 when she was giving her kids

dinner.  Ms. Birnbach said when she picked up the phone,

E. Jean Carroll sounded agitated like she was hyperventilating.

Lisa Birnbach told you that E. Jean proceeded to tell her that

1    she had gone into a dressing room with Donald Trump, that he

2    pushed her up against the wall, he hit her head and pulled down

3    her tights and forced himself inside her.  Ms. Birnbach told

4    you that upon hearing what had happened, she left the kitchen

5    so her kids wouldn't be able to overhear her, and told

6    Ms. Carroll, in no uncertain terms, E. Jean you have been

7    raped.  The fact that she left the kitchen, by the way, is a

8    very telling detail, it is the kind of detail that someone

9    doesn't make up.

10          Ms. Birnbach also told Ms. Carroll to tell the police,

11   to go to the police, she even offered to go with her.  But as

12   Lisa Birnbach testified, E. Jean Carroll said she didn't want

13   to go to the police and she made Lisa promise never to tell

14   anyone about it ever again.  Lisa Birnbach agreed to that.  As

15   she explained it to you, it was E. Jean Carroll's story, it was

16   her secret, it was not Lisa Birnbach's story or secret to tell,

17   so she promised not to tell anyone and she kept that secret for

18   two decades.  Let's now go to Carol Martin.

19          A day or two after the attack at Bergdorf Goodman,

20   E. Jean approached her good friend Carol Martin, who was

21   actually her closer friend at the time, at the America's

22   Talking offices in New Jersey.  They decided that they would

23   talk at Ms. Martin's house which is only 10 minutes away, by

24   car, from work.  After work they each drove their own cars to

25   Ms. Martin's house and they went in the house and sat down at

N585car2                    Summation - Ms. Kaplan

1   the kitchen island in Ms. Martin's house.  At that island

2   Ms. Carroll described what Donald Trump had done to her.  Carol

3   Martin told you that she was shocked by what she heard and she

4   hugged Ms. Carroll, continually asking her if she was OK.

5   Carol Martin also testified that she told E. Jean Carroll that

6   it would be crazy for her to report the attack to the police.

7   She advised E. Jean to tell no one and to do nothing.  Trump,

8   in Ms. Carroll's mind, was way too powerful, he would bury her

9   if she came forward.

10          Together in this courtroom Lisa Birnbach and Carol

11  Martin provided powerful, independent corroboration of E. Jean

12  Carroll's story.  Ms. Carroll spoke with both of them at the

13  time separately.  They didn't know each other very well at that

14  point in time and weren't really friends but they each gave

15  Ms. Carroll very different advice and they both sat right over

16  there and told you that they believed Ms. Carroll when she

17  first told them what had happened and they continue to believe

18  her today.

19          Let's now turn to what happened after the attack.

20  E. Jean Carroll returned home that evening with pain in her

21  head and in her vagina, but because of the kind of person she

22  is, rather than taking anything, anything stronger than an

23  aspirin or going to the doctor, she went right to bed.  She

24  even went to work the very next day.  But despite her best

25  efforts, the assault continued to interfere with her life.  She

1  testified that she had regular flashbacks or intrusive

2  memories.  She never again engaged in an intimate relationship

3  with another man.  You heard Ms. Carroll explain to you that

4  she lost out on so much of life; no walking the dog together,

5  no cooking dinner together, no one to sit with while you are

6  watching TV.  And for years she never told anyone else about

7  what had happened in that dressing room.  That is partly

8  because of how she was raised.  You heard her sister Cande

9  Carroll explain that in their family they never talked about

10  personal issues.  E. Jean Carroll faced life's challenges by

11  putting on the public persona that she had built her career

12  around, the public E. Jean, as she explained it here in this

13  courtroom.  She kept her pain and isolation or the private

14  E. Jean to herself.  Her sister explained to you that, as

15  children, they were always told by their father to always have

16  a smile on their face, and that's what E. Jean Carroll did.

17  And she, justifiably, was scared that Donald Trump would

18  brutally retaliate if she spoke out, as her friend Carol had

19  warned her he would do, and as we all know since we are sitting

20  here today, he eventually did.

21         Over two decades later, in 2018, Ms. Carroll set off

22  on a road trip in order to write her next book.  During that

23  trip, news broke on the Internet and nationwide that many women

24  were speaking out about being sexually abused or assaulted by

25  the famous Hollywood producer Harvey Weinstein.  Ms. Carroll

1   started drafting a list of the men who had mistreated her; some

2   in small humorous ways, like the guy who failed to fix her car,

3   and others in big ways.  But, at first, one man in particular

4   was not it on that list.  It would be weeks before she would

5   decide to include Donald Trump.  She told you here herself why

6   she finally came forward.  She could not be silent any longer.

7   It was time, finally, to tell her readers the truth.

8           In June 2019, an excerpt of her book recounting the

9   attack by Trump, was published in *New York* magazine.  As it

10  turns out, Carol Martin was 100 percent right.  Donald Trump's

11  response was immediate and it was brutal.  He went much further

12  than just denying her claim.  From the White House he unleashed

13  a series of vicious lies telling the world that she had made

14  the whole thing up, that she was doing it as part of a

15  political conspiracy, and that she was not his type.  As a

16  result, Ms. Carroll lost her job at *Elle* magazine where she had

17  worked for the last 27 years.  But perhaps much worse than

18  that, she lost the trust of her readers.  She had spent almost

19  four decades as a writer working so hard to establish her

20  reputation for honesty and integrity.  Her former Editor Robbie

21  Myers told you that to her readers, E. Jean Carroll was a

22  beloved truth-teller, but in a couple of Tweets, Mr. Trump

23  wiped that all away.

24          The backlash from Donald Trump's statements was

25  terrifying.  You heard E. Jean Carroll tell you that she

N585car2                    Summation - Ms. Kaplan

1    started sleeping at night with a loaded gun in her bed.

2              E. Jean Carroll made the decision, one of the bravest

3    things I have ever seen, to do the one thing she thought she

4    could do to help restore her name, her reputation for honesty,

5    and her integrity -- she filed a lawsuit against Donald Trump.

6    But even that did not stop him.  In October 2022, just last

7    year, just as Ms. Carroll told you that she was finally

8    starting to get back, to regain her footing after the earlier

9    attack, Mr. Trump doubled down on every nasty lie he had told

10   about her in 2019 calling her story a con job and a hoax.

11             As Ms. Carroll told you, just as she was getting back

12   up and feeling better, this is the statement that went out.

13   So, when New York passed a law allowing survivors of sexual

14   assault to bring claims, even if the attack happened years ago,

15   Ms. Carroll filed this lawsuit that we are sitting here today

16   for.

17             Now, Ms. Carroll's -- withdrawn.

18             I forgot to show this to you and it is my fault.

19   These are the responses that E. Jean Carroll got -- some of the

20   responses she got, many, many in response to the October 2022

21   statement, and I will let you take some time to read them.  I

22   apologize for that.  I apologize in advance, given the

23   language.  I'm not going to try to read them out loud.

24             OK.  Ms. Carroll's case is not only corroborated by

25   documents like you just saw, and by testimony that I have been

N585car2                    Summation - Ms. Kaplan

talking about, it is also corroborated by science, by what

psychologists have learned about what happens to someone when

they experience trauma like a sexual assault.

        Dr. Leslie Lebowitz is a clinical psychologist who has

been seeing people who have experienced trauma for four

decades.  She treats veterans for PTSD following combat.  She

has worked with veterans in the Air Force to train them on how

to deal with sexual assault.  She has worked at some of the

most important medical centers that have developed the current

treatment protocols for how you deal with people who have been

injured by trauma.  Dr. Lebowitz's testimony backs up each and

every aspect of what Ms. Carroll told you, from how she reacted

to the sexual assault itself, to how she remembers it, to how

she was harmed by the assault in the long-term.  Let's start

with the sexual assault itself.

        Dr. Lebowitz explained exactly what happens to a

person when they experience trauma.  What happens is that a

person's brain is flooded with stress hormones.  The frontal

lobe of the brain -- the part of the brain that we use to make

decisions, to think through alternatives and decide what to

do -- that part of the brain is significantly weakened.

Instead, the older, the more primitive part of the brain in the

back takes over.  As a result of that, people tend to act in

really strange ways, in ways that may seem irrational.

Dr. Lebowitz explained how sometimes people forget -- or often

1    people forget how even to dial 911.  Dr. Lebowitz gave you a

2    great example of this.

3            Remember what she told you about her mother's friend

4    who was a child in Finland during World War II?  She told the

5    story that this woman was with her mother as a child and bombs

6    were falling.  The force of a bomb blew away the mother's hat.

7    Instead of grabbing her daughter's hand and running to safety,

8    the mother ran after her hat.  That mother loved her child.  In

9    that moment she didn't consciously choose to run after her hat,

10   she wouldn't have expected to do that and she probably wouldn't

11   be able to explain to you sitting here today why she did it.

12   That's the brain chemistry of a person experiencing trauma.

13           Now, you heard Donald Trump's lawyers repeatedly ask

14   Ms. Carroll why she was laughing when she got first pushed up

15   against the wall.  They repeatedly asked her why she didn't

16   scream.  They acted as if Ms. Carroll's response was unusual,

17   unheard of, implausible.  But you now understand why those

18   reactions are consistent with the behavior of someone who is

19   experiencing trauma.  Dr. Lebowitz explained it to you.  People

20   have really strange, really unexpected responses to traumatic

21   situations all the time.

22           Remember when Mr. Trump's lawyers asked Dr. Lebowitz

23   whether or not screaming would be consistent with a rape?  Here

24   is what she said.  She said that not screaming would not only

25   be absolutely consistent with being raped, but based on her

1    40 years of clinical work, screaming is one of the least likely

2    things that actually occurs.

3         Dr. Lebowitz' testimony also helps to explain the ways

4    in which Ms. Carroll remembered the attack by Donald Trump

5    after it happened.  So, first of all, Dr. Lebowitz told you

6    that people tend to remember lots of details from the beginning

7    of a traumatic event but far fewer details at the end.  Why is

8    that?  It's because those stress hormones, as they come into

9    the brain, over time, become toxic and they impinge on the

10   brain's ability to remember things.

11        In addition, there are certain things that people

12   remember from a trauma better than others.  What people tend to

13   remember are sense reimpressions -- the way something smelled,

14   the way it felt -- since its easier for the brain to remember

15   that and to store it.  But people may not remember more

16   complicated things like the context of what was happening when

17   it was going on outside the trauma.

18        Remember the example Dr. Lebowitz gave you?  She

19   talked about parents who thought their child had been hit by a

20   car when they heard the screeching of tires outside their

21   house.  The sinking feeling that they felt in their gut when

22   they ran outside and didn't see their child.  That sinking

23   feeling -- I am sure we have all experienced it -- may stick

24   with you for years and years.  But even if that sinking feeling

25   remains, the parents -- and I am sure you have also experienced

that too -- may later disagree about what exactly the date was

when that happened or even what house they were living in at

the time.

Think about how that explains E. Jean Carroll's

testimony here.  She remembers certain things from her

encounter with Donald Trump in vivid, technicolor detail.  She

remembers the back and forth about trying on the bodysuit in

the lead-up to the assault.  She remembers the gifts they were

talking about, the hat that she said Donald Trump petted and

the handbag that they looked at on the first floor.  She

remembers distinctly some of the exact words they exchanged.

*Hey, you're that advice lady.*  She remembers exactly how it

felt to have Trump's fingers inside her.  And -- I find this

part really telling -- she remembers the sound of Trump's heavy

breathing as he was facing the wall next to her neck.  But

Ms. Carroll does not remember exactly how she got out of the

store and she has made no secret of the fact she doesn't

remember the exact date.  She remembers -- just like

Dr. Lebowitz said, she remembers certain things vividly and

other things not so much.  Again, that's exactly what you would

expect to see in someone who has survived trauma.

Dr. Lebowitz also testified to you about how

Ms. Carroll processed the rape and how that contributed to her

decision not to talk about it for so many years.  She said

that -- Dr. Lebowitz said that E. Jean Carroll experienced what

N585car2                    Summation - Ms. Kaplan

1    is called self-blame.  In many ways that kind of means what it

2    says, it is to blame yourself.  But the problem with self-blame

3    is that people may blame themself for something, even like

4    here, when they have no responsibility for it.  They know in

5    their head it wasn't their fault but they still feel in their

6    gut like it was.

7         Ms. Carroll presents a classic case of self-blame.

8    Self-blame helps to explain why she didn't go to the police,

9    why she didn't go to store security right after the assault,

10   and it explains why she had so much difficulty talking about

11   the assault in the years that followed.

12        Finally, Dr. Lebowitz talked about the long-term harm

13   that the sexual assault caused Ms. Carroll.  Self-blame,

14   itself, is a big part of that.  Imagine what it would feel like

15   to feel like you were responsible or to blame being sexually

16   assaulted.  It made Ms. Carroll feel dirty and unworthy and

17   spoiled, like spoiled goods, and ashamed.

18        Ms. Carroll also experiences what psychologists call

19   intrusive memories.  They come in snippets or flashes.  She

20   doesn't, to this day, know exactly what the triggers are.  She

21   might unsuspectedly see an image of sexual assault.  She might

22   actually feel physically Trump's fingers.  When these

23   intrusions occur, she has to work really hard to bat them away.

24   That process of trying to get the ugly thoughts and intrusive

25   memories out of her mind is itself really tiring and

1    emotionally draining.  But perhaps, most important of all,

2    Dr. Lebowitz testified that the sexual assault caused E. Jean

3    Carroll to engage in what are called avoidant behaviors, that

4    means something you do something to avoid something else.  For

5    Ms. Carroll, this meant that she would avoid engaging in the

6    types of activity that she blames herself for that led to the

7    sexual assault.  What does that mean?  It means that when she

8    encounters a man of a similar age who might seem like a

9    romantic possibility, she literally shuts down.  She doesn't

10   flirt, as she did that day, with Donald Trump at Bergdorf

11   Goodman.  She doesn't engage, as she did that day, with Donald

12   Trump; she avoids eye contact.  As Dr. Lebowitz told you, it is

13   like a metal grate being pulled down over the front of a bodega

14   in New York City.  This is a huge departure from the way

15   E. Jean Carroll lived her life before the assault.  She used to

16   have a healthy dating life, she was married twice, she loved

17   romance, she loved being in love, she continued to date men

18   until right up when the sexual assault happened.  But

19   afterwards, she cut herself off from any possibility of

20   developing a romantic relationship.  For almost 30 years she

21   hasn't had a partner, for almost 30 years she hasn't had

22   companionship.

23       Finally, Dr. Lebowitz did not exaggerate, in any

24   respect, Ms. Carroll's harms.  Dr. Lebowitz told you, and

25   recognizes, that Ms. Carroll is a very resilient person.  She

1    acknowledged that E. Jean Carroll has drawn on that resiliency

2    and strength to cope with the trauma she experienced.  She did

3    not diagnose E. Jean Carroll with PTSD.  She says she has

4    symptoms in two of the categories but not all four that are

5    necessary, and that she is not disabled the way she talked

6    about with some of those veterans she had diagnosed with PTSD.

7             Dr. Lebowitz also freely acknowledged certain aspects

8    of Ms. Carroll's life after the sexual assault that might seem

9    weird or unusual to you and that Mr. Trump's lawyers pointed

10   out.  She was aware that Ms. Carroll had watched *The Apprentice*

11   on the TV, she was aware that E. Jean Carroll kept the dress

12   from the day of the assault, and she was aware that E. Jean

13   Carroll returned to Bergdorf Goodman.  She explained that these

14   behaviors were consistent with who E. Jean is, her need to

15   avoid the fact that she had been negatively impacted in any way

16   by Donald Trump.  In other words, throwing away a very

17   expensive dress, refusing to watch a popular TV show that all

18   your friends were talking about, or not going back to her very

19   favorite store that would have forced her to acknowledge

20   something too painful for her, that the assault had impacted

21   her deeply.

22            Now, one more thing on Dr. Lebowitz.  Donald Trump's

23   lawyers tried to suggest that maybe Ms. Carroll had somehow

24   tricked Dr. Lebowitz into arriving at her opinion based on

25   lies, on false or exaggerated information.  Do you remember

1   what Dr. Lebowitz said in response to that?  She testified that

2   it was her opinion, as a psychologist with 40 years of

3   experience, that E. Jean did not lie about her symptoms and

4   experiences in order to benefit her case.  This, ladies and

5   gentlemen of the jury, is a very big deal.  The psychological

6   expert in this case told you that she believes Ms. Carroll.

7         I now want to talk about the ways Mr. Trump and his

8   team have tried to attack all the evidence that we have just

9   gone through supporting E. Jean Carroll.  One principal line of

10  attack, the one main line of attack that they have has focused

11  on the way that E. Jean Carroll has lived her life in the years

12  since she was attacked.

13        During his cross-examination of Ms. Carroll,

14  Mr. Tacopina asked her a lot of questions about the fact that

15  in the years after the assault and right up until today, if

16  someone on a TV show or a podcast or in the hallway outside

17  this courtroom asked E. Jean Carroll how she was doing, she

18  would almost inevitably always answer that she is fabulous.

19  Ms. Carroll freely acknowledged that in many of her public

20  appearances she would say that her career was going well, that

21  she was happy.  She also acknowledged that from time to time

22  she even would go to parties with her friends.  When

23  Mr. Tacopina asked these questions on cross-examination, he

24  acted as if E. Jean Carroll had made some huge confession, as

25  if there were something wrong with this behavior, as if it is

N585car2                   Summation - Ms. Kaplan

1    somehow problematic that E. Jean Carroll has tried her best to

2    live a happy life and present a brave, brave face to the world.

3    But Ms. Carroll testified here that as much as she had to try

4    to portray the public E. Jean as happy and successful, as

5    fabulous -- she used her favorite word -- in private she has

6    continued to suffer a great deal.  She has tried to live her

7    life on her own terms as best she can.  She has continued to

8    work.  She talked about setting up her Substack after she was

9    let go at *Elle*.  She has enjoyed time for happiness.  And she

10   has definitely gone to parties with friends.  Why is Mr. Trump

11   trying to blame Ms. Carroll for these things?  His argument

12   seems to be that if a woman is going to accuse a man of sexual

13   assault she must play the part, she must act the way a rape

14   victim is somehow supposed to act.  But this makes no sense and

15   you know that.  If a person is the victim of any other kind of

16   wrongdoing, if they are injured in a car accident, if they get

17   mugged on the street, are they required to live a life of total

18   suffering and helplessness in order to seek justice in the

19   courts?  Of course not.  But when it comes to survivors of

20   sexual assault, like Ms. Carroll, Donald Trump thinks she is

21   somehow not entitled to assert her claim if she has taken any

22   step to pick up the pieces of her life, to move on, to seek out

23   friends, to seek out company, to go to parties.  That's just

24   plain wrong.

25           Now, you have heard Mr. Trump's team say over and over

N585car2                    Summation - Ms. Kaplan

1   again that you should rely on Ms. Carroll's interview on

2   Anderson Cooper, that it somehow sheds light on whether or not

3   she was sexually assaulted.  For example, in his October 2022

4   TruthSocial post that is Plaintiff's Exhibit 4, Donald Trump

5   says:  If you watched Anderson Cooper's interview with her

6   where she was promoting a really crummy book, you will see that

7   it was a complete scam.

8           At his deposition in Florida that happened just a week

9   after that, Mr. Trump testified that on the Anderson Cooper

10  show E. Jean Carroll said that she loved it, that she said it

11  was very sexy to be raped, he even claimed that she said

12  something to the effect that she loved being sexually

13  assaulted.

14          Let's watch for ourselves.

15          (video played)

16          MS. KAPLAN:  You know what E. Jean actually said.  She

17  did not say being raped by Mr. Trump was sexy, or that she

18  loved -- loved -- being sexually assaulted by him.  Not at all.

19  She explained that she was talking about our popular culture

20  and entertainment, shows like *Game of Thrones* where rapes

21  happen over and over again and that's part of drawing people

22  into the audience.  She said that what Donald Trump did to her,

23  on the other hand, was violent and horrible.

24          Ms. Carroll testified, and you saw it for yourselves

25  in this courtroom, that she still has a very, very hard time

1    using the word rape.  But as we heard Dr. Lebowitz explain,

2    E. Jean's refusal to call what happened to her rape or to

3    identify herself as a victim does not mean that she was not

4    sexually assaulted.

5              Now, another way that Donald Trump responds to all of

6    this is by trying to get you to believe in the big lie.  What

7    do I mean when I say the big lie?  I mean that Mr. Trump's

8    lawyers need you to find that not only E. Jean Carroll, but

9    also Lisa Birnbach and Carol Martin are all lying, that they

10   are all part of some part of coordinated conspiracy, that they

11   somehow joined forces and agreed to come up with a story about

12   an assault that happened nearly 30 years ago simply because

13   they hate Donald Trump.  I'm sorry.  Seriously?  That's just

14   ridiculous.

15             First of all, there is no evidence -- not a shred --

16   that any such conspiracy exists.  No testimony.  No documents.

17   Nowhere in all of those pages of e-mails and texts between

18   E. Jean Carroll, Lisa Birnbach, and Carol Martin did you see

19   anything suggesting that they all agreed to come up with a lie

20   that Donald Trump raped E. Jean Carroll.  In fact, you saw the

21   opposite of that.  You heard Ms. Martin read from a text she

22   sent to a friend in 2021 -- a friend, so it is not Lisa

23   Birnbach and she is not texting E. Jean Carroll -- another

24   friend, in which she expressed frustration that she was dealing

25   with the publicity from this case and she suggested that that

1   was due to a simple chat with a friend 25 years ago.  That's

2   the chat she testified to in the kitchen.

3          And you also saw the text that Lisa Birnbach sent

4   E. Jean Carroll right after she agreed to become publicly

5   identified as one of the people that E. Jean Carroll told.

6   Ms. Birnbach explained that even though that she was scared and

7   concerned that then president Donald Trump would attack her she

8   says, "it wasn't political in 1996 when you told me, it was

9   personal."

10          These are private texts that Carol Martin and Lisa

11  Birnbach never expected to see the light of day, much less to

12  have you read them here in this courtroom.  And far from

13  suggesting that these women were somehow in cahoots with

14  E. Jean Carroll to lie about Donald Trump assaulting her, they

15  are rock solid evidence that all three of them are telling the

16  truth.

17          What about the defense's theory that E. Jean, Lisa and

18  Carol hatched this conspiracy because they really, really hated

19  Donald Trump.  I'm going to be honest with you.  It is true for

20  sure that Lisa Birnbach and Carol Martin don't like Donald

21  Trump.  They oppose his political positions.  They didn't think

22  he was a good president, to put it mildly, and they certainly

23  don't want him to become president again.  And, by the way,

24  they're not exactly happy about the fact that he sexually

25  assaulted their good friend.  But the idea that this means that

N585car2                    Summation - Ms. Kaplan

they would hatch a conspiracy in 2017 or 2018 about something
that happened in 1996 is absurd.  As Mr. Tacopina pointed out
in his opening statement, Donald Trump is a figure who elicits
strong feelings in many people.  Mr. Tacopina told you that day
that it's OK if you don't like Donald Trump.  As he explained
and as I agree, the right place to act on those feelings is in
the ballot box, not here in this case.  The same, of course
however, is equally true for Lisa Birnbach and Carol Martin.
Yes, they oppose Donald Trump politically but that has nothing
to do with their testimony in this case.  Lisa Birnbach
confirmed that for you on the witness stand when asked whether
she would perjure herself, lie under oath in order to ensure
that Donald Trump did not become president again she said under
oath "never in a million years."  Joshua Matz said the same
thing.  As much as she regarded the Trump presidency as a
disaster, she said that under no circumstances would she
perjure herself and lie about a sexual assault in order to take
him down politically.

        Think about this for a second.  Lisa Birnbach and
Carol Martin are both successful women with families and
established careers.  Why would someone like Carol Martin, who
through her own grit and determination worked her way up to
become a nightly news anchor in New York City, why would she
agree to lie under oath for anyone, even for E. Jean Carroll?
To suggest that she would engage in that kind of conspiracy is

N585car2                    Summation - Ms. Kaplan

1   literally crazy.

2           In his cross-examination of Carol, Mr. Tacopina

3   focused on some text messages.  In venting to friend and

4   relatives, Carol Martin didn't always say super nice things

5   about her friend E. Jean.  Trump's lawyers have suggested that

6   these private texts and this private venting must mean that

7   Carol Martin is lying.  But you heard from Martin herself.  She

8   testified that she has not always agreed with the way E. Jean

9   has handled the public attention in this case and that she has

10  been concerned that it has taken up too much of E. Jean

11  Carroll's life.  She also testified that she was worried when

12  she became publicly identified about her own safety and about

13  the safety of her daughter and granddaughter.  And while she

14  regrets some of the strong language she used, she also told you

15  that there is nothing in those texts that she hasn't shared

16  directly with E. Jean Carroll.  Indeed, as I am sure some of

17  you know, sometimes that's just the way how close friends talk

18  about each other.

19          But that does not mean that Carol Martin doubted what

20  E. Jean Carroll told her about the attack at Bergdorf Goodman.

21  Carol Martin told you, point blank, that she believes E. Jean

22  Carroll.  If the sexual assault had never happened, why

23  wouldn't Carol Martin, frustrated by the invasion of privacy,

24  frustrated by the concerns about her security, why would she

25  play along with the lie?  If Trump's so-called conspiracy

1  actually existed, why would Carol Martin complain about one of

2  the women in the conspiracy -- E. Jean Carroll -- to friends of

3  hers outside the conspiracy?

4  　　　　Carol Martin did not have to publicly support E. Jean

5  Carroll when she came forward in 2019.  Carol Martin told you,

6  point blank, that she wasn't thrilled about participating in

7  this lawsuit.  She wasn't thrilled about producing her private

8  texts to Trump's lawyers.  She wasn't thrilled about testifying

9  at her deposition, and she certainly hadn't been looking

10 forward to testifying here but she did all of those things and

11 she did all of those things because she was telling the truth.

12 　　　　To be clear, in order to win, Trump needs you to

13 conclude that not only that E. Jean Carroll is lying, but that

14 all three of these women perjured themselves in this courtroom.

15 I think you know that that didn't happen.

16 　　　　At this point I think you can see how the weight of

17 the evidence in this case is extremely lopsided.  On the one

18 hand you have the repeated denials of Donald Trump.  On the

19 other hand, you have the testimony of E. Jean Carroll, Cande

20 Carroll, Cheryl Beall, Robert Salerno, Lisa Birnbach, and Carol

21 Martin, who all corroborated E. Jean Carroll's case and Trump

22 wants you to reject it.  Actually, Trump needs you to reject

23 all of it.  But it doesn't stop there.  You will learn that

24 what happened to E. Jean Carroll at Bergdorf Goodman that day

25 was not an isolated event.

