**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

E. JEAN CARROLL,

    *Plaintiff*,

v.                                                          No. 22 Civ. 10016 (LAK)

DONALD J. TRUMP,

            *Defendant*.

**PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION FOR A NEW
TRIAL OR REMITTITUR**

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carrol*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND .......................................................................................................................... 2

ARGUMENT ............................................................................................................................... 10

    I.   THE JURY'S COMPENSATORY DAMAGES AWARD FOR BATTERY IS NOT
         EXCESSIVE ....................................................................................................................... 11

    II.  THE DEFAMATION DAMAGES ARE NOT EXCESSIVE EITHER........................... 17

        A.  The Compensatory Damages Accurately Reflect the Evidence Presented at Trial .... 17

        B.  The Punitive Damages for Defamation Are Proportional and Reasonable ................ 25

CONCLUSION............................................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*A.B. v. Staropoli*,
    No. 08 Civ. 4585, 2013 WL 12441525 (S.D.N.Y. Dec. 11, 2013)...........................................16

*Alcantara v. Bell*,
    No. 19 Civ. 3686, 2022 WL 4638127 (E.D.N.Y. Sept. 30, 2022)...........................................13

*Allen v. CH Energy Grp., Inc.*,
    58 A.D.3d 1102 (3d Dep't 2009) ...............................................................................................24

*Anderson v. Eli Lilly & Co.*,
    79 N.Y.2d 797 (1991) ................................................................................................................12

*Bender v. City of N.Y.*,
    78 F.3d 787 (2d Cir. 1996) ........................................................................................................20

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559, 116 S. Ct. 1589 (1996)..................................................................................25, 26

*Boule v. Hutton*,
    328 F.3d 84 (2d Cir. 2003) ........................................................................................................17

*Bouveng v. NYG Cap. LLC*,
    175 F. Supp. 3d 280 (S.D.N.Y. 2016) ................................................................................18, 26

*Breest v. Haggis*,
    No. 161137/2017, 2023 WL 374404 (N.Y. Sup. Ct., N.Y. Cty. Jan. 24, 2023).................14, 17

*Cantu v. Flanigan*,
    705 F. Supp. 2d 220 (E.D.N.Y. 2010) ......................................................................................25

*Carroll v. Trump*,
    No. 22 Civ. 10016, 2023 WL 185507 (S.D.N.Y. Jan. 13, 2023)...............................................16

*Dalbec v. Gentleman's Companion, Inc.*,
    828 F.2d 921 (2d Cir. 1987) ......................................................................................................24

*Doe v. Green*,
    No. 17 Civ. 1765, 2021 WL 2188534 (S.D.N.Y. Apr. 29, 2021)...............................................15

*Doe v. Green*,
    No. 17 Civ. 1765, 2021 WL 2188148 (S.D.N.Y. May 28, 2021)...............................................15

*Egan v. Gordon*,
    No. 904231-20 (N.Y. Sup. Ct., Albany Cty., Nov. 10, 2022) .................................................. 15

*Ferri v. Berkowitz*,
    561 F. App'x 64 (2d Cir. 2014) ........................................................................................ 17, 18

*Fin. Cas. & Sur. Co., Inc. v. Zouvelos*,
    No. 12 Civ. 3476, 2018 WL 3950634 (E.D.N.Y. May 3, 2018) .......................................... 18

*France & Canada S.S. Corp. v. Berwind-White Coal Mining Co.*,
    229 N.Y. 89 (1920) ............................................................................................................ 10

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011) ............................................................................... 20

*In re Vivendi Universal, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .............................................................................................. 20

*ING Glob. v. United Parcel Serv. Oasis Supply Corp.*,
    757 F.3d 92 (2d Cir. 2014) ........................................................................................... 10, 22

*Jacques v. DiMarzio, Inc.*,
    386 F.3d 192 (2d Cir. 2004) .............................................................................................. 22

*Jalal v. Shanahan*,
    No. 16 Civ. 281, 2018 WL 10466837 (E.D.N.Y. May 10, 2018) ........................................ 24

*Jennings v. Yurkiw*,
    18 F.4th 383 (2d Cir. 2021) .............................................................................................. 25

*Jester v. Hutt*,
    937 F.3d 233 (3d Cir. 2019) .............................................................................................. 25

*Johnson v. White*,
    No. 06 Civ. 2540, 2010 WL 11586681 (S.D.N.Y. Nov. 18, 2010) ...................................... 15

*King v. Macri*,
    800 F. Supp. 1157 (S.D.N.Y. 1992) .................................................................................. 17

*Laurie Marie M. v. Jeffrey T.M.*,
    159 A.D.2d 52 (2d Dep't 1990) ......................................................................................... 16

*Laurie Marie M. v. Jeffrey T.M.*,
    77 N.Y.2d 981 (1991) ....................................................................................................... 16

*Leather v. Ten Eyck*,
    97 F. Supp. 2d 482 (S.D.N.Y. 2000) ................................................................................. 17

*Leather v. Ten Eyck,*
  2 F. App'x 145 (2d Cir. 2001) .............................................. 17

*Lippe v. Bairnco Corp.,*
  288 B.R. 678 (S.D.N.Y. 2003) .............................................. 19

*Lippe v. Bairnco Corp.,*
  99 F. App'x 274 (2d Cir. 2004) ............................................ 19

*Lore v. City of Syracuse,*
  670 F.3d 127 (2d Cir. 2012) ............................................... 10

*Lynch v. N.Y. Times Co.,*
  171 A.D. 399 (1st Dep't 1916) ............................................. 17

*Mathie v. Fries,*
  121 F.3d 808 (2d Cir. 1997) ............................................... 15

*Matter of Ariana F.F.,*
  202 A.D.3d 1440 (4th Dep't 2022) .......................................... 14

*Miller v. State,*
  110 A.D.2d 627 (2d Dep't 1985) ............................................ 16

*MJAC Consulting, Inc. v. Barrett,*
  No. 04 Civ. 6078, 2006 WL 2051129 (S.D.N.Y. July 24, 2006) ................ 19

*Offei v. Omar,*
  No. 11 Civ. 4283, 2012 WL 2086356 (S.D.N.Y. June 8, 2012) ................. 15

*Ortiz v. N.Y. City Hous. Auth.,*
  22 F. Supp. 2d 15 (E.D.N.Y. 1998) ........................................ 15

*Ortiz v. N.Y. City Hous. Auth.,*
  198 F.3d 234 (2d Cir. 1999) ............................................... 15

*Osorio v. Source Enters., Inc.,*
  No. 05 Civ. 10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) ............. 18, 24

*Perney v. Medical One New York, P.C.,*
  No. 159080/2019, 2020 WL 8613521 (N.Y. Sup. Ct., N.Y. Cty. Feb. 17, 2020) ... 15

*Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada,*
  973 F.2d 1050 (2d Cir. 1992) .............................................. 21

*Powers v. Memorial Sloan Kettering Cancer Ctr.,*
  No. 20 Civ. 2625, 2022 WL 874846 (S.D.N.Y. Mar. 24, 2022) ................. 12

*Purgess v. Sharrock,*
  33 F.3d 134 (2d Cir. 1994) ................................................................................ 24, 26

*Ravina v. Columbia Univ.,*
  No. 16 Civ. 2137, 2019 WL 1450449 (S.D.N.Y. Mar. 31, 2019) ............................ 26

