# EXHIBIT 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                    Plaintiff,            New York, N.Y.
 4
                v.                        22 Civ.10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                    Defendant.
 7   ------------------------------x     Jury Trial

 8                                        April 26, 2023
                                          10:10 a.m.
 9
     Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                          District Judge
12                                              and a Jury

13
                            APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24
     W. PERRY BRANDT
25        Attorney for Defendant
```

1   to Bergdorf's?

2   A.   I am guessing that it was a sale.

3   Q.   Do you recall sitting here today?

4   A.   No.

5   Q.   Did you buy anything that day?

6   A.   I don't think I did because I didn't have carrier bags with

7   me.  I didn't have shopping bags.

8   Q.   Do you recall how long you were in the store?

9   A.   No.

10   Q.   When did you first see Mr. Trump that day?

11   A.   I was leaving the store, and I was exiting the 58th Street

12   entrance, and I was just about to go out the door.  He was

13   standing on the other side of it and put up his hand.

14   Q.   You're putting up your hand to indicate what, Ms. Carroll,

15   so it's clear?

16   A.   It's universal signal for stop.

17   Q.   What did you do?

18   A.   I stopped.

19   Q.   What happened next?

20   A.   And he came through the door and he said, hey, you are that

21   advice lady.

22   Q.   How did you respond?

23   A.   I said, hey, you're that real estate tycoon.

24   Q.   What was your impression of Donald Trump at that time when

25   you saw him at Bergdorf's?

1   A.  Very personable, engaging.

2   Q.  What happened after you said, hey, you're that real estate

3   tycoon?

4   A.  He said, I need to buy a gift, come help me.  Come help me.

5   Come advise me.

6   Q.  Did you agree?

7   A.  I was delighted.

8   Q.  Why?

9   A.  Well, it was such a funny New York scene.  I'm a born

10  advice columnist.  I love to give advice, and here was Donald

11  Trump asking me for advice about buying a present.  It was a

12  wonderful prospect for me.

13  Q.  Who was he shopping for, if you know?

14  A.  I asked him.  I said:  Who is it for?  He said:  A girl.

15  And then I asked him, trying to figure out who it would be:

16  How old is she?  And he replied with:  How old are you?

17  Q.  What did you say?

18  A.  I said 52.

19  Q.  How did he respond?

20  A.  He said:  You are so old.

21  Q.  Was that in a fresh way or in a sort of teasing way?

22  A.  No.  It was humorous the way he said it.

23  Q.  What did the two of you do next?

24  A.  At the time, in '96, the little circular alcove we were

25  standing in had displayed three or four handbags, which were so

1  beautiful and such works of art I thought, wow, any girl would

2  love one of these handbags.  But he didn't like the idea of a

3  handbag.  So we went -- we turned to the left, went walk

4  through the first floor to the hats.  I thought a hat would be

5  great, and she is going to love a hat.

6  Q.  As far as you were able to tell -- what floor of Bergdorf

7  were you on at this point?

8  A.  First floor.

9  Q.  As far as you were able to tell, did anyone recognize you

10 or Mr. Trump?

11 A.  There was a shopper.  She was tiny, because I remember her

12 staring up at him in awe.  She recognized him.  He was very

13 pleasant.

14 Q.  Anyone else?

15 A.  There was a sales attendant, and she was also very pleased

16 to see him.  He was pleased to see her.

17 Q.  What, if any, words did they exchange?

18 A.  I think he said hello, how are you doing, how are you.

19 Q.  What happened after hats?

20 A.  He was holding -- he picked up a hat that was a fur hat and

21 he was petting it like a little cat or a dog.  And as he was

22 petting it he said, I know, lingerie.

23 Q.  Lingerie meaning underwear?

24 A.  Yes.

25 Q.  Where was the lingerie -- the lingerie section, I guess, in

1   the store?  Where was that located?

2   A.  I didn't know where it was.  I do now know where it is.

3   But he led the way to the escalator, and we started to go up

4   the escalator.

5   Q.  What floor do you recall lingerie being on at that time?

6   A.  Six.

7   Q.  Was there anything sort of discomforting to you about the

8   fact that Mr. Trump had proposed the lingerie?

9   A.  No.  By this time -- first of all, he was very talkative.

10  In the escalator he talked about how great Bergdorf's was.  At

11  one time he was thinking of buying Bergdorf's.  I was

12  absolutely enchanted -- I could only think of it as a scene,

13  such a great story, so I was delighted to go to lingerie with

14  him.

15  Q.  Were you chatting --

16  A.  Yes.  He was very funny, yeah.

17  Q.  Do you recall what the two of you were discussing as you

18  made your way to the lingerie area?

19  A.  He was talking about Bergdorf's.  I don't remember

20  precisely.

21  Q.  What was the tone of the conversation?

22  A.  Very joshing and light.

23  Q.  Who, if anyone else, in the store did you see as you rode

24  up to the lingerie area?

25  A.  I wasn't looking.  I was watching him and watching that I

1    didn't fall when I went on the escalator -- when the escalator

2    hit the top.

3    Q.  When you arrived at the six floor on the escalator, do you

4    recall how you walked to the area where the lingerie was?

5    A.  Yeah.  We walked -- yeah.

6    Q.  Sort of walk us through how you remember moving through the

7    floor, which way you would turn, etc.

8    A.  Do you mind if I stand up?  Because I cannot -- I'm very,

9    very bad on direction.

10            MR. FERRARA:  Your Honor, may the witness stand up to

11    orient herself?

12            THE COURT:  Yes.

13   A.  We go to the top.  We turn to the left.

14   Q.  Then what?  Is the lingerie like right there?

15   A.  No, no.  If you just keep going, you will see lingerie a

16   little bit to the right, just slightly off to a little section.

17   Q.  What happened when the two of you arrived at that section?

18   A.  There is a glass covered sort of cabinet, very elegant

19   piece of furniture.  And on the top of this glass was a lovely

20   piece of see-through grayish blue bodysuit, and he snatched it

21   up.  He held it up and he said:  Go put this on.

22   Q.  Is a body suit a type of lingerie?

23   A.  Yes.  It's quite a lovely piece.  It looks like a swimsuit,

24   except this was see-through?  They used to be called teddies.

25   Q.  Who else was in the -- in that area when you -- with you

1   and Mr. Trump?

2   A.  I didn't see anybody.

3   Q.  Was that surprising?

4   A.  It didn't surprise me, no.

5   Q.  What about sales attendants?

6   A.  Didn't see any.

7   Q.  Why didn't that surprise you?

8   A.  Bergdorf's was not busy in the evenings.

9   Q.  Have you written before that you were surprised by the lack

10  of people on the floor?

11  A.  Well -- I was not surprised and yet I was surprised.

12  Q.  How is that?

13  A.  The whole thing about going up in the escalators with

14  Donald Trump was surprising.  The fact that we didn't see any

15  salespeople, I think I noticed it.  I may have described it

16  before as being surprising.  I may have been surprised.  I

17  really can't say.  Now I find it surprising.

18  Q.  What happened after Mr. Trump picked up the piece of

19  lingerie?

20  A.  He said:  Go put this on.

21  Q.  Did you?

22  A.  No.  I had no intention of putting it on.

23  Q.  What was his demeanor when he said go put this on?

24  A.  Jesting, joshing.

25  Q.  How did you respond?

1    A.  I said:  You put it on.  It's your color.

2    Q.  What did he say?

3    A.  Then he held it up and he held it against me.  He said:

4    You're in shape.  Go put this on.  I said:  No.  It goes with

5    your eyes.  It's your size.  You put it on.

6    Q.  Why in the world would you think that Mr. Trump would put

7    on that piece of lingerie?

8    A.  Because his tone was -- he was having a very good time and

9    so was I.  The idea was very funny, and I could just picture it

10   in my mind, Donald Trump putting on this filmy see-through bit

11   of lingerie over his pants.  That's how I pictured it.

12   Q.  So what happened next?

13   A.  He said:  Go try this one -- no.  He said:  Let's try this

14   on.  And he motioned towards the dressing room.

15   Q.  What did you do?

16   A.  Well, I thought, hmm, and he had me by the arm -- he

17   motioned with his arm, he had me by the arm with this hand, and

18   the door was open and he went like this.  And I said OK.  I

19   sort of saw it as a Saturday Night Live sketch.  I had written

20   a sketch that was similar to this very scene I was entering.

21   And Donald Trump was being very light and it was very joshy and

22   pleasant and very funny.

23   Q.  Just to be clear, was he dragging you into the dressing

24   room?

25   A.  No.  He went like this.

1   Q.  In your mind, at the time, Ms. Carroll, had things --
2   withdrawn.

3        Had you been flirting sort of much this time with
4   Mr. Trump?
5   A.  Yeah.  I was flirting the whole time, probably.
6   Q.  At this point now, when Mr. Trump has proposed going to the
7   dressing room, have things escalated in your mind?
8   A.  The comedy was escalating, and I thought it was getting
9   funnier and funnier.
10  Q.  Did you ever think about saying, no, I'm not going in?
11  A.  No.  It didn't occur to me.  I didn't really think about
12  going into the dressing room.  I thought of it as sort of an
13  open area.  I thought the door was open, we walked in.  I
14  didn't picture anything about what was about to happen.  Didn't
15  picture it.
16  Q.  What happened once you -- first off, was the dressing room
17  open or closed?
18  A.  The door was opened.  That open door has plagued me for
19  years because I just walked into it, just walked in.
20  Q.  Let's take it one step at a time.  What happened once you
21  entered the dressing room?
22  A.  He immediately shut the door and shoved me up against the
23  wall and shoved me so hard my head banged.
24  Q.  What were you thinking at that moment?
25  A.  I was extremely confused and suddenly realizing that what I

1   thought was happening was not happening.

2   Q.  How did you react in that moment?

3   A.  I was laughing as we walked in, and I continued to laugh

4   because I thought -- I wasn't sure -- for a minute I thought

5   maybe it was a mistake, that he didn't mean to do that.  He

6   didn't mean to shut the door.  And just to make sure -- I

7   continued to laugh just in case he was thinking of something

8   intimate.  And so I'm very rapidly trying to figure out, what's

9   going on and trying to get out of it at the same time.

10  Q.  What did he do next?

11  A.  I pushed him back, and he thrust me back against the wall

12  again, banging my head again.

13  Q.  Were you still laughing at this point?

14  A.  I think I may have been.  I really -- here is the thing.  I

15  didn't -- just in case -- this is going to sound odd.  I didn't

16  want to make a scene.  I know that sounds strange.  I didn't

17  want to -- I didn't want to make him angry at me.  I didn't

18  want to stop what started out as something light and fun and

19  comedic and a great story to people I am having dinner with,

20  and it suddenly turned absolutely dark.

21  Q.  What did he do after he pushed you up against the wall the

22  second time?

23  A.  He put his shoulder against me and hold me against the

24  wall.

25  Q.  Then what happened?

1   A.   I remember him being -- he was very large, and his whole

2   weight came against my chest and held me up there, and he

3   leaned down and pulled down my tights.

4   Q.   What, if anything, were you doing while that was happening?

5   A.   I was pushing him back.  It was quite clear that I was not

6   going -- I didn't want anything else to happen.  It was quite

7   clear.  I pushed him back.  This arm was pinned down.  This arm

8   had my purse.  Trying to get him back.

9   Q.   At any point during this encounter, do you recall saying

10  no?

11  A.   No, I don't recall saying it.  I may have said it.

12          MR. FERRARA:  Just one moment, your Honor.

13  Q.   At any point during this encounter did you scream?

14  A.   I don't remember screaming.  I'm not a screamer.  I'm a

15  fighter.  I'm much more physical than I am vocal.

16  Q.   What about his head?  What is happening?