1    At this trial you heard powerful evidence that Donald
2    Trump has an MO.  What's his MO?  He chats up women in a
3    friendly way in a semi-public place, he then pounces on them
4    suddenly or unexpectedly, he then starts kissing them without
5    their consent.  For some of them, including E. Jean, he grabs
6    them by the vagina.  It is not just E. Jean Carroll who fit
7    this pattern.  You heard the testimony of two other women,
8    Jessica Leeds and Natasha Stoynoff who were sexually assaulted
9    by Donald Trump in a very similar way.  Let me start with
10   Jessica Leeds.

11   Jessica Leeds testified that, in 1979, Donald Trump
12   assaulted her on an airplane.  Just a few years younger than
13   E. Jean Carroll, Jessica Leeds was a product of the same
14   generation.  She didn't tell a soul about it.  She knew that
15   things like this happened when she traveled and she didn't want
16   to risk losing her job.  But, in 2016 she watched a
17   presidential debate and heard Donald Trump tell Anderson Cooper
18   that he never kissed a woman without her consent.  She came
19   forward.  And then what happened?  Trump went after her.  He
20   declared that she was lying.  He said -- and again, remember
21   these words -- he told the world that she was not his type.
22   Sound familiar, ladies and gentlemen of the jury?

23   You also heard from Natasha Stoynoff, it happens much
24   later in time, now December 2005.  Her job at *People* magazine
25   is to cover the Trump beat, she covered the Trump family.  In

1    December 2005 she traveled to Mar-a-Lago to write a story about

2    his wife Melania who was then pregnant.  Ms. Stoynoff told you

3    that when Melania left to change her outfit, Trump led Natasha

4    into an empty room, claiming that he wanted to show her a

5    painting, but as soon as they entered the room he closed the

6    door behind them, pushed her against the wall, pinned her down

7    with his shoulder, and started kissing her without consent.

8    Again, sound familiar?

9            Ms. Stoynoff, who is much younger than Ms. Carroll and

10   Ms. Leeds, told several people about the attack right

11   afterwards.  His attorney, Mr. Tacopina, didn't really try to

12   cross-examine her at all.  That's because they know it is true.

13           In 2016 Ms. Stoynoff came forward after hearing

14   Trump's denial in that same presidential debate.  And when she

15   did, yet again, following the MO, Trump publicly disparaged

16   her, denying the attack, and again insulting her appearance.

17   This time he said:  *Look at her.  Go take a look at her.  I*

18   *don't think so.*

19           There is even another similarity.  You heard that just

20   like E. Jean Carroll, neither Jessica Leeds, nor Natasha

21   Stoynoff, screamed.  None of them screamed when Donald Trump

22   was assaulting them.  Not one.

23           So, what do we have?  Three different women, decades

24   apart as you can see on this chart, but one single pattern of

25   behavior.  In that respect what happened to E. Jean Carroll is

1  not unique.  Trump's physical attack and his verbal attacks are

2  his standard operating procedure or MO.  What happened to

3  E. Jean Carroll right in the middle fits this pattern

4  perfectly.

5          Now let's take a look at Donald Trump's side of the

6  story.  As I have said more than once this morning, Trump

7  really offers you nothing.  It is Trump's word against everyone

8  else's word.  As Bugs Bunny used to say at end of the Looney

9  Tunes cartoons I used to loved as a kid:  *That's all, folks.*

10 But why would you believe him?  The testimony in this case

11 shows that Donald Trump has told lie after lie after lie.  What

12 does this tell you?  Donald Trump lies as a matter of habit.

13 He lies about almost everything or anything all the time.  Some

14 of his lies are big, some are not.  But the pattern is clear.

15 Trump decides what to say based on what he thinks will help him

16 most in the moment, not based on what is true.

17         To trust someone they have to be credible.  They must

18 be trustworthy, worthy of your trust.  Time and time again,

19 Trump has shown you in this case that he is not worthy of

20 anyone's trust.  Let me give just a few examples of Donald

21 Trump's clear lies.

22         First, Donald Trump said that he did not shop at

23 Bergdorf's.  That was a lie.  Cheryl Beall saw him right

24 outside the store and Robert Salerno saw him in the store on at

25 least one or two occasions in the mid-1990s.  And you saw on

N585car2                         Summation - Ms. Kaplan

1    the tape that as I was asking the questions about that, he

2    continued to lie.  His lies got bigger during the testimony.

3          Two, Donald Trump said he had never met Ms. Carroll.

4    That was also a lie.  There is a photograph that you have all

5    seen now showing otherwise.

6          Three, Donald Trump said that Ms. Carroll was not his

7    type.  But then, when he was shown a picture of her at his

8    deposition, he confused her with his second wife Marla Maples.

9    And then, when Trump realized that mistake -- again, this is

10   classic -- he told yet another lie.  He said that the

11   photograph was blurry.  Blurry?  You have seen that photograph.

12   There is nothing blurry about that professionally-taken

13   photograph.

14         Donald Trump -- I'm going to do one more.  Donald

15   Trump even lied about his friend Roger Ailes.  At his

16   deposition in 2022, Mr. Trump told me that he hadn't become

17   friends with Roger Ailes until seven or eight years ago.  But

18   you saw the video clip from November 1995 of Donald Trump

19   appearing on Roger Ailes' show.  In that clip, which you saw,

20   they're talking about being on a plane with Trump's daughter,

21   about going to Florida.  Obviously they were already friends in

22   1995.  You want to know why Donald Trump told me that lie?

23   Because admitting that he knew Roger Ailes in the mid-1990s

24   would be further proof that Donald Trump knew E. Jean Carroll.

25   Roger Ailes was E. Jean Carroll's boss at that time.  Donald

N585car2                          Summation – Ms. Kaplan

1    Trump filmed an episode of his talk show at the very studio in

2    New Jersey where E. Jean Carroll worked every single day.

3              Now, Mr. Tacopina is going to get to come up here as

4    he must, it is his job, and tell you that Ms. Carroll is a liar

5    and she is making it all up.  When he does that, think about

6    Donald Trump's MO.  Think about the pattern that he admitted to

7    when he thought no one else, other than Billy Bush, was

8    listening on that bus during the *Access Hollywood* tape.

9              (Continued on next page)

1           MS. KAPLAN:  And when Mr. Tacopina does that,

2    understand that he necessarily is telling you that all of the

3    other witnesses you have heard over the past couple of weeks

4    are also lying.  Donald Trump's defense here is essentially

5    that there is a vast conspiracy against him; that Ms. Carroll

6    conspired with Lisa Birnbach, that she conspired with Carol

7    Martin to fabricate an extreme hoax about Trump; that she

8    somehow also got two former Bergdorf Goodman employees, people

9    who she never met, to join in that conspiracy; and that she

10   somehow was able to convince Natasha Stoynoff and Jessica Leeds

11   to travel here to New York City and commit perjury on the

12   witness stand.  Donald Trump wants and needs you to disregard

13   all the evidence you have heard in this case, to brand all the

14   witnesses who are brave enough to come here and testify as

15   liars.  Does that make any sense at all?  Or does it, instead,

16   suggest that there is one person here who is lying, and that

17   person is Donald Trump?

18           Tomorrow morning you will hear from the judge,

19   Judge Kaplan, who will provide you with detailed instructions

20   on the legal questions you must answer in this case, but -- and

21   you will have that for yourselves tomorrow.  But let me just

22   pause here and talk about something that the judge explained at

23   the beginning of the trial and I'm sure he is going to talk

24   about more tomorrow.  This is not a criminal case.  This is a

25   civil case, which means that if you find Donald Trump liable,

1    he is not going to jail.

2            Because this isn't a criminal case, what we call the

3    standard of proof or our burden as the plaintiff in this case

4    is very different.  In criminal cases, as you probably heard, a

5    jury has to find a defendant committed a crime beyond a

6    reasonable doubt.  That's a very, very high standard, and that

7    standard does not apply here.  But because this is a civil

8    case, the burden of proof is lower.

9            For Ms. Carroll's battery claim, you have to find that

10   it is more likely or more probable than not that Donald Trump

11   did what he did in the Bergdorf Goodman dressing room that day,

12   more likely than not.  That means over 50 percent.  So the

13   question you have to ask yourselves is is it more probable than

14   not that Donald Trump did what E. Jean Carroll and the others

15   have testified to.  We believe that the evidence here is

16   overwhelming that he did it, so that should be a pretty easy

17   question to answer.

18           For Ms. Carroll's defamation claim, the standard of

19   proof is different for several of the elements.  It is instead

20   clear and convincing evidence.  As the judge will explain to

21   you clear and convincing evidence requires something more than

22   just over 50 percent.  It requires you to find that something

23   is highly probable.  But it still doesn't require proof beyond

24   a reasonable doubt.

25           As you work through the various questions in this case

N582Car3                    Summation - Ms. Kaplan

1    in the jury room, remember what the two sides have presented

2    throughout this trial.  On the one hand, you have all the

3    evidence that E. Jean Carroll has presented.  You have her own

4    testimony.  You have the consistent testimony of Lisa Birnbach.

5    You have the consistent testimony of Carol Martin.  You have

6    the consistent testimony of Cheryl Beall and Bob Salerno from

7    Bergdorf Goodman.  You have the testimony of two other women,

8    Natasha Stoynoff and Jessica Leeds, who were attacked by Donald

9    Trump in a very similar way.  You also have the testimony of

10   Dr. Lebowitz, Professor Humphreys, her former boss Robbie Myers

11   and her sister Cande Carroll.

12          On the other hand, you have Donald Trump and Donald

13   Trump alone.  Mr. Trump's defense in this action is to accuse

14   each and every one of the other witnesses of lying, of crafting

15   an elaborate conspiracy, a hoax, which is a word he likes to

16   use.  He is asking you to take his word for it over the word of

17   literally everyone else.

18          And Mr. Trump—and this is very important—is accusing

19   everyone of lying about everything.  He didn't offer some

20   middle ground position in which Ms. Carroll is right about some

21   things but misremembers in some respects what actually

22   happened.  He doesn't admit to seeing E. Jean Carroll at

23   Bergdorf that day but claim that she somehow consented to have

24   sex with him, as you heard Ms. Carroll said she expected him to

25   say.  No.  That's not it at all.  According to Donald Trump, he

N582Car3                    Summation - Ms. Kaplan

1    wasn't at Bergdorf Goodman that day at all.  According to

2    Donald Trump, he almost never went to Bergdorf Goodman.  In

3    fact, as we discussed, he claims he never met E. Jean Carroll

4    at all.  He is claiming that everything you heard at trial,

5    every sworn detail is a lie.  And as we have discussed, Donald

6    Trump has uttered multiple lies in this very case, both big and

7    small.  In order for you to find for him, you need to conclude

8    that Donald Trump, the nonstop liar, is the only person in this

9    courtroom who has been telling the truth.

10         But it's even worse than that.  In order to find for

11   Donald Trump, you also need to conclude that he is telling --

12   that while he is telling the truth now, when he was speaking

13   earlier, he was not telling the truth.  Remember the

14   *Access Hollywood* tape?  There, when he thought no one was

15   listening and when he wasn't trying to avoid the consequences

16   of his own actions, he admitted on video to doing exactly the

17   kind of things that has brought us here to this courtroom.

18   Grab 'em by the pussy.  Don't wait.

19         Donald Trump has an M.O.  He makes friendly chitchat

20   with a woman he finds he is attracted to in a semi public space

21   where they wouldn't expect to be attacked.  He suddenly lunges

22   at her.  He pounces.  He kisses.  He grabs.  He doesn't wait.

23   And if a woman later speaks up, he lies about it.  He demeans

24   her.  He insults her.  He says that she is too ugly for anyone

25   to assault.

1    At this point, I believe that my review of the

2    evidence has shown you that it is very clear that Donald Trump

3    did in fact sexually assault E. Jean Carroll in the spring of

4    1996 and that he defamed her in 2022 after she told the truth

5    about what he had done.

6        Because Donald Trump did both of these things, the law

7    allows you to compensate E. Jean Carroll for the harm that she

8    suffered.  So what is the level of damages?  I'm not going to

9    stand here and tell you exactly how much you should award

10   E. Jean Carroll in damages, but there are a few things that you

11   can consider in coming to that conclusion.

12       First of all, Professor Humphreys told you about the

13   millions of people that heard and likely believed Donald

14   Trump's public statements about E. Jean Carroll.  What is the

15   price for having to live your life in shame and to lose your

16   good name because Donald Trump lied and told millions of people

17   that you are a liar?

18       In addition, Dr. Lebowitz told you that the assault

19   caused E. Jean Carroll to lose something extremely important to

20   her and, frankly, to all of us, her ability to pursue romantic

21   relationships, her ability to pursue intimacy, and perhaps most

22   importantly, companionship.  What is the price for decades of

23   living alone without companionship, for having no one to cook

24   dinner with, no one to walk your dog with, no one to watch TV

25   with, and for feeling for decades like you are dirty and

N582Car3                    Summation - Ms. Kaplan

1   unworthy?  Once again, ladies and gentlemen, that's your issue

2   to decide.  I'm not going to put a number on that for you.

3            As the judge will instruct you, the law allows you to

4   award damages for these considerations and others that he will

5   read to you tomorrow.  Ultimately, you should consider the

6   evidence and pick the number you think is right.  But please

7   remember, for E. Jean Carroll, this lawsuit is not about the

8   money.  As she told you on the stand, this lawsuit is about

9   getting her name back.  That's why we all are here.

10           Ultimately, I know that you will deliver a verdict

11  based on the evidence you have seen and heard.  You watched

12  Ms. Carroll right here in this courtroom as she delivered

13  incredibly courageous, consistent, clear testimony over two

14  days.  You watched the other fact witnesses sit before you and

15  also provide compelling testimony that corroborated what

16  E. Jean Carroll had said, sometimes down to the smallest

17  detail.  Taken together, the overwhelming weight of the

18  evidence establishes two things:  One, Donald Trump sexually

19  assaulted E. Jean Carroll in a dressing room in the lingerie

20  department at Bergdorf Goodman in the early spring of 1996;

21  and, two, Donald Trump defamed E. Jean Carroll after she spoke

22  up publicly about what had happened.  That is what the evidence

23  in this case establishes.  But I think you already know that.

24           On behalf of our whole team, on behalf of my brave

25  client, E. Jean Carroll, for whom it has been such a privilege

N582Car3

1    and honor to represent, thank you very much for your time.

2              THE COURT:   Thank you, counsel.

3              Could I just see Mr. Tacopina and Ms. Kaplan at the

4    sidebar?

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N582Car3

1          (At the sidebar)

2          THE COURT:  The timing turns out to be different than

3    we all thought, so my question to you is do you want to make

4    any change in what we planned?  I don't know how long you plan

5    to be, Mr. Tacopina.

6          MR. TACOPINA:  Probably less than two hours, I think,

7    but, you know, I have done a dry run, and there are slides and

8    all this stuff.  Your Honor, if we can just take a bathroom

9    break and I could start.  If we start at 11:30, I will go past

10   1:00, though.  Is that okay?

11         THE COURT:  That's really what I am asking, because if

12   you go past 1:00 and then we break for three quarters of an

13   hour, 1:45, then we finish at 2:15, 2:30, I could charge until

14   3:30, and the case could go to the jury today.  I'm not sure

15   what to do about that.

16         MS. KAPLAN:  Would it be okay, your Honor, if we take

17   a break now, I talk to my team, and we come back with a

18   proposal?  I apologize.  I had a post it --

19         THE COURT:  They are ready to eat lunch right now.

20         MS. KAPLAN:  Are you asking right now?

21         MR. TACOPINA:  Me?  You mean the jury.

22         THE COURT:  Yes.  The question is do we take 45

23   minutes now or do we take five minutes?

24         MS. KAPLAN:  I defer to Mr. Tacopina.

25         MR. TACOPINA:  I'm ready whenever you are, your Honor.

N582Car3

 1                  THE COURT:  You want the time?  Fine.

 2                  MR. TACOPINA:  Yeah, 45 minutes, yes.

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N582Car3

1                (In open court)

2                THE COURT:  Scheduling discussions, ladies and

3    gentlemen.

4                We will break until 12:00.  I understand your lunch,

5    whether you are eager for it or not, is inside, and then we

6    will continue at noon with the defense closing argument, and we

7    will see how it goes during the rest of the day in terms of

8    timing.

9                Thank you.

10                (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N582Car3

```
 1                A F T E R N O O N    S E S S I O N

 2                          12:05 p.m.

 3            (Jury not present)

 4            THE COURT:  Good afternoon.  Quiet please.

 5            Just so you know where I am going, I misspoke in the

 6     course of making that ruling on an objection to the charge

 7     relating to Law & Order.  It's at page 1217 of the transcript,

 8     line 20.  I seem to have said plaintiff.  I should have said

 9     defendant.  It's clear from the context, in any case.

10            Okay, Mr. Ferrara.

11            MR. FERRARA:  Your Honor, defense counsel shared --

12     let us look through their slides for their closing, and we had

13     one issue.  They use a slide that refers to a piece of

14     transcript about George Conway introducing Ms. Carroll to her

15     attorney.  Your Honor will recall that I had made an objection

16     during the course of the trial.  Your Honor pointed out,

17     rightly, that I belatedly had made that objection.  But during

18     the course of the back-and-forth regarding the objection,

19     Mr. Tacopina represented to the Court that there would be no

20     more argument about George Conway, particularly as regards to

21     linking Ms. Carroll up with her lawyers.  And so your Honor

22     said there was nothing to do.  I think the way your Honor put

23     it, at 652 of the transcript, at line 19, was, "I have three

24     things to say about that.  Based on the representation by

25     Mr. Tacopina that there will be no such argument for the rest
```

N582Car3

```
 1    of this case about Mr. Conway and how the lawyer got together
 2    with Ms. Carroll, I don't think I have a problem going
 3    forward."  So that's at 652/line 20.
 4            So we just want to flag this because there is this
 5    slide that highlights that testimony from Ms. Carroll.
 6            THE COURT:  Let me see the slide.
 7            MR. TACOPINA:  Someone put the slide up for the judge,
 8    please.
 9            Your Honor, while you are waiting for the slide, can I
10    say something?
11            THE COURT:  I would rather see the slide first.
12            MR. TACOPINA:  There it is.
13            THE COURT:  Now Mr. Tacopina.
14            MR. TACOPINA:  Sure, your Honor.
15            THE COURT:  Go ahead.
16            MR. TACOPINA:  Your Honor, if you look above, the
17    above attribution to me, it was simply about not invoking the
18    name of the Kaplan law firm, which I still don't intend to do.
19            THE COURT:  I'm sorry.  We are talking --
20            MR. TACOPINA:  Yeah.
21            THE COURT:  We are talking about at page 650-something
22    of the transcript or are we talking about somewhere else?
23            MR. TACOPINA:  Page 652 of the transcript, your Honor.
24    I said:  I stand by the question.  It is an appropriate
25    question, because Mr. Conway introduced Ms. Carroll to an
```

N582Car3

1    attorney.  And I specifically did not mention Ms. Kaplan.  I

2    have no intention of arguing Ms. Kaplan is part of any

3    democratic conspiracy or anyone at that table.  So that's why I

4    made it bland when I said an attorney.  That's also what I -- I

5    don't plan on invoking Ms. Kaplan's name or the firm's name,

6    simply that what I said there I stand by.  I'm just bringing

7    out the fact that he simply introduced her to an attorney,

8    which is the trial testimony.

9              MR. FERRARA:  We think it's obvious, your Honor, that

10   we are the attorneys, we are the attorneys sitting here, and

11   there was a motion *in limine* on this about not arguing or

12   putting in evidence about choice of counsel.  So we just don't

13   think that it is an appropriate line of argument.

14             THE COURT:  Which *in limine* ruling?

15             MR. TACOPINA:  Your Honor, your Honor, I can make this

16   easier.  We can take that one slide easier.

17             THE COURT:  Thank you, Mr. Tacopina.

18             MR. TACOPINA:  Mike, I'm still using the argument

19   about Mr. Conway's convincing Ms. Carroll, but I won't

20   reference that he introduced --

21             THE COURT:  I didn't get the substance of what you

22   just said.

23             MR. TACOPINA:  I'm sorry.  Mr. Ferrara, who had --

24             THE COURT:  Maybe Mr. Ferrara and you communicate on a

25   different plane, but I didn't get it.

N582Car3

| | |
|---|---|
| 1 | MR. FERRARA:  I think what Mr. Tacopina is saying, we |
| 2 | don't object to the idea that Mr. Tacopina may argue that |
| 3 | George Conway put this idea or discussed a lawsuit with |
| 4 | Ms. Carroll.  We understand.  We are not objecting to that line |
| 5 | of argument. |
| 6 | THE COURT:  But what I am trying to find out, the |
| 7 | meaning of what Mr. Tacopina just said that I didn't |
| 8 | understand.  That's what I am trying to find out. |
| 9 | MR. TACOPINA:  Trial testimony, your Honor.  It is |
| 10 | just trial testimony that Mr. Conway was the one who convinced, |
| 11 | persuaded Ms. Carroll to bring a lawsuit without going into |
| 12 | "and then he introduced her to an attorney."  I will leave that |
| 13 | out. |
| 14 | THE COURT:  Is that a problem, now, Mr. Ferrara? |
| 15 | MR. FERRARA:  No, your Honor. |
| 16 | MR. TACOPINA:  Let me take it out before I forget I |
| 17 | took it out.  Hold on. |
| 18 | THE COURT:  So much for the 45-minute lunch break. |
| 19 | MR. TACOPINA:  We are okay. |
| 20 | THE COURT:  All right.  Let's get the jury. |
| 21 | (Continued on next page) |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1          (Jury present)

2          THE COURT:  Okay.  We will now hear closing argument

3   on behalf of the defendant.

4          Mr. Tacopina.

5          MR. TACOPINA:  Thank you, your Honor.

6          Counsel.  Good afternoon, ladies and gentlemen.

7          That last hour and a half was hard for me to listen to

8   from Ms. Kaplan.  Ms. Kaplan is a great lawyer, no question

9   about that, but she took some liberty with the facts in this

10  case.  What I am going to do is different.  I am going to show

11  you transcripts on key issues here, transcripts from the trial

12  before you on key issues.  We are going to take a journey to

13  justice and as I show you how this story falls apart piece by

14  piece.

15         Before I go there, I just want to recall from two

16  weeks ago——it seems like two years ago when we had the opening

17  statements, but two weeks ago——I shared some words of

18  importance regarding the justice system.  And after seeing the

19  evidence in this case, in this courtroom, come to light, I

20  think those words have greater meaning and bear repeating, so

21  bear with me.

22         But first and foremost, I want to thank you for your

23  time.  That's something that, you know, we take for granted,

24  but you guys have been ripped out of your daily lives and your

25  families and your work and whatever else you do and you have

N582Car3                    Summation - Mr. Tacopina

1    given yourself to this important, important case, and this

2    commitment.

3            And there is no greater service that a citizen can do

4    in this country than what you are being asked to do now,

5    consider whether an accusation as heinous as a claim of rape

6    has merit, to serve on a jury, to weigh the evidence fairly and

7    impartially, and to safeguard our rights and the legal process.

8            And with that in mind, I want to remind you what I

9    said in my opening.  I said that one thing in this country that

10   cannot be compromised, that cannot be bent, that must always be

11   absolute, that should not be wielded by the -- based on the

12   whims of someone who would seek to abuse it is the justice

13   system.  It's our defense against all tyranny.  It's what gives

14   you, the citizens of this country, the ability to defend

15   against oppression and defend yourselves.

16           People have very strong feelings about Donald Trump.

17   That's obvious.  One way or the other.  That's a fact.  And

18   however you feel about it is okay.  We didn't even ask you that

19   when we picked you as jurors.  It's okay however you feel about

20   him.  I said this before.  You could hate Donald Trump.  It's

21   okay.  But there is a time and a secret place to do that.  It's

22   called a ballot box during an election.  It's not here.

23   Because to do so in a court of law would make one no better

24   than those who would seek to bend the rule of law for their own

25   personal agendas.  We must all strive to be better than that,

N582Car3                    Summation - Mr. Tacopina

1    to protect ourselves, to show that while -- Ms. Kaplan said no

2    one is above the law, absolutely, but no one is below it

3    either.  No one is below it either.

4           Politicians don't make this country great.  Jurors do.

5    Jurors do.  If you follow your solemn oaths as jurors in this

6    case and take them seriously and apply the facts to the law,

7    justice will be served quickly, quickly.  And that's paramount

8    in this courtroom, that the rule of law that every defendant,

9    regardless of that defendant's name, be protected for the sake

10   of all of us.

11          With that in mind, the evidence in this case has shown

12   that what E. Jean Carroll has done here is an affront to

13   justice.  She has abused this system by bringing a false claim

14   for, amongst other things, money, status, political reasons.

15   And I'm not just going to say it, I'm going to show you the

16   testimony.  And in doing so, she has minimized real rape

17   victims, you know, rape victims down by the water and around

18   the world, to use someone's words.  She is exploiting their

19   pain and suffering and is capitalizing on their stories, and we

20   can't let her profit to the tune of millions of dollars for her

21   abuse of this process and her efforts to deceive you.  I'm

22   going to show you.  I'm going to pull it all together for you,

23   I promise you, in this next little time we spend together.  You

24   will have no doubt how this story, this scam of a lawsuit came

25   together.

1    As I said, you can feel however you feel about Donald

2    Trump.  It's okay.  But, guys, ladies and gentlemen, not a

3    single word, not a single word tearing apart her story comes

4    from Donald Trump.  Ms. Carroll said it's the word of Donald

5    Trump against the word of everyone else.  No, it's not.  All

6    Donald Trump said was, I didn't do it.  I don't know what she's

7    talking about.  He just said, I didn't do it.  He didn't tear

8    apart her story.  She tore apart her story.  Cross-examination,

9    Carol Martin, others tore apart her story.

10   You heard him deny through his deposition testimony

11   that she made it up.  He met her briefly on a receiving line at

12   an event seven or eight years before she claims this happened

13   at Bergdorf Goodman, which hundreds of people were present, and

14   he didn't remember seeing her.  And, you know, Ms. Kaplan then

15   said, well, maybe, maybe he saw her when he was at Roger Ailes'

16   TV show because, you know, she also filmed a show there.  It

17   was four hours earlier, but maybe she saw him there or he saw

18   her there.  And maybe he was watching late night TV and

19   watching a rerun on Roger Ailes' network of E. Jean Carroll.