*Restivo v. Hessemann,*
  846 F.3d 547 (2d Cir. 2017) ............................................................ 10, 11, 12, 14

*Rombom v. Weberman,*
  No. 1378/00, 2002 WL 1461890 (N.Y. Sup. Ct., Kings Cty. June 13, 2002) ........... 26

*Rombom v. Weberman,*
  766 N.Y.S.2d 88 (2d Dep't 2003) .......................................................................... 26

*Stampf v. Long Island R. Co.,*
  761 F.3d 192 (2d Cir. 2014) ................................................................................. 10

*Strader v. Ashley,*
  61 A.D.3d 1244 (3d Dep't 2009) ........................................................................... 24

*Torres v. Hyun Taik Cho,*
  902 N.Y.S.2d 781 (Sup. Ct., N.Y. Cty. 2010) ........................................................ 12

*Turley v. ISG Lackawanna, Inc.,*
  774 F.3d 140 (2d Cir. 2014) ................................................................................. 25

*United States v. Gleason,*
  616 F.2d 2 (2d Cir. 1979) .................................................................................... 16

*United States v. Williams,*
  690 F.3d 70 (2d Cir. 2012) ................................................................................... 21

*Vargas v. Premiere Staff Agency,*
  No. 17 Civ. 4280, 2019 WL 10632865 (S.D.N.Y. July 18, 2019) ........................... 16

*Vargas v. Premiere Staff Agency,*
  No. 17 Civ. 4280, 2020 WL 5663412 (S.D.N.Y. Sept. 23, 2020) ........................... 16

*Webber v. Dash,*
  607 F. Supp. 3d 407 (S.D.N.Y. 2022) ............................................................. 25, 26

*Witherspoon v. State of Ill.,*
  391 U.S. 510, 88 S. Ct. 1770 (1968) ..................................................................... 17

*Xiaokang Xu v. Xiaoling Shirley He,*
  147 A.D.3d 1223 (3d Dep't 2017) ......................................................................... 24

*Yammine v. DeVita*,
   43 A.D.3d 520 (3d Dep't 2007) ................................................................................ 17

**Statutes**

10 U.S.C. § 920 ............................................................................................................. 13

N.Y. C.P.L.R. § 5501 ..................................................................................................... 10

**Rules**

Federal Rule of Civil Procedure 59 ................................................................... 8, 10, 18, 22

Federal Rule of Evidence 702 ........................................................................................ 19

**Other Authorities**

N.Y. Pattern Jury Instr., Civil 3:29 ................................................................................ 17

Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2810.1 (3d ed.) ...................................... 19

## PRELIMINARY STATEMENT

Over the course of two and a half days of trial testimony, E. Jean Carroll spoke clearly, powerfully, and courageously about the harms caused by Donald J. Trump when he sexually assaulted her more than 25 years ago in a dressing room at Bergdorf Goodman and then lied about her publicly in October 2022. Two experts—one on psychological harms and the other on defamation damages—backed her testimony with credible and reliable analysis. The jury considered that evidence carefully. And ultimately, the jury concluded that Carroll was telling the truth and Trump was not, finding that Trump had sexually abused and later defamed Carroll and awarding her $5 million in damages.

Importantly, on this motion, Trump does not seek to disturb the jury's verdict on the merits. Rather, he takes issue with the amount of money that the jury awarded Carroll as damages. But Trump's motion is nothing more than his latest effort to obfuscate the import of the jury's verdict by engaging in his own particular Trump-branded form of magical thinking. Once again, Trump has the nerve to claim public vindication from the jury in this case when, in fact, the jury determined that he penetrated Carroll's vagina with his fingers without her consent and then defamed her last year. *See also Carroll v. Trump*, No. 20 Civ. 7311 (S.D.N.Y.) ("*Carroll I*"), ECF 168 at 3–7. His factual misrepresentations about what happened at trial are only compounded by the legal errors in his brief, both in articulating how courts have applied the relevant standards to assess battery and defamation jury awards and in suggesting how those standards should apply to the damages awarded here. As explained further below, the Court should reject Trump's request either for a new trial on damages, or for the Court to decrease on its own the amount that the jury determined that Trump now owes.

**BACKGROUND**

During a two-week trial, the jury in this case heard credible testimony from nine fact witnesses and two expert witnesses, all of whom Carroll called during her case-in-chief to support her sexual battery and defamation claims. Seventy-eight total documents and videos were admitted into evidence as exhibits. Trump, for his part, did not call a single witness and did not take the stand himself, opting instead for the jury to hear from him solely through his prior videotaped deposition testimony. Taken together, this presentation of evidence overwhelmingly supported the jury's finding for Carroll on the merits, as well as its award of $2 million and $2.7 million in compensatory damages for battery and defamation, respectively, and its relatively modest award of $300,000 in punitive damages (mostly on the defamation claim).

***The underlying sexual assault.*** Carroll testified that one evening during the spring of 1996, she ran into Trump at the 58th Street entrance of Bergdorf Goodman. Ex. 1 ("Tr.") at 170:10–13, 356:21–24.[1] Trump recognized Carroll and asked her to help him pick out a gift for a woman. Carroll obliged. *Id.* at 171:2–16. Trump eventually suggested that they go to the lingerie department on the sixth floor. *Id.* at 172:19–173:6. Once there, the two came across a piece of lingerie set on top of a glass display case. *Id.* at 174:19–21. After some playful banter about who should try on the bodysuit, Trump took Carroll's arm and led her toward the dressing room. *Id.* at 175:18–20, 176:1–22.

As soon as Carroll entered the room, Trump "immediately shut the door and shoved [her] up against the wall," banging her head. *Id.* at 177:22–23. Carroll pushed Trump back, trying to break the tension, but he "thrust [her] back against the wall again, banging [her] head" once more. *Id.* at 178:11–12. Then, Trump pinned Carroll against the wall with his shoulder—"his whole

---

[1] All "Ex." cites are to exhibits attached to the accompanying declaration of Roberta A. Kaplan.

weight came against [her] chest and held [her] up there." *Id.* at 178:23–179:2. "[H]e leaned down and pulled down [her] tights." *Id.* at 179:2–3. She could hear him breathing in her ear. *Id.* at 179:17. He pushed his mouth against hers. *Id.* at 179:17–18 All the while, Carroll was fighting—her "whole reason for being alive in that moment was to get out of that room." *Id.* at 180:19–20.

But she couldn't overpower Trump. "[H]e had pulled down [her] tights and … his fingers went into [her] vagina." *Id.* at 180:22–24. Carroll testified that "it was a horrible feeling because … he put his hand inside of [her] and curved his finger," which "was extremely painful, extremely painful." *Id.* at 180:24–181:1. Carroll told the jury that sitting on the witness stand—more than 25 years later—she could "still feel" the pain and sensation of Trump forcibly penetrating her with his fingers. *Id.* at 181:1–2. Carroll believed that Trump then inserted his penis into her vagina. But he was leaning against her with his whole weight, and while she couldn't see precisely what was happening, she "could certainly feel that pain in the finger jamming up." *Id.* at 181:20–23. Finally, Carroll managed to get her knee up and push Trump off her. *Id.* at 182:14–16. She rushed out of the dressing room and left the store as quickly as she could. *Id.* at 182:18–19. Carroll returned to her car and drove home, her head and vagina still hurting. *Id.* at 187:14–18. That night (like many nights that followed) Carroll relived the attack over and over again in her mind, visions of the attack "wash[ing] over [her]." *Id.* at 225:19.