17  A.   His head was beside mine breathing.  First, he put his

18  mouth against me.

19  Q.   Do you mean he kissed you?

20  A.   Yes.

21  Q.   Did you kiss him back?

22  A.   No.  I didn't consider it a kiss.  It was such -- it was a

23  shocking thing for him to suddenly put his mouth against mine.

24  I thought what.  What.  What.  No.

25  Q.   Do you think -- based on what you were experiencing, do you

1   believe that if someone had been nearby, they would have been

2   able to hear what was happening in the dressing room?

3   A.   They would have heard the head hitting and definitely would

4   have heard me laughing.

5   Q.   You described Mr. Trump as a -- you described Mr. Trump as

6   sort of, I think, larger than you?

7   A.   Yeah.

8   Q.   Do you recall approximately what the difference or how tall

9   are you?

10   A.   At the time I was five-nine.  Because I'm 79, I have sort

11   of all compacted down due to gravity, but at the time I was

12   five-nine.  I was wearing four-inch heels.  So it put me about

13   level with Donald Trump, who I think is six-two.  I was

14   six-one.  And I weighed at the time about 120, and I believe he

15   weighed about 100 more pounds.

16   Q.   Were you afraid while this was happening?

17   A.   I was in -- this is going to sound strange.  I was almost

18   too frightened to think if I was afraid or not.  I was

19   stamping.  My whole reason for being alive in that moment was

20   to get out of that room.

21   Q.   How were you trying to accomplish that?

22   A.   Stamping and trying to wiggle out from under him.  But he

23   had pulled down my tights and his hand went -- his fingers went

24   into my vagina, which was extremely painful, extremely painful.

25   It was a horrible feeling because he curved, he put his hand

1   inside of me and curved his finger.  As I'm sitting here today,

2   I can still feel it.  It was --

3   Q.  Then what happened?

4   A.  Then he inserted his penis.

5   Q.  What did you do in that moment?

6   A.  I tried --

7   Q.  Do you need a moment, Ms. Carroll?

8   A.  You asked me what I did in that moment.  I always think

9   back to why I walked in there to get myself in that situation,

10  but I'm proud to say I did get out.  I got my knee up.  I got

11  my knee up and pushed him back.

12  Q.  Was anything in your hands?

13  A.  My handbag.

14  Q.  Why were you holding your handbag?

15  A.  I have no idea.

16  Q.  I want to be -- I want to make sure I understand it.

17          How were you able to -- were you able to see what

18  Mr. Trump was doing with his hand, or are you telling us what

19  you experienced sort of physically by feeling it?

20  A.  He was against me, his whole shoulder -- I couldn't see

21  anything.  I couldn't see anything that was happening.  But I

22  could certainly feel it.  I could certainly feel that pain in

23  the finger jamming up.

24  Q.  How long was your dress?

25  A.  Mid knee.  Mid knee.

 1   Q.  Do you recall how far down he pushed your tights?

 2   A.  Yeah.  A little bit below mid thigh.

 3   Q.  Were you wearing underwear?

 4   A.  No.  To me, tights are underwear.  I wouldn't wear two pair

 5   of underwear, no.

 6   Q.  Do you recall either of you saying anything as this was

 7   happening?

 8   A.  I can't say if I said -- I can't say -- I had so much

 9   adrenaline pouring through me at this time, I can't tell you if

10   I said anything.

11   Q.  Do you know if he ejaculated?

12   A.  I don't think so.

13   Q.  You said you got your knee up.  What happened next?

14   A.  Once I could get my knee up, I could get him to back off.

15   I could actually move his body.  I was quite strong.  I was an

16   athlete.  I could push him back by putting that knee up.

17   Q.  What did you do after you were able to push him off?

18   A.  I exited the room, and I got out of the store as quickly as

19   I could.

20   Q.  How long do you believe the encounter, the assault in the

21   dressing room, do you recall how long that assault lasted?

22   A.  From walking in, from walking in?

23   Q.  Just in the dressing room.

24   A.  A very few minutes, very few.  That was another thing that

25   surprised me.

1   A.  Because I had done -- I thought it was -- I was ashamed.  I

2   thought it was my fault.

3   Q.  Why did you think it was your fault, Ms. Carroll?

4   A.  Because I was flirting with him and laughing and having one

5   of the great times.  It was high comedy.  It was funny.  And

6   then to have it turn into the --

7   Q.  Do you recall anything else about that conversation with

8   Ms. Birnbach?

9   A.  Yes.  After she told me to go to the police, I said no, no

10  way.  She said:  I'll go with you.  I said no.  I could not

11  talk about this with anyone.  And we are not going to talk

12  about it either.  I don't want to talk about it anymore.  And

13  that's it.

14  Q.  Then what did you do that night after the call ended?

15  A.  I walked to the garage and drove home.

16  Q.  That night, the night of the assault, do you recall whether

17  you had any physical signs of injury?

18  A.  My head hurt, my vagina felt pain, and --

19  Q.  Did you seek medical attention?

20  A.  No.

21  Q.  Was there any damage to your clothing?

22  A.  No.

23  Q.  What did you do with the dress you were wearing?

24  A.  I hung it in the closet.

25  Q.  Did you throw it out?

 1   Q.  Where were Mr. Ailes' studios in relation to your studio --

 2   or set?  Let me --

 3   A.  Sets.  They kept Roger's set on the sets -- we -- many of

 4   the shows use the same studio, so they break the sets between

 5   shows and then put them up.  Roger had -- he did live shows in

 6   New Jersey and he did live shows also in New York.  So we ran

 7   into each other almost every day in Fort Lee.

 8   Q.  When you say "we," who do you --

 9   A.  Roger and I.

10   Q.  Do you recall ever seeing Mr. Trump on Mr. Ailes' set?

11   A.  No.

12   Q.  And do you recall -- sitting here today, Ms. Carroll, do

13   you know when exactly that interview was filmed or aired?

14   A.  I have a pretty good idea.

15   Q.  When do you think that was filmed or aired?

16   A.  Well, whenever that big parade was.

17   Q.  Okay.  So let's -- so thank you for just going back to

18   that.

19          Let's come back, though, now to where we were, sort of

20   where we had left off before lunch.

21          I think we had finished discussing the assault and

22   sort of your immediate steps that you took.  Looking sort of

23   further out, have you had a romantic relationship since the

24   assault?

25   A.  No.

1   Q.  Why not?

2   A.  I -- the short answer is because Donald Trump raped me.

3   Q.  How did that affect you in a way -- can you describe for

4   the jurors why that assault left you unable to form a romantic

5   connection?

6   A.  What I did was I flirted with Donald Trump.  I laughed with

7   him.  I tried to be -- tried to engage him.  I laughed at his

8   jokes.  I found him charming.  And what happened to me when I

9   was flirting?  I got into serious trouble.  And so I, after

10  that event, I found it's impossible for me -- if I meet a man

11  who is a possibility, it's impossible for me to even -- well,

12  to even look at him and smile.  And in order to fall in love or

13  have dinner with someone, you've got to at least look at them

14  in the eye and smile, and I couldn't -- I couldn't force myself

15  to show a man that I liked that I liked them.  I couldn't do

16  it.  It just led to terrible consequences, hence, I didn't meet

17  anybody.

18  Q.  I'm sorry to ask this so directly, but have you had sex

19  since Donald Trump assaulted you?

20  A.  No.

21  Q.  This person you just described to us as sort of having shut

22  down, is that how you portrayed yourself on television

23  following the assault or in public appearances?

24  A.  No, I have a, I have a, I have a public self, which is

25  vibrant and wanting to help everyone, and always, always upbeat

1   and always optimistic and always putting forth a strong front.

2   And then I have, you know, a private side, and that's the one

3   that can't admit out loud that there's been any suffering.

4           MR. FERRARA:  May I approach the witness, your Honor?

5           THE COURT:  You may.

6   A.  Thank you.

7   Q.  What is private E. Jean Carroll like?

8   A.  Well, I like her.  I like private E. Jean.  She gets to be

9   quiet and she doesn't have to be the invincible old lady that's

10  my front.  I'm invincible.  I solve other people's problems.  I

11  am the cheerleader.  I'm the one who says you can go on, pick

12  yourself up, you can do it, you can do it.  And when my

13  correspondents don't take my advice, I go right on and say you

14  can do it, you can do it, you can do it.

15          Private E. Jean is -- she -- she is not that

16  cheerleader.

17  Q.  Prior to the assault, had there been extended period of

18  time where you had not, let's say, dated?

19  A.  No.  I loved meeting men.  I loved going out.  I loved

20  conversations.  I loved dancing.  I loved meeting new people,

21  loved it.  I loved life.  I loved living in New York.  It's the

22  best place in the world.

23  Q.  Remind us how old you were when Mr. Trump assaulted you?

24  A.  52.

25  Q.  Could your age have been a reason why you never had sex

1    A.  May I see it?

2    Q.  Let's go to -- well, let me come back to it, Ms. Carroll.

3    Let me ask you a different way that I think will have it more

4    at my fingerprints.  Let me put it this way.  Do you recall

5    saying -- and just one moment, your Honor.

6              (Counsel confer)

7    BY MR. FERRARA:

8    Q.  Do you recall saying in August of 2019 or around then that

9    you think perhaps it -- your inability to find a romantic

10   connection was not because of Mr. Trump, that it may have been

11   luck?

12   A.  I have said that, specifically I remember saying that in my

13   book.  I thought it -- I thought luck -- I've always believed

14   that luck has a strong influence in everyone's life.

15   Q.  Have you tried to date since the assault?

16   A.  Well, yes.  I mean, I was not unaware that I was not in a

17   romantic relationship.  I was very aware of that and I knew

18   something was wrong.

19   Q.  Have you tried -- have you tried to use dating apps?

20   A.  Yes.

21   Q.  Which ones?

22   A.  Well, mainly I was on dating apps because I was studying

23   the competition because I had two -- I was a founder of two

24   dating sites.  So most of my activity on the dating sites were

25   to look at the competition.  But I confess I was also looking.

1    Q.  Were you able to find anyone, any match?

2    A.  No.

3    Q.  Were you set up on any dates after --

4    A.  Yes.

5    Q.  You are chuckling --

6    A.  My friends noticed that I'd been sitting at home, and so my

7    friends at Esquire, five or six guys, got together and found

8    the perfect man for me and they had a dinner and I was invited

9    and the man was invited.  He was perfect.  He was a journalist.

10   He was just so entertaining, and his conversation was

11   enthralling, and I took one look at him and I was so obnoxious.

12   I didn't laugh at his jokes, didn't look in his eyes, looked

13   away when he was talking because he was a possible.  He was

14   just about right.  Scared me to death.

15   Q.  Why?

16   A.  I -- well, I think it's because -- flirting, flirting ended

17   up as the worst decision of my life.

18   Q.  What is that -- just to be clear, what is that a reference

19   to, the worst decision?

20   A.  Flirting.

21   Q.  The worst decision of your life, what is that a reference

22   to?

23   A.  Going in that dressing room.

24   Q.  Sitting here today, do you believe you were afraid to be

25   around sort of a suitable potential partner?  Was it fear?

1          MR. TACOPINA:  I'm sorry.  I really just don't --

2          THE COURT:  Sustained.

3          MR. FERRARA:  I will withdraw that question.

4   BY MR. FERRARA:

5   Q.  How do you feel about not having been in a relationship

6   since the mid '90s?

7   A.  I feel I have lost out.  I'm sorry.  I am a happy person

8   basically, but I'm aware that I have lost out on one of the

9   glorious experiences of any human being.  Being in love with

10  somebody else, making dinner with them, walking the dog

11  together.  I don't have that.  I am -- and just cuddling on the

12  sofa, watching TV, and eating popcorn.  I am aware of how much

13  I have lost and I feel, here's the thing, I feel like I should