20   So maybe.  So that's proof that they knew each other.  That was

21   the argument.

22   Look.  That opening statement by Ms. Kaplan, again,

23   who I respect a lot, was very, very defensive for someone who

24   has the burden of proof in this case, very defensive.  She

25   spent a large part of her opening presenting excuses.  The

1    store was empty, the door was open, why she acted and didn't

2    act the way she did, oh, the text messages from Ms. Martin and

3    Ms. Birnbach and all that, a lot of excuses, not a lot about

4    the substance of what was alleged here.

5            I'm going to now, so we get this out of the way, play

6    you the defendant's sworn testimony denying this claim, so

7    there is no question that he has denied this under oath, being

8    questioned by the same lawyer sitting here today.

9            Go ahead, please.

10           (Video played)

11           MR. TACOPINA:  So that was his under oath testimony

12   saying it's not true.  I didn't do it.

13           Now I'm going to harken back to that in a second, but

14   before I do, let's just put up Plaintiff's Exhibit 12.  This

15   whole thing about he knew her, knew her, met her, seriously,

16   this is smoking gun evidence that he knew her, that they met at

17   some event for a few minutes on a line or -- and by the way, if

18   you look at this, Mr. Trump is clearly addressing John Johnson

19   right there with his fingers extended towards him,

20   Ms. Carroll's ex-husband, but for some reason she held on to

21   this photograph for three decades and brought it to court as

22   some sort of proof that they knew each other.

23           Look.  Donald Trump doesn't have a story to tell here

24   other than to say it's a lie, what you heard him say and how

25   outrageous it is to be accused of rape, the worst thing you

1   could accuse someone of, rape.  You heard him say under oath,

2   being questioned by Ms. Kaplan -- and understand this, folks,

3   we are not arguing, and I think you know this by now, but we

4   are not arguing consent, meaning this was a consensual act

5   where Ms. Carroll was okay with it and Mr. Trump was playing

6   along.

7          I mean, by the way, Ms. Carroll said she wouldn't have

8   even sued him if he had simply just said it was consensual,

9   which is ridiculous.  Think about what she is saying here.

10  Suddenly being lunged at, having her head banged against the

11  wall twice, that it hurt, being physically restrained, having

12  his chest pressed so heavily into her that it prevented her

13  from screaming, having someone forcibly put their penis in

14  without an invitation, and causing to engage in a colossal

15  battle to free herself by stomping her feet, hitting him, and

16  pushing the person off with her knee could somehow be viewed as

17  consensual?  She literally said to him, I don't think I would

18  have sued him if he just said it was consensual.  A rape is a

19  rape is a rape.  That's just as much a rape as anything else.

20         We are saying it never happened because it did not

21  happen.  I don't think anyone seriously thinks this happened in

22  Bergdorf Goodman in the lingerie section of a department store

23  in New York City, open department store and Donald Trump, one

24  of the most famous people in New York City, in there.

25         But think about this here.  The evidence in this case

N582Car3                    Summation - Mr. Tacopina

1    it was commented, oh, well, we didn't call any witness.  Well,

2    who?  I could say to any one of you, You stole my pen on some

3    unknown date.  How do you prove you didn't do it?  How do you

4    prove a negative?  You stole my pen, Mr. DeOreo.  How do you

5    prove you didn't do it?  Say, I didn't do it?  Call witnesses?

6            I mean, if something is completely made up, the only

7    way to defend yourself against that accusation is by

8    challenging the people who made it up and the story itself.

9    That's why our defense came out through cross-examination in

10   this case.  The entire defense came out through

11   cross-examination of their witnesses.  Challenging the story is

12   our defense.  There are no witnesses for us to call.  Who are

13   you going to call?  Somebody who wasn't in Bergdorf Goodman on

14   some unknown date?  There is no witnesses for us to call

15   because he wasn't there.  It didn't happen.

16           And if Donald Trump testified, what could I have asked

17   him?  What could I have asked Donald Trump that he wasn't just

18   asked in that day-long deposition?  Where were you on some

19   unknown date 27 or 28 years ago?  I mean, that would have to be

20   the question because they don't know the date, they don't know

21   the year.  And why is there no date to an event as significant

22   as this in someone's life?  No date.  By Ms. Carroll, by

23   Ms. Birnbach, and by Ms. Martin.  It's not a coincidence all of

24   them can't narrow down a time frame because they don't want to

25   give Donald Trump the opportunity to present an alibi witness.

N582Car3                 Summation - Mr. Tacopina

 1    Give me a date.  November of 1995, November 7, April 3 of 1996?
 2    Sure.  There's calendars.  There's schedules.  There's
 3    appointments.  We could see where he was.  But of course with
 4    no date, no month, no year, can't present an alibi.  Can't call
 5    witnesses.
 6            For the first time at trial Ms. Carroll actually said
 7    to you or to anyone she always thought it was a Thursday night.
 8    She always thought it was a Thursday.  The first time, that
 9    happened at trial.  But she didn't say beforehand, she said,
10    because she wasn't 100 percent sure.  This from a person who
11    gave you two different years, two different seasons.  Obviously
12    she wasn't sure about that.  She had no problem giving you
13    that.  But Thursday, she wasn't 100 percent sure, so she didn't
14    want to say Thursday.  But now she claims she didn't say the
15    day of the week because she wasn't 100 percent certain.  She
16    only said Thursday, ladies and gentlemen, for the first time
17    ever at this trial because she just watched the witness before
18    her, the Bergdorf Goodman lady come in here and testify that
19    Bergdorf Goodman was open late on Thursdays.  She tailored her
20    testimony right in front of you, right in front of you, one of
21    several times, and we're going to get there.
22            And by the way, this is a civil case.  Ms. Kaplan is
23    right.  This is a civil case.  If they wanted to, they could
24    have called Donald Trump as a witness.  They could have asked
25    him questions.  They didn't want to do that.  Instead, what

1   they want is for you to hate him enough to ignore the facts.

2   That's what they want.  They hope you will hate him enough, you

3   will ignore her story, but that story makes no sense by her own

4   admission, by her own admission.  They want you to focus on

5   anything but her story.  Her whole opening summation was about

6   the excuses, not the story.

7          They call Robbie Myers, the last witness to the

8   witness stand, Robbie Myers, the former editor in chief at *Elle*

9   who left in 2017, before Ms. Carroll was terminated, years

10  before Ms. Carroll was terminated?  To tell you what?  That she

11  was a great writer?  How is that relevant here?  What was that

12  hour of our lives wasted for?  Robbie Myers.

13         They called Cande Carol, the sister of Ms. Carroll,

14  who said, well, we never shared negative things with our

15  parents because we were private.  That's not private.  That's

16  family.  Private.  Private is I don't tell my friends something

17  embarrassing or something like that.  That's her family.  They

18  brought her in here to give that excuse.  Oh, we didn't share

19  anything private.  It's family.  Our dad told us to always

20  smile.  Seriously?  That was -- that was why she was called to

21  the witness stand?  Dad always said smile, so we couldn't talk

22  about bad things in our house ever, in our family ever.  That's

23  why Ms. Carroll didn't tell anyone.  Really.

24         And even when learning about this alleged rape in an

25  e-mail from her sister, Cande Carroll didn't ask her sister,

1   Why didn't you tell me about this earlier?  No.  She never even

2   questioned her about it.  Hmm.  Is that credible?  Is that

3   believable?  Is that what we would all do in our lives?

4         You know, all of that was meant to distract you from

5   E. Jean Carroll's story, just like the other women they brought

6   in here, Natasha Stoynoff and Jessica Leeds.  They have nothing

7   to do with whether you should believe E. Jean Carroll's

8   unbelievable story.  Those two have nothing to do with whether

9   you should believe the story that she even calls unbelievable.

10  They both told you, both told you they have no legal claim for

11  you, the jury, to decide.  I can't help but comment on the

12  absurdity of Ms. Leeds's story, however, that's because I can't

13  help myself sometimes, but that's a woman who actually said 40

14  years ago she was sexually assaulted on a commercial airplane.

15  At first on TV she said it was for 15 minutes I was being

16  assaulted, then here she said it was a few seconds.  It's a

17  close one—three seconds, 15 minutes.

18        She said some stranger assaulted her as another

19  passenger watched this happening.  She didn't tell the flight

20  attendant or anyone else because, she said, it's just like the

21  rigors of travel, like lose your luggage or a flight delay or

22  get sexually assaulted.  That's not my words.  I'm showing you

23  the transcript because it's almost -- you wouldn't believe me

24  if I said that to you:

25        "And the reason you didn't say anything to your boss

1  is because you didn't want to explain" -- should be complain --

2  "about the, to use your words -- the rigors of travel.

3  Correct."

4       Answer -- I'm sorry.

5  "A  Correct.

6  "Q  So it's your testimony that getting sexually assaulted on a

7  plane is sort of just rigors of travel?

8  "A  Yes."

9       Are you kidding me?  Losing your luggage is the rigors

10  of travel.  Having a delay on the flight is the rigors of

11  travel.  Being sexually assaulted on a plane is the rigors of

12  travel?

13       She also said that, well, she wouldn't have been upset

14  if that person that she didn't know had stopped on the above

15  the waist, was just sexually assaulting her above the waist.

16  She wouldn't even have left first class for that.  It's just

17  absurd.  It's absurd.

18       Then she claims she sees him at a charity event three

19  years later where she looks completely different.  She cut her

20  long hair short.  On the plane she said she was wearing a brown

21  tweed business suit.  At the charity event she was wearing a

22  yellow evening gown, and that Donald Trump walks up with his

23  pregnant wife to get his ticket and she is there handing him

24  the thing for this table and Donald Trump says to her, You're

25  the cunt from the airplane, right in front of his pregnant wife

1    and a crowd of people.  Is that really believable?

2            Think of her story.  And of course she is passionate

3    about politics.  She only comes forward with the story for the

4    first time ever after 40 years, when he is seriously

5    considering running for president.  And she is, as she told

6    you, jumping up and down in rage in front of her TV, then she

7    comes forward with the story.  It's ridiculous.

8            And Natasha Stoynoff's claim is that Donald Trump

9    kissed her and she pushed him off her.  The reason I didn't ask

10   her any questions is simply this.  I asked her, I did ask her

11   one question:  Do you have any claim for this jury to decide?

12   And she said, no, I never brought a claim and I have no claim

13   for this jury to decide.  Okay.  Thank you.

14           You know, it doesn't all of a sudden make

15   Ms. Carroll's unbelievable claim and absurd claim suddenly

16   believable.  Ms. Kaplan said I didn't ask her questions

17   because -- listen.  This was the argument you just heard.  I

18   didn't ask Ms. Stoynoff any questions, even though I did the

19   important one like, anything for this jury to decide?  No.

20   Thank you.  But Ms. Kaplan said I didn't ask her any

21   questions—I guess she meant about the facts—because I knew

22   she was telling the truth.  Well, following Ms. Kaplan's

23   argument, then, I guess I knew what Ms. Carroll and Ms. Leeds

24   said wasn't the truth because I asked them plenty of questions.

25   I asked them plenty of questions.

1        Again, neither of those two claims are for you to

2   decide.  They are distractions.  Why did they call them?  The

3   same reason they played that *Access Hollywood* tape five times

4   in this courtroom so far.  The *Access Hollywood* tape, five

5   times of Donald Trump talking about women letting you do

6   certain things because you are a celebrity?  Ms. Kaplan said

7   sexual assault.  If you listen to that tape, he is talking

8   about being rejected by one woman he was trying to get with,

9   and she said no and then he is saying they let you do that when

10  you are a celebrity.

11       Now, make no mistake about it the word sexual assault

12  came from Ms. Kaplan's mouth, but that's what she is saying.

13  It's crude.  It's rude.  You heard him apologize for it on that

14  debate with Hillary Clinton.  He apologized for it.  he said, I

15  embarrassed my family, I embarrassed myself, it was locker room

16  talk, I apologize.  It's rude and it's crude.  It's gross.  I

17  would knock my boys' teeth out if they talked like that,

18  honestly.  But he did.  He talked that way.  He said that.

19       But that doesn't make Ms. Carroll's unbelievable story

20  believable.  That doesn't do that.  That's a distraction again.

21  So they argued that he had a *modus operandi*——M.O.——of denying

22  and attacking women who have made allegations against him, as

23  if that's a *modus operandi*?  When he gets falsely accused of

24  doing something, he denies it.  And he lashes out.  Rightfully

25  or wrongfully, he lashes out.  it Doesn't make up for the lack

N582Car3                    Summation - Mr. Tacopina

1    of proof in Ms. Carroll's unbelievable story.

2            The reason I keep saying Ms. Carroll's unbelievable

3    story is because that's the word she used in describing her

4    story.  I will show you the testimony.  What they are doing,

5    there is tactic here.  It's called the art of distraction.

6    It's a technique that's used to divert attention away from what

7    you are supposed to be focusing on, which is Ms. Carroll's

8    story and whether it's credible or not or believable or not, or

9    real or passes the common sense test that we all have.  They

10   are trying to take parts of Donald Trump you dislike or even

11   hate and stretch that over a story that makes no sense

12   whatsoever.

13           But two things can be true at the same time.  You

14   could think Donald Trump is a rude and crude person and that

15   her story makes no sense.  Both of those could be true.  They

16   just want you to ignore all the problems with the story.  If

17   the defendant's name were anything but Donald J. Trump, you

18   know we wouldn't be here today.  Not on that.  Not on this

19   story.  There is no way.

20           But she got caught.  A couple times she got caught.

21           This was an e-mail that was introduced.  Now this

22   e-mail, as the judge will tell you, it was not offered for the

23   truth of the matter in the e-mail itself.  It was offered for

24   the state of mind of Ms. Carroll.  But it was an e-mail from

25   someone that is in evidence saying, Just to warn you that a

N582Car3                    Summation - Mr. Tacopina

1   *Law & Order SVU* episode, Theater Tricks, 2012, has a character,

2   a judge, speaking of a fantasy that he rapes a woman in a

3   Bergdorf Goodman dressing room in the lingerie department.

4   Anyway, I saw the episode last night.  Trumpsters will use it

5   against you.  Perhaps the writer of the episode, Marygrace

6   O'Shea, is one of the friends you told.

7           Well, let's get that out of the way right away.  she

8   didn't say anything to Marygrace O'Shea.  She doesn't know who

9   that is, Ms. Carroll.

10          Ms. Carroll responded:  Thank you.  I haven't seen it,

11  but this happens all the time with *Law & Order* stories.

12          What happens all the time with *Law & Order* stories?

13  That there is a rape in a Bergdorf Goodman lingerie dressing

14  room?  That happens all the time in *Law & Order*?

15          There are 200 scripted shows a year on TV.  This kind

16  of thing is bound to show up.  I mean, it was inevitable that

17  eventually there was going to be a TV show that just happened

18  to match exactly the allegation in this case, to the store, the

19  department, and the dressing room.  Just always shows up, was

20  bound to happen.  I'm surprised I haven't seen this plot more

21  often, Ms. Carroll says.

22          Well you know that's not true.  But here's what she

23  said in trial.  This is for the truth of the matter.  It's her

24  answer at trial.  So my initial question was:  "as you sit here

25  today, you know that there was a *Law & Order* episode from 2012

N582Car3                    Summation - Mr. Tacopina

1    that featured a woman getting raped in the Bergdorf Goodman

2    lingerie dressing room, correct?

3    "A  I am aware, yes."

4            Okay.  One of the biggest problems they have is that

5    that cannot be ignored, folks.  That could not be ignored.  The

6    exact scenario of E. Jean Carroll's rape claim was an episode

7    on *Law & Order* before she wrote her book.  Ask yourself what is

8    the likelihood that someone who got raped in Bergdorf Goodman

9    dressing room in the lingerie department and the exact scenario

10   was a TV show?  What's the likelihood of that?  Probably one in

11   20 billion.  Maybe we should get the statistician marketing

12   Ms. Humphreys back up here to give us some numbers on that, one

13   in 20 billion, one in 10 billion?

14           It's the same department store.  It's not like Macy's

15   or Bloomingdale's or Saks, not Marshall's, not Nordstrom, but

16   Bergdorf Goodman.  What a coincidence.  It's not just any

17   department in Bergdorf Goodman—not women's wear, not shoes,

18   purses—the lingerie department.  And not just anywhere in the

19   lingerie department, not the vestibule, the bathroom, the

20   hallway, the steps, you know, where it is sometimes a little

21   barren, but the dressing room.

22           THE COURT:  Just a minute, Mr. Tacopina.

23           MS. KAPLAN:  Your Honor, this has been talked about

24   earlier, and I think your Honor issued an order about there may

25   be an instruction after the opening would be appropriate as to

N582Car3                         Summation - Mr. Tacopina

1   what this evidence is in for.

2            THE COURT:  I'm sorry.  I didn't get everything you

3   said.

4            MS. KAPLAN:  Sure.  Your Honor, as you know, you

5   issued an order about this very issue I believe yesterday, and

6   we think that a limiting instruction might be appropriate as to

7   what this is admitted for and what it is not admitted for.

8            THE COURT:  I issued an order yesterday?

9            (Counsel confer)

10           MS. KAPLAN:  Yeah, I apologize, your Honor, it was the

11  letters were sent yesterday and you ruled this morning.

12           THE COURT:  Members of the jury, I'm going to instruct

13  you in greater detail about this later, but there is a

14  distinction to be drawn here and ultimately you will decide

15  what to make of this, if anything.

16           Mr. Tacopina acknowledged that the e-mail from whoever

17  sent the e-mail to Ms. Carroll purporting to relate information

18  about an alleged *Law & Order* episode was not offered and it was

19  not received for the truth of what this person said.

20           Now, let me explain that.  If she had written an

21  e-mail saying:  Dear Ms. Carroll, the moon is made of green

22  cheese, the effect of the ruling and Mr. Tacopina's

23  acknowledgment that it is not received for the truth of the

24  communication from this other person to Ms. Carroll means that

25  the e-mail from the other person is not evidence you can

1  consider if for some reason it mattered in this case whether or

2  not the moon was made of green cheese.  The e-mail was received

3  only for your ability to understand Ms. Carroll's response to

4  the e-mail.

5          Here, Mr. Tacopina puts before you a piece of evidence

6  which he argues constituted an admission, an acknowledgment by

7  Ms. Carroll that there in fact was such a *Law & Order* episode

8  and what its contents were.  You are going to have to decide in

9  context whether that is what Ms. Carroll's answer to this

10 question meant or whether it meant something else.  And I am

11 confident that you heard the evidence, because there was more

12 testimony at the time, and that you are likely to hear more

13 about it later.

14         Any objection to that, Mr. Tacopina?

15         MR. TACOPINA:  No, your Honor.  Thank you.

16         THE COURT:  Okay.  Go ahead.

17         (Continued on next page)

1              MR. TACOPINA:  Anyway, the Judge just said it.   The

2      e-mails -- what I told you before, it was an e-mail, and the

3      judge has instructed you on what that meant, but this here, you

4      can decide if she was answering the question I asked which was

5      simply:

6              As you sit here today, you know there was a law and

7      order episode from 2012 that featured a woman getting raped in

8      the Bergdorf Goodman lingerie dressing room, correct?

9              Answer:  I am aware, yes.

10             Now, maybe she was answering some other question that

11     I asked, I don't know, two days earlier, or maybe she was

12     talking about something else, but this seems pretty clear

13     evidence, folks, for you to consider.  This is her under oath,

14     on-trial testimony, that she is aware that that episode

15     existed.

16             Back to the coincidence.  Are you kidding me?  Before

17     she wrote her book there is an exact episode that details the

18     most improbable scenario, in the history of scenarios, that's a

19     Law & Order episode.  I didn't hear a word about that in

20     Ms. Kaplan's summation -- not a word -- because it is lethal.

21     It's proof.  She, Ms. Carroll herself, called this an

22     astonishing coincidence.  That's her testimony.

23     "Q  Fantasy of getting raped in the lingerie section of the

24     Bergdorf Goodman department store?

25     "A  That was amazing to me.

N585car4                    Summation - Mr. Tacopina

1     "Q   What do you mean amazing?"

2           I assume amazing coincidence?  Yes, astonishing.  It

3     was an astonishing coincidence that the show had a fantasy of

4     getting raped in the lingerie department dressing room of the

5     Bergdorf Goodman department store.  It was amazing and

6     astonishing to Ms. Carroll.  Amazing, astonishing and

7     unbelievable.  Atonishing and unbelievable are both

8     Ms. Carroll's words in describing her story, by the way.  That

9     is not my argument.

10          Think about it.  Donald Trump has a building across

11    the street which we have all heard about, Trump Tower.  I mean,

12    he could have taken her there if he wanted to go back with her,

13    she was excited, she was going to dine for life on this story.

14    No, instead he goes into a public department store and risks it

15    all, throwing his whole life away, hoping to God no one would

16    show up on the sixth floor and hear him banging somebody

17    against the wall where he would be immediately arrested by the

18    police, prosecuted for rape, *Apprentice* over, Trump Tower over,

19    everything over.  Everything.  Think about that.  He is going

20    to risk all that in Bergdorf Goodman and his house is across

21    the street?

22          Within minutes -- according to her story, he meets

23    her.  Within minutes he is raping her?  Within minutes.  In a

24    New York City department store in the dressing room that she

25    claimed she walked into first.

1    You heard how famous Donald Trump was in the mid-1990s

2    and she had you believe he is buying lingerie with another

3    woman in a public store in the lingerie section.  I don't know

4    if that would happen.  I think the New York Post might have put

5    that on Page Six.

6    And think about it.  The premise of her story that

7    Donald Trump, 6'3" tall, a generous 225 pounds at the time, one

8    of New York City's most famous people in a public department

9    store was going to try on, over his suit pants, a very pretty

10    see-through lilac/grayish blue one-piece bodysuit?  When you

11    became jurors no one asked you to leave your God-given common

12    sense at those doors, no one.  And no one will ask you to do

13    that.  Putting aside the obvious fact he couldn't get into

14    that, the whole story is clearly an unbelievable work of

15    fiction.  I mean, Ms. Carroll tried to liken it to some script

16    she wrote from Saturday Night Live where she said she wrote a

17    script for SNL with William Shatner in it and he was in the

18    bathroom, by himself, trying on underwear admiring himself.  I

19    don't even understand that connection or what that has to do

20    with being raped in the changing room of a Bergdorf Goodman

21    dressing room.  But, she likened that to this script that she

22    wrote to this situation here.

23    Third thing out of the box on Ms. Carroll, on

24    cross-examination used the word "unbelievable."  She called it

25    unbelievable.  How are you supposed to believe it?  The list of

N585car4                    Summation - Mr. Tacopina

1   unbelievable facts you have to believe to possibly accept the

2   story is ludicrous.

3              One, although Bergdorf Goodman is New York's most

4   prestigious department store, no one was on the sixth floor.

5   It wasn't likely occupied, there was not a soul there the

6   entire time.  Ms. Carroll says that circumstance is hard to

7   imagine, unbelievable.  Here is her testimony:

8   "Q  You agree that the story about no one being on the sixth

9   floor is inconceivable, correct?

10  "A  It's hard to imagine that there would not be a sales

11  attendant in Bergdorf's.  Its surprising.

12  "Q  The word you used to describe that lack of sales attendants

13  or anyone close was 'inconceivable,' correct?

14  "A  Yes.

15  "Q  Inconceivable?

16  "A  Cannot be imagined.

17  "Q  Unbelievable, correct?

18  "A  Yes.  That's what it means."

19             That was the third question of cross-examination.  It

20  is unbelievable.  And after hearing that the -- remember this

21  testimony because I'm going to go here for a second to

22  something else that happened -- after hearing the Bergdorf

23  Goodman witness, the first witness who testified say, well, it

24  wasn't really busy in the evenings -- that was Ms. Beall --

25  Ms. Carroll tailored her testimony again in front of you saying

1   it didn't surprise her that no one else was there.  Here it is

2   unbelievable and inconceivable; at trial she said, no, it

3   didn't surprise me.  And because of what she had said

4   previously in her deposition, her own lawyer, Mr. Ferrara, when

5   he was questioning her, had to contradict her on

6   cross-examination.  These are the questions from the trial from

7   her lawyer, not me:

8   "Q  Who else was in the -- in that area when you -- with you

9   and Mr. Trump?

10  "A  I didn't see anyone.

11  "Q  Was that surprising?

12  "A  It didn't surprise me, no."

13          OK, remember what she had just said in the last slide

14  it was astonishing?  Or no, it was unbelievable, inconceivable.

15  "Q  What about sales attendants?

16  "A  Didn't see any.

17  "Q  Why didn't that surprise you?

18  "A  Bergdorf's was not busy in the evenings."

19          Where did she get that from?

20  "Q  Had you ever written before that you were surprised by the

21  lack of people on the floor?

22  "A  I was not surprised and yet I was surprised."

23          What?  What does that mean.  She got caught, her

24  lawyer had to correct it because they didn't know I was going

25  to ask her that.  So in her deposition she was astonished, it

N585car4                    Summation - Mr. Tacopina

1    was unbelievable -- I'm sorry -- inconceivable and unbelievable

2    that no one was up there.  At trial, after hearing the Bergdorf

3    Goodman witness, nah, that didn't surprise me.  Her lawyer said

4    but, yeah, didn't you say before that you were surprised?  Oh

5    well, yeah, I was surprised and yet -- I was not surprised and

6    yet I was surprised.

7            Really?  You know, on cross-examination Ms. Carroll

8    admitted no one else there is hard to imagine, it is

9    inconceivable, unbelievable.  You saw that slide.  Think about

10   that.  There it is again but we just went through it.  Think

11   about that.  Donald Trump is shopping in the most attentive,

12   upscale store in New York City, maybe the world, I don't know.

13   You heard both Bergdorf Goodman witnesses Ms. Beall and

14   Mr. Salerno talk about the store's luxury shopping experience

15   and personalized service.  They refer to their customers as

16   clients.  And no one -- no one -- not a sales associate, who

17   works on commission, are paying attention to Donald Trump in

18   the women's store no less?  No.  They wanted to leave him alone

19   and have privacy.  That's how they make their money.

20           Ms. Carroll would have you believe that apart from two

21   people on the ground floor she didn't see another person in

22   that department store at all.  It was like the sixth floor was

23   like *The Walking Dead*.  You know, the TV show where zombies ate

24   everyone and everything is, like, barren and destitute and

25   deserted.  That's literally the description.  Sixth floor.

Crickets.  Nobody.  No one there at all.  That doesn't sound

right.  And I think you know that, that no one at all, for this

entire time, popped into that sixth floor at all, anywhere on

the sixth floor.