***Harms resulting from the assault.*** Trump's traumatic attack would negatively affect Carroll for the rest of her life. At first, Carroll's "overwhelming thought was [that she] had died and was somehow still alive." *Id.* at 635:23–636:1. Dr. Leslie Lebowitz, a psychological expert and trauma specialist, testified that this is a common experience for survivors of violent sexual attacks: this kind of attack "so violates [a victim's] sense of humanity and independence and selfhood tha[t] people feel psychologically that they are being killed. They feel at risk. They feel

like their personhood is being murdered, even if they know at some level that they were never in that kind of mortal, physical danger." *Id.* at 865:8–13.

In a very real sense, Trump did kill an integral part of Carroll's dignity and identity in the Bergdorf's dressing room that evening—Carroll would not go on to have a romantic relationship or sexual relationship ever again. *Id.* at 215:23–25, 216:18–20. Carroll had actively dated before the attack. *Id.* at 217:19–20. Indeed, she "loved meeting men … loved going out … loved conversations." *Id.* at 217:19–20. But afterward, whenever Carroll met a potential romantic partner, it was "impossible" for her "to even look at him and smile." *Id.* at 216:9–12. That inability to engage in this way was a direct result of Trump's violent attack: "What I did was I flirted with Donald Trump. I laughed with him. I tried to be—tried to engage him. I laughed at his jokes. I found him charming. And what happened to me when I was flirting? I got into serious trouble." *Id.* at 216:6–9; *see also id.* at 220:16–23, 216:3–17. This pattern of avoidance, as Dr. Lebowitz testified, "led to an inability [for Carroll] to maintain a romantic and intimate life, which has led to deep feelings of loss." *Id.* at 875:18–20. Dr. Lebowitz further emphasized that Carroll's aversion to romantic relationships was "a complete departure" from Carroll's "previous pattern" of long-term relationships. *Id.* at 883:10–19. Carroll consciously felt this loss, too: "I feel I have lost out. … I am a happy person basically, but I'm aware that I have lost out on one of the glorious experiences of any human being." *Id.* at 221:7–9; *see also id.* at 221:9–14.

In addition to losing out on one of life's great joys, Carroll has also suffered from intense intrusive memories or "intrusions" that have affected nearly all aspects of her life. These intrusions take the form of various memories of what happened at Bergdorf's that suddenly and randomly "take over [her] brain." *Id.* at 226:3–7. Carroll told the jury about one recent example. Late one evening, decades after the attack, she pulled off the road on her way home because she was feeling

tired and wanted to take a quick nap. *Id.* at 226:11–13. She closed her eyes and the next thing she knew she "felt Donald Trump again on top of [her]." *Id.* at 226:13–15. She couldn't breathe; she "thought for a minute [that she] was going to die." *Id.* at 226:15–16.

These intrusive memories are often combined with physical symptoms. Carroll has sometimes felt "[Trump's] fingers jammed up inside of [her]," as if the assault were happening again. *Id.* at 226:18–21. And those physical symptoms have often occurred when Carroll has had to speak about the assault. During Carroll's evaluation with Dr. Lebowitz as part of this case, Carroll had to recount the sexual assault and her subsequent experiences with intrusions in painstaking detail. At the end of the evaluation, as Dr. Lebowitz herself observed, Carroll was "doubled over, holding her stomach and just said I have a really bad stomachache." *Id.* at 867:1–2. In the days that followed, Carroll "got actually very sick with pneumonia." *Id.* at 867:2–6. Then, Carroll's stomach issues returned when she and Dr. Lebowitz continued their evaluation weeks later. Dr. Lebowitz testified that, in her professional opinion, these physical symptoms were either the result of or exacerbated by Carroll having to review the entire assault in detail. *Id.* at 866:23–867:1.

The sexual assault has deeply affected how Carroll thinks of herself, causing her to experience self-blame and shame. *Id.* at 187:1–6. Dr. Lebowitz explained how Carroll continues to hold herself responsible for the assault, even though she consciously knows that it was not her fault. All of Carroll's attempts to avoid victimhood were because Trump's assault "made her feel like she was worth less than she had been before. She felt degraded and diminished. She felt like she had been treated as if she wasn't even a person." *Id.* at 876:2–5; *see also id.* at 875:21–876:7, 876:25–877:17. In part to ease the blame that she felt, Carroll testified that she has long resisted

using the word "rape" to describe the assault. *Id.* at 545:13–17. Instead, she "liked the word 'fight'" because it "gave [her] action" and made her feel less like a victim. *Id.* at 545:17–18, 876:8–24.

Carroll's injuries continue to this day. Dr. Lebowitz concluded that Carroll has exhibited severe symptoms in at least three of the four diagnostic categories for post-traumatic stress disorder. *Id.* at 853:11–15. She also testified that, based on the academic literature and her professional experience seeing patients, having a few severe symptoms of post-traumatic stress may be as bad as being diagnosed with PTSD as the result of meeting all four diagnostic criteria for the disorder. *Id.* at 854:1–7.

**The defamation and resulting harms.** Carroll's psychological harms contributed to her decision to remain silent about Trump's attack for decades. It wasn't until 2019 that she told her story publicly for the first time. In June of that year, Carroll published an excerpt from her forthcoming book that included a description of her encounter with Trump in *New York Magazine*. *Id.* at 250:9–20. Over the next several days, Trump responded to Carroll's allegations with a series of defamatory statements denying Carroll's allegations and attacking her motives for coming forward. *See* Exs. 2, 3, 4. Those statements, and their resulting harms, are at issue in the related action, *Carroll I*. However, Carroll testified about these statements—and Trump's counsel did not object to their admission—because they provided essential context to the present dispute concerning a more recent defamatory statement that Trump made.

On October 12, 2022, Trump posted about Carroll on the social media platform Truth Social. In his statement, Trump falsely wrote that Carroll's accusation was "a complete con job" and a "hoax and a lie"; "this so–called 'event' … never happened"; Carroll was making up "a complete scam" to "promot[e] a really crummy book"; and Carroll was "not [his] type!" Ex. 5. The statement continued: "E. Jean Carroll is not telling the truth, is a woman I had nothing to do

with, didn't know, and would have no interest in knowing her if I ever had the chance." *Id.* Trump admitted that he wrote the statement himself and subsequently had it disseminated to major press outlets. Ex. 6 at 127:5–20 (transcript of Trump deposition designations).

Trump's statement reached a broad audience. At the time he published it, Trump had roughly 4.7 million followers on Truth Social, and the statement was covered widely in the press. Tr. 1116:9–12. Professor Ashlee Humphreys—Carroll's defamation damages expert—testified that based on conservative estimates, Trump's October 2022 defamatory statement garnered between 13.7 million and 18 million impressions across various media. *Id.* at 1127:19–25. According to her expert opinion, between 3.7 million and 5.6 million of those impressions were "receptive impressions," meaning they involved individuals likely to believe Trump's statement. *Id.* at 1134:12–19. Professor Humphreys thus determined that it would cost up to $2.7 million to run an adequate reputation repair campaign to counteract the *negative* impressions caused by Trump's defamatory statement. *Id.* at 1141:14–21.