14  be able to overcome it.

15  Q.  I want to come back to your second marriage to Mr. Johnson,

16  John Johnson.  Was there violence in that relationship?

17  A.  Yes.

18  Q.  What kind of violence?

19  A.  Well, we were -- it was a very passionate marriage, very

20  passionate, very hot, very tempestuous, lots of fun, I mean, we

21  would laugh so hard I would literally fall out of my chair.

22          But on the flip side of that is we argued.  We were

23  dog and cat.

24  Q.  Was there violence?

25  A.  Yes.

1   A.  Because he -- Cam didn't -- it was not violent.

2   Q.  Has -- sorry?

3   A.  The incident in Bergdorf's was very violent.

4   Q.  I want to -- for clarification, was the -- you mentioned

5   William Goldman.  Was your relationship with William Goldman

6   before or after Mr. Trump assaulted you?

7   A.  Before.

8   Q.  Have you ever been diagnosed with any mental health

9   conditions such as PTSD or depression?

10  A.  No.

11  Q.  Have you taken any medication for depression or anxiety?

12  A.  No.

13  Q.  Are you a happy person, Ms. Carroll?

14  A.  I am a happy person.  I know it seems strange to hear me

15  after today, but I'm basically a happy person.  But I think I

16  could work on a few things.

17  Q.  How often, if at all, do you think about the assault that

18  night at Bergdorf's?

19  A.  Well, that very night the visions would wash over me.  I

20  couldn't -- it was horrible.  Not only did it happen in

21  Bergdorf, but it happened over and over and over in my mind

22  because I did not have the ability to strike to get the visions

23  out of my head.

24          As I learned to deal with the sudden intrusions, I got

25  better and better at moving them aside.  And so they -- I've

1    had them ever since the attack.  They were more frequent right

2    after the attack and they stayed about -- I had -- I would be

3    going about my normal day, I would be walking the dog, I would

4    be hiking on -- hiking, and suddenly up would come the vision.

5    Those types of intrusions happened regularly.  I didn't know

6    when they would come, I didn't know when to expect them, but

7    they would absolutely take over my brain.  I would move them

8    aside.  So that was fairly frequent.

9    Q.  Can you give the jurors a sense or examples of what -- what

10   would you see?  What does a vision sort of look like?

11   A.  Just recently, I pulled over to the side of the high -- of

12   the road on my way home because it was late and I thought I

13   would rest my eyes and just take a quick nap.  I closed my

14   eyes.  I must have fallen asleep.  Because when I woke, I felt

15   Donald Trump again on top of me, his huge -- I thought for a

16   minute I was going to die because I couldn't breathe.  That's

17   the sudden, horrible kind.

18           But normally I would be cooking pasta or just going

19   about my normal day, and in would slide just a picture of him

20   going like this into the dressing room or hitting my head or

21   feeling his fingers jammed up inside of me and then with effort

22   I could move those out of my mind.  I think everybody has

23   visions coming up.

24   Q.  Were there specific -- are there specific things, were

25   there specific things that triggered these visions?

1   Q.  What did you share with them?

2   A.  I shared nine pages of the draft that I was going to turn

3   in.

4   Q.  Were either of them ultimately named in the book?

5   A.  No.  Prior to publication, I took the names out and just

6   referred to them as two good friends, both journalists.

7   Q.  Did either of them provide any feedback on the excerpt?

8   A.  No.  They are both writers.

9   Q.  The first time that chapter about Donald Trump, do you

10  recall the first time that was sort of published or made

11  public, just maybe as an excerpt?

12  A.  Yes.

13  Q.  When was that?

14  A.  That was at the end of June 2019.

15  Q.  If you recall, in what form was that excerpt first

16  published?

17  A.  That was New York magazine ran an early excerpt of it, and

18  it hit the Internet before it hit the magazine came out in hard

19  copy.  So it ran three days on the Internet before it hit --

20  before the publishing form appeared.

21  Q.  Were you involved in pitching the excerpt to New York

22  magazine?

23  A.  Yes.

24  Q.  Let me show you what has been marked for identification as

25  Plaintiff's Exhibits 6 and 7.

N4RMCAR2

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    E. JEAN CARROLL,
3
                    Plaintiff,              New York, N.Y.
4
            v.                              22 Civ.10016 (LAK)
5
    DONALD J. TRUMP,
6
                    Defendant.
7   ------------------------------x        Jury Trial

8                                          April 27, 2023
                                           10:50 a.m.
9
    Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                           District Judge
12                                            and a Jury

13
                            APPEARANCES
14
    KAPLAN HECKER & FINK LLP
15       Attorneys for Plaintiff
    BY:  ROBERTA A. KAPLAN
16       MICHAEL J. FERRARA
         SHAWN G. CROWLEY
17       MATTHEW J. CRAIG

18
    TACOPINA SEIGEL & DeOREO
19       Attorneys for Defendant
    BY:  JOSEPH TACOPINA
20       CHAD D. SEIGEL
         MATTHEW G. DeOREO
21

22  HABBA MADAIO & ASSOCIATES, LLP
         Attorneys for Defendant
23  BY:  MICHAEL T. MADAIO

24
    W. PERRY BRANDT
25       Attorney for Defendant

N4RMCAR2                        Carroll - Direct

1    Q.  Why did you agree in the first place?

2    A.  I was a big admirer of Ivy's work.

3    Q.  Why did you stop filming?

4    A.  Because this lawsuit became very important, and Ivy and I

5    decided together, we should cease.

6    Q.  Have you received any payments for that documentary?

7    A.  No.

8    Q.  I want to call your attention -- I think this is sort of

9    the last topic.  I want to call your attention to October of

10   2022.

11   A.  Yes.

12   Q.  Do you recall, what, if any, additional relevant statements

13   did Donald Trump make at that time?

14   A.  Just when I had managed to get my Substack up and running,

15   get my career a little bit back and feeling that things were

16   going to be OK, Donald Trump posted on social media every

17   single thing that I was suing him for.  He repeated it on

18   October 12 and then added the fact that he thought the justice

19   system in America was broken, and one of the prime examples of

20   the justice system being broken was my suing him.

21   Q.  Let me show you what has been marked for identification as

22   Plaintiff's Exhibit 4.

23            Do you recognize this?

24   A.  Yes.

25   Q.  What is it?

1  keep moving.

2  Q.  Are you on Truth Social, Ms. Carroll?

3  A.  Yes.

4  Q.  How did you find out about this statement?

5  A.  I heard from several people that he had posted it.

6  Q.  How, if at all, do you believe this statement affected your

7  reputation?

8  A.  I really thought I was gaining back a bit of ground.  I

9  thought, it's starting to go and I felt, you know, happy that,

10  you know, I was back on my feet, had garnered some readers, and

11  feeling pretty good, and then, boom, he knocks me back down

12  again.

13  Q.  Were you surprised by the statement?

14  A.  Stunned.

15  Q.  Why?

16  A.  Because I'm suing him for saying these very things.

17  Q.  In light of Mr. Trump's October 22 statement, did you file

18  a second lawsuit?

19  A.  Yes.

20  Q.  Is that second lawsuit why we are here today?

21  A.  Yes.  This is why we are here.

22  Q.  What did you sue him for in the second lawsuit?

23  A.  I sued him for defamation of character.

24  Q.  Anything else?

25  A.  Yes.  I also sued him for assault.

1   Q.  Why didn't you sue him for assault in the first lawsuit?

2   A.  Because the time period allowed was -- it had passed, and I

3   could not do it.

4   Q.  What happened that allowed you to do it -- to sue him for

5   assault in the second lawsuit?

6   A.  The state assembly and the state senate passed what they

7   called the Adult Survivors Act, and it gave survivors of sexual

8   assault, sexual abuse, sexual harassment a one-year window to

9   come forward and bring suit against the people.

10  Q.  Had you advocated for passage of that law?

11  A.  Yes.

12  Q.  Why.

13  A.  Because I understand why women, particularly, and some men

14  do not come forward and tell what happened.  It takes sometimes

15  years to get the courage to face the person who hurt you, if at

16  all.  It takes years.  And some maturity and some age.  It

17  takes -- there are many people, reasons why people don't report

18  it, and this act gives us a chance to be heard.

19  Q.  What, if any, I'll call it sort of public response did you

20  experience after Mr. Trump made his October 2022 statement?

21  A.  It was not very nice.

22  Q.  What do you recall?

23  A.  Just a wave of slime.  It was very seedy comments, very

24  denigrating.  Almost an endless stream of people repeating what

25  Donald Trump says, I was a liar and I was in it for the money,

1   can't wait for the payoff, working for the democrats, over and

2   over.  But the main thing was way too ugly.  It is very hard to

3   get up in the morning and face the fact that you're receiving

4   these messages you are just too ugly to go on living,

5   practically.

6   Q.  Let me show you what has been marked for identification as

7   Plaintiff's Exhibit 45.

8        Do you recognize this, Ms. Carroll?

9   A.  Yeah.  I think it was -- it appeared -- yeah.

10  Q.  What is it?

11  A.  It's a tweet.

12  Q.  What is the date?

13  A.  October 13.

14  Q.  Of what year?

15  A.  2022.

16  Q.  Is your name mentioned?

17  A.  I guess that is me.

18        MR. FERRARA:  Your Honor, plaintiff offers 45.

19        THE COURT:  Received.

20        (Plaintiff's Exhibit 45 received in evidence)

21        MR. FERRARA:  Mr. Lam, we can publish this for the

22  jurors.  Thank you.

23        If we just focus on the tweet in the upper left, the

24  sort of main tweet.

25  Q.  Ms. Carroll, this was the day after Mr. Trump's statement?

1    A.  Yes.

2          MR. TACOPINA:  And, your Honor, this is a compilation

3    of some excerpts from that book.  We have turned it over to

4    counsel.  I'm going to offer this, subject to any redactions

5    that counsel needs, into evidence at this time.

6          MR. FERRARA:  With that caveat, no objection, your

7    Honor.

8          THE COURT:  All right.  On that basis, received.

9          (Defendant's Exhibit AA received in evidence)

10   BY MR. TACOPINA:

11   Q.  Ms. Carroll, using your own words, the facts you allege in

12   your story you have told here to this jury are odd, correct?

13   A.  Can you repeat that again?

14   Q.  Sure.  Using your own words, the facts you allege in the

15   story you have told here are odd, O-D-D?

16   A.  Ah, yes.  Odd.

17   Q.  In fact, you could agree that your story is inconceivable,

18   correct?

19   A.  Certain parts of this story are difficult to conceive of,

20   yes.

21   Q.  And we will talk about your story and your accusations in a

22   while, but before we get there, you were writing the Ask

23   E. Jean column in *Elle* magazine for 25 years, correct?

24   A.  26 years.

25   Q.  26.

N4r2Car3                        Carroll - Cross

1            And it's fair to say that gave you status in New York,

2    at least you believe that you gave you status in New York,

3    correct?

4    A.  Yes, it did.

5    Q.  And you were fired from *Elle* magazine on December 11, 2019,

6    right?

7    A.  Yes.

8    Q.  And after you lost your job at *Elle* magazine, you felt

9    small and diminished, right?

10   A.  Yes.

11   Q.  And at that point in 2019, you experienced a different way

12   of life, right?

13   A.  Yes.  It was the first time that I had lost something very

14   important to me.

15   Q.  And that's because, in your own words, you then felt like

16   just another person, right?

17   A.  I have never felt like another person, like just another,

18   never like that.

19   Q.  You never felt like that after you lost your job?

20   A.  I felt many things, perhaps for a moment I felt like -- I

21   don't think I feel like just another person.  I don't think

22   there is such a thing as just another person.

23   Q.  Well, you testified yesterday about your interview session

24   with Dr. Lebowitz, your expert witness in this case, right?

25   A.  Yes.