What else is unbelievable?  She said the dressing room

door was unlocked and opened.  Ms. Carroll says that

circumstance was odd and an amazing happenstance.  Previously

I'm asking about Bergdorf Goodman:

"Q  So Bergdorf Goodman dressing rooms are usually closed?

"A  Yes.  It struck me as odd.

"Q  Usually the way it works is they remain locked and closed

until a client wanted to try something on and the sales

attendant will lock the door and let them in?

"A  Yes."

Ms. Carroll's testimony.  She said it was odd, and

then I think she went on to say, yes, it was an amazing

happenstance.  Amazing happenstance that that door was open.

Well, first of all, Ms. Kaplan was talking about the

fact that I made a big deal out of saying the door was open,

even though the Bergdorf witnesses said, oh, sometimes they're

open.  I didn't make a big deal of it, that's what Ms. Carroll

said under oath, that it was an amazing happenstance.  I was

repeating what she had said.

And despite what Ms. Beall came in here and said to

you, or tried to sell to you, well, the doors, of course, are

N585car4                    Summation - Mr. Tacopina

1       supposed to be locked and closed, they don't want running into,

2       especially in the lingerie section, going into the dressing

3       room, throwing little lace things in their pockets and leaving.

4       They're supposed to be locked and closed in a high-value store

5       of things where they're expensive.  And of course they are and

6       she said that, Ms. Beall said, yes, that's our policy, they're

7       supposed to be locked and closed but, you know, sales

8       associates, they're just sales associates so sometimes they

9       don't follow the rules.

10              Sorry, Ms. Beall.  You know, I come from regular

11      stock, ladies and gentlemen, and I prefer it that way.  That

12      offended me.  That statement offended me.  But Ms. Beall said

13      eh, they're just sales associates so, you know, you can't rely

14      on them to follow the rules.  Sorry, Ms. Beall, I'm not as

15      erudite and sophisticated as you.  But that is an excuse,

16      another excuse for what is supposed to be there that wasn't

17      there and, as Ms. Carroll said, was an amazing happenstance.

18      What else doesn't make sense?  She described what happened in

19      that dressing room as a colossal struggle for three minutes

20      while stomping her feet, hitting him back and fighting to free

21      herself.  But, while all of this happened, she never lets go of

22      her purse.  She is in a fight for her life and she never lets

23      go of her purse.  That's her testimony.

24      "A  Hit him back with my knee.

25      "Q  OK. And while all of this was happening, your purse was

N585car4                    Summation - Mr. Tacopina

1    still in one of your hands?"

2         Her answer is not "yes."  "Yeah.  I know, yeah.  I

3    never let go of my purse."

4         That's not right.  That doesn't sound right and you

5    know that you if you are going to struggle, the last thing you

6    worry about is holding on to your purse.  But why would she say

7    these unbelievable things if she's making up her story?  Why?

8    Why not say things that are much more unbelievable like I

9    dropped my purse.  You know, if she is going to lie, why not

10   say things that are more believable than this?  I will tell you

11   why.  Because she needs to reverse-engineer her story, ladies

12   and gentlemen, and what I mean by that is after deciding to

13   write this story with her favorite store Bergdorf Goodman as

14   the backdrop, ripped off the pages of Law & Order, she needed

15   to create a scenario where no one else would be involved -- no

16   one else would be involved -- because otherwise, she needed to

17   identify anyone else who would be present and her story would

18   fall apart because it never happened.

19        What else is unbelievable is that there was loose --

20   not one piece on a display counter, Ms. Carroll said there were

21   two boxes of merchandise just lying around, things lying around

22   on the counter like it was like Filene's Basement where you go

23   in there and start rumbling through stuff.

24        Her tights didn't rip after this colossal struggle?

25   And the physical act itself is impossible.  I mean, these are

N585car4                      Summation - Mr. Tacopina

1   all things you get to consider.  The physical act itself.  I

2   mean, think about it, Ms. Carroll described here what she

3   described, that Donald Trump, with his shoulder pushed against

4   her chest, while her knees -- her tights are pulled down above

5   her knees while she is stomping him with four inch heels,

6   hitting him, he must have managed somehow with that other hand

7   to open his pants and during the struggle, somehow engaged in a

8   sexual act with her while she is standing up, stamping her

9   feet, with her legs being pulled together by tights above her

10  knee?  You can consider anything you want.  I am going to tell

11  you what you can consider and what not to consider but common

12  sense, again.

13          Ms. Carroll's claims about what she did during or

14  after the rape, she describes that in her book as problematic,

15  not attacking.  She described in her book as problematic, then.

16  They know they have problems with her story so they brought in

17  Dr. Lebowitz.  She was a hired gun, she was here to serve as an

18  excuse machine, as if somehow she could try to explain away all

19  the unexplainable.  So, that's why, at $600 an hour,

20  everything -- listen to this -- everything to her is consistent

21  with rape.  Her testimony:

22  "Q  Are there any reactions to a rape that are not consistent

23  with the victim actually being raped?

24  "A  There may be.  I can't call any to mind at this moment, but

25  there may be."

N585car4                    Summation - Mr. Tacopina

1          Look at that testimony for a second.  Imagine that.  I
2     mean, if Dr. Lebowitz has her way, anyone who accuses someone
3     of rape, regardless of how unbelievable their story is, would
4     have to be believed because there is no reaction that's not
5     consistent with rape.  If you scream, it is consistent.  If you
6     don't scream, it is consistent.  If you hit someone, it is
7     consistent.  If you are paralyzed with fear and don't move, it
8     is consistent.  Everything is consistent, according to her.
9     She wasn't credible, Dr. Lebowitz.  She was here as a hired
10    expert, a hired gun, as they say, an excuse machine.

11         When asked of Ms. Carroll's statements -- watch this
12    one if you want to determine credibility.  When asked of
13    Ms. Carroll's statements "I have these intrusive images since
14    the event" and "I rarely think of it" are inconsistent in terms
15    of context?  She said no.  That's it, that's the testimony.  I
16    have these intrusive images since the event itself, but in her
17    book she wrote:  I rarely think of it.

18         *Are those inconsistent Dr. Lebowitz?*

19         *No, that's not inconsistent.*

20         This is as inconsistent as you get.  But, don't worry.
21    We know that is not true not because we all have brains, we
22    also know it is not true because in her sworn deposition, only
23    one month before this trial, here is what she said:
24    "Q  So there is no inconsistency for her saying that she's been
25    having these ongoing inrusive images since the event herself

1   and then her saying in her book I rarely thought of it?

2   "A   They are -- they are inconsistent in terms of content."

3         Come on.  That's exactly, literally, the opposite of

4   what she testified to you at trial.  This was one month before

5   her trial testimony in her under-oath deposition.  You don't

6   need to be a psychologist to know that that's not true.  She

7   was here to toe their line even if that meant blatantly turning

8   a blind eye to things that were horrible for them like that.

9         She also admitted Ms. Carroll told her experiences

10  about physical manifestations of back pain just thinking about

11  the camp counselor who had supposedly molested her when she was

12  younger.  And because that physical symptom, the back pain, was

13  attributed to something other than Donald Trump, Dr. Lebowitz

14  just left it out of her report.  Left it out completely.

15        In any event, her opinion here is meaningless because

16  she had no firsthand knowledge of Ms. Carroll's claim and is

17  just relying on what Ms. Carroll told you, nothing more.  Here

18  is the trial testimony:

19  "Q   and to be clear, you have no independent knowledge of

20  whether the the alleged sexual assault occurred or not; right?

21  "A   That is correct.

22  "Q   Your opinions in this case are based upon the accuracy and

23  truth of what Ms. Carroll told you, right?

24  "A   Yes.

25  "Q   If Ms. Carroll made up this entire event, that would be a

1   problem for your report and opinion; right?

2   "A  Yes."

3           So basically, ladies and gentlemen, this is a classic

4   example of garbage in, garbage out.  Right?  Whatever you put

5   in, it has to be, if it is not accurate or truthful, the report

6   on the other end doesn't mean anything.  That is what she just

7   said and acknowledged and she has no idea whether this happened

8   or not.

9           We also know Ms. Carroll withheld information from

10  Dr. Lebowitz.  There is a reason Dr. Lebowitz could have used

11  the objective testing to help assess whether Ms. Carroll was

12  malingering -- or the basic word is lying -- but she didn't use

13  any of that testing, she said.  She didn't use any of it.

14  Although, Dr. Lebowitz opined that Ms. Carroll felt frightened

15  and overwhelmed walking down the street after she sued Donald

16  Trump.  Ms. Carroll never shared this message with her, Exhibit

17  CJ, a text message from Ms. Carroll, she never shared this with

18  Dr. Lebowitz: *Don't worry.  I have been walking these great*

19  *New York streets the last six days alone and at night and all*

20  *day long and receive nothing but 'thanks' and thumbs up.  It is*

21  *the opposite of concern.*

22          Another conclusion Dr. Lebowitz made, based on the

23  fact that Ms. Carroll told her, that Donald Trump was the cause

24  of her inability to engage in romantic sexual relations.

25  That's what she told her.  She said I can't engage in romantic

1  relationships anymore because of this, because of Donald Trump.

2  So, Dr. Lebowitz put that in her report.

3       Look at this.  Listen to this.  There is a podcast,

4  OK, and there is a podcast where Ms. Carroll was on called

5  *UnStyled*, and she was asked the question about that and her

6  answer in this podcast was: *Well, after the episode in*

7  *Bergdorf's, I never had sex again but I think it wasn't because*

8  *of him.*  That is something that Dr. Lebowitz never heard.

9  Ever.

10       Ms. Carroll told Dr. Lebowitz she believed she lost

11  her job at *Elle* because of Donald Trump calling her a liar.

12  What she never told Dr. Lebowitz was that her editor in chief

13  loathed her for selling her story to *New York* magazine, a

14  competitor magazine.  This is from the trial:

15  "Q  Ms. Carroll never told you when you were interviewing her

16  that her editor in chief loathed her for publishing her story

17  in a competitor magazine, did she?

18  "A  No."  By Dr. Lebowitz.

19       So Dr. Lebowitz didn't know that so she was going on

20  the fact, OK, he got her fired because he said she was a liar

21  and we know that is not true.

22       You know, remember this, she claims that she was fired

23  because Donald Trump called her a liar.  Why did she say that?

24  So she could hold him financially responsible.  That's what she

25  is saying that.  We know that claim is not true.  We saw the

N585car4                    Summation - Mr. Tacopina

1   e-mail between Ms. Carroll and her agent saying that the editor

2   hated her, that Nina Garcia hated her.  Not because of Donald

3   Trump calling her a liar, but because, after decades of being

4   employed by *Elle*, she went behind their back and sold a story

5   to another magazine.  That's why Nina Garcia hated her,

6   according to the e-mail Ms. Carroll sent to her own agent.

7           Ms. Carroll told Dr. Lebowitz she didn't watch *The*

8   *Apprentice* a lot, in fact, she only saw it a few times.  Well,

9   we know that is not true.  Ms. Carroll didn't tell her what she

10  posted on social media which was that:  She was -- all caps --

11  a massive fan of *The Apprentice*, which she admitted in this

12  courtroom to you.  She was a big fan of the show.  And think

13  about that.  To believe her story she was raped by Donald Trump

14  you have to believe the show that she was a massive fan in --

15  or of -- was hosted by her rapist and she just watched it

16  repeatedly.

17          She also shopped at Bergdorf Goodman regularly, even

18  went to dressing rooms.  OK?  And she knew that part sounded

19  bad.  She knew that part about going to the dressing room

20  sounded bad so that last part about going to the dressing

21  rooms, she didn't want to say it to you, she lied to you, but

22  got caught.  Here is what she said initially:

23  "Q  OK.  And you go into changing rooms there when making

24  purchases?

25  "A  No.  I don't believe I ever went into a dressing room"

1    Because that wouldn't sound right but here is what she

2    said earlier from her deposition:

3    "Q  Did you go into changing rooms alone?

4    "A  Yes.  No, I never did?  Yes, I did."

5         Right in front of you.

6         You know this, folks, reminds me of a story, this

7    episode we just watched on cross-examination, and on occasion

8    humor creeps its way in whether it is the Court or plaintiff's

9    counsel or defense counsel.  Humor creeps its way in sometimes,

10   into a trial, and on occasion if you couldn't break the tension

11   that comes to bear with a case involving some serious

12   accusations we would all go nuts from the tension that comes to

13   bear as a result.  So, humor is OK.  Sometimes humor is the

14   best way to make a point that you remember long into the night

15   or long into your deliberations, however long you choose it to

16   be, but this story, it is in support because it is important to

17   understand because it is really what this whole trial was

18   about, the whole trial.

19        The story is of an old town long ago.  There was a

20   busy intersection, there were no cars, it was horses and

21   buggies, and a man is driving a wagon pulled by a horse, a

22   horse-drawn wagon through an intersection.  A dog runs out,

23   scares the horse, the horse rears up, falls on the dog, the

24   wagon turns over, falls on the man.

25        28 years later there is a court case about this and

1    the people who are being sued are trying to show the wagon

2    driver wasn't injured.  Even though the wagon fell on him, he

3    wasn't really injured so they're trying to show that.

4           They call the policeman who was the first man on the

5    scene, the first witness on the scene.  And they asked the

6    policeman, they said, *Sir, when you came to the scene, what did*

7    *the wagon driver say to you?*  And the police officer doubtfully

8    responds he said, *I'm OK, I'm OK.*

9           It seems like pretty solid evidence there is nothing

10   wrong with this guy, that he is not really hurt.

11          Then I get up and do what I do, the cross-examination,

12   the search for the truth, the complete story, and I say to the

13   officer, *Tell this jury everything you saw, everything you did*

14   *from the moment you came on the scene.*  And the cop says, *Well,*

15   *you know, I came there, it was terrible.  It was a horrible*

16   *scene.  The dog was howling in pain; he had three broken legs.*

17   *I took out my gun and I shot the dog.  Then I turned to the*

18   *horse.  The horse had three broken legs, he was whining in*

19   *pain, so I took out my gun and I shot the horse.  Then I turned*

20   *to the wagon driver, he said:  I'm OK, I'm OK.*

21          Now, those of you who didn't get it, that's because he

22   didn't want to get shot by the police officer.  And don't you

23   need cross-examination for the search for the truth?  That's

24   what that's about.  It is an analogy but that's what happened

25   in this case, you just saw it with Ms. Carroll again and again

1    and again.

2             Look.  Turning back to Dr. Lebowitz, she gave an

3    example of a Vietnam vet who walked down the street and had an

4    adverse reaction to just smelling Vietnamese food, it sent him

5    into a tizzy.  OK?  He had a reaction.  E. Jean Carroll can go

6    to Bergdorf, watch Trump on *The Apprentice* with no reaction at

7    all.  Dr. Lebowitz claims that rape victims engage in avoidant

8    behavior but not Ms. Carroll.  Not at all.

9             What else did we learn from Dr. Lebowitz?  That

10   Ms. Carroll doesn't have anxiety, doesn't have depression,

11   doesn't have PTSD.  She has absolutely no diagnosis whatsoever

12   to corroborate her claim of being raped because it never

13   happened.  Despite trying to come up with excuses for the

14   unbelievable, they never asked Dr. Lebowitz to discuss

15   Ms. Carroll claimed that she didn't shower after she was raped.

16   Never asked her that one at all.  I don't know if she would

17   have an explanation for that.

18            Likewise, they never asked Dr. Lebowitz about

19   Ms. Carroll joking on Facebook in August of 2012 about having

20   sex with Donald Trump for money.  That's her Facebook post.

21   Would you have sex with Donald Trump for $17,000 even if you

22   could (a) give the money to charity; (b) close your eyes and he

23   is not allowed to speak.

24            And I asked her, so you joked around about having sex

25   with Donald Trump for money on this Facebook post that you

N585car4                    Summation - Mr. Tacopina

1    made?  Answer:  Yes.

2         Think about that for a second.  You would have to

3    believe that she was joking around about having sex for money

4    with her rapist.  It's not believable which is why they didn't

5    even try to come up with an excuse for that one with

6    Dr. Lebowitz.  They didn't ask her about that.

7         And let's not forget this one, Defendant's Exhibit CU.

8    This is Ms. Carroll who posted a picture of herself on her own

9    Instagram of her walking for The Most Hideous Men in New York

10   City walking tour, the one that went through Tiffany's, NBC,

11   Fox News, Bergdorf.  And she posted that on her Instagram while

12   smiling standing next to a man dressed up as Donald Trump, her

13   supposed rapist.

14        I stated in my opening that a picture is worth a

15   thousand words and you see that during this trial why this

16   picture is worth so much more.  It is unbelievable that E. Jean

17   Carroll would have been raped by Donald Trump.  The man she

18   says is responsible for destroying her reputation, her career,

19   her romantic life, her life, would have caused her these

20   painful intrusive thoughts and yet there she is gleefully

21   posing with his likeliness.  And they didn't ask Dr. Lebowitz

22   about that one either, they didn't try and explain that one

23   away.  It is unexplainable.

24        And look at what she, Ms. Carroll, posted under this

25   photo.  Not taking the orange jumpsuit -- not taking off the

1    orange jumpsuit -- which I guess is prison attire -- until

2    Weinstein, Spacey, and certain hideous men are in jail.  The

3    Most Hideous Men in New York City Walking Tour.  Onward.

4            Do you know who she doesn't seek to put in jail there,

5    obviously is the person who she claims raped her.  And on that

6    point, there is no -- I mean no -- objective evidence to

7    corroborate her claim including a police report.  That's

8    because she never went to the police.  Never went to the

9    police.  Even though Ms. Carroll said to you that's not an odd

10   fact.  In her book she described it as an odd fact.  She wanted

11   to clear it up before she even told her story.  This is from

12   her book:  *There are several facts, however -- and I will try*

13   *to make them as unsexy as possible* -- whatever that means -- *in*

14   *fact are so odd I want to clear them up now before we start:*

15           *Did I report the attack to the police?  No.*

16           She comes on and says, no, I didn't go to the police

17   but there in her book she did.  But the thing is even in her

18   book, she never cleared it up, she didn't explain why she

19   didn't go to the police.  All she said was, No.  She only

20   provided an answer to that when asked on television, this is

21   Defendant's Exhibit AW.

22           (video played)

23           MR. TACOPINA:  Absorb that for a second, if you would.

24   How, please tell me, would that be disrespectful if it really

25   happened?  What was she saying?  Going to the police to report

N585car4                          Summation - Mr. Tacopina

1       a violent rapist would be disrespectful to other rape victims

2       around the world.  How would that be, exactly?  How would that

3       be disrespectful to other rape victims?

4                   See, what she really meant to say, and it almost

5       slipped out, was it would be disrespectful to true rape victims

6       to make a false police report.  That's why she was never going

7       to the police.  I mean, first of all, she talks about there

8       being this issue about the women down by the border -- I

9       wouldn't go to the police because the women down by the border

10      are being raped.  Well, first of all, there is no border crisis

11      in the mid-1990s.  That was a today thought so she realized

12      when she said that, ah, oh boy.  And the women around the

13      world -- so it is not just the women down at the border -- the

14      women around the world who have been raped, it would have been

15      disrespectful to you if I report a rapist.

16                  Come on.  It doesn't strike anyone's common sense

17      cords at all.  At all.  That was very telling in that

18      television interview.  Here is the real reason she never went

19      to the police, ladies and gentlemen.  She never went to the

20      police because it didn't happen.  And when you go to the police

21      and file a police report and make a complaint that someone

22      raped you, the police do a real investigation, you know, with a

23      crime scene unit and forensics and they do all of that stuff

24      that a police investigation would require, especially on an

25      allegation serious as rape.  That's why she didn't go to the

1   police.  Because they would have investigated the real way.

2   They would have gone to Bergdorf.  Do you have video cameras

3   here?  Let me see if you have Donald Trump and Ms. Carroll

4   together, on the first floor even.  Uh, do you have a date,

5   Ms. Carroll?  Like do you have one?  A little bit?  A police

6   investigation would not be something she would want, that's why

7   she didn't report it to the police, not because she didn't want

8   to be disrespectful to the people down at the border who

9   weren't even having an issue in 1995 or 1996.

10        You know, bringing a civil case is very different.

11  Now, you hire a lawyer, the lawyer sues someone, and you go to

12  court.  That's it.  No one does an independent investigation.

13  No one.  Along the same lines she even told you she never even

14  went back to think about looking for surveillance video at

15  Bergdorf Goodman which would have proven her case.  She didn't

16  think about it because it never happened.  Likewise, there is

17  no medical records, there is no therapeutic records to support

18  her claim because she never went to a doctor, psychiatrist,

19  psychologist, again, because it didn't happen.  And that's the

20  reason there is no diary entry about something as horrific as

21  this if it were real.  No diary entry.

22        Ms. Carroll is a writer who kept diaries her entire

23  life.  She told you.  But she doesn't have a diary entry

24  regarding this incident.  Why, Ms. Carroll?  Well, I never

25  write anything negative in my diaries, she said.  You know I

write things like:  Threw the ball to the dog.  Took a walk.

That's what she puts in there:  Dear Diary, Today I took a

walk.

         You know, you know that is not true.  And you know it

is not true also not just because I am saying it is not true

but because common sense says it is not true because the last

thing you heard in this case, which is a stipulation which

means an agreement between the two parties, establishing that

Ms. Carroll had in fact made negative entries in her diaries,

that he listed three of them.  She made negative entries in her

diaries, just not that one.

         All objective evidence cuts against her -- all of

it -- in this case.  So they don't present evidence, they

present excuses for lack of evidence and they don't make sense.

They just hope -- again, I keep saying it because it is the

only reason we are here -- they hope you will be blinded by the

hatred for Donald Trump if you feel that way.  They just hope.

         So how did this unbelievable story come about?  What

are the motivations for it?  Well, the genesis of the story is

Ms. Carroll's book.  She told you people would be interested in

Donald Trump's story and selling books was important to her.

She tried to downplay that motivation claiming -- remember this

one -- I don't know what a signing bonus is.  She used that

exact term herself.  This is trial testimony in front of you

all, you jurors who she swore to tell the truth to here.

1   "Q  Do you recall previously testifying that you may have

2   gotten a signing bonus?

3   "A  I -- I don't know.

4   "Q  You don't know?

5   "A  I don't know what a signing bonus is."

6       She said to you

7   "Q  I'm sorry, Ms. Carroll, did you just say you don't know

8   what a signing bonus for a book advance is it?

9   "A  Yeah.  I have no idea."

10      That's her sworn testimony and she wants you to

11  believe.  Look what happened.

12      (video played)

13      MR. TACOPINA:  Hmm.  You know?  That's just wrong.  It

14  is just wrong to get up on the witness stand and swear to you.

15  Signing bonus?  What do those words mean?  I don't know what a

16  signing bonus is.  She brings up in her sworn deposition, under

17  oath, only a few months ago in October of 2022, that's her

18  testimony.  So why would she lie to you about that?  Why?

19  Because she wanted to minimize her financial reasons for making

20  up this false story which was to sell her book.  Sell her book.

21  She told you how important selling her book was.  She went on a

22  quest for it.  And this is with Ms. Birnbach, she and Lisa

23  Birnbach, by the way, Ms. Birnbach was all too happy to

24  piggyback on Ms. Carroll's story as an opportunity to sell her

25  own books.  This is Ms. Carroll commenting to Ms. Birnbach

N585car4                    Summation - Mr. Tacopina

1    about them selling books together and she said -- well -- and

2    Ms. Birnbach first writes:  Uh, we could talk about your book

3    because that was the point but maybe sell a couple copies of my

4    book too.  We'll see.

5           And then Ms. Carroll:  The main thing is -- all

6    caps -- to sell books.  That's the main thing.

7           Ms. Birnbach tried to minimize that saying, well,

8    Ms. Carroll wasn't really able to have a book tour so these

9    book events were as much as she got to do.  Well, that's not

10   true.  That's not true.  I don't know why she said that because

11   Ms. Carroll told you about her podcasts, television interviews

12   you saw her pushing her PR agents, actually berating her PR

13   agents for not getting her more press.  She wanted more and

14   more and more.

15          You know, here is a woman who claimed she couldn't

16   talk about this to anybody for 25 years, all of a sudden she

17   can't stop talking about it.  Get me more press, that e-mail to

18   the PR agent.  I want more.  I did the New York Times.  I got

19   the big interviews.  Get me some more, you are the big agency.

20          Couldn't stop talking about it.  25 years, not a word.

21   It became her lifestyle.  Carol Martin told you that.  I didn't

22   tell you that, Carol Martin said that, her friend.  And

23   Ms. Kaplan said I attacked her for having a lifestyle?  No.

24   No, no, no, no.  Her behavior is relevant for your

25   consideration but if anyone attacked her lifestyle it was her

1   good friend Carol Martin, not me.  Let's go through it and see

2   if you think it is consistent with someone who went through

3   what she claims she went through.

4          You heard she had a watch party for her lawsuit like

5   it was a movie premier or an NFL drafting or something.  They

6   had a watch party for her lawsuit so people could gather around

7   and celebrate her.  And remember the reaction she blurted out

8   on the witness stand about that?  She was reading e-mails about

9   her parties and watch parties and all the celebration of her

10  and she said, *I'm happy to read these e-mails.*  Just blurted

11  that out.  E. Jean Carroll told you status in New York was

12  important to her, that's from her trial testimony.

13  "A  Status is important in New York, that's for sure."

14         And her accusing Donald Trump definitely gave her her

15  status and media exposure, which she loved; you saw with her

16  agents:  More.  More.  More.  More.  I want more TV.  More

17  podcasts.  And you saw her on Anderson Cooper living it up.

18  Living it up on CNN.  Now, having -- to borrow her word -- she

19  was having a fabulous time.  You saw her bizarre behavior on

20  that interview.  You heard even stranger things she said.  You

21  saw Anderson Cooper's reaction.  He almost had a fit at the

22  end.  Watch.

23         (video played)

24         MR. TACOPINA:  So, you get to evaluate that yourself,

25  I don't have to tell you what you see there or what you should

1   see.  You are all people with common sense and street smarts,

2   tell us how that resonated with you.  You can decide that.  But

3   she certainly presents herself very differently on that program

4   than she did in this courtroom.  In fact, she told you she

5   didn't cry there or on any other TV show she had been on

6   talking about this or on any podcast in her multiple, multiple

7   under-oath depositions about this case where she had to do

8   nothing but talk about the event.  Never cried once.  And on

9   redirect they got back up when her lawyer questioned her after

10  I cross-examined her and tried to suggest she cried because I

11  was asking about screaming on cross-examination.  Most of her

12  crying in this case was done on direct examination before I

13  even got up.  When she was asked questions about her lawyer and

14  what did she say about the crying itself?  It was because she

15  was astonished that in 2023 someone could ask her about not

16  screaming; it was offensive and astonishing.