Carroll testified as to additional harms that Trump's October 2022 statement caused. At the time Trump issued the statement, Carroll had just "managed to get [her] Substack up and running, get [her] career a little bit back and feeling that things were going to be OK." *Id.* at 320:14–16. She testified that she had "really thought [she] was gaining back a bit of ground." *Id.* at 322:8. She felt "happy" to be "back on [her] feet," but "then, boom, he knock[ed] [her] back down again." *Id.* at 322:10–12. And, in the wake of this statement, Carroll was buried by "a wave of slime." *Id.* at 323:20–23. Trump's supporters inundated Carroll with "very seedy," "very denigrating" comments, repeating, for instance, Trump's refrain that she was too ugly to assault. *Id.* at 323:23–324:2. Carroll testified that these messages were uniquely painful: "It is very hard to get up in the morning and face the fact that you're receiving these messages [that] you are just too

ugly to go on living, practically." *Id.* at 324:2–5. Professor Humphreys confirmed that "a huge volume, a very large number, tens of thousands of online … associations [with Carroll] were really negative." *Id.* at 1135:7–8.

**Jury verdict.** At the end of the two-week trial, the Court charged the jury. On the battery count, the Court explained that "Carroll claims that Trump is liable to her for battery on three different and alternative bases, each of which corresponds to a criminal law definition of a different sex crime. Trump denies that he is liable to her for battery on any of these three different and alternative bases." *Id.* at 1416:1–5.[2] The jury ultimately concluded that Trump had sexually abused Carroll. ECF 174. Consistent with the Court's instruction, this result means that the jury found that Trump used physical force to engage in sexual contact against Carroll without her consent in order to gratify his own sexual desires. Tr. 1418:3–1419:20.

Regarding battery damages, the Court instructed that if the jury decided that Trump committed battery, it would be their "task to determine from the evidence a dollar amount, if any, that would justly and adequately compensate Carroll for any physical injury, pain and suffering, and mental anguish, as well as emotional distress, fear, personal humiliation, and indignation that she has suffered, or will suffer in the future, as a result of Trump's … sexual abuse." Tr. 1422:24–1423:5. The Court specifically noted that the "[d]amages may be awarded based on a plaintiff's subjective testimony of pain." *Id.* at 1423:23–24. The jury awarded Carroll $2 million in damages for harms resulting from the sexual abuse. ECF 174. Additionally, the Court charged that the jury "may award punitive damages if Carroll proved by a preponderance of the evidence that Trump's

---

[2] Although Trump is preoccupied by Carroll's complaint in this action—and specifically her allegations concerning rape—it is unclear how they are relevant to his Federal Rule of Civil Procedure 59(a) motion, given that there is now a complete trial record to draw from. In any event, and contrary to Trump's implication that Carroll only pleaded rape in her complaint, Carroll alleged that "Trump's actions constitute sexual offenses as defined in Article 130 of the New York Penal Law, including but not limited to rape in the first degree (§ 130.35), rape in the third degree (§ 130.25), sexual abuse in the first degree (§ 130.65), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52)." ECF 1 ¶ 125.

conduct, if any, that caused Carroll's alleged injury was wanton and reckless or done with a conscious disregard for Carroll's rights." Tr. 1424:21–25. The jury found that punitive damages were appropriate and awarded Carroll an additional $20,000. ECF 174.

On the defamation count, the Court was careful to emphasize that Carroll's defamation claim was only "in relation to Trump's October 12, 2022 statement, and more specifically to the parts of that statement about Carroll." Tr. 1428:6–8. For the avoidance of doubt, the Court read all relevant excerpts of Trump's October 2022 statement during the charge. *Id.* at 1428:15–1429:10. The Court then instructed the jury on each element of defamation, and notably, as part of its instruction on the falsity element, the Court stated that "whether Trump's statement is false or true depends largely or entirely on whether you find that Trump raped *or* sexually abused *or* forcibly touched *or* otherwise sexually attacked Carroll." *Id.* at 1431:2–6 (emphases added). Consistent with the sexual abuse finding, the jury determined that Trump had defamed Carroll. ECF 174.

Regarding defamation damages, the Court instructed the jury to "award an amount that, in the exercise of your good judgment and common sense, you decide is fair and just compensation for the injury to the plaintiff's reputation and the humiliation and mental anguish in her public and private life which you decide was caused by the defendant's statement." Tr. 1433:1–5. The Court further instructed that in deciding damages resulting from the defamation, the jury "should consider the plaintiff's standing in the community, the nature of Trump's statement made about Carroll, the extent to which the statement was circulated, the tendency of the statement to injure a person such as Carroll, and all of the other facts and circumstances in the case." *Id.* at 1433:6–11. The jury awarded Carroll $2.7 million in compensatory damages, $1.7 million of which was specifically related to the cost of running an adequate reputation repair campaign. ECF 174.

Finally, the Court instructed the jury that they may award punitive damages relating to the defamation if they found that Trump's statement was made maliciously, meaning "with deliberate intent to injure or made out of hatred or ill will or spite or made with willful or wanton or reckless disregard of another's rights." Tr. 1435:6–10. The Court also provided the jury with a detailed set of considerations to guide their determination of the appropriate number of punitive damages. *Id.* at 1435:22–1436:10. The jury found that Trump's conduct warranted punitive damages for defamation in the amount of $280,000. ECF 174.

## ARGUMENT

When presented with a motion for a new trial on damages or for remittitur, "the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (citation omitted). A "high degree of deference is accorded to the jury's evaluation of witness credibility," *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014), and a jury's factual findings that bear on damages must be given "considerable deference," *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017). As the Second Circuit has long recognized, "when damages are awarded, calculation of damages is the province of the jury." *Id.*; *accord France & Canada S.S. Corp. v. Berwind-White Coal Mining Co.*, 229 N.Y. 89, 95 (1920).

As a result, a court "will not 'vacate or reduce a jury award merely because [it] would have granted a lesser amount of damages.'" *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (citation omitted). Instead, a court may order a new trial on damages or remittitur only where "the award is intrinsically excessive." *Id.* Under New York law, an award is excessive "if it deviates materially from what would be reasonable compensation." *Id.* (quoting N.Y. C.P.L.R. § 5501(c)).

"Although a review of comparable cases is appropriate," the key question is simply "whether the verdict lies within the reasonable range." *Restivo*, 846 F.3d at 587.

Trump misapplies these principles in his brief. He repeatedly advances arguments premised on mischaracterizations of the record, asking the Court to rely on a version of the facts that the jury clearly (and rightfully) rejected. And he argues for a lowest-common-denominator approach to jury verdicts, effectively claiming that damages should max out at the level of the lowest awards that Trump has been able identify across nearly four decades of reported cases. As explained below, there is no valid basis for disturbing the damages that the jury awarded to Carroll here.

## I.   THE JURY'S COMPENSATORY DAMAGES AWARD FOR BATTERY IS NOT EXCESSIVE

To determine appropriate damages arising from Trump's sexual assault, the jury was instructed to identify an "amount that would fairly and adequately compensate Ms. Carroll for [her] injuries." Tr. 1424:2–3. Those injuries included "any physical injury, pain and suffering, and mental anguish, as well as emotional distress, fear, personal humiliation, and indignation that she has suffered, or will suffer in the future, as a result of Mr. Trump's … sexual abuse." *Id.* at 1423:1–5. The Court cautioned the jury that it "may award damages only for those injuries … proved by a preponderance of the evidence," and not for any damages "based on speculation or sympathy." *Id.* at 1423:7–10. In other words, the award of damages should be "based on the evidence at trial and only that evidence," *id.* at 1423:10–11, including Carroll's "subjective testimony of pain," *id.* at 1423:24.