```
1    give you a specific date of the alleged incident, either,
2    right?
3    A.  No.
4    Q.  They couldn't.
5    A.  No.
6    Q.  You couldn't.
7    A.  No.
8    Q.  No one.
9    A.  I wish to heaven we could give you a date.  I wish we could
10   give you a date.
11   Q.  In fact, they couldn't even tell you the year, whether it
12   was 1995 or 1996?
13   A.  Oh, no, no.  Lisa believes that because she published a
14   sort of a bombshell New York magazine piece about Mar-a-Lago
15   being opened as a club and Donald Trump had personally invited
16   Lisa to come down to do the story of the opening of the club,
17   New York magazine published it February -- in February.  I'm
18   not quite sure of the date.  Lisa believes she never would have
19   accepted that assignment if it had happened before she went
20   down to Florida.  So that places it definitely in 1996.
21   Q.  Okay.  And certainly you or them couldn't tell you whether
22   it was the fall or the spring.  You have testified to that?
23   A.  No, Lisa believes that it was in the spring of '96 because
24   of the New York magazine articles.  She swears up and down that
25   she would never go if she had heard about what Trump did to me
```

N4RMCAR4                          Carroll – Cross

1  any erotic intention.

2  Q.  According to you, after Donald Trump had you against the

3  wall, he pulled your tights down?

4  A.  Yes.

5  Q.  It's your story that at some point you felt his penis

6  inside of you?

7  A.  Yes.

8  Q.  But before that, it's your sworn testimony that you felt

9  his fingers, what you said was rummaging around your vagina?

10  A.  It's an unforgettable feeling.

11  Q.  Now, when you say rummaging around your vagina, that's

12  different than inserting a finger inside your vagina.

13  A.  At first he rummaged around and then he put his finger

14  inside me.

15  Q.  In your book you wrote that he was forcing his fingers

16  around my private area and then thrust his penis halfway

17  completely, I'm not certain, inside me.  Is that accurate?

18  A.  Yes.

19  Q.  And this attack or this fight, based on your word, this

20  fight that you were in, could have taken as long as three

21  minutes?

22  A.  From entering the dressing room to my leaving it, I don't

23  think it could be any more than three minutes.  I may be wrong.

24  I didn't have a stopwatch, but it was about three minutes.

25  Q.  Even though you understood you were in the middle of this

N512car1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   E. JEAN CARROLL,
3
                 Plaintiff,              New York, N.Y.
4
            v.                           22 Civ.10016 (LAK)
5
   DONALD J. TRUMP,
6
                 Defendant.
7  ------------------------------x      Jury Trial

8                                        May 1, 2023
                                         9:30 a.m.
9
   Before:
10
                       HON. LEWIS A. KAPLAN,
11
                                         District Judge
12                                          and a Jury

13
                         APPEARANCES
14
   KAPLAN HECKER & FINK LLP
15      Attorneys for Plaintiff
   BY:  ROBERTA A. KAPLAN
16      MICHAEL J. FERRARA
        SHAWN G. CROWLEY
17      MATTHEW J. CRAIG

18
   TACOPINA SEIGEL & DeOREO
19      Attorneys for Defendant
   BY:  JOSEPH TACOPINA
20      CHAD D. SEIGEL
        MATTHEW G. DeOREO
21
22  HABBA MADAIO & ASSOCIATES, LLP
        Attorneys for Defendant
23  BY:  ALINA HABBA
        MICHAEL T. MADAIO
24
25  W. PERRY BRANDT
        Attorney for Defendant

1          THE COURT:  You know what I am talking about, number

2     one and number two.

3          MR. FERRARA:  In terms of an instruction, your Honor?

4          THE COURT:  In some way.

5          MR. TACOPINA:  Okay.  We will figure it out.  You want

6     us to get together to --

7          THE COURT:  No.  Maybe we can do it now.

8          MR. TACOPINA:  Okay, sure.

9          THE COURT:  Members of the jury -- and if counsel has

10    any objection to my doing it?

11         MR. TACOPINA:  It's okay.

12         THE COURT:  Okay.

13         Members of the jury, there are two lawsuits between

14    Ms. Carroll and Mr. Trump.  This is one of them.  The first

15    lawsuit was brought in 2019.  That's not the one we are dealing

16    with.  It's still alive, but you don't have to worry about why

17    or where or whatever.  That was brought solely for alleged

18    defamation that Mr. Trump allegedly committed in 2019.  At that

19    time, Ms. Carroll could not have sued him for allegedly raping

20    her for legal reasons.

21         The legal context changed.  It changed in November of

22    2022.  She at that time gained the right to sue him for the

23    rape, the alleged rape.

24         In addition, Mr. Trump had issued a statement that you

25    have already seen in October of 2022 in which Ms. Carroll

 1    contends Mr. Trump libeled her or defamed her again.  That's

 2    this case.  You are not concerned with the first case.  You

 3    just need to know, for example, for the context of some

 4    questions that it is out there, and it is not your job and

 5    don't worry about that.

 6              Any objection to that, Mr. Tacopina?

 7              MR. TACOPINA:  That was perfect, your Honor.

 8              THE COURT:  *Wunderbar*.

 9              MR. FERRARA:  Agreed, your Honor.

10              THE COURT:  Okay.  Let's go.

11    BY MR. TACOPINA:

12    Q.  Before bringing this lawsuit, the one that's before the

13    jury against Donald Trump, you interviewed Natasha Stoynoff on

14    June 22, 2020.

15    A.  Yes.

16    Q.  And you prepared a transcript of that interview.

17    A.  Yes.

18    Q.  And during that interview, even though Natasha Stoynoff

19    repeatedly told you that she didn't recall Donald Trump

20    grinding against her, you repeatedly try to get her to say that

21    she did.

22    A.  I didn't get her to try to say that she did.  I just asked

23    her to try to think if it was a possibility.

24    Q.  Well, you asked Ms. Stoynoff at one point:  Do you recall

25    him grinding against you?

N512Car3                          Carroll - Cross

1   happened to --

2   A.  No.  I'm just -- I was talking about the culture in

3   general.  Anderson Cooper's audience, I was -- I assume a lot

4   of people think of rape as being sexy.

5   Q.  And you used the word "fight," not "rape" to describe what

6   happened to you in that interview because sexual violence is in

7   every country and every strata of society and you just feel

8   that so many women are undergoing sexual violence and that

9   yours was short, you got out, you are happy now, and you are

10  moving on.  Do you stand by that statement?

11  A.  I felt, I felt humble that I was aware of how much sexual

12  violence there is in the world.  I felt lucky to have gotten

13  out alive and was able to tell my story.  And at the time, when

14  I wrote the book, I don't think I used the word "rape."  I was

15  very -- I just very uncomfortable using the word because when I

16  use the word these intrusions and the visions would come up

17  into my head.  So I just -- I liked the word "fight" because it

18  gave -- it gave me action.  I felt I took action, and it wasn't

19  something done to me.  I got away.  So I used the word "fight."

20  Q.  Okay.  And after you made that comment that we discussed

21  about how you characterized rape being sexy, Anderson Cooper

22  said let's take a short break, and then you went to commercial

23  break, right?

24  A.  No.  I said "think of the fantasies."

25  Q.  Right, and then you said "you are fascinating to talk to"

N515car4                          Carroll - Cross

1   Q.  And you never told her anything about the Bergdorf Goodman

2   incident?

3   A.  No.  I told no one.

4   Q.  OK.  You can take that down.

5           You were fired from *Elle* magazine on December 11,

6   2019?

7   A.  Yes.

8   Q.  And it is your testimony that *Elle* magazine fired you

9   because Donald Trump called you a liar?

10  A.  Yes.

11  Q.  In fact, you don't blame *Elle* magazine for your

12  termination, according to you?

13  A.  I understood.  I was angry about it and hurt.  And I was

14  forlorn.  And I was going to miss my readers.  But, yes, they

15  let me go after 27 years.

16  Q.  And no one from *Elle* magazine told you that you were being

17  fired from *Elle* magazine because you were being branded a liar

18  by Donald Trump?

19  A.  No, they did not tell me that.

20  Q.  Did not tell you that.

21          In fact, you are aware that *Elle* magazine has publicly

22  stated that the decision not to renew your contract was a

23  business decision that had nothing to do with politics?

24  A.  Well, I think they're right when they say it is a business

25  decision, because when one of their --

N515car4                    Carroll – Cross

1              MR. FERRARA:  Your Honor, I object to this question.

2              THE COURT:  Sustained.  The jury will disregard the

3     question and the suggestion that *Elle* magazine issued a

4     statement or what it said.  There is no evidence of that.

5              MR. TACOPINA:  Your Honor, if I can direct the Court

6     attention and counsel's attention to the deposition of October

7     14, 2022, page 183, lines 10 to 21.

8              THE COURT:  Give me a minute.

9              MR. TACOPINA:  Yes, sir.

10             THE COURT:  You said 193?

11             MR. TACOPINA:  183, your Honor.

12             THE COURT:  OK.

13             MR. TACOPINA:  183, lines 10 to 21.

14             MR. FERRARA:  Same objection, your Honor.

15             THE COURT:  Same ruling.  Sustained.

16             MR. TACOPINA:  Yes.

17    BY MR. TACOPINA:

18    Q.  Regardless, you were very surprised by your termination in

19    December of 2019?

20    A.  I thought they were calling me to invite me to their

21    Christmas party.

22    Q.  Yet four months earlier, on August 1, 2019, you sent an

23    e-mail to your agent, Sarah Lazin?

24    A.  Yes.

25    Q.  Telling her that after Nina Garcia -- who I think you

1   testified on direct is the head of *Elle* magazine?

2   A.  Yes, she was the editor in chief.

3   Q.  So you sent an e-mail to Sarah Lazin that after Nina Garcia

4   took over at *Elle*, the magazine cut your pay in half from

5   $10,000 a column to $5,000 a column?

6   A.  That was being done across the board at magazines, they

7   were cutting back on salaries and pages.

8   Q.  In fact, in August of 2019, before your firing in December,

9   you were looking to get out of your contract with *Elle*

10  magazine?

11  A.  I was looking for other work at other magazines as an

12  advice columnist, true.

13  Q.  OK, but you were looking for other work.  You were looking

14  to get out of your contract with *Elle* magazine?

15  A.  I had my contract checked by a lawyer, yes.

16  Q.  And you told your agent, Sarah, that *The Atlantic* was

17  interested in sort of stealing you and your advice column from

18  *Elle*?

19  A.  Yes.

20  Q.  And you were considering it?

21  A.  Yes, I was considering it.  Yes.

22  Q.  And that's because *Elle* cut your salary in half?

23  A.  Yes.

24  Q.  And left you without an editor?

25  A.  Yes.

N515car4                          Carroll - Cross

1    Q.  And didn't run your column in July of 2019?

2    A.  Didn't run it, and they also cut my column pages from two

3    pages to one.

4    Q.  OK.

5    A.  They also hid the column in the magazine and kept -- in

6    magazines you get a pride of placement with the most

7    interesting piece of writing in what we call the "well".  The

8    well is where the beautiful pictures are and that's usually

9    where the Ask E. Jean column resided, but when the new folks

10   came in, the Ask E. Jean column was found in a different place

11   every month so nobody could find the column.  They also buried

12   me online.

13   Q.  And you complained to your agent that Nina Garcia, the

14   editor in chief at *Elle*, loathed or hated you because you

15   published your book excerpt in *New York* magazine?

16   A.  They were not happy.

17   Q.  And that's the book excerpt that obviously featured the

18   story about Donald Trump and Bergdorf Goodman?

19   A.  Yes.

20   Q.  And you agree that Nina Garcia, the editor in chief of

21   *Elle*, is a well respected editor in the magazine world?

22   A.  Nina is extremely respected.  And also, she was the star of

23   project run way.  Nina Garcia is a brilliant editor in chief.

24   Q.  And you told your agent that Nina really loathes you?

25   A.  Nina got very, very angry at me for publishing the excerpt

1  in *New York* magazine.

2  Q.  OK, but did you use the word "loathe" in describing how

3  Nina felt about you to your agent?

4  A.  I am sure I did.

5  Q.  OK.

6          Now, you testified at trial on direct that you were

7  fired from *Elle* magazine because Donald Trump accused you or

8  defamed you?

9  A.  Because he called me a liar and my entire column rested on

10  the foundation that readers were able to trust that I would

11  tell them the truth.

12  Q.  OK.

13  A.  So, when the president of the United States called me a

14  liar for three straight days, I took a huge hit.  My

15  trustworthiness was exploded.  It was like -- just crumbled,

16  the foundation on which the whole column had rested for 27

17  years.

18  Q.  OK.  In your August e-mail, August 2019 e-mail to your

19  agent, you said that the reason that Nina hated or loathed you

20  was because you published your excerpt in *New York* magazine.

21  A.  Yes.

22  Q.  By that point Donald Trump, who had already called you a

23  liar, nearly a month and a half earlier on June 21, 2019?

24  A.  Yes.

25  Q.  When explaining -- withdrawn.

1   Q.  So, Ms. Carroll, you heard yourself say in that podcast

2   that you don't think the reason you have not had sex again

3   since the Bergdorf incident was because of him, meaning Donald

4   Trump.

5   A.  I heard myself say that, yes.

6   Q.  Okay.

7   A.  May I add?

8   Q.  No.  I'm not asking anymore questions on that.  We are

9   going to move right along.  Okay?  Did you want to say

10  something else, though?

11  A.  No.  Go ahead.

12  Q.  Okay.  Now, I'm going to move on.  All right.  Your

13  original lawsuit, the one that the judge said, the first

14  lawsuit was filed in November 2019, only sought damages for

15  your alleged defamation.

16  A.  Yes.

17  Q.  Okay.  And by contrast, your current lawsuit, the one

18  containing the battery, not only seeks damages for defamation,

19  but also seeks emotional damages for your alleged rape.

20  A.  Yes.

21  Q.  And the first edition of your book was July 2019.

22  A.  Yes.

23  Q.  Years before you could sue for emotional injuries stemming

24  from the alleged rape.

25  A.  Yes.

N515car6                        Carroll - Redirect

1   prior piece, not for the truth of the matter, it is to rebut a

2   suggestion of recent fabrication.

3            MR. FERRARA:  If we can publish that?

4            THE COURT:  Yes.

5            MR. FERRARA:  Thank you, Mr. Lam.

6   Q.  Was that truthful testimony, Ms. Carroll?

7   A.  Yes.

8   Q.  To be clear -- I just want to be totally clear and fair --

9   you are not suggesting he was dragging you by the arm?

10  A.  No.  It was just a light tug on the elbow.

11           MR. FERRARA:  We can take that down.  Thank you.

12  Q.  Do you recall Mr. Tacopina asked you whether it had

13  occurred to you before your call with Lisa Birnbach that you

14  had been raped?  Just do you recall that line of questioning.

15  A.  I do recall the line of questioning, yes.

16  Q.  And he asked you about your statement when Lisa said he

17  raped you brought the reality to the forefront of your mind.

18  Do you remember saying that?

19  A.  Yes.

20  Q.  Ms. Carroll, was there ever a doubt in your mind about what

21  had happened in that dressing room?

22  A.  My -- oh.  Where I am sitting here today was there ever a

23  doubt?  No.  No doubt.  But the seconds, the minutes following

24  it I -- it was -- the floods through my body, I guess it is

25  adrenaline, my overwhelming thought was I had died and was

1  somehow still alive.  That was -- really.  It took me minutes,

2  well seconds, and then minutes.  And even when Lisa said it, it

3  took a real effort for me to take it in.

4  Q.  Was -- sorry.

5  A.  Yes.  Lisa is the one who focused my brain for that moment.

6  It was Lisa saying that.

7  Q.  Was there ever any doubt in your mind that Mr. Trump had

8  penetrated you with his fingers and penis?

9  A.  Oh, never a doubt about that.

10  Q.  Was there a doubt in your mind that you tried to shove him

11  away?

12  A.  Oh, no.  There was never a doubt about that.

13  Q.  Was there ever a doubt in your mind regarding whether you

14  had consented to this, to what he had done to you?

15  A.  Never.  The minute that door shut I -- there was no

16  consent.

17  Q.  Was there ever a doubt in your mind that you hit him in the

18  head with your purse?

19  A.  I believe I hit him in the head with my purse that year.

20  Q.  Was there ever a doubt in your mind that you tried to fight

21  him off?

22  A.  No.  Never.  That's how I got out.

23  Q.  Before you spoke to Ms. Birnbach how, if at all, have you

24  processed all of that information?

25  A.  Before I had?

N525car1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     E. JEAN CARROLL,
3
                   Plaintiff,              New York, N.Y.
4
              v.                           22 Civ. 10016 (LAK)
5
     DONALD J. TRUMP,
6
                   Defendant.
7    ------------------------------x       Jury Trial

8                                          May 2, 2023
                                           9:50 a.m.
9
     Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                           District Judge
12                                           and a Jury

13
                           APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24

25   W. PERRY BRANDT
          Attorney for Defendant
```