17          Well, she asked herself that question, folks, before I

18  ever came into this picture, for sure.  This is her book

19  proposal, she was getting ready for her book proposal, this is

20  in evidence, and she knew she was going to be asked questions

21  when presenting her book proposal and one of the questions she

22  prepared, her Q&A:  Why didn't you scream?  And she gave her

23  answer:  Too much adrenaline pouring through me to think to

24  scream.  She asked herself that question when she was writing

25  her book and preparin to go out and sell her book.  Feigning to

N585car4                    Summation - Mr. Tacopina

1    be offended when someone follows up own that question?  She

2    prepared that question because she knew it was a problem with

3    the story.  That's why she had four different versions for why

4    she didn't scream:  Four.  One, I'm not a screamer; two, Donald

5    Trump's chest interfered with her screaming; three, the one you

6    just saw, too much adrenaline to think to scream; and number

7    four, she didn't want to make a fuss in Bergdorf Goodman about

8    making a fuss while being raped.  Four different reasons she

9    gave.

10           And understand this folks, please, if there is any

11   questions, I am a father of two daughters, I would never tell a

12   real rape victim how they should actually act or what they

13   should actually do or shouldn't do.  I was asking those

14   questions because she gave four different answers for why she

15   says she didn't scream.  She even asked herself that question

16   preparing her book tour.

17           But common sense cannot be left at the door.  We are

18   not talking about a generic assault in the secluded woods

19   somewhere.  She was in an upscale department store, with

20   attentive personal shoppers, in the heart of New York City,

21   with a New York City celebrity.  Make no mistake about it,

22   E. Jean Carroll told people she was fabulous coming out with

23   the story because she was fabulous.  This was her moment, she

24   became a star.  And you heard her.  After appearing on CNN that

25   night, she went to a party with her friends and editors and she

1    told them she was having a ball.  She said it was a great

2    night.  She said it to you, ladies and gentlemen of the jury.

3    And obviously she said when she was testifying here, you know,

4    that she had a great night when she was talking to you about

5    that party.  When she was testifying that wasn't her public

6    persona.  When she was testifying here that was her real

7    persona, right?  She didn't come in here with her public

8    persona but yet she told you she still had a great night at

9    that party.

10        She even made a point to go to Bergdorf Goodman that

11   day to buy a pair of earrings as a gift for the hostess who

12   organized the party for her.  And just stop and think about

13   that for a second.  In order to buy a gift for the host of the

14   party meant to celebrate her talking about being raped at

15   Bergdorf Goodman by Donald Trump, she went to Bergdorf Goodman

16   to buy a gift.

17        You know, in this courtroom they try to tell you that

18   when she said she was brave it was just a public persona and

19   that she was very different in private, but what she said in

20   her public book, on TV, she also said it in her private

21   deposition under oath.  She said I'm great for two decades.

22   And think about it.  That was not on TV or in her book or on a

23   podcast, it was under oath in a deposition in preparation for

24   this case.  That's the transcript.  And this is important in a

25   second.  Watch:

1  "Q  During the two decades that followed, how would you say the

2  alleged attack impacted your life?

3  "A  Well, four or five years ago I would have told you no

4  effect.  I'm as good as new.  This is great.  I'm fine.  I

5  rarely think of it.  But I've come to understand that the rape

6  changed my life which is shocking to me."

7         So she is saying here is for two decades never thought

8  about it.  Never.  But then, when she can sue for rape under

9  the Adult Survivors Act and she filed that second lawsuit last

10  year because they opened up that window, now when she can sue

11  for rape, she had intrusive thoughts since this first happened.

12  There wasn't a 20-year void there anymore.

13         Look at this testimony.  Dr. Lebowitz told you:

14  "Q  Now, during your interview, Ms. Carroll told you she had

15  intrusive images that have been ongoing since the alleged rape;

16  correct?

17  "A  She did."

18         Well, there you go again.  One instance she says I am

19  completely different and then the other instance.  And this one

20  was changed because now she can sue for rape and try and get

21  damages for rape so now it is has been on her mind ever since

22  that day.  Before she could sue for rape, never thought about

23  it, doesn't enter her mind.

24         The fact is, E. Jean Carroll was never better until

25  she was thrust into the spotlight after falsely claiming she

1  was raped by the president of the United States.  That's when

2  she brought it out, when he was president.  She said she made

3  more money with Substack, said she got her revenge on *Elle* with

4  her own admission, and received lots of love and support.

5          Look at this.

6          (video played)

7          MR. TACOPINA:  Putting aside their reputational harm

8  expert, who is irrelevant if you find there was no sexual

9  assault, which there wasn't, but she comes in here,

10 Ms. Humphreys, and says she never measured the positive impact

11 of Ms. Carroll's accusation against Donald Trump, only the

12 negative.  Meaning she ruled out the fact that the positive

13 impact, which Ms. Carroll talked about when she was talking

14 about the support and love, she didn't measure that, whether it

15 far outweighed the negative impact she had.  But, more

16 importantly, the entire analysis is irrelevant here because,

17 again, Ms. Carroll was not defamed by Donald Trump when he

18 strongly denied the rape allegation.  She wasn't defamed

19 because it was false.  And remember, if there is no rape, there

20 is no defamation.  And you will see when you get the verdict

21 sheet all the different rapes and assault, it is all one.

22 There is no sexual assault and there is no defamation, they go

23 hand in hand.

24         You heard, among others reasons, Ms. Carroll's

25 political motivation for making a false accusation.  You heard

1    that come out.  This is from the initial draft of her book

2    which a publisher must have realized was so harsh, so bad, it

3    called into question her credibility because it was removed

4    from her final version but I get to show it to you at trial.

5         This was from her initial version of the book:  *But*

6    *now after two years of watching the man in action, I've become*

7    *persuaded that he wants to kill me.  He is poisoning my water.*

8    *He is polluting my air.  He is cooking my planet.  As he stacks*

9    *the courts my rights over my body will be taken away state by*

10   *state.  I am afraid that my right to free speech will go next*

11   *so now I will tell you what happened.*

12        Now, just to be clear, I asked Ms. Carroll, I said,

13   that's what you wrote in the initial draft of your book,

14   correct?  And the last four lines here on this big thing and

15   she says -- I asked:

16   "Q  That's what you wrote in your initial draft, correct?

17   "A  Yes.

18   "Q  That part never made it to the book, did it?

19   "A  No."

20        You know why that didn't make it into the book.

21   Because it showed the political bias and the motivation for now

22   I'm going to tell you the story.  Likewise, you heard

23   Ms. Carroll acknowledge that the same month she filed her

24   lawsuit against Donald Trump, the first lawsuit, the defamation

25   one in November of 2019, she posted on Twitter:  *Why isn't a*

1    *rape allegation worthy of an impeachment inquiry?*  She thought

2    her story would get him impeached or at least an inquiry.  She

3    posted that on Twitter.

4            You heard Lisa Birnbach, what she thinks of Donald

5    Trump politically.  She tried to downplay that right out of the

6    box, her political bend right out of the box on

7    cross-examination, second question by Mr. Brandt:  Have you

8    made campaign contributions always as a democrat?  And her

9    answer was:  I think I gave, once, a little bit of money to a

10   pro-choice republican -- this actually may have been on

11   direct -- but here is her answer:  I gave money to a republican

12   once.

13           OK?  Now, the one problem with that answer is her

14   previous sworn deposition was that she only -- only -- donated

15   to democrats:

16   "Q  Have you ever donated to any political campaigns in the

17   past?

18   "A  Yes.

19   "Q  Which campaigns?

20   "A  Many.

21   "Q  And have all of those been democratic campaigns?

22   "A  Yes."

23           So, again, make no mistake about it, this was a woman

24   who hates -- hated and hates -- Donald Trump with a passion.

25   Hates him politically and personally with a passion.  Her own

N585car4                    Summation - Mr. Tacopina

words posted on Facebook, and I asked her this -- or Mr. Brandt

asked her this, did she recall posting it on Facebook:  "Does

it get worse than Donald Trump?  Could he be more of a

slimeball for whom there are no consequences?  Will America

survive this administrative?  Will we?  Some days I am just not

sure.  I'll tell you one thing, in my entire life I have never

felt the hatred that I feel towards this person."

          And she says she made that statement.  Here is a

person who, by her own account, thinks about Donald Trump every

hour, every day, whether she is awake or asleep.  She thinks it

is unfathomable that he be treated as anything but a

cataclysmic self-interested person who is not good for America.

She thinks about him even when she sleeps every day, every

hour.

          Ms. Birnbach told you she thinks Donald Trump, for

what he has done politically, should be held accountable.  She

decided to take matters into her own hands and hold him

accountable and her friend E. Jean Carroll gave her just that

opportunity.  In fact, she told you exactly -- exactly --

Ms. Birnbach, what her mindset was -- that Donald Trump would

be dealing with so many lawsuits he won't be able to run for

president.

          Carol Martin likewise -- you saw the message from

Carol Martin, that poor lady that was in here, about how much

she hates Donald Trump politically:  *I can't bear to listen to*

1   *Trump.  I feel unsafe under his rule.  I hate Donald Trump more*

2   *than words.  He deliberately abandoned us.*

3           The reasons Ms. Carroll, Ms. Birnbach, and Ms. Martin

4   colluded to advance this false rape story from 27 or 28 years

5   ago weren't well hidden before you.  And you know what else

6   they couldn't hide from you which shows that they made this up?

7   The fact that none of them -- none of them -- spoke to anyone

8   else about it again, not even amongst themselves.  Never again,

9   until Ms. Carroll's book decades after the fact.  They just had

10  this one quick conversation, never spoke about it again,

11  Ms. Birnbach wasn't allowed to think about it, she thought, we

12  will get to that, never a word to each other ever, or anyone

13  else.  That's just an amazing fact, too amazing to be true.

14  Amazing.  And that's the word that Ms. Martin used, not me.

15  She used it herself, despite what E. Jean Carroll told you,

16  Carol Martin said she wasn't even asked to remain silent:

17  "Q  And why do you think you never discussed it?"  I asked

18  Ms. Martin:

19  "A  It was sort of amazing but she didn't ask me not to.  But

20  it just wasn't something we talked about."

21          Amazing.  Odd.  Inconceivable.  Unbelievable.

22  Everything in this case is one of those things.  But you are

23  supposed to buy it hook, line, and sinker.  So understand that

24  testimony right there.  Carol Martin, according to her, sees

25  her friend at work the next time they were at work -- they were

N585car4                    Summation - Mr. Tacopina

1    work friends, really -- and she told her in her house that she

2    had been raped by Donald Trump.  And when she sees her at work

3    and doesn't even say *How you doing?  Are you OK?*  Never.

4    Never.  *Do you need anything?*  That's what they actually

5    testified to.  Do you really believe that, ladies and gentlemen

6    of the jury?

7            Is that just another amazing claim?  Ms. Martin didn't

8    tell anyone, not her husband, not during the election night

9    even though she hated Trump, felt so strongly about Donald

10   Trump politically?  Didn't mention it?  *Oh my God, he is going*

11   *win, he raped my friend.*  And why is that?  Because they didn't

12   get together and collude until Ms. Carroll's book.

13           The devil is in the details, especially when it comes

14   to things that weren't in Ms. Carroll's book.  It is easier to

15   read the book and remember what is in the book but there was no

16   script for, I don't know, for instance, for how Ms. Carroll

17   claims to have told Ms. Martin about her rape.  According to

18   Ms. Carroll, she says she mentioned a few details about the

19   sexual assault at work and then Ms. Carroll said let's go back

20   to my house and talk about it tonight.  That's what she said.

21           In fact, it is your testimony that you gave Carol

22   Martin a few details right there and then while still at work?

23           Yes, I did; Ms. Carroll said.

24           According to you, after you gave Ms. Martin a few

25   details about what supposedly happened, she told let's go,

N585car4                    Summation - Mr. Tacopina

1    let's talk about it at my house tonight?

2           Yes.

3           So, that's Ms. Carroll's version.  Of course, this is

4    not part of the book.  Ms. Martin says something completely

5    different, that they didn't discuss it or she didn't know

6    anything about it until they got to her home.

7    "Q  Anyway, it is -- Ms. Martin, it's your testimony before you

8    got to your house and had that conversation did you know

9    specifically what Ms. Carroll wanted to speak to you about?

10   "A  No, I did not."

11          According is to Ms. Martin it was an ordinary day and

12   Ms. Carroll simply asked if they could go back to the house and

13   talk, in fact, contradicting Ms. Carroll's testimony, E. Jean

14   Carroll's testimony.  Ms. Martin said Ms. Carroll didn't give

15   her any details about this until they got to their home.  What

16   did she say?  Again, taking this piece by piece, what did she

17   say happened?  She introduced it to me by saying you won't

18   believe what happened to me the other night, as I recall, and I

19   didn't know what to expect so I just turned to her and she

20   said:  Trump attacked the me.  According to Ms. Martin it was

21   an ordinary day and Ms. Carroll simply asked to hang out after

22   work, and of course that contradicted what Ms. Carroll said to

23   you all.

24          And you saw the message from Ms. Martin to E. Jean

25   Carroll about definitely needing to get together with her and

N585car4                     Summation - Mr. Tacopina

1   Ms. Birnbach before Ms. Martin's deposition in this case.  Look

2   at that right there for a second, folks.  That's a text message

3   from Ms. Martin to E. Jean Carroll.  You, me, and Lisa

4   definitely -- all caps -- have to get together and sit and chat

5   before then.  And what they're talking about is, if you look up

6   above, her being prepared for her deposition from her lawyer.

7   She has a deposition coming up and they have to get together

8   before then.

9           Think about what that tells you.  Think about what it

10  tells you, really.  If they were being truthful, why do they

11  definitely have to get together before the deposition?  Why?

12  Why?  You're being deposed under oath, tell the truth, nothing

13  but the truth, and then leave.  Why do we definitely have to

14  get together before I am being deposed?

15          And again, she never thought this message would ever

16  see a courtroom.  Never.  She was shocked.

17          But even with this scheme, they didn't think to nail

18  down the details of their story.  But, even if they could,

19  there is simply no plausible explanation at all as to why they

20  didn't talk amongst themselves even once before Ms. Carroll's

21  book except for the obvious:  The story was made up for

22  Ms. Carroll's book.  I mean, put yourself in those shoes for a

23  second.  Your best friend or a friend tells you they were raped

24  by someone everyone knows and you don't even follow up and ask

25  are you OK?  20 years.  The guy is running for president.  You

are watching the election with that friend.  Do you believe

this?  The guy who raped you?  No.  Nothing.  Until the book.

          Lisa Birnbach actually said that she forgot her friend

was supposedly raped by Donald Trump.  Forgot.  For 20-some

years.  Think about what Ms. Birnbach had to say about this.

Ms. Birnbach says she didn't even think about this story on

election night 2016, that Donald Trump, the person she hated

more than anybody according to her message, had raped her close

friend E. Jean Carroll.  She is watching the election with

E. Jean Carroll.  They're sick to their stomach that Donald

Trump is winning.  Not that they can't even talk about it, it

didn't cross her mind.  It didn't even cross her mind.

          The testimony of Ms. Birnbach:

          It is your testimony that on that night, at your

residence, with Ms. Carroll present, it never came up in your

mind, the connection between Ms. Carroll and Mr. Trump and the

alleged incident in Bergdorf Goodman?

          That is correct.  It did not come up.

          It didn't enter your mind?

          I wasn't thinking about it.

          Please.  Come on, ladies and gentlemen.  Where do we

all come from?  There is no way that is truthful testimony.  Or

it is truthful because nothing ever happened.  There is no way

you would not be talking to your friend about it because you

don't remember it.

N585car4                    Summation - Mr. Tacopina

1          And when questioned about this by the New York Times,

2     what her reason for it not crossing her mind is she didn't

3     recall that her friend was raped by Donald Trump.  When

4     testifying here, Ms. Birnbach put it a different way saying she

5     just wasn't tapping into that part of her brain.  Whatever that

6     means.  She wasn't tapping into that part of her brain.  But

7     regardless of how she describes it, is it at all believable

8     that she forgets that the man winning the presidential

9     election, whom she hated, raped the friend she was watching the

10    election with?  Is that at all believable?

11         Lisa Birnbach realized that was a problem so her

12    explanation that she didn't think about it until Ms. Carroll --

13    listen to this -- until Ms. Carroll gave her permission to

14    think about it.  This is the testimony:

15         And that is because Ms. Carroll reminded you of it in

16    2019?

17         When E. Jean told me she was writing about it she gave

18    me permission to think about it again, and there are parts of

19    the phone call I remember, it is just a phone call I remember

20    vividly.

21         OK.  How is that possible?  That a person needs

22    permission to remember something, to be able to think about a

23    memory?  That is not how thinking and remembering works.  Is

24    that at all believable, that Lisa Birnbach didn't think about

25    her friend being raped by the presidential candidate during an

1   election because she was not given permission to do so?

2          It is like fantasy world stuff.  It is more likely

3   that it never came up in 2016 during that election because

4   E. Jean Carroll hadn't come up with her story yet for the book.

5   Lisa Birnbach says she went to a dinner on February 14, 2018 at

6   which Ms. Carroll gave her and Ms. Martin the blue envelopes

7   with the ribbon on them that was sealed and says:  *Please read*

8   *them, but don't show these to anyone.*

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. TACOPINA:  Please read, but don't show to anyone,

2     the blue ribbons and whatnot.

3          Well, Ms. Birnbach claims she didn't even open the

4     envelope because something in the way she said it made her feel

5     like it might create responsibilities that she wasn't prepared

6     to have at that time, again, whatever that means.

7          "Did you open the envelope Ms. Birnbach?

8     "A  No.

9          "So did you -- you didn't read what was inside?

10    "A  No, I did not.

11    "Q  Why not?

12         "Something in the way she said it made me feel like it

13    might -- it might create responsibilities that I wasn't

14    prepared to have at that time."

15         Just like, blah, just say things.  She said it sounded

16    like it could be something heavy that she wasn't ready for,

17    Ms. Birnbach, in further testimony.

18         Mr. Brandt asked:  "What do you mean by that?

19         "Well, if I had to read it but not tell anyone, you

20    know, it sounded just like it could be something heavy that I

21    wasn't ready for."

22         So you are a writer and your writer friend gives you

23    something to read.  You don't know what it is, but because it

24    just sounded like something heavy, you didn't read it?  Does

25    that make any sense?  I keep asking that question because it's

an appropriate question.  Does that make any sense?

        This is supposed to be the same friend she trusted

enough over 20 years earlier to supposedly confide that she had

been raped.  And even though Lisa Birnbach said she didn't know

what was in the envelope, you heard Ms. Martin tell you they

had a sense about what was in it.

        Here's Ms. Martin's testimony on the famous envelope:

        "And did you read the chapter after she gave it to you

that night?

"A  I didn't read it right away, but we"——herself and Lisa

Birnbach——"had a sense of what it was about because we knew

what had happened, so."

        Of course they knew what was in that envelope, ladies

and gentlemen.  They knew.  And they knew what was in that

envelope because E. Jean Carroll sent a text to Lisa Birnbach

admitting that.  Do you remember this?  This is Defense Exhibit

AG.  It is in evidence.

        E. Jean Carroll to Lisa Birnbach:  "I told Megan that

I gave" -- Megan is the *New York Times* reporter.  "I told Megan

that I gave you and Carol the chapter at our Carmine's dinner.

That neither of you read it.  That I turned over the entire

book to you when I got sick, and we agreed you would publish it

when I croaked.  And you never read it.  And I copped to the

fact I sent you the proof of the excerpt before it was

published with instructions not to forward it, copy it, etc.

1  Are you eating birthday cake?"

2          Okay.  So look at that message.  What is E. Jean

3  Carroll telling us here?  She told Ms. Birnbach -- and, by the

4  way, she said that if they had any changes to the excerpt, they

5  should let her know.  Okay?  But Ms. Birnbach and Ms. Martin

6  here are about to be interviewed by *The New York Times*

7  reporter, Ms. Twohey, Megan Twohey, and Ms. Carroll can't have

8  the reporter thinking that her friends got the story from her

9  book, so she gives Ms. Birnbach and Martin, wink, wink, that

10 neither of them read it.  She says it twice.  "Neither of you

11 read it" and "neither of you read it."  Why does she have to

12 tell them they didn't read it?  She is telling them that's the

13 answer.  When you speak to the reporter, you didn't read the

14 book.  You didn't read it.

15         Both Ms. Birnbach and Ms. Martin would have you

16 believe that they didn't read that chapter.  Ms. Birnbach would

17 have you believe she had no idea what was even in the envelope,

18 just a big blue envelope with a ribbon on it that she never

19 opened.

20         But here Ms. Carroll admits they both read it and knew

21 exactly what it was, even though she first lied to the *New York*

22 *Times* reporter, Ms. Twohey, about that.  She admits that they

23 both read it by telling them, remember, neither of you read it.

24 Twice she has to tell them that to remind them.

25         In fact, Ms. Carroll was still lying to you in this

1   courtroom about that.  She actually claimed in front of you --

2   let me clear that thing.  She claimed in front of you that she

3   doesn't know to this day if Ms. Martin or Ms. Birnbach actually

4   read the chapter, to this day, that's the testimony.  "I don't

5   know if Carol or Lisa actually read the chapter.

6           "To this day?

7           "To this day."

8           Here they are testifying, her very close friends

9   testified in this courtroom for her about her story.  She

10  doesn't know if they read the book still, still.

11          Lisa Birnbach went with Ms. Carroll to an event to

12  sell her book.  Does that sound credible?  Of course not.  In

13  fact, they both acknowledge that they knew their names weren't

14  in the book.  Both Ms. Martin and Ms. Birnbach acknowledge:  We

15  know our names weren't in the book.  Hmm?  How did you know

16  that?

17          Well, why lie about reading the excerpt then.  Why?

18  Let's ask the question, right?  I'm saying it, but why lie

19  about reading the excerpt, why lie to Megan Twohey about it,

20  and why lie to you?  Because they knew, they knew, that's where

21  they got the details of the story from.  Not from remembering

22  some outcry 27 or 28 years ago that no one remembers the year

23  or the date, but because that never happened.  That's where

24  they got the story from.

25          Or is Ms. Birnbach's story more believable?  Remember,

N582Car5                     Summation - Mr. Tacopina

1   Ms. Birnbach told you that she and Carol Martin were only work

2   friends in the mid 1990s.

3            "How would you describe your relationship with

4   Ms. Carroll in the mid '90s?

5            "We were -- we were more work friends.  We became more

6   work friends, especially when the other couple split up and we

7   didn't have that social fabric in between us."

8            so they were work friends.

9            And of course they didn't become close friends until

10   six years later, around 2017.  What else happened in 2017?  Oh,

11   the book happened in 2017.  That's when they became close

12   friends.

13            They would have you believe that Ms. Carroll's first

14   thought was to immediately call Ms. Birnbach 27 or 28 years

15   ago, her work friend.  And remember what Ms. Birnbach

16   claimed -- I'm sorry, what Ms. Birnbach claimed that E. Jean

17   Carroll told her during that phone call?  It was almost a

18   verbatim, verbatim account of her book excerpt on Donald Trump,

19   that phone call.  Basically they want you to believe that

20   Ms. Carroll called a work friend, dictated a chapter of her

21   book over the phone over 20 years before it was written during

22   a three-minute call.

23            And what do I mean by that?  Look what Ms. Birnbach

24   said the call was about.  It took actually Ms. Birnbach longer

25   than three minutes to testify to the story she said happened on

1    that phone call.  Are we really supposed to believe that

2    Ms. Carroll dictated this book, all these details, while she

3    was exasperated after being attacked or laughing and after she

4    said she had been sexually assaulted?

5            Look at what Ms. Birnbach claims to have remembered

6    about the phone call.  E. Jean said that after work that day

7    she had gone to Bergdorf's to look around.  Now, this is the

8    phone call, the outcry, the urgent phone call to her friend

9    that she had just been assaulted.  "So I went to work" -- "to

10   Bergdorf's that day after work.  I looked around.  I was on my

11   way out.  I believe it was a revolving door."  You imagine that

12   in the phone call?  My God, it was a revolving door that I saw.

13   And on the other side of the glass from her going in, as she

14   was going out, Donald Trump said to her, "Hey, you're the

15   advice lady," and she said, "You're the real estate guy."  This

16   is allegedly what Ms. Birnbach remembers from the phone call,

17   the outcry phone call.  This is the book.

18           But, anyway, let's go on.  He said:  You're so good at

19   advice, you are so smart, why don't you help me pick out a

20   present for a friend?  So she thought she would -- it sounded

21   like a funny thing, this guy, who is famous, and she went back

22   to the store and tried to in my -- in my memory tried to show

23   him things; would she like a hat?  And then she eventually gets

24   on to talk about what she says happened in the dressing room.

25           But imagine that's the phone call when you are

1  exasperated and you feel like you just got out of a fight for

2  your life and you called your friend to try and make it better,

3  and you start going into details.  I think I was looking for a

4  hat.  I think the door was a revolving door.  You know, this is

5  what Lisa Birnbach says she remembers from 27 or 28 years ago.

6  That's not a phone call.  That's the book.

7          And this is from the person who, by the way, she gave

8  all these details of that phone call to you in court after she

9  claims they were wiped from her memory bank for 21 years, gone,

10 that she didn't even remember it for 21 years.  But yet now 28

11 years later she is back here remembering revolving door, hats

12 from that phone call.  Do you think that's credible?  Do you

13 think that's believable?

14         You know, she said this was a phone call she got from

15 Ms. Carroll.  Again, that's the story in Ms. Carroll's book,

16 which she claims she didn't even read.  And remember, this is

17 supposedly right after Ms. Carroll claimed she was attacked and

18 gives these sort of details, you know, borrow Ms. Kaplan's

19 words.  Really?  Really?

20         Consider this.  Ms. Carroll's explanation as to why

21 she called Ms. Birnbach out of all people that day, which of

22 course never happened, but it was because she thought

23 Ms. Birnbach might believe it was hysterical that I had just

24 been attacked.  That's why she called Ms. Birnbach.

25 Ms. Birnbach might have believed this was hysterical, and that

1  would have been okay.

2         When questioned about this, Ms. Carroll, what did she

3  say?  She said it hadn't even occurred to her that she had been

4  raped until Ms. Birnbach told her.  Didn't even occur to her

5  that she had been raped until Ms. Birnbach told her.