The extensive trial record leaves no doubt that the jury abided by these instructions. Carroll was on the witness stand for two and a half days, during which she described Trump's attack in excruciating detail and relived the painful sensation of Trump forcing his fingers inside her vagina. She testified to the damage that the attack caused her—not just in the immediate aftermath, but for

decades to follow. Carroll experienced chronic traumatic stress, feelings of shame and dirtiness, unwanted memories of the assault, a continuing inability to pursue romantic intimacy, and ultimately loss of companionship and partnership. And it was not just Carroll who gave a comprehensive account of her injuries. The jury also heard from Dr. Lebowitz, an expert in trauma, including sexual trauma, who backed up each and every aspect of Carroll's testimony and explained, in scientific terms, just how much damage Trump had caused. Trump did not present an expert of his own. Given the "considerable deference" owed to the jury's assessment of this evidence, the Court should leave the jury's $2 million verdict undisturbed. *Restivo*, 846 F.3d at 587.

Not surprisingly, each of the arguments that Trump offers for why, in his view, Carroll's damages are "grossly excessive" lacks merit. *See* ECF 184 ("Trump Br.") at 1, 13–16.

*First*, Trump mischaracterizes the nature of Carroll's damages by labeling this a "loss of consortium" case. Trump Br. 13. But under New York law, "loss of consortium is a claim specific to married persons" and represents "'the marital partners' interest in the continuance of the marital relationship as it existed at its inception.'" *Torres v. Hyun Taik Cho*, 902 N.Y.S.2d 781, 783 (Sup. Ct., N.Y. Cty. 2010) (quoting *Anderson v. Eli Lilly & Co.*, 79 N.Y.2d 797, 798 (1991)). Such a claim is derivative of the claims of the "impaired spouse" who has suffered a direct injury. *Powers v. Memorial Sloan Kettering Cancer Ctr.*, No. 20 Civ. 2625, 2022 WL 874846, at *5 (S.D.N.Y. Mar. 24, 2022). As a result, this doctrine is plainly inapplicable here. And even if considerations of companionship are relevant, a non-injured spouse's derivative claim is categorically distinct from the damages Carroll is owed for the forcible, non-consensual sexual assault that Trump committed against her. To be clear, Carroll's injuries go far beyond loss of companionship. Carroll has experienced shame and a diminished sense of self for more than 25 years, has been plagued by

intrusive memories, and has had to relive the painful sensation of Trump's fingers jamming inside her. These are not the hallmarks of a loss of consortium claim.

*Second*, Trump fares no better when trying to write this off as a mere "groping" case, in which he might have simply "grop[ed] [Carroll's] breast through clothing." Trump Br. 1, 14. In fact, that was not a version of events that was presented to the jury at trial at all. The word "breast" was not used a single time during Carroll's testimony, in contrast to the word "vagina," which was used repeatedly. The latter was a focus of Carroll's cross-examination, during which Trump's counsel pressed Carroll on the difference between "rummaging around [her] vagina" and "inserting a finger inside [it]." Tr. 406:11–12. Carroll made clear that Trump had done both, *id.* at 406:13–14, and Trump cannot now demand that damages be based on some imaginary version of events in which he did nothing more than touch Carroll's breast through her dress.

Trump's effort to draw a sharp line between forcibly penetrating Carroll with his fingers and penetrating her with his penis does not advance the ball either. There is no dispute that, in resolving Carroll's battery claim, the jury did not find that Trump had raped Carroll as that term is specifically defined under New York law. *See* Tr. 1417:2 (rape under New York law requires penetration "of the penis into the vaginal opening"). But the jury did find that he had sexually abused her. *See* ECF 174; Tr. 1418:3–1420:10. The conduct that sexual abuse covers is hardly *de minimis*. Forcibly penetrating Carroll with his fingers would make Trump liable for rape in other jurisdictions. *E.g.*, 10 U.S.C. § 920 (defining rape to include "the penetration, however slight, of the vulva … of another by any part of the body or any object"). And the jury may well have found that Trump gratified himself sexually by forcibly touching the outside of Carroll's vagina with his penis. *Alcantara v. Bell*, No. 19 Civ. 3686, 2022 WL 4638127, at *1, *6 (E.D.N.Y. Sept. 30, 2022) (defendant committed sexual abuse by "rubbing his penis on the naked buttocks" of victim);

*Matter of Ariana F.F.*, 202 A.D.3d 1440, 1442 (4th Dep't 2022) (defendant committed sexual abuse by "touch[ing] his penis to [victim's] vagina while they were both naked"). In any event, Trump's sexual abuse was still criminal under New York law, and it involved non-consensual penetration that caused Carroll significant, long-lasting harm. Put simply, Trump is not entitled to a substantial discount on damages simply because the jury found that he forcibly penetrated Carroll with his fingers instead of his penis.

*Third*, the cases that Trump cites do not justify remittitur or a new trial either. *See* Trump Br. 14–16.

It is certainly true that there are cases involving serious sexual misconduct in which a plaintiff received lower damages than Carroll did. But a verdict need only be "within [a] reasonable range," *Restivo*, 846 F.3d at 587, and the jury's middle-of-the-road award to Carroll is significantly less than the compensatory damages awarded in other cases. In *Breest v. Haggis*, for example, the jury awarded Haleigh Breest $7.5 million in compensatory damages based on her claim that she had been raped by screenwriter and director Paul Haggis in 2013. Breest experienced many of the same symptoms of sexual assault-related trauma as Carroll. After the assault, Breest, like Carroll, had difficulty going on dates and had sex only one time. Ex. 7 at 334:12–19, 364:4–8 (*Breest* trial transcript). Breest, like Carroll, repeatedly experienced unwanted memories of the assault, and those unwanted memories caused Breest emotional distress that interfered with her daily life. *Id.* at 1210:15–1211:3, 1211:21–1213:5. And Breest, like Carroll, experienced sexual violence at the hands of a powerful and influential man. While it is true that Breest, unlike Carroll, was diagnosed with PTSD and that may explain in part why the jury awarded her $5.5 million more in compensatory damages, that is no reason to find that the jury's much smaller award to Carroll was excessive. *See Breest v. Haggis*, No. 161137/2017, 2023 WL 374404, at *3 (N.Y. Sup. Ct., N.Y.

Cty. Jan. 24, 2023) (upholding damages award and citing nine cases involving even higher damages than Breest obtained); *see also Egan v. Gordon,* No. 904231-20 (N.Y. Sup. Ct., Albany Cty., Nov. 10, 2022) (jury awarded $13.8 million in compensatory damages to a rape survivor who "continuously relives" the abuse through "flashbacks," and whose personal life was shattered by the sexual violence she experienced); *Ortiz v. N.Y. City Hous. Auth.*, 22 F. Supp. 2d 15, 38–40 (E.D.N.Y. 1998) (jury awarded $3 million in compensatory damages for injuries plaintiff suffered as a result of being raped, including five-year period of anxiety and depression and loss of "interest in social activity, including sexual activity"), *aff'd*, 198 F.3d 234 (2d Cir. 1999).