1   unstructured interview setting?

2   A.  I think altogether it was 20 to 22 hours.

3   Q.  And that sounds like a long time, Doctor.  How does that

4   compare to other cases in which you have been retained?

5   A.  I think that's about in the middle for me, actually.

6   Q.  And what topics, generally speaking, did you discuss with

7   Ms. Carroll during that interview?

8   A.  Well, we started with her --

9   Q.  Let me interrupt myself.  22 hours, you didn't do that in

10  one day, I take it.

11  A.  No.

12  Q.  Can you explain --

13  A.  Yeah.

14  Q.  -- what those hours entailed in terms of how you scheduled

15  it?

16  A.  Yeah.  We had three long in-person interviews and then a

17  few much shorter ones over Zoom.

18  Q.  And going back to my last question, what topics, generally

19  speaking, did you cover during those 22 hours?

20  A.  We covered, you know, everything that I thought would

21  inform my understanding of who she was and how she got to this

22  point.  So we talked about her childhood, her family, her

23  culture and socialization and upbringing, how emotions and

24  things like that were managed in her family.  We talked about

25  her development from early childhood until now, talked about

N554CAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

                    Plaintiff,              New York, N.Y.

            v.                              22 Civ.10016 (LAK)

DONALD J. TRUMP,

                    Defendant.
------------------------------x             Jury Trial

                                            May 3, 2023
                                            10:05 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                            District Judge
                                              and a Jury

                         APPEARANCES

KAPLAN HECKER & FINK LLP
        Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
        MICHAEL J. FERRARA
        SHAWN G. CROWLEY
        MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
        Attorneys for Defendant
BY:  JOSEPH TACOPINA
        CHAD D. SEIGEL
        MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
        Attorneys for Defendant
BY:  ALINA HABBA
        MICHAEL T. MADAIO


W. PERRY BRANDT
        Attorney for Defendant

1   categories, and those symptoms need to be intense and

2   disruptive.

3           So in order to meet full criteria for PTSD, you are

4   talking about a pretty severe mental illness, which is often

5   chronic.  It is also the case that people can have symptoms in

6   one or two categories and suffer a lot of negative consequences

7   from that as well.

8   Q.  And in this case, Doctor, did you diagnosis Ms. Carroll

9   with PTSD?

10  A.  I did not.

11  Q.  Did -- does Ms. Carroll have symptoms in any of the four

12  categories you talked about?

13  A.  She does.  She has avoidance symptoms, she has alterations

14  in her thoughts and feelings about herself, and she has

15  intrusions.

16  Q.  Now, Doctor, based on your experience as a psychologist and

17  your reading of the literature, what percentage of people who

18  have experienced trauma then have sufficient symptoms to be

19  diagnosed with PTSD?

20  A.  You know, the data is a little bit complicated because

21  there are so many different kinds of trauma, but it's

22  approximately 20 to 30 percent of people who meet full criteria

23  for posttraumatic stress disorder.

24  Q.  And what about the people in the other 70 to 80 percent,

25  Doctor?

1    A.   There is a larger category of people who have some enduring

2    and painful symptoms but who will never meet full criteria.   In

3    fact, there has been some -- there was some research done a

4    while ago where they looked at the impact of having a few very

5    severe symptoms versus meeting full criteria, and the research

6    was basically making the point that both are quite injurious to

7    a life.   However, we do think about PTSD as being a severe

8    illness.

9    Q.   Now, Mr. Lam, can you put up the second page of the

10   demonstrative.

11          Understanding that every person is different, Doctor,

12   are there broad categories of the ways in which a traumatic

13   effect -- withdrawn.

14          Are there broad categories of the ways in which a

15   traumatic event --

16          THE COURT:   Sorry.   Would you take that a little

17   slower?

18          MS. KAPLAN:   Sure.   I apologize, your Honor.

19   BY MS. KAPLAN:

20   Q.   Are there broad categories, Doctor, of the ways in which

21   trauma can affect a person?

22   A.   Yes.   I think the easiest way to think about it is that

23   what is remarkable about trauma is that it has a capacity to

24   affect all aspects of our functioning.   So it can affect us

25   emotionally, biologically, it can affect how we think about

```
1    independence of adolescence and into, if you will, adulthood.
2    And through all of those transitions, one of the things that is
3    happening is you are consolidating a sense of this is me and
4    that is you, and we are distinguished because I have a boundary
5    and you have a boundary.  I can invite you in and I can push
6    you away.  But we know ourselves as -- we recognize ourselves
7    as people, as fully human because we have boundaries and
8    autonomy.  We can take action.  And what rape does is it so
9    violates that sense of humanity and independence and selfhood
10   than people feel psychologically that they are being killed.
11   They feel at risk.  They feel like their personhood is being
12   murdered, even if they know at some level that they were never
13   in that kind of mortal, physical danger, if that makes sense.
14   Q.  Now, we have been talking about -- mostly about the brain
15   and about emotional reactions.  I want to pause for a second to
16   turn to actual reactions in other parts of the body.
17   A.  Okay.
18   Q.  Can people who have experienced trauma actually feel
19   physical symptoms in other parts of their body?
20   A.  Yes.  When I talk about a visceral remembering, it feels
21   like it's happening right then.  It feels like somebody's hands
22   are on you or in you or in some way it is literally being -- it
23   is literally -- it feels like it's happening in the present.
24   It's one of the hallmarks of trauma is that the past doesn't
25   stay past, it continues to revisit us now.
```

1    Q.  And in addition to feeling something, like, happening

2    again, Doctor, can people experience common physical pains

3    from --

4    A.  Sure, I mean, there is a couple ways in which this is

5    important, and it becomes very important over the lifespan,

6    which is when you -- you know, when you are intruded upon or

7    when you are struggling to avoid intrusive memories or in any

8    way being revisited by the trauma, it is common to have -- for

9    the stress hormones from that event to also revisit you.  So

10   people can have all kind of physical symptoms at the time, but

11   even if there is not an awareness that that is happening in the

12   present, it is well-documented at this point that there are

13   long-term consequences, specifically a history of serious

14   traumatic events, such as a sexual assault, is -- seems to

15   contribute substantially to the development of a wide range of

16   physical illnesses, including autoimmune diseases, diabetes,

17   cardiovascular problems, musculoskeletal problems.  So in other

18   words, a history of trauma is a risk factor for the development

19   of all kinds of illness down the road, and that's because of

20   the effect of stress hormones on the body.

21   Q.  In the time you spent with Ms. Carroll, Doctor, did you

22   observe her feeling any of these physical symptoms?

23   A.  At the very conclusion of our interview, where we had

24   really gone over everything, and I think she had, because of

25   the amount of time that we had spoken, she had gotten a kind of

1   bird's eye view of her life, she doubled over, holding her

2   stomach and just said I have a really bad stomachache.  And

3   after that, she got actually very sick with pneumonia, and so I

4   didn't speak with her for a while, and then we then met over

5   Zoom to complete the interview.  She mentioned that she still

6   had the stomach ache.

7   Q.  Could you put up, Mr. Lam, the second page of the

8   demonstrative again.

9           I want to turn now, Doctor, to the second category of

10  harm, which is -- responses to trauma, which is changes in

11  thinking.

12          You can take that down, Mr. Lam.

13          I am going to use kind of a fancy term, and I want, if

14  you can, if you can explain it to the jury, Doctor, that would

15  be great.

16          What does the term "schema" or the word "schema" mean

17  in the context of psychology?

18  A.  So we use the word "schema" as a shorthand way of

19  describing how our mind holds all of our knowledge and all of

20  our beliefs and all of our expectations.  And these schemas or

21  these mental maps or internal representations are all kind of

22  interchangeable terms.  They develop over the course of a

23  lifetime, so they kind of layer one on top of each other.  And

24  the thing about a schema, the role of a schema is to both help

25  you interpret what happens to you and respond to it adaptively

1  be very resilient for certain things and then that resiliency

2  might run out around something else.

3  Q.  And what explains -- what, if any, factors explain

4  differences in resiliency, Doctor?

5  A.  Well, that is still a matter to some extent of open debate,

6  but we know a few things that seem to facilitate the

7  development of resilience.  One is having a warm, supportive

8  family.  The other is being intelligent, attractive, and

9  sociable.  The third is having experiences which are

10  challenging and difficult, but not traumatic.  It sort of

11  builds strength.

12  Q.  I want to turn now to Ms. Carroll, and I know you said it

13  yesterday, but just to remind the jury, what are the ways that,

14  in your view, Ms. Carroll has been negatively impacted by the

15  incident at Bergdorf Goodman?

16  A.  She suffers from intrusions.  She suffered a diminishment

17  in her ability to feel positively about herself in certain

18  ways.  She experiences or manifests avoidance behaviors which

19  have led to an inability to maintain a romantic and intimate

20  life, which has led to deep feelings of loss.

21  Q.  Now, we spoke a bit about schemas in the way someone sees

22  themselves in the world.  How has the incident at Bergdorf

23  Goodman affected Ms. Carroll's schemas, the way she sees

24  herself in the world?

25  A.  Well, partly because she blamed herself for it.  She felt

1    like she was stupid in a way that was hard to shake.  But

2    perhaps even more fundamentally than that, it made her feel

3    like she was worth less than she had been before.  She felt

4    degraded and diminished.  She felt like she had been treated as

5    if she wasn't even a person.  And that, of course, made her

6    feel like she was worth less than a person -- than the person

7    she had been.

8    Q.   Is there any connection between what you just said, Doctor,

9    and Ms. Carroll's reluctance to use words like "rape" or

10   "victim"?

11   A.   Sure.  There is all the connection.  Ms. Carroll, you know,

12   like most of us in many ways, doesn't want to be a victim,

13   doesn't want to be pitied, but perhaps more than most people,

14   she has fiercely identified with being strong, being resilient,

15   being the person who can just march on and overcome thing, you

16   know, stiff upper lip, take an action and put it behind you.

17        And being raped meant, to her, being a victim, being

18   weak, being stupid, being vulnerable, being dirty.  And so

19   there is no part of her that wanted any part of that word to

20   apply to her, and so it was very hard to use it.  Using a word

21   like "fight" is much more attractive because it places her in

22   an active role.  Using a word like "rape victim" suggests that

23   the other person actually dominated in that fight, and that's

24   painful.

25   Q.   Doctor, we have talked about self-blame, but what, if any,

1    conclusions did you reach about whether Ms. Carroll experiences

2    self-blame?

3    A.   Absolutely.  I think for many years, for most of the years,

4    she just simply blamed herself for the assault, period.  She

5    just felt like she had done something stupid and that's why it

6    happened.  She was also afraid of other people blaming her,

7    which is an understandable fear.

8    Q.   And moving forward to more recent periods, does she still

9    at a conscious level believe that she is to blame?

10   A.   I think, you know, based on the advice she gave other

11   women, based on, you know, changes in the political landscape,

12   I think that if you asked her what she believes is true, she

13   would say, no, a woman can't be responsible.  If you asked her

14   what do you feel is true, I think she would probably still say,

15   well, it still feels like it's kind of true.  That's just one

16   of the ways that humans work.  We don't always feel what we

17   think.

18   Q.   Now, we have talked about intrusive memories, and I

19   apologize if this is slightly repetitive, but what, if

20   anything, Doctor, did you conclude with respect to whether

21   Ms. Carroll experiences intrusive memories?

22   A.   She does.  She experiences intrusive physical remembrances.

23   She can still feel aspects of the assault.  She can still hear

24   aspects of the assault.  She remembers the feelings in her

25   body.  She sometimes sees pieces or all of the experience kind

Case 1:22-cv-10016-LAK   Document 208-1   Filed 06/22/23   Page 58 of 91       883
N532Car1                    Lebowitz - Direct

1    you want to do and doesn't make sense, the mind makes up

2    alternative explanations.  And so she decided she just hadn't

3    met the right guy yet, you know, she hadn't been lucky, she was

4    getting older.  I think she just -- and I think she just came

5    up with a bunch of explanations, and then I think she didn't

6    hold on to the connection, which is also incredibly common for

7    trauma, that the connection between your current problems and

8    the past traumatic experience, that connection gets buried and

9    people lose it.