6         So this is the advice columnist who gives loads of

7  people advice about rape and gave them the New York City rape

8  hotline number.  She didn't know she was raped, according to

9  her, until her friend told her.  And her friend she was hoping

10 would think the whole thing was hysterical.  Why would anyone

11 think that was hysterical if that really happened?

12        Now, watch this next thing, because this will put it

13 all together, how Ms. Martin and Ms. Birnbach got sucked into

14 this thing, and they never thought it was going to be here.

15 That's for sure.  It's not as simple as they all came up with a

16 lie, as Ms. Kaplan said.  It didn't start that way, that they

17 all came up with a lie.

18        Follow this.  I will explain it slowly.  This is

19 crucial to this case because it's how Ms. Birnbach and

20 Ms. Martin got dragged in here.  And it's not everyone lying.

21 I don't think Cande Carroll's lying or Robbie Myers.  I'm sure

22 she was a great writer.  Who cares if she was a great writer?

23 Who cares?  She left two years before Carroll got fired.  I

24 don't think the Bergdorf witnesses are lying, or anyone else is

25 lying, everyone's lying.  No.  Ms. Carroll's story is

1     fabricated and made up.

2              Ms. Martin and Ms. Birnbach got sucked into something,

3     and I'm going to show you how it comes out through their

4     e-mails and text messages.  And what's more plausible?  That 27

5     or 28 years ago E. Jean Carroll called people she wasn't very

6     close with at the time to tell them—and no one else by the

7     way, no one else—that she was raped, who themselves didn't

8     tell anyone for 27 or 28 years, and one doesn't even remember

9     it, actually.  Or—this is more plausible—that she told two

10    very, very close friends just a few years ago to go along with

11    the story, which at first was just meant to be a book, a book

12    and nothing more, that didn't identify them by name.  They

13    weren't in the book by name.

14             They agreed because they hated Donald Trump with a

15    passion.  You heard those words.  Ms. Birnbach couldn't stop

16    thinking about him even when she was asleep, she said.  She

17    hated him more than any person she has ever hated in her life.

18    So they hate him with a passion and never thought it would go

19    any further, never.  Which sounds more believable?  Remember,

20    Ms. Carroll never planned to file a lawsuit in this case until

21    George Conway, the democratic attorney, politically adverse to

22    Donald Trump, hated Donald Trump, got his hooks into

23    Ms. Carroll.  Because up to that point she never planned on

24    filing a lawsuit.  It was just about a book and selling books.

25             And, you know, because she first lied to you about

1    that and said Mr. Conway didn't tell her to seriously think

2    about suing Donald Trump, here's the first question about this.

3    This is the beginning of it all coming together:  "Did

4    Mr. Conway tell you that you should seriously think about suing

5    Donald Trump?"  She told me no.  She told you no.

6           But she was asked about this previously under oath and

7    she got caught and changed her answer.  This is from her

8    deposition, as you see up here, from six months earlier.

9    "Q  At what point did you decide to file a lawsuit against the

10   defendant?

11   "A  Well, wherever I went after the story went, wherever I went

12   after the story went, people said, Are you going to sue him?

13   Are you going to sue him?  And I would say, no, no, no.  I'm

14   not going to do it.  I'm just not.  And then I had a

15   conversation with someone who knew the ins and outs, and an

16   actual lawyer, and he said you should really think about -- you

17   should really seriously think about this."

18          "Do you recall giving that testimony?

19   "Q  Was that true?  Was that testimony true?

20   "A  Yes.  George said you should seriously think about this

21   after he laid out the various ways, that's correct."

22          George is George Conway.  Arch enemy of Donald Trump,

23   lawyer, democratic party lawyer, who convinced her to bring a

24   lawsuit.  So this wasn't even in the plans.

25          And then you see there is a dinner with lawyers and

Ms. Martin and Ms. Birnbach and Ms. Carroll having a dinner together, or pizza, whatever they had together, two witnesses and Ms. Carroll and lawyers having a dinner.  That's how we got here.  And that's how Lisa Birnbach and Carol Martin got here.  Because, keep in mind, they didn't even want their names to be part of the book at first.  They didn't want their names to be part of the book.  Lisa Birnbach told you they were not even named in the *New York* magazine excerpt, in The Cut.  Only after, when the story picked up traction, as we all knew it would, only after that did they have to be convinced to go along with it by name publicly.  Because for the story to have any credibility, she had to name the two people she claimed she told.

Look at this very telling testimony piece right here. 702, please okay.  This is Ms. Birnbach's testimony.  "I don't remember the date, but it was not long after.  E. Jean invited Carol and me to lunch to meet a few reporters from *The New York Times* who wanted to write about what happened to her, and over the course of lunch, Carol and I were persuaded that it would be more effective" for the story of course "if we were real people and not anonymous sources."  And of course the Carol she is referring to is Carol Martin.

So think about that.  They had to be persuaded to come out, not to be anonymous sources, which first what they agreed to, yeah, we will be anonymous sources, put us in your book,

N582Car5                    Summation - Mr. Tacopina

1    you don't have to call us by name, just put us in your book and

2    call it two people.  Sure.  We hate Trump, too.  You told us.

3           Then they had to be persuaded to come out and, again,

4    this is just to the press now.  We are still just talking about

5    the press.  You saw this play out in Carol Martin's messages,

6    how this whole story came together, and those same messages

7    also show it was never meant to get this far in a courtroom

8    under oath, never.

9           Here.  She told you her messages were never supposed

10   to be -- she said, "I don't understand why they are being

11   offered in evidence."  She didn't want that to happen,

12   Ms. Martin.  She then said, okay.

13          Suffice it to say, I questioned her, "You did not

14   expect at the time you were writing those e-mails for those to

15   see the inside of a courtroom."

16          "No, certainly not."

17          No, of course not.  Of course not.

18          And the first message in that category is her scheming

19   e-mail with Ms. Carroll from September 23, 2017.  Folks, look

20   at this e-mail.  Okay?  This is PX 122.  This is where it all

21   starts.

22          Donald Trump is now president.  Okay?  Ms. Martin says

23   in this e-mail, "I don't know much about Namibia, but I know it

24   ain't Nambia as Orange Crush"——that's a derogatory term for

25   Trump——"called it at the UN this week.  This has to stop.  As

1  soon as we are both well enough to scheme, we must do our

2  patriotic duty."

3          Ms. Carroll replies to that e-mail, all caps,

4  "Totally!!! I have something special for you when we meet" in

5  the context of this exchange.  She is talking about her book,

6  the idea for her book, because that comes next.

7          But wait.  Now, I asked Ms. Carroll about this.  Take

8  all these things I did here off.

9          I asked Ms. Carroll about this, this e-mail, and what

10  she claimed and what was said to her, and Ms. Carroll said,

11  pshew, no idea what that was about.  She can remember directly

12  that conversation about revolving doors, hats from 27, 28 years

13  ago, did they have tea, but she has no idea what this e-mail

14  from five years ago is about, no idea.

15          Of course, they couldn't let that happen twice.  That

16  could not happen twice.  So when Carol Martin was asked about

17  it, she said, oh, the word scheme we use all the time.  Well,

18  you know that's not true.  There is not one other e-mail in

19  evidence in this case that has the word scheme in it.  Not one

20  other.

21          And then I say, so, Ms. Martin, tell us what scheme

22  means.

23  "Q  Do you know the definition of scheme or do you know what

24  the definition of scheme is?

25  "A  I think so.

1    "What do you think it is.

2    "It's a plan, to put together a plan."

3    I said:  "Okay.

4    She said:  "That's how I think of scheme."

5    Well, we all know that's not what the word scheme

6    means.  Scheme is a secret, nefarious plan.  You know what?

7    Better.  Let's try that in a real sentence in everyday life.

8    Let's use Ms. Carroll's definition of scheme.

9    Let's scheme to go get pizza.

10    Let's scheme to go to the movies together.

11    Let's scheme to go to the library.

12    Let's make a scheme to go see the Yankee game.

13    No.  We don't talk like that.  we don't use the word

14    scheme like that.  Scheme means exactly what it means, what you

15    think it means.  It's a scheme.  We have to scheme to do our

16    patriotic duty.  We have to stop him.  This is all in the

17    e-mail.  Put that e-mail back up, please.

18    And when asked -- I asked Ms. Martin:  What was meant

19    by Ms. Carroll saying "I have something special for you"?

20    Remember when I asked Ms. Carroll that, she had no idea what

21    she meant by that.  When I asked Ms. Martin that, they couldn't

22    let that happen again either, and it was Ms. Martin's response

23    that it was a stuffed squirrel.  That's what I think of scheme.

24    "And to you this something special was a stuffed

25    squirrel?"

1           "Well, I believe so."

2           Okay.  Obviously that doesn't make sense.

3           By the way, which is why you heard Ms. Martin tell you

4    she never said anything about a stuffed squirrel before her

5    trial testimony.  But put this message back up for a second.

6    Look at this message in context, folks.  This is the beginning.

7    She is watching Trump.  She -- "this has to stop," Carol Martin

8    says, "has to stop.  When we are both well enough, we have to

9    scheme.  We must do our patriotic duty."  Ms. Carroll says, in

10   all caps——she had to make that cap button on her computer go

11   down——Totally!!! I have a stuffed squirrel for you.

12          Does anyone actually think that was the next line?  We

13   have to do our patriotic duty.  We have to scheme.  We have to

14   stop them.  Totally, and I have a stuffed squirrel for you.

15   That's ridiculous.

16          The "I have something for you" had to do with the

17   contents of this e-mail exchange.  So Ms. Carroll, again,

18   didn't want you to see her messages because they reveal the

19   scheme, and that's why Ms. Martin learned -- when she did learn

20   her messages were going to be subpoenaed in a lawsuit, she sent

21   this text message to Ms. Carroll, folks.  Ms. Martin to

22   Ms. Carroll:  "No more chats and texts til further notice."

23          Think about that for a second.  That's Crip talk.

24   That's Crip talk.  That's not the way people talk who have

25   nothing to hide.  That's not the way people talk who don't want

their schemes revealed.  Why -- if we're all just telling the

truth and there's no schemes, no plans, why no more chats and

texts until further notice?  Why, as Ms. Martin said, we

definitely have to get together, me, you and Lisa, before I get

deposed, definitely.

        And one of the biggest reveals in this case, I present

to you now, is Defense Exhibit ER.  It's a text message from

Ms. Martin to her friend on November 30, 2021.  Take the

highlight off, please.  This message, this message is lethal to

them, lethal to their case.  It exposes what's exactly behind

the curtain.  It shows you proof that this was made up.  This

is lethal.

        I'm going to read you the message first.  "Sitting in

traffic again" -- now this is just a response to E. Jean's

text.  This is Ms. Carroll to her friend Pat.  "Just read your

response to E. Jean's texts.  You are not a cynical bitch."  So

apparently Pat was also commenting about Ms. Carroll's behavior

and conduct.  "You are not a cynical bitch.  You tell the

truth.  I told you, I'm over it.  Just don't know how to thread

the needle.  Kind of hoping they cancel the court date, which

could easily happen before the end of next week, right?  It's

too hyperbolic.  Too much celebratory stuff over something that

hasn't really happened."

        Next sentence from that, "She said next she's going to

sue T"—Trump—"when Adult Victims of Rape law is passed in New

1    York State or something.  WTF."  "What the fuck," that's what

2    that means.  "This is a defamation case and the DOJ oversight

3    or something.  It's gone to another level, and not something I

4    can relate to.  For her, sadly, I think this quest has become a

5    lifestyle.  Seriously."

6           That's Carol Martin talking about E. Jean Carroll to

7    her good friend.

8           Now, look at what Ms. Martin is saying here.  So her

9    very close friend is going to sue Donald Trump for rape, and

10   she thinks it's gone to another level and isn't something she

11   can relate to?  I mean, if Ms. Martin were a real outcry

12   witness from 27 years ago or 8 years, whatever it is, who was

13   actually told decades earlier that her close friend was raped,

14   how is that something she can't relate to?  What do you mean

15   she can't relate to it?  Of course she should be able to relate

16   to it, if her friend was really raped.

17          How could she even write that, Ms. Martin, if she

18   believed, if she knew that the story was true, that she really

19   got a call or a visit to the house from Ms. Carroll 27 years

20   ago, whatever it is?  How could she even write, That's

21   something I can't relate to?  That, they got caught.

22   Ms. Martin talked to her friend, never thought this message,

23   because E. Jean Carroll wasn't on this, would ever see this

24   courtroom.

25          And the answer is right in the message how she could

1    even write it.  She is hoping this all gets canceled, the court

2    date, the case.  She is hoping it gets canceled because there

3    is too much celebratory stuff, you know, all the parties that

4    we're having for Ms. Carroll, too much celebratory stuff for

5    something that hasn't really happened.

6           This is in evidence.  You get to look at this a

7    hundred times.  I want to leave this up for an hour and let you

8    look at it, but I'm not going to do that because I have no

9    time.  But you get to take this back with you.

10          The next sentence puts that first line, too much

11   celebratory stuff over something that hasn't really happened.

12   She said she is going to sue T when Adult Victims of Rape law

13   is passed or something.  What the fuck?  I'm sorry to use those

14   words.  This is the message.  What the fuck?  She is suing for

15   rape?  What the fuck, over something that hasn't really

16   happened?  This has gone way too far now.  She doesn't even

17   know I'm -- I told you I'm over it.  I just don't know how to

18   thread the needle, Ms. Martin is saying.  She doesn't know how

19   to thread the needle.

20          First she is all in, yeah, let's get Trump.  Write

21   your book.  We will be your outcry witness anonymously.  No

22   problem.  Anonymous.  Then they get persuaded to tell *The New*

23   *York Times* their names because really the story doesn't sound

24   credible with two anonymous outcry witnesses.  We might as well

25   have a hundred outcry witnesses who are all anonymous.  They

1   needed names.  So then they get persuaded, as you saw in the

2   message, to tell *The New York Times* their names.  That is

3   just -- just is an article, and Trump is Trump, Trump.

4            Oh, no.  Then this happens, then there is a lawsuit.

5   WTF.  I'm out.  I didn't sign up for this.  I can't relate to

6   this, over something that hasn't really happened.  Game, set,

7   and match.  Game, set, and match.  This message is death.

8            Do you understand what you are seeing here?  That

9   Ms. Martin is confiding with her friend in what she thought was

10  a private text message that they are celebrating over something

11  that isn't real?  And she is going to sue him for rape?  WTF?

12  I can't relate to that.  Why?  Why?  If it really happened, why

13  WTF, she is suing him for rape?  He raped her, right?  Why?

14  Why WTF?  Why if something hasn't really happened?  Why I can't

15  relate to it?

16           They got caught, and that's why Ms. Carroll says why

17  are my messages going into evidence?  She got stuck into this

18  thing that Ms. Carroll took to different levels that they never

19  signed up for.  So she is on this train from the beginning and

20  the ends justifies the means.  It's Donald Trump.  Don't worry

21  about the truth.  Don't worry about the facts.  Don't worry

22  about what hasn't happened.  Don't worry about what hasn't

23  really happened.  It's Donald Trump.

24           But Carol Martin felt comfortable only going so far.

25  In the message she wrote, she is going to sue.  When the rape

1   law is passed, she is going to sue him for rape.  WTF.  She was

2   along for the ride when it was a book.  Even a defamation case.

3   But a rape accusation was going to another level, something she

4   couldn't relate to.  So in her own words, it was over.  I'm not

5   doing that.

6        You saw she was different on the stand than E. Jean

7   Carroll and Lisa Birnbach, who were both trying to sell books.

8   Ms. Martin was standing by her close friend, but she did not

9   want to be here.  I think that was pretty obvious.  That's why

10  she was venting to another friend about Ms. Carroll turning the

11  entire transaction into a lifestyle, transaction she said in

12  the message, turning another transaction into -- turning this

13  transaction into a lifestyle.  Is that a word anyone would ever

14  use to describe a rape?  A transaction?  Transaction into a

15  lifestyle.

16       You saw that lifestyle for yourself—the podcast,

17  television appearances, you are fascinating to talk to, TV

18  appearances again, testimony in court when she said "this is my

19  moment."

20       Ms. Martin even called Ms. Carroll a narcissist that

21  was acting scary.  Think about that.  It's a hell of a thing to

22  call your friend who is a true rape victim a narcissist who is

23  acting scary?  Ms. Carroll didn't want to admit that in this

24  courtroom, but the messages were the messages.  She called

25  Ms. Carroll a narcissist who was acting scary?  That doesn't

N582Car5                    Summation - Mr. Tacopina

1    jibe with being a real rape victim.

2          But after going on the record and getting subpoenaed

3    for her messages, Ms. Martin couldn't thread the needle and get

4    out.  She was in too deep.  Look at what -- we don't need that

5    anymore.

6          And even though Ms. Martin continued to toe the line

7    for her friend, she's indirectly shared with you the truth

8    through her messages that she never thought would see the light

9    of day, ever.  And what's telling about those messages?

10   Especially, especially the ones you just saw between her and

11   her friend, and especially the ones between Ms. Carroll and

12   Ms. Martin.  There were a host of messages between Ms. Carroll

13   and Ms. Martin, text messages, e-mails.  They called Donald

14   Trump every name in the book, every name in the book.

15         I asked:  In any of those messages between just the

16   two of you, Ms. Carroll and Ms. Martin, just the two of you,

17   never thinking those would ever go anywhere, did you ever

18   allude to him as a rapist?  No, I don't believe so.

19         I mean, they couldn't say worse things about this guy.

20   That's how they felt.  They called him everything, but not a

21   rapist.

22         There is no evidence, Ms. Kaplan argued, no evidence

23   of conspiracy?  No documents?  What did I just go through with

24   you?  The scheme e-mail.  No texts, no chats until further

25   notice, nothing in writing.  This is something that hasn't

N582Car5                    Summation - Mr. Tacopina

1    really happened?  There is no documents to support the

2    conspiracy?

3         Ms. Kaplan argued that you have to believe that a

4    conspiracy -- if this were a conspiracy, everyone lied,

5    everyone lied.  That's not true.  I'm not saying any of those

6    other people in that big chart lied.  Ms. Carroll made up a

7    story ripped off the pages of *Law & Order*, made up a story to

8    sell a book.  Ms. Martin and Ms. Birnbach went along as the

9    anonymous sources, and you just saw what happened.  They got

10   sucked in, and you heard Ms. Martin say how it all played out.

11   Then they got stuck here.  Now what are they going to do?

12        And then, of course, the question, they post the

13   transcript of Ms. Birnbach and Ms. Martin saying, oh, you hate

14   Donald Trump so much, but would you ever perjure yourselves for

15   him?  What answer do you think you were going to get for that?

16   What answer?  Do you think anyone who would get stuck in a

17   situation like this and has to lie would say, yes, I would lie.

18   Shocking that answer was no.  Wow.

19        So look, all these messages, they never thought they

20   would see the inside of a courtroom.  You know, even that one

21   message they put up about Ms. Martin referring to a simple chat

22   25 years ago, simple chat is certainly not a rape conversation,

23   and she didn't even know what that simple chat was referring

24   to.  They could put that transcript back up, maybe, when they

25   stand up again.  But she is saying, I don't know, I'm

1  guessing -- I was referring to the conversation with

2  Ms. Carroll about the rape.  She called it a simple chat.

3  There is nothing simple about a chat when your friend tells you

4  I have been raped by Donald Trump.  It's not a simple chat.

5  She wasn't referring to that, and she didn't even say she was

6  referring to that.

7         They certainly didn't want you to see those messages

8  because they let you peek behind the curtain hiding their

9  scheme.

10        Folks, I'm coming to an end, but before I do, I want

11  to bring this all together for you before I sit down.  Just a

12  couple of quick slides to give you some context to the stuff

13  I've been talking about for two hours.

14        One is a timeline slide.  It is a sort of a chronology

15  of events.

16        The first thing that happens is Donald Trump is

17  elected.  Now, no story's ever told, anything about Donald

18  Trump, Bergdorf Goodman's, or anything like that, but Donald

19  Trump is elected in 2016.

20        Then what happens next?  2017, scheming e-mail.  We

21  must do our patriotic duty.  Totally.  I have something for

22  you.

23        What happens?  Something for you.  A month later.  She

24  begins her road trip, Ms. Carroll, to start writing her book.

25        What happens next?  Two years later, the book is

1    ready, book excerpt is published in The Cut, *New York* magazine

2    publication.

3           Same month, the start of the media exposure, the

4    parties, the lifestyle, it all begins.

5           2019, Ms. Birnbach and Ms. Martin are interviewed by

6    *The New York Times*, and the message we -- regarding that

7    message we just talked about here, how they had to be

8    persuaded.

9           2019, July, the book is published.

10          What happens next?  Mid July 2019, George Conway

11   recommends litigation, that she litigate.

12          MS. KAPLAN:  Objection, your Honor.

13          MR. TACOPINA:  November --

14          THE COURT:  Just a minute.

15          MR. TACOPINA:  Oh, sorry, your Honor.

16          THE COURT:  Objection sustained.  The jury will

17   disregard the sentence regarding Mr. Conway.

18          MR. TACOPINA:  No, your Honor.  I simply said that

19   Mr. Conway recommended she sue Donald Trump, litigates.  That's

20   all I said.

21          THE COURT:  That's what I have just stricken and told

22   them to disregard.

23          MR. TACOPINA:  Oh, okay.

24          Anyway, you heard the testimony, you saw the testimony

25   about what George Conway said to Ms. Carroll.  There was

1    testimony in the summation we discussed it.

2              MS. KAPLAN:  Your Honor?

3              THE COURT:  I'm sorry.

4              MS. KAPLAN:  Excuse me for interrupting.  Can they

5    take down the slide that has what your Honor just told them to

6    disregard?

7              THE COURT:  Yes.

8              MR. TACOPINA:  Can you take that one piece down?  If

9    it's not doable, let me know, please.

10             THE COURT:  Publish the slide to me alone for a

11   moment, the last one.

12             MR. TACOPINA:  So, your Honor, the objectionable --

13             THE COURT:  This isn't the last slide.  This is not

14   what was on the screen that you asked him to take down.

15             MR. TACOPINA:  No, I know.  We removed it.

16             THE COURT:  I know.  I want to see what was removed.

17             MR. TACOPINA:  Oh.  You have to put it back in.  Do we

18   have a paper piece we can give to the Court?

19             THE COURT:  I want to be sure I was right in

20   sustaining that objection.

21             MR. TACOPINA:  I know why Ms. Kaplan objected.  It was

22   part right and part wrong, but that's -- there you go, your

23   Honor.

24             THE COURT:  That's exactly what I thought --

25             MR. TACOPINA:  Yeah, yeah, yeah.

N582Car5                    Summation - Mr. Tacopina

1              THE COURT:  -- and therefore it is out.

2              MR. TACOPINA:  Right.  So that's why I removed it.

3              THE COURT:  Okay.

4              MR. TACOPINA:  Now remove it again, please.

5              There you go.  Can you put that back for the jury now?

6    Ms. Kaplan, we are good now, right?

7              MS. KAPLAN:  Yeah.

8              MR. TACOPINA:  Okay.

9              The jury has it now?  Okay.

10             Okay.  2019, the first lawsuit is filed.

11             2019 November, the ongoing media exposure, more

12   parties and celebrations.

13             November of 2021, two years later, Ms. Martin's text

14   regarding—can we slow it down a little bit so I can actually

15   get it, thank you—Ms. Martin's text regarding too much

16   celebratory stuff over something that hasn't really happened;

17   going to sue Trump for rape, WTF; it's gone to another level,

18   something I can't relate to; and four it has become a

19   lifestyle.  That was that text we just went through.

20             Go ahead.  August of 2022, Martin texting about

21   getting together with Ms. Carroll and Ms. Birnbach before her

22   deposition.

23             And November of 2022, the lawsuit you all are sitting

24   in judgment of here today.

25             Before all that happened, go ahead, scooting all the

N582Car5                     Summation – Mr. Tacopina

1    way back to 2012, *Law & Order SVU* episode that Ms. Carroll --

2              MS. KAPLAN:  Objection, your Honor.

3              THE COURT:  Sustained.  The jury will disregard that.

4              MR. TACOPINA:  Okay.  You heard Ms. Carroll's

5    testimony on it, folks.

6              Put the slide down.  You can take the slide down.

7              You heard her testimony on it.  She was aware of that

8    episode.  That's her testimony on trial before you.

9              THE COURT:  Sustained.

10             MR. TACOPINA:  That's the testimony, your Honor.

11             THE COURT:  That's your version.

12             MR. TACOPINA:  No.  It's the transcript's version.  We

13   can put that up, if you would like.

14             THE COURT:  Counsel, one more word.

15             MR. TACOPINA:  Yes, sir.

16             Ladies and gentlemen, I'm done -- well, there is one

17   other thing.  Let me put up this for you.  I'm trying to

18   summarize all this in a slide for you, but look at all the

19   reasons to disbelieve an unbelievable story.

20             No one present in an upscale store.  Just pick and

21   choose.

22             Open and unlocked dressing room door.

23             Donald Trump trying on women's lingerie.

24             Impossibility of the physical act.

25             No one speaks about it for over 20 years.

1     No police report.

2     No diary entries.

3     No medical/psychological corroboration.

4     Massive *Apprentice* fan.

5     Joking on Facebook about having sex with Donald Trump

6     for money.

7     The Instagram photo of the hideous men's walking tour

8     with the big gleaming style next to Donald Trump.

9     The book motive.

10    The political hatred which came out loud and clear.

11    The status and the lifestyle.

12    Anderson Cooper video.  Take that for what it's worth.

13    The scheming e-mail.

14    The no more chats, no more text messages.

15    Hasn't really happened.

16    Rape, WTF.

17    Never alluded to Donald Trump as a rapist in messages.

18    And again --

19    MS. KAPLAN:  Objection, your Honor.

20    THE COURT:  Sustained.

21    MR. TACOPINA:  Move on.

22    THE COURT:  That was inappropriate, Mr. Tacopina.

23    MR. TACOPINA:  Okay, your Honor.  I apologize.  But I

24    think I am misunderstanding your ruling, but I apologize, but

25    we are moving on.

N582Car5                    Summation - Mr. Tacopina

1            Ladies and gentlemen, I am done reviewing the

2    evidence, and I will submit it to you.  I will submit it to

3    you.

4            I sit down soon, and plaintiff's counsel gets a chance

5    to come up again and do another summation or rebuttal

6    summation.  And they go first and they go last not because we

7    lost a coin toss, it's just the way the law works, because they

8    have the burden of proving this case.  That burden remains on

9    them in this courtroom the entire time.  It's not a burden you

10   can carry, not on this evidence, not with these facts, not by a

11   long shot.