The weakness of Trump's position becomes even clearer upon closer examination of several of Trump's purported "comparator" cases. *See* Trump Br. 14–16. In some cases, the plaintiff was awarded the exact amount of compensatory damages that the plaintiff herself had requested, often as part of a damages inquest conducted by a magistrate judge during default judgment proceedings. *See Doe v. Green*, No. 17 Civ. 1765, 2021 WL 2188534, at *1 (S.D.N.Y. Apr. 29, 2021), *report and recommendation adopted*, 2021 WL 2188148 (S.D.N.Y. May 28, 2021); *Johnson v. White*, No. 06 Civ. 2540, 2010 WL 11586681, at *1, *5 (S.D.N.Y. Nov. 18, 2010); *Perney v. Medical One New York, P.C.*, No. 159080/2019, 2020 WL 8613521, at *2 (N.Y. Sup. Ct., N.Y. Cty. Feb. 17, 2020); *see also Offei v. Omar*, No. 11 Civ. 4283, 2012 WL 2086356, at *1 (S.D.N.Y. June 8, 2012) (plaintiff raised no objection to damages award recommended by magistrate judge). As a result, those cases obviously have little to nothing to say about the damages that a jury might have awarded on a full evidentiary record developed at trial, as occurred here.

Other cases cited by Trump involved evidentiary issues not present in this case. *See Mathie v. Fries*, 121 F.3d 808, 815 (2d Cir. 1997) (acknowledging that "part" or "substantial part" the plaintiff's "psychological distress resulted from 'his participation in a brutal murder'" and his

subsequent conviction and sentence—"conditions for which [the defendant] is obviously not responsible"); *A.B. v. Staropoli*, No. 08 Civ. 4585, 2013 WL 12441525, at *7 (S.D.N.Y. Dec. 11, 2013) (noting that there was "little evidence" presented about victim's psychological state in the years immediately prior to damages inquest); *Laurie Marie M. v. Jeffrey T.M.*, 159 A.D.2d 52, 57 (2d Dep't 1990) (citing evidence that the plaintiff was "dating" and noting "paucity of proof of permanent psychological damages"), *aff'd*, 77 N.Y.2d 981 (1991). Certain of Trump's cases involved claims against a party other than the person who committed the sexual assault. *See Vargas v. Premiere Staff Agency*, No. 17 Civ. 4280, 2019 WL 10632865 (S.D.N.Y. July 18, 2019) (claim against employer for discrimination where sexual assault had been committed by nonparty), *report and recommendation adopted*, 2020 WL 5663412 (S.D.N.Y. Sept. 23, 2020); *Miller v. State*, 110 A.D.2d 627 (2d Dep't 1985) (claim against university for negligence). And not one of the cases Trump cites involved evidence of injury covering a 25-year-plus period. That distinguishes Carroll's case from all of the cases on which Trump relies, and it was entirely reasonable for the jury to account for the harm that Carroll has experienced ever since the assault in 1996 in determining compensatory damages.

Carroll's case is also different because her trial happened in the present day. While Trump cites cases dating all the way back to 1985 as supposed comparators, our society's views on sexual assault and the attendant harms have changed significantly in recent years. In fact, this shift is the reason why the New York legislature enacted the Adult Survivors Act (ASA) in the first place, giving Carroll the opportunity to bring her battery claim. *See Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 185507, at *5–*9 (S.D.N.Y. Jan. 13, 2023). When it comes to evaluating a damages award, this shift cannot be ignored. That's because the jury serves as the "conscience of the community," *United States v. Gleason*, 616 F.2d 2, 15 (2d Cir. 1979), and "one of [its] most

16

important functions" is to "maintain a link between contemporary community values" and the courts, *Witherspoon v. State of Ill.,* 391 U.S. 510, 519 n.15, 88 S. Ct. 1770 (1968). Courts "must refrain from placing unreasonable restrictions on [a jury's] power to do so" through their award of compensatory damages. *Leather v. Ten Eyck,* 97 F. Supp. 2d 482, 488 (S.D.N.Y. 2000), *aff'd,* 2 F. App'x 145 (2d Cir. 2001); *see Breest,* 2023 WL 374404, at *4 (considering a shift in "public attitudes and reasonableness … regarding rape and sexual assault" in reviewing damages awarded by jury); *King v. Macri,* 800 F. Supp. 1157, 1164 (S.D.N.Y. 1992) (considering "a shift in societal attitudes" around police brutality). In other words, "[i]nsofar as the jury's award … reflects the more enlightened collective views of today, it should not be disregarded or minimized." *Breest,* 2023 WL 374404, at *4.

## II.   THE DEFAMATION DAMAGES ARE NOT EXCESSIVE EITHER

### A.   The Compensatory Damages Accurately Reflect the Evidence Presented at Trial

It has long been understood that "[i]n a libel case, more, perhaps, than in any other, the jury is generally considered to be the supreme arbiter on the question of damages." *Lynch v. N.Y. Times Co.*, 171 A.D. 399, 401 (1st Dep't 1916). "In actions for other torts there is generally some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part." *Yammine v. DeVita*, 43 A.D.3d 520, 521 (3d Dep't 2007) (cleaned up). Indeed, the law presumes damages arising from defamation *per se, Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003), and juries are commonly instructed that defamation damages cannot be proven with "mathematical accuracy," *Ferri v. Berkowitz*, 561 F. App'x 64, 65 (2d Cir. 2014) (quoting N.Y. Pattern Jury Instr., Civil 3:29). Because the assessment of damages is "peculiarly within the jury's province," a court "must use prudence and restraint … in the exercise of its discretion over these

awards." *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 344 (S.D.N.Y. 2016) (omission in original).

Against this backdrop, the jury weighed the evidence to determine "fair and just compensation" for the injury to Carroll's reputation and "the humiliation and mental anguish in her public and private life" that Trump's October 2022 statement caused her to endure. Tr. 1433:2–5. To answer that question, the jury was instructed to consider: (1) Carroll's "standing in the community"; (2) the "nature of Mr. Trump's statement made about [her]"; (3) "the extent to which the statement was circulated"; (4) "the tendency of the statement to injure [her]"; and (5) "all of the other facts and circumstances in the case." *Id.* at 1433:5–11; *see Ferri*, 561 F. App'x at 65 (identifying these factors as bearing on defamation damages under New York law). Although cautioning that "[f]air compensation" for those harms "may vary," the Court told the jury that it could award a "substantial sum if you decide that there was substantial injury." Tr. 1433:12–15. And the jury heeded that guidance, deciding that Carroll's injury was substantial and awarding $2.7 million in compensatory damages to reflect that finding.

The jury's defamation damages award in no way requires remittitur or a new trial on damages. Trump's long list of grievances are riddled with factual misrepresentations and legal errors that neither individually nor collectively provide grounds for granting his motion. His arguments do not show that the jury verdict was "not supported by competent evidence" or that it "deviate[d] materially from approved awards in similar cases." *Osorio v. Source Enters., Inc.*, No. 05 Civ. 10029, 2007 WL 683985, at *10 (S.D.N.Y. Mar. 2, 2007). As a result, and for the following reasons, the Court should uphold the jury's compensatory damages award in this case.