10   Q.  And how does Ms. Carroll's avoidant behavior with respect

11   to eligible men her age compare to her romantic patterns before

12   the incident at Bergdorf Goodman?  And again, I don't want you

13   to give any specificity, just very general.

14   A.  It's a very sharp departure.  Actually, it's a complete

15   departure.  Her previous pattern had been to be in a long-term

16   partnership and, when that wasn't happening, to date pretty

17   avidly for a period of time until she found somebody else she

18   wanted to be in a long-term partnership with, and she was very,

19   very social and outgoing, and all of that changed afterwards.

20   Q.  Now, how do you reconcile what you have been saying about

21   avoidant behaviors, Doctor, with the fact that Ms. Carroll

22   continued to shop at Bergdorf Goodman?

23   A.  Well, she didn't feel that Bergdorf Goodman raped her was

24   the primary reason.  The store -- she didn't blame the store.

25   She blamed herself.  The store didn't feel threatening.  I also

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N545car1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

                    Plaintiff,              New York, N.Y.

               v.                           22 Civ. 10016 (LAK)

DONALD J. TRUMP,

                    Defendant.
------------------------------x          Jury Trial

                                         May 4, 2023
                                         10:00 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                         District Judge
                                           and a Jury

                         APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
     MICHAEL J. FERRARA
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
     Attorneys for Defendant
BY:  JOSEPH TACOPINA
     CHAD D. SEIGEL
     MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
     Attorneys for Defendant
BY:  ALINA HABBA
     MICHAEL T. MADAIO


W. PERRY BRANDT
     Attorney for Defendant

1   TruthSocial?

2   A.   Yes.

3   Q.   What is it?

4   A.   So TruthSocial is a social networking site where people

5   have profiles.  It is a lot like Twitter, it has the same

6   structure as Twitter where somebody has a profile and people

7   can follow that person, and the followers or some of them see

8   the message that is posted.

9   Q.   Does Donald Trump have a profile on TruthSocial?

10   A.   Yes, he does.

11   Q.   Do you know about how many followers he has?

12   A.   I believe he has 4.7 million followers.

13   Q.   So, just in broad strokes, could you explain how you went

14   about figuring out how, if at all, Mr. Trump's October 12, 2022

15   statement affected Ms. Carroll's reputation?

16   A.   Sure.  So the first step in the process was to figure out

17   how widely was the statement seen, how many times did it appear

18   to people.  And that I call the impressions model.

19         The next step was to figure out, OK, people saw the

20   statement but did it have an impact on Ms. Carroll's

21   reputation?  So for that I first did a qualitative analysis

22   where I looked at what was the response on social media, what

23   did people say in response when they were Retweeting or

24   circulating the statement, and then I also wanted to know,

25   well, what percentage of those people likely believed the

1    statement, were they receptive to the statement.  And that I

2    call the impact analysis.

3              And then, finally, I needed to know, OK, for those

4    people who might have been receptive to the statement, how much

5    would it cost to repair Ms. Carroll's reputation.

6    Q.  And in your experience, is this a standard way -- fairly

7    standard way to measure reputational harm by experts in your

8    field?

9    A.  Yes, it is.

10   Q.  So, I would like to talk first about some basic concepts.

11   What is a reputation?

12   A.  So, a reputation, we all have a reputation, we develop it

13   through our life, our friendships, our work.  It allows us to

14   kind of be a member of society to build trust with people.  So,

15   we all have reputations and, of course, if we are more famous

16   or well known, that reputation can also exist amongst people we

17   don't know in the media and in the public sphere.

18   Q.  Explain how reputation can be damaged.

19   A.  So, a reputation can be damaged when there emerge negative

20   associations that kind of undermine that reputation that might

21   cause people to mistrust you or think you are a bad person or

22   things like that.

23   Q.  And how, if at all, can a reputation that's been damaged be

24   repaired?

25   A.  So, reputation can be repaired through sort of strategic

A.   The followers are the number of people who follow that

account on Twitter.

Q.   So using these 13 Tweets, how did you calculate the number

of impressions from Donald Trump's statements on Twitter?

A.   So, to calculate the number of impressions, you have to

keep in mind that not all of your followers see what you Tweet.

There are many reasons that people might not sign on that day,

they may subscribe to a lot of accounts, and that information

might be crowded out, so actually only a fraction of your

followers see what you Tweet and so you have to take a series

of deductions.  So, hypothetically, you know, if you have a

hundred followers, the first deduction you have to consider is

a bot.

          So, a bot is an account or a follower who would follow

you and just kind of, it is in a computer, it Retweets what you

Tweet.  So if you are Fox News you could have a follower that

is just a bot that Retweets what you Tweet so I took those out.

And computer science research tells us that about 12 percent of

your followers are bots and so I subtracted those.  So, if you

subtract that, then that leaves you with, hypothetically, about

87 followers.  But then you need to make another cut for some

of the reasons that I mentioned because people may not sign on

that day, etc.  So, the benchmark in marketing is thought to be

20 percent, that 20 percent of your followers see what you

Tweet, so that would leave you with about 17 followers.

1          Alternatively, computer science gives us a formula or

2     a way to calculate how many people would see your Tweet if you

3     have other information about it.  So, if you know how many

4     times it has been Retweeted, how many followers those people

5     have, things like that, then you can basically use a formula to

6     calculate how many impressions your Tweet got using that

7     formula, and that comes out to anywhere from 6 percent of your

8     followers to as low as 1 percent of your followers, for a

9     typical person.

10    Q.  Turning to the slide on the screen, and if you could use

11    the first row, would you walk us through how you calculated the

12    number of impressions from Donald Trump's statement on the Fox

13    News account?

14    A.  Sure.  So, for Fox News, for example, they have

15    22.4 million followers.  The total followers includes the

16    followers who saw the original quote because it was Retweeted,

17    so you include those Retweets as well.  And then you take the

18    deductions that I mentioned:  The bots, the 12 percent, and the

19    impression rate which is either 6, 1, or 20 percent.  And so,

20    for Fox News that would leave you with a low estimate of

21    778,000 people impressions on the low end, or on the high end

22    3.9 million impressions.

23    Q.  It looks like you calculated high and low impressions for

24    the first four Twitter accounts on the chart but not for the

25    last nine.  Can you explain why you did that?

A.   Sure.  So, for the people that you see in yellow here,
those are more just typical people and so I didn't use that
high a rate, I used a rate of 1 percent for them, just assuming
that they're going to have a 1 percent impression rate, and
everybody who saw their Tweets are just going to be typical
people, too, and so those people also will have a 1 percent
impression rate.

Q.   So you assume that for the average person only about 1
percent of their followers would see the Tweet in which they're
Retweeting Donald Trump's statement?

A.   That's correct.

Q.   Were you able to determine the total amount of impressions
of Donald Trump's statement on Twitter, on the 13 Twitter
accounts?

A.   Yes.  So I calculated the impressions for each account and
then I added those up.

Q.   And how did you calculate the number of TruthSocial
impressions from Donald Trump's post?

A.   So, for TruthSocial it's pretty much just like Twitter, and
yet it hasn't been studied quite as much.  We also didn't have
full access to the Retweeting information, and so because it is
structurally similar to Twitter, I used the same impression
rate, that 6 percent rate.

Q.   And what were the total number of social media impressions
of Twitter and TruthSocial from the statement?

1    that measures exactly how many people are watching the program

2    at that time.

3    Q.  And how many people watched Donald Trump's or viewed Donald

4    Trump's October 12th statement on television?

5    A.  So, if you add that up, that is 7 million impressions.

6    Q.  Finally, you testified that you also calculated print

7    impressions from Donald Trump's statement.  Can you explain how

8    you did that?

9    A.  Yes.  So, there is a database where you can search all

10   print news articles and so I, again, searched for the statement

11   and I found one print article.

12   Q.  Where was that article published?

13   A.  That was in the Washington Post.

14   Q.  And what was -- how did you determine the total number of

15   impressions from the Washington Post article?

16   A.  So, here there is a service that measures how many readers

17   every article has, and the circulation rate for the Washington

18   Post was 159,000 people.

19   Q.  After looking at all of these forms of media, were you able

20   to estimate the total number of impressions of Donald Trump's

21   October 12th statement?

22   A.  Yes, I was.

23   Q.  And what was your final estimate?

24   A.  So the final estimate, when you add up across all the

25   media, was between 13.7 million and 18 million impressions.

1    of 21 percent.

2    Q.  So, to be clear, the 21 percent is the percentage of

3    republicans who viewed the statement who likely believed it?

4    A.  Yes.  I would call those receptive impressions.

5    Q.  What was the next step in your analysis?

6    A.  So, the next step was to take the number of impressions

7    that I had from that first step, which was a lot of

8    impressions, and then discount it by only the impressions where

9    people were receptive to the statement.  And so, that gives you

10   an estimate, a high and low estimate for each type of media,

11   and then you can add those up.

12   Q.  And what did you, when you alleged it up, what did you get?

13   A.  So, on the low end we have 3.7 million receptive

14   impressions and on the high end you have 5.6 million receptive

15   impressions.

16   Q.  And just to summarize, does that mean that between

17   3.7 million and 5.6 million people saw Mr. Trump's statement

18   and likely believed it?

19   A.  That's correct.

20   Q.  To your knowledge -- we saw some examples of negative

21   commentary that Ms. Carroll received after the October 12

22   statement.  To your knowledge, did Ms. Carroll receive any

23   positive response following Donald Trump's statement?

24   A.  Yes, she did.

25   Q.  How, if at all, did your analysis account for the positive

1    response that she received?

2    A.   So, one thing in my analysis that I noticed is, prior to

3    the June 2019 statement, there were, of course, many positive

4    associations of her but the volume was relatively small.  After

5    the October 12 statement there was a huge volume of

6    associations associated with her, some of those were positive,

7    but then a huge volume, a very large number, tens of thousands

8    of those associations were really negative.

9    Q.   How, if at all, do positive responses or comments offset

10   negative responses?

11   A.   I would say in terms of reputation, they don't.  So, if you

12   imagine, like, at the place where you work, if 20 percent of

13   your colleagues think that you stole money where you work,

14   let's say you have a hundred colleagues and 20 of them think

15   that you stole money, that still has an impact on your work

16   life and your day-to-day reputation, and so I think that

17   20 percent is still important.

18              (Continued on next page)

19

20

21

22

23

24

25

1  Q.  After calculating the amount it would cost to place

2  corrective messages on each type of media, were you able to

3  determine how much it would cost to place corrective messages

4  on all these types of media?

5  A.  That's right.  So I calculated for each type of media how

6  much it would cost and I added that up.

7  Q.  And what was the number?

8  A.  So the final number at the high end was $2.7 million.

9  Q.  What was the next step in your analysis?

10 A.  So the final step was to apply this logic to kind of my

11 previous -- my low impressions estimate and my high impressions

12 estimate for each level of frequency—for one, three, and five

13 times.

14 Q.  And what was the range, the cost range to run a

15 reputational repair campaign for Ms. Carroll following the

16 October 12 statement?

17 A.  So at the low, low end it would be three hundred and

18 sixty-eight thousand dollars, hundred thousand dollars and on

19 the high end it would be $2.7 million but, again, I don't think

20 the low campaign would be effective if no campaign had been run

21 previously.

22 Q.  So to summarize, Professor Humphreys, what was your

23 conclusion about how far or how wide Mr. Trump's statements

24 spread?

25 A.  So my conclusion about how wide it spread in the

1   BY MR. BRANDT:

2   Q.  Now, we have had some discussion about this previously, but

3   there are actually two cases, correct?

4   A.  That's right.

5   Q.  And you were retained as an expert by Ms. Carroll in two

6   cases, correct?

7   A.  Correct.

8   Q.  And the first case chronologically related to statements

9   made by Mr. Trump in June of 2019, correct?

10  A.  That's correct.

11  Q.  And as I recollect your first report, you said that those

12  statements were widely published at the time, correct?

13  A.  Yes.

14  Q.  And following that time, there were appearances by

15  Ms. Carroll and others on news shows and interviews and

16  podcasts and articles, is that correct?

17  A.  I did not study those as part of my report.

18  Q.  So you didn't look at any of that?

19  A.  I did not look at her activities, no.

20  Q.  Okay.  We will come to that in a little bit.

21          But did you at least come to the conclusion that there

22  had been widespread publication of the June 2019 statements?

23  A.  Yes.

24  Q.  And the statement that you looked at in the second case was

25  only the October 2022 statement, correct?

1          MR. BRANDT:  Well, I think even higher or lower is

2    getting a number out.

3          THE COURT:  Look, members of the jury, the question of

4    whether there was any adverse effect by virtue of the 2019

5    statements and, if there was, how much adverse effect is not at

6    issue in this case.  It is not for you to determine.

7          With that instruction, I will allow an answer to the

8    question as it was asked.

9          MS. CROWLEY:  May I ask it again?

10         THE COURT:  You may ask it again.

11   BY MS. CROWLEY:

12   Q.  Was the cost that you estimated to repair Ms. Carroll's

13   reputation following Trump's June 2019 statements higher or

14   lower than the cost that you estimated it would take to repair

15   her reputation following the October 12 statement?