12           You know, facts are stubborn things, and whatever may

13   be our wishes, our inclinations, the dictates of our passions,

14   they cannot alter the state of facts in evidence.  The facts in

15   evidence made plain here that E. Jean Carroll's story is not

16   worthy of your belief, not even close.  Her story——and it's

17   just that, a story——is not true, she was not raped at Bergdorf

18   Goodman's.  She was not defamed by being called out on making

19   up that story.

20           And I will say it again, this jury is blessed with an

21   abundance of street smarts, an abundance, and we know reality

22   from fiction.  What she is asking you to do is not just to make

23   a finding in her favor here, folks, in a civil case, just make

24   a finding.  What she is asking you to do is to condemn another

25   citizen as a rapist, the worst thing you could ever be called.

1    She is asking you to do it on evidence that couldn't stand up

2    in any credible, objective fact assessment that would never

3    make it through a police investigation in a million years.  She

4    is asking you, on this evidence, to do that.

5            To condemn someone as a rapist is a decision you would

6    have to live with for the rest of your lives.  Don't let her

7    throw that burden on you.  Don't let her throw her burden on

8    you to have to carry forever.  You know this didn't happen,

9    that Donald Trump raped E. Jean Carroll in a Bergdorf Goodman

10   changing room.  You know it didn't happen.

11           You know, Ms. Kaplan said you don't really have to

12   believe her that much because it's not a criminal case only a

13   civil case, just 50, just over 50 percent you have to believe

14   her, over 50 percent.  That's all.  Boy, is that very telling.

15   They know.  They know this case.  You don't have to believe her

16   that much, just 51 percent.

17           You believe her or you don't believe her.  This is

18   condemning someone as a rapist.  You believe her or you don't

19   believe her, not just a little bit believe her.

20           This is an absolutely outrageous case.  It's an

21   outrageous case.  She had her political reasons, her desire for

22   status, her motivations to sell the book, fabricate the story,

23   her two friends.  We just saw what happened, how they got

24   sucked into this.  But one motivation that should drive all in

25   this courtroom is adherence to the rule of law.  It's

1    everything for us.

2         You know, ladies and gentlemen, Judge Kaplan is the

3    judge here.  His name is on the courtroom door.  But when it

4    comes to the facts in this case, this is your courtroom.  This

5    is your courtroom.  And when it comes to deciding if what was

6    done here was right, this is your courtroom.  When it comes to

7    deciding who to believe or not believe, this is your courtroom.

8    No one else's courtroom but your courtroom.  You, and you

9    alone, are the ones empowered in that regard to make sure that

10   the rule of law is upheld, just you.  Not some journalist --

11   and I know you don't read the press.  Not some journalist who

12   comes in for a day during openings or summations and writes an

13   article like they have been sitting here like you have been,

14   attentive, with notepads, writing, listening to every single

15   word.

16        MS. KAPLAN:  Objection, your Honor.

17        THE COURT:  What's the objection?

18        MS. KAPLAN:  Talking about journalists, which is not

19   about the case in any way, shape, or form.

20        THE COURT:  Overruled.

21        MR. TACOPINA:  You know, we can afford certain things,

22   but one thing I ask you is can we afford to sweep away the law

23   because we don't like the defendant?  Shall we say that the law

24   should be ignored because the defendant is unlikeable?  If

25   that's the case, then there is no longer the need for the law.

1  There is no longer the need.  If the law is not strong enough

2  to protect all of our citizens equally, including the most

3  unpopular, then it deserves the contempt of all.

4          To your candor, to your integrity, I submit the

5  defendant, Donald J. Trump.  I ask you all to please——to

6  please——have the courage to do what is right here.

7          Thank you very much.

8          THE COURT:  Thank you, Mr. Tacopina.

9          Members of the jury, we will take 20 minutes.

10         Counsel remain.

11         (Jury not present)

12         THE COURT:  Be seated, folks.

13         I'm referring to the online transcript, at page 149 of

14  the draft transcript into 150, and I want to make sure that the

15  record is clear as to what was happening.  I will pick up in

16  the realtime transcript at the point where Mr. Tacopina said

17  "Anderson Cooper video, take that for what it's worth; the

18  scheming e-mail; the no more chats, no more text messages;

19  hasn't really happened; rape, WTF; never alluded to Donald

20  Trump as a rapist in messages."

21         Right after that, still attributed to Mr. Tacopina

22  appear the words "and again --" followed by an attribution to

23  Ms. Kaplan "objection, your Honor," which I sustained.

24         Now, what the transcript was never intended to capture

25  and could not capture is what happened between the words

1   "Donald Trump is a rapist in messages" and the objection.

2            Defense counsel, not inappropriately in general, has

3   been using a PowerPoint deck to go along with the summation,

4   and right at that point, either a new slide or a new version of

5   a slide was projected on the screen in front of the jury.  And

6   what I remember singularly about it is a heavy red line at the

7   top of the slide that ran from the right to the left with an

8   arrow on the left and some words on the left or some indication

9   of something else.

10           Now, that can't appear in the transcript.  And I want

11  to have that slide printed out and marked as Court Exhibit C.

12  And if counsel will confer with the reporter with respect to

13  what, if anything, was said after "rapist in messages" and the

14  imposition of Ms. Kaplan's objection, so that hopefully we can

15  have an agreed version of what, if anything, was said in there

16  before the objection is recorded, I would appreciate it, and I

17  hope you can agree on it, and if you can't, I will hear you on

18  it, not before we go on, but later in the day, because the

19  transcript, as it stands, could not possibly have captured the

20  multimedia aspect of this presentation.

21           Any problem with that by either side, Ms. Carroll?

22           MS. KAPLAN:  We will endeavor to do that, your Honor.

23           THE COURT:  Mr. Tacopina?

24           MR. TACOPINA:  Sure, your Honor.

25           THE COURT:  Pardon?

1           MR. TACOPINA:  Yes.

2           THE COURT:  All right, fine.

3           MS. KAPLAN:  Can I raise one more issue, your Honor?

4           THE COURT:  Pardon?

5           MS. KAPLAN:  Can I raise one more issue?

6           THE COURT:  Yes.

7           MS. KAPLAN:  We are going to take a look.  We may want

8    to amend the instruction on some of these issues based on what

9    was said, but we will come back to you at the end of the day if

10   we think anything needs to be changed on the charge.

11          THE COURT:  Well, we will deal with that if, as, and

12   when it is done.

13          MR. TACOPINA:  Your Honor, just in response to that,

14   then, being that we are discussing this, first of all, I would

15   point out these slides were given to counsel with the exact

16   things that were shown, given to counsel before my summation,

17   and they were given time to look through them before we

18   started.  So there was no objection there.  There actually was

19   an objection to one which we removed, but there was no

20   objection to what was shown to the jury.  And then, your Honor,

21   again, please understand I'm not -- you know how much I respect

22   you.  I'm not trying to be disrespectful.  I know you are

23   smiling, but you do you know I do, and I wasn't trying to be

24   disrespectful to you.

25          THE COURT:  I don't think you were, Mr. Tacopina.

1         MR. TACOPINA:  Okay, okay, okay.

2         THE COURT:  You are a heck of a good lawyer and you

3    are doing absolutely what you think is the best you can do for

4    your client, and every now and then judges and lawyers in the

5    best of good faith disagree with each other.

6         MR. TACOPINA:  Right.  I think this one you got wrong,

7    though, I'm just saying, with all respect, because I did say --

8    what I was questioning -- as a matter of fact, when I brought

9    that e-mail before the jury, I actually gave the instruction

10   that you are going to be giving later about it's not being

11   offered for the truth of the matter, the *Law & Order* e-mail not

12   being offered for the truth of the matter, not proof of

13   anything other than Ms. Carroll's state of mind, but I then

14   cited her trial testimony --

15        THE COURT:  Yes, I understood that.

16        MR. TACOPINA:  -- which is -- but I thought you said I

17   misstated it.

18        THE COURT:  And to be frank between us here, while we

19   are being frank, the quote you took from the trial testimony

20   omits the question and answer or two before what you quoted

21   which put what she said, and I concede it could be argued

22   either way, potentially puts what she said in an entirely

23   different light than you argued.  That's the point.

24        MR. TACOPINA:  Okay.  But the thing was, your Honor, I

25   didn't go into -- the e-mail was coming up next.  I haven't

1  asked her about the e-mail at that point, just so your Honor

2  knows.

3        THE COURT:  Look, I know precisely.  You are referring

4  to the sidebar yesterday?

5        MR. TACOPINA:  No, sir.  I'm saying in the trial

6  transcript I'm looking at it, nothing happened before.  There

7  was no preceding question.  I asked one question.

8        THE COURT:  There was several days of trial before.

9        MR. TACOPINA:  No, your Honor, on *Law & Order*.  I'm

10  talking about on *Law & Order*, on this episode, I used the word

11  "law," whoo, everyone jumped up.  We had a sidebar.  I didn't

12  even get the question out.  This was my first question to

13  Ms. Carroll that I read, and I showed the slide for it, and it

14  was simply her acknowledging.  Then I went into the e-mail.

15        THE COURT:  What was the page of the trial transcript

16  of the --

17        MR. TACOPINA:  Of the sidebar.

18        THE COURT:  No.  I am asking what page of the

19  transcript did the quote come from that you put up.

20        MR. TACOPINA:  575.

21        THE COURT:  All right.  Give me a moment.

22        MR. TACOPINA:  All right.

23        (Pause)

24        THE COURT:  Mr. Tacopina, at page 571, line 23, you

25  said, "Ms. Carroll, as you sit here today, you know there was a

1    *Law & Order* episode that features a woman," there was an

2    objection, and then we went to sidebar.

3              MR. TACOPINA:  Right.

4              THE COURT:  You put it to -- and obviously she is

5    prepared, all the witnesses are prepared, the exhibits were

6    exchanged in advance of trial.  And so when you then, after the

7    sidebar, say to her, "So my initial question was, as you sit

8    here today, you know that there was a *Law & Order* episode from

9    2012 that featured a woman getting raped in the Bergdorf

10   Goodman lingerie dressing room, correct?" and she answered "I

11   am aware, yes," one interpretation of that is the one that you

12   are advancing, that she was aware that there in fact was such

13   an episode and what its contents was.  An alternative

14   explanation of that is that she is aware of an e-mail in which

15   somebody reported that to her, which is not in for the truth of

16   the content.  That's the point.  And I let you go quite far

17   with it.  I didn't interrupt you.  There was no objection.

18   That's all fine.  But I'm aware that your argument was somewhat

19   selective about the context in which you presented that

20   excerpt, or at least it could be argued that way.

21             MR. TACOPINA:  That's fair, your Honor, but it is

22   argument.  That's why I was arguing my -- my are

23   interpretation.

24             THE COURT:  I understand it's argument.

25             MR. TACOPINA:  Good.  We're good.  We're good.

1          THE COURT:  I just want to let you know, everybody,

2     that I do follow along here.

3          MR. TACOPINA:  I know you do.

4          MS. KAPLAN:  Your Honor, if I may just say --

5          MR. TACOPINA:  And I'm proud of you.

6          MS. KAPLAN:  I apologize, your Honor.

7          THE COURT:  Some day, in the greatest traditions of

8     the bar, the three of us will have a drink, okay?  Maybe.

9          MS. KAPLAN:  Just one quick thing, just so the record

10    is clear, because there was a statement made about our review

11    of the Power Point.  I'm not attributing any bad faith on the

12    other side.  We gave them our PowerPoint several minutes -- for

13    a while before I stood up to speak.  We got a—what do you call

14    that thing that goes to the computer; God, I'm so old—thumb

15    drive of theirs, your Honor, that we had to look at their

16    computer right here just before.  So there was no waiver of any

17    argument, your Honor.  We didn't see the animation that you

18    kind of saw during that piece at the very end.

19         THE COURT:  And I suspect I'm right that all of the

20    slide decks on both sides were prepared before the ruling was

21    made this morning on the *Law & Order* episode.

22         MR. TACOPINA:  Correct.

23         THE COURT:  So I take that into account.

24         Okay.  See you in a few minutes.

25         (Recess)

1           THE COURT:  OK.  Let's get the jury.

2           THE DEPUTY CLERK:  Jury entering.

3           (jury present)

4           THE COURT:  OK.  We will now hear rebuttal argument on

5    behalf of the plaintiff.

6           Mr. Ferrara, you may proceed.

7           MR. FERRARA:  Thank you, your Honor.  Hi, everyone.

8           So, I have been sitting here, listening to

9    Mr. Tacopina, and he is a very good lawyer, but as Judge Kaplan

10   told you, there is a difference between argument and evidence.

11   What we presented to you in this case is evidence and what you

12   just heard, of course, was argument.  No one is asking you to

13   find Mr. Trump liable because you don't like him.  We are

14   asking you to find him liable based on the evidence you saw and

15   heard in this courtroom, evidence like Ms. Carroll's powerful,

16   credible testimony that Donald Trump sexually assaulted her;

17   Lisa Birnbach and Carol Martin's testimony that Ms. Carroll

18   told them immediately after the incident; Natasha Stoynoff and

19   Jessica Leeds' testimony that Donald Trump did the same thing

20   to them, sexually assaulted them in very, very similar ways;

21   the witnesses who worked at Bergdorf Goodman in the mid-1990s

22   who told you the store was often very quiet on Thursday nights

23   and that Donald Trump shopped there from time to time;

24   Dr. Leslie Lebowitz, who explained the psychology of

25   Ms. Carroll and other trauma victims; and you heard from Donald

N585car6                        Rebuttal - Mr. Ferrara

1    Trump himself that this is how he treats women, that attacking

2    beautiful women is just something he does and can do,

3    fortunately -- that's his word -- because he is a star.

4            That was the evidence.  Evidence that leads to only

5    one conclusion:  That Donald Trump sexually assaulted E. Jean

6    Carroll in that dressing room and then he lied about it and

7    defamed her.  That's what the evidence showed.

8            You heard Mr. Tacopina say, you know, who can you call

9    as a witness to disprove that something like that happened?

10   And I have an idea for him.  It is a little late, but maybe

11   Donald Trump.  But he wasn't here.  It's funny that

12   Mr. Tacopina started his closing by talking about the justice

13   system and respect for the system when his own client didn't

14   have enough respect to come in to this court during this trial.

15   I guess he had better things to do.  He is not president

16   anymore, it is not like he has to meet with heads of state or

17   worry about the situation in Ukraine.  He just decided not to

18   be here.  He never looked you in the eye and denied raping

19   Ms. Carroll.  Never did that.

20           So, the defense, confronted with our evidence and

21   having no witnesses of their own, they made a lot of arguments

22   and those arguments are not supported by any evidence.  And we

23   will talk more about this but I'm going to give you an example

24   and it is this idea that Trump needs you to believe that

25   everyone is lying because they're in this grand conspiracy to

N585car6                     Rebuttal – Mr. Ferrara

1    take him down and there is just no evidence of that.  Yeah,
2    many of our witnesses are registered democrats and they have no
3    love for Donald Trump.  It's true.  That doesn't make them
4    unique and that's not evidence of a conspiracy.

5         Ms. Martin and Ms. Birnbach have built their careers
6    as writers and journalists based on trust that their viewers
7    and readers trust them.  They're not going to throw away their
8    reputations and livelihood on some hair-brained scheme to take
9    down Donald Trump.  But that's what the defense argued.

10        And in addition to ignoring the evidence, the defense
11   made several arguments which sort of contradict themselves.
12   The way I put it is they want it both ways.  And I will explain
13   what I mean and will give you a couple examples.  So, let's
14   take an easy one.

15        Trump's team, of course, has to argue that Ms. Carroll
16   is lying that Donald Trump assaulted her.  OK.  But here is the
17   thing.  The defense also actually wants you to believe that
18   Ms. Carroll is telling the truth in all sorts of ways.  For
19   instance, the defense wants you to believe that Ms. Carroll is
20   a happy person despite what Trump did to her.  Which we told
21   you that.  Ms. Carroll did.  She told you that herself.  She
22   didn't have to say that but she did because it was the truth.
23   The defense wants you to believe that, and you should.

24        The defense also wants you to believe, for example,
25   that other bad things have happened to Ms. Carroll in her life.

1    And again, that's true, and it was Ms. Carroll who told you

2    that herself.

3           So, there are lots of things Ms. Carroll told you that

4    the defense wants you to believe, the things she said that they

5    believed helped their case, but then they turn around and ask

6    you not to believe anything else, like that Trump assaulted

7    her.  They want it both ways.  We are asking you to credit

8    everything Ms. Carroll said, the good and the bad.  The defense

9    is asking you to pick and choose because their argument depends

10   on having it both ways.  You should reject that.

11          So, that's one, that's one of the ways that they sort

12   of, they want it both ways, and here is another example and I

13   previewed it a moment ago.

14          So, Mr. Tacopina is asking you to believe that

15   Ms. Carroll, Lisa Birnbach, and Carol Martin hate Donald Trump

16   so much they're willing to lie to you, commit perjury, risk

17   going to jail, risk their reputations and their careers as

18   trusted journalists to drum up some hair-brained scheme to take

19   down Donald Trump.  But at the same time he shows you texts in

20   which they're gossiping about one another, they're talking to

21   friends, calling each other names.  Which is it?  Are they

22   conspirators in a scheme?  Or are they gossiping with each

23   other about petty grievances?

24          Let's start with the scheme because there is no

25   evidence of this scheme.  The best Trump's team can do is point

N585car6                    Rebuttal - Mr. Ferrara

1    to an e-mail exchange you have seen between Ms. Carroll and

2    Ms. Martin where Ms. Martin refers to a scheme.  And

3    Mr. Tacopina made a lot of that e-mail.  He suggested that that

4    one word, from an e-mail Ms. Martin sent back in 2017, proves

5    that these three people got together and hatched a plan to come

6    up with a big lie that would take down a sitting president.  So

7    let's look at it, let's look at the e-mail, it is Plaintiff's

8    Exhibit 122.

9               THE COURT:  Are you having a problem?  Thank you.

10              MR. FERRARA:  There it is.  Thank you, Mr. Lam.

11              So, Ms. Martin wrote:  As soon as we are both well

12   enough to scheme, we must do our patriotic duty again.

13              So the defense argues that the patriotic duty, it is I

14   guess to come up with a lie to destroy Trump.  But look at what

15   else Ms. Martin wrote.  She wrote:  We must do our patriotic

16   duty again.  Mr. Tacopina read this about three times and he

17   never read the word "again."  Why did she write "again?"  Is

18   the defense suggesting that Ms. Carroll and her friends had, on

19   some previous occasion, accused some different president of an

20   assault?  Does the defense have some evidence that these women

21   accused Ronald Reagan of rape that they haven't shown us?  Of

22   course not.  It is silly.

23              We can take that down.  Thank you.

24              Ms. Martin told you what the scheme was and it makes

25   total sense.  She said the scheme did involve a plan to ensure

Donald Trump was never re-elected but not by lying, by getting

out the vote, by engaging in public advocacy.  Any of the

totally legitimate things a voter does to prevent someone they

don't support from being elected.  That's why she wrote again,

because all she was talking about was standard civic

engagement.

By the way, that e-mail was from 2017, but

Mr. Tacopina also argued that Ms. Carroll made this up in 2019

for her book and that Ms. Birnbach and Ms. Martin went along

with it.  So which is it?  Was the scheme hatched in 2017 by

all three or was it hatched in 2019 and the other two women had

to go along?  If it makes no sense, it is because it didn't

happen that way.  This wasn't a conspiracy.

Mr. Tacopina also showed you Defendant's Exhibit ER,

this is the text in which Ms. Martin says they're celebrating

over something that hasn't really happened.  You see in the

middle:  Too much celebratory stuff over something that hasn't

really happened.  Ms. Martin then continued in this text to

talk about the adult victims of rape law.  She said:  She is

going to sue T when adult victims of rape law is passed in New

York State.

Now, Mr. Tacopina, cross-examined Ms. Martin.  He

could have asked her what she meant by this but he didn't want

the answer because it wasn't good for him.  It's clear from

this text that Ms. Martin is referring to this adult victims of

rape law as this something that hasn't happened.  This text is
from 2021.  You heard earlier about this law which is the Adult
Survivors Act.  Ms. Carroll testified about it and Judge Kaplan
explained it in his preliminary instructions at page 18 of the
transcript.

        The law was passed in 2022 after Ms. Martin wrote this
text.  Ms. Martin is saying Ms. Carroll is celebrating
something that might not happen, meaning the passage of the
law.  And you heard that the law in fact later was passed and
Ms. Carroll did bring this lawsuit under that new law.  That's
all that was.  A friend gossiping about silliness.  That's it.
It's boring.  There is no scheme.

        By the way, I will also mention that the timing of the
defense's sort of silly theory doesn't work at all.  According
to them, Ms. Carroll published her account of Donald Trump to
take him down as president.  Now, you recall Ms. Carroll
published that account online and in her book in June of 2019.
Mr. Trump was already president then.  He had been elected in
November of 2016.  Mr. Trump was elected after the *Access
Hollywood* video came out, that came out earlier in 2016.  He
was elected after Natasha Stoynoff and Jessica Leeds had come
forward with their own accusations against him.  They came
forward in October of 2016 before Election Day.  So why is this
important?  It is important because when America voted for
Donald Trump, we all knew how he treated women.  By Election

N585car6                    Rebuttal - Mr. Ferrara

Day of 2016, two women had spoken publicly about Trump

assaulting them -- Ms. Leeds and Ms. Stoynoff, and the *Access

Hollywood* tape had aired in which Trump admitted to grabbing

women by the you-know-what.  That was all out there and America

voted for him anyway.  So there was no way that Ms. Carroll,

Ms. Martin, and Ms. Birnbach would have ever thought that

another assault accusation over two years later was going to

have any effect whatsoever on whether Trump was re-elected.  It

is dumb.  The defense's made up conspiracy is just wrong.

          Oh.  Sorry.  Don't let me forget.  According to the

defense, these women were so stupid that they stole the idea

for their scheme from the plot of a Law & Order SVU episode.

          This is Defendant's Exhibit CK which Mr. Tacopina

showed you.  And then, Mr. Tacopina argues that, you know,

Ms. Carroll admitted when she testified she was aware of the

show.  Yes.  Yes, she was aware of the show -- from this

e-mail.  The e-mail she received after she had already come

forward about Trump in her book.  What does Ms. Carroll say in

response to the person alerting her to the SVU episode?  She

says:  I haven't seen it.  Which is exactly what she testified

to on the stand.

          And do you know where this e-mail came from?  From

Ms. Carroll.  If she was willing to commit a crime by lying

under oath and bringing a false lawsuit against Trump she would

also be willing to delete this e-mail.  If this was a

1  conspiracy, she wouldn't keep it and then give it to her

2  accuser to help, an e-mail that he says exposes the whole

3  thing.  Never.  But this isn't a conspiracy and Ms. Carroll

4  turned over this e-mail because it is meaningless to her and

5  proves nothing.

6          Mr. Tacopina told you, wrongly, that my colleague,

7  Ms. Kaplan, had taken liberties with the transcript.  That's

8  funny, because Mr. Tacopina repeatedly cherry-picked lines of

9  testimony he thought helped him without giving you the

10  surrounding context, and he did it on this topic, among others

11  which I will come to later, because he wants you to believe

12  some of her testimony but not the rest.

13          So, he showed you the question and answer where

14  Ms. Carroll said she was aware of the episode but he didn't

15  show you the rest of it so let me do that now.  This is page

16  626 of the transcript of Ms. Carroll's testimony.

17          Do you recall the questions?

18  "A  Yes.

19  "Q  Have you ever seen that episode?

20  "A  Never.

21  "Q  Had you ever seen it or heard of it before you wrote your

22  book?

23  "A  Never.

24  "Q  Sitting here today, do you have any idea what actually

25  happens in that episode of television?

1    "A  No.

2    "Q  Are you making up your accusation based on what happened in

3    a popular TV show?

4    "A  No.  No."

5          Let's step back.

6          We can take this down.  Thank you, Mr. Lam.

7          Let's step back for one minute.  The Trump team's

8    theory is that Ms. Carroll, Ms. Martin, and Ms. Birnbach, three

9    intelligent, successful people, modeled their secret-secret

10   scheme on an episode of one of the most popular shows on

11   television because, yeah, why not model your big conspiracy on

12   an episode of television that 6 million people have seen.  Who

13   is going to notice other than those 6 million people?  It makes

14   no sense.  Put aside -- put aside -- how silly it is on its

15   face if these three people were going to make up an accusation.

16   This is the best they could do?  If these three women were

17   going to make up a lie, why would they say the assault happened

18   in a department store?  They could make up a more private place

19   than that.  They could agree on a more specific time period.

20   They could say that E. Jean screamed, not that she laughed.

21   But they didn't say those things to you because that's not the

22   truth.  What they told you was the truth, good or bad.  This

23   isn't a conspiracy to take down Donald Trump, it is evidence of

24   what actually happened, that Donald Trump assaulted

25   Ms. Carroll.

1          But I was telling you how the defense wants it both

2     ways and so they want you to believe that these three people

3     are in this conspiracy but at the same time Mr. Tacopina showed

4     Carol Martin all those texts where Ms. Martin said some mean

5     things about Ms. Carroll and you remember them, Mr. Tacopina

6     went over them.  Ms. Martin called Ms. Carroll narcissistic, a

7     little scary.  She wrote that Ms. Carroll's lawsuit had gone to

8     another level that she had she couldn't relate, she was just

9     not there for it.  You saw it.

10         So, the question is if Ms. Martin was in a secret

11    scheme with Ms. Carroll, why in the world is she complaining to

12    random friends about it?  Which is it?  Are they in grand

13    scheme to take down the president, or is Ms. Martin gossiping

14    to friend and calling E. Jean names?  The defense argument

15    doesn't pass the smell test.

16         Or, remember what Lisa Birnbach told you.  She said

17    that after Ms. Carroll told her about the assault she never

18    checked in with Ms. Carroll about it.  She worked not to think

19    about it.  It is weird, right?  It is weird that Ms. Carroll

20    told her friend she had been raped and her friend never asked

21    about it again for 20 years.  The truth is often weird.  But

22    here is my point:  No one lies like this.  If Ms. Birnbach was

23    in a conspiracy with Ms. Carroll and was willing to commit

24    perjury and lie to you, she would tell you she thought about

25    the assault often.  She would tell you that she frequently

asked Ms. Carroll if she was OK, that they had discussed it on

election night, because that's easier to understand and who

could prove her wrong?  But what you heard was a witness --

Lisa Birnbach -- being completely honest with you, even when it

opened her up to difficult questions by the defense.  She told

you the truth, not what she thought you wanted to hear.  And,

you know the truth.  Ms. Carroll was sexually assaulted by

Donald Trump and immediately told her good friends Lisa and

Carol.