*First*, a Rule 59 motion is not a vehicle to raise new legal or evidentiary arguments that could have been raised before. *See Fin. Cas. & Sur. Co., Inc. v. Zouvelos*, No. 12 Civ. 3476, 2018

WL 3950634, at *2 (E.D.N.Y. May 3, 2018) ("[A]rguments presented for the first time in a Rule 59(e) motion ordinarily are deemed forfeited."); *MJAC Consulting, Inc. v. Barrett*, No. 04 Civ. 6078, 2006 WL 2051129, at *3 (S.D.N.Y. July 24, 2006) ("[Defendant] failed to raise [] argument at trial and accordingly waived her right to assert it" in a Rule 59 motion) (collecting cases); *see also* Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2810.1 (3d ed.). Yet, that is precisely what Trump is trying to do. By attacking Professor Humphreys's analysis as supposedly full of facially implausible "error rates," faulty inputs, and glaring oversights, Trump asserts that any reliance on Humphreys's testimony to formulate a damages number could only mean that the jury itself had relied on "pure speculation." Trump Br. 18–22. Those are not proper Rule 59 arguments. Instead, they get at the core of Professor Humphreys's reliability as an expert, something Trump could have challenged under Federal Rule of Evidence 702 or raised on cross-examination. *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (listing these kinds of arguments as bearing on an expert's reliability under Rule 702). He chose not to. A motion under Rule 59 is not the opportunity for litigants to try their hand at new strategies when previous ones did not work out in their favor.

In any event, Trump's complaints about Professor Humphreys resemble arguments that he could have advanced through examination or made to a jury during summation; yet they are virtually absent from the three sentences his attorney dedicated to Professor Humphreys during his closing. Tr. 1330:7–18. None of them requires remittitur. For instance, Trump argues that Professor Humphreys's estimation that Trump's October 2022 statement was viewed between 1.5 million and 5.7 million times contains an "error rate of 74%" and therefore is "pure speculation." Trump Br. 20. He similarly faults the estimated costs for repairing Carroll's reputation. *Id.* at 21. But as Professor Humphreys testified, these estimate ranges were the byproduct of instituting

certain controls and assumptions through the modeling process based on the information available. *E.g.*, Tr. 1116:16–117:5, 1123:3–1125:11, 1141:10–13, 1141:17–20. Nothing prevented the jury from picking the number that reflected the assumptions it thought were reasonable. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 575 (S.D.N.Y. 2011) ("[I]t is well-established that the computation of damages is a quintessential fact issue for the jury, and that a jury need not accept an expert's damage calculations wholesale.") (collecting cases), *aff'd*, 838 F.3d 223 (2d Cir. 2016).

In other instances, Trump takes issue with what Professor Humphreys supposedly did not consider, like the "positive support" Carroll received after Trump defamed her. Trump Br. 20–21. But the jury was well aware of this positive support, and Professor Humphreys testified that, in her expert opinion, the existence of positive support says little about the cost of redressing the *negative* views that have been formed about an individual. Tr. 1134:25–1135:17. The jury was entitled to weigh that decision, and others Professor Humphreys made, in assessing her credibility as an expert. No argument that Trump offers suggests that the jury's credibility determinations were impermissible.[3]

*Second*, the jury did not award Carroll "double recovery" for harms stemming from Trump's 2019 defamatory statements. Trump Br. 18–19. For one, this is simply not a double recovery case within the meaning of the doctrine. As the cases Trump cites show, double recovery concerns the situation where a plaintiff presents two legal theories to account for the same injury. *Bender v. City of N.Y.,* 78 F.3d 787, 793 (2d Cir. 1996) ("If two causes of action provide a legal

---

[3] Tellingly, Trump asks for Carroll's reputation repair damages to be reduced to $368,000, the low end of Professor Humphreys's estimate. Trump Br. 18. It is unclear why Trump thinks that number would be accurate given all the flaws he supposedly finds in Humphreys's analysis. What it illustrates is that Trump simply wishes the jury had made a different choice among the options available to it. But he offers no legal reason for why the jury was required to side in his favor, nor could he.

theory for compensating one injury, only one recovery may be obtained."); *Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*, 973 F.2d 1050, 1063–64 (2d Cir. 1992) (similar). That is entirely different from a situation where a plaintiff has two separate cases to address two separate injuries, the plaintiff tries one of them, and a jury awards her damages for that injury alone.

Nor is there any record support for the idea that the jury awarded Carroll reputational damages that predated the October 2022 statement anyway. To the contrary, the jury was expressly instructed not to consider those harms; Professor Humphreys was clear that her analysis and reputation repair budget did not incorporate those harms (and, as Trump elicited on cross, informed the jury that she created a separate report for *Carroll I*, Tr. 1148:5–13);[4] and the exhibits entered into the record to substantiate the harms Carroll incurred focused solely on events after October 2022, *see* Ex. 8 (PX-45, 46, 48, 51, 53, 57). Although the jury certainly heard testimony about Trump's June 2019 statements, that testimony was important to understanding the broader context of the case. The parties were in agreement on this point, and it was Trump's counsel who elicited much of the testimony about the June 2019 statements with which he now takes issue. *E.g.*, Tr. 331:21–332:10, 578:5–582:12, 606:12–20; *see also* ECF 144. Trump's counsel described as "perfect" the instruction that the Court ultimately gave to the jury about the related action. Tr. 537:13–538:7. There is no basis for Trump's claim now that the jury disregarded the Court's instructions. *See United States v. Williams*, 690 F.3d 70, 77 (2d Cir. 2012) ("We presume that jurors follow their instructions.").

---

[4] Professor Humphreys specifically testified that the damages range she calculated for *Carroll I* was much higher than the range she presented the jury in this case, contradicting the notion that the jury relied on those damages in reaching a number in this case that is less than the upper end of the budget that Professor Humphreys developed for *Carroll II*. Tr. 1158:12–23.

*Third*, the jury's finding that Trump did not "rape" Carroll as that term is defined under New York law does not undermine that same jury's determination of appropriate compensatory damages for Trump's defamatory statement. Until now, Trump has agreed that they were distinct issues. The Court instructed the jury that, for the purposes of the defamation analysis, "whether Trump's statement is false or true depends largely or entirely on whether you find that Trump raped or sexually abused or forcibly touched or otherwise sexually attacked Carroll." Tr. 1431:2–6. Trump did not object to this jury instruction during the charge conference, Tr. 1211:5–1213:15, and his own proposed verdict form, setting forth three distinct ASA predicates for Carroll's battery claim, enabled the jury to reach the very outcome that the jury did here, ECF 101. But now, in his brief and elsewhere, Trump tries to walk it all back. He asserts that the portions of his October 2022 statement that concern the underlying assault cannot be defamatory—and therefore cannot contribute to the compensatory damages award—because the jury found that he "sexually abused" Carroll rather than "raped" her. Trump Br. 18–19.

This argument is baseless as both a legal and factual matter. Rule 51 "requires parties to articulate and lodge their objections to jury charges before they are delivered so that 'the trial court [will have] an opportunity to cure any defects in the instructions before sending the jury to deliberate.'" *ING Glob.*, 757 F.3d at 97 (quoting *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 200 (2d Cir. 2004)). "Permitting a party out of compliance with Rules 50 [or] 51 to prevail under Rule 59(e) would render those Rules, which are basic to the conduct of federal trials, essentially superfluous." *Id.* Yet, that's the result Trump seeks here. The Court instructed, and the parties agreed, that the jury could award Carroll defamation damages no matter the ASA predicate offense on which it decided to rely for battery. Trump cannot backtrack from that simply because he dislikes the damages the jury ultimately decided to award.