16   A.  It was higher.

17   Q.  Why was it higher?

18   A.  So that statement generated considerably more impressions

19   and considerably more receptive impressions.

20   Q.  And how did that factor into the analysis that you did on

21   the cost following the October 12 statement?

22   A.  So here I only looked at the reputational harm from the

23   October 12 statement.

24         MS. CROWLEY:  Thank you, your Honor.  Nothing further.

25         THE COURT:  Thank you.

N582CAR1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   E. JEAN CARROLL,
3
                  Plaintiff,              New York, N.Y.
4
              v.                          22 Civ.10016 (LAK)
5
   DONALD J. TRUMP,
6
                  Defendant.
7  ------------------------------x       Jury Trial

8                                        May 8, 2023
                                         9:10 a.m.
9
   Before:
10
                      HON. LEWIS A. KAPLAN,
11
                                         District Judge
12                                         and a Jury

13
                         APPEARANCES
14
   KAPLAN HECKER & FINK LLP
15      Attorneys for Plaintiff
   BY:  ROBERTA A. KAPLAN
16      MICHAEL J. FERRARA
        SHAWN G. CROWLEY
17      MATTHEW J. CRAIG

18
   TACOPINA SEIGEL & DeOREO
19      Attorneys for Defendant
   BY:  JOSEPH TACOPINA
20      CHAD D. SEIGEL
        MATTHEW G. DeOREO
21
22  HABBA MADAIO & ASSOCIATES, LLP
        Attorneys for Defendant
23  BY:  ALINA HABBA
        MICHAEL T. MADAIO
24
25  W. PERRY BRANDT
        Attorney for Defendant

1    deposition that he was or could be regarded as a star, and I

2    believe that there are other references.

3              Overruled, Mr. Brandt.

4              Okay.  That takes care of the battery count.

5              Page 13/line 1 through page 16/line 5.

6              Mr. Matz.

7              MR. MATZ:  Yes, your Honor.  We did have just one

8    proposed modification to the instructions, specifically at the

9    top of page 13, the third line on the page, the second

10   sentence, where it says, "The next set of questions and the

11   verdict form questions 6 through 10 deal with Ms. Carroll's

12   defamation claim in relation to Mr. Trump's October 12, 2022

13   statement."  Because the statement as it's being given to the

14   jury in these instructions excludes portions of the original

15   statement that refer to tangential matters, like Peekaboo James

16   and all of that stuff, and because the original statement is in

17   evidence in full, we are just slightly concerned that the jury

18   may be a bit confused about the relationship between the full

19   statement and the portions that we are saying are defamatory.

20   So I would respectfully propose one very slight addition at the

21   beginning, which would be after the word "statement" at the end

22   of that sentence, it would say "specifically, the portions of

23   that statement either about or of and concerning Ms. Carroll,"

24   so that there is no confusion in their minds that this is about

25   the portions of the statement that don't have to do with her.

N582CAR1

```
1          THE COURT:  Okay.  Thank you.

2          Mr. Brandt.

3          MR. BRANDT:  I have a problem with the phraseology "of

4     and concerning Ms. Carroll," because that's one of the things

5     the jury is supposed to find is whether the statements were of

6     and concerning her.  So if there was some other way we could

7     phrase that, that would be fine.

8          MR. MATZ:  Your Honor, how about the phrase "about

9     Ms. Carroll"?

10          MR. BRANDT:  That's okay.

11          THE COURT:  Point me to where you would like the

12     language and give me the language.

13          MR. MATZ:  The court reporter probably knows it better

14     than I do at the moment.

15          THE COURT:  But we're not going to do that.

16          MR. MATZ:  So it's on the top of 13, at the end of the

17     first sentence of subsection D, following the word "statement,"

18     perhaps an em dash or a comma, "specifically the portions of

19     that statement about Ms. Carroll."

20          MR. BRANDT:  Again, I think that's fine, your Honor.

21          THE COURT:  Thank you, Mr. Brandt.  I will do that.

22          Anything else with respect to this section from the

23     plaintiff?

24          MR. MATZ:  No, your Honor.

25          THE COURT:  Mr. Brandt.
```

1            MR. BRANDT:  No.

2            THE COURT:  Thank you.

3            Page 16/line 8 through page 17/line 16.

4            MR. MATZ:  Nothing from plaintiff, your Honor.

5            MR. BRANDT:  And nothing from defendant.

6            THE COURT:  Thank you.

7            Page 17/line 18 through page 19/line 10.

8            MR. MATZ:  Once again, nothing from plaintiff.

9            MR. BRANDT:  Again, your Honor, just the bullet point

10  about Mr. Trump's financial condition, we would object on that,

11  but I understand the Court's prior ruling.

12           THE COURT:  Thank you.  I reiterate it.

13           Page 19/line 12 through page 22/line 7.

14           MR. MATZ:  No objections from plaintiff.

15           MR. BRANDT:  Nothing, your Honor.

16           THE COURT:  Thank you.

17           Page 22/line 9 through page 24/line 17.

18           MR. MATZ:  No objection from plaintiff, your Honor.

19           MR. BRANDT:  And, your Honor, on page -- starting on

20  page 22 and continuing on to page 23, under the subheading 4(b)

21  "Evidence of Sexual Assault on Other Persons," we have already

22  briefed this in detail, but I just wanted to note, under Rule

23  of Evidence 413(d), the evidence regarding other person is

24  supposed to involve genital contact, and that is not in these

25  instructions.  So we would object to the instruction unless it

was raped by the president of the United States.  That's when

she brought it out, when he was president.  She said she made

more money with Substack, said she got her revenge on *Elle* with

her own admission, and received lots of love and support.

Look at this.

(video played)

MR. TACOPINA:  Putting aside their reputational harm

expert, who is irrelevant if you find there was no sexual

assault, which there wasn't, but she comes in here,

Ms. Humphreys, and says she never measured the positive impact

of Ms. Carroll's accusation against Donald Trump, only the

negative.  Meaning she ruled out the fact that the positive

impact, which Ms. Carroll talked about when she was talking

about the support and love, she didn't measure that, whether it

far outweighed the negative impact she had.  But, more

importantly, the entire analysis is irrelevant here because,

again, Ms. Carroll was not defamed by Donald Trump when he

strongly denied the rape allegation.  She wasn't defamed

because it was false.  And remember, if there is no rape, there

is no defamation.  And you will see when you get the verdict

sheet all the different rapes and assault, it is all one.

There is no sexual assault and there is no defamation, they go

hand in hand.

You heard, among others reasons, Ms. Carroll's

political motivation for making a false accusation.  You heard

N592CAR1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     E. JEAN CARROLL,
3
                   Plaintiff,              New York, N.Y.
4
            v.                             22 Civ.10016 (LAK)
5
     DONALD J. TRUMP,
6
                   Defendant.
7    ------------------------------x       Jury Trial

8                                          May 9, 2023
                                           10:05 a.m.
9
     Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                           District Judge
12                                            and a Jury