        When Ms. Carroll eventually came forward, Ms. Martin

was upset that she had to be deposed, that she had to testify

and turn over her private texts and e-mails, that she had to

fear for her safety.  And so, like we have all done,

Ms. Martin, texting privately with her other friends, said some

unkind things about Ms. Carroll.  We have all been there, we

have all been on both sides of that.

        But here is another problem with the defense argument.

If Ms. Martin was scheming to help her friend file a lawsuit

against Donald Trump, she would know she was going to have to

turn over those texts and e-mails.  These women aren't stupid.

She would know the end game was a lawsuit and they know that

would mean they would have to produce their communications.

Ms. Martin wouldn't have written those texts if she was

conspiring to help her friend file a lawsuit.  And, if she was

willing to commit perjury, well then she would be willing to

1    delete the texts before ever giving them anyway.  She didn't do

2    those things because this isn't a conspiracy.  Ms. Martin --

3    she didn't want to be here but she came and testified because

4    it was the truth and she believed it was the right thing to do.

5            Last point on this.  In all of those private texts you

6    saw there wasn't a single one in which Ms. Martin or

7    Ms. Birnbach ever questioned that Donald Trump had assaulted

8    Ms. Carroll because that's the truth.  Ms. Martin said she

9    produced years' worth of texts -- that's at 1046 -- years'

10   worth, and not one of them did Ms. Martin ever question whether

11   Trump assaulted Ms. Carroll because she knew the answer to that

12   question and so do you.  It happened.  Donald Trump did it.

13           So, OK, let's talk about how else the defense wants it

14   both ways and this is also something I briefly touched on

15   earlier.

16           So, Mr. Trump publicly denied raping Ms. Carroll.  And

17   of course that's part of the defense argument, that Ms. Carroll

18   made all of this up and it never happened.  OK.  But if that's

19   Trump's defense, why did Mr. Tacopina ask all those questions

20   about whether Ms. Carroll screamed, about whether she was

21   laughing, about whether she willingly went into the dressing

22   room with Mr. Trump?  Those questions are about whether

23   Ms. Carroll consented to what Trump did to her.  And

24   Mr. Tacopina agreed that this isn't a case about consent, that

25   consent is not their defense.  So then why does it matter?  If

N585car6                      Rebuttal - Mr. Ferrara

1   consent is not the defense, why does it matter if she screamed?

2   Why does it matter if she laughed?  Why does it matter?  She

3   walked into the dressing room first.  I thought Trump said he

4   was never there and he had no idea who this woman was.

5         Those questions were a distraction.  As Mr. Tacopina

6   agreed, consent is not the defense.  Donald Trump claimed this

7   never happened, he had no idea who this woman is.  He doesn't

8   go to Bergdorf's.  That's what he said.  And those denials were

9   lies.

10         You are not being asked anything about consent.  You

11   are being asked to decide whether an assault happened at all

12   and you know the answer to that.  It did.  And I really can't

13   stress this enough:  If you find yourselves in the jury room

14   talking about whether Ms. Carroll consented, then she wins,

15   because it means you have concluded she was in that dressing

16   room with Donald Trump's hands on her.  This is not a case

17   about consent.  But, the defense wants it both ways, they want

18   to argue that it never happened but then ask questions

19   suggesting that if it did, Ms. Carroll consented.  And it

20   doesn't work.  It just doesn't work.

21         I'm sorry, but if their defenses conflict with each

22   other, that means they have no defense and you should reject

23   their efforts to throw everything at the wall and see what

24   sticks.  None of it sticks because Donald Trump was in that

25   store with Ms. Carroll that day and he assaulted her and then

1    he lied about it and defamed her.  They didn't put on a defense

2    case because they don't have a defense.  And that actually

3    leads me to another example of how the defense wants it both

4    ways.

5          Mr. Tacopina argues that we haven't carried our burden

6    of prove in this trial.  And he is of course correct, it is our

7    burden.  It is our burden of proof, we embrace that burden.

8    And, we have carried it.  We have to prove it is more likely

9    than not that Trump assaulted Ms. Carroll.

10          Remember, as everyone agrees, right, this is not a

11    criminal case, the standard is not beyond a reasonable doubt,

12    and we have proven, by overwhelming evidence, that that assault

13    occurred.  We are not worried about 51 percent but that's the

14    standard, so he told it to you accurately.  And the question --

15    you are going to render a verdict based only on the evidence

16    you have seen in this courtroom.  Only on the evidence in this

17    courtroom.  You are going to be asked to decide whose version

18    of events is more likely.  So think of it like a scale, right?

19    And the scale is balanced when the evidence on each side is

20    exactly the same and the question here is whether the side of

21    the scale with our evidence is heavier than the side of the

22    scale with the defense evidence.  And the defense says no.

23    They say, no, it's not.  But they're totally wrong because, as

24    you know, they didn't call any witnesses, not a single one, and

25    yet --

1           MR. TACOPINA:  Judge, that's objectionable.  Scales

2    are based on witness -- quantity of witnesses.

3           THE COURT:  That's enough.  Thank you.

4           Members of the jury I will instruct you.

5    Preponderance of the evidence refers, as has been said, to the

6    preponderance of the credible evidence.  It means which side is

7    more likely right and that doesn't depend on who called how

8    many witnesses or put in what documents.

9           Go ahead.

10          MR. FERRARA:  Mr. Tacopina argued that the defense

11   couldn't find any witnesses or evidence because Ms. Carroll

12   wasn't specific about the date.  Remember this?  That

13   Ms. Carroll is deliberately being vague about the date the

14   assault occurred because she doesn't want Trump to be able to

15   find any witnesses or evidence and he talked about not being

16   able to prove a negative or disprove that the assault happened?

17          Well, first things first.  The reason they can't

18   disprove it is because it happened.  OK?  It's true.  Trump

19   assaulted Ms. Carroll.  And if it wasn't true, they would have

20   been able to find evidence that it wasn't true.  And because it

21   is true, we were able to find evidence from that period of time

22   all of which backs up Ms. Carroll's testimony every step of the

23   way.

24          So, for example, Ms. Carroll said she had met Trump.

25   He said they hadn't.  We have a photo from that period of time

1    showing the two of them speaking.  That's Plaintiff's Exhibit

2    12, the photo where Trump mistook Ms. Carroll for Marla Maples,

3    his second wife.

4         Trump also said he never went to Bergdorf's.  Well, we

5    found two people who worked at Bergdorf Goodman during that

6    period of time, Cheryl Beall and Robert Salerno.  Mr. Salerno

7    remembers seeing Trump in the store and Ms. Beall remembers

8    seeing him right outside.  So, that's one reason you should

9    reject Mr. Tacopina's argument that they couldn't find any

10   evidence.  Because we did.  We found evidence from that time

11   period and we showed it to you at this trial.

12        But there is a second, even simpler reason why the

13   Trump team is wrong when they argued that they couldn't find

14   evidence or witnesses.  There were two people in that dressing

15   room back in 1996, Ms. Carroll and Mr. Trump.  One of them

16   testified, one of them didn't.  The defense didn't call

17   Mr. Trump to testify and you should conclude it is because he

18   would have hurt their case if he had.  And that brings me to my

19   final example of how the defense wants it both ways.

20        They argue that Ms. Carroll lied when she testified to

21   you.  Mr. Tacopina mentioned points he made on

22   cross-examination to try to argue that Ms. Carroll lied.  You

23   saw her testify and you can tell from her demeanor and her

24   answers and all the other evidence that she was telling the

25   truth, but it's ironic that Mr. Tacopina points to his

1   cross-examination of Ms. Carroll as evidence that she lied

2   because Mr. Tacopina's client, Donald Trump, never took the

3   witness stand at all.  He didn't even show up in court.  And in

4   his attempt to make an excuse for his client's decision not to

5   attend this trial, Mr. Tacopina pointed out that Mr. Trump was

6   deposed.  And you saw that.  You also saw that Ms. Carroll was

7   deposed, twice, by some of the same lawyers in this courtroom.

8        Mr. Tacopina claims that it was enough that Trump was

9   deposed once over seven months ago.  But then why wasn't it

10  enough that Ms. Carroll was also asked questions at her

11  deposition?  Why did Mr. Tacopina have to spend nearly two full

12  days asking her questions during this trial if her deposition

13  was enough?  Because that's not how this works.

14       Respect for the justice system.  It was Ms. Carroll

15  who respected the justice system enough to walk into this

16  courtroom, swear an oath, look all of you in the eye, and

17  subject herself to two days of cross-examination.  Donald Trump

18  did not do that.  He could not do that.

19       Mr. Tacopina said to you minutes ago that you need

20  cross examination in your search for the truth.  And we

21  couldn't agree more.  What does that tell you?  What does your

22  common sense tell you?  If someone accused you of rape and you

23  didn't do it, you would run to the courtroom, look the jurors

24  in the eye, and tell them it never happened.  Mr. Trump didn't

25  do that.  Ms. Carroll was here every day, testified for over

1    two days, hour after hour of cross-examination.  Not Trump.

2    Didn't want to answer our questions.

3              Mr. Tacopina criticizes Ms. Carroll's testimony

4    because she showed up, she swore an oath, and told you what

5    happened, and meanwhile, Donald Trump was nowhere to be found;

6    didn't come into the courtroom, didn't take the witness stand.

7    And you should draw the conclusion that that's because he did

8    it, because he raped Ms. Carroll and he didn't want to testify

9    about it.

10             Now, I mentioned that Mr. Tacopina has, at times,

11   cherry-picked portions of the transcript to show you throughout

12   his summation and I gave you one example and I want to come

13   back to a couple more.

14             Again, he is a good lawyer, he has the transcript, and

15   he showed it to you when it suited him to do that but he, at

16   times, did not give you the full context because it would hurt

17   his case to show you that so I will do it.

18             He put up a slide with a line of testimony from page

19   605 of Ms. Carroll's testimony.  Here is what he showed you.

20   Ms. Carroll saying I never had sex again but I think it wasn't

21   because of him.  Here is what he left out, let's add in the

22   rest of it.

23             And then, he also didn't show you the rest of the

24   context Ms. Carroll gave on page 625.

25             Do we have that, Mr. Lam, too?

1          *Here is the thing.  I was killing my own luck.*  She

2     testified.  *I was getting in the way of my own luck.  I made*

3     *sure I wasn't lucky.  I just made sure I didn't meet a person*

4     *because I didn't allow myself to flirt or smile at a possible*

5     *romantic partner.*  That was the context.

6          Another example --

7          We can take that down.  Thank you, sir.

8          Another example of cherry-picking had to do with the

9     testimony of Dr. Lebowitz.  Now, Mr. Tacopina spent a lot of

10    time on Dr. Lebowitz and he made this point about how, if

11    Ms. Carroll had lied to Dr. Lebowitz, then it sort of just goes

12    into the report.  He used this phrase:  Garbage in, garbage

13    out.  Remember that?  But, again, he cherry-picked this too

14    because, as my colleague Ms. Kaplan explained earlier,

15    Dr. Lebowitz testified that she believed Ms. Carroll.  A

16    licensed, clinical psychologist with a speciality in trauma

17    who, for years, has treated members of the military who suffer

18    trauma, that clinical expert believes Ms. Carroll.  And that's

19    at page 896, Ms. Kaplan showed it to you.  The defense asked

20    her that but Mr. Tacopina didn't show you that part.

21         Mr. Tacopina also cherry-picked and misrepresented the

22    evidence when he was talking about this guy George Conway.

23    Mr. Tacopina called Mr. Conway a democratic party lawyer and he

24    showed you one question of Ms. Carroll's testimony so let me

25    show you the rest.  It is page 315 of the transcript.

1          I am really putting Mr. Lam through the paces.  Thank

2    you, sir.

3          Ms. Carroll told you on direct examination -- not

4    cross, on direct examination -- that a conversation with George

5    Connolly crystallized the idea of a lawsuit.  It is down

6    towards the bottom.  And then I asked:

7          Who is George Conway?

8          And even then she said:  George Conway is a republican

9    lawyer.

10         Not a democrat, a republican lawyer.  And yes, the

11   evidence showed that Conway is no fan of Donald Trump because

12   you don't have to be a democrat to dislike that guy.

13         You can take that down.  Thank you.

14         Almost every time he showed you testimony it was out

15   of context.  Those are just a few examples.  But you should

16   scrutinize carefully everything he said to you.

17         So, pointing out something else, Mr. Tacopina was very

18   fired up about the fact that Ms. Carroll told you that Donald

19   Trump assaulted her on a Thursday.  He mentioned repeatedly

20   that she hadn't said that the -- had never before said that the

21   assault happened on a Thursday and that's true.  She freely

22   admitted that to you when she was on direct examination, it is

23   at page 166 of the transcript.  And let's be clear,

24   Ms. Carroll, to this day, isn't sure it happened on a Thursday.

25   That's her best recollection and it makes sense to her but

1     she's the first to admit she really isn't sure.  But I am

2     surprised that Mr. Tacopina made such a big deal of this in

3     both his opening and his closing.  It's no secret that

4     Ms. Carroll can't pin down the date this happened.  She told

5     you she wishes she could.  She understandably has been asked

6     when it happened over and over in interviews and in this

7     courtroom.  So, is it any wonder that she obsessively racks her

8     brain every day for any and every honest detail she has in her

9     memory about what happened, about when this happened?  That she

10    never gives up trying to remember that?  Of course not.

11          And that's what you saw on the witness stand, a woman

12    trying her best to tell you what she remembered and what she

13    didn't.  She shouldn't be criticized for that.

14          Ms. Kaplan walked you through the timing so I'm not

15    going to belabor it but just briefly, Ms. Carroll remembers the

16    assault happened in fall of '95 or spring of '96.  When you add

17    in the detail about Lisa Birnbach interviewing Donald Trump in

18    early 1996, it made sense that it was the spring of '96, both

19    because Ms. Birnbach wouldn't have interviewed Trump had she

20    just been told that he had raped her friend, and also because

21    it makes sense that Ms. Carroll called Ms. Birnbach because

22    Ms. Carroll was thinking about how Ms. Birnbach had just

23    interviewed Trump.  So that all makes sense.  And then you

24    factor in that Ms. Carroll going to Bergdorf's after she

25    finished her show and the time of day she called Ms. Birnbach,

1    which was around 6:00 or 7:00 at night and it made sense it was

2    the night that the store stayed open late:  Thursday.  That's

3    it.  No big deal.  It is not lies, it is just common sense and

4    best efforts to remember.

5            Mr. Tacopina also argued that Ms. Carroll is lying to

6    sell her book and that the lawsuit is a money grab.  Well,

7    that's totally wrong and look, first, again, my partner

8    Ms. Kaplan spoke to you for 90 minutes earlier and she never

9    asked you once to award Ms. Carroll some ridiculous amount of

10   money and I'm not going to do that either.

11           Second, Ms. Carroll told you that this lawsuit isn't

12   about the money.  I asked her if she's hoping for a large

13   payout from this case and she answered "it's not about the

14   money, it's about getting my name back."  That's at page 316 of

15   the transcript.  If Ms. Carroll is hoping for a huge payday,

16   why would she tell you, the jury that will decide the issue,

17   that it isn't about the money?  She wouldn't.  What she told

18   you is the truth.  This lawsuit is about far more than money to

19   her, it is about getting her life back.

20           And the book?  I mean, Ms. Carroll told you the book

21   was a dud and didn't sell but remember the evidence about how

22   Ms. Carroll published the Trump chapter from the book?  That

23   chapter about Trump and a few other chapters were published

24   online by *New York* magazine.  Right?  So, in other words,

25   Ms. Carroll gave away, for free, online, the chapter about

Trump.  She wouldn't have done that if she was making up a story to get people to buy her book.  This is not a money grab.

The defense also argued that Ms. Carroll is lying about whether Ms. Martin and Ms. Birnbach read the book excerpt about Trump.  And I guess his point there was that they're lying about having read the book because they've secretly read it and they got their stories straight to coordinate their accounts.  I apologize, I honestly did not completely follow this one, but I -- but the book was published, period.  The excerpt was online.  Ms. Carroll, Ms. Martin, and Ms. Birnbach all told you they did an interview together for the New York Times.  No one is saying to you that they had not heard each others' accounts before they testified here.  No one is saying that.  They told you that.  So, I don't understand the argument about did they read the excerpt?  Did they not?  They told you about sitting with one another for an interview.

This goes to what I was sort of saying earlier about if they were going to lie, wouldn't they lie better than this?  I mean, it goes back to that idea but, similarly, if they wanted to get their story straight, which I think is what Mr. Tacopina is suggesting I think he is saying, they wanted to get their story straight, but they also could have done that a lot better because there are little inconsistencies throughout their testimony that shows you they didn't coordinate with each other, they're just doing their best to remember a conversation

1   from a long time ago and I will give you a couple examples.

2           So, the night Ms. Carroll told Ms. Martin about the

3   assault, Ms. Martin told you that Ms. Carroll had the idea of

4   going to Ms. Martin's house to talk but Ms. Carroll remembers

5   it the other way, that Ms. Martin proposed going to her home.

6   And so, you can compare the pages of the transcript at 190 and

7   1026.  That's just one example.

8           How about Ms. Birnbach.  As you remember, Ms. Carroll

9   testified that Trump penetrated her both with his fingers and

10  his penis.  But when Ms. Birnbach described what Ms. Carroll

11  had told her back in 1996, she didn't say anything about

12  Trump's fingers, and that's page 636 and 690.

13          There are other examples but you get the idea.  This

14  isn't how people testify when they have concocted a story and

15  have a script.  What the witnesses told you was the truth:

16  That Donald Trump had assaulted Ms. Carroll who then told her

17  friends what had happened.

18          So, let's talk about the *Access Hollywood* tape.  I'm

19  not going to play it again.  Mr. Tacopina repeated what

20  Mr. Trump said in his deposition, was that it was locker room

21  talk.  But you know what Trump didn't do?  He didn't say it

22  wasn't true.  Trump said it is locker room talk but he didn't

23  say what I said there isn't true.  So I have a different term

24  for what Mr. Trump said on that video:  It was a confession.

25  Ms. Kaplan already walked you through the tape so, again, I'm

N585car6                          Rebuttal - Mr. Ferrara

1   not going to play it again, but the idea that this is locker

2   room talk is absurd and even Trump doesn't deny it was true.

3          So first off, look.  I have been in a lot of locker

4   rooms and I have never heard anyone talk about furniture

5   shopping.  And I'm not trying to be cute here, there is a

6   point.  Locker room talk can be crude.  OK.  I get it.  Things

7   you wouldn't say in front of your mom or your boss.  Fine.

8   Whatever.  That's not what this was.  Let's look at the

9   transcript.

10          Let's put up 25-T, Mr. Lam, if you could.

11          So let's pull up, up top, the big quote by Donald

12   Trump where he mentioned:  No, no, Nancy.  Yes.

13          He says:  I took her out furniture shopping.  She

14   wanted to get some furniture.  I said, I'll show you where they

15   have some nice furniture.  I moved on her like a b-i-t-c-h but

16   I couldn't get there.

17          All right?  Trump was describing a specific incident

18   in which he took a woman shopping and moved on her.  Does that

19   sound familiar?  Is that not exactly what happened with

20   Ms. Carroll?  They were shopping and then he moved on her.

21   Trump never denied this.

22          And then he describes how he just kisses women, he

23   doesn't wait, grabs them by their genitals.  You get it.

24          We can take that down.  Thank you, Mr. Lam.

25          Your common sense and experience tells you that's not

locker room talk but you know from the evidence in this case
that it's definitely not locker room talk when Donald Trump
says it because you heard from three witnesses who said he did
exactly that:  Ms. Carroll, Jessica Leeds, and Natasha
Stoynoff.  They all described Trump grabbing them and kissing
them without warning.  And he didn't deny what he said.

          So, one last thing on this.  The *Access Hollywood*
video is from 2005.  The recording is from 2005 and it became
public in 2016.  2005, the year Trump talked about grabbing
women by their genitals, that was the same year he assaulted
Natasha Stoynoff.  That video is a confession.

          Now, the defense spent some time talking about how
Ms. Carroll had said she's fine, or great, or fabulous, on many
occasions since the assault.  Ms. Kaplan talked about this, how
Ms. Carroll minimizes difficulties.  And you heard testimony
from Dr. Lebowitz and Ms. Carroll's sister Cande explaining why
Ms. Carroll does that, why she has such a hard time checking in
deeply with her own emotions.  But I also will admit I just
don't get the argument.  Is the defense saying that because
Ms. Carroll was raped she could never be happy again?  That she
can never shop in Bergdorf Goodman's again?  That can't be the
argument, right?  If I get mugged outside of my office, am I
supposed to never go to work again because it is too
triggering?  If a loved one passes away and you manage to get
on with your life and find happiness again, does that mean you

N585car6                    Rebuttal - Mr. Ferrara

1   didn't care about the person you lost?  Of course not.  And

2   Dr. Lebowitz explained this to you too.  She told you that

3   Ms. Carroll doesn't blame Bergdorf's.  It wasn't the store that

4   assaulted her, it was Donald Trump.  That's at page 883 of the

5   transcript.  Or, the point about having, you know, kept the

6   dress she was wearing when Trump assaulted her.  This is

7   something Ms. Carroll told you herself.  If she is going to

8   lie, why not say she destroyed the dress?  Why not say I

9   destroyed it, I don't have it anymore.  Who could ever prove

10  her wrong?  Because she told you the truth, good or bad.  She

11  kept the dress because it was beautiful and it was her nicest

12  dress, and Dr. Lebowitz explained that.

13          Or how about watching *The Apprentice*?  Dr. Lebowitz

14  explained the reaction Ms. Carroll had when Ms. Carroll first

15  saw the trailer for *The Apprentice*.  You guys remember this?

16  Ms. Carroll was sitting in a meeting and someone showed the

17  trailer for *The Apprentice* and Ms. Carroll completely froze and

18  couldn't speak.  This is at page 884 of the transcript.  But at

19  the same time, as Dr. Lebowitz told you, *The Apprentice* was a

20  show that everyone in Ms. Carroll's social circle was watching

21  at that time and if she hadn't, she would have sort of stood

22  out.

23          I think the point is that Ms. Carroll is entitled to

24  find happiness again in her life, to focus on the positive

25  things in life and work to be the happiest, best version of

1    herself, and it feels like the defense has this idea of the

2    perfect rape victim and in their version it goes something like

3    this:  The perfect rape victim doesn't flirt.  The perfect rape

4    victim screams.  The perfect rape victim never goes back to

5    where they were raped.  The perfect rape victim tells the

6    police but otherwise never discusses the rape publicly.  The

7    perfect rape victim burns whatever clothes they were wearing.

8    The perfect rape victim never laughs again, never jokes around.

9    The perfect rape victim never again has success in their

10   career.  The perfect rape victim never looks at their rapist

11   again.  The perfect rape victim never tries to hold their

12   rapist accountable, never gets their day in court.  And, the

13   perfect rape victim is never happy again.

14          That's the defense's out-of-date, out-of-touch view.

15   It is as wrong as it is offensive.  Dr. Lebowitz explained to

16   you why it is wrong.  For example, she talked about victims who

17   don't scream, even if they're being raped in the stacks of the

18   public library.  That's at page 857 of the transcript.  But you

19   also know it is wrong because you heard from three victims of

20   sexual assault in this case, three of Donald Trump's victims

21   and they told you the same thing.  Ms. Carroll couldn't process

22   what was happening and was extremely confused when Trump

23   attacked her.  That's what she told you, that's at page 177.

24   Jessica Leeds told you that when Trump started groping her on

25   the airplane she didn't scream or shout and to this day she

1    still doesn't know why.  That's at 742.  And Natasha Stoynoff,

2    the *People* magazine writer, described how after Trump assaulted

3    her at Mar-a-Lago, she went into auto-pilot, as she put it, and

4    finished the interview with Trump and his wife Melania.  That's

5    at 993.

6          Three women, all assaulted by Trump, none of them

7    screamed, none of them discussed it with their employers, none

8    of them wanted to fired or sued.  All of them went on with

9    their lives and careers and found happiness despite what

10   happened to them.  And because they did, the defense wants you

11   to believe they were never assaulted.  But, you know Donald

12   Trump assaulted every one of them.  They told you that and he

13   told you that when he described how he treats women on the

14   *Access Hollywood* tape.

15         THE COURT:  Let's try to wrap it up in the next five

16   minutes.

17         MR. FERRARA:  Yes, sir.  I have one minute and a half,

18   your Honor.

19         THE COURT:  OK.

20         MR. FERRARA:  The long and short of it is this, ladies

21   and gentlemen:  Donald Trump's entire defense rests on calling

22   everyone a liar.  He needs you to believe Ms. Carroll is a

23   liar; Lisa Birnbach, Carol Martin, liars.  Natasha Stoynoff and

24   Jessica Leeds, he has to call them liars.  Even Robert Salerno

25   and Cheryl Beall, I guess they're lying, too, when they talk

N585car6

1    about seeing Trump in or near the store.  All of them

2    apparently willing to break the law and risk ruining their

3    lives to bring down Donald Trump.  Trump even needs you to

4    believe he was lying on the *Access Hollywood* tape.

5            Each of our witnesses took the stand and swore an oath

6    to tell the truth.  Their testimony is consistent and it is

7    overwhelming.  And the guy calling them a liar is the only one

8    of them who didn't testify, who couldn't swear an oath in this

9    courtroom without admitting he assaulted Ms. Carroll.  This was

10   never going to be a "he said, she said" case, we had too many

11   witnesses for that.  But now, at the end of this trial, we see

12   there wasn't even "he said," because Donald Trump never looked

13   you in the eye and denied it.  Find him liable for assaulting

14   and defaming E. Jean Carroll.

15           Thank you.

16           THE COURT:  Thank you, Mr. Ferrara.

17           Ladies and gentlemen, 10:00 tomorrow morning.  I will

18   give you my instructions and you will get the case.

19           Don't talk about it, don't read or listen to anything

20   about it.  Thank you.

21           Counsel remain, please.

22           (Jury not present)

23           THE COURT:  Be seated, folks, please.

24           Now, was there something else that somebody wanted to

25   bring up?  Or not.  Are we clear?

N585car6

1          MS. KAPLAN:  Not from our side, your Honor.

2          THE COURT:  Mr. Tacopina?

3          MR. TACOPINA:  No, your Honor.

4          THE COURT:  OK.  See you tomorrow morning.

5          (Adjourned to May 9, 2023, at 10:00 a.m.)