22

In any event, Trump's argument has no grounding in fact. Trump's defense has never been that he forcibly inserted his fingers in Carroll's vagina without her consent but did not insert his penis, which is what his argument presupposes. He has insisted that nothing, at all, ever happened between him and Carroll. The jury saw through that lie, finding that Carroll's account was supported by clear and convincing evidence. In other words, that there was "no real substantial doubt" in the jury's mind that Trump had lied when he denied that *anything* happened. Tr. 1439:10–11. Taking Trump's October 2022 statement according to "the ordinary meaning of its words," *id.* at 1430:25–1431:1, it is clear that Trump was denying the entire encounter, not a narrow and technical *ex post* categorization of it. That denial rightfully contributed to the jury's defamation determination.

*Fourth*, the jury's damages award does not materially deviate from approved awards in similar cases. Trump is a former President of the United States. Because of this, he has one of the biggest platforms in the world. Nearly every statement he makes is circulated widely—in the press, across social media, and on television. His October 2022 statement was no exception. The jury heard Trump say during his deposition testimony that he posted the October 2022 statement on Truth Social and made sure that the press covered it. Ex. 6 at 127:14–20. Trump had almost five million followers on Truth Social at the time. Tr. 1116:11–12. That platform and Trump's media outreach enabled Trump's statement to generate between 13 and 18 million impressions across various channels of communication, of which between 3.7 and 5.6 million were to people likely to be receptive to his message. *Id.* at 1134:13–15. Professor Humphreys estimated that Carroll, as a result, would have to pay between $368,000 and $2.7 million to repair her reputation in the eyes of those who believed Trump. *Id.* at 1141:17–21. Carroll herself testified about the acute and overwhelming humiliation that comes from the former *President* branding you a liar, and from his

23

supporters repeating those same claims again and again with impunity. All of these factors together contributed to significant harms that Carroll experienced at the hands of the man who sexually abused her—a conclusion the jury found was supported by the weight of the evidence and deserving of a $2.7 million compensatory damages award.

None of the cases Trump relies on in his analysis is comparable to this case. *See* Trump Br. 16–17. One concerned a local magazine article published in 1987, prior to when the internet made such defamatory publications far more accessible. *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987). Others concerned a tenant's comments about her landlord on a local television show, *Jalal v. Shanahan*, No. 16 Civ. 281, 2018 WL 10466837, at *6 (E.D.N.Y. May 10, 2018), a defamatory letter sent to an employer and some undefined online "postings," *Xiaokang Xu v. Xiaoling Shirley He*, 147 A.D.3d 1223, 1224 (3d Dep't 2017), a statement where there was "no evidence that the statement was widely disseminated" and was heard "perhaps only one person," *Allen v. CH Energy Grp., Inc.*, 58 A.D.3d 1102, 1104 (3d Dep't 2009), and false criminal charges reported in a "local newspaper," *Strader v. Ashley*, 61 A.D.3d 1244, 1247 (3d Dep't 2009).

These cases and the others relied on by Trump do not compare in the slightest to being defamed by one of the loudest voices in the world, in a statement read by millions and millions of people, which described you as a liar, labeled your account of a forcible sexual assault a "hoax," and accused you of making up a horrific accusation to sell a "really crummy book." Diminishing those unique facts to place them in the same ballpark as the cases Trump cites would be a category mistake. Indeed, courts have upheld larger awards on less egregious facts than the one awarded here. *E.g.*, *Osorio*, 2007 WL 683985, at *6, *10 ($3.5 million; statement in an interview by an board member of an article in which he said the editor-in-chief had engaged in extortion); *Purgess v. Sharrock*, 33 F.3d 134, 140 (2d Cir. 1994) ($3.5 million; hospital defamed doctor by publishing

a formal report about his care that contained falsehoods and sending that report to the medical board); *see also Cantu v. Flanigan*, 705 F. Supp. 2d 220, 226–31 (E.D.N.Y. 2010) ($150 million; farce legal complaint in which defendant described plaintiff as an operations manager of a racketeering enterprise who was involved with drug cartels and at one point had conspired with Saddam Hussein).

**B.     The Punitive Damages for Defamation Are Proportional and Reasonable**

Trump's punitive damages argument is not serious. By all relevant metrics, the jury's punitive damages award of $280,000 is well within reason and far from excessive. In reviewing punitive damages awards, courts consider three "guideposts": (1) "'the degree of reprehensibility' associated with the defendants' actions; (2) 'the disparity between the harm or potential harm suffered' and the size of the punitive award; and (3) the difference between the remedy in this case and the penalties imposed in comparable cases." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589 (1996)). All three weigh decisively in Carroll's favor here.[5]

On the first, the evidence at trial firmly established that Trump acted with substantial malice in defaming Carroll and that he knew his October 2022 statement was false. This conduct was neither innocent nor negligent—the jury found that it was malicious, calculated, and carried out with the intent to harm Carroll, a person Trump sexually abused decades prior. Trump himself admitted that he took steps to disseminate his false claims about Carroll to millions upon millions of people. Therefore, the degree of reprehensibility is high. *See Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021) (citing *Gore*, 517 U.S. at 575–76, 116 S. Ct. 1589). Trump's claim that his

---

[5] Trump cites a footnote in a Third Circuit decision for the proposition that the third guidepost is irrelevant to defamation verdicts. Trump Br. 22 (citing *Jester v. Hutt*, 937 F.3d 233, 241 n.1 (3d Cir. 2019). But that is not the law that courts apply in this Circuit. *See, e.g.*, *Webber v. Dash*, 607 F. Supp. 3d 407, 418 (S.D.N.Y. 2022).

conduct is "barely reprehensible" is premised on a version of the facts in which he was vindicated by the verdict, not the actual facts as found by the jury. *See* Trump Br. 23.

Turning to the second, Trump's argument as to the appropriate ratio of damages is frivolous. "Cases in which punitive damages are challenged as excessive typically, although certainly not always, are ones in which the amount of punitive damages awarded exceeds the amount of compensatory damages awarded." *Webber*, 607 F. Supp. 3d at 417. The cases Trump relies on demonstrate this principle. *See* Trump Br. 22 (arguing, without irony, for "a ratio of 1:1 or less"). But far from exceeding the compensatory damages here, the punitive damages constitute only 10.37% of the compensatory damages that the jury awarded. Plainly, a 10:1 ratio "does not raise concerns of excessiveness." *Ravina v. Columbia Univ.*, No. 16 Civ. 2137, 2019 WL 1450449, at *14 (S.D.N.Y. Mar. 31, 2019).

Finally, courts have upheld far larger punitive damages awards in cases where the "extent, scope, nature, and dissemination of the defamatory statements" were narrower and less egregious than with Trump's defamatory statement here. *See Bouveng*, 175 F. Supp. 3d at 351 (total of $4,000,000 in punitive damages against three defendants, where online statements appeared for ten months on website that was visited by 50,000 separate viewers each month); *Rombom v. Weberman*, No. 1378/00, 2002 WL 1461890, at *9–*11 (N.Y. Sup. Ct., Kings Cty. June 13, 2002) ($500,000 in punitive damages where defendant posted statements on several internet websites), *aff'd*, 766 N.Y.S.2d 88 (2d Dep't 2003); *Purgess*, 33 F.3d at 143 ($500,000 in punitive damages where hospital knowingly published false statements about associated doctor). At bottom, there is nothing excessive, shocking, or unreasonable about the jury's award of punitive damages to Carroll.

**CONCLUSION**

For the foregoing reasons, the Court should deny Trump's motion for a new trial or remittitur.

Dated: New York, New York
      June 22, 2023

Respectfully submitted,

Roberta A. Kaplan
Michael Ferrara
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
mferrara@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*