13
                          APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24

25   W. PERRY BRANDT
          Attorney for Defendant
```

crimes.  Ms. Carroll claims that Mr. Trump is liable to her for

battery on three different and alternative bases, each of which

corresponds to a criminal law definition of a different sex

crime.  Mr. Trump denies that he is liable to her for battery

on any of these three different and alternative bases.

Accordingly, the first set of questions in the verdict form has

to do with whether or not Ms. Carroll has established that

Mr. Trump's conduct, if any, came within any of those criminal

law definitions.  But I emphasize to you that this is a civil

case for damages.  It is not a criminal case.

          Now, if you look on the verdict form, you will see the

first question is whether Ms. Carroll proved by a preponderance

of the evidence that Mr. Trump raped her.  It's a yes/no

question.  I am going to explain the preponderance of the

evidence standard, which is incorporated in that question,

later on.  But right now I am going to tell you the required

elements of rape under the New York law.

          In order to establish that Mr. Trump raped her,

Ms. Carroll must prove each of two elements by a preponderance

of the evidence.

          The first element is that Mr. Trump engaged in sexual

intercourse with her.

          The second element is that Mr. Trump did so without

Ms. Carroll's consent by the use of forcible compulsion.  So

let me define each one of those terms.

N592Car1                          Charge

1          "Sexual intercourse" means any penetration, however

2     slight, of the penis into the vaginal opening.  In other words,

3     any penetration of the penis into the vaginal opening,

4     regardless of the distance of penetration, constitutes an act

5     of sexual intercourse.  Sexual intercourse does not necessarily

6     require erection of the penis, emission, or an orgasm.

7          Now, of course, I hope you will forgive me for this

8     very explicit language, but I have no alternative——nobody has

9     in this case——in discussing the elements of the alleged

10    battery.

11         I also used the phrase "forcible compulsion," and what

12    that means is intentionally to compel by the use of physical

13    force.

14         If you find that Ms. Carroll has proved by a

15    preponderance of the evidence both of those two elements, you

16    will answer Question 1 "yes."  If you answer Question 1 "yes,"

17    I instruct you that Mr. Trump thus committed battery against

18    Ms. Carroll.  There would be no need to consider whether he

19    committed battery on either of the other two alternative bases.

20    Remember, I said there were three alternatives.  So if you

21    answer Question 1 "yes," you will skip question 2 and question

22    3 on the verdict form and go right on to question 4.  If you

23    find that Ms. Carroll has not proven either of the two elements

24    of rape by a preponderance of the evidence, you must answer

25    "no" to Question 1 and go on to Question 2, which deals with

1   the second of the three alternative bases for the battery

2   claim.

3            The second theory of battery corresponds to something

4   called sexual abuse.  Sexual abuse has two elements.  In order

5   to establish that Mr. Trump sexually abused her, Ms. Carroll

6   must prove each of two elements by a preponderance of the

7   evidence.

8            The first element is that Mr. Trump subjected

9   Ms. Carroll to sexual contact.

10           The second element is that he did so without

11  Ms. Carroll's consent by the use of forcible compulsion.

12           So let me define "sexual contact" for you.  Sexual

13  contact for this purpose means any touching of the sexual or

14  other intimate parts of a person for the purpose of gratifying

15  the sexual desire of either person.  It includes the touching

16  of the actor by the victim, as well as the touching of the

17  victim by the actor, and the touching may be either directly or

18  through clothing.

19           Now, I just used the term or the phrase "sexual or

20  intimate part" in defining sexual contact.  For this purpose, a

21  "sexual part" is an organ of human reproduction.

22           So far as intimate part is concerned, the law does not

23  specifically define which parts of the body are intimate.

24  Intimacy, moreover, is a function of behavior and not just

25  anatomy.  Therefore, if any touching occurred, the manner and

circumstances of the touching may inform your determination

whether Mr. Trump touched any of Ms. Carroll's intimate parts.

You should apply your common sense to determine whether, under

general societal norms and considering all the circumstances,

any area or areas that Mr. Trump touched, if he touched any,

were sufficiently personal or private that it would not have

been touched in the absence of a close relationship between the

parties.

  I mentioned also that the touching, if any, of any

sexual or intimate parts must have been for the purpose of

gratifying the sexual desire of either party.  Sexual

gratification is a subjective determination that may be

inferred from the nature of the acts committed and the

circumstances in which they occurred.  There is no requirement

that actual gratification occur, but only that the touching, if

there was any, was for that purpose.

  The second element of this theory is forcible

compulsion.  I defined that for you a couple of minutes ago

when I told you the elements of rape, and here, as there, it

means intentionally to compel by the use of physical force.

  If you find that Ms. Carroll has proved by a

preponderance of the evidence both of the two elements that I

just referred to, the two elements of sexual abuse, then you

will answer "yes" to Question 2.  If you answer yes to Question

2, I instruct you that Mr. Trump thus committed battery against

N592Car1                    Charge

Forcible touching takes place without a person's consent when

it results from any circumstances in which a person does not

expressly or impliedly acquiesce to the actor's conduct.

        If you find that Ms. Carroll has proved by a

preponderance of the evidence all five of these elements, of

forcible touching, you will answer Question 3 "yes."  If you

answer Question 3 "yes," I instruct you that Mr. Trump thus

committed battery against Ms. Carroll.  In that event, you will

go on to Question 4.  If you find that Ms. Carroll has not

proven one or more of the elements of forcible touching by a

preponderance of the evidence, you must answer "no" to

Question 3.  You will skip Questions 4 and 5 and go on to

Question 6, which begins the questions relating to

Ms. Carroll's defamation claim.

        But let me now instruct you on Questions 4 and 5.

        Questions 4 and 5 deal with the subject of damages in

relation to Ms. Carroll's battery claim.  My instructions to

you on the law of damages should not be taken by you as a hint

that you should find for the plaintiff.  That is for you to

decide by answering the questions I have put to you based on

the evidence presented.  But if you answer "yes" to any of

Question 1, Question 2, or Question 3, you will have determined

that Ms. Carroll has prevailed on her claim of battery.  In

that event, it will be your task to determine from the evidence

a dollar amount, if any, that would justly and adequately

N592Car1                    Charge

1   compensate Ms. Carroll for any physical injury, pain and

2   suffering, and mental anguish, as well as emotional distress,

3   fear, personal humiliation, and indignation that she has

4   suffered, or will suffer in the future, as a result of

5   Mr. Trump's alleged rape, sexual abuse, or forcible touching as

6   the case may be.

7       You may award damages only for those injuries that you

8   find Ms. Carroll has proved by a preponderance of the evidence.

9   Compensatory damages may not be based on speculation or

10  sympathy.  They must be based on the evidence presented at

11  trial and only on that evidence.

12      Now, if you answer "yes" to Question 4——and here I

13  invite your attention to the verdict form——in other words, if

14  you conclude that Ms. Carroll has proved by a preponderance of

15  the evidence that she was injured as a result of any of the

16  three theories of battery by Mr. Trump that I have already

17  explained, she would be entitled to a dollar amount to

18  compensate her adequately and fairly for any physical injury,

19  pain and suffering, mental anguish, emotional distress, and the

20  other things I just mentioned a moment ago, that she suffered

21  by virtue of Mr. Trump's alleged battery, in other words, his

22  alleged rape, sexual abuse, or forcible touching, as the case

23  may be.  Damages may be awarded based on a plaintiff's

24  subjective testimony of pain, but the plaintiff's proof must

25  satisfactorily establish that the injury is more than minimal.

So if you answer Question 4 "yes," you will determine the

amount that would fairly and adequately compensate Ms. Carroll

for the injuries she allegedly sustained as a result of

Mr. Trump's battery and enter that amount in the space provided

in Question 4 of the verdict form, which is right down at the

bottom of page 1.

On the other hand, if you answer "no" to Question

4—that is, if you decide that Ms. Carroll has not proved by a

preponderance of the evidence that she was injured as a result

of Mr. Trump's conduct, if any—you will write down in the

blank space provided on your form, and it appears at the top of

page 2, the figure $1.  That represents nominal damages.

Regardless of your answers to Question 4, you will go

on to Question 5.

Question 5 deals with the subject of punitive damages.

In the event you find Mr. Trump liable to Ms. Carroll

for battery—that is, for rape, sexual abuse, or forcible

touching—you may, but you are not required to, award

Ms. Carroll punitive damages in addition to any compensatory

damages that you may award.

You may award punitive damages if Ms. Carroll proved

by a preponderance of the evidence that Mr. Trump's conduct, if

any, that caused Ms. Carroll's alleged injury was wanton and

reckless or done with a conscious disregard for Ms. Carroll's

rights.  Punitive damages may be awarded for conduct that

N592Car1                    Charge

1    ever you wish.  I'm going to sit down in just a minute.  And we

2    are about 40 percent of the way through what I have to say to

3    you this morning.

4            So now we are going to go on to the questions in the

5    verdict form, which are Questions 6 through 10, which deal with

6    Ms. Carroll's defamation claim in relation to Mr. Trump's

7    October 12, 2022 statement, and more specifically to the parts

8    of that statement about Ms. Carroll.  Under New York law, there

9    are two categories of defamation.  One of them is called libel.

10   Written statements, like Mr. Trump's October 12, 2022

11   statement, the law regards as libel.  I'm telling you this only

12   because I may use the terms "defamation" and "libel"

13   interchangeably in my instructions, and it means the same thing

14   as far as you are concerned for purposes of this case.

15           Now, you have seen and heard Mr. Trump's October 12

16   statement at various points in the course of this trial.  And

17   if memory serves, you will have it in the jury room.  To remind

18   you, that statement, which Ms. Carroll alleges was defamatory,

19   read as follows:  "This 'Ms. Bergdorf Goodman case' is a

20   complete con job . . . She completely made up a story that I

21   met her at the doors of this crowded New York City department

22   store and, within minutes, 'swooned' her.  It is a Hoax and a

23   lie. . . .  She has no idea what day, what week, what month,

24   what year, or what decade this so-called 'event' supposedly

25   took place.  The reason she doesn't know is because it never

1   happened, and she doesn't want to get caught up with details or

2   facts that can be proven wrong.  If you watch Anderson Cooper's

3   interview with her, where she was promoting a really crummy

4   book, you will see that it is a complete Scam.  She changed her

5   story from beginning to end, after the commercial break, to

6   suit the purposes of CNN and Andy Cooper. . . .  In the

7   meantime, and for the record, E. Jean Carroll is not telling

8   the truth, is a woman who I had nothing to do with, didn't

9   know, and would have no interest in knowing her if I ever had

10  the chance."

11          Now, there are several elements that Ms. Carroll has

12  the burden of proving for her to recover damages for libel, and

13  I'm going to instruct you on each one as we go through the

14  verdict form.

15          Question 6 asks whether Ms. Carroll has proved by a

16  preponderance of the evidence that Mr. Trump's statement was

17  defamatory.  A statement is defamatory if it tends to disparage

18  a person in the way of that person's business or office or

19  profession or trade.  It is also defamatory if it tends to

20  expose someone to hatred or contempt or aversion or to induce

21  an evil or an unsavory opinion of that person in the minds of a

22  substantial number of people in the community, even though it

23  may impute no moral turpitude to the person.

24          Now, not every unpleasant or uncomplimentary statement

25  is defamatory.  A statement that is merely unpleasant, or

offensive, or embarrassing, or that hurts someone's feelings,

isn't necessarily defamatory.  Because language often has

different meanings, the law imposes on the plaintiff the burden

of proving that the October 12, 2022 statement about the

plaintiff in fact would have been understood by the average

person as defamatory, as I defined that word a minute ago.

If Ms. Carroll has proved by a preponderance of the

evidence that Mr. Trump's October 12, 2022 statement was

defamatory, you will answer "yes" to Question 6 and go on to

Question 7.  If you answer it "no," your task ends right there

and you will return your verdict in the manner that I am going

to describe later.

Question 7 asks whether Ms. Carroll has proved by

clear and convincing evidence that Mr. Trump's statements about

her were false.  I will explain later -- and I just want to

make sure.  I want to correct myself.  I misspoke.

Question 7, as you see on the verdict form, asks

whether Ms. Carroll has proved by something called clear and

convincing evidence that Mr. Trump's statement was false.  I am

going to explain clear and convincing evidence, which is

different from a preponderance of the evidence, in a short

while.  A statement is false if it is not substantially true.

You will determine from the evidence presented what the truth

was and then compare that with Mr. Trump's October 12

statement, taking that statement according to its ordinary

N592Car1                    Charge

1   meaning, the ordinary meaning of its words.

2          As you probably already have guessed, whether

3   Mr. Trump's statement is false or true depends largely or

4   entirely on whether you find that Mr. Trump raped or sexually

5   abused or forcibly touched or otherwise sexually attacked

6   Ms. Carroll.

7          If Ms. Carroll has proved by clear and convincing

8   evidence that Mr. Trump's October 12, 2022 statement was false,

9   you will answer Question 7 "yes" and go on to Question 8.  If

10   you answer it "no," your task ends there, and you will return

11   your verdict as I will instruct you.

12          Question 8, in substance, asks you to determine

13   whether Ms. Carroll has proved by clear and convincing evidence

14   that Mr. Trump made the statement with what the law calls

15   actual malice.  Actual malice for this purpose——and I want to

16   alert you to the fact that it means something different from

17   malice in a different context that I am going to speak to you

18   about in a few minutes——means that Mr. Trump made the statement

19   knowing that it was false or acted in reckless disregard of

20   whether or not it was true.  Reckless disregard means that when

21   he made the October 12 statement, he had serious doubts as to

22   the truth of the statement or made the statement with a high

23   degree of awareness that it was probably false.  So Question 8

24   asks you to decide whether Ms. Carroll proved by clear and

25   convincing evidence that Mr. Trump, when he made his October 12

1    will award an amount that, in the exercise of your good

2    judgment and common sense, you decide is fair and just

3    compensation for the injury to the plaintiff's reputation and

4    the humiliation and mental anguish in her public and private

5    life which you decide was caused by the defendant's statement.

6    In fixing that amount, if you fix one, you should consider the

7    plaintiff's standing in the community, the nature of

8    Mr. Trump's statement made about Ms. Carroll, the extent to

9    which the statement was circulated, the tendency of the

10   statement to injure a person such as Ms. Carroll, and all of

11   the other facts and circumstances in the case.  These damages

12   can't be proved with mathematical certainty.  Fair compensation

13   may vary, ranging from one dollar, if you decide that there was

14   no injury, to a substantial sum if you decide that there was

15   substantial injury.

16          Now, in this case, Question 9, I have divided the

17   damages determination into two parts, and you will see those on

18   page 3 of the verdict form in the parts below the yes/no

19   question.  The first of those two parts asks you whether or not

20   Ms. Carroll has proved by a preponderance of the evidence that

21   she was injured in any of the respects I have just described.

22   I misspoke about where on the form.  The first part of

23   Question 9, right at the top, the yes/no question asks you to

24   decide whether Ms. Carroll has proved by a preponderance of the

25   evidence that she was injured in any of the respects I just

play.  I previously instructed you about "actual malice" with

regard to Question 8.  With regard to Question 10, I'm using

the words "malice" or "maliciously," not the phrase "actual

malice," and the word "malice" and the word "maliciously" for

purposes of Question 10 means something different from "actual

malice."  A statement is made with malice or it's made

maliciously for the purpose of Question 10 if it's made with

deliberate intent to injure or made out of hatred or ill will

or spite or made with willful or wanton or reckless disregard

of another's rights.

     If you answer "yes" to the first part of Question

10—in other words, if you find that Mr. Trump acted with

malice, as I have just defined that term for you, in making the

October 12 statement about Ms. Carroll—you will write down an

amount, if any, that you find Mr. Trump should pay to

Ms. Carroll in punitive damages for the defamation.  If you

answer "no" to that first part of Question 10—that is, you

find that Mr. Trump's statement was not made maliciously—you

may not award punitive damages.  Ms. Carroll bears the burden

of proving by a preponderance of the evidence that Mr. Trump

acted in accordance with this standard.

     In arriving at your decision as to the amount of

punitive damages, you should consider here with respect to the

defamation punitive damage claim:

     The nature and reprehensibility of what Mr. Trump did

N592Car1                    Charge

1    if he defamed her; that would include the character of the

2    wrongdoing and Mr. Trump's awareness of what harm the conduct

3    caused or was likely to cause.  In considering the amount of

4    punitive damages to award, you should weigh that factor

5    heavily;

6              You should consider the actual and potential harm

7    created by Mr. Trump's conduct; and

8              You should consider Mr. Trump's financial condition

9    and the impact of your award of punitive damages, if any, on

10   Mr. Trump.

11             Once you have answered Question 10, if you answer

12   Question 10, you will return your verdict, your task will be

13   over.

14             Those are my substantive instructions on the law, that

15   is, on battery, on defamation, and on damages.  Those are the

16   rules you must apply here to the facts as you find them.

17             Now, the remaining part of what I have to say, and it

18   is shorter, I promise, I know that you are probably ready to

19   get up and do your job, but I need -- ah, yes.  Andy, thank

20   you, or whoever passed the note.

21             In instructing you on punitive damages on the

22   defamation claim, I skipped over one sentence, and I will read

23   it to you now.

24             The amount of punitive damages that you award, if any,

25   must be reasonable and proportionate to the actual and

N592Car1                    Charge

1    the issues in Question 7, which is the falsity of the statement

2    of October 12 and Question 8, actual malice, by clear and

3    convincing evidence, you must decide against her on those

4    issues.  What does "clear and convincing evidence" mean?  Clear

5    and convincing evidence is a more exacting standard than proof

6    by a preponderance of the evidence, where you need believe only

7    that a party's claim is more likely true than not.  On the

8    other hand, clear and convincing evidence, clear and convincing

9    proof, is not as high a standard as the burden of proof applied

10   in criminal cases, beyond a reasonable doubt.  Clear and

11   convincing proof leaves no real substantial doubt in your mind.

12   It is proof that establishes in your mind not only the

13   proposition -- not only that the proposition at issue is

14   probable, but also that it is highly probable.  It is enough if

15   Ms. Carroll establishes that Mr. Trump's statement was

16   false—which is Question 7—and that he made the statement with

17   actual malice—that's Question 8—beyond any "substantial

18   doubt"; she does not have to dispel every "reasonable doubt."

19          Now, you folks, the nine of you, are the sole and

20   exclusive judges of the facts.  I certainly do not mean to

21   indicate any opinion as to the facts or as to what your verdict

22   ought to be.  The rulings I have made during this trial are not

23   any indication of any views on my part about what your decision

24   ought to be or as to who should prevail here.  I express no

25   such opinion with respect to what you ought to do